**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALAN PACELLA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HESAI GROUP, YIFAN LI, LOUIS T. HSIEH, KAI SUN, SHAOQING XIANG, CAILIAN YANG, COLLEEN A. DEVRIES, GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY ASIA LIMITED, CREDIT SUISSE SECURITIES (USA) LLC, HUATAI SECURITIES (USA), INC., COGENCY GLOBAL, INC.<br><br>Defendants. | Case No. 1:24-cv-876-CM<br><br>**AMENDED COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Lead Plaintiff King Ho Wong ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for his amended complaint against Defendants Hesai Group ("Hesai," or the "Company"), Yifan Li, Louis T. Hsieh, Kai Sun, Shaoqing Xiang, Cailian Yang, Colleen A. DeVries, Cogency Global, Inc., Goldman Sachs (Asia) L.L.C., Morgan Stanley Asia Limited, Credit Suisse Securities (USA) LLC, Huatai Securities (USA), Inc. ("Defendants"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review and analysis of: (i) Hesai's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Hesai's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of Hesai's conference calls;

1

(v) interviews with witnesses with relevant information, including former Hesai employees; and (vi) other publicly-available material and data identified herein. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of a Class comprising all persons and entities who purchased Hesai American Depositary Shares ("ADSs")[1] pursuant and/or traceable to the Offering Documents issued in connection with Hesai's initial public offering conducted on or about February 8, 2023 ("IPO") and were damaged thereby.[2] Plaintiff brings claims individually and on behalf of the Class pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act").

2. In January 2023, Hesai filed its IPO Registration Statement on Form F-1. A few weeks later, Hesai filed its final Prospectus for the IPO on Form 424B4. Together, the Registration Statement and Prospectus are the "Offering Documents." Hesai, a Cayman Islands company with operations primarily located in China, conducted its U.S. IPO pursuant to the Offering Documents in February 2023, raising over $192 million.

---

[1] American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

[2] Excluded from the Class are (i) Defendants; (ii) all present and former officers, directors, or control persons of Hesai; (iii) any excluded person's immediate family members, legal representatives, heirs, successors, predecessors, or assigns; (iv) the present and former parents, subsidiaries, assigns, successors, predecessors, and affiliates of any Defendant; and (v) any entity in which any person excluded under subsections (i)-(iv) has or had a material ownership interest.

3.      Plaintiff alleges that the Offering Documents contained several misleading statements and omissions of material fact concerning Hesai's drastically decreasing gross margin for its LiDAR products and the undisclosed risk (and consequences thereof) that Hesai could be listed by the U.S. Department of Defense as a Chinese military company.

4.      Hesai is a Chinese manufacturer of light detection and ranging ("LiDAR") products. LiDAR is a remote sensing technology akin to sonar and radar, and Hesai's products are used primarily in the automotive industry for advanced driver-assistance systems ("ADAS") and Autonomous Mobility (*i.e.*, driverless cars or robotaxis).

5.      In the Offering Documents, Hesai touted to investors its outstanding historical gross margins, which served as a major basis of Hesai's growth story. The Offering Documents boasted that Hesai had earned gross margins of over 50% in 2019, 2020, and 2021. In the Offering Documents, Hesai repeatedly touted that its "industry-leading gross margin of approximately 50% from 2020 onwards enables it to organically and rapidly grow its business" and that its "margins validate its global leadership."

6.      Hesai misleadingly omitted critical information that told a very different story. Hesai's outstanding margins in prior years were based almost exclusively on sales of its Autonomous Mobility products. Hesai only began shipping its ADAS products at commercial volumes in July 2022, as its ADAS manufacturing ramped up. Hesai did ***not*** provide pricing, cost, or margin information about these new products despite the fact that it planned to continue significantly ramping up production of its ADAS products.

7.      Hesai vaguely told investors in the Offering Documents that it expected its gross margin to decrease in the fourth quarter of 2022 ("4Q22")—which was complete, but for which Hesai had not yet reported final results—because it was shifting its product mix towards lower-

3

price ADAS products. However, the Offering Documents concealed from investors that the ADAS products were not just lower-*price* compared to the Autonomous Mobility products, they were also lower-*margin*. The difference was massive: Hesai's ADAS margins were less than 10% of its historical 50%+ margins on Autonomous Mobility products.

8. It was true that the ADAS products sold for only a fraction of the price of the Autonomous Mobility products, with average 2022 sale prices (disclosed only after the IPO) of approximately $742 for ADAS compared to $13,000 for Autonomous Mobility. But the price differential did not tell the whole story. What the Offering Documents failed to disclose was that Hesai's margin on its ADAS products was *less than 5%*. That was *an order of magnitude smaller* than its consistently 50%+ margin for Autonomous Mobility products.

9. As a result, when Hesai finally revealed its fourth-quarter and full-year financial results in March 2023, the gross margin results were shocking. Hesai's gross margin for 4Q22 was only 30.0%, *a decrease of 43%* from the prior year's fourth quarter. Hesai's full-year 2022 gross margin was only 39.2%, *a decrease of 26%* from 2021. Only after the IPO did Hesai finally admit that this massive decline in gross margin was due to "the increased shipments of lower-margin ADAS LiDAR products."

10. During the earnings conference call following the release of Hesai's 4Q22 results, Hesai's CFO disclosed for the first time the gaping disparity in both price *and margin* between the ADAS and Autonomous Mobility products. He also revealed that these substantially lower margins would persist through at least the first half of 2023, if not longer, with a long-term gross margin target of only 30-35%.

11. On this news, the price of Hesai's ADSs fell over 10%.

12.     In addition to failing to disclose the true source and extent of Hesai's significant decrease in gross margin, the Offering Documents also failed to disclose the material risk that Hesai could be named to a statutory list of Chinese military companies by the U.S. Department of Defense ("DoD"). Section 1260H of the 2021 National Defense Authorization Act provided that the DoD may designate an entity as a "Chinese military company" and place it on the "1260H List" if the entity is "identified as a military-civil fusion contributor to the Chinese defense industrial base." A "military-civil fusion contributor" includes, among others, "[e]ntities residing in or affiliated with a military-civil fusion enterprise zone."

13.     The Offering Documents failed to disclose to investors that, at the time of the IPO, Hesai had built, was building, or planned to build, major facilities in Chinese military-civil fusion enterprise zones, including the Jiading Industrial Zone.

14.     Hesai was named to the DoD's 1260H List in January 2024. On this news, the price of Hesai's ADSs fell over 30%. As Hesai later revealed, its inclusion on the 1260H List had material adverse impacts on Hesai, including reputational damage and lost business opportunities.

15.     In March 2025, Blue Orca Capital issued a report on Hesai which, among other things, revealed for the first time that Hesai's largest customer—accounting for over 20% of Hesai's revenues from 2019-2023—was an autonomous vehicle subsidiary of General Motors ("GM"). As Blue Orca explained, Hesai's inclusion on the DoD's 1260H List imperiled its relationship with its largest customer because the DoD may not purchase products from companies (like GM) whose suppliers were on the 1260H List. Blue Orca also revealed a series of pictures and videos from Chinese media sources that appeared to show Chinese military tanks and vehicles equipped with Hesai's LiDAR products, contradicting Hesai's attempts to disavow any dealings with the Chinese military.

16. Not only did the Offering Documents fail to disclose the risk that Hesai could be included on the 1260H List based on then-existing facts, it also failed to disclose the risk that it could lose business of its largest customer. Moreover, GM purchased primarily high-margin Autonomous Mobility products from Hesai, meaning that being named on the 1260H list also bore a material risk of reducing Hesai's gross margin.

17. Hesai filed suit against the DoD to challenge its inclusion on the 1260H list. In July 2025, a U.S. District Court judge denied Hesai's motion for summary judgment and granted the DoD's cross-motion for summary judgment. The court found that there was substantial evidence to support the DoD's determination that Hesai was a Chinese military company as defined in Section 1260H. It based its findings on the grounds that: (1) Hesai was building, or planned to build, major facilities in Chinese military-civil fusion enterprise zones; and (2) Hesai's LiDAR products had substantial military applications.

18. As a result of the material misrepresentations and omissions in the Offering Documents, by the commencement of this action the price of Hesai's ADSs had fallen to $12.17 per ADS—down 35% from the $19.00 IPO price, materially damaging investors.

## JURISDICTION AND VENUE

19. The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

21. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)). Defendants conducted the IPO in this District, drafted the Registration Statement in substantial part in this District, disseminated the statements alleged to be false and misleading herein into this District, and solicited purchasers of Hesai ADSs in this District. The Hesai ADSs issued in the IPO also trade in this District.

23.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, the Internet, and the facilities of a national securities exchange.

## PARTIES

24.     Lead Plaintiff King Ho Wong, as set forth in his certification on file with the Court (Dkt. No. 6-2) and incorporated by reference herein, purchased Hesai ADSs pursuant and/or traceable to the Offering Documents and was damaged thereby.

25.     Defendant Hesai is incorporated in the Cayman Islands and had its principal executive offices at 9th Floor, Building L2-B, 1588 Zhuguang Road, Qingpu District, Shanghai, the People's Republic of China ("PRC" or "China") at the time of the IPO. Hesai ADSs trade on the NASDAQ exchange ("NASDAQ") under the ticker symbol "HSAI." Hesai Technology Co., Ltd. ("Hesai Technology") is the Company's main operating subsidiary. The Company's Offering Documents explained that "[u]nless otherwise specified, in the context of describing business and operations, we are referring to the business and operations conducted by Hesai Technology." The address of Hesai Technology has always been and remains in the Jiading Industrial Zone, with the specific address being Building 2, No. 468 Xinlai Road at the time of the IPO, and currently at No. 3188 Baoqian Road, Jiading District, Shanghai, China.

26.      Defendant Cogency Global Inc. ("Cogency") was Hesai's designated and authorized U.S. representative for purposes of the IPO. Defendant DeVries, who signed the Offering Documents, was an employee of Cogency. As a result, Cogency is liable for the securities law violations committed by DeVries in its capacity as employer and as a control person under the Securities Act.

27.      Defendant Yifan "David" Li ("Li"), also known as David Li, is a co-founder of Hesai. Li served as the Chief Executive Officer ("CEO") and a director of the Company since its founding. Li reviewed, contributed to the drafting of, and signed the Company's Registration Statement. As set forth in the Offering Documents, prior to the Offering, Li owned 9,899,374 Hesai Class A shares, which counted for 8.6% of total ordinary shares and 25.7% of the aggregated voting power. Immediately following the Offering, Li owned 9,899,374 Hesai Class A shares, which counted for 7.9% of total ordinary shares and 25.1% of the aggregated voting power.

28.      Defendant Louis T. Hsieh ("Hsieh") served as Hesai's Global Chief Financial Officer ("CFO") since April 2021 and as a director since June 2021. Hsieh reviewed, contributed to the drafting of, and signed the Company's Registration Statement.

29.      Defendant Kai Sun ("Sun") co-founded Hesai. Sun served as Hesai's Chief Scientist and a director since the Company's founding. Sun reviewed, contributed to the drafting of, and signed the Company's Registration Statement. As set forth in the Offering Documents, prior to the Offering, Sun owned 10,234,631 Hesai Class A shares, which counted for 8.9% of total ordinary shares and 26.5% of the aggregated voting power. Immediately following the Offering, Sun owned 10,234,631 Hesai Class A shares, which counted for 8.2% of total ordinary shares and 25.9% of the aggregated voting power.

30.     Defendant Shaoqing Xiang ("Xiang") co-founded Hesai. Xiang served as a Director and the Chief Technology Officer for Hesai since its founding. Xiang reviewed, contributed to the drafting of, and signed the Company's Registration Statement. As set forth in the Offering Documents, prior to the Offering, Xiang owned 9,899,374 Hesai Class A shares, which counted for 8.6% of total ordinary shares and 25.7% of the aggregated voting power. Immediately following the Offering, Xiang owned 9,899,374 Hesai Class A shares, which counted for 7.9% of total ordinary shares and 25.1% of the aggregated voting power.

31.     Defendant Cailian "Rachel" Yang ("Yang") served as Hesai's Vice President of Operations and a director since November 2017. Yang was Hesai's first employee, joining the Company in December 2014. Yang reviewed, contributed to the drafting of, and signed the Company's Registration Statement.

32.     Defendant Colleen A. DeVries ("DeVries") was a Senior Vice President of Defendant Cogency, who acted as the Company's duly authorized representative in the United States at all relevant times, including at the time of the IPO. DeVries signed the Registration Statement on her own behalf and on behalf of Cogency, her employer.

33.     Defendants Li, Hsieh, Sun, Xiang, Yang, and DeVries are sometimes referred to herein as the "Individual Defendants."

34.     Each of the Individual Defendants and Cogency participated in the Offering Documents' preparation and in the making of the materially false and misleading statements and omissions alleged herein. Each of the Individual Defendants and Cogency hired and assisted the Underwriter Defendants, reviewed, edited, approved, signed or authorized the signing of, and disseminated to investors, the Offering Documents and Hesai's IPO roadshow presentations, talking points, and scripts. The Individual Defendants also conducted the roadshows along with

the Underwriter Defendants to solicit the purchase of Hesai ADSs in the IPO to serve their financial interests and those of the Company (and in the case of DeVries, the interests of Cogency).

35.    Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm that acted as an underwriter for the Company's IPO, helping to draft and disseminate the Offering Documents and to solicit investors to purchase Hesai ADSs issued pursuant thereto. Goldman Sachs' address is 68th Floor, Cheung Kong Center, 2 Queens Road Central, Hong Kong.

36.    Defendant Morgan Stanley Asia Limited ("Morgan Stanley") is an investment banking firm that acted as an underwriter for the Company's IPO, helping to draft and disseminate the Offering Documents and to solicit investors to purchase Hesai ADSs issued pursuant thereto. Morgan Stanley's address is 46/F, International Commerce Center, 1 Austin Road West, Kowloon, Hong Kong.

37.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment banking firm that acted as an underwriter for the Company's IPO, helping to draft and disseminate the Offering Documents and to solicit investors to purchase Hesai ADSs issued pursuant thereto. Credit Suisse's address is Eleven Madison Avenue, New York, New York, 10010.

38.    Defendant Huatai Securities (USA) Inc. ("Huatai") is an investment banking firm that acted as an underwriter for the Company's IPO, helping to draft and disseminate the Offering Documents and to solicit investors to purchase Hesai ADSs issued pursuant thereto. Huatai's address is 21 Floor East, 280 Park Avenue, New York, New York 10017.

39.    Defendants Goldman Sachs, Morgan Stanley, Credit Suisse, and Huatai are sometimes referred to herein as the as the "Underwriter Defendants." Defendants Goldman Sachs, Morgan Stanley and Credit Suisse acted as the representatives of all the Underwriter Defendants ("Lead Underwriters").

10

40.     The Underwriter Defendants agreed to purchase and to sell shares of Hesai ADSs to the public in connection with the IPO as follows:

| Name | Number of ADSs |
|---|---|
| Goldman Sachs (Asia) L.L.C. | 3,650,000 |
| Morgan Stanley Asia Limited | 2,600,000 |
| Credit Suisse Securities (USA) LLC | 3,650,000 |
| Huatai Securities (USA), Inc. | 100,000 |
| Total: | 10,000,000 |

41.     The Underwriters had an option to sell an additional 1.5 million Hesai ADSs in the IPO, which they exercised in part, selling 125,118 additional ADSs. The Underwriters collectively received approximately $13.6 million in underwriting discounts and commissions for underwriting the IPO.

42.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false and misleading statements and omissions contained in the Offering Documents for the following reasons:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and received over $13.3 millions of dollars in fees, collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Hesai ADSs in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates and counsel, to market Hesai ADSs, and those personnel worked on and approved the content of Hesai's Offering Documents.

(b)     The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from Defendant Hesai, met with potential investors and

11

presented highly favorable information about the Company, its operations and its financial prospects.

(c)     The Underwriter Defendants demanded and obtained an agreement from Hesai that Hesai would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Hesai had purchased millions of dollars in directors' and officers' liability insurance.

(d)     Representatives of the Underwriter Defendants also assisted Hesai, the Individual Defendants, and Cogency in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Hesai, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Hesai's most up-to-date operational and financial results and prospects.

(e)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Hesai's counsel, management, and top executives (including the Individual Defendants) and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Hesai ADSs would be sold; (iii) the language to be used in the Offering Documents, including what disclosures about Hesai would be made in the Offering Documents; and (iv) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and

communications between the Underwriter Defendants' representatives and Hesai's management and top executives (including the Individual Defendants), the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Hesai's existing problems as detailed herein.

(f) The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with the offers and sales of Hesai ADSs registered thereby, including those to Plaintiff and the other members of the Class.

(g) The Underwriter Defendants solicited and sold in the IPO Hesai ADSs to Plaintiff and other members of the Class. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

43. Hesai, Cogency, the Individual Defendants, and the Underwriter Defendants are sometimes collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company and LiDAR Industry Background

44. Hesai is a Cayman Islands company with its operations located primarily in China. It commenced operations in October 2014, manufacturing LiDAR products.

45. LiDAR is a remote sensing technology akin to sonar and radar. It uses pulses of laser light to accurately measure distances and properties of objects by gauging the time taken for the light to reflect back to the LiDAR sensor. The LiDAR technology is applied in diverse fields. In the automobile industry, LiDAR has recently emerged as an attractive option for ADAS and autonomous driving because the high-resolution data and accuracy LiDAR technology offers

enables vehicles to perceive their surroundings with clarity, facilitating safe navigation without human input.

46.     According to the Society of Automotive Engineers International ("SAE"), there are six levels of driving automation for cars based on the level of human intervention and the extent of driving assistance features, ranging from level 0 (No Driving Automation) to level 5 (Full Automation), transitioning gradually from "driver support features" to "automated driving features." This SAE categorization scheme has been adopted by the U.S. National Highway Traffic Safey Administration.  These levels are illustrated in the chart below.



*Source: Hesai Offering Documents*

47.     For ADAS driving (typically SAE Levels 1-3) and autonomous driving (typically SAE Levels 4 or 5), LiDAR offers higher resolution compared to sensor devices like radar and ultrasonic sensors, enabling precise distance measurements and real-time reconstruction of the

environment. Compared to cameras, LiDAR offers a more reliable means of object recognition and classification.

48.     However, LiDAR products are much more expensive than other sensor devices due to the sophistication of the software and the computing resources needed for LiDAR. For instance, while ultrasonic sensors, automotive radar sensors, mono-cameras, and thermal cameras typically range from $10-$40, $50-$220, $100-$1,000, and $700-$3,000 per unit, respectively, LiDAR systems can cost $500-$75,000 per unit. LiDAR products also require high power consumption and certain configurations can be too bulky for installation on a car.

49.     Accordingly, notwithstanding its many technical advantages over alternative sensor devices, automotive manufacturers have not widely adopted LiDAR except for highly autonomous vehicles. In 2021, only 0.15% of the approximately 78 million vehicles in the world (approximately 117,000 vehicles) were equipped with LiDAR.

50.     LiDAR manufacturers, including Hesai, have therefore been working on solutions to reduce LiDAR's costs and size while enhancing its performance to make LiDAR commercially viable for the automobile industry. The solution that Hesai has purportedly developed is its proprietary application specific integrated circuits ("ASIC")-based architecture coupled with its proprietary in-house manufacturing process, which, according to Hesai, allowed Hesai to offer LiDAR products with greater performance, higher quality, and better consistency at lower cost.

51.     By the time of the IPO, Hesai had purportedly become the world's most commercially successful LiDAR company in terms of shipment volume, revenue scale, and margins.

52.     Hesai's outstanding historical margins were a major selling point for the IPO, including in the Offering Documents, and served as a major basis for Hesai's putative growth story. The Offering Documents boasted that Hesai had earned gross margins of over 50% each year from 2019-2021.

53.     In the Offering Documents, Hesai repeatedly touted that it "has been growing rapidly while maintaining industry-leading gross margins as compared to major publicly listed LiDAR companies," and how its "industry-leading gross margin of approximately 50% from 2020 onwards enables it to organically and rapidly grow its business." Hesai also boasted that its "margins validate its global leadership." The Offering Documents claimed that Hesai "has been growing rapidly while maintaining industry-leading gross margins as compared to major publicly listed LiDAR companies."

## Hesai's LiDAR Production Capabilities

54.     According to its Offering Documents, Hesai manufactured three categories of LiDAR products: (i) ADAS products, or LiDAR for vehicles with ADAS functions at SAE automation Level 3 or below; (ii) Autonomous Mobility products, or LiDAR for vehicles with autonomous mobility functions at SAE automation levels 4 and 5; and (iii) LiDAR for robotic devices. Hesai claimed that it had captured 27% of the global ADAS market and 60% of the global autonomous mobility market.

55.     Prior to the IPO, Hesai had been making and selling Autonomous Mobility products for multiple years. As Hesai explained in its Offering Documents, in July 2022 the Company first began "volume shipment" of ADAS products to customers. At the time of the IPO, Hesai's commercial ADAS products comprised only its AT128 model, or "AT series."

56. At the time of the IPO, Hesai manufactured its LiDAR products at its in-house manufacturing facilities located in Jiading, Shanghai, China. Hesai claimed that Jiading was "the hub for automotive OEMs [original equipment manufacturers] in China." In the Offering Documents, Hesai claimed that its Jiading manufacturing facilities supported an annual production capacity of approximately 35,000 non-AT series LiDAR units, plus a "transitional line" dedicated to AT series units with a monthly production capacity of approximately 20,000 units.

57. Hesai touted the Jiading facilities' powerful in-house manufacturing capacity, crediting them for Hesai's commercial success in the ADAS market and its ability to fulfill both the current and near-term demand for its popular ADAS products.

58. At the time of the IPO, and as referenced in the Offering Documents, Hesai was also building a new manufacturing facility to meet the increasing demand for its products, which was expected to commence operations in 2023 and was expected to eventually increase its annual total production capacity from approximately 275,000 units up to approximately 1.2 million. In the Offering Documents, Hesai explained that "we plan to construct a new manufacturing facility in Jiading, Shanghai to prepare for further production ramp-up of our existing and future LiDAR products. The new facility is expected to commence manufacturing in 2023."

59. Hesai's new manufacturing facility was called the Maxwell Intelligent Manufacturing Center ("Maxwell Facility"). It broke ground in May 2021 and was officially completed in November 2023, becoming operational soon thereafter.

**Hesai's Largest LiDAR Customer**

60.     According to Hesai's Offering Documents and its annual reports for 2022 and 2023, filed with the SEC on Forms 20-F, Hesai's largest customer in 2019, 2021, and 2023, and its second-largest customer in 2020 and 2022, was "Customer B." The Offering Documents stated only that Customer B was "a leading global OEM headquartered in the United States." Upon information and belief, "Customer B" was General Motors' autonomous driving project, Cruise ("GM Cruise").

61.     Cruise LLC was an American self-driving car company that General Motors, ("GM") acquired in 2016. Cruise tested and developed autonomous car technology. After its acquisition, Cruise focused on producing a fleet of driverless taxis.

62.     In Hesai's Chinese prospectus for its Shanghai Stock Exchange public offering (pre-dating its U.S. IPO), Hesai explained that its largest customer in 2019 was "[a] leading global automaker headquartered in Detroit, with a subsidiary focused on autonomous driving." GM, notably, is headquartered in Detroit, Michigan.

63.     In a report issued by Blue Orca Capital on March 18, 2025 ("Blue Orca Report"), Blue Orca reported that a former executive at Hesai confirmed that this customer, Hesai's biggest, was GM Cruise. According to the Blue Orca Report, a LiDAR industry report issued in December 2024 by Yole Group listed the top ten major players in the robotaxi/autonomous driving industry and their respective LiDAR suppliers, of which only four were U.S. companies that use Hesai's LiDAR products. GM Cruise was the only one of those companies that matches Hesai's description of its largest customer. Plaintiff's counsel have independently obtained the December 2024 industry report, published by a Chinese

investment Bank SPDB International on December 16, 2024, which contained the below chart used by the Blue Orca Report, corroborating the assertions of the Blue Orca Report.[3]

图表 34: Robotaxi 行业主要玩家车辆激光雷达配置情况对比

| 公司 | 激光雷达供应商 | 激光雷达单车总用量 | 长距激光雷达搭载量 | 短距激光雷达搭载量 |
|---|---|---|---|---|
| Waymo | WAYMO | 5 | 1 | 4 |
| Cruise | HESAI | 5 | 5 | 0 |
| Aurora | Aurora HESAI | 7 | 3 | 4 |
| 百度Apollo | HESAI | 5 | 1 | 4 |
| 滴滴 | HESAI | 5 | 1 | 4 |
| Motional | OUSTER HESAI | 4 | 1 | 3 |
| 小马智行 | robosense HESAI | 5 | 2 | 3 |
| 文远知行 | HESAI | 5 | 3 | 4 |
| AutoX | HESAI SiLC | 2 | 2 | 0 |
| Zoox | HESAI | 8 | 4 | 4 |

资料来源: Yole、艾瑞咨询、各公司官网、公开资料、浦银国际整理

2024-12-16                                24                              浦银国际

64.     As reported in Hesai's Offering Documents and its 2022 and 2023 annual reports, "Customer B" accounted for approximately 20.8% percent of Hesai's revenues from 2019-2023. Thus, GM Cruise was easily the Company's largest customer during that five-year

---

[3]     A     copy     of     the     report     is     available     at: https://pdf.dfcfw.com/pdf/H3_AP202412171641326505_1.pdf.

19

span and for most individual years during the same time period, accounting for over 20% of Hesai's revenues, or approximately $134.3 million.

| Hesai Revenues From "Customer B" (GM Cruise) | | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2019-2023 |
| Percent | 23.6% | 10.4% | 17.5% | 13.7% | 28.4% | 20.7% |
| Total (Hesai) | $48.9M* | $58.4M* | $101.3M | $174.4M | $264.4M | $647.4M |
| Total (GM Cruise) | $11.5M | $6.1M | $17.7M | $23.9M | $75.1M | $134.3M |

*estimated using the US$1.00=RMB7.1135 conversion rate used in the Prospectus*

## Hesai Conducts Its IPO

65. On or about January 17, 2023, Hesai filed with the SEC a Registration Statement on Form F-1, which, after an amendment on Form F-1/A dated February 2, 2023, was declared effective by the SEC on February 8, 2023 ("Registration Statement").

66. On or about February 9, 2023, Hesai commenced the IPO on NASDAQ pursuant to the Registration Statement. In the IPO, Hesai, through the Underwriter Defendants, sold 10 million ADSs for $19.00 per ADS. Each ADS represented one of the Company's Class B shares. The Underwriter Defendants had a 30-day option to purchase up to an additional 1,500,000 ADSs from the Company at the IPO price, less the underwriting discount. Subsequently, the Underwriter Defendants partially exercised their over-allotment option, purchasing an additional 125,118 ADSs at the IPO price.

67. On February 9, 2023, Hesai filed with the SEC its final prospectus for the IPO on Form 424B4, which was expressly incorporated into, and forms part of, the Registration Statement ("Prospectus," and together with the Registration Statement, the "Offering Documents"). On February 13, 2023, the Company closed the IPO.

68. The Offering Documents expressly stated that:

> We have not authorized anyone to provide any information other than that contained in this prospectus or in any free writing

20

prospectus prepared by or on behalf of us or to which we may have referred you. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We and the underwriters have not authorized any other person to provide you with different or additional information.

69.    Under the subheading, "WHERE YOU CAN FIND ADDITIONAL INFORMATION," the Prospectus referred investors *only* to the Registration Statement and future filings Hesai might make with the SEC.

70.    In total, Hesai raised over $192 million in gross proceeds in the IPO, including the overallotment.

## The U.S. Department of Defense's List of Chinese Military Companies

71.    Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965-66 (2021) ("2021 NDAA"), provides that the DoD may designate an entity as a "Chinese military company" and place it on the "1260H List" if the DoD concludes that the entity meets certain statutory criteria.

72.    Under Section 1260H, a "Chinese military company" is defined to include "an entity that is ... identified as a military-civil fusion contributor to the Chinese defense industrial base." 2021 NDAA § 1260H(d)(1)(B)(i)(II). The statute further defines the term "military-civil fusion contributor" as including, among other sufficient criteria, "Entities residing in or affiliated with a military-civil fusion enterprise zone." 2021 NDAA § 1260H(d)(2)(E).

73.    Upon determining that an entity meets the statutory definition of "Chinese military company," the DoD may place the company on the public 1260H List, which the DoD then submits to Congress. *See* 2021 NDAA § 1260H(b)(1).

74.     Effective June 30, 2026, entities on this list and their controlled affiliates will be prohibited from entering into contracts with the DoD for the procurement of goods, services, or technology. Effective June 30, 2027, the DoD will be prohibited from purchasing goods or services produced or developed by entities on the list indirectly through third parties. That means if a company's supplier is on the 1260H List, the DoD will not purchase goods from the company that are made with parts from the listed supplier.

75.     Entities on the list and their subsidiaries are also prohibited from receiving contracts or other funding from the U.S. Department of Homeland Security. Aside from the direct effects, being named on the 1260H List creates a distinct stigma for a company, particularly in the U.S. market.

### At the Time of the IPO, Hesai Had Built, Was Building or Planning to Build Facilities in Military-Civil Fusion Enterprise Zones in China

76.     The Jiading Industrial Zone is a key industrial and economic development area in the Jiading District of Shanghai, China, focused on the development of high-tech manufacturing and services. The zone provides infrastructure construction, real estate development, and various support services for its resident businesses.

77.     According to an article on Wenhui Bao from April 2019 titled "Jiading Industrial Zone Military-Civilian Integration Industry Alliance was established and 24 key industrial projects were signed," the Jiading Industrial Zone Military-Civilian Integration Industry Alliance was established in 2019.[4] The Wenhui article explained that "the military-civilian integration industry alliance in Jiading Industrial Zone is ... a specific measure to connect with the national strategy of military-civilian integration." The Wenhui article also

---

[4] Wenhui Bao, anglicized as the Wenhui Daily, is a Chinese daily newspaper based in Shanghai.

stated that "Jiading Industrial Park will take the establishment of the industrial alliance as an opportunity to help enterprises in the park carry out exchanges and cooperation in the field of military-civilian integration...."

78.     The Maxwell Facility was located in the Jiading Industrial Zone. As reported in a Chinese news article by Jiemian News on March 17, 2025[5], "The Maxwell Intelligent Manufacturing Center, designed and built by Hesai Technology, is located in Shanghai's Jiading Industrial Zone." As reported in a Chinese news article on Shanghai Gasgoo Automotive on August 11, 2023[6], "The Hesai Maxwell Intelligent Manufacturing Center is located in the core area of the northern district of Jiading Industrial Zone. The center held its groundbreaking ceremony on May 28, 2021."

79.     As a Chinese news article on jiading.gov.cn dated October 16, 2020[7] described: "With the government's careful nurturing, a group of science and technology-based private enterprises have grown into 'hidden champions' or even 'unicorns' in their respective fields in Jiading Industrial Zone." The first example cited was Hesai, with the article noting that "Hesai has grown into a unicorn in the 'new infrastructure' sector." The article confirmed that "the Jiading Industrial Zone has allocated 40 mu (approximately 16 acres) of valuable land to support Hesai's construction of a global lidar testing laboratory and R&D and manufacturing center." As the article described, to help Hesai, "the Jiading Industrial Zone provided free factory space and helped recruit more laser talent from the Institute of Optics and Fine Mechanics within the district."

---

[5] *Available at* https://stcn.com/article/detail/1587692.html.

[6] *Available at* https://news.qq.com/rain/a/20230811A03OY900.

[7] *Available at* https://www.jiading.gov.cn/xinwen/mtkjd/content_685401.

80.    The Institute of Optics and Fine Mechanics, officially the Shanghai Institute of Optics and Fine Mechanics, Chinese Academy of Sciences ("SIOM"), is China's oldest and largest specialized research institute for laser science and technology. SIOM has a profound military background and operates to advance the strategic goals of the Chinese Communist Party ("CCP") and the People's Liberation Army ("PLA"), *i.e.*, the Chinese military.[8] Founded in 1964 under direct CCP and military directives from Mao Zedong, with personal oversight from central leadership and national ministries, SIOM was explicitly established to spearhead military laser research.[9] Since 2015, SIOM has also maintained a strategic partnership with the College of Mechatronics and Automation of the National University of Defense Technology, a key university directly commanded by the Central Military Commission.[10] This partnership is explicitly aimed at strategic industrial development, specifically "to enhance the production capacity of high-power laser optical components and promote the development of the high-power laser component industry."

81.    On March 26, 2023, just weeks after the IPO, Hesai announced its agreement to build its Technology Software Global R&D Headquarters, set up an "innovation incubation center," and create a LiDAR "industrial park" in the Chongqing Economic Development Zone. Upon information and belief, based on the timing of the agreement, Hesai knew at the time of the IPO that it was planning to build this facility in the Chongqing Economic Development Zone.

---

[8] https://siom.cas.cn/jggk_1/jgjj/

[9] http://www.siom.cas.cn/xlzt/sq55/sdsj/

[10] http://www.siom.cas.cn/xwzx/zhxw/201512/t20151222_4500535.html

82.     The Chongqing Economic Development Zone, a state-level economic hub in Southwest China, was established by China to advance military-civil fusion through scientific and technological innovation in industry.

83.     A 2022 "Policy Interpretation" document from the Nan'an District Science and Technology Bureau[11] stated that under the Chinese Communist Party's Fourteenth Five-Year Plan for the Chongqing Economic and Technological Development Zone, one of the "key tasks" of the plan is to "advance the integration of military and civilian science and technology innovation."

84.     While Hesai and its officer and directors were aware that Hesai's existing and planned facilities were located in the Jiading Industrial Zone and the Chongqing Economic Development Zone, that information was not provided in the Offering Documents and not well known to investors.

### Hesai's LiDAR Products Had Substantial Military Applications and Hesai Cooperated With Chinese Agencies Focused on Military-Civil Integration

85.     Hesai has insisted that it does not and did not sell its LiDAR products directly to the Chinese military. Those protestations appear dubious in light of the photographic and video evidence laid out in the Blue Orca Report (discussed in further detail below). In any event, regardless of whether Hesai directly sold its LiDAR products to the Chinese military, it is clear that those products have substantial military applications.

86.     According to an article on Defense One (a U.S. defense and international security website) titled "China claims breakthroughs in autonomous vehicles," autonomous vehicles "have massive applications for the intelligent systems at the center of both U.S. and Chinese military

---

[11] *Available at* https://jkq.cq.gov.cn/zwgk/zcjd/202203/t20220324_10545618_wap.html

plans."[12] According to the Defense One article, "At the front line of this race towards fully-realized autonomous vehicles is the push to dominate the market for LiDAR [] systems. ... Initially intended for landscape and oceanographic mapping, LiDAR quickly became the main "eyes" for self-driving vehicles and driver assistance systems in both military and civilian vehicles. Without LiDAR, any improvements in how autonomous vehicles interpret real-world data would be useless."

87.    The Defense One article explained in detail the rise of Hesai and advancements pursued and achieved by the Chinese government in the LiDAR field, and their importance for military applications:

> U.S. companies controlled the LiDAR market until relatively recently, when Chinese companies rose seemingly out of nowhere to dethrone U.S. dominance through state subsidies and other support. In particular, PRC documents from 2020 note that numerous government organs were directed to surge their aid for "intelligent vehicles" and "establishing an integrated sensory system" for urban environments.
>
> This growing Chinese presence was first spotted in August of 2023, when a Congressional Research Service report highlighted the Chinese push into the LiDAR market. The report found that on top of the typical subsidies provided by Chinese industrial policy, the Chinese government is also allocating resources to acquire foreign IP, encourage foreign manufacturers to establish factories in China, and push for the promotion of Chinese standards on the market. This has led to numerous concerns about how PRC automobile sensors like cameras and LiDAR gather massive amounts of data about their surroundings and even passengers, which could easily be used to gather intelligence.

88.    The Defense One article also noted that Hesai "was found to have connections to the China Electronics Technology Group Corporation (CETC), a company founded to supply

---

[12]    *Available at* https://www.defenseone.com/ideas/2024/09/china-claims-breakthroughs-autonomous-vehicles/399254/

advanced electronics to the PLA." According to a letter from the House Select Committee on Strategic Competition between the United States and the Chinese Communist Party dated November 28, 2023, CETC is a Chinese state-owned entity that is a key player in advancing China's military civil fusion program.[13] CETC is also on the DoD's 1260H List.

89.    As the Defense One article further explained, there are significant military implications for the U.S. and China arising from Hesai and other Chinese companies' continuing expansion and development in the LiDAR industry:

> Such expansion [of Hesai and other Chinese companies in the LiDAR market] points to China's growing weight in the world of autonomous vehicles, with the new advances in their suite of sensors set to accelerate that trend. If Chinese companies succeed in solidifying their dominance of the autonomous vehicle and LiDAR markets, the security implications are profound. There is already great concern over modern Chinese-manufactured automobiles' ability to sense their surroundings with driver-assistance systems such as rear-view cameras and blindspot warning systems, and their ability to collect far more personal data than consumers realize. Although the U.S. Government is moving to counter these concerns, it is still in the information gathering phase and has not yet implemented controls to address these risks.
>
> As the importance of autonomous vehicles, their suite of sensors, and the security implications therein grows, so too will the need to maintain U.S alternatives to adversarial advancements. If the Chinese Academy of Sciences' SIMIT continues to refine their capabilities, this need will only rise in tandem.

90.    According to the "Action Plan to Accelerate the Development and Industrialization of Smart Sensors and Intelligent Instrumentation (2013-2025)," issued by the Chinese Ministry of Industry and Information Technology ("MIIT"), Ministry of Science and Technology, Ministry of Finance, National Development and Reform Commission, and State Council Leading Group for

---

[13] A copy of the letter is available at: https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/2023-11-28-lidar-letter-final_0.pdf

Standardization, the development and manufacturing of "sensors and intelligent instruments" such as LiDAR, are "needed for national defense, key industrial security, and major engineering projects."

## THE OFFERING DOCUMENTS CONTAINED FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

91.     The Offering Documents was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

92.     Under applicable SEC rules and regulations, the Offering Documents were also required to disclose known trends, events, material risks, or uncertainties that were having, and/or were reasonably likely to have, an impact on the Company's continuing operations.

### False and Misleading Statements in the Offering Documents

93.     The Offering Documents contained several false and misleading statements of material fact concerning Hesai's gross margins, the risk of losing business from its largest customer, and the risk of being named on the DoD's 1260H List.

94.     The Offering Documents repeatedly touted Hesai's outstanding historical margins as a major selling point and those margins served as a major basis for Hesai's putative growth story. The Offering Documents boasted that Hesai had earned gross margins of greater than 50% each year from 2019-2021. While the Offering Documents disclosed that Hesai "expects its gross margin to further decrease in the fourth quarter of 2022 as it shifts its product mix toward LiDAR products for the ADAS market," they misleadingly presented the true cause and extent of the decreased margins, which were likely to persist well beyond the IPO.

95.     Specifically, the Offering Documents stated that:

> ***[Hesai's] shipment volume, revenue scale and margins validate its global leadership.*** It has shipped over 103,000 LiDAR units from 2017 to December 31, 2022, and it has shipped over 80,400 LiDAR units in aggregate in 2022. In particular, it has shipped approximately 62,000 AT128 LiDAR units for ADAS customers in aggregate in 2022, which demonstrates the highest estimated shipment of volume LiDAR units (excluding low-end LiDARs with 16 channels or less) for ADAS customers in 2022, according to the Frost & Sullivan Report. It generated the highest revenue as compared with listed LiDAR companies around the world for the nine months ended September 30, 2022, outperforming the second place by over 3.6 times, according to the Frost & Sullivan Report. ***Its industry-leading gross margin enables it to organically and rapidly grow its business.*** Hesai Technology's gross margin was 70.3%, 57.5%, 53.0% and 44.0% in 2019, 2020, 2021, and the nine months ended September 30, 2022, respectively. ***[Hesai] expects its gross margin to further decrease in the fourth quarter of 2022 as it shifts its product mix toward LiDAR products for the ADAS market.*** For more details, see "— Key Factors Affecting Our Results of Operations — Our ability to optimize the pricing and mix of our LiDAR products.

> [Emphasis added.]

96.     The bolded and italicized statements above were materially misleading because they omitted the principal reason that had already caused Hesai's gross margin to substantially decline – Hesai was achieving gross margins for its ADAS products that were ***an order of magnitude lower*** than its autonomous mobility products that had historically supported its sky-high gross margins. At the time of the IPO, Hesai had realized gross margins on its ADAS products of ***less than 5%*** in 2022, while it earned gross margins of ***over 50%*** on its autonomous mobility products. This was particularly material for investors because Hesai had only just started ramping up production of its ADAS products in July 2022, and it planned to massively increase its ADAS production in the months and years following the IPO. As it shifted its product mix more and more towards ADAS products, Hesai's gross margin stood to dramatically decline by far more than the disclosed 4.5% decrease from 2020 to 2021 due to the gaping disparity in margin between its

ADAS and autonomous mobility products. Failing to disclose that disparity concealed from investors that Hesai's gross margin for the periods beyond the already-completed fourth quarter of 2022 were also likely to fall far short of Hesai's historical gross margins. Realizing significantly lower margins in 4Q22 and going forward would therefore undermine Hesai's "global leadership" and its ability "to organically and rapidly grow its business."

97.     The section of the Offering Documents titled, "Key Factors Affecting Our Results of Operations—Our Ability to optimize the pricing and mix of our LiDAR Products," as referenced in the above statement, was also misleading. It stated:

> Our LiDAR products for the Autonomous Mobility market include the Pandar series for long-range detection and the QT series for blind-spot detection. The XT series, shipped in volume in 2022, is our ASIC-based LiDAR product line for the Robotics market, and the AT series and the FT series are our LiDAR product lines for the ADAS market, which have been shipped in volume in 2022 and are expected to ship in 2023, respectively. As we offer a diverse set of LiDAR products, our gross margin is affected by the pricing and mix of our products. In 2019, 2020, 2021, and the nine months ended September 30, 2021 and 2022, the average selling price of our LiDAR units was approximately US$17,400, US$12,700, US$7,700, US$8,000 and US$3,100, respectively. During the same periods, the percentage of revenues generated from the Pandar series (including Pardar128, Pandar64, Pandar40 and other Pandar LiDARs) was 94.1%, 75.2%, 76.8%, 78.7% and 57.5%, respectively. Our gross margin decreased from 70.3% in 2019 to 57.5% in 2020, and further decreased to 53.0% in 2021. Our gross margin decreased from 53.3% in the nine months ended September 30, 2021 to 44.0% in the nine months ended September 30, 2022. ***We expect the average selling price for our LiDAR units and our gross margin to decrease as our shipment volume increases, especially with the increasing shipment of LiDAR units for the ADAS market and LiDAR units shipped to the United States that incur higher tariffs. The LiDAR products for the ADAS market generally have much lower selling prices than the LiDAR products for the Autonomous Mobility market, and our changes in product mix that now starts to focus more on the LiDAR products for the ADAS market will decrease our average selling price.*** In addition, OEMs also expect the selling price for the LiDAR products for the Autonomous Mobility market to decrease by approximately 10% to

30

20% per year, which further drives down the average selling price for our LiDAR products. At the same time, we are facing increasing costs related to materials, chips and supply chain globally, which would further negatively affect our gross margin. See "Risk Factors — Risks Related to Our Business and Industry — Continued pricing pressures may result in lower than anticipated margins, or losses, which may adversely affect our business."

[Emphasis added.]

98.    The bolded and italicized statements above were materially misleading because they obfuscated and omitted the principal reason that had already caused Hesai's gross margin to substantially decline – Hesai was achieving gross margins for its ADAS products that were *an order of magnitude lower* than its autonomous mobility products that had historically supported its sky-high gross margins. Instead, these statements misleadingly attributed the predicted decline in gross margin to the "much lower selling prices" for ADAS products compared to Autonomous Mobility products. While it was true that Hesai's ADAS products had substantially lower selling prices (by a factor of nearly 20) in 2022, the real reason that the shift in Hesai's product mix towards ADAS products would result in lower gross margin going forward was that the *margins* for ADAS products were a fraction of those for Autonomous Mobility products. At the time of the IPO, Hesai had realized gross margins on its ADAS products of *less than 5%* in 2022, while it earned gross margins of *over 50%* on its autonomous mobility products. Failing to disclose the massive disparity in *margins*, not just in prices, concealed from investors the true reason that Hesai's gross margin for the periods beyond the already-completed fourth quarter of 2022 were also likely to fall far short of Hesai's historical gross margins.

99.    The section of the Offering Documents titled, "Risk Factors — Risks Related to Our Business and Industry — Continued pricing pressures may result in lower than anticipated margins, or losses, which may adversely affect our business," as referenced in the above statement, stated:

31

Cost-cutting initiatives adopted by our customers often result in increased downward pressure on pricing. In addition, many of our customers, particularly automotive OEMs, possess significant leverage over their suppliers, including us, because they are large multinational companies with substantial negotiating power and the automotive component supply industry is inherently highly competitive, serves a limited number of customers and has a high fixed cost base. The growing competition among both established players and new market entrants in the industry further exacerbates the pricing pressures we face.

Accordingly, we expect to be subject to substantial continuing pressure from automotive OEMs and other major customers to reduce the price of our products. It is possible that pricing pressures beyond our expectations could intensify as customers including automotive OEMs pursue restructuring, consolidation and cost-cutting initiatives. ***If we are unable to generate sufficient production cost savings in the future to offset price reductions, our gross margin and profitability would be adversely affected.***

100.     The bolded and italicized statement above was materially misleading because it obfuscated and omitted the principal reason that had already caused Hesai's gross margin to substantially decline – Hesai was achieving gross margins for its ADAS products that were ***an order of magnitude lower*** than its autonomous mobility products that had historically supported its sky-high gross margins. Instead, these statements misleadingly attributed a *potential* decline in gross margin (which had already materialized at the time of the IPO) to a *hypothetical* inability to "generate sufficient production cost savings in the future to offset price reductions," as alluded to in the prior challenged statement (¶97). This further perpetuated the false impression from the previous statement that decreased margins might result only from lower prices. This generic and obvious statement, that ***if*** Hesai was unable to offset price reductions by cost reductions it would lower margins, did not materially change the misleading information conveyed in the previous statement. Thus, this statement, when read in conjunction with the immediately preceding statement that expressly referenced it (¶97), was also misleading.

32

101.    The Offering Documents stated that "Our gross margin decreased from 53.3% for the nine months ended September 30, 2021 to 44.0% for the nine months ended September 30, 2022 primarily due to the increased sales of LiDAR units that have lower margins." However, the Offering Documents also stated that "Our gross margin decreased from 57.5% in 2020 to 53.0% in 2021 primarily due to the increased sales of LiDAR units that have lower margins."

102.    The first statement was materially misleading because Hesai generically referred to their sales of "LiDAR units that have lower margins," not specifying that the ADAS units in particular had drastically lower margins that the Autonomous Mobility units. This was misleading because Hesai used identical language to explain the decrease in gross margin between 2020 and 2021, before Hesai had started commercial sales of ADAS units. The statement about the decrease in gross margin between 2020 and 2021 could only have referred to Hesai selling relatively lower-margin Autonomous Mobility LiDAR units. Thus, when reading the ***exact same language*** in the context of the decrease in gross margin between the first three quarters of 2021 and the same period in 2022, a reasonable investor would have mistakenly understood the same language to be again referring only to relatively lower-margin Autonomous Mobility units. They would ***not*** have understood that language to reveal that the gross margin for the ADAS units that Hesai only started selling in the third quarter of 2022 (not the first two quarters) were an order of magnitude lower than the gross margin for the Autonomous Mobility units. The statements certainly revealed nothing about 4Q22 sales or margins for ADAS units.

103.    In contrast, Hesai's annual reports for 2022 and 2023 used different language to specify that its gross margin had decreased between 2021 and 2022 because of sales of ADAS units specifically, each stating that: "Our gross margin decreased from 53.0% in 2021 to 39.2% in 2022,  primarily due to the increased shipments of ***lower-margin ADAS LiDAR products*** during

33

the early ramp-up stage with lower in-house plant capacity utilization rate." The Offering

Documents could have included that precise language, as all of the necessary facts were known to

Hesai at the time of the IPO, but instead they obfuscated the truth through vague and misleading

language.

104.    The Offering Documents also stated the following, under the title, "We generate

a substantial portion of our revenue from a limited number of customers and products, and the loss

of, or a significant reduction in, revenue from such customers or products could materially and

adversely affect our results of operations":

> Although we have and continue to pursue a broad customer base, we are dependent on a collection of large customers with strong purchasing power. In 2019, 2020, 2021 and the nine months ended September 30, 2021 and 2022, one customer, a leading global OEM headquartered in the United States, accounted for 23.6%, 10.4%, 17.5%, 10.7% and 10.1% of our revenue, respectively. ...
>
> ... ***The loss of business from any of our major customers (whether by lower overall demand for our products, cancellation of existing contracts or product orders or the failure to award us new business) could have a material adverse effect on our business and results of operations.*** ...

105.    The bolded and italicized statement above was materially misleading because it

omitted the distinct material risk, which existed at the time of the IPO, that Hesai could lose

business from its largest customer, GM Cruise, due to Hesai being named on the DoD's 1260H

List. Not only would the loss of GM Cruise's business deprive Hesai of the substantial revenues

from its largest customer—which represented over 20% of Hesai's revenues between 2019-

2023—the loss of GM Cruise's business would also have a material adverse impact on Hesai's

margins.

106.    GM Cruise was an autonomous driving "robotaxi" project. That means that at

the time of the IPO its LiDAR purchases from Hesai were primarily the much higher-margin

Autonomous Mobility units, as opposed to ADAS units (which Hesai did not begin selling at commercial volumes until July 2022).

107.    As the Offering Documents explained, Hesai's "top five customers in terms of revenues in 2020 for LiDAR solutions in the Autonomous Mobility industry include, among others, a leading global OEM headquartered in the United States.... Its top five customers in terms of revenues in 2021 [before Hesai began selling ADAS units] were a leading global OEM headquartered in the United States.... Its top five customers in terms of revenues in the nine months ended September 30, 2022 [the first six months of which predated Hesai's sales of ADAS units] were ... a leading global OEM headquartered in the United States...." The Offering Documents also stated that: "In the Autonomous Mobility market, our flagship Pandar series customers include a leading global OEM headquartered in the United States...."

108.    In contrast, Hesai stated that its "top ADAS customers, in terms of shipment volume as of September 30, 2022, include Li Auto, Lotus, a new electric vehicle manufacturer headquartered in Shanghai, Jidu and a leading consumer electronics manufacturer in China that has leaped into the electric vehicles industry," none of which describe GM Cruise.

109.    GM Cruise was therefore not just one of Hesai's largest customers by volume, but one of its most profitable customers thanks to its high gross margin profile. The risk of losing GM Cruise's business due to Hesai being named on the 1260H List therefore represented a significant undisclosed risk to Hesai's gross margins.

110.    The Offering Documents also stated the following, under the title, "The current tensions in international trade and rising political tensions, particularly between the United States and China, may adversely impact our business, financial condition, and results of operations":

> Although we are a primarily China-based company, we have operations in the U.S. and many of our major customers and

suppliers are located in the U.S. and other countries outside of China. In addition, certain of our technologies, such as technologies relating to autonomous driving applications, could be subject to restrictions by the U.S. government in the future. Therefore, government policies restricting international trade and investment, such as capital controls, economic or trade sanctions, export controls, tariffs or foreign investment filings and approvals, may affect the demand for our products and services, impact the competitive position of our products, or prevent us from being able to sell products in certain countries. ***If any new tariffs, legislation, or regulations are implemented (including those imposing economic or trade sanctions, export control restrictions or outbound investments restrictions), or if existing trade agreements are renegotiated, such changes could adversely affect our business, financial condition, and results of operations.*** Recently, there have been heightened tensions in international economic relations, such as that between the United States and China, but also as a result of the conflict in Ukraine and sanctions on Russia. More recently, the U.S. Department of Commerce published an interim final rule that introduces novel restrictions related to semiconductor, semiconductor manufacturing, supercomputer, and advanced computing items and end uses in China. These sanctions and export controls could adversely affect us and/or our supply chain, business partners, or customers.

The U.S. government has imposed, and has proposed to impose additional, new, or higher tariffs on certain products imported from China to penalize China for what it characterizes as unfair trade practices. China has responded by imposing, and proposing to impose additional, new, or higher tariffs on certain products imported from the United States. Following mutual retaliatory actions for months, on January 15, 2020, the United States and China entered into the Economic and Trade Agreement between the United States of America and the People's Republic of China as a phase one trade deal, effective on February 14, 2020. In addition, the U.S. government has issued new rules that expanded the definition of military end use and eliminated the applicability of certain license exceptions for exports to countries including China, thereby expanding the export license requirements for U.S. companies to sell certain items to companies in China that have operations that could support military end uses. The U.S. government has also broadened the restrictions on the sale of goods manufactured outside the United States that are produced using certain controlled U.S.-origin technology or software to companies on a special list, or the Entity List, and the restrictions on the use of U.S.-origin semiconductor manufacturing equipment that produces semiconductor devices for companies on the Entity List.

36

In addition, political tensions between the United States and China have escalated due to, among other things, trade disputes, the COVID-19 outbreak, tensions over Taiwan sanctions imposed by the U.S. Department of Treasury on certain officials of the Hong Kong Special Administrative Region and the PRC central government, the executive orders issued by former U.S. President Donald J. Trump in August 2020 that prohibit certain transactions with certain Chinese companies, and various restrictions related to the Chinese semiconductor industry imposed by the U.S. government. Against this backdrop, China has implemented, and may further implement, measures in response to the changing trade policies, treaties, tariffs and sanctions and restrictions against Chinese companies initiated by the U.S. government.

On September 19, 2020, the Ministry of Commerce of the People's Republic of China ("MOFCOM") promulgated the Regulations on the List of Unreliable Entities, or MOFCOM Order No. 4 of 2020. A working mechanism composed of relevant government agencies will be established to administer the regime of the List of Unreliable Entities. A foreign entity that is designated onto the List of Unreliable Entities may be subject to several measures, including but not limited to: (i) being restricted or prohibited from engaging in import or export activities related to China; and (ii) being restricted or prohibited from investing in China. When an enterprise, organization, or individual of China must conduct business with a designated foreign entity in special circumstances, the enterprise, organization, or individual shall submit an application to the working mechanism for approval, and only when approval is granted may such enterprise, organization, or individual conduct the corresponding transaction.

On January 9, 2021, the MOFCOM promulgated the Rules on Counteracting Unjustified Extra-Territorial Application of Foreign Legislation and Other Measures, or MOFCOM Order No. 1 of 2021. Pursuant to MOFCOM Order No. 1 of 2021, where a citizen, legal person or other organization of China is prohibited or restricted by foreign legislation and other measures from engaging in normal economic, trade and related activities with a third nation (or region) or its citizens, legal persons or other organizations, they shall truthfully report such matters to the competent department of commerce of the State Council within 30 days. The working mechanism, with the participation of relevant departments of central government authorities, will take the following factors into account when assessing whether there exists unjustified extra-territorial application of foreign legislation and other measures: (i) whether international law or the basic principles of international relations are violated; (ii) potential impact on China's national sovereignty,

security and development interests; (iii) potential impact on the legitimate rights and interests of the citizens, legal persons or other organizations of China; and (iv) other factors that shall be taken into account. If it is determined that there exists unjustified extra-territorial application of foreign legislation and other measures, MOFCOM may issue an injunction that the relevant foreign legislation and other measures shall not be accepted, executed, or observed. A citizen, legal person or other organization in China may apply for exemption from compliance with an injunction.

On June 10, 2021, the Standing Committee of National People's Congress, or the SCNPC passed the Countering Foreign Sanctions Law, which became effective immediately. The Countering Foreign Sanctions Law provides a legal basis not only for the Chinese government to take action in response to foreign sanctions, but also for Chinese citizens and organizations to bring civil actions for injunctive relief or damages. Under the Countering Foreign Sanctions Law, the competent department of the State Council may place any individuals and organizations that are directly or indirectly involved in making, determining, or implementing the discriminatory restrictive measures as provided therein on the Countermeasure List. A foreign individual or organization on the Countermeasure List may be subject to one or several countermeasures, including but not limited to prohibitions or restrictions on commercial transactions, cooperation or such other activities with organizations and individuals within the territory of China. Furthermore, pursuant to the Countering Foreign Sanctions Law, any organization and individual within the territory of China shall comply with the countermeasures. Any organization or individual who fails to comply or cooperate in implementing the countermeasures may be held liable in accordance with law.

Since the MOFCOM Order No. 4 of 2020, the MOFCOM Order No. 1 of 2021 and the Countering Foreign Sanctions Law are newly enacted, there is a high degree of uncertainty with respect to how they will be interpreted and implemented.

Rising political tensions could reduce levels of trade, investment, technological exchange, and other economic activities between the two major economies, which would have a material adverse effect on global economic conditions and the stability of global financial markets. Any of these factors could have a material adverse effect on our and our customers' business, prospects, financial condition, and results of operations.

As our business depends on markets and supplies located overseas, tariffs and export control measures taken by the PRC, U.S. or any

other government or other trade tensions or unfavorable trade policies may affect the costs and/or marketability of our products. Currently, exports of our LiDAR products to the U.S. are subject to 25% tariffs imposed pursuant to Section 301 of Trade Act of 1974. The current international trade tensions and political tensions between the United States and China, and any escalation of such tensions, may have a material negative impact on our ability to secure the supply of raw materials and key components necessary for our operations and our ability to continue to sell to global customers and further grow our customer base. For example, while we are not currently affected by the Entity List or other U.S. export control laws or regulations in any material respect, as the Entity List and other U.S. export control laws and regulations continue to expand and evolve, future U.S. export controls may materially affect or target some of our significant suppliers or customers, in which event our business may be affected if we fail to promptly secure alternative sources of supply or demand on terms acceptable to us. While certain of our items manufactured in China contain a small number of components subject to the U.S. Export Administration Regulations (EAR), our items manufactured in China are not themselves subject to the EAR. Our business, financial condition, and results of operations may be significantly affected by the continued international trade and political tensions.

111. The bolded and italicized statement above was materially misleading because it appeared to provide investors with a comprehensive list of ways in which U.S.-Chinese tensions and a wide array of regulations might impact Hesai's business, while omitting that Hesai already qualified for inclusion on the 1260H List, based on then-existing laws, regulations, and facts known to Hesai. Specifically, the criteria for inclusion on the 1260H List in force at the time of the IPO included "entities residing in or affiliated with a military-civil fusion enterprise zone," and Hesai had built or planned to build multiple facilities in military-civil fusion enterprise zones in China. Hesai's LiDAR products also had substantial military applications. Thus, Hesai was a military-civil fusion contributor to the Chinese defense industrial base," and Hesai's failure to disclose the material risk that it would be named on the 1260H List on that basis (or others) was materially misleading, particularly in light of its extensive disclosures of other current and potential regulatory risks stemming from U.S.-Chinese tensions, laws, and regulations.

39

**Defendants Had an Affirmative Duty to Disclose Material Trends, Risks, and Uncertainties Under SEC Regulations**

112. SEC Regulation S-K (17 C.F.R. § 229.10) governs the duty of affirmative disclosure imposed upon filers of various reports under the Securities Act and the Securities Exchange Act of 1934. In connection with the IPO, these regulations imposed on Defendants the duty to disclose in the Offering Documents certain material trends, risks, and uncertainties.

113. Regulation S-K provides that registration statements such as the one filed by Hesai on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act."

114. Part I, Item 4(a) of Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

### *Item 5 Required Defendants to Disclose Known Material Trends*

115. Part I, Item 5(D) of Form 20-F ("Item 5"), requires registrants to:

> discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

116. Item 5 also requires the registrant to provide "such other information that is necessary for an investor's understanding of the company's financial condition, changes in financial condition and results of operations."

117. The SEC interprets Item 5 as "calling for the same disclosure as Item 303 of Regulation S-K". *Interpretation: Commission Guidance Regarding Management's Discussion*

40

*and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-38960; FR-72, *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.[14]

118.    Item 303 of Regulation S-K (17 C.F.R. § 229.303) ("Item 303") and the SEC's related interpretive releases thereto mandate that the registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

119.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) ("1989 Interpretive Release"), 1989 WL 1092885.[15]

---

[14] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …." FRM § 9410.1.

[15] The 1989 Interpretive Guidance also applies to Item 5. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance).

120.    Item 5 requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

121.    Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303 or Item 5 is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release, 1989 WL 1092885, at *6.

122.    As with Item 5, the SEC's Instructions to Item 303 require that the Management's Discussion and Analysis of Financial Condition and Results of Operations "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

123.    In violation of the SEC's disclosure requirements under Item 5, the Offering Documents failed to disclose that Hesai's gross margin had already drastically decreased in the then-completed fourth quarter of 2022, and was likely to continue to decrease compared to historical levels, due to the fact that Hesai's increasing sales volume of ADAS units generated gross margins that were ***an order of magnitude lower*** than Hesai's historical margins from sales

of Autonomous Mobility units. These undisclosed material facts had already had an adverse impact on the Company's gross margin and overall financial results for the fourth quarter and full year of 2022, as well as the first several weeks of the first quarter of 2023. That adverse impact was likely to continue beyond the IPO through the entirety of 2023, as Hesai continued to ramp up its production and sale of ADAS units. Hesai knew of the drastically lower margins for its ADAS units, as well as its resulting total gross margin for 4Q22, at the time of the IPO.

124.    Hesai's disclosure that it "expected" gross margin to decrease in (only) the fourth quarter of 2022 (which was already complete) because of the shift in product mix toward lower-*price* ADAS units was insufficient to apprise investors of this material trend. As discussed above, noting lower *prices* for ADAS units compared to Autonomous Mobility units did not sufficiently disclose the dramatically lower *margins* for ADAS units. Likewise, Hesai's disclosure that its overall gross margin for 2019-2021 and the first nine months of 2022 (most of which transpired before Hesai began volume shipment of ADAS units) had decreased slightly was not sufficient to accurately convey to investors the material existing trend of ADAS unit margins that were *over ten times lower* than the Autonomous Mobility units that Hesai's historical margins were based on. Notably, Hesai also declined to disclose the ADAS margins from the completed third quarter of 2022, for which its financial results were otherwise finalized and reported, instead reporting only a combined gross margin despite having begun volume shipment of ADAS units in July 2022.

125.    These omissions violated Item 5 because these undisclosed facts were known to Defendants, as was the high likelihood (which had already partially materialized) that they would have a material impact on the Company's gross profit margin and overall financial results, including for the already-completed fourth quarter of 2022, the then-underway first quarter of 2023, and the rest of 2023.

126. Indeed this trend did continue beyond the IPO. Hesai's gross margin continued falling, from 39.2% in 2022 down to 35.2% in 2023, as Hesai continued to ramp up production of its significantly lower-margin ADAS products.

### *Item 3 Required Defendants to Disclose Known Material Risks*

127. Item 3(D) of SEC Form 20-F ("Item 3") requires that the registrant, in the "Risk Factors" section of the registration statement, "prominently disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk." The SEC's Instructions to Item 3 clarify that these risk factor disclosures should "explain clearly how the risk affects the issuer or the securities."

128. These requirements are essentially the same as Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105").[16] Item 105 requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id.*

129. As alleged above, Hesai qualified as a Chinese Military Company for the purposes of the DoD's 1260H List, based on the facts and laws known at the time of the IPO. Thus, there was a known material risk existing at the time of the IPO that Hesai could be validly included on

---

[16] Item 105's requirements were previously set forth in 17 CFR §229.503 ("Item 503"). On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K. Item 105 was amended in October 2020, to expand the scope of required disclosure from "the most significant factors" to "material factors." The purpose of the revision was to "focus registrants on disclosing the risks to which reasonable investors would attach importance in making investment or voting decisions." *See* 85 F.R. 63761, 63744-45 (Oct. 8, 2020).

the DoD's 1260H List and suffer material adverse consequences as a result of its inclusion on that list.

130.    Hesai's undisclosed eligibility for inclusion on the DoD's 1260H List also meant there was a material undisclosed risk at the time of the IPO that Hesai could lose some or all of its business with GM Cruise, which was Hesai's largest customer and which historically purchased the higher-margin Autonomous Mobility LiDAR units. Thus, Hesai knew of a further material risk at the time of the IPO: that its gross margin would decrease significantly if it lost GM Cruise's business, which could be imperiled by Hesai's inclusion on the 1260H List. This was a material fact that made an investment in Hesai's ADSs speculative and risky.

131.    Thus, under Item 3 Defendants had a duty to disclose both that (1) Hesai qualified as a Chinese Military Company and could be included on the DoD's 1260H List; and (2) the associated known material risks that it could lose its largest customer as a result of being included on such list, which would have a significant impact on both its revenues and gross margin.

132.    As detailed above, the purported risk factors stated in the Offering Documents were inadequate to describe these risks, failed to explain clearly how the risks affected the Company, and were themselves misleading due to the omissions of material fact.

133.    Thus, pursuant to Item 5 and Item 3, Defendants had an affirmative duty to disclose in the Offering Documents the known material trend in the drastically lower margins for Hesai's ADAS units, the likelihood of being validly included on the DoD's 1260H List, and the attendant material risks to the Company's financial operations and results that could result from inclusion on the 1260H List.

**EVENTS FOLLOWING THE IPO**

134.    Since the IPO, as a result of the material adverse facts omitted from the Offering Documents, the Company's ADS price has fallen substantially below its IPO price, damaging Plaintiff and Class members. On April 6, 2023, the last trading day before this case was filed, the Company's ADS price closed at $12.17, a 35.9% decline from the IPO price.

### *Hesai's Gross Margin Cratered Before and After the IPO*

135.    On March 16, 2023, just five weeks after Hesai's IPO, the Company reported its quarterly financial results for 4Q22 and its full-year financial results for 2022 on a Form 6-K filed with the SEC. Although the fourth quarter was completed at the time of the February 2023 IPO, Hesai had not disclosed its results for the period in the Offering Documents or prior to the IPO. In the Form 6-K, the Company reported that its gross margin had fallen to 30.0% for 4Q22, *a decrease of 43%* year-over-year from the 52.4% gross margin in the fourth quarter of 2021. Hesai's gross margin for the full year of 2022 was 39.2%, *a decrease of 26%* from the 53.0% gross margin in 2021. Hesai attributed this massive decline in gross margin to "the increased shipments of lower-margin ADAS LiDAR products during the early ramp-up stage with lower in-house plant capacity utilization rate."

136.    On this news, the price of Hesai's ADSs fell $1.55, or approximately 10.2%, to close at $13.69 on March 16, 2023.

137.    In the earnings conference call conducted on the same day ("4Q22 Earnings Call"), Hesai's CFO, Defendant Hsieh, revealed to investors for the first time that Hesai's gross margin for its Autonomous Mobility products was "over 50%" in 2022, with an average selling price ("ASP") of over $13,000. In contrast, Hesai's gross margin for its ADAS products was "*less than 5%*" in 2022, with an ASP of approximately $742 (based on total 2022 revenue from

ADAS sales of $46 million, for 62,000 ADAS units, per Hsieh's comments). Hsieh revealed that Hesai expected the ASP for ADAS units "to be around USD500...by year-end" and that "we expect the gross margin to be in the high single-digits to low double-digits, so probably 9% to 13% as we exit this year."

138. Hsieh reported that in 2022, Hesai's AT128 sales totaled approximately $46 million, comprising "about 25%" of Hesai's revenues. As Hsieh explained, ADAS sales were "expected to account for 40% to 45% of revenue in 2023 with an expected more than 3x increase from the 62,000 units in 2022."

139. According to Hsieh, the Company's gross margin would remain low, and potentially decrease even further, for at least the first and second quarters of 2023. As Hsieh explained, even if the Company were to successfully "ramp up" its ADAS production"[b]y Q3-Q4" as planned, "[i]t will take some time for us to gain economies of scale in manufacturing, efficiency, and utilization, material procurement and labor intensity to reach our long-term target of 25% to 30% gross margins in ADAS." According to Hsieh, "[t]he combined effects of product mix with ADAS increasing in revenue mix from approximately 25% to 45% of revenue and the opening of two large production facilities which will take time to reach optimal scale efficiency and utilization will put downward pressure on blended gross margin percentage in 2023."

140. Hsieh noted that while Hesai was working on a "new AT redesign that will be much lower cost and that will improve the gross margin profile," it would be implemented and produced only in the planned manufacturing plant in Hangzhou (not the current facilities in Jiading or the Maxwell Facility), which was not going to operational until at least late 2023.

141.    During the 4Q22 Earnings Call, several securities analysts asked for more details about Hesai's gross margin results for 2022 and expectations for 2023. Analysts again raised those questions during the earnings call for the first quarter of 2023, when Hesai revealed that its gross margin for the quarter was 37.8%, down from 50.9% in the first quarter of 2022. Hesai also revealed that it "anticipate[s] a lower gross margin for Q2 and Q3" and provided guidance for gross margin of 25-30% for the full year of 2023, below its long-term target of 30-35% and significantly below its historical margins of over 50% as disclosed in the Offering Documents.

### *The DoD Names Hesai on the 1260H List*

142.    On January 31, 2024, the DoD published its 1260H List, which included Hesai. Hesai issued a response that same night, disputing that Hesai had any connection to the Chinese military despite its inclusion on the 1260H List.

143.    On this news, the price of Hesai's ADSs plummeted $1.81, or approximately 31.0%, to close at $4.02 on February 1, 2024.

144.    On August 19, 2024, Hesai held an earnings call for the second quarter of 2024 ("2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Li revealed some of the impact Hesai had experienced from being named on the DoD's 1260H List:

> ...being on the list did seriously impact our reputation. And as you can see, the stock price, it also impeded some of the business opportunities over the past few months since we've been included. And again, to be honest, it actually made things very tricky for some of the customers because they're worried that we might have ties to the Chinese military, as that's what the list meant.

145.    On this news, the price of Hesai's ADSs fell $0.36, or approximately 7.9%, to close at $4.17 on August 20, 2024.

### *Blue Orca Reveals Hesai's Connection to the Chinese Military and Risks Regarding Hesai's Business with GM Cruise*

146.    On March 18, 2025, Blue Orca issued its report on Hesai, revealing evidence appearing to directly undermine Hesai's disclaimer of any connection to the Chinese military, and revealing the consequences of Hesai's inclusion on the DoD's 1260H List, including the previously undisclosed risk to Hesai's high-margin business with GM Cruise.

147.    The Blue Orca Report stated the following about Hesai's links to the Chinese military:

> We found multiple videos and pictures from Chinese authorities showcasing new military vehicles clearly equipped with Hesai's LiDAR. **We even found smoking gun videos produced by the Chinese government owned CCTV showing Hesai's LiDAR on Chinese military combat vehicles**. ...
>
> [Emphasis in original.]

148.    The Blue Orca Report included the following image of Hesai LiDAR on a Chinese military vehicle, which was featured in Chinese national television[17]:



Source: YouTube, Uploaded in February 2025

---

[17] Video link: https://www.youtube.com/watch?v=8q77sg-xV-Q&t=157s

49

149.    The Blue orca Report also included this image, taken in November 2024 at the 15th China International Aviation & Aerospace Exhibition, where Norinco Group, a Chinese state-owned enterprise that manufactures commercial and military products, showcased its combat vehicles.[18] The image, under the title "VU-T5 lightweight tracked ground unmanned combat platform" is of an autonomous battlefield vehicle which has been equipped with Hesai's LiDAR:



Source: Norinco Group, WeChat

150.    The Blue Orca Report also included these additional images.[19] The Blue Orca Report noted that while some of the LiDAR products displayed on military vehicles did not have Hesai's logo, Blue Orca believed "they are also Hesai's LiDAR based on their shape and design":

---

[18] *Available at*: http://www.norincogroup.com.cn/art/2024/11/12/art_9035_501817.html

[19]    Respectively    available    at    the    links    provided    in    the    Blue    Orca    Report: https://www.youtube.com/watch?v=eW1rweMqy_c&t=245s; https://depositphotos.com/editorial/unmanned-vehicle-performs-ground-mobility-demonstration-12th-china-international-aviation-233317082.html; https://www.globaltimes.cn/page/202107/1227901.shtml; https://defesabrasil.com/forum/viewtopic.php?t=20171&start=855; https://m.thepaper.cn/wifiKey_detail.jsp?contid=14688890&from=wifiKey#



Source: YouTube, July 2024



Source: Pictures Taken at the 12th China International Aviation & Aerospace Exhibition, Hesai Website



Source: https://www.globaltimes.cn/page/202107/1227901.shtml, Hesai Website



Source: *Defesa Brasil*, *Hesai Website*



Source: *Defesa Brasil*, *Hesai Website*



Source: *Chinese News Articles*, *Hesai Website*

151.    The Blue Orca Report also explained that it had corroborated the apparent use of Hesai's LiDAR products by the Chinese military with a former Hesai employee:

> We corroborated this evidence with a former Hesai employee. He told us point blank that based on his visit to the manufacturing facilities and time he spent with Hesai's founders, he believes that Hesai stole their IP from American companies in Silicon Valley and now supplies products to the Chinese military. He was so uncomfortable with what he learned about Hesai that he resigned.

152.    The Blue Orca Report also quoted the former Hesai employee as saying "I have personally visited both of [Hesai's] manufacturing facilities in Shanghai and have very strong reason to believe that the company supplies sensors to the Chinese military," and that "the Chinese government helped them establish a foothold and build-out manufacturing operations."

153.    The Blue Orca Report stated the following about the significant business consequences for Hesai from being designated a Chinese military company:

> ... Hesai already conceded in court papers that its inclusion on the 1260H list of Chinese military companies has jeopardized ongoing contract negotiations, disrupted existing and potential customers relationships, and forced it to pause advanced plans to establish a manufacturing facility in the U.S. ...
>
> ***In particular, we think losing the case will impede Hesai from selling its highest margin products to historically its biggest revenue generating customers: American autonomous driving companies. Hesai's American customers, such as GM (Cruise)***

53

*and Amazon (Zoox) also have military contracts, which we believe would be at risk if they continue to buy from a business like Hesai that is soon to lose its case to overturn its designation as a Chinese military company*. Furthermore, even outside the context of any military applications, in this geopolitical climate we doubt that Hesai's major U.S. customers, such as GM and Amazon, will be eager to partner with a DoD designated Chinese military company. As such, we believe that Hesai will soon lose a customer cohort which historically accounted for 40% of its revenues and an estimated 57%% of its gross profit.

[Emphasis added.]

154.    On this news, the price of Hesai's ADSs fell $1.74, or approximately 7.8%, to close at $20.56 on March 18, 2025.

### *Hesai Sues the DoD for Removal From the 1260H List; Loses on Summary Judgment*

155.    On May 13, 2024, in response to the DoD's inclusion of Hesai on the 1260H List, Hesai filed suit against the DoD to be removed from the list. *Hesai Tech. Co., Ltd. v. U.S. Dep't of Defense, et al.*, No. 1:24-cv-1381-PLF (D.D.C.). The parties filed competing motions for summary judgment.

156.    In October 2024, the DoD removed Hesai from the 1260H List and then immediately relisted Hesai the same day, providing Hesai with additional factual grounds for the continued listing: (1) Hesai "knowingly receiv[es] assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus," 2021 NDAA § 1260H(d)(2)(A); (2) Hesai is "affiliated with the Chinese [MIIT]," 2021 NDAA § 1260H(d)(2)(B); (3) Hesai "resid[es] in or [is] affiliated with a military-civil fusion enterprise zone or receiv[es] assistance from the Government of China through such enterprise zone," 2021 NDAA § 1260H(d)(2)(E); and (4) Hesai "advertise[s] on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China." 2021 NDAA § 1260H(d)(2)(G). Accordingly, the DoD found that,

pursuant to 2021 NDAA § 1260H(d)(1)(B)(i)(II), Hesai is a "military-civil fusion contributor" and that Hesai contributes "to the Chinese defense industrial base." Hesai was included on the DoD's 1260H List published in January 2025 as well.

157.    On July 11, 2025, U.S. District Judge Paul L. Friedman issued an order and opinion denying Hesai's motion for summary judgment and granting the DoD's cross-motion for summary judgment. Judge Friedman found that the DoD's inclusion of Hesai on the 1260H List was authorized under 2021 NDAA §§ 1260H(d)(1)(B)(i)(II) and 1260H(d)(2)(E) (if not also on other factual grounds, which Judge Friedman found unnecessary to address), due to Hesai's facilities (existing and planned) in the Jiading Industrial Zone and Chongqing Economic Development Zone and the substantial military applications of Hesai's LiDAR products and research. Judge Friedman found that the DoD's determination that Hesai was a Chinese military company as defined in Section 1260H was supported by substantial evidence.

## CLASS ACTION ALLEGATIONS

158.    Plaintiff brings this action as a class action on behalf of a Class comprising all persons and entities who purchased Hesai ADSs pursuant and/or traceable to the Offering Documents issued in connection with Hesai's February 8, 2023 IPO. Excluded from the Class are (i) Defendants; (ii) all present and former officers, directors, or control persons of Hesai; (iii) any excluded person's immediate family members, legal representatives, heirs, successors, predecessors, or assigns; (iv) the present and former parents, subsidiaries, assigns, successors, predecessors, and affiliates of any Defendant; and (v) any entity in which any of the persons excluded under subsections (i)-(iv) has or had a material ownership interest.

159.    The members of the Class are so numerous that joinder of all members is impracticable. There were over 10 million Hesai ADSs sold in the IPO. Since the IPO, Hesai's

ADSs traded on the NASDAQ exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Hesai or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

160.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act that is complained of herein.

161.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

162.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether Defendants violated the federal securities laws;

b)    whether the Offering Documents contained false or misleading statements of material fact about the business and operations of Hesai and/or omitted material information required to be stated therein;

c)    whether the Offering Documents were negligently prepared; and

d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

163. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

164. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

165. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**Violations of Section 11 of the Securities Act**
**(Against All Defendants)**

166. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

167. This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and the Class, against all Defendants.

168. This cause of action does not sound in fraud. Plaintiff does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. This cause of action is based solely on strict liability as to Hesai and negligence as to the remaining Defendants.

169. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

170.    Hesai was the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Offering Documents, and/or were directors or underwriters who are appropriate defendants as to this Count.

171.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, not misleading, and without omissions of any material facts that would render the statements misleading. Had they exercised reasonable care, they would have known of the material misrepresentations and omissions alleged herein.

172.    Each of the Individual Defendants signed the Offering Documents and/or was a director of Hesai at the time of the IPO. Each of the Individual Defendants caused the issuance of the Offering Documents. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Offering Documents contained misstatements of material facts and omissions of material facts. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Plaintiff and the Class.

173.    Cogency was Hesai's Authorized U.S. Representative for the IPO. Cogency employed and directed DeVries, who signed the Offering Documents individually and on behalf of Cogency. Therefore, Cogency is responsible for DeVries's violations of the Securities Act under principles of agency and *respondeat superior*. As such, Cogency is liable under Section 11 of the Securities Act to Plaintiff and the Class.

174.   The Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. The Underwriter Defendants, as underwriters of the ADSs offered in the IPO pursuant to the Offering Documents, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. The Underwriter Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of Underwriter Defendants' failure to exercise reasonable care, the Offering Documents contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, the Underwriter Defendants are liable under Section 11 of the Securities Act to Plaintiff and the Class.

175.   None of the untrue or misleading statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

176.   Each of the Defendants issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Documents, which misstated and failed to disclose, *inter alia*, the facts set forth above.

177.   By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

178.    Plaintiff purchased Hesai ADSs pursuant and/or traceable to the Offering Documents for the IPO.

179.    Plaintiff and the Class have sustained damages. The value of Hesai ADSs has declined substantially subsequent to, and because of, Defendants' violations of the Securities Act as alleged herein.

180.    At the time of their purchases of Hesai ADSs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

181.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering Documents that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT II
### Violations of Section 12(a)(2) of the Securities Act
### (Against All Defendants)

182.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

183.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of Plaintiff and the Class, against all Defendants.

184.    This cause of action does not sound in fraud. Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Hesai and negligence as to the remaining Defendants.

185.    Each of the Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's ADSs pursuant to the defective Prospectus. The actions of solicitation by the Defendants included participating in the preparation of the false and misleading Prospectus, roadshows, and marketing of Hesai ADSs to investors, such as Plaintiff and other members of the Class. In the absence of the Defendants' efforts to publicize the IPO and solicit ADS purchasers, the IPO could not have occurred. Moreover, Cogency, which employed and directed DeVries, is responsible for DeVries's violations of the Securities Act under principles of agency and *respondeat superior*.

186.    The Prospectus contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

187.    Each of Defendants owed to the purchasers of Hesai ADSs, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements made therein not misleading and no omission of material fact required by the rules and regulations governing the Prospectus's preparation. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above. By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained material misstatements of fact, omitted material facts necessary to make the statements therein not misleading, and omitted material facts required to be stated therein. As such, each of these Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiff and the Class.

188.    Plaintiff and other members of the Class did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff or other members of the Class purchased Hesai ADSs.

189.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Hesai ADSs pursuant to the Prospectus sustained substantial damages. Accordingly, Plaintiff and the other members of the Class who hold the ADSs issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their ADSs with interest thereon or damages as allowed by law or in equity. Class members who have sold their Hesai ADSs seek damages to the extent permitted by law.

190.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering Documents that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

### COUNT III
**Violations of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

191.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

192.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants.

193.    The Individual Defendants were controlling persons of Hesai by virtue of their positions as directors or senior officers of Hesai. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major

shareholders of Hesai. The Individual Defendants each had and exercised the power and influence to cause Hesai to engage in the acts described herein. The Individual Defendants were in positions to control, and did control, the issuance of the false and misleading statements and omissions contained in the Offering Documents.

194. None of the Individual Defendants (nor the Company) made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and not misleading in all material respects. Had they exercised reasonable care, they would have known of the material misrepresentations and omissions alleged herein.

195. The Individual Defendants were each culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged above, based on their participation in the review and/or drafting of the Company's Offering Documents, having signed or authorized the signing of the Offering Documents, selling Hesai ADSs in the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

196. By reason of such wrongful conduct, the Individual Defendants violated Section 15 of the Securities Act.

197. Plaintiff and the Class have sustained damages. The value of Hesai ADSs has declined substantially subsequent and due to the Securities Act violations alleged herein.

198. This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment and relief against Defendants as follows:

A.  Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B.  Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other costs; and

D.  Awarding Plaintiff and the Class such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury for all claims.

Dated: November 13, 2025                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*
Phillip Kim
Jing Chen
Joshua Baker
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         jchen@rosenlegal.com

64

jbaker@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*