# Exhibit E

PUBLIC LAW 118–31—DEC. 22, 2023

# NATIONAL DEFENSE AUTHORIZATION ACT
# FOR FISCAL YEAR 2024

137 STAT. 136                PUBLIC LAW 118–31—DEC. 22, 2023

Public Law 118–31
118th Congress

## An Act

Dec. 22, 2023
[H.R. 2670]

To authorize appropriations for fiscal year 2024 for military activities of the Department of Defense and for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

National Defense
Authorization
Act for Fiscal
Year 2024.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2024".

**SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.**

(a) DIVISIONS.—This Act is organized into seven divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.
(4) Division D—Funding Tables.
(5) Division E—Other Matters.
(6) Division F—Department of State Authorization Act of 2023.
(7) Division G—Intelligence Authorization Act for Fiscal Year 2024.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees.
Sec. 4. Budgetary effects of this Act.

DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization of Appropriations

Sec. 101. Authorization of appropriations.

Subtitle B—Army Programs

Sec. 111. Limitation on availability of funds pending assessment of Army Trackless Moving Target systems.
Sec. 112. Strategy for Army tactical wheeled vehicle program.
Sec. 113. Report on acquisition strategies for the logistics augmentation program of the Army.

Subtitle C—Navy Programs

Sec. 121. Modification of requirements for minimum number of carrier air wings of the Navy.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 137

Sec. 122. Extension of prohibition on availability of funds for Navy port waterborne security barriers.
Sec. 123. Multiyear procurement authority for Virginia class submarine program.
Sec. 124. Procurement authority for Auxiliary Personnel Lighter program.
Sec. 125. Limitation on reductions to V–22 aircraft nacelle improvement program.
Sec. 126.  Limitation on consideration of Government-operated dry docks in certain contract solicitations.
Sec. 127. Annual reports on use of Government docks for ship repair and maintenance.

Subtitle D—Air Force Programs

Sec. 131. Limitation on retirement of F–15 aircraft and modification of related reporting requirement.
Sec. 132. Limitations and minimum inventory requirement relating to RQ–4 aircraft.
Sec. 133. Temporary exception to minimum inventory requirement for fighter aircraft of the Air Force.
Sec. 134. Modification of minimum inventory requirements for C–130 aircraft.
Sec. 135. Modification of annual reports on T–7A Advanced Pilot Training System.
Sec. 136. Modification to prohibition on certain reductions to B–1 bomber aircraft squadrons.
Sec. 137. Modification of minimum inventory requirements for A–10 aircraft.
Sec. 138. Procurement authority for over-the-horizon radar systems.
Sec. 139. Prohibition on availability of funds for retirement of KC–135 aircraft.
Sec. 140. Prohibition on reduction of KC–135 aircraft in PMAI of the reserve components.
Sec. 141. Limitation on issuance of acquisition strategy for the KC–135 recapitalization program.
Sec. 142. Prohibition on certain reductions to inventory of E–3 airborne warning and control system aircraft.
Sec. 143. Prohibition on availability of funds for termination of production lines for the HH–60W aircraft.
Sec. 144. Limitation on retirement of F–16C/D aircraft.
Sec. 145. Limitation on procurement of KC–46A aircraft.
Sec. 146. Limitation on actions relating to remote vision systems of KC–46A aircraft.
Sec. 147.  Limitation on retirement of T–1A training aircraft.
Sec. 148. Plan for long-term Air Force fighter force structure.

Subtitle E—Defense-wide, Joint, and Multiservice Matters

Sec. 151. Annual report on force structure changes exhibit for the defense budget.
Sec. 152. Multiyear procurement authority for domestically processed critical minerals.
Sec. 153. Prohibition on solicitation of proprietary armor for certain tactical vehicles.
Sec. 154. Prohibition on availability of funds for procurement of certain batteries.

TITLE II—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

Subtitle A—Authorization of Appropriations

Sec. 201. Authorization of appropriations.

Subtitle B—Program Requirements, Restrictions, and Limitations

Sec. 211. Annual report on unfunded priorities of the Under Secretary of Defense for Research and Engineering.
Sec. 212. Delegation of responsibility for certain research programs.
Sec. 213. Modification to personnel management authority to attract experts in science and engineering.
Sec. 214. Clarifying role of partnership intermediaries to promote defense research and education.
Sec. 215. Naval Air Warfare Rapid Capabilities Office.
Sec. 216. Modification of support for research and development of bioindustrial manufacturing processes.
Sec. 217. Modification to administration of the Advanced Sensors Application Program.
Sec. 218. Matters pertaining to hypersonic capabilities and testing strategies.
Sec. 219. Improvements to defense quantum information science and technology research and development program.
Sec. 220. Application of public-private talent exchange programs in the Department of Defense to quantum information sciences and technology research.
Sec. 221. Support for protection of sensitive research performed on behalf of the Department of Defense.

137 STAT. 138          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 222. Support to the Defence Innovation Accelerator for the North Atlantic.
Sec. 223. Consortium on use of additive manufacturing for defense capability development.
Sec. 224. Next Generation Air Dominance family of systems development program accountability matrices.
Sec. 225. Continuous capability development and delivery program for F–35 aircraft.
Sec. 226. F–35 propulsion and thermal management modernization program.
Sec. 227. Establishment or expansion of University Affiliated Research Centers for critical materials.
Sec. 228. Policies for management and certification of Link 16 military tactical data link network.
Sec. 229. Rapid response to emergent technology advancements or threats.
Sec. 230. Pilot program to commercialize prototypes of the Department of the Air Force.
Sec. 231. Pilot program on near-term quantum computing applications.
Sec. 232. Pilot program to facilitate access to advanced technology developed by small businesses for ground vehicle systems of the Army.
Sec. 233. Limitation on availability of funds pending documentation on Future Attack Reconnaissance Aircraft program.

Subtitle C—Energetics and Other Munitions Matters

Sec. 241. Joint Energetics Transition Office.
Sec. 242. Consideration of lethality in the analysis of alternatives for munitions.
Sec. 243. Pilot program on incorporation of the CL20 compound in certain weapon systems.
Sec. 244. Limitation on sourcing chemical materials for munitions from certain countries.
Sec. 245. Defense industrial base munition surge capacity critical reserve.

Subtitle D—Plans, Reports, and Other Matters

Sec. 251. Congressional notification of changes to Department of Defense policy on autonomy in weapon systems.
Sec. 252. Audit to identify diversion of Department of Defense funding to China's research labs.
Sec. 253. Annual review of status of implementation plan for digital engineering career tracks.

TITLE III—OPERATION AND MAINTENANCE

Subtitle A—Authorization of Appropriations

Sec. 301. Authorization of appropriations.

Subtitle B—Energy and Environment

Sec. 311. Improvement and codification of Sentinel Landscapes Partnership program authority.
Sec. 312. Modification of authority for environmental restoration projects at National Guard facilities.
Sec. 313. Modification to technical assistance authority for environmental restoration activities.
Sec. 314. Coordination on agreements to limit encroachments and other constraints on military training, testing, and operations.
Sec. 315. Requirement for approval by Under Secretary of Defense for Acquisition and Sustainment of waiver for systems not meeting fuel efficiency key performance parameter.
Sec. 316. Modification to prototype and demonstration projects for energy resilience at certain military installations.
Sec. 317. Authority to transfer certain funds as payment relating to Naval Air Station, Moffett Field, California.
Sec. 318. Prohibition on required disclosure by Department of Defense contractors of information relating to greenhouse gas emissions.
Sec. 319. Required infrastructure plan prior to deployment of certain non-tactical vehicles at military installations.
Sec. 320. Prohibition and report requirement relating to certain energy programs of Department of Defense.
Sec. 321. Report on schedule and cost estimates for completion of testing and remediation of contaminated sites; publication of cleanup information.

Subtitle C—Treatment of Perfluoroalkyl Substances and Polyfluoroalkyl Substances

Sec. 331. Modification of timing of report on activities of PFAS Task Force.
Sec. 332. Budget justification document for funding relating to perfluoroalkyl substances and polyfluoroalkyl substances.

PUBLIC LAW 118–31—DEC. 22, 2023         137 STAT. 139

Sec. 333. Increase of transfer authority for funding of study and assessment on health implications of perfluoroalkyl substances and polyfluoroalkyl substances contamination in drinking water by Agency for Toxic Substances and Disease Registry.
Sec. 334. Prizes for development of technology for thermal destruction of perfluoroalkyl substances or polyfluoroalkyl substances.
Sec. 335. Treatment of certain materials contaminated with perfluoroalkyl substances or polyfluoroalkyl substances.
Sec. 336. Government Accountability Office reports on testing and remediation of perfluoroalkyl substances and polyfluoroalkyl substances.

Subtitle D—Logistics and Sustainment

Sec. 341.  Modification of rule of construction regarding provision of support and services to non-Department of Defense organizations and activities.
Sec. 342. Repeal of Comptroller General review requirement relating to core logistics capabilities.
Sec. 343. Modifications to Contested Logistics Working Group of Department of Defense.
Sec. 344. Matters relating to briefings on Shipyard Infrastructure Optimization Program of the Navy.
Sec. 345. Foreign military sales exclusion in calculation for certain workload carryover of Department of the Army.
Sec. 346. Pilot program on optimization of aerial refueling and fuel management in contested logistics environments through use of artificial intelligence.
Sec. 347. Limitation on availability of funds to expand leased facilities for Joint Military Information Support Operations Web Operations Center.
Sec. 348. Limitation on availability of funds pending submission of certain 30-year shipbuilding plan by the Secretary of the Navy.
Sec. 349. Plan regarding condition and maintenance of prepositioned stockpiles of the Army.
Sec. 350. Strategy and assessment on use of automation and artificial intelligence for shipyard optimization.
Sec. 351. Assessment and strategy relating to hardening of certain military installations against attack by Iran and Iranian-associated groups.
Sec. 352. Semiannual briefings on operational status of amphibious warship fleet.

Subtitle E—Other Matters

Sec. 361. Review of notice of presumed risk issued by Military Aviation and Installation Assurance Clearinghouse.
Sec. 362. Modifications to military aviation and installation assurance clearinghouse for review of mission obstructions.
Sec. 363. Modification to Joint Safety Council.
Sec. 364. Designation of official responsible for coordination of renegotiation of certain land leases owned by Department of Defense in Hawaii.
Sec. 365. Continued designation of Secretary of the Navy as executive agent for Naval Small Craft Instruction and Technical Training School.
Sec. 366. Establishment of Caisson Platoon and support for military and State funeral services at Arlington National Cemetery.
Sec. 367. Recovery of rare earth elements and other strategic and critical materials through end-of-life equipment recycling.

TITLE IV—MILITARY PERSONNEL AUTHORIZATIONS

Subtitle A—Active Forces

Sec. 401. End strengths for active forces.
Sec. 402. End strength level matters.

Subtitle B—Reserve Forces

Sec. 411. End strengths for Selected Reserve.
Sec. 412. End strengths for Reserves on active duty in support of the Reserves.
Sec. 413. End strengths for military technicians (dual status).
Sec. 414. Maximum number of reserve personnel authorized to be on active duty for operational support.

Subtitle C—Authorization of Appropriations

Sec. 421. Military personnel.

TITLE V—MILITARY PERSONNEL POLICY

Subtitle A—Officer Policy

Sec. 501. Authorized strength: general and flag officers on active duty.

137 STAT. 140          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 502. Extension of active duty term for Attending Physician at United States Capitol.
Sec. 503. Updating authority to authorize promotion transfers between components of the same Armed Force or a different Armed Force.
Sec. 504. Flexibility in determining terms of appointment for certain senior officer positions.
Sec. 505. Realignment of Navy spot-promotion quotas.
Sec. 506. Authority to increase the number of medical and dental officers recommended for promotion to certain grades.
Sec. 507. Prohibition on appointment or nomination of certain officers who are subject to special selection review boards.
Sec. 508. Effect of failure of selection for promotion.
Sec. 509. Improvements relating to service obligation for Marine Corps cyberspace operations officers.
Sec. 509A. Time in grade requirements.
Sec. 509B. Establishment of Legislative Liaison of the Space Force.
Sec. 509C. Extension of authority to vary number of Space Force officers considered for promotion to major general.
Sec. 509D. Briefing on number of general officers of the Space Force on active duty.

Subtitle B—Reserve Component Management

Sec. 511. Removal of active duty prohibition for members of the Air Force Reserve Policy Committee.
Sec. 512. Grade of Vice Chief of the National Guard Bureau.
Sec. 513. Mobilization of Selected Reserve for preplanned missions in support of the combatant commands.
Sec. 514. Alternative promotion authority for reserve officers in designated competitive categories.
Sec. 515. Authorization for FireGuard Program.
Sec. 516. Designation of at least one general officer of the Marine Corps Reserve as a joint qualified officer.

Subtitle C—General Service Authorities and Prohibitions

Sec. 521. Permanent authority to order retired members to active duty in high-demand, low-density appointments.
Sec. 522. Prohibition on policy of the Department of Defense regarding identification of gender or personal pronouns in official correspondence.
Sec. 523. Prohibition on former members of the Armed Forces accepting post-service employment with certain foreign governments.
Sec. 524. Verification of the financial independence of financial services counselors in the Department of Defense.
Sec. 525. Modification of requirements for approval of foreign employment by retired and reserve members of uniformed services.
Sec. 526. Consideration of reinstatement of a member of the Armed Forces involuntarily separated on the basis of refusal to receive a vaccination against COVID-19.
Sec. 527. Reviews of characterization of administrative discharges of certain members on the basis of failure to receive COVID-19 vaccine.
Sec. 528. Certain members discharged or dismissed on the sole basis of failure to obey a lawful order to receive a vaccine for COVID-19: communication strategy regarding reinstatement process.
Sec. 529. Continuing military service for certain members eligible for chapter 61 retirement.
Sec. 529A. Threat-based security services and equipment for certain former or retired Department of Defense personnel.
Sec. 529B. Limitation on establishment of new diversity, equity, and inclusion positions; hiring freeze.
Sec. 529C. Requirement to base military accessions and promotions on merit and performance.

Subtitle D—Military Justice and Other Legal Matters

Sec. 531. Technical and conforming amendments to the Uniform Code of Military Justice.
Sec. 532. Establishment of staggered terms for members of the Military Justice Review Panel.
Sec. 533. Supreme Court review of certain actions of the United States Court of Appeals for the Armed Forces.
Sec. 534. Additional requirements for initiative to enhance the capability of military criminal investigative organizations to prevent and combat child sexual exploitation.
Sec. 535. Limitation on availability of funds for relocation of Army CID special agent training course.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 141

Sec. 536. Study on requirement for unanimous votes for findings in general and special courts-martial and related milestones for implementation.
Sec. 537. Study on removal of Sexual Assault Victim Advocates from the chain of command of victims.

Subtitle E—Accession Standards and Recruitment

Sec. 541. Increased access to potential recruits at secondary schools.
Sec. 542. Modification of limitation on enlistment and induction of persons whose score on the Armed Forces Qualification Test is below a prescribed level.
Sec. 543. Increased access to potential recruits at institutions of higher education.
Sec. 544. Increase in accession bonus for nurse officer candidates.
Sec. 545. Improvements to medical standards for accession to certain Armed Forces.
Sec. 546. Future servicemember preparatory course.
Sec. 547. Pilot program on cardiac screenings for military accessions.
Sec. 548. Community college Enlisted Training Corps demonstration program.
Sec. 549. Annual briefings on military recruitment practices in public secondary schools and community colleges.

Subtitle F—Junior Reserve Officers' Training Corps

Sec. 551. Expansion of Junior Reserve Officers' Training Corps.
Sec. 552. Requirement for memoranda of understanding addressing certain matters pertaining to units of the Junior Reserve Officers' Training Corps.
Sec. 553. Junior Reserve Officers' Training Corps administrator and instructor compensation.
Sec. 554. Prohibition of establishment or maintenance of a unit of the Junior Reserve Officers' Training Corps at an educational institution owned, operated, or controlled by the Chinese Communist Party.
Sec. 555. Enforcement of program requirements for the Junior Reserve Officers' Training Corps.
Sec. 556. Annual report on allegations of sexual misconduct in Junior Reserve Officers' Training Corps programs.

Subtitle G—Member Education

Sec. 561. Service Academies: numbers of nominations by Members of Congress and appointments by the Secretaries of the military departments.
Sec. 562. Increase in the number of nominees from Guam to the Service Academies.
Sec. 563. Consideration of standardized test scores in military service academy application process.
Sec. 564. Service Academy professional sports pathway report and legislative proposal required.
Sec. 565. Briefing on inclusion of advanced research programs at certain institutions of professional military education.

Subtitle H—Member Training and Transition

Sec. 571. Amendments to pathways for counseling in the Transition Assistance Program.
Sec. 572. Skillbridge: staffing; budgeting; outreach; report.
Sec. 573. Extension of Troops-to-Teachers program to the Job Corps.
Sec. 574. Troops-to-Teachers Program: expansion; extension.
Sec. 575. Language training centers for members of the Armed Forces and civilian employees of the Department of Defense.
Sec. 576. Prohibition on use of Federal funds to endorse critical race theory.
Sec. 577. Increased fitness standards for Army close combat force military occupational specialties.
Sec. 578. Publication of training materials of the Defense Equal Opportunity Management Institute.
Sec. 579. Prohibition on Federal funds for the Department of Defense Countering Extremism Work Group.

Subtitle I—Family Programs, Child Care, and Dependent Education

Sec. 581. Non-medical counseling services for military families.
Sec. 582. Increase in the target funding level for military child care.
Sec. 583. Modifications to assistance to local educational agencies that benefit dependents of members of the Armed Forces with enrollment changes due to base closures, force structure changes, or force relocations.
Sec. 584. Certain assistance to local educational agencies that benefit dependents of military and civilian personnel.
Sec. 585. Outreach campaign relating to waiting lists for military child development centers; annual briefing.

137 STAT. 142          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 586. Briefings on pilot program on hiring of special needs inclusion coordinators for Department of Defense child development centers.
Sec. 587. Briefings on implementation of universal pre-kindergarten programs in schools operated by the Department of Defense Education Activity.
Sec. 588. Report on mental health and wellness support for students enrolled in schools operated by the Department of Defense Education Activity.
Sec. 589. Rights of parents of children attending schools operated by the Department of Defense Education Activity.

Subtitle J—Decorations and Awards and Other Personnel Matters, Reports, and Briefings

Sec. 591. Armed Forces workplace surveys.
Sec. 592. Due date for report on efforts to prevent and respond to deaths by suicide in the Navy.
Sec. 593. Extension of deadline for review of World War I valor medals.
Sec. 594. Digital ambassador program of the Navy: cessation; report; restart.

TITLE VI—COMPENSATION AND OTHER PERSONNEL BENEFITS

Subtitle A—Basic Pay, Retired Pay, and Leave

Sec. 601. Parental leave parity for members of certain reserve components of the Armed Forces.
Sec. 602. Pay of members of reserve components for inactive-duty training to obtain or maintain an aeronautical rating or designation.
Sec. 603. Expansion of authority to pay a member of the Armed Forces who is absent without leave or over leave for such absence.

Subtitle B—Bonus and Incentive Pays

Sec. 611. Expansion of continuation pay eligibility.
Sec. 612. Modification of special and incentive pay authorities for members of reserve components.
Sec. 613. One-year extension of certain expiring bonus and special pay authorities.
Sec. 614. Authorization of monthly bonus pay for a junior member of the uniformed services during calendar year 2024.
Sec. 615. Determination of cold weather location for purposes of special duty pay.
Sec. 616. Feasibility study regarding assignment incentive pay for members of the Air Force assigned to remotely piloted aircraft.

Subtitle C—Allowances

Sec. 621. Modification of calculation of gross household income for basic needs allowance to address areas of demonstrated need.
Sec. 622. Improved calculation of basic allowance for housing for junior enlisted members.
Sec. 623. Basic allowance for housing for members assigned to vessels undergoing maintenance.
Sec. 624. Dual basic allowance for housing for training.
Sec. 625. Cost-of-living allowance in the continental United States: high cost areas.
Sec. 626. Family separation allowance: increase; review.
Sec. 627. OCONUS cost-of-living allowance: adjustments.
Sec. 628. Extension of one-time uniform allowance for officers who transfer to the Space Force.

Subtitle D—Family and Survivor Benefits

Sec. 631. Modifications to transitional compensation for dependents of members separated for dependent abuse.
Sec. 632. Lodging expenses for dependents of members separated for dependent abuse.
Sec. 633. Access to commissary and exchange privileges for remarried surviving spouses.
Sec. 634. Assistance for military spouses to obtain certifications as doulas and International Board Certified Lactation Consultants.
Sec. 635. Expansion of qualifying events for which a member of the uniformed services may be reimbursed for spousal relicensing or business costs due to the member's relocation.

TITLE VII—HEALTH CARE PROVISIONS

Subtitle A—TRICARE and Other Health Care Benefits

Sec. 701. Waiver of cost-sharing for three mental health outpatient visits for certain beneficiaries under the TRICARE program.

Sec. 702. Extension of period of eligibility for health benefits under TRICARE Reserve Select for survivors of a member of the Selected Reserve.
Sec. 703. Expansion of eligibility for hearing aids to include children of certain retired members of the uniformed services.
Sec. 704. Authority to provide dental care for dependents located at certain remote or isolated locations.
Sec. 705. Clarification of applicability of required mental health self-initiated referral process for members of the Selected Reserve.
Sec. 706. Naloxone and fentanyl: regulations; briefing.
Sec. 707. Authority to expand the TRICARE Competitive Plans Demonstration Project.

Subtitle B—Health Care Administration

Sec. 711. Modification of requirement to transfer research and development and public health functions to the Defense Health Agency.
Sec. 712. Increase in stipend for participants in health professions scholarship and financial assistance programs.
Sec. 713. Modification of administration of medical malpractice claims by members of the uniformed services.
Sec. 714. Networks of the Defense Health Agency: delayed implementation; GAO study.
Sec. 715. Real-time data sharing agreement regarding medical care provided to members of the Coast Guard.
Sec. 716. Establishment of military pharmaceutical and medical device vulnerability working group.

Subtitle C—Studies, Briefings, Reports, and Other Matters

Sec. 721. Modification of partnership program for military trauma care and research.
Sec. 722. Study on opioid alternatives.
Sec. 723. Program of the Department of Defense to study treatment of certain conditions using certain psychedelic substances.
Sec. 724. Annual report regarding overdoses by certain members of the Armed Forces.
Sec. 725. Study and report on health conditions of members of the Armed Forces on active duty developed after administration of COVID–19 vaccine.
Sec. 726. GAO study on health care available to certain individuals supporting the missions of United States Forces Japan and Joint Region Marianas.

TITLE VIII—ACQUISITION POLICY, ACQUISITION MANAGEMENT, AND RELATED MATTERS

Subtitle A—Acquisition Policy and Management

Sec. 801. Commercial nature determination memo available to contractor.
Sec. 802. Modification of truthful cost or pricing data submissions and report.
Sec. 803. Prohibition on the transfer of certain data on employees of the Department of Defense to third parties.
Sec. 804. Prohibition on contracting with persons that have fossil fuel operations with the Government of the Russian Federation or the Russian energy sector.
Sec. 805. Prohibition of the Department of Defense procurement related to entities identified as Chinese military companies operating in the United States.
Sec. 806. Principal Technology Transition Advisor.
Sec. 807. Senior contracting official for Strategic Capabilities Office.
Sec. 808. Pilot program for the use of innovative intellectual property strategies.
Sec. 809. Pilot program for anything-as-a-service.
Sec. 810. Updated guidance on planning for exportability features for future programs.
Sec. 811. Modernizing the Department of Defense requirements process.
Sec. 812. Preventing conflicts of interest for entities that provide certain consulting services to the Department of Defense.
Sec. 813. Focused commercial solutions openings opportunities.

Subtitle B—Amendments to General Contracting Authorities, Procedures, and Limitations

Sec. 820. Amendments to multiyear procurement authority.
Sec. 821. Modification of approval authority for certain follow-on production contracts or transactions.
Sec. 822. Clarification of other transaction authority for installation or facility prototyping.

137 STAT. 144          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 823. Extension and revisions to never contract with the enemy.
Sec. 824. Modification and extension of temporary authority to modify certain con-
          tracts and options based on the impacts of inflation.
Sec. 825. Countering adversary logistics information technologies.
Sec. 826. Modification of contracts and options to provide economic price adjust-
          ments.
Sec. 827. Modifications to earned value management system requirements.

Subtitle C—Domestic Sourcing Requirements

Sec. 831. Emergency acquisition authority for purposes of replenishing United
          States stockpiles.
Sec. 832. Requirement for full domestic production of flags of the United States ac-
          quired by the Department of Defense.
Sec. 833. Amendment to requirement to buy certain metals from American sources.
Sec. 834. Acquisition of sensitive material prohibition exception amendment.
Sec. 835. Enhanced domestic content requirement for major defense acquisition
          programs.

Subtitle D—Provisions Relating to Programs for Accelerating Acquisition

Sec. 841. Pilot program to accelerate contracting and pricing processes.
Sec. 842. Demonstration and prototyping program to advance international product
          support capabilities in a contested logistics environment.
Sec. 843. Special authority for rapid contracting for commanders of combatant com-
          mands.

Subtitle E—Industrial Base Matters

Sec. 851. Additional national security objectives for the national technology and in-
          dustrial base.
Sec. 852. Department of Defense Mentor-Protege Program.
Sec. 853. Modifications to the Procurement Technical Assistance Program.
Sec. 854. Modification of effective date for expansion on the prohibition on acquir-
          ing certain metal products.
Sec. 855. Extension of pilot program for distribution support and services for weap-
          ons systems contractors.
Sec. 856. Pilot program to analyze and monitor certain supply chains.
Sec. 857. Department of Defense notification of certain transactions.

Subtitle F—Small Business Matters

Sec. 860. Amendments to defense research and development rapid innovation pro-
          gram.
Sec. 861. Annual reports regarding the SBIR program of the Department of De-
          fense.
Sec. 862. Payment of subcontractors.
Sec. 863. Increase in Governmentwide goal for participation in Federal contracts by
          small business concerns owned and controlled by service-disabled vet-
          erans.
Sec. 864. Eliminating self-certification for service-disabled veteran-owned small
          businesses.
Sec. 865. Consideration of the past performance of affiliate companies of small
          business concerns.

Subtitle G—Other Matters

Sec. 871. Extension of mission management pilot program.
Sec. 872. Extension of pilot program to incentivize contracting with employee-
          owned businesses.
Sec. 873. Program and processes relating to foreign acquisition.
Sec. 874. Pilot program to incentivize progress payments.
Sec. 875. Study on reducing barriers to acquisition of commercial products and
          services.

TITLE IX—DEPARTMENT OF DEFENSE ORGANIZATION AND MANAGEMENT

Subtitle A—Office of the Secretary of Defense and Related Matters

Sec. 901. Conforming amendments to carry out elimination of position of Chief
          Management Officer.
Sec. 902. Modification of responsibilities of Director of Cost Assessment and Pro-
          gram Evaluation.
Sec. 903. Establishment of Office of Strategic Capital.
Sec. 904. Establishment and assignment of roles and responsibilities for combined
          joint all-domain command and control in support of integrated joint
          warfighting.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 145

Sec. 905. Principal Deputy Assistant Secretaries to support Assistant Secretary of Defense for Special Operations and Low Intensity Conflict.

Subtitle B—Other Department of Defense Organization and Management Matters

Sec. 911. Additional requirements under general policy for total force management.
Sec. 912. Addition of College of International Security Affairs to National Defense University.
Sec. 913. Codification of the Defense Innovation Unit.
Sec. 914. Repeal of authority to appoint a Naval Research Advisory Committee.
Sec. 915. Eligibility of members of Space Force for instruction at the Naval Post-graduate School.
Sec. 916. Membership of the Air Force Reserve Forces Policy Committee.
Sec. 917. Modification of cross-functional team to address emerging threat relating to anomalous health incidents.
Sec. 918. Technology release and foreign disclosure reform initiative.
Sec. 919. Software-based capability to facilitate scheduling between the Department of Defense and Congress.
Sec. 920. Metrics to operationalize audit readiness.
Sec. 921. Next generation business health metrics.
Sec. 922. Independent assessment of defense business enterprise architecture.
Sec. 923. Future force design of the Department of the Air Force.
Sec. 924. Feasibility study on the consolidation or transfer of space functions of the National Guard to the Space Force.

TITLE X—GENERAL PROVISIONS

Subtitle A—Financial Matters

Sec. 1001. General transfer authority.
Sec. 1002. Annual report on budget prioritization by Secretary of Defense and military departments.
Sec. 1003. Additional reporting requirements related to unfunded priorities of armed forces and combatant commands.
Sec. 1004. Audit requirement for Department of Defense components.
Sec. 1005. Requirement for unqualified opinion on Department of Defense financial statements.

Subtitle B—Counterdrug Activities

Sec. 1010. Enhanced support for counterdrug activities and activities to counter transnational organized crime.
Sec. 1011. Modification of support for counterdrug activities and activities to counter transnational organized crime: increase in cap for small scale construction projects.
Sec. 1012. Drug interdiction and counter-drug activities.
Sec. 1013. Disruption of fentanyl trafficking.

Subtitle C—Naval Vessels and Shipyards

Sec. 1015. Modifications to annual naval vessel construction plan.
Sec. 1016. Critical components of national sea-based deterrence vessels.
Sec. 1017. Grants for improvement of Navy ship repair or alterations capability.
Sec. 1018. Repeal of obsolete provision of law regarding vessel nomenclature.
Sec. 1019. Responsibility of Commandant of the Marine Corps with respect to naval battle force ship assessment and requirement reporting.
Sec. 1020. Policy of the United States on shipbuilding defense industrial base.
Sec. 1021. Prohibition on retirement of certain naval vessels.
Sec. 1022. Authority to use incremental funding to enter into a contract for the advance procurement and construction of a San Antonio-class amphibious ship.
Sec. 1023. Authority to use incremental funding to enter into a contract for the advance procurement and construction of a submarine tender.
Sec. 1024. Biannual briefings on submarine readiness.

Subtitle D—Counterterrorism

Sec. 1031. Extension of prohibition on use of funds for transfer or release of individuals detained at United States Naval Station, Guantanamo Bay, Cuba, to the United States.
Sec. 1032. Extension of prohibition on use of funds to construct or modify facilities in the United States to house detainees transferred from United States Naval Station, Guantanamo Bay, Cuba.
Sec. 1033. Extension of prohibition on use of funds for transfer or release of individuals detained at United States Naval Station, Guantanamo Bay, Cuba, to certain countries.

137 STAT. 146 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1034. Extension of prohibition on use of funds to close or relinquish control of United States Naval Station, Guantanamo Bay, Cuba.

Subtitle E—Miscellaneous Authorities and Limitations

Sec. 1041. Limitation on availability of certain funds until submission of Chairman's Risk Assessment; briefing requirement.
Sec. 1042. Assistance in support of Department of Defense accounting for missing United States Government personnel.
Sec. 1043. Implementation of arrangements to build transparency, confidence, and security.
Sec. 1044. Modification to definitions of Confucius Institute.
Sec. 1045. Termination of authority to issue waiver of limitation on use of funds to institutions of higher education hosting Confucius Institutes.
Sec. 1046. Vetting procedures and monitoring requirements for allies and partners participating in education or training activities in the United States.
Sec. 1047. Authority to include funding requests for the chemical and biological defense program in budget accounts of military departments.
Sec. 1048. Limitation on availability of funds until delivery of report on next generation tactical communications.
Sec. 1049. Establishment of procedure of the Department of Defense to determine certain complaints or requests regarding public displays or public expressions of religion on property of the Department.
Sec. 1050. Limitation on availability of funds for destruction of landmines.
Sec. 1051. Limitation on availability of funds for travel expenses of Office of the Secretary of Defense until submission of certain plans.
Sec. 1052. Prohibition on display of unapproved flags.
Sec. 1053. Collaboration with partner countries to develop and maintain military-wide transformational strategies for operational energy.
Sec. 1054. Student loan deferment for dislocated military spouses.

Subtitle F—Studies and Reports

Sec. 1061. Modifications of reporting requirements.
Sec. 1062. Extension of requirement to submit a report on Department of Defense support for Department of Homeland Security at the international borders of the United States.
Sec. 1063. Briefing on Defense POW/MIA Accounting Agency capabilities required to expand accounting for persons missing from designated past conflicts.
Sec. 1064. Air Force plan for maintaining proficient aircrews in certain mission areas.
Sec. 1065. Independent study on naval mine warfare.
Sec. 1066. Annual report and briefing on implementation of Force Design 2030.
Sec. 1067. Study and report on potential inclusion of black box data recorders in tactical vehicles.
Sec. 1068. Plan on countering human trafficking.
Sec. 1069. Update to strategic plan on Department of Defense combating trafficking in persons program.
Sec. 1070. Report on use of tactical fighter aircraft for deployments and homeland defense missions.
Sec. 1071. Report on equipping certain ground combat units with small unmanned aerial systems.
Sec. 1072. Biannual briefings on homeland defense planning.
Sec. 1073. Report on effectiveness of current use of United States Naval Station, Guantanamo Bay, Cuba.
Sec. 1074. Holistic training range assessment.
Sec. 1075. Special operations force structure.
Sec. 1076. Comprehensive assessment of Marine Corps Force Design 2030.
Sec. 1077.  Assessment and recommendations relating to infrastructure, capacity, resources, and personnel on Guam.
Sec. 1078. Feasibility study on conversion of Joint Task Force North into Joint Interagency Task Force North.

Subtitle G—Other Matters

Sec. 1080. Modification of definition of domestic source for title III of the Defense Production Act of 1950.
Sec. 1081. Integrated and authenticated access to Department of Defense systems for certain congressional staff for oversight purposes.
Sec. 1082. Modification of compensation for members of the Afghanistan War Commission.
Sec. 1083. Senate National Security Working Group.
Sec. 1084. Tribal liaisons at military installations.
Sec. 1085. Commercial integration cell plan within certain combatant commands.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 147

Sec. 1086. Guidance for use of unmanned aircraft systems by National Guard.
Sec. 1087. Public disclosure of Afghanistan war records.
Sec. 1088. Implementation plan for Joint Concept for Competing.
Sec. 1089. Notification of safety and security concerns at certain Department of Defense laboratories.
Sec. 1090. Conduct of weather reconnaissance in the United States.
Sec. 1091. Sense of Congress regarding authority of Secretary of Defense with respect to irregular warfare.
Sec. 1092. Red Hill health impacts.

TITLE XI—CIVILIAN PERSONNEL

Sec. 1101. Diversity, equity, and inclusion personnel grade cap.
Sec. 1102. Authorization to pay a living quarters allowance for Department of the Navy civilian employees assigned to permanent duty in Guam for performing work, or supporting work being performed, aboard or dockside, of U.S. naval vessels.
Sec. 1103. Consolidation of direct hire authorities for candidates with specified degrees at science and technology reinvention laboratories.
Sec. 1104. Direct hire authority for certain personnel of the Department of Defense.
Sec. 1105. One-year extension of authority to waive annual limitation on premium pay and aggregate limitation on pay for Federal civilian employees working overseas.
Sec. 1106. Extension of authority to grant competitive status to employees of inspectors general for overseas contingency operations.
Sec. 1107. Extension of direct hire authority for domestic industrial base facilities and Major Range and Test Facilities Base.
Sec. 1108. Exclusion of nonappropriated fund employees from limitations on dual pay.
Sec. 1109. One-year extension of temporary authority to grant allowances, benefits, and gratuities to civilian personnel on official duty in a combat zone.
Sec. 1110. Modification to shore leave accrual for crews of vessels to support crew rotations and improve retention of civilian mariners.
Sec. 1111. Assessments of staffing in Office of the Under Secretary of Defense for Personnel and Readiness.
Sec. 1112. Military Spouse Employment Act.
Sec. 1113. Amendments to the John S. McCain Strategic Defense Fellows Program.
Sec. 1114. Including military service in determining family and medical leave eligibility for Federal employees.
Sec. 1115. Exception to limitation on number of Senior Executive Service positions for the Department of Defense.
Sec. 1116. Extension of direct hire authority for the Department of Defense for post-secondary students and recent graduates.
Sec. 1117. Authority to employ civilian faculty members at Space Force schools.
Sec. 1118. Report and sunset relating to inapplicability of certification of executive qualifications by qualification review boards of Office of Personnel Management.
Sec. 1119. Expansion of noncompetitive appointment eligibility to spouses of Department of Defense civilians.
Sec. 1120. Elimination of Government Accountability Office review requirement relating to Department of Defense personnel authorities.

TITLE XII—MATTERS RELATING TO FOREIGN NATIONS

Subtitle A—Assistance and Training

Sec. 1201. Modification of support of special operations for irregular warfare.
Sec. 1202. Modification of combatant commander initiative fund.
Sec. 1203. Increase in small-scale construction limit and modification of authority to build capacity.
Sec. 1204. Modifications to security cooperation workforce development program and establishment of defense security cooperation university.
Sec. 1205. Extension and modification of authority for reimbursement of certain coalition nations for support provided to United States military operations.
Sec. 1206. Extension of cross-servicing agreements for loan of personnel protection and personnel survivability equipment in coalition operations.
Sec. 1207. Modification of authority to provide support to certain governments for border security operations.
Sec. 1208. Extension of legal institutional capacity building initiative for foreign defense institutions.
Sec. 1209. Report on ex gratia payments.
Sec. 1210. Authority to provide mission training through distributed simulation.

137 STAT. 148                PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1211. Requirement for military exercises.

Subtitle B—Matters Relating to Other Authorities of the Department of Defense

Sec. 1221. Modification of authority for expenditure of funds for clandestine activities that support operational preparation of the environment and nonconventional assisted recovery capabilities.
Sec. 1222. Modification to the American, British, Canadian, and Australian armies' program.
Sec. 1223. First modification of initiative to support protection of national security academic researchers from undue influence and other security threats.
Sec. 1224. Second modification of initiative to support protection of national security academic researchers from undue influence and other security threats.
Sec. 1225. Extension of authority for Department of Defense support for stabilization activities in national security interest of the United States.
Sec. 1226. Modification of Defense Operational Resilience International Cooperation Pilot Program.
Sec. 1227. Extension of prohibition on in-flight refueling to non-United States aircraft that engage in hostilities in the ongoing civil war in Yemen.
Sec. 1228. Limitation on availability of funds for International Security Cooperation Program.
Sec. 1229. Protection and legal preparedness for members of the Armed Forces abroad.
Sec. 1230. Report on hostilities involving United States Armed Forces.
Sec. 1231. Congressional notification regarding the Global Engagement Center.

Subtitle C—Matters Relating to Ukraine, Russia, and NATO

Sec. 1241. Extension of Ukraine Security Assistance Initiative.
Sec. 1242. Extension and modification of certain temporary authorizations related to munitions replacement.
Sec. 1243. Report relating to allied and partner support to Ukraine.
Sec. 1244. Extension of prohibition on availability of funds relating to sovereignty of the Russian Federation over internationally recognized territory of Ukraine.
Sec. 1245. Study and report on lessons learned regarding information operations and deterrence.
Sec. 1246. Prohibition on New START treaty information sharing.
Sec. 1247. Black Sea security and development strategy.
Sec. 1248. Revival of authority for participation of NATO naval personnel in submarine safety programs.
Sec. 1249. Extension and modification of training for Eastern European national security forces in the course of multilateral exercises.
Sec. 1250. U.S. basing, training, and exercises in North Atlantic Treaty Organization member countries.
Sec. 1250A. Limitation on withdrawal from the North Atlantic Treaty Organization.
Sec. 1250B. Oversight of programs and operations funded with amounts appropriated by the United States for Ukraine.

Subtitle D—Matters Relating to Israel

Sec. 1251. Euro-NATO Joint Jet Pilot Training Program.
Sec. 1252. Extension of United States-Israel anti-tunnel cooperation.
Sec. 1253. Improvements relating to United States-Israel cooperation to counter unmanned aerial systems.
Sec. 1254. Modification of authority for cooperation on directed energy capabilities.
Sec. 1255. Ensuring peace through strength in Israel.
Sec. 1256. Assistance to Israel for aerial refueling.
Sec. 1257. Rules governing transfer of aerial refueling tankers to Israel.
Sec. 1258. Report.

Subtitle E—Matters Relating to Syria, Iraq, Iran, and Afghanistan

Sec. 1261. Middle East integrated maritime domain awareness and interdiction capability.
Sec. 1262. Modification of establishment of coordinator for detained ISIS members and relevant populations in Syria.
Sec. 1263. Extension and modification of authority to provide assistance to counter the Islamic State of Iraq and Syria.
Sec. 1264. Extension and modification of authority to provide assistance to vetted Syrian groups and individuals.
Sec. 1265. Extension of authority to support operations and activities of the Office of Security Cooperation in Iraq.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 149

Sec. 1266. Plan of action to equip and train Iraqi security forces and Kurdish Peshmerga forces.
Sec. 1267. Prohibition on transfers to the Badr Organization.
Sec. 1268. Extension and modification of annual report on military power of Iran.
Sec. 1269. Modification and update to report on military capabilities of Iran and related activities.
Sec. 1270. Prohibition on funds to Iran.
Sec. 1271. Prohibition on transporting currency to the Taliban and the Islamic Emirate of Afghanistan.
Sec. 1272. Prohibition on funding for the Taliban.

TITLE XIII—OTHER MATTERS RELATING TO FOREIGN NATIONS

Subtitle A—Matters Relating to the Indo-Pacific Region

Sec. 1301. Sense of Congress on defense alliances and partnerships in the Indo-Pacific region.
Sec. 1302. Extension of Pacific Deterrence Initiative and report, briefings, and plan under the Initiative.
Sec. 1303. Modification of pilot program to develop young civilian defense leaders in the Indo-Pacific region.
Sec. 1304. Indo-Pacific campaigning initiative.
Sec. 1305. Indo-Pacific Maritime Domain Awareness Initiative.
Sec. 1306. Limitation on availability of funds pending feasibility study regarding delivery of harpoon missiles to foreign security partners.
Sec. 1307. Sense of Congress on Taiwan defense relations.
Sec. 1308. Oversight of Taiwan Enhanced Resilience Act.
Sec. 1309. Training, advising, and institutional capacity-building program for military forces of Taiwan.
Sec. 1310. Prohibition on use of funds to support entertainment projects with ties to the Government of the People's Republic of China.
Sec. 1311. Determination on involvement of the People's Republic of China in the Mexican fentanyl trade.
Sec. 1312. Analysis of certain biotechnology entities.
Sec. 1313. Studies on defense budget transparency of the People's Republic of China and the United States.
Sec. 1314. Extension of authority to transfer funds for Bien Hoa dioxin cleanup.
Sec. 1315. Extension and modification of pilot program to improve cyber cooperation with foreign military partners in Southeast Asia.
Sec. 1316. Enhancing major defense partnership with India.
Sec. 1317. Report on enhanced security cooperation with Japan.
Sec. 1318. Report and notification relating to transfer of operational control on Korean Peninsula.
Sec. 1319. Study and report on command structure and force posture of United States Armed Forces in the Indo-Pacific region.

Subtitle B—Matters Relating to the AUKUS Partnership

Sec. 1321. Definitions.

PART 1—ADMINISTRATIVE PROVISIONS

Sec. 1331. AUKUS partnership oversight and accountability framework.
Sec. 1332. Designation of senior official for Department of Defense activities relating to, and implementation plan for, the AUKUS partnership.
Sec. 1333. Reporting related to the AUKUS partnership.

PART 2—STREAMLINING AND PROTECTING TRANSFERS OF UNITED STATES MILITARY TECHNOLOGY FROM COMPROMISE

Sec. 1341. Priority for Australia and the United Kingdom in Foreign Military Sales and Direct Commercial Sales.
Sec. 1342. Identification and pre-clearance of platforms, technologies, and equipment for sale to Australia and the United Kingdom through Foreign Military Sales and Direct Commercial Sales.
Sec. 1343. Export control exemptions and standards.
Sec. 1344. Expedited review of export licenses for exports of advanced technologies to Australia, the United Kingdom, and Canada.
Sec. 1345. United States Munitions List.

PART 3—AUKUS SUBMARINE TRANSFER AUTHORIZATION ACT

Sec. 1351. Short title.
Sec. 1352. Authorization of sales of Virginia Class submarines to Australia.
Sec. 1353. Acceptance of contributions in support of Australia, United Kingdom, and United States submarine security activities.

137 STAT. 150          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1354. Appropriate congressional committees and leadership defined.

TITLE XIV—OTHER AUTHORIZATIONS

Subtitle A—Military Programs

Sec. 1401. Working capital funds.
Sec. 1402. Chemical agents and munitions destruction, defense.
Sec. 1403. Drug interdiction and counter-drug activities, defense-wide.
Sec. 1404. Defense Inspector General.
Sec. 1405. Defense Health Program.

Subtitle B—National Defense Stockpile

Sec. 1411. Improvements to Strategic and Critical Materials Stock Piling Act.
Sec. 1412. Authority to dispose of materials from the National Defense Stockpile.
Sec. 1413. Beginning balances of the National Defense Stockpile Transaction Fund for audit purposes.
Sec. 1414. Critical mineral independence.

Subtitle C—Other Matters

Sec. 1421. Modification of leasing authority of Armed Forces Retirement Home.
Sec. 1422. Authority for transfer of funds to joint Department of Defense-Department of Veterans Affairs Medical Facility Demonstration Fund for Captain James A. Lovell Health Care Center, Illinois.
Sec. 1423. Authorization of appropriations for Armed Forces Retirement Home.

TITLE XV—CYBERSPACE-RELATED MATTERS

Subtitle A—Cyber Operations

Sec. 1501. Performance metrics for pilot program on sharing cyber capabilities and related information with foreign operational partners.
Sec. 1502. Harmonization and clarification of Strategic Cybersecurity Program and related matters.
Sec. 1503. Modification of authority to use operation and maintenance funds for cyber operations-peculiar capability development projects.
Sec. 1504. Quarterly briefings on joint all domain command and control effort.
Sec. 1505. Authority for countering illegal trafficking by Mexican transnational criminal organizations in cyberspace.
Sec. 1506. Development of cyber support mechanisms for geographic combatant commands.
Sec. 1507. Review and plan relating to cyber red teams of Department of Defense.

Subtitle B—Cybersecurity

Sec. 1511. Responsibility for cybersecurity and critical infrastructure protection of defense industrial base.
Sec. 1512. Cybersecurity enhancements for nuclear command, control, and communications network.
Sec. 1513. Pilot program relating to semiconductor supply chain and Cybersecurity Collaboration Center.
Sec. 1514. Transfer of data and technology developed under MOSAICS program.
Sec. 1515. Modernization program for network boundary and cross-domain defense.
Sec. 1516. Establishment of certain identity, credential, and access management activities as program of record.
Sec. 1517. Pilot program on assuring critical infrastructure support for military contingencies.
Sec. 1518. Military cybersecurity cooperation with Taiwan.
Sec. 1519. Guidance regarding securing laboratories of the Armed Forces.

Subtitle C—Information Technology and Data Management

Sec. 1521. Control and management of Department of Defense data; establishment of Chief Digital and Artificial Intelligence Officer Governing Council.
Sec. 1522. Modification to Department of Defense enterprise-wide procurement of cyber data products and services.
Sec. 1523. Management of data assets by Chief Digital and Artificial Intelligence Officer.
Sec. 1524. Course of education and pilot program on authentication of digital content provenance for certain Department of Defense media content.
Sec. 1525. Prize competitions for business systems modernization.
Sec. 1526. Requirements for deployment of fifth generation information and communications capabilities to military installations and other Department facilities.
Sec. 1527. Required policies to establish datalink strategy of Department of Defense.

### Subtitle D—Personnel

Sec. 1531. Office for academic engagement relating to cyber activities.
Sec. 1532. Selected Reserve order to active duty to respond to a significant cyber incident.
Sec. 1533. Post-graduate employment of Department of Defense Cyber Service Academy scholarship recipients in intelligence community.
Sec. 1534. Minimum number of scholarships to be awarded annually through Department of Defense Cyber Service Academy.
Sec. 1535. Pilot program and other measures to enhance readiness and effectiveness of Cyber Mission Force.
Sec. 1536. Authority to conduct pilot program on Civilian Cybersecurity Reserve.
Sec. 1537. Requirements for implementation of user activity monitoring for certain personnel.
Sec. 1538. Study on occupational resiliency of Cyber Mission Force.

### Subtitle E—Artificial Intelligence

Sec. 1541. Modification to acquisition authority of senior official with principal responsibility for artificial intelligence and machine learning.
Sec. 1542. Artificial intelligence bug bounty programs.
Sec. 1543. Prize competition for technology that detects and watermarks use of generative artificial intelligence.
Sec. 1544. Plans, strategies, and other matters relating to artificial intelligence.
Sec. 1545. Study to analyze vulnerability for artificial intelligence-enabled military applications.

### Subtitle F—Reports and Other Matters

Sec. 1551. Limitation on availability of funds for travel for Office of Under Secretary of Defense for Personnel and Readiness pending strategy relating to Defense Travel System.
Sec. 1552. Management by Department of Defense of mobile applications.
Sec. 1553. Report on Department of Defense Enterprise capabilities for cybersecurity.
Sec. 1554. Report on technology modernization for Army Human Resources Command 2030 Transformation Plan.
Sec. 1555. Certification requirement regarding contracting for military recruiting.

### TITLE XVI—SPACE ACTIVITIES, STRATEGIC PROGRAMS, AND INTELLIGENCE MATTERS

### Subtitle A—Space Activities

Sec. 1601. Delegation of certain authority of explosive safety board.
Sec. 1602. Classification review of space major defense acquisition programs.
Sec. 1603. Enhanced authority to increase space launch capacity through space launch support services.
Sec. 1604. Principal Military Deputy for Space Acquisition and Integration.
Sec. 1605. Modification to updates of space policy review.
Sec. 1606. Authorization for establishment of the National Space Intelligence Center as a field operating agency.
Sec. 1607. Initial operational capability for Advanced Tracking and Launch Analysis System and requirements for system-level review.
Sec. 1608. Use of middle tier acquisition program for proliferated warfighter space architecture of the Space Development Agency.
Sec. 1609. Process and plan for Space Force space situational awareness.
Sec. 1610. Plan to improve threat-sharing arrangements with commercial space operators.
Sec. 1611. Plan for an integrated and resilient satellite communications architecture for the Space Force.

### Subtitle B—Defense Intelligence and Intelligence-Related Activities

Sec. 1621. Military intelligence collection and analysis partnerships.

### Subtitle C—Nuclear Forces

Sec. 1631. Establishment of major force program for nuclear command, control, and communications programs.
Sec. 1632. Technical amendment to additional report matters on strategic delivery systems.
Sec. 1633. Amendment to annual report on the plan for the nuclear weapons stockpile, nuclear weapons complex, nuclear weapons delivery systems, and nuclear weapons command and control systems.
Sec. 1634. Matters relating to the acquisition and deployment of the Sentinel intercontinental ballistic missile weapon system.

137 STAT. 152 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1635. Tasking and oversight authority with respect to intercontinental ballistic missile site activation task force for Sentinel Program.
Sec. 1636. Study of weapons programs that allow Armed Forces to address hard and deeply buried targets.
Sec. 1637. Repeal of requirement for review of nuclear deterrence postures.
Sec. 1638. Retention of capability to redeploy multiple independently targetable re-entry vehicles.
Sec. 1639. Authorization to establish technology transition program for strategic nuclear deterrence.
Sec. 1640. Matters relating to the nuclear-armed, sea-launched cruise missile.
Sec. 1641. Requirements relating to operational silos for the Sentinel intercontinental ballistic missile.
Sec. 1642. Long-term sustainment of Sentinel ICBM guidance system.
Sec. 1643. Integrated master schedule for the Sentinel missile program of the Air Force.
Sec. 1644. Operational timeline for Strategic Automated Command and Control System.
Sec. 1645. Pilot program on development of reentry vehicles and related systems.
Sec. 1646. Prohibition on reduction of the intercontinental ballistic missiles of the United States.
Sec. 1647. Limitation on availability of funds pending compliance with information requests from the Government Accountability Office.
Sec. 1648. Congressional notification of decision to delay strategic delivery system test event.
Sec. 1649. Congressional notification of nuclear cooperation between Russia and China.
Sec. 1650. Plan for decreasing the time to upload additional warheads to the intercontinental ballistic missile fleet.

Subtitle D—Missile Defense Programs

Sec. 1661. Deputy Director of Office of Missile Defense Agency.
Sec. 1662. Modification of program accountability matrices requirements for next generation interceptors for missile defense.
Sec. 1663. National missile defense policy.
Sec. 1664. Modification of requirement for Comptroller General to review and assess missile defense acquisition programs.
Sec. 1665. Iron Dome short-range rocket defense system and Israeli cooperative missile defense program co-development and co-production.
Sec. 1666. Programs to achieve initial and full operational capabilities for the Glide Phase Interceptor program.
Sec. 1667. Rescission of memorandum on missile defense governance.
Sec. 1668. Limitation on availability of funds for Office of Cost Assessment and Program Evaluation until submission of report on missile defense roles and responsibilities.
Sec. 1669. Strategy for integrated air and missile defense of Hawaii and the Indo-Pacific region.
Sec. 1670. Report on potential enhancements to integrated air and missile defense capabilities in Europe.
Sec. 1671. Independent analysis of space-based missile defense capability.

Subtitle E—Other Matters

Sec. 1681. Extension of authorization for protection of certain facilities and assets from unmanned aircraft.
Sec. 1682. Electromagnetic warfare.
Sec. 1683. Cooperative threat reduction funds.
Sec. 1684. Matters relating to space-based ground and airborne moving target indication systems.
Sec. 1685. Positioning, navigation, and timing.
Sec. 1686. Actions to address serious deficiencies in electronic protection of systems that operate in the radio frequency spectrum.
Sec. 1687. Limitation on use of funds for certain unreported programs.
Sec. 1688. Indo-Pacific missile strategy.
Sec. 1689. Study on the future of the Integrated Tactical Warning Attack Assessment System.
Sec. 1690. Research and analysis on multipolar deterrence and escalation dynamics.

TITLE XVII—SPACE FORCE PERSONNEL MANAGEMENT

Sec. 1701. Short title.

Subtitle A—Space Force Military Personnel System Without Component

Sec. 1711. Establishment of military personnel management system for the Space Force.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 153

Sec. 1712. Composition of the Space Force without component.
Sec. 1713. Definitions for single personnel management system for the Space Force.
Sec. 1714. Basic policies relating to service in the Space Force.
Sec. 1715. Status and participation.
Sec. 1716. Officers.
Sec. 1717. Enlisted members.
Sec. 1718. Retention and separation generally.
Sec. 1719. Separation of officers for substandard performance of duty or for certain other reasons.
Sec. 1719A. Retirement.

Subtitle B—Conforming Amendments Related to Space Force Military Personnel System

Sec. 1721. Amendments to Department of the Air Force provisions of title 10, United States Code.
Sec. 1722. Amendments to subtitle A of title 10, United States Code.
Sec. 1723. Title 38, United States Code (Veterans' Benefits).

Subtitle C—Transition Provisions

Sec. 1731. Transition period.
Sec. 1732. Change of duty status of members of the Space Force.
Sec. 1733. Transfer to the Space Force of members of the reserve components of the Air Force.
Sec. 1734. Placement of officers on the Space Force officer list.
Sec. 1735. Disestablishment of Regular Space Force.
Sec. 1736. End strength flexibility.
Sec. 1737. Promotion authority flexibility.

Subtitle D—Other Amendments Related to the Space Force

Sec. 1741. Title 10, United States Code.
Sec. 1742. Other provisions of law.

TITLE XVIII—OTHER DEFENSE MATTERS

Subtitle A—Other Defense Matters

Sec. 1801. Technical and conforming amendments.
Sec. 1802. Extension of authority to engage in certain commercial activities.
Sec. 1803. Modification to requirements relating to combating military reliance on Russian energy.
Sec. 1804. U.S. Hostage and Wrongful Detainee Day Act of 2023.
Sec. 1805. Improvements to Department of Veterans Affairs-Department of Defense Joint Executive Committee.
Sec. 1806. Access to and use of military post offices by United States citizens employed overseas by the North Atlantic Treaty Organization who perform functions in support of military operations of the Armed Forces.
Sec. 1807. Extension of admission to Guam or the Commonwealth of the Northern Mariana Islands for certain nonimmigrant H–2B workers.
Sec. 1808. Support for execution of bilateral agreements concerning illicit transnational maritime activity in Africa.
Sec. 1809. National Cold War Center designation.
Sec. 1810. Revision of requirement for transfer of certain aircraft to State of California for wildfire suppression purposes.
Sec. 1811. Limitation on funds for Wuhan Institute of Virology and EcoHealth Alliance, Inc.

Subtitle B—Drone Security

Sec. 1821. Short title.
Sec. 1822. Definitions.
Sec. 1823. Prohibition on procurement of covered unmanned aircraft systems from covered foreign entities.
Sec. 1824. Prohibition on operation of covered unmanned aircraft systems from covered foreign entities.
Sec. 1825. Prohibition on use of Federal funds for procurement and operation of covered unmanned aircraft systems from covered foreign entities.
Sec. 1826. Prohibition on use of Government-issued purchase cards to purchase covered unmanned aircraft systems from covered foreign entities.
Sec. 1827. Management of existing inventories of covered unmanned aircraft systems from covered foreign entities.
Sec. 1828. Comptroller General report.
Sec. 1829. Government-wide policy for procurement of unmanned aircraft systems.

137 STAT. 154 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1830. State, local, and territorial law enforcement and emergency service exemption.
Sec. 1831. Study.
Sec. 1832. Exceptions.
Sec. 1833. Sunset.

Subtitle C—Unidentified Anomalous Phenomena

Sec. 1841. Unidentified anomalous phenomena records collection at the National Archives and Records Administration.
Sec. 1842. Review, identification, transmission to the National Archives, and public disclosure of unidentified anomalous phenomena records by government offices.
Sec. 1843. Grounds for postponement of public disclosure of unidentified anomalous phenomena records.

Subtitle D—World Trade Center Health Program

Sec. 1851. Flexibility and funding for the World Trade Center Health Program.
Sec. 1852. Extension of certain direct spending reductions.
Sec. 1853. Medicare improvement fund.

DIVISION B—MILITARY CONSTRUCTION AUTHORIZATIONS

Sec. 2001. Short title.
Sec. 2002. Expiration of authorizations and amounts required to be specified by law.
Sec. 2003. Effective date.

TITLE XXI—ARMY MILITARY CONSTRUCTION

Sec. 2101. Authorized Army construction and land acquisition projects.
Sec. 2102. Family housing.
Sec. 2103. Authorization of appropriations, Army.
Sec. 2104. Extension of authority to use cash payments in special account from land conveyance, Natick Soldier Systems Center, Massachusetts.
Sec. 2105. Extension of authority to carry out fiscal year 2018 project at Kunsan Air Base, Korea.
Sec. 2106. Extension of authority to carry out certain fiscal year 2019 Army military construction projects.
Sec. 2107. Extension of authority to carry out certain fiscal year 2021 Army military construction projects.

TITLE XXII—NAVY MILITARY CONSTRUCTION

Sec. 2201. Authorized Navy construction and land acquisition projects.
Sec. 2202. Family housing.
Sec. 2203. Authorization of appropriations, Navy.
Sec. 2204. Extension of authority to carry out certain fiscal year 2019 Navy military construction projects.
Sec. 2205. Extension of authority to carry out certain fiscal year 2021 Navy military construction projects.

TITLE XXIII—AIR FORCE MILITARY CONSTRUCTION

Sec. 2301. Authorized Air Force construction and land acquisition projects.
Sec. 2302. Family housing.
Sec. 2303. Authorization of appropriations, Air Force.
Sec. 2304. Extension of authority to carry out certain fiscal year 2017 Air Force military construction projects.
Sec. 2305. Extension of authority to carry out certain fiscal year 2018 Air Force military construction projects.
Sec. 2306. Extension of authority to carry out certain fiscal year 2019 Air Force military construction projects.
Sec. 2307. Extension of authority to carry out fiscal year 2021 Air Force military construction projects.

TITLE XXIV—DEFENSE AGENCIES MILITARY CONSTRUCTION

Sec. 2401.  Authorized Defense Agencies construction and land acquisition projects.
Sec. 2402. Authorized Energy Resilience and Conservation Investment Program projects.
Sec. 2403. Authorization of appropriations, Defense Agencies.
Sec. 2404. Extension of authority to carry out certain fiscal year 2018 Defense Agencies military construction projects.
Sec. 2405. Extension and modification of authority to carry out certain fiscal year 2019 Defense Agencies military construction projects.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 155

Sec. 2406. Extension of authority to carry out fiscal year 2021 project at Defense Fuel Support Point Tsurumi, Japan.
Sec. 2407. Extension of authority to carry out certain fiscal year 2021 Energy Resilience and Conservation Investment projects.
Sec. 2408. Authority to carry out military construction projects to improve certain fiscal year 2022 utility systems.
Sec. 2409. Additional authority to carry out certain military construction projects to improve certain fiscal year 2023 utility systems.

### TITLE XXV—INTERNATIONAL PROGRAMS

#### Subtitle A—North Atlantic Treaty Organization Security Investment

Sec. 2501. Authorized NATO construction and land acquisition projects.
Sec. 2502. Authorization of appropriations, NATO.

#### Subtitle B—Host Country In-Kind Contributions

Sec. 2511. Republic of Korea funded construction projects.
Sec. 2512. Republic of Poland funded construction projects.

### TITLE XXVI—GUARD AND RESERVE FORCES FACILITIES

Sec. 2601. Authorized Army National Guard construction and land acquisition projects.
Sec. 2602. Authorized Army Reserve construction and land acquisition projects.
Sec. 2603. Authorized Navy Reserve and Marine Corps Reserve construction and land acquisition projects.
Sec. 2604. Authorized Air National Guard construction and land acquisition projects.
Sec. 2605. Authorized Air Force Reserve construction and land acquisition projects.
Sec. 2606. Authorization of appropriations, National Guard and Reserve.
Sec. 2607. Extension of authority to carry out fiscal year 2018 project at Hulman Regional Airport, Indiana.
Sec. 2608. Extension of authority to carry out fiscal year 2019 project at Francis S. Gabreski Airport, New York.
Sec. 2609. Extension of authority to carry out certain fiscal year 2021 National Guard and Reserve military construction projects.
Sec. 2610. Modification of authority to carry out fiscal year 2023 project at Camp Pendleton, California.
Sec. 2611. Authority to conduct restoration and modernization projects at the First City Troop Readiness Center in Philadelphia, Pennsylvania.

### TITLE XXVII—BASE REALIGNMENT AND CLOSURE ACTIVITIES

Sec. 2701. Authorization of appropriations for base realignment and closure activities funded through Department of Defense Base Closure Account.
Sec. 2702. Prohibition on conducting additional base realignment and closure (BRAC) round.

### TITLE XXVIII—MILITARY CONSTRUCTION GENERAL PROVISIONS

#### Subtitle A—Military Construction Programs

Sec. 2801. Modifications to Defense Community Infrastructure Program.
Sec. 2802.  Modification to authority for unspecified minor construction.
Sec. 2803. Application of dollar limitations for unspecified minor military construction projects to locations outside the United States.
Sec. 2804. Increase to amount of certain funds for military installation resilience projects.
Sec. 2805. Authority for certain construction projects in friendly foreign countries.
Sec. 2806. Temporary expansion of authority for use of one-step turn-key procedures for repair projects.
Sec. 2807. Authorization of cost-plus incentive-fee contracting for military construction projects to mitigate risk to the Sentinel program schedule and cost.
Sec. 2808. Inclusion on Department of Defense Form 1391 of information on consideration of certain methods of construction for certain military construction projects.
Sec. 2809. Incorporation of cybersecurity supply chain risk management tools and methods.
Sec. 2810. Authority for Indo-Pacific posture unspecified minor military construction projects.
Sec. 2811. Authority to conduct energy resilience and conservation projects at installations at which certain energy projects have occurred.

#### Subtitle B—Military Housing Reforms

Sec. 2821. Establishment of the Military Family Readiness Working Group for Military Housing.

137 STAT. 156          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 2822. Improvements to privatized military housing.
Sec. 2823. Notification relating to legal counsel for nondisclosure agreements.
Sec. 2824. Inclusion of questions regarding military housing for members of the Armed Forces in status of forces survey.
Sec. 2825. Implementation of Comptroller General recommendations relating to strengthening oversight of privatized military housing.

Subtitle C—Covered Military Unaccompanied Housing Reforms

Sec. 2831. Design standards for covered military unaccompanied housing.
Sec. 2832. Establishment of standards for habitability of covered military unaccompanied housing.
Sec. 2833. Modification of procedures for issuance of waivers of covered privacy and configuration standards; temporary biannual briefing.
Sec. 2834. Certification of habitability of covered military unaccompanied housing.
Sec. 2835. Pilot program for military construction projects to replace certain covered military unaccompanied housing facilities.
Sec. 2836. Establishment of civilian employees for oversight of covered military unaccompanied housing.
Sec. 2837. Maintenance work order management process for covered military unaccompanied housing.
Sec. 2838. Uniform index for evaluating the condition of covered military unaccompanied housing facilities.
Sec. 2839. Annual reports on the condition of covered military unaccompanied housing.
Sec. 2840. Submission of temporary housing support certification to Members of Congress.
Sec. 2841. Elimination of flexibilities for construction standards for covered military unaccompanied housing.

Subtitle D—Real Property and Facilities Administration

Sec. 2851. Guidance on Department of Defense-wide standards for access to military installations.
Sec. 2852. Authority to make grants for security and fire protection for former Army and Navy General Hospital, Hot Springs National Park, Hot Springs, Arkansas; briefing.
Sec. 2853. Plan and report on critical infrastructure systems at military installations.
Sec. 2854. Closure and disposal of the Pueblo Chemical Depot, Pueblo County, Colorado.
Sec. 2855. Limitation on authority to modify or restrict public access to Greenbury Point Conservation Area at Naval Support Activity Annapolis, Maryland.
Sec. 2856. Authorization for the Secretary of the Navy to resolve the electrical utility operations at Former Naval Air Station Barbers Point, Hawaii.
Sec. 2857. Inclusion of military installation resilience in real property management and installation master planning of Department.
Sec. 2858. Modification of authority to relocate Joint Spectrum Center to Fort Meade, Maryland.

Subtitle E—Land Conveyances

Sec. 2861. Extension of sunset for land conveyance, Sharpe Army Depot, Lathrop, California.
Sec. 2862. Clarification of authority of Department of Defense to conduct certain military activities at Nevada test and training range.
Sec. 2863. Extensions, additions, and revisions to the Military Lands Withdrawal Act of 1999 relating to the Barry M. Goldwater Range, Arizona.
Sec. 2864. Land acquisition, Westmoreland State Park, Virginia.
Sec. 2865. Land conveyance, Naval Weapons Station Earle, New Jersey.
Sec. 2866. Land Conveyance, Paine Field Air National Guard Station, Everett, Snohomish County, Washington.
Sec. 2867. Land conveyance, Wetzel County Memorial Army Reserve Center, New Martinsville, West Virginia.
Sec. 2868. Land conveyance, BG J Sumner Jones Army Reserve Center, Wheeling, West Virginia.

Subtitle F—Pilot Programs and Reports

Sec. 2871. Modification of pilot program on increased use of sustainable building materials in military construction.
Sec. 2872. Modification of pilot program on establishment of account for reimbursement for use of testing facilities at installations of the Department of the Air Force.

Sec. 2873. Pilot program to provide air purification technology in covered military housing.
Sec. 2874. Joint Housing Requirements and Market Analysis for certain military installations in Hawaii.
Sec. 2875. Quarterly briefings on military construction related to the Sentinel intercontinental ballistic missile weapon system program.

Subtitle G—Other Matters

Sec. 2881. Increase of limitation on fee for architectural and engineering services procured by military departments.
Sec. 2882. Development and operation of Marine Corps Heritage Center and National Museum of the Marine Corps.
Sec. 2883. Technical corrections.
Sec. 2884. Modification of authority of Secretary of the Army to enter into cooperative agreements relating to access and management of Air Force Memorial.
Sec. 2885. Designation of National Museum of the Mighty Eighth Air Force.
Sec. 2886. Continuing education curriculum on use of innovative products for military construction projects.
Sec. 2887. Guidance on encroachment that affects covered sites.
Sec. 2888. Extension and modification of annual updates to master plans and investment strategies for Army ammunition plants.
Sec. 2889. Limitation on use of funds for United States Space Command Headquarters.
Sec. 2890.  Plan for use of excess construction materials on southwest border.

DIVISION C—DEPARTMENT OF ENERGY NATIONAL SECURITY
AUTHORIZATIONS AND OTHER AUTHORIZATIONS

TITLE XXXI—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS

Subtitle A—National Security Programs and Authorizations

Sec. 3101. National Nuclear Security Administration.
Sec. 3102. Defense environmental cleanup.
Sec. 3103. Other defense activities.
Sec. 3104. Nuclear energy.

Subtitle B—Program Authorizations, Restrictions, and Limitations

Sec. 3111. Transfer of cybersecurity responsibilities to Administrator for Nuclear Security.
Sec. 3112. Redesignating duties related to departmental radiological and nuclear incident responses.
Sec. 3113. Cybersecurity Risk Inventory, Assessment, and Mitigation Working Group.
Sec. 3114. Modification of authority to establish certain contracting, program management, scientific, engineering, and technical positions.
Sec. 3115. Criminal penalties for interference with the transport of special nuclear materials, nuclear weapons components, or restricted data.
Sec. 3116. Prohibition on expansion of Advanced Recovery and Integrated Extraction System pending achievement of 30 pit-per-year base capability.
Sec. 3117. Plutonium Modernization Program management.
Sec. 3118. Modification of certain requirements and authorities relating to the removal or security of fissile materials, radiological materials, and related equipment at vulnerable sites worldwide.
Sec. 3119. Extension of briefing and reporting requirements for certain National Nuclear Security Administration contracts.
Sec. 3120. Modification of minor construction threshold for plant projects.
Sec. 3121. Modifications relating to unfunded priorities of the National Nuclear Security Administration.
Sec. 3122. Limitation on establishing an enduring bioassurance program within the National Nuclear Security Administration.
Sec. 3123. Modification of reporting requirements for uranium capabilities replacement project.
Sec. 3124. Prohibition on availability of funds for naval nuclear fuel systems based on low-enriched uranium.
Sec. 3125. Prohibition on availability of funds to reconvert or retire W76–2 warheads.
Sec. 3126. Limitation on availability of funds pending submittal of spend plan for development of sea-launched cruise missile warhead.
Sec. 3127. Deadlines for commencement of operations of certain atomic energy replacement projects.

137 STAT. 158          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 3128. Integrated schedule for future-years nuclear security program.

Subtitle C—Other Matters

Sec. 3131. U.S. nuclear fuel security initiative.
Sec. 3132. Updated financial integration policy.
Sec. 3133. Plan for domestic enrichment capability to satisfy Department of Defense uranium requirements.
Sec. 3134. Briefings on implementation of enhanced mission delivery initiative.

TITLE XXXII—DEFENSE NUCLEAR FACILITIES SAFETY BOARD

Sec. 3201. Authorization.

TITLE XXXIV—NAVAL PETROLEUM RESERVES

Sec. 3401. Authorization of appropriations.

TITLE XXXV—MARITIME ADMINISTRATION

Subtitle A—Maritime Administration

Sec. 3501. Authorization of appropriations for Maritime Administration.

Subtitle B—Maritime Infrastructure

Sec. 3511. Port infrastructure development program eligible projects.
Sec. 3512. Assistance for small inland river and coastal ports and terminals.
Sec. 3513. Port infrastructure development program: eligibility of shore power projects; selection criteria.
Sec. 3514. Codification of existing language; technical amendments.

Subtitle C—Reports

Sec. 3521. Reports on maritime industry, policies, and programs.
Sec. 3522. Reports on availability of used sealift vessels and the scrapping and recycling of imported vessels.
Sec. 3523. Study on foreign ownership and control of marine terminals.
Sec. 3524. Reports to Congress.

Subtitle D—Other Matters

Sec. 3531. Cargoes procured, furnished, or financed by the United States Government.
Sec. 3532. Recapitalization of National Defense Reserve Fleet.
Sec. 3533. United States Merchant Marine Academy and Coast Guard Academy matters; Maritime Administration requirements.
Sec. 3534. Maritime workforce working group.
Sec. 3535. Consideration of life-cycle cost estimates for acquisition and procurement of vessels.
Sec. 3536. Loans for retrofitting to qualify as a vessel of the United States.
Sec. 3537. Accountability for National Maritime Strategy.

DIVISION D—FUNDING TABLES

Sec. 4001. Authorization of amounts in funding tables.

TITLE XLI—PROCUREMENT

Sec. 4101. Procurement.

TITLE XLII—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

Sec. 4201. Research, development, test, and evaluation.

TITLE XLIII—OPERATION AND MAINTENANCE

Sec. 4301. Operation and maintenance.

TITLE XLIV—MILITARY PERSONNEL

Sec. 4401. Military personnel.

TITLE XLV—OTHER AUTHORIZATIONS

Sec. 4501. Other authorizations.

TITLE XLVI—MILITARY CONSTRUCTION

Sec. 4601. Military construction.

TITLE XLVII—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS

Sec. 4701. Department of Energy national security programs.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 159

DIVISION E—OTHER MATTERS

TITLE L—VETERANS AFFAIRS MATTERS

Sec. 5001. Adjustment of threshold amount for minor medical facility projects of Department of Veterans Affairs.
Sec. 5002. Grave markers at Santa Fe National Cemetery, New Mexico.
Sec. 5003. Improving processing by Department of Veterans Affairs of disability claims for post-traumatic stress disorder through improved training.

TITLE LI—JUDICIARY MATTERS

Sec. 5101. Prohibition of demand for bribe.
Sec. 5102. Preventing child sex abuse.
Sec. 5103. Recognition as corporation and grant of Federal charter for National American Indian Veterans, Incorporated.
Sec. 5104. Visa availability for government employee immigrant visa program.

TITLE LII—OVERSIGHT AND ACCOUNTABILITY MATTERS

Sec. 5201. Establishment of higher rates of regularly scheduled overtime pay for United States Border Patrol agents classified at GS–12.

TITLE LIII—FEDERAL DATA AND INFORMATION SECURITY

Sec. 5301. Short title.
Sec. 5302. Federal Data Center Consolidation Initiative amendments.

TITLE LIV—FOREIGN AFFAIRS MATTERS

Subtitle A—Combating Global Corruption

Sec. 5401. Short title.
Sec. 5402. Definitions.
Sec. 5403. Publication and provision of lists regarding progress on anti-corruption efforts.
Sec. 5404. Minimum standards for the elimination of corruption and assessment of efforts to combat corruption.
Sec. 5405. Imposition of sanctions under Global Magnitsky Human Rights Accountability Act.
Sec. 5406. Designation of embassy anti-corruption points of contact.

Subtitle B—Other Matters

Sec. 5411. Global cooperative framework to end human rights abuses in sourcing critical minerals.
Sec. 5412. Connecting Oceania's Nations with Vanguard Exercises and National Empowerment.
Sec. 5413. Ending China's developing nation status.
Sec. 5414. Permitting for international bridges.

TITLE LV—EDUCATION AND WORKFORCE MATTERS

Sec. 5501. Amendments to the Energy Employees Occupational Illness Compensation Program Act of 2000.

TITLE LVI—TRANSPORTATION AND INFRASTRUCTURE MATTERS

Sec. 5601. Extension of prohibition on provision of airport improvement grant funds to certain entities that have violated intellectual property rights of United States entities.
Sec. 5602. Nogales wastewater improvement.
Sec. 5603. International Port Security Enforcement Act.

TITLE LVII—ARCHITECT OF THE CAPITOL APPOINTMENT ACT OF 2023

Sec. 5701. Short title.
Sec. 5702. Appointment and term of service of Architect of the Capitol.
Sec. 5703. Appointment of Deputy Architect of the Capitol; vacancy in Architect or Deputy Architect.
Sec. 5704. Deputy Architect of the Capitol to serve as acting in case of absence, disability, or vacancy.

TITLE LVIII—FINANCIAL SERVICES MATTERS

Sec. 5801. Assessment of gifts and grants to United States institutions of higher education from entities on the Non-SDN Chinese Military-Industrial Complex Companies List.

DIVISION F—DEPARTMENT OF STATE AUTHORIZATION ACT OF 2023

Sec. 6001. Short title; table of contents.

137 STAT. 160          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 6002. Definitions.

TITLE LXI—DIPLOMATIC SECURITY AND CONSULAR AFFAIRS

Sec. 6101. Special hiring authority for passport services.
Sec. 6102. Quarterly report on passport wait times.
Sec. 6103. Passport travel advisories.
Sec. 6104. Strategy to ensure access to passport services for all Americans.
Sec. 6105. Strengthening the National Passport Information Center.
Sec. 6106. Strengthening passport customer visibility and transparency.
Sec. 6107. Annual Office of Authentications report.
Sec. 6108. Publication and updates of estimated time for processing of passport ap-
          plications.
Sec. 6109. Authority to designate additional passport acceptance agents.
Sec. 6110. Notification of passport expiration.
Sec. 6111. Use of commercially available technology in online passport renewal pro-
          gram.
Sec. 6112. Electronic payment for passport application fees.
Sec. 6113. Agreements with foreign countries regarding passports nearing expira-
          tion.
Sec. 6114. Passport fee exception for search, rescue, and other related disaster re-
          lief operations.
Sec. 6115. Increased accountability in assignment restrictions and reviews.
Sec. 6116. Suitability reviews for Foreign Service Institute instructors.
Sec. 6117. Diplomatic security fellowship programs.

TITLE LXII—PERSONNEL MATTERS

Subtitle A—Hiring, Promotion, and Development

Sec. 6201. Adjustment to promotion precepts.
Sec. 6202. Hiring authorities.
Sec. 6203. Extending paths to service for paid student interns.
Sec. 6204. Lateral Entry Program.
Sec. 6205. Mid-Career Mentoring Program.
Sec. 6206. Report on the Foreign Service Institute's language program.
Sec. 6207. Consideration of career civil servants as chiefs of missions.
Sec. 6208. Civil service rotational program.
Sec. 6209. Reporting requirement on chiefs of mission.
Sec. 6210. Report on chiefs of mission and deputy chiefs of mission.
Sec. 6211. Efforts to improve retention and prevent retaliation.
Sec. 6212. National advertising campaign.
Sec. 6213. Expansion of diplomats in residence programs.

Subtitle B—Pay, Benefits, and Workforce Matters

Sec. 6221. Education allowance.
Sec. 6222. Improving mental health services for foreign and civil servants.
Sec. 6223. Emergency back-up care.
Sec. 6224. Exception for government-financed air transportation.
Sec. 6225. Internet at hardship posts.
Sec. 6226. Competitive local compensation plan.
Sec. 6227. Supporting tandem spouses in the Foreign Service.
Sec. 6228. Accessibility at diplomatic missions.
Sec. 6229. Report on breastfeeding accommodations overseas.
Sec. 6230. Determining the effectiveness of knowledge transfers between Foreign
          Service Officers.
Sec. 6231. Education allowance for dependents of Department of State employees
          located in United States territories.
Sec. 6232. Overtime pay exception for protective services.

TITLE LXIII—INFORMATION SECURITY AND CYBER DIPLOMACY

Sec. 6301. Data-informed diplomacy.
Sec. 6302. Establishment and expansion of the Bureau Chief Data Officer Program.
Sec. 6303. Establishment of the Chief Artificial Intelligence Officer of the Depart-
          ment of State.
Sec. 6304. Strengthening the Chief Information Officer of the Department of State.
Sec. 6305. Sense of Congress on strengthening enterprise governance.
Sec. 6306. Digital connectivity and cybersecurity partnership.
Sec. 6307. Establishment of a cyberspace, digital connectivity, and related tech-
          nologies (CDT) fund.
Sec. 6308. Cyber protection support for personnel of the Department of State in po-
          sitions highly vulnerable to cyber attack.
Sec. 6309. Implementation of GAO High Risk List recommendations.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 161

### TITLE LXIV—ORGANIZATION AND OPERATIONS

Sec. 6401. Personal services contractors.
Sec. 6402. Hard-to-fill posts.
Sec. 6403. Enhanced oversight of the Office of Civil Rights.
Sec. 6404. Crisis response operations.
Sec. 6405. Special Envoy to the Pacific Islands Forum.
Sec. 6406. Special Envoy for Belarus.
Sec. 6407. Presidential Envoy for the Abraham Accords, Negev Forum, and Related
          Integration and Normalization Fora and Agreements.
Sec. 6408. Overseas placement of special appointment positions.
Sec. 6409. Resources for United States nationals unlawfully or wrongfully detained
          abroad.
Sec. 6410. Establishment of fiscal responsibility award.

### TITLE LXV—ECONOMIC DIPLOMACY

Sec. 6501. Report on recruitment, retention, and promotion of Foreign Service eco-
          nomic officers.
Sec. 6502. Mandate to revise Department of State metrics for successful economic
          and commercial diplomacy.
Sec. 6503. Direction to embassy deal teams.
Sec. 6504. Establishment of a "Deal Team of the Year" award.

### TITLE LXVI—PUBLIC DIPLOMACY

Sec. 6601. Public diplomacy outreach.
Sec. 6602. Modification on use of funds for Radio Free Europe/Radio Liberty.
Sec. 6603. Report on Radio Free Africa and Radio Free Americas.
Sec. 6604. John Lewis Civil Rights Fellowship program.
Sec. 6605. Domestic engagement and public affairs.
Sec. 6606. Modernization and enhancement strategy.

### TITLE LXVII—OTHER MATTERS

Sec. 6701. Internships of United States nationals at international organizations.
Sec. 6702. Training for international organizations.
Sec. 6703. Infrastructure projects and investments by the United States and Peo-
          ple's Republic of China.
Sec. 6704. Special envoys.
Sec. 6705. US-ASEAN Center.
Sec. 6706. Briefings on the United States-European Union Trade and Technology
          Council.
Sec. 6707. Modification and repeal of reports.
Sec. 6708. Art in embassies.
Sec. 6709. Institute for Transatlantic Engagement.
Sec. 6710. Notification of revocation of clearances.

### DIVISION G—INTELLIGENCE AUTHORIZATION ACT FOR FISCAL YEAR 2024

Sec. 7001. Short title.
Sec. 7002. Definitions.
Sec. 7003. Explanatory statement.

### TITLE I—INTELLIGENCE ACTIVITIES

Sec. 7101. Authorization of appropriations.
Sec. 7102. Classified Schedule of Authorizations.
Sec. 7103. Intelligence Community Management Account.
Sec. 7104. Increase in employee compensation and benefits authorized by law.
Sec. 7105. Restriction on conduct of intelligence activities.

### TITLE II—CENTRAL INTELLIGENCE AGENCY RETIREMENT AND DISABILITY SYSTEM

Sec. 7201. Authorization of appropriations.

### TITLE III—INTELLIGENCE COMMUNITY MATTERS

#### Subtitle A—General Intelligence Community Matters

Sec. 7301. Plan to recruit, train, and retain personnel with experience in financial
          intelligence and emerging technologies.
Sec. 7302. Policy and performance framework for mobility of intelligence commu-
          nity workforce.
Sec. 7303. Standards, criteria, and guidance for counterintelligence vulnerability
          assessments and surveys.

137 STAT. 162            PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 7304. Improving administration of certain post-employment restrictions for intelligence community.
Sec. 7305. Mission of the National Counterintelligence and Security Center.
Sec. 7306. Budget transparency on costs of implementation of Executive Order 13556.
Sec. 7307. Improvements relating to intelligence community staffing, details, and assignments.
Sec. 7308. Insider threats.
Sec. 7309. Modification of deadline for annual submission of National Intelligence Priorities Framework.
Sec. 7310. Matters relating to chief data officers of intelligence community.
Sec. 7311. Modification to special pay authority for science, technology, engineering, or mathematics positions.
Sec. 7312. Annual report on unfunded priorities of intelligence community.
Sec. 7313. Submission of legislative proposals.
Sec. 7314. Annual report on reporting requirements.
Sec. 7315. Notice and damage assessment with respect to significant unauthorized disclosure or compromise of classified national intelligence.
Sec. 7316. In-state tuition rates for certain members of intelligence community.
Sec. 7317. Repeal of study on personnel under Strategic Intelligence Partnership Program.
Sec. 7318. Intelligence Community Counterintelligence Office at the Department of Agriculture.
Sec. 7319. Sunset of Climate Security Advisory Council.
Sec. 7320. Inclusion of counternarcotics as special topic in certain budget justification materials.
Sec. 7321. Development of plan to make open-source intelligence products available to certain Federal employees.
Sec. 7322. Intelligence community-wide policy on prepublication review.
Sec. 7323. Review relating to confidential human source program of Federal Bureau of Investigation.
Sec. 7324. Prohibition on availability of funds for certain activities and assessment of the Overt Human Intelligence and Open Source Intelligence Collection Programs of the Office of Intelligence and Analysis of the Department of Homeland Security.
Sec. 7325. Sense of Congress on priority of fentanyl in National Intelligence Priorities Framework.
Sec. 7326. Reports on civilian casualties caused by certain operations of foreign governments.
Sec. 7327. Modification and repeal of reporting requirements.

Subtitle B—Central Intelligence Agency

Sec. 7331. Change to penalties and increased availability of mental health treatment for unlawful conduct on Central Intelligence Agency installations.
Sec. 7332. Modifications to procurement authorities of the Central Intelligence Agency.
Sec. 7333. Inspector General of the Central Intelligence Agency quarterly employee engagement summaries.
Sec. 7334. Benjamin Tallmadge Institute as primary Central Intelligence Agency entity for education and training in counterintelligence.
Sec. 7335. Central Intelligence Agency intelligence assessment of Sinaloa Cartel and Jalisco Cartel.
Sec. 7336. Central Intelligence Agency intelligence assessment with respect to efforts by People's Republic of China to increase influence in Middle East.
Sec. 7337. Assessment of availability of mental health and chaplain services to Agency employees.
Sec. 7338. Assessment by Director of Central Intelligence Agency on certain effects of Abraham Accords.
Sec. 7339. Reporting and investigating allegations of sexual assault and sexual harassment within the Central Intelligence Agency.

Subtitle C—Matters Relating to Defense Intelligence and Overhead Architecture

Sec. 7341. Modification of reporting requirement for All-Domain Anomaly Resolution Office.
Sec. 7342. Defense Intelligence Agency assessment of strategic competition in Latin America and the Caribbean.
Sec. 7343. Funding limitations relating to unidentified anomalous phenomena.

Subtitle D—Matters Relating to National Security Agency, Cyber, and Commercial Cloud Enterprise

Sec. 7351. Congressional notification by National Security Agency of intelligence collection adjustments.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 163

Sec. 7352. Modifications to enforcement of cybersecurity requirements for national security systems.
Sec. 7353. Support by intelligence community for certain cross-functional team of Department of Defense.
Sec. 7354. Commercial Cloud Enterprise notification.
Sec. 7355. Commercial Cloud Enterprise sole source task order notification requirement.
Sec. 7356. Analysis of commercial cloud initiatives of intelligence community.

### TITLE IV—MATTERS CONCERNING FOREIGN COUNTRIES

#### Subtitle A—People's Republic of China

Sec. 7401. Intelligence community coordinator for accountability of atrocities of the People's Republic of China.
Sec. 7402. Interagency working group and report on the malign efforts of the People's Republic of China in Africa.
Sec. 7403. Amendment to requirement for annual assessment by intelligence community working group for monitoring the economic and technological capabilities of the People's Republic of China.
Sec. 7404. Assessments of reciprocity in the relationship between the United States and the People's Republic of China.
Sec. 7405. Assessment of threat posed to United States ports by cranes manufactured by countries of concern.
Sec. 7406. Intelligence assessment of influence operations by People's Republic of China toward Pacific Islands countries.
Sec. 7407. Independent study on economic impact of military invasion of Taiwan by People's Republic of China.
Sec. 7408. Report by Director of National Intelligence on Uyghur genocide.

#### Subtitle B—Other Foreign Countries

Sec. 7411. Report on efforts to capture and detain United States citizens as hostages.
Sec. 7412. Intelligence assessments regarding Haiti.
Sec. 7413. Monitoring Iranian enrichment of uranium-235.

### TITLE V—MATTERS PERTAINING TO UNITED STATES ECONOMIC AND EMERGING TECHNOLOGY COMPETITION WITH UNITED STATES ADVERSARIES

#### Subtitle A—General Matters

Sec. 7501. Detail of individuals from intelligence community to Department of Commerce.
Sec. 7502. Intelligence Community Innovation Unit.
Sec. 7503. Establishment of Office of Engagement.
Sec. 7504. Designation of a chief technology officer within certain elements of the intelligence community.
Sec. 7505. Requirement to authorize additional security clearances for certain contractors.
Sec. 7506. Intelligence Innovation Board.
Sec. 7507. Programs for next-generation microelectronics in support of artificial intelligence.
Sec. 7508. Program for Beyond 5G.
Sec. 7509. Intelligence community commercial remote sensing requirements.
Sec. 7510. Requirement to ensure intelligence community directives appropriately account for artificial intelligence and machine learning tools in intelligence products.

#### Subtitle B—Next-generation Energy, Biotechnology, and Artificial Intelligence

Sec. 7511. Expanded annual assessment of economic and technological capabilities of the People's Republic of China and related briefing.
Sec. 7512. Assessment of using civil nuclear energy for intelligence community capabilities.
Sec. 7513. Policies established by Director of National Intelligence for artificial intelligence capabilities.

### TITLE VI—CLASSIFICATION REFORM

Sec. 7601. Short title.
Sec. 7602. Promoting efficient declassification review.
Sec. 7603. Training to promote sensible classification.
Sec. 7604. Improvements to Public Interest Declassification Board.

137 STAT. 164 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 7605. Implementation of technology for classification and declassification.
Sec. 7606. Studies and recommendations on necessity of security clearances.

TITLE VII—SECURITY CLEARANCE AND TRUSTED WORKFORCE

Sec. 7701. Review of shared information technology services for personnel vetting.
Sec. 7702. Timeliness standard for rendering determinations of trust for personnel vetting.
Sec. 7703. Annual report on personnel vetting trust determinations.
Sec. 7704. Survey to assess strengths and weaknesses of Trusted Workforce 2.0.

TITLE VIII—ANOMALOUS HEALTH INCIDENTS

Sec. 7801. Improved funding flexibility for payments made by the Central Intelligence Agency for qualifying injuries to the brain.
Sec. 7802. Clarification of requirements to seek certain benefits relating to injuries to the brain.
Sec. 7803. Intelligence community implementation of HAVANA Act of 2021 authorities.
Sec. 7804. Report and briefings on Central Intelligence Agency handling of anomalous health incidents.

TITLE IX—OTHER MATTERS

Sec. 7901. Technical corrections.
Sec. 7902. Extension of title VII of FISA.

10 USC 101 note.

**SEC. 3. CONGRESSIONAL DEFENSE COMMITTEES.**

In this Act, the term "congressional defense committees" has the meaning given that term in section 101(a)(16) of title 10, United States Code.

**SEC. 4. BUDGETARY EFFECTS OF THIS ACT.**

The budgetary effects of this Act, for the purposes of complying with the Statutory Pay-As-You-Go Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, jointly submitted for printing in the Congressional Record by the Chairmen of the House and Senate Budget Committees, provided that such statement has been submitted prior to the vote on passage in the House acting first on the conference report or amendment between the Houses.

# DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

# TITLE I—PROCUREMENT

Subtitle A—Authorization of Appropriations

Sec. 101. Authorization of appropriations.

Subtitle B—Army Programs

Sec. 111. Limitation on availability of funds pending assessment of Army Trackless Moving Target systems.
Sec. 112. Strategy for Army tactical wheeled vehicle program.
Sec. 113. Report on acquisition strategies for the logistics augmentation program of the Army.

Subtitle C—Navy Programs

Sec. 121. Modification of requirements for minimum number of carrier air wings of the Navy.
Sec. 122. Extension of prohibition on availability of funds for Navy port waterborne security barriers.
Sec. 123. Multiyear procurement authority for Virginia class submarine program.
Sec. 124. Procurement authority for Auxiliary Personnel Lighter program.
Sec. 125. Limitation on reductions to V–22 aircraft nacelle improvement program.
Sec. 126. Limitation on consideration of Government-operated dry docks in certain contract solicitations.

Sec. 127. Annual reports on use of Government docks for ship repair and mainte-
nance.

Subtitle D—Air Force Programs

Sec. 131. Limitation on retirement of F–15 aircraft and modification of related re-
porting requirement.
Sec. 132. Limitations and minimum inventory requirement relating to RQ–4 air-
craft.
Sec. 133. Temporary exception to minimum inventory requirement for fighter air-
craft of the Air Force.
Sec. 134. Modification of minimum inventory requirements for C–130 aircraft.
Sec. 135. Modification of annual reports on T–7A Advanced Pilot Training System.
Sec. 136. Modification to prohibition on certain reductions to B–1 bomber aircraft
squadrons.
Sec. 137. Modification of minimum inventory requirements for A–10 aircraft.
Sec. 138. Procurement authority for over-the-horizon radar systems.
Sec. 139. Prohibition on availability of funds for retirement of KC–135 aircraft.
Sec. 140. Prohibition on reduction of KC–135 aircraft in PMAI of the reserve com-
ponents.
Sec. 141. Limitation on issuance of acquisition strategy for the KC–135 recapital-
ization program.
Sec. 142. Prohibition on certain reductions to inventory of E–3 airborne warning
and control system aircraft.
Sec. 143. Prohibition on availability of funds for termination of production lines for
the HH–60W aircraft.
Sec. 144. Limitation on retirement of F–16C/D aircraft.
Sec. 145. Limitation on procurement of KC–46A aircraft.
Sec. 146. Limitation on actions relating to remote vision systems of KC–46A air-
craft.
Sec. 147.  Limitation on retirement of T–1A training aircraft.
Sec. 148. Plan for long-term Air Force fighter force structure.

Subtitle E—Defense-wide, Joint, and Multiservice Matters

Sec. 151. Annual report on force structure changes exhibit for the defense budget.
Sec. 152. Multiyear procurement authority for domestically processed critical min-
erals.
Sec. 153. Prohibition on solicitation of proprietary armor for certain tactical vehi-
cles.
Sec. 154. Prohibition on availability of funds for procurement of certain batteries.

# Subtitle A—Authorization of Appropriations

### SEC. 101. AUTHORIZATION OF APPROPRIATIONS.

Funds are hereby authorized to be appropriated for fiscal year 2024 for procurement for the Army, the Navy and the Marine Corps, the Air Force and the Space Force, and Defense-wide activities, as specified in the funding table in section 4101.

# Subtitle B—Army Programs

### SEC. 111. LIMITATION ON AVAILABILITY OF FUNDS PENDING ASSESSMENT OF ARMY TRACKLESS MOVING TARGET SYSTEMS.

(a) IN GENERAL.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Trackless Moving Target program of the Army, not more than 75 percent may be obligated or expended to procure or further develop the Trackless Moving Target–Infantry variant until the Secretary of the Army—

(1) acting through the Army Combat Capabilities Development Command, conducts an assessment of the Trackless Moving Target–Infantry variant, which shall include—

137 STAT. 166          PUBLIC LAW 118–31—DEC. 22, 2023

(A) obtaining end-user feedback regarding such variant; and

(B) comparing the performance of such variant against the applicable program requirements set forth in the report of Secretary of the Army titled "Autonomous Robotic Targets for Small Arms Range Training", as submitted to Congress in March 2023;

(2) obtains direct soldier feedback on the current Trackless Moving Target program;

Certification.

(3) certifies to the congressional defense committees that the acquisition strategy of the Army for the Trackless Moving Target–Infantry variant meets the program requirements set forth in the report referred to in paragraph (1)(B); and

Reports.

(4) submits to the congressional defense committees the report required under subsection (b).

(b) REPORT REQUIRED.—Not later than 30 days after the date of the completion of the assessment and soldier feedback required under paragraphs (1) and (2) of subsection (a), the Secretary of the Army shall submit to the congressional defense committees a report that includes—

(1) detailed results of the assessment conducted under subsection (a)(1), including a comparison of the Trackless Moving Target–Infantry variant under development by the Army to other operationally deployed, commercially available targets in use by other Armed Forces;

Summary.

(2) a summary of the soldier feedback obtained under subsection (a)(2); and

Certification.
Compliance.

(3) a certification that the development of the Trackless Moving Target–Infantry variant is in compliance with the requirements of section 4061 of title 10, United States Code.

10 USC 7013 note.

**SEC. 112. STRATEGY FOR ARMY TACTICAL WHEELED VEHICLE PROGRAM.**

Time periods.
Reports.

(a) STRATEGY REQUIRED.—In the budget justification materials submitted in support of the budget of the Department of Defense (as submitted with the budget of the President under section 1105(a) of title 31, United States Code) for each of fiscal years 2025, 2030, and 2035, the Secretary of the Army shall include a report on the strategy of the Army for tactical wheeled vehicles.

(b) REQUIREMENTS FOR STRATEGY.—Each strategy required by subsection (a) shall—

(1) align with the applicable national defense strategy under section 113(g) of title 10, United States Code, and applicable policies;

(2) be designed so that the force of tactical wheeled vehicles provided under the strategy supports the national security strategy of the United States as set forth in the most recent national security strategy report of the President under section 108 of the National Security Act of 1947 (50 U.S.C. 3043); and

(3) define capabilities and capacity requirements across the entire fleet of tactical wheeled vehicles, including—

(A) light, medium, and heavy tactical wheeled vehicles; and

(B) associated trailer and support equipment.

(c) STRATEGY ELEMENTS.—Each strategy required by subsection (a) shall include the following:

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 167

(1) A detailed program for the construction of light, medium, and heavy tactical wheeled vehicles for the Army over the period of five fiscal years following the date of the strategy.

(2) A description of the necessary force structure and capabilities of tactical wheeled vehicles to meet the requirements of the national security strategy described in subsection (b)(2).

(3) The estimated levels of annual funding, by vehicle class, in both graphical and tabular form, necessary to carry out the program described in paragraph (1), together with a discussion of the procurement strategies on which such estimated levels of annual funding are based.

(4) The estimated total cost of construction for each vehicle class used to determine the estimated levels of annual funding described in paragraph (3).

(d) CONSIDERATIONS.—In developing each strategy required by subsection (a), the Secretary of the Army shall consider the following objectives and factors:

(1) Objectives relating to protection, fleet operations, mission command, mobility, and the industrial base.

(2) Technological advances that are expected to increase efficiency of and reduce demand for tactical wheeled vehicles.

(3) Technological advances that allow for the operation of tactical wheeled vehicles in a variety of climate and geographic conditions.

(4) Existing commercial technologies such as vehicle electrification, autonomous capabilities, and predictive maintenance, among others.

(5) The capabilities of autonomous equivalents to tactical wheeled vehicles.

(e) BRIEFING REQUIREMENTS.—Not later than 15 days after each budget submission described in subsection (a), in conjunction with the submission of each strategy required by such subsection, the Secretary of the Army shall provide to the congressional defense committees a briefing that addresses the investment needed for each platform of tactical wheeled vehicle of the Army across the period covered by the most recent future-years defense program submitted to Congress under section 221 of title 10, United States Code (as of the date of the briefing).

### SEC. 113. REPORT ON ACQUISITION STRATEGIES FOR THE LOGISTICS AUGMENTATION PROGRAM OF THE ARMY.

(a) IN GENERAL.—The Secretary of the Army, in consultation with the Secretary of Defense and the commanders of the geographic combatant commands, shall conduct a review of the proposed recompete of the operational task orders of the geographic combatant commands under the LOGCAP V contract.

(b) ELEMENTS.—The review required by subsection (a) shall include the following:

(1) A business case analysis of the cost and operational benefit of recompeting the task orders described in subsection (a).

(2) Input from stakeholders, including the Commanding General of Army Sustainment Command, the commanders of the geographic combatant commands, and the commanders of the Army Service Component Commands, on the desirability

*Time period.*

*Funding estimate.*

*Cost estimate.*

*Deadline.*

*Review.*

*Analysis.*

and operational effects of the proposed recompete described in subsection (a).

Cost estimates.
Timelines.

(3) Detailed cost estimates and timelines, including projected transition costs and timelines for the task orders described in subsection (a).

Assessment.

(4) An assessment of the potential effects of the recompete described in subsection (a) on—

(A) the quality and timing of the work performed under the task orders described in such subsection; and

(B) the ability of the Army to transition to the LOGCAP VI contract, including any effects on the quality and timing of such transition.

Analysis.

(5) An analysis of recompeting the task orders described in subsection (a) compared to transitioning directly to the LOGCAP VI contract instead of recompeting such task orders.

Overview.

(6) An overview of potential innovations and efficiencies derived from a competition for the LOGCAP VI contract.

(7) An explanation of the benefit of recompeting the task orders described in subsection (a) compared to conducting an open competition for the LOGCAP VI contract instead of recompeting such task orders.

(8) A breakdown of any additional authorities needed to move directly to the LOGCAP VI contract instead of recompeting the task orders described in subsection (a).

(c) REPORT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Army shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the results of the review conducted under subsection (a), including the results of the review with respect to each element specified in subsection (b).

(d) DEFINITIONS.—In this section:

(1) The term "LOGCAP V contract" means the contract for the logistics augmentation program of the Army that is due to expire in 2028.

(2) The term "LOGCAP VI contract" means a successor contract for the logistics augmentation program of the Army that is expected to be entered into following the expiration of the LOGCAP V contract.

# Subtitle C—Navy Programs

### SEC. 121. MODIFICATION OF REQUIREMENTS FOR MINIMUM NUMBER OF CARRIER AIR WINGS OF THE NAVY.

(a) MODIFICATION OF REQUIREMENTS.—

(1) IN GENERAL.—Subsection (e) of section 8062 of title 10, United States Code, is amended to read as follows—

"(e) The Secretary of the Navy shall ensure that—

"(1) the Navy maintains a minimum of 9 carrier air wings; and

"(2) for each such carrier air wing, the Navy maintains a dedicated and fully staffed headquarters.".

Reports.
10 USC 8062
note.

Notification.

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall take effect one year after the date on which the Secretary of the Navy submits to Congress the report required under subsection (b)(3). The Secretary of the Navy shall notify the Law Revision Counsel of the House of Representatives

of the submission of the report so that the Law Revision Counsel may execute the amendment made by paragraph (1) in accordance with the preceding sentence.

(b) ANALYSIS AND REPORT.—

(1) IN GENERAL.—The Secretary of the Navy shall conduct an analysis of potential approaches to the manning, operation, and deployment of a 10th aircraft carrier and associated carrier air wing to determine how the Navy can mobilize such a carrier and air wing if required by operational needs. <span>Determination.</span>

(2) ELEMENTS.—The analysis under paragraph (1) shall address the following:

(A) The timeline associated with removing an aircraft carrier from each the following maintenance availability types: <span>Timeline.</span>

(i) Complex Overhaul.

(ii) Selected Restricted Availability.

(iii) Docking Selected Restricted Availability.

(iv) Planned Incremental Availability.

(v) Docking Planned Incremental Availability.

(B) The potential for establishing a reserve component air wing capable of mobilization as a 10th carrier air wing.

(C) The timeline for activation of such a reserve component carrier air wing. <span>Timeline.</span>

(D) The costs associated with establishing and maintaining a 10th active carrier air wing versus establishing and maintaining a reserve component air wing as described in subparagraph (B). <span>Costs.</span>

(E) The potential for deployment of a 10th aircraft carrier without a fully manned carrier air wing in the event the Navy only operates and crews 9 carrier air wings at the time deployment of a 10th aircraft carrier is required.

(F) The potential for additional forward deployed squadrons that could support an aircraft carrier during theater operations that may not have a fully embarked air wing at the time of embarkation.

(3) REPORT.—Following completion of the analysis required under paragraph (1), Secretary of the Navy shall submit to the congressional defense committees a report on the results of the analysis.

### SEC. 122. EXTENSION OF PROHIBITION ON AVAILABILITY OF FUNDS FOR NAVY PORT WATERBORNE SECURITY BARRIERS.

Section 130(a) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1665), as most recently amended by section 123(a) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2443), is further amended by striking "through 2023" and inserting "through 2024".

### SEC. 123. MULTIYEAR PROCUREMENT AUTHORITY FOR VIRGINIA CLASS SUBMARINE PROGRAM.

(a) AUTHORITY FOR MULTIYEAR PROCUREMENT.—Subject to section 3501 of title 10, United States Code, the Secretary of the Navy may enter into one or more multiyear contracts for the procurement of not more than 13 Virginia class submarines.

(b) AUTHORITY FOR ADVANCE PROCUREMENT.—The Secretary of the Navy may enter into one or more contracts, beginning in <span>Effective date.</span>

fiscal year 2024, for advance procurement associated with the Virginia class submarines for which authorization to enter into a multiyear procurement contract is provided under subsection (a) and for equipment or subsystems associated with the Virginia class submarine program, including procurement of—

    (1) long lead time material; or

    (2) material or equipment in economic order quantities when cost savings are achievable.

(c) CONDITION FOR OUT-YEAR CONTRACT PAYMENTS.—A contract entered into under subsection (a) shall provide that any obligation of the United States to make a payment under the contract for a fiscal year after fiscal year 2025 is subject to the availability of appropriations or funds for that purpose for such later fiscal year.

(d) LIMITATION ON TERMINATION LIABILITY.—A contract for the construction of Virginia class submarines entered into under subsection (a) shall include a clause that limits the liability of the United States to the contractor for any termination of the contract. The maximum liability of the United States under the clause shall be the amount appropriated for the submarines covered by the contract regardless of the amount obligated under the contract.

(e) VIRGINIA CLASS SUBMARINE DEFINED.—The term "Virginia class submarine" means a block VI configured Virginia class submarine.

### SEC. 124. PROCUREMENT AUTHORITY FOR AUXILIARY PERSONNEL LIGHTER PROGRAM.

Effective date.

(a) CONTRACT AUTHORITY.—Beginning in fiscal year 2024, the Secretary of the Navy may enter into one or more contracts for the procurement of up to six Auxiliary Personnel Lighter class vessels and associated material.

(b) LIABILITY.—Any contract entered into under subsection (a) shall provide that—

Payments.

    (1) any obligation of the United States to make a payment under the contract is subject to the availability of appropriations for that purpose; and

    (2) the total liability of the Federal Government for termination of the contract shall be limited to the total amount of funding obligated to the contract at the time of termination.

### SEC. 125. LIMITATION ON REDUCTIONS TO V–22 AIRCRAFT NACELLE IMPROVEMENT PROGRAM.

(a) LIMITATION.—Except as provided in subsection (b), the Secretary of Defense shall upgrade not fewer than 24 V–22 aircraft under the V–22 nacelle improvement program in accordance with the plan for such program set forth in the budget of the President for fiscal year 2024 (as submitted to Congress under section 1105(a) of title 31, United States Code).

Certification.

(b) EXCEPTION.—The Secretary of Defense may reduce the number of aircraft upgraded under subsection (a) below 24 if the Secretary certifies to the congressional defense committees that such reduction is in the interests of national security.

### SEC. 126. LIMITATION ON CONSIDERATION OF GOVERNMENT-OPERATED DRY DOCKS IN CERTAIN CONTRACT SOLICITATIONS.

California.

(a) IN GENERAL.—With respect to a solicitation of the Secretary of the Navy for the award of a contract for private sector nonnuclear surface ship maintenance in San Diego, California, the

Secretary shall ensure, in accordance with section 2466 of title 10, United States Code, that Government-operated dry docks are only included in such solicitation if there is insufficient capacity at privately-operated dry docks for performance of such contract.

(b) APPLICABILITY AND TERMINATION.—The prohibition under subsection (a) shall apply with respect to solicitations for contracts issued after the date of the enactment of this Act and shall terminate on the date that is five years after such date of enactment.

### SEC. 127. ANNUAL REPORTS ON USE OF GOVERNMENT DOCKS FOR SHIP REPAIR AND MAINTENANCE.

Not later than June 30, 2024, and on an annual basis thereafter through 2028, the Secretary of the Navy shall submit to the congressional defense committees a report that— <span style="float:right">Time period.</span>

(1) identifies each instance in the year preceding the date of the report in which the Navy used a Government dock for a ship repair and maintenance availability when sufficient capacity was available in private docks during the period in which such repairs and maintenance were expected to be performed; and

(2) for each such instance, provides an explanation of the reasons the Navy used a Government dock rather than a private dock.

# Subtitle D—Air Force Programs

### SEC. 131. LIMITATION ON RETIREMENT OF F–15 AIRCRAFT AND MODIFICATION OF RELATED REPORTING REQUIREMENT.

(a) LIMITATION.—Section 9062 of title 10, United States Code, is amended by adding at the end the following new subsection:

"(l)(1) During the period beginning on the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024 and ending on September 30, 2029, the Secretary of the Air Force may not— <span style="float:right">Time period.</span>

"(A) retire more than 68 F–15E aircraft;

"(B) reduce funding for unit personnel or weapon system sustainment activities for retained F–15E aircraft in a manner that presumes future congressional authority to divest such aircraft; or

"(C) keep an F–15E aircraft (other than an aircraft identified for retirement under subparagraph (A)) in a status considered excess to the requirements of the possessing command and awaiting disposition instructions (commonly referred to as 'XJ' status).

"(2) The prohibition under paragraph (1) shall not apply to individual F–15E aircraft that the Secretary of the Air Force determines, on a case-by-case basis, to be no longer mission capable and uneconomical to repair because of aircraft accidents, mishaps, or excessive material degradation and non-airworthiness status of certain aircraft.". <span style="float:right">Determination.</span>

(b) MODIFICATION TO REPORT REQUIRED BEFORE DIVESTMENT.— Section 150 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2456) is amended—

(1) in subsection (b)(1)—

137 STAT. 172          PUBLIC LAW 118–31—DEC. 22, 2023

(A) in subparagraph (C)(ii), by striking "and" at the end;

(B) in subparagraph (D), by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following new subparagraph:

"(E) for each F–15E aircraft that the Secretary plans to divest, a description of—

"(i) each upgrade and modification made to such aircraft, including—

"(I) the date of the upgrade or modification; and

"(II) the cost of such upgrade or modification in current year dollars; and

"(ii) the estimated remaining service-life (expressed as equivalent flight hours and years) of—

"(I) the aircraft; and

"(II) the onboard systems of the aircraft.";

(2) by redesignating subsection (c) as subsection (d); and

(3) by inserting after subsection (b) the following new subsection (c):

*Deadlines.*
*Time period.*

"(c) ANNUAL UPDATES.—Not later than October 1, 2024, and not later than October 1 of each year thereafter through 2029, the Secretary of the Air Force shall—

"(1) update the report required under subsection (b); and

"(2) submit the updated report to the congressional defense committees.".

*Compliance.*
*10 USC 9062 note.*

(c) CLARIFICATION OF RELATIONSHIP BETWEEN LIMITATIONS.— The authority of the Secretary of the Air Force to retire F–15E aircraft to the extent allowed under subsection (l)(1)(A) of section 9062 of title 10, United States Code (as added by subsection (a) of this section) shall not apply until the Secretary complies with the requirements of section 150 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117– 263; 136 Stat. 2456) (as amended by subsection (b) of this section).

### SEC. 132. LIMITATIONS AND MINIMUM INVENTORY REQUIREMENT RELATING TO RQ–4 AIRCRAFT.

Section 9062 of title 10, United States Code, as amended by section 131, is further amended by adding at the end the following new subsection:

*Time period.*

"(m)(1) During the period beginning on the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024 and ending on September 30, 2028, the Secretary of the Air Force may not—

"(A) retire an RQ–4 aircraft;

"(B) reduce funding for unit personnel or weapon system sustainment activities for RQ–4 aircraft in a manner that presumes future congressional authority to divest such aircraft;

"(C) keep an RQ–4 aircraft in a status considered excess to the requirements of the possessing command and awaiting disposition instructions (commonly referred to as 'XJ' status); or

"(D) decrease the total aircraft inventory of RQ–4 aircraft below 10 aircraft.

"(2) The prohibition under paragraph (1) shall not apply to individual RQ–4 aircraft that the Secretary of the Air Force determines, on a case-by-case basis, to be no longer mission capable and uneconomical to repair because of aircraft accidents, mishaps, or excessive material degradation and non-airworthiness status of certain aircraft.". *Determination.*

### SEC. 133. TEMPORARY EXCEPTION TO MINIMUM INVENTORY REQUIRE-MENT FOR FIGHTER AIRCRAFT OF THE AIR FORCE.

(a) TEMPORARY AUTHORITY.—Notwithstanding section 9062(i)(1) of title 10, United States Code, during the covered period, the Secretary of the Air Force may decrease the total quantity of fighter aircraft in the primary mission aircraft inventory of the Air Force to not fewer than 1,112 aircraft.

(b) TERMINATION.—Following expiration of the covered period, the minimum primary mission aircraft inventory requirements specified in section 9062(i)(1) of title 10, United States Code, shall apply as if this section had not been enacted. *Applicability.*

(c) DEFINITIONS.—In this section:

(1) The term "covered period" means the period beginning on the date of the enactment of this Act and ending on October 1, 2024.

(2) The terms "fighter aircraft" and "primary mission aircraft inventory" have the meanings given those terms in section 9062(i)(2) of title 10, United States Code.

### SEC. 134. MODIFICATION OF MINIMUM INVENTORY REQUIREMENTS FOR C–130 AIRCRAFT.

(a) MINIMUM INVENTORY REQUIREMENT.—Section 146(a)(3)(B) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2455) is amended by striking "2023" and inserting "2024".

(b) PROHIBITION ON REDUCTION OF C–130 AIRCRAFT ASSIGNED TO NATIONAL GUARD.—Section 146(b)(1) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2455) is amended by striking "fiscal year 2023" and inserting "fiscal years 2023 and 2024".

### SEC. 135. MODIFICATION OF ANNUAL REPORTS ON T–7A ADVANCED PILOT TRAINING SYSTEM.

Section 156 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2460) is amended—

(1) in subsection (a), by striking "through 2028" and inserting "through 2033"; and

(2) in subsection (b)—

(A) by redesignating paragraph (9) as paragraph (11); and

(B) by inserting after paragraph (8) the following new paragraphs:

"(9) A schedule risk assessment, conducted by the Secretary of the Air Force at the 80 percent confidence level, that includes risks associated with the overlap of the development, testing, and production phases of the program and risks related to contractor management. *Risk assessment.*

"(10) A plan for determining the conditions under which the Secretary of the Air Force may accept production work *Plan.*

on the T–7A Advanced Pilot Training System that was completed by the contractor for the program in anticipation of the Air Force ordering additional systems, but which was not subject to typical production oversight because there was no contract for the procurement of such additional systems in effect when such work was performed.".

### SEC. 136. MODIFICATION TO PROHIBITION ON CERTAIN REDUCTIONS TO B–1 BOMBER AIRCRAFT SQUADRONS.

Section 133 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1574) is amended—
(1) by amending subsection (b) to read as follows:
"(b) EXCEPTIONS.—The prohibition under subsection (a) shall not apply—
"(1) to a bomb wing for which the Secretary of the Air Force has commenced the process of replacing B–1 bomber aircraft with B–21 bomber aircraft; or

*Determination.*

"(2) so as to prohibit the retirement of the individual B–1 aircraft designated 85–0089, which has been determined by Secretary of the Air Force to be no longer mission capable and uneconomical to repair due to damage sustained on April 20, 2022."; and
(2) in subsection (c)(1), by striking "and ending on September 30, 2023" and inserting "and ending on September 30, 2026".

### SEC. 137. MODIFICATION OF MINIMUM INVENTORY REQUIREMENTS FOR A–10 AIRCRAFT.

(a) IN GENERAL.—Section 134(d) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 130 Stat. 2038), as amended by section 141(b)(1) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2452), is amended by striking "153 A–10 aircraft" and inserting "135 A–10 aircraft".

*Evaluation.*

(b) POTENTIAL TRANSFER OF CERTAIN AIRCRAFT.—In the case of any A–10 aircraft that is retired, prepared to retire, or placed in storage using funds authorized to be appropriated by this Act or by the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), the Secretary of Defense shall ensure that such aircraft is evaluated for potential transfer to the military forces of a nation that is an ally or partner of the United States.
(c) REPEAL.—Section 142 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 755) is amended—
(1) by striking subsection (b);
(2) by redesignating subsections (c) through (e) as subsections (b) through (d), respectively; and
(3) in subsection (c), as so redesignated, by striking "subsection (c)" and inserting "subsection (b)".

### SEC. 138. PROCUREMENT AUTHORITY FOR OVER-THE-HORIZON RADAR SYSTEMS.

(a) IN GENERAL.—As soon as practicable after the date of the enactment of this Act, the Secretary of the Air Force shall seek to enter into one or more contracts for the procurement of up to six over-the-horizon radar systems that meet the requirements of the United States Northern Command with respect to the detection of increasingly complex threats.

(b) USE OF COMPETITIVE PROCEDURES AND SOLE-SOURCE CONTRACTS.—

(1) INITIAL CONTRACTS.—With respect to the award of a contract for the procurement of the first two over-the-horizon radar systems under subsection (a)—

(A) the Secretary of the Air Force may use procedures other than competitive procedures (in accordance with section 3204 of title 10, United States Code) if the Secretary determines it is not feasible to use competitive procedures; and

*Determination.*

(B) if the Secretary makes a determination to award a sole source contract for such procurement in order to meet the requirements established by the Commander of the United States Northern Command, not later than 14 days after making such determination, the Secretary shall submit to the congressional defense committees a notification of such determination, including the rationale for such determination.

*Deadline.*
*Notification.*

(2) SUBSEQUENT CONTRACTS.—The Secretary of the Air Force shall use competitive procedures for the award of a contract for the procurement of the third and any subsequent over-the-horizon radar systems under subsection (a).

(3) COMPETITIVE PROCEDURES DEFINED.—In this section, the term "competitive procedures" has the meaning given that term in section 3012 of title 10, United States Code.

### SEC. 139. PROHIBITION ON AVAILABILITY OF FUNDS FOR RETIREMENT OF KC–135 AIRCRAFT.

(a) PROHIBITION.—Except as provided in subsection (b), none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Air Force may be obligated or expended to retire, or prepare to retire, a KC–135 aircraft.

(b) EXCEPTION.—The prohibition under subsection (a) shall not apply to individual KC–135 aircraft that the Secretary of the Air Force determines, on a case-by-case basis, to be no longer mission capable and uneconomical to repair because of aircraft accidents, mishaps, or excessive material degradation and non-airworthiness status of certain aircraft.

*Determination.*

### SEC. 140. PROHIBITION ON REDUCTION OF KC–135 AIRCRAFT IN PMAI OF THE RESERVE COMPONENTS.

(a) PROHIBITION.—None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Air Force may be obligated or expended to reduce the number of KC–135 aircraft designated as primary mission aircraft inventory within the reserve components of the Air Force.

(b) PRIMARY MISSION AIRCRAFT INVENTORY DEFINED.—In this section, the term "primary mission aircraft inventory" has the meaning given that term in section 9062(i)(2)(B) of title 10, United States Code.

### SEC. 141. LIMITATION ON ISSUANCE OF ACQUISITION STRATEGY FOR THE KC–135 RECAPITALIZATION PROGRAM.

The Secretary of the Air Force may not issue an acquisition strategy for the KC–135 recapitalization program until the date on which the Secretary submits to the congressional defense committees the following documentation:

137 STAT. 176     PUBLIC LAW 118–31—DEC. 22, 2023

Update.
Timeline.
Analysis.

Requirements.

(1) An updated tanker roadmap timeline to include procurement of the Next Generation Air Refueling System.

(2) The business case analysis of the Air Force for the KC–135 recapitalization program.

(3) Validated requirements from the Joint Staff for the contract competition under the KC–135 recapitalization program.

### SEC. 142. PROHIBITION ON CERTAIN REDUCTIONS TO INVENTORY OF E–3 AIRBORNE WARNING AND CONTROL SYSTEM AIRCRAFT.

(a) PROHIBITION.—Except as provided in subsections (b) and (c), none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Air Force may be obligated or expended to retire, prepare to retire, or place in storage or in backup aircraft inventory any E–3 aircraft if such actions would reduce the total aircraft inventory of such aircraft below 16.

Effective date.

(b) EXCEPTION FOR PLAN.—If the Secretary of the Air Force submits to the congressional defense committees a plan for maintaining readiness and ensuring there is no lapse in mission capabilities, the prohibition under subsection (a) shall not apply to actions taken to reduce the total aircraft inventory of E–3 aircraft to below 16, beginning 30 days after the date on which the plan is so submitted.

(c) EXCEPTION FOR E–7 PROCUREMENT.—If the Secretary of the Air Force procures enough E–7 Wedgetail aircraft to accomplish the required mission load, the prohibition under subsection (a) shall not apply to actions taken to reduce the total aircraft inventory of E–3 aircraft to below 16 after the date on which such E–7 Wedgetail aircraft are delivered.

### SEC. 143. PROHIBITION ON AVAILABILITY OF FUNDS FOR TERMINATION OF PRODUCTION LINES FOR THE HH–60W AIRCRAFT.

None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Air Force may be obligated or expended to terminate the operations of, or to prepare to terminate the operations of, a production line for HH–60W Combat Rescue Helicopters.

### SEC. 144. LIMITATION ON RETIREMENT OF F–16C/D AIRCRAFT.

Effective date.
Time period.
Reports.

(a) LIMITATION.—Beginning on the date of the enactment of this Act and except as provided in subsection (b), the Secretary of the Air Force may not retire, prepare to retire, or place in storage or on backup aircraft inventory status any F–16C/D aircraft until a period of 180 days has elapsed following the date on which the Secretary submits the report required under section 148.

Determination.

(b) EXCEPTION.—The limitation under subsection (a) shall not apply to individual F–16C/D aircraft that the Secretary of the Air Force determines, on a case-by-case basis, to be no longer mission capable and uneconomical to repair because of aircraft accidents, mishaps, or excessive material degradation and non-airworthiness status of certain aircraft.

(c) INFORMATION TO CONGRESS.—For each F–16C/D aircraft that the Secretary of the Air Force proposes to retire in a fiscal year, the Secretary shall include, in the materials submitted by the Secretary in support of the budget of the President for that

fiscal year (as submitted to Congress under section 1105(a) of title 31, United States Code), a description of—

(1) each upgrade and modification made to such aircraft, including—

(A) the date of the upgrade or modification; and

(B) the cost of such upgrade or modification in current year dollars; and

(2) the estimated remaining service-life (expressed as equivalent flight hours and years) of— *Estimate.*

(A) the aircraft; and

(B) the onboard systems of the aircraft.

### SEC. 145. LIMITATION ON PROCUREMENT OF KC–46A AIRCRAFT.

(a) LIMITATION.—The Secretary of the Air Force may not procure more than six KC–46A aircraft under the final lot of the covered contract unless—

(1)(A) the Secretary submits to the congressional defense committees written notice of the intent of the Secretary to procure more than six KC–46A aircraft under the final lot of the covered contract; and *Notice.*

(B) a period of 180 days has elapsed following the date on which such notice was submitted; or *Time period.*

(2) the Secretary submits to the congressional defense committees written certification by the Assistant Secretary of the Air Force for Acquisition, Technology, and Logistics that— *Certification.*

(A) there are validated needs of the Air Force requiring the procurement more than six KC–46A aircraft under the final lot of the covered contract; and

(B) cost estimates are complete for the long-term sustainment of any additional aircraft planned to be procured. *Cost estimates.*

(b) COVERED CONTRACT DEFINED.—In this section, the term "covered contract" means the contract for the procurement of KC–46A aircraft entered into between the Department of the Air Force and the Boeing Company that is in effect as of the date of the enactment of this Act.

### SEC. 146. LIMITATION ON ACTIONS RELATING TO REMOTE VISION SYSTEMS OF KC–46A AIRCRAFT.

(a) LIMITATION.—The Secretary of the Air Force may not take any action described in subsection (b) until the date on which the Secretary certifies to the Committees on Armed Services of the Senate and the House of Representatives that— *Certification.*

(1) the Secretary has identified a solution to fix the remote vision systems of KC–46A aircraft; and

(2) such solution resolves all issues identified in the category 1 deficiency reports for such systems, except for issues relating to the panoramic system.

(b) ACTIONS DESCRIBED.—The actions described in this subsection are the following:

(1) Approving the incorporation of version 2.0 of the KC–46A remote vision system into production aircraft (other than an aircraft specifically used to test and validate that version of the system).

(2) Retrofitting aircraft with version 2.0 of the KC–46A remote vision system (other than an aircraft specifically used to test and validate that version of the system).

### SEC. 147. LIMITATION ON RETIREMENT OF T–1A TRAINING AIRCRAFT.

The Secretary of the Air Force may not retire, prepare to retire, or place in storage or on backup aircraft inventory status any T–1A training aircraft until the date on which the Secretary submits to the congressional defense committees—

Certification.

(1) a certification indicating that the Secretary has completed the full, fleet-wide implementation of the Undergraduate Pilot Training curriculum (formerly known as the "Undergraduate Pilot Training 2.5" curriculum); and

Assessment.

(2) a written assessment of—

(A) the effect of the implementation of the Undergraduate Pilot Training curriculum on the availability and training completion rates of undergraduate pilot trainees; and

(B) how the retirement of T–1A training aircraft may affect programs and initiatives of the Air Force to accelerate the rate at which pilots complete training.

### SEC. 148. PLAN FOR LONG-TERM AIR FORCE FIGHTER FORCE STRUCTURE.

(a) PLAN REQUIRED.—The Secretary of the Air Force, in consultation with the Director of the Air National Guard and the Commander of the Air Force Reserve, shall develop a long-term tactical fighter force structure, recapitalization, training, and sustainment plan for the active and reserve components of the Air Force.

(b) ELEMENTS.—The plan under subsection (a) shall address each of the following:

Analyses.

(1) The appropriate mix of tactical fighter aircraft force structure, with accompanying operational risk analyses, required for the Secretary of the Air Force to meet expected steady-state, global force management allocation plans and geographical combatant commander contingency operational plans tasked to the Air Force using active and reserve component units.

Time period.

(2) The procurement, divestment, unit activation, deactivation, or re-missioning plans or actions the Secretary plans to implement, fiscal year-by-fiscal year, unit-by-unit, for the next 12 years for each active and reserve component tactical fighter aircraft unit existing as of the date of the enactment of this Act, including the rationale and justification for any such plans or actions.

(3) The actions the Secretary will take to ensure that required operational readiness rates are maintained during any planned recapitalization, modernization, or change of mission affecting tactical fighter aircraft units.

(4) Any plans of the Secretary to augment or supplant existing piloted tactical fighter aircraft capability or capacity with Collaborative Combat Aircraft Increment 1 or Increment 2 capability or capacity.

(5) Any plans of the Secretary to augment or supplant existing piloted tactical fighter aircraft training events via acquisition and fielding of common, joint, all-domain, high-fidelity synthetic simulation environments.

(c) REPORT.—Not later than April 1, 2024, the Secretary of the Air Force shall submit to the congressional defense committees a report that includes the plan developed under subsection (a).

(d) FORM OF REPORT.—The report required under subsection (c) shall be submitted in unclassified form, but may contain a classified annex.

# Subtitle E—Defense-wide, Joint, and Multiservice Matters

### SEC. 151. ANNUAL REPORT ON FORCE STRUCTURE CHANGES EXHIBIT FOR THE DEFENSE BUDGET.

Chapter 9 of title 10, United States Code, is amended by inserting after section 233 the following new section:

10 USC prec. 221.

### "§ 233a. Annual report on force structure changes exhibit for the defense budget

10 USC 233a.

"(a) ANNUAL REPORT.—Not later than 10 days after the date on which the budget of the President for a fiscal year is submitted to Congress pursuant to section 1105 of title 31, the Secretary of Defense shall submit to the congressional defense committees a report on any major weapon systems proposed to be divested, re-prioritized, or retired in such budget.

"(b) CONTENTS.—Each report under subsection (a) shall include the following:

"(1) Identification of each major weapon system the Secretary of Defense proposes to divest, re-prioritize, or retire in the period of five fiscal years following the date of the report.

Time period.

"(2) Budget line-item details related to each major weapon system identified under paragraph (1).

"(3) For each proposed divestment, re-prioritization, or retirement, an explanation of—

"(A) the timeline for the divestment, re-prioritization, or retirement, including any factors that may affect such timelines positively or negatively;

Timeline.

"(B) any cost savings associated with the divestment, re-prioritization, or retirement;

"(C) the rationale for the divestment, re-prioritization, or retirement, including a qualitative description of the risk associated with the divestment, re-prioritization, or retirement based on the most recent National Defense Strategy (as of the date of the report);

"(D) any critical dependencies with other program efforts that might affect the timeline for such divestment, reprioritization, or retirement;

"(E) the expected disposition of the weapon system after divestment, re-prioritization or retirement; and

"(F) identification of the system or systems that are expected to satisfy the military requirements that were fulfilled by the weapon system once the divestment, re-prioritization, or retirement of that weapon system is completed.

"(c) RELATIONSHIP TO OTHER REPORTS.—The Secretary of Defense shall ensure that the report required under subsection (a) is deconflicted with the report required under section 222e of this title.

137 STAT. 180          PUBLIC LAW 118–31—DEC. 22, 2023

"(d) MAJOR WEAPON SYSTEM DEFINED.—In this section, the term 'major weapon system' has the meaning given that term in section 3455(f) of this title.".

50 USC 98e–2.

**SEC. 152. MULTIYEAR PROCUREMENT AUTHORITY FOR DOMESTI-CALLY PROCESSED CRITICAL MINERALS.**

(a) AUTHORITY FOR MULTIYEAR PROCUREMENT.—Subject to section 3501 of title 10, United States Code, and from amounts made available by discretionary appropriations Acts from the National Defense Stockpile Transaction Fund (as established under section 9(a) of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98h(a))) after the date of the enactment of this Act, the Secretary of Defense may enter into one or more multiyear contracts for the procurement of critical minerals that are processed in the United States by domestic sources.

(b) APPLICATION OF STRATEGIC AND CRITICAL MATERIALS STOCK PILING ACT.—A multiyear contract entered into under this section shall be deemed to be an acquisition under the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.).

Effective date.

(c) AUTHORITY FOR ADVANCE PROCUREMENT.—The Secretary of Defense may enter into one or more contracts, beginning in fiscal year 2024, for advance procurement associated with the domestically processed critical minerals for which authorization to enter into a multiyear procurement contract is provided under subsection (a).

(d) CONDITION FOR OUT-YEAR CONTRACT PAYMENTS.—A contract entered into under subsection (a) shall provide that any obligation of the United States to make a payment under the contract for a fiscal year after fiscal year 2024 is subject to the availability of appropriations or funds for that purpose for such later fiscal year.

(e) DEFINITIONS.—In this section:

(1) The term "critical mineral" means a mineral determined to be a strategic and critical material under section 3(a) of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98b(a)).

(2) The term "processed" means the processing or recycling of a critical mineral or magnet, including the separation, reduction, metallization, alloying, milling, pressing, strip casting, and sintering of a critical mineral.

(3) The term "domestic source" has the meaning given that term in section 702 of the Defense Production Act of 1950 (50 U.S.C. 4552).

10 USC note prec. 3201.

**SEC. 153. PROHIBITION ON SOLICITATION OF PROPRIETARY ARMOR FOR CERTAIN TACTICAL VEHICLES.**

(a) PROHIBITION.—The Secretary of Defense may not include in a solicitation for a tactical tracked vehicle or tactical wheeled vehicle a requirement that such vehicle use proprietary armor.

(b) APPLICABILITY.—Subsection (a) shall not apply to a contract for the procurement of a tactical tracked vehicle or tactical wheeled vehicle entered into before the date of the enactment of this Act.

10 USC note prec. 4651.

**SEC. 154. PROHIBITION ON AVAILABILITY OF FUNDS FOR PROCURE-MENT OF CERTAIN BATTERIES.**

Effective date.

(a) LIMITATION.—Beginning on October 1, 2027, none of the funds authorized to be appropriated or otherwise made available for the Department of Defense may be obligated or expended to

procure a battery produced by an entity specified in subsection (b).

(b) ENTITIES SPECIFIED.—The entities specified in this subsection are the following:

(1) Contemporary Amperex Technology Company, Limited (also known as "CATL").

(2) BYD Company, Limited.

(3) Envision Energy, Limited.

(4) EVE Energy Company, Limited.

(5) Gotion High tech Company, Limited.

(6) Hithium Energy Storage Technology company, Limited.

(7) Any successor to an entity specified in paragraphs (1) through (6).

(c) TREATMENT OF PRODUCTION.—For purposes of this section, a battery shall be treated as produced by an entity specified in subsection (b) if that entity—

(1) assembles or manufactures the final product; or

(2) creates or otherwise provides a majority of the components used in the battery.

(d) WAIVER.—The Secretary of Defense may waive the limitation under subsection (a).

# TITLE II—RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

Subtitle A—Authorization of Appropriations

Sec. 201. Authorization of appropriations.

Subtitle B—Program Requirements, Restrictions, and Limitations

Sec. 211. Annual report on unfunded priorities of the Under Secretary of Defense for Research and Engineering.
Sec. 212. Delegation of responsibility for certain research programs.
Sec. 213. Modification to personnel management authority to attract experts in science and engineering.
Sec. 214. Clarifying role of partnership intermediaries to promote defense research and education.
Sec. 215. Naval Air Warfare Rapid Capabilities Office.
Sec. 216. Modification of support for research and development of bioindustrial manufacturing processes.
Sec. 217. Modification to administration of the Advanced Sensors Application Program.
Sec. 218. Matters pertaining to hypersonic capabilities and testing strategies.
Sec. 219. Improvements to defense quantum information science and technology research and development program.
Sec. 220. Application of public-private talent exchange programs in the Department of Defense to quantum information sciences and technology research.
Sec. 221. Support for protection of sensitive research performed on behalf of the Department of Defense.
Sec. 222. Support to the Defence Innovation Accelerator for the North Atlantic.
Sec. 223. Consortium on use of additive manufacturing for defense capability development.
Sec. 224. Next Generation Air Dominance family of systems development program accountability matrices.
Sec. 225. Continuous capability development and delivery program for F–35 aircraft.
Sec. 226. F–35 propulsion and thermal management modernization program.
Sec. 227. Establishment or expansion of University Affiliated Research Centers for critical materials.
Sec. 228. Policies for management and certification of Link 16 military tactical data link network.
Sec. 229. Rapid response to emergent technology advancements or threats.
Sec. 230. Pilot program to commercialize prototypes of the Department of the Air Force.

137 STAT. 182          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 231. Pilot program on near-term quantum computing applications.
Sec. 232. Pilot program to facilitate access to advanced technology developed by small businesses for ground vehicle systems of the Army.
Sec. 233. Limitation on availability of funds pending documentation on Future Attack Reconnaissance Aircraft program.

Subtitle C—Energetics and Other Munitions Matters

Sec. 241. Joint Energetics Transition Office.
Sec. 242. Consideration of lethality in the analysis of alternatives for munitions.
Sec. 243. Pilot program on incorporation of the CL20 compound in certain weapon systems.
Sec. 244. Limitation on sourcing chemical materials for munitions from certain countries.
Sec. 245. Defense industrial base munition surge capacity critical reserve.

Subtitle D—Plans, Reports, and Other Matters

Sec. 251. Congressional notification of changes to Department of Defense policy on autonomy in weapon systems.
Sec. 252. Audit to identify diversion of Department of Defense funding to China's research labs.
Sec. 253. Annual review of status of implementation plan for digital engineering career tracks.

# Subtitle A—Authorization of Appropriations

### SEC. 201. AUTHORIZATION OF APPROPRIATIONS.

Funds are hereby authorized to be appropriated for fiscal year 2024 for the use of the Department of Defense for research, development, test, and evaluation, as specified in the funding table in section 4201.

# Subtitle B—Program Requirements, Restrictions, and Limitations

### SEC. 211. ANNUAL REPORT ON UNFUNDED PRIORITIES OF THE UNDER SECRETARY OF DEFENSE FOR RESEARCH AND ENGINEERING.

10 USC prec. 221.

Chapter 9 of title 10, United States Code, is amended by inserting after section 222d the following new section:

10 USC 222e.

**"§ 222e. Unfunded priorities of the Under Secretary of Defense for Research and Engineering: annual report**

"(a) ANNUAL REPORT.—Not later than 10 days after the date on which the budget of the President for a fiscal year is submitted to Congress pursuant to section 1105 of title 31, the Secretary of Defense shall submit to the congressional defense committees a report on the unfunded priorities of the Department of Defense related to activities for which the Under Secretary of Defense for Research and Engineering has authority.

"(b) ELEMENTS.—

"(1) IN GENERAL.—Except as provided in subsection (c), each report submitted under subsection (a) shall specify, for each unfunded priority covered by such report, the following:

Summary.

"(A) A summary description of such priority, including the objectives to be achieved if such priority is funded (whether in whole or in part).

"(B) The additional amount of funds recommended in connection with the objectives under subparagraph (A).

"(C) Account information with respect to such priority, including the following (as applicable):

"(i) Line Item Number (LIN) for applicable procurement accounts.

"(ii) Program Element (PE) number for applicable research, development, test, and evaluation accounts.

"(2) PRIORITIZATION OF PRIORITIES.—The report under subsection (a) shall present the unfunded priorities covered by such report in order of urgency of priority.

"(c) EXCLUSION OF PRIORITIES COVERED IN OTHER REPORTS.—The report submitted under subsection (a) shall not include unfunded priorities or requirements covered in reports submitted under—

"(1) section 222a or 222b of this title; or

"(2) section 2806 of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 10 U.S.C. 222a note).

"(d) FORM OF REPORT.—Each report submitted under subsection (a) shall be submitted in classified form, but may include an unclassified summary as the Secretary considers appropriate.

"(e) UNFUNDED PRIORITY DEFINED.—In this section, the term 'unfunded priority', in the case of a fiscal year, means a program, activity, or mission requirement, that—

"(1) is not funded in the budget of the President for the fiscal year as submitted to Congress pursuant to section 1105 of title 31; and

"(2) would have been recommended for funding through that budget if—

"(A) additional resources had been available for the budget to fund the program, activity, or mission requirement; or

"(B) the program, activity, or mission requirement has emerged since the budget was formulated.".

*Margin notes:* Recommendations. — Classified information. Summary.

## SEC. 212. DELEGATION OF RESPONSIBILITY FOR CERTAIN RESEARCH PROGRAMS.

Section 980(b) of title 10, United Stated Code, is amended—

(1) by inserting "(1)" before "The Secretary"; and

(2) by adding at the end the following new paragraph:

"(2) The Secretary may delegate the authority provided by paragraph (1) to the Under Secretary of Defense for Research and Engineering.".

## SEC. 213. MODIFICATION TO PERSONNEL MANAGEMENT AUTHORITY TO ATTRACT EXPERTS IN SCIENCE AND ENGINEERING.

Section 4092(b) of title 10, United States Code, is amended—

(1) in paragraph (1)(B), by striking ", of which not more than 5 such positions may be positions of administration or management of the Agency"; and

(2) by amending paragraph (4) to read as follows:

"(4) during any fiscal year—

"(A) pay up to 15 individuals newly appointed pursuant to paragraph (1)(B) the travel, transportation, and relocation expenses and services described under sections 5724, 5724a, and 5724c of title 5; and

"(B) pay up to 15 individuals previously appointed pursuant to such paragraph, upon separation, the travel, transportation, and relocation expenses and services described under such sections (as applicable).".

### SEC. 214. CLARIFYING ROLE OF PARTNERSHIP INTERMEDIARIES TO PROMOTE DEFENSE RESEARCH AND EDUCATION.

Section 4124(f)(2) of title 10, United States Code, is amended—
(1) by striking "that assists" and inserting the following: "that—
"(A) assists";
(2) in subparagraph (A), as designated by paragraph (1), by striking the period at the end and inserting a semicolon; and
(3) by adding at the end the following new subparagraphs:
"(B) facilitates technology transfer from industry or academic institutions to a Center; or
"(C) assists and facilitates workforce development in critical technology areas for technology transition activities to fulfill unmet needs of a Center.".

### SEC. 215. NAVAL AIR WARFARE RAPID CAPABILITIES OFFICE.

10 USC prec. 8011.

Chapter 803 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC 8029.

### "§ 8029. Naval Air Warfare Rapid Capabilities Office

"(a) ESTABLISHMENT.—There is established within the Department of the Navy an office to be known as the Naval Air Warfare Rapid Capabilities Office (in this section referred to as the 'Office').

"(b) HEAD OF OFFICE.—The head of the Office shall be the designee of the Commander of the Naval Air Systems Command.

"(c) MISSION.—The mission of the Office shall be—
"(1) to fulfill naval and joint military operational requirements by supporting the identification and rapid development of—
"(A) new naval aviation weapons and airborne electronic warfare capabilities;
"(B) innovative applications for existing naval aviation weapons and airborne electronic warfare capabilities; and
"(C) other innovative solutions to enhance the effectiveness of naval aviation weapons and airborne electronic warfare capabilities; and
"(2) to contribute to the rapid experimentation, development, testing, and fielding of unclassified and classified naval aviation weapons and airborne electronic warfare capabilities.

"(d) ACQUISITION AUTHORITIES.—
"(1) IN GENERAL.—To procure goods or services for the Office, the senior contracting official (as defined in section 1737 of this title) and any members of the acquisition workforce for the Department of the Navy may use—
"(A) any applicable pathway of the adaptive acquisition framework (as described in Department of Defense Instruction 5000.02, 'Operation of the Adaptive Acquisition Framework'); and
"(B) any other alternative acquisition pathway that allows for accelerated or flexible methods of contracting.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 185

"(2) INAPPLICABILITY OF JCIDS.—The Joint Capabilities Integration and Development System process shall not apply to procurements described in paragraph (1).

"(e) REQUIRED PROGRAM ELEMENTS.—The Secretary of the Navy shall ensure, within budget program elements for naval air warfare programs, that—

"(1) there are separate, dedicated program elements for naval air warfare rapid capabilities; and

"(2) the Office executes the responsibilities of the Office using such program elements.

"(f) EXECUTIVE OVERSIGHT BOARD.—

"(1) IN GENERAL.—There is an executive oversight board for the Office which shall consist of the officials specified in paragraph (2). The executive oversight board shall provide prioritization, oversight, and approval of projects of the Office.

"(2) OFFICIALS SPECIFIED.—The officials specified in this paragraph are the following:

"(A) The Vice Chief of Naval Operations.

"(B) The Assistant Commandant of the Marine Corps.

"(C) The Assistant Secretary of the Navy for Research, Development and Acquisition.

"(D) The Commander of the Naval Air Systems Command.

"(g) ANNUAL REPORTS AND BRIEFINGS.—

"(1) REPORT.—On an annual basis, the head of the Office shall submit to the executive oversight board described in subsection (f) a report on the activities of the Office.

"(2) BRIEFING.—On an annual basis following the submittal of the report under paragraph (1), the Assistant Secretary of the Navy for Research, Development and Acquisition shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the activities of the Office.

"(3) ELEMENTS.—Each report under paragraph (1) and briefing under paragraph (2) shall include, with respect to the year preceding the date of the report or briefing (as applicable), a description of—

"(A) funding allocations for the projects of the Office;

"(B) capability gaps addressed by the Office;

"(C) the progress of the Office in experimenting, developing, testing, and fielding capabilities described in subsection (c); and

"(D) any barriers to the ability of the Office to carry out its mission, including any legislative or regulatory barriers.".

## SEC. 216. MODIFICATION OF SUPPORT FOR RESEARCH AND DEVELOPMENT OF BIOINDUSTRIAL MANUFACTURING PROCESSES.

Section 215(c)(1) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 4841 note) is amended by inserting "pharmaceutical biologics and associated precursor materials," after "commodity chemicals,".

## SEC. 217. MODIFICATION TO ADMINISTRATION OF THE ADVANCED SENSORS APPLICATION PROGRAM.

Section 218 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2476) is amended—

137 STAT. 186          PUBLIC LAW 118–31—DEC. 22, 2023

(1) in subsection (a)—
(A) in paragraph (1), by striking "The Commander of Naval Air Systems Command and the Director of Air Warfare shall jointly serve as the resource sponsors" and inserting "The Under Secretary of Defense for Intelligence and Security, acting through the Director of the Concepts, Development, and Management Office of the Air Force, shall serve as the resource sponsor"; and
(B) in paragraph (2), by striking "The resource sponsors of the Program shall be responsible" and inserting "The resource sponsor of the Program, in consultation with the Commander of Naval Air Systems Command, shall be responsible";
(2) in subsection (b), by striking "Only the Secretary of the Navy, the Under Secretary of the Navy, and the Commander of Naval Air Systems Command may" and inserting "Only the Under Secretary of Defense for Intelligence and Security and the Director of the Concepts, Development, and Management Office of the Air Force, in consultation with the Commander of Naval Air Systems Command, may"; and
(3) in subsection (d)(3), by striking "exercised by the Commander of Naval Air Systems Command, the Secretary of the Navy, or the Under Secretary of the Navy" and inserting "exercised by the Under Secretary of Defense for Intelligence and Security, the Director of the Concepts, Development, and Management Office of the Air Force, or the Commander of Naval Air Systems Command".

**SEC. 218. MATTERS PERTAINING TO HYPERSONIC CAPABILITIES AND TESTING STRATEGIES.**

(a) BIENNIAL UPDATES TO HYPERSONICS TESTING STRATEGY.—Section 237(c) of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2492) is amended by adding at the end the following new paragraph:
"(4) BIENNIAL UPDATES.—
"(A) IN GENERAL.—Not less frequently than once every two years after the submittal of the initial strategy under paragraph (1), the Secretary of Defense shall—
"(i) revise and update the strategy; and
"(ii) submit the revised and updated strategy to the appropriate congressional committees.
"(B) SUNSET.—The requirement to prepare and submit updates under this paragraph shall terminate on December 31, 2030.".
(b) LIMITATION ON AVAILABILITY OF FUNDS PENDING SUBMITTAL OF STRATEGY.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024, and available for the Office of the Under Secretary of Defense for Research and Engineering for the travel of persons, not more than 90 percent may be obligated or expended until the date on which the Secretary of Defense submits to the congressional defense committees the strategy required under section 237(c)(1) of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2492).
(c) EVALUATION OF POTENTIAL HYPERSONIC TEST RANGES.—
(1) STUDY.—The Secretary of Defense shall conduct a study to evaluate not fewer than two possible locations in the United

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 187

States, selected in consultation with the Under Secretary of Defense for Research and Engineering, that have potential to be used as additional corridors for long-distance hypersonic system testing.

(2) ACTIVITIES UNDER NATIONAL ENVIRONMENTAL POLICY ACT.—Following the completion of the study under paragraph (1), the Secretary of Defense shall initiate any activities required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) in connection with the conduct of long-distance hypersonic system testing at the locations evaluated under the study.

(3) REPORT.—Not later than December 31, 2024, the Secretary of Defense shall submit to the congressional defense committees, the Committee on Energy and Natural Resources of the Senate, and the Committee on Natural Resources of the House of Representatives a report on the results of the study conducted under paragraph (1).

(d) ANNUAL REPORT ON FUNDING AND INVESTMENTS IN HYPERSONIC CAPABILITIES.—

(1) IN GENERAL.—Not later than March 1, 2024, and not later than March 1 of each year thereafter through 2030, the Secretary of Defense shall submit to the congressional defense committees a report on the funding and investments of the Department of Defense relating to hypersonic capabilities, including any funding or investments with respect to the procurement, research, development, test, and evaluation, and operation and maintenance of offensive and defensive hypersonic weapons. 　　　　　　　　　　　　　　　*Time period.*

(2) ELEMENTS.—Each report under paragraph (1) shall—

(A) include cost data on the hypersonic capabilities 　*Cost data.*
of the Department of Defense, including vehicles, developmental and operational testing, hypersonic sensors, command and control architectures, infrastructure, testing infrastructure, software, workforce, training, ranges, integration costs, and such other items as the Secretary of Defense considers appropriate;

(B) to the extent applicable, for each item included in the report, identify whether such item relates to an offensive or defensive hypersonic capability;

(C) with respect to any research and development activities covered by the report, identify—

(i) the program element for the activity;

(ii) the name of the entity that is carrying out the activity; and

(iii) the purpose of the activity; and

(D) to the extent applicable, with respect to any developmental ground and flight testing and operational test and evaluation activities covered by the report, identify—

(i) the program element for the activity;

(ii) the name of the entity that is carrying out the activity; and

(iii) the purpose of the activity.

(3) FORM.—Each report submitted under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

### SEC. 219. IMPROVEMENTS TO DEFENSE QUANTUM INFORMATION SCIENCE AND TECHNOLOGY RESEARCH AND DEVELOPMENT PROGRAM.

Section 234 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 4001 note) is amended—

(1) by redesignating subsection (f) as subsection (h); and

(2) by inserting after subsection (e) the following new subsections:

"(f) FELLOWSHIPS.—

"(1) PROGRAM AUTHORIZED.—In carrying out the program under subsection (a) and subject to the availability of appropriations to carry out this subsection, the Secretary may carry out a program of fellowships in quantum information science and technology research and development for individuals who have a graduate or postgraduate degree.

Procedures.

"(2) EQUAL ACCESS.—In carrying out the program under paragraph (1), the Secretary may establish procedures to ensure that minority, geographically diverse, and economically disadvantaged students have equal access to fellowship opportunities under such program.

"(g) MULTIDISCIPLINARY PARTNERSHIPS WITH UNIVERSITIES.—In carrying out the program under subsection (a), the Secretary of Defense may develop partnerships with universities to enable students to engage in multidisciplinary courses of study.".

10 USC 1599g note.

### SEC. 220. APPLICATION OF PUBLIC-PRIVATE TALENT EXCHANGE PROGRAMS IN THE DEPARTMENT OF DEFENSE TO QUANTUM INFORMATION SCIENCES AND TECHNOLOGY RESEARCH.

(a) IN GENERAL.—Using the authority provided under section 1599g of title 10, United States Code, the Secretary of Defense shall seek to establish public-private talent exchange programs with private-sector entities working on quantum information sciences and technology research applications.

(b) MAXIMUM NUMBER OF PARTICIPANTS.—Each public-private talent exchange program established under subsection (a) may include not more than 10 program participants.

(c) PROGRAM PARTICIPANT DEFINED.—For purposes of subsection (b), the term "program participant" includes—

(1) an employee of the Department of Defense who is assigned to a private-sector organization pursuant to subsection (a); and

(2) an employee of a private-sector organization who is assigned to a Department of Defense organization pursuant to such subsection.

Contracts.
10 USC note prec. 4141.

### SEC. 221. SUPPORT FOR PROTECTION OF SENSITIVE RESEARCH PERFORMED ON BEHALF OF THE DEPARTMENT OF DEFENSE.

(a) IN GENERAL.—The Secretary of Defense, acting through the Under Secretary of Defense for Research and Engineering, may enter into contracts or other agreements with one or more eligible entities to assist institutions of higher education in protecting sensitive research performed on behalf of the Department of Defense.

(b) ACTIVITIES.—An eligible entity that enters into a contract or other agreement with the Secretary of Defense under subsection (a) shall carry out activities to assist institutions of higher education

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 189

in protecting sensitive research performed on behalf of the Department of Defense. Such activities may include—

(1) conducting effective due diligence in vetting visiting scholars;

(2) assisting institutions in meeting applicable research security requirements, including through the use of common procedures and practices and shared infrastructure, as appropriate;

(3) providing training to employees and offices of the institution that have responsibilities relating to research security; and

(4) providing advice and assistance to institutions in establishing and maintaining research security programs.

(c) CONSIDERATIONS.—In selecting an entity to receive a contract or other agreement under subsection (a), the Secretary of Defense shall consider the following:

(1) Geographic diversity and the extent to which the entity is able to maximize coverage of different regions of the United States.

(2) Any ratings of the entity made by the Defense Counterintelligence and Security Agency as part of the Agency's annual security vulnerability assessment ratings.

(3) Whether and to what extent the entity uses best practices for research security as outlined by the National Institute of Standards and Technology.

(4) The entity's demonstrated excellence in security programs, including receipt of awards for excellence in counterintelligence and outstanding achievement in industrial security.

(d) PERFORMANCE METRICS.—The Secretary of Defense shall establish metrics to measure the performance of each entity with which the Secretary enters into a contract or other agreement under subsection (a).

(e) NOTIFICATION AND REPORT.—For any year in which the Secretary of Defense exercises the authority provided under subsection (a), the Secretary shall submit to the congressional defense committees a report that—

(1) identifies each eligible entity with which the Secretary entered into a contract or other agreement under such subsection; and

(2) evaluates the performance of the entity.

(f) ELIGIBLE ENTITY DEFINED.—In this section, the term "eligible entity" means—

(1) an entity the Secretary of Defense determines to be eligible to participate in the activities authorized under this section; or

*Determination.*

(2) a consortium composed of two or more such entities.

### SEC. 222. SUPPORT TO THE DEFENCE INNOVATION ACCELERATOR FOR THE NORTH ATLANTIC.

(a) AUTHORITY.—Subject to the availability of appropriations, the Secretary of Defense, acting through the Under Secretary of Defense for Research and Engineering, is authorized to make available not more than $15,000,000 for each of fiscal years 2024 through 2029 to the North Atlantic Treaty Organization for the joint fund established for the Defence Innovation Accelerator for the North

*Time periods.*

137 STAT. 190        PUBLIC LAW 118–31—DEC. 22, 2023

Atlantic (DIANA) initiative (referred to in this section as the "Initiative") to sustain the participation of the United States in such initiative.

(b) NOTIFICATION.—

Deadline.

(1) IN GENERAL.—Not later than 15 days after each instance in which the Secretary of Defense provides funds to the Initiative pursuant to subsection (a), the Secretary, acting through the Under Secretary of Defense for Research and Engineering, shall submit to the appropriate congressional committees written notice that such funds were provided.

(2) CONTENTS.—Each notification submitted under paragraph (1) shall include the following:

(A) The total amount of funding provided under subsection (a) together with a detailed breakdown showing the specific amounts and purposes for which such funds are intended to be used, if any.

(B) The time period for which such funds are provided.

(c) STRATEGY.—

Deadline.

(1) IN GENERAL.—Not later than July 1, 2024, the Secretary of Defense, acting through the Under Secretary of Defense for Research and Engineering, shall submit to the appropriate congressional committees a strategy for participation by the United States in the Initiative.

(2) CONTENTS.—The strategy under paragraph (1) shall include the following:

(A) A description of how the Initiative fits into the science, technology, and innovation activities of the North Atlantic Treaty Organization and how the Initiative is synchronized with and expected to interact with other science, technology, and innovation activities of the Department of Defense.

(B) The anticipated funding profile for the Initiative across the period covered by the most recent future-years defense program submitted to Congress under section 221 of title 10, United States Code (as of the date of the strategy).

(C) Identification of key technology focus areas to be addressed each year under the Initiative across such period.

(D) A description of any anticipated areas of expansion in the Initiative, including any anticipated expansion of the Initiative to or within key nodes or locations that have strategic value for national security and where there is also a significant presence of technology-oriented startup businesses.

(E) A description of how the Initiative is expected to contribute to fostering the spread of innovation throughout the United States.

Time period.

(d) ANNUAL REPORT.—Not later than September 1, 2024, and not later than February 1 of each year thereafter through 2030, the Secretary of Defense shall submit to the congressional defense committees an annual report on—

(1) the activities of the Initiative that were supported by the Department of Defense under subsection (a) in the year preceding the date of the report; and

(2) any key milestones or other objectives that were achieved under the initiative in such year.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 191

(e) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the congressional defense committees;

(2) the Committee on Foreign Affairs of the House of Representatives; and

(3) the Committee on Foreign Relations of the Senate.

**SEC. 223. CONSORTIUM ON USE OF ADDITIVE MANUFACTURING FOR DEFENSE CAPABILITY DEVELOPMENT.**

10 USC 4841 note.

(a) ESTABLISHMENT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Secretaries of the military departments, shall establish a consortium to facilitate the use of additive manufacturing for the development of capabilities for the Department of Defense. The consortium shall be known as the "Consortium on Additive Manufacturing for Defense Capability Development" (referred to in this section as the "Consortium").

Deadline.

(b) COMPOSITION.—The Consortium shall be composed of qualified organizations, selected by the Secretary of Defense, that have functions and expertise relevant to additive manufacturing. At a minimum, the Consortium shall include the following:

(1) Representation from one or more science and technology reinvention laboratories (as designated under section 4121 of title 10, United States Code) from each of the military departments, which may include—

(A) from the Department of the Army—

(i) the Combat Capabilities Development Command, Army Research Laboratory;

(ii) the Combat Capabilities Development Command, Aviation and Missile Center;

(iii) the Combat Capabilities Development Command, Armaments Center;

(iv) the Combat Capabilities Development Command, Ground Vehicle Systems Center;

(v) the Combat Capabilities Development Command, Soldier Center;

(vi) the Combat Capabilities Development Command, Chemical Biological Center;

(vii) the Combat Capabilities Development Command, Command, Control, Communications, Computers, Cyber, Intelligence, Surveillance, and Reconnaissance Center; and

(viii) the Space and Missile Defense Command, Technical Center;

(ix) the Engineer Research and Development Center;

(x) the Medical Research and Development Command; and

(xi) the Army Research Institute for the Behavioral and Social Sciences;

(B) from the Department of the Navy—

(i) the Naval Research Laboratory;

(ii) the Office of Naval Research;

(iii) the Naval Air Systems Command Warfare Centers;

137 STAT. 192          PUBLIC LAW 118–31—DEC. 22, 2023

(iv) the Naval Sea Systems Command Warfare Centers;

(v) the Naval Facilities Engineering Command, Engineering and Expeditionary Warfare Center;

(vi) the Naval Medical Research Center; and

(vii) the Naval Information Warfare Centers, Atlantic and Pacific; and

(C) from the Department of the Air Force—

(i) the Air Force Research Laboratory; and

(ii) the Joint Warfighting Analysis Center.

(2) Representation from one or more maintenance, logistics, or sustainment organizations from each of the military departments.

(3) One or more organizations from private sector industry.

(4) One or more institutions of higher education or other research institutions.

(c) ACTIVITIES.—The Consortium shall—

(1) facilitate the use of additive manufacturing—

(A) to significantly reduce logistic footprints, material costs, and delivery lead-times; and

(B) to extended logistical supply chain dependencies that often challenge weapon system readiness for forward deployed warfighters;

Standards.
Certification process.

(2) develop standards and a certification process for the use of additive manufacturing in safety-critical applications, including additive material and part certification requirements for additive manufactured items intended for use in military vehicles;

Evaluation.

(3) evaluate, adapt, or apply the standards developed in the commercial sector, or new process approaches for additive manufacturing that may be of use to the Department of Defense;

(4) as directed by an organization of the Department of Defense included in the Consortium, conduct reverse engineering (including testing and certification) for critical parts which may have limited sources of supply;

(5) use data standards, common repositories, and information security to track, store, and secure technical data relating to additive manufacturing and ensure the interoperability of such data; and

Analyses.
Assessments.

(6) conduct comparative cost analyses for new and emerging additive manufacturing approaches, including assessments of life-cycle costs for tooling, training, and intellectual property needed to sustain such approaches.

### SEC. 224. NEXT GENERATION AIR DOMINANCE FAMILY OF SYSTEMS DEVELOPMENT PROGRAM ACCOUNTABILITY MATRICES.

(a) SUBMITTAL OF MATRICES.—Concurrent with the submission of the budget of the President to Congress pursuant to section 1105(a) of title 31, United States Code, for fiscal year 2025—

(1) the Secretary of the Air Force shall submit to the congressional defense committees and the Comptroller General of the United States the matrices described in subsection (b) relating to the Next Generation Air Dominance piloted fighter aircraft and the autonomous, uncrewed Collaborative Combat Aircraft programs of the Air Force; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 193

(2) the Secretary of the Navy shall submit to the congressional defense committees and the Comptroller General of the United States the matrices described in subsection (b) relating to the Next Generation Air Dominance piloted fighter aircraft and the autonomous, uncrewed Collaborative Combat Aircraft programs of the Navy and the Marine Corps.

(b) MATRICES DESCRIBED.—The matrices described in this subsection are the following:

Time periods.

(1) ENGINEERING MANUFACTURING AND DEVELOPMENT GOALS.—A matrix that identifies, in six month increments, key milestones, development and testing events, and specific performance goals for the engineering manufacturing and development phase (referred to in this section as the "EMD phase") of the programs described in subsection (a), and which shall be subdivided, at a minimum, according to the following:

(A) Technology readiness levels of major components and subsystems and key demonstration and testing events.

(B) Design maturity.

(C) Software maturity.

(D) Subsystem and system-level integration maturity.

(E) Manufacturing readiness levels for critical manufacturing operations and key demonstration and testing events.

(F) Manufacturing operations.

(G) System verification, validation, and key flight test events.

(H) Reliability.

(I) Availability for flight operations.

(J) Maintainability.

(2) COST.—A matrix expressing, in six month increments, the total cost for the Secretary's service cost position for the EMD phase and low initial rate of production lots of the programs described in subsection (a) and a matrix expressing the total cost for the prime contractor's estimate for such EMD phase and production lots, both of which shall be phased over the entire EMD period and subdivided according to the costs of the following:

(A) Air vehicle.

(B) Propulsion.

(C) Mission systems.

(D) Vehicle subsystems.

(E) Air vehicle software.

(F) Systems engineering.

(G) Program management.

(H) System test and evaluation.

(I) Support and training systems.

(J) Contract fee.

(K) Engineering changes.

(L) Direct mission support, including Congressional General Reductions.

(M) Government testing.

(N) Ancillary aircraft equipment.

(O) Initial spares.

(P) Contractor support.

(Q) Modifications.

(c) SEMIANNUAL UPDATE OF MATRICES.—

137 STAT. 194          PUBLIC LAW 118–31—DEC. 22, 2023

Deadlines.

(1) IN GENERAL.—Each Secretary concerned shall submit to the congressional defense committees and the Comptroller General of the United States updates to the matrices described in subsection (b) as follows:

(A) The first update shall be submitted not later than 180 days after the date on which the Secretaries concerned submit the initial matrices as required by subsection (a).

(B) Following the first update under paragraph (1), additional updates shall be submitted—

(i) concurrent with the submission of the budget of the President to Congress pursuant to section 1105(a) of title 31, United States Code, for each fiscal year; and

(ii) not later than 180 days after each such submittal.

Cost estimates.

(2) ELEMENTS.—Each update submitted under paragraph (1) shall detail progress made toward the goals identified in the matrix described in subsection (b)(1) and provide updated cost estimates as described in subsection (b)(2).

(3) TREATMENT OF INITIAL MATRICES AS BASELINE.—The initial matrices submitted pursuant to subsection (a) shall be treated as the baseline for the full EMD phase and low-rate initial production of the programs described in subsection (a) for purposes of the updates submitted pursuant to paragraph (1) of this subsection.

Deadline.
Review.

(d) ASSESSMENT BY COMPTROLLER GENERAL OF THE UNITED STATES.—Not later than the date that is 60 days after the date on which the Comptroller General of the United States receives an update to a matrix under subsection (c)(1), the Comptroller General shall review the sufficiency of such matrix and submit to the congressional defense committees an assessment of such matrix, including by identifying cost, schedule, or performance trends.

(e) KEY PERFORMANCE PARAMETER REQUIREMENTS.—

(1) IN GENERAL.—Each Secretary concerned shall develop key performance parameters (referred to in this section as "cost KPPs") for the threshold and objective costs of the programs described in subsection (a) under the jurisdiction of such Secretary and shall include those values as program performance requirements in any capability development document or system requirements document for the program involved. Each cost KPP shall include, for each cost category specified in paragraph (2)—

(A) a threshold value indicating the highest acceptable cost for that category, as determined by the Secretary concerned; and

(B) an objective value indicating the lowest cost expected to be achieved for that category, as determined by the Secretary concerned.

(2) COST CATEGORIES SPECIFIED.—The cost categories specified in this paragraph are the following:

(A) Unit recurring flyaway cost.

(B) Average procurement unit cost.

(C) Gross/weapon system unit cost.

(D) Aircraft cost-per-tail-per-year.

(E) Aircraft cost-per-flight-hour.

(f) DEFINITIONS.—In this section, the term "Secretary concerned" means—

(1) the Secretary of the Navy, with respect to aircraft programs of the Navy and the Marine Corps; and

(2) the Secretary of the Air Force, with respect to aircraft programs of the Air Force.

## SEC. 225. CONTINUOUS CAPABILITY DEVELOPMENT AND DELIVERY PROGRAM FOR F–35 AIRCRAFT.

(a) DESIGNATION OF MAJOR SUBPROGRAM.—In accordance with section 4203 of title 10, United States Code, the Secretary of Defense shall designate all Block 4 and Technical Refresh–3 elements of the F–35 aircraft acquisition program, collectively, as a single major subprogram of the F–35 aircraft acquisition program.

(b) PROCUREMENT OF F–35 DEVELOPMENTAL TESTING AIRCRAFT.—

(1) IN GENERAL.—From the aircraft described in paragraph (2), the Program Executive Officer for the F–35 aircraft program shall designate two F–35A aircraft, two F–35B aircraft, and two F–35C aircraft to be manufactured and delivered, by not later than the end of 2030, in a necessary configuration that would adequately support future F–35 developmental testing activities. *Deadline.*

(2) AIRCRAFT DESCRIBED.—The aircraft described in this paragraph are F–35 aircraft to be procured—

(A) as part of the Lot 19 production lot or a subsequent production lot for F–35 aircraft; and

(B) using funds made available for fiscal year 2024 or a subsequent fiscal year for the procurement of F–35 aircraft.

## SEC. 226. F–35 PROPULSION AND THERMAL MANAGEMENT MODERNIZATION PROGRAM.

(a) ESTABLISHMENT AND VALIDATION OF REQUIREMENTS.—The Secretary of the Air Force (with respect to F–35A aircraft of the Air Force) and the Secretary of the Navy (with respect to F–35B and F–35C aircraft of the Navy and the Marine Corps) shall each—

(1) establish requirements for the propulsion, power and cooling, thermal management, and electrical power systems of the F–35 aircraft system that adequately support the planned service-life and all planned mission systems hardware and software capability upgrades for such aircraft system;

(2) validate the requirements; and *Validation.*

(3) promptly provide the validated requirements to the Program Executive Officer for the F–35 aircraft acquisition program.

(b) COST-BENEFIT AND TECHNICAL RISK ANALYSIS.—

(1) IN GENERAL.—Based on the requirements established and validated under subsection (a), the Program Executive Officer for the F–35 aircraft acquisition program shall conduct a complete and comprehensive cost-benefit and technical risk analysis that evaluates and determines the upgrades and modernization required of the F–35 aircraft system to support all of the requirements established under such subsection. *Evaluation. Determination.*

(2) ELEMENTS.—The cost-benefit and technical risk analysis conducted under paragraph (1) shall assess, at a minimum, *Assessments.*

137 STAT. 196          PUBLIC LAW 118–31—DEC. 22, 2023

the cost, risk, modernization, integration activities, and acquisition strategy required for the upgrade and modernization options available for the following major subsystems of F–35 aircraft:

(A) The aircraft propulsion system and gearbox.

(B) The power and thermal management system.

(C) The fuel thermal management system.

(D) The electrical power system.

(E) The engine ice protection system.

(F) Mission systems hardware, avionics, sensors, and weapons.

Determination.

(G) Any additional systems of the F–35 aircraft system the Program Executive Officer determines to be relevant to support the planned service-life requirements for each variant of such aircraft.

(3) LIMITATION ON COMMENCEMENT.—The Program Executive Officer may not commence the analysis required under paragraph (1) until the requirements established under subsection (a) have been provided to the Officer.

(4) INDEPENDENT COST ESTIMATE.—In addition to developing the cost-benefit analysis under paragraph (1), the Program Executive Officer shall also obtain an independent cost estimate from an organization within the Department of Defense that is not directly associated with the Office of the Program Executive Officer, the Department of the Air Force, or the Department of the Navy.

(5) REPORT.—Following the completion of the analysis under paragraph (1) and the independent cost estimate under paragraph (4), but not later than July 1, 2024, the Program Executive Officer shall submit to the congressional defense committees—

(A) a report on the results of the analysis under paragraph (1); and

Records.

(B) a copy of the cost estimate obtained under paragraph (4).

(c) DESIGNATION OF MAJOR SUBPROGRAM.—In accordance with section 4203 of title 10, United States Code, the Secretary of Defense shall designate all activities relating to the modernization, upgrade, and integration of the major subsystems included in the analysis under subsection (b)(1), collectively, as a single major subprogram of the F–35 aircraft acquisition program.

**SEC. 227. ESTABLISHMENT OR EXPANSION OF UNIVERSITY AFFILIATED RESEARCH CENTERS FOR CRITICAL MATERIALS.**

(a) FEASIBILITY AND ADVISABILITY ASSESSMENT.—The Secretary of Defense, in consultation with the Under Secretary of Defense for Research and Engineering, shall—

(1) assess the feasibility and advisability of establishing a new University Affiliated Research Center (in this section referred to as a "UARC") or expanding an existing UARC at a specified covered educational institution; and

Recommendations.

(2) submit a recommendation regarding the feasibility and advisability of such establishment or expansion to the congressional defense committees.

Deadline.

(b) DETERMINATION.—Not later than 15 days after submitting the assessment required under subsection (a) the Secretary of

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 197

Defense shall determine whether it is feasible and advisable to establish or expand a UARC and—

(1) for a positive determination, submit to the congressional defense committees a plan described in subsection (c); and

(2) for a negative determination, submit to the congressional defense committees a justification for such determination that includes the data and analysis to support such determination.

(c) PLAN.—If the Secretary of Defense determines that establishing or expanding a UARC is feasible and advisable under subsection (b), the Secretary shall submit to the congressional defense committees a plan for such establishment or expansion, including an assessment of the institutional capacity of the covered educational institution at which such UARC is to be established or expanded.

(d) ELEMENTS.—The plan described in subsection (c) shall include the following:

(1) An assessment of the engineering, applied research, commercialization, or workforce development capabilities relating to critical materials for national security purposes of the United States of the covered educational institution at which the UARC will be established or expanded, including an assessment of the personnel and physical research infrastructure of such institution.

(2) An assessment of the ability of such institution—

(A) to participate in engineering, applied research, commercialization, and workforce development activities relating to critical materials for national security purposes of the United States;

(B) to effectively compete for engineering, applied research, commercialization, and workforce development contracts and grants relating to critical materials for national security purposes of the United States; and

(C) to support the mission of the Under Secretary.

(3) An assessment of the activities and investments necessary—

(A) to augment facilities or educational programming at such institution—

(i) to support the mission of the Under Secretary;

(ii) to access, secure, and conduct research relating to sensitive or classified information; and

(iii) to respond quickly to emerging engineering, applied research, commercialization, and workforce development needs relating to critical materials;

(B) to increase the participation of such institutions in engineering, applied research, commercialization, and workforce development activities; and

(C) to increase the ability of such institutions to effectively compete for engineering, applied research, commercialization, and workforce development contracts and grants.

(4) Recommendations identifying actions that may be taken by the Secretary, the Under Secretary, Congress, such institutions, and other organizations to increase the participation of such institutions in engineering, applied research, commercialization, and workforce development activities, contracts, and grants relating to critical materials.

Plan.

Data.
Analysis.

Assessment.

Assessments.

Recommendations.

137 STAT. 198          PUBLIC LAW 118–31—DEC. 22, 2023

(5) Any specific goals, incentives, and metrics developed by the Secretary to increase and measure the capacity of such institutions to address the engineering, applied research, commercialization, and workforce development needs of the Department of Defense relating to critical materials.

(e) REPORT REQUIRED.—Not later than one year after the date of the enactment of this Act, the Secretary shall—

(1) submit to the congressional defense committees a report that includes the plan developed under this subsection; and

Public information. Web posting. 10 USC note prec. 4141. Contracts. Grants.

(2) make the plan available on a publicly accessible website of the Department of Defense.

(f) SUPPORT TO COVERED EDUCATIONAL INSTITUTIONS.—

(1) IN GENERAL.—The Under Secretary of Defense for Research and Engineering may establish a program to award contracts, grants, or other agreements on a competitive basis to a covered educational institution, and to perform other appropriate activities, for the purposes described in paragraph (2).

(2) PURPOSES.—The purposes described in this paragraph are the following:

(A) Developing the capability, including workforce and research infrastructure capabilities, for covered educational institutions to more effectively compete for Federal engineering, applied research, commercialization, and workforce development funding opportunities.

(B) Improving the capability of covered educational institutions to—

(i) recruit and retain research faculty;

(ii) participate in appropriate personnel exchange programs; and

(iii) participate in appropriate educational and career development activities.

Determination.

(C) Any other purposes the Under Secretary determines appropriate for enhancing the engineering, applied research, commercialization, and development capabilities of covered educational institutions.

(g) DEFINITIONS.—In this section:

(1) COVERED EDUCATIONAL INSTITUTION.—The term "covered educational institution" means—

(A) a mining, metallurgical, geological, or mineral engineering program—

(i) accredited by a non-governmental organization that accredits post-secondary education programs in applied and natural science, engineering technology, and computing; and

(ii) located at an institution of higher education; or

(B) any other post-secondary educational institution with a geology or engineering program or department that has experience in mining research or work with the mining industry.

(2) CRITICAL MATERIALS.—The term "critical materials" means materials designated as strategic and critical under section 3(a) of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98b(a)).

(3) INSTITUTION OF HIGHER EDUCATION.—For purposes of paragraph (1), the term "institution of higher education" has

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 199

the meaning given in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001).

**SEC. 228. POLICIES FOR MANAGEMENT AND CERTIFICATION OF LINK 16 MILITARY TACTICAL DATA LINK NETWORK.**

10 USC 4571 note.

(a) POLICIES REQUIRED.—The Secretary of Defense shall develop and implement policies to adapt Link 16 system management and certification to align with agile development practices.

(b) ELEMENTS.—The policies required by subsection (a) shall include the following:

Processes.

(1) A standardized process through a Chairman, Joint Chiefs of Staff Manual, to allow Link 16 frequency use within approved special use airspaces for the purpose of testing radio systems and associated software that have not completed electromagnetic compatibility features certification. Such process—

(A) shall, at a minimum, ensure routine and continued approval for test operations of developmental systems in the Nevada Test and Training Range, Restricted Area 2508, Warning Area 151/470, Warning Area 386, and the Joint Pacific Alaska Range Complex; and

(B) may incorporate standardized mitigations that enable routine approval including effective radiated power settings and coordination for rapid test termination.

(2) Processes to streamline approval or denial of temporary frequency assignment for Link 16 operations to not more than 15 days for test, training, and large-scale exercises. In developing such processes, the Secretary of Defense—

Deadline.

(A) shall ensure that the processes cover operations in excess of uncoordinated operations time slot duty factor limits, inclusion of foreign participants, and participation of non-stage 4 approved terminals or platforms; and

(B) consider delegating sole authority for temporary frequency assignment to the Department of Defense and the automation of decision-making processes relating to such assignments.

(3) Delegation of authority to the system manager for Link 16 to determine when new software within Department of Defense Link 16 terminals affects electromagnetic compatibility features and requires recertification.

Determination.

(4) The self-certification by the Department of Defense of the compliance of the Department's radios with electromagnetic compatibility features.

Compliance.

(5) Processes to internally manage Link 16 uncoordinated operations that enable approval for test, training, and exercises that does not exceed 15 days for systems holding an active radio frequency authorization or temporary frequency assignment.

Deadline.

(c) INFORMATION TO CONGRESS.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the congressional defense committees—

Deadline.

(1) a briefing on the policies developed under subsection (a), along with a timeline for implementation of such policies; and

Briefing.

(2) a list of such additional resources or authorities as the Secretary determines may be required to implement such policies.

List. Determination.

137 STAT. 200          PUBLIC LAW 118–31—DEC. 22, 2023

(d) TESTING REQUIRED.—

Review.
Determinations.

(1) IN GENERAL.—In conjunction with the development of the policies required under subsection (a), the Secretary of Defense shall conduct, sponsor, or review testing and analysis that determines if any effects on air traffic systems are possible due to Link 16 terminals which have not completed electromagnetic compatibility features certification and quantifies any

Evaluation.

such effects. Such testing shall evaluate Link 16 transmission within plus or minus 7 megahertz of the 1030 and 1090 megahertz frequency bands to determine if effects on air traffic systems are possible, under what conditions such effects could occur, and the impact of such effects.

(2) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report on the results of the testing conducted under paragraph (1), with an emphasis on procedures that the Secretary intends to implement to negate harmful effects on air traffic from the use of Link 16 terminals or platforms that have not completed electromagnetic compatibility features certification, within special use airspace.

10 USC 3601 note.

**SEC. 229. RAPID RESPONSE TO EMERGENT TECHNOLOGY ADVANCEMENTS OR THREATS.**

Time period.

(a) AUTHORITIES.—Upon approval by the Secretary of Defense of a determination described in subsection (b), the Secretary of a military department may use the rapid acquisition and funding authorities established pursuant to section 3601 of title 10, United States Code, to initiate urgent or emerging operational development activities for a period of up to one year, in order to—

(1) leverage an emergent technological advancement of value to the national defense to address a military service-specific need; or

(2) provide a rapid response to an emerging threat identified by a military service.

(b) DETERMINATION.—A determination described in this subsection is a determination by the Secretary of a military department submitted in writing to the Secretary of Defense that provides the following:

(1) Identification of a compelling urgent or emergency national security need to immediately initiate development activity in anticipation of a programming or budgeting action, in order to leverage an emergent technological advancement or provide a rapid response to an emerging threat.

(2) Justification for why the effort cannot be delayed until the next submission of the budget of the President (under section 1105(a) of title 31, United States Code) without harming the national defense.

(3) Funding is identified for the effort in the current fiscal year to initiate the activity.

(4) An appropriate acquisition pathway and programmed funding for transition to continued development, integration, or sustainment is identified to on-ramp this activity within two years.

Deadlines.

(c) ADDITIONAL PROCEDURES.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 201

amend the procedures for the rapid acquisition and deployment of capabilities needed in response to urgent operational needs prescribed pursuant to such section 3601 to carry out this section. Such updated procedures shall be provided to the congressional defense committees concurrently with the promulgation to the rest of the Department of Defense.

(2) REQUIREMENTS TO BE INCLUDED.—The procedures amended under paragraph (1) shall include the following requirements:

(A) FUNDING.—(i) Subject to clause (ii), in any fiscal year in which a determination described in subsection (b) is made, the Secretary of the military department making the determination may initiate the activities authorized under subsection (a) using any funds available to the Secretary for such fiscal year for—

(I) procurement; or

(II) research, development, test, and evaluation.

(ii) The total cost of all developmental activities within the Department of Defense, funded under this section, may not exceed $100,000,000 for any fiscal year.

(B) WAIVER AUTHORITY.—(i) Subject to clause (ii), the Secretary of the military department making a determination under subsection (b) may issue a waiver under subsection (d) of such section 3601.

(ii) Chapter 221 of title 10, United States Code, may not be waived pursuant to clause (i).

(C) TRANSITION.—(i) Any acquisition initiated under subsection (a) shall transition to an appropriate acquisition pathway for transition and integration of the development activity, or be transitioned to a newly established program element or procurement line for completion of such activity.

(ii)(I) Transition shall be completed within one year of initiation, but may be extended one time only at the discretion of the Secretary of the military department for one additional year. *Extension authority.*

(II) In the event an extension determination is made under subclause (I), the affected Secretary of the military department shall submit to the congressional defense committees, not later than 30 days before the extension takes effect, written notification of the extension with a justification for the extension. *Notification.*

(3) SUBMITTAL TO CONGRESS.—Concurrent with promulgation to the Department of the amendments to the procedures under paragraph (1), the Secretary shall submit to the congressional defense committees the procedures updated by such amendments.

(d) CONGRESSIONAL NOTIFICATION.—Within 15 days after the Secretary of Defense approves a determination described in subsection (b), the Secretary of the military department making the determination shall provide written notification of such determination to the congressional defense committees following the procedures for notification in subsections (c)(4)(D) and (c)(4)(F) of such section 3601. A notice under this subsection shall be sufficient to fulfill any requirement to provide notification to Congress for a new start program. *Deadline.*

137 STAT. 202          PUBLIC LAW 118–31—DEC. 22, 2023

10 USC note prec. 9531.

### SEC. 230. PILOT PROGRAM TO COMMERCIALIZE PROTOTYPES OF THE DEPARTMENT OF THE AIR FORCE.

Deadline.

(a) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of the Air Force, acting through the Assistant Secretary of the Air Force for Acquisition, Technology, and Logistics, shall carry out a pilot program under which the Secretary identifies prototypes under development by the Department of the Air Force that have the potential to be developed into commercial products and provides support to qualified entities to carry out projects to commercialize such prototypes.

(b) FORM OF SUPPORT.—The support provided to a qualified entity under subsection (a) may include the award of—

Grants.
Contracts.

(1) a grant;

(2) a contract or other agreement; or

(3) such other form of support as the Secretary of the Air Force determines appropriate.

(c) AMOUNT.—The total value of support awarded to a qualified entity under this section may not exceed $10,000,000.

(d) FUNDING.—The Secretary of the Air Force shall carry out the pilot program under this section using funds designated as budget activity 6 (RDT&E management support) or budget activity 4 (Advanced Component Development and Prototypes) as those budget activity classifications are set forth in volume 2B, chapter 5 of the Department of Defense Financial Management Regulation (DOD 7000.14-R).

(e) APPLICATION.—

(1) IN GENERAL.—A qualified entity that seeks an award of support under this section shall submit an application to the Secretary of the Air Force at such time, in such manner, and containing such information as the Secretary may require.

(2) CONTENTS.—As part of the application required under paragraph (1), a qualified entity shall—

(A) outline measures the entity will implement to give the Department of Defense purchasing priority when supply chain issues are a factor;

Certification.
Compliance.

(B) certify that the entity will, with respect to the export of any such product, comply with—

(i) International Traffic in Arms Regulations under subchapter M of chapter I of title 22, Code of Federal Regulations (or any successor regulations); and

(ii) any other applicable export restrictions; and

(C) acknowledge that the entity may seek advice and assistance from the Department of the Air Force and the Department of State in the event that the export restrictions applicable to a commercial product developed with support under this section—

(i) are more restrictive than the export restrictions applicable to the component technologies that comprise the product; and

(ii) are expected to unnecessarily impede the ability to make the product commercially available outside the United States.

Deadline.

(f) BRIEFING.—Not later than December 31, 2024, the Assistant Secretary of the Air Force for Acquisition, Technology, and Logistics shall provide to the congressional defense committees a briefing on the implementation of the pilot program under this section and any related policy issues.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 203

(g) NOTICE TO CONGRESS.—Not later than 30 days after each    Deadline.
instance in which the Assistant Secretary of the Air Force for
Acquisition, Technology, and Logistics awards support to a qualified
entity under this section, the Assistant Secretary shall submit
to the congressional defense committees notice of such award.

(h) TERMINATION.—The pilot program under this section shall
terminate on the date that is five years after the date of the
enactment of this Act.

(i) DEFINITIONS.—In this section:
    (1) The term "commercialize", when used with respect to
a prototype, means to transition a prototype into a commercial
product.
    (2) The term "commercial product" has the meaning given
that term in section 103 of title 41, United States Code.
    (3) The term "qualified entity" means an individual or
entity the Secretary of the Air Force determines to be qualified
to participate in the pilot program under this section.

## SEC. 231. PILOT PROGRAM ON NEAR-TERM QUANTUM COMPUTING APPLICATIONS.

10 USC 4001
note.

(a) PILOT PROGRAM.—The Secretary of Defense may carry out
a pilot program under which the Secretary, in partnership with
the entities specified in subsection (b), establishes and operates
a program that enables organizations of the Department of Defense,
including the Armed Forces, to test and evaluate how quantum
and quantum-hybrid applications may be used—
    (1) to solve technical problems and research challenges
identified under section 234(e) of the John S. McCain National
Defense Authorization Act for Fiscal Year 2019 (Public Law
115–232; 10 U.S.C. 4001 note) and such other near-term tech-
nical problems and challenges facing the Department and the
Armed Forces as the Secretary may identify; and
    (2) to provide capabilities needed by the Department and
the Armed Forces in the near-term.
(b) ENTITIES SPECIFIED.—The Secretary of Defense shall seek
to carry out the pilot program under subsection (a) in partnership
with—
    (1) a federally funded research and development center,
university affiliated research center, center of excellence, or
similar entity; and
    (2) one or more private-sector entities with expertise in
quantum computing and quantum information science.
(c) ACTIVITIES.—Under the pilot program, the Secretary of
Defense, in partnership with the entities specified in subsection
(b), may—
    (1) convene a group of experts and organizations to identify
and articulate challenges faced by the Department of Defense,
including the Armed Forces, that have the potential to be
addressed by quantum and quantum-hybrid applications;
    (2) develop and mature demonstrations, proofs of concept,
pilot programs, and other measures to address the challenges
identified under paragraph (1) using quantum and quantum-
hybrid applications;
    (3) develop pathways through which successful demonstra-
tions, proofs of concept, pilot programs, and other measures
developed and matured under paragraph (2) may be

137 STAT. 204          PUBLIC LAW 118–31—DEC. 22, 2023

transitioned to more advanced stages of research and development or into operational use within the Department;

(4) ensure that any quantum-based or quantum-hybrid application-based solutions identified under the program are capable of development and deployment within the period covered by the most recent future-years defense program submitted to Congress under section 221 of title 10, United States Code (as of the time of the pilot program);

Assessment.

(4) assess the utility of commercial quantum and quantum-hybrid applications for meeting the near-term needs of warfighters; and

(5) seek to build and strengthen relationships between the Department of Defense, academic institutions, small businesses, and nontraditional defense contractors (as defined in section 3014 of title 10, United States Code) in the technology industry that may have unused or underused solutions to specific operational challenges of the Department relating to quantum and quantum-hybrid applications.

(d) BRIEFING AND REPORTS.—

(1) INTERIM BRIEFING.—Not later than 30 days before commencing the pilot program under subsection (a), the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing that—

(A) identifies the entities the Secretary intends to partner with for the purposes of carrying out the pilot program, including—

(i) any entities specified in subsection (b);
(ii) any of the Armed Forces; and
(iii) any other departments and agencies of the Federal Government with pre-existing quantum technology research efforts; and

Plan.

(B) describes the plan of the Secretary for developing and operating the program.

(2) ANNUAL REPORT.—By December 1 of each year in which the pilot program under subsection (a) is carried out, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report that includes—

(A) a description of the problem sets and capabilities that were evaluated by organizations of the Department of Defense under the program;

(B) an explanation of whether and to what extent the program resulted in the identification of potential solutions based on quantum and quantum-hybrid applications;

(C) any potential barriers to the use of quantum and quantum-hybrid applications to solve near-term problems for the Department of Defense, including the Armed Forces; and

Recommendations.

(D) recommendations regarding how the Department of Defense can better leverage and deploy quantum and quantum-hybrid applications to address near-term military applications and operational needs.

(e) TERMINATION.—The authority to carry out the pilot program under subsection (a) shall terminate on September 30, 2026.

(f) DEFINITION.—In this section, the term "quantum and quantum-hybrid applications" means algorithms and applications

which use quantum mechanics through quantum processing units, including—

    (1) quantum-classical hybrid applications which are applications that use both quantum computing and classical computing hardware systems;

    (2) annealing and gate systems; and

    (3) all qubit modalities (including superconducting, trapped-ion, neutral atom, and photonics).

### SEC. 232. PILOT PROGRAM TO FACILITATE ACCESS TO ADVANCED TECHNOLOGY DEVELOPED BY SMALL BUSINESSES FOR GROUND VEHICLE SYSTEMS OF THE ARMY.

10 USC note prec. 7532.

    (a) PROGRAM REQUIRED.—Beginning not later than 90 days after the date of the enactment of this Act, the Secretary of the Army shall carry out a pilot program under which the Secretary seeks to facilitate a contract between the Ground Vehicle Systems Center of the Army and a non-profit research institute for the purposes of improving the ability of the Center to access advanced technology developed by a small business concern (as defined under section 3 of the Small Business Act (15 U.S.C. 632)). Any such contract shall be a commercial solutions opening contract entered into pursuant to section 3458 of title 10, United States Code.

Deadline.
Contracts.

    (b) TERMINATION.—The authority to carry out the pilot program under this section shall terminate five years after the date of the enactment of this Act.

### SEC. 233. LIMITATION ON AVAILABILITY OF FUNDS PENDING DOCUMENTATION ON FUTURE ATTACK RECONNAISSANCE AIRCRAFT PROGRAM.

    Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024, and available for the Office of the Secretary of the Army for the travel of persons, not more than 70 percent may be obligated or expended until the date on which the Secretary submits to the congressional defense committees the analysis of alternatives document for the Future Attack Reconnaissance Aircraft program.

# Subtitle C—Energetics and Other Munitions Matters

### SEC. 241. JOINT ENERGETICS TRANSITION OFFICE.

    (a) IN GENERAL.—Chapter 4 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC prec. 131.

### "§ 148. Joint Energetics Transition Office

10 USC 148.

    "(a) IN GENERAL.—The Secretary of Defense shall establish a Joint Energetics Transition Office (in this section referred to as the 'Office') within the Department of Defense. The Office shall carry out the activities described in subsection (c) and shall have such other responsibilities relating to energetic materials as the Secretary shall specify.

Establishment.

    "(b) LEADERSHIP AND ADMINISTRATION.—

        "(1) The Under Secretary of Defense for Acquisition and Sustainment shall designate an individual to serve as the head of the Office. The Under Secretary shall select such individual from among officials of the Department of Defense serving

Designations.

in organizations under the jurisdiction of the Under Secretary at the time of such designation. The head of the Office shall—

"(A) report directly to the Under Secretary of Defense for Acquisition and Sustainment; and

Coordination.

"(B) coordinate, as appropriate, with the Under Secretary of Defense for Research and Engineering.

"(2) The Under Secretary of Defense for Research and Engineering shall designate an individual to serve as the deputy head of the Office. The Under Secretary shall select such individual from among officials of the Department of Defense serving in organizations under the jurisdiction of the Under Secretary at the time of such designation. The deputy head of the Office shall report directly to the head of the Office and to the Under Secretary of Defense for Research and Engineering.

"(3) The head of the Office and deputy head of the Office shall be responsible for the overall management and operation of the Office. The Under Secretaries shall ensure that the head and deputy head of the Office are not assigned outside duties that would diminish their ability to effectively manage and operate the Office.

"(c) RESPONSIBILITIES.—The Office shall do the following:

"(1) Develop and periodically update an energetic materials strategic plan and investment strategy to guide investments in both new and legacy energetic materials and technologies across the entire supply chain for the total life cycle of energetic materials, including raw materials, ingredients, propellants, pyrotechnics, and explosives for munitions, weapons, and propulsion systems. Such strategy and plan shall provide for—

"(A) developing or supporting the development of strategic plans for energetic materials and technologies, including associated performance metrics for the Office, over the periods covered by the future-years defense program required under section 221 of this title and the program objective memorandum process;

"(B) initiating special studies or analyses—

"(i) to determine targets that would be optimally addressed or defeated by weapons that incorporate novel energetic materials; and

"(ii) to inform the program objective memorandum process; and

"(C) identifying any shortfalls in the supply chain for energetic materials and developing plans to alleviate any shortfalls through the expansion of the energetic materials industrial base to include critical contractors, subcontractors, and suppliers.

"(2) Coordinate and ensure consistency and congruity among research, development, test, and evaluation efforts in energetic materials across the Department of Defense—

"(A) to identify promising new energetic materials and technologies;

"(B) to mature, integrate, prototype, test, and demonstrate novel energetic materials and technologies, including new materials and manufacturing technologies;

"(C) to expedite testing, evaluation, and acquisition of energetic materials and technologies to meet the emergent needs of the Department, including the rapid integration of promising new materials and other promising energetic compounds into weapons platforms;

"(D) to identify or establish prototyping demonstration venues to integrate advanced technologies that speed the maturation and deployment of energetic materials; and

"(E) to support collaboration among industry, academia, and elements of the Department of Defense to transition energetic materials and technologies from the research and development phase to production and operational use within the Department.

"(3) Oversee a process to expedite—

"(A) the validation, verification, and accreditation of modeling and simulation of energetic materials for the development of requirements; and

"(B) the qualification process for energetic materials, from discovery through transition to production and integration into weapon systems.

"(4) Recommend changes to laws, regulations, and policies that present barriers or extend timelines for the expedited process described in paragraph (3).

"(5) Coordinate with other organizations involved in energetic materials activities within the Department of Defense, including the Armed Forces, and across other departments and agencies of the Federal Government.

"(6) Pursuant to the authority provided under section 191 of this title, establish and manage a Department of Defense Field Activity dedicated to systems engineering associated with energetic materials. Such Field Activity shall be funded under budget activity 3 (advanced technology development) or budget activity 4 (advanced component development and prototypes) (as such budget activity classifications are set forth in volume 2B, chapter 5 of the Department of Defense Financial Management Regulation (DOD 7000.14-R)) to reduce technical risk, integrate research, development, test, and evaluation, and perform system demonstration programs of the Department of Defense on novel energetic materials for use in weapon systems.

"(7) Carry out such other responsibilities relating to energetic materials as the Secretary shall specify.

"(d) ADDITIONAL REQUIREMENTS.—The Secretary of Defense shall ensure that the Office is budgeted for and funded in a manner sufficient to ensure the Office has the staff and other resources necessary to effectively carry out the responsibilities specified in subsection (c).

"(e) DEFINITIONS.—In this section, the term 'energetic materials' means critical chemicals and formulations that—

"(1) release large amounts of stored chemical energy; and

"(2) are capable of being used as explosives, propellants, pyrotechnics, and reactive materials that—

"(A) create lethal effects in warheads in kinetic weapons components and systems; or

"(B) increase propellant performance in a weapon propulsion system as related to lethal effects, range, or speed.".

137 STAT. 208          PUBLIC LAW 118–31—DEC. 22, 2023

(b) STATUS REPORTS.—The Secretary of Defense shall submit to the congressional defense committees—

(1) not later than 60 days after the date of the enactment of this Act, a report on the status of the establishment of Joint Energetics Transition Office under section 148 of title 10, United States Code, as added by subsection (a);

(2) not later than one year after such date of enactment, a report on the measures taken to provide the Joint Energetics Transition Office with the staff and resources necessary for the Office to carry out the responsibilities specified in subsection (c) of such section 148; and

(3) not later than two years after such date of enactment, a report that includes the energetic materials strategic plan and investment strategy required under subsection (c)(1) of such section 148.

Time period.
Overviews.

(c) ANNUAL REPORTS.—Not later than March 1, 2024, and not later than March 1 of each year thereafter through 2029, the head of the Joint Energetics Transition Office shall submit to the congressional defense committees a report that includes, with respect to the year covered by the report, the following information:

(1) A description of activities carried out in accordance with the energetic materials strategic plan and investment strategy developed under section 148(c)(1) of title 10, United States Code, as added by subsection (a) of this section, including—

(A) a description of any updates to the performance metrics developed for purposes of such plan and strategy; and

Assessment.

(B) an assessment of the performance of the Office against those metrics.

(2) An overview of the research, development, test, and evaluation efforts initiated or completed by the Office.

(3) An overview of the efforts of the Office to expedite qualification processes for energetic materials.

(4) An overview of efforts of the Office to coordinate with other organizations involved in energetic materials activities across the Department of Defense and other departments and agencies of the Federal Government.

10 USC 4172
note.

**SEC. 242. CONSIDERATION OF LETHALITY IN THE ANALYSIS OF ALTER-NATIVES FOR MUNITIONS.**

(a) ANALYSIS OF ALTERNATIVES REVIEW.—The Secretary of Defense shall ensure that lethality is considered in any analysis of alternatives conducted prior to issuing a capability development document for purposes of procuring any new munition or modifying an existing munition.

(b) CONSIDERATION OF ENERGETIC MATERIALS.—In assessing the lethality of a munition for purposes of the analysis of alternatives described under subsection (a), the Secretary of Defense shall include the margin of effectiveness, increased system capacities, and cost implications afforded by the potential use of novel or alternative energetic materials in the munition to achieve increased explosive effects.

(c) ENERGETIC MATERIALS DEFINED.—In this section, the term "energetic materials" means critical chemicals that—

(1) release large amounts of energy in a short amount of time; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 209

(2) are capable of being used in explosives that create lethal effects in warheads.

**SEC. 243. PILOT PROGRAM ON INCORPORATION OF THE CL20 COMPOUND IN CERTAIN WEAPON SYSTEMS.**

10 USC 4172 note.

(a) PILOT PROGRAM REQUIRED.—The Secretary of Defense shall carry out a pilot program under which the Secretary incorporates the CL20 compound as the energetic material for the main fill in the warheads or propellants of three weapon systems under development by the Department of Defense for the purpose of determining cost, schedule, and lethality performance parameters for such systems.

(b) SELECTION OF WEAPON SYSTEMS.—Each of the three weapon systems selected under subsection (a) shall be a weapon system that does not, as of the date of the enactment of this Act, already incorporate the CL20 compound as the energetic material for the main fill in the warhead or propellant of the system.

(c) TIMELINE FOR INTEGRATION.—The Secretary of Defense shall ensure that the CL20 energetic compound is integrated into each weapon system selected under subsection (a) by not later than three years after the date of the enactment of this Act.

Deadline.

(d) BRIEFING.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall provide to the congressional defense committees a briefing on progress of the Secretary in carrying out the pilot program under this section, including—

Deadline.

(1) identification of the weapon systems selected by the Secretary under subsection (a);

(2) with respect to each such weapon system, identification of—

(A) a timeline for incorporating the CL20 energetic compound into such weapon system;

Timeline.

(B) the organization within the Department of Defense responsible for carrying out activities under the pilot program for such weapon system; and

(C) any locations at which testing associated with such weapon system under the program is expected to be carried out; and

(3) the baseline cost, schedule, and lethality objectives that will be used to evaluate the performance of weapon systems under the program.

(e) DEFINITIONS.—In this section, the term "energetic material" means critical chemicals and formulations that—

(1) release large amounts of stored chemical energy; and

(2) are capable of being used as explosives, propellants, pyrotechnics, and reactive materials that—

(A) create lethal effects in warheads in kinetic weapons components and systems; or

(B) increase propellant performance in a weapon propulsion system as related to lethal effects, range, or speed.

**SEC. 244. LIMITATION ON SOURCING CHEMICAL MATERIALS FOR MUNITIONS FROM CERTAIN COUNTRIES.**

10 USC note prec. 4651.

(a) LIMITATION.—The Secretary of Defense may not procure a chemical material for munitions specified in subsection (b) from any country specified in subsection (c).

(b) CHEMICAL MATERIALS SPECIFIED.—The chemical materials for munitions specified in this subsection are the chemicals listed under the heading "Task 1: Domestic Production of Critical Chemicals" in section 3.0E of the document of the Department of Defense titled "Statement of Objectives (SOO) for Critical Chemicals Production" (FOA: FA8650-19-S-5010, Appendix VI, Call: 012) and dated December 5, 2022.

(c) COUNTRIES SPECIFIED.—The countries specified in this subsection are the following:

(1) The People's Republic of China.
(2) The Russian Federation.
(3) The Islamic Republic of Iran.
(4) The Democratic People's Republic of North Korea.

*Determination.*

(d) EFFECTIVE DATE.—The requirements of this section shall take effect on a date determined by the Secretary of Defense that is not later than September 30, 2028.

*10 USC note prec. 3201.*

**SEC. 245. DEFENSE INDUSTRIAL BASE MUNITION SURGE CAPACITY CRITICAL RESERVE.**

(a) IN GENERAL.—The Under Secretary of Defense for Acquisition and Sustainment, in coordination with the service acquisition executive of each military department, may establish a reserve of long-lead items and components to accelerate the delivery of munitions described in section 222c(c) of title 10, United States Code.

(b) QUANTITY.—The quantity of long-lead items and components reserved pursuant to subsection (a) should be in amounts commensurate to fulfill the requirements identified as Out-Year Unconstrained Total Munitions Requirement and Out-Year inventory numbers under section 222c(a) of title 10, United States Code.

*Effective date.*

(c) AUTHORITY FOR ADVANCE PROCUREMENT.—The Under Secretary of Defense for Acquisition and Sustainment may enter into one or more contracts, beginning in fiscal year 2024, for the advance procurement of long-lead items and components, or economic order quantities of such items and components when cost savings are achievable, associated with munitions identified in subsection (a). Advance procurement authority may include the cost of shipping, storage, tracking, maintenance, and obsolescence management of long-lead items and components while held in the reserve described in subsection (a).

*Time period.*

(d) LIMITATIONS.—No long-lead item or component may be procured under this section if the anticipated life cycle of such item or component requires disposal due to lack of military utility less than 8 years after such item or component is procured.

*Termination date.*

(e) REPORT.—Not later than February 1, 2025, and annually thereafter until February 1, 2030, the Under Secretary of Defense for Acquisition and Sustainment shall submit to the congressional defense committees a report that describes the use of the authority under this section, including—

(1) the type, number, and value of long-lead items and components procured under each contractual action; and
(2) information about the location of storage of such items and components.

(f) DEFINITIONS.—In this section:

(1) The term "long-lead item or component" means a material, component, or subsystem of a munition that must be procured well in advance of the need for such munition.

(2) The terms "service acquisition executive" and "military department" have the meanings given, respectively, in section 101 of title 10, United States Code.

# Subtitle D—Plans, Reports, and Other Matters

### SEC. 251. CONGRESSIONAL NOTIFICATION OF CHANGES TO DEPARTMENT OF DEFENSE POLICY ON AUTONOMY IN WEAPON SYSTEMS.

Not later than 30 days after making a modification to Department of Defense Directive 3000.09 (relating to autonomy in weapon systems) the Secretary of Defense shall provide to the congressional defense committees a briefing that includes—

> Deadline.
> Briefing.

(1) a description of the modification; and

(2) an explanation of the reasons for the modification.

### SEC. 252. AUDIT TO IDENTIFY DIVERSION OF DEPARTMENT OF DEFENSE FUNDING TO CHINA'S RESEARCH LABS.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Inspector General of the Department of Defense shall conduct a study, and submit a report to the congressional defense committees, regarding the amount of Federal funds awarded by the Department of Defense (whether directly or indirectly) through grants, contracts, subgrants, subcontracts, or any other type of agreement or collaboration, during the 10-year period immediately preceding such date of enactment, that—

> Study.
> Time period.

(1) was provided, whether purposely or inadvertently, to—

(A) the People's Republic of China;

(B) the Communist Party of China;

(C) the Wuhan Institute of Virology or any other organization administered by the Chinese Academy of Sciences;

> Wuhan Institute
> of Virology.

(D) EcoHealth Alliance Inc. for work performed in China on research supported by the Government of China, including any subsidiaries and related organizations that are directly controlled by EcoHealth Alliance, Inc.;

> EcoHealth
> Alliance Inc.

(E) the Academy of Military Medical Sciences or any of its research institutes, including the Beijing Institute of Microbiology and Epidemiology; or

> Academy of
> Military Medical
> Sciences.
> Beijing Institute
> of Microbiology
> and
> Epidemiology.

(F) any other lab, agency, organization, individual, or instrumentality that is owned, controlled (directly or indirectly), or overseen (officially or unofficially) by any of the entities listed in subparagraphs (A) through (E); or

(2) was used to fund research or experiments that could have reasonably resulted in the enhancement of any coronavirus, influenza, Nipah, Ebola, or other pathogen of pandemic potential or chimeric versions of such a virus or pathogen in the People's Republic of China or any other foreign country.

(b) IDENTIFICATION OF COUNTRIES AND PATHOGENS.—The report required under subsection (a) shall specify—

(1) the countries in which the research or experiments described in subsection (a)(2) was conducted; and

(2) the pathogens involved in such research or experiments.

**137 STAT. 212         PUBLIC LAW 118–31—DEC. 22, 2023**

### SEC. 253. ANNUAL REVIEW OF STATUS OF IMPLEMENTATION PLAN FOR DIGITAL ENGINEERING CAREER TRACKS.

*Termination date.*

Not less frequently than once each year until December 31, 2029, the Secretary of Defense shall—

(1) conduct an internal review of the status of the implementation of the plan submitted to Congress pursuant to section 230(b) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 501 note prec.), which shall include consideration of how the rapid rate of technological change in data science and machine learning may affect the implementation of the plan; and

(2) submit to the congressional defense committees a report that includes—

*Summary.*

(A) a summary of the status of the implementation of the plan described in paragraph (1);

(B) the findings of the Secretary with respect to the most recent review conducted under such paragraph; and

(C) the plan of the Secretary for addressing the digital engineering personnel needs of the Department of Defense in the years following the date of the report.

# TITLE III—OPERATION AND MAINTENANCE

Subtitle A—Authorization of Appropriations

Sec. 301. Authorization of appropriations.

Subtitle B—Energy and Environment

Sec. 311. Improvement and codification of Sentinel Landscapes Partnership program authority.
Sec. 312. Modification of authority for environmental restoration projects at National Guard facilities.
Sec. 313. Modification to technical assistance authority for environmental restoration activities.
Sec. 314. Coordination on agreements to limit encroachments and other constraints on military training, testing, and operations.
Sec. 315. Requirement for approval by Under Secretary of Defense for Acquisition and Sustainment of waiver for systems not meeting fuel efficiency key performance parameter.
Sec. 316. Modification to prototype and demonstration projects for energy resilience at certain military installations.
Sec. 317. Authority to transfer certain funds as payment relating to Naval Air Station, Moffett Field, California.
Sec. 318. Prohibition on required disclosure by Department of Defense contractors of information relating to greenhouse gas emissions.
Sec. 319. Required infrastructure plan prior to deployment of certain non-tactical vehicles at military installations.
Sec. 320. Prohibition and report requirement relating to certain energy programs of Department of Defense.
Sec. 321. Report on schedule and cost estimates for completion of testing and remediation of contaminated sites; publication of cleanup information.

Subtitle C—Treatment of Perfluoroalkyl Substances and Polyfluoroalkyl Substances

Sec. 331. Modification of timing of report on activities of PFAS Task Force.
Sec. 332. Budget justification document for funding relating to perfluoroalkyl substances and polyfluoroalkyl substances.
Sec. 333. Increase of transfer authority for funding of study and assessment on health implications of perfluoroalkyl substances and polyfluoroalkyl substances contamination in drinking water by Agency for Toxic Substances and Disease Registry.
Sec. 334. Prizes for development of technology for thermal destruction of perfluoroalkyl substances or polyfluoroalkyl substances.
Sec. 335. Treatment of certain materials contaminated with perfluoroalkyl substances or polyfluoroalkyl substances.

Sec. 336. Government Accountability Office reports on testing and remediation of perfluoroalkyl substances and polyfluoroalkyl substances.

Subtitle D—Logistics and Sustainment

Sec. 341.  Modification of rule of construction regarding provision of support and services to non-Department of Defense organizations and activities.
Sec. 342. Repeal of Comptroller General review requirement relating to core logistics capabilities.
Sec. 343. Modifications to Contested Logistics Working Group of Department of Defense.
Sec. 344. Matters relating to briefings on Shipyard Infrastructure Optimization Program of the Navy.
Sec. 345. Foreign military sales exclusion in calculation for certain workload carry-over of Department of the Army.
Sec. 346. Pilot program on optimization of aerial refueling and fuel management in contested logistics environments through use of artificial intelligence.
Sec. 347. Limitation on availability of funds to expand leased facilities for Joint Military Information Support Operations Web Operations Center.
Sec. 348. Limitation on availability of funds pending submission of certain 30-year shipbuilding plan by the Secretary of the Navy.
Sec. 349. Plan regarding condition and maintenance of prepositioned stockpiles of the Army.
Sec. 350. Strategy and assessment on use of automation and artificial intelligence for shipyard optimization.
Sec. 351. Assessment and strategy relating to hardening of certain military installations against attack by Iran and Iranian-associated groups.
Sec. 352. Semiannual briefings on operational status of amphibious warship fleet.

Subtitle E—Other Matters

Sec. 361. Review of notice of presumed risk issued by Military Aviation and Installation Assurance Clearinghouse.
Sec. 362. Modifications to military aviation and installation assurance clearinghouse for review of mission obstructions.
Sec. 363. Modification to Joint Safety Council.
Sec. 364. Designation of official responsible for coordination of renegotiation of certain land leases owned by Department of Defense in Hawaii.
Sec. 365. Continued designation of Secretary of the Navy as executive agent for Naval Small Craft Instruction and Technical Training School.
Sec. 366. Establishment of Caisson Platoon and support for military and State funeral services at Arlington National Cemetery.
Sec. 367. Recovery of rare earth elements and other strategic and critical materials through end-of-life equipment recycling.

# Subtitle A—Authorization of Appropriations

**SEC. 301. AUTHORIZATION OF APPROPRIATIONS.**

Funds are hereby authorized to be appropriated for fiscal year 2024 for the use of the Armed Forces and other activities and agencies of the Department of Defense for expenses, not otherwise provided for, for operation and maintenance, as specified in the funding table in section 4301.

# Subtitle B—Energy and Environment

**SEC. 311. IMPROVEMENT AND CODIFICATION OF SENTINEL LAND-SCAPES PARTNERSHIP PROGRAM AUTHORITY.**

(a) CODIFICATION OF EXISTING STATUTE.—Section 317 of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 10 U.S.C. 2684a note) is—

10 USC prec. 2661, 2684a notes, 2693.

(1) transferred to chapter 159 of title 10, United States Code;

(2) inserted after section 2692 of such chapter; and

(3) redesignated as section 2693.

(b) IMPROVEMENTS TO SENTINEL LANDSCAPES PARTNERSHIP PROGRAM.—Section 2693 of title 10, United States Code, as so transferred and redesignated, is further amended—

(1) in subsection (a), by striking "and the Secretary of the Interior" and inserting ", the Secretary of the Interior, and the heads of other Federal departments and agencies that elect to become full partners in the program";

(2) in subsection (b), by striking "and the Secretary of the Interior, may, as the Secretaries" and inserting "the Secretary of the Interior, and the heads of other Federal departments and agencies that elect to become full partners in the Sentinel Landscapes Partnership may, as such Secretaries and other heads";

(3) by amending subsection (c) to read as follows:

"(c) COORDINATION OF ACTIVITIES.—In carrying out this section, the Secretaries and the other heads of Federal departments and agencies may coordinate actions between their departments and agencies and with other Federal, State, interstate, and local agencies, Indian Tribes, and private entities to more efficiently work together for the mutual benefit of conservation, resilience, working lands, and national defense, and to encourage owners and managers of land to engage in voluntary land management, resilience, and conservation activities that contribute to the sustainment of military installations, State-owned National Guard installations, and associated airspace.";

(4) in subsection (d)—

(A) by striking the first sentence and inserting "In carrying out this section, the Secretaries and the other heads of Federal departments and agencies may give to any eligible owner or manager of land within a designated sentinel landscape priority consideration for participation in any easement, grant, or assistance program administered by that Secretary or head."; and

(B) in the second sentence, by striking "eligible landowner or agricultural producer" and inserting "eligible owner or manager of land";

(5) by redesignating subsection (f) as subsection (g);

(6) by inserting after subsection (e) the following new subsection (f):

"(f) RULE OF CONSTRUCTION.—Nothing in this section may be construed to require an owner or manager of land, including a private landowner or agricultural producer, to participate in any land management, resilience, or conservation activity under this section."; and

(7) in subsection (g), as redesignated by paragraph (5)—

(A) in paragraph (1), by striking "section 670(1) of title 16, United States Code" and inserting "section 100(1) of the Sikes Act (16 U.S.C. 670(1))";

(B) in paragraph (2), by striking "section 670(3) of title 16, United States Code" and inserting "section 100(3) of the Sikes Act (16 U.S.C. 670(3))"; and

(C) in paragraph (3), by amending subparagraph (B) to read as follows:

"(B) the publicly and privately owned lands that serve to protect and support the rural economy, the natural environment, outdoor recreation, and the national defense

missions of a military installation or State-owned National Guard installation.".

(c) CONFORMING AMENDMENTS.—Title 10, United States Code, is further amended—

(1) in section 2684a(g)(2)(E), by striking "Sentinel Landscapes Partnership established under section 317 of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 10 U.S.C. 2684a note)" and inserting "Sentinel Landscapes Partnership under section 2693 of this title"; and

(2) in section 2694(e), by striking "meaning given that term in section 317(f) of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 10 U.S.C. 2684a note)" and inserting "meaning given that term in section 2693(g) of this title".

## SEC. 312. MODIFICATION OF AUTHORITY FOR ENVIRONMENTAL RESTORATION PROJECTS AT NATIONAL GUARD FACILITIES.

(a) CLARIFICATION OF DEFINITION OF NATIONAL GUARD FACILITIES.—Section 2700(4) of title 10, United States Code, is amended—

(1) by striking "State-owned";

(2) by striking "owned and operated by a State when such land is"; and

(3) by striking "even though such land is not under the jurisdiction of the Department of Defense." and inserting "without regard to—"

"(A) the owner or operator of the facility; or

"(B) whether the facility is under the jurisdiction of the Department of Defense or a military department.".

(b) INCLUSION UNDER DEFENSE ENVIRONMENTAL RESTORATION PROGRAM.—Section 2701(a)(1) of such title is amended by striking "State-owned".

(c) RESPONSE ACTIONS AT NATIONAL GUARD FACILITIES.—Section 2701(c)(1)(D) of such title is amended by striking "State-owned".

(d) SERVICES OF OTHER ENTITIES.—Section 2701(d)(1) of such title is amended, in the second sentence, by inserting "or at a National Guard facility" before the period at the end.

(e) ENVIRONMENTAL RESTORATION ACCOUNTS.—Section 2703(g)(1) of such title is amended by inserting ", a National Guard facility," after "Department of Defense".

(f) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) REPEAL.—Section 2707 of such title is amended by striking subsection (e).

(2) REFERENCE UPDATE.—Section 345(f)(1) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 2715 note) is amended by striking "facility where military activities are conducted by the National Guard of a State pursuant to section 2707(e) of title 10, United States Code" and inserting "National Guard facility, as such term is defined in section 2700 of title 10, United States Code".

## SEC. 313. MODIFICATION TO TECHNICAL ASSISTANCE AUTHORITY FOR ENVIRONMENTAL RESTORATION ACTIVITIES.

Section 2705(e) of title 10, United States Code, is amended—

(1) in paragraph (1)—

(A) by striking "upon the request of the technical review committee or restoration advisory board for an installation" and inserting "upon the request of the technical review committee for an installation, restoration

137 STAT. 216          PUBLIC LAW 118–31—DEC. 22, 2023

advisory board for an installation, community concerned with respect to an installation, or individual member of such community"; and

(B) by striking "to obtain" and all that follows through "interpreting" and inserting "to obtain from covered sources technical assistance for the committee, advisory board, community, or individual (as the case may be) to interpret";

(2) in paragraph (2)—

(A) by striking "technical review committee or restoration advisory board" and inserting "technical review committee, restoration advisory board, community, or individual"; and

(B) by striking "only if" and all that follows through the closing period and inserting "only if the technical assistance—"

"(A) is likely to contribute to the efficiency, effectiveness, or timeliness of environmental restoration activities at the installation; or

"(B) is a service described in paragraph (3)."; and

(3) by adding at the end the following new paragraphs:

"(3) A service described in this paragraph is a service to improve public participation in, or assist in the navigation of, environmental restoration activities at an installation by the community concerned or an individual member of such community, including with respect to the following:

"(A) The interpretation of site-related documents, including documents concerning the nature of a release or threatened release at the installation, monitoring, testing plans, and reports associated with site assessment and characterization at the installation.

"(B) The interpretation of health-related information.

"(C) The interpretation of documents, plans, proposed actions, and final decisions relating to—

"(i) an interim remedial action;

"(ii) a remedial investigation or feasibility study;

"(iii) a record of decision;

"(iv) a remedial design;

"(v) the selection and construction of remedial action;

"(vi) operation and maintenance;

"(vii) a five-year review at the installation; or

"(viii) a removal action at the installation.

"(D) Assistance with the preparation of public comments.

"(E) The development of outreach materials to improve public participation.

"(F) The provision of advice and guidance regarding additional technical assistance for which the community or individual, as the case may be, may be eligible.

Definition.

"(4) In this subsection, the term 'covered source' means a private sector source, a Federal department or agency other than the Department of Defense (pursuant to a Federal interagency agreement), or a nonprofit entity (pursuant to a cooperative agreement entered into with such entity).".

### SEC. 314. COORDINATION ON AGREEMENTS TO LIMIT ENCROACHMENTS AND OTHER CONSTRAINTS ON MILITARY TRAINING, TESTING, AND OPERATIONS.

Section 2684a of title 10, United States Code, is amended—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 217

(1) by redesignating subsections (c) through (j) as subsections (d) through (k), respectively;

(2) by inserting after subsection (b) the following new subsection:

"(c) AUTHORITY TO COORDINATE.—(1) In entering into an agreement under subsection (a) or undertaking a project under such agreement, the Secretary of Defense or the Secretary of a military department, as the case may be, may coordinate with any other covered official with an interest in the activities proposed to be undertaken under such agreement.

"(2) In this subsection, the term 'covered official' means a Secretary concerned, the Director of the Army National Guard, or the Director of the Air National Guard."; and

Definition.

(3) in subsection (h)(2)(D), as redesignated by paragraph (1), by striking "subsection (d)" and inserting "subsection (e)".

## SEC. 315. REQUIREMENT FOR APPROVAL BY UNDER SECRETARY OF DEFENSE FOR ACQUISITION AND SUSTAINMENT OF WAIVER FOR SYSTEMS NOT MEETING FUEL EFFICIENCY KEY PERFORMANCE PARAMETER.

Section 332(b) of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417; 10 U.S.C. 2911 note) is amended—

(1) by striking "The Secretary of Defense" and inserting the following: "(1) IN GENERAL.—The Secretary of Defense"; and

(2) by adding at the end the following new paragraph:

"(2) WAIVER OF FUEL EFFICIENCY KEY PERFORMANCE PARAMETER.—

"(A) IN GENERAL.—The fuel efficiency key performance parameter implemented pursuant to paragraph (1) may be waived with respect to a system only if—

"(i) such waiver is approved by the Under Secretary of Defense for Acquisition and Sustainment; and

"(ii) the system is a fuel consuming system that the Under Secretary of Defense for Acquisition and Sustainment determines requires, or is likely to require, sustainment on at least an occasional basis.

Determination.

"(B) NONDELEGATION.—The authority to approve a waiver under subparagraph (A) may not be delegated.".

## SEC. 316. MODIFICATION TO PROTOTYPE AND DEMONSTRATION PROJECTS FOR ENERGY RESILIENCE AT CERTAIN MILITARY INSTALLATIONS.

(a) MODIFICATION TO COVERED TECHNOLOGIES FOR PROTOTYPE AND DEMONSTRATION PROJECTS.—Section 322(c)(6) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2511; 10 U.S.C. 2911 note) is amended by adding at the end the following new subparagraph:

"(C) Hydrogen creation, storage, and power generation technologies using natural gas or renewable electricity.".

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to covered prototype and demonstration projects (as defined in section 322(k) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2511; 10 U.S.C. 2911 note)) commencing on or after the date of the enactment of this Act.

10 USC 2911 note.

137 STAT. 218          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 317. AUTHORITY TO TRANSFER CERTAIN FUNDS AS PAYMENT RELATING TO NAVAL AIR STATION, MOFFETT FIELD, CALIFORNIA.

(a) AUTHORITY TO TRANSFER FUNDS.—

(1) TRANSFER AUTHORITY.—The Secretary of the Navy shall, in accordance with section 2703(f) of title 10, United States Code—

(A) transfer $218,125 to the Hazardous Substance Superfund established under subchapter A of chapter 98 of the Internal Revenue Code of 1986, without regard to section 2215 of such title; and

(B) transfer $218,125 to the State of California for deposit into the California State Water Pollution Cleanup and Abatement Account.

(2) SOURCE OF FUNDS.—Any transfer under this subsection shall be made using funds authorized to be appropriated by this Act for fiscal year 2024 for the Department of Defense Base Closure Account established by section 2906(a) of the Defense Base Closure and Realignment Act of 1990 (10 U.S.C. 2687 note).

(b) PURPOSE OF TRANSFER.—A transfer under subsection (a) shall be for the purpose of satisfying a stipulated penalty assessed by the Environmental Protection Agency on May 4, 2018, regarding former Naval Air Station, Moffett Field, California, under the Federal Facility Agreement for Naval Air Station, Moffett Field, which was entered into by the Navy, the State of California, and the Environmental Protection Agency in 1990 pursuant to section 120 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9620), and which provided for equal sharing of any such stipulated penalty between the appropriate Federal and State funds.

(c) EFFECT OF TRANSFERS.—If the Secretary of the Navy transfers under subsection (a)(1) the amounts required under such subsection, such transferred amounts shall be deemed to satisfy in full the stipulated penalty referred to in subsection (b) for purposes of the agreement referred to in such subsection, pursuant to the resolution of stipulated penalties agreed to with respect to such penalties by the Navy, the State of California, and the Environmental Protection Agency on October 1, 2018.

10 USC note prec. 4651.

### SEC. 318. PROHIBITION ON REQUIRED DISCLOSURE BY DEPARTMENT OF DEFENSE CONTRACTORS OF INFORMATION RELATING TO GREENHOUSE GAS EMISSIONS.

Determinations.

(a) PROHIBITION ON DISCLOSURE REQUIREMENTS.—

(1) NONTRADITIONAL DEFENSE CONTRACTORS.—The Secretary of Defense may not require that any nontraditional defense contractor, as a condition of being awarded a contract with the Secretary, disclose a greenhouse gas inventory or any other report on greenhouse gas emissions, unless the Secretary determines that requiring such disclosure is necessary to verify a voluntary disclosure of such inventory or other report by the nontraditional defense contractor.

Time period.

(2) OTHER THAN NONTRADITIONAL DEFENSE CONTRACTORS.—During the one-year period beginning on the date of the enactment of this Act, the Secretary of Defense may not require that any individual or entity other than a nontraditional defense contractor, as a condition of being awarded a contract

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 219

with the Secretary, disclose a greenhouse gas inventory or any other report on greenhouse gas emissions, unless the Secretary determines that requiring such disclosure is necessary to verify a voluntary disclosure of such inventory or other report by the individual or entity.

(b) WAIVER.—The Secretary of Defense may issue a waiver on a contract-by-contract basis provided that the information provided is directly related to the performance of the contract. In issuing such a waiver, the Secretary of Defense shall ensure that any information that is required is clearly identifiable.

(c) DEFINITIONS.—In this section:
    (1) The term "greenhouse gas" means—
        (A) carbon dioxide;
        (B) methane;
        (C) nitrous oxide;
        (D) nitrogen trifluoride;
        (E) hydrofluorocarbons;
        (F) perfluorocarbons; or
        (G) sulfur hexafluoride.
    (2) The term "greenhouse gas inventory" means, with respect to a person, a quantified list of the annual greenhouse gas emissions of the person.
    (3) The term "nontraditional defense contractor" has the meaning given the term in section 3014 of title 10, United States Code.

**SEC. 319. REQUIRED INFRASTRUCTURE PLAN PRIOR TO DEPLOYMENT OF CERTAIN NON-TACTICAL VEHICLES AT MILITARY INSTALLATIONS.**

10 USC note prec. 2661.

(a) REQUIREMENT.—No Secretary concerned may deploy covered non-tactical vehicles to a military installation until, for each such prospective deployment—

Time periods.

    (1) the Secretary concerned—
        (A) ensures there is completed an infrastructure plan for that military installation relating to the prospective deployment; and
        (B) determines such plan is sufficient to ensure the satisfaction of the conditions described in subsection (b); and

Determination.

    (2) in the case of the first prospective deployment to that military installation, a period of 180 days has elapsed since such determination; or
    (3) in the case of any subsequent prospective deployment to that military installation, a period of 60 days has elapsed since such determination.

(b) CONDITIONS DESCRIBED.—The conditions described in this subsection are, with respect to a prospective deployment of covered non-tactical vehicles to a military installation, the following:
    (1) Military logistics and operational requirements of that military installation would not be substantially affected as a result of a lack of infrastructure to support the kind and quantity of such vehicles proposed to be deployed.
    (2) Adequate support facilities for the kind and quantity of such vehicles proposed to be deployed exist at that military installation.

(c) DEFINITIONS.—In this section:

(1) The term "covered non-tactical vehicle" means a non-tactical vehicle that is an electric vehicle, hydrogen-powered vehicle, or advanced biofuel-powered vehicle, as such terms are defined in section 328 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2519).

(2) The term "Secretary concerned" has the meaning given that term in section 101 of title 10, United States Code.

10 USC note prec. 2922.

**SEC. 320. PROHIBITION AND REPORT REQUIREMENT RELATING TO CERTAIN ENERGY PROGRAMS OF DEPARTMENT OF DEFENSE.**

Russia.
China.

(a) PROHIBITION.—None of the funds authorized to be appropriated by this Act or otherwise made available for the Department of Defense for any operational energy program may be provided to any entity owned by, or with known financial or leadership ties to, the Russian Federation or the Chinese Communist Party.

(b) REPORT REQUIREMENT.—As part of the report submitted under section 2925(a) of title 10, United States Code, for fiscal year 2024, the Secretary of Defense shall submit to the congressional defense committees a report on operational energy programs that includes—

List.

(1) a list of each operational energy program; and

(2) to the extent such information may be determined, a description of—

(A) how each such program improves military readiness or capabilities;

(B) how each such program shall be sustained (including in a contested environment); and

Cost estimate.

(C) the estimated life-cycle costs of each such program, including the estimated cost avoidance over such life cycle.

(c) OPERATIONAL ENERGY PROGRAM DEFINED.—In this section, the term "operational energy program" means any program carried out under an operational energy initiative of the Department of Defense specified in section 2925(b)(3) of title 10, United States Code.

**SEC. 321. REPORT ON SCHEDULE AND COST ESTIMATES FOR COMPLETION OF TESTING AND REMEDIATION OF CONTAMINATED SITES; PUBLICATION OF CLEANUP INFORMATION.**

(a) REPORT REQUIRED.—

Termination date.

(1) REPORT.—Not later than one year after the date of the enactment of this Act, and once every two years thereafter until December 31, 2029, the Secretary of Defense shall submit to the Committees on Armed Services of the House of Representatives and the Senate a report that includes—

Proposal.

(A) a proposed schedule for the completion of testing and remediation activities (including with respect to the remediation of perfluoroalkyl substances and polyfluoroalkyl substances) at military installations, National Guard facilities, and sites formerly used by the Department of Defense in the United States with respect to which the Secretary obligated funds for environmental restoration activities in fiscal year 2022;

(B) for each site specified in subparagraph (A) for which an element of the Department of Defense has completed a remedial investigation but for which testing and

remediation activities have not been completed, a detailed cost estimate—

(i) for any such activities to be carried out at such site during the following year; and

(ii) for the completion of such activities at such site;

(C) if either cost estimate specified in subparagraph (B) is unavailable with respect to a given site specified in subparagraph (A), a detailed description of known and unknown factors, including site characteristics and the nature of contamination, that may affect the cost to complete testing and remediation activities at such site based on historical costs of remediation for—

(i) sites remediated under the Defense Environmental Restoration Program under section 2701 of title 10, United States Code;

(ii) other federally-funded sites; or

(iii) privately-funded sites; and

(D) for each site specified in subparagraph (A) for which the Secretary has completed the preliminary assessment or site inspection phase and that has been designated as requiring a remedial investigation or study on the feasibility of remediating the site, the timeline for the completion of such investigation or study.

*Timeline.*

(2) DEFINITIONS.—In this subsection:

(A) The term "military installation" has the meaning given such term in section 2801(c) of title 10, United States Code.

(B) The term "National Guard facility" has the meaning given that term in section 2700 of title 10, United States Code.

(b) PUBLICATION OF INFORMATION.—Beginning not later than one year after the date of the enactment of this Act, the Secretary of Defense shall publish on the publicly available website established under section 331(b) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 2701 note) timely and regularly updated information on the status of cleanup at sites for which the Secretary has obligated funds for environmental restoration activities.

*Public
information.
Web posting.
Updates.
10 USC 2701
note.*

# Subtitle C—Treatment of Perfluoroalkyl Substances and Polyfluoroalkyl Substances

### SEC. 331. MODIFICATION OF TIMING OF REPORT ON ACTIVITIES OF PFAS TASK FORCE.

Section 2714(f) of title 10, United States Code, is amended by striking "and quarterly thereafter," and inserting "and annually thereafter through 2029,".

### SEC. 332. BUDGET JUSTIFICATION DOCUMENT FOR FUNDING RELATING TO PERFLUOROALKYL SUBSTANCES AND POLYFLUOROALKYL SUBSTANCES.

Chapter 160 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC
prec. 2700,
2716.

**"§ 2716. Budget justification document for funding relating to perfluoroalkyl substances and polyfluoroalkyl substances**

"The Secretary of Defense shall submit to Congress, concurrent with the submission to Congress of the budget of the President for each fiscal year pursuant to section 1105(a) of title 31, a separate budget justification document that consolidates all information pertaining to activities of the Department of Defense relating to perfluoroalkyl substances or polyfluoroalkyl substances, including funding for and descriptions of—

"(1) research and development efforts;

"(2) testing;

"(3) remediation;

"(4) contaminant disposal; and

"(5) community outreach.".

**SEC. 333. INCREASE OF TRANSFER AUTHORITY FOR FUNDING OF STUDY AND ASSESSMENT ON HEALTH IMPLICATIONS OF PERFLUOROALKYL SUBSTANCES AND POLYFLUOROALKYL SUBSTANCES CONTAMINATION IN DRINKING WATER BY AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY.**

Section 316(a)(2)(B) of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 131 Stat. 1350) is amended by adding at the end the following new clause:

Time period.

"(iv) Without regard to section 2215 of title 10, United States Code, the Secretary of Defense may transfer not more than $5,000,000 during fiscal year 2024 to the Secretary of Health and Human Services to pay for the study and assessment required by this section.".

**SEC. 334. PRIZES FOR DEVELOPMENT OF TECHNOLOGY FOR THERMAL DESTRUCTION OF PERFLUOROALKYL SUBSTANCES OR POLYFLUOROALKYL SUBSTANCES.**

(a) PRIZES.—Section 330 of the National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 2661 note prec.), as amended by section 343 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2530), is further amended—

(1) in subsection (a), by adding at the end the following new paragraph:

"(3) Technology for the thermal destruction of perfluoroalkyl substances or polyfluoroalkyl substances."; and

(2) in subsection (g), by striking "October 1, 2024" and inserting "December 31, 2026".

(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Department of Defense for fiscal year 2024 $1,000,000 to carry out this section.

**SEC. 335. TREATMENT OF CERTAIN MATERIALS CONTAMINATED WITH PERFLUOROALKYL SUBSTANCES OR POLYFLUOROALKYL SUBSTANCES.**

Section 343 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1643; 10 U.S.C. 2701 note) is amended—

(1) in subsection (a), by striking "Beginning not later" and inserting "Except as provided in subsection (c), beginning not later";

(2) by redesignating subsections (c) through (e) as subsections (d) through (f), respectively;

(3) by inserting after subsection (b) the following new subsection:

"(c) TREATMENT OF CERTAIN MATERIALS.—Notwithstanding subsection (a), until the date on which the Secretary adopts the final rule pursuant to subsection (b), the Secretary may treat covered materials, including soils that have been contaminated with PFAS, through the use of any remediation or disposal technology that is approved by the Administrator of the Environmental Protection Agency."; and

(4) in subsection (e), as redesignated by paragraph (2), by striking "subsection (c)" and inserting "subsection (d)".

### SEC. 336. GOVERNMENT ACCOUNTABILITY OFFICE REPORTS ON TESTING AND REMEDIATION OF PERFLUOROALKYL SUBSTANCES AND POLYFLUOROALKYL SUBSTANCES.

Not later than one year after the date of the enactment of this Act, and not later than five years thereafter, the Comptroller General of the United States shall submit to the congressional defense committees a report assessing the state of ongoing testing and remediation by the Department of Defense of current or former military installations contaminated with perfluoroalkyl substances or polyfluoroalkyl substances, including—

*Assessments.*

(1) an assessment of the thoroughness, pace, and cost-effectiveness of efforts of the Department to conduct testing and remediation relating to such substances;

(2) recommendations to improve such efforts; and

(3) such other matters as the Comptroller General determines appropriate.

*Recommendations.*
*Determination.*

# Subtitle D—Logistics and Sustainment

### SEC. 341. MODIFICATION OF RULE OF CONSTRUCTION REGARDING PROVISION OF SUPPORT AND SERVICES TO NON-DEPARTMENT OF DEFENSE ORGANIZATIONS AND ACTIVITIES.

Section 2012(i) of title 10, United States Code, is amended—

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively;

(2) in the matter preceding subparagraph (A), as redesignated by paragraph (1), by striking "Nothing in this section" and inserting "(1) Nothing in this section";

(3) in subparagraph (A), as so redesignated, by inserting ", except as provided in paragraph (2)," before "for response"; and

(4) by adding at the end the following new paragraph:

"(2) Funds available to the Secretary of a military department for operation and maintenance for the Innovative Readiness Training program (as established pursuant to this section) may be expended under this section, upon approval by the Secretary concerned, to assist in demolition, clearing of roads, infrastructure improvements, and military construction to restore an area after a natural disaster.".

### SEC. 342. REPEAL OF COMPTROLLER GENERAL REVIEW REQUIRE-MENT RELATING TO CORE LOGISTICS CAPABILITIES.

Section 2464 of title 10, United States Code, is amended by striking subsection (e).

### SEC. 343. MODIFICATIONS TO CONTESTED LOGISTICS WORKING GROUP OF DEPARTMENT OF DEFENSE.

Section 2926(d) of title 10, United States Code, is amended as follows:

(1) EXPANSION OF WORKING GROUP.—

(A) EXPANSION.—In paragraph (3)—

(i) in the matter preceding subparagraph (A), by striking "appointed"; and

(ii) by adding at the end the following new sub-paragraphs:

Appointment.

"(D) A senior official of the Defense Logistics Agency, who shall be appointed by the Director of the Defense Logistics Agency to represent the Defense Logistics Agency.

Nomination.

"(E) An official of the Office of the Under Secretary of Defense for Research and Engineering, who shall be nominated by the Secretary of Defense and confirmed by the Senate to represent such Office.

"(F) The Assistant Secretary of Defense for Acquisition, who shall represent the Office of the Under Secretary of Defense for Acquisition.

"(G) The Assistant Secretary of Defense for Sustainment, who shall represent the Office of the Assistant Secretary of Defense for Sustainment.".

Deadline.
Appointments.
10 USC 2926 note.

(B) TIMING.—Not later than 60 days after the date of the enactment of this Act, the Secretary of Defense shall appoint the additional members of the working group required under subparagraphs (D) through (G) of paragraph (3) of such section, as added by subparagraph (A).

(2) RESPONSIBILITIES OF MEMBERS.—In paragraph (4), by inserting ", or developing capabilities for such purposes," after "coordinated initiatives".

(3) MEETINGS; REPORTS.—By adding at the end the following new paragraphs:

Time period.

"(6) The working group under paragraph (1) shall meet not less frequently than quarterly.

Reports.

"(7)(A) Not later than February 1 of each year, the working group under paragraph (1) shall submit to the congressional defense committees a report that contains a description of the following:

"(i) The topics addressed in the meetings of the working group during the preceding year.

Priorities.
Time period.

"(ii) The priorities of the working group for the following year (including with respect to any shortfalls in personnel, equipment, infrastructure, energy and storage, or capabilities) in support of the operational plans of the Department of Defense.

"(iii) Any steps taken by the working group, as of the date of the submission, to address any identified shortfalls in budget or capabilities.

"(B) Each report under subparagraph (A) shall be submitted in unclassified form, but may include a classified annex.".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 225

### SEC. 344. MATTERS RELATING TO BRIEFINGS ON SHIPYARD INFRASTRUCTURE OPTIMIZATION PROGRAM OF THE NAVY.

(a) MODIFICATION TO BRIEFING REQUIREMENT.—Section 355(b)(2) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 8013 note) is amended by adding at the end the following new subparagraph:

"(D) A risk analysis of how the schedule for such project affects the availability schedule for submarines and aircraft carriers, including the following: — Risk analysis.

"(i) A timeline for the completion of such project, including construction dates and dates of planned maintenance at each shipyard under such project. — Timeline.

"(ii) Contingency maintenance plans if such project is delayed, including any backup location for maintenance availabilities determined by the Chief Naval Officer and any resulting alteration in plans or schedules for maintenance. — Plans. Determination.

"(iii) The effect on public shipyards should a delay to such project result in the implementation of a contingency plan pursuant to clause (ii), including the effect on the workforce and workload capacity at the public shipyard with respect to which such project is conducted.

"(iv) A cost-benefit analysis of the potential for private shipyards to assist with such workload should such project be delayed, including an identification of any gaps in the capability of private shipyards to conduct the maintenance described in clause (ii). — Cost-benefit analysis.

"(v) An assessment of whether greater flexibilities in authorities are necessary to better support fleet maintenance needs and the Shipyard Infrastructure Optimization Program.". — Assessment.

(b) BRIEFING ON IMPLEMENTATION STATUS.—Not later than October 1, 2024, the Secretary of the Navy shall provide to the congressional defense committees a briefing on the status of the implementation of the Shipyard Infrastructure Optimization Program of the Department of the Navy. Such briefing shall include, with respect to each covered project, the information specified in each of subparagraphs (A) through (D) of section 355(b)(2) of the National Defense Authorization Act for Fiscal Year 2022, as amended by subsection (a). — Deadline.

### SEC. 345. FOREIGN MILITARY SALES EXCLUSION IN CALCULATION FOR CERTAIN WORKLOAD CARRYOVER OF DEPARTMENT OF THE ARMY.

Section 377 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2542; 10 U.S.C. 2476 note) is amended by striking "that applies" and all that follows through the closing period and inserting "that—"

"(1) applies a material end of period exclusion; and

"(2) excludes from the calculated carryover amount the proceeds of any foreign military sale.".

137 STAT. 226          PUBLIC LAW 118–31—DEC. 22, 2023

10 USC 4001
note.

**SEC. 346. PILOT PROGRAM ON OPTIMIZATION OF AERIAL REFUELING AND FUEL MANAGEMENT IN CONTESTED LOGISTICS ENVIRONMENTS THROUGH USE OF ARTIFICIAL INTELLIGENCE.**

(a) DESIGN OF PILOT PROGRAM.—

Deadline.

(1) DESIGN.—Not later than 90 days after the date of the enactment of this Act, the Chief Digital and Artificial Intelligence Officer of the Department of Defense, in collaboration with the Under Secretary of Defense for Acquisition and Sustainment and the Chief of Staff of the Air Force, shall design a pilot program to optimize the logistics of aerial refueling and fuel management in the context of contested logistics environments through the use of advanced digital technologies and artificial intelligence (in this section referred to as the "pilot program").

(2) COORDINATION AND CONSULTATION.—In designing the pilot program, the Chief Digital and Artificial Intelligence Officer shall—

(A) coordinate with the Commander of the United States Transportation Command and the Commander of the United States Indo-Pacific Command regarding the activities to be carried out under the pilot program, to ensure the pilot program will align with existing operational requirements; and

(B) seek to consult with relevant experts in the fields of artificial intelligence, logistics, aviation, and fuel management.

(b) OBJECTIVES.—The objectives of the pilot program shall include the following:

Assessments.

(1) Assessing the feasibility and effectiveness of artificial intelligence-driven approaches in enhancing aerial refueling operations and fuel management processes compared to existing mission planning processes executed by members of the Air Force with relevant training.

(2) Identifying opportunities to reduce fuel consumption, decrease operational costs, and minimize the environmental impact of fuel management while maintaining military readiness.

Evaluations.

(3) Evaluating the interoperability and compatibility of artificial intelligence-enabled systems with the existing logistics infrastructure of the Department of Defense.

(4) Enhancing situational awareness and decision-making capabilities through real-time data analysis and predictive modeling.

(5) Addressing potential challenges and risks associated with the integration of artificial intelligence and other advanced digital technologies, including challenges and risks involving cybersecurity concerns.

Deadline.

(c) COMMENCEMENT.—Not later than one year after the date of the enactment of this Act, the Chief Digital and Artificial Intelligence Officer, in collaboration with the Under Secretary of Defense for Acquisition and Sustainment and the Chief of Staff of the Air Force, shall commence the pilot program.

(d) REPORT.—Not later than one year after the date of the enactment of this Act, the Chief Digital and Artificial Intelligence Officer shall submit to the Committees on Armed Services of the House of Representatives and the Senate a report on—

(1) the design of the pilot program under subsection (a);

(2) the status of any efforts underway to commence the pilot program under subsection (c); and

(3) any planned future activities to be carried out under the pilot program to test expected outcomes regarding improved efficiencies or other benefits that may be derived from artificial intelligence-driven approaches to aerial refueling operations and fuel management.

(e) TERMINATION.—The authority to conduct the pilot program under this section shall terminate on January 1, 2027.

### SEC. 347. LIMITATION ON AVAILABILITY OF FUNDS TO EXPAND LEASED FACILITIES FOR JOINT MILITARY INFORMATION SUPPORT OPERATIONS WEB OPERATIONS CENTER.

None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for Operation and Maintenance, Defense-wide, may be obligated or expended to expand leased facilities for the Joint Military Information Support Operations Web Operations Center until the Secretary of Defense submits to the congressional defense committees a validated man-power study for such center that includes the following:

Study.

(1) Validated estimates of the number of personnel from the United States Special Operations Command and the other combatant commands that will be housed in leased facilities of such center.

Estimates.

(2) An explanation of how such estimates are aligned with and support the priorities established by the national defense strategy under 113(g) of title 10, United States Code.

### SEC. 348. LIMITATION ON AVAILABILITY OF FUNDS PENDING SUBMISSION OF CERTAIN 30-YEAR SHIPBUILDING PLAN BY THE SECRETARY OF THE NAVY.

(a) PLAN REQUIRED.—The Secretary of the Navy shall include with the defense budget materials for fiscal year 2025 (as submitted to Congress in support of the budget of the President under section 1105(a) of title 31, United States Code) a 30-year shipbuilding plan that meets the statutory requirement to maintain 31 amphibious warships as found in section 8062(b) of title 10, United States Code.

(b) LIMITATION.—If the Secretary of the Navy does not submit to the congressional defense committees a 30-year shipbuilding plan as described in subsection (a), not more than 50 percent of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for Administration and Servicewide Activities, Operation and Maintenance, Navy, may be obligated or expended until the date on which the Secretary of the Navy submits to the congressional defense committees a 30-year shipbuilding plan as described in such subsection.

(c) AMPHIBIOUS WARSHIP DEFINED.—In this section, the term "amphibious warship" means a ship that is classified as an amphibious assault ship (general purpose) (LHA), an amphibious assault ship (multi-purpose) (LHD), an amphibious transport dock (LPD), or a dock landing ship (LSD) that is included in the Battle Force Inventory in accordance with instruction 5030.8D of the Secretary of the Navy, or a successor instruction.

137 STAT. 228          PUBLIC LAW 118–31—DEC. 22, 2023

Deadlines.
Time periods.
10 USC 2229
note.

### SEC. 349. PLAN REGARDING CONDITION AND MAINTENANCE OF PREPOSITIONED STOCKPILES OF THE ARMY.

(a) PLAN REQUIRED.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Army shall develop a plan to improve the required inspection procedures for the prepositioned stockpiles of the Army, for the purpose of identifying deficiencies and conducting maintenance repairs at levels necessary to ensure such prepositioned stockpiles are mission-capable.

(b) IMPLEMENTATION.—Not later than 30 days after the date on which the Secretary completes the development of the plan under subsection (a), and not less frequently than twice each year thereafter for the three-year period beginning on the date of the enactment of this Act, the Secretary shall inspect the prepositioned stockpiles of the Army in accordance with the procedures under such plan.

(c) BRIEFINGS.—

(1) BRIEFING ON PLAN.—Not later than 120 days after the date of the enactment of this Act, the Secretary of the Army shall provide to the congressional defense committees a briefing on the plan developed under subsection (a).

(2) BRIEFINGS ON STATUS OF PREPOSITIONED STOCKPILES.—Not later than 180 days after the date of the enactment of this Act, and every 180 days thereafter for the three-year period beginning on the date of the enactment of this Act, the Secretary of the Army shall provide to the congressional defense committees a briefing on the status and condition of the prepositioned stockpiles of the Army.

### SEC. 350. STRATEGY AND ASSESSMENT ON USE OF AUTOMATION AND ARTIFICIAL INTELLIGENCE FOR SHIPYARD OPTIMIZATION.

10 USC 8013
note.

(a) STRATEGY.—The Secretary of the Navy, in coordination with the Shipyard Infrastructure Optimization Program of the Department of the Navy, shall develop and implement a strategy to leverage commercial best practices used in shipyards to improve the efficiency of operations and to demonstrate a digital platform that uses artificial intelligence to analyze data on the maintenance and condition of shipboard assets of the Navy at shipyards, for the purpose of improving the readiness of the Armed Forces, predicting and diagnosing issues prior to the occurrence of such issues, and lowering maintenance costs.

(b) ASSESSMENT.—The Secretary of the Navy shall conduct an assessment of the costs of maintenance delays on shipboard assets of the Navy and the potential cost savings of adopting artificial intelligence predictive maintenance technologies to assist in the determination of the condition of in-service equipment and estimate when maintenance should be performed prior to failure or end of life of such equipment. Such assessment shall include—

Analysis.

(1) an analysis of maintenance delays and costs due to unplanned and unpredicted maintenance issues;

Evaluation.

(2) an evaluation of opportunities to demonstrate commercial best practices at shipyards, including the demonstration of artificial intelligence technologies to ensure timely predictions for individuals responsible for maintenance and planning at shipyards by connecting datasets, executing models, and providing outputs in near real-time;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 229

(3) an identification of shipyard assets of the Navy with sufficient data available to enable near-term demonstrations of artificial intelligence predictive maintenance technologies, and an estimate of resources needed within the Navy to accelerate such demonstrations with respect to such assets; and

(4) an identification of any policy or technical challenges to implementing artificial intelligence or machine learning for purposes of carrying out the Shipyard Infrastructure Optimization Program of the Department of the Navy.

(c) BRIEFING.—Not later than 180 days after the date of the enactment of this Act, the Secretary of the Navy shall provide to the congressional defense committees a briefing on—

    *Deadline.*

(1) the strategy under subsection (a);

(2) the results of the assessment under subsection (b); and

(3) a plan to execute any measures pursuant to such assessment.

    *Plan.*

### SEC. 351. ASSESSMENT AND STRATEGY RELATING TO HARDENING OF CERTAIN MILITARY INSTALLATIONS AGAINST ATTACK BY IRAN AND IRANIAN-ASSOCIATED GROUPS.

(a) ASSESSMENT AND STRATEGY.—The Secretary of Defense, in coordination with the Commander of the United States Central Command, shall—

(1) conduct an assessment of the air and missile defense capabilities at covered military installations with respect to defense against potential attacks from Iran, the Islamic Revolutionary Guard Corps, and any associated groups; and

(2) taking into account the results of such assessment, develop a strategy to expedite the hardening of covered military installations and the upgrade of air and missile defense capabilities at such installations to improve defense against such potential attacks.

(b) REPORTS.—

(1) INITIAL REPORT.—Not later than 180 days after the date of the enactment of this Act, the Secretary shall submit to the congressional defense committees a report containing the results of the assessment under subsection (a)(1) and the strategy developed under subsection (a)(2).

(2) UPDATE.—Not later than 180 days after the date on which the Secretary submits the report under paragraph (1), the Secretary shall submit to the congressional defense committees a report containing a description of any update made to such assessment or progress made in implementing such strategy.

(c) DEFINITIONS.—In this section:

(1) The term "covered military installation" means a military installation located in the area of responsibility of the United States Central Command.

(2) The term "military installation" has the meaning given such term in section 2801 of title 10, United States Code.

### SEC. 352. SEMIANNUAL BRIEFINGS ON OPERATIONAL STATUS OF AMPHIBIOUS WARSHIP FLEET.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and on a semiannual basis thereafter until September 30, 2026, the Secretary of the Navy shall provide

    *Deadline.*
    *Termination date.*

to the congressional defense committees a briefing on the operational status of the amphibious warship fleet of the Department of the Navy.

(b) ELEMENTS.—Each briefing under subsection (a) shall include, with respect to each amphibious warship within such fleet, the following information:

(1) The average quarterly operational availability of the amphibious warship.

(2) The number of days the amphibious warship was underway during the period covered by the briefing as follows:

(A) Training for the purpose of supporting the requirements set forth in the training and readiness manual of the Marine Corps, including unit level well-deck training, flight-deck operations training, and Amphibious Ready Group and Marine Expeditionary Unit integrated training.

(B) Deployed, which shall not include scheduled or unscheduled in-port maintenance.

Estimate.

(3) A baseline and current estimate of the completion date for in-work and scheduled and unscheduled maintenance for the amphibious warship.

Update.

(4) An update on any delays in the completion of scheduled or unscheduled maintenance, and on any casualty reports, of the amphibious warship affecting the following:

(A) Scheduled unit level well-deck or flight-deck operations training of the Marine Corps.

(B) Requirements set forth in the training and readiness manual of the Marine Corps, including with respect to mobility, communications, amphibious well-deck operations, aviation operations, and warfare training.

(C) The composition and deployment dates of Amphibious Ready Groups and Marine Expeditionary Units that are deployed or scheduled to be deployed.

Plan.

(5) A plan to schedule maintenance and repair for the amphibious warship in a manner that provides for the continuous operation of a total of three Amphibious Ready Groups and Marine Expeditionary Units as soon as practicable.

(c) DEFINITIONS.—In this section:

(1) The term "amphibious warship" means a ship that is classified as an amphibious assault ship (general purpose), an amphibious assault ship (multi-purpose), an amphibious transport dock, or a dock landing ship and is included within the battle force inventory of the Department of the Navy in accordance with the instruction from the Secretary of the Navy published on June 28, 2022, titled "General Guidance for the Classification of Naval Vessels and Battle Force Ship Counting Procedures" (SECNAVINST 5030.8), or any successor instruction.

(2) The terms "Amphibious Ready Group" and "Marine Expeditionary Unit" mean a group or unit, as the case may be, that consists of a minimum of three amphibious warships, comprised of at least—

(A) one amphibious assault ship (general purpose) or amphibious assault ship (multi-purpose); and

(B) one amphibious transport dock.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 231

# Subtitle E—Other Matters

### SEC. 361. REVIEW OF NOTICE OF PRESUMED RISK ISSUED BY MILITARY AVIATION AND INSTALLATION ASSURANCE CLEARING-HOUSE.

Section 183a(c)(3) of title 10, United States Code, is amended by inserting "The Clearinghouse shall ensure that a governor has at least 30 days after the date on which the governor receives the notice of presumed risk to provide any such comments and shall provide detailed information and other information necessary to ensure that the governor can fully understand the nature of the presumed risk." after the first sentence.

Time period.

### SEC. 362. MODIFICATIONS TO MILITARY AVIATION AND INSTALLATION ASSURANCE CLEARINGHOUSE FOR REVIEW OF MISSION OBSTRUCTIONS.

(a) Projects Proposed Within Two Nautical Miles of Any Active Intercontinental Ballistic Missile Launch Facility or Control Center.—Section 183a of title 10, United States Code, is amended—

(1) in subsection (d)(2)—

(A) in subparagraph (B), by inserting "or any active intercontinental ballistic missile launch facility or control center" after "military training routes"; and

(B) in subparagraph (E), by striking "or a Deputy Under Secretary of Defense" and inserting "a Deputy Under Secretary of Defense, or, in the case of a geographic area of concern related to an active intercontinental ballistic missile launch facility or control center, the Assistant Secretary of Defense for Energy, Installations, and Environment"; and

(2) in subsection (e)(1)—

(A) in the first sentence—

(i) by striking "The Secretary" and inserting "(A) The Secretary"; and

(ii) by inserting "or antenna structure project" after "energy project";

(B) in the second sentence, by striking "The Secretary of Defense's finding of unacceptable risk to national security" and inserting the following new subparagraph:

"(C) Any finding of unacceptable risk to national security by the Secretary of Defense under this paragraph"; and

(C) by inserting after subparagraph (A), as designated by subparagraph (A)(i) of this paragraph, the following new subparagraph:

"(B)(i) In the case of any energy project or antenna structure project with proposed structures more than 200 feet above ground level located within two nautical miles of the geographic center of an active intercontinental ballistic missile launch facility or control center, the Secretary of Defense shall issue a finding of unacceptable risk to national security for such project if the mitigation actions identified pursuant to this section do not include removal of all such proposed structures from such project after receiving notice of presumed risk from the Clearinghouse under subsection (c)(2).

"(ii) Clause (i) does not apply to structures approved before the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024 or to structures that are re-powered with updated technology in the same location as previously approved structures.".

(b) INCLUSION OF ANTENNA STRUCTURE PROJECTS.—

(1) IN GENERAL.—Such section is further amended—

(A) by inserting "or antenna structure projects" after "energy projects" each place it appears; and

(B) by inserting "or antenna structure project" after "energy project" each place it appears (except for subsections (e)(1) and (h)(2)).

(2) ANTENNA STRUCTURE PROJECT AND INTERCONTINENTAL BALLISTIC MISSILE LAUNCH FACILITY OR CONTROL CENTER DEFINED.—Section 183a(h) of such title is amended—

(A) by redesignating paragraphs (2) through (9) as paragraphs (4) through (11), respectively; and

(B) by inserting after paragraph (1) the following new paragraphs:

"(2) The term 'antenna structure project'—

"(A) means a project to construct a structure located within two nautical miles of the geographic center of any intercontinental ballistic missile launch facility or control center that—

"(i) is constructed or used to transmit radio energy or that is constructed or used for the primary purpose of supporting antennas to transmit or receive radio energy (or both), and any antennas and other appurtenances mounted on the structure, from the time construction of the supporting structure begins until such time as the supporting structure is dismantled; and

"(ii) for which notification is required to be made to the Federal Aviation Administration pursuant to processes already established under this title; and

"(B) does not include—

"(i) any structure constructed before the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, including any such structure which is upgraded, repaired, or otherwise modified after such date of enactment as long as such upgrade, repair, or modification has not increased the height of such structure; or

"(ii) any project in support of or required by an intercontinental ballistic missile launch facility or control center, or any other such project that has been approved by the Secretary of Defense or the Secretary of Defense's designee for use on the same military installation at which such facility or control center is located.

"(3) The term 'intercontinental ballistic missile launch facility or control center' means such facilities or control centers located at the Francis E. Warren Air Force Base; the Malmstrom Air Force Base, and the Minot Air Force Base, and their respective missile fields.".

#### SEC. 363. MODIFICATION TO JOINT SAFETY COUNCIL.

Title 10, United States Code, is amended—

(1) by redesignating the second section 184 (relating to the Joint Safety Council) as section 185; <span style="float:right">10 USC prec. 171.</span>

(2) in section 185(d), as so redesignated—

(A) by redesignating paragraphs (7) through (9) as paragraphs (8) through (10), respectively;

(B) by inserting after paragraph (6) the following new paragraph (7):

"(7) Ensuring each military department has in place, for the safety management system and program described in paragraphs (5) and (6), respectively, of that military department—

"(A) a resolution plan that identifies specific corrective and preventative actions to address the causes of mishaps; and

"(B) an implementation plan for such system and program.";

(C) in paragraph (8), as redesignated by subparagraph (A), by striking "the safety management systems described in paragraphs (9) and (10)" and inserting "the safety management system and program described in paragraphs (5) and (6), respectively"; and

(D) by adding at the end the following new paragraphs:

"(11) Not later than one year after the initial identification of corrective and preventative actions by a military department pursuant to a resolution plan under paragraph (7)(A), and periodically thereafter, reviewing and validating each such identified corrective and preventative action to ensure the action is effective. <span style="float:right">Deadline.</span>

"(12) Ensuring any related change in methods, tactics, or procedures necessary for the conduct of such identified corrective and preventative actions have been implemented.".

#### SEC. 364. DESIGNATION OF OFFICIAL RESPONSIBLE FOR COORDINATION OF RENEGOTIATION OF CERTAIN LAND LEASES OWNED BY DEPARTMENT OF DEFENSE IN HAWAII. <span style="float:right">Deadlines.</span>

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall designate an official to be responsible for, in coordination with appropriate officials from the military departments (as such term is defined in section 101(a) of title 10, United States Code) and the United States Indo-Pacific Command—

(1) coordinating Department of Defense-wide efforts relating to the renegotiation of land leases owned by the Department of Defense in the State of Hawaii expiring between 2029 and 2031;

(2) representing the Department of Defense during any such renegotiation; and

(3) ensuring clear and consistent communication to such State, State and local elected officials, and the public regarding the needs and priorities of the Department of Defense with respect to joint land use in such State.

(b) SELECTION.—In making the designation under subsection (a), the Secretary of Defense may appoint an individual with a significant background and expertise in—

(1) relevant legal and technical aspects of land lease issues; and

137 STAT. 234        PUBLIC LAW 118–31—DEC. 22, 2023

(2) working with State and local elected officials and the public in such State.

(c) NOTIFICATION.—Not later than 30 days after the date on which the Secretary of Defense makes the designation under subsection (a), the Secretary shall submit to the congressional defense committees and the Governor of Hawaii a notification that includes the name and contact information of the individual so designated.

**SEC. 365. CONTINUED DESIGNATION OF SECRETARY OF THE NAVY AS EXECUTIVE AGENT FOR NAVAL SMALL CRAFT INSTRUCTION AND TECHNICAL TRAINING SCHOOL.**

The Secretary of the Navy shall continue, through fiscal year 2024—

(1) to perform the responsibilities of the Department of Defense executive agent for the Naval Small Craft Instruction and Technical Training School pursuant to section 352(b) of title 10, United States Code; and

(2) in coordination with the Commander of the United States Special Operations Command, to provide such support, including resourcing and manpower, as may be necessary for the continued operation of such school.

10 USC 7721 note.

**SEC. 366. ESTABLISHMENT OF CAISSON PLATOON AND SUPPORT FOR MILITARY AND STATE FUNERAL SERVICES AT ARLINGTON NATIONAL CEMETERY.**

(a) ESTABLISHMENT.—There is established in the Department of the Army an equine unit, to be known as the "Caisson Platoon", assigned to the 3rd Infantry Regiment of the Army. The duties of such unit shall include the provision of support for military and State funerals.

(b) PROHIBITIONS ON ELIMINATION.—The Secretary of the Army may not eliminate the Caisson Platoon of the 3rd Infantry Regiment of the Army established under subsection (a).

(c) BRIEFINGS.—

Deadline.
Time periods.
Termination date.

(1) PROVISION TO CONGRESS.—Not later than 60 days after the date of the enactment of this Act, and not less frequently than every 180 days thereafter until March 31, 2027, the Secretary of the Army shall provide to the congressional defense committees a briefing on the health, welfare, and sustainment of military working equids.

Updates.

(2) ELEMENTS.—Each briefing under paragraph (1) shall include the following:

Assessment.

(A) An assessment of the ability of the Caisson Platoon of the 3rd Infantry Regiment of the Army to support military funeral operations within Arlington National Cemetery, including milestones associated with achieving full operational capability for such Caisson Platoon.

(B) An update on the plan of the task force known as the "Task Force-Military Working Equids" established by the Office of the Surgeon General, as directed by the Director of the Army Staff, in May 2022 (or any successor task force), to promote, support, and sustain animal health and welfare.

(C) An update on the plan of such task force to ensure the Caisson Platoon of the 3rd Infantry Regiment of the Army has the ability to continuously support military and State funeral operations within Arlington National Cemetery.

#### SEC. 367. RECOVERY OF RARE EARTH ELEMENTS AND OTHER STRATEGIC AND CRITICAL MATERIALS THROUGH END-OF-LIFE EQUIPMENT RECYCLING.

10 USC 4811 note.

The Secretary of Defense shall issue policies and establish procedures to—

Policies.
Procedures.

(1) identify end-of-life equipment of the Department of Defense that contains rare earth elements and other materials determined pursuant to section 3(a) of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98b(a)) to be strategic and critical materials; and

(2) recover such materials from such equipment for the purposes of reuse by the Department of Defense.

# TITLE IV—MILITARY PERSONNEL AUTHORIZATIONS

Subtitle A—Active Forces

Sec. 401. End strengths for active forces.
Sec. 402. End strength level matters.

Subtitle B—Reserve Forces

Sec. 411. End strengths for Selected Reserve.
Sec. 412. End strengths for Reserves on active duty in support of the Reserves.
Sec. 413. End strengths for military technicians (dual status).
Sec. 414. Maximum number of reserve personnel authorized to be on active duty for operational support.

Subtitle C—Authorization of Appropriations

Sec. 421. Military personnel.

# Subtitle A—Active Forces

#### SEC. 401. END STRENGTHS FOR ACTIVE FORCES.

The Armed Forces are authorized strengths for active duty personnel as of September 30, 2024, as follows:

(1) The Army, 445,000.
(2) The Navy, 337,800.
(3) The Marine Corps, 172,300.
(4) The Air Force, 320,000.
(5) The Space Force, 9,400.

#### SEC. 402. END STRENGTH LEVEL MATTERS.

Section 115 of title 10, United States Code, is amended—

(1) in subsection (f)(2), by striking "not more than 2 percent" and inserting "not more than 3 percent"; and

(2) in subsection (g)(1), by striking subparagraphs (A) and (B) and inserting the following new subparagraphs:

"(A) vary the end strength pursuant to subsection (a)(1)(A) for a fiscal year for the armed force or forces under the jurisdiction of that Secretary by a number not equal to more than 2 percent of such authorized end strength;

"(B) vary the end strength pursuant to subsection (a)(1)(B) for a fiscal year for the armed force or forces under the jurisdiction of that Secretary by a number not equal to more than 2 percent of such authorized end strength; and

"(C) vary the end strength pursuant to subsection (a)(2) for a fiscal year for the Selected Reserve of the reserve component of the armed force or forces under the jurisdiction of that Secretary by a number equal to not more than 2 percent of such authorized end strength.".

# Subtitle B—Reserve Forces

### SEC. 411. END STRENGTHS FOR SELECTED RESERVE.

(a) IN GENERAL.—The Armed Forces are authorized strengths for Selected Reserve personnel of the reserve components as of September 30, 2024, as follows:

(1) The Army National Guard of the United States, 325,000.
(2) The Army Reserve, 174,800.
(3) The Navy Reserve, 57,200.
(4) The Marine Corps Reserve, 32,000.
(5) The Air National Guard of the United States, 105,000.
(6) The Air Force Reserve, 69,600.
(7) The Coast Guard Reserve, 7,000.

(b) END STRENGTH REDUCTIONS.—The end strengths prescribed by subsection (a) for the Selected Reserve of any reserve component shall be proportionately reduced by—

(1) the total authorized strength of units organized to serve as units of the Selected Reserve of such component which are on active duty (other than for training) at the end of the fiscal year; and

(2) the total number of individual members not in units organized to serve as units of the Selected Reserve of such component who are on active duty (other than for training or for unsatisfactory participation in training) without their consent at the end of the fiscal year.

(c) END STRENGTH INCREASES.—Whenever units or individual members of the Selected Reserve for any reserve component are released from active duty during any fiscal year, the end strength prescribed for such fiscal year for the Selected Reserve of such reserve component shall be increased proportionately by the total authorized strengths of such units and by the total number of such individual members.

### SEC. 412. END STRENGTHS FOR RESERVES ON ACTIVE DUTY IN SUP-PORT OF THE RESERVES.

Within the end strengths prescribed in section 411(a), the reserve components of the Armed Forces are authorized, as of September 30, 2024, the following number of Reserves to be serving on full-time active duty or full-time duty, in the case of members of the National Guard, for the purpose of organizing, administering, recruiting, instructing, or training the reserve components:

(1) The Army National Guard of the United States, 30,845.
(2) The Army Reserve, 16,511.
(3) The Navy Reserve, 10,327.
(4) The Marine Corps Reserve, 2,355.
(5) The Air National Guard of the United States, 25,333.
(6) The Air Force Reserve, 6,003.

**SEC. 413. END STRENGTHS FOR MILITARY TECHNICIANS (DUAL STATUS).**

The minimum number of military technicians (dual status) as of the last day of fiscal year 2024 for the reserve components of the Army and the Air Force (notwithstanding section 129 of title 10, United States Code) shall be the following:

(1) For the Army National Guard of the United States, 22,294.

(2) For the Army Reserve, 7,990.

(3) For the Air National Guard of the United States, 10,994.

(4) For the Air Force Reserve, 6,882.

**SEC. 414. MAXIMUM NUMBER OF RESERVE PERSONNEL AUTHORIZED TO BE ON ACTIVE DUTY FOR OPERATIONAL SUPPORT.**

During fiscal year 2024, the maximum number of members of the reserve components of the Armed Forces who may be serving at any time on full-time operational support duty under section 115(b) of title 10, United States Code, is the following:

(1) The Army National Guard of the United States, 17,000.

(2) The Army Reserve, 13,000.

(3) The Navy Reserve, 6,200.

(4) The Marine Corps Reserve, 3,000.

(5) The Air National Guard of the United States, 16,000.

(6) The Air Force Reserve, 14,000.

# Subtitle C—Authorization of Appropriations

**SEC. 421. MILITARY PERSONNEL.**

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated for fiscal year 2024 for the use of the Armed Forces and other activities and agencies of the Department of Defense for expenses, not otherwise provided for, for military personnel, as specified in the funding table in section 4401.

(b) CONSTRUCTION OF AUTHORIZATION.—The authorization of appropriations in subsection (a) supersedes any other authorization of appropriations (definite or indefinite) for such purpose for fiscal year 2024.

# TITLE V—MILITARY PERSONNEL POLICY

Subtitle A—Officer Policy

Sec. 501. Authorized strength: general and flag officers on active duty.
Sec. 502. Extension of active duty term for Attending Physician at United States Capitol.
Sec. 503. Updating authority to authorize promotion transfers between components of the same Armed Force or a different Armed Force.
Sec. 504. Flexibility in determining terms of appointment for certain senior officer positions.
Sec. 505. Realignment of Navy spot-promotion quotas.
Sec. 506. Authority to increase the number of medical and dental officers recommended for promotion to certain grades.
Sec. 507. Prohibition on appointment or nomination of certain officers who are subject to special selection review boards.
Sec. 508. Effect of failure of selection for promotion.
Sec. 509. Improvements relating to service obligation for Marine Corps cyberspace operations officers.

137 STAT. 238 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 509A. Time in grade requirements.
Sec. 509B. Establishment of Legislative Liaison of the Space Force.
Sec. 509C. Extension of authority to vary number of Space Force officers considered for promotion to major general.
Sec. 509D. Briefing on number of general officers of the Space Force on active duty.

Subtitle B—Reserve Component Management

Sec. 511. Removal of active duty prohibition for members of the Air Force Reserve Policy Committee.
Sec. 512. Grade of Vice Chief of the National Guard Bureau.
Sec. 513. Mobilization of Selected Reserve for preplanned missions in support of the combatant commands.
Sec. 514. Alternative promotion authority for reserve officers in designated competitive categories.
Sec. 515. Authorization for FireGuard Program.
Sec. 516. Designation of at least one general officer of the Marine Corps Reserve as a joint qualified officer.

Subtitle C—General Service Authorities and Prohibitions

Sec. 521. Permanent authority to order retired members to active duty in high-demand, low-density appointments.
Sec. 522. Prohibition on policy of the Department of Defense regarding identification of gender or personal pronouns in official correspondence.
Sec. 523. Prohibition on former members of the Armed Forces accepting post-service employment with certain foreign governments.
Sec. 524. Verification of the financial independence of financial services counselors in the Department of Defense.
Sec. 525. Modification of requirements for approval of foreign employment by retired and reserve members of uniformed services.
Sec. 526. Consideration of reinstatement of a member of the Armed Forces involuntarily separated on the basis of refusal to receive a vaccination against COVID-19.
Sec. 527. Reviews of characterization of administrative discharges of certain members on the basis of failure to receive COVID-19 vaccine.
Sec. 528. Certain members discharged or dismissed on the sole basis of failure to obey a lawful order to receive a vaccine for COVID-19: communication strategy regarding reinstatement process.
Sec. 529. Continuing military service for certain members eligible for chapter 61 retirement.
Sec. 529A. Threat-based security services and equipment for certain former or retired Department of Defense personnel.
Sec. 529B. Limitation on establishment of new diversity, equity, and inclusion positions; hiring freeze.
Sec. 529C. Requirement to base military accessions and promotions on merit and performance.

Subtitle D—Military Justice and Other Legal Matters

Sec. 531. Technical and conforming amendments to the Uniform Code of Military Justice.
Sec. 532. Establishment of staggered terms for members of the Military Justice Review Panel.
Sec. 533. Supreme Court review of certain actions of the United States Court of Appeals for the Armed Forces.
Sec. 534. Additional requirements for initiative to enhance the capability of military criminal investigative organizations to prevent and combat child sexual exploitation.
Sec. 535. Limitation on availability of funds for relocation of Army CID special agent training course.
Sec. 536. Study on requirement for unanimous votes for findings in general and special courts-martial and related milestones for implementation.
Sec. 537. Study on removal of Sexual Assault Victim Advocates from the chain of command of victims.

Subtitle E—Accession Standards and Recruitment

Sec. 541. Increased access to potential recruits at secondary schools.
Sec. 542. Modification of limitation on enlistment and induction of persons whose score on the Armed Forces Qualification Test is below a prescribed level.
Sec. 543. Increased access to potential recruits at institutions of higher education.
Sec. 544. Increase in accession bonus for nurse officer candidates.
Sec. 545. Improvements to medical standards for accession to certain Armed Forces.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 239

Sec. 546. Future servicemember preparatory course.
Sec. 547. Pilot program on cardiac screenings for military accessions.
Sec. 548. Community college Enlisted Training Corps demonstration program.
Sec. 549. Annual briefings on military recruitment practices in public secondary schools and community colleges.

Subtitle F—Junior Reserve Officers' Training Corps

Sec. 551. Expansion of Junior Reserve Officers' Training Corps.
Sec. 552. Requirement for memoranda of understanding addressing certain matters pertaining to units of the Junior Reserve Officers' Training Corps.
Sec. 553. Junior Reserve Officers' Training Corps administrator and instructor compensation.
Sec. 554. Prohibition of establishment or maintenance of a unit of the Junior Reserve Officers' Training Corps at an educational institution owned, operated, or controlled by the Chinese Communist Party.
Sec. 555. Enforcement of program requirements for the Junior Reserve Officers' Training Corps.
Sec. 556. Annual report on allegations of sexual misconduct in Junior Reserve Officers' Training Corps programs.

Subtitle G—Member Education

Sec. 561. Service Academies: numbers of nominations by Members of Congress and appointments by the Secretaries of the military departments.
Sec. 562. Increase in the number of nominees from Guam to the Service Academies.
Sec. 563. Consideration of standardized test scores in military service academy application process.
Sec. 564. Service Academy professional sports pathway report and legislative proposal required.
Sec. 565. Briefing on inclusion of advanced research programs at certain institutions of professional military education.

Subtitle H—Member Training and Transition

Sec. 571. Amendments to pathways for counseling in the Transition Assistance Program.
Sec. 572. Skillbridge: staffing; budgeting; outreach; report.
Sec. 573. Extension of Troops-to-Teachers program to the Job Corps.
Sec. 574. Troops-to-Teachers Program: expansion; extension.
Sec. 575. Language training centers for members of the Armed Forces and civilian employees of the Department of Defense.
Sec. 576. Prohibition on use of Federal funds to endorse critical race theory.
Sec. 577. Increased fitness standards for Army close combat force military occupational specialties.
Sec. 578. Publication of training materials of the Defense Equal Opportunity Management Institute.
Sec. 579. Prohibition on Federal funds for the Department of Defense Countering Extremism Work Group.

Subtitle I—Family Programs, Child Care, and Dependent Education

Sec. 581. Non-medical counseling services for military families.
Sec. 582. Increase in the target funding level for military child care.
Sec. 583. Modifications to assistance to local educational agencies that benefit dependents of members of the Armed Forces with enrollment changes due to base closures, force structure changes, or force relocations.
Sec. 584. Certain assistance to local educational agencies that benefit dependents of military and civilian personnel.
Sec. 585. Outreach campaign relating to waiting lists for military child development centers; annual briefing.
Sec. 586. Briefings on pilot program on hiring of special needs inclusion coordinators for Department of Defense child development centers.
Sec. 587. Briefings on implementation of universal pre-kindergarten programs in schools operated by the Department of Defense Education Activity.
Sec. 588. Report on mental health and wellness support for students enrolled in schools operated by the Department of Defense Education Activity.
Sec. 589. Rights of parents of children attending schools operated by the Department of Defense Education Activity.

Subtitle J—Decorations and Awards and Other Personnel Matters, Reports, and Briefings

Sec. 591. Armed Forces workplace surveys.
Sec. 592. Due date for report on efforts to prevent and respond to deaths by suicide in the Navy.

137 STAT. 240          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 593. Extension of deadline for review of World War I valor medals.
Sec. 594. Digital ambassador program of the Navy: cessation; report; restart.

# Subtitle A—Officer Policy

### SEC. 501. AUTHORIZED STRENGTH: GENERAL AND FLAG OFFICERS ON ACTIVE DUTY.

(a) REPEAL OF OBSOLETE AUTHORITY; REDESIGNATION.—Chapter 32 of title 10, United States Code, is amended—

(1) by repealing section 526;

(2) by redesignating section 526a as section 526;

(3) in the table of sections for such chapter, by striking the item relating to section 526a; and

(4) in the section heading for section 526, as redesignated by paragraph (2), by striking "**after December 31, 2022**".

(b) INCREASED AUTHORIZED STRENGTH.—Section 526 of title 10, United States Code, as redesignated and amended by subsection (a), is further amended—

(1) in subsection (a)—

(A) by striking "after December 31, 2022,";

(B) in paragraph (1), by striking "218" and inserting "219";

(C) in paragraph (2), by striking "149" and inserting "150";

(D) in paragraph (3), by striking "170" and inserting "171"; and

(E) in paragraph (4), by striking "62" and inserting "64"; and

(2) by redesignating the second subsection designated as subsection (i) as subsection (j).

(c) REPEAL OF EXCLUSION OF OFFICERS SERVING AS LEAD SPECIAL TRIAL COUNSEL FROM LIMITATIONS ON AUTHORIZED STRENGTHS.—Section 506 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 is hereby repealed.

### SEC. 502. EXTENSION OF ACTIVE DUTY TERM FOR ATTENDING PHYSICIAN AT UNITED STATES CAPITOL.

The present incumbent Attending Physician at the United States Capitol shall be continued on active duty until six years after the date of the enactment of this Act.

### SEC. 503. UPDATING AUTHORITY TO AUTHORIZE PROMOTION TRANSFERS BETWEEN COMPONENTS OF THE SAME ARMED FORCE OR A DIFFERENT ARMED FORCE.

(a) WARRANT OFFICERS TRANSFERRED BETWEEN COMPONENTS WITHIN THE SAME OR A DIFFERENT ARMED FORCE.—Section 578 of title 10, United States Code, is amended by adding at the end the following new subsection:

"(g) Notwithstanding subsection (d), and subject to regulations prescribed by the Secretary of Defense, in the case of a warrant officer who is selected for promotion by a selection board convened under this chapter, and prior to the placement of the warrant officer's name on the applicable promotion list is approved for transfer to a new component within the same or a different armed force, the Secretary concerned may place the warrant officer's name on a corresponding promotion list of the new component without regard to the warrant officer's competitive category. A warrant

officer's promotion under this subsection shall be made pursuant to section 12242 of this title.".

(b) OFFICERS TRANSFERRED TO RESERVE ACTIVE-STATUS LIST.—

(1) IN GENERAL.—Section 624 of such title is amended by adding at the end the following new subsections:

"(e) Notwithstanding subsection (a)(2), in the case of an officer who is selected for promotion by a selection board convened under this chapter, and prior to the placement of the officer's name on the applicable promotion list is approved for transfer to the reserve active-status list of the same or a different armed force, the Secretary concerned may place the officer's name on a corresponding promotion list on the reserve active-status list without regard to the officer's competitive category. An officer's promotion under this subsection shall be made pursuant to section 14308 of this title.

"(f) Notwithstanding subsection (a)(3), in the case of an officer who is placed on an all-fully-qualified-officers list, and is subsequently approved for transfer to the reserve active-status list, the Secretary concerned may place the officer's name on an appropriate all-fully-qualified-officers list on the reserve active-status list. An officer's promotion under this subsection shall be made pursuant to section 14308 of this title.".

(2) DATE OF RANK.—Section 14308(c) of such title is amended—

(A) by redesignating paragraph (3) as paragraph (4); and

(B) by inserting after paragraph (2) the following new paragraph:

"(3) The Secretary concerned may adjust the date of rank of an officer whose name is placed on a reserve active-status promotion list pursuant to subsection (e) or (f) of section 624 of this title.".

### SEC. 504. FLEXIBILITY IN DETERMINING TERMS OF APPOINTMENT FOR CERTAIN SENIOR OFFICER POSITIONS.

(a) IN GENERAL.—Chapter 35 of title 10, United States Code, is amended by inserting after section 601 the following new section:

### "§ 602. Flexibility in determining terms of appointment for certain senior officer positions

10 USC 602.

"The Secretary of Defense may extend or reduce the duration of an appointment made under section 152, 154, 7033, 8033, 8043, 9033, or 9082 of this title by up to six months if the Secretary determines that such an extension or reduction is necessary either in the interests of national defense, or to ensure an appropriate staggering of terms of senior military leadership.".

Time period.

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 35 of title 10, United States Code, is amended by inserting after the item relating to section 601 the following new item:

10 USC prec. 601.

"602. Flexibility in determining terms of appointment for certain senior officer positions.".

### SEC. 505. REALIGNMENT OF NAVY SPOT-PROMOTION QUOTAS.

Section 605(g)(4)(B) of title 10, United States Code, is amended by striking "325" and inserting "425".

### SEC. 506. AUTHORITY TO INCREASE THE NUMBER OF MEDICAL AND DENTAL OFFICERS RECOMMENDED FOR PROMOTION TO CERTAIN GRADES.

Determination.

Section 616(d) of title 10, United States Code, is amended by inserting ", except, the Secretary concerned may authorize a greater number of officers so recommended that is less than 100 percent of the number of officers so included, for medical and dental officers recommended for promotion to major or lieutenant commander, if the Secretary concerned determines that such greater number is necessary to maintain or improve medical readiness" before the period at the end.

### SEC. 507. PROHIBITION ON APPOINTMENT OR NOMINATION OF CERTAIN OFFICERS WHO ARE SUBJECT TO SPECIAL SELECTION REVIEW BOARDS.

(a) OFFICERS ON ACTIVE-DUTY LIST.—

Section 628a(a)(2)(B) of title 10, United States Code, is amended to read as follows:

"(B) shall not be forwarded for appointment or nomination to the Secretary of Defense, the President, or the Senate, as applicable.".

(b) OFFICERS ON RESERVE ACTIVE-STATUS LIST.—

Section 14502a(a)(2)(B) of title 10, United States Code, is amended to read as follows:

"(B) shall not be forwarded for appointment or nomination to the Secretary of Defense, the President, or the Senate, as applicable.".

### SEC. 508. EFFECT OF FAILURE OF SELECTION FOR PROMOTION.

(a) EFFECT OF FAILURE OF SELECTION FOR PROMOTION: CAPTAINS AND MAJORS OF THE ARMY, AIR FORCE, MARINE CORPS, AND SPACE FORCE AND LIEUTENANTS AND LIEUTENANT COMMANDERS OF THE NAVY.—

(1) IN GENERAL.—Section 632 of title 10, United States Code, is amended—

(A) in the section heading, by striking "**and Marine Corps**" and inserting "**Marine Corps, and Space Force**";

(B) in subsection (a)(1), by striking "President approves the report of the board which considered him for the second time" and inserting "Secretary concerned releases the promotion results of the board which considered the officer for the second time to the public".

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 36 of title 10, United States Code, is amended by striking the item relating to section 632 and inserting the following new item:

10 USC prec. 627.

"632. Effect of failure of selection for promotion: captains and majors of the Army, Air Force, Marine Corps, and Space Force and lieutenants and lieutenant commanders of the Navy.".

(b) RETIREMENT OF REGULAR OFFICERS OF THE NAVY FOR LENGTH OF SERVICE OR FAILURE OF SELECTION FOR PROMOTION.— Section 8372(a)(2)(A) of title 10, United States Code, is amended by striking "President approves the report of the board which considered him for the second time" and inserting "Secretary concerned releases the promotion results of the board which considered the officer for the second time to the public".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 243

### SEC. 509. IMPROVEMENTS RELATING TO SERVICE OBLIGATION FOR MARINE CORPS CYBERSPACE OPERATIONS OFFICERS.

(a) REQUIRED SERVICE.—Section 651(c) of title 10, United States Code, is amended—

 (1) in paragraph (1), by inserting "or in the case of an unrestricted officer designated within a cyberspace occupational specialty" before the period at the end; and

 (2) in paragraph (2)—

  (A) in subparagraph (A), by striking "; or" and inserting a semicolon;

  (B) in subparagraph (B), by striking the period and inserting "; or"; and

  (C) by adding at the end the following new subparagraph:

 "(C) in the case of an unrestricted officer designated within a cyberspace occupational specialty, the period of obligated service specified in the enlistment agreement of such officer.".

(b) MINIMUM SERVICE REQUIREMENT FOR CERTAIN CYBERSPACE OCCUPATIONAL SPECIALTIES.—Chapter 37 of title 10, United States Code, is amended by inserting after section 653 the following new section:     10 USC prec. 651.

### "§ 654. Minimum service requirement for certain cyberspace occupational specialties
   10 USC 654.

"(a) CYBERSPACE OPERATIONS OFFICER.—The minimum service obligation for any member who successfully completes training in the armed forces in direct accession to the cyberspace operations officer occupational specialty of the Marine Corps shall be eight years.    Time period.

"(b) SERVICE OBLIGATION DEFINED.—In this section, the term 'service obligation' means the period of active duty or, in the case of a member of a reserve component who completed cyberspace operations training in an active duty for training status as a member of a reserve component, the period of service in an active status in the Selected Reserve, required to be served after completion of cyberspace operations training.".

### SEC. 509A. TIME IN GRADE REQUIREMENTS.

Section 1305 of title 10, United States Code, is amended—

 (1) in subsection (a)(3), by inserting "or a Marine Corps Marine Gunner warrant officer in such grade," after "chief warrant officer, W–5,";

 (2) in subsection (b), by striking "when he" and inserting "when the warrant officer"; and

 (3) in subsection (c)—

  (A) by striking "as he" and inserting "as the Secretary concerned"; and

  (B) by striking "after he" and inserting "after the warrant officer".

### SEC. 509B. ESTABLISHMENT OF LEGISLATIVE LIAISON OF THE SPACE FORCE.

Chapter 903 of title 10, United States Code, is amended by inserting, after section 9023, the following new section:—    10 USC prec. 9011.

### "§ 9023a. Legislative Liaison of the Space Force
   10 USC 9023a.

"(a) ESTABLISHMENT.—There is a Legislative Liaison of the Space Force.

137 STAT. 244          PUBLIC LAW 118–31—DEC. 22, 2023

"(b) FUNCTIONS.—The Legislative Liaison shall perform legislative affairs functions under the direction of the Chief of Space Operations.".

### SEC. 509C. EXTENSION OF AUTHORITY TO VARY NUMBER OF SPACE FORCE OFFICERS CONSIDERED FOR PROMOTION TO MAJOR GENERAL.

Termination date.

Subsection (b) of section 503 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1680) is amended by striking "shall terminate on December 31, 2022" and inserting "shall terminate on December 31, 2024".

### SEC. 509D. BRIEFING ON NUMBER OF GENERAL OFFICERS OF THE SPACE FORCE ON ACTIVE DUTY.

Deadline.

Not later than March 1, 2024, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a briefing regarding the number of general officers of the Space Force on active duty. Such briefing shall include the following elements:

Evaluation.

(1) The evaluation of the Secretary whether the current number of such general officers is sufficient to meet the requirements of—
(A) the Space Force;
(B) joint duty assignments under chapter 38 of title 10, United States Code; and
(C) the combatant commands.

Proposals.

(2) Any proposal of the Secretary to increase the maximum number (under section 526a of such title) of such general officers in order to meet such requirements in the future.
(3) A justification for any such proposal.

# Subtitle B—Reserve Component Management

### SEC. 511. REMOVAL OF ACTIVE DUTY PROHIBITION FOR MEMBERS OF THE AIR FORCE RESERVE POLICY COMMITTEE.

Section 10305 of title 10, United States Code, is amended—
(1) in subsection (b), by striking "not on active duty" both places it appears; and
(2) in subsection (c)—
(A) by inserting "of the reserve components" after "among the members"; and
(B) by striking "not on active duty".

### SEC. 512. GRADE OF VICE CHIEF OF THE NATIONAL GUARD BUREAU.

Section 10505 of title 10, United States Code, is amended by adding at the end the following new subsection:

Appointment.

"(c) GRADE.—(1) The Vice Chief of the National Guard Bureau shall be appointed to serve in the grade of general.

Designation.

"(2) The Secretary of Defense shall designate, pursuant to subsection (b) of section 526 of this title, the position of Vice Chief of the National Guard Bureau as one of the general officer and flag officer positions to be excluded from the limitations in subsection (a) of such section.".

#### SEC. 513. MOBILIZATION OF SELECTED RESERVE FOR PREPLANNED MISSIONS IN SUPPORT OF THE COMBATANT COMMANDS.

Section 12304b(b)(1) of title 10, United States Code, is amended—

(1) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively;

(2) by striking "Units" and inserting "(A) Except as provided under subparagraph (B), units"; and

(3) by adding at the end the following new subparagraph:

"(B) In the event the President's budget is delivered later than April 1st in the year prior to the year of the mobilization of one or more units under this section, the Secretary concerned may submit to Congress the information required under subparagraph (A) in a separate notice.". <span style="float:right">Notice.</span>

#### SEC. 514. ALTERNATIVE PROMOTION AUTHORITY FOR RESERVE OFFICERS IN DESIGNATED COMPETITIVE CATEGORIES.

(a) IN GENERAL.—Part III of subtitle E of title 10, United States Code, is amended by adding at the end the following new chapter: <span style="float:right">10 USC prec. 10001.</span>

### "CHAPTER 1413—ALTERNATIVE PROMOTION AUTHORITY FOR OFFICERS IN DESIGNATED COMPETITIVE CATEGORIES
<span style="float:right">10 USC prec. 15101.</span>

"Sec.
"15101. Officers in designated competitive categories.
"15102. Selection for promotion.
"15103. Eligibility for consideration for promotion.
"15104. Opportunities for consideration for promotion.
"15105. Promotions.
"15106. Failure of selection for promotion.
"15107. Retirement: retirement for years of service; selective early retirement.
"15108. Continuation on the Reserve Active-Status List.
"15109. Other administrative authorities.
"15110. Regulations.

#### "§ 15101. Officers in designated competitive categories
<span style="float:right">10 USC 15101.</span>

"(a) AUTHORITY TO DESIGNATE COMPETITIVE CATEGORIES OF OFFICERS.—Each Secretary of a military department may designate one or more competitive categories for promotion of officers under section 14005 of this title that are under the jurisdiction of such Secretary as a competitive category of officers whose promotion, retirement, and continuation on the reserve active-status list shall be subject to the provisions of this chapter.

"(b) LIMITATION ON EXERCISE OF AUTHORITY.—The Secretary of a military department may not designate a competitive category of officers for purposes of this chapter until 60 days after the date on which the Secretary submits to the Committees on Armed Services of the Senate and the House of Representatives a report on the designation of the competitive category. The report on the designation of a competitive category shall set forth the following: <span style="float:right">Time period. Reports.</span>

"(1) A detailed description of officer requirements for officers within the competitive category. <span style="float:right">Requirements.</span>

"(2) An explanation of the number of opportunities for consideration for promotion to each particular grade, and an estimate of promotion timing, within the competitive category. <span style="float:right">Estimates.</span>

"(3) An estimate of the size of the promotion zone for each grade within the competitive category.

"(4) A description of any other matters the Secretary considered in determining to designate the competitive category for purposes of this chapter.

10 USC 15102.

## "§ 15102. Selection for promotion

"(a) IN GENERAL.—Except as provided in this section, the selection for promotion of officers in any competitive category of officers designated for purposes of this chapter shall be governed by the provisions under chapter 1403 of this title.

"(b) NO RECOMMENDATION FOR PROMOTION OF OFFICERS BELOW PROMOTION ZONE.—Section 14301(d) of this title shall not apply to the selection for promotion of officers described in subsection (a).

"(c) RECOMMENDATION FOR OFFICERS TO BE EXCLUDED FROM FUTURE CONSIDERATION FOR PROMOTION.—In making recommendations pursuant to chapter 1403 of this title for purposes of the administration of this chapter, a selection board convened under section 14101(a) of this title may recommend that an officer considered by the board be excluded from future consideration for promotion under this chapter.

10 USC 15103.

## "§ 15103. Eligibility for consideration for promotion

"(a) IN GENERAL.—Except as provided by this section, eligibility for promotion of officers in any competitive category of officers designated for purposes of this chapter shall be governed by the provisions of sections 14301, 14303, and 14304 of this title.

"(b) INAPPLICABILITY OF CERTAIN TIME-IN-GRADE REQUIREMENTS.—Sections 14303 and 14304 of this title shall not apply to the promotion of officers described in subsection (a).

"(c) INAPPLICABILITY TO OFFICERS ABOVE AND BELOW PROMOTION ZONE.—The following provisions of this title shall not apply to the promotion of officers described in subsection (a):

"(1) The reference in section 14301(b) to an officer above the promotion zone.

"(2) Section 14301(d).

"(d) INELIGIBILITY OF CERTAIN OFFICERS.—The following officers are not eligible for promotion under this chapter:

"(1) An officer described in section 14301(c) of this title.

"(2) An officer not included within the promotion zone.

"(3) An officer who has failed of promotion to a higher grade the maximum number of times specified for opportunities for promotion for such grade within the competitive category concerned pursuant to section 15104 of this title.

"(4) An officer recommended by a selection board to be removed from consideration for promotion in accordance with section 15102(c) of this title.

10 USC 15104.

## "§ 15104. Opportunities for consideration for promotion

"(a) SPECIFICATION OF NUMBER OF OPPORTUNITIES FOR CONSIDERATION FOR PROMOTION.—In designating a competitive category of officers pursuant to section 15101 of this title, the Secretary of a military department shall specify the number of opportunities for consideration for promotion to be afforded officers of the armed force concerned within the category for promotion to each grade above the grade of first lieutenant or lieutenant (junior grade), as applicable.

"(b) LIMITED AUTHORITY OF SECRETARY OF MILITARY DEPARTMENT TO MODIFY NUMBER OF OPPORTUNITIES.—The Secretary of a military department may modify the number of opportunities for consideration for promotion to be afforded officers of an armed force within a competitive category for promotion to a particular grade, as previously specified by the Secretary pursuant subsection (a) of this subsection, not more frequently than once every five years.

*Time period.*

"(c) DISCRETIONARY AUTHORITY OF SECRETARY OF DEFENSE TO MODIFY NUMBER OF OPPORTUNITIES.—The Secretary of Defense may modify the number of opportunities for consideration for promotion to be afforded officers of an armed force within a competitive category for promotion to a particular grade, as previously specified or modified pursuant to any provision of this section, at the discretion of the Secretary.

"(d) LIMITATION ON NUMBER OF OPPORTUNITIES SPECIFIED.—The number of opportunities for consideration for promotion to be afforded officers of an armed force within a competitive category for promotion to a particular grade, as specified or modified pursuant to any provision of this section, may not exceed five opportunities.

"(e) EFFECT OF CERTAIN REDUCTION IN NUMBER OF OPPORTUNITIES SPECIFIED.—If, by reason of a reduction in the number of opportunities for consideration for promotion under this section, an officer would no longer have one or more opportunities for consideration for promotion that were available to the officer before the reduction, the officer shall be afforded one additional opportunity for consideration for promotion after the reduction.

## "§ 15105. Promotions

10 USC 15105.

"Sections 14307 through 14317 of this title shall apply in promotions of officers in competitive categories of officers designated for purposes of this chapter.

Applicability.

## "§ 15106. Failure of selection for promotion

10 USC 15106.

"(a) IN GENERAL.—Except as provided in this section, sections 14501 through 14513 of this title shall apply to promotions of officers in competitive categories of officers designated for purposes of this chapter.

Applicability.

"(b) INAPPLICABILITY OF FAILURE OF SELECTION FOR PROMOTION TO OFFICERS ABOVE PROMOTION ZONE.—The reference in section 14501 of this title to an officer above the promotion zone shall not apply in the promotion of officers described in subsection (a).

"(c) SPECIAL SELECTION BOARD MATTERS.—The reference in section 14502(a)(1) of this title to a person above the promotion zone shall not apply in the promotion of officers described in subsection (a).

"(d) EFFECT OF FAILURE OF SELECTION.—In the administration of this chapter pursuant to subsection (a)—

"(1) an officer described in subsection (a) shall not be deemed to have failed twice of selection for promotion for purposes of section 14502(b) of this title until the officer has failed selection of promotion to the next higher grade the maximum number of times specified for opportunities for promotion to such grade within the competitive category concerned pursuant to section 15104 of this title; and

"(2) any reference in sections 14504 through 14506 of this title to an officer who has failed of selection for promotion to the next higher grade for the second time shall be deemed to refer instead to an officer described in subsection (a) who has failed of selection for promotion to the next higher grade for the maximum number of times specified for opportunities for promotion to such grade within the competitive category concerned pursuant to such section 15104.

Applicability.
10 USC 15107.

## "§ 15107. Retirement: retirement for years of service; selective early retirement

"(a) RETIREMENT FOR YEARS OF SERVICE.—Sections 14507 through 14515 of this title shall apply to the retirement of officers in competitive categories of officers designated for purposes of this chapter.

"(b) SELECTIVE EARLY RETIREMENT.—Section 14101(b) of this title shall apply to the retirement of officers described in subsection (a).

Applicability.
10 USC 15108.

## "§ 15108. Continuation on the Reserve Active-Status List

"Sections 14701 through 14703 of this title shall apply in continuation or retention on a reserve active-status list of officers designated for purposes of this chapter.

10 USC 15109.

## "§ 15109. Other administrative authorities

Applicability.

"(a) IN GENERAL.—The following provisions of this title shall apply to officers in competitive categories of officers designated for purposes of this chapter:

"(1) Section 14518, relating to continuation of officers to complete disciplinary action.

"(2) Section 14519, relating to deferment of retirement or separation for medical reasons.

"(3) Section 14704, relating to the selective early removal from the reserve active-status list.

"(4) Section 14705, relating to the selective early retirement of reserve general and flag officers of the Navy and Marine Corps.

10 USC 15110.

## "§ 15110. Regulations

"The Secretary of Defense shall prescribe regulations regarding the administration of this chapter. The elements of such regulations shall include mechanisms to clarify the manner in which provisions of other chapters of this part of the title shall be used in the administration of this chapter in accordance with the provisions of this chapter.".

(b) TABLE OF CHAPTERS AMENDMENT.—The table of chapters at the beginning of part III of subtitle E of title 10, United States Code, is amended by adding at the end the following new item:

10 USC
prec. 14001.

"1413. Alternative promotion authority for officers in designated competitive categories ...............................................................................................................15101".

### SEC. 515. AUTHORIZATION FOR FIREGUARD PROGRAM.

(a) AUTHORITY.—Chapter 5 of title 32, United States Code, is amended by adding at the end the following new section:

32 USC 510.

## "§ 510. Authorization for FireGuard Program

"The Secretary of Defense may use members of the National Guard to carry out a program to aggregate, analyze, and assess

multi-source remote sensing information for interagency partnerships in the detection and monitoring of wildfires, and to support any emergency response to such wildfires. Such a program shall be known as the 'FireGuard Program'.".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by adding at the end the following new item: <span style="float:right">32 USC prec. 501.</span>

"510. Authorization for FireGuard Program.".

(c) CONFORMING AMENDMENT.—The National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81) is amended by striking section 515. <span style="float:right">32 USC 501 note.</span>

### SEC. 516. DESIGNATION OF AT LEAST ONE GENERAL OFFICER OF THE MARINE CORPS RESERVE AS A JOINT QUALIFIED OFFICER. <span style="float:right">10 USC 661 note.</span>

The Secretary of Defense shall ensure that at least one general officer of the Marine Corps Reserve is designated as a joint qualified officer.

# Subtitle C—General Service Authorities and Prohibitions

### SEC. 521. PERMANENT AUTHORITY TO ORDER RETIRED MEMBERS TO ACTIVE DUTY IN HIGH-DEMAND, LOW-DENSITY APPOINTMENTS.

(a) IN GENERAL.—Section 688a of title 10, United States Code, is amended—

(1) in the section heading, by striking "**Retired members: temporary authority**" and inserting "**Authority**";

(2) by striking subsection (f);

(3) by redesignating subsections (g) and (h) as subsections (f) and (g), respectively; and

(4) in subsection (f), as redesignated by paragraph (3), by striking "limitations in subsections (c) and (f)" and inserting "limitation in subsection (c)".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 39 of title 10, United States Code, is amended by striking the item relating to section 688a and inserting the following new item: <span style="float:right">10 USC prec. 671.</span>

"688a. Authority to order to active duty in high-demand, low-density assignments.".

### SEC. 522. PROHIBITION ON POLICY OF THE DEPARTMENT OF DEFENSE REGARDING IDENTIFICATION OF GENDER OR PERSONAL PRONOUNS IN OFFICIAL CORRESPONDENCE.

Chapter 49 of title 10, United States Code, is amended by inserting after section 985 the following new section 986: <span style="float:right">10 USC prec. 971.</span>

### "§ 986. Policy regarding identification of gender or personal pronouns in official correspondence <span style="float:right">10 USC 986.</span>

"The Secretary of Defense may not require or prohibit a member of the armed forces or a civilian employee of the Department of Defense to identify the gender or personal pronouns of such member or employee in any official correspondence of the Department.".

### SEC. 523. PROHIBITION ON FORMER MEMBERS OF THE ARMED FORCES ACCEPTING POST-SERVICE EMPLOYMENT WITH CERTAIN FOREIGN GOVERNMENTS.

(a) IN GENERAL.—Chapter 49 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC 989.

### "§ 989. Prohibition on former members of the armed forces accepting post-service employment with certain foreign governments

"(a) IN GENERAL.—Except as provided by subsection (b), a covered individual may not occupy a covered post-service position.

"(b) TEMPORARY WAIVER.—

Processes.
Determinations.

"(1) IN GENERAL.—The Secretary of Defense shall establish a process under which a covered individual may be granted a temporary waiver of the prohibition under subsection (a) if—

"(A) the individual, or a Federal agency on behalf of, and with the consent of, the individual, submits to the Secretary a written application for a waiver in such form and manner as the Secretary determines appropriate; and

"(B) the Secretary determines that the waiver is necessary to advance the national security interests of the United States.

Applicability.

"(2) PERIOD OF WAIVER.—A waiver issued under paragraph (1) shall apply for a period not exceeding 5 years. The Secretary may renew such a waiver.

Determination.

"(3) REVOCATION.—The Secretary may revoke a waiver issued under paragraph (1) to a covered individual with respect to a covered-post service position if the Secretary determines that the employment of the individual in the covered-post service position poses a threat to national security.

"(4) NOTIFICATION.—

Deadline.

"(A) IN GENERAL.—Not later than 30 days after the date on which the Secretary issues a waiver under paragraph (1) or revokes a waiver under paragraph (3), the Secretary shall submit to the Committees on Armed Services of the Senate and the House of Representatives written notification of the waiver or revocation, as the case may be.

"(B) ELEMENTS.—A notification required by subparagraph (A) shall include the following:

"(i) With respect to a waiver issued to a covered individual—

"(I) the details of the application, including the position held by the individual in the armed forces;

"(II) the nature of the post-service position of the individual;

"(III) a description of the national security interests that will be advanced by reason of issuing such a waiver; and

"(IV) the specific reasons why the Secretary determines that issuing the waiver will advance such interests.

"(ii) With respect to a revocation of a waiver issued to a covered individual—

"(I) the details of the waiver, including any renewals of the waiver, and the dates of such waiver and renewals; and

"(II) the specific reasons why the Secretary determined that the revocation is warranted.

"(c) CERTIFICATION OF PROHIBITION.—In implementing the prohibition under subsection (a), the Secretary shall establish a process under which each member of the armed forces is, before the member retires or is otherwise separated from the armed forces—

"(1) informed in writing of the prohibition, and the penalties for violations of the prohibition; and

"(2) required to certify that the member understands the prohibition and those penalties.

"(d) PENALTIES.—In the case of a covered individual who knowingly and willfully fails to comply with the prohibition under subsection (a), the Secretary may, as applicable—

"(1) withhold any pay, allowances, or benefits that would otherwise be provided to the individual by the Department of Defense; and

"(2) revoke any security clearance of the individual.

"(e) ANNUAL REPORTS.—

"(1) REQUIREMENT.—Not later than March 31, 2024, and annually thereafter, the Secretary shall submit to the congressional defense committees a report on covered post-service employment occurring during the year covered by the report.

"(2) ELEMENTS.—Each report required by paragraph (1) shall include the following:

"(A) The number of former covered individuals who occupy a covered post-service position, broken down by—

"(i) the name of the employer;

"(ii) the foreign government, including by the specific foreign individual, agency, or entity, for whom the covered post-service employment is being performed; and

"(iii) the nature of the services provided as part of the covered post-service employment.

"(B) An assessment by the Secretary of whether—

"(i) the Department of Defense maintains adequate systems and processes for ensuring that former members of the armed forces are submitting required reports relating to their employment by foreign governments;

"(ii) all covered individuals who occupy a covered post-service position are in compliance with this section;

"(iii) the services provided by the covered individuals who occupy a covered post-service position pose a current or future threat to the national security of the United States; and

"(iv) there is any credible information or reporting that any covered individual who occupies a covered post-service position has engaged in activities that violate Federal law.

"(3) FORM OF REPORT.—Each report required by paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

Processes.

Assessments.

137 STAT. 252                PUBLIC LAW 118–31—DEC. 22, 2023

Deadline.

"(f) NOTIFICATIONS OF DETERMINATIONS OF CERTAIN THREATS.—
        "(1) REQUIREMENT.—In addition to the annual reports under subsection (d), if the Secretary determines that the services provided by a covered individual who occupies a covered post-service position pose a threat described in clause (iii) of paragraph (2)(B) of that subsection, or include activities described in clause (iv) of such paragraph, the Secretary shall notify the congressional defense committees of that determination by not later than 30 days after making the determination.
        "(2) ELEMENTS.—A notification required by paragraph (1) shall include the following:
                "(A) The name of the covered individual.
                "(B) The name of the employer.
                "(C) The foreign government, including the specific foreign individual, agency, or entity, for whom the covered post-service employment is being performed.
                "(D) As applicable, a description of the risk to national security and the activities that may violate Federal law.
        "(g) RULE OF CONSTRUCTION.—Nothing in this section may be construed to indemnify or shield covered individuals from prosecution under any relevant provision of title 18.
        "(h) DEFINITIONS.—In this section:
        "(1) COVERED INDIVIDUAL.—The term 'covered individual' means an individual who has retired or otherwise separated from an active or reserve component of the Armed Forces.
        "(2) COVERED POST-SERVICE EMPLOYMENT.—The term 'covered post-service employment' means direct or indirect employment by, representation of, or any provision of advice or services relating to national security, intelligence, the military, or internal security to—
                "(A) the government of—
                        "(i) a country of concern (as defined in section 1(m) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(m))); or

Determinations.

                        "(ii) a country the Secretary of Defense determines acts as a proxy or passthrough for services for a country of concern; or
                "(B) any company, entity, or other person the activities of which are directly or indirectly supervised, directed, controlled, financed, or subsidized, in whole or in major part, by a government described in subparagraph (A).
        "(3) COVERED POST-SERVICE POSITION.—The term 'covered post-service position' means a position of employment described in paragraph (2).".

10 USC prec. 971.

        (b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 49 of such title is amended by adding at the end the following new item:

"989. Prohibition on former members of the armed forces accepting post-service employment with certain foreign governments.".

        (c) CONFORMING AMENDMENT.—Section 908 of title 37, United States Code, is amended by adding at the end the following new subsection:
        "(f) PROHIBITION ON FORMER MEMBERS OF ARMED FORCES ACCEPTING EMPLOYMENT WITH CERTAIN FOREIGN GOVERNMENTS.—For a provision of law prohibiting former members of the armed forces from accepting post-service employment with certain foreign governments, see section 989 of title 10.".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 253

### SEC. 524. VERIFICATION OF THE FINANCIAL INDEPENDENCE OF FINANCIAL SERVICES COUNSELORS IN THE DEPARTMENT OF DEFENSE.

(a) VERIFICATION OF FINANCIAL INDEPENDENCE.—Section 992 of title 10, United States Code, is amended—

(1) in subsection (b)(2)(A)—

(A) in clause (i), by striking "and" at the end;

(B) in clause (ii)—

(i) by striking "may" and inserting "shall";

(ii) by striking "installation by any means elected by the Secretary from among the following:" and inserting "installation—";

(iii) in subclause (I)—

(I) by striking "Through" and inserting "through"; and

(II) by striking "Defense." and inserting "Defense;";

(iv) in subclause (II)—

(I) by striking "By contract" and inserting "by contract"; and

(II) by striking "Internet." and inserting "Internet; or"; and

(v) in subclause (III)—

(I) by striking "Through" and inserting "through"; and

(II) by striking "counseling." and inserting "counseling; and"; and

(C) by adding at the end the following new clause:

"(iii) may not provide financial services through any individual unless such individual agrees to submit financial disclosures annually to the Secretary.";

Disclosures.

(2) in subsection (b)(2)(B), by striking "installation by any of the means set forth in subparagraph (A)(ii), as elected by the Secretary concerned." and inserting "installation in accordance with the requirements established under subparagraph (A)(ii) and (iii)."; and

(3) in subsection (b)(4)—

(A) by inserting "(A)" before "The Secretary"; and

(B) by inserting at the end the following new subparagraphs:

"(B) In carrying out the requirements of subparagraph (A), the Secretary concerned shall establish a requirement that each financial services counselor under paragraph (2)(A)(i), and any other individual providing counseling on financial services under paragraph (2), submit financial disclosures annually to the Secretary.

Requirement.
Disclosures.

"(C) The Secretary concerned shall review all financial disclosures submitted pursuant to subparagraph (B) to ensure the counselor, or the individual providing counseling, is free from conflict as required under this paragraph.

Review.

"(D) If the Secretary concerned determines that a financial services counselor under paragraph (2)(A)(i), or any other individual providing counseling on financial services under paragraph (2), is not free from conflict as required under this paragraph, the Secretary shall ensure that the counselor, or the individual providing counseling, does not provide such services until such time as the Secretary determines that such conflict is resolved.".

Determinations.

137 STAT. 254          PUBLIC LAW 118–31—DEC. 22, 2023

Deadline.

(b) BRIEFING ON FINANCIAL INDEPENDENCE.—Not later than 180 days after the date of the enactment of this Act, each Secretary concerned shall submit to Congress a briefing on the implementation of the amendments made by this section.

(c) SECRETARY CONCERNED DEFINED.—In this section, the term "Secretary concerned" has the meaning given to such term in section 101 of title 10, United States Code.

**SEC. 525. MODIFICATION OF REQUIREMENTS FOR APPROVAL OF FOREIGN EMPLOYMENT BY RETIRED AND RESERVE MEMBERS OF UNIFORMED SERVICES.**

Section 908 of title 37, United States Code, is amended—
(1) in subsection (b)—
(A) by striking "A person" and inserting "(1) A person";
(B) by inserting "after determining that such approval is not contrary to the national interests of the United States" after "approve the employment"; and
(C) by adding at the end the following new paragraph:

Delegation authority. Determination.

"(2) The Secretary of a military department may delegate the determination of the Secretary required by paragraph (1) only to an official of the military department at or above the level of an Assistant Secretary or, in the event of a vacancy in the position of such an official, a civilian official performing the duties of that position."; and
(2) in subsection (d)—
(A) in paragraph (2)—
(i) in the matter preceding subparagraph (A), by striking "an officer" and inserting "a person"; and
(ii) by striking subparagraphs (B) and (C) and inserting the following new subparagraphs:
"(B) A description of the duties, if any, the person is to perform and the compensation the person is to receive for such duties, as reflected in the person's application for approval of the employment or compensation or payment or award.
"(C) The position the person held or holds in the armed forces, including the rank of the person and the armed force in which the person served.
"(D) Any other information the Secretaries of the military departments consider relevant, except that such information may not include the person's date of birth, Social Security number, home address, phone number, or any other personal identifier other than the name and rank of the person and the armed force in which the person served."; and
(B) by adding at the end the following new paragraph:

Reports. Public information. Web posting.

"(3) Not later than 60 days after the date on which a report required by paragraph (1) is submitted, the Secretaries of the military departments shall make the report, and all contents of the report, available on a publicly accessible internet website.".

Time periods. 10 USC note prec. 1161.

**SEC. 526. CONSIDERATION OF REINSTATEMENT OF A MEMBER OF THE ARMED FORCES INVOLUNTARILY SEPARATED ON THE BASIS OF REFUSAL TO RECEIVE A VACCINATION AGAINST COVID-19.**

(a) REINSTATEMENT.—
(1) REQUEST; CONSIDERATION.—At the request of a covered individual during the two years following the date of the involuntary separation of the covered individual, the Secretary concerned shall consider reinstating such covered individual—

(A) as a member of the Armed Force concerned; and

(B) in the grade held by such covered individual immediately before the involuntary separation of the covered individual.

(2) TREATMENT OF PERIOD BETWEEN SEPARATION AND REINSTATEMENT.—The Secretary concerned shall treat the period of time between the involuntary separation of a covered individual and the reinstatement of such covered individual under paragraph (1) as a period of inactivation from active service under the following provisions of section 710 of title 10, United States Code:

(A) Subsection (b).

(B) Subparagraphs (B) through (D) of paragraph (2) of subsection (f).

(C) Paragraph (4) of subsection (f).

(D) Subsection (g).

(b) COVERED INDIVIDUAL DEFINED.—In this section, the term "covered individual" means an individual—

(1) involuntarily separated from an Armed Force solely on the basis of the refusal of such individual to receive a vaccination against COVID–19; and

(2) who, during the period beginning on August 24, 2021, and ending on February 24, 2023, submitted a request for a religious, administrative, or medical exemption from a requirement to receive a vaccination against COVID–19.

**SEC. 527. REVIEWS OF CHARACTERIZATION OF ADMINISTRATIVE DISCHARGES OF CERTAIN MEMBERS ON THE BASIS OF FAILURE TO RECEIVE COVID-19 VACCINE.**

10 USC 1553 note.

(a) MANDATORY REVIEW.—A board established under section 1553 of title 10, United States Code, shall grant a request pursuant to such section to review the characterization of a discharge or dismissal of a former member of a covered Armed Force if such discharge or dismissal was solely based on the failure of such former member to obey a lawful order to receive a vaccine for COVID–19.

(b) COVERED ARMED FORCE DEFINED.—In this section, the term "covered Armed Force" means the Army, Navy, Marine Corps, Air Force, Coast Guard, or Space Force.

**SEC. 528. CERTAIN MEMBERS DISCHARGED OR DISMISSED ON THE SOLE BASIS OF FAILURE TO OBEY A LAWFUL ORDER TO RECEIVE A VACCINE FOR COVID-19: COMMUNICATION STRATEGY REGARDING REINSTATEMENT PROCESS.**

10 USC note prec. 1161.

(a) COMMUNICATION STRATEGY REQUIRED.—Not later than six months after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Secretaries of the military departments or, with respect the Coast Guard, the Secretary of the department in which the Secretary is operating when the Coast Guard is not operating as a service in the Navy, shall communicate, to a covered individual, the current, established, process by which a covered individual may be reinstated in the covered Armed Force concerned.

Deadline.

(b) DEFINITIONS.—In this section:

(1) The term "covered individual" means an individual discharged or dismissed from a covered Armed Force on the sole basis of failure to obey a lawful order to receive a vaccine for COVID–19.

(2) The term "covered Armed Force" means the Army, Navy, Marine Corps, Air Force, Coast Guard, or Space Force.

10 USC note prec. 1201.

Deadline. Regulations.

### SEC. 529. CONTINUING MILITARY SERVICE FOR CERTAIN MEMBERS ELIGIBLE FOR CHAPTER 61 RETIREMENT.

(a) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall prescribe regulations that authorize the Secretary of the military department concerned to authorize a covered member to continue to serve in the Armed Forces—

(1) in the current military occupational specialty of such covered member, for which the covered member may not be deployable; or

(2) in a military occupational specialty for which the covered member is deployable.

(b) RULE OF CONSTRUCTION.—A covered member who completes 20 years of service computed under section 1208 of title 10, United States Code shall not be denied any benefit—

(1) for which the covered member is eligible under laws administered by the Secretary of Defense or the Secretary of Veterans Affairs; and

(2) solely on the basis that the covered member elected to continue to serve in the Armed Forces instead of taking retirement under chapter 61 of title 10, United States Code.

(c) COVERED MEMBER DEFINED.—In this section, the term "covered member" means a member of the Army, Navy, Air Force, Marine Corps, or Space Force—

(1) whom the Secretary of the military department concerned determines possesses skill or experience vital to the Armed Force concerned;

(2) who incurs a disability—

(A) while eligible for special pay under section 310 of title 37, United States Code; and

(B) that renders the member eligible for retirement under chapter 61 of title 10, United States Code; and

(3) who seeks to continue to serve in the Armed Forces instead of taking such retirement.

### SEC. 529A. THREAT-BASED SECURITY SERVICES AND EQUIPMENT FOR CERTAIN FORMER OR RETIRED DEPARTMENT OF DEFENSE PERSONNEL.

(a) REMOVAL OF TIME LIMITATIONS.—Subsection (b) of section 714 of title 10, United States Code, is amended—

(1) in paragraph (1)(A), by striking "imminent and credible threat" and inserting "serious and credible threat";

(2) in paragraph (2)(B), by striking "for a period of up to two years beginning on the date on which the official separates from the Department";

(3) by amending paragraph (5) to read as follows:

Requirement.
Reviews.
Time period.

"(5) DURATION OF PROTECTION.—The Secretary of Defense shall require periodic reviews, not less than once every six months, of the duration of protection provided to individuals under this subsection."; and

(4) in paragraph (6)(A), by striking "and of each determination under paragraph (5)(B) to extend such protection and security".

(b) AUTHORIZATION OF REIMBURSEMENT OR ACQUISITION OF SECURITY SERVICES.—Such section 714, as amended by subsection (a), is further amended by adding at the end the following:

"(e) REIMBURSEMENT.—The Secretary of Defense may reimburse a former or retired official who faces serious and credible threats arising from duties performed while employed by the Department for security services and equipment procured at the personal expense of the official, not to exceed an aggregate of $15,000,000 in any fiscal year for all former and retired officials authorized by the Secretary of Defense for such reimbursement.".

### SEC. 529B. LIMITATION ON ESTABLISHMENT OF NEW DIVERSITY, EQUITY, AND INCLUSION POSITIONS; HIRING FREEZE.

(a) IN GENERAL.—During the period described in subsection (b), the Secretary of Defense may not—

(1) establish any new positions within the Department of Defense with responsibility for matters relating to diversity, equity, and inclusion; or

(2) fill any vacancies in positions in the Department with responsibility for such matters.

(b) PERIOD DESCRIBED.—The period described in this subsection is the period—

(1) beginning on the date of the enactment of this Act; and

(2) ending on the date on which the Comptroller General of the United States submits to Congress the review of the Department of Defense diversity, equity, and inclusion workforce required by the report of the Committee on Armed Services of the Senate accompanying the National Defense Authorization Act for Fiscal Year 2024.

### SEC. 529C. REQUIREMENT TO BASE MILITARY ACCESSIONS AND PROMOTIONS ON MERIT AND PERFORMANCE.

10 USC note prec. 501.

(a) MERIT REQUIREMENT.—A military accession or a promotion in the Department of Defense shall be based on individual merit and demonstrated performance.

(b) REGULATIONS.—The Secretary of Defense shall prescribe regulations to carry out this section not later than 90 days after the date of the enactment of this Act.

Deadline.

## Subtitle D—Military Justice and Other Legal Matters

### SEC. 531. TECHNICAL AND CONFORMING AMENDMENTS TO THE UNIFORM CODE OF MILITARY JUSTICE.

(a) TECHNICAL AMENDMENT RELATING TO GUILTY PLEAS FOR MURDER.—Section 918 of title 10, United States Code (article 118 of the Uniform Code of Military Justice), is amended—

(1) by striking "he" each place it appears and inserting "such person"; and

(2) in the matter following paragraph (4), by striking the period and inserting ", unless such person is otherwise sentenced in accordance with a plea agreement entered into between the parties under section 853a of this title (article 53a).".

(b) TECHNICAL AMENDMENTS RELATING TO THE MILITARY JUS-
TICE REFORMS IN THE NATIONAL DEFENSE AUTHORIZATION ACT FOR
FISCAL YEAR 2022.—

(1) ARTICLE 16.—Subsection (c)(2)(A) of section 816 of title
10, United States Code (article 16 of the Uniform Code of
Military Justice), is amended by striking "by the convening
authority".

(2) ARTICLE 25.—Section 825 of title 10, United States
Code (article 25 of the Uniform Code of Military Justice), is
amended—

(A) in subsection (d)—

(i) in paragraph (1), by striking "may, after the
findings are announced and before any matter is pre-
sented in the sentencing phase, request, orally on the
record or in writing, sentencing by members" and
inserting "shall be sentenced by the military judge";
and

(ii) by amending paragraph (2) to read as follows:
"(2) In a capital case, if the accused is convicted of an offense
for which the court-martial may sentence the accused to death,
the accused shall be sentenced in accordance with section 853(c)
of this title (article 53(c)).";

(B) in subsection (e)—

(i) in paragraph (1), by striking "him" and inserting
"the member being tried"; and

(ii) in paragraph (2)—

(I) in the first sentence, by striking "his
opinion" and inserting "the opinion of the con-
vening authority"; and

(II) in the second sentence, by striking "he"
and inserting "the member"; and

(C) in subsection (f), in the second sentence—

(i) by striking "his authority" and inserting "the
authority of the convening authority"; and

(ii) by striking "his staff judge advocate or legal
officer" and inserting "the staff judge advocate or legal
officer of the convening authority".

(c) AUTHORITY OF SPECIAL TRIAL COUNSEL WITH RESPECT TO
CERTAIN OFFENSES OCCURRING BEFORE EFFECTIVE DATE OF MILI-
TARY JUSTICE REFORMS ENACTED IN THE NATIONAL DEFENSE
AUTHORIZATION ACT FOR FISCAL YEAR 2022.—

(1) AUTHORITY.—Section 824a of title 10, United States
Code (article 24a of the Uniform Code of Military Justice),
as added by section 531 of the National Defense Authorization
Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1692),
is amended by adding at the end the following new subsection:
"(d) SPECIAL TRIAL COUNSEL AUTHORITY OVER CERTAIN OTHER
OFFENSES.—

"(1) OFFENSES OCCURRING BEFORE EFFECTIVE DATE.—A spe-
cial trial counsel may, at the sole and exclusive discretion
of the special trial counsel, exercise authority over the following
offenses:

"(A) An offense under section 917a (article 117a), 918
(article 118), section 919 (article 119), section 920 (article
120), section 920b (article 120b), section 920c (article 120c),
section 928b (article 128b), or the standalone offense of
child pornography punishable under section 934 (article

134) of this title that occurred on or before December 27, 2023.

"(B) An offense under section 925 (article 125), section 930 (article 130), or section 932 (article 132) of this title that occurred on or after January 1, 2019, and before December 28, 2023.

"(C) An offense under section 920a (article 120a) of this title, an offense under section 925 (article 125) of this title alleging an act of nonconsensual sodomy, or the standalone offense of kidnapping punishable under section 934 (article 134) of this title that occurred before January 1, 2019.

"(D) A conspiracy to commit an offense specified in subparagraph (A), (B), or (C) as punishable under section 881 of this title (article 81).

"(E) A solicitation to commit an offense specified in subparagraph (A), (B), or (C) as punishable under section 882 of this title (article 82).

"(F) An attempt to commit an offense specified in subparagraph (A), (B), (C), (D), or (E) as punishable under section 880 of this title (article 80).

"(2) EFFECT OF EXERCISE OF AUTHORITY.—

"(A) TREATMENT AS COVERED OFFENSE.—If a special trial counsel exercises authority over an offense pursuant to paragraph (1), the offense over which the special trial counsel exercises authority shall be considered a covered offense for purposes of this chapter.

"(B) KNOWN OR RELATED OFFENSES.—If a special trial counsel exercises authority over an offense pursuant to paragraph (1), the special trial counsel may exercise the authority of the special trial counsel under subparagraph (B) of subsection (c)(2) with respect to other offenses described in that subparagraph without regard to the date on which the other offenses occur.".

(2) CONFORMING AMENDMENT TO EFFECTIVE DATE.—Section 539C(a) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 801 note) is amended by striking "and shall" and inserting "and, except as provided in section 824a(d) of title 10, United States Code (article 24a(d) of the Uniform Code of Military Justice), shall".

(d) CLARIFICATION OF APPLICABILITY OF DOMESTIC VIOLENCE AND STALKING TO DATING PARTNERS.—

(1) ARTICLE 128B; DOMESTIC VIOLENCE.—Section 928b of title 10, United States Code (article 128b of the Uniform Code of Military Justice), is amended—

(A) in the matter preceding paragraph (1), by striking "Any person" and inserting "(a) IN GENERAL.—Any person";

(B) in subsection (a), as designated by paragraph (1) of this section, by inserting "a dating partner," after "an intimate partner," each place it appears; and

(C) by adding at the end the following new subsection:

"(b) DEFINITIONS.—In this section, the terms 'dating partner', 'immediate family', and 'intimate partner' have the meanings given such terms in section 930 of this title (article 130).".

(2) ARTICLE 130; STALKING.—Section 930 of such title (article 130 of the Uniform Code of Military Justice) is amended—

(A) in subsection (a), by striking "or to his or her intimate partner" each place it appears and inserting "to his or her intimate partner, or to his or her dating partner"; and

(B) in subsection (b)—

(i) by redesignating paragraphs (3) through (5) as paragraphs (4) through (6), respectively; and

(ii) by inserting after paragraph (2) the following new paragraph:

Definition.

"(3) The term 'dating partner', in the case of a specific person, means a person who is or has been in a social relationship of a romantic or intimate nature with such specific person based on a consideration of—

"(A) the length of the relationship;

"(B) the type of relationship;

"(C) the frequency of interaction between the persons involved in the relationship; and

"(D) the extent of physical intimacy or sexual contact between the persons involved in the relationship.".

10 USC 816 note.

(e) EFFECTIVE DATE.—The amendments made by subsection (b) and subsection (c)(1) shall take effect immediately after the coming into effect of the amendments made by part 1 of subtitle D of title V of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81) as provided in section 539C of that Act (10 U.S.C. 801 note).

Time periods.

### SEC. 532. ESTABLISHMENT OF STAGGERED TERMS FOR MEMBERS OF THE MILITARY JUSTICE REVIEW PANEL.

(a) APPOINTMENT TO STAGGERED TERMS.—Subsection (b) of section 946 of title 10, United States Code (article 146 of the Uniform Code of Military Justice), is amended by adding at the end the following new paragraph:

"(4) ESTABLISHMENT OF STAGGERED TERMS.—Notwithstanding subsection (e), members of the Panel appointed to serve on the Panel to fill vacancies that exist due to terms of appointment expiring during the period beginning on August 1, 2030, and ending on November 30, 2030, shall be appointed to terms as follows:

"(A) Three members designated by the Secretary of Defense shall serve a term of two years.

"(B) Three members designated by the Secretary of Defense shall serve a term of four years.

"(C) Three members designated by the Secretary of Defense shall serve a term of six years.

"(D) Four members designated by the Secretary of Defense shall serve a term of eight years.".

(b) TERM; VACANCIES.—Subsection (e) of such section is amended to read as follows:

"(e) TERM; VACANCIES.—

"(1) TERM.—Subject to subsection (b)(4) and paragraphs (2) and (3) of this subsection, each member shall be appointed for a term of eight years, and no member may serve more than one term.

"(2) VACANCY.—Any vacancy in the Panel shall be filled in the same manner as the original appointment. A member appointed to fill a vacancy in the Panel that occurs before the expiration of the term of appointment of the predecessor

of such member shall be appointed for the remainder of the term of such predecessor.

"(3) AVAILABILITY OF REAPPOINTMENT FOR CERTAIN MEMBERS.—Notwithstanding paragraph (1), a member of the Panel may be appointed to a single additional term if—

"(A) the appointment of the member is to fill a vacancy described in subsection (b)(4); or

"(B) the member was initially appointed—

"(i) to a term of four years or less in accordance with subsection (b)(4); or

"(ii) to fill a vacancy that occurs before the expiration of the term of the predecessor of such member and for which the remainder of the term of such predecessor is four years or less.".

## SEC. 533. SUPREME COURT REVIEW OF CERTAIN ACTIONS OF THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES.

(a) CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES.—

(1) IN GENERAL.—Section 1259 of title 28, United States Code, is amended—

(A) in paragraph (3), by inserting "or refused to grant" after "granted"; and

(B) in paragraph (4), by inserting "or refused to grant" after "granted".

(2) TECHNICAL AND CONFORMING AMENDMENTS.—

(A) TITLE 10.—Section 867a(a) of title 10, United States Code (article 67a of the Uniform Code of Military Justice), is amended by striking "The Supreme Court may not review by a writ of certiorari under this section any action of the United States Court of Appeals for the Armed Forces in refusing to grant a petition for review.".

(B) TIME FOR APPLICATION FOR WRIT OF CERTIORARI.—Subsection (g) of section 2101 of title 28, United States Code, is amended to read as follows:

"(g) The time for application for a writ of certiorari to review a decision of the United States Court of Appeals for the Armed Forces, or the decision of a Court of Criminal Appeals that the United States Court of Appeals for the Armed Forces refuses to grant a petition to review, shall be as prescribed by rules of the Supreme Court.".

(b) EFFECTIVE DATE AND APPLICABILITY.—

10 USC 867a note.

(1) IN GENERAL.—The amendments made by subsection (a) shall take effect on the date that is one year after the date of the enactment of this Act and shall apply with respect to any action of the United States Court of Appeals for the Armed Forces in granting or refusing to grant a petition for review submitted to such Court for the first time on or after such effective date.

(2) INAPPLICABILITY TO PENDING DECISIONS.—With respect to a petition submitted to the United States Court of Appeals for the Armed Forces before the effective date specified in paragraph (1) and on which the Court has not taken action as of such date, the provisions of the United States Code amended by subsection (a) shall apply as if such amendments had not been enacted. Any action of the United States Court

137 STAT. 262          PUBLIC LAW 118–31—DEC. 22, 2023

of Appeals for the Armed Forces in granting or refusing to grant such a petition is final and conclusive.

(3) FINALITY OF DECISIONS BEFORE EFFECTIVE DATE.—Any action of the United States Court of Appeals for the Armed Forces in granting or refusing to grant a petition for review before the effective date specified in paragraph (1) is final and conclusive.

Deadline.

(4) RULES REQUIRED.—The Supreme Court shall prescribe rules to carry out section 2101(g) of title 28, United States Code, as amended by subsection (a)(2)(B) of this section, by not later than the effective date specified in paragraph (1).

### SEC. 534. ADDITIONAL REQUIREMENTS FOR INITIATIVE TO ENHANCE THE CAPABILITY OF MILITARY CRIMINAL INVESTIGATIVE ORGANIZATIONS TO PREVENT AND COMBAT CHILD SEXUAL EXPLOITATION.

Section 550D of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 1561 note prec.) is amended by adding at the end the following new subsection:

"(c) ADDITIONAL REQUIREMENTS.—As part of the initiative under subsection (a), the Secretary of Defense shall carry out the following activities:

Time period.

"(1) ANNUAL REPORT.—Not later than 90 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, an on an annual basis thereafter through 2029, the Secretary shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the progress of the initiative, which shall include a description of specific actions that have been taken, or that are planned to be taken, to detect, combat, and stop the use of the Department of Defense information technology network to further online child sexual exploitation.

"(2) PARTNERSHIPS.—The Secretary shall seek to enter into partnerships and execute collaborative agreements with functional experts, including highly qualified national child protection organizations or law enforcement training centers with demonstrated expertise in the delivery of law enforcement training, to identify, investigate, and prosecute individuals engaged in online child sexual exploitation.

"(3) MANDATORY TRAINING.—The Secretary shall establish mandatory training for criminal investigative organizations of the Department of Defense and other appropriate personnel at military installations to ensure that the capability and capacity to investigate child sexual exploitation is continuously maintained regardless of staff turnover and relocations.".

### SEC. 535. LIMITATION ON AVAILABILITY OF FUNDS FOR RELOCATION OF ARMY CID SPECIAL AGENT TRAINING COURSE.

(a) LIMITATION.—None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Army may be obligated or expended to relocate an Army CID special agent training course until—

Reports.
Plans.

(1) the Secretary of the Army submits to the Committees on Armed Services of the Senate and the House of Representatives a report on any plans of the Secretary to relocate an Army CID special agent training course, including an explanation of the business case for any transfer of training personnel proposed as part of such plan; and

(2) the Secretary provides to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the contents of the report specified in paragraph (1).

Briefing.

(b) DEFINITIONS.—In this section:

(1) The term "relocate", when used with respect to an Army CID special agent training course, means the transfer of such course to a location different than the location used for such course as of the date of the enactment of this Act.

(2) The term "Army CID special agent training course" means a training course provided to members of the Army to prepare such members for service as special agents in the Army Criminal Investigation Division.

## SEC. 536. STUDY ON REQUIREMENT FOR UNANIMOUS VOTES FOR FINDINGS IN GENERAL AND SPECIAL COURTS-MARTIAL AND RELATED MILESTONES FOR IMPLEMENTATION.

(a) STUDY REQUIRED.—The Secretary of Defense shall conduct a study to determine the feasibility and advisability of requiring unanimous votes for findings of guilty, not guilty, or not guilty only by reason of lack of mental responsibility in general and special courts-martial conducted under chapter 47 of title 10, United States Code (the Uniform Code of Military Justice).

Determination.

(b) USE OF MILITARY JUSTICE EXPERTS.—The Secretary of Defense shall convene a group of members of the Armed Forces and civilian employees of the Department of Defense with significant expertise in military justice matters to carry out the study required under subsection (a).

(c) INFORMATION TO CONGRESS.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives the following:

Deadlines.

(1) REPORT.—A report containing the results of the study required under subsection (a).

(2) DRAFT LEGISLATIVE TEXT.—Without regard to the contents of the report under paragraph (1), draft legislative text that would revise chapter 47 of title 10, United States Code (the Uniform Code of Military Justice) to—

(A) require a unanimous vote of all members present in a general or special court-martial for a finding of guilty, not guilty, or not guilty only by reason of lack of mental responsibility for a specification; and

(B) provide that an accused may be tried a second time for the same offense if a general or special court-martial requiring such a unanimous vote does not result in a finding of guilty, not guilty, or not guilty only by reason of lack of mental responsibility for such offense.

(3) MILESTONES FOR IMPLEMENTATION.—A description of any milestones or other requirements that would need to be met for the legislative text provided under paragraph (2) to be enacted by not later than December 31, 2027.

## SEC. 537. STUDY ON REMOVAL OF SEXUAL ASSAULT VICTIM ADVOCATES FROM THE CHAIN OF COMMAND OF VICTIMS.

(a) STUDY.—The Secretary of Defense shall conduct a study to determine—

Determinations.

(1) the feasibility and advisability of requiring that any Sexual Assault Victim Advocate assigned to a victim under

section 1565b of title 10, United States Code, be from outside the chain of command of the victim; and

(2) the potential effects of such a requirement on the ability of the Armed Forces to implement sexual assault prevention and response programs.

(b) REPORT.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the results of the study conducted under subsection (a).

# Subtitle E—Accession Standards and Recruitment

### SEC. 541. INCREASED ACCESS TO POTENTIAL RECRUITS AT SECONDARY SCHOOLS.

Section 503(c) of title 10, United States Code, is amended—
(1) in paragraph (1)—
(A) in subparagraph (A)—
(i) in clause (i), by striking "; and" and inserting a semicolon;
(ii) by redesignating clause (ii) as clause (iii);
(iii) by inserting after clause (i) the following new clause:
"(ii) shall provide to military recruiters access to career fairs or similar events upon a request made by military recruiters for military recruiting purposes; and"; and
(iv) in clause (iii), as redesignated by subparagraph (B), by inserting ", not later than 60 days after receiving such request," after "provide"; and
(B) in subparagraph (B), by striking "subparagraph (A)(ii)" and inserting "subparagraph (A)(iii)";
(2) by redesignating paragraph (6) as paragraph (7); and
(3) by inserting after paragraph (5) the following new paragraph:

*Reports.*

"(6) The Secretary of Defense shall submit an annual report to Congress not later than February 1 each calendar year, detailing each notification of denial of recruiting access issued under paragraph (3).".

### SEC. 542. MODIFICATION OF LIMITATION ON ENLISTMENT AND INDUCTION OF PERSONS WHOSE SCORE ON THE ARMED FORCES QUALIFICATION TEST IS BELOW A PRESCRIBED LEVEL.

Section 520(a) of title 10, United States Code, is amended—
(1) by striking "The number of persons" and inserting "(1) The number of persons";
(2) by striking "may not exceed 20 percent" and inserting "may not exceed 4 percent"; and
(3) by adding at the end the following new paragraph:
"(2) Upon the request of the Secretary concerned, the Secretary of Defense may authorize an armed force to increase the limitation specified in paragraph (1) to not exceed 20 percent of the total number of persons originally enlisted or inducted to serve on active duty (other than active duty for training) in such armed forced during such fiscal year. The Secretary of Defense shall notify the

*Notification.*
*Deadline.*

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 265

Committees on Armed Services of the Senate and the House of Representatives not later than 30 days after using such authority.".

### SEC. 543. INCREASED ACCESS TO POTENTIAL RECRUITS AT INSTITUTIONS OF HIGHER EDUCATION.

Section 983(b) of title 10, United States Code, is amended—
  (1) in paragraph (1), by striking "; or" and inserting a semicolon;
  (2) in paragraph (2)—
    (A) by striking "to the following information pertaining" and inserting ", with respect";
    (B) by striking "institution):" and inserting "institution)—";
    (C) in subparagraph (A)—
      (i) by striking "Names" and inserting "names"; and
      (ii) by striking "telephone listings." and inserting "telephone listings, which information shall be made available not later than the 60th day following the date of a request; and"; and

<div style="text-align:right">Deadline.</div>

    (D) in subparagraph (B), by striking "Date" and inserting "date".

### SEC. 544. INCREASE IN ACCESSION BONUS FOR NURSE OFFICER CANDIDATES.

Section 2130a(a) of title 10, United States Code, is amended—
  (1) by striking "$20,000" and inserting "$40,000"; and
  (2) by striking "$10,000" and inserting "$20,000".

### SEC. 545. IMPROVEMENTS TO MEDICAL STANDARDS FOR ACCESSION TO CERTAIN ARMED FORCES.

<div style="text-align:right">10 USC note prec. 501.</div>

(a) IMPROVEMENTS.—Not later than one year after the date of the enactment of this Act, and once four years thereafter, the Secretary of Defense shall—

<div style="text-align:right">Deadlines. Processes.</div>

  (1) conduct an assessment of the prescribed medical standards and medical screening processes required for the appointment of an individual as an officer, or enlistment of an individual as a member, in each covered Armed Force;

<div style="text-align:right">Assessment.</div>

  (2) taking into account the findings of such assessment—
    (A) update such standards and processes, as may be necessary; and

<div style="text-align:right">Updates.</div>

    (B) take such steps as may be necessary to improve the waiver process for individuals who do not meet such prescribed medical standards; and
  (3) submit to the Committees on Armed Services of the House of Representatives and the Senate a report containing, with respect to the most recently conducted assessment under paragraph (1)—

<div style="text-align:right">Reports.</div>

    (A) the findings of that assessment and a description of the actions carried out pursuant to paragraph (2); and
    (B) recommendations by the Secretary for any legislative action the Secretary determines necessary to further improve such standards and processes.

<div style="text-align:right">Recommendations.</div>

(b) COVERED ARMED FORCE DEFINED.—In this section, the term "covered Armed Force" means the Army, Navy, Air Force, Marine Corps, or Space Force.

137 STAT. 266          PUBLIC LAW 118–31—DEC. 22, 2023

10 USC 520 note.

**SEC. 546. FUTURE SERVICEMEMBER PREPARATORY COURSE.**

(a) REQUIREMENT.—If the number of nonprior service enlisted personnel covered under section 520 of title 10, United States Code, exceeds 10 percent of the total number of persons originally enlisted in an Armed Force during a fiscal year, the Secretary concerned shall establish a future servicemember preparatory course within the Armed Force concerned.

(b) PURPOSE.—The course established under subsection (a) shall be designed to improve the physical and aptitude qualifications of military recruits.

Compliance.

(c) CRITERIA.—Each course established under this section shall comply with the following requirements:

(1) ENROLLMENT.—All nonprior service enlisted persons whose score on the Armed Forces Qualification Test is below the thirty-first percentile must be enrolled in the course prior to attending initial basic training.

(2) GRADUATION REQUIREMENT.—Prior to attending initial basic training, all enlisted persons attending the course established under this section must achieve a score on the Armed Forces Qualification Test that is at least 10 points higher than the individual's most recent score taken prior to the individual's date of enlistment.

Deadline.

(3) EFFECT OF COURSE FAILURE.—Any enlisted person who fails to achieve course graduation requirements within 180 days of enlistment shall be separated under regulations prescribed by the Secretary concerned.

Time period.

(d) REPORT.—If a preparatory course under this section is established by the Secretary concerned, the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the structure and results of the course for the preceding fiscal year by December 1st of the subsequent fiscal year. The report shall include the following elements:

(1) The number of individuals who attended the preparatory course.

(2) The number of individuals who graduated the preparatory course.

(3) The average improvement in the Armed Forces Qualification Test score for individuals who graduated from the prepatory course.

(4) Any other matter the Secretary determines relevant.

(e) SUNSET.—The requirements of this section shall expire on September 30th, 2028.

10 USC note prec. 501.

**SEC. 547. PILOT PROGRAM ON CARDIAC SCREENINGS FOR MILITARY ACCESSIONS.**

Deadline.

(a) ESTABLISHMENT.—Not later than September 30, 2024, the Secretary of Defense shall carry out a pilot program to provide an electrocardiogram to individuals who undergo military accession screenings. Each such electrocardiogram shall be provided—

(1) on a mandatory basis;

(2) at no cost to the recipient; and

(3) in a facility of the Department of Defense or by a member or employee of the military health system.

(b) PURPOSES.—In carrying out the pilot program, the Secretary shall—

Determination. Costs.

(1) determine the costs (including protocols and personnel and equipment for each location where the Secretary carries

out the pilot program) and benefits to the Department of providing an electrocardiogram to every individual who undergoes a military accession screening;

(2) develop and implement appropriate processes to assess the long-term impacts of electrocardiogram results on military service; and

Processes.
Assessment.

(3) consult with experts in cardiology to develop appropriate clinical practice guidelines for cardiac screenings, diagnosis, and treatment.

Consultation.

(c) BRIEFING.—Not later than 180 days after the date on which the pilot program terminates, the Secretary shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the pilot program. Such briefing shall include the following:

Deadline.

(1) The results of all electrocardiograms provided to individuals under the pilot program—

(A) disaggregated by Armed Force, race, and gender; and

(B) without any personally identifiable information.

(2) The rate of significant cardiac issues detected pursuant to electrocardiograms provided under the pilot program, disaggregated by Armed Force, race, and gender.

(3) The number of individuals, if any, who were disqualified from accession based solely on the result of an electrocardiogram provided under the pilot program.

(4) The cost of carrying out the pilot program.

Costs.

(d) TERMINATION.—The pilot program shall terminate after three years after its implementation.

## SEC. 548. COMMUNITY COLLEGE ENLISTED TRAINING CORPS DEMONSTRATION PROGRAM.

10 USC 503 note.

(a) DEMONSTRATION PROGRAM.—

(1) IN GENERAL.—Not later than August 1, 2025, the Secretary concerned shall establish within each military department an Enlisted Training Corps demonstration program for the purpose of introducing students to the military, and preparing selected students for enlisted service in the Army, Navy, Air Force, Marine Corps, or Space Force.

Deadline.

(2) LOCATION.—Demonstration programs established under this section shall be located at a community or junior college. No program may be established at a military college or military junior college as defined for purposes of section 2107a of title 10, United States Code.

(b) ELIGIBILITY FOR MEMBERSHIP.—To be eligible for membership in a program under this section, a person must be a student at an institution where a unit of the Enlisted Training Corps is located.

(c) INSTRUCTORS.—The Secretary concerned may assign as an instructor for a unit established under this section an individual eligible to serve as an instructor under section 2111 or section 2031 of title 10, United States Code. Instructors who are not currently members on active duty shall be paid in a manner consistent with section 2031 of title 10, United States Code.

(d) FINANCIAL ASSISTANCE.—The Secretary of the military department concerned may provide financial assistance to persons enrolled in a unit of the Enlisted Training Corps in exchange for an agreement in writing that the person enlist in the active

component of the military department concerned upon graduation or disenrollment from the community college. Financial assistance provided under this subsection may include tuition, living expenses, stipend, or other payment.

(e) CURRICULUM.—The Secretary concerned shall ensure that any programs created under this section include as part of the curriculum the following:

(1) An introduction to the benefits of military service.

(2) Military history.

(3) Military customs and courtesies.

(4) Physical fitness requirements.

(5) Instruction on ethical behavior and decision making.

(f) REPORTING REQUIREMENT.—Not later than one year after the date of the enactment of this Act, and annually thereafter until the date specified by subsection (g), the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the status of the demonstration program required by this section.

(g) SUNSET.—The requirements of this provision shall sunset on September 30, 2030.

### SEC. 549. ANNUAL BRIEFINGS ON MILITARY RECRUITMENT PRACTICES IN PUBLIC SECONDARY SCHOOLS AND COMMUNITY COLLEGES.

Deadline.
Time period.

(a) BRIEFINGS REQUIRED.—Not later than December 31, 2024, and on an annual basis thereafter through December 31, 2028, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on military recruitment practices carried out in public secondary schools and community colleges during the calendar year preceding the date of the briefing.

(b) ELEMENTS.—Each briefing under subsection (a) shall include, with respect to the year covered by the briefing, the following:

(1) Identification of the public secondary schools and community colleges visited by military recruiters.

(2) Identification of the number of recruits obtained from such schools and colleges.

Demographic analysis.

(3) A demographic analysis of such recruits, including analysis of the race, ethnicity, and gender of such recruits.

(c) DISAGGREGATION.—The information required under each of a paragraphs (1) through (3) of subsection (b) shall be set forth separately—

(1) by ZIP code, in the case of information concerning community colleges; and

(2) by local educational agency, in the case information concerning public secondary schools.

(d) DEFINITIONS.—In this section, the terms "local educational agency" and "secondary school" have the meanings given those terms in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801).

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 269

# Subtitle F—Junior Reserve Officers' Training Corps

### SEC. 551. EXPANSION OF JUNIOR RESERVE OFFICERS' TRAINING CORPS.

Section 2031 of title 10, United States Code, is amended—

(1) in subsection (a)(1)—

(A) by striking "The President shall promulgate" and inserting "The Secretary of Defense shall promulgate"; and

(B) by striking "maintained, and shall provide" and all that follows through the period at the end and inserting "maintained."; and

(2) by adding at the end the following new subsection:

"(i)(1) The Secretary of Defense shall establish and support not fewer than 3,400, and not more than 4,000, units of the Junior Reserve Officers' Training Corps.

"(2) The requirement under paragraph (1) shall not apply—

"(A) if the Secretary fails to receive an adequate number of requests for Junior Reserve Officer's Training Corps units by public and private secondary educational institutions; and

"(B) during a time of national emergency when the Secretaries of the military departments determine that funding must be allocated elsewhere.".

Determination.

### SEC. 552. REQUIREMENT FOR MEMORANDA OF UNDERSTANDING ADDRESSING CERTAIN MATTERS PERTAINING TO UNITS OF THE JUNIOR RESERVE OFFICERS' TRAINING CORPS.

Section 2031(b) of title 10, United States Code, is amended—

(1) by redesignating paragraphs (1) through (5) as subparagraphs (A) through (E);

(2) by inserting "(1)" after "(b)";

(3) in subparagraph (A), as redesignated by paragraph (1)—

(A) by striking "(A)" and inserting "(i)"; and

(B) by striking "(B)" and inserting "(ii)";

(4) in subparagraph (E), as so redesignated, by striking "as may be established by the Secretary of the military department concerned" and inserting "as the Secretary of the military department concerned prescribes in the memorandum of understanding required under paragraph (2)."; and

(5) by adding at the end the following new paragraph:

"(2) The Secretary of Defense shall prescribe in regulations a memorandum of understanding to be signed by the Secretary of the military department concerned and each institution operating a unit under this section. The memorandum shall be standardized to the extent practicable and include the following elements:

Regulations.

Processes.

"(A) A requirement that an institution notify the Secretary of the military department concerned of allegations of misconduct (including sexual misconduct and harassment) against an instructor who is receiving retired or other pay, not later than 48 hours after such institution learns of such allegations.

Notification.
Deadline.

"(B) A process by which the Secretary of the military department concerned certifies an instructor, including the

137 STAT. 270      PUBLIC LAW 118–31—DEC. 22, 2023

conduct of appropriate background checks by such Secretary and the institution concerned.

Expiration date.

"(C) A process by which the Secretary of the military department concerned shall conduct oversight of instructors certified by such Secretary, including a requirement that such certification shall expire after not more than five years.

Inspection.
Time period.
Effective date.

"(D) Processes by which such institution's program will be inspected by the military department concerned prior to establishment of a new unit, or not less often than once every four years in the case of units existing as of January 1, 2024, staggered as the Secretary determines appropriate.

Certification.
Reports.
Applicability.

"(E) A requirement that each institution certifies it—

"(i) has created a process for students to report violations of their rights under title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), as applicable, and title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), including the rights of students to not be subject to discrimination or subject to retaliation for reporting a violation of those laws, if such laws apply to the public or private institution;

Policies.
Notification.

"(ii) has implemented policies ensuring students and instructors are notified of those rights, as well as the process for reporting violations of those rights, including information on available mandatory reporters, if such laws apply to the institution;

"(iii) has implemented annual training to inform students of methods to prevent, respond to, and report sexual assault and harassment;

"(iv) agrees to report all allegations of violations described in this subparagraph to the military department concerned and, if subject to the jurisdiction of the Department of Education, the Office of Civil Rights of the Department of Education not less often than annually;

"(v) has developed processes to ensure that each student enrolled in a unit under this section has done so voluntarily; and

Data.

"(vi) agrees to provide the data necessary to compile the report required under subsection (i).".

### SEC. 553. JUNIOR RESERVE OFFICERS' TRAINING CORPS ADMINISTRATOR AND INSTRUCTOR COMPENSATION.

(a) IN GENERAL.—Section 2031 of title 10, United States Code, as amended by sections 551 and 552, is further amended—

(1) by amending subsection (d) to read as follows:

"(d)(1) Instead of, or in addition to, detailing officers and non-commissioned officers on active duty under subsection (c)(1), the Secretary of the military department concerned may authorize qualified institutions to employ, as administrators and instructors in the program—

"(A) retired officers and noncommissioned officers whose qualifications are approved by the Secretary and the institution concerned and who request such employment;

Time periods.

"(B) officers and noncommissioned officers who are separated with an honorable discharge within the past 5 years

with at least 8 years of service and are approved by the Secretary and the institution concerned and who request such employment; or

"(C) officers and noncommissioned officers who are active participating members of the selected reserve at the time of application, for purposes of section 101(d) of this title, and have not yet reached retirement eligibility and are approved by the Secretary and the institution concerned and who request such employment.

"(2) Employment under this subsection shall be subject to the following conditions:

"(A) The Secretary concerned shall pay to the institution an amount equal to one-half of the Department's prescribed JROTC Standardized Instructor Pay Scale amount paid to the member by the institution for any period.

"(B) The Secretary concerned may pay to the institution more than one-half of the amount paid to the member by the institution if (as determined by the Secretary)—

"(i) the institution is in an educationally and economically deprived area; and

"(ii) the Secretary determines that such action is in the national interest.

"(C) Payments by the Secretary concerned under this subsection shall be made from funds appropriated for that purpose.

"(D) The Secretary concerned may require successful applicants to transfer to the Individual Ready Reserve.";

(2) by striking subsections (e) and (f); and

(3) by redesignating subsections (g) and (h) as subsections (e) and (f), respectively.

(b) TREATMENT OF CURRENT ADMINISTRATORS AND INSTRUCTORS.—An administrator or instructor employed under section 2031 of title 10, United States Code, on the date of enactment of this section shall not be subject to a reduction in total compensation as a result of such enactment.

### SEC. 554. PROHIBITION OF ESTABLISHMENT OR MAINTENANCE OF A UNIT OF THE JUNIOR RESERVE OFFICERS' TRAINING CORPS AT AN EDUCATIONAL INSTITUTION OWNED, OPERATED, OR CONTROLLED BY THE CHINESE COMMUNIST PARTY.

Section 2031 of title 10, United States Code, as amended by sections 551, 552, and 553, is further amended by adding at the end the following new subsection:

"(g) No unit may be established or maintained at an educational institution that is owned, operated, or controlled by a person that—

"(1) is the People's Republic of China;

"(2) is a member of the Chinese Communist Party;

"(3) is a member of the People's Liberation Army;

"(4) is identified by the Secretary of Defense under section 1260H(a) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note) as a Chinese military company;

"(5) is included in the Non-SDN Chinese Military-Industrial Complex Companies List published by the Department of the Treasury; or

Payments.

Determination.

10 USC 2031 note.

137 STAT. 272        PUBLIC LAW 118–31—DEC. 22, 2023

"(6) is owned by or controlled by or is an agency or instrumentality of any person described in paragraphs (1) through (5).".

Time periods.

**SEC. 555. ENFORCEMENT OF PROGRAM REQUIREMENTS FOR THE JUNIOR RESERVE OFFICERS' TRAINING CORPS.**

Penalties.

(a) IN GENERAL.—Section 2031 of title 10, United States Code, as amended by sections 551 through 554, is further amended by adding at the end the following new subsection:

"(h)(1) The Secretary of Defense may suspend or place on probation a unit of the Junior Reserve Officers' Training Corps that fails to comply with the provisions of the memorandum of understanding required pursuant to subsection (b) or any other requirement of this section.

"(2) A unit may be placed on probation under paragraph (1) for a period of up to three years.

Determination.

"(3) A unit may be suspended under paragraph (1) if, after the three-year probationary period, such unit remains out of compliance with the requirements of this section and the Secretary of the military department concerned determines that such suspension is necessary to mitigate program deficiencies or to protect the safety of program participants.".

(b) ANNUAL REPORTS.—Not later than one year after the date of the enactment of this Act, and annually thereafter for four years, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report including information on—

(1) any units of the Junior Reserve Officers' Training Corps suspended or placed on probation pursuant to section 2031(i) of title 10, United States Code (as added by subsection (a)), in the year covered by the report; and

(2) with respect any unit that is reinstated after previously being suspended or placed on probation pursuant to such section, justification for the reinstatement of such unit.

**SEC. 556. ANNUAL REPORT ON ALLEGATIONS OF SEXUAL MISCONDUCT IN JUNIOR RESERVE OFFICERS' TRAINING CORPS PROGRAMS.**

Section 2031 of title 10, United States Code, as amended by sections 551 through 555, is further amended, by adding at the end the following new subsection:

Time period.

"(i)(1) Not later than March 31, 2024, and annually thereafter through March 31, 2029, the Secretary of Defense shall submit to Committees on Armed Services of the Senate and the House of Representatives a report on allegations of sexual misconduct, sexual harassment, and sex discrimination in Junior Reserve Officers' Training Corps programs during the preceding year.

"(2) Each report required under paragraph (1) shall set forth the following:

"(A) The number of reported allegations of violations under title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) in school-affiliated Junior Reserve Officers' Training Corps programs, including—

"(i) the number of such reported allegations that were investigated;

"(ii) the outcome of those investigations; and

"(iii) the number of such reported allegations by State, the District of Columbia, or overseas location where these reports occurred.

"(B) The number of reports that the Department of Defense or armed forces have received during the reporting period involving allegations of acts of violence, including sexual abuse or harassment, by instructors against students in Junior Reserve Officers' Training Corps programs, including—

"(i) the offense involved;

"(ii) the armed force involved;

"(iii) the number of instructors and number of allegations each instructor received;

"(iv) the number of reports of sexual misconduct and harassment that have been investigated;

"(v) the number of reports or investigations that have led to the removal of an instructor from a Junior Reserve Officers' Training Corps program; and

"(vi) the number of such reported allegations by State, the District of Columbia, or overseas location where these reports occurred.

"(C) Any steps the Department of Defense has taken to mitigate sexual misconduct and harassment in Junior Reserve Officers' Training Corps programs during the preceding year.

"(3) Each report required under paragraph (1) shall be submitted in unclassified form and may not be designated as controlled unclassified information.

"(4) The Secretary shall annually report to the Committees on Armed Services of the Senate and the House of Representatives regarding compliance with this subsection by the Junior Reserve Officers' Training Corps programs, including an up-to-date report on the Secretary's monitoring of such compliance.".     Compliance.

# Subtitle G—Member Education

### SEC. 561. SERVICE ACADEMIES: NUMBERS OF NOMINATIONS BY MEMBERS OF CONGRESS AND APPOINTMENTS BY THE SECRETARIES OF THE MILITARY DEPARTMENTS.

(a) UNITED STATES MILITARY ACADEMY.—Section 7442 of title 10, United States Code, is amended—

(1) in subsection (a), in the matter following paragraph (10), by striking "10 persons" and inserting "15 persons"; and

(2) in subsection (b)(5), by striking "150" and inserting "200".

(b) UNITED STATES NAVAL ACADEMY.—Section 8454 of title 10, United States Code, is amended—

(1) in subsection (a), in the matter following paragraph (10), by striking "10 persons" and inserting "15 persons"; and

(2) in subsection (b)(5), by striking "150" and inserting "200".

(c) UNITED STATES AIR FORCE ACADEMY.—Section 9442 of title 10, United States Code, is amended—

(1) in subsection (a), in the matter following paragraph (10), by striking "10 persons" and inserting "15 persons"; and

(2) in subsection (b)(5), by striking "150" and inserting "200".

137 STAT. 274         PUBLIC LAW 118–31—DEC. 22, 2023

10 USC 7442
note.

(d) APPLICABILITY.—The amendments made by this section shall apply to nominations of candidates and appointments to the Service Academies (as such term is defined in section 347 of title 10, United States Code) for classes entering such Service Academies beginning with the 2025-2026 academic year.

### SEC. 562. INCREASE IN THE NUMBER OF NOMINEES FROM GUAM TO THE SERVICE ACADEMIES.

(a) UNITED STATES MILITARY ACADEMY.—Section 7442 of title 10, United States Code, as amended by section 561, is further amended, in subsection (a)(8), by striking "Four" and inserting "Five".

(b) UNITED STATES NAVAL ACADEMY.—Section 8454 of title 10, United States Code, as amended by section 561, is further amended, in subsection (a)(8), by striking "Four" and inserting "Five".

(c) UNITED STATES AIR FORCE ACADEMY.—Section 9442 of title 10, United States Code, as amended by section 561, is further amended, in subsection (a)(8), by striking "Four" and inserting "Five".

Requirement.
10 USC 7446
note.

### SEC. 563. CONSIDERATION OF STANDARDIZED TEST SCORES IN MILITARY SERVICE ACADEMY APPLICATION PROCESS.

The Secretary of Defense shall ensure that the United States Military Academy, the United States Naval Academy, and the United States Air Force Academy require the submission and consideration of standardized test scores as part of the application process.

### SEC. 564. SERVICE ACADEMY PROFESSIONAL SPORTS PATHWAY REPORT AND LEGISLATIVE PROPOSAL REQUIRED.

(a) LEGISLATIVE PROPOSAL.—Not later than March 1, 2024, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report including the following elements:

Time periods.
Update.

(1) A legislative proposal that would—
(A) update and clarify the legislative framework related to the ability of Service Academy graduates to pursue employment as a professional athlete prior to serving at least 5 years on active duty; and
(B) retain the existing requirement that all Service Academy graduates must serve for 2 years on active duty before affiliating with the reserves to pursue employment as a professional athlete.
(2) A description of amendments to current law that would be necessary to implement the legislative proposal described under paragraph (1).

10 USC 7448
note.

(b) REPORT REQUIRED.—Not later than March 1, 2024, and annually thereafter, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a report that includes the following information:
(1) The name, covered Armed Force, and sport of each Service Academy graduate released or deferred from active service in order to participate in professional sports.
(2) A description of the sports career progress of each participant, such as drafted, signed, released, or returned to service in a covered Armed Force.

(3) A summary by participant of marketing strategy and recruiting related activities conducted.

(4) A description by participant of the assessments conducted by the military services to determine the recruiting value associated with approved releases from active duty.

(5) The current status of each participant, including, as appropriate, affiliated franchise.

(c) DEFINITIONS.—In this section:

(1) The term "covered Armed Force" means the Army, Navy, Air Force, Marine Corps, or Space Force.

(2) The term "Service Academy" has the meaning given such term in section 347 of title 10, United States Code.

*Margin notes: Summary. / Assessments. Determination.*

### SEC. 565. BRIEFING ON INCLUSION OF ADVANCED RESEARCH PROGRAMS AT CERTAIN INSTITUTIONS OF PROFESSIONAL MILITARY EDUCATION.

Not later than April 1, 2024, the President of the National Defense University, the Commandant of the United States Army Command and General Staff College, the Commandant of the Army War College, the President of the Naval War College, and the Commander of the Air University shall each provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on—

(1) the current requirements and outcomes for wargaming and force structure recommendations resulting from activities conducted under existing advanced research programs; and

(2) the feasibility and advisability of establishing a permanent advanced research program at the institution of professional military education concerned.

*Margin notes: Deadline. / Recommendations.*

# Subtitle H—Member Training and Transition

### SEC. 571. AMENDMENTS TO PATHWAYS FOR COUNSELING IN THE TRANSITION ASSISTANCE PROGRAM.

Section 1142(c)(1) of title 10, United States Code, is amended—

(1) in subparagraph (E), by striking "Disability" and inserting "Potential or confirmed disability"; and

(2) in subparagraph (F), by striking "Character" and inserting "Potential or confirmed character".

### SEC. 572. SKILLBRIDGE: STAFFING; BUDGETING; OUTREACH; REPORT.

(a) IN GENERAL.—Section 1143(e) of title 10, United States Code is amended—

(1) in paragraph (1)—

(A) by inserting "(A)" before "The Secretary concerned"; and

(B) by adding at the end the following new subparagraph:

"(B) The Secretary of a military department shall carry out one or more programs under this subsection.";

(2) by redesignating paragraphs (3) and (4) as paragraphs (5) and (6), respectively; and

(3) by inserting after paragraph (2) the following new paragraphs:

"(3) To carry out this subsection, the Secretary concerned shall—

"(A) assign not fewer than two full-time equivalent positions; and

*Funding plans.*

"(B) develop for each fiscal year a funding plan that includes funding lines across the future-years defense program under section 221 of this title.

"(4) For any program under this subsection, the Secretary concerned shall, on an annual basis—

"(A) circulate, to members serving on active duty under the jurisdiction of such Secretary concerned, information about the program (including eligibility requirements and the application process); and

"(B) conduct outreach to inform potential employers about Skillbridge, participating members, and how the program operates, and to increase the number of, and types of, employers that hire program participants.".

(b) GAO REPORT.—Not later than July 1, 2024, the Comptroller General of the United States shall submit to the Committees on Armed Services of the Senate and House of Representatives a report regarding Skillbridge. Such report shall include the following:

(1) The extent to which members of the Armed Forces have participated in the Skillbridge program, including the characteristics of such personnel and completed internships.

*Processes.*

(2) The process by which the Secretary of Defense determines that a member of the Armed Forces is eligible to participate in Skillbridge.

(3) The extent to which the process described in paragraph (2) and guidance prescribed by the Secretary regarding Skillbridge incorporate relevant Federal ethics rules regarding internships.

*Time periods.*

(4) The number of members, disaggregated by rank, who participated in Skillbridge in each of fiscal years 2019 through 2023.

(5) The number of members described in paragraph (4) who received full-time offers of employment from the participating employer upon completion of an internship under Skillbridge.

(6) Any other information the Comptroller General determines appropriate.

**SEC. 573. EXTENSION OF TROOPS-TO-TEACHERS PROGRAM TO THE JOB CORPS.**

Section 1154 of title 10, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (2)—

(i) in subparagraph (A)(ii), by striking "; or" and inserting a semicolon;

(ii) in subparagraph (B), by striking the period at the end and inserting "; or"; and

(iii) by adding at the end the following new subparagraph:

"(C) a Job Corps center as defined in section 147 of the Workforce Innovation and Opportunity Act (29 U.S.C. 3197)."; and

(B) in paragraph (3)—

(i) in subparagraph (B), by striking "; or" and inserting a semicolon;

(ii) in subparagraph (C), by striking the period at the end and inserting "; or"; and

(iii) by adding at the end the following new subparagraph:

"(D) a Job Corps center as defined in section 147 of the Workforce Innovation and Opportunity Act (29 U.S.C. 3197).";

(2) in subsection (d)(4)(A)(ii), by inserting "or Job Corps centers" after "secondary schools"; and

(3) in subsection (e)(2)(E), by inserting "or Job Corps center" after "secondary school".

## SEC. 574. TROOPS-TO-TEACHERS PROGRAM: EXPANSION; EXTENSION.

Section 1154 of title 10, United States Code, as amended by section 573, is further amended—

(1) in subsection (b)(2)—

(A) in subparagraph (A)(ii), by striking "; and" and inserting a semicolon;

(B) in subparagraph (B), by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following new subparagraph:

"(C) as administrators and instructors of the Junior Reserve Officers' Training Corps under section 2031(d) of this title."; and

(2) in subsection (k), by striking "2025" and inserting "2027".

## SEC. 575. LANGUAGE TRAINING CENTERS FOR MEMBERS OF THE ARMED FORCES AND CIVILIAN EMPLOYEES OF THE DEPARTMENT OF DEFENSE.

Section 529 of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84; 10 U.S.C. 2001 note prec.) is amended—

(1) in subsection (a), by striking "may carry out a program" and inserting "shall carry out a program";

(2) by redesignating subsection (e) as subsection (f);

(3) by inserting after subsection (d) the following new subsection:

"(e) CONTRACT AUTHORITY.—The Secretary of Defense may enter into one or more contracts, cooperative agreements, or grants with private national organizations having an expertise in foreign languages, area studies, and other international fields, for the awarding of grants to accredited universities, senior military colleges, or other similar institutions of higher education to establish and maintain language training centers authorized by subsection (a)."; and

<div style="float:right">Grants.</div>

(4) in subsection (f), as redesignated by paragraph (2)—

(A) by striking "one year after the date of the establishment of the program authorized by subsection (a)" and inserting "180 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024";

(B) by striking "report on the program" and inserting "report on the Language Training Center program";

(C) by redesignating paragraph (4) as paragraph (5);

(D) by inserting after paragraph (3) the following new paragraph:

Assessment.
Time period.

"(4) An assessment of the resources required to carry out the Language Training Center program by year through fiscal year 2027."; and

(E) in paragraph (5), as redesignated by subparagraph (C), by striking "A recommendation whether the program should be continued and, if so, recommendations as to any modifications of the program" and inserting "Recommendations as to any modifications to the Language Training Center program".

### SEC. 576. PROHIBITION ON USE OF FEDERAL FUNDS TO ENDORSE CRITICAL RACE THEORY.

(a) PROHIBITION.—No funds authorized to be appropriated by this Act may be used to endorse critical race theory—

(1) at an academic institution operated by the Department of Defense;

(2) in training provided to a member of the Armed Forces; or

(3) in professional military education.

(b) PROTECTION OF ACADEMIC FREEDOM.—Nothing in this section shall be construed to supersede the institutional autonomy or academic freedom of instructors involved in the selection of textbooks, supplemental materials, or other classroom materials, or in the preparation or presentation of classroom instruction or lectures.

(c) DEFINITIONS.—In this section, the term "critical race theory" means the theory that individuals, by virtue of race, ethnicity, color, or national origin, bear collective guilt and are inherently responsible for actions committed in the past by other individuals of such race, ethnicity, color, or national origin.

Deadlines.
10 USC 7013
note.

### SEC. 577. INCREASED FITNESS STANDARDS FOR ARMY CLOSE COMBAT FORCE MILITARY OCCUPATIONAL SPECIALTIES.

(a) IMPLEMENTATION.—Not later than 18 months after the date of the enactment of this Act, the Secretary of the Army shall implement increased minimum fitness standards as part of the Army Combat Fitness Test for all soldiers of the following military occupational specialties or areas of concentration:

(1) 11A.
(2) 11B.
(3) 11C.
(4) 11Z.
(5) 12A.
(6) 12B.
(7) 13A.
(8) 13F.
(9) 18A.
(10) 18B.
(11) 18C.
(12) 18D.
(13) 18E.
(14) 18F.
(15) 18Z.
(16) 19A.
(17) 19C.
(18) 19D.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 279

(19) 19K.
(20) 19Z.

(b) BRIEFING.—Not later than 365 days after the date of the enactment of this Act, the Secretary of the Army provide a briefing to the Committees on Armed Services of the Senate and House of Representatives describing the methodology used to establish standards under subsection (a).

### SEC. 578. PUBLICATION OF TRAINING MATERIALS OF THE DEFENSE EQUAL OPPORTUNITY MANAGEMENT INSTITUTE.

Deadline.

Not later than September 30, 2024, the Secretary of Defense shall publish all materials created by the Defense Equal Opportunity Management Institute for the purpose of training members of the Armed Forces on the website of such Institute.

### SEC. 579. PROHIBITION ON FEDERAL FUNDS FOR THE DEPARTMENT OF DEFENSE COUNTERING EXTREMISM WORK GROUP.

No funds authorized to be appropriated by this Act may be used to fund the Department of Defense Countering Extremism Working Group established by the Secretary of Defense memorandum on April 9, 2021.

# Subtitle I—Family Programs, Child Care, and Dependent Education

### SEC. 581. NON-MEDICAL COUNSELING SERVICES FOR MILITARY FAMILIES.

Section 1781 of title 10, United States Code, is amended by adding at the end the following new subsection:

"(d) NON-MEDICAL COUNSELING SERVICES.—(1) In carrying out its duties under subsection (b), the Office may coordinate programs and activities to provide non-medical counseling services to military families through the Department of Defense Military and Family Life Counseling Program.

"(2) A mental health care professional described in paragraph (3) may provide non-medical counseling services at any location in a State, the District of Columbia, or a territory or possession of the United States, without regard to where the professional or recipient of such services is located or delivery of such services is provided (including face-to-face and telehealth), if the provision of such services is within the scope of the authorized Federal duties of the professional.

"(3) A non-medical mental health professional described in this subsection is a person who is—

"(A) a currently licensed mental health care provider who holds a license that is—

"(i) issued by a State, the District of Columbia, or a territory or possession of the United States; and

"(ii) recognized by the Secretary of Defense as an appropriate license for the provision of non-medical counseling services;

"(B) a member of the armed forces, a civilian employee of the Department of Defense, or a contractor designated by the Secretary; and

"(C) performing authorized duties for the Department of Defense under a program or activity referred to in paragraph (1).

Termination date.

"(4) The authority under this subsection shall terminate three years after the date of the enactment of this subsection.

Definition.

"(5) In this subsection, the term 'non-medical counseling services' means mental health care services that are non-clinical, short-term and solution focused, and address topics related to personal growth, development, and positive functioning.".

## SEC. 582. INCREASE IN THE TARGET FUNDING LEVEL FOR MILITARY CHILD CARE.

Section 1791 of title 10, United States Code, is amended, in subsection (a), by inserting "115 percent of" after "not less than".

## SEC. 583. MODIFICATIONS TO ASSISTANCE TO LOCAL EDUCATIONAL AGENCIES THAT BENEFIT DEPENDENTS OF MEMBERS OF THE ARMED FORCES WITH ENROLLMENT CHANGES DUE TO BASE CLOSURES, FORCE STRUCTURE CHANGES, OR FORCE RELOCATIONS.

(a) IN GENERAL.—Section 575 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 20 U.S.C. 7703d) is amended—

(1) in subsection (a)—

(A) by striking "year, the local educational agency" and all that follows through "(as determined" and inserting "year, the local educational agency had (as determined";

(B) by striking paragraph (2);

(C) by redesignating subparagraphs (A) and (B) as paragraphs (1) and (2), respectively, and by moving such paragraphs, as so redesignated, two ems to the left; and

(D) in paragraph (2), as redesignated by subparagraph (C), by striking "; or" and inserting a period;

(2) by striking subsection (h); and

(3) by redesignating subsections (i) and (j) as subsections (h) and (i), respectively.

Deadline.

(b) BRIEFING REQUIRED.—Not later than March 1, 2024, the Director of the Department of Defense Education Activity shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on—

(1) any additional authorities that would be helpful to the Activity in its efforts to better support local educational agencies; and

(2) the amounts and types of any financial assistance provided to local educational agencies under section 575 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 20 U.S.C. 7703d) as of the date of the briefing.

## SEC. 584. CERTAIN ASSISTANCE TO LOCAL EDUCATIONAL AGENCIES THAT BENEFIT DEPENDENTS OF MILITARY AND CIVILIAN PERSONNEL.

(a) CONTINUATION OF AUTHORITY TO ASSIST LOCAL EDUCATIONAL AGENCIES THAT BENEFIT DEPENDENTS OF MEMBERS OF THE ARMED FORCES AND DEPARTMENT OF DEFENSE CIVILIAN EMPLOYEES.—

(1) ASSISTANCE TO SCHOOLS WITH SIGNIFICANT NUMBERS OF MILITARY DEPENDENT STUDENTS.—Of the amount authorized

to be appropriated for fiscal year 2024 by section 301 and available for operation and maintenance for Defense-wide activities as specified in the funding table in section 4301, $50,000,000 shall be available only for the purpose of providing assistance to local educational agencies under subsection (a) of section 572 of the National Defense Authorization Act for Fiscal Year 2006 (Public Law 109–163; 20 U.S.C. 7703b).

(2) LOCAL EDUCATIONAL AGENCY DEFINED.—In this subsection, the term "local educational agency" has the meaning given that term in section 7013(9) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7713(9)).

(b) IMPACT AID FOR CHILDREN WITH SEVERE DISABILITIES.— *Payments.*

(1) IN GENERAL.—Of the amount authorized to be appropriated for fiscal year 2024 pursuant to section 301 and available for operation and maintenance for Defense-wide activities as specified in the funding table in section 4301, $10,000,000 shall be available for payments under section 363 of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001 (as enacted into law by Public Law 106–398; 114 Stat. 1654A–77; 20 U.S.C. 7703a).

(2) ADDITIONAL AMOUNT.—Of the amount authorized to be appropriated for fiscal year 2024 pursuant to section 301 and available for operation and maintenance for Defense-wide activities as specified in the funding table in section 4301, $10,000,000 shall be available for use by the Secretary of Defense to make payments to local educational agencies determined by the Secretary to have higher concentrations of military children with severe disabilities.

(3) BRIEFING.—Not later than March 31, 2024, the Secretary shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the Secretary's evaluation of each local educational agency with higher concentrations of military children with severe disabilities and the subsequent determination of the Secretary with respect to the amounts of impact aid each such agency shall receive. *Deadline. Evaluation. Determination.*

## SEC. 585. OUTREACH CAMPAIGN RELATING TO WAITING LISTS FOR MILITARY CHILD DEVELOPMENT CENTERS; ANNUAL BRIEFING.

*10 USC note prec. 1791.*

(a) IN GENERAL.—The Secretary of Defense, in coordination with the Secretaries of the military departments, shall develop a campaign to conduct outreach, not less than once every six months, to inform individuals eligible for child care services under chapter 88 of title 10, United States Code, including child care employees— *Time period.*

(1) how to—

(A) join a waiting list for child care services at a military child development center; and

(B) check the position of such an individual on such waiting list; and

(2) of—

(A) what factors affect positions on such waiting list;

(B) the process to prioritize such individuals to receive child care services at a military child development center;

(C) the fee schedule for child care services at a military child development center; and

137 STAT. 282          PUBLIC LAW 118–31—DEC. 22, 2023

(D) options for child care services available to such individuals other than military child development centers, including pilot programs at the duty station of such member, if applicable.

Deadline.
Time period.

(b) ANNUAL BRIEFING.—Not later than 90 days after the date of the enactment of this Act, and on an annual basis thereafter for five years, the Secretary of Defense, in coordination with the Secretaries of the military departments, shall submit to the Committees on Armed Services of the House of Representatives and the Senate a briefing that includes, for each military department—

List.

(1) a list of the five military installations with the longest waiting lists for child care services at military child development centers; and

(2) the number of classrooms for child care services, disaggregated by military installation, closed during the period covered by the briefing due to—

(A) insufficient staffing; or

(B) issues relating to maintenance.

(c) DEFINITIONS.—In this section, the terms "child care employee" and "military child development center" have the meanings given such terms in section 1800 of title 10, United States Code.

## SEC. 586. BRIEFINGS ON PILOT PROGRAM ON HIRING OF SPECIAL NEEDS INCLUSION COORDINATORS FOR DEPARTMENT OF DEFENSE CHILD DEVELOPMENT CENTERS.

Section 576(d) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 1792 note) is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by inserting, after paragraph (1) the following new paragraph (2):

Effective date.

"(2) BRIEFINGS ON IMPLEMENTATION.—Beginning on January 31, 2024, until the termination of the pilot program, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a biannual briefing on the implementation of the pilot program. Each such briefing shall include the following:

Processes.

"(A) The process for selecting child development centers under subsection (b).

"(B) How a special needs inclusion coordinator hired under the pilot program coordinates with the head of the child development center concerned and the commander of the military installation concerned.

"(C) How many special needs inclusion coordinators have been hired under the pilot program.".

## SEC. 587. BRIEFINGS ON IMPLEMENTATION OF UNIVERSAL PRE-KINDERGARTEN PROGRAMS IN SCHOOLS OPERATED BY THE DEPARTMENT OF DEFENSE EDUCATION ACTIVITY.

Deadline.
Time period.

(a) QUARTERLY BRIEFINGS REQUIRED.—Not later than January 30, 2024, and on a quarterly basis thereafter until December 31, 2027, the Secretary of Defense shall submit to the committees on Armed Services of the Senate and the House of Representatives a briefing on the progress of the Secretary in implementing universal pre-kindergarten programs in schools operated by the Department of Defense Education Activity.

(b) CONTENTS OF INITIAL BRIEFING.—The initial briefing under subsection (a) shall include—

(1) identification of all locations under the jurisdiction of the Department of Defense at which universal pre-kindergarten programs and child development centers are co-located; and

(2) an estimate of the number of children expected to transfer from child development centers to pre-kindergarten programs as a result of such programs being offered.

*Estimate.*

(c) CONTENTS OF SUBSEQUENT BRIEFINGS.—Following the initial briefing under subsection (a), each subsequent briefing shall include—

(1) the total anticipated costs of funding universal pre-kindergarten programs in schools operated by the Department of Defense Education Activity;

*Costs.*

(2) the estimated differential between the cost of caring for a child in a child development center versus the cost of a child's participation in a pre-kindergarten program;

*Cost estimate.*

(3) the estimated differential between the costs of employing caregivers in child development centers versus the costs of employing teachers in pre-kindergarten programs;

*Cost estimate.*

(4) the child-to-caregiver ratio requirements for child development centers versus the child-to-teacher ratio requirements for pre-kindergarten programs;

(5) a needs assessment of facilities for universal pre-kindergarten programs based on anticipated capacity;

*Assessment.*

(6) an assessment of the availability of teachers for pre-kindergarten programs; and

*Assessment.*

(7) an indication of whether, and to what extent, members of the Armed Forces have expressed a preference for enrolling their children in pre-kindergarten programs rather than continuing care for such children in child development centers.

## SEC. 588. REPORT ON MENTAL HEALTH AND WELLNESS SUPPORT FOR STUDENTS ENROLLED IN SCHOOLS OPERATED BY THE DEPARTMENT OF DEFENSE EDUCATION ACTIVITY.

(a) IN GENERAL.—Not later than December 1, 2024, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on programs and policies to support mental health and wellness among students in schools operated by the Department of Defense Education Activity (referred to in this section as "DODEA Schools").

(b) ELEMENTS.—The report required under subsection (a) shall include the following:

(1) A description of the mental health and wellness resources available to students enrolled in DODEA schools.

(2) An overview of policies and procedures in place in DODEA schools to ensure that students are regularly screened for mental health and wellness.

*Overview.*

(3) An overview of policies and procedures in place in DODEA schools for administrators and teachers to communicate and coordinate with parents and guardians of students in such schools in cases in which students have a demonstrated need for mental health and wellness support.

*Overview.*

(4) Any recommendations for new policies, programs, or resources to improve mental health and wellness support for students enrolled in DODEA schools.

*Recommendations.*

137 STAT. 284         PUBLIC LAW 118–31—DEC. 22, 2023

Assessment.

(5) An assessment of the feasibility and advisability of conducting a pilot program to detail licensed medical health care providers under the control of the Defense Health Agency to DODEA schools in order to improve mental health and wellness care for students enrolled in such schools.

(6) Any other matters the Secretary of Defense determines to be relevant and appropriate for inclusion in the report.

(c) MENTAL HEALTH AND WELLNESS CONSIDERATIONS.—In considering student mental health and wellness for purposes of this section, the Secretary of Defense shall, at a minimum, take into account the following conditions:

(1) Depression.
(2) Suicidal ideation.
(3) Anxiety.
(4) Attention-deficit/hyperactivity disorder (ADHD).
(5) Eating disorders.
(6) Substance abuse.
(7) Dual diagnosis conditions.

### SEC. 589. RIGHTS OF PARENTS OF CHILDREN ATTENDING SCHOOLS OPERATED BY THE DEPARTMENT OF DEFENSE EDUCATION ACTIVITY.

(a) ESTABLISHMENT.—Chapter 108 of title 10, United States Code, is amended by inserting after section 2164 the following new section:

10 USC prec. 2161.

10 USC 2164a.

### "§ 2164a. Rights of parents of children attending schools operated by the Department of Defense Education Activity

"(a) IN GENERAL.—The parent of a child who attends a school operated by the Department of Defense Education Activity has the following rights:

"(1) The right to review the curriculum of the school.

"(2) The right to be informed if the school or the Department of Defense Education Activity alters the school's academic standards or learning benchmarks.

"(3) The right to meet with each teacher of their child not less than twice during each school year.

"(4) The right to review all instructional materials used by their students.

"(5) The right to inspect a list of the books and other reading materials contained in the library of the school.

"(6) The right to address the school advisory committee or the school board.

"(7) The right to data about the school's discipline policy and any disciplinary action that results in a suspension or expulsion from the school, unless such disclosure is prohibited by law.

"(8) The right to information about any plans to eliminate gifted and talented programs or accelerated coursework at the school.

"(b) DISCLOSURES AND NOTIFICATIONS.—Consistent with the parental rights specified in subsection (a) and except as provided by subsection (c), a school operated by the Department of Defense Education Activity shall—

Public information. Web posting. Curriculum.

"(1) post on a publicly accessible website of the school—

"(A) the curriculum for each course and grade level;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 285

"(B) the academic standards or other learning bench-       Standards.
marks used by the school; and
"(C) notice of any proposed revisions to such standards     Notice.
or benchmarks and a copy of any such revisions;            Records.
"(2) provide the parent of a child attending the school
with—
"(A) the opportunity to meet in person with each
teacher of their child not less frequently than twice during
each school year at a time mutually agreed upon by both
parties; and
"(B) notice of such opportunity at the beginning of     Notice.
each school year;
"(3) provide parents access to the online school library
catalog;
"(4) notify parents in a timely manner of any plans to
eliminate gifted and talented programs or accelerated
coursework at the school;
"(5) except as provided by paragraph (6) or subsection
(c), notify parents of any medical examinations or screenings
the school may administer to their child and receive written
consent from parents for any such examination or screening
prior to conducting the examination or screening;
"(6) in the event of an emergency that requires a medical
examination or screening without time for parental notification,
promptly notify parents of such examination or screening and
provide an explanation of the emergency that prevented
notification prior to such examination or screening; and
"(7) notify parents of any medical information that will
be collected on their child, receive written parental consent
prior to collecting such information, and provide parents an
opportunity to inspect such information at the parent's request.
"(c) EXCEPTIONS.—(1) Paragraph (5) of subsection (a) and para-     Effective date.
graph (3) of subsection (b) shall not be effective until the day
that is two years after the date of the enactment of the National
Defense Authorization Act for Fiscal Year 2024.
"(2) A requirement set forth in subsection (b) shall not apply
in a case in which the requirement would violate any applicable
provision of a Federal or State statute or regulation.
"(d) SCHOOL ADVISORY COMMITTEES AND BOARDS.—Not less     Time period.
frequently than four times per year, a school advisory committee
or school board for a school operated by the Department of Defense
Education Activity shall provide parents of children attending the
school with the opportunity to address the advisory committee
or school board on any matters relating to the school or the edu-
cational services provided to their children.
"(e) DEFINITIONS.—In this section:
"(1) The term 'medical examination or screening'—
"(A) means a physical examination provided by a
health care provider; and
"(B) does not include an evaluation by, or an encounter
with, non-clinical school staff.
"(2) The term 'school' means—
"(A) a Department of Defense domestic dependent
elementary or secondary school, as described in section
2164 of this title; or

137 STAT. 286          PUBLIC LAW 118–31—DEC. 22, 2023

"(B) any elementary or secondary school or program for dependents operated by the Department of Defense Education Activity.".

(b) REPORT.—Not later than 30 days after the date of the enactment of this Act and consistent with section 2164a of title 10, United States Code, as added by subsection (a), the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the parental rights specified in such section. The report shall include, with respect to the schools operated by the Department of Defense Education Activity, an explanation of—

(1) how and where a parent may access information about their rights;

(2) the accessibility of that information;

(3) how such schools inform parents of their rights and the means to access such rights; and

(4) the uniformity of parental rights across such schools.

# Subtitle J—Decorations and Awards and Other Personnel Matters, Reports, and Briefings

### SEC. 591. ARMED FORCES WORKPLACE SURVEYS.

Subsection (c) of section 481 of title 10, United States Code, is amended—

(1) by redesignating paragraphs (3), (4), and (5) as paragraphs (4), (5), and (6), respectively; and

(2) by inserting after paragraph (2) the following new paragraph:

"(3) Indicators of the assault (including unwanted sexual contact) that give reason to believe that the victim was targeted, or discriminated against, or both, for a status in a group.".

### SEC. 592. DUE DATE FOR REPORT ON EFFORTS TO PREVENT AND RESPOND TO DEATHS BY SUICIDE IN THE NAVY.

Section 599A(c) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended by striking "180 days after the date of the enactment of this Act" and inserting "September 30, 2024".

### SEC. 593. EXTENSION OF DEADLINE FOR REVIEW OF WORLD WAR I VALOR MEDALS.

Section 584(f) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 7271 note) is amended by striking "six years after the date of the enactment of this Act" and inserting "December 31, 2028".

10 USC 8013 note.

### SEC. 594. DIGITAL AMBASSADOR PROGRAM OF THE NAVY: CESSATION; REPORT; RESTART.

Notification.

(a) CESSATION.—The Secretary of the Navy shall cease all activities of the digital ambassador program of the Office of Information of the Department of the Navy. The Secretary shall notify each individual designated as a digital ambassador of such cessation and that the individual is not authorized to act as a digital ambassador of the Navy.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 287

(b) RESTART.—The Secretary may not restart such program until 60 days after the date on which the Secretary submits to the Committees on Armed Services of the Senate and House of Representatives a report containing the following:

(1) All policies and documents of the program.

Policies.

(2) The number of digital ambassadors designated.

(3) The process and criteria for such designation.

Processes.
Criteria.

(4) The duties of a digital ambassador.

(5) The online platforms (including social media) on which an individual is authorized under such program to perform duties of a digital ambassador.

(6) The determination of the Secretary that such program complies with applicable laws, regulations, and guidance.

Determination.
Compliance.

# TITLE VI—COMPENSATION AND OTHER PERSONNEL BENEFITS

Subtitle A—Basic Pay, Retired Pay, and Leave

Sec. 601. Parental leave parity for members of certain reserve components of the Armed Forces.
Sec. 602. Pay of members of reserve components for inactive-duty training to obtain or maintain an aeronautical rating or designation.
Sec. 603. Expansion of authority to pay a member of the Armed Forces who is absent without leave or over leave for such absence.

Subtitle B—Bonus and Incentive Pays

Sec. 611. Expansion of continuation pay eligibility.
Sec. 612. Modification of special and incentive pay authorities for members of reserve components.
Sec. 613. One-year extension of certain expiring bonus and special pay authorities.
Sec. 614. Authorization of monthly bonus pay for a junior member of the uniformed services during calendar year 2024.
Sec. 615. Determination of cold weather location for purposes of special duty pay.
Sec. 616. Feasibility study regarding assignment incentive pay for members of the Air Force assigned to remotely piloted aircraft.

Subtitle C—Allowances

Sec. 621. Modification of calculation of gross household income for basic needs allowance to address areas of demonstrated need.
Sec. 622. Improved calculation of basic allowance for housing for junior enlisted members.
Sec. 623. Basic allowance for housing for members assigned to vessels undergoing maintenance.
Sec. 624. Dual basic allowance for housing for training.
Sec. 625. Cost-of-living allowance in the continental United States: high cost areas.
Sec. 626. Family separation allowance: increase; review.
Sec. 627. OCONUS cost-of-living allowance: adjustments.
Sec. 628. Extension of one-time uniform allowance for officers who transfer to the Space Force.

Subtitle D—Family and Survivor Benefits

Sec. 631. Modifications to transitional compensation for dependents of members separated for dependent abuse.
Sec. 632. Lodging expenses for dependents of members separated for dependent abuse.
Sec. 633. Access to commissary and exchange privileges for remarried surviving spouses.
Sec. 634. Assistance for military spouses to obtain certifications as doulas and International Board Certified Lactation Consultants.
Sec. 635. Expansion of qualifying events for which a member of the uniformed services may be reimbursed for spousal relicensing or business costs due to the member's relocation.

# Subtitle A—Basic Pay, Retired Pay, and Leave

### SEC. 601. PARENTAL LEAVE PARITY FOR MEMBERS OF CERTAIN RESERVE COMPONENTS OF THE ARMED FORCES.

(a) PARENTAL LEAVE.—

(1) IN GENERAL.—Chapter 40 of title 10, United States Code, is amended by inserting after section 710 the following new section:

10 USC 711.

## "§ 711. Parental leave for members of certain reserve components of the armed forces

Regulations. Time period.

"(a)(1) Under regulations prescribed by the Secretary of Defense, a member of a reserve component of the armed forces described in subsection (b) is allowed parental leave for a duration of up to 12 inactive-duty training periods, under section 206 of title 37, during the one-year period beginning after the following events:

"(A) the birth or adoption of a child of the member and to care for such child; or

"(B) the placement of a minor child with the member for adoption or long-term foster care.

"(2)(A) The Secretary concerned, under uniform regulations to be prescribed by the Secretary of Defense, may authorize leave described under subparagraph (A) to be taken after the one-year period described in subparagraph (A) in the case of a member described in subsection (b) who, except for this subparagraph, would lose unused parental leave at the end of the one-year period described in subparagraph (A) as a result of—

"(i) operational requirements;

"(ii) professional military education obligations; or

"(iii) other circumstances that the Secretary determines reasonable and appropriate.

Requirement. Determination.

"(B) The regulations prescribed under clause (i) shall require that any leave authorized to be taken after the one-year period described in subparagraph (A) shall be taken within a reasonable period of time, as determined by the Secretary of Defense, after cessation of the circumstances warranting the extended deadline.;

"(b) A member described in this subsection is a member of the Army, Navy, Marine Corps, Air Force, or Space Force who is a member of—

"(1) the selected reserve who is entitled to compensation under section 206 of title 37; or

"(2) the individual ready reserve who is entitled to compensation under section 206 of title 37 when attending or participating in a sufficient number of periods of inactive-duty training during a year to count the year as a qualifying year of creditable service toward eligibility for retired pay.".

10 USC prec. 701.

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 40 of such title is amended by inserting after the item relating to section 710 the following new item:

"711. Parental leave for members of the reserve component of the armed forces.".

(b) COMPENSATION.—Section 206(a) of title 37, United States Code, is amended by amending paragraph (4) to read as follows:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 289

"(4) for a regular period of instruction, period of appropriate duty, or such other equivalent training that a member would be required to perform but does not perform because such member was authorized to take parental leave pursuant to section 711 of title 10.".

(c) CONTRIBUTION OF LEAVE TOWARD ENTITLEMENT TO RETIRED PAY.—Section 12732(a)(2)(G) of title 10, United States Code, is amended by striking "12 per period" and all that follows through the end of the sentence and inserting the following: "1 per inactive-duty training period, under section 206 of title 37, during which the member is on parental leave under section 711 of this title.".

(d) CREDIT FOR RETIRED PAY PURPOSES.—Section 602(b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 12732 note) is amended—

(1) in paragraph (1), by striking "maternity leave" and all that follows through "birth of a child" and inserting "parental leave described in section 12732(a)(2)(G) of title 10, United States Code, taken by a member of the reserve components of the Armed Forces";

(2) in paragraph (2), by striking "maternity leave" and all that follows through "childbirth event" and inserting "parental leave taken by the member"; and

(3) in paragraph (3), by striking "maternity leave" each place it appears and inserting "parental leave".

(e) EFFECTIVE DATE.—This section and the amendments made by this section shall take effect on October 1, 2024, and apply with respect to periods of parental leave that commence on or after such date.

10 USC 711 note.

SEC. 602. PAY OF MEMBERS OF RESERVE COMPONENTS FOR INACTIVE-DUTY TRAINING TO OBTAIN OR MAINTAIN AN AERONAUTICAL RATING OR DESIGNATION.

(a) IN GENERAL.—Chapter 3 of title 37, United States Code, is amended by inserting after section 206 the following new section:

## "§ 206a. Pay of members of reserve components for inactive-duty training to obtain or maintain an aeronautical rating or designation

37 USC 206a.

"Under regulations prescribed by the Secretary concerned, a member of the National Guard or a member of a reserve component of a uniformed service who is receiving aviation incentive pay under section 334(a) of this title and is entitled to compensation under section 206 of this title is entitled to such compensation for a number of periods of inactive-duty training each month sufficient for the member to obtain or maintain an aeronautical rating or designation.".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 3 of such title is amended by inserting after the item relating to section 206 the following new item:

37 USC prec. 201.

"206a. Pay of members of reserve components for inactive-duty training to obtain or maintain an aeronautical rating or designation.".

SEC. 603. EXPANSION OF AUTHORITY TO PAY A MEMBER OF THE ARMED FORCES WHO IS ABSENT WITHOUT LEAVE OR OVER LEAVE FOR SUCH ABSENCE.

Section 503(a) of title 37, United States Code, is amended—

137 STAT. 290          PUBLIC LAW 118–31—DEC. 22, 2023

(1) by striking "A member" and inserting "(1) Subject to paragraph (2), a member"; and

(2) by adding at the end the following new paragraph (2):

Determination.

"(2)(A) In the case of a member of the Army, Navy, Air Force, Marine Corps, Space Force, or Coast Guard when it is operating as service in the Department of the Navy, the Secretary of Defense may determine to pay the pay and allowances described in paragraph (1).

"(B) The Secretary may not delegate the authority to make a determination under subparagraph (A).

Reports.

"(C) Not later than 30 days after determining to pay any pay or allowance under subparagraph (A), the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives a report regarding such determination.".

# Subtitle B—Bonus and Incentive Pays

### SEC. 611. EXPANSION OF CONTINUATION PAY ELIGIBILITY.

(a) CONTINUATION PAY: FULL TSP MEMBERS WITH 8 TO 12 YEARS OF SERVICE.—Section 356 of title 37, United States Code, is amended—

(1) in the section heading, by striking "**8**" and inserting "**7**"; and

(2) in subsections (a)(1) and (d), by striking "8" and inserting "7".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 5 of such title is amended by striking the item relating to section 356 and inserting the following new item:

37 USC
prec. 301.

"356. Continuation pay: full TSP members with 7 to 12 years of service.".

### SEC. 612. MODIFICATION OF SPECIAL AND INCENTIVE PAY AUTHORITIES FOR MEMBERS OF RESERVE COMPONENTS.

(a) IN GENERAL.—Section 357 of title 37, United States Code, is amended—

(1) by striking "incentive pay" and inserting "special or incentive pay";

(2) by striking the period at the end and inserting "if the Secretary concerned is paying the member of the reserve component the special or incentive pay for the purpose of—"; and

(3) by adding at the end the following:

"(1) maintaining a skill certification or proficiency identical to a skill certification or proficiency required of the member in the regular component; or

"(2) compensating the member of the reserve component for exposure to hazards or risks identical to hazards or risks to which the member in the regular component was exposed.".

(b) CONFORMING AND CLERICAL AMENDMENTS.—

(1) CONFORMING AMENDMENT.—The section heading for section 357 of title 37, United States Code, is amended by striking "**Incentive**" and inserting "**Special and incentive**".

(2) CLERICAL AMENDMENT.—The table of sections for chapter 5 of such title is amended by striking the item relating to section 357 and inserting the following new item:

37 USC prec. 301.

"357. Special and incentive pay authorities for members of the reserve components of the armed forces.".

(c) MODIFICATION OF IMPLEMENTATION DETERMINATION.—Section 602(d) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 37 U.S.C. 357 note) is amended—

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and by moving such subparagraphs, as so redesignated, two ems to the right;

(2) by striking "The Secretary may" and inserting the following:

"(1) IN GENERAL.—The Secretary shall";

(3) in subparagraph (A), as redesignated by paragraph (1), by striking "subsection (b)" and inserting "subsection (c)"; and

(4) by adding at the end the following new paragraph:

"(2) EVALUATION OF TYPES OF SPECIAL AND INCENTIVE PAY.—In making the determination and certification described in paragraph (1)(B), the Secretary shall evaluate each type or category of special and incentive pay separately and may make the determination and certification based on the effect on an Armed Force concerned of a particular type or category of special or incentive pay.".

Evaluation.

### SEC. 613. ONE-YEAR EXTENSION OF CERTAIN EXPIRING BONUS AND SPECIAL PAY AUTHORITIES.

(a) AUTHORITIES RELATING TO RESERVE FORCES.—Section 910(g) of title 37, United States Code, relating to income replacement payments for reserve component members experiencing extended and frequent mobilization for active duty service, is amended by striking "December 31, 2023" and inserting "December 31, 2024".

(b) TITLE 10 AUTHORITIES RELATING TO HEALTH CARE PROFESSIONALS.—The following sections of title 10, United States Code, are amended by striking "December 31, 2023" and inserting "December 31, 2024":

(1) Section 2130a(a)(1), relating to nurse officer candidate accession program.

(2) Section 16302(d), relating to repayment of education loans for certain health professionals who serve in the Selected Reserve.

(c) AUTHORITIES RELATING TO NUCLEAR OFFICERS.—Section 333(i) of title 37, United States Code, is amended by striking "December 31, 2023" and inserting "December 31, 2024".

(d) AUTHORITIES RELATING TO TITLE 37 CONSOLIDATED SPECIAL PAY, INCENTIVE PAY, AND BONUS AUTHORITIES.—The following sections of title 37, United States Code, are amended by striking "December 31, 2023" and inserting "December 31, 2024":

(1) Section 331(h), relating to general bonus authority for enlisted members.

(2) Section 332(g), relating to general bonus authority for officers.

(3) Section 334(i), relating to special aviation incentive pay and bonus authorities for officers.

(4) Section 335(k), relating to special bonus and incentive pay authorities for officers in health professions.

(5) Section 336(g), relating to contracting bonus for cadets and midshipmen enrolled in the Senior Reserve Officers' Training Corps.

(6) Section 351(h), relating to hazardous duty pay.

(7) Section 352(g), relating to assignment pay or special duty pay.

(8) Section 353(i), relating to skill incentive pay or proficiency bonus.

(9) Section 355(h), relating to retention incentives for members qualified in critical military skills or assigned to high priority units.

(e) AUTHORITY TO PROVIDE TEMPORARY INCREASE IN RATES OF BASIC ALLOWANCE FOR HOUSING.—Section 403(b) of title 37, United States Code, is amended—

(1) in paragraph (7)(E), relating to an area covered by a major disaster declaration or containing an installation experiencing an influx of military personnel, by striking "December 31, 2023" and inserting "December 31, 2024"; and

(2) by striking subparagraph (C) of paragraph (8), relating to an area where actual housing costs differ from current rates by more than 20 percent, and inserting the following:

"(C) This paragraph shall cease to be effective on December 31, 2024.".

Expiration date.

37 USC 301 note.

**SEC. 614. AUTHORIZATION OF MONTHLY BONUS PAY FOR A JUNIOR MEMBER OF THE UNIFORMED SERVICES DURING CALENDAR YEAR 2024.**

Effective date.
Determination.

(a) AUTHORIZATION.—Beginning on January 1, 2024, if the Secretary concerned determines that prevailing economic conditions may adversely affect an eligible member, the Secretary concerned may pay a monthly bonus to each eligible member.

Determination.

(b) AMOUNT OF PAY.—Each bonus payment under this section shall be in an amount equal to a percentage, determined by the Secretary concerned, of the rate—

Effective date.

(1) in effect on December 31, 2023; and

(2) of, for an eligible member—

(A) pay under section 204 of title 37, United States Code; or

(B) compensation under section 206 of title 37, United States Code.

(c) RELATIONSHIP TO OTHER PAY AND ALLOWANCES.—Bonus pay paid to an eligible member under this section is in addition to any other pay and allowances to which the eligible member is entitled.

(d) TERMINATION.—No bonus may be paid under this section after December 31, 2024.

(e) ELIGIBLE MEMBER DEFINED.—In this section, the term "eligible member" means a member of the uniformed services who—

(1) is entitled to pay or compensation described in subsection (b)(2); and

(2) is in a grade below E-6.

37 USC 352 note.

**SEC. 615. DETERMINATION OF COLD WEATHER LOCATION FOR PURPOSES OF SPECIAL DUTY PAY.**

For purposes of special duty pay under section 352 of title 37, United States Code, the Secretary concerned shall determine that a duty station is a cold weather location if, at such duty station, the temperature is expected to drop below -20 °F according

to the 2012 Plant Hardiness Zone Map published by the Agricultural Research Service of the Department of Agriculture.

### SEC. 616. FEASIBILITY STUDY REGARDING ASSIGNMENT INCENTIVE PAY FOR MEMBERS OF THE AIR FORCE ASSIGNED TO REMOTELY PILOTED AIRCRAFT.

Not later than 180 days after the date of enactment of this Act, the Secretary of the Air Force shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the feasibility and advisability of paying assignment incentive pay under section 307a of title 37, United States Code, to members of the Air Force assigned to remotely piloted aircraft, including at Creech Air Force Base. The study shall include— Reports.

(1) an assessment of the financial stress experienced by such members, especially junior members with families, associated with— Assessment.

(A) the daily commute to and from the duty station;

(B) the unique demands of the mission to remotely pilot aircraft; and

(C) limited access to essential services, including child care, housing, and readily accessible health care; and

(2) the overall cost to the United States, and financial relief provided by, such assignment incentive pay authorized by the Secretary of the Air Force in 2008 for such members. Costs.

# Subtitle C—Allowances

### SEC. 621. MODIFICATION OF CALCULATION OF GROSS HOUSEHOLD INCOME FOR BASIC NEEDS ALLOWANCE TO ADDRESS AREAS OF DEMONSTRATED NEED.

(a) IN GENERAL.—Section 402b(k)(1)(B) of title 37, United States Code, is amended by inserting "or that otherwise has a demonstrated need" after "high cost of living".

(b) IMPLEMENTATION GUIDANCE.—The Secretary of Defense shall revise the guidance issued with respect to implementation of the basic needs allowance under section 402b of title 37, United States Code, to reflect the amendment made by subsection (a). Revision. 37 USC 402b note.

### SEC. 622. IMPROVED CALCULATION OF BASIC ALLOWANCE FOR HOUSING FOR JUNIOR ENLISTED MEMBERS.

Section 403 of title 37, United States Code, is amended, in subsection (b)(5), by striking "and shall be based" and all that follows and inserting a period.

### SEC. 623. BASIC ALLOWANCE FOR HOUSING FOR MEMBERS ASSIGNED TO VESSELS UNDERGOING MAINTENANCE.

Section 403(f)(2) of title 37, United States Code, is amended—

(1) in subparagraph (A), by striking "subparagraphs (B) and (C)" and inserting "subparagraphs (B), (C), and (D)"; and

(2) by adding at the end the following new subparagraph:

"(D)(i) Under regulations prescribed by the Secretary concerned, the Secretary may authorize the payment of a basic allowance for housing to a member of a uniformed service without dependents who is serving in a pay grade below E–6 and has orders to a naval vessel during a shipyard availability or maintenance period. Regulations.

"(ii) In prescribing regulations under clause (i), the Secretary concerned shall consider the availability of quarters for members

137 STAT. 294        PUBLIC LAW 118–31—DEC. 22, 2023

serving in pay grades below E–6 before authorizing the payment of a basic allowance for housing for such members.".

Time period.

**SEC. 624. DUAL BASIC ALLOWANCE FOR HOUSING FOR TRAINING.**

Section 403 of title 37, United States Code, as amended by sections 622 and 623, is further amended, in subsection (g)(3), by striking "Paragraphs" and inserting "Except in the case of a member of a reserve component without dependents who is called or ordered to active duty to attend training for at least 140 days but fewer than 365 days, paragraphs".

**SEC. 625. COST-OF-LIVING ALLOWANCE IN THE CONTINENTAL UNITED STATES: HIGH COST AREAS.**

Section 403b(c) of title 37, United States Code, is amended—
(1) in the second sentence, by striking "8 percent" and inserting "5 percent"; and
(2) in the third sentence, by striking "shall prescribe" and inserting "may prescribe".

**SEC. 626. FAMILY SEPARATION ALLOWANCE: INCREASE; REVIEW.**

(a) INCREASE.—Section 427(a) of title 37, United States Code, is amended, in paragraph (1), by striking "equal to $250" and inserting "of not less than $250, and not more than $400,".

President.
37 USC 1008 note.

(b) REVIEW.—In each quadrennial review of military compensation conducted after the date of the enactment of this Act and under section 1008(b) of such title, the President shall include—
(1) a review of the family separation allowance under section 427 of such title (or successor allowance); and

Recommendations.

(2) the recommendation of the President regarding whether to increase the amount of such allowance to better compensate a member of the uniformed services for separation from family during service described in such paragraph.

**SEC. 627. OCONUS COST-OF-LIVING ALLOWANCE: ADJUSTMENTS.**

37 USC 403b note.

Section 617 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended by striking subsections (a), (b), and (c) and inserting the following:
"(a) REDUCTIONS.—The Secretary of Defense may reduce an OCONUS COLA in accordance with this subsection.
"(1) FREQUENCY.—The Secretary may not announce a reduction to an OCONUS COLA for a location outside the continental United States more than twice per calendar year.
"(2) MAXIMUM REDUCTION.—A reduction to an OCONUS COLA may not exceed the lesser of—
"(A) 10 OCONUS COLA index points; or
"(B) the number of OCONUS COLA index points by which the cost of living of the permanent duty station of the covered member exceeds the average cost of living index in the continental United States.
"(3) LIMITATIONS.—Paragraphs (1) and (2) shall not apply to a reduction on the basis of—
"(A) a change in the rate of exchange of foreign currencies; or
"(B) a permanent change of station for a covered member.
"(4) IMPLEMENTATION.—The Secretary may phase in a reduction under this subsection.

"(b) INCREASES.—The Secretary may increase an OCONUS COLA at any time.

"(c) REPORTING.—Not later than February 1 of each year, the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives a report regarding reductions and increases to OCONUS COLAs during the previous calendar year. Such report shall include the following elements: *[margin note: Time period.]*

"(1) The areas outside the continental United States subject to such a reduction or increase.

"(2) The previous and new amounts of an adjusted OCONUS COLA for a member with three dependents, 10 years of service, and in grade—

"(A) E-6; and

"(B) O-4.

"(3) The number of OCONUS COLA index points by which a new OCONUS COLA index differs from such previous index.

"(4) The number of members of the uniformed services affected by each such reduction or increase.

"(5) The assessment of the Secretary of the calculation of an OCONUS COLA. In making such assessment, the Secretary shall consider factors including— *[margin note: Assessment. Costs.]*

"(A) Costs of local transportation in the area surrounding the duty station of a member.

"(B) Costs of travel from such duty station to the United States.

"(C) Other costs the Secretary determines appropriate.

"(d) DEFINITIONS.—In this section:

"(1) The term 'continental United States' has the meaning given such term in section 101 of title 37, United States Code.

"(2) The term 'covered member' means a member of the uniformed services—

"(A) who is assigned to a permanent duty station located outside the continental United States; or

"(B) whose dependents reside outside the continental United States but not withing the vicinity to permanent duty station of such member.

"(3) The term 'OCONUS COLA' means a cost-of-living allowance paid to a member of the uniformed services on the basis that such member is a covered member.

"(4) The term 'OCONUS COLA index' means the index computed by the Secretary of the weighted average prices of goods and services (excluding housing costs) in a location outside the continental United States, relative to the weighted average of prices of the same goods and services in the continental United States.

"(5) The term 'OCONUS COLA index point' means 1 percent of the OCONUS COLA index for the weighted average prices of goods and services (excluding housing costs) in a location in the continental United States.".

### SEC. 628. EXTENSION OF ONE-TIME UNIFORM ALLOWANCE FOR OFFICERS WHO TRANSFER TO THE SPACE FORCE.

Section 606(d)(1) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 37 U.S.C. 416 note) is amended by striking "September 30, 2023" and inserting "September 30, 2025".

# Subtitle D—Family and Survivor Benefits

### SEC. 631. MODIFICATIONS TO TRANSITIONAL COMPENSATION FOR DEPENDENTS OF MEMBERS SEPARATED FOR DEPENDENT ABUSE.

(a) COVERED PUNITIVE ACTIONS.—Subsection (b) of section 1059 of title 10, United States Code, is amended—

(1) in paragraph (1)(B), by striking "; or" and inserting a semicolon;

(2) in paragraph (2), by striking the period at the end and inserting "; or"; and

(3) by adding at the end the following new paragraph:

"(3) who is—

"(A) convicted of a dependent-abuse offense in a district court of the United States or a State court; and

"(B) separated from active duty pursuant to a sentence of a court-martial, or administratively separated, voluntarily or involuntarily, from active duty, for an offense other than the dependent-abuse offense.".

(b) COMMENCEMENT OF PAYMENT.—Subsection (e)(1) of such section is amended—

(1) in subparagraph (A)—

(A) in the matter preceding clause (i), by inserting after "offense" the following: "or an offense described in subsection (b)(3)(B)"; and

(B) in clause (ii), by striking "; and" and inserting a semicolon; and

(2) in subparagraph (B), by striking "(if the basis" and all that follows through "offense)".

(c) DEFINITION OF DEPENDENT CHILD.—Subsection (l) of such section is amended, in the matter preceding paragraph (1)—

(1) by striking "resulting in the separation of the former member or" and inserting "referred to in subsection (b) or"; and

(2) by striking "resulting in the separation of the former member and" and inserting "and".

(d) DELEGATION OF DETERMINATIONS RELATING TO EXCEPTIONAL ELIGIBILITY.—Subsection (m)(4) of such section is amended to read as follows:

"(4) The Secretary concerned may delegate the authority under paragraph (1) to authorize eligibility for benefits under this section for dependents and former dependents of a member or former member to the first general or flag officer (or civilian equivalent) in the chain of command of the member.".

### SEC. 632. LODGING EXPENSES FOR DEPENDENTS OF MEMBERS SEPARATED FOR DEPENDENT ABUSE.

Section 1059 of title 10, United States Code, as amended by section 631, is further amended—

10 USC prec. 1030.

(1) in the heading, by adding "**; lodging expenses**" at the end;

(2) by redesignating subsections (k), (l), and (m) as subsections (m), (n), and (l), respectively;

(3) by striking "subsection (k)" each place it appears and inserting "subsection (m)"; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 297

(4) by inserting, after subsection (j), the following new subsection (k):

"(k) LODGING EXPENSES.—A dependent or former dependent entitled to payment of monthly transitional compensation under this section shall, while receiving payments in accordance with this section, be entitled to lodging expenses for a period not longer than 30 days.". <span style="float:right">Time period.</span>

## SEC. 633. ACCESS TO COMMISSARY AND EXCHANGE PRIVILEGES FOR REMARRIED SURVIVING SPOUSES.

(a) IN GENERAL.—Section 1062 of title 10, United States Code, is amended—

(1) by striking "The Secretary of Defense" and inserting the following:

"(a) CERTAIN UNREMARRIED FORMER SPOUSES.—The Secretary of Defense";

(2) by striking "commissary and exchange privileges" and inserting "use commissary stores and MWR retail facilities";

(3) by adding at the end the following new subsection:

"(b) CERTAIN REMARRIED SURVIVING SPOUSES.—The Secretary of Defense shall prescribe such regulations as may be necessary to provide that a surviving spouse of a deceased member of the armed forces, regardless of the marital status of the surviving spouse, is entitled to use commissary stores and MWR retail facilities to the same extent and on the same basis as an unremarried surviving spouse of a member of the uniformed services."; and <span style="float:right">Regulations.</span>

(4) by adding at the end the following new subsection:

"(c) MWR RETAIL FACILITIES DEFINED.—In this section, the term 'MWR retail facilities' has the meaning given that term in section 1063 of this title.".

(b) REGULATIONS.—The Secretary of Defense shall prescribe regulations under section 1062(b) of title 10, United States Code, as added by subsection (a)(3), not later than October 1, 2025. <span style="float:right">Deadline.<br>10 USC 1062 note.</span>

(c) CLERICAL AMENDMENT.—The heading of such section is amended by adding "**and surviving spouses**" at the end. <span style="float:right">10 USC prec. 1061.</span>

## SEC. 634. ASSISTANCE FOR MILITARY SPOUSES TO OBTAIN CERTIFICATIONS AS DOULAS AND INTERNATIONAL BOARD CERTIFIED LACTATION CONSULTANTS.

Section 1784a of title 10, United States Code, is amended—

(1) by redesignating subsections (d) and (e) as subsections (e) and (f), respectively; and

(2) by inserting after subsection (c) the following new subsection (d):

"(d) DOULA AND IBCLC CERTIFICATIONS.—In carrying out the programs authorized by subsection (a), the Secretary shall provide assistance to the spouse of a member of the armed forces described in subsection (b) with obtaining certification—

"(1) as a doula or International Board Certified Lactation Consultant; and

"(2) provided by an organization that receives reimbursement under the extramedical maternal health providers demonstration project required by section 746 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 1073 note).".

**SEC. 635. EXPANSION OF QUALIFYING EVENTS FOR WHICH A MEMBER OF THE UNIFORMED SERVICES MAY BE REIMBURSED FOR SPOUSAL RELICENSING OR BUSINESS COSTS DUE TO THE MEMBER'S RELOCATION.**

Section 453(g) of title 37, United States Code, is amended—

(1) by striking the subsection heading and inserting "REIMBURSEMENT OF QUALIFYING SPOUSE RELICENSING COSTS AND BUSINESS COSTS";

(2) in paragraph (1)—

(A) in the matter preceding subparagraph (A), by striking "or qualified business costs" and inserting "and qualified business costs";

(B) by amending subparagraph (A) to read as follows:

"(A) the member relocates to a new jurisdiction or geographic area as the result of—

"(i) an assignment to a duty station;

"(ii) a reassignment, either as a result of a permanent change of station or permanent change of assignment, between duty stations;

"(iii) a transfer from a regular component of a uniformed service into the Selected Reserve of the Ready Reserve of a uniformed service, if the member is authorized a final move from the last duty station to the new jurisdiction or geographic area; or

"(iv) placement on the temporary disability retired list under chapter 61 of title 10; and"; and

(C) in subparagraph (B), by striking "reassignment" and inserting "relocation";

(3) in paragraph (2), by striking "reassignment" both places it appears and inserting "relocation";

(4) in paragraph (4)—

(A) in subparagraph (A), by striking "movement described in" and all that follows through the semicolon and inserting "the member's relocation described in paragraph (1);"; and

(B) in subparagraph (B), by striking "reassignment" and inserting "relocation"; and

(5) in paragraph (5)—

(A) in subparagraph (A), by striking "movement described in" and all that follows through the semicolon and inserting "the member's relocation described in paragraph (1);"; and

(B) in subparagraph (B), by striking "reassignment" and inserting "relocation".

# TITLE VII—HEALTH CARE PROVISIONS

Subtitle A—TRICARE and Other Health Care Benefits

Sec. 701. Waiver of cost-sharing for three mental health outpatient visits for certain beneficiaries under the TRICARE program.
Sec. 702. Extension of period of eligibility for health benefits under TRICARE Reserve Select for survivors of a member of the Selected Reserve.
Sec. 703. Expansion of eligibility for hearing aids to include children of certain retired members of the uniformed services.
Sec. 704. Authority to provide dental care for dependents located at certain remote or isolated locations.
Sec. 705. Clarification of applicability of required mental health self-initiated referral process for members of the Selected Reserve.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 299

Sec. 706. Naloxone and fentanyl: regulations; briefing.
Sec. 707. Authority to expand the TRICARE Competitive Plans Demonstration Project.

### Subtitle B—Health Care Administration

Sec. 711. Modification of requirement to transfer research and development and public health functions to the Defense Health Agency.
Sec. 712. Increase in stipend for participants in health professions scholarship and financial assistance programs.
Sec. 713. Modification of administration of medical malpractice claims by members of the uniformed services.
Sec. 714. Networks of the Defense Health Agency: delayed implementation; GAO study.
Sec. 715. Real-time data sharing agreement regarding medical care provided to members of the Coast Guard.
Sec. 716. Establishment of military pharmaceutical and medical device vulnerability working group.

### Subtitle C—Studies, Briefings, Reports, and Other Matters

Sec. 721. Modification of partnership program for military trauma care and research.
Sec. 722. Study on opioid alternatives.
Sec. 723. Program of the Department of Defense to study treatment of certain conditions using certain psychedelic substances.
Sec. 724. Annual report regarding overdoses by certain members of the Armed Forces.
Sec. 725. Study and report on health conditions of members of the Armed Forces on active duty developed after administration of COVID–19 vaccine.
Sec. 726. GAO study on health care available to certain individuals supporting the missions of United States Forces Japan and Joint Region Marianas.

# Subtitle A—TRICARE and Other Health Care Benefits

**SEC. 701. WAIVER OF COST-SHARING FOR THREE MENTAL HEALTH OUTPATIENT VISITS FOR CERTAIN BENEFICIARIES UNDER THE TRICARE PROGRAM.**

*Termination dates.*

(a) TRICARE SELECT.—Section 1075(c) of title 10, United States Code, is amended by adding at the end the following new paragraph:

"(4)(A) Consistent with other provisions of this chapter and subject to requirements to be prescribed by the Secretary, the Secretary may waive cost-sharing requirements for the first three outpatient mental health visits each year of any of the following beneficiaries:

"(i) Beneficiaries in the active-duty family member category.

"(ii) Beneficiaries covered by section 1110b of this title.

"(B) This paragraph shall terminate on the date that is five years after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024.".

(b) TRICARE PRIME.—Section 1075a(a) of such title is amended by adding at the end the following new paragraph:

"(4)(A) Consistent with other provisions of this chapter and subject to requirements to be prescribed by the Secretary, the Secretary may waive cost-sharing requirements for the first three outpatient mental health visits each year of a beneficiary in the active-duty family member category (as described in section 1075(b)(1)(A) of this title).

"(B) This paragraph shall terminate on the date that is five years after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024.".

137 STAT. 300          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 702. EXTENSION OF PERIOD OF ELIGIBILITY FOR HEALTH BENE-FITS UNDER TRICARE RESERVE SELECT FOR SURVIVORS OF A MEMBER OF THE SELECTED RESERVE.

(a) IN GENERAL.— Section 1076d(c) of title 10, United States Code, is amended by striking "six months" and inserting "three years".

10 USC 1076d note.

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on October 1, 2025.

### SEC. 703. EXPANSION OF ELIGIBILITY FOR HEARING AIDS TO INCLUDE CHILDREN OF CERTAIN RETIRED MEMBERS OF THE UNI-FORMED SERVICES.

Paragraph (16) of section 1077(a) of title 10, United States Code, is amended to read as follows:

Determination.

"(16) Except as provided by subsection (g), a hearing aid, but only if the dependent has a profound hearing loss, as determined under standards prescribed in regulations by the Secretary of Defense in consultation with the administering Secretaries, and only for the following dependents:

"(A) A dependent of a member of the uniformed services on active duty.

"(B) A dependent under subparagraph (D) or (I) of section 1072(2) of this title of a former member of the uniformed services who—

"(i) is entitled to retired or retainer pay, or equivalent pay; and

"(ii) is enrolled in family coverage under TRICARE Prime.".

### SEC. 704. AUTHORITY TO PROVIDE DENTAL CARE FOR DEPENDENTS LOCATED AT CERTAIN REMOTE OR ISOLATED LOCATIONS.

Section 1077(c) of title 10, United States Code, is amended—

(1) in paragraph (1), by striking "paragraph (2)" and inserting "paragraphs (2) and (3)"; and

(2) by adding at the end the following new paragraph:

Determination.

"(3)(A) Dependents who reside within a specified geographic area and are covered by a dental plan established under section 1076a may receive dental care in a dental treatment facility of the uniformed services on a space available basis if the Secretary of Defense determines that—

"(i) civilian dental care within the specified geographic area is inadequate or is not sufficiently available; and

"(ii) adequate resources exist to provide space available dental care to the dependents at the facility.

"(B) Care under subparagraph (A) shall be provided on a reimbursable basis.".

### SEC. 705. CLARIFICATION OF APPLICABILITY OF REQUIRED MENTAL HEALTH SELF-INITIATED REFERRAL PROCESS FOR MEM-BERS OF THE SELECTED RESERVE.

Section 1090b(e) of title 10, United States Code, is amended—

(1) in paragraph (1), in the matter preceding subparagraph (A), by inserting "described in paragraph (3)" after "member of the armed forces"; and

(2) by adding at the end the following new paragraph:

"(3) A member of the armed forces described in this paragraph is—

    "(A) a member on active duty for a period of longer than 30 days; or
    "(B) a member of the Selected Reserve in a duty status.".

### SEC. 706. NALOXONE AND FENTANYL: REGULATIONS; BRIEFING.

Deadline.
10 USC 1090 note.

    (a) REGULATIONS.—Not later than January 1, 2025, the Secretary of Defense, in coordination with the Secretaries of the military departments shall prescribe regulations regarding naloxone and fentanyl on military installations. Such regulations shall—
        (1) ensure that naloxone is available for members of the Armed Forces—
            (A) on all military installations; and
            (B) in each operational environment; and
        (2) establish a standardized tracking system—
            (A) for naloxone distributed under paragraph (1); and
            (B) of the illegal use of fentanyl and other controlled substances in the military departments.
    (b) BRIEFING.—Not later than June 1, 2025, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a briefing regarding naloxone and fentanyl. Such briefing shall include the following elements:
        (1) Progress in the implementation of regulations prescribed under subsection (a).
        (2) The prevalence and incidence of the illegal use of fentanyl and other controlled substances in the military departments during the five years preceding the briefing.

Time period.

        (3) Processes of the military departments to mitigate substance abuse, particularly with regards to fentanyl.
    (c) NALOXONE DEFINED.—In this section, the term "naloxone" means naloxone and any other medication used to reverse opioid overdose.

### SEC. 707. AUTHORITY TO EXPAND THE TRICARE COMPETITIVE PLANS DEMONSTRATION PROJECT.

10 USC 1073a note.

    (a) AUTHORITY.—To the extent practicable, the Secretary of Defense shall seek to expand the TRICARE Competitive Plans Demonstration Project to not fewer than five locations not later than one year after the date of the enactment of this Act.

Deadline.

    (b) TRICARE COMPETITIVE PLANS DEMONSTRATION PROJECT DEFINED.—In this section, the term "TRICARE Competitive Plans Demonstration Project" means the project designed to test the contract acquisition strategy of providing an opportunity for local, regional, and national health plans to participate in the competition for managed care support functions under the TRICARE program, in accordance with section 705(c)(3) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 1073a note).

# Subtitle B—Health Care Administration

### SEC. 711. MODIFICATION OF REQUIREMENT TO TRANSFER RESEARCH AND DEVELOPMENT AND PUBLIC HEALTH FUNCTIONS TO THE DEFENSE HEALTH AGENCY.

    (a) IN GENERAL.—Section 1073c of title 10, United States Code, is amended—

(1) in subsection (e), in the matter preceding paragraph (1), by striking "Not later than September 30, 2022," and inserting "Not later than September 30, 2024, and subject to subsection (f),";

(2) by redesignating subsections (f) and (g) as subsections (g) and (h), respectively; and

(3) by inserting, after subsection (e), the following new subsection (f):

Determination.

"(f) EXCEPTION TO ESTABLISHMENT OF ADDITIONAL DHA ORGANIZATIONS.—At the discretion of the Secretary of Defense, a military department may retain a function that would otherwise be transferred to the Defense Health Agency under subsection (e) if the Secretary of Defense determines the function—

"(1) addresses a need that is unique to the military department; and

"(2) is in direct support of operating forces and necessary to execute strategies relating to national security and defense.".

Deadline.
Determinations.

(b) BRIEFING UPDATE.—Not later than September 30, 2024, the Secretary of Defense shall provide to the Committees on Armed Services of the House of Representatives and the Senate an update to the briefing under section 720(b) of the James F. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117-263; 10 U.S.C. 1073c note), including—

(1) a description of each function that the Secretary has determined to retain in a military department pursuant to subsection (f) of section 1073c of title 10, United States Code, as amended by subsection (a); and

(2) the rationale for each such determination.

### SEC. 712. INCREASE IN STIPEND FOR PARTICIPANTS IN HEALTH PROFESSIONS SCHOLARSHIP AND FINANCIAL ASSISTANCE PROGRAMS.

Section 2121(d) of title 10, United States Code, is amended, in the matter preceding paragraph (1), by striking "$30,000" and inserting "$50,000".

### SEC. 713. MODIFICATION OF ADMINISTRATION OF MEDICAL MALPRACTICE CLAIMS BY MEMBERS OF THE UNIFORMED SERVICES.

Section 2733a of title 10, United States Code, is amended—

(1) in subsection (a), by striking "subsection (f)" and inserting "subsection (g)";

(2) in subsection (b)(6), by striking "subsection (f)" and inserting "subsection (g)";

(3) in subsection (d)(1), by striking "subsection (f)" and inserting "subsection (g)";

(4) by redesignating subsections (f) through (i) as subsections (g) through (j), respectively; and

(5) by inserting after subsection (e) the following new subsection (f):

Records.
Reports.

"(f) JUSTIFICATION OF DENIAL.—If a claim under this section is denied, the Secretary of Defense shall provide the claimant with detailed reasoning justifying the denial of the claim, including—

"(1) copies of any written reports prepared by any expert upon which the denial is based; and

"(2) all records and documents relied upon in preparing such written reports, other than medical quality assurance records (as such term is defined in section 1102 of this title).".

### SEC. 714. NETWORKS OF THE DEFENSE HEALTH AGENCY: DELAYED IMPLEMENTATION; GAO STUDY.

(a) TEMPORARY PROHIBITION.—The Secretary of Defense may not advance beyond phase one of the organizational advancement plan to establish nine networks of the Defense Health Agency for the management of military medical treatment facilities, announced on October 1, 2023, until the Comptroller General of the United States submits the report under subsection (b).

*Reports.*

(b) GAO STUDY ON DEFENSE HEALTH AGENCY MANAGEMENT OF MILITARY MEDICAL TREATMENT FACILITIES.—

(1) STUDY REQUIRED.—The Comptroller General of the United States shall conduct a study of the plan described in subsection (a).

(2) ELEMENTS.—The study under paragraph (1) shall include the following elements:

*Assessments.*

(A) An assessment of the structure of such networks, including—

(i) the analytical basis for the size and number of networks established;

(ii) an analysis of personnel requirements for the network model;

*Analysis.*

(iii) a review of how input from internal and external stakeholders was incorporated; and

*Review.*

(iv) the plans for achieving consolidation of business functions across military medical treatment facilities within the new networks;

*Plans.*

(B) an assessment of how the Director of the Defense Health Agency considered lessons learned from previous market offices, including the allocation of personnel and budgetary resource sharing; and

(C) a comparison of the new network model to previous organizational structures of the Defense Health Agency, including market structures and component models.

(3) BRIEFING; REPORT.—Not later than May 1, 2024, the Comptroller General shall brief the Committees on Armed Services of the Senate and the House of Representatives on the preliminary findings of the study, with a report to follow at such time and in such format as is mutually agreed upon by the committees and the Comptroller General.

(c) TECHNICAL CORRECTIONS.—

(1) DEFENSE HEALTH AGENCY REGIONS IN CONUS.—Subsection (c) of section 712 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 1073c note) is amended—

(A) in paragraph (1), in the paragraph heading, by striking "HEALTHAGENCY" and inserting "HEALTH AGENCY"; and

(B) in paragraph (2)(A), by striking "military".

(2) DEFENSE HEALTH AGENCY REGIONS OCONUS.—Subsection (d)(3) of such section is amended by striking "defense health regions" and inserting "Defense Health Agency regions".

(3) PLANNING AND COORDINATION.—Subsection (e)(1)(A) of such section is amended by striking "defense health region" and inserting "Defense Health Agency region".

**SEC. 715. REAL-TIME DATA SHARING AGREEMENT REGARDING MEDICAL CARE PROVIDED TO MEMBERS OF THE COAST GUARD.**

Deadline.
Consultation.
10 USC 1073 note.

Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall consult and enter into an agreement with the Secretary of Homeland Security with respect to policies, mechanisms, and processes that the Secretaries concerned shall establish to allow ongoing use by the Coast Guard for access to data, records, and information regarding access by members of the Coast Guard and beneficiaries of such members to military medical facilities or care provided through the TRICARE program that will enhance the ability to monitor, assess, and optimize healthcare services.

**SEC. 716. ESTABLISHMENT OF MILITARY PHARMACEUTICAL AND MEDICAL DEVICE VULNERABILITY WORKING GROUP.**

Deadline.

(a) ESTABLISHMENT.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Chairman of the Joint Chiefs of Staff, the Under Secretary of Defense for Personnel and Readiness, and the Under Secretary of Defense for Acquisition and Sustainment, shall establish a military pharmaceutical and medical device vulnerability working group.

(b) MEMBERSHIP.—Each member of the working group shall be a member of the Armed Forces or a civilian employee of the Department of Defense.

Appointment.

(c) COCHAIRS.—The Secretary shall appoint a chair of the working group. The working group shall elect a cochair from among its members.

(d) DUTIES.—The duties of the working group shall include the following:

(1) To provide a forum for members of the working group to discuss issues involving access, threats, and vulnerabilities to pharmaceuticals, therapeutics and medical devices in operational environments of the Department.

(2) To identify current vulnerabilities, including supply chain issues, active pharmaceutical ingredient supplies, device component issues and cyber and electronic threats that may disrupt operations of the Department.

(3) To identify locations where the Secretary can support manufacturing capabilities needed to improve the timely increase of domestic production.

(4) To review policies of the Department to identify pharmaceutical manufacturing and supply guidance related to—

(A) diversification of the supply chain;

(B) transparency from pharmaceutical suppliers and manufacturers;

(C) prerequisites for a vendor to sell to the Department during a shortage;

(D) timely communication regarding a potential shortage or other supply chain disruption; and

(E) the application of rules and processes of the Food and Drug Administration to the Department.

(5) To include any information in the joint medical estimate of the Department or a similar report that highlights information that would be classified as sensitive or requiring a security classification above unclassified.

(6) To develop a plan for the allocation of scarce pharmaceutical resources within the Department during a supply chain disruption and potential conflicts with competitors highlighted in the national defense strategy.

(7) To develop a plan for stockpiling essential medications to ensure availability of a 180-day supply during an armed conflict or other supply chain disruption.

(8) To develop a plan that mitigates vulnerabilities to active pharmaceutical ingredient supply chains and reduces dependence on active pharmaceutical ingredients from foreign sources.

(e) BRIEFINGS.— 

*Deadlines.*

(1) INITIAL BRIEFING.—Not later than 180 days after the date of the enactment of this Act, the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives an interim briefing on the organization, activities, plans, actions and milestones of the working group.

(2) ANNUAL BRIEFING.—Not later than September 30 of each year, beginning in 2025 and ending in 2028, the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives a briefing describing the activities, funding, plans, actions, and milestones of the working group, and other matters determined by the Secretary, during the preceding year.

(f) TERMINATION.—The working group shall terminate on September 30, 2028.

# Subtitle C—Studies, Briefings, Reports, and Other Matters

### SEC. 721. MODIFICATION OF PARTNERSHIP PROGRAM FOR MILITARY TRAUMA CARE AND RESEARCH.

Section 736 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 1071 note) is amended—

(1) by redesignating paragraphs (7) through (9) as paragraphs (8) through (10), respectively; and

(2) by inserting after paragraph (6) the following new paragraph (7):

"(7) The provision of training and support to Ukraine for the treatment of individuals with extremity trauma, amputations, post-traumatic stress disorder, traumatic brain injuries, and any other mental health conditions associated with post-traumatic stress disorder or traumatic brain injuries, including— 

*Ukraine.*

"(A) the exchange of subject matter expertise;

"(B) training and support relating to advanced clinical skills development; and

"(C) training and support relating to clinical case management support.".

### SEC. 722. STUDY ON OPIOID ALTERNATIVES.

Deadline.

(a) ESTABLISHMENT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall carry out a study in military treatment facilities on the efficacy of opioid alternatives for pain management.

(b) REPORT.—Not later than one year after the date of the enactment of this Act, the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the results of the study under this section. Such report shall include recommendations of the Secretary regarding the use of opioid alternatives in military treatment facilities.

Recommendations.

(c) OPIOID ALTERNATIVE DEFINED.—In this section, the term "opioid alternative" includes the following:

(1) Cryotherapy.
(2) Hyperbaric oxygen therapy.
(3) Sensory deprivation.

10 USC 1074 note.

### SEC. 723. PROGRAM OF THE DEPARTMENT OF DEFENSE TO STUDY TREATMENT OF CERTAIN CONDITIONS USING CERTAIN PSYCHEDELIC SUBSTANCES.

Deadlines.
Processes.

(a) ESTABLISHMENT.—Not later than 180 days after the date of enactment of this Act, the Secretary of Defense shall establish a process to fund eligible entities to conduct research on the treatment of eligible members of the Armed Forces with a covered condition using covered psychedelic substances. Not later than 180 days after the date of the enactment of this Act, the Secretary shall designate a lead administrator to carry out the program under this section.

Designation.

Contracts.

(b) ELIGIBLE ENTITIES.—The Secretary may enter into a partnership and award funding under this section to any of the following:

(1) A department or agency of the Federal Government or a State government.
(2) An academic institution.

(c) PARTICIPATION IN CLINICAL TRIALS.—The Secretary may authorize any member of the Armed Forces serving on active duty who is diagnosed with a covered condition to participate in a clinical trial that is conducted using funding awarded under this section and is authorized pursuant to section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), without regard to—

(1) whether the clinical trial involves a substance included in the schedule under section 202 of the Controlled Substances Act (21 U.S.C. 812); or
(2) section 912a of title 10, United States Code (article 112a of the Uniform Code of Military Justice).

Time period.

(d) REPORT REQUIRED.—Not later than one year after the date of the enactment of this Act, and annually thereafter for three years, the Secretary shall submit to the Committees on Armed Services of the House of Representatives and the Senate a report on funding awarded under this section, including the following:

(1) Identification of clinics designated to host activities under the program.
(2) A description of entities to whom the Secretary has awarded such funding.
(3) The number of members of the Armed Forces serving on active duty who participated in a clinical trial described

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 307

in subsection (c), the covered conditions of such members treated, and whether such members returned to full duty.

(4) Information on the findings of such clinical trials.

(e) DEFINITIONS.—In this section:

(1) The term "covered condition" means any of the following:

(A) Post-traumatic stress.

(B) Traumatic brain injury.

(2) The term "covered psychedelic substances" means any of the following:

(A) 3,4-Methylenedioxy-methamphetamine (commonly known as "MDMA").

(B) Psilocybin.

(C) Ibogaine.

(D) 5-Methoxy-N,N-dimethyltryptamine (commonly known as "5-MeO-DMT").

(E) Qualified plant-based alternative therapies.

(3) The term "Secretary" means the Secretary of Defense.

(4) The term "State" has the meaning given such term in section 901 of title 32, United States Code.

## SEC. 724. ANNUAL REPORT REGARDING OVERDOSES BY CERTAIN MEMBERS OF THE ARMED FORCES.

(a) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, and annually thereafter for four years, the Secretary of Defense shall submit to the Committee on Armed Services of the Senate and House of Representatives a report on the number of annual overdoses among covered members.

*Time period.*

(2) CONTENTS.—The report required by paragraph (1) shall include the following:

(A) The total number of covered members who suffered a fatal or nonfatal overdose during the previous calendar year, including—

(i) demographic information, including gender, race, age, military department, military rank, pay grade, and station;

(ii) the location of the fatal overdose, including whether the overdose was on a military base; and

(iii) a list of the substances involved in the fatal overdose.

*List.*

(B) Of the covered members identified in subparagraph (A)—

(i) the number of covered members who received mental health or substance use disorder services prior to a fatal or nonfatal overdose, including a description of whether such services were received from a private sector provider;

(ii) the number of covered members with comorbid mental health diagnoses;

(iii) the number of covered members who had been prescribed opioids, benzodiazepines, or stimulants;

(iv) the number of covered members who had been categorized as high-risk and prescribed or provided naloxone prior to a fatal or nonfatal overdose;

137 STAT. 308          PUBLIC LAW 118–31—DEC. 22, 2023

> (v) the number of covered members who had a positive drug test prior to the fatal overdose, including any substance identified in such test;
> (vi) the number of covered members referred to, including by self-referral, or engaged in medical treatment, including medication treatment for opioid use disorder;
> (vii) with respect to each covered member identified in clause (vi), whether the covered member was referred after a positive drug test and the source of such referral; and
> (viii) the number of fatal overdoses and intentional overdoses.

Analysis.

(C) An analysis of discernable patterns in fatal and nonfatal overdoses of covered members.

(D) A description of existing or anticipated response efforts to fatal and nonfatal overdoses at military bases that have rates of fatal overdoses that exceed the average rate of fatal overdoses in the United States.

Assessment.

(E) An assessment of the availability of substance use disorder treatment for covered members.

(F) The number of medical facilities of, or affiliated with, the Department of Defense that have opioid treatment programs.

(G) A description of punitive measures taken by the Secretary of Defense in response to substance misuse, substance use disorder, or overdose by covered member.

(3) PRIVACY.—

(A) IN GENERAL.—Nothing in this subsection shall be construed to authorize the disclosure by the Secretary of Defense of personally identifiable information of covered members or military family members, including anonymized personal information that could be used to identify covered members or military family members.

(B) APPLICATION OF HIPAA.—In carrying out this subsection, the Secretary of Defense shall take steps to protect the privacy of covered members and military family members pursuant to regulations prescribed under section 264(c) of the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. 1320d–2 note; Public Law 104–191).

(b) DEFINITIONS.—In this section:

(1) The term "covered member" means a member of the Army, Navy, Air Force, Marine Corps, or Space Force.

(2) The term "military family member" means a family member of a covered member, including—

(A) the spouse, parent, dependent, or child of a covered member; or

(B) an individual who has legal responsibility for the child of a covered member.

Assessments.

**SEC. 725. STUDY AND REPORT ON HEALTH CONDITIONS OF MEMBERS OF THE ARMED FORCES ON ACTIVE DUTY DEVELOPED AFTER ADMINISTRATION OF COVID–19 VACCINE.**

Evaluation.

(a) STUDY.—The Secretary of Defense shall conduct a study to assess and evaluate any health conditions arising in members

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 309

of the Armed Forces on active duty one year after receiving the first dose of a COVID–19 vaccine.

(b) STUDY PARAMETERS.—In conducting the study under subsection (a), the Secretary shall—

(1) disaggregate data collected by—

Data.

(A) vaccine type and manufacturer;

(B) age group at the time such first dose was administered;

(C) any health condition developed after receiving such first dose, regardless of whether the condition is attributable to the receipt of such first dose; and

(D) an accounting of adverse events (including hyperimmune response), including further disaggregation by history of infection; and

(2) assess the prevalence of each such health condition by each age group specified in paragraph (1)(B) among the unvaccinated population for each of years 2017, 2018, and 2019.

(c) REPORT.—Not later than one year after the date of the enactment of this Act and each year thereafter for the subsequent four years, the Secretary shall submit to the Committees on Armed Services of the House of Representatives and the Senate a report on the results of each study conducted under subsection (a).

Time period.

(d) COVID–19 VACCINE DEFINED.—The term "COVID–19 vaccine" means a vaccine licensed under section 351 of the Public Health Service Act (42 U.S.C. 262) or authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb–3) for immunization against the virus responsible for COVID–19.

**SEC. 726. GAO STUDY ON HEALTH CARE AVAILABLE TO CERTAIN INDIVIDUALS SUPPORTING THE MISSIONS OF UNITED STATES FORCES JAPAN AND JOINT REGION MARIANAS.**

(a) STUDY REQUIRED.—The Comptroller General of the United States shall conduct a study to determine whether health care services available to covered individuals are sufficient to support the missions and readiness of United States Forces Japan and Joint Region Marianas.

(b) ELEMENTS.—The study under this section shall include the following elements:

(1) The assessment of the Comptroller General of the effects of the changes to the administration and management of the military health system—

Assessment.

(A) under Defense Health Agency Region Indo-Pacific Administrative Instruction 6025.02, signed on December 22, 2022; and

(B) on health care services available to covered individuals through the direct care component of the TRICARE program.

(2) An estimate of—

Estimate.
Time period.

(A) the number of covered individuals who in fiscal years 2020 through 2023 received health care services through the military health system on a space-available basis; and

(B) the percentage of covered individuals described in subparagraph (A) who had health insurance not provided through the military health system.

137 STAT. 310          PUBLIC LAW 118–31—DEC. 22, 2023

Summary.

(3) A summary of any health-related screenings adminis-tered by the Federal Government to a civilian employee before such civilian employee begins an assignment in the area of responsibility of the United States Indo-Pacific Command.

Determination.

(4) The determination of the Comptroller General whether the Secretary of Defense has conducted or participated in an assessment of health care services—

(A) provided to covered individuals through the mili-tary health system; or

(B) otherwise available to covered individuals.

Evaluation.

(5) The evaluation of the Comptroller General of the most recent assessment described in paragraph (4).

(6) Other information the Comptroller General determines appropriate.

(c) BRIEFING; REPORT.—The Comptroller General shall submit to the Committees on Armed Services of the Senate and House of Representatives—

(1) an interim briefing on the study not later than 180 days after the date of the enactment of this Act; and

(2) a final report on the study in a format and on a date agreed to by the Comptroller General and such Committees during such briefing.

(d) COVERED INDIVIDUAL DEFINED.—In this section, the term "covered individual" means an individual who supports the mission of United States Forces Japan or Joint Region Marianas, who is—

(1) a United States citizen, national, or lawful permanent resident and—

(A) a civilian employee of the Federal Government; or

(B) an employee of a contractor or subcontractor under an agreement between such contractor and the Secretary of Defense; or

(2) a dependent of—

(A) a member of the Armed Forces; or

(B) an individual described in paragraph (1).

# TITLE VIII—ACQUISITION POLICY, AC-QUISITION MANAGEMENT, AND RE-LATED MATTERS

Subtitle A—Acquisition Policy and Management

Sec. 801. Commercial nature determination memo available to contractor.
Sec. 802. Modification of truthful cost or pricing data submissions and report.
Sec. 803. Prohibition on the transfer of certain data on employees of the Depart-ment of Defense to third parties.
Sec. 804. Prohibition on contracting with persons that have fossil fuel operations with the Government of the Russian Federation or the Russian energy sector.
Sec. 805. Prohibition of the Department of Defense procurement related to entities identified as Chinese military companies operating in the United States.
Sec. 806. Principal Technology Transition Advisor.
Sec. 807. Senior contracting official for Strategic Capabilities Office.
Sec. 808. Pilot program for the use of innovative intellectual property strategies.
Sec. 809. Pilot program for anything-as-a-service.
Sec. 810. Updated guidance on planning for exportability features for future pro-grams.
Sec. 811. Modernizing the Department of Defense requirements process.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 311

Sec. 812. Preventing conflicts of interest for entities that provide certain consulting services to the Department of Defense.
Sec. 813. Focused commercial solutions openings opportunities.

Subtitle B—Amendments to General Contracting Authorities, Procedures, and Limitations

Sec. 820. Amendments to multiyear procurement authority.
Sec. 821. Modification of approval authority for certain follow-on production contracts or transactions.
Sec. 822. Clarification of other transaction authority for installation or facility prototyping.
Sec. 823. Extension and revisions to never contract with the enemy.
Sec. 824. Modification and extension of temporary authority to modify certain contracts and options based on the impacts of inflation.
Sec. 825. Countering adversary logistics information technologies.
Sec. 826. Modification of contracts and options to provide economic price adjustments.
Sec. 827. Modifications to earned value management system requirements.

Subtitle C—Domestic Sourcing Requirements

Sec. 831. Emergency acquisition authority for purposes of replenishing United States stockpiles.
Sec. 832. Requirement for full domestic production of flags of the United States acquired by the Department of Defense.
Sec. 833. Amendment to requirement to buy certain metals from American sources.
Sec. 834. Acquisition of sensitive material prohibition exception amendment.
Sec. 835. Enhanced domestic content requirement for major defense acquisition programs.

Subtitle D—Provisions Relating to Programs for Accelerating Acquisition

Sec. 841. Pilot program to accelerate contracting and pricing processes.
Sec. 842. Demonstration and prototyping program to advance international product support capabilities in a contested logistics environment.
Sec. 843. Special authority for rapid contracting for commanders of combatant commands.

Subtitle E—Industrial Base Matters

Sec. 851. Additional national security objectives for the national technology and industrial base.
Sec. 852. Department of Defense Mentor-Protege Program.
Sec. 853. Modifications to the Procurement Technical Assistance Program.
Sec. 854. Modification of effective date for expansion on the prohibition on acquiring certain metal products.
Sec. 855. Extension of pilot program for distribution support and services for weapons systems contractors.
Sec. 856. Pilot program to analyze and monitor certain supply chains.
Sec. 857. Department of Defense notification of certain transactions.

Subtitle F—Small Business Matters

Sec. 860. Amendments to defense research and development rapid innovation program.
Sec. 861. Annual reports regarding the SBIR program of the Department of Defense.
Sec. 862. Payment of subcontractors.
Sec. 863. Increase in Governmentwide goal for participation in Federal contracts by small business concerns owned and controlled by service-disabled veterans.
Sec. 864. Eliminating self-certification for service-disabled veteran-owned small businesses.
Sec. 865. Consideration of the past performance of affiliate companies of small business concerns.

Subtitle G—Other Matters

Sec. 871. Extension of mission management pilot program.
Sec. 872. Extension of pilot program to incentivize contracting with employee-owned businesses.
Sec. 873. Program and processes relating to foreign acquisition.
Sec. 874. Pilot program to incentivize progress payments.
Sec. 875. Study on reducing barriers to acquisition of commercial products and services.

137 STAT. 312          PUBLIC LAW 118–31—DEC. 22, 2023

# Subtitle A—Acquisition Policy and Management

### SEC. 801. COMMERCIAL NATURE DETERMINATION MEMO AVAILABLE TO CONTRACTOR.

Section 3456(b)(2) of title 10, United States Code, is amended—

(1) by striking "for such determination" and inserting "why the product or service was determined to be commercial or noncommercial"; and

Records.

(2) by adding at the end the following: "Upon the request of the contractor or subcontractor offering the product or service for which such determination is summarized in such memorandum, the contracting officer shall provide to such contractor or subcontractor a copy of such memorandum.".

### SEC. 802. MODIFICATION OF TRUTHFUL COST OR PRICING DATA SUBMISSIONS AND REPORT.

Section 3705(b)(2) of title 10, United States Code, is amended—

(1) in subparagraph (B), by adding at the end the following new sentence: "The Under Secretary shall make appropriate portions of the report available to the leadership of the offerors named in such report."; and

(2) by adding at the end the following new subparagraph:

"(C) The Under Secretary of Defense for Acquisition and Sustainment shall develop a framework for revising what constitutes a denial of uncertified cost or pricing data, including—

"(i) identifying situations under which such denials occur to exclude situations outside the control of the offeror or Federal Government;

"(ii) identifying whether such denial is from the prime contractor or subcontractor; and

"(iii) developing an appropriate timeframe for requiring submission of uncertified cost or pricing data before a request for such data is considered a denial, including a standardized determination of a starting point and conclusion for such requests.".

### SEC. 803. PROHIBITION ON THE TRANSFER OF CERTAIN DATA ON EMPLOYEES OF THE DEPARTMENT OF DEFENSE TO THIRD PARTIES.

10 USC prec. 4651.

Chapter 363 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC 4662.

## "§ 4662. Prohibition on the transfer of certain data on employees of the Department of Defense to third parties

"(a) IN GENERAL.—Each contract entered into by the Department of Defense on or after the date of the enactment of this section shall include a provision prohibiting the contractor and each subcontractor under such contract from selling, licensing, or otherwise transferring covered individually identifiable Department employee data to any individual or entity other than the Federal Government, except to the extent required to perform such contract or a subcontract under such contract and that would be permissible pursuant to statute or guidance from the Director of the Office of Management and Budget.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 313

"(b) WAIVER.—The Secretary of Defense may waive the requirements of subsection (a) with respect to a sale, licensing, or other transfer of covered individually identifiable Department employee data if the Secretary determines that such waiver is appropriate.

Determination.

"(c) DEFINITIONS.—In this section:

"(1) The term 'covered individually identifiable Department employee data' means individually identifiable Department employee data obtained by—

"(A) a contractor pursuant to the performance of a contract described in subsection (a) by such contractor; or

"(B) a subcontractor pursuant to the performance of a subcontract under such a contract by such subcontractor.

"(2) The term 'individually identifiable Department employee data' means information related to an employee of the Department of Defense, including a member of the Armed Forces, that—

"(A) identifies such employee; or

"(B) which may be used to infer, by either direct or indirect means, the identity of such an employee to whom the information applies.".

**SEC. 804. PROHIBITION ON CONTRACTING WITH PERSONS THAT HAVE FOSSIL FUEL OPERATIONS WITH THE GOVERNMENT OF THE RUSSIAN FEDERATION OR THE RUSSIAN ENERGY SECTOR.**

10 USC note prec. 4651.

(a) PROHIBITION.—

(1) IN GENERAL.—Except as provided under subsections (b), (c), and (d), the Secretary of Defense may not enter into a contract for the procurement of goods or services with any person that is or that has fossil fuel business operations with a person that is not less than 50 percent owned, individually or collectively, by—

(A) an authority of the Government of the Russian Federation; or

(B) a fossil fuel company that operates in the Russian Federation, except if the fossil fuel company transports oil or gas—

(i) through the Russian Federation for sale outside of the Russian Federation; and

(ii) that was extracted from a country other than the Russian Federation with respect to the energy sector of which the President has not imposed sanctions as of the date on which the contract is awarded.

(2) OIL AND GAS ORIGIN.—For the purposes of applying the exception under paragraph (1)(B), oil and gas transported by a fossil fuel company shall be deemed to have been extracted from the location of extraction specified in the certificate of origin or other documentation confirming the origin of such oil or gas unless the person with respect to which such exception would apply knew or had reason to know that such location in such documentation was false or incorrect.

(b) EXCEPTIONS.—

(1) IN GENERAL.—The prohibition under subsection (a) does not apply to a contract that the Secretary of Defense and the Secretary of State jointly determine—

Determination.

(A) is necessary—

(i) for purposes of providing humanitarian assistance to the people of Russia; or

(ii) for purposes of providing disaster relief and other urgent life-saving measures;

(B) is vital to the military readiness, basing, or operations of the United States or the North Atlantic Treaty Organization;

(C) is vital to the national security interests of the United States; or

(D) was a business operation with a fossil fuel company in a country other than the Russian Federation that was entered into prior to the date of the enactment of this section.

(2) NOTIFICATION REQUIREMENT.—The Secretary of Defense shall notify the appropriate congressional committees of any contract entered into on the basis of an exception provided for under paragraph (1).

(3) OFFICE OF FOREIGN ASSETS CONTROL LICENSES.—The prohibition in subsection (a) shall not apply to a person that has a valid license to operate in Russia issued by the Office of Foreign Assets Control of the Department of the Treasury or is otherwise authorized to operate in Russia by the Federal Government notwithstanding the imposition of sanctions.

(4) AMERICAN DIPLOMATIC MISSION IN RUSSIA.—The prohibition in subsection (a) shall not apply to contracts related to the operation and maintenance of the United States Government's consular offices and diplomatic posts in Russia.

(c) APPLICABILITY.—This section shall take effect on the date of the enactment of this Act and apply with respect to any contract entered into on or after such effective date.

(d) SUNSET.—This section shall terminate on December 31, 2029.

(e) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Oversight and Accountability, the Committee on Armed Services, and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Homeland Security and Governmental Affairs, the Committee on Armed Services, and the Committee on Foreign Relations of the Senate.

(2) BUSINESS OPERATIONS.—

(A) IN GENERAL.—The term "business operations" means engaging in commerce in any form, including acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, or any other apparatus of business or commerce.

(B) EXCEPTIONS.—The term "business operations" does not include—

(i) any shipment subject to price caps as specified in the "Statement of the G7 and Australia on a Price Cap for Seaborne Russian-Origin Crude Oil", issued on December 2, 2022, between member countries of that coalition, or the price caps as specified in the "Statement of the G7 and Australia on price caps for seaborne Russian-origin petroleum products Berlin,

Brussels, Canberra, London, Ottawa, Paris, Rome, Tokyo, Washington", issued on February 4, 2023, between such members, if such shipment complies with the applicable price caps;

(ii) actions taken for the benefit of the country of Ukraine, as determined by the Secretary of Defense; or

Ukraine.
Determination.

(iii) actions taken to support the suspension or termination of business operations for commercial activities during the period beginning on the date of the enactment of this Act and ending on the date described in subsection (d), including—

(I) any action to secure or divest from facilities, property, or equipment;

(II) the provision of products or services provided to reduce or eliminate operations in territory internationally recognized as the Russian Federation or to comply with sanctions relating to the Russian Federation; and

(III) activities that are incident to liquidating, dissolving, or winding down a subsidiary or legal entity in Russia.

(3) FOSSIL FUEL COMPANY.—The term "fossil fuel company" means a person that—

(A) carries out oil, gas, or coal exploration, development, or production activities;

(B) processes or refines oil, gas, or coal; or

(C) transports, or constructs facilities for the transportation of, Russian oil, gas, or coal.

(4) PERSON.—The term "person" means—

(A) a natural person, corporation, company, business association, partnership, society, trust, or any other non-governmental entity, organization, or group;

(B) any governmental entity or instrumentality of a government, including a multilateral development institution (as defined in section 1701(c)(3) of the International Financial Institutions Act (22 U.S.C. 262r(c)(3))); and

(C) any successor, subunit, parent entity, or subsidiary of, or any entity under common ownership or control with, any entity described in subparagraph (A) or (B).

**SEC. 805. PROHIBITION OF THE DEPARTMENT OF DEFENSE PROCUREMENT RELATED TO ENTITIES IDENTIFIED AS CHINESE MILITARY COMPANIES OPERATING IN THE UNITED STATES.**

10 USC note
prec. 4651.

(a) PROHIBITION ON USE OR PROCUREMENT.—

(1) IN GENERAL.—Except as provided under subsection (d), the Secretary may not—

(A) enter into, renew, or extend a contract for the procurement of goods, services, or technology with an entity described in paragraph (2); or

(B) enter into, renew, or extend a contract for the procurement of goods or services that include goods or services produced or developed by an entity described in paragraph (2).

(2) ENTITIES DESCRIBED.—An entity described in this paragraph is—

137 STAT. 316          PUBLIC LAW 118–31—DEC. 22, 2023

(A) an entity that is identified in the annual list published in the Federal Register by the Department of Defense of Chinese military companies operating in the United States pursuant to section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note); or

(B) any entity subject to the control of an entity described in subparagraph (A).

(3) LIMITATION ON APPLICABILITY.—

(A) IN GENERAL.—Nothing in paragraph (1) shall prohibit the Secretary from entering into, renewing, or extending a contract for the procurement of goods, services, or technology to provide a service that connects to the facilities of a third party, including backhaul, roaming, or interconnection arrangements.

(B) EXISTING CONTRACTS.—Nothing in this section shall permit the Secretary to apply the prohibitions in paragraph (1) to existing contracts for goods, services, or technology, including when such contracts are modified, extended, or renewed, entered into prior to the relevant date described in subsection (b).

(C) COMPONENTS.—Paragraph (1) shall not apply with respect to components (as defined in section 105 of title 41, United States Code).

Deadlines.

(4) RULEMAKING.—

(A) ENTITY PROHIBITION.—Not later than one year after the date of the enactment of this Act, the Secretary shall amend the Defense Federal Acquisition Regulation Supplement to implement the prohibitions in paragraph (1)(A) for the Department of Defense.

(B) GOODS AND SERVICES PROHIBITION.—Not later than 545 days after the date of the enactment of this Act, the Secretary shall amend the Defense Federal Acquisition Regulation Supplement to implement the prohibitions in paragraph (1)(B) for the Department of Defense, including—

(i) best practices to avoid being subject to the prohibitions described in paragraph (1)(B); and

(ii) technical support to assist affected businesses, institutions, and organizations as is reasonably necessary for those affected entities to comply with this section.

(b) EFFECTIVE DATES.—The prohibition under subsection (a)(1)(A) shall take effect on June 30, 2026, and the prohibition under subsection (a)(1)(B) shall take effect on June 30, 2027.

(c) WAIVER AUTHORITY.—

(1) IN GENERAL.—The Secretary may waive the requirements under subsection (a) with respect to an entity that requests such a waiver if the entity seeking the waiver—

(A) provides to the Secretary a compelling justification for the additional time to implement the requirements under such subsection, as determined by the Secretary of Defense; and

Plan.

(B) provides to the Secretary a phase-out plan to eliminate goods, services, or technology produced or developed by an entity described in subsection (a)(2) from the systems of the entity.

(2) DURATION.—A waiver granted under paragraph (1) may remain in effect until the date on which the Secretary determines that commercially viable providers exist outside of the People's Republic of China that can and are willing to provide the Department of Defense with quality goods and services in the quantity demanded.

(3) DELEGATION.—The Secretary may designate the authority under this section only to—

(A) the service acquisition executive of the military department (as such terms are defined in section 101(a) of title 10, United States Code) concerned; or

(B) the official responsible for all acquisition functions of such other element or organization of the Department of Defense concerned.

(d) EXCEPTION.—The President shall not be required to apply or maintain the prohibition under subsection (a) for activities subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.), or to any authorized intelligence activities of the United States.

(e) DEFINITIONS.—In this section:

(1) CONTROL.—The term "control" has the meaning given that term in part 800.208 of title 31, Code of Federal Regulations, or any successor regulations.

(2) SECRETARY.—The term "Secretary" means the Secretary of Defense.

### SEC. 806. PRINCIPAL TECHNOLOGY TRANSITION ADVISOR.

10 USC 1701 note.
Deadline.

(a) DESIGNATION.—Not later than one year after the date of the enactment of this Act, each service acquisition executive of a military department shall designate a Principal Technology Transition Advisor who shall advise each Secretary of a military department on the transition of technologies, including technologies from science and technology programs of the Department, private commercial entities, research institutions, and universities, to fulfill identified and potential warfighter requirements for the military department.

(b) ADVISOR STATUS.—The Principal Technology Transition Advisor of a military department designated under subsection (a) shall be a member of the Senior Executive Service or a general officer and directly report to the service acquisition executive of such military department.

(c) RESPONSIBILITIES.—The Principal Technology Transition Advisor of a military department designated under subsection (a) shall do the following:

(1) Identify technologies being researched, developed, tested, or evaluated by science and technology programs of the Department, including Defense research facilities (as defined in section 4125(b) of title 10, United States Code), that the military department may use to meet identified and potential warfighter requirements, including technologies for which the Department owns and maintains the intellectual property rights.

(2) Consult with Department of Defense innovation programs to identify technologies from private commercial entities, research institutions, universities, and other entities that the military department may use to meet identified and potential warfighter requirements.

(3) Make recommendations to the service acquisition executive of the military department regarding the acquisition of technologies identified under paragraphs (1) and (2) for acquisition decisions at the service acquisition executive level.

(4) Inform program managers (as defined in section 1737 of title 10, United States Code) and other relevant acquisition officials of the military department of relevant technologies identified under paragraphs (1) and (2).

(5) Develop policies and processes for promoting to small business concerns (as defined under section 3 of the Small Business Act (15 U.S.C. 632)) and nontraditional defense contractors (as defined in section 3014 of title 10, United States Code) opportunities to license intellectual property developed by the Department, including opportunities and methods for small business concerns and nontraditional defense contractors to engage with the Department regarding such licensing.

(6) Develop and maintain metrics tracking the outcomes of projects and other activities of the military department for which the military department expended amounts designated as budget activity 3 (Advanced Technology Development), budget activity 4 (Advanced Component Development and Prototypes), and budget activity 5 (System Development and Demonstration), as those budget activity classifications are set forth in volume 2B, chapter 5 of the Department of Defense Financial Management Regulation (DOD 7000.14-R).

Time period.

(d) CONGRESSIONAL REPORT.—Not later than one year after the designation of the Principal Technology Transition Advisor of a military department under subsection (a), and annually thereafter, the Principal Technology Transition Advisor of such military department shall submit to Congress a report on the following for the one-year period preceding the submission of the report:

(1) The activities of the Principal Technology Transition Advisor.

(2) The outcomes of projects and other activities described in subsection (c)(6), including the metrics described in such subsection.

(e) DEFINITIONS.—In this section—

(1) the term "Department" means the Department of Defense;

(2) the term "Department of Defense innovation programs" means the Defense Innovation Unit of the Department of Defense, AFWERX of the Air Force, and other programs sponsored by the Department of Defense, or any component thereof, with a focus on accelerating the adoption of emerging technologies for mission-relevant applications or innovation; and

(3) the terms "military department" and "service acquisition executive" have the meanings given such terms in section 101(a) of title 10, United States Code.

10 USC 132 note.

## SEC. 807. SENIOR CONTRACTING OFFICIAL FOR STRATEGIC CAPABILITIES OFFICE.

(a) SENIOR CONTRACTING OFFICIAL.—The staff of the Director of the Strategic Capabilities Office shall include a senior contracting official (as defined in section 1737 of title 10, United States Code) who shall have the authority to enter into and administer contracts, grants, cooperative agreements, and other transactions in execution of the program activities of the Strategic Capabilities Office.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 319

(b) EFFECTIVE DATE; IMPLEMENTATION PLAN.—

(1) EFFECTIVE DATE.—The authorities described in subsection (a) shall take effect 30 days after the date on which the Secretary of Defense submits the plan described in paragraph (2).

(2) PLAN.—Not later than 90 days after the date of the enactment of this Act, the Secretary shall submit to the congressional defense committees a plan for the implementation of the authorities described in subsection (a). The plan shall include the following:

(A) A plan for oversight of the senior contracting official described under subsection (a).

(B) An assessment of the acquisition workforce needs of the Strategic Capabilities Office to support the authority provided under subsection (a).

(C) Other matters as appropriate.

### SEC. 808. PILOT PROGRAM FOR THE USE OF INNOVATIVE INTELLECTUAL PROPERTY STRATEGIES.

10 USC 3791 note.

(a) ESTABLISHMENT.—The Secretary of Defense shall establish a pilot program for the use of innovative intellectual property strategies that meet the criteria described in subsection (b) to acquire the necessary technical data rights required for the operation, maintenance, and installation of, and training for, covered programs designated under subsection (c).

(b) CRITERIA FOR STRATEGIES.—The innovative intellectual property strategies used in a pilot program established under this section may include the following:

(1) The use of an escrow account to verify and hold intellectual property data.

(2) The use of royalties or licenses.

(3) Other strategies, as determined by the Secretary.

(c) DESIGNATION OF COVERED PROGRAMS.—Not later than May 1, 2024, and with respect to the pilot program established under this section—

(1) the Secretary of each military department shall designate one covered program within the military department under the jurisdiction of such Secretary; and

(2) the Under Secretary of Defense for Acquisition and Sustainment shall designate one covered program within the Defense Agencies or Department of Defense Field Activities (as defined, respectively, in section 101 of title 10, United States Code).

(d) BRIEFING REQUIREMENT.—Not later than 180 days after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment, in coordination with the Secretaries of the military departments, shall provide a briefing to the Committees on Armed Services of the Senate and the House of Representatives with a detailed plan to implement the pilot program required under this section.

(e) ANNUAL REPORT.—Beginning on the date on which the first program is designated under subsection (c) and until the termination date in subsection (f), the Under Secretary of Defense for Acquisition and Sustainment, in coordination with the Secretaries of the military departments, shall provide an annual report to the Committees on Armed Services of the Senate and the House of Representatives on—

Deadline.

Assessment.

Deadline.

Deadline.
Plan.

137 STAT. 320          PUBLIC LAW 118–31—DEC. 22, 2023

(1) the effectiveness of the pilot program in acquiring the necessary technical data rights necessary to support timely, cost-effective maintenance and sustainment of the acquisition programs designated under subsection (c); and

Recommendations.

(2) any recommendations for the applicability of lessons learned from the pilot program.

(f) TERMINATION.—The authority to carry out the pilot program established under this section shall terminate on December 31, 2028.

(g) DEFINITIONS.—In this section:

(1) The term "covered program" means an acquisition program under which procurements are conducted using a pathway of the adaptive acquisition framework (as described in Department of Defense Instruction 5000.02, "Operation of the Adaptive Acquisition Framework").

(2) The term "technical data rights" has the meaning given in section 3771 of title 10, United States Code.

10 USC note prec. 3301.

**SEC. 809. PILOT PROGRAM FOR ANYTHING-AS-A-SERVICE.**

(a) IN GENERAL.—The Secretary of Defense shall establish a pilot program to explore the use of consumption-based solutions to address any defense need, hereafter "anything-as-a-service", that is feasible to provide users on-demand access, quickly add newly released capabilities, and bill based on actual usage at fixed price units.

(b) REQUIREMENTS.—A contract or other agreement for anything-as-a-service entered into under the pilot program shall require the outcomes of the capability to be measurable, including the cost and speed of delivery in comparison to using processes other than anything-as-a-service, at the regular intervals that are customary for the type of solution provided.

Public information. Time period.

(c) NOTICE.—With respect to each opportunity to participate in the pilot program established under subsection (a), the Secretary shall make publicly available a notice of such opportunity for not less than 60 days.

Deadline.

(d) TIMING.—The Secretary shall, to the extent practicable, enter into a contract or other agreement under this section not later than 100 days after the date on which the Secretary, under subsection (c), makes publicly available a notice to participate in the pilot program established under this section.

(e) EXEMPTIONS.—A contract or other agreement entered into under this section shall be exempt from the following:

(1) The requirements of section 3702 of title 10, United States Code.

(2) With respect to a modification to add new features or capabilities in an amount less than or equal to 25 percent of the total value of such contract or other agreement, the requirements of full and open competition (as defined in section 2302 of title 10, United States Code).

Deadline.

(f) BRIEFING.—Not later than June 30, 2024, the Secretary of Defense shall provide a briefing to the congressional defense committees on the implementation of the pilot program.

(g) ANYTHING-AS-A-SERVICE DEFINED.—In this section, the term "anything-as-a-service" means a model under which a technology-supported capability is provided to the Department of Defense and may utilize any combination of software, hardware or equipment,

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 321

data, and labor or services that provides a capability that is metered and billed based on actual usage at fixed price units.

**SEC. 810. UPDATED GUIDANCE ON PLANNING FOR EXPORTABILITY FEATURES FOR FUTURE PROGRAMS.**

    (a) PROGRAM GUIDANCE ON PLANNING FOR EXPORTABILITY FEATURES.—Not later than one year after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment shall ensure that the program guidance for major defense acquisition programs (as defined in section 4201 of title 10, United States Code) and for acquisition programs and projects that are carried out using the rapid fielding or rapid prototyping acquisition pathway under section 804 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 10 U.S.C. 3201 note prec.) is revised to integrate planning for exportability features under section 4067 of title 10, United States Code, including—

        (1) for major defense acquisition programs, an assessment of such programs to identify potential exportability needs; and

        (2) for technologies under an acquisition program or project carried out using the rapid fielding or rapid prototyping acquisition pathway that are transitioned to a major capability acquisition program, an assessment of potential exportability needs of such technologies not later than one year after the date of such transition.

    (b) REVISION OF GUIDANCE FOR PROGRAM PROTECTION PLANS.—Not later than three years after the date of the enactment of this Act, the Under Secretary shall revise guidance for program protection plans to integrate a requirement to determine exportability for the programs covered by such plans.

**SEC. 811. MODERNIZING THE DEPARTMENT OF DEFENSE REQUIREMENTS PROCESS.**

    (a) MODERNIZING THE DEPARTMENT OF DEFENSE REQUIREMENTS PROCESS.—Not later than October 1, 2025, the Secretary of Defense, acting through the Vice Chairman of the Joint Chiefs of Staff, in coordination with the Secretaries of the military departments and the commanders of the combatant commands, and in consultation with the Under Secretary of Defense for Acquisition and Sustainment, shall develop and implement a streamlined requirements development process for the Department of Defense, to include revising the Joint Capabilities Integration and Development System, in order to improve alignment between modern warfare concepts, technologies, and system development and reduce the time to deliver needed capabilities to warfighters.

    (b) REFORM ELEMENTS.—The process required by subsection (a) shall—

        (1) streamline requirements documents, reviews, and approval processes, focusing on programs below the major defense acquisition program threshold described in section 4201 of title 10, United States Code;

        (2) revise requirements management practices using a clean-sheet approach that avoids prescriptive language, is based on mission outcomes and assessed threats, enables a more iterative and collaborative approach with the Armed Forces, maximizes the use of commercial products or commercial services in accordance with section 3453 of title 10, United States Code, and allows for a broader range of new or alternative

*Margin notes:*

Deadlines.
10 USC 4067 note.

Assessments.

10 USC note prec. 3101.

Deadline.
Revisions.

Revisions.

137 STAT. 322          PUBLIC LAW 118–31—DEC. 22, 2023

technological opportunities to be incorporated without the requirement being validated again;

(3) develop a capability needs and requirements framework and pathways that are aligned to the pathways of the adaptive acquisition framework (as described in Department of Defense Instruction 5000.02, "Operation of the Adaptive Acquisition Framework"), and better aligned and integrated with the science and technology development processes of the Department;

(4) provide continuity to the acquisition and research programs of the military departments by enabling the military departments to develop, with respect to collections of capabilities grouped by function by the Department of Defense, sets of requirements that are designed to remain applicable to programs and systems relating to such capabilities over substantial periods of time;

(5) require the military departments to—

(A) articulate in a concise model and document with a set of mission impact measures the sets of requirements developed under paragraph (4); and

(B) seek to continuously improve the capabilities subject to such sets of requirements the acquisition of additional capabilities;

(6) establish a process to rapidly validate the ability of commercial products and services to meet capability needs or opportunities;

(7) retire and replace the Department of Defense Architecture Framework with a new structure focused on enabling interoperability through application program interfaces, enterprise architectures and platforms, and government and commercial standards; and

(8) ensure that requirements processes for software, artificial intelligence, data, and related capability areas enable a more rapid, dynamic, and iterative approach than the requirements processes for traditional hardware systems.

(c) ELEMENTS.—With respect to the implementation of the process required by subsection (a), the Vice Chairman of the Joint Chiefs of Staff shall—

(1) collaborate with industry partners, contractors of the Department and nontraditional defense contractors (as defined in section 3014 of title 10, United States Code), and Department of Defense science and technology reinvention laboratories (as designated under section 4121(b) of title 10, United States Code) regarding the development of the streamlined requirements development process under subsection (a) to ensure such process effectively uses the innovation ecosystem (as defined in section 236(g) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (10 U.S.C. 4001 note));

(2) develop a formal career path, training, and structure for requirements managers; and

Publications.

(3) publish new policies, guidance, and templates for the operational, requirements, and acquisition workforces online in digital formats.

(d) INTERIM REPORT.—Not later than October 1, 2024, the Secretary of Defense shall submit to the congressional defense committees a report on the development and implementation of the process required by subsection (a), including—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 323

(1) a description of the efforts to develop and implement the streamlined requirements development process under subsection (a);

(2) the plans of the Department of Defense to implement, communicate, and continuously improve the requirements development process required by subsection (a); and
<span style="float:right">Plans.</span>

(3) any additional recommendations for legislation that the Secretary determines appropriate.
<span style="float:right">Recommendations.</span>

(e) FINAL REPORT.—Not later than October 1, 2025, the Secretary of Defense shall submit to the congressional defense committees a report describing activities carried out pursuant to this section.

**SEC. 812. PREVENTING CONFLICTS OF INTEREST FOR ENTITIES THAT PROVIDE CERTAIN CONSULTING SERVICES TO THE DEPARTMENT OF DEFENSE.**
<span style="float:right">10 USC note prec. 4501.</span>

(a) IN GENERAL.—

(1) CERTIFICATION.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall amend the Department of Defense Supplement to the Federal Acquisition Regulation to require any entity that provides consulting services and is assigned a North American Industry Classification System code beginning with 5416, after the effective date of such amendment and before entering into a covered contract, to certify that—
<span style="float:right">Deadline. Regulations.</span>

(A) neither the entity nor any subsidiaries or affiliates of the entity (as that term is defined in section 2.101 of the Federal Acquisition Regulation) hold a contract for consulting services with one or more covered foreign entities; or

(B) the entity maintains a Conflict of Interest Mitigation plan described under subsection (b) that is auditable by a contract oversight entity.

(2) PROHIBITION.—The Secretary of Defense may not enter into a covered contract with an entity described in paragraph (1) that is unable to make the certification required under such paragraph.

(b) CONFLICT OF INTEREST MITIGATION PLAN.—A Conflict of Interest Mitigation plan described under this subsection shall include—

(1) an identification, where such identification is not otherwise prohibited by law or regulation, of any covered contracts of an entity described in subsection (a) with a covered foreign entity;

(2) a written analysis, including a course of action for avoiding, neutralizing, or mitigating the actual or potential conflict of interest of such a covered contract with the Department of Defense;
<span style="float:right">Analysis.</span>

(3) a description of the procedures adopted by an entity to ensure that individuals who will be performing a covered contract will not, for the duration of such contract, also provide any consulting services to any covered foreign entity; and
<span style="float:right">Procedures.</span>

(4) a description of the procedures by which an entity will submit to the contract oversight entities a notice of an unmitigated conflict of interest with respect to a covered contract within 15 days of determining that such a conflict has arisen.
<span style="float:right">Procedures. Notice. Deadline. Determination.</span>

137 STAT. 324          PUBLIC LAW 118–31—DEC. 22, 2023

(c) ALTERNATIVE IDENTIFICATION OF COVERED FOREIGN ENTI-TIES.—If an entity is unable to identify covered foreign entities under subsection (b)(1) due to confidentiality obligations, the entity shall identify any such covered foreign entity as an entity described in subparagraphs (A) through (F) of subsection (f)(4) in the Conflict of Interest Mitigation plan.

(d) NOTIFICATION.—Before determining to withhold an award of a covered contract based on a conflict of interest under this section that cannot be avoided or mitigated, the contracting officer for the contract shall notify the offeror of the reasons for such withholding and allow the offeror a reasonable opportunity to respond. If the contracting officer for the contract finds that it is in the best interests of the United States to award the contract notwithstanding such a conflict of interest, a request for waiver shall be submitted in accordance with section 9.503 of title 48, Code of Federal Regulations. The waiver request and decision shall be included in the contract file.

(e) WAIVER.—

(1) AUTHORITY.—The Secretary of Defense may issue a waiver with respect to the requirements of this section for the award of a covered contract on a case-by-case basis as may be necessary in the interest of national security. The Secretary of Defense may not delegate the authority under this subsection to an official who has not been Presidentially appointed and confirmed by the Senate.

Deadline.

(2) WAIVER NOTIFICATION.—Not later than 30 days after issuing a waiver under this subsection, the Secretary of Defense shall provide a written notification to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives regarding the use of such waiver authority. The notification shall include—

(A) the specific justification for providing the waiver;

(B) an identification of the covered foreign entity that is the subject of the waiver request;

(C) the number of bidders for the covered contract for which the waiver was granted;

(D) the number of bidders for the covered contract that did not request a waiver; and

(E) the total dollar value of the covered contract.

(f) DEFINITIONS.—In this section:

(1) The term "consulting services" has the meaning given the term "advisory and assistance services" in section 2.101 of the Federal Acquisition Regulation, except that the term does not include the provision of products or services related to—

(A) compliance with legal, audit, accounting, tax, reporting, or other requirements of the laws and standards of countries; or

(B) participation in a judicial, legal, or equitable dispute resolution proceeding.

(2) The term "contract oversight entity" means any of the following:

(A) The contracting officer.

(B) The contracting officer representative.

(C) The Defense Contract Management Agency.

(D) The Defense Contract Audit Agency.

(E) The Office of Inspector General of the Department of Defense or any subcomponent of such office.

(F) The Government Accountability Office.

(3) The term "covered contract" means a contract of the Department of Defense for consulting services.

(4) The term "covered foreign entity" means any of the following:

(A) The Government of the People's Republic of China, the Chinese Communist Party, the People's Liberation Army, the Ministry of State Security, or other security service or intelligence agency of the People's Republic of China.

China.

(B) The Government of the Russian Federation or any entity sanctioned by the Secretary of the Treasury under Executive Order 13662 titled "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (79 Fed. Reg. 16169).

Russia.

(C) The government of any country if the Secretary of State determines that such government has repeatedly provided support for acts of international terrorism pursuant to any of the following:

Determination.

(i) Section 1754(c)(1)(A) of the Export Control Reform Act of 2018 (50 U.S.C. 4318(c)(1)(A)).

(ii) Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

(iii) Section 40 of the Arms Export Control Act (22 U.S.C. 2780).

(iv) Any other provision of law.

(D) Any entity included on any of the following lists maintained by the Department of Commerce:

(i) The Entity List set forth in Supplement No. 4 to part 744 of the Export Administration Regulations.

(ii) The Denied Persons List as described in section 764.3(a)(2) of the Export Administration Regulations.

(iii) The Unverified List set forth in Supplement No. 6 to part 744 of the Export Administration Regulations.

(iv) The Military End User List set forth in Supplement No. 7 to part 744 of the Export Administration Regulations.

(E) Any entity identified by the Secretary of Defense pursuant to section 1237(b) of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 (Public Law 105–261; 50 U.S.C. 1701 note).

(F) Any entity on the Non-SDN Chinese Military-Industrial Complex Companies List (NS–CMIC List) maintained by the Office of Foreign Assets Control of the Department of the Treasury under Executive Order 14032 (86 Fed. Reg. 30145; relating to addressing the threat from securities investments that finance certain companies of the People's Republic of China), or any successor order.

## SEC. 813. FOCUSED COMMERCIAL SOLUTIONS OPENINGS OPPORTUNITIES.

10 USC 3458 note.

(a) REQUIREMENT.—During each fiscal year beginning after the date of the enactment of this Act, the Secretary of Defense, in coordination with the service acquisition executives of each military

Time periods.
Effective date.

department, shall exercise the authority under section 3458 of title 10, United States Code, not less than four times to acquire goods or services addressing the mission needs of a geographic combatant command.

(b) EXECUTION.—With respect to acquisition carried out under section 3458 of title 10, United States Code, pursuant to subsection (a), the Secretary of Defense shall—

(1) assign the responsibility for carrying out such acquisition to a program executive officer and a head of a science and technology reinvention laboratory from the same military department, who shall co-lead such acquisition; and

(2) ensure that the program executive officer and the head of a science and technology reinvention laboratory assigned as co-leads under paragraph (1) have similar existing requirements and funding for transitioning technologies to acquisition programs within the area of focus for such acquisition.

(c) SUNSET.—Subsection (a) shall expire on September 30, 2027.

(d) DEFINITIONS.—In this section:

(1) The terms "military department" and "services acquisition executive" have the meanings given such terms in section 101(a) of title 10, United States Code.

(2) The term "program executive officer" has the meaning given such term in section 1737(a) of title 10, United States Code.

(3) The term "science and technology reinvention laboratory" means a science and technology reinvention laboratory designated under section 4121(b) of title 10, United States Code.

# Subtitle B—Amendments to General Contracting Authorities, Procedures, and Limitations

### SEC. 820. AMENDMENTS TO MULTIYEAR PROCUREMENT AUTHORITY.

Section 3501(a)(1) of title 10, United States Code, is amended—

(1) by striking "will result in significant savings" and inserting the following: "will result in—

"(A) significant savings"; and

(2) by striking "annual contracts." and inserting the following: "annual contracts; or

"(B) necessary defense industrial base stability not otherwise achievable through annual contracts.".

### SEC. 821. MODIFICATION OF APPROVAL AUTHORITY FOR CERTAIN FOLLOW-ON PRODUCTION CONTRACTS OR TRANSACTIONS.

Section 4022 of title 10, United States Code, is amended—

(1) in subsection (a)(2)(C)(i)(I), by inserting after "subsection (d)" the following: "were met for the prior transaction for the prototype project that provided for the award of the follow-on production contract or transaction, and the requirements of subsection (f)"; and

(2) in subsection (d), by adding at the end the following new paragraph:

"(3) The requirements of this subsection do not apply to follow-on production contracts or transactions under subsection (f).".

## SEC. 822. CLARIFICATION OF OTHER TRANSACTION AUTHORITY FOR INSTALLATION OR FACILITY PROTOTYPING.

(a) IN GENERAL.—Section 4022(i) of title 10, United States Code, is amended—

(1) in paragraph (2)—

(A) in subparagraph (A), by inserting "except for projects carried out for the purpose of repairing a facility," before "not more"; and

(B) in subparagraph (B), by striking "$200,000,000" and inserting "$300,000,000";

(2) by redesignating paragraph (3) as paragraph (4); and

(3) by inserting after paragraph (2) the following new paragraph:

"(3) USE OF AMOUNTS.—The Secretary of Defense or the Secretary of a military department may carry out prototype projects under the pilot program established under paragraph (1) using amounts available to the Secretary of Defense or the Secretary of a military department (as applicable) for military construction, operation and maintenance, or research, development, test, and evaluation, notwithstanding—

"(A) subchapters I and III of chapter 169 of this title; and

"(B) chapters 221 and 223 of this title.".

(b) APPLICABILITY.—The amendments made by this section shall apply with respect to transactions entered into on or after the date of the enactment of this Act.

10 USC 4022 note.

## SEC. 823. EXTENSION AND REVISIONS TO NEVER CONTRACT WITH THE ENEMY.

(a) IN GENERAL.—Section 841 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291; 10 U.S.C. 4871 note prec.) is amended—

(1) by striking the section heading and inserting "THREAT MITIGATION IN COMMERCIAL SUPPORT TO OPERATIONS";

(2) in subsection (a)—

(A) by striking the subsection heading and inserting "PROGRAM ESTABLISHED"; and

(B) in matter preceding paragraph (1), by striking "and in consultation with the Secretary of State" and all that follows through the period at the end and inserting "and the Secretary of State, establish a program to enable commanders of combatant commands to identify and manage risks resulting from covered persons and entities engaging in covered activities. The Secretary of Defense shall issue guidance establishing such program, including identifying who shall be responsible for carrying out and overseeing the program, procedures for using information available from intelligence, security, and law enforcement sources to identify such risks, and strategies for managing the risks posed by covered persons and entities engaging in covered activities.";

Guidance.
Procedures.
Strategies.

(3) by amending subsection (b) to read as follows:

"(b) AUTHORITY.—

"(1) IDENTIFICATION.—

Evaluation.

"(A) IN GENERAL.—Under the program established under subsection (a), the commander of the combatant command concerned shall evaluate covered persons and entities within the area of responsibility of such command to identify such covered persons and entities that are engaging in covered activities.

Notice.

"(B) NOTIFICATION.—Upon identification of a covered person or entity who is engaging in covered activities pursuant to an evaluation under subparagraph (A), the commander of the combatant command concerned, or the designated deputies of such commander, shall submit to the Under Secretary of Defense for Acquisition and Sustainment, the Under Secretary of Defense for Intelligence and Security, and the Under Secretary of Defense for Policy a notice of such identification and the rationale for such identification.

Notification.

"(2) COVERED PROCUREMENT ACTIONS.—The head of a contracting activity may take a covered procurement action with respect to a person or entity identified as engaging in a covered activity under the program established under subsection (a) if such head receives a notification from the Under Secretary of Defense for Acquisition and Sustainment stating that, based on a risk assessment conducted by the commander of a combatant command who made such identification—

"(A) such person or entity is a covered person or entity;

"(B) such person or entity is or was engaging in one or more covered activities; and

"(C) less intrusive measures are not reasonably available to manage the risk posed by such person or entity.";

(4) by amending subsection (c) to read as follows:

"(c) NOTIFICATION TO COVERED PERSON OR ENTITY.—

"(1) ADVANCE NOTICE.—The head of a contracting activity, or other appropriate official, shall notify covered persons and entities of the following:

"(A) The program established under subsection (a).

"(B) The authorities provided by subsection (b).

"(C) The responsibilities of covered persons or entities to exercise due diligence to mitigate their engagement in covered activities.

"(2) NOTICE OF COVERED PROCUREMENT ACTIONS.—

Deadlines.

Review.

"(A) IN GENERAL.—Not later than 30 days prior to taking a covered procurement action, the head of a contracting activity shall notify the covered person or entity of the covered procurement action. The covered person or entity shall be permitted the opportunity to challenge the covered procurement action by requesting an administrative review of the action under the procedures of the Department of Defense not later than 30 days after receipt of notice of the action.

"(B) LIMITATION ON DISCLOSURE OF INFORMATION.—The rationale of the commander of a combatant command that identified the covered person or entity receiving a notice under subparagraph (A) as a covered person or entity engaging in a covered activity under subsection (b)(1) shall not be disclosed to such covered person or entity, or their representatives, to the extent that such disclosure would

compromise national security or pose an unacceptable threat to personnel of the United States or its partners or allies.

"(C) PROTECTION OF CLASSIFIED INFORMATION.—Classified information relied upon to take a covered procurement action may not be disclosed to a covered person or entity, or to their representatives, unless a protective order issued by a court of competent jurisdiction established under article I or article III of the Constitution of the United States specifically addresses the conditions under which such classified information may be disclosed.";

(5) by amending subsection (d) to read as follows:

"(d) COVERED PROCUREMENT ACTION REPORTING.—Not later than 15 days after the head of a contracting activity takes a covered procurement action, such head of a contracting activity shall report such covered procurement action to the Under Secretary of Defense for Acquisition and Sustainment and include such covered procurement action in the Federal Awardee Performance and Integrity Information System or other formal systems of record and, in the case that such cover procurement action is for the exclusion a person or commercial entity from an award, the System for Award Management.";

(6) by amending subsection (e) to read as follows:

"(e) ANNUAL REVIEW.—The Secretary of Defense, in coordination with the Director of National Intelligence and the Secretary of State, shall, on an annual basis, review the lists of persons and entities previously subject to a covered procurement action under subsection (b)(2) to determine whether or not such persons and entities continue to warrant use of the covered procurement action.";

*Determination.*

(7) by amending subsection (f) to read as follows:

"(f) WAIVER.—The Secretary of Defense, in conjunction with the Secretary of State, may grant a waiver for actions taken under subsection (b) if it is in the best interest of national security.";

(8) by amending subsection (g) to read as follows:

"(g) DELEGATION OF AUTHORITY.—The authority provided by subsection (b) to make a determination to use a covered procurement action, in whole or in part, may not be delegated below the level of head of contracting activity, or equivalent official, for purposes of grants or cooperative agreements.";

*Determination.*

(9) by amending subsection (h) to read as follows:

"(h) UPDATING REGULATIONS.—The Federal Acquisition Regulation and the Defense Federal Acquisition Regulation Supplement shall be revised to implement the provisions of this subtitle.";

(10) in subsection (i)—

(A) in paragraph (1)—

(i) by striking "Director of the Office of Management and Budget" and inserting "Secretary of Defense";

(ii) by striking "appropriate committees of Congress" and inserting "congressional defense committees (as defined in section 101(a) of title 10, United States Code)";

(iii) in subparagraph (A)—

(I) by striking "an executive agency exercised the authority to terminate, void, or restrict a contract, grant, and cooperative agreement pursuant to subsection (c), based on a notification under

PUBLIC LAW 118–31—DEC. 22, 2023

subsection (b)" and inserting "a head of contracting activity took a covered procurement action";

(II) in clause (i), by striking "executive agency" and inserting "head of contracting activity";

(III) in clause (ii), by striking "the action taken" and inserting "taking the covered procurement action";

(IV) in clause (iii), by striking "voided or terminated" and inserting "subject to the covered procurement action"; and

(V) in clause (iv)—

(aa) by striking "of the executive agency in force" and inserting "the Department of Defense has"; and

(bb) by striking "at the time the contract, grant, or cooperative agreement was terminated or voided" and inserting "at the time of taking the covered procurement action"; and

(iv) in subparagraph (B)—

(I) by striking "an executive agency did not exercise the authority to terminate, void, or restrict a contract, grant, and cooperative agreement pursuant to subsection (c), based on a notification" and inserting "a head of contracting activity did not take a covered procurement action following an identification from a combatant commander";

(II) in clause (i), by striking "executive agency" and inserting "head of contracting activity"; and

(III) in clause (ii), by inserting "covered procurement" before "action"; and

(B) in paragraph (2), by striking "Director" and inserting "Secretary of Defense";

(11) by striking subsections (j) and (m) and redesignating subsections (k), (l), and (n) as subsections (j), (k), and (l), respectively;

(12) in subsection (k), as redesignated by paragraph (11), by striking "Except as provided in subsection (m), the" and inserting "The"; and

(13) in subsection (l), as so redesignated, by striking "December 31, 2025" and inserting "December 31, 2033".

(b) ACCESS TO RECORDS.—Section 842 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 is amended by striking subsections (a) through (c) and inserting the following:

Examination.

"(a) ADDITIONAL ACCESS TO RECORDS.—The Secretary of Defense may examine any records of persons or entities that have existing contracts with, or are active recipients of a grant or cooperative agreement from, the Department of Defense, including any subcontractors or subgrantees, to the extent necessary to support the program established under section 841 of this Act.

Determination.

"(b) LIMITATION.—The examination authorized under subsection (a) may only take place after a written determination is made by the contracting officer, based on a finding from the combatant commander, stating that this examination will support the program established under such section 841 and that less intrusive measures are not reasonably available to manage the risk.".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 331

(c) DEFINITIONS.—Section 843 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 is amended—

(1) by striking paragraphs (1), (2), (3), (7), and (9) and redesignating paragraphs (5), (6), and (8) as paragraphs (2), (3), and (7);

(2) before paragraph (2), as so redesignated, by inserting the following new paragraph:

"(1) COVERED ACTIVITIES.—The term 'covered activities' means activities where a covered person or entity is—

"(A) engaging in acts of violence against personnel of the United States or its partners and allies;

"(B) providing financing, logistics, training, or intelligence to a person described in subparagraph (A);

"(C) engaging in foreign intelligence activities against the United States or its partners and allies;

"(D) engaging in transnational organized crime or criminal activities; or

"(E) engaging in other activities that present a direct or indirect risk to United States or partner and allied missions and forces.";

(3) in paragraph (2), as so redesignated, by striking "with an estimated value in excess of $50,000 that is performed outside the United States, including its possessions and territories, in support" and all that follows through the period at the end and inserting "that is performed outside the United States, including its possessions and territories.";

(4) by amending paragraph (3), as so redesignated, to read as follows:

"(3) COVERED PERSON OR ENTITY.—The term 'covered person or entity' means any person, corporation, company, limited liability company, limited partnership, business trust, business association, or other similar entity outside of the United States or any foreign reporting company in accordance with section 5336(a)(11)(A)(ii) of title 31, United States Code, that is responding to a covered solicitation or performing work on a covered contract, grant, or cooperative agreement."; and

(5) by inserting after paragraph (4) the following new paragraphs:

"(5) COVERED PROCUREMENT ACTION.—The term 'covered procurement action' means an action taken by a head of contracting activity to—

"(A) exclude a person or commercial entity from an award with or without an existing contract, grant, or cooperative agreement;

"(B) terminate a contract, grant, or cooperative agreement for default; or

"(C) void, in whole or in part, a contract, grant, or cooperative agreement.

"(6) COVERED SOLICITATION.—The term 'covered solicitation' means any solicitation by the Department of Defense for work for which the place of performance is outside of the United States.".

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect 180 days after the date of the enactment of this Act, and shall apply to covered solicitations issued and covered contracts, grants, or cooperative agreements (as that term is defined

10 USC note prec. 4871.

**137 STAT. 332**          PUBLIC LAW 118–31—DEC. 22, 2023

in section 843 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, as amended by subsection (c)), awarded on or after such date, and to task and delivery orders that have been issued on or after such date pursuant to covered contracts, grants, or cooperative agreements that are awarded before, on, or after such date.

### SEC. 824. MODIFICATION AND EXTENSION OF TEMPORARY AUTHORITY TO MODIFY CERTAIN CONTRACTS AND OPTIONS BASED ON THE IMPACTS OF INFLATION.

The first section of Public Law 85–804 (50 U.S.C. 1431) is amended—

(1) in subsection (b), by adding at the end the following new sentence: "If any such amounts are so specifically provided, the Secretary may use them for such purposes."; and

(2) in subsection (e), by striking "December 31, 2023" and inserting "December 31, 2024".

*46 USC 50309 note.*

### SEC. 825. COUNTERING ADVERSARY LOGISTICS INFORMATION TECHNOLOGIES.

(a) COUNTERING THE SPREAD OF COVERED LOGISTICS PLATFORMS.—

(1) CONTRACTING PROHIBITION.—

(A) IN GENERAL.—The Secretary of Defense may not enter into a contract with an entity that provides data to covered logistics platforms.

*Effective date.*

(B) APPLICABILITY.—This paragraph shall apply with respect to any contract entered into on or after the date that is 180 days after the date of the enactment of this subsection.

(2) WAIVER.—The Secretary of Defense may waive the provisions of this subsection for a specific contract if the Secretary—

*Determination.*

(A) makes a determination that such waiver is vital to the national security of the United States; and

*Reports.*

(B) submits to Congress a report justifying the use of such waiver and the importance of such waiver to the national security of the United States.

*Time periods.*

(3) REPORT.—Not later than one year after the date of the enactment of this subsection, and annually for three subsequent years, the Secretary of Defense shall submit to Congress a report on the implementation of this subsection.

(b) POLICY WITH RESPECT TO PORTS ACCEPTING FEDERAL GRANT MONEY.—

(1) IN GENERAL.—Chapter 503 of title 46, United States Code, is amended by adding at the end the following:

*46 USC 50309.*

**"§ 50309. Securing logistics information data of the United States**

"(a) IN GENERAL.—

"(1) PROHIBITION.—A covered entity shall not use a covered logistics platform.

"(2) ELIGIBILITY.—A covered entity that is found to use a covered logistics platform shall not be eligible to receive any Federal grant funding as long as the covered entity uses a covered logistics platform.

"(b) GUIDANCE.—The Secretary of Transportation shall—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 333

"(1) notify covered entities of the prohibition in subsection (a) as soon as practicable, including notice of funding opportunities for grant programs; and

*Notification.*
*Notice.*

"(2) publish on a website of the Department of Transportation, and update regularly, a list of covered logistics platforms subject to the prohibition in subsection (a).

*Web posting.*
*Updates.*
*List.*

"(c) CONSULTATION.—In carrying out this section, the Secretary shall consult with—

"(1) the Secretary of Defense;

"(2) the Secretary of the Department in which the Coast Guard is operating;

"(3) the Secretary of State; and

"(4) the Secretary of Commerce.

"(d) WAIVER.—The Secretary of Transportation, in consultation with the Secretary of Defense, may waive the provisions of this section for a specific contract if the Secretary of Transportation—

"(1) makes a determination that such waiver is vital to the national security of the United States; and

*Determination.*

"(2) submits to Congress a report justifying the use of such waiver and the importance of such waiver to the national security of the United States.

*Reports.*

"(e) DEFINITIONS.—In this section:

"(1) COVERED LOGISTICS PLATFORM.—The term 'covered logistics platform' means a data exchange platform that utilizes or provides, in part or whole—

*China.*

"(A) the national transportation logistics public information platform (commonly referred to as 'LOGINK') provided by the People's Republic of China, or departments, ministries, centers, agencies, or instrumentalities of the Government of the People's Republic of China;

"(B) any national transportation logistics information platform provided by or sponsored by the People's Republic of China, or a controlled commercial entity; or

"(C) a similar system provided by Chinese state-affiliated entities.

"(2) COVERED ENTITY.—The term 'covered entity' means—

"(A) a port authority that receives funding after the date of the enactment of this section under—

"(i) the port infrastructure development program under section 54301;

"(ii) the maritime transportation system emergency relief program under section 50308; or

"(iii) any Federal grant funding program;

"(B) any marine terminal operator located on property owned by a port authority as described in subparagraph (A) or at a seaport described in subparagraph (D);

"(C) any agency or instrumentality of the United States Government or that of a State; or

"(D) a commercial strategic seaport within the National Port Readiness Network.".

(2) CLERICAL AMENDMENT.—The analysis for chapter 503 of title 46, United States Code, is amended by adding at the end the following new item:

*46 USC*
*prec. 50301.*

"50309. Securing logistics information data of the United States.".

(3) APPLICABILITY.—Section 50309 of title 46, United States Code, as added by paragraph (1), shall apply with respect

*Effective date.*

137 STAT. 334          PUBLIC LAW 118–31—DEC. 22, 2023

to any contract entered into on or after the date that is 180 days after the date of the enactment of this subsection.

Time periods.

(4) REPORTING.—Not later than one year after the date of the enactment of this subsection, and annually for three subsequent years, the Secretary of Transportation shall submit to Congress a report on the implementation of section 50309 of title 46, United States Code, as added by paragraph (1).

President.
Determination.

(c) NEGOTIATIONS WITH ALLIES AND PARTNERS.—

(1) NEGOTIATIONS REQUIRED.—The Secretary of State shall seek to enter into negotiations with United States ally and partner countries, including those described in paragraph (3), if the President determines that ports or other entities operating within the jurisdiction of such ally or partner countries are using or are considering using a covered logistics platform.

(2) ELEMENTS.—As part of the negotiations described in paragraph (1), the President shall—

(A) urge governments of such ally and partner countries to require entities within the jurisdiction of such governments to terminate the use of a covered logistics platform;

(B) describe the threats posed by a covered logistics platform to United States military and strategic interests and the implications such threats may have for the presence of members of the Armed Forces of the United States in such countries;

(C) urge governments to use their voice, influence, and vote to align with the United States and to counter attempts by foreign adversaries at international standards-setting bodies to adopt standards that incorporate a covered logistics platform; and

(D) attempt to establish, through multilateral entities, bilateral or multilateral negotiations, military cooperation, and other relevant engagements or agreements, a prohibition on the use of a covered logistics platform.

(3) ALLIES AND PARTNERS DESCRIBED.—The countries and entities with which the President shall conduct negotiations described in this subsection shall include—

(A) all countries party to a collective defense treaty or other collective defense arrangement with the United States;

India.
Taiwan.

(B) India; and

(C) Taiwan.

(4) REPORT.—Not later than one year after the date of the enactment of this subsection, the Secretary of State shall submit a report to the appropriate congressional committees describing—

(A) the efforts made by the United States Government as of the date of the submission of the report in the negotiations described in this subsection; and

(B) the actions taken by the governments of ally and partner countries pursuant to the negotiation priorities described in this subsection.

(d) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committees on Armed Services, Foreign Affairs, and Transportation and Infrastructure of the House of Representatives; and

(B) the Committees on Armed Services, Foreign Relations, and Commerce, Science, and Transportation of the Senate.

(2) COVERED LOGISTICS PLATFORM.—The term "covered logistics platform" has the meaning given in section 50309 of title 46, United States Code, as added by this section.

(3) FOREIGN ADVERSARY.—The term "foreign adversary" means— <span style="float:right">Country listing.</span>

(A) the People's Republic of China, including the Hong Kong and Macau Special Administrative Regions;

(B) the Republic of Cuba;

(C) the Islamic Republic of Iran;

(D) the Democratic People's Republic of Korea;

(E) the Russian Federation; and

(F) the Bolivarian Republic of Venezuela under the regime of Nicolás Maduro Moros. <span style="float:right">Nicolás Maduro Moros.</span>

## SEC. 826. MODIFICATION OF CONTRACTS AND OPTIONS TO PROVIDE ECONOMIC PRICE ADJUSTMENTS.

<span style="float:right">10 USC note prec. 4601.</span>

(a) AUTHORITY.—Amounts authorized to be appropriated by this Act for the Department of Defense may be used to modify the terms and conditions of a contract or option to provide an economic price adjustment consistent with sections 16.203–1 and 16.203–2 of the Federal Acquisition Regulation during the relevant period of performance for that contract or option and as specified in section 16.203–3 of the Federal Acquisition Regulation, to the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes of this section.

(b) GUIDANCE.—Not later than 30 days after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment shall issue guidance implementing the authority under this section. <span style="float:right">Deadline.</span>

## SEC. 827. MODIFICATIONS TO EARNED VALUE MANAGEMENT SYSTEM REQUIREMENTS.

<span style="float:right">10 USC note prec. 4601.</span>

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Department of Defense Supplement to the Federal Acquisition Regulation shall be revised to— <span style="float:right">Deadline.<br>Regulations.</span>

(1) exempt all software contracts and subcontracts of the Department of Defense from earned value management system requirements;

(2) impose earned value management system requirements for cost contracts or incentive contracts with a value greater than or equal to $20,000,000 and less than $50,000,000; and

(3) require a defense contractor to use an earned value management system for contracts awarded with a value greater than or equal to $50,000,000 and less than $100,000,000.

(b) IMPLEMENTATION.—If the Department of Defense Supplement to the Federal Acquisition Regulation is not revised as described in subsection (a) before the deadline specified in such subsection, the Under Secretary of Defense for Acquisition and Sustainment shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the timeline for such revisions. <span style="float:right">Briefing.<br>Timeline.</span>

# Subtitle C—Domestic Sourcing Requirements

### SEC. 831. EMERGENCY ACQUISITION AUTHORITY FOR PURPOSES OF REPLENISHING UNITED STATES STOCKPILES.

Section 3601(a)(1) of title 10, United States Code, is amended—
(1) in subparagraph (A)(iv), by striking "or" at the end;
(2) in subparagraph (B), by striking the period at the end and inserting "; or"; and
(3) by adding at the end the following new subparagraph:
"(C) with respect to an armed attack by a country of concern (as defined in section 1(m) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(m)), to which the United States is not a party, for purposes of—
"(i) replenishing United States stockpiles of defense articles when such stockpiles are diminished as a result of the United States providing defense articles in response to such armed attack by a country of concern against—
"(I) a United States ally (as that term is defined in section 201(d) of the Act of December 2, 1942, titled 'To provide benefits for the injury, disability, death, or enemy detention of employees of contractors with the United States, and for other purposes' (56 Stat. 1028, chapter 668; 42 U.S.C. 1711(d))); or
"(II) a United States partner; or
"(ii) contracting for the movement or delivery of defense articles transferred to such ally or partner through the President's drawdown authorities under sections 506(a)(1) and 614 of the Foreign Assistance Act of 1961 (22 U.S.C. 2318(a)(1) and 2364) in connection with such response.".

Contracts.

### SEC. 832. REQUIREMENT FOR FULL DOMESTIC PRODUCTION OF FLAGS OF THE UNITED STATES ACQUIRED BY THE DEPARTMENT OF DEFENSE.

(a) IN GENERAL.—Section 4862 of title 10, United States Code, is amended—
(1) in subsection (b), by adding at the end the following new paragraph:
"(5) A flag of the United States."; and
(2) in subsection (h)—
(A) in paragraph (1), by striking "Subsection (a)" and inserting "Except with respect to purchases of flags of the United States, subsection (a)";
(B) by redesignating paragraph (2) as paragraph (3); and
(C) by inserting after paragraph (1) the following new paragraph:
"(2)(A)(i) Except as provided by subparagraph (B), subsection (a) does not apply to purchases of flags of the United States for amounts not greater than $10,000.
"(ii) A proposed procurement in an amount greater than $10,000 may not be divided into several purchases

or contracts for lesser amounts in order to qualify for the exception under clause (i).

"(B) The Secretary of Defense may waive subsection (a) with respect to a purchase of flags of the United States in an amount greater than $10,000 if the Secretary of Defense determines such waiver appropriate.

"(C) This section is applicable to contracts and subcontracts for the procurement of flags of the United States.".

(b) APPLICABILITY.—The amendments made by subsection (a) shall apply only with respect to agreements entered into on or after the date of the enactment of this Act.

### SEC. 833. AMENDMENT TO REQUIREMENT TO BUY CERTAIN METALS FROM AMERICAN SOURCES.

(a) IN GENERAL.—Section 4863 of title 10, United States Code, is amended—

(1) in subsection (d)—

(A) in paragraph (1)(B), by striking "; and" and inserting a semicolon;

(B) in paragraph (2), by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following new paragraph:

"(3) any specialty metal procured as mill product or incorporated into a component other than an end item pursuant to this subsection shall be melted or produced—

"(A) in the United States;

"(B) in the country from which the mill product or component is procured; or

"(C) in another country covered under subparagraph (1)(B).";

(2) by redesignating subsections (l) and (m) as subsections (m) and (n), respectively; and

(3) by inserting after subsection (k) the following new subsection:

"(l) PROVENANCE OF AEROSPACE-GRADE METALS.—(1) The Secretary of Defense shall require that, for any system or component for which the provenance of materials must be tracked to comply with safety regulations concerning flight, the supplier of such system or component shall inform the government if any of the materials were known to be manufactured or processed in—

"(A) China;

"(B) Iran;

"(C) North Korea; or

"(D) Russia.

"(2) Not later than March 31 of each year, the Secretary of Defense shall submit to the congressional defense committees a report indicating how much specialty metal has been acquired and placed into systems of the Department of Defense from the countries described in paragraph (1).".

(b) EFFECTIVE DATE.—Subsection (a) shall take effect on the date that is 24 months after the date of the enactment of this Act.

### SEC. 834. ACQUISITION OF SENSITIVE MATERIAL PROHIBITION EXCEPTION AMENDMENT.

Section 4872(c) of title 10, United States Code, is amended—

(1) in the matter preceding paragraph (1), by striking "Subsection (a)" and inserting "Subsection (a)(1)"; and

Waiver authority.
Determination.

Applicability.

10 USC 4862 note.

Reports.

10 USC 4863 note.

(2) in paragraph (1)—

(A) by striking "Defense determines that covered materials" and inserting the following: "Defense—

"(A) identifies a specific end item for which a specific covered material";

(B) by striking the period at the end and inserting "; and" ; and

(C) by adding at the end the following new subparagraph:

"(B) waives subsection (a)(1) for such specific end item and such specific covered material for a period not exceeding 36 months.".

SEC. 835. ENHANCED DOMESTIC CONTENT REQUIREMENT FOR MAJOR DEFENSE ACQUISITION PROGRAMS.

10 USC note prec. 4201.

(a) ASSESSMENT REQUIRED.—

Reports.

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report assessing the domestic source content of procurements carried out in connection with a major defense acquisition program.

(2) INFORMATION REPOSITORY.—The Secretary of Defense shall establish an information repository for the collection and analysis of information related to domestic source content for products the Secretary deems critical, where such information can be used for continuous data analysis and program management activities.

Deadlines.

(b) ENHANCED DOMESTIC CONTENT REQUIREMENT.—

(1) IN GENERAL.—Except as provided in paragraph (2), for purposes of chapter 83 of title 41, United States Code, manufactured articles, materials, or supplies procured in connection with a major defense acquisition program are manufactured substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States if the cost of such component articles, materials, or supplies—

(A) supplied not later than the date of the enactment of this Act, exceeds 60 percent of cost of the manufactured articles, materials, or supplies procured;

Time period.

(B) supplied during the period beginning January 1, 2024, and ending December 31, 2028, exceeds 65 percent of the cost of the manufactured articles, materials, or supplies; and

(C) supplied on or after January 1, 2029, exceeds 75 percent of the cost of the manufactured articles, materials, or supplies.

(2) EXCLUSION FOR CERTAIN MANUFACTURED ARTICLES.— Paragraph (1) shall not apply to manufactured articles that consist wholly or predominantly of iron, steel, or a combination of iron and steel.

(3) RULEMAKING TO CREATE A FALLBACK THRESHOLD.—

Determination.

(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall issue rules to determine the treatment of the lowest price offered for a foreign end product for which 55 percent or more of the component articles, materials, or supplies of such foreign end product are manufactured substantially

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 339

all from articles, materials, or supplies mined, produced, or manufactured in the United States if—

(i) the application of paragraph (1) results in an unreasonable cost; or

(ii) no offers are submitted to supply manufactured articles, materials, or supplies manufactured substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States.

(B) TERMINATION.—Rules issued under this paragraph shall cease to have force or effect on January 1, 2031.

(4) APPLICABILITY.—The requirements of this subsection—

(A) shall apply to contracts entered into on or after the date of the enactment of this Act;

(B) shall not apply to articles manufactured in countries that have executed a reciprocal defense procurement memorandum of understanding with the United States entered into pursuant to section 4851 of title 10, United States Code; and

(C) shall not apply to a country that is a member of the national technology and industrial base (as defined by section 4801 of title 10, United States Code).

(c) MAJOR DEFENSE ACQUISITION PROGRAM DEFINED.—The term "major defense acquisition program" has the meaning given in section 4201 of title 10, United States Code.

# Subtitle D—Provisions Relating to Programs for Accelerating Acquisition

### SEC. 841. PILOT PROGRAM TO ACCELERATE CONTRACTING AND PRICING PROCESSES.

Section 890 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232) is amended—

10 USC note prec. 3701.

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively;

(2) by inserting after subsection (a) the following new subsection:

"(b) IMPLEMENTATION GUIDANCE.—The Secretary, acting through the Under Secretary of Defense for Acquisition and Sustainment, shall ensure that each senior contracting official (as defined in section 1737 of title 10, United States Code) for a contract described in subsection (a) has the discretion to implement the pilot program under this section efficiently and effectively by ensuring the following:

"(1) That the pilot program does not include any preferences for contract type or specific contract requirements.

"(2) That each Secretary of a military department has minimal reporting requirements to the Under Secretary of Defense for Acquisition and Sustainment with respect to the pilot program."; and

(3) in subsection (d), as so redesignated, by striking "January 2, 2024" and inserting "January 2, 2028".

137 STAT. 340          PUBLIC LAW 118–31—DEC. 22, 2023

10 USC 2341
note.

SEC. 842. DEMONSTRATION AND PROTOTYPING PROGRAM TO ADVANCE INTERNATIONAL PRODUCT SUPPORT CAPABILITIES IN A CONTESTED LOGISTICS ENVIRONMENT.

(a) CONTESTED LOGISTICS DEMONSTRATION AND PROTOTYPING PROGRAM REQUIRED.—The Secretary of Defense shall establish a contested logistics demonstration and prototyping program to identify, develop, demonstrate, and field capabilities for product support in order to reduce or mitigate the risks associated with operations in a contested logistics environment.

(b) ELEMENTS.—In carrying out the Program, the Secretary shall do the following:

(1) Identify ways to capitalize on the inherent interoperability, commonality, and interchangeability of platforms and information systems operated by the United States and one or more covered nations, including to enable effective maintenance and repair activities in a contested logistics environment.

Determination.

(2) Determine, develop, or establish best practices to reduce time needed to return repaired equipment to service, including the use of—

(A) commercial best practices for rapid supply support; and

(B) common or shared parts pools.

(3) Explore opportunities to expand the ability to preposition or store materials needed to enable rapid surge capability or to support operations in a contested logistics environment.

(4) Identify, develop, demonstrate, and field effective and efficient means of conducting repairs of equipment away from permanent repair facilities.

(5) Explore flexible approaches to contracting and use of partnership agreements to enable use or development of the capabilities of covered product support providers to effectively, efficiently, and timely satisfy the product support requirements of a combat commander and any applicable covered nation in a contested logistics environment.

(6) Identify the resources, including any additional authorizations, required by the Secretary of Defense to reduce or mitigate the risks associated with operations in a contested logistics environment.

(7) Identify and document impediments to the performance of product support by covered product support providers in a contested logistics environment, including impediments created by statute, regulation, policy, agency guidance, or limitations on expenditure, transfer, or receipt of funds for product support in contested logistics environments.

(8) Identify and document any statutory or regulatory waivers or exemptions that may be applicable or necessary to enable the United States and covered nations to jointly carry out product support activities in contested logistics environments located outside of the United States, including, for each such waiver and exemption—

(A) the person responsible for requesting such waiver or exemption;

(B) the criteria for approval of such waiver or exemption; and

(C) the person responsible for approving such waiver or exemption.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 341

(c) ADVANCE PLANNING AND PREPARATION.—The Secretary may establish a product support arrangement, including an agreement for prepositioning or storage of materials, with a covered product support provider to enable a rapid response in a contingency operation (as defined in section 101(a) of title 10, United States Code) to the product support requirements of such contingency operation.

Contracts.

(d) AUTHORITIES.—In carrying out the Program, the Secretary may, in accordance with section 3 of the Arms Export Control Act (22 U.S.C. 2753), use the authorities under sections 2342, 2474, 3601, 4021, and 4022 of title 10, United States Code.

(e) REPORT.—Not later than 24 months after the date of the enactment of this Act, the Secretary shall submit to Congress a report summarizing Program activities, including—

Summaries.
Recommenda-
tions.

(1) any recommendations to reduce impediments to meeting the requirements of a combatant command or covered nation for product support in a contested logistics environment;

(2) a summary of impediments identified under subsection (b)(7) and specific recommendations for necessary changes to statutory, regulatory, policy, agency guidance, or current limitations on expenditure, transfer, or receipt of funds to carry out the product support activities under this pilot indefinitely;

(3) a summary of waivers or exemptions identified under subsection (b)(8), along with any recommendations for changes to the processes for obtaining such waivers or exemptions; and

(4) recommendations for improving the Program, including whether to extend or make the Program permanent.

(f) DEVELOPMENT AND PROMULGATION OF DEPARTMENT OF DEFENSE GUIDANCE.—Not later than 180 days after the date of the enactment of this Act, the Secretary shall issue guidance implementing the Program.

Deadline.

(g) SUNSET.—The authority under this section shall terminate on the date that is three years after the date of the enactment of this Act.

(h) DEFINITIONS.—In this section:

(1) CONTESTED LOGISTICS ENVIRONMENT.—The term "contested logistics environment" has the meaning given such term in section 2926 of title 10, United States Code.

(2) COVERED NATIONS.—The term "covered nation" means—

(A) Australia;

(B) Canada;

(C) New Zealand;

(D) the United Kingdom of Great Britain and Northern Ireland; or

(E) other nations as designated as a covered nation for the purposes of this Program by the Secretary.

(3) COVERED PRODUCT SUPPORT PROVIDER.—The term "covered product support provider" means—

(A) a product support provider that includes an entity within the government of a covered nation;

(B) a private sector product support provider; or

(C) a product support integrator domiciled in the United States or a covered nation.

(4) PRODUCT SUPPORT; PRODUCT SUPPORT INTEGRATOR; PRODUCT SUPPORT PROVIDER.—The terms "product support", "product support integrator", and "product support provider"

have the meanings given, respectively, in section 4324 of title 10, United States Code.

(5) PRODUCT SUPPORT ARRANGEMENT.—

(A) IN GENERAL.—The term "product support arrangement" means a contract, task order, or any other type of agreement or arrangement, between the United States and a covered product support provider, for the performance of the functions described in subparagraph (B) with respect to—

(i) a platform or information system operated by the United States and the covered nation of such covered product support provider; or

(ii) a subsystem or components of such a platform or information system.

(B) FUNCTIONS DESCRIBED.—The functions described in this subparagraph, with respect to a platform, information system, subsystem, or component described in subparagraph (A), are the following:

(i) Performance-based logistics.

(ii) Sustainment support.

(iii) Contractor logistics support.

(iv) Life-cycle product support.

(v) Weapon system product support.

(6) PROGRAM.—The term "Program" means the demonstration and prototyping program established under subsection (a).

(7) SECRETARY.—The term "Secretary" means the Secretary of Defense.

**SEC. 843. SPECIAL AUTHORITY FOR RAPID CONTRACTING FOR COMMANDERS OF COMBATANT COMMANDS.**

10 USC 3601 note.

Determination.

(a) IN GENERAL.—The commander of a combatant command, upon providing a written determination to a senior contracting official (as defined in section 1737 of title 10, United States Code), may request use of the special authorities described in subsection (b)—

(1) in support of a contingency operation (as defined in section 101(a) of title 10, United States Code);

(2) to facilitate the defense against or recovery from a cyber attack, nuclear attack, biological attack, chemical attack, or radiological attack against the United States;

(3) in support of a humanitarian or peacekeeping operation (as the term is defined in section 3015(2) of title 10, United States Code); and

(4) for purposes of protecting the national security interests of the United States during directed operations that are below the threshold of traditional armed conflict.

(b) SPECIAL AUTHORITIES DESCRIBED.—The special authorities for contracting that may be used by the senior contracting official to rapidly respond to time-sensitive or unplanned emergency situations are as follows:

(1) Procedures applicable to purchases below micro-purchase threshold (described in section 1902 of title 41, United States Code), with respect to a single contracting action taken under subsection (a) for a contract to be awarded and performed, or purchase to be made—

(A) in the United States, with a value less than $15,000; or

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 343

(B) outside the United States, with a value less than $25,000.

(2) Simplified acquisition procedures (described in section 1901 of title 41, United States Code), with respect to a single contracting action taken under subsection (a) for a contract to be awarded and performed, or purchase to be made—

(A) in the United States, with a value less than $750,000; or

(B) outside the United States, with a value less than $1,500,000.

(3) For simplified procedures for purchases under section 3205 of title 10, United States Code, subsection (a)(2) of such section shall be applied by substituting "$10,000,000" for "$5,000,000". <span style="float:right">Applicability.</span>

(4) The property or service being procured may be treated as a commercial product or a commercial service for the purpose of carrying out the procurement.

(c) DETERMINATION.—A written determination required under subsection (a)—

(1) may include more than one requested action;

(2) may be directed to more than one senior contracting official; and

(3) shall include—

(A) the rationale for the request in accordance with paragraphs (1) through (4) of such subsection;

(B) a description of any special authority requested; and

(C) an attestation that funds are available for such special authority.

(d) SUNSET.—The authority under subsection (a) shall terminate on September 30, 2028.

(e) ANNUAL REPORT.—Not later than January 15, 2025, and annually thereafter for four years, the Chairman of the Joint Chiefs of Staff, in coordination with the Under Secretary of Defense for Acquisition and Sustainment, shall submit to the congressional defense committees a report on the use of the authority under this section for the fiscal year preceding the date of submission of the report. The report shall include a summary of each instance of the authority being used, including— <span style="float:right">Summary.</span>

(1) an identification of each commander submitting a request under subsection (a);

(2) an identification of each senior contracting official responding to such request; and

(3) the specific special authority requested, including an identification of the contractor that performed the contract and the value of the contract.

# Subtitle E—Industrial Base Matters

### SEC. 851. ADDITIONAL NATIONAL SECURITY OBJECTIVES FOR THE NATIONAL TECHNOLOGY AND INDUSTRIAL BASE.

Section 4811(a)(9) of title 10, United States Code, is amended—

(1) by inserting "services, supplies, and" before "materials"; and

(2) by inserting before the period at the end the following: ", including by reducing reliance on potential adversaries for

such services, supplies, and materials to the maximum extent practicable".

### SEC. 852. DEPARTMENT OF DEFENSE MENTOR-PROTEGE PROGRAM.

Section 4902(e) of title 10, United States Code, is amended—

(1) in paragraph (1), by redesignating subparagraphs (A) through (D) as clauses (i) through (iv), respectively;

(2) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively;

(3) by striking "Before providing assistance" and inserting "(1) Before providing assistance"; and

(4) by adding at the end the following new paragraph:

Contracts.

"(2) An agreement under this subsection may be a contract, cooperative agreement, or a partnership intermediary agreement.".

### SEC. 853. MODIFICATIONS TO THE PROCUREMENT TECHNICAL ASSIST-ANCE PROGRAM.

(a) DEFINITIONS.—Section 4951 of title 10, United States Code, is amended—

(1) in paragraph (1)(C), by striking "private, nonprofit organization" and inserting "nonprofit organization"; and

(2) by adding at the end the following new paragraph:

"(5) The term 'business entity' means a corporation, association, partnership, limited liability company, limited liability partnership, consortia, not-for-profit, or other legal entity.".

(b) COOPERATIVE AGREEMENTS.—Section 4954 of title 10, United States Code, is amended—

(1) in subsection (b)—

(A) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B);

(B) by inserting "(1)" before "Under"; and

(C) by adding at the end the following new paragraph:

Waiver authority.
Determination.

"(2) The Secretary shall have the ability to waive or modify the percentages specified in paragraph (1), on a case-by-case basis, if the Secretary determines that it would be in the best interest of the program.";

(2) by striking subsection (c) and redesignating subsections (d), (e), and (f) as subsections (c), (d), and (e); and

(3) by inserting after subsection (e), as redesignated by paragraph (2), the following new subsection:

Determination.

"(f) WAIVER OF GOVERNMENT COST SHARE RESTRICTION.—If the Secretary of Defense determines it to be in the best interests of the Federal Government, the Secretary may waive the restrictions on the percentage of eligible costs covered by the program under

Submission.

section (b). The Secretary shall submit to the congressional defense committees a written justification for such determination.".

(c) AUTHORITY TO PROVIDE CERTAIN TYPES OF TECHNICAL ASSISTANCE.—Section 4958(c) of title 10, United States Code, is amended—

(1) in paragraph (1), by striking "; and" and inserting a semicolon;

(2) in paragraph (2), by striking the period at the end and inserting a semicolon; and

(3) by adding at the end the following new paragraphs:

"(3) under clause 252.204–7012 of the Defense Acquisition Regulation Supplement, or any successor regulation, and on compliance with those requirements (and any successor requirements); and

"(4) under section 847 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1505), and on compliance with those requirements (and any such successor requirements).".

**SEC. 854. MODIFICATION OF EFFECTIVE DATE FOR EXPANSION ON THE PROHIBITION ON ACQUIRING CERTAIN METAL PRODUCTS.**

Section 844(b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3766) is amended by striking "5 years" and inserting "6 years". 

*10 USC 4872 note.*

**SEC. 855. EXTENSION OF PILOT PROGRAM FOR DISTRIBUTION SUPPORT AND SERVICES FOR WEAPONS SYSTEMS CONTRACTORS.**

Section 883 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 4292 note prec.) is amended—

(1) in subsection (a), by striking "seven-year pilot program" and inserting "eight-year pilot program"; and

(2) in subsection (g), by striking "seven years" and inserting "eight years".

**SEC. 856. PILOT PROGRAM TO ANALYZE AND MONITOR CERTAIN SUPPLY CHAINS.**

*10 USC note prec. 3241.*

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment shall establish and carry out a pilot program to analyze, map, and monitor supply chains for up to five covered weapons platforms, under which the Under Secretary shall—

*Deadline.*

(1) identify impediments to production and opportunities to expand the production of components of such a covered weapons platform;

(2) identify potential risks to and vulnerabilities of suppliers for such covered weapons platforms and ways to mitigate such risks; and

(3) identify critical suppliers for such covered weapons platforms.

(b) USE OF TOOLS.—The Under Secretary may use a combination of commercial tools and tools available to the Department of Defense to carry out the program established under this section, including artificial intelligence and machine learning tools to improve data analysis capabilities for such supply chains.

(c) ANNUAL REPORTS.—Not later than one year after the date of the enactment of this Act, and annually thereafter until the date specified in subsection (d), the Under Secretary shall submit to the congressional defense committees a report containing—

(1) a list of the vulnerabilities of the supply chains for each covered weapons platform selected under subsection (a), categorized by severity of threat or risk to deployment of such a platform;

*List.*

(2) for each vulnerability, a description of such vulnerability, whether such vulnerability has been resolved, and, if resolved, the time from identification to resolution; and

(3) an assessment of any efficiencies achieved by addressing impediments to the supply chain.

*Assessment.*

137 STAT. 346        PUBLIC LAW 118–31—DEC. 22, 2023

(d) TERMINATION.—The authority to carry out the pilot program under this section shall terminate on January 1, 2028.

(e) COVERED WEAPONS PLATFORM DEFINED.—In this section, the term "covered weapons platform" means any weapons platform identified in the reports submitted under section 1251(d)(1) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note).

15 USC 18a note.    **SEC. 857. DEPARTMENT OF DEFENSE NOTIFICATION OF CERTAIN TRANSACTIONS.**

The parties to a proposed merger or acquisition that will require a review by the Department of Defense who are required to file the notification and provide supplementary information to the Department of Justice or the Federal Trade Commission under section 7A of the Clayton Act (15 U.S.C. 18a) shall concurrently provide such information to the Department of Defense during the waiting period under section 7A of the Clayton Act (15 U.S.C. 18a).

# Subtitle F—Small Business Matters

### SEC. 860. AMENDMENTS TO DEFENSE RESEARCH AND DEVELOPMENT RAPID INNOVATION PROGRAM.

Section 4061 of title 10, United States Code, is amended—
(1) in subsection (a)—
(A) in paragraph (1)—
(i) by inserting "to enable and assist small businesses" after "merit-based program";
(ii) by striking "fielding of technologies" and inserting "commercialization of various technologies, including critical technologies"; and
(iii) by inserting "capabilities developed through competitively awarded prototype agreements" after "defense laboratories,"; and
(B) in paragraph (2), by inserting "support the integration of such products," after "evaluation outcomes,";
(2) in subsection (b)—
(A) in paragraph (1), by inserting "primarily major defense acquisition programs, but also other" after "candidate proposals in support of"; and
(B) in paragraph (2), by striking "by each military department" and inserting "by each Office of Small Business Programs of each military department"; and
(3) in subsection (d)(2), by striking "$3,000,000" and inserting "$6,000,000".

### SEC. 861. ANNUAL REPORTS REGARDING THE SBIR PROGRAM OF THE DEPARTMENT OF DEFENSE.

Section 279(a) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3507) is amended by striking "each fiscal years 2021, 2022, and 2023" and replacing with "each fiscal year through fiscal year 2028".

### SEC. 862. PAYMENT OF SUBCONTRACTORS.

(a) IN GENERAL.—Section 8(d)(13) of the Small Business Act (15 U.S.C. 637(d)(13)) is amended—

(1) in subparagraph (B)(i), by striking "90 days" and inserting "30 days";

(2) in subparagraph (C)—

(A) by striking "contract shall" and inserting "contract—

"(i) shall";

(B) in clause (i), as so designated, by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following:

"(ii) may enter or modify past performance information of the prime contractor in connection with the unjustified failure to make a full or timely payment to a subcontractor subject to this paragraph before or after close-out of the covered contract.";

(3) in subparagraph (D), by striking "subparagraph (E)" and inserting "subparagraph (F)";

(4) by redesignating subparagraph (E) as subparagraph (F); and

(5) by inserting after subparagraph (D) the following:

"(E) COOPERATION.—

"(i) IN GENERAL.—Once a contracting officer determines, with respect to the past performance of a prime contractor, that there was an unjustified failure by the prime contractor on a covered contract to make a full or timely payment to a subcontractor covered by subparagraph (B) or (C), the prime contractor is required to cooperate with the contracting officer, who shall consult with the Director of Small Business Programs or the Director of Small and Disadvantaged Business Utilization acting pursuant to section 15(k)(6) and other representatives of the Government, regarding correcting and mitigating the unjustified failure to make a full or timely payment to a subcontractor.

*Determination.*
*Requirement.*
*Consultation.*

"(ii) DURATION.—The duty of cooperation under this subparagraph for a prime contractor described in clause (i) continues until the subcontractor is made whole or the determination of the contracting officer determination is no longer effective, and regardless of performance or close-out status of the covered contract.".

(b) REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Administrator shall submit to the Federal Acquisition Regulatory Council proposed revisions to regulations that the Administrator determines necessary to carry out the amendments made by this section.

*Deadline.*
*Determination.*
*15 USC 637 note.*

**SEC. 863. INCREASE IN GOVERNMENTWIDE GOAL FOR PARTICIPATION IN FEDERAL CONTRACTS BY SMALL BUSINESS CONCERNS OWNED AND CONTROLLED BY SERVICE-DISABLED VETERANS.**

Section 15(g)(1)(A)(ii) of the Small Business Act (15 U.S.C. 644(g)(1)(A)(ii)) is amended by striking "3 percent" and inserting "5 percent".

**SEC. 864. ELIMINATING SELF-CERTIFICATION FOR SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESSES.**

*15 USC 644 note.*

(a) DEFINITIONS.—In this section:

(1) ADMINISTRATOR.—The term "Administrator" means the Administrator of the Small Business Administration.

(2) SMALL BUSINESS CONCERN; SMALL BUSINESS CONCERNS OWNED AND CONTROLLED BY SERVICE-DISABLED VETERANS.—The terms "small business concern" and "small business concerns owned and controlled by service-disabled veterans" have the meanings given those terms in section 3 of the Small Business Act (15 U.S.C. 632).

(b) ELIMINATING SELF-CERTIFICATION IN PRIME CONTRACTING AND SUBCONTRACTING FOR SDVOSBS.—

(1) IN GENERAL.—Each prime contract award and subcontract award that is counted for the purpose of meeting the goals for participation by small business concerns owned and controlled by service-disabled veterans in procurement contracts for Federal agencies, as established in section 15(g)(2) of the Small Business Act (15 U.S.C. 644(g)(2)), shall be entered into with small business concerns certified by the Administrator as small business concerns owned and controlled by service-disabled veterans under section 36 of such Act (15 U.S.C. 657f).

(2) EFFECTIVE DATE.—Paragraph (1) shall take effect on October 1 of the fiscal year beginning after the Administrator promulgates the regulations required under subsection (d).

(c) PHASED APPROACH TO ELIMINATING SELF-CERTIFICATION FOR SDVOSBS.—Notwithstanding any other provision of law, any small business concern that self-certified as a small business concern owned and controlled by service-disabled veterans may—

(1) if the small business concern files a certification application with the Administrator before the end of the 1-year period beginning on the date of the enactment of this Act, maintain such self-certification until the Administrator makes a determination with respect to such certification; and

(2) if the small business concern does not file a certification application before the end of the 1-year period beginning on the date of enactment of this Act, lose, at the end of such 1-year period, any self-certification of the small business concern as a small business concern owned and controlled by service-disabled veterans.

(d) RULEMAKING.—Not later than 180 days after the date of the enactment of this Act, the Administrator shall promulgate regulations to carry out this section.

**SEC. 865. CONSIDERATION OF THE PAST PERFORMANCE OF AFFILIATE COMPANIES OF SMALL BUSINESS CONCERNS.**

Not later than July 1, 2024, the Secretary of Defense shall amend section 215.305 of the Defense Federal Acquisition Supplement (or any successor regulation) to require that when small business concerns bid on Department of Defense contracts, the past performance evaluation and source selection processes shall consider, if relevant, the past performance information of affiliate companies of the small business concerns.

Time periods.
Determination.

Deadline.

Deadline.
Requirements.
Contracts.
10 USC 3301
note.

# Subtitle G—Other Matters

**SEC. 871. EXTENSION OF MISSION MANAGEMENT PILOT PROGRAM.**

Section 871 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 191 note) is amended—

(1) in subsection (b)—

(A) in paragraph (1)—

(i) by striking "IN GENERAL.—Except" and inserting the following: "IN GENERAL.—

"(A) SELECTION.—Except"; and

(ii) by adding at the end the following new subparagraph:

"(B) DELEGATION OF OVERSIGHT AND MANAGEMENT.— The Deputy Secretary of Defense may delegate to one or more mission managers the responsibility to oversee the selected missions and provide mission management."; and

(B) by adding at the end the following new paragraph:

"(4) IDENTIFICATION OF FUNDING.—For each mission selected under paragraph (1), the Deputy Secretary of Defense shall identify funding sources in detail in defense budget materials submitted to Congress pursuant to section 1105 of title 31, United States Code, for the first year for which the selected mission is intended to be carried out. Such materials shall also include a description of each such selected mission and the proposed solution to achieve the goals of such mission.";

(2) in subsection (c)(2)—

(A) in subparagraph (E), by striking "; and" and inserting a semicolon;

(B) by redesignating subparagraph (F) as subparagraph (G); and

(C) by inserting after subparagraph (E) the following new subparagraph:

"(F) assist the Deputy Secretary of Defense in the identification of funding that could contribute to the mission through existing authorized methods to realign, reprogram, or transfer funds; and";

(3) in subsection (f)(1)(A), by striking "every six months thereafter until the date that is five years after the date of the enactment of this Act" and inserting "annually thereafter until September 30, 2028"; and

(4) in subsection (h), by striking "terminate on the date that is five years after the date of the enactment of this Act" and inserting "terminate on September 30, 2028".

**SEC. 872. EXTENSION OF PILOT PROGRAM TO INCENTIVIZE CON-TRACTING WITH EMPLOYEE-OWNED BUSINESSES.**

Section 874 of the National Defense Authorization Act for Fiscal Year 2022 (10 U.S.C. 3204 note) is amended—

(1) in subsection (b)—

(A) in paragraph (1), by inserting "and prescribe regulations" after "establish a pilot program";

(B) in paragraph (2)—

(i) by inserting "or for" after "services procured by"; and

(ii) by inserting "or for" after "may be procured by"; and

(C) in paragraph (3), by striking "A qualified" and inserting "Each contract held by a qualified";

(2) in subsection (c)(2), by striking "expended on subcontracts, subject to such necessary and reasonable waivers" and inserting the following: "expended on subcontracts, except—

"(A) to the extent subcontracted amounts exceeding 50 percent are subcontracted to other qualified businesses wholly-owned through an Employee Stock Ownership Plan;

"(B) in the case of contracts for products, to the extent subcontracted amounts exceeding 50 percent are for materials not available from another qualified business wholly-owned through an Employee Stock Ownership Plan; or

"(C) pursuant to such necessary and reasonable waivers"; and

(3) in subsection (e), by striking "five years after" and inserting "eight years after".

**SEC. 873. PROGRAM AND PROCESSES RELATING TO FOREIGN ACQUISITION.**

Deadlines.
10 USC 301 note.

(a) PILOT PROGRAM FOR COMBATANT COMMAND USE OF DEFENSE ACQUISITION WORKFORCE DEVELOPMENT ACCOUNT.—Each commander of a geographic combatant command may use amounts from the Defense Acquisition Workforce Development Account established under section 1705 of title 10, United States Code, to hire not more than two members of the acquisition workforce (as defined in section 101 of such title) or contracting officers to advise the combatant command on the processes for foreign military sales authorized under chapter 2 of the Arms Export Control Act (22 U.S.C. 2761 et seq.) and the Department of Defense security cooperation processes under chapter 16 of title 10, United States Code, for the purpose of facilitating the effective implementation of such processes.

(b) INDUSTRY DAY.—

(1) IN GENERAL.—Not later than March 1, 2024, and not less frequently than annually thereafter, the Secretary of Defense shall conduct an event to be known as the "industry day"—

(A) to raise awareness and understanding among officials of foreign governments, covered embassy personnel, and representatives of the defense industrial base with respect to the role of the Department of Defense in implementing the foreign military sales process and the Department of Defense security cooperation process; and

(B) to raise awareness—

(i) within the private sector of the United States with respect to—

(I) foreign demand for United States weapon systems; and

(II) potential foreign industry partnering opportunities; and

(ii) among officials of foreign governments and covered embassy personnel with respect to potential United States materiel solutions for capability needs.

Public information.

(2) FORMAT.—In conducting each industry day under paragraph (1), the Secretary of Defense, to the extent practicable, shall seek to maximize participation by representatives of the

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 351

defense industrial base and government officials while minimizing cost, by—

(A) ensuring that information provided at the industry day is unclassified;

(B) making the industry day publicly accessible through teleconference or other virtual means; and

(C) posting any supporting materials on a publicly accessible internet website.

*Web posting.*

(3) COVERED EMBASSY PERSONNEL.—In this subsection, the term "covered embassy personnel" means personnel at United States diplomatic and consular posts and personnel of foreign missions located in the United States.

*Definition.*

(c) SENIOR-LEVEL INDUSTRY ADVISORY GROUP.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with representatives of the defense industrial base, shall establish or designate senior-level individuals working in the defense industrial base to serve on an advisory group for the purpose of focusing on the role of the Department of Defense in the foreign military sales process and the Department of Defense security cooperation process. Such advisory group shall terminate on the date specified in subsection (f).

(d) DEPARTMENT OF DEFENSE POINTS OF CONTACT FOR FOREIGN MILITARY SALES.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment and the Secretary of each military department shall each designate an individual to serve as a single point of contact—

(A) to coordinate information and outreach on Department of Defense implementation of the foreign military sales process; and

(B) to respond to inquiries from representatives of the defense industrial base and partner countries.

(2) POINTS OF CONTACT.—The Under Secretary of Defense for Acquisition and Sustainment and the Secretary of each military department shall each ensure that the contact information for each individual designated under paragraph (1) is publicized at each industry day conducted under subsection (b) and disseminated among the members of the advisory group established under subsection (c).

(3) TERMINATION.—The responsibilities of each individual designated under paragraph (1) shall terminate on the date specified in subsection (f).

(e) REGIONAL THEATER NEEDS FOR EXPORTABILITY.—Not later than July 1, 2024, and annually thereafter until the date specified in (f), the Under Secretary of Defense for Acquisition and Sustainment, in consultation with the commander of each geographic combatant command, the Director of Strategy, Plans, and Policy on the Joint Staff, each Secretary of a military department, and the Secretary of State, shall provide to the Secretary of Defense a list of systems relating to research and development, procurement, or sustainment that would benefit from investment for exportability features in support of the security cooperation objectives of the regional theaters.

*List.*

(f) TERMINATION.—The requirements of and the authority under this section shall cease to have effect on December 31, 2028.

137 STAT. 352        PUBLIC LAW 118–31—DEC. 22, 2023

10 USC 3804 note.

**SEC. 874. PILOT PROGRAM TO INCENTIVIZE PROGRESS PAYMENTS.**

(a) PILOT PROGRAM.—The Under Secretary of Defense for Acquisition and Sustainment shall establish and implement a pilot program to incentivize contractor performance by paying covered contractors a progress payment rate that is up to 10 percent higher than the customary progress payment rate on a contract-by-contract basis.

(b) INCENTIVE CRITERIA.—The Under Secretary shall develop and establish clear and measurable criteria for the payment to contractors of higher progress payments as described in subsection (a), including criteria for qualifying for such payments and the amount of such payments.

(c) APPLICABILITY.—The Under Secretary shall apply the criteria established under subsection (b) and any associated incentive on a contract-by-contract basis when determining whether to pay a contractor a higher progress payment under the pilot program established under subsection (a) and the amount of such payment.

(d) PARTICIPATION VOLUNTARY.—Participation in the pilot program established under subsection (a) shall be on a voluntary basis.

Public comment.
Deadline.

(e) NOTICE AND COMMENT.—The Under Secretary shall issue the regulations implementing the pilot program established under subsection (a) and establishing the criteria required by subsection (b) after notice and an opportunity for public comment of not more than 30 days.

List.

(f) REPORT.—Not later than September 30, 2024, and annually thereafter, the Under Secretary for Acquisition and Sustainment shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the implementation and activities of the pilot program established under subsection (a), including a comprehensive list of contractors that received increased progress payments under the pilot program and the contracts with respect to which such increased progress payments were made.

(g) DEFINITIONS.—In this section:

(1) COVERED CONTRACTOR.—The term "covered contractor" means a contractor of the Department of Defense that is eligible for progress payments under section 3804 of title 10, United States Code.

(2) CUSTOMARY PROGRESS PAYMENT RATE.—The term "customary progress payment rate" refers to the rate of progress payments provided for under section 3804 of title 10, United States Code, and payable in accordance with the applicable provisions of the Federal Acquisition Regulation and the Defense Federal Acquisition Regulation Supplement.

(3) UNDER SECRETARY.—The term "Under Secretary" means the Under Secretary for Acquisition and Sustainment.

(h) SUNSET.—

(1) IN GENERAL.—Except as provided by paragraph (2), the authority to carry out the pilot program established under subsection (a) shall terminate on January 1, 2029.

(2) EXISTING CONTRACTS.—Notwithstanding paragraph (1), a contractor that the Under Secretary determines under the pilot program established under subsection (a) shall be paid a higher progress payment under such pilot program with respect to a contract in effect as of the date described in paragraph (1) shall receive such higher progress payments until the earlier of—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 353

(A) the termination or expiration of the contract; or
(B) the date on which the contractor becomes ineligible for progress payments or higher progress payments under such pilot program.

**SEC. 875. STUDY ON REDUCING BARRIERS TO ACQUISITION OF COMMERCIAL PRODUCTS AND SERVICES.**

(a) IN GENERAL.—The Secretary of Defense, acting through the Under Secretary of Defense for Acquisition and Sustainment, shall conduct a study on the feasibility and advisability of—

(1) establishing a default determination that products and services acquired by the Department of Defense are commercial and do not require commercial determination as provided under section 3456 of title 10, United States Code;

(2) establishing a requirement for a product or service to be determined not to be a commercial product or service prior to the use of procedures other than procedures under part 12 of the Federal Acquisition Regulation; and

(3) mandating the use of commercial procedures under part 12 of the Federal Acquisition Regulation unless a justification for a determination that a product or service is not a commercial product or service is determined.

(b) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report on the findings of the study conducted under subsection (a). The report shall include specific findings with relevant data and proposed recommendations, including any necessary and desirable modifications to applicable statute for any changes the Department seeks to make regarding paragraphs (1) through (3) of subsection (a).

Data.
Recommenda-
tions.

# TITLE IX—DEPARTMENT OF DEFENSE ORGANIZATION AND MANAGEMENT

Subtitle A—Office of the Secretary of Defense and Related Matters

Sec. 901. Conforming amendments to carry out elimination of position of Chief Management Officer.
Sec. 902. Modification of responsibilities of Director of Cost Assessment and Program Evaluation.
Sec. 903. Establishment of Office of Strategic Capital.
Sec. 904. Establishment and assignment of roles and responsibilities for combined joint all-domain command and control in support of integrated joint warfighting.
Sec. 905. Principal Deputy Assistant Secretaries to support Assistant Secretary of Defense for Special Operations and Low Intensity Conflict.

Subtitle B—Other Department of Defense Organization and Management Matters

Sec. 911. Additional requirements under general policy for total force management.
Sec. 912. Addition of College of International Security Affairs to National Defense University.
Sec. 913. Codification of the Defense Innovation Unit.
Sec. 914. Repeal of authority to appoint a Naval Research Advisory Committee.
Sec. 915. Eligibility of members of Space Force for instruction at the Naval Postgraduate School.
Sec. 916. Membership of the Air Force Reserve Forces Policy Committee.
Sec. 917. Modification of cross-functional team to address emerging threat relating to anomalous health incidents.
Sec. 918. Technology release and foreign disclosure reform initiative.
Sec. 919. Software-based capability to facilitate scheduling between the Department of Defense and Congress.
Sec. 920. Metrics to operationalize audit readiness.

Sec. 921. Next generation business health metrics.
Sec. 922. Independent assessment of defense business enterprise architecture.
Sec. 923. Future force design of the Department of the Air Force.
Sec. 924. Feasibility study on the consolidation or transfer of space functions of the National Guard to the Space Force.

# Subtitle A—Office of the Secretary of Defense and Related Matters

**SEC. 901. CONFORMING AMENDMENTS TO CARRY OUT ELIMINATION OF POSITION OF CHIEF MANAGEMENT OFFICER.**

(a) REMOVAL OF REFERENCES TO CHIEF MANAGEMENT OFFICER IN PROVISIONS OF LAW RELATING TO PRECEDENCE.—Chapter 4 of title 10, United States Code, is amended—

(1) in section 133a(c)—

(A) in paragraph (1), by striking ", the Deputy Secretary of Defense, and the Chief Management Officer of the Department of Defense" and inserting "and the Deputy Secretary of Defense"; and

(B) in paragraph (2), by striking "the Chief Management Officer,";

(2) in section 133b(c)—

(A) in paragraph (1), by striking "the Chief Management Officer of the Department of Defense,"; and

(B) in paragraph (2), by striking "the Chief Management Officer,";

(3) in section 137a(d), by striking "the Chief Management Officer of the Department of Defense,"; and

(4) in section 138(d), by striking "the Chief Management Officer of the Department of Defense,".

(b) ASSIGNMENT OF PERIODIC REVIEW OF DEFENSE AGENCIES AND DOD FIELD ACTIVITIES TO SECRETARY OF DEFENSE.—Section 192(c) of such title is amended—

(1) in paragraph (1)—

(A) in subparagraph (A), by striking "the Chief Management Officer of the Department of Defense" and inserting "the Secretary of Defense"; and

(B) in subparagraphs (B) and (C), by striking "the Chief Management Officer" and inserting "the Secretary"; and

(2) in paragraph (2), by striking "the Chief Management Officer" each place it appears and inserting "the Secretary".

(c) ASSIGNMENT OF RESPONSIBILITY FOR FINANCIAL IMPROVEMENT AND AUDIT REMEDIATION TO UNDER SECRETARY OF DEFENSE (COMPTROLLER).—Section 240b of such title is amended—

(1) in subsection (a)(1), by striking "The Chief Management Officer of the Department of Defense shall, in consultation with the Under Secretary of Defense (Comptroller)," and inserting "The Under Secretary of Defense (Comptroller) shall, in consultation with the Performance Improvement Officer of the Department of Defense,"; and

(2) in subsection (b)(1)(C)(ii), by striking "the Chief Management Officer" and inserting "the Performance Improvement Officer".

(d) REMOVAL OF CHIEF MANAGEMENT OFFICER AS RECIPIENT OF REPORTS OF AUDITS BY EXTERNAL AUDITORS.—Section

240d(d)(1)(A) of such title is amended by striking "and the Chief Management Officer of the Department of Defense".

(e) CONFORMING AMENDMENTS TO PROVISIONS OF LAW RELATED TO FREEDOM OF INFORMATION ACT EXEMPTIONS.—Such title is further amended—

(1) in section 130e—

(A) by striking subsection (d);

(B) by redesignating subsections (e) and (f) as subsections (d) and (e), respectively; and

(C) in subsection (d), as so redesignated—

(i) by striking ", or the Secretary's designee,"; and

(ii) by striking ", through the Office of the Director of Administration and Management"; and

(2) in section 2254a—

(A) by striking subsection (c);

(B) by redesignating subsection (d) as subsection (c); and

(C) in subsection (c), as so redesignated—

(i) by striking ", or the Secretary's designee,"; and

(ii) by striking ", through the Office of the Director of Administration and Management".

(f) ASSIGNMENT OF RESPONSIBILITY FOR ANNUAL REVIEW OF AGENCY INFORMATION TECHNOLOGY PORTFOLIO TO THE CHIEF INFORMATION OFFICER.—Section 11319(d)(4) of title 40, United States Code, is amended, in the second sentence, by striking "the Chief Management Officer of the Department of Defense (or any successor to such Officer), in consultation with the Chief Information Officer, the Under Secretary of Defense for Acquisition and Sustainment, and" and inserting "the Chief Information Officer of the Department of Defense, in consultation with the Under Secretary of Defense for Acquisition and Sustainment and".

(g) REMOVAL OF CHIEF MANAGEMENT OFFICER AS REQUIRED COORDINATOR ON DEFENSE RESALE MATTERS.—Section 631(a) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 2481 note) is amended by striking ", in coordination with the Chief Management Officer of the Department of Defense,".

**SEC. 902. MODIFICATION OF RESPONSIBILITIES OF DIRECTOR OF COST ASSESSMENT AND PROGRAM EVALUATION.**

Deadlines.

(a) IN GENERAL.—Section 139a of title 10, United States Code, is amended—

(1) in subsection (d)—

(A) in paragraph (5)—

(i) by striking ", ensuring" and inserting "and ensuring"; and

(ii) by striking ", and assessing" and all that follows through "economy"; and

(B) in paragraph (8), by inserting after "defense resources" the following: ", including the standardization of analytical methodologies and the establishment and maintenance of a centralized knowledge repository of physical attributes or other data for modeling and simulation purposes"; and

(2) by adding at the end the following new subsections:

"(e) PROGRAM EVALUATION COMPETITIVE ANALYSIS CELL.—

"(1) Not later than June 1, 2024, the Secretary of Defense shall establish a team, to be known as the 'Program Evaluation Competitive Analysis Cell' (referred to in this subsection as the 'Cell'), to critically assess the analytical methodologies, assumptions, and data used in key strategic and operational analyses conducted by the Director of Cost Assessment and Program Evaluation.

"(2) The Secretary of Defense shall—

Designation.

"(A) designate an individual to serve as the head of the Cell; and

"(B) ensure that the Cell has a sufficient number of personnel to carry out the duties described in this subsection.

"(3) The Cell shall be independent of the Director of Cost Assessment and Program Evaluation. The head of the Cell shall report directly to the Secretary of Defense or the Deputy Secretary of Defense.

"(4)(A) Not less frequently than once every two years, the Cell shall conduct an alternative operational or strategic analysis of an analytical question identified by the Chairman of the Joint Chiefs of Staff under subparagraph (B). In conducting such alternative analysis, the Cell shall use assumptions different from the assumptions used by the Director of Cost Assessment and Program Evaluation for the original analysis of such question.

"(B) For purposes of each alternative analysis required under subparagraph (A), at an appropriate time before the commencement of such analysis—

List.

"(i) the Director of the Joint Staff shall submit to the Chairman of the Joint Chiefs of Staff a list of not fewer than three operational or strategic questions previously studied by the Director of Cost Assessment and Program Evaluation that could potentially serve as the basis of for such alternative analysis; and

"(ii) from such list, the Chairman shall select one question to serve as the basis for such analysis.

"(f) INCLUSION OF RISK ESTIMATES IN CERTAIN SUBMISSIONS.— In any case in which the Director of Cost Assessment and Program Evaluation submits to the Secretary of Defense an analytical product that recommends not meeting or changing a requirement established by the Joint Requirements Oversight Council, the Director shall include with such submission—

"(1) a risk assessment that assesses any risks of the recommended course of action with respect to the execution of operational plans and the long-term ability of the armed forces to meet the needs of combatant commanders (as determined by the Secretary of Defense); and

"(2) a risk estimate from the military service in question that assesses the risks described in paragraph (1).

"(g) ANNUAL REPORTS.—

"(1) IN GENERAL.—Not later than February 1, 2024, and annually thereafter, the Director of Cost Assessment and Program Evaluation shall submit to the congressional defense committees a report on any strategic and operational analyses conducted under paragraphs (2), (3), (6), (7), or (8) of subsection (d). Each report shall include—

Reviews.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 357

"(A) a review of strategic portfolio reviews completed in the fiscal year preceding submission of the report and a description of such reviews planned for the fiscal year that begins after submission of the report;

"(B) a review of analyses of alternatives completed in the fiscal year preceding submission of the report and a description of such analyses planned for the fiscal year that begins after submission of the report; and

"(C) a review of defense program projections completed in the fiscal year preceding submission of the report and a description of such projections planned for the fiscal year that begins after submission of the report.

"(2) FORM.—Each report required by paragraph (1) shall be submitted in classified form, but shall include an unclassified summary.

Classified information.

"(3) BRIEFINGS.—Not later than 15 days after the submission of each report required by paragraph (1), the Director of Cost Assessment and Program Evaluation shall provide to the congressional defense committees a briefing on the contents of the report.

"(h) QUARTERLY BRIEFINGS.—Beginning not later than 30 days after the date of the enactment of this subsection, and on a quarterly basis thereafter, the Director of Cost Assessment and Program Evaluation shall provide to the congressional defense committees a briefing on the activities carried out by Director during the preceding quarter an any ongoing activities of the Director as of the date of briefing.".

(b) PILOT PROGRAM ON ALTERNATIVE ANALYSIS.—

10 USC 139a note.

(1) IN GENERAL.—Not later than May 1, 2024, the Director of Cost Assessment and Program Evaluation shall establish a pilot program on alternative analysis (referred to in this subsection as the "pilot program").

(2) STRUCTURE.—Under the pilot program, the Director shall establish three analytical groups focused on programmatic analysis in the following:

Establishment. Time periods.

(A) Year 1 of the future-years defense program under section 221 of title 10, United States Code, beginning with fiscal year 2025.

(B) Years 2 through 5 of the future-years defense program.

(C) Years outside the future-years defense program.

(3) REQUIREMENTS.—The Director shall ensure that at least one strategic portfolio review or an equivalent analytical effort is conducted each year under the pilot program.

(4) TERMINATION.—The pilot program shall terminate on September 30, 2028.

(c) ESTABLISHMENT OF ANALYSIS WORKING GROUP.—

(1) IN GENERAL.—Not later than May 1, 2024, the Secretary of Defense shall establish within the Department of Defense a working group to be known as the "Analysis Working Group".

(2) PERSONNEL.—The Secretary of Defense shall ensure that the Analysis Working Group possesses sufficient full-time equivalent support personnel to carry out the duties of the Group, including expansive coordination activities across the Department of Defense.

(3) MEMBERSHIP.—

(A) REGULAR MEMBERS.—The Analysis Working Group shall be composed of at least one representative from each of the following components of the Department of Defense:

(i) The Office of the Director of Cost Assessment and Program Evaluation.

(ii) The Directorate for Joint Force Development (J7) of the Joint Staff.

(iii) The Directorate for Force Structure, Resources, and Assessment (J8) of the Joint Staff.

(iv) The Office of the Secretary of Defense for Policy.

(v) The Chief Digital and Artificial Intelligence Office.

(B) OBSERVERS.—At least one representative from each of the following commands shall serve as observers of the Analysis Working Group:

(i) The United States Indo-Pacific Command.

(ii) The United States European Command.

(iii) The United States Central Command.

(4) DUTIES.—The Analysis Working Group shall—

(A) establish clear priorities and standards to focus analysts on decision support;

(B) improve transparency of methodologies, tools, and tradecraft across the analytic community, including testing and validation for new or emerging methodologies, tools, and tradecraft;

(C) improve quality of and expand access to data, including evaluation of new data sets, or application of existing data sets in new or novel ways;

(D) evolve the methodologies, tools, and tradecraft methods and tools used in strategic analysis;

(E) resolve classified access and infrastructure challenges;

(F) foster a workforce and organizations that are innovative, creative, and provide high-quality strategic decision support; and

(G) carry out such other activities as the Secretary of Defense determines appropriate.

(d) RULE OF CONSTRUCTION.—Nothing in subsection (b) or (c) shall be construed to interfere with the authority of the Chiefs of Staff of the Armed Forces to establish military requirements, performance requirements, and joint performance requirements, or the authority of the Joint Requirements Oversight Council to validate such requirements under section 181 of title 10, United States Code.

### SEC. 903. ESTABLISHMENT OF OFFICE OF STRATEGIC CAPITAL.

(a) ESTABLISHMENT OF OFFICE.—Chapter 4 of title 10, United States Code, as amended by section 241, is further amended by adding at the end the following new section:

10 USC prec. 131.

10 USC 149.

### "§ 149. Office of Strategic Capital

"(a) ESTABLISHMENT.—There is in the Office of the Secretary of Defense an office to be known as the Office of Strategic Capital (in this section referred to as the 'Office').

"(b) DIRECTOR.—The Office shall be headed by a Director (in this section referred to as the 'Director'), who shall be appointed

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 359

by the Secretary from among employees in Senior Executive Service positions (as defined in section 3132 of title 5), or from outside the civil service who have successfully held equivalent positions.

"(c) DUTIES.—The Office shall—

"(1) develop, integrate, and implement capital investment strategies proven in the commercial sector to shape and scale investment in critical technologies and assets;

"(2) identify and prioritize promising critical technologies and assets that require capital assistance and have the potential to benefit the Department of Defense; and

"(3) make eligible investments in such technologies and assets, such as supply chain technologies not always supported through direct investment.

"(d) NON-FEDERAL FUNDING REQUIREMENTS FOR CERTAIN INVESTMENTS.—In the case of an eligible investment made through a direct loan, not less than 80 percent of the total capital provided for the specific technology to be funded by the investment shall be derived from non-Federal sources as of the time of the investment.

"(e) DEFINITIONS.—In this section:

"(1) The term 'capital assistance' means a loan, loan guarantee, or technical assistance.

"(2) The term 'covered technology category' means the following:

"(A) Advanced bulk materials.
"(B) Advanced manufacturing.
"(C) Autonomous mobile robots.
"(D) Battery storage.
"(E) Biochemicals.
"(F) Bioenergetics.
"(G) Biomass.
"(H) Cybersecurity.
"(I) Data fabric.
"(J) Decision science.
"(K) Edge computing.
"(L) External communication.
"(M) Hydrogen generation and storage.
"(N) Mesh networks.
"(O) Microelectronics assembly, testing, or packaging.
"(P) Microelectronics design and development.
"(Q) Microelectronics fabrication.
"(R) Microelectronics manufacturing equipment.
"(S) Microelectronics materials.
"(T) Nanomaterials and metamaterials.
"(U) Open RAN.
"(V) Optical communications.
"(W) Sensor hardware.
"(X) Solar.
"(Y) Space launch.
"(Z) Spacecraft.
"(AA) Space-enabled services and equipment.
"(BB) Synthetic biology.
"(CC) Quantum computing.
"(DD) Quantum security.
"(EE) Quantum sensing.

"(3) The term 'eligible entity' means—

"(A) an individual;

Strategies.

137 STAT. 360          PUBLIC LAW 118–31—DEC. 22, 2023

"(B) a corporation;

"(C) a partnership, which may include a public-private partnership, limited partnership, or general partnership;

"(D) a joint venture;

"(E) a trust;

"(F) a State, including a political subdivision or any other instrumentality of a State;

"(G) a Tribal government or consortium of Tribal governments;

"(H) any other governmental entity or public agency in the United States, including a special purpose district or public authority, including a port authority;

"(I) a multi-State or multi-jurisdictional group of public entities; or

"(J) a strategic alliance among two or more entities described in subparagraphs (A) through (I).

"(4) The term 'eligible investment' means an investment, in the form of capital assistance provided to an eligible entity, for a technology that—

"(A) is in a covered technology category; and

"(B) is not a technology that solely has defense applications.".

10 USC 4811 note.

(b) PILOT PROGRAM ON CAPITAL ASSISTANCE TO SUPPORT DEFENSE INVESTMENT IN THE INDUSTRIAL BASE.—

(1) CAPITAL ASSISTANCE.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in this subsection, the Secretary of Defense, acting through the Director of the Office of Strategic Capital (referred to in this section as the "Director"), may carry out a pilot program under this subsection to provide capital assistance to eligible entities for eligible investments to develop technologies that support the duties and elements of the Office and meet the needs of the Department of Defense.

(2) ELIGIBILITY AND APPLICATION PROCESS.—

(A) IN GENERAL.—An eligible entity seeking capital assistance for an eligible investment under this subsection shall submit to the Director an application at such time, in such manner, and containing such information as the Director may require.

Criteria.

(B) SELECTION OF INVESTMENTS.—The Director shall establish criteria for selecting among eligible investments for which applications are submitted under subparagraph (A). The criteria shall include—

(i) the extent to which an investment supports the national security or economic interests of the United States;

(ii) the likelihood that capital assistance provided for an investment would enable the investment to proceed sooner than the investment would otherwise be able to proceed; and

(iii) the creditworthiness of an investment.

(3) CAPITAL ASSISTANCE.—

(A) LOANS AND LOAN GUARANTEES.—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 361

(i) IN GENERAL.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in this subsection, the Director may provide loans or loan guarantees to finance or refinance the costs of an eligible investment selected pursuant to paragraph (2)(B).

(ii) ADMINISTRATION OF LOANS.—

(I) INTEREST RATE.—

(aa) IN GENERAL.—Except as provided under item (bb), the interest rate on a loan provided under clause (i) shall be not less than the yield on marketable United States Treasury securities of a similar maturity to the maturity of the loan on the date of execution of the loan agreement.

(bb) EXCEPTION.—The Director may waive the requirement under item (aa) with respect to an investment if the investment is determined by the Secretary of Defense to be vital to the national security of the United States. <span style="float:right">Waiver authority.</span>

(cc) CRITERIA.—The Director shall establish separate and distinct criteria for interest rates for loan guarantees with private sector lending institutions.

(II) FINAL MATURITY DATE.—The final maturity date of a loan provided under clause (i) shall be not later than 50 years after the date on which the loan was provided.

(III) PREPAYMENT.—A loan provided under clause (i) may be paid earlier than is provided for under the loan agreement without a penalty.

(IV) NONSUBORDINATION.—

(aa) IN GENERAL.—A loan provided under clause (i) shall not be subordinated to the claims of any holder of investment obligations in the event of bankruptcy, insolvency, or liquidation of the obligor.

(bb) EXCEPTION.—The Director may waive the requirement under item (aa) with respect to the investment in order to mitigate risks to loan repayment. <span style="float:right">Waiver authority.</span>

(V) SALE OF LOANS.—The Director may sell to another entity or reoffer into the capital markets a loan provided under clause (i) if the Director determines that the sale or reoffering can be made on favorable terms.

(VI) LOAN GUARANTEES.—Any loan guarantee provided under clause (i) shall specify the percentage of the principal amount guaranteed. If the Secretary determines that the holder of a loan guaranteed by the Department of Defense defaults on the loan, the Director shall pay the holder as specified in the loan guarantee agreement.

(VII) INVESTMENT-GRADE RATING.—The Director shall establish a credit rating system to ensure a reasonable reassurance of repayment.

The system may include use of existing credit rating agencies where appropriate.

(VIII) TERMS AND CONDITIONS.—Loans and loan guarantees provided under clause (i) shall be subject to such other terms and conditions and contain such other covenants, representations, warranties, and requirements (including requirements for audits) as the Secretary determines appropriate.

(IX) APPLICABILITY OF FEDERAL CREDIT REFORM ACT OF 1990.—Loans and loan guarantees provided under clause (i) shall be subject to the requirements of the Federal Credit Reform Act of 1990 (2 U.S.C. 661 et seq.).

(B) TECHNICAL ASSISTANCE.—Subject to appropriations Acts, the Director may provide technical assistance with respect to developing and financing investments to eligible entities seeking capital assistance for eligible investments and eligible entities receiving capital assistance under this subsection.

(C) TERMS AND CONDITIONS.—

(i) AMOUNT OF CAPITAL ASSISTANCE.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in this subsection, the Director shall provide to an eligible investment selected pursuant to paragraph (2)(B) the amount of capital assistance necessary to carry out the investment.

(ii) USE OF UNITED STATES DOLLARS.—All financial transactions conducted under this section shall be conducted in United States dollars.

(4) NON-FEDERAL FUNDING REQUIREMENTS.—The requirements of section 149(d) of title 10, United States Code (as added by subsection (a)) shall apply to eligible investments under this subsection.

(5) ESTABLISHMENT OF ACCOUNTS.—

(A) CREDIT PROGRAM ACCOUNT.—

(i) ESTABLISHMENT.—There is established in the Treasury of the United States a Department of Defense Credit Program Account to make and guarantee loans under this subsection in accordance with section 502 of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a).

(ii) FUNDING.—The Credit Program Account shall consist of amounts appropriated pursuant to the authorization of appropriations.

(B) USE OF FUNDS.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in this subsection, the Director is authorized to pay, from amounts in the Department of Defense Credit Program Account—

(i) the cost, as defined in section 502 of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a), of loans and loan guarantees and other capital assistance;

(ii) administrative expenses associated with activities under this section;

(iii) project-specific transaction costs; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 363

(iv) the cost of providing support authorized by this subsection.

(6) REGULATIONS.—The Secretary of Defense may prescribe such regulations as the Secretary determines to be appropriate to carry out this subsection.

(7) ANNUAL REPORT.—Not later than the first Monday in February of a fiscal year, the Secretary of Defense shall submit to the congressional defense committees an annual report describing activities carried out pursuant to this subsection in the preceding fiscal year and the goals of the Department of Defense in accordance with this subsection for the next fiscal year.

(8) NOTIFICATION REQUIREMENT.—The Secretary of Defense shall notify the congressional defense committees not later than 30 days after a use of loans, loan guarantees, or technical assistance under this subsection. <span style="float:right">Deadline.</span>

(9) SUNSET.—The authorities provided under this subsection shall expire on October 1, 2028.

(10) DEFINITIONS.—In this subsection:

(A) The term "capital assistance" means loans, loan guarantees, or technical assistance provided under paragraph (3).

(B) The terms "eligible entity" and "eligible investment" have the meanings given those terms in section 149(e) of title 10, United States Code (as added by subsection (a)).

(C) The term "obligor" means a party that is primarily liable for payment of the principal of or interest on a loan.

**SEC. 904. ESTABLISHMENT AND ASSIGNMENT OF ROLES AND RESPONSIBILITIES FOR COMBINED JOINT ALL-DOMAIN COMMAND AND CONTROL IN SUPPORT OF INTEGRATED JOINT WARFIGHTING.** <span style="float:right">10 USC 131 note.</span>

(a) IN GENERAL.—The Secretary of Defense shall establish, and assign to appropriate components of the Office of the Secretary, roles and responsibilities relating to—

(1) the development of combined joint all-domain command and control (commonly known as "CJADC2") capabilities in support of integrated joint warfighting; and

(2) the delivery of such capabilities to the combatant commands.

(b) ROLES AND RESPONSIBILITIES.—The roles and responsibilities established and assigned under subsection (a) shall include, at a minimum, the following:

(1) Identifying new technology and operational concepts for experimentation and prototyping for delivery to the Joint Force to address key operational challenges.

(2) Providing technical support for the Joint Force in exploring and analyzing new combined joint all-domain command and control capabilities and operational concepts, including through advanced modeling and simulation.

(3) Executing experimentation associated with such capabilities through the Rapid Defense Experimentation Reserve or another mechanism.

**137 STAT. 364**          **PUBLIC LAW 118–31—DEC. 22, 2023**

(4) Enabling the acquisition of cross-domain, joint, and cross-system mission capabilities, including resourcing of modifications necessary for integration and interoperability among mission components.

(5) Ensuring the effectiveness of cross-domain, joint, and cross-system mission capabilities through analysis and testing.

(6) Creating and operating a complete capability for software development that allows for iterative, secure, and continuous deployment of developmental, prototype, and operational tools and capabilities from multiple vendors to test networks and operational networks for combatant commanders to—

(A) gain operational awareness, make decisions, and take actions;

Data.

(B) integrate relevant data sources to support target selection, target prioritization, and weapon-target pairing; and

(C) assign targets through networks, tools, and systems of the Armed Forces and combat support agencies.

(c) INITIAL PRIORITIZATION.—In establishing an initial set of roles and responsibilities under subsection (a), the Secretary of Defense shall prioritize the development and delivery of capabilities that meet the requirements of the United States Indo-Pacific Command.

Deadline.
Time period.

(d) BRIEFINGS REQUIRED.—Not later than 90 days after the date of the enactment of this Act, and not less frequently than once every 180 days thereafter through December 31, 2026, the Secretary of Defense shall provide to the congressional defense committees a briefing on—

(1) any activities carried out in accordance with the roles and responsibilities under subsection (a); and

(2) any plans associated with such roles and responsibilities.

10 USC 138 note.

**SEC. 905. PRINCIPAL DEPUTY ASSISTANT SECRETARIES TO SUPPORT ASSISTANT SECRETARY OF DEFENSE FOR SPECIAL OPERATIONS AND LOW INTENSITY CONFLICT.**

The Secretary of Defense may appoint two Principal Deputy Assistant Secretaries to report to the Assistant Secretary of Defense for Special Operations and Low Intensity Conflict—

(1) one of whom may be assigned to support the Assistant Secretary in the discharge of responsibilities specified in clause (i) of section 138(b)(2)(A) of title 10, United States Code; and

(2) one of whom may be assigned to support the Assistant Secretary in the discharge of responsibilities specified in clause (ii) of that section.

# Subtitle B—Other Department of Defense Organization and Management Matters

**SEC. 911. ADDITIONAL REQUIREMENTS UNDER GENERAL POLICY FOR TOTAL FORCE MANAGEMENT.**

Section 129a(c)(2) of title 10, United States Code, is amended by adding at the end the following: "The Secretary of Defense shall ensure that the requirements determination, planning, programming, and budgeting conducted under this paragraph considers all components of the total force (including active and reserve

military, the civilian workforce, and contract support) in a holistic manner—

"(A) to avoid duplication of efforts and waste of resources attributable to a component working outside the scope of its responsibilities; and

"(B) to ensure that risk, cost, and mission validation and prioritization considerations are consistent with the national defense strategy.".

### SEC. 912. ADDITION OF COLLEGE OF INTERNATIONAL SECURITY AFFAIRS TO NATIONAL DEFENSE UNIVERSITY.

Section 2165(b) of title 10, United States Code, is amended—

(1) by redesignating paragraph (6) as paragraph (7); and

(2) by inserting after paragraph (5) the following new paragraph (6):

"(6) The College of International Security Affairs.".

### SEC. 913. CODIFICATION OF THE DEFENSE INNOVATION UNIT.

(a) CODIFICATION OF DEFENSE INNOVATION UNIT.—

(1) IN GENERAL.—Subchapter III of chapter 303 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC prec. 4061.

### "§ 4127. Defense innovation unit

10 USC 4127.

"(a) ESTABLISHMENT.—There is established in the Department of Defense a Defense Innovation Unit (referred to in this section as the 'Unit').

"(b) DIRECTOR AND DEPUTY DIRECTOR.—There is a Director of the Unit who shall be appointed by the Secretary of Defense from among persons with substantial experience in innovation and commercial technology, as determined by the Secretary.

Appointment.

"(c) AUTHORITY OF DIRECTOR.—The Director is the head of the Unit. The Director—

"(1) shall serve as a principal staff assistant to the Secretary of Defense on matters within the responsibility of the Unit;

"(2) shall report directly to the Secretary without intervening authority; and

"(3) may communicate views on matters within the responsibility of the Unit directly to the Secretary without obtaining the approval or concurrence of any other official within the Department of Defense.

"(d) RESPONSIBILITIES.—The Unit shall have the following responsibilities:

"(1) Seek out, identify, and support development of and experimentation with commercial technologies that have the potential to be implemented within the Department of Defense.

"(2) Accelerate the adoption or integration of commercial technologies within the Department of Defense to transform military capacity and capabilities.

"(3) Serve as the principal liaison between the Department of Defense and individuals and entities in the national security innovation base, including entrepreneurs, startups, commercial technology companies, and venture capital sources.

"(4) Carry out programs, projects, and other activities to strengthen the national security innovation base.

"(5) Coordinate and harmonize the activities of other organizations and elements of the Department of Defense on

137 STAT. 366          PUBLIC LAW 118–31—DEC. 22, 2023

matters relating to commercial technologies, dual use technologies, and the innovation of such technologies.

"(6) Coordinate and advise efforts among elements of the Department of Defense on matters relating to the development, procurement, and fielding of nontraditional capabilities.

"(7) Coordinate with the Joint Staff and the commanders of the combatant commands to identify operational challenges that have the potential to be addressed through the use of nontraditional capabilities, including dual-use technologies, that are being developed and financed in the commercial sector.

"(8) Using funds made available to the Unit—

"(A) select projects to be carried out by one or more of the service-level innovation organizations;

"(B) allocate funds to service-level innovation organizations to carry out such projects; and

"(C) monitor the execution of such projects by the service-level innovation organizations.

"(9) Serve as the principal liaison between the Department of Defense, nontraditional defense contractors, investors in nontraditional defense companies, and departments and agencies of the Federal Government pursing nontraditional capabilities similar to those pursued by the Department.

"(10) Lead engagement with industry, academia, and other nongovernment entities to develop—

"(A) domestic capacity with respect to innovative, commercial, and dual-use technologies and the use of nontraditional defense contractors; and

"(B) the capacity of international allies and partners of the United States with respect to such technologies and the use of such contractors.

"(11) Carry out such other activities as the Secretary of Defense determines appropriate.

"(e) SUPPORT FOR MULTI-STAKEHOLDER PARTNERSHIPS.—

"(1) The Director shall identify and support multi-stakeholder research and innovation partnerships that—

"(A) have the potential to generate technologies, processes, products, or other solutions that address national defense or security needs; and

"(B) have as an objective the technology transfer or commercialization of the work product generated by the partnership, which may include work product that incorporates Government-developed intellectual property licensed to the partnership in accordance with paragraph (3).

"(2) Support provided by the Director to a multi-stakeholder research and innovation partnership under this subsection may include—

"(A) providing funding or other resources to the partnership;

"(B) participating in the partnership;

"(C) providing technical and technological advice and guidance to the partnership;

"(D) suggesting and introducing other participants for inclusion in the partnership;

"(E) providing the partnership with insight into desired solutions for defense and security needs; and

"(F) such other forms of support as the Director determines appropriate.

"(3) To the extent the Director determines appropriate, the Director shall seek to actively inform potential participants in multi-stakeholder research and innovation partnerships of the availability of Government-developed intellectual property that may be licensed to the partnership.

"(4) On an annual basis, the Director shall submit to the Secretary of Defense and the congressional defense committees a report on the activities, advances, outcomes, and work product of the multi-stakeholder research and innovation partnerships supported under this subsection.

Reports.

"(f) DEFINITIONS.—In this section:

"(1) The term 'multi-stakeholder research and innovation partnership' means a partnership composed of any combination of two or more of the following:

"(A) Universities, colleges, or other institutions of higher education with research and innovation capability.

"(B) Non-profit organizations that provide policy, research, outreach, operations, organizational, management, testing, evaluation, technology transfer, legal, financial, or advocacy expertise.

"(C) For-profit commercial enterprises that may be publicly or privately owned, early stage or mature, and incorporated or operating by another ownership structure.

"(D) Departments or agencies of the Federal Government with expertise, operations, or resources related to the objectives of the multi-stakeholder research and innovation partnership.

"(2) The term 'nontraditional capability' means a solution to an operational challenge that can significantly leverage commercial innovation or external capital with minimal dependencies on fielded systems.

"(3) The term 'nontraditional defense contractor' has the meaning given that term in section 3014 of this title.".

(2) MODIFICATION OF OTHER TRANSACTION AUTHORITY.—Section 4021 of title 10, United States Code, is amended—

(A) in subsection (b), by inserting ", the Defense Innovation Unit," after "Defense Advanced Research Projects Agency"; and

(B) in subsection (f), by striking "and the Defense Advanced Research Projects Agency" and inserting ", the Defense Innovation Unit, and the Defense Advanced Research Projects Agency".

(3) MODIFICATION OF AUTHORITY TO CARRY OUT CERTAIN PROTOTYPE PROJECTS.—Section 4022 of title 10, United States Code, is amended—

(A) in subsection (a)—

(i) in paragraph (1), by inserting "the Director of the Defense Innovation Unit," after "Defense Advanced Research Projects Agency,";

(ii) in paragraph (2)(A), by inserting ", the Defense Innovation Unit," after "Defense Advanced Research Projects Agency"; and

(iii) in paragraph (3), by inserting ", Defense Innovation Unit," after "Defense Advanced Research Projects Agency"; and

(B) in subsection (e)(1)—
    (i) by redesignating subparagraphs (C) through (E) as subparagraphs (D) through (F), respectively; and
    (ii) by inserting after subparagraph (B) the following new subparagraph:
"(C) the Director of the Defense Innovation Unit;".
    (4) CONFORMING AMENDMENTS.—Section 1766 of title 10, United States Code, is amended—
        (A) in subsection (b), by striking "as determined by the Under Secretary of Defense for Research and Engineering" and inserting "as determined by the Secretary of Defense"; and
        (B) in subsection (c)(3), by striking "as directed by the Under Secretary of Defense for Research and Engineering" and inserting "as directed by the Secretary of Defense".
(b) EFFECTIVE DATE AND IMPLEMENTATION.—

10 USC 1766 note.

    (1) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect 180 days after the date of the enactment of this Act.

10 USC 1766 note.

    (2) IMPLEMENTATION.—Not later than the effective date specified in paragraph (1), the Secretary of Defense shall issue or modify any rules, regulations, policies, or other guidance necessary to implement the amendments made by subsection (a).
(c) MANPOWER SUFFICIENCY EVALUATION.—

Determination.

    (1) EVALUATION.—The Secretary of Defense shall evaluate the staffing levels of the Defense Innovation Unit as of the date of the enactment of this Act to determine if the Unit is sufficiently staffed to achieve the responsibilities of the Unit under section 4127 of title 10, United States Code, as added by subsection (a) of this section.
    (2) REPORT.—Not later than the effective date specified in subsection (b)(1), the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the results of the evaluation under paragraph (1). The report shall include a plan—

Plan.

        (A) to address any staffing shortfalls identified as a part of the assessment; and
        (B) for funding any activities necessary to address such shortfalls.

10 USC prec. 8011.

**SEC. 914. REPEAL OF AUTHORITY TO APPOINT A NAVAL RESEARCH ADVISORY COMMITTEE.**

Section 8024 of title 10, United States Code, is repealed.

**SEC. 915. ELIGIBILITY OF MEMBERS OF SPACE FORCE FOR INSTRUCTION AT THE NAVAL POSTGRADUATE SCHOOL.**

Section 8545 of title 10, United States Code, is amended—
    (1) in subsection (a)(1), by striking "and Coast Guard" and inserting "Space Force, and Coast Guard"; and
    (2) in subsection (c), by striking "and Coast Guard" and inserting "Space Force, and Coast Guard".

**SEC. 916. MEMBERSHIP OF THE AIR FORCE RESERVE FORCES POLICY COMMITTEE.**

Section 10305(b) of title 10, United States Code, is amended—

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 369

(1) by striking "consists of" and inserting "shall have voting members, who shall be" before "officers";

(2) by redesignating paragraphs (1) through (3) as subparagraphs (A) through (C), respectively;

(3) by inserting "(1)" before "The committee"; and

(4) by adding at the end the following new paragraph:

"(2)(A) The committee shall have four nonvoting members, who shall be the Chief Master Sergeants of the Air Force, the Air Force Reserve, the Air National Guard, and the Space Force.

"(B) A nonvoting member who cannot attend a meeting of the committee may designate a member in the grade of E–8 or E–9 to attend in their stead.".

### SEC. 917. MODIFICATION OF CROSS-FUNCTIONAL TEAM TO ADDRESS EMERGING THREAT RELATING TO ANOMALOUS HEALTH INCIDENTS.

Section 910 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 111 note) is amended—

(1) in subsection (a), by inserting ", including capabilities that plausibly could result in such incidents," after "(as defined by the Secretary)";

(2) in subsection (b), by striking paragraphs (1) through (3) and inserting the following new paragraphs:

"(1) to investigate and carry out such other activities as may be necessary—

"(A) to identify anomalous health incidents;

"(B) to determine the causes and sources of such incidents, including identification of any individuals, entities, capabilities, or phenomena to which such incidents may plausibly be attributed; and

"(C) to understand how such incidents may be mitigated and treated;

"(2) to address the challenges posed by anomalous health incidents, including by coordinating research into—

"(A) non-kinetic capabilities that plausibly might result in such incidents, such as anti-personnel capabilities and directed energy capabilities;

"(B) the detection and mitigation of such capabilities; and

"(C) the development of countermeasures for such capabilities;

"(3) to integrate and deconflict the efforts of the Department of Defense regarding anomalous health incidents with the efforts of other departments or agencies of the Federal Government regarding such incidents; and

"(4) to undertake any other efforts regarding non-kinetic threats to personnel and anomalous health incidents that the Secretary considers appropriate.";

(3) in subsection (d), by striking "in consultation with the Director of National Intelligence and"; and

(4) in subsection (e)(2)—

(A) by striking "March 1, 2026" and inserting "March 1, 2028"; and

(B) by striking "with respect to the efforts of the Department regarding anomalous health incidents" an inserting "on any activities carried out to fulfill the duties

*[margin notes: Determination. Coordination. Research and development.]*

specified in subsection (b) since the date of the preceding briefing under this section".

10 USC 301 note.

**SEC. 918. TECHNOLOGY RELEASE AND FOREIGN DISCLOSURE REFORM INITIATIVE.**

(a) INITIATIVE REQUIRED.—

(1) IN GENERAL.—The Secretary of Defense shall carry out an initiative to reform and improve the policies, processes, and procedures applicable to technology release and foreign disclosure decisions by the Department of Defense.

(2) OBJECTIVES.—The objectives of such initiative shall be—

Recommendations.

(A) to develop recommendations for the continuous improvement of such policies, processes, and procedures within the Department and across other departments and agencies of the Federal Government involved in technology release and foreign disclosure decisions;

(B) to increase efficiency and reduce timelines for the processing of such decisions;

(C) to standardize, to the extent practicable, processes and information sharing systems applicable to such decisions; and

(D) to provide for the continuous exchange of timely and relevant information among—

(i) the principal organizations involved in technology release and foreign disclosure decisions;

(ii) the broader acquisition and program executive officer communities; and

(iii) interagency partners of the Department.

(3) METHOD OF IMPLEMENTATION.—For purposes of the initiative required under paragraph (1), the Secretary of Defense may—

(A) establish a new initiative;

(B) modify an existing initiative of the Department of Defense; or

(C) carry out the initiative through a combination of the approaches described in subparagraphs (A) and (B).

(b) METRICS.—

(1) IN GENERAL.—In conjunction with the initiative required under subsection (a), the Under Secretary of Defense for Policy shall develop metrics for the management of the technology release and foreign disclosure process to provide objective and subjective measures of performance and improve senior leader decision-making in the Department of Defense.

(2) ELEMENTS.—The metrics developed under paragraph (1) shall include—

(A) methods for tracking individual technology release and foreign disclosure decisions made by the Defense Technology Security Administration;

(B) objectives and deadlines related to the completion of such decisions; and

(C) a method of prioritizing among technology release and foreign disclosure requests that takes into account—

(i) the importance of the request to the national security of the United States; and

(ii) the risks associated with the release or disclosure.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 371

(3) BRIEFING REQUIRED.—Not later than June 1, 2024, the Under Secretary of Defense for Policy shall provide to the congressional defense committees a briefing on the metrics developed under paragraph (1). <span style="float:right">Deadline.</span>

(c) DESIGNATION OF POINTS OF CONTACT.—Not later than 90 days after the date of the enactment of this Act— <span style="float:right">Deadline.</span>

(1) the Under Secretary of Defense for Policy shall establish or designate—

(A) one position within the Office of the Under Secretary to lead the development and oversee the implementation of technology release and foreign disclosure policies for the Department of Defense; and

(B) one position within the Office to coordinate information and outreach to relevant stakeholders on relevant Department of Defense technology release and foreign disclosure policies and to respond to inquiries from representatives of the commercial defense industry and partner countries; and

(2) each Secretary of a military department shall establish or designate—

(A) one position within the department under the jurisdiction of such Secretary to lead the development and oversee the implementation of technology release and foreign disclosure policies for that department; and

(B) one position within such department to coordinate information and outreach to relevant stakeholders on relevant Department of Defense technology release and foreign disclosure policies and to respond to inquiries from representatives of the commercial defense industry and partner countries.

(d) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than December 31, 2024, the Secretary of Defense shall submit to the congressional defense committees a report that includes the following: <span style="float:right">Assessments.</span>

(A) An assessment of the staffing levels of the organizations specified in paragraph (2).

(B) An assessment of the feasibility and advisability of consolidating the functions and organizations of the Department of Defense involved in technology release and foreign disclosure decisions, including the organizations specified in paragraph (2).

(C) A review of any statutes and regulations applicable to technology release and foreign disclosure, together with recommendations for any changes to such statutes and regulations. <span style="float:right">Review.<br>Recommendations.</span>

(D) A survey and description of the data and methodology used to assess operational risk, technology risk, and the effects of technology release and foreign disclosure decisions on the defense industrial base. <span style="float:right">Survey.<br>Data.</span>

(E) An assessment of the benefits of developing and implementing anticipatory policies for technology release and foreign disclosure that include standardized capability thresholds for countries and geopolitical regions, especially for emerging capabilities for partners and allies of the United States.

(F) An assessment of the extent to which the lessons learned from technology release and foreign disclosure

137 STAT. 372          PUBLIC LAW 118–31—DEC. 22, 2023

decisions made in support of the Ukraine conflict have been applied to broader processes.

(2) ORGANIZATIONS SPECIFIED.—The organizations specified in this paragraph are—

(A) the Defense Technology Security Administration;

(B) the Low Observable/Counter Low Observable Tri-Service Committee;

(C) the Executive Agent for Anti-Tamper;

(D) the Communications Security Review and Advisory Board; and

(E) the organizations responsible for technology release and foreign disclosure in each of the military departments.

10 USC 111 note.

### SEC. 919. SOFTWARE-BASED CAPABILITY TO FACILITATE SCHEDULING BETWEEN THE DEPARTMENT OF DEFENSE AND CONGRESS.

Deadline.

Not later than September 30, 2024, the Secretary of Defense shall seek to develop and implement a software-based capability to facilitate the mutual scheduling of engagements between the Department of Defense and the congressional defense committees. Such capability shall—

Data.

(1) enable the automated transmission of scheduling data to and from the congressional defense committees; and

(2) be compatible and interoperable with the information technology systems of such committees.

10 USC 240b note.

### SEC. 920. METRICS TO OPERATIONALIZE AUDIT READINESS.

(a) METRICS REQUIRED.—

(1) IN GENERAL.—The Secretary of Defense, in coordination with the Secretaries of the military departments, shall develop a set of metrics that reflect the Secretary's audit remediation goals and metrics to measure progress made by the military departments with respect to such goals.

Contracts.

(2) FFRDC SUPPORT.—The Secretary of Defense may enter into a contract or other agreement with a federally funded research and development center or university-affiliated research center to support the development of the metrics required under paragraph (1).

(3) DEADLINE.—The Secretary of Defense shall develop and implement an initial set of metrics under paragraph (1) by not later than April 30, 2025.

(b) LEADER PERFORMANCE ASSESSMENTS.—

Evaluation.

(1) IN GENERAL.—The Secretary of Defense, in coordination with the Secretaries of the military departments and the Under Secretary of Defense for Personnel and Readiness, shall evaluate means by which the metrics developed under subsection (a) can be used in the performance evaluation of general officers, flag officers, and employees of the military departments who are members of the Senior Executive Service.

Deadline.

(2) BRIEFING REQUIRED.—Not later than September 30, 2024, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the evaluation conducted under paragraph (1). The briefing shall include the following:

(A) Identification of the general officer, flag officer, and Senior Executive Service positions in the military departments for which it would be appropriate to use the

metrics developed under subsection (a) in support of the performance evaluation process.

(B) Evaluations of available measures to reward or recognize superior or above-average performance with respect to such metrics.

Evaluation.

(C) Assessment of the potential value, and challenges, to integrating such measures into the annual performance evaluations for positions identified under subparagraph (A).

(D) Any other issues the Secretary considers appropriate.

### SEC. 921. NEXT GENERATION BUSINESS HEALTH METRICS.

10 USC 2222 note.

(a) METRICS REQUIRED.—The Secretary of Defense, in coordination with the Secretaries of the military departments, shall develop an updated set of business health metrics to inform decision-making by senior leaders of the Department of Defense.

(b) ELEMENTS.—In developing the metrics required by subsection (a), the Secretary of Defense shall—

(1) using the latest literature on performance measurement, determine what additional new metrics should be implemented, or current metrics should be adapted, to reduce output-based measures and emphasize objective, measurable indicators aligned to enduring strategic goals of the Department of Defense;

Determination.

(2) assess the current business processes of the Department and provide recommendations to align the metrics with available data sources to determine what gaps might exist in such processes;

Assessment.
Recommendations.
Determination.

(3) ensure that data can be collected automatically and, on a long-term basis, in a manner that provides for longitudinal analysis;

(4) link the metrics with the Strategic Management Plan and other performance documents guiding the Department;

(5) identify any shortfalls in resources, data, training, policy, or law that could be an impediment to implementing the metrics;

(6) revise leading and lagging indicators associated with each such metric to provide a benchmark against which to assess progress;

Revision.
Assessment.

(7) improve visualization of and comprehension for the use of the metrics in data-driven decision-making, including adoption of new policies and training as needed;

(8) incorporate the ability to aggregate and disaggregate data to provide the ability to focus on functional, component-level metrics; and

(9) increase standardization of the use and collection of business health metrics across the Department.

(c) ADDITIONAL SUPPORT.—The Secretary of Defense may enter into a contract or other agreement with a federally funded research and development center or university-affiliated research center to support the development of the metrics required under subsection (a).

Contracts.

### SEC. 922. INDEPENDENT ASSESSMENT OF DEFENSE BUSINESS ENTERPRISE ARCHITECTURE.

(a) IN GENERAL.—The Secretary of Defense shall seek to enter into a contract or other agreement with a federally funded research and development center or a university affiliated research center

Contracts.

137 STAT. 374        PUBLIC LAW 118–31—DEC. 22, 2023

to conduct an independent assessment of the defense business enterprise architecture developed under section 2222(e) of title 10, United States Code.

(b) ELEMENTS.—The assessment required by subsection (a) shall include the following elements:

(1) An assessment of the effectiveness of the defense business enterprise architecture as of the date of the enactment of this Act in providing an adequate and useful framework for planning, managing, and integrating the business systems of the Department of Defense.

(2) A comparison of the defense business enterprise architecture with similar models in use by other government agencies in the United States, foreign governments, and major commercial entities, including an assessment of any lessons from such models that might be applied to the defense business enterprise architecture.

(3) An assessment of the adequacy of the defense business enterprise architecture in informing business process re-engineering and being sufficiently responsive to changes in business processes over time.

(4) An identification of any shortfalls or implementation challenges in the utility of the defense business enterprise architecture.

Recommendations.

(5) Recommendations for replacement of the existing defense business enterprise architecture or for modifications to the existing architecture to make that architecture and the process for updating that architecture more effective and responsive to the business process needs of the Department.

(c) INTERIM BRIEFING.—Not later than April 1, 2024, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the status of the assessment required by subsection (a).

(d) FINAL REPORT.—Not later than January 30, 2025, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the results of the assessment required by subsection (a).

### SEC. 923. FUTURE FORCE DESIGN OF THE DEPARTMENT OF THE AIR FORCE.

Deadline.

(a) FORCE DESIGN REQUIRED.—Not later than August 31, 2024, the Secretary of the Air Force shall develop a force design for the Air Force and Space Force projected through 2050.

(b) ELEMENTS.—The force design under subsection (a) shall address—

(1) the concepts, capabilities, and structural elements (including size and form) of the Air Force and Space Force that are necessary to ensure those forces effectively execute their core functions through 2050 in support of the National Defense Strategy and the National Military Strategy;

(2) force structure, including the development of capabilities (including platforms and systems) at the correct level of capacity to address the challenges outlined by the National Defense Strategy and the National Military Strategy;

(3) force composition, including recruitment and development of human capital, effective distribution of forces in the total force, and policies to increase career flexibility across the various components of the force;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 375

(4) organizational design, including development of potential models to increase agility and operational effectiveness across the Air Force and Space Force; and

(5) such other matters as the Secretary of the Air Force determines to be relevant.

(c) INFORMATION TO CONGRESS.—Not later than 60 days after completion of the force design required under subsection (a), the Secretary of the Air Force shall— | Deadline.

(1) submit a summary of the force design to the congressional defense committees; and | Summary.

(2) provide to the congressional defense committees a briefing on the force design. | Briefing.

**SEC. 924. FEASIBILITY STUDY ON THE CONSOLIDATION OR TRANSFER OF SPACE FUNCTIONS OF THE NATIONAL GUARD TO THE SPACE FORCE.**

(a) STUDY REQUIRED.—The Secretary of Defense shall conduct a study to assess the feasibility and advisability of transferring all covered space functions of the National Guard to the Space Force. | Assessment.

(b) ELEMENTS.—The study under subsection (a) shall include the following: | Analyses.

(1) An analysis and recommendations addressing, at a minimum, each of the following courses of action with respect to the covered space functions of the National Guard: | Recommendations.

(A) Maintaining the current model under which the Air National Guard has units and personnel performing such functions.

(B) Transferring such functions, including units and personnel, to the Space Force.

(C) The establishment of a new National Guard component of the Space Force to perform such functions.

(2) A cost-benefit analysis for each course of action addressed under paragraph (1).

(3) An assessment any risks or benefits to the mission or readiness of the Space Force, including the ability of the Space Force to meet applicable objectives of the National Defense Strategy, that may be presented by transferring or consolidating units of the Air National Guard as described in paragraph (1). | Assessment.

(c) INTERIM BRIEFING.—Not later than February 1, 2024, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and House of Representatives an interim briefing on the preliminary results of the study conducted under subsection (a). | Deadline.

(d) FINAL REPORT.—

(1) IN GENERAL.—Not later than March 1, 2024, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the final results of the study conducted under subsection (a), including the results of the study with respect to each element specified in subsection (b).

(2) FORM OF REPORT.—The report required under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(e) COVERED SPACE FUNCTIONS OF THE NATIONAL GUARD DEFINED.—In this section, the term "covered space functions of

137 STAT. 376          PUBLIC LAW 118–31—DEC. 22, 2023

the National Guard" means all units, personnel billets, equipment, and resources of the Air National Guard associated with the performance a space related function that is (as determined by the Secretary of the Air Force, in consultation with the Chief of Space Operations)—

(1) a core space-related function of the Space Force; or
(2) otherwise integral to the mission of the Space Force.

# TITLE X—GENERAL PROVISIONS

Subtitle A—Financial Matters

Sec. 1001. General transfer authority.
Sec. 1002. Annual report on budget prioritization by Secretary of Defense and military departments.
Sec. 1003. Additional reporting requirements related to unfunded priorities of armed forces and combatant commands.
Sec. 1004. Audit requirement for Department of Defense components.
Sec. 1005. Requirement for unqualified opinion on Department of Defense financial statements.

Subtitle B—Counterdrug Activities

Sec. 1010. Enhanced support for counterdrug activities and activities to counter transnational organized crime.
Sec. 1011. Modification of support for counterdrug activities and activities to counter transnational organized crime: increase in cap for small scale construction projects.
Sec. 1012. Drug interdiction and counter-drug activities.
Sec. 1013. Disruption of fentanyl trafficking.

Subtitle C—Naval Vessels and Shipyards

Sec. 1015. Modifications to annual naval vessel construction plan.
Sec. 1016. Critical components of national sea-based deterrence vessels.
Sec. 1017. Grants for improvement of Navy ship repair or alterations capability.
Sec. 1018. Repeal of obsolete provision of law regarding vessel nomenclature.
Sec. 1019. Responsibility of Commandant of the Marine Corps with respect to naval battle force ship assessment and requirement reporting.
Sec. 1020. Policy of the United States on shipbuilding defense industrial base.
Sec. 1021. Prohibition on retirement of certain naval vessels.
Sec. 1022. Authority to use incremental funding to enter into a contract for the advance procurement and construction of a San Antonio-class amphibious ship.
Sec. 1023. Authority to use incremental funding to enter into a contract for the advance procurement and construction of a submarine tender.
Sec. 1024. Biannual briefings on submarine readiness.

Subtitle D—Counterterrorism

Sec. 1031. Extension of prohibition on use of funds for transfer or release of individuals detained at United States Naval Station, Guantanamo Bay, Cuba, to the United States.
Sec. 1032. Extension of prohibition on use of funds to construct or modify facilities in the United States to house detainees transferred from United States Naval Station, Guantanamo Bay, Cuba.
Sec. 1033. Extension of prohibition on use of funds for transfer or release of individuals detained at United States Naval Station, Guantanamo Bay, Cuba, to certain countries.
Sec. 1034. Extension of prohibition on use of funds to close or relinquish control of United States Naval Station, Guantanamo Bay, Cuba.

Subtitle E—Miscellaneous Authorities and Limitations

Sec. 1041. Limitation on availability of certain funds until submission of Chairman's Risk Assessment; briefing requirement.
Sec. 1042. Assistance in support of Department of Defense accounting for missing United States Government personnel.
Sec. 1043. Implementation of arrangements to build transparency, confidence, and security.
Sec. 1044. Modification to definitions of Confucius Institute.
Sec. 1045. Termination of authority to issue waiver of limitation on use of funds to institutions of higher education hosting Confucius Institutes.

Sec. 1046. Vetting procedures and monitoring requirements for allies and partners participating in education or training activities in the United States.
Sec. 1047. Authority to include funding requests for the chemical and biological defense program in budget accounts of military departments.
Sec. 1048. Limitation on availability of funds until delivery of report on next generation tactical communications.
Sec. 1049. Establishment of procedure of the Department of Defense to determine certain complaints or requests regarding public displays or public expressions of religion on property of the Department.
Sec. 1050. Limitation on availability of funds for destruction of landmines.
Sec. 1051. Limitation on availability of funds for travel expenses of Office of the Secretary of Defense until submission of certain plans.
Sec. 1052. Prohibition on display of unapproved flags.
Sec. 1053. Collaboration with partner countries to develop and maintain military-wide transformational strategies for operational energy.
Sec. 1054. Student loan deferment for dislocated military spouses.

Subtitle F—Studies and Reports

Sec. 1061. Modifications of reporting requirements.
Sec. 1062. Extension of requirement to submit a report on Department of Defense support for Department of Homeland Security at the international borders of the United States.
Sec. 1063. Briefing on Defense POW/MIA Accounting Agency capabilities required to expand accounting for persons missing from designated past conflicts.
Sec. 1064. Air Force plan for maintaining proficient aircrews in certain mission areas.
Sec. 1065. Independent study on naval mine warfare.
Sec. 1066. Annual report and briefing on implementation of Force Design 2030.
Sec. 1067. Study and report on potential inclusion of black box data recorders in tactical vehicles.
Sec. 1068. Plan on countering human trafficking.
Sec. 1069. Update to strategic plan on Department of Defense combating trafficking in persons program.
Sec. 1070. Report on use of tactical fighter aircraft for deployments and homeland defense missions.
Sec. 1071. Report on equipping certain ground combat units with small unmanned aerial systems.
Sec. 1072. Biannual briefings on homeland defense planning.
Sec. 1073. Report on effectiveness of current use of United States Naval Station, Guantanamo Bay, Cuba.
Sec. 1074. Holistic training range assessment.
Sec. 1075. Special operations force structure.
Sec. 1076. Comprehensive assessment of Marine Corps Force Design 2030.
Sec. 1077.  Assessment and recommendations relating to infrastructure, capacity, resources, and personnel on Guam.
Sec. 1078. Feasibility study on conversion of Joint Task Force North into Joint Interagency Task Force North.

Subtitle G—Other Matters

Sec. 1080. Modification of definition of domestic source for title III of the Defense Production Act of 1950.
Sec. 1081. Integrated and authenticated access to Department of Defense systems for certain congressional staff for oversight purposes.
Sec. 1082. Modification of compensation for members of the Afghanistan War Commission.
Sec. 1083. Senate National Security Working Group.
Sec. 1084. Tribal liaisons at military installations.
Sec. 1085. Commercial integration cell plan within certain combatant commands.
Sec. 1086. Guidance for use of unmanned aircraft systems by National Guard.
Sec. 1087. Public disclosure of Afghanistan war records.
Sec. 1088. Implementation plan for Joint Concept for Competing.
Sec. 1089. Notification of safety and security concerns at certain Department of Defense laboratories.
Sec. 1090. Conduct of weather reconnaissance in the United States.
Sec. 1091. Sense of Congress regarding authority of Secretary of Defense with respect to irregular warfare.
Sec. 1092. Red Hill health impacts.

# Subtitle A—Financial Matters

**SEC. 1001. GENERAL TRANSFER AUTHORITY.**

(a) AUTHORITY TO TRANSFER AUTHORIZATIONS.—

Determination.

(1) AUTHORITY.—Upon determination by the Secretary of Defense that such action is necessary in the national interest, the Secretary may transfer amounts of authorizations made available to the Department of Defense in this division for fiscal year 2024 between any such authorizations for that fiscal year (or any subdivisions thereof). Amounts of authorizations so transferred shall be merged with and be available for the same purposes as the authorization to which transferred.

(2) LIMITATION.—Except as provided in paragraph (3), the total amount of authorizations that the Secretary may transfer under the authority of this section may not exceed $6,000,000,000.

(3) EXCEPTION FOR TRANSFERS BETWEEN MILITARY PERSONNEL AUTHORIZATIONS.—A transfer of funds between military personnel authorizations under title IV shall not be counted toward the dollar limitation in paragraph (2).

(b) LIMITATIONS.—The authority provided by subsection (a) to transfer authorizations—

(1) may only be used to provide authority for items that have a higher priority than the items from which authority is transferred; and

(2) may not be used to provide authority for an item that has been denied authorization by Congress.

(c) EFFECT ON AUTHORIZATION AMOUNTS.—A transfer made from one account to another under the authority of this section shall be deemed to increase the amount authorized for the account to which the amount is transferred by an amount equal to the amount transferred.

(d) NOTICE TO CONGRESS.—The Secretary shall promptly notify Congress of each transfer made under subsection (a).

10 USC
prec. 221.

**SEC. 1002. ANNUAL REPORT ON BUDGET PRIORITIZATION BY SECRETARY OF DEFENSE AND MILITARY DEPARTMENTS.**

Chapter 9 of title 10, United States Code, is amended by inserting after section 222d the following new section:

10 USC 222e.

**"§ 222e. Programs, projects, and activities that were internally changed in the submission of the President's budget: annual report**

"(a) IN GENERAL.—The Secretary of Defense, acting through the Secretaries of the military departments and the officers of Department of Defense agencies and offices not under the control of a Secretary of a military department, shall submit to the congressional defense committees each year, not later than 30 days after the submission of the budget of the President for the fiscal year beginning in such year under section 1105(a) of title 31, a report that includes organized tabulations of programs, projects, and activities in research, development, test, and evaluation, procurement, and military construction the total obligational authority for which was changed in the current budget year proposal compared to the prior-year projection for the current year.

"(b) ELEMENTS.—The tabulations required under subsection (a) shall include, for each program, project, or activity that was internally changed, the following elements:

"(1) Whether the program, project, or activity was added, eliminated, or reduced and in which fiscal year.

"(2) The appropriations sub-account.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 379

"(3) The appropriate program element, line item number, or sub-activity group.

"(4) The program, project, or activity name.

"(5) The prior year enacted appropriation.

"(6) The prior year projected current year budget.

"(7) The current year budget request.

"(8) If applicable, the amount reduced or saved by the current year elimination or reduction over the future years defense plan.

"(9) A characterization of the change as a fact-of-life change, a prioritization change, a programmatic change, or a change due to congressional action.

"(c) FORM.—The report required under subsection (a) shall be submitted in machine readable, electronic form.".

### SEC. 1003. ADDITIONAL REPORTING REQUIREMENTS RELATED TO UNFUNDED PRIORITIES OF ARMED FORCES AND COMBATANT COMMANDS.

Section 222a(c)(1) of title 10, United States Code, is amended by adding at the end the following new subparagraphs:

"(E) The requirement to be addressed by the unfunded priority.

"(F) The reason why funding for the priority was not included in the budget of the President.

"(G) A description of any funding provided for the requirement for the current and preceding fiscal year.

"(H) An assessment of the effect that providing funding for the priority would have on the future-years defense plan.".

Assessment.

### SEC. 1004. AUDIT REQUIREMENT FOR DEPARTMENT OF DEFENSE COMPONENTS.

10 USC 240d note.

(a) IN GENERAL.—During fiscal year 2024, and during each of the nine fiscal years thereafter, each component of the Department of Defense shall be subject to an independent audit. Any such component that fails to be subject to such an audit during any fiscal year shall have 1.5 percent of unobligated amounts available for the component be cancelled and returned to the general fund of the Treasury for deficit reduction, except as provided in subsection (b).

(b) EXCEPTIONS.—The following accounts are excluded from any reductions:

(1) Military personnel, reserve personnel, and National Guard personnel accounts of the Department of Defense.

(2) The Defense Health Program account of the Department of Defense.

### SEC. 1005. REQUIREMENT FOR UNQUALIFIED OPINION ON DEPARTMENT OF DEFENSE FINANCIAL STATEMENTS.

10 USC 240a note.

The Secretary of Defense shall ensure that the Department of Defense has received an unqualified opinion on the financial statements of the Department by not later than December 31, 2028.

Deadline.

137 STAT. 380          PUBLIC LAW 118–31—DEC. 22, 2023

# Subtitle B—Counterdrug Activities

### SEC. 1010. ENHANCED SUPPORT FOR COUNTERDRUG ACTIVITIES AND ACTIVITIES TO COUNTER TRANSNATIONAL ORGANIZED CRIME.

Section 284(b)(9) of title 10, United States Code, is amended by striking "linguist and intelligence analysis" and inserting "linguist, intelligence analysis, and planning".

### SEC. 1011. MODIFICATION OF SUPPORT FOR COUNTERDRUG ACTIVITIES AND ACTIVITIES TO COUNTER TRANSNATIONAL ORGANIZED CRIME: INCREASE IN CAP FOR SMALL SCALE CONSTRUCTION PROJECTS.

Section 284(i)(3) of title 10, United States Code, is amended by striking "$750,000" and inserting "$1,000,000".

### SEC. 1012. DRUG INTERDICTION AND COUNTER-DRUG ACTIVITIES.

Section 112(a)(3) of title 32, United States Code, is amended by striking "$5,000" and inserting "$15,000".

### SEC. 1013. DISRUPTION OF FENTANYL TRAFFICKING.

(a) DEVELOPMENT OF STRATEGY TO COUNTER FENTANYL TRAFFICKING.—

Deadline.

(1) STRATEGY.—Not later than 120 days after the date of enactment of this Act, the Secretary of Defense, in consultation with the Secretary of State and the Attorney General and in coordination with appropriate Federal, State, Tribal, and local law enforcement agencies, shall develop and submit to the appropriate congressional committees a strategy to address threats to the national security of the United States caused or exacerbated by fentanyl trafficking.

(2) CONTENTS.—The strategy required by paragraph (1) shall outline how the Secretary of Defense will—

(A) leverage existing authorities regarding counterdrug and counter-transnational organized crime activities with a counter-fentanyl nexus to detect and monitor activities related to fentanyl trafficking;

(B) leverage existing authorities, as appropriate, to support operations to counter fentanyl trafficking carried out by Federal, State, Tribal, and local law enforcement agencies, or foreign security forces;

Coordination.
Data.

(C) coordinate efforts of the Department of Defense for the detection and monitoring of aerial, maritime, and surface traffic suspected of carrying fentanyl bound for the United States, including efforts to unify the use of technology, surveillance, and related resources across air and maritime domains to counter fentanyl trafficking, including with respect to data collection, data processing, and integrating sensors across such domains, consistent with paragraphs (6) and (10) of section 284(b) of title 10, United States Code, and section 124 of title 10, United States Code;

(D) provide Department of Defense-specific capabilities to support activities by the United States Government and foreign security forces to detect and monitor the trafficking of fentanyl and precursor chemicals used in fentanyl production, consistent with relevant existing law;

(E) leverage existing counterdrug and counter-transnational organized crime programs of the Department to counter fentanyl trafficking;

(F) assess existing training programs of the Department and assess whether opportunities exist for the provision of training for Federal, State, Tribal, and local law enforcement agencies to counter fentanyl trafficking, consistent with section 284(b)(5) of title 10, United States Code;

*Assessment.*

(G) engage with foreign security forces to ensure the counterdrug and counter-transnational organized crime programs of the Department—

(i) support efforts to counter fentanyl trafficking; and

(ii) build capacity to interdict fentanyl in foreign countries, including programs to train security forces in partner countries to counter fentanyl trafficking, including countering illicit flows of fentanyl precursors, consistent with sections 284(c) and 333 of title 10, United States Code;

(H) increase domain awareness to detect and monitor fentanyl trafficking through the North American Defense Ministerial and the bilateral defense working groups and bilateral military cooperation roundtables with Canada and Mexico;

*Canada.*
*Mexico.*

(I) evaluate existing policies, procedures, processes, resources, and existing joint interagency task forces focused on supporting the countering of fentanyl trafficking by Federal, State, Tribal, and local law enforcement agencies, consistent with existing counterdrug and counter-transnational organized crime authorities;

*Evaluation.*

(J) describe any previous actions taken by the Department of Defense in cyberspace to counter illegal activities by transnational criminal organizations that traffic fentanyl; and

(K) assess the resources that the Secretary can deploy to counter transnational criminal organizations' cyber activities.

*Assessment.*

(3) FORM.—The strategy required by paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(4) BRIEFING.—Not later than 60 days after the submission of the strategy required by paragraph (1), the Secretary shall provide to the appropriate congressional committees a briefing on the strategy and plans for its implementation.

*Deadline.*

(b) COOPERATION WITH MEXICO.—The Secretary of Defense shall seek to enhance cooperation with defense officials of the Government of Mexico to target, disrupt, and degrade transnational criminal organizations within Mexico that traffic fentanyl.

*10 USC 284 note.*

(c) DEFINITION OF APPROPRIATE CONGRESSIONAL COMMITTEES.— In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services of the Senate;

(2) the Committee on Armed Services of the House of Representatives;

(3) the Committee on Foreign Affairs of the House of Representatives;

137 STAT. 382 PUBLIC LAW 118–31—DEC. 22, 2023

(4) the Committee on Foreign Relations of the Senate;

(5) the Committee on the Judiciary of the Senate; and

(6) the Committee on the Judiciary of the House of Representatives.

# Subtitle C—Naval Vessels and Shipyards

### SEC. 1015. MODIFICATIONS TO ANNUAL NAVAL VESSEL CONSTRUCTION PLAN.

Section 231 of title 10, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (2), by inserting before the period at the end the following: ", together with the views of the Chief of Naval Operations and Commandant of the Marine Corps on the budget"; and

(B) by adding at the end the following new paragraph:

"(3) The unaltered assessment of the Chief of Naval Operations and the Commandant of the Marine Corps of the plan required under paragraph (1)."; and

(2) in subsection (b), by adding at the end the following new paragraphs:

"(3) In developing annual naval vessel construction plans for purposes of subsection (a)(1), the Secretary of the Navy shall take into consideration the most recent biennial report on shipbuilder training and the defense industrial base required by section 8693 of this title.".

### SEC. 1016. CRITICAL COMPONENTS OF NATIONAL SEA-BASED DETERRENCE VESSELS.

Section 2218a(k)(3) of title 10, United States Code, is amended by adding at the end the following new subparagraphs:

"(P) Major bulkheads and tanks.

"(Q) All major pumps and motors.

"(R) Large vertical array.

"(S) Atmosphere control equipment.

"(T) Diesel systems and components.

"(U) Hydraulic valves and components.

"(V) Bearings.

"(W) Major air and blow valves and components.

"(X) Decks and superstructure.

"(Y) Castings, forgings, and tank structure.

"(Z) Hatches and hull penetrators.".

10 USC
prec. 2201.

### SEC. 1017. GRANTS FOR IMPROVEMENT OF NAVY SHIP REPAIR OR ALTERATIONS CAPABILITY.

Chapter 131 of title 10, United States Code, is amended by inserting after section 2218a the following new section:

10 USC 2219.

### "§ 2219. Grants for improvement of Navy ship repair or alterations capability

"(a) ASSISTANCE AUTHORIZED.—(1) Subject to the availability of appropriations, the Secretary of the Navy may make grants to an eligible entity for the purpose of carrying out—

"(A) a capital improvement project; or

"(B) a maritime training program designed to foster technical skills and operational productivity.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 383

"(2) The amount of a grant under this section may not exceed 75 percent of the total cost of the project or program funded by the grant.

"(3) A grant provided under this section may not be used to construct buildings or other physical facilities, except for piers, dry docks, and structures in support of piers and dry docks, or to acquire land.

"(4) The Secretary may not award a grant to an eligible entity under this section unless the Secretary determines that—          Determination.

"(A) the entity has access to sufficient non-Federal funding to meet the requirement under paragraph (2);

"(B) the entity has authority to carry out the proposed project; and

"(C) the project or program would improve—

"(i) efficiency, competitive operations, capability, or quality of United States Navy ship repair or alterations; or

"(ii) employee, or potential employee, skills and enhanced productivity related to United States Navy ship repair or alterations.

"(b) ELIGIBILITY.—To be eligible for a grant under this section, an entity shall—

"(1) be a shipyard or other entity that provides ship repair or alteration for non-nuclear ships;

"(2) submit an application, at such time, in such form,    Submission. and containing such information and assurances as the Secretary may require, including a comprehensive description of—

"(A) the need for the project or program proposed to be funded under the grant;

"(B) the methodology to be used to implement the project or program; and

"(C) any existing programs or arrangements that could be used to supplement or leverage a grant provided under this section; and

"(3) enter into an agreement with the Secretary under    Contracts. which the entity agrees—

"(A) to complete the project or program funded by the grant within a certain timeframe and without unreasonable delay and the Secretary determines such project or program is likely to be completed within the timeframe provided in such agreement;

"(B) to return to the Secretary any amount of the grant that is—

"(i) not used by the grant recipient for the purpose for which the grant was awarded; or

"(ii) not obligated or expended within the timeframe provided in the agreement;

"(C) to maintain such records as the Secretary may require and make such records available for review and audit by the Secretary; and

"(D) not to purchase any product or material for the project or program using grant funds, including any commercially available off-the-shelf item, unless such product or material is—

"(i) an unmanufactured article, material, or supply that has been mined or produced in the United States; or

"(ii) a manufactured article, material, or supply that has been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States.

"(c) GUIDELINES.—The Secretary shall issue guidelines to establish appropriate accounting, reporting, and review procedures to ensure that—

"(1) amounts awarded as grants under this section are used for the purposes for which such amounts were made available; and

"(2) an entity that receives a grant under this section complies with the terms of the agreement such entity enters into with the Secretary pursuant to subsection (b)(3).

"(d) DEFINITIONS.—In this section:

"(1) The term 'commercially available off-the-shelf item'—

"(A) means any item of supply (including construction material) that is—

"(i) a commercial item, as defined by section 2.101 of title 48, Code of Federal Regulations (as in effect on the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024); and

"(ii) sold in substantial quantities in the commercial marketplace; and

"(B) does not include bulk cargo, as defined in section 40102(4) of title 46, such as agricultural products and petroleum products.

"(2) The term 'product or material', with respect to a project or program—

"(A) means an article, material, or supply brought to the site where the project or program is being carried out for incorporation into the project or program; and

"(B) includes an item brought to the site preassembled from articles, materials, or supplies.

"(3) The term 'United States' includes the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, Guam, American Samoa, and the Virgin Islands.".

### SEC. 1018. REPEAL OF OBSOLETE PROVISION OF LAW REGARDING VESSEL NOMENCLATURE.

Section 8662 of title 10, United States Code, is amended—

(1) by striking subsection (b); and

(2) by redesignating subsection (c) as subsection (b).

### SEC. 1019. RESPONSIBILITY OF COMMANDANT OF THE MARINE CORPS WITH RESPECT TO NAVAL BATTLE FORCE SHIP ASSESSMENT AND REQUIREMENT REPORTING.

Section 8695(e) of title 10, United States Code, is amended—

(1) in the subsection heading, by striking "AMPHIBIOUS WARFARE SHIPS" and inserting "RESPONSIBILITIES OF COMMANDANT OF MARINE CORPS"; and

(2) by inserting before the period at the end the following: "and for naval vessels with the primary mission of transporting Marines".

**SEC. 1020. POLICY OF THE UNITED STATES ON SHIPBUILDING DEFENSE INDUSTRIAL BASE.**

10 USC 8661 note.

Section 1025(a) of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 10 U.S.C. 7291 note) is amended—

(1) by striking "United States" and all that follows and inserting "United States—"; and

(2) by adding at the end the following new paragraphs:

"(1) to have available, as soon as practicable, not fewer than 355 battle force ships, comprised of the optimal mix of platforms, with funding subject to the availability of appropriations or other funds; and

"(2) that the United States shipbuilding defense industrial base is fundamental to achieving the shipbuilding requirements of the Navy and constitutes a unique national security imperative that requires sustainment and support by the Navy and Congress.".

**SEC. 1021. PROHIBITION ON RETIREMENT OF CERTAIN NAVAL VESSELS.**

None of the funds authorized to be appropriated by this Act for fiscal year 2024 may be obligated or expended to retire, prepare to retire, or place in storage any of the following naval vessels:

(1) USS Germantown (LSD 42).

(2) USS Gunston Hall (LSD 44).

(3) USS Tortuga (LSD 46).

(4) USS Shiloh (CG 67).

**SEC. 1022. AUTHORITY TO USE INCREMENTAL FUNDING TO ENTER INTO A CONTRACT FOR THE ADVANCE PROCUREMENT AND CONSTRUCTION OF A SAN ANTONIO-CLASS AMPHIBIOUS SHIP.**

(a) IN GENERAL.—Amounts authorized to be appropriated by this Act or otherwise made available for the Navy for Shipbuilding and Conversion for any of fiscal years 2023 through 2025 may be used by the Secretary of the Navy to enter into an incrementally funded contract for the advance procurement and construction of a San Antonio-class amphibious ship.

Time period.

(b) AVAILABILITY OF FUNDS.—A contract entered into under subsection (a) shall provide that any obligation of the United States to make a payment under the contract is subject to the availability of appropriations for that purpose, and that total liability to the Government for the termination of the contract shall be limited to the total amount of funding obligated at time of termination.

**SEC. 1023. AUTHORITY TO USE INCREMENTAL FUNDING TO ENTER INTO A CONTRACT FOR THE ADVANCE PROCUREMENT AND CONSTRUCTION OF A SUBMARINE TENDER.**

(a) IN GENERAL.—Amounts authorized to be appropriated by this Act or otherwise made available for the Navy for Shipbuilding and Conversion for fiscal year 2024 may be used by the Secretary of the Navy to enter into an incrementally funded contract for the advance procurement and construction of a submarine tender.

(b) AVAILABILITY OF FUNDS.—A contract entered into under subsection (a) shall provide that any obligation of the United States to make a payment under the contract is subject to the availability of appropriations for that purpose, and that total liability to the

137 STAT. 386          PUBLIC LAW 118–31—DEC. 22, 2023

Government for the termination of the contract shall be limited to the total amount of funding obligated at time of termination.

**SEC. 1024. BIANNUAL BRIEFINGS ON SUBMARINE READINESS.**

Deadline.
Termination date.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and once every 180 days thereafter until September 30, 2026, the Secretary of the Navy shall provide to the congressional defense committees a briefing on submarine maintenance and readiness.

(b) ELEMENTS.—Each briefing required under subsection (a) shall include the following:

Overview.

(1) An overview of submarine maintenance activities, including—

(A) the original estimated schedule for completion of attack, ballistic, and guided missile submarine depot-level maintenance activities;

(B) any adjustments made to such schedule;

(C) in the case of any such adjustment—

(i) the reason why the adjustment was necessary; and

(ii) an identification of the new timeframe for completion and any additional costs, broken out by shipyard or private entity (by site), by name, and by type of submarine;

(iii) a discussion of the reasons for the scheduling delays (manpower, parts, or other), including projections with respect to the availability of parts;

(iv) a discussion of how the cannibalization of submarines for parts affects the overall maintenance capacity and scheduling, as well as a discussion on how moving money from program to program during the year of execution affects the scheduling of maintenance; and

(v) a discussion of the efforts the Navy has taken to address the ongoing delays.

(2) A discussion of ongoing Shipyard Infrastructure Optimization Program efforts and how such efforts affect depot-level maintenance activities for attack, ballistic, and guided missile submarines.

(3) A discussion of how the Department of the Navy is applying lessons learned from other Navy programs to the submarine maintenance enterprise.

Recommendations.

(4) Recommendations for legislative changes required with respect to policies or resources to ensure efficient and effective maintenance and operational readiness for the submarine enterprise.

# Subtitle D—Counterterrorism

**SEC. 1031. EXTENSION OF PROHIBITION ON USE OF FUNDS FOR TRANSFER OR RELEASE OF INDIVIDUALS DETAINED AT UNITED STATES NAVAL STATION, GUANTANAMO BAY, CUBA, TO THE UNITED STATES.**

Section 1033 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1953), as most recently amended by section 1031 of the James

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 387

M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended by striking "December 31, 2023" and inserting "December 31, 2024".

136 Stat. 2769.

### SEC. 1032. EXTENSION OF PROHIBITION ON USE OF FUNDS TO CONSTRUCT OR MODIFY FACILITIES IN THE UNITED STATES TO HOUSE DETAINEES TRANSFERRED FROM UNITED STATES NAVAL STATION, GUANTANAMO BAY, CUBA.

Section 1034(a) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1954), as most recently amended by section 1032 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended by striking "December 31, 2023" and inserting "December 31, 2024".

136 Stat. 2769.

### SEC. 1033. EXTENSION OF PROHIBITION ON USE OF FUNDS FOR TRANSFER OR RELEASE OF INDIVIDUALS DETAINED AT UNITED STATES NAVAL STATION, GUANTANAMO BAY, CUBA, TO CERTAIN COUNTRIES.

Section 1035 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1954), as most recently amended by section 1033 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended by striking "December 31, 2023" and inserting "December 31, 2024".

136 Stat. 2769.

### SEC. 1034. EXTENSION OF PROHIBITION ON USE OF FUNDS TO CLOSE OR RELINQUISH CONTROL OF UNITED STATES NAVAL STATION, GUANTANAMO BAY, CUBA.

Section 1036 of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 131 Stat. 1551), as most recently amended by section 1034 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended by striking "2023" and inserting "2024".

136 Stat. 2769.

# Subtitle E—Miscellaneous Authorities and Limitations

### SEC. 1041. LIMITATION ON AVAILABILITY OF CERTAIN FUNDS UNTIL SUBMISSION OF CHAIRMAN'S RISK ASSESSMENT; BRIEFING REQUIREMENT.

(a) OFFICE OF THE CHAIRMAN OF THE JOINT CHIEFS OF STAFF.— Of the amounts authorized to be appropriated by this Act for fiscal year 2024 for operation and maintenance, Defense-wide, and available for the Office of the Chairman of the Joint Chiefs of Staff for travel expenses, not more than 80 percent may be obligated or expended until the date that is 15 days after the date on which the Secretary of Defense submits to the Committees on Armed Services of the Senate and House of Representatives the risk assessment mandated by paragraph (2) of subsection (b) of section 153 of title 10, United States Code, and required to be submitted pursuant to paragraph (3) of such subsection by not later than February 15, 2024.

Effective date.
Deadline.

(b) OFFICE OF THE SECRETARY OF DEFENSE.—Of the amounts authorized to be appropriated by this Act for fiscal year 2024 for operation and maintenance, Defense-wide, and available for

Plan.

137 STAT. 388          PUBLIC LAW 118–31—DEC. 22, 2023

the Office of the Secretary of Defense for travel expenses, not more than 80 percent may be obligated or expended until the date that is 15 days after the date on which the Secretary submits to the Committees on Armed Services of the Senate and the House of Representatives the risk mitigation plan required to be submitted as part of the assessment referred to in subsection (a), if applicable.

(c) BRIEFING REQUIREMENT.—Section 153 of title 10, United States Code, is amended by adding at the end the following new subsection:

"(d) BRIEFING REQUIREMENT.—(1) Not later than 15 days after the submission of the risk assessment required under subsection (b)(2) or March 1 of each even-numbered year, whichever is earlier, the Chairman shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the activities of the Chairman under this section.

"(2) The briefing required under paragraph (1) shall include—

"(A) a detailed review of the risk assessment required under paragraph (2) of subsection (b), including how such risk assessment addresses the elements required in subparagraph (B) of such paragraph;

"(B) an analysis of how the risk assessment informs and supports other Joint Staff assessments, including joint capability development assessments, joint force development assessments, comprehensive joint readiness assessments, and global military integration assessments; and

"(C) if the risk assessment is not delivered at or before the time of the briefing, a timeline for when the risk assessment will be submitted to the Committees on Armed Services of the Senate and the House of Representatives.".

## SEC. 1042. ASSISTANCE IN SUPPORT OF DEPARTMENT OF DEFENSE ACCOUNTING FOR MISSING UNITED STATES GOVERNMENT PERSONNEL.

(a) MODIFICATION OF ASSISTANCE.—Section 408 of title 10, United States Code, is amended—

(1) in the section heading, by striking "**Equipment and training of foreign personnel to assist in**" and inserting "**Assistance in support of**";

(2) in subsection (b), by adding at the end the following new paragraph:

"(5) Funds.";

(3) in subsection (d)—

(A) in the subsection heading, by striking "LIMITATION" and inserting "LIMITATIONS";

(B) by striking "The" and inserting "(1) Except as provided in paragraph (2), the";

(C) by striking "$1,000,000" and inserting "$5,000,000"; and

(D) by adding at the end the following new paragraphs:

"(2) The Secretary may waive the limitation under paragraph (1) if the Secretary submits to the congressional defense committees notice of the waiver together with the reasons why the waiver is necessary.

"(3) No assistance may be provided under this section to a foreign nation the government of which the Secretary of State determines has repeatedly provided support for international terrorism pursuant to—

*[margin notes: Review. Analysis. Timeline. 10 USC prec. 401. Waiver authority. Notice. Determination.]*

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 389

"(A) section 1754(c)(1)(A) of the Export Control Reform Act of 2018 (50 U.S.C. 4813(c)(1)(A));

"(B) section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371); or

"(C) section 40 of the Arms Export Control Act (22 U.S.C. 2780).";

(4) by striking subsection (f); and

(5) by adding at the end the following new subsection (f):

"(f) ANNUAL REPORT.—Not later than December 31 of each year, the Secretary of Defense shall submit to the congressional defense committees a report on the assistance provided under this section during the preceding fiscal year.". *Time period.*

(b) BRIEFING.—Not later than July 1, 2024, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and House of Representatives a briefing on the provision of funds under section 408 of title 10, United States Code, as amended by subsection (a), and the anticipated demand for such funds. *Deadline.*

### SEC. 1043. IMPLEMENTATION OF ARRANGEMENTS TO BUILD TRANS-PARENCY, CONFIDENCE, AND SECURITY.

Section 2241 of title 10, United States Code, is amended by adding at the end the following new subsection:

"(d) IMPLEMENTATION OF VIENNA DOCUMENT 2011.—Amounts appropriated for operation and maintenance may be used by the Secretary of Defense for travel, transportation, and subsistence expenses for meetings and demonstrations hosted by the Department of Defense for the implementation of the Vienna Document 2011 on Confidence and Security-Building Measures.".

### SEC. 1044. MODIFICATION TO DEFINITIONS OF CONFUCIUS INSTITUTE.

(a) LIMITATION ON PROVISION OF FUNDS TO INSTITUTIONS OF HIGHER EDUCATION.—Paragraph (1) of section 1062(d) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 2241) is amended to read as follows: *10 USC 2241 note.*

"(1) CONFUCIUS INSTITUTE.—The term 'Confucius Institute' means—

"(A) any program that receives funding or support from—

"(i) the Chinese International Education Foundation; or

"(ii) the Center for Language Exchange Cooperation of the Ministry of Education of the People's Republic of China; or

"(B) any cultural institute funded by the Government of the People's Republic of China.".

(b) PROHIBITION OF FUNDS FOR CHINESE LANGUAGE INSTRUCTION.—Paragraph (2) of section 1091(d) of the of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1998) is amended to read as follows:

"(2) CONFUCIUS INSTITUTE.—The term 'Confucius Institute' means—

"(A) any program that receives funding or support from—

"(i) the Chinese International Education Foundation; or

"(ii) the Center for Language Exchange Cooperation of the Ministry of Education of the People's Republic of China; or

"(B) any cultural institute funded by the Government of the People's Republic of China.".

### SEC. 1045. TERMINATION OF AUTHORITY TO ISSUE WAIVER OF LIMITATION ON USE OF FUNDS TO INSTITUTIONS OF HIGHER EDUCATION HOSTING CONFUCIUS INSTITUTES.

Section 1062(b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 2241 note) is amended by adding at the end the following new paragraph:

"(3) TERMINATION OF AUTHORITY.—The authority to issue a waiver under paragraph (1) shall terminate on October 1, 2026, and any waiver issued under such paragraph shall not apply on or after such date.".

### SEC. 1046. VETTING PROCEDURES AND MONITORING REQUIREMENTS FOR ALLIES AND PARTNERS PARTICIPATING IN EDUCATION OR TRAINING ACTIVITIES IN THE UNITED STATES.

(a) WAIVER BY SECRETARY OF DEFENSE.—Subsection (a) of section 1090 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 113 note) is amended by adding at the end the following new paragraph:

"(5) WAIVER.—

Determination.

"(A) IN GENERAL.—The Secretary of Defense, with the concurrence of the Secretary of State, and without delegation, may waive the requirement to vet covered individuals under this section—

"(i) on a person-by-person basis, if the Secretary of Defense determines that the waiver is in the national security interests of the United States; or

"(ii) on a country-by-country basis, with respect to foreign nationals or other appropriate persons who hold a security clearance issued by that country, if the Secretary of Defense determines that the vetting procedures of the country are functionally equivalent to the vetting procedures of the United States for United States military personnel.

"(B) FUNCTIONAL EQUIVALENCE.—

"(i) DEFINITION.—The Secretary of Defense, acting through the Under Secretary of Defense for Intelligence and Security and in consultation, as appropriate, with the Secretary of State, shall establish and submit to the congressional defense committees a definition of functional equivalence for purposes of making a determination under subparagraph (A)(ii). The Secretary of Defense shall notify the congressional defense committees of any subsequent modification the Secretary makes to the definition.

Notification.

"(ii) ASSESSMENT.—The Secretary of Defense shall conduct an assessment of the vetting procedures of a country prior to making a determination of functional equivalence under subparagraph (A)(ii). Such assessment shall take into consideration any information

about such procedures provided to the Secretary of Defense by the Secretary of State.

"(C) NOTIFICATION REQUIREMENT.—The Secretary of Defense shall submit a written notification to the congressional defense committees not later than 48 hours after exercising the waiver authority under subparagraph (A), including a justification for the waiver and an assessment of the vetting procedures of a country, if appropriate.".

(b) TYPE OF ACCESS COVERED.—Subsections (a) through (c) of such section 1090 are further amended by striking "physical access" each place it appears and inserting "unescorted physical access".

(c) DEFINITIONS.—

(1) COVERED INDIVIDUAL.—Subsection (e)(2) of such section is amended to read as follows:

"(2) The term 'covered individual'—

"(A) except as provided in subparagraph (B), means a foreign national or other appropriate person who is—

"(i) seeking unescorted physical access to a Department of Defense installation or facility within the United States; and

"(ii)(I) selected, nominated, or accepted for training or education for a period of more than 14 days occurring on a Department of Defense installation or facility within the United States; or

"(II) an immediate family member accompanying a foreign national or other appropriate person who has been so selected, nominated, or accepted for such training or education; and

"(B) does not include a foreign national or other appropriate person of Australia, Canada, New Zealand, or the United Kingdom who holds a security clearance issued by the country of the foreign national and has provided the Department of Defense a certification of such clearance.".

(2) IMMEDIATE FAMILY MEMBER.—Subsection (e)(4) of such section is amended—

(A) by striking "means the parent" and inserting the following: "means a person who—

"(A) is the parent";

(B) in subparagraph (A), as designated by subparagraph (A) of this paragraph, by striking the period and inserting "; and"; and

(C) by adding at the end the following new subparagraph:

"(B) has attained the age of 16 years old at the time that unescorted physical access is to begin.".

(3) FOREIGN NATIONAL; OTHER APPROPRIATE PERSON.—Section 1090(e) of such Act is amended by adding at the end the following new paragraphs:

"(5) The term 'foreign national' means a person who is not a citizen or national of the United States or an alien lawfully admitted for permanent residence in the United States under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

"(6) The term 'other appropriate person' means a person who is a citizen of both the United States and another country

137 STAT. 392          PUBLIC LAW 118–31—DEC. 22, 2023

or who is an alien lawfully admitted for permanent residence in the United States, if such person intends to attend training or education on behalf of a foreign country.".

(d) CLARIFYING AMENDMENT.—Such section is further amended by striking "Secretary" each place it appears and inserting "Secretary of Defense" in the following provisions:

(1) Paragraphs (2), (3), and (4) of subsection (a).

(2) Paragraph (1) of subsection (b) in the matter preceding subparagraph (A).

**SEC. 1047. AUTHORITY TO INCLUDE FUNDING REQUESTS FOR THE CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM IN BUDGET ACCOUNTS OF MILITARY DEPARTMENTS.**

Section 1701(d)(2) of the National Defense Authorization Act for Fiscal Year 1994 (Public Law 103–160; 50 U.S.C. 1522(d)(2)) is amended by striking "may not be included in the budget accounts" and inserting "may be included in the budget accounts".

**SEC. 1048. LIMITATION ON AVAILABILITY OF FUNDS UNTIL DELIVERY OF REPORT ON NEXT GENERATION TACTICAL COMMUNICATIONS.**

(a) REPORT REQUIRED.—Not later than 180 days after the date of the enactment of this Act, the Commander of the United States Special Operations Command and the Assistant Secretary of Defense for Special Operations and Low Intensity Conflict shall jointly submit to the congressional defense committees a report on special operations forces tactical communications requirements and plans for addressing such requirements.

(b) ELEMENTS.—The report required under subsection (a) shall include each of the following:

(1) A description of special operations forces tactical communications requirements.

(2) An explanation of how funding provided in prior fiscal years, and the proposed funding for fiscal year 2024, has enhanced, and will continue to enhance, the fielding of tactical communications capabilities to special operations forces components.

(3) A description of deficiencies identified with the AN/PRC-163 radio and a plan for addressing such deficiencies.

(4) An update on the status of fielding of two-channel manpack and two-channel handheld radios to special operations forces, including an explanation for any special operations forces components or units that have requested, but not yet received, such radios.

(5) An articulation of lessons learned from the prior testing and fielding of tactical communications capabilities to meet unique mission requirements of special operations forces components.

(6) An explanation of the approach of the United States Special Operations Command to ensuring that communications capabilities under the tactical communications program meet security and resiliency requirements mandated by section 168 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92).

(7) Any other matter the Commander of United States Special Operations Command and the Assistant Secretary of Defense for Special Operations and Low Intensity Conflict determine relevant.

PUBLIC LAW 118–31—DEC. 22, 2023     137 STAT. 393

(c) LIMITATION ON USE OF FUNDS.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the United States Special Operations Command for procurement of next generation tactical communications, not more than 90 percent may be obligated or expended until the Commander of United States Special Operations Command and the Assistant Secretary of Defense for Special Operations and Low Intensity Conflict submit to the congressional defense committees the report required under subsection (a).

**SEC. 1049. ESTABLISHMENT OF PROCEDURE OF THE DEPARTMENT OF DEFENSE TO DETERMINE CERTAIN COMPLAINTS OR REQUESTS REGARDING PUBLIC DISPLAYS OR PUBLIC EXPRESSIONS OF RELIGION ON PROPERTY OF THE DEPARTMENT.**

10 USC note prec. 1561.

(a) ESTABLISHMENT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall prescribe regulations that establish the procedure for the timely determination of a covered complaint or request regarding a public display or public expression of religion on property of the Department of Defense. Such regulations shall ensure that—

Deadline. Regulations.

(1) the officer or official of the Department who receives such complaint or request forwards the covered complaint or request—

(A) to the individual authorized to make a determination under subsection (b); and

(B) not later than 10 days after such receipt; and

(2) such individual—

(A) makes such determination not later than 30 days after such individual receives such forwarded covered complaint or request; and

(B) timely notifies the individual or entity who made such covered complaint or request, and the officer or official of the Department who received such covered complaint or request, of such determination.

Notification.

(b) DETERMINATIONS.—A determination under regulations prescribed under subsection (a) shall be made—

(1) by—

(A) the Secretary of the military department concerned; or

(B) the head of the Defense Agency or Department of Defense Field Activity concerned; and

(2) after consultation with—

(A)(i) in the case of a determination made by the Secretary of the military department concerned, the Chief of Chaplains of the military department concerned; or

(ii) in the case of a determination made by the head of the Defense Agency or Department of Defense Field Activity concerned, the Armed Forces Chaplains Board; and

(B)(i) a civilian attorney under the jurisdiction the Secretary of the military department concerned or the head of the Defense Agency or Department of Defense Field Activity concerned; or

(ii) an officer of the Judge Advocate General's Corps.

(c) COVERED COMPLAINT OR REQUEST DEFINED.—In this section, the term "covered complaint or request" means a complaint or request—

(1) regarding a public display or public expression of religion on property of the Department of Defense; and

(2) made by an individual or entity other than—

(A) a member of the Armed Forces;

(B) a civilian employee of the Department of Defense; or

(C) a contractor of the Department of Defense.

### SEC. 1050. LIMITATION ON AVAILABILITY OF FUNDS FOR DESTRUCTION OF LANDMINES.

(a) LIMITATION.—Except as provided in subsection (b), of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of Defense for the destruction of anti-personnel landmine munitions, not more than 30 percent may be obligated or expended before the date on which the Secretary of Defense submits the report required by subsection (c).

*Determination.*

(b) EXCEPTION FOR SAFETY.—Notwithstanding subsection (a), the Secretary may obligate or expend funds referred to in such subsection in excess of the limitation under such subsection as necessary for the destruction of any anti-personnel landmine munition that the Secretary determines is unsafe or could pose a safety risk to the United States Armed Forces if not demilitarized or destroyed.

(c) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report that includes each of the following:

(A) A description of the policy of the Department of Defense regarding the use of anti-personnel landmines, including any available methods for commanders to seek waivers to use such munitions.

*Cost projections.*
*Time period.*
*Inventory.*

(B) Projections covering the period of 10 years following the date of the report of—

(i) the inventory levels for all anti-personnel landmine munitions, taking into account future production of anti-personnel landmine munitions, any plans for demilitarization of such munitions, the age of the munitions, storage and safety considerations, and any other factors that are expected to affect the size of the inventory;

(ii) the cost to achieve the inventory levels projected in clause (i), including the cost for potential demilitarization or disposal of such munitions; and

*Determination.*

(iii) the cost to develop and produce new anti-personnel landmine munitions if the Secretary determines such munitions are necessary to meet the demands of operational plans.

*Assessment.*

(C) An assessment by the Chairman of the Joint Chiefs of Staff of the adequacy of the inventory levels projected under subparagraph (B)(i) to meet operational requirements.

(D) Any other matters that the Secretary determines appropriate for inclusion in the report.

(2) FORM OF REPORT.—The report required by paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(d) BRIEFING REQUIRED.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the congressional defense committees a briefing on the status, as of the date of the briefing, of research and development into operational alternatives to anti-personnel landmine munitions.

Deadline.

(2) FORM OF BRIEFING.—The briefing required by paragraph (1) may contain classified information.

(e) ANTI-PERSONNEL LANDMINE MUNITIONS DEFINED.—In this section, the term "anti-personnel landmine munitions" includes anti-personnel landmines and submunitions, as defined by the Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on their Destruction, concluded at Oslo September 18, 1997, as determined by the Secretary.

## SEC. 1051. LIMITATION ON AVAILABILITY OF FUNDS FOR TRAVEL EXPENSES OF OFFICE OF THE SECRETARY OF DEFENSE UNTIL SUBMISSION OF CERTAIN PLANS.

Of the funds authorized to be appropriated by this Act for fiscal year 2024 for operation and maintenance, Defense-wide, and available for the Office of the Secretary of Defense for travel expenses, not more than 80 percent may be obligated or expended until the Secretary of Defense submits—

(1) the implementation plan required by section 1087(b) of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2802; 10 U.S.C. 161 note) relating to the requirement of such section to establish a joint force headquarters in the area of operations of United States Indo-Pacific Command to serve as an operational command; and

(2) the plan required by section 1332(g) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 2008) relating to strategic competition in the areas of responsibility of United States Southern Command and United States Africa Command.

## SEC. 1052. PROHIBITION ON DISPLAY OF UNAPPROVED FLAGS.

10 USC 2661 note.

(a) PROHIBITION.—No flag other than an approved flag shall be displayed in any work place, common access area, or public area of the Department of Defense.

(b) EXCLUSIONS.—The prohibition under subsection (a) shall not apply to—

(1) the public display or depiction of a flag other than an approved flag in a museum exhibit, State-issued license plate, grave site, memorial marker, monument, educational display, historical display, or work of art, if the nature of the display or depiction cannot reasonably be viewed as endorsement of the flag by the Department of Defense; or

(2) a building or area that primarily serves as a place of residence, including a barracks, dormitory, bachelor quarters, government-operated housing, or public-private venture housing area.

(c) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to affect the authority of a military commander to enforce good order and discipline on a military installation.

(d) DEFINITIONS.—In this section:

(1) The term "approved flag" means any of the following:

(A) The American flag.

(B) The flag of a State or of the District of Columbia.

(C) A military service flag.

(D) A flag or general officer flag.

(E) A Presidentially-appointed, Senate-confirmed civilian flag.

(F) A Senior Executive Service or military department-specific flag.

(G) The National League of Families POW/MIA flag.

(H) The flag of another country that is an ally or partner of the United States or for official protocol purposes.

(I) The flag of an organization of which the United States is a member.

(J) A ceremonial, command, unit, or branch flag or guidon.

(K) The flag of an athletic team, club, cadet-led organization, academic department, unit subdivision, or other entity approved to operate at a Service Academy (as such term is defined in section 347 of title 10, United States Code) or in conjunction with a Reserve Officer Training Corps activity.

(L) A flag or banner displayed by a retail tenant or non-government entity operating in a building owned or controlled by the Department of Defense, for the purposes of advertising business products and services, if authorized by contract.

(M) A religious flag or banner, including a holiday flag, if otherwise authorized.

(N) A flag approved at the discretion of the military chain of command or senior civilian leadership, as appropriate.

(2) The term "work place, common access area, or public area of the Department of Defense" includes the following:

(A) An office building, facility, naval vessel, aircraft, governmental vehicle, hangar, garage, ready room, storage room, tool and equipment room, or workshop.

(B) A sensitive compartmented information facility of other secure facility.

(C) A schoolhouse or training facility.

(D) The area in plain view of such a building that is not residential in nature, including the areas outside of buildings of the Department of Defense.

### SEC. 1053. COLLABORATION WITH PARTNER COUNTRIES TO DEVELOP AND MAINTAIN MILITARY-WIDE TRANSFORMATIONAL STRATEGIES FOR OPERATIONAL ENERGY.

Section 2926(e)(2)(E) of title 10, United States Code, is amended—

(1) by striking "An assessment" and inserting "A biennial assessment";

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 397

(2) by striking the period at the end and inserting ", which shall include—"; and

(3) by adding at the end the following new clauses:

Analyses.

"(i) an identification of efforts by the United States and allied and partner countries to mitigate mutual contested logistics challenges and to develop complementary energy security and energy reliance measures;

"(ii) an analysis of investments made by allied and partner countries in any technology, including electric, hydrogen, nuclear, biofuels, and any other sustainable fuel technology or renewable energy technology, that may reduce demand for operational energy in the near-term or long-term;

"(iii) an identification of any limitations or barriers to closing or mitigating gaps in operational energy investment with allied and partner countries, including any additional authorities or appropriations that may be required; and

"(iv) an analysis of the feasibility and advisability of establishing a partnership program using existing authorities to collaborate with the national security forces of allied and partner countries for the purpose of developing and maintaining transformational strategies for operational energy with the objectives of enhancing the readiness of such countries and employing diverse energy sources that reduce demand and logistical vulnerabilities.".

## SEC. 1054. STUDENT LOAN DEFERMENT FOR DISLOCATED MILITARY SPOUSES.

(a) IN GENERAL.—Section 455(f) of the Higher Education Act of 1965 (20 U.S.C. 1087e(f)) is amended—

(1) by redesignating paragraphs (4) and (5) as paragraphs (5) and (6), respectively; and

(2) by inserting after paragraph (3) the following:

"(4) DEFERMENT FOR DISLOCATED MILITARY SPOUSES.—

"(A) DURATION AND EFFECT ON PRINCIPAL AND INTEREST.—A borrower of a loan made under this part who meets the requirements of subparagraph (B) shall be eligible for a deferment for an aggregate period of 180 days, during which periodic installments of principal need not be paid, and interest—

"(i) shall not accrue, in the case of a—

"(I) Federal Direct Stafford Loan; or

"(II) a Federal Direct Consolidation Loan that consolidated only Federal Direct Stafford Loans, or a combination of such loans and Federal Stafford Loans for which the student borrower received an interest subsidy under section 428; or

"(ii) shall accrue and be capitalized or paid by the borrower, in the case of a Federal Direct PLUS Loan, a Federal Direct Unsubsidized Stafford Loan, or a Federal Direct Consolidation Loan not described in clause (i)(II).

"(B) ELIGIBILITY.—A borrower of a loan made under this part shall be eligible for a deferment under subparagraph (A) if the borrower—

137 STAT. 398          PUBLIC LAW 118–31—DEC. 22, 2023

"(i) is the spouse of a member of the Armed Forces serving on active duty; and

"(ii) has experienced a loss of employment as a result of relocation to accommodate a permanent change in duty station of such member.

"(C) DOCUMENTATION AND APPROVAL.—

"(i) IN GENERAL.—A borrower may establish eligibility for a deferment under subparagraph (A) by providing to the Secretary—

"(I) the documentation described in clause (ii); or

"(II) such other documentation as the Secretary determines appropriate.

"(ii) DOCUMENTATION.—The documentation described in this clause is—

"(I) evidence that the borrower is the spouse of a member of the Armed Forces serving on active duty;

"(II) evidence that a military permanent change of station order was issued to such member; and

"(III)(aa) evidence that the borrower is eligible for unemployment benefits due to a loss of employment resulting from relocation to accommodate such permanent change in duty station; or

"(bb) a written certification, or an equivalent as approved by the Secretary, that the borrower is registered with a public or private employment agency due to a loss of employment resulting from relocation to accommodate such permanent change in duty station.".

20 USC 1087e note.

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect 90 days after the date of the enactment of this Act.

# Subtitle F—Studies and Reports

### SEC. 1061. MODIFICATIONS OF REPORTING REQUIREMENTS.

(a) CONSOLIDATED BUDGET QUARTERLY REPORT ON USE OF FUNDS.—Section 381(b) of title 10, United States Code, is amended—

(1) in the subsection heading, by striking "QUARTERLY REPORT" and inserting "SEMIANNUAL REPORT";

(2) by striking "Not later than 60 days after the end of each calendar quarter, the" and inserting "The";

(3) by striking "Defense during such calendar quarter" and inserting "Defense—"; and

(4) by adding at the end the following new paragraphs:

"(1) by not later than August 31 of each year, for the first six-month period of that year; and

"(2) by not later than February 28 of each year, for the second six-month period of the preceding year.".

(b) NATIONAL SECURITY STRATEGY FOR THE NATIONAL TECHNOLOGY AND INDUSTRIAL BASE.—Section 4811(a) of title 10, United States Code, is amended by striking "The Secretary shall submit such strategy to Congress not later than 180 days after the date

of submission of the national security strategy report required under section 108 of the National Security Act of 1947 (50 U.S.C. 3043)." and inserting "The Secretary shall submit such strategy to Congress as an integrated part of the report submitted under section 4814 of this title.".

(c) NATIONAL TECHNOLOGY AND INDUSTRIAL BASE REPORT AND QUARTERLY BRIEFING.—

(1) IN GENERAL.—Section 4814 of title 10, United States Code, is amended—

(A) by amending the section heading to read as follows:

## "§ 4814. National technology and industrial base: biennial report";

(B) by striking "(a) ANNUAL REPORT.—";

(C) by striking "March 1 of each year" and inserting "March 1 of each odd-numbered year"; and

(D) by striking subsection (b).

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 382 of such title is amended by striking the item relating to section 4814 and inserting the following:

"4814. National technology and industrial base: biennial report.".

*10 USC prec. 4811.*

(3) CONFORMING AMENDMENT.—Section 858(b)(2) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended—

*10 USC 48110 note.*

(A) by striking subparagraph (A); and

(B) by redesignating subparagraphs (B) through (H) as subparagraphs (A) through (G), respectively.

(d) ANNUAL MILITARY CYBERSPACE OPERATIONS REPORT.—Section 1644 of the National Defense Authorization Act for Fiscal Year 2020 (10 U.S.C. 394 note; Public Law 116–92) is amended—

(1) in subsection (a) in the matter preceding paragraph (1) in the first sentence—

(A) by inserting "effects" after "all named military cyberspace"; and

(B) by striking ", operations, cyber effects enabling operations, and cyber operations conducted as defensive operations" and inserting "conducted for either offensive or defensive purposes"; and

(2) in subsection (c), by inserting "or cyber effects operations for which Congress has otherwise been provided notice" before the period.

(e) EXTENSION AND MODIFICATION OF AUTHORITY TO PROVIDE ASSISTANCE TO THE VETTED SYRIAN OPPOSITION.—Section 1231(d) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232) is amended—

(1) in the subsection heading, by striking "QUARTERLY" and inserting "SEMIANNUAL"; and

(2) in paragraph (1)—

(A) in the matter preceding subparagraph (A), by striking "quarterly" and inserting "semiannual"; and

(B) in subparagraph (A), by striking "90-day" and inserting "180-day".

(f) THEFT, LOSS, OR RELEASE OF BIOLOGICAL SELECT AGENTS OR TOXINS INVOLVING DEPARTMENT OF DEFENSE.—Section 1067(a) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 50 U.S.C. 1528(a)) is amended to read as follows:

137 STAT. 400            PUBLIC LAW 118–31—DEC. 22, 2023

"(a) NOTIFICATION.—(1) Subject to paragraph (2), not later than 45 days after a covered report of any theft, loss, or release of a biological select agent or toxin involving the Department of Defense is filed with the Centers for Disease Control and Prevention or the Animal and Plant Health Inspection Service, the Secretary of Defense, acting through the Assistant Secretary of Defense for Nuclear, Chemical, and Biological Defense Programs, shall provide to the congressional defense committees notice of such theft, loss, or release.

Determination.

"(2) The Secretary shall provide to the congressional defense committees notice of a release under paragraph (1) only if the Secretary, acting through the Assistant Secretary, determines that the release is outside the barriers of secondary containment into the ambient air or environment or is causing occupational exposure that presents a threat to public safety.

Definition.

"(3) In this subsection, the term 'covered report' means a report filed under any of the following (or any successor regulations):

"(A) Section 331.19 of title 7, Code of Federal Regulations.
"(B) Section 121.19 of title 9, Code of Federal Regulations.
"(C) Section 73.19 of title 42, Code of Federal Regulations.".

(g) AUDIT OF DEPARTMENT OF DEFENSE FINANCIAL STATE-MENTS.—Section 240a of title 10, United States Code, is amended—
(1) by striking "(A) ANNUAL AUDIT REQUIRED.—"; and
(2) by striking subsection (b).

(h) FINANCIAL IMPROVEMENT AND AUDIT REMEDIATION PLAN.—Section 240b(b) of title 10, United States Code, is amended—
(1) in paragraph (1)—
(A) in subparagraph (A), by striking "June 30, 2019, and annually thereafter" and inserting "July 31 each year";
(B) in subparagraph (B)—
(i) by striking clauses (vii) through (x); and
(ii) by redesignating clauses (xi), (xii), and (xiii) as clauses (vii), (viii), and (ix), respectively; and
(C) by striking subparagraph (C); and
(2) in paragraph (2)—
(A) in subparagraph (A)—
(i) by striking "June 30" and inserting "July 31"; and
(ii) by striking the second sentence; and
(B) in subparagraph (B)—
(i) by striking "June 30" and inserting "July 31"; and
(ii) by striking the second sentence.

(i) ANNUAL REPORTS ON FUNDING.—Section 1009(c) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 240b note) is amended by striking "five days" and inserting "10 days".

**SEC. 1062. EXTENSION OF REQUIREMENT TO SUBMIT A REPORT ON DEPARTMENT OF DEFENSE SUPPORT FOR DEPARTMENT OF HOMELAND SECURITY AT THE INTERNATIONAL BORDERS OF THE UNITED STATES.**

Section 1014(d)(3) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 271 note) is amended by striking "December 31, 2024" and inserting "December 31, 2025".

### SEC. 1063. BRIEFING ON DEFENSE POW/MIA ACCOUNTING AGENCY CAPABILITIES REQUIRED TO EXPAND ACCOUNTING FOR PERSONS MISSING FROM DESIGNATED PAST CONFLICTS.

(a) IN GENERAL.—Not later than March 1, 2024, and annually thereafter for each of the next five years, the Director of the Defense POW/MIA Accounting Agency shall provide to the Committees on Armed Services of the Senate and House of Representatives a briefing on the capabilities required to expand accounting for persons missing from designated past conflicts.

Deadline.

(b) AUTHORITY TO ENTER INTO AGREEMENTS.—The Director of the Defense POW/MIA Accounting Agency may enter into agreements with universities or research organizations under which such universities or research organizations agree to provide additional capabilities for specialized missions or research requirements relating to expanding accounting for persons missing from designated past conflicts.

10 USC 1501 note.

### SEC. 1064. AIR FORCE PLAN FOR MAINTAINING PROFICIENT AIRCREWS IN CERTAIN MISSION AREAS.

(a) PLAN REQUIRED.— The Secretary of the Air Force shall develop a plan, and the associated actions and milestones for implementing the plan, to designate, equip, and train the number of combat air forces aviation units (in this section referred to as "CAF units"), equipped with fixed-wing or rotorcraft assets, that are required in order to maintain proficient aircrew skills in accordance with the Core Mission Essential Task List and Designed Operational Capability Statement of each such unit in the following mission areas:

(1) Close air support.
(2) Forward air controller–airborne.
(3) Combat search and rescue.
(4) Airborne battle management.

(b) REPORT.—The Secretary of the Air Force shall submit to the congressional defense committees a report on the plan required under subsection (a). Such report shall include the following information:

(1) The number of CAF units required to meet steady-state, contingency, and wartime mission requirements for each mission area referred to in subsection (a).

(2) The number of proficient aircrews each unit must maintain in order to be qualified and current in each such mission area.

(3) The number of CAF units and aircrew personnel that, as of the date of the enactment of this Act, are trained and equipped to meet steady-state, contingency, and wartime mission requirements for each such mission area.

(4) The location of any CAF unit and associated aircraft that have been designated to be proficient in such mission areas.

(5) The minimum quantity of initial training and continuation training sorties and events aircrews will be required to achieve monthly and yearly to be qualified as proficient, current, and experienced in such mission areas.

(6) Any other information, data, or analyses the Secretary determines relevant.

(c) LIMITATION.—The Secretary of the Air Force may not reduce the total inventory of the Air Force of A-10 aircraft below 218

Effective date.

137 STAT. 402        PUBLIC LAW 118–31—DEC. 22, 2023

until the date that is 180 days after the date on which the Secretary submits the report required under subsection (b).

(d) DEFINITION OF PROFICIENT.—In this section, the term "proficient", with respect to an aircrew, means that such aircrew—

(1) has thorough knowledge but occasionally may make an error of omission or commission;

(2) is able to operate in a complex, fluid environment and is able to handle most contingencies and unusual circumstances; and

(3) is prepared for mission tasking on the first sortie in a theater of operations.

Deadlines.

Contracts.

**SEC. 1065. INDEPENDENT STUDY ON NAVAL MINE WARFARE.**

(a) STUDY REQUIRED.—Not later than 60 days after the date of the enactment of this Act, the Secretary of the Navy shall seek to enter into an agreement with a federally funded research and development center to conduct an independent study of the mine warfare capabilities of the Navy.

(b) ELEMENTS.—The study under subsection (a) shall include an assessment and comprehensive review of—

(1) the offensive and defensive mine warfare capabilities of the Navy; and

(2) the offensive mine inventories of Navy as of the date of study.

(c) RESULTS.—Following the completion of the study under subsection (a), the federally funded research and development center that conducts the study shall submit to the Secretary of Defense a report on the results of the study. The report shall include—

Summary.

(1) a summary of the research and other activities carried out as part of the study; and

Recommendations.

(2) considerations and recommendations to improve the mine warfare capabilities of the Navy, including recommendations for any legislation that may be needed for such purpose.

(d) SUBMITTAL TO CONGRESS.—

(1) IN GENERAL.—Not later than December 31, 2024, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives—

Records.

(A) an unaltered copy of the results of the study, as submitted to the Secretary under subsection (c); and

(B) the written responses of the Secretary and the Chairman of the Joint Chiefs of Staff to such results.

(2) FORM.—The submission under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

Time periods.

**SEC. 1066. ANNUAL REPORT AND BRIEFING ON IMPLEMENTATION OF FORCE DESIGN 2030.**

(a) IN GENERAL.—Not later than February 15, 2024, and annually thereafter through February 15, 2030, the Commandant of the Marine Corps shall submit to the congressional defense committees a report detailing the programmatic choices made to implement Force Design 2030, including both new developmental and fielded capabilities, as well as capabilities and capacity divested to accelerate the implementation of Force Design 2030.

(b) BRIEFING REQUIREMENT.—Not later than March 15, 2024, and annually thereafter through March 15, 2030, the Commandant of the Marine Corps shall provide to the congressional defense committees a briefing on the elements described in subsection (c).

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 403

(c) ELEMENTS.—Each report required under subsection (a) and briefing required under subsection (b) shall include the following elements:

    (1) An assessment of changes in the national defense strategy, Defense Planning Guidance, Joint Warfighting Concept (and associated concept required capabilities), and other planning processes that informed Force Design 2030.

    (2) An inventory and assessment of the exercises and experimentation related to the Force Design, starting in fiscal year 2020, including an identification of the capabilities that were involved and the extent to which such exercises and experimentation validated or militated against proposed capability investments.

    (3) An inventory of divestments of capability or capacity, whether force structure or equipment, starting in fiscal year 2020, including—

        (A) a timeline of the progress of each divestment;

        (B) the type of force structure or equipment divested or reduced;

        (C) the percentage of force structure or equipment divested or reduced, including any equipment entered into inventory management or another form of storage;

        (D) the rationale and context behind such divestment;

        (E) an identification of whether such divestment affects the ability of the Marine Corps to meet the requirements of the Global Force Management process and operational plans, including an explanation of how the Marine Corps plans to mitigate the loss of such capability or capacity if the divestment affects the ability of the Marine Corps to meet the requirements of the Global Force Management process and operational plans, including through new investments, additional joint planning and training, or other methods; and

        (F) an assessment of the actual and projected recruitment and retention percentages for the Marine Corps, starting in fiscal year 2020.

    (4) An inventory of extant or planned investments as a part of Force Design 2030, disaggregated by integrated air and missile defense, littoral mobility and maneuver, sea denial, and reconnaissance and counter-reconnaissance forces, including—

        (A) capability name;

        (B) capability purpose and context;

        (C) capability being replaced (or not applicable);

        (D) date of initial operational capability;

        (E) date of full operational capability;

        (F) deliveries of units by year; and

        (G) approved acquisition objective or similar inventory objective.

    (5) A description of the amphibious warfare ship and maritime mobility requirements the Marine Corps submitted to the Department of the Navy in support of the Marine Corps organization and concepts under Force Design 2030 and its statutory requirements, including—

        (A) an explicit statement of the planning assumptions about readiness of amphibious warfare ships and maritime

*Assessments.*

*Inventory.*

*Inventory.*

*Timeline.*

*Inventory.*

mobility platforms that were used in developing the requirements; and

(B) an assessment of whether the 30-year shipbuilding plan of the Navy and the budget for the fiscal year covered by the briefing meet the amphibious ship requirements of the Navy.

(6) An assessment of how the capability investments described in paragraph (4) contribute to joint force efficacy in new ways, including through support of other Armed Forces.

(7) An assessment of the ability of the Marine Corps to generate required force elements for the Immediate Ready Force and the Contingency Ready Force over the two fiscal years preceding the fiscal year during which the report and briefing are provided and the expected ability to generate forces for the subsequent two fiscal years.

(8) An assessment of Marine Corps force structure and the readiness of Marine Expeditionary Units compared to availability of amphibious ships comprising an Amphibious Ready Group over the two fiscal years preceding the fiscal year during which the report and briefing are provided and the expected availability for the subsequent two fiscal years.

(9) An assessment by the Marine Corps of the compliance of the Marine Corps with the statutory organization prescribed in section 8063 of title 10, United States Code, that "[t]he Marine Corps, within the Department of the Navy, shall be so organized as to include not less than three combat divisions and three air wings, and such other land combat, aviation, and other services as may be organic therein".

(10) An assessment by the Marine Corps of the compliance of the Marine Corps with the statutory functions prescribed in section 8063 of title 10, United States Code, that "[t]he Marine Corps shall be organized, trained, and equipped to provide fleet marine forces of combined arms, together with supporting air components, for service with the fleet in the seizure or defense of advanced naval bases and for the conduct of such land operations as may be essential to the prosecution of a naval campaign".

Termination date.

(d) EFFECT ON OTHER REQUIREMENTS.—Effective on the date of the submission of the first report required under subsection (a), the requirement to provide a briefing pursuant to section 1023 of the Joint Explanatory Statement accompanying the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) shall cease to have force or effect.

### SEC. 1067. STUDY AND REPORT ON POTENTIAL INCLUSION OF BLACK BOX DATA RECORDERS IN TACTICAL VEHICLES.

(a) STUDY.—The Comptroller General of the United States shall carry out a study to determine the extent to which the Department of Defense has evaluated feasability and advisability of equipping all tactical vehicles of the Armed Forces with black box data recorders.

(b) REPORT.—The Comptroller General shall—

(1) not later than 180 days after the date of the enactment of this Act, the Comptroller General shall provide to the congressional defense committees a briefing on the preliminary findings of the study conducted under subsection (a); and

PUBLIC LAW 118–31—DEC. 22, 2023 137 STAT. 405

(2) submit to the congressional defense committees a final report on such study.

**SEC. 1068. PLAN ON COUNTERING HUMAN TRAFFICKING.**

Deadlines.

(a) PLAN.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the appropriate congressional committees a plan for coordinating with defense partners in North America and South America and supporting interagency departments and agencies, as appropriate, in countering human trafficking operations, including human trafficking by transnational criminal organizations.

(b) ELEMENTS OF PLAN.—The plan under subsection (a) shall include—

(1) a description of the threat to United States security from human trafficking operations;

(2) a description of the authorities of the Department of Defense for the purposes specified in subsection (a);

(3) a description of any current or proposed Department of Defense programs or activities to coordinate with defense partners or provide support to interagency departments and agencies as described in subsection (a); and

(4) any recommendations of the Secretary of Defense for additional authorities for the purposes of countering human trafficking, including by transnational criminal organizations.

Recommendations.

(c) BRIEFING.—Not later than 180 days after the submission of the plan required under subsection (a), the Secretary of Defense shall brief the appropriate congressional committees regarding the authorities, programs, and activities of the Department of Defense to counter human trafficking operations.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES.—In this section, the term "appropriate congressional committees" means—

Definition.

(1) the congressional defense committees;

(2) the Committee on Homeland Security and Governmental Affairs and the Committee on Foreign Relations of the Senate; and

(3) the Committee on Oversight and Administration and the Committee on Foreign Affairs of the House of Representatives.

**SEC. 1069. UPDATE TO STRATEGIC PLAN ON DEPARTMENT OF DEFENSE COMBATING TRAFFICKING IN PERSONS PROGRAM.**

(a) IN GENERAL.—The Secretary of Defense shall update the strategic plan for the combating trafficking in persons program of the Department of Defense.

(b) ELEMENTS OF PLAN.—The updated strategic plan required under subsection (a) shall include each of the following:

(1) An assessment of the efforts of the Department of Defense to combat trafficking in persons in areas with high populations of members of the United States Armed Forces, including in overseas locations.

Assessment.

(2) A review of the coordination of efforts of the Department to combat trafficking in persons across the military departments in areas where multiple military departments operate bases.

Review.

(3) Recommendations for improved cooperation with local communities and relevant Federal, State, and local law enforcement agencies in addressing trafficking in persons.

Recommendations.

137 STAT. 406          PUBLIC LAW 118–31—DEC. 22, 2023

Review.

(4) A review of new methods and concepts for combating trafficking in persons that the Department has implemented since the previous strategic plan.

(5) A description of plans of the Department to adapt innovative approaches, and integrate new technologies.

Analysis.

(6) An analysis of Department capabilities to combat child sexual abuse and exploitation in areas with high populations of members of the United States Armed Forces, including overseas locations.

Recommendations.

(7) Recommendations for programs to educate members of the United States Armed Forces on how to identify and report instances of child sexual abuse and exploitation, both online and in-person, to the appropriate law enforcement agency.

Deadline.

(c) BRIEFING.—Not later than June 1, 2024, the Secretary of Defense shall provide to the appropriate congressional committees a briefing on the updated strategic plan required under subsection (a).

Definition.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services, the Committee on Foreign Affairs, and the Committee on Oversight and Accountability of the House of Representatives; and

(2) the Committee Armed Services, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate.

### SEC. 1070. REPORT ON USE OF TACTICAL FIGHTER AIRCRAFT FOR DEPLOYMENTS AND HOMELAND DEFENSE MISSIONS.

(a) STUDY REQUIRED.—The Secretary of Defense, in consultation with the Secretary of the Air Force and the Secretary of the Navy, shall conduct a study on the use of Department of Defense tactical fighter aircraft for deployments, including taskings supporting homeland defense missions.

Reviews.
Assessments.

(b) ELEMENTS.—In carrying out the study required under subsection (a), the Secretary shall—

(1) review both deployment and exercise requirements for tactical fighter aircraft levied by each geographic combatant command;

(2) assess the deployable forces currently available to fulfill each of the requirements identified under paragraph (1), including whether such forces are adequate to meet the global requirements;

(3) review any relevant tactical fighter forces that are not considered deployable or available to meet the requirements of the combatant commanders and consider whether the status of such forces can or should change;

(4) assess whether tactical fighter aircraft coverage of the United States during the deployment of tactical fighter aircraft to locations outside the United States has been adequately considered, in particular with respect to the areas in and around Alaska and Hawaii;

(5) assess the land-based tactical fighter aircraft units of the active and reserve components of the Air Force, Navy, and Marine Corps that could be considered for inclusion in homeland defense mission requirements; and

(6) identify and evaluate deployment metrics, for each of the 15 fiscal years preceding the fiscal year during which the study is conducted, for the tactical fighter squadrons of the active and reserve components of the Air Force, Navy, and Marine Corps, which shall include— <span style="float:right">Evaluation.<br>Time periods.</span>

(A) all contingency taskings supported, aggregated by active and reserve component taskings supporting Operation Noble Eagle and President of the United States support missions and overseas contingency taskings;

(B) the average number of deployments per squadron, aggregated by active and reserve component squadrons;

(C) the average deployment duration (in days), aggregated by active and reserve components; and

(D) the percentage of days deployed, aggregated by active and reserve components.

(c) REPORT.—Not later than May 1, 2024, the Secretary of Defense shall submit to the congressional defense committees a report that includes the results of a study required under subsection (a).

**SEC. 1071. REPORT ON EQUIPPING CERTAIN GROUND COMBAT UNITS WITH SMALL UNMANNED AERIAL SYSTEMS.**

(a) REPORT REQUIRED.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense, in consultation with the Secretaries of the military departments, shall submit to the congressional defense committees a report on equipping platoon-sized ground combat formations with group 1 or group 2 unmanned aerial systems.

(b) ELEMENTS.—The report submitted pursuant to subsection (a) shall address the following:

(1) The use of group 1 or group 2 unmanned aerial systems in the Ukraine conflict and best practices learned.

(2) The potential use of group 1 or group 2 unmanned aerial systems to augment small unit tactics and lethality in the ground combat forces.

(3) Procurement challenges, legal restrictions, training shortfalls, operational limitations, or other impediments to fielding group 1 or group 2 unmanned aerial systems at the platoon level. <span style="float:right">Contracts.</span>

(4) A plan to equip platoon-sized ground combat formations in the close combat force with group 1 or group 2 unmanned aerial systems at a basis of issue, as determined appropriate by the Secretary of the military department concerned, including a proposed timeline and fielding strategy. <span style="float:right">Plan.</span>

(5) A plan to equip such other ground combat units with group 1 or group 2 unmanned aerial systems, as determined appropriate by the Secretary of the military department concerned. <span style="float:right">Plan.</span>

**SEC. 1072. BIANNUAL BRIEFINGS ON HOMELAND DEFENSE PLANNING.**

(a) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act, and every 180 days thereafter through February 1, 2026, the Secretary of Defense shall provide to the congressional defense committees a briefing on efforts to bolster homeland defense. <span style="float:right">Deadline.<br>Time period.</span>

(b) CONTENTS.—

(1) FIRST BRIEFING.—The first briefing required by subsection (a) shall include each of the following:

137 STAT. 408          PUBLIC LAW 118–31—DEC. 22, 2023

(A) A detailed description of the homeland defense policy guidance.

(B) The assumptions used in the drafting of such guidance.

Guidance.
Timeline.

(C) If such guidance has not been completed, an explanation of the reasons for the lack of completion and a timeline for completion.

(2) ALL BRIEFINGS.—Each briefing required under subsection (a) shall include each of the following:

Foreign
countries.
Updates.
Determinations.
Summary.

(A) A summary of any update made to the homeland defense policy guidance.

(B) An update on threats to the United States emanating from the Government of the People's Republic of China, the Government of the Russian Federation, the Government of the Democratic People's Republic of Korea, the Government of Iran, and any other adversary country, as determined by the Secretary.

Time period.

(C) A description of major actions taken by the Department during the preceding fiscal year to respond to and mitigate military threats to the United States.

(D) A description of the homeland defense policies of the Department in the event of a military conflict with the People's Republic of China, the Russian Federation, the Democratic People's Republic of Korea, the Islamic Republic of Iran, or any other country as determined by the Secretary.

(E) Any other matter the Secretary considers relevant.

### SEC. 1073. REPORT ON EFFECTIVENESS OF CURRENT USE OF UNITED STATES NAVAL STATION, GUANTANAMO BAY, CUBA.

(a) IN GENERAL.—Not later than April 30, 2024, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the extent to which United States Naval Station, Guantanamo Bay, Cuba, is being used effectively to defend the national security interests of the United States.

(b) ELEMENTS.—The report required by subsection (a) shall include each of the following:

Analysis.
Russia.
China.
Assessment.

(1) An analysis of the intelligence collection, cyber, and information operation activities in Cuba of the militaries of foreign governments, including the Russian Federation and the People's Republic of China, and an assessment of the effects of such activities.

(2) An identification of the mitigation measures currently in place for addressing the activities referred to in paragraph (1) and a discussion of any measures that would be appropriate for further mitigation.

(3) Such other matters as the Secretary determines appropriate.

(c) FORM OF REPORT.—The report required by subsection (a) shall be submitted in unclassified form, but may include a classified annex.

### SEC. 1074. HOLISTIC TRAINING RANGE ASSESSMENT.

(a) ASSESSMENT REQUIRED.—The Secretary of Defense, after coordinating with the Secretaries of the military departments, shall carry out a comprehensive assessment of the capabilities, limitations, and anticipated future training constraints on the use of

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 409

military lands, marine areas, and airspace facilities that are available in the United States and overseas, for training of the covered Armed Forces.

(b) CONTENTS.—The assessment required by subsection (a) shall include each of the following:

(1) An assessment of the range capability of each facility.

(2) An assessment of current and future training requirements, including any opportunities for regional interconnectivity of existing sites to increase capability.

(3) An evaluation of the adequacy of current Department of Defense resources (including virtual and constructive training assets as well as military lands, marine areas, and airspace available in the United States and overseas) to meet current and future training range requirements—    *Evaluation.*

(A) identified under paragraph (2);

(B) relating to testing and training of fifth generation weapons systems; and

(C) relating to near-peer competition.

(4) An evaluation of threats posed by adversarial intelligence collection at each facility.    *Evaluation.*

(5) An assessment of current capacity for testing and training of electromagnetic warfare operations, including—

(A) electromagnetic spectrum operations;

(B) operations in the information environment;

(C) Joint All Domain Command and Control; and

(D) information warfare.

(6) An assessment of current capacity for training and testing and future potential for Joint All Domain operations, including—

(A) an assessment of current shortfalls at domestic military installations; and

(B) an analysis of ranges capable of hosting large-scale, operationally relevant, live-fire campaign-level Joint All Domain operations training exercises based on near-peer competition.    *Analysis.*

(7) An assessment of the capacity of the covered Armed Forces to routinely train, test, evaluate, and qualify theater-level operations in support of operations versus a pacing threat, as defined by the most recent national defense strategy submitted pursuant to section 113(g) of title 10, United States Code, for the purpose of increasing the capacity and rate of force readiness with respect to deterrence and defense at theater-level distances. Such assessment shall include—

(A) an identification of areas in which multiple ranges can be used simultaneously to simulate Pacific Deterrence Initiative theater operation plans, including areas for over water and coastline training;

(B) an analysis of the combined capability of the total test or training areas to simulate various public, private, and academic initiatives in support of the Pacific Deterrence Initiative while advancing military readiness; and    *Analysis.*

(C) a review of any test or training areas that may enhance efforts of the Department to train at scale and range when persistently networked into a live, virtual, and constructive Pacific environment.    *Review.*

(8) Proposals to enhance training range capabilities and mitigate any shortfalls or encroachment, including Department    *Proposals. Timeline. Budget estimate.*

137 STAT. 410          PUBLIC LAW 118–31—DEC. 22, 2023

assets within the range footprint, in current Department of Defense resources identified pursuant to the assessment required under this section, including timeline and budget estimates for implementing any proposed mitigations.

(9) Such other matters as the Secretary determines appropriate.

(c) INITIAL REPORT.—At the same time as the submission of the budget of the President to Congress pursuant to section 1105 of title 31, United States Code, for fiscal year 2026, the Secretary shall submit to the congressional defense committees an initial report on the assessment required by subsection (a).

Time period.

(d) SUBSEQUENT ANNUAL REPORTS.—At the same time as the submission of the President submits to Congress pursuant to such section for each of fiscal years 2027 through 2032, the Secretary shall submit to Congress a report describing the progress made in implementing the proposals referred to in subsection (b)(8) and any additional actions taken, or to be taken, to address training constraints caused by limitations on the use of military lands, marine areas, and airspace.

(e) COVERED ARMED FORCE DEFINED.—In this section, the term "covered Armed Force" means the Army, Navy, Air Force, Marine Corps, and Space Force.

10 USC 993 note.

### SEC. 1075. SPECIAL OPERATIONS FORCE STRUCTURE.

Assessments.

(a) REPORT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report containing an assessment of the optimal force structure for special operations forces. Such report shall include—

(1) a description of the role of special operations forces in implementing the most recent national defense strategy under section 113(g) of title 10, United States Code;

(2) a detailed accounting of the demand for special operations forces by the geographic combatant commands;

(3) an assessment of current and projected capabilities and capacities of the general purpose forces of the United States Armed Forces, including forces that enable special operations, that could affect force structure capability and capacity requirements of special operations forces;

(4) an assessment of the size, composition, and organizational structure of the special operations command headquarters of each of the Armed Forces and subordinate headquarters elements;

(5) an assessment of the adequacy of special operations force structure for meeting the goals of the National Military Strategy under section 153(b) of title 10, United States Code;

(6) a description of the role of special operations forces in supporting the Joint Concept for Competing; and

(7) any other matters the Secretary of Defense determines relevant.

Deadline.

(b) NOTIFICATION REQUIRED.—Except as provided in subsection (d), not later than 15 days before making any reduction in the number of special operations forces by more than 1,000 personnel and prior to implementing or announcing such reduction, the Secretary of Defense shall submit to the congressional defense committees written notification of the decision to make such reduction.

(c) CONTENTS OF NOTIFICATION.—A notification required under subsection (b) shall include—

(1) details of the planned changes to force structure and personnel requirements and a justification for the planned changes, including—

(A) which units or occupational skills are planned to be reduced or reallocated; and

(B) to which units or capabilities the force structure is planned to be transferred or reallocated;

(2) an accounting of the personnel planned to be transferred under the force structure change, including which units such personnel are planned to be transferred to and from;

(3) an analysis of the expected implications of the planned change on the ability of the Department of Defense to carry out operational and campaign plans of combatant commanders, support the Joint Concept for Competing, and meet the goals of the most recent national defense strategy under section 113(g) of title 10, United States Code; and

Analysis.

(4) any other matters the Secretary of Defense determines relevant.

(d) EXCEPTION.—The notification requirement under subsection (b) shall not apply with respect to a reduction in the number of special operations forces if the Secretary of Defense submits to the congressional defense committees certification that such reduction needs to be implemented expeditiously for reasons of military urgency.

Certification.

(e) DEFINITIONS.—In this section:

(1) The term "special operations forces" means the forces described in section 167(j) of title 10, United States Code.

(2) The term "force structure", when used with respect to an organization, means—

(A) the mission of the organization;

(B) the personnel required to operate the organization; and

(C) the equipment required to execute the mission of the organization.

### SEC. 1076. COMPREHENSIVE ASSESSMENT OF MARINE CORPS FORCE DESIGN 2030.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall seek to enter into an agreement with a federally funded research and development center for the conduct of an independent review, assessment, and analysis of the modernization initiatives of the Marine Corps. The agreement shall provide that not later than one year after the date on which the Secretary and the center enter into the agreement, the center shall provide to the Secretary a report on the findings of the review, assessment, and analysis. Upon receipt of the report, the Secretary shall transmit the report to the congressional defense committees.

Deadline.
Contracts.
Review.
Analysis.

(b) ELEMENTS.—The report required under subsection (a) shall include the following elements:

(1) An assessment of changes in the National Defense Strategy, Defense Planning Guidance, the Joint Warfighting Concept, and other strategic documents and concepts that informed Force Design modernization requirements.

137 STAT. 412          PUBLIC LAW 118–31—DEC. 22, 2023

(2) An assessment of how the Marine Corps, consistent with authorized end strength, can be structured, organized, trained, equipped, and postured to meet the challenges of future competition, crisis, and conflict to include discussion of multiple structural options as relevant and the tradeoffs between different options.

(3) An assessment of the ability of the defense innovation base and defense industrial base to develop and produce the technologies required to implement the Force Design modernization plan published by the Marine Corps on a timeline and at production rates sufficient to sustain military operations.

(4) An assessment of forward infrastructure and the extent to which installations are operationalized to deter, compete, and prevail during conflict in support of the Marine Corps modernization.

(5) An assessment of whether the Marine Corps is in compliance with the statutory organization and functions prescribed in section 8063 of title 10, United States Code.

(6) An assessment of the current retention and recruiting environment and the ability of the Marine Corps to sustain manpower requirements necessary for operational requirements levied by title 10, United States Code, in light of the published Force Design plan.

(7) The extent to which the modernization initiatives within the Marine Corps are nested within applicable joint warfighting concepts.

(8) An assessment of whether the modernization of the Marine Corps is consistent with the strategy of integrated deterrence.

(9) An assessment of the ability of the Marine Corps to generate required force elements for the Immediate Ready Force and the Contingency Ready Force, based on current and planned end strength and structure.

(10) The extent to which the plan for modernized capabilities published by the Marine Corps can be integrated across the Joint Force, including warfighting concepts at the combatant command level.

(11) The extent to which the modernization efforts of the Marine Corps currently meet the requirements of the current plans of the combatant commanders and global force management operations, including a description of any mechanisms that exist to ensure geographic combatant requirements inform Marine Corps modernization efforts.

(12) The extent to which modeling and simulation, experimentation, wargaming, and other analytic methods support the changes incorporated into the modernization initiatives of the Marine Corps, including the underlying assumptions and outcomes of such analyses.

Inventory.

(13) An inventory of extant or planned investments as part of the modernization efforts of the Marine Corps, disaggregated by the following capability areas and including actual or projected dates of Initial Operational Capability and Full Operational Capability:

(A) Command and Control.
(B) Information.
(C) Intelligence.
(D) Fires.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 413

(E) Movement and Maneuver.

(F) Protection.

(G) Sustainment.

(14) An inventory of divestments of capability or capacity, whether force structure or equipment, starting in fiscal year 2020, including—

    (A) a timeline of the progress of each divestment;

    (B) the type of force structure or equipment divested or reduced;

    (C) the percentage of force structure of equipment divested or reduced, including any equipment entered into inventory management or other form of storage;

    (D) the rationale and context behind such divestment; and

    (E) an identification of whether such divestment affects the ability of the Marine Corps to meet the requirements of Global Force Management process and the operational plans.

(15) An assessment of how observations regarding the invasion and defense of Ukraine affect the feasibility, advisability, and suitability of the modernization plans published by the Marine Corps.

(c) CLASSIFICATION OF REPORT.—The report required under subsection (a) shall be submitted in unclassified form, but may include a classified appendix to the extent required to ensure that the report is accurate and complete.

## SEC. 1077. ASSESSMENT AND RECOMMENDATIONS RELATING TO INFRASTRUCTURE, CAPACITY, RESOURCES, AND PERSONNEL ON GUAM.

*Time periods.*

(a) ASSESSMENT.—The Secretary of Defense, in coordination with the Commander of United States Indo-Pacific Command, shall assess the infrastructure, capacity, resource, and personnel requirements for Guam during fiscal years 2024 through 2029 to meet United States strategic objectives.

*Time period.*

(b) ELEMENTS.—The assessment under subsection (a) shall include the following elements:

(1) An appraisal of the potential role Guam could play as a key logistics and operational hub for the United States military in the Indo-Pacific region.

*Appraisal.*

(2) An assessment of whether current Department of Defense infrastructure, capacity, resources, and personnel in Guam are sufficient to meet the expected demands during relevant operations and contingency scenarios.

(3) An assessment of the adequacy of civilian infrastructure in Guam for supporting the requirements of United States Indo-Pacific Command, including—

    (A) the resilience of such infrastructure in the event of a natural disaster; and

    (B) the vulnerability of such infrastructure to cyber threats.

(4) A plan, including timelines and associated estimated costs, to improve Department of Defense infrastructure, capacity, resources, and personnel in Guam during fiscal years 2024 through 2029 to meet United States Indo-Pacific Command strategic objectives, including the need for Department of Defense civilian recruiting and retention programs, such

*Plan.*
*Timeline.*

137 STAT. 414          PUBLIC LAW 118–31—DEC. 22, 2023

as cost-of-living adjustments, initiatives for dealing with any shortages of civilian employees, and programs to improve quality-of-life for personnel assigned to Guam.

(5) An assessment of the implementation of Joint Task Force Micronesia.

(6) Any other matters determined relevant by the Secretary.

(c) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report including the results of the assessment required under subsection (a).

### SEC. 1078. FEASIBILITY STUDY ON CONVERSION OF JOINT TASK FORCE NORTH INTO JOINT INTERAGENCY TASK FORCE NORTH.

Deadline.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, in consultation with the head of any relevant Federal department or agency and acting through the Under Secretary of Defense for Policy, shall submit to the congressional defense committees a feasibility study on converting the Joint Task Force North of the United States Northern Command into a joint interagency task force to be known as the "Joint Interagency Task Force North".

(b) ELEMENTS.—The study under (a) shall include the following elements:

(1) A description of the mission of a Joint Interagency Task Force North.

(2) A detailed description of the resources of the Department of Defense, including personnel, facilities, and operating costs, necessary to convert Joint Task Force North into a joint interagency task force.

(3) An identification of—

(A) each relevant department and agency of the United States Government the participation in a Joint Interagency Task Force North of which is necessary in order to enable a Joint Interagency Task Force North to effectively carry out its mission; and

(B) the interagency arrangements necessary to ensure effective participation by each such department and agency.

(4) An identification of each international liaison necessary for a Joint Interagency Task Force North to effectively carry out its mission.

(5) A description of the bilateral and multilateral agreements with foreign partners and regional and international organizations that would support the implementation of the mission of the Joint Interagency Task Force North.

(6) A description of the relationship between a Joint Interagency Task Force North and Joint Interagency Task Force South of the United States Southern Command.

(7) A description of the likely relationship between a Joint Interagency Task Force North and the relevant security forces of the Government of Mexico and the Government of the Bahamas.

Recommendations.

(8) A recommendation on whether a Joint Interagency Task Force North should be an enduring entity and a discussion of the circumstances under which the mission of a Joint Interagency Task Force North would transition to one or more

entities within the United States Government other than the United States Northern Command.

(9) Any recommendations for additional legal authority needed for the Joint Interagency Task Force North to effectively carry out its mission.

Recommendations.

(10) Any other matters the Secretary of Defense considers relevant.

(c) FORM.—The study required by subsection (a) shall be submitted in unclassified form but may include a classified annex.

# Subtitle G—Other Matters

### SEC. 1080. MODIFICATION OF DEFINITION OF DOMESTIC SOURCE FOR TITLE III OF THE DEFENSE PRODUCTION ACT OF 1950.

(a) IN GENERAL.—Section 702(7) of the Defense Production Act of 1950 (50 U.S.C. 4552(7)) is amended—

(1) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively, and by moving such clauses, as so redesignated, two ems to the right;

(2) by striking "The term" and inserting the following: "(A) IN GENERAL.—Except as provided in subparagraph (B), the term";

(3) in clause (ii), as redesignated by paragraph (1), by striking "subparagraph (A)" and inserting "clause (i)"; and

(4) by adding at the end the following new subparagraph (B):

"(B) DOMESTIC SOURCE FOR TITLE III.—

"(i) IN GENERAL.—For purposes of title III, the term 'domestic source' means a business concern that—

Definition.

"(I) performs substantially all of the research and development, engineering, manufacturing, and production activities required of such business concern under a contract with the United States relating to a critical component or a critical technology item in—

"(aa) the United States or Canada; or

"(bb) subject to clause (ii), Australia or the United Kingdom; and

"(II) procures from business concerns described in subclause (I) substantially all of any components or assemblies required under a contract with the United States relating to a critical component or critical technology item.

"(ii) LIMITATIONS ON USE OF BUSINESS CONCERNS IN AUSTRALIA AND UNITED KINGDOM.—

"(I) IN GENERAL.—A business concern described in clause (i)(I)(bb) may be treated as a domestic source only for purposes of the exercise of authorities under title III relating to national defense matters that cannot be fully addressed with business concerns described in clause (i)(I)(aa).

"(II) NATIONAL DEFENSE MATTER DEFINED.— For purposes of subclause (I), the term 'national defense matter' is a matter relating to the development or production of—

137 STAT. 416          PUBLIC LAW 118–31—DEC. 22, 2023

"(aa) a defense article, as defined in section 301 of title 10, United States Code; or

"(bb) materials critical to national security, as defined in section 10(f) of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98h–1(f)).".

(b) REPORTS ON EXERCISE OF TITLE III AUTHORITIES.—Title III of the Defense Production Act of 1950 (50 U.S.C. 4531 et seq.) is amended by adding at the end the following new section:

50 USC 4535.

President.
Briefing.

"SEC. 305. REPORTS ON EXERCISE OF AUTHORITIES.

"(a) IN GENERAL.—The President, or the head of an agency to which the President has delegated authorities under this title, shall submit a report and provide a briefing to the appropriate congressional committees with respect to any action taken pursuant to such authorities—

"(1) except as provided by paragraph (2), not later than 30 days after taking the action; and

"(2) in the case of an action that involves a business concern in the United Kingdom or Australia, not later than 30 days before taking the action.

"(b) ELEMENTS.—

"(1) IN GENERAL.—Each report and briefing required by subsection (a) with respect to an action described in that subsection shall include—

"(A) a justification of the necessity of the use of authorities under this title; and

"(B) a description of the financial terms of any related financial transaction.

"(2) ADDITIONAL ELEMENTS RELATING TO BUSINESS CONCERNS IN THE UNITED KINGDOM OR AUSTRALIA.—Each report and briefing required by subsection (a) with respect to an action described in paragraph (2) of that subsection shall include, in addition to the elements under paragraph (1)—

Certification.

"(A) a certification that business concerns in the United States or Canada were not available with respect to the action; and

Analysis.

"(B) an analysis of why such business concerns were not available.

"(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term 'appropriate congressional committees' means—

"(1) the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives; and

"(2) in the case of an action described in subsection (a) involving materials critical to national security (as defined in section 702(7)(B)(ii)(II)(bb)), the Committee on Energy and Natural Resources of the Senate and the Committee on Natural Resources of the House of Representatives.".

SEC. 1081. INTEGRATED AND AUTHENTICATED ACCESS TO DEPARTMENT OF DEFENSE SYSTEMS FOR CERTAIN CONGRESSIONAL STAFF FOR OVERSIGHT PURPOSES.

Section 1046(a) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 111 note) is amended—

(1) in paragraph (1)(B), by striking "; and" and inserting a semicolon;

(2) in paragraph (2), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(3) to the extent feasible, be integrated with software used by the Department of Defense Parking Management Office to validate parking requests.".

### SEC. 1082. MODIFICATION OF COMPENSATION FOR MEMBERS OF THE AFGHANISTAN WAR COMMISSION.

(a) COMPENSATION.—Section 1094(g)(1) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1942) is amended to read as follows:

"(1) COMPENSATION OF MEMBERS.—

"(A) NON-FEDERAL EMPLOYEES.—A member of the Commission who is not an officer or employee of the Federal Government shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during which the member is engaged in the performance of the duties of the Commission.

"(B) FEDERAL EMPLOYEES.—

"(i) IN GENERAL.—A member of the Commission who is an employee of the Federal Government may be compensated as provided for under subparagraph (a) for periods of time during which the member is engaged in the performance of the duties of the Commission that fall outside of ordinary agency working hours, as determined by the employing agency of such member.

"(ii) RULE OF CONSTRUCTION.—Nothing in this paragraph shall be construed to authorize dual pay for work performed on behalf of the Commission and for a Federal agency during the same hours of the same day.".

(b) TRAVEL SUPPORT.—Section 1050 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2775) is amended—

10 USC 2642 note.

(1) in the section heading, by striking "**DEPARTMENT OF DEFENSE SUPPORT**" and inserting "**EXECUTIVE BRANCH SUPPORT**";

(2) by redesignating subsection (b) as subsection (c); and

(3) by inserting after subsection (a) the following new subsection:

"(b) PROVISION OF TRAVEL SUPPORT TO CERTAIN COMMISSIONS.—For the purpose of providing support to facilitate overseas travel requests from a legislative branch commission, or any commission so designated for support under this subsection jointly by the Majority Leader of the Senate, the Speaker of the House of Representatives, the Minority Leader of the Senate, and the Minority Leader of the House of Representatives, the Secretary of Defense and the Secretary of State shall consider such requests as equivalent to a request from Congress, and apply the same standards in determining the extent to which such support may be provided under law and regulation. Any support so provided

shall be funded out of amounts appropriated for the operation of such commission.".

### SEC. 1083. SENATE NATIONAL SECURITY WORKING GROUP.

(a) IN GENERAL.—Section 21 of Senate Resolution 64 (113th Congress), agreed to March 5, 2013, is amended by striking subsection (d).

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as though enacted on December 31, 2022.

10 USC 2661 note.

### SEC. 1084. TRIBAL LIAISONS AT MILITARY INSTALLATIONS.

(a) TRIBAL LIAISONS AT MILITARY INSTALLATIONS.—The Secretary of Defense shall ensure that each military installation under the jurisdiction of a military department that has an Indian Tribe, Native Hawaiian organization, or Tribal interest in the area surrounding the installation has a Tribal liaison located at the installation.

(b) TRIBAL INTEREST.—For purposes of subsection (a), an area surrounding a military installation shall be considered to be an area in which there is a Tribal interest if an Indian Tribe or Native Hawaiian organization is historically or culturally affiliated with the land or water managed or directly affected by the military installation.

(c) DEFINITIONS.—In this section:

(1) The term "Indian Tribe" has the meaning given that term in section 4(e) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304(e)).

(2) The term "Native Hawaiian organization" has the meaning given that term in section 6207 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7517).

Deadlines.

### SEC. 1085. COMMERCIAL INTEGRATION CELL PLAN WITHIN CERTAIN COMBATANT COMMANDS.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Commander of the United States Africa Command, the Commander of the United States European Command, the Commander of the United States Indo-Pacific Command, the Commander of the United States Northern Command, and the Commander of the United States Southern Command shall each develop a plan that includes—

(1) the potential establishment of a commercial integration cell within the respective combatant command of each commander for the purpose of closely integrating public and private entities with capabilities relevant to the area of operation of such combatant command; and

(2) the potential establishment of a chief technology officer position within the respective combatant command of each commander, the duties of which would include—

(A) overseeing such commercial integration cell; and

(B) reporting directly to the commander of the applicable combatant command on the activities of the relevant commercial integration cell.

(b) BRIEFING.—Not later than 180 days after the date of the enactment of this Act, each commander of a combatant command referred to in subsection (a) shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing on the feasibility, costs, and benefits of establishing a commercial integration cell.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 419

**SEC. 1086. GUIDANCE FOR USE OF UNMANNED AIRCRAFT SYSTEMS BY NATIONAL GUARD.**

Deadlines.
32 USC 901 note.

(a) UPDATED GUIDANCE REQUIRED.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall issue updated guidance on the use of unmanned aircraft systems by the National Guard for covered activities.

(b) BRIEFING.—Not later than 60 days after the date on which the Secretary issues the updated guidance under subsection (a), the Secretary shall provide to the Committees on Armed Services of the Senate and House of Representatives. Such briefing shall include—

(1) an explanation of whether the updated guidance is more restrictive than guidance on the use of other types of aircraft for covered activities; and

(2) if the updated guidance is more restrictive, an explanation for the reasons why such guidance is more restrictive.

(c) COVERED ACTIVITIES DEFINED.—In this section, the term "covered activities" means any of the following:

(1) Emergency operations.

(2) Search and rescue operations.

(3) Defense support to civil authorities.

(4) Support provided under section 502(f) of title 32, United States Code.

**SEC. 1087. PUBLIC DISCLOSURE OF AFGHANISTAN WAR RECORDS.**

10 USC 113 note.

The Secretary of Defense, in a manner consistent with the protection of intelligence sources and methods, shall expeditiously disclose to the public all relevant unclassified records of the Department of Defense relating to the war in Afghanistan.

**SEC. 1088. IMPLEMENTATION PLAN FOR JOINT CONCEPT FOR COMPETING.**

Deadlines.
10 USC 113 note.

(a) IMPLEMENTATION PLAN REQUIRED.—Not later than March 1, 2024, the Chairman of the Joint Chiefs of Staff shall submit to the congressional defense committees an implementation plan for of the Joint Concept for Competing, released on February 10, 2023.

(b) ELEMENTS.—The implementation plan required by subsection (a) shall include—

(1) timelines for the development of integrated competitive strategies for engaging in strategic competition, as described in the Joint Concept for Competing, to address the challenges posed by specific competitors, including such strategies designed to—

Timelines.

(A) deter adversarial military action;

(B) counter the efforts of specific competitors, as necessary; and

(C) support the efforts of the United States interagency and foreign allies, partners, and multilateral organizations;

(2) an identification of any relevant updates to joint doctrine or professional military education;

(3) a description of the integration of the Joint Concept for Competing with other joint force development and design efforts;

(4) a description of concept-required capabilities that are necessary for joint force development and design in support of the Joint Concept for Competing, including the assignment

137 STAT. 420          PUBLIC LAW 118–31—DEC. 22, 2023

of roles and responsibilities and the timelines for attaining such capabilities;

(5) a description of efforts to coordinate and synchronize Department of Defense activities with the activities of interagency and foreign partners for the purpose of integrated campaigning;

(6) an identification of any recommendations to better integrate the role of the Joint Force, as identified by the Joint Concept for Competing, with national security efforts of interagency and foreign partners;

(7) an identification of any changes to authorities or resources necessary to implement the Joint Concept for Competing; and

(8) a description of any other matters the Chairman determines appropriate.

Time period.
Update.

(c) BRIEFING.—Not later than 180 days after the delivery of the implementation plan required under subsection (a), and every 180 days thereafter through March 1, 2026, the Chairman of the Joint Chiefs of Staff shall provide to the congressional defense committees a briefing that includes an update on the status of the implementation plan required under subsection (a).

50 USC 1527 note.

**SEC. 1089. NOTIFICATION OF SAFETY AND SECURITY CONCERNS AT CERTAIN DEPARTMENT OF DEFENSE LABORATORIES.**

Deadline.

(a) IN GENERAL.—The Secretary of Defense shall notify the congressional defense committees within 7 days after ceasing operations at any Department of Defense laboratory or facility rated at biosafety level–3 or higher for safety or security reasons.

(b) CONTENT.—The notification required under subsection (a) shall include—

(1) the reason why operations have ceased at the laboratory or facility;

(2) whether appropriate notification to other Federal agencies has occurred;

(3) a description of the actions taken to determine the root cause of the cessation; and

(4) a description of the actions taken to restore operations at the laboratory or facility.

15 USC 313 note.

**SEC. 1090. CONDUCT OF WEATHER RECONNAISSANCE IN THE UNITED STATES.**

(a) CONDUCT OF RECONNAISSANCE.—

(1) IN GENERAL.—Subject to the availability of appropriations, the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command and the Administrator of the National Oceanic and Atmospheric Administration may use aircraft, personnel, and equipment necessary to meet the mission requirements of—

(A) the National Hurricane Operations Plan; and

(B) the National Winter Seasons Operation plan, as long as aircraft are able to fully meet needs for hurricane monitoring response.

(2) ACTIVITIES.—If the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command exercises the authority under paragraph (1), such Squadron, in consultation with the Administrator of the National Oceanic and Atmospheric Administration and appropriate line offices of the

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 421

National Oceanic and Atmospheric Administration, shall use such authority to—

(A) improve the accuracy and timeliness of observations of storms that result in large amounts of precipitation, such as tropical cyclones and atmospheric rivers, to support the forecast and warning services of the National Weather Service of the United States;

(B) collect data in data-sparse regions where conventional observations are lacking;

(C) support water management decision-making and flood forecasting through the execution of targeted in-situ measurements, airborne dropsondes, buoys, autonomous platform observations, satellite observations, remote sensing observations, and other observation platforms as appropriate, including enhanced assimilation of the data from those observations over the eastern, central, and western north Pacific Ocean, the Gulf of Mexico, and the western Atlantic Ocean to improve forecasts of large storms for civil authorities and military decision makers;

(D) participate in the research and operations partnership that guides flight planning and uses research methods to improve and expand the capabilities and effectiveness of weather reconnaissance over time; and

(E) undertake such other additional activities as the Administrator of the National Oceanic and Atmospheric Administration, in collaboration with the 53rd Weather Reconnaissance Squadron, considers appropriate to further prediction of dangerous weather events.

(b) REPORTS.—

(1) AIR FORCE.—

(A) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Air Force, in consultation with the Administrator of the National Oceanic and Atmospheric Administration, shall perform a resources review of mission capabilities needed for observation to carry out the activities described in subsection (a)(2) and submit to the appropriate committees of Congress a comprehensive report, for the period beginning on the date of the enactment of this Act and ending on December 31, 2035, on—

(i) the resources necessary for the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command to continue to support—

(I) the National Hurricane Operations Plan;

(II) the National Winter Season Operations Plan;

(III) emerging technologies that offer new, improved, or innovative ways to collect data for improved forecasts of strength and landfall for hurricanes, atmospheric rivers, and winter storms; and

(IV) any other operational requirements relating to weather reconnaissance;

(ii) the resources expended by the National Oceanic and Atmospheric Administration to cover taskings that the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command is unable to accomplish; and

*Data.*

*Reviews.*
*Time period.*

137 STAT. 422          PUBLIC LAW 118–31—DEC. 22, 2023

(iii) the resources expended by the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command to cover taskings that the National Oceanic and Atmospheric Administration is unable to accomplish.

Definition.

(B) APPROPRIATE COMMITTEES OF CONGRESS.—In this paragraph, the term "appropriate committees of Congress" means—

(i) the Committee on Armed Services of the Senate;

(ii) the Subcommittee on Defense of the Committee on Appropriations of the Senate;

(iii) the Committee on Commerce, Science, and Transportation of the Senate;

(iv) the Committee on Science, Space, and Technology of the House of Representatives;

(v) the Committee on Armed Services of the House of Representatives; and

(vi) the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

(2) COMMERCE.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Commerce shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Science, Space, and Technology of the House of Representatives a comprehensive report, for the period beginning on the date of the enactment of this Act and ending on December 31, 2035, on—

(A) the resources necessary for the National Oceanic and Atmospheric Administration to continue to support—

(i) the National Hurricane Operations Plan;

(ii) the National Winter Season Operations Plan;

(iii) emerging technologies that offer new, improved, and innovative ways to collect data for improved forecasts of strength and landfall for hurricanes, atmospheric rivers, and winter storms; and

(iv) any other operational requirements relating to weather reconnaissance;

(B) how taskings that the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command is unable to accomplish could affect the ability of the National Oceanic and Atmospheric Administration to fulfill its mission; and

(C) how taskings that the National Oceanic and Atmospheric Administration is unable to accomplish could affect the ability of the 53rd Weather Reconnaissance Squadron of the Air Force Reserve Command to fulfill its mission.

(c) TRANSFER OF FUNDS.—The Secretary of the Air Force may transfer funds to the National Oceanic and Atmospheric Administration for additional hurricane monitoring and response activities that fulfill the mission of the Air Force, including transfers of funds for the compensation of personnel and for the provision of other such services, funds, facilities, and other support services as necessary.

### SEC. 1091. SENSE OF CONGRESS REGARDING AUTHORITY OF SECRETARY OF DEFENSE WITH RESPECT TO IRREGULAR WARFARE.

(a) IN GENERAL.—It is the sense of Congress that the Secretary of Defense has the authority to conduct irregular warfare operations, including clandestine irregular warfare operations, to defend the United States, allies of the United States, and interests of the United States, when such operations have been appropriately authorized.

(b) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to constitute a specific statutory authorization for any of the following:

(1) The conduct of a covert action, as such term is defined in section 503(e) of the National Security Act of 1947 (50 U.S.C. 3093(e)).

(2) The introduction of United States Armed Forces, within the meaning of the War Powers Resolution (Public Law 93–148; 50 U.S.C. 1541 et seq.), into hostilities or into situations wherein hostilities are clearly indicated by the circumstances.

### SEC. 1092. RED HILL HEALTH IMPACTS.

(a) IN GENERAL.—

(1) REVIEW.—The Secretary of Defense (referred to in this section as the "Secretary"), in coordination with the Director of the Centers for Disease Control and Prevention, the Secretary of Veterans Affairs, and such State and local authorities or other partners as the Secretary considers appropriate, shall—

(A) review the Federal programs and services available to individuals exposed to petroleum;

(B) review current research on petroleum exposure in order to identify additional research needs; and

(C) undertake any other review or activities that the Secretary determines to be appropriate.

(2) REPORT.—Not later than one year after the date of enactment of this Act, and annually thereafter for six subsequent years, the Secretary shall submit to the appropriate congressional committees a report on the review and activities undertaken under paragraph (1) that includes— *Time period.*

(A) strategies for communicating and engaging with stakeholders on the Red Hill Incident; *Strategies.*

(B) the number of impacted and potentially impacted individuals;

(C) measures and frequency of follow-up to collect data and specimens related to exposure, health, and developmental milestones as appropriate; and *Data.*

(D) a summary of data and analyses on exposure, health, and developmental milestones for impacted individuals. *Summary. Analyses.*

(3) CONSULTATION.—In carrying out paragraphs (1) and (2), the Secretary shall consult with non-Federal experts, including individuals with certification in epidemiology, toxicology, mental health, pediatrics, and environmental health, and members of the impacted community.

(b) RED HILL EPIDEMIOLOGICAL HEALTH OUTCOMES STUDY.— *Deadlines.*

(1) CONTRACTS.—The Secretary may contract with independent research institutes or consultants, nonprofit or public

137 STAT. 424          PUBLIC LAW 118–31—DEC. 22, 2023

entities, laboratories, or medical schools, as the Secretary considers appropriate, that are not part of the Federal Government to assist with the feasibility assessment required by paragraph (2).

Determination.

(2) FEASIBILITY ASSESSMENT.—Not later than one year after the date of the enactment of this Act, the Secretary shall submit to the appropriate congressional committees the results of a feasibility assessment to determine the necessity of an epidemiological health outcomes study and to inform the design of the potential epidemiological study or studies to assess health outcomes for impacted individuals, which may include—

Strategy.

(A) a strategy to recruit impacted individuals to participate in the study or studies, including incentives for participation;

(B) a description of protocols and methodologies to assess health outcomes from the Red Hill Incident, including data management protocols to secure the privacy and security of the personal information of impacted individuals;

Data.

(C) the periodicity for data collection that takes into account the differences between health care practices among impacted individuals who are—

(i) members of the Armed Forces on active duty or spouses or dependents of such members;

(ii) members of the Armed Forces separating from active duty or spouses or dependents of such members;

(iii) veterans and other individuals with access to health care from the Department of Veterans Affairs; and

(iv) individuals without access to health care from the Department of Defense or the Department of Veterans Affairs;

(D) a description of methodologies to analyze data received from the study or studies to determine possible connections between exposure to water contaminated during the Red Hill Incident and adverse impacts to the health of impacted individuals;

(E) an identification of exposures resulting from the Red Hill Incident that may qualify individuals to be eligible for participation in the study or studies as a result of those exposures;

(F) steps that will be taken to provide individuals impacted by the Red Hill Incident with information on available resources and services; and

Determination.

(G) a final determination on whether it is feasible to conduct an epidemiological health outcomes study.

(3) NOTIFICATIONS; BRIEFINGS.—If the Secretary determines, upon completion of the feasibility assessment under paragraph (2), that an epidemiological health outcomes study is feasible and necessary, not later than one year after the completion of the feasibility assessment under paragraph (2), the Secretary shall—

(A) notify impacted individuals on the interim findings of the study or studies; and

(B) brief the appropriate congressional committees on the interim findings of the study or studies.

(c) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Armed Services and the Subcommittee on Defense of the Committee on Appropriations of the Senate;

(B) the Committee on Veterans' Affairs of the Senate;

(C) the Committee on Health, Education, Labor, and Pensions of the Senate;

(D) the Committee on Armed Services and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives;

(E) the Committee on Veterans' Affairs of the House of Representatives; and

(F) the Committee on Energy and Commerce of the House of Representatives.

(2) IMPACTED INDIVIDUAL.—The term "impacted individual" means an individual who, at the time of the Red Hill Incident, lived or worked in a building or residence served by the community water system at Joint Base Pearl Harbor-Hickam, Oahu, Hawaii.

(3) RED HILL INCIDENT.—The term "Red Hill Incident" means the release of fuel from the Red Hill Bulk Fuel Storage Facility, Oahu, Hawaii, into the sole-source basal aquifer located 100 feet below the facility, contaminating the community water system at Joint Base Pearl Harbor-Hickam on November 20, 2021.

# TITLE XI—CIVILIAN PERSONNEL

Sec. 1101. Diversity, equity, and inclusion personnel grade cap.
Sec. 1102. Authorization to pay a living quarters allowance for Department of the Navy civilian employees assigned to permanent duty in Guam for performing work, or supporting work being performed, aboard or dockside, of U.S. naval vessels.
Sec. 1103. Consolidation of direct hire authorities for candidates with specified degrees at science and technology reinvention laboratories.
Sec. 1104. Direct hire authority for certain personnel of the Department of Defense.
Sec. 1105. One-year extension of authority to waive annual limitation on premium pay and aggregate limitation on pay for Federal civilian employees working overseas.
Sec. 1106. Extension of authority to grant competitive status to employees of inspectors general for overseas contingency operations.
Sec. 1107. Extension of direct hire authority for domestic industrial base facilities and Major Range and Test Facilities Base.
Sec. 1108. Exclusion of nonappropriated fund employees from limitations on dual pay.
Sec. 1109. One-year extension of temporary authority to grant allowances, benefits, and gratuities to civilian personnel on official duty in a combat zone.
Sec. 1110. Modification to shore leave accrual for crews of vessels to support crew rotations and improve retention of civilian mariners.
Sec. 1111. Assessments of staffing in Office of the Under Secretary of Defense for Personnel and Readiness.
Sec. 1112. Military Spouse Employment Act.
Sec. 1113. Amendments to the John S. McCain Strategic Defense Fellows Program.
Sec. 1114. Including military service in determining family and medical leave eligibility for Federal employees.
Sec. 1115. Exception to limitation on number of Senior Executive Service positions for the Department of Defense.
Sec. 1116. Extension of direct hire authority for the Department of Defense for post-secondary students and recent graduates.
Sec. 1117. Authority to employ civilian faculty members at Space Force schools.
Sec. 1118. Report and sunset relating to inapplicability of certification of executive qualifications by qualification review boards of Office of Personnel Management.

137 STAT. 426          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1119. Expansion of noncompetitive appointment eligibility to spouses of Department of Defense civilians.
Sec. 1120. Elimination of Government Accountability Office review requirement relating to Department of Defense personnel authorities.

10 USC note prec. 1580.

**SEC. 1101. DIVERSITY, EQUITY, AND INCLUSION PERSONNEL GRADE CAP.**

(a) IN GENERAL.—The Secretary concerned may not appoint to, or otherwise employ in, any position with primary duties as described in subsection (b) a civilian employee paid annual pay at a rate that exceeds the equivalent of the rate payable for GS–10, not adjusted for locality.

(b) COVERED DUTIES.—The duties referred to in subsection (a) are as follows:

(1) Developing, refining, and implementing diversity, equity, and inclusion policy.

(2) Leading working groups and councils to developing diversity, equity, and inclusion goals and objectives to measure performance and outcomes.

(3) Creating and implementing diversity, equity, and inclusion education, training courses, and workshops for military and civilian personnel.

Deadline.

(c) APPLICABILITY TO CURRENT EMPLOYEES.—Any civilian employee appointed to a position with duties described in subsection (b) who is paid annual pay at a rate that exceeds the amount allowed under subsection (a) shall be reassigned to another position not later than 180 days after the date of the enactment of this Act.

10 USC note prec. 8101.

**SEC. 1102. AUTHORIZATION TO PAY A LIVING QUARTERS ALLOWANCE FOR DEPARTMENT OF THE NAVY CIVILIAN EMPLOYEES ASSIGNED TO PERMANENT DUTY IN GUAM FOR PERFORMING WORK, OR SUPPORTING WORK BEING PERFORMED, ABOARD OR DOCKSIDE, OF U.S. NAVAL VESSELS.**

(a) ALLOWANCE.—When Government owned or rented quarters are not otherwise provided without charge to a covered employee, the Secretary of the Navy may grant to a covered employee one or more of the following allowances:

(1) A living quarters allowance for rent, heat, light, fuel, gas, electricity, and water. The Secretary is authorized to pay such allowance by reimbursement or by advance payments.

(2) Under unusual circumstances, as determined by the Secretary, payment or reimbursement for extraordinary, necessary, and reasonable expenses, not otherwise compensated for, incurred in initial repairs, alterations, and improvements to the privately leased residence in Guam of a covered employee—

(A) the expenses are administratively approved in advance; and

(B) the duration and terms of the lease justify payment of the expenses by the Government.

(b) COVERED EMPLOYEE DEFINED.—In this section, the term "covered employee" means any civilian employee of the Department of the Navy who is assigned to permanent duty in Guam for performing work or supporting work being performed, aboard or dockside, of U.S. naval vessels.

**SEC. 1103. CONSOLIDATION OF DIRECT HIRE AUTHORITIES FOR CANDIDATES WITH SPECIFIED DEGREES AT SCIENCE AND TECHNOLOGY REINVENTION LABORATORIES.**

Section 4091 of title 10, United States Code, is amended—

(1) in subsection (a)(1), by striking "bachelor's degree" and inserting "bachelor's or advanced degree";

(2) in subsection (c)—

(A) in the subsection heading, by striking "CALENDAR YEAR" and inserting "FISCAL YEAR";

(B) in the matter preceding paragraph (1), by striking "calendar year" and inserting "fiscal year";

(C) in paragraph (1), by striking "6 percent" and inserting "11 percent"; and

(D) in paragraphs (1), (2), and (3), by striking "the fiscal year last ending before the start of such calendar year" and inserting "the preceding fiscal year";

(3) by striking subsection (f); and

(4) by redesignating subsection (g) as subsection (f).

**SEC. 1104. DIRECT HIRE AUTHORITY FOR CERTAIN PERSONNEL OF THE DEPARTMENT OF DEFENSE.**

Section 9905(a) of title 5, United States Code, is amended—

(1) in the matter preceding paragraph (1), by inserting ", 3307," after "3303"; and

(2) by adding at the end the following new paragraphs:

"(12) Any position in support of aircraft operations for which the Secretary determines there is a critical hiring need or shortage of candidates.

"(13) Any position in support of the safety of the public, law enforcement, or first response for which the Secretary determines there is a critical hiring need or shortage of candidates.".

**SEC. 1105. ONE-YEAR EXTENSION OF AUTHORITY TO WAIVE ANNUAL LIMITATION ON PREMIUM PAY AND AGGREGATE LIMITATION ON PAY FOR FEDERAL CIVILIAN EMPLOYEES WORKING OVERSEAS.**

Subsection (a) of section 1101 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417; 122 Stat. 4615), as most recently amended by section 1102 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended by striking "through 2023" and inserting "through 2024".

136 Stat. 2816.

**SEC. 1106. EXTENSION OF AUTHORITY TO GRANT COMPETITIVE STATUS TO EMPLOYEES OF INSPECTORS GENERAL FOR OVERSEAS CONTINGENCY OPERATIONS.**

Section 419(d)(5)(B) of title 5, United States Code, is amended by striking "2 years" and inserting "5 years".

**SEC. 1107. EXTENSION OF DIRECT HIRE AUTHORITY FOR DOMESTIC INDUSTRIAL BASE FACILITIES AND MAJOR RANGE AND TEST FACILITIES BASE.**

Section 1125(a) of the National Defense Authorization Act for Fiscal Year 2017 (10 U.S.C. 1580 note prec.; Public Law 114–328) is amended by striking "through 2025," and inserting "through 2028,".

137 STAT. 428        PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 1108. EXCLUSION OF NONAPPROPRIATED FUND EMPLOYEES FROM LIMITATIONS ON DUAL PAY.

Section 5531(2) of title 5, United States Code, is amended by striking "Government corporation and" and inserting "Government corporation, but excluding".

### SEC. 1109. ONE-YEAR EXTENSION OF TEMPORARY AUTHORITY TO GRANT ALLOWANCES, BENEFITS, AND GRATUITIES TO CIVILIAN PERSONNEL ON OFFICIAL DUTY IN A COMBAT ZONE.

Paragraph (2) of section 1603(a) of the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006 (Public Law 109–234; 120 Stat. 443), as added by section 1102 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417; 122 Stat. 4616) and as most recently amended by section 1103 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended by striking "2024" and inserting "2025".

136 Stat. 2816.

### SEC. 1110. MODIFICATION TO SHORE LEAVE ACCRUAL FOR CREWS OF VESSELS TO SUPPORT CREW ROTATIONS AND IMPROVE RETENTION OF CIVILIAN MARINERS.

Section 6305 of title 5, United States Code, is amended by adding at the end the following:

Applicability.
Time period.

"(d) With respect to an officer, crewmember, or other employee of the Department of Defense serving aboard an oceangoing vessel on an extended voyage, the first sentence in the matter preceding paragraph (1) of subsection (c) of this section shall be applied by substituting '7 calendar days' for '30 calendar days'.".

### SEC. 1111. ASSESSMENTS OF STAFFING IN OFFICE OF THE UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS.

(a) IN GENERAL.—

(1) DOD ASSESSMENT.—The Secretary of Defense shall conduct an assessment of personnel requirements in the Office of the Under Secretary of Defense for Personnel and Readiness against existing personnel of the Office. The assessment should include military, civilian, and contractor personnel. For purposes of carrying out such assessment, the head of the Office shall submit to the Secretary the alignment of total force manpower resources of the Office against core missions, tasks, and functions, including a mapping of missions to the originating statute or Department policy.

(2) OFFICE ASSESSMENT.—The head of the Office shall conduct an assessment on the tasks, functions, and associated civilian personnel the Office believes are necessary to perform the duties of the Office.

Determination.

(3) DOD ANALYSIS.—The Secretary shall determine whether there is any conflict between the assessment conducted under paragraph (1) and the assessment under paragraph (2), and what personnel actions (if any) the Secretary will take to eliminate such conflict.

(b) INTERIM BRIEFING AND REPORT.—

(1) INTERIM BRIEFING.—Not later than April 1, 2024, the Secretary of Defense shall provide to the congressional defense

committees an interim briefing on the assessments under subsection (a).

(2) FINAL REPORT.—Not later than one year after the date of the enactment of this Act, the Secretary shall submit to the congressional defense committees a report on the assessments under subsection (a). Such report shall include the following:

(A) An assessment of every military, civilian, and contractor personnel position and billet (funded and unfunded, filled and unfilled) in the Office against existing personnel requirements.

(B) The methodology and process through which such assessment was performed.

(C) Relevant statistical analysis on personnel position fill rates against validated requirements. *Analysis.*

(D) Analysis of each position, grade, and rank, and whether the position description, grade, and rank match the function and task requirements of the position. *Analysis.*

(E) Plan to update rank, grades, and position descriptions to meet current and future requirements, tasks, and functions. *Plan.*

(F) Any legislative, policy or budgetary recommendations of the Secretary related to the subject matter of the report. *Recommendations.*

(d) DEFINITIONS.—In this section—

(1) the term "civil service" has the meaning given that term in section 2101 of title 5, United States Code; and

(2) the term "Office" means the Office of the Under Secretary of Defense for Personnel and Readiness.

### SEC. 1112. MILITARY SPOUSE EMPLOYMENT ACT.

(a) APPOINTMENT OF MILITARY SPOUSES.—Section 3330d of title 5, United States Code, is amended—

(1) in subsection (a)—

(A) by redesignating paragraph (3) as paragraph (4);

(B) by inserting after paragraph (2) the following:

"(3) The term 'remote work' refers to a particular type of telework under which an employee is not expected to report to an officially established agency location on a regular and recurring basis."; and

(C) by adding at the end the following:

"(5) The term 'telework' has the meaning given the term in section 6501.";

(2) in subsection (b)—

(A) in paragraph (1), by striking "or" at the end;

(B) in paragraph (2), by striking the period at the end and inserting "; or"; and

(C) by adding at the end the following:

"(3) a spouse of a member of the Armed Forces on active duty, or a spouse of a disabled or deceased member of the Armed Forces, to a position in which the spouse will engage in remote work."; and

(3) in subsection (c)(1), by striking "subsection (a)(3)" and inserting "subsection (a)(4)".

(b) GAO STUDY AND REPORT.—

(1) DEFINITIONS.—In this subsection—

(A) the terms "agency" means an agency described in paragraph (1) or (2) of section 901(b) of title 31, United States Code;

(B) the term "employee" means an employee of an agency;

(C) the term "remote work" means a particular type of telework under which an employee is not expected to report to an officially established agency location on a regular and recurring basis; and

(D) the term "telework" means a work flexibility arrangement under which an employee performs the duties and responsibilities of such employee's position, and other authorized activities, from an approved worksite other than the location from which the employee would otherwise work.

(2) REQUIREMENT.—Not later than 18 months after the date of enactment of this Act, the Comptroller General of the United States shall conduct a study and publish a report regarding the use of remote work by agencies, which shall include a discussion of what is known regarding—

(A) the number of employees who are engaging in remote work;

(B) the role of remote work in agency recruitment and retention efforts;

(C) the geographic location of employees who engage in remote work;

(D) the effect that remote work has had on how often employees are reporting to officially established agency locations to perform the duties and responsibilities of the positions of those employees and other authorized activities; and

(E) how the use of remote work has affected Federal office space utilization and spending.

### SEC. 1113. AMENDMENTS TO THE JOHN S. MCCAIN STRATEGIC DEFENSE FELLOWS PROGRAM.

(a) SELECTION OF PARTICIPANTS.—Subsection (d)(2) of section 932 of the John S. McCain National Defense Authorization Act for Fiscal Year (Public Law 115–232; 10 U.S.C. 1580 note prec.) is amended to read as follows:

"(2) GEOGRAPHICAL REPRESENTATION.—Out of the total number of individuals selected to participate in the fellows program, which shall not exceed 60 individuals in any year, no more than 20 percent may be from any of the following geographic regions:

"(A) The Northeast United States.

"(B) The Southeast United States.

"(C) The Midwest United States.

"(D) The Southwest United States.

"(E) The Western United States.

"(F) Alaska, Hawaii, United States territories, and areas outside the United States.".

(b) APPOINTMENT AND CAREER DEVELOPMENT.—Such section is further amended—

(1) in subsection (d)(3)—

(A) by striking "assigned" and inserting "appointed"; and

(B) by striking "assignment" and inserting "appointment"; and

(2) by amending subsections (e) and (f) to read as follows:

"(e) APPOINTMENT.—

"(1) IN GENERAL.—An individual who participates in the fellows program shall be appointed into an excepted service position in the Department.

"(2) POSITION REQUIREMENTS.—Each year, the head of each Department of Defense Component shall submit to the Secretary of Defense placement opportunities for participants in the fellows program. Such placement opportunities shall provide for leadership development and potential commencement of a career track toward a position of senior leadership in the Department. The Secretary of Defense, in coordination with the heads of Department of Defense Components, shall establish qualification requirements for the appointment of participants under paragraph (1).

"(3) APPOINTMENT TO POSITIONS.—Each year, the Secretary of Defense shall appoint participants in the fellows program to positions in the Department of Defense Components. In making such appointments, the Secretary shall seek to best match the qualifications and skills of the participants with the requirements for positions available for appointment.

"(4) TERM.—The term of each appointment under the fellows program shall be one year with the option to extend the appointment up to one additional year.

"(5) GRADE.—An individual appointed to a position under the fellows program shall be appointed at a level between GS–10 and GS–12 of the General Schedule based on the directly-related qualifications, skills, and professional experience of the individual.

"(6) EDUCATION LOAN REPAYMENT.—To the extent that funds are provided in advance in appropriations Acts, the Secretary of Defense may repay a loan of a participant in the fellows program if the loan is described by subparagraph (A), (B), or (C) of section 16301(a)(1) of title 10, United States Code. Any repayment of a loan under this paragraph may require a minimum service agreement, as determined by the Secretary.

"(7) DEPARTMENT OF DEFENSE COMPONENT DEFINED.—In this subsection, the term 'Department of Defense Component' means a Department of Defense Component, as set forth in section 111 of title 10, United States Code.

"(f) CAREER DEVELOPMENT.—

"(1) IN GENERAL.—The Secretary of Defense shall ensure that participants in the fellows program—

"(A) receive career development opportunities and support appropriate for the commencement of a career track within the Department leading toward a future position of senior leadership within the Department, including ongoing mentorship support through appropriate personnel from entities within the Department; and

"(B) are provided appropriate employment opportunities for competitive and excepted service positions in the Department upon successful completion of the fellows program.

137 STAT. 432            PUBLIC LAW 118–31—DEC. 22, 2023

Web posting.

"(2) PUBLICATION OF SELECTION.—The Secretary shall publish, on an Internet website of the Department available to the public, the names of the individuals selected to participate in the fellows program.".

**SEC. 1114. INCLUDING MILITARY SERVICE IN DETERMINING FAMILY AND MEDICAL LEAVE ELIGIBILITY FOR FEDERAL EMPLOYEES.**

(a) TITLE 5.—Section 6381(1)(B) of title 5, United States Code, is amended to read as follows:

"(B) has completed at least 12 months of service—

"(i) as an employee (as that term is defined in section 2105) of the Government of the United States, including service with the United States Postal Service, the Postal Regulatory Commission, and a non-appropriated fund instrumentality as described in section 2105(c); or

"(ii) which qualifies as honorable active service in the Army, Navy, Air Force, Space Force, or Marine Corps of the United States;".

29 USC 2611 note.

(b) FMLA.—

(1) IN GENERAL.—A covered employee who has completed 12 months of service which qualifies as honorable active service in the Army, Navy, Air Force, Space Force, or Marine Corps of the United States shall be deemed to have met the service requirement in section 101(1)(A) of the Family and Medical Leave Act of 1993, notwithstanding the requirements of such section 101(1)(A).

(2) COVERED EMPLOYEE DEFINED.—In this subsection, the term "covered employee"—

(A) includes—

(i) any Federal employee eligible for family and medical leave under the Family and Medical Leave Act of 1993 based on their status as such an employee;

(ii) any Federal employee covered by the Congressional Accountability Act of 1995 eligible for family and medical leave by operation of section 202 of such Act;

(iii) any Federal employee of the Executive Office of the President eligible for family and medical leave by operation of section 412 of title 3, United States Code; and

(iv) any non-judicial employee of the District of Columbia courts and any employee of the District of Columbia Public Defender Service; and

(B) does not include any member of the Commissioned Corps of the Public Health Service or the Commissioned Corps of the National Oceanic and Atmospheric Administration,

Deadline.
38 USC 7425 note.

(c) DEPARTMENT OF VETERANS AFFAIRS.—Not later than 6 months after the date of enactment of this Act, the Secretary of Veterans Affairs shall modify the family and medical leave program provided by operation of section 7425(c) of title 38, United States Code, to conform with the requirements of the amendment made by subsection (a) with respect to military service in section 6381(1)(B)(ii) of title 5, United States Code, as added by such subsection.

**SEC. 1115. EXCEPTION TO LIMITATION ON NUMBER OF SENIOR EXECU-
TIVE SERVICE POSITIONS FOR THE DEPARTMENT OF
DEFENSE.**

Section 1109(a) of the National Defense Authorization Act for
Fiscal Year 2017 (Public Law 114–328; 130 Stat. 2449; 5 U.S.C.
3133 note) is amended by adding at the end the following new
paragraph:

"(3) EXCEPTION.—The limitation under this subsection shall
not apply to positions described in this subsection that are
fully funded through amounts appropriated to an agency other
than the Department of Defense.".

**SEC. 1116. EXTENSION OF DIRECT HIRE AUTHORITY FOR THE DEPART-
MENT OF DEFENSE FOR POST-SECONDARY STUDENTS
AND RECENT GRADUATES.**

Section 1106(d) of the National Defense Authorization Act for
Fiscal Year 2017 (10 U.S.C. 1580 note prec.) is amended by striking
"September 30, 2025" and inserting "September 30, 2030".

**SEC. 1117. AUTHORITY TO EMPLOY CIVILIAN FACULTY MEMBERS AT
SPACE FORCE SCHOOLS.**

(a) IN GENERAL.—Section 9371 of title 10, United States Code,
is amended—

(1) in the section heading, by inserting "**and Space Delta
13**" after "**Air University**"

(2) in subsection (a), by inserting "or of the Space Delta
13" after "Air University"; and

(3) in subsection (c)—

(A) in paragraphs (1), by inserting "or of the Space
Delta 13" after "Air University"; and

(B) in paragraph (2), by inserting "or of the Space
Delta 13" after "Air University".

(b) CLERICAL AMENDMENT.—The table of sections at the begin-
ning of chapter 947 of such title is amended by striking the item
relating to section 9371 and inserting the following new item:
"9371. Air University and Space Delta 13: civilian faculty members.".

10 USC
prec. 9371.

**SEC. 1118. REPORT AND SUNSET RELATING TO INAPPLICABILITY OF
CERTIFICATION OF EXECUTIVE QUALIFICATIONS BY
QUALIFICATION REVIEW BOARDS OF OFFICE OF PER-
SONNEL MANAGEMENT.**

Section 1109 of the John S. McCain National Defense
Authorization Act for Fiscal Year 2019 (5 U.S.C. 3393 note) is
amended—

(1) in subsection (d)—

(A) in paragraph (1), in the matter preceding subpara-
graph (A), by striking "paragraph (3)" and inserting "para-
graph (4)";

(B) in paragraph (2), in the matter preceding subpara-
graph (A), by striking "paragraph (3)" and inserting "para-
graph (4)";

(C) by redesignating paragraph (3) as paragraph (4);
and

(D) by inserting after paragraph (2) the following new
paragraph (3):

"(3) ADDITIONAL REPORT.—Not later than December 1,
2024, the Secretary shall submit to the committees of Congress
specified in paragraph (4) and the Comptroller General of the

Assessments.

137 STAT. 434          PUBLIC LAW 118–31—DEC. 22, 2023

United States a report on the use of the authority provided in this section. The report shall include the following:

Time period.

"(A) The number and type of appointments made under this section between August 13, 2018, and the date of the report.

Data.

"(B) Data on and an assessment of whether appointments under the authority in this section reduced the time to hire when compared with the time to hire under the review system of the Office of Personnel Management in use as of the date of the report.

"(C) An assessment of the utility of the appointment authority and process under this section.

"(D) An assessment of whether the appointments made under this section resulted in higher quality new executives for the Senior Executive Service of the Department when compared with the executives produced in the Department under the review system in use between August 13, 2013, and August 13, 2018.

Recommenda-
tions.

"(E) Any recommendation for the improvement of the selection and qualification process for the Senior Executive Service of the Department that the Secretary considers necessary in order to attract and hire highly qualified candidates for service in that Senior Executive Service."; and

(2) in subsection (e), by striking "August 13, 2023" and inserting "September 30, 2025".

**SEC. 1119. EXPANSION OF NONCOMPETITIVE APPOINTMENT ELIGI-
BILITY TO SPOUSES OF DEPARTMENT OF DEFENSE
CIVILIANS.**

(a) IN GENERAL.—Section 3330d of title 5, United States Code, is amended—

(1) in the section heading, by inserting "**and Department of Defense civilian**" after "**military**";

(2) in subsection (a), by adding at the end the following:

Definition.

"(4) The term 'spouse of an employee of the Department of Defense' means an individual who is married to an employee of the Department of Defense who is transferred in the interest of the Government from one official station within the Department to another within the Department (that is outside of normal commuting distance) for permanent duty."; and

(3) in subsection (b)—

(A) in paragraph (1), by striking "or" at the end;

(B) in paragraph (2), by striking the period at the end and inserting "; or"; and

(C) by adding at the end the following:

"(3) a spouse of an employee of the Department of Defense.".

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for subchapter I of chapter 33 of title 5, United States Code, is amended by striking the item relating to section 3330d and inserting the following:

5 USC
prec. 3301.

"3330d. Appointment of military and Department of Defense civilian spouses.".

5 USC 3330d
note.

(c) OPM LIMITATION AND REPORTS.—

(1) RELOCATING SPOUSES.—With respect to the noncompetitive appointment of a relocating spouse of an employee of the Department of Defense under paragraph (3) of section

3330d(b) of title 5, United States Code, as added by subsection (a), the Director of the Office of Personnel Management shall—

(A) monitor the number of those appointments;

(B) require the head of each agency with the authority to make those appointments under that provision to submit to the Director an annual report on those appointments, including information on the number of individuals so appointed, the types of positions filled, and the effectiveness of the authority for those appointments; and

*Requirement.*

(C) not later than 18 months after the date of enactment of this Act, submit, to the Committees on Armed Services and Homeland Security and Governmental Affairs of the Senate and the Committees on Armed Services and Oversight and Accountability of the House of Representatives, a report on the use and effectiveness of the authority described in subparagraph (B).

(2) NON-RELOCATING SPOUSES.—With respect to the noncompetitive appointment of a spouse of an employee of the Department of Defense other than a relocating spouse described in paragraph (1), the Director of the Office of Personnel Management—

(A) shall treat the spouse as a relocating spouse under paragraph (1); and

(B) may limit the number of those appointments.

(d) SUNSET.—Effective on December 31, 2028—

*5 USC 3330d note.*

(1) the authority provided by this section, and the amendments made by this section, shall expire; and

(2) the provisions of section 3330d of title 5, United States Code, amended or repealed by this section are restored or revived as if this section had not been enacted.

**SEC. 1120. ELIMINATION OF GOVERNMENT ACCOUNTABILITY OFFICE REVIEW REQUIREMENT RELATING TO DEPARTMENT OF DEFENSE PERSONNEL AUTHORITIES.**

Section 9902(h) of title 5, United States Code, is amended—

(1) in paragraph (1)(B), by striking "and the Comptroller General,";

(2) by striking paragraph (2); and

(3) by redesignating paragraph (3) as paragraph (2).

# TITLE XII—MATTERS RELATING TO FOREIGN NATIONS

Subtitle A—Assistance and Training

Sec. 1201. Modification of support of special operations for irregular warfare.
Sec. 1202. Modification of combatant commander initiative fund.
Sec. 1203. Increase in small-scale construction limit and modification of authority to build capacity.
Sec. 1204. Modifications to security cooperation workforce development program and establishment of defense security cooperation university.
Sec. 1205. Extension and modification of authority for reimbursement of certain coalition nations for support provided to United States military operations.
Sec. 1206. Extension of cross-servicing agreements for loan of personnel protection and personnel survivability equipment in coalition operations.
Sec. 1207. Modification of authority to provide support to certain governments for border security operations.
Sec. 1208. Extension of legal institutional capacity building initiative for foreign defense institutions.

137 STAT. 436     PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1209.  Report on ex gratia payments.
Sec. 1210.  Authority to provide mission training through distributed simulation.
Sec. 1211.  Requirement for military exercises.

Subtitle B—Matters Relating to Other Authorities of the Department of Defense

Sec. 1221.  Modification of authority for expenditure of funds for clandestine activi-
            ties that support operational preparation of the environment and non-
            conventional assisted recovery capabilities.
Sec. 1222.  Modification to the American, British, Canadian, and Australian armies'
            program.
Sec. 1223.  First modification of initiative to support protection of national security
            academic researchers from undue influence and other security threats.
Sec. 1224.  Second modification of initiative to support protection of national secu-
            rity academic researchers from undue influence and other security
            threats.
Sec. 1225.  Extension of authority for Department of Defense support for stabiliza-
            tion activities in national security interest of the United States.
Sec. 1226.  Modification of Defense Operational Resilience International Coopera-
            tion Pilot Program.
Sec. 1227.  Extension of prohibition on in-flight refueling to non-United States air-
            craft that engage in hostilities in the ongoing civil war in Yemen.
Sec. 1228.  Limitation on availability of funds for International Security Coopera-
            tion Program.
Sec. 1229.  Protection and legal preparedness for members of the Armed Forces
            abroad.
Sec. 1230.  Report on hostilities involving United States Armed Forces.
Sec. 1231.  Congressional notification regarding the Global Engagement Center.

Subtitle C—Matters Relating to Ukraine, Russia, and NATO

Sec. 1241.  Extension of Ukraine Security Assistance Initiative.
Sec. 1242.  Extension and modification of certain temporary authorizations related
            to munitions replacement.
Sec. 1243.  Report relating to allied and partner support to Ukraine.
Sec. 1244.  Extension of prohibition on availability of funds relating to sovereignty
            of the Russian Federation over internationally recognized territory of
            Ukraine.
Sec. 1245.  Study and report on lessons learned regarding information operations
            and deterrence.
Sec. 1246.  Prohibition on New START treaty information sharing.
Sec. 1247.  Black Sea security and development strategy.
Sec. 1248.  Revival of authority for participation of NATO naval personnel in sub-
            marine safety programs.
Sec. 1249.  Extension and modification of training for Eastern European national
            security forces in the course of multilateral exercises.
Sec. 1250.  U.S. basing, training, and exercises in North Atlantic Treaty Organiza-
            tion member countries.
Sec. 1250A. Limitation on withdrawal from the North Atlantic Treaty Organiza-
            tion.
Sec. 1250B. Oversight of programs and operations funded with amounts appro-
            priated by the United States for Ukraine.

Subtitle D—Matters Relating to Israel

Sec. 1251.  Euro-NATO Joint Jet Pilot Training Program.
Sec. 1252.  Extension of United States-Israel anti-tunnel cooperation.
Sec. 1253.  Improvements relating to United States-Israel cooperation to counter
            unmanned aerial systems.
Sec. 1254.  Modification of authority for cooperation on directed energy capabilities.
Sec. 1255.  Ensuring peace through strength in Israel.
Sec. 1256.  Assistance to Israel for aerial refueling.
Sec. 1257.  Rules governing transfer of aerial refueling tankers to Israel.
Sec. 1258.  Report.

Subtitle E—Matters Relating to Syria, Iraq, Iran, and Afghanistan

Sec. 1261.  Middle East integrated maritime domain awareness and interdiction ca-
            pability.
Sec. 1262.  Modification of establishment of coordinator for detained ISIS members
            and relevant populations in Syria.
Sec. 1263.  Extension and modification of authority to provide assistance to counter
            the Islamic State of Iraq and Syria.
Sec. 1264.  Extension and modification of authority to provide assistance to vetted
            Syrian groups and individuals.

Sec. 1265. Extension of authority to support operations and activities of the Office of Security Cooperation in Iraq.
Sec. 1266. Plan of action to equip and train Iraqi security forces and Kurdish Peshmerga forces.
Sec. 1267. Prohibition on transfers to the Badr Organization.
Sec. 1268. Extension and modification of annual report on military power of Iran.
Sec. 1269. Modification and update to report on military capabilities of Iran and related activities.
Sec. 1270. Prohibition on funds to Iran.
Sec. 1271. Prohibition on transporting currency to the Taliban and the Islamic Emirate of Afghanistan.
Sec. 1272. Prohibition on funding for the Taliban.

# Subtitle A—Assistance and Training

### SEC. 1201. MODIFICATION OF SUPPORT OF SPECIAL OPERATIONS FOR IRREGULAR WARFARE.

(a) IN GENERAL.—Chapter 3 of title 10, United States Code, is amended by inserting after section 127c the following:

### "§ 127d. Support of special operations for irregular warfare

10 USC 127d.

"(a) AUTHORITY.—The Secretary of Defense may, with the concurrence of the relevant Chief of Mission, expend up to $20,000,000 during any fiscal year to provide support to foreign forces, irregular forces, groups, or individuals engaged in supporting or facilitating ongoing and authorized irregular warfare operations by United States Special Operations Forces.

"(b) FUNDS.—Funds for support under this section in a fiscal year shall be derived from amounts authorized to be appropriated for that fiscal year for the Department of Defense for operation and maintenance.

"(c) PROCEDURES.—

"(1) IN GENERAL.—The authority in this section shall be exercised in accordance with such procedures as the Secretary shall establish for purposes of this section.

"(2) ELEMENTS.—The procedures required under paragraph (1) shall establish, at a minimum, the following:

"(A) Policy guidance for the execution of, and constraints within, activities under the authority in this section.

"(B) The processes through which activities under the authority in this section are to be developed, validated, and coordinated, as appropriate, with relevant entities of the United States Government.

"(C) The processes through which legal reviews and determinations are made to comply with the authority in this section and ensure that the exercise of such authority is consistent with the national security of the United States.

"(D) The processes to ensure, to the extent practicable, that before a decision to provide support is made, the recipients of support do not pose a counterintelligence or force protection threat and have not engaged in gross violations of human rights.

"(E) The processes by which the Department shall keep the congressional defense committees fully and currently informed of—

"(i) the requirements for the use of the authority in this section; and

"(ii) activities conducted under such authority.

"(3) NOTICE TO CONGRESS ON PROCEDURES AND MATERIAL MODIFICATIONS.—The Secretary shall notify the congressional defense committees of the procedures established pursuant to this section before any exercise of the authority in this section, and shall notify such committee of any material modification of the procedures.

"(d) CONSTRUCTION OF AUTHORITY.—Nothing in this section shall be construed to constitute a specific statutory authorization for any of the following:

"(1) The conduct of a covert action, as such term is defined in section 503(e) of the National Security Act of 1947 (50 U.S.C. 3093(e)).

"(2) The introduction of United States Armed Forces (including as such term is defined in section 8(c) of the War Powers Resolution ( 50 U.S.C. 1547(c))) into hostilities or into situations wherein hostilities are clearly indicated by the circumstances.

"(3) The provision of support to regular forces, irregular forces, groups, or individuals for the conduct of operations that United States Special Operations Forces are not otherwise legally authorized to conduct themselves.

"(4) The conduct or support of activities, directly or indirectly, that are inconsistent with the laws of armed conflict.

"(e) LIMITATION ON DELEGATION.—The authority of the Secretary to make funds available under this section for support of a military operation may not be delegated.

"(f) PROGRAMMATIC AND POLICY OVERSIGHT.—The Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict shall have primary programmatic and policy oversight within the Office of the Secretary of Defense of support to irregular warfare activities authorized by this section.

"(g) NOTIFICATION.—

Deadline.

"(1) IN GENERAL.—Not later than 15 days before exercising the authority in this section to make funds available to initiate support of an ongoing and authorized operation or changing the scope or funding level of any support under this section for such an operation by $500,000 or an amount equal to 10 percent of such funding level (whichever is less), the Secretary shall notify the congressional defense committees of the use of such authority with respect to such operation. Any such notification shall be in writing.

"(2) ELEMENTS.—A notification required by this subsection shall include the following:

"(A) The type of support to be provided to United States Special Operations Forces, and a description of the ongoing and authorized operation to be supported.

"(B) A description of the foreign forces, irregular forces, groups, or individuals engaged in supporting or facilitating the ongoing and authorized operation that is to be the recipient of funds.

"(C) The type of support to be provided to the recipient of the funds, and a description of the end-use monitoring to be used in connection with the use of the funds.

"(D) The amount obligated under the authority to provide support.

PUBLIC LAW 118–31—DEC. 22, 2023         137 STAT. 439

"(E) The duration for which the support is expected to be provided, and an identification of the timeframe in which the provision of support will be reviewed by the commander of the applicable combatant command for a determination with respect to the necessity of continuing such support.

"(F) The determination of the Secretary that the provision of support does not constitute any of the following:

Determination.

"(i) An introduction of United States Armed Forces (including as such term is defined in section 8(c) of the War Powers Resolution (50 U.S.C. 1547(c))) into hostilities, or into situations where hostilities are clearly indicated by the circumstances, without specific statutory authorization within the meaning of section 5(b) of such Resolution (50 U.S.C. 1544(b)).

"(ii) A covert action, as such term is defined in section 503(e) of the National Security Act of 1947 (50 U.S.C. 3093(e)).

"(iii) An authorization for the provision of support to regular forces, irregular forces, groups, or individuals for the conduct of operations that United States Special Operations Forces are not otherwise legally authorized to conduct themselves.

"(iv) The conduct or support of activities, directly or indirectly, that are inconsistent with the laws of armed conflict.

"(h) NOTIFICATION OF SUSPENSION OR TERMINATION OF SUPPORT.—

"(1) IN GENERAL.—Not later than 48 hours after suspending or terminating support to any foreign force, irregular force, group, or individual provided pursuant to the authority in this section, the Secretary shall submit to the congressional defense committees a written notice of such suspension or termination.

Deadline.

"(2) ELEMENTS.—The written notice required by paragraph (1) shall include each of the following:

"(A) A description of the reasons for the suspension or termination of such support.

"(B) A description of any effect on regional, theater, or global campaign plan objectives anticipated to result from such suspension or termination.

"(C) A plan for such suspension or termination, and, in the case of support that is planned to be transitioned to any other program of the Department of Defense or to a program of any other Federal department or agency, a detailed description of the transition plan, including the resources, equipment, capabilities, and personnel associated with such plan.

Plan.

"(i) BIANNUAL REPORTS.—

"(1) REPORT ON PRECEDING FISCAL YEAR.—Not later than 120 days after the close of each fiscal year in which subsection (a) is in effect, the Secretary shall submit to the congressional defense committees a report on the support provided under this section during the preceding fiscal year.

"(2) REPORT ON CURRENT CALENDAR YEAR.— Not later than 180 days after the submittal of each report required by paragraph (1), the Secretary shall submit to the congressional

defense committees a report on the support provided under this section during the first half of the fiscal year in which the report under this paragraph is submitted.

Summary.

"(3) ELEMENTS.—Each report required by this subsection shall include the following:

"(A) A summary of the ongoing irregular warfare operations, and associated authorized campaign plans, being conducted by United States Special Operations Forces that were supported or facilitated by foreign forces, irregular forces, groups, or individuals for which support was provided under this section during the period covered by such report.

"(B) A description of the support or facilitation provided by such foreign forces, irregular forces, groups, or individuals to United States Special Operations Forces during such period.

"(C) The type of recipients that were provided support under this section during such period, identified by authorized category (foreign forces, irregular forces, groups, or individuals).

"(D) A detailed description of the support provided to the recipients under this section during such period.

"(E) The total amount obligated for support under this section during such period, including budget details.

"(F) The intended duration of support provided under this section during such period.

Assessment.

"(G) An assessment of value of the support provided under this section during such period, including a summary of significant activities undertaken by foreign forces, irregular forces, groups, or individuals to support irregular warfare operations by United States Special Operations Forces.

"(H) The total amount obligated for support under this section in prior fiscal years.

"(j) QUARTERLY BRIEFINGS.—

"(1) IN GENERAL.—Not less frequently than quarterly, the Secretary shall provide to the congressional defense committees a briefing on the use of the authority provided by this section, and other matters relating to irregular warfare, with the primary purposes of—

"(A) keeping the congressional defense committees fully and currently informed of irregular warfare requirements and activities, including emerging combatant commands requirements; and

"(B) consulting with the congressional defense committees regarding such matters.

Overview.

"(2) ELEMENTS.—Each briefing required by paragraph (1) shall include the following:

Update.

"(A) An update on irregular warfare activities within each geographic combatant command and a description of the manner in which such activities support the respective theater campaign plan and the National Defense Strategy.

"(B) An overview of relevant authorities and legal issues, including limitations.

"(C) An overview of irregular warfare-related interagency activities and initiatives.

"(D) A description of emerging combatant command requirements for the use of the authority provided by this section.

"(k) IRREGULAR WARFARE DEFINED.—Subject to subsection (d), in this section, the term 'irregular warfare' means Department of Defense activities not involving armed conflict that support predetermined United States policy and military objectives conducted by, with, and through regular forces, irregular forces, groups, and individuals.".

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of such chapter is amended by inserting after the item relating to section 127c the following new item:

10 USC 121 prec.

"127d. Support of special operations for irregular warfare.".

(c) REPEAL.—Section 1202 of the National Defense Authorization Act for Fiscal Year 2018 is repealed.

131 Stat. 1639.

## SEC. 1202. MODIFICATION OF COMBATANT COMMANDER INITIATIVE FUND.

(a) IN GENERAL.—Section 166a of title 10, United States Code, is amended—

(1) in subsection (b), by adding at the end the following:

"(11) Incremental expenses (as such term is defined in section 301(5) of this title) related to security cooperation programs and activities of the Department of Defense (as such term is defined in section 301(7) of this title)."; and

(2) in subsection (c)—

(A) in paragraph (2), by striking "and" at the end;

(B) in paragraph (3), by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following:

"(4) incremental expenses related to security cooperation programs and activities of the Department of Defense, as authorized by subsection (b)(11), for United States Africa Command and United States Southern Command.".

(b) AUTHORIZATION OF APPROPRIATIONS.—Funds are authorized to be appropriated to the Combatant Commander Initiative Fund for fiscal year 2024, as specified in section 4301 of this Act, to carry out the activities authorized by paragraphs (7), (8), and (11) (as added by subsection (a)(1)) of section 166a(b) of title 10, United States Code, for United States Africa Command and United States Southern Command.

## SEC. 1203. INCREASE IN SMALL-SCALE CONSTRUCTION LIMIT AND MODIFICATION OF AUTHORITY TO BUILD CAPACITY.

(a) DEFINITION OF SMALL-SCALE CONSTRUCTION.—Section 301(8) of title 10, United States Code, is amended by striking "$1,500,000" and inserting "$2,000,000".

(b) EQUIPMENT DISPOSITION.—Section 333 of title 10, United States Code, is amended by adding at the end the following:

"(h) EQUIPMENT DISPOSITION; NOTICE AND WAIT.—

"(1) The Secretary of Defense may treat as stocks of the Department of Defense—

"(A) equipment procured to carry out a program pursuant to subsection (a) that has not yet been transferred to a foreign country and is no longer needed to support such program or any other program carried out pursuant to such subsection; and

137 STAT. 442          PUBLIC LAW 118–31—DEC. 22, 2023

Deadline.

"(B) equipment that has been transferred to a foreign country to carry out a program pursuant to subsection (a) and is returned by the foreign country to the United States.

"(2) NOTICE AND WAIT.—Not later than 15 days before initiating activities under a program under subsection (a), the Secretary of Defense shall submit to the appropriate committees of Congress a written and electronic notice of the following:

"(A) The foreign country, and specific unit, whose capacity was intended to be built under the program, and the amount, type, and purpose of the equipment that was to be provided.

"(B) An explanation why the equipment is no longer needed to support such program or another program carried out pursuant to such subsection.".

(c) INTERNATIONAL AGREEMENTS.—Such section is further amended by adding at the end the following:

"(i) INTERNATIONAL AGREEMENTS.—

"(1) IN GENERAL.—The Secretary of Defense, with the concurrence of the Secretary of State, may—

"(A) allow a foreign country to provide sole-source direction for assistance in support of a program carried out pursuant to subsection (a); and

"(B) enter into an agreement with a foreign country to provide such sole-source direction.

Deadline.

"(2) NOTIFICATION.—Not later than 72 hours after the Secretary of Defense enters into an agreement under paragraph (1), the Secretary shall submit to the congressional defense committees a written notification that includes the following:

"(A) A description of the parameters of the agreement, including types of support, objectives, and duration of support and cooperation under the agreement.

"(B) A description and justification of any anticipated use of sole-source direction pursuant to such agreement.

Assessment.

"(C) An assessment of the extent to which the equipment to be provided under the agreement—

"(i) responds to the needs of the foreign country; and

"(ii) can be sustained by the foreign country.

Determination.

"(D) A determination as to whether the anticipated costs to be incurred under the agreement are fair and reasonable.

Certification.

"(E) A certification that the agreement is in the national security interests of the United States.

"(F) Any other matter relating to the agreement, as determined by the Secretary of Defense.".

**SEC. 1204. MODIFICATIONS TO SECURITY COOPERATION WORKFORCE DEVELOPMENT PROGRAM AND ESTABLISHMENT OF DEFENSE SECURITY COOPERATION UNIVERSITY.**

(a) MODIFICATIONS TO PROGRAM.—Section 384 of title 10, United States Code, is amended—

(1) by amending subsection (c) to read as follows:

"(c) ELEMENTS.—The Program shall consist of elements relating to the development and management of the security cooperation workforce for the purposes specified in subsection (b), including the following elements on training, certification, assignment, career

development, and tracking of personnel of the security cooperation workforce:

"(1) Establishment of a comprehensive system to track and account for all Department of Defense personnel in the security cooperation workforce, using systems of record in the military departments, the Office of the Secretary of Defense, the combatant commands, Defense Agencies, Department of Defense Field Activities, and the National Guard.

"(2) Establishment of a management information system, pursuant to regulations prescribed by the Secretary of Defense, acting through the Under Secretary of Defense for Policy and the Director of the Defense Security Cooperation Agency, to ensure that all organizations and elements of the Department provide standardized information and data to the Secretary on persons serving in security cooperation positions. Such management information system shall, at a minimum, provide for the collection and retention of information concerning the qualification, assignments, and tenure of persons in the security cooperation workforce.

"(3) Implementation and management of the security cooperation human capital initiative under subsection (e).

"(4) Establishment of a defense security cooperation service, pursuant to regulations prescribed by the Secretary of Defense, acting through the Under Secretary of Defense for Policy and the Director of the Defense Security Cooperation Agency, to ensure that security cooperation organizations of the United States located at overseas missions possess the requisite personnel, and that such personnel possess the skills needed, to properly perform their missions, which shall include—

"(A) members of the armed forces and civilians assigned to security cooperation organizations of United States missions overseas who are performing security cooperation functions, regardless of funding source; and

"(B) personnel of the Department of Defense performing functions in furtherance of section 515 of the Foreign Assistance Act of 1961 (22 U.S.C. 2321i).

"(5) Such other elements as the Secretary of Defense determines appropriate.";

(2) by amending subsection (d) to read as follows:

"(d) MANAGEMENT.—

"(1) IN GENERAL.—The Program shall be managed by the Director of the Defense Security Cooperation Agency.

"(2) MANAGING ENTITY.—

"(A) DESIGNATION.—The Secretary of Defense, acting through the Under Secretary of Defense for Policy and the Director of the Defense Security Cooperation Agency, shall designate the Defense Security Cooperation University to serve as the lead entity for managing the implementation of the Program.

"(B) DUTIES.—The Defense Security Cooperation University shall carry out the management and implementation of the Program, consistent with objectives formulated by the Secretary of Defense, which shall include the following:

"(i) Providing for comprehensive tracking of and accounting for all Department of Defense employees engaged in the security cooperation enterprise.

137 STAT. 444          PUBLIC LAW 118–31—DEC. 22, 2023

"(ii) Providing training requirements specified at the requisite proficiency levels for each position.

Determination.

"(C) REPORTING.—The Secretary of Defense shall ensure that, not less frequently than semi-annually, each military department, the Office of the Secretary of Defense, and each combatant command, Defense Agency, Department of Defense Field Activity, and unit of the National Guard submits to the Defense Security Cooperation University a formal manpower document as determined by the Director of the Defense Security Cooperation Agency that—

List.

"(i) lists each position in the security cooperation workforce of the organization concerned as determined by the Director of the Defense Security Cooperation Agency; and

"(ii) uniquely codes every position within component manpower systems for the security cooperation workforce for the management and career development of the security cooperation workforce, as determined by the Director of the Defense Security Cooperation Agency.

Regulations.

"(3) SECURITY COOPERATION WORKFORCE MANAGEMENT INFORMATION SYSTEM.—The Secretary of Defense, acting through the Director of the Defense Security Cooperation Agency, shall prescribe regulations to ensure that each military department, the Office of the Secretary of Defense, and each combatant command, Defense Agency, Department of Defense Field Activity, and unit of the National Guard provides standardized information and data to the Secretary on persons serving in positions within the security cooperation workforce.";

(3) by amending subsection (e) to read as follows:

"(e) SECURITY COOPERATION HUMAN CAPITAL INITIATIVE.—

"(1) IN GENERAL.—The Secretary shall implement a security cooperation human capital initiative within the Defense Security Cooperation University to identify, account for, and manage the career progression of personnel in the security cooperation workforce.

"(2) ELEMENTS.—The security cooperation human capital initiative shall do the following:

"(A) Provide direction to the Department of Defense on the establishment of professional career paths for the personnel of the security cooperation workforce, addressing training and education standards, promotion opportunities and requirements, retention policies, and scope of workforce demands.

"(B) Provide for a mechanism to identify and define training and certification requirements for security cooperation positions in the Department and a means to track workforce skills and certifications.

"(C) Provide for a mechanism to establish a program of professional certification in Department of Defense security cooperation for personnel of the security cooperation workforce in different career tracks and levels of competency based on requisite training and experience.

Requirements.

"(D) Establish requirements for training and professional development associated with each level of certification provided for under subparagraph (C).

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 445

"(E) Provide for a mechanism for assigning appropriately certified personnel of the security cooperation workforce to assignments associated with key positions in connection with security cooperation programs and activities.

"(F) Identify the appropriate composition of career and temporary personnel necessary to constitute the security cooperation workforce.

"(G) Identify specific positions throughout the security cooperation workforce to be managed and assigned through the Program.

"(H) Identify career paths that provide a competency-based road map for security cooperation employees to aid in their career planning and professional development.

"(I) Develop a competency-based approach to the security cooperation workforce that enables components of the Department of Defense to incorporate competencies in recruitment and retention tools such as job analysis, position descriptions, vacancy announcements, selection assessment questionnaires, and employee training and development plans.

"(J) Align with the Department of Defense and Defense Security Cooperation Agency strategic planning, budget process, performance management goals, and metrics to ensure the appropriate workforce mix and skill sets to accomplish the security cooperation mission.

"(K) Include assessment measures intended to assess progress in implementing the security cooperation workforce using results-oriented performance measures.";

Assessment.

(4) in subsection (h)(6), by striking "guidance issued under subsection (e)" and inserting "security cooperation human capital initiative under subsection (e)";

(5) by redesignating subsections (f) through (h) (as amended) as subsections (h) through (j), respectively;

(6) by inserting after subsection (e) the following new subsections:

"(f) FOREIGN MILITARY SALES CENTER OF EXCELLENCE.—

"(1) ESTABLISHMENT.—The Secretary of Defense shall direct an educational institution of the Department of Defense with the requisite expertise in foreign military sales and in education, training, research, and analysis of the security cooperation workforce within the Department of Defense to serve as a Foreign Military Sales Center of Excellence to improve the training and education of personnel engaged in foreign military sales planning and execution.

"(2) OBJECTIVES.—The objectives of the Foreign Military Sales Center of Excellence shall include—

"(A) conducting research on and promoting best practices for ensuring that foreign military sales are timely and effective; and

"(B) enhancing existing curricula for the purpose of ensuring that the foreign military sales workforce is fully trained and prepared to execute the foreign military sales program.

"(g) DEFENSE SECURITY COOPERATION UNIVERSITY.—

"(1) CHARTER.—The Secretary of Defense shall develop and promulgate a charter for the operation of the Defense Security Cooperation University.

"(2) MISSION.—The charter required by paragraph (1) shall set forth the mission, and associated structures and organizations, of the Defense Security Cooperation University, which shall include—

"(A) management and implementation of international military training and education security cooperation programs and authorities executed by the Department of Defense;

"(B) management and provision of institutional capacity-building services executed by the Department of Defense; and

"(C) advancement of the profession of security cooperation through research, data collection, analysis, publication, and learning.

"(3) COOPERATIVE RESEARCH AND DEVELOPMENT ARRANGEMENTS.—

"(A) IN GENERAL.—In engaging in research and development projects pursuant to subsection (a) of section 4001 of this title by a contract, cooperative agreement, or grant pursuant to subsection (b)(1) of such section, the Secretary of Defense may enter into such contract or cooperative agreement, or award such grant, through the Defense Security Cooperation University.

"(B) TREATMENT AS GOVERNMENT-OPERATED FEDERAL LABORATORY.—The Defense Security Cooperation University shall be considered a Government-operated Federal laboratory for purposes of section 12 of the Stevenson-Wydler Technology Innovation Act of 1980 (15 U.S.C. 3710a).

"(4) ACCEPTANCE OF RESEARCH GRANTS.—

"(A) IN GENERAL.—The Secretary of Defense, through the Under Secretary of Defense for Policy, may authorize the President of the Defense Security Cooperation University to accept qualifying research grants. Any such grant may only be accepted if the work under the grant is to be carried out by a professor or instructor of the Defense Security Cooperation University for a scientific, literary, or educational purpose.

"(B) QUALIFYING GRANTS.—A qualifying research grant under this paragraph is a grant that is awarded on a competitive basis by an entity described in subparagraph (C) for a research project with a scientific, literary, or educational purpose.

"(C) ENTITIES FROM WHICH GRANTS MAY BE ACCEPTED.—A grant may be accepted under this paragraph only from a corporation, fund, foundation, educational institution, or similar entity that is organized and operated primarily for scientific, literary, or educational purposes.

"(D) ADMINISTRATION OF GRANT FUNDS.—The Director of the Defense Security Cooperation Agency shall establish an account for administering funds received as research grants under this section. The President of the Defense Security Cooperation University shall use the funds in the account in accordance with applicable provisions of

the regulations and the terms and condition of the grants received.

"(E) RELATED EXPENSES.—Subject to such limitations as may be provided in appropriations Acts, appropriations available for the Defense Security Cooperation University may be used to pay expenses incurred by the Defense Security Cooperation University in applying for, and otherwise pursuing, the award of qualifying research grants.

"(F) REGULATIONS.—The Secretary of Defense, through the Under Secretary of Defense for Policy, shall prescribe regulations for the administration of this subsection."; and

(7) by adding at the end the following new subsections:

"(k) REPORT ON SECURITY COOPERATION WORKFORCE.—

"(1) IN GENERAL.—Not later than 2 years after the date of the enactment of this subsection, and not less frequently than once every 2 years thereafter, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the Department of Defense security cooperation workforce.

"(2) ELEMENTS.—Each report under paragraph (1) shall—

"(A) identify current and projected security cooperation workforce manpower requirements, including expeditionary requirements within the context of total force planning, needed to meet the security cooperation mission;

"(B) identify critical skill gaps (such as recruitment in the existing or projected workforce) and development of strategies to manage the security cooperation workforce to address those gaps;

"(C) address development, validation, implementation, and assessment of security cooperation workforce and Department-wide competencies for security cooperation and associated occupational series using the Department taxonomy;

"(D) produce a comparison between competency proficiency levels against target proficiency levels at enterprise and individual levels to identify competency gaps and gap closure strategies, for competencies needed at the time of the report and in the future;

"(E) identify any exceptions and waivers granted with respect to the application of qualification, assignment, and tenure policies, procedures, and practices to persons, billets or positions;

"(F) indicate relative promotion rates for security cooperation workforce personnel;

"(G) identify the funds requested or allocated for the Department of Defense security cooperation workforce and address whether such funds are sufficient to—

"(i) address the critical skill gaps identified pursuant to subparagraph (B); and

"(ii) provide incentives to recruit and retain high-quality personnel in the security cooperation workforce; and

"(H) include any other matters the Secretary of Defense determines appropriate.

"(l) COMPTROLLER GENERAL EVALUATION.—

"(1) IN GENERAL.—The Comptroller General of the United States shall conduct an independent evaluation of the actions

137 STAT. 448          PUBLIC LAW 118–31—DEC. 22, 2023

taken by the Secretary of Defense to carry out the requirements of this section.

"(2) REPORT.—Not later than 2 years after the date of the enactment of this subsection, the Comptroller General shall submit to the Committees on Armed Services of the Senate and House of Representatives a report on the evaluation conducted under paragraph (1). Such report shall include—

Analysis.

"(A) an analysis of the effectiveness of the actions taken by the Secretary to carry out the requirements of this section; and

Recommendations.

"(B) such legislative and administrative recommendations as the Comptroller General considers appropriate to meet the objectives of this section.".

(b) MODIFICATION TO SUNSET.—Section 1250(b)(1) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 130 Stat. 2529) is amended by striking "2026" and inserting "2025".

SEC. 1205. EXTENSION AND MODIFICATION OF AUTHORITY FOR REIMBURSEMENT OF CERTAIN COALITION NATIONS FOR SUPPORT PROVIDED TO UNITED STATES MILITARY OPERATIONS.

(a) EXTENSION.—Subsection (a) of section 1233 of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181; 122 Stat. 393) is amended by striking "beginning on October 1, 2022, and ending on December 31, 2023" and inserting "beginning on October 1, 2023, and ending on December 31, 2024".

(b) MODIFICATION TO LIMITATION.—Subsection (d)(1) of such section is amended—

(1) by striking "beginning on October 1, 2022, and ending on December 31, 2023" and inserting "beginning on October 1, 2023, and ending on December 31, 2024"; and

(2) by striking "$30,000,000" and inserting "$15,000,000".

SEC. 1206. EXTENSION OF CROSS-SERVICING AGREEMENTS FOR LOAN OF PERSONNEL PROTECTION AND PERSONNEL SURVIVABILITY EQUIPMENT IN COALITION OPERATIONS.

Section 1207(f) of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291; 10 U.S.C. 2342 note) is amended by striking "December 31, 2024" and inserting "December 31, 2029".

SEC. 1207. MODIFICATION OF AUTHORITY TO PROVIDE SUPPORT TO CERTAIN GOVERNMENTS FOR BORDER SECURITY OPERATIONS.

Section 1226(a)(1) of the National Defense Authorization Act for Fiscal Year 2016 (22 U.S.C. 2151 note) is amended by adding at the end the following:

"(G) To the Government of Tajikistan for purposes of supporting and enhancing efforts of the armed forces of Tajikistan to increase security and sustain increased security along the border of Tajikistan and Afghanistan.

"(H) To the Government of Uzbekistan for purposes of supporting and enhancing efforts of the armed forces of Uzbekistan to increase security and sustain increased security along the border of Uzbekistan and Afghanistan.

"(I) To the Government of Turkmenistan for purposes of supporting and enhancing efforts of the armed forces

of Turkmenistan to increase security and sustain increased security along the border of Turkmenistan and Afghanistan.".

### SEC. 1208. EXTENSION OF LEGAL INSTITUTIONAL CAPACITY BUILDING INITIATIVE FOR FOREIGN DEFENSE INSTITUTIONS.

Section 1210(e) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1626) is amended by striking "December 31, 2024" and inserting "December 31, 2028".

*10 USC 332 note.*

### SEC. 1209. REPORT ON EX GRATIA PAYMENTS.

Section 1213(h) of the National Defense Authorization Act for Fiscal Year 2020 (10 U.S.C. 2731 note) is amended—

(1) in the matter preceding paragraph (1)(A), by striking "in this subsection" and inserting "in this section"; and

(2) by amending paragraph (2) to read as follows:

"(2) The status of all other pending or denied ex gratia payments or requests, including—

"(A) when any such request was made;

"(B) what steps the Department is taking to respond to the request;

"(C) whether the Department denied any requests for any such payment, along with the reason for such denial;

"(D) whether any such payment was refused, along with the reason for such refusal, if known; or

"(E) any other reason for which a payment was not offered or made.".

### SEC. 1210. AUTHORITY TO PROVIDE MISSION TRAINING THROUGH DISTRIBUTED SIMULATION.

*10 USC 346 note.*

(a) AUTHORITY FOR TRAINING AND DISTRIBUTION.—To enhance the interoperability and integration between the United States Armed Forces and the military forces of friendly foreign countries, effective beginning on the date that is 30 days after the date on which the Secretary of Defense submits the report required by subsection (d), the Secretary of Defense, with the concurrence of the Secretary of State, is authorized—

*Effective date.*

(1) to provide to military personnel of a friendly foreign country persistent advanced networked training and exercise activities (in this section referred to as "mission training through distributed simulation"); and

(2) to provide information technology related to mission training through distributed simulation, including hardware and computer software developed for such activities.

(b) SCOPE OF MISSION TRAINING.—Mission training through distributed simulation provided under subsection (a) may include advanced distributed network training events and computer-assisted exercises.

(c) GUIDANCE ON USE OF AUTHORITY.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall develop and issue guidance on the procedures for the use of the authority provided in this section.

*Deadline.*

(d) REPORT.—

(1) IN GENERAL.—The Secretary of Defense shall submit to the appropriate committees of Congress a report on the anticipated use of mission training through distributed simulation by military personnel of friendly foreign countries.

(2) ELEMENTS.—The report required by paragraph (1) shall include the following:

(A) A description of anticipated mission training through distributed simulation activities between the United States Armed Forces and the military forces of friendly foreign countries.

(B) A description of the current capabilities of the military forces of friendly foreign countries to support mission training through distributed simulation activities with the United States Armed Forces.

(C) A description of the manner in which the Department intends to use mission training through distributed simulation activities to support implementation of the National Defense Strategy, including in areas of responsibility of the United States European Command and the United States Indo-Pacific Command.

Recommendation.

(D) Any recommendation of the Secretary of Defense for legislative proposals or policy guidance regarding the use of mission training through distributed simulation activities.

(3) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term "appropriate committees of Congress" means—

(A) the Committee on Armed Services, the Committee on Appropriations, and the Committee on Foreign Relations of the Senate; and

(B) the Committee on Armed Services, the Committee on Appropriations, and the Committee on Foreign Affairs of the House of Representatives.

(e) SUNSET.—The authority provided in this section shall terminate on December 31, 2025.

### SEC. 1211. REQUIREMENT FOR MILITARY EXERCISES.

Effective date.

(a) EXERCISES REQUIRED.—Beginning on January 1 of the year which begins after the date of the enactment of this Act, the Secretary of Defense shall require the United States Central Command or other relevant commands, units, or organizations of the United States Armed Forces, as the Secretary deems appropriate, to conduct military exercises that—

Time period.
Israel.

(1) occur not fewer than two times in a calendar year;

(2) shall include invitations for the armed forces of Israel, provided that the Government of Israel consents to the participation of its forces in such exercises;

(3) may include invitations for the armed forces of other allies and partners of the United States to take part in the exercises;

(4) seek to enhance the interoperability and effectiveness of the United States Armed Forces, the armed forces of Israel, and the armed forces of other allies and partners of the United States in coalition operations; and

(5) shall include, at a minimum, the following activities—

(A) practicing or simulating large-scale and long-range strike missions;

(B) practicing the aerial refueling of combat aircraft of the armed forces of Israel by United States aerial refueling aircraft; and

(C) practicing the provision by the United States Armed Forces of other enabling capabilities to the armed forces of Israel, including—

(i) logistics support;

(ii) intelligence, surveillance, and reconnaissance; and

(iii) air defense.

(b) CERTIFICATION.—Not later than December 31 of the calendar year specified in subsection (a), the Secretary of Defense shall— *Deadline.*

(1) submit to the congressional defense committees a certification that the requirements of this section have been met by December 31 of such calendar year; or

(2) if the requirements of this section are not met by December 31 of such calendar year, provide, in writing, the reasons the requirements of this section were not met.

(c) SUNSET.—The requirements in subsection (a) shall terminate on December 31 of the calendar year specified in subsection (a).

(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services of the House of Representatives; and

(2) the Committee on Armed Services of the Senate.

# Subtitle B—Matters Relating to Other Authorities of the Department of Defense

### SEC. 1221. MODIFICATION OF AUTHORITY FOR EXPENDITURE OF FUNDS FOR CLANDESTINE ACTIVITIES THAT SUPPORT OPERATIONAL PREPARATION OF THE ENVIRONMENT AND NON-CONVENTIONAL ASSISTED RECOVERY CAPABILITIES.

(a) IN GENERAL.—Section 127f of title 10, United States Code, is amended—

(1) in the section heading, by adding at the end the following: "**and non-conventional assisted recovery capabilities**";

(2) in subsection (a)—

(A) by striking the first sentence and inserting the following: "(1) Amounts appropriated or otherwise made available for the Department of Defense for operation and maintenance, Defense-wide, may be used for any purpose the Secretary of Defense determines to be proper—

"(A) for operational preparation of the environment for operations of a confidential nature; or

"(B) to establish, develop, and maintain non-conventional assisted recovery capabilities to facilitate the recovery of United States military and civilian personnel, or other individuals, who become isolated or separated."; and

(B) by striking "Such a determination" and inserting the following:

"(2) Such a determination";

(3) by striking subsection (b) and inserting the following:

"(b) AUTHORIZED ACTIVITIES.—Activities authorized by subsection (a) may, in limited and special circumstances as determined

137 STAT. 452          PUBLIC LAW 118–31—DEC. 22, 2023

by the Secretary of Defense, include the provision of support to foreign forces, irregular forces, groups, or individuals to conduct operational preparation of the environment and to conduct or support operations to establish, develop, and maintain non-conventional assisted recovery capabilities to facilitate the recovery of United States military and civilian personnel, or other individuals, who become isolated or separated. Such support may include limited amounts of equipment, supplies, training, transportation, or other logistical support or funding.".

(4) by redesignating subsections (c), (d), (e), (f), and (g) as subsections (d), (e), (f), (g), and (h), respectively;

(5) by inserting after subsection (b), as amended, the following:

"(c) PROCEDURES.—

"(1) IN GENERAL.—The authority in this section shall be exercised in accordance with such procedures as the Secretary of Defense shall establish for purposes of this section.

"(2) ELEMENTS.—The procedures required under paragraph (1) shall establish, at a minimum, each of the following:

"(A) Policy, strategy, or other guidance for the execution of, and constraints within, activities conducted under this section.

"(B) The processes through which activities conducted under this section are to be developed, validated, and coordinated, as appropriate, with relevant Federal entities.

"(C) The processes through which legal reviews and determinations are made to comply with the authority in this section and ensure that the exercise of such authority is consistent with the national security interests of the United States.

"(D) The processes by which the Department of Defense shall keep the congressional defense committees fully and currently informed of—

"(i) the requirements for the use of the authority in this section; and

"(ii) activities conducted under such authority.

"(3) NOTICE TO CONGRESS.—The Secretary shall notify the congressional defense committees of any material change to the procedures established under paragraph (1).";

(6) in subsection (d), as redesignated—

(A) in the subsection heading, by striking "LIMITATION ON DELEGATION" and inserting "LIMITATIONS"; and

(B) by striking "The Secretary of Defense may not delegate" and inserting the following: "The Secretary of Defense—

"(1) may expend up to $40,000,000 in any fiscal year for the purposes described in subsection (a); and

"(2) may not delegate";

(7) in subsection (g), as redesignated—

(A) by redesignating paragraph (4) as paragraph (5); and

(B) by striking paragraphs (1), (2), and (3) and inserting the following:

"(1) a description of activities carried out for the purposes described in subsection (a);

"(2) the amount of such expenditures;

"(3) an identification of the type of recipients to receive support, including foreign forces, irregular forces, groups or individuals, as appropriate;

"(4) the total amount of funds obligated for such expenditures in prior fiscal years; and"; and

(8) by adding at the end the following:

"(i) OVERSIGHT BY ASSISTANT SECRETARY OF DEFENSE FOR SPECIAL OPERATIONS AND LOW INTENSITY CONFLICT.—The Assistant Secretary of Defense for Special Operations and Low Intensity Conflict shall have primary responsibility within the Office of the Secretary of Defense for oversight of policies and programs authorized by this section.

"(j) OPERATIONAL PREPARATION OF THE ENVIRONMENT DEFINED.—In this section, the term 'operational preparation of the environment' means the conduct of activities in likely or potential operational areas to set conditions for mission execution.".

(b) CLERICAL AMENDMENT.—The table of sections for chapter 3 of title 10, United States Code, is amended by striking the item relating to section 127f and inserting the following:

"127f. Expenditure of funds for clandestine activities that support operational preparation of the environment and non-conventional assisted recovery capabilities.".

### SEC. 1222. MODIFICATION TO THE AMERICAN, BRITISH, CANADIAN, AND AUSTRALIAN ARMIES' PROGRAM.

(a) IN GENERAL.—Section 1274(a) of the National Defense Authorization Act for Fiscal Year 2013 (10 U.S.C. 2350a(a) note) is amended by inserting "or the air force program known as the Five Eyes Air Force Interoperability Council" after "the American, British, Canadian, and Australian Armies' Program".

(b) CLERICAL AMENDMENT.—The heading of section 1274 of such Act (and the entry in the table of contents for such Act corresponding to such section 1274) is amended to read as follows: "Administration of the American, British, Canadian, and Australian Armies' Program and the Five Eyes Air Force Interoperability Council.".

10 USC 121 prec.

### SEC. 1223. FIRST MODIFICATION OF INITIATIVE TO SUPPORT PROTECTION OF NATIONAL SECURITY ACADEMIC RESEARCHERS FROM UNDUE INFLUENCE AND OTHER SECURITY THREATS.

(a) IN GENERAL.—Section 1286(a) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (10 U.S.C. 4001 note) is amended—

(1) in paragraph (2), by striking "and" at the end;

(2) by redesignating paragraph (3) as paragraph (4); and

(3) by inserting after paragraph (2) the following:

"(3) to limit academic institutions identified on the list developed under subsection (c)(8)(A) from benefitting from funding provided by the Department of Defense to United States academic institutions; and".

(b) OFFICE OF THE INSPECTOR GENERAL REPORT.—Not later than 18 months after the date of the enactment of this Act, the Office of the Inspector General of the Department of Defense shall submit to the congressional defense committees a report on—

(1) the implementation of the policies and procedures developed under section 1286 of the John S. McCain National

Defense Authorization Act for Fiscal Year 2019 (10 U.S.C. 4001 note), as amended by this Act; and

(2) the implementation of the policies of the Department of Defense required under National Security Presidential Memorandum-33 (NSPM-33).

**SEC. 1224. SECOND MODIFICATION OF INITIATIVE TO SUPPORT PROTECTION OF NATIONAL SECURITY ACADEMIC RESEARCHERS FROM UNDUE INFLUENCE AND OTHER SECURITY THREATS.**

(a) IN GENERAL.—Section 1286 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (10 U.S.C. 4001 note) is amended—

(1) in subsection (c)—

(A) by redesignating paragraphs (7) through (9) as paragraphs (8) through (10), respectively;

(B) by inserting after paragraph (6) the following new paragraph (7):

"(7) Policies to limit or prohibit funding provided by the Department of Defense for institutions or individual researchers who knowingly contract or make other financial arrangements with entities identified in the list described in paragraph (9), which policies shall include—

"(A) use of such list as part of a risk assessment decision matrix during proposal evaluations, including the development of a question for proposers or broad area announcements that require proposers to disclose any contractual or financial connections with such entities;

"(B) a requirement that the Department shall notify a proposer of suspected noncompliance with a policy issued under this paragraph and provide not less than 30 days to take actions to remedy such noncompliance;

"(C) the establishment of an appeals procedure under which a proposer may appeal a negative decision on a proposal if the decision is based on a determination informed by such list;

"(D) a requirement that each awardee of funding provided by the Department shall disclose to the Department any contract or financial arrangement made with such an entity during the period of the award; and

"(E) a requirement that each awardee of funding provided by the Department shall provide to the Department an annual certification of compliance with policies promulgated pursuant to this paragraph;"; and

(C) by adding at the end the following new paragraph:

"(11) Development of measures of effectiveness and performance to assess and track progress of the Department of Defense across the initiative, which measures shall include—

"(A) the evaluation of currently available data to support the assessment of such measures, including the identification of areas in which gaps exist that may require collection of completely new data, or modifications to existing data sets;

"(B) current means and methods for the collection of data in an automated manner, including the identification of areas in which gaps exist that may require new means for data collection or visualization of such data; and

*(margin notes)* Requirements. Notification. Deadline. Procedures. Disclosure. Certification. Assessments. Data. Evaluation.

"(C) the development of an analysis and assessment methodology framework to make tradeoffs between the measures developed under this paragraph and other metrics related to assessing undue foreign influence on the Department of Defense research enterprise, such as commercial due diligence, beneficial ownership, and foreign ownership, control, and influence."; and

Analysis.

(2) in subsection (e)(2), by adding at the end the following new subparagraph:

"(G) A description of the status of the measures of effectiveness and performance described in subsection (c)(11) for the period covered by such report, including an analytical assessment of the impact of such measures on the goals of the initiative.".

(b) DEADLINE.—The Secretary of Defense shall develop the policies required by paragraph (7) of section 1286(c) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (10 U.S.C. 4001 note), as added by subsection (a)(1)(B), by not later than June 1, 2024.

10 USC 4001 note.

### SEC. 1225. EXTENSION OF AUTHORITY FOR DEPARTMENT OF DEFENSE SUPPORT FOR STABILIZATION ACTIVITIES IN NATIONAL SECURITY INTEREST OF THE UNITED STATES.

Section 1210A(h) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1626) is amended by striking "December 31, 2023" and inserting "December 31, 2025".

### SEC. 1226. MODIFICATION OF DEFENSE OPERATIONAL RESILIENCE INTERNATIONAL COOPERATION PILOT PROGRAM.

Section 1212 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2834; 10 U.S.C. 311 note) is amended—

(1) in subsection (a), by striking "military forces" and inserting "national security forces";

(2) in subsection (c)—

(A) in paragraph (1)—

(i) in subparagraph (A), by striking "military-to-military relationships" and inserting "relationships with the national security forces of partner countries"; and

(ii) in subparagraph (C), by striking "military forces" and inserting "national security forces"; and

(B) by adding at the end the following new paragraph:

"(4) SUSTAINMENT AND NON-LETHAL ASSISTANCE.—A program under subsection (a) may include the provision of sustainment and non-lethal assistance, including training, defense services, and supplies (including consumables).";

(3) in subsection (e)(3)(A), by striking "military force" and inserting "national security forces"; and

(4) by adding at the end the following new subsection:

"(g) DEFINITIONS.—In this section the terms 'defense services', 'national security forces', and 'training' have the meaning given those terms in section 301 of title 10, United States Code.".

137 STAT. 456          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 1227. EXTENSION OF PROHIBITION ON IN-FLIGHT REFUELING TO NON-UNITED STATES AIRCRAFT THAT ENGAGE IN HOSTILITIES IN THE ONGOING CIVIL WAR IN YEMEN.

Section 1273 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1699) is amended to read as follows:

### "SEC. 1273. PROHIBITION ON IN-FLIGHT REFUELING TO NON-UNITED STATES AIRCRAFT THAT ENGAGE IN HOSTILITIES IN THE ONGOING CIVIL WAR IN YEMEN.

Time period.
Effective date.

"For the one-year period beginning on the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, the Department of Defense may not provide in-flight refueling pursuant to section 2342 of title 10, United States Code, or any other applicable statutory authority, to non-United States aircraft that engage in hostilities in the ongoing civil war in Yemen unless and until a declaration of war or a specific statutory authorization for such use of the United States Armed Forces has been enacted.".

### SEC. 1228. LIMITATION ON AVAILABILITY OF FUNDS FOR INTERNATIONAL SECURITY COOPERATION PROGRAM.

Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for operation and maintenance, Defense-wide, and available for the Defense Security Cooperation Agency for the International Security Cooperation Program, not more than 85 percent may be obligated or expended until the Secretary of Defense submits the security cooperation strategy for each covered combatant command required by section 1206 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1960).

10 USC note
prec. 2001.
Reviews.

### SEC. 1229. PROTECTION AND LEGAL PREPAREDNESS FOR MEMBERS OF THE ARMED FORCES ABROAD.

(a) REVIEW AND BRIEFING REQUIRED.—

Deadline.

(1) IN GENERAL.—Not later than December 31, 2024, the Secretary of State, in coordination with the Secretary of Defense, shall—

(A) review the legal protections afforded by bilateral agreements between the United States and the countries listed in paragraph (2), and how the rights and privileges afforded under such agreements may differ from United States law; and

(B) brief the appropriate congressional committees on the findings of the review.

(2) COUNTRIES LISTED.—The countries listed in this paragraph are the following:

(A) Australia.
(B) Bahrain.
(C) Germany.
(D) Italy.
(E) Japan.
(F) Kuwait.
(G) Qatar.
(H) South Korea.
(I) Spain.
(J) Turkey.
(K) The United Kingdom.

(L) Any other country the Secretary of Defense determines to be appropriate.

(3) MATTERS TO BE INCLUDED.—The review required by paragraph (1)(A) shall address whether the legal protections afforded by bilateral agreements between the United States and the countries listed in paragraph (2) provide members of the Armed Forces who are stationed in the country, and the spouses and dependents of such members who are covered by the agreements, with the right to legal counsel, access to competent language translation services, a prompt and speedy trial, the right to be confronted with witnesses against the member, spouse, or dependent, and a compulsory process for obtaining witnesses in favor of the member, spouse, or dependent if the witness is located in the jurisdiction of the country.

(4) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this subsection, the term "appropriate congressional committees" means—

(A) the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Armed Services and the Committee on Foreign Relations of the Senate.

(b) TRAINING REQUIRED.—The Secretary of Defense shall review and improve as necessary training and educational materials for members of the Armed Forces who are stationed in a country reviewed pursuant to subsection (a)(1)(A), and the spouses and dependents of such members who are covered by the agreements, regarding relevant foreign laws, how such foreign laws may differ from the laws of the United States, and the rights of accused in common scenarios under such foreign laws.

(c) TRANSLATION STANDARDS AND READINESS.—The Secretary of Defense shall review foreign language standards for members of the Armed Forces and employees of the Department of Defense who are responsible for providing foreign language translation services in situations involving foreign law enforcement where such a member or employee may be being detained, to ensure such members and employees maintain an appropriate proficiency in the legal terminology and meaning of essential terms in a relevant language.

## SEC. 1230. REPORT ON HOSTILITIES INVOLVING UNITED STATES ARMED FORCES.

50 USC 1543a.

(a) IN GENERAL.—Not later than 48 hours after any incident in which the United States Armed Forces are involved in an attack or hostilities, whether in an offensive or defensive capacity, the President shall transmit to the congressional defense committees, the Committee on Foreign Relations of the Senate, and the Committee on Foreign Affairs of the House of Representatives a report on the incident, unless the President—

President.

(1) otherwise reports the incident within 48 hours pursuant to section 4 of the War Powers Resolution (50 U.S.C. 1543); or

(2) has determined prior to the incident, and so reported pursuant to section 1264 of the National Defense Authorization Act for Fiscal Year 2018 (50 U.S.C. 1549), that the United

States Armed Forces involved in the incident would be operating under specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)).

(b) MATTERS TO BE INCLUDED.—Each report required by subsection (a) shall include—

(1) the authority or authorities under which the United States Armed Forces were operating when the incident occurred;

(2) the date, location, and duration of the incident and the other parties involved;

(3) a description of the United States Armed Forces involved in the incident and the mission of such Armed Forces;

(4) the numbers of any combatant casualties and civilian casualties that occurred as a result of the incident; and

(5) any other information the President determines appropriate.

Deadline.
22 USC 2656.

### SEC. 1231. CONGRESSIONAL NOTIFICATION REGARDING THE GLOBAL ENGAGEMENT CENTER.

Not later than 30 days after making funds or personnel available to the Global Engagement Center established pursuant to section 1287 of the National Defense Authorization Act for Fiscal Year 2017 (22 U.S.C. 2656 note), the Secretary of Defense shall provide to the congressional defense committees a notification that includes—

(1) an accounting of such funds or personnel; and

(2) an explanation of the reason for the availability of such funds or personnel.

# Subtitle C—Matters Relating to Ukraine, Russia, and NATO

### SEC. 1241. EXTENSION OF UKRAINE SECURITY ASSISTANCE INITIATIVE.

Section 1250 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1068) is amended—

(1) in subsection (f)—

(A) in the matter preceding paragraph (1), by striking "for overseas contingency operations" ; and

(B) by adding at the end the following:

"(9) For fiscal year 2024, $300,000,000.

"(10) For fiscal year 2025, $300,000,000."; and

(2) in subsection (h), by striking "December 31, 2024" and inserting "December 31, 2026".

### SEC. 1242. EXTENSION AND MODIFICATION OF CERTAIN TEMPORARY AUTHORIZATIONS RELATED TO MUNITIONS REPLACEMENT.

136 Stat. 2844

Section 1244 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended—

(1) in the section heading, by striking "and Other Matters" and inserting ", Taiwan, and Israel";

(2) in subsection (a)—

(A) in paragraph (1)—

(i) in subparagraph (A), by inserting "or replenish" after "to build";

(ii) in subparagraph (B)—

(I) by striking "the Government of Ukraine" and inserting "Ukraine, Taiwan, or Israel"; and

(II) by striking "; and" and inserting "; or"; and

(iii) in subparagraph (C), by striking "the Government of Ukraine" and inserting "Ukraine, Taiwan, or Israel";

(B) in paragraph (2)(B)(i)(II), by striking "comparable" and inserting "equivalent";

(C) in paragraph (5)—

(i) in the matter preceding subparagraph (A), by inserting "and associated parts" after "large-caliber cannons";

(ii) by amending subparagraph (A) to read as follows:

"(A) the replacement of defense articles from stocks of the Department of Defense provided to—

"(i) the Ukraine, Taiwan, or Israel; or

"(ii) foreign countries that have provided support to Ukraine, Taiwan, or Israel;";

(iii) by amending subparagraph (B) to read as follows:

"(B) the Department of Defense to provide materiel directly to Ukraine, Taiwan, or Israel; or"; and

(iv) by inserting after subparagraph (B), as so amended, the following new subparagraph:

"(C) use by Ukraine, Taiwan, or Israel.";

(D) by amending paragraph (6) to read as follows:

"(6) TEMPORARY EXEMPTION FROM CERTIFIED COST AND PRICING DATA REQUIREMENTS.—

"(A) IN GENERAL.—At the discretion of the Secretary of Defense, the requirements under section 3702 of title 10, United States Code, shall not apply to a covered agreement.

"(B) APPLICATION.—An exemption under subparagraph (A) shall also apply to subcontracts under prime contracts that are exempt under this paragraph.

"(C) PRICE REASONABLENESS.—In awarding or modifying a covered agreement pursuant to a waiver under subparagraph (A), the Secretary of Defense shall base price reasonableness determinations on actual cost and pricing data for purchases of the same or similar products for the Department of Defense.";

(E) in paragraph (7), by striking "September 30, 2024" and inserting "September 30, 2028";

(F) by redesignating paragraph (7), as so amended, as paragraph (8); and

(G) by inserting after paragraph (6) the following new paragraph:

"(7) NOTIFICATION.—Not later than 7 days after the exercise of authority under subsection (a) the Secretary of Defense shall notify the congressional defense committees of the specific authority exercised, the relevant contract, and the estimated reductions in schedule."; and

Deadline.

137 STAT. 460         PUBLIC LAW 118–31—DEC. 22, 2023

(3) in subsection (c)(1)—
(A) in the matter preceding subparagraph (A)—
(i) by inserting "or fiscal year 2024" after "fiscal year 2023"; and
(ii) by inserting "for systems, items, services, and logistics support associated with the systems identified in this paragraph (1)" after "multiyear contracts".
(B) in subparagraph (P), by striking "; and" and inserting a semicolon;
(C) in subparagraph (Q), by striking the period at the end and inserting a semicolon; and
(D) by inserting at the end the following new subparagraphs:
"(R) 3,300 Tomahawk Cruise Missiles;
"(S) 1,100 Precision Strike Missiles (PrSM);
"(T) 550 Mark 48 Torpedoes;
"(U) 1,650 RIM–162 Evolved Sea Sparrow Missiles (ESSM);
"(V) 1,980 RIM–116 Rolling Airframe Missiles (RAM); and
"(W) 11,550 Small Diameter Bomb IIs (SDB–II).".

### SEC. 1243. REPORT RELATING TO ALLIED AND PARTNER SUPPORT TO UKRAINE.

(a) REPORT REQUIRED.—Not later than 90 days after the date of the enactment of this Act, and every 90 days thereafter, the Secretary of Defense shall submit to the congressional defense committees a report on—
(1) all military contributions to Ukraine made by allied and partner countries in absolute and relative terms, disaggregated by country, since January 1, 2022; and
(2) any other matters that the Secretary determines to be relevant.
(b) FORM.—The report required under subsection (a) shall be submitted in unclassified form, but may include a classified annex.
(c) SUNSET.—The reporting requirement in subsection (a) shall terminate on January 1, 2025.

### SEC. 1244. EXTENSION OF PROHIBITION ON AVAILABILITY OF FUNDS RELATING TO SOVEREIGNTY OF THE RUSSIAN FEDERATION OVER INTERNATIONALLY RECOGNIZED TERRITORY OF UKRAINE.

136 Stat. 2847.

Section 1245(a) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended by striking "None of the funds" and all that follows through "2023" and inserting "None of the funds authorized to be appropriated for fiscal year 2023 or 2024".

### SEC. 1245. STUDY AND REPORT ON LESSONS LEARNED REGARDING INFORMATION OPERATIONS AND DETERRENCE.

Contracts.

(a) STUDY.—
(1) IN GENERAL.—The Secretary of Defense shall seek to enter into a contract or other agreement with an eligible entity to conduct an independent study on lessons learned from information operations conducted by the United States, Ukraine, the Russian Federation, and member countries of the North Atlantic Treaty Organization during the lead-up

to the Russian Federation's full-scale invasion of Ukraine in 2022 and throughout the conflict.

(2) ELEMENTS.—The study required by paragraph (1) shall include— <span style="float:right">Assessments.</span>

(A) an assessment of information operations capabilities of the Russian Federation prior to, and since, the full-scale invasion of Ukraine;

(B) an assessment of notable successes or challenges with regard to the information operations conducted by the United States, NATO member countries, and Ukraine prior to, and since, the full-scale invasion of Ukraine; and

(C) recommendations for improvements to United States information operations to enhance effectiveness, as well as recommendations on how information operations may be improved to support the maintenance of deterrence. <span style="float:right">Recommendations.</span>

(b) REPORT.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the results of the study required by subsection (a) in its entirety, along with any such comments as the Secretary considers relevant.

(2) FORM.—The report required by paragraph (1) shall be submitted in unclassified form but may include a classified annex.

(c) ELIGIBLE ENTITY DEFINED.—In this section, the term "eligible entity" means—

(1) a federally funded research and development center; or

(2) an independent, nongovernmental institute described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code that has recognized credentials and expertise in national security and military affairs appropriate for the assessment.

### SEC. 1246. PROHIBITION ON NEW START TREATY INFORMATION SHARING.

(a) PROHIBITION.—None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of Defense may be made available to provide the Russian Federation with notifications as required by the New START Treaty.

(b) WAIVER.—The Secretary of Defense, with the concurrence of the Secretary of State, may waive the prohibition in subsection (a) if the Secretary of Defense certifies to the appropriate congressional committees in writing that— <span style="float:right">Certification.</span>

(1) the Russian Federation is providing similar information to the United States as required by the New START Treaty; or

(2) it is in the national security interest of the United States to unilaterally provide such notifications to the Russian Federation

(c) DEFINITIONS.—In this section—

(1) the term "appropriate congressional committees" means—

137 STAT. 462          PUBLIC LAW 118–31—DEC. 22, 2023

(A) the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Armed Services and the Committee on Foreign Relations of the Senate; and

(2) the term "New START Treaty" means the Treaty between the United States of America and the Russian Federation on Measures for the Further Reduction and Limitation of Strategic Offensive Arms, signed at Prague April 8, 2010, and entered into force February 5, 2011.

President.

### SEC. 1247. BLACK SEA SECURITY AND DEVELOPMENT STRATEGY.

(a) IN GENERAL.—The President shall direct the National Security Council to develop an interagency strategy with regard to the Black Sea region and Black Sea states—

(1) to increase coordination with the North Atlantic Treaty Organization (NATO) and the European Union;

(2) to deepen economic ties;

(3) to strengthen energy security;

(4) to support efforts to bolster their democratic resilience; and

(5) to enhance security assistance with regional partners in accordance with the values and interests of the United States.

(b) PURPOSE AND OBJECTIVES.—The strategy authorized under subsection (b) shall have the following goals and objectives:

(1) Ensuring the efficient and effective delivery of security assistance to regional partners in accordance with the values and interests of the United States, prioritizing assistance that will bolster defenses, increase regional cooperation on Black Sea security, and improve interoperability with NATO forces.

(2) Bolstering United States support for the region's energy security and integration with Europe and reducing the region's dependence on Russia while supporting energy diversification.

(3) Working with partners and allies to mitigate the impact of economic coercion by the Russian Federation and the People's Republic of China on Black Sea states and identifying new opportunities for foreign direct investment from the United States and cooperating countries and the enhancement of United States business ties with regional partners in accordance with the values and interests of the United States.

(4) Increasing high-level engagement between the United States and regional partners, including reinforcing economic growth, infrastructure development, and enhancing trade with a focus on improving high-level economic cooperation.

(5) Increasing United States coordination with the European Union and NATO member states to maximize effectiveness and minimize duplication.

(c) ACTIVITIES.—

(1) SECURITY.—The strategy authorized under subsection (b) should include the following elements related to security:

(A) A plan to increase interagency coordination on the Black Sea region.

(B) A plan to coordinate and synchronize security assistance with Black Sea states, focused on Ukraine, Romania, Bulgaria, Moldova, and Georgia, with the aim of increasing regional cooperation on Black Sea security.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 463

(C) A plan to enhance collaboration with Black Sea states to recognize and respond to Russian disinformation and propaganda in the Black Sea region.

(2) ECONOMIC PROSPERITY.—The strategy authorized under subsection (b) shall include the following elements related to economic prosperity:

(A) A strategy to foster dialogue between experts from the United States and from the Black Sea states on economic expansion, foreign direct investment, strengthening rule of law initiatives, and mitigating economic coercion by the Russian Federation and the People's Republic of China.

(B) A strategy for all the relevant Federal departments and agencies that contribute to United States economic statecraft to expand their presence and identify new opportunities for private investment with regional partners in accordance with the values and interests of the United States.

(C) Assessments on energy security, focusing on the immediate need to replace energy supplies from the Russian Federation, and recognizing the long-term importance of broader energy diversification. *Assessment.*

(D) Assessments of potential food security solutions, including sustainable, long-term arrangements. *Assessment.*

(3) DEMOCRATIC RESILIENCE.—The strategy authorized under subsection (b) shall include the following elements related to democratic resilience: *Plans.*

(A) A plan to increase independent media and United States-supported media initiatives to combat foreign malign influence in the Black Sea region.

(B) A plan to increase mobilization of initiatives spearheaded by the Department of State and the United States Agency for International Development to counter Russian propaganda and disinformation in the Black Sea region.

(d) IDENTIFICATION OF NECESSARY AUTHORITIES AND BUDGETARY RESOURCES.—The President shall identify any necessary authorities or budgetary resources required, by agency, to support the implementation of the strategy for fiscal years 2025 and 2026.

(e) SUBMISSION OF STRATEGY AND RESOURCE ASSESSMENT.— The President shall submit to the appropriate committees of Congress— *Deadlines.*

(1) the strategy authorized by subsection (b) not later than 180 days after the date of the enactment of this Act; and

(2) the authority and resourcing assessment required by subsection (d) not later than 360 days after such date of enactment.

(f) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the Committee on Foreign Relations, the Committee on Armed Services, the Committee on Appropriations, the Select Committee on Intelligence, and the Committee on Energy and Natural Resources of the Senate; and

(B) the Committee on Foreign Affairs, the Committee on Armed Services, the Committee on Appropriations, the

**137 STAT. 464**          **PUBLIC LAW 118–31—DEC. 22, 2023**

Permanent Select Committee on Intelligence, and the Committee on Energy and Commerce of the House of Representatives.

(2) BLACK SEA STATES.—The term "Black Sea states" means—

(A) Bulgaria;
(B) Georgia;
(C) Moldova;
(D) Romania;
(E) Turkey; and
(F) Ukraine.

### SEC. 1248. REVIVAL OF AUTHORITY FOR PARTICIPATION OF NATO NAVAL PERSONNEL IN SUBMARINE SAFETY PROGRAMS.

(a) IN GENERAL.—Subsection (e) of section 8634 of title 10, United States Code, is repealed.

(b) CONFORMING AMENDMENT.—Subsection (a) of such section 8634 is amended by striking "the Secretary of the Navy may conduct a program" and inserting "the Secretary of the Navy may conduct a program beginning on or after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024".

### SEC. 1249. EXTENSION AND MODIFICATION OF TRAINING FOR EASTERN EUROPEAN NATIONAL SECURITY FORCES IN THE COURSE OF MULTILATERAL EXERCISES.

Section 1251 of the National Defense Authorization Act for Fiscal Year 2016 (10 U.S.C. 333 note) is amended—

(1) in subsection (c)(1), by adding at the end the following new subparagraph:

"(C) The Republic of Kosovo."; and

(2) in subsection (h)—

(A) in the first sentence, by striking "December 31, 2024" and inserting "December 31, 2026"; and

(B) in the second sentence, by striking "December 31, 2024." and inserting "December 31, 2026".

10 USC 113 note.

### SEC. 1250. U.S. BASING, TRAINING, AND EXERCISES IN NORTH ATLANTIC TREATY ORGANIZATION MEMBER COUNTRIES.

When considering decisions related to United States military basing, training, and exercises, the Secretary of Defense shall include among the factors whether a country, if a member of the North Atlantic Treaty Organization, has achieved defense spending of not less than 2 percent of its gross domestic product.

22 USC 1928f.

### SEC. 1250A. LIMITATION ON WITHDRAWAL FROM THE NORTH ATLANTIC TREATY ORGANIZATION.

(a) OPPOSITION OF CONGRESS TO SUSPENSION, TERMINATION, DENUNCIATION, OR WITHDRAWAL FROM NORTH ATLANTIC TREATY.—The President shall not suspend, terminate, denounce, or withdraw the United States from the North Atlantic Treaty, done at Washington, DC, April 4, 1949, except by and with the advice and consent of the Senate, provided that two-thirds of the Senators present concur, or pursuant to an Act of Congress.

(b) LIMITATION ON THE USE OF FUNDS.—No funds authorized or appropriated by any Act may be used to support, directly or indirectly, any decision on the part of any United States Government official to suspend, terminate, denounce, or withdraw the United States from the North Atlantic Treaty, done at Washington,

DC, April 4, 1949, except by and with the advice and consent of the Senate, provided that two-thirds of the Senators present concur, or pursuant to an Act of Congress.

(c) NOTIFICATION OF TREATY ACTION.— <span style="float:right">President.</span>

(1) CONSULTATION.—Prior to the notification described in paragraph (2), the President shall consult with the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives in relation to any initiative to suspend, terminate, denounce, or withdraw the United States from the North Atlantic Treaty.

(2) NOTIFICATION.—The President shall notify the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives in writing of any deliberation or decision to suspend, terminate, denounce, or withdraw the United States from the North Atlantic Treaty, as soon as possible but in no event later than 180 days prior to taking such action. <span style="float:right">Deadline.</span>

(d) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to authorize, imply, or otherwise indicate that the President may suspend, terminate, denounce, or withdraw from any treaty to which the Senate has provided its advice and consent without the advice and consent of the Senate to such act or pursuant to an Act of Congress.

(e) SEVERABILITY.—If any provision of this section or the application of such provision is held by a Federal court to be unconstitutional, the remainder of this subtitle and the application of such provisions to any other person or circumstance shall not be affected thereby.

(f) DEFINITIONS.—In this subtitle, the terms "withdrawal", "denunciation", "suspension", and "termination" have the meaning given the terms in the Vienna Convention on the Law of Treaties, concluded at Vienna May 23, 1969.

## SEC. 1250B. OVERSIGHT OF PROGRAMS AND OPERATIONS FUNDED WITH AMOUNTS APPROPRIATED BY THE UNITED STATES FOR UKRAINE.

(a) SPECIAL INSPECTOR GENERAL FOR OPERATION ATLANTIC RESOLVE.— <span style="float:right">5 USC 419 note.</span>

(1) IN GENERAL.—Subject to the requirements of this section, the President, acting through the Chair of the Council of the Inspectors General on Integrity and Efficiency, shall maintain the position of the Lead Inspector General for Operation Atlantic Resolve in accordance with section 419 of title 5, United States Code. <span style="float:right">President.</span>

(2) REDESIGNATION.—

(A) IN GENERAL.—The title of the position of the Lead Inspector General for Operation Atlantic Resolve is hereby redesignated as the "Special Inspector General for Operation Atlantic Resolve" (in this section referred to as the "Special Inspector General").

(B) REFERENCES.—Any reference in law, regulation, document, paper, or other record of the United States to the Lead Inspector General for Operation Atlantic Resolve shall be deemed to be a reference to the Special Inspector General for Operation Atlantic Resolve.

(b) BRIEFINGS.—Upon request by the Chair or Ranking Member of an appropriate committee of Congress, not later than 30 days <span style="float:right">Deadline.</span>

after receiving the request, the Special Inspector General shall to the extent practicable provide a briefing to such committee on the activities of the Special Inspector General with respect to programs and operations funded with amounts appropriated by the United States for Ukraine.

Deadlines.
Web posting.
Public
information.

(c) PUBLICATION OF ACCOUNTING OF UNITED STATES ASSISTANCE FOR UKRAINE.—Not later than 45 days after the date of the enactment of this Act, and every 90 days thereafter, the President shall publish on a publicly available website of the United States Government a comprehensive accounting of unclassified amounts appropriated by the United States for Ukraine.

(d) QUARTERLY REPORTS.—

Summary.
Time period.

(1) IN GENERAL.—Not later than 45 days after the end of each fiscal-year quarter, the Special Inspector General shall submit to the appropriate committees of Congress a report summarizing, with respect to that quarter and, to the extent possible, the period beginning on the date on which such quarter ends and ending on the date on which the report is submitted, the activities of the Special Inspector General with respect to programs and operations funded with amounts appropriated by the United States for Ukraine for—

(A) security, economic, and humanitarian assistance to Ukraine and other countries affected by the war;

(B) United States European Command operations and related support for the United States military; and

(C) operations of other relevant United States Government agencies involved in the Ukraine response, as appropriate.

(2) ELEMENTS.—Each report required by paragraph (1) shall include, for the period covered by the report—

(A) a description of any waste, fraud, or abuse identified by the Inspectors General with respect to programs and operations funded with amounts appropriated by the United States for Ukraine;

(B) a description of the status and results of—

(i) investigations, inspections, and audits; and

(ii) referrals to the Department of Justice; and

(C) a description of the overall plans for review by the Inspectors General of such support of Ukraine, including plans for investigations, inspections, and audits.

Web posting.
Public
information.

(3) AVAILABILITY.—The Special Inspector General shall publish on a publicly available website the unclassified form of each report required by paragraph (1).

(4) FORM.—Each report required by paragraph (1) shall be submitted in unclassified form, but may include a classified annex if the Special Inspector General considers it necessary.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to limit the Special Inspector General from exercising all authorities and discharging all responsibilities granted to the Lead Inspector General for Operation Atlantic Resolve in accordance with section 419 of title 5, United States Code, in the exercise of oversight responsibilities for Operation Atlantic Resolve generally and under this section with respect to Ukraine.

(f) SUNSET.—The requirements and authorities of this section with respect to the Special Inspector General shall cease in accordance with the sunset provisions for the Lead Inspector General

for Operation Atlantic Resolve pursuant to section 419(f) of title 5, United States Code.

(g) DEFINITIONS.—In this section:

(1) The term "appropriate committees of Congress" means—

(A) the Committee on Appropriations, the Committee on Armed Services, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(B) the Committee on Appropriations, the Committee on Armed Services, the Committee on Foreign Affairs, and the Committee on Oversight and Accountability of the House of Representatives.

(2) The term "Inspectors General" means the following:

(A) The Inspector General of the Department of Defense.

(B) The Inspector General of the Department of State.

(C) The Inspector General of the United States Agency for International Development.

(h) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated for fiscal year 2024 $8,000,000 to carry out this section.

(i) EXPANSION AND EXTENSION OF DIRECT HIRE AUTHORITY FOR CERTAIN PERSONNEL OF THE DEPARTMENT OF DEFENSE.—

(1) EXPANSION.—Section 9905(a) of title 5, United States Code, as amended by section 1104, is further amended by adding at the end the following new paragraph:

"(14) Any position in support of Special Inspector General for Operation Atlantic Resolve for which the Secretary determines there is a critical hiring need and shortage of candidates.".

(2) EXTENSION.—Section 9905(b)(1) of title 5, United States Code, is amended by striking "September 30, 2025" and inserting "September 30, 2030".

# Subtitle D—Matters Relating to Israel

**SEC. 1251. EURO-NATO JOINT JET PILOT TRAINING PROGRAM.**

Reports.

Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report on the feasibility and advisability of including Israel in observer status in the Euro-NATO Joint Jet Pilot Training Program (ENJJPT).

**SEC. 1252. EXTENSION OF UNITED STATES-ISRAEL ANTI-TUNNEL COOPERATION.**

Section 1279(f) of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1079; 22 U.S.C. 8606 note) is amended by striking "December 31, 2024" and inserting "December 31, 2026".

**SEC. 1253. IMPROVEMENTS RELATING TO UNITED STATES-ISRAEL COOPERATION TO COUNTER UNMANNED AERIAL SYSTEMS.**

Section 1278(b)(4) of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1702; 22 U.S.C. 8606 note) is amended by striking "$40,000,000" and inserting "$55,000,000".

### SEC. 1254. MODIFICATION OF AUTHORITY FOR COOPERATION ON DIRECTED ENERGY CAPABILITIES.

Section 1280 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3982; 22 U.S.C. 8606 note) is amended—

(1) in subsection (d), in the first sentence—

(A) by inserting "acting through the Under Secretary of Defense for Research and Engineering," after "the Secretary of Defense,"; and

(B) by striking "may establish a program" and inserting "is authorized"; and

(2) by adding at the end the following new subsection:

"(e) NOTIFICATION.—

Deadline.
Assessment.

"(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this subsection, the Under Secretary of Defense for Research and Engineering shall submit to the appropriate committees of Congress an assessment detailing—

"(A) the most promising directed energy missile defense technologies available for co-development with the Government of Israel;

"(B) any risks relating to the implementation of a directed energy missile defense technology co-development program with the Government of Israel;

Spending plan.

"(C) an anticipated spending plan for fiscal year 2024 funding authorized by the National Defense Authorization Act for Fiscal Year 2024 to carry out this section; and

Time period.

"(D) initial projections for likely funding requirements to carry out a directed energy missile defense technology co-development program with the Government of Israel over the five fiscal years beginning after the date of the enactment this subsection, as applicable.

"(2) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term 'appropriate committees of Congress' means—

"(A) the Committee on Armed Services, the Committee on Appropriations, and the Committee on Foreign Relations of the Senate; and

"(B) the Committee on Armed Services, the Committee on Appropriations, and the Committee on Foreign Affairs of the House of Representatives.".

### SEC. 1255. ENSURING PEACE THROUGH STRENGTH IN ISRAEL.

(a) EXTENSION OF AUTHORITIES.—

(1) WAR RESERVES STOCKPILE AUTHORITY.—Section 12001(d) of the Department of Defense Appropriations Act, 2005 (Public Law 108–287; 118 Stat. 1011) is amended by striking "September 30, 2025" and inserting "January 1, 2027".

(2) RULES GOVERNING THE TRANSFER OF PRECISION-GUIDED MUNITIONS TO ISRAEL ABOVE THE ANNUAL RESTRICTION.—Section 1275(e) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3980; 22 U.S.C. 2321h note) is amended by striking "on the date that is three years after the date of the enactment of this Act" and inserting "on January 1, 2027".

(b) DEPARTMENT OF DEFENSE ASSESSMENT OF TYPE AND QUANTITY OF PRECISION-GUIDED MUNITIONS AND OTHER MUNITIONS FOR USE BY ISRAEL.—

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 469

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and annually thereafter through December 31, 2027, the Secretary of Defense, in consultation with the Secretary of State, shall conduct an assessment with respect to the following:

Deadlines.
Assessment.
Terrorism.

(A) The current quantity and type of precision-guided munitions in the stockpile pursuant to section 12001(d) of the Department of Defense Appropriations Act, 2005 (Public Law 108–287; 118 Stat. 1011).

(B) The quantity and type of precision-guided munitions necessary for Israel to protect its homeland and counter Hezbollah, Hamas, Palestinian Islamic Jihad, or any other armed terror group or hostile forces in the region in the event of a sustained armed confrontation.

(C) The quantity and type of other munitions necessary for Israel to protect its homeland and counter Hezbollah, Hamas, Palestinian Islamic Jihad, or any other armed group or hostile forces in the region in the event of a sustained armed confrontation.

(D) The quantity and type of munitions, including precision-guided munitions, necessary for Israel to protect its homeland and counter any combination of Hezbollah, Hamas, Palestinian Islamic Jihad, and any other armed terror groups or hostile forces in the region in the event of a multi-front, sustained armed confrontation.

(E) The resources the Government of Israel would need to dedicate to acquire the quantity and type of munitions, including precision-guided munitions, described in subparagraphs (B) through (D).

(F) Whether, as of the date on which the applicable assessment is completed, sufficient quantities and types of munitions, including precision-guided munitions, to conduct operations described in subparagraphs (B) through (D) are present in—

(i) the inventory of the military forces of Israel;

(ii) the War Reserves Stock Allies-Israel;

(iii) any other United States stockpile or depot within the area of responsibility of United States Central Command, as the Secretary considers appropriate to disclose to the Government of Israel; or

(iv) the inventory of the United States Armed Forces, as the Secretary considers appropriate to disclose to the Government of Israel.

(G) The current inventory of such munitions, including precision-guided munitions, possessed by the United States, and whether, as of the date on which the applicable assessment is completed, the United States is assessed to have sufficient munitions to meet the requirements of current operation plans of the United States or global other munitions requirements.

(H) United States planning and steps being taken—

(i) to assist Israel to prepare for the contingencies, and to conduct the operations, described in subparagraphs (B) through (D); and

(ii) to resupply Israel with the quantity and type of such munitions described in such subparagraphs

137 STAT. 470        PUBLIC LAW 118–31—DEC. 22, 2023

in the event of a sustained armed confrontation described in such subparagraphs.

(I) The quantity and pace at which the United States is capable of pre-positioning, increasing, stockpiling, or rapidly replenishing, or assisting in the rapid replenishment of, such munitions in preparation for, and in the event of, such a sustained armed confrontation.

(2) CONSULTATION.—In carrying out the assessment required by paragraph (1), the Secretary shall consult with the Israeli Ministry of Defense, provided that the Israeli Ministry of Defense agrees to be so consulted.

(c) REPORTS.—

(1) DEPARTMENT OF DEFENSE ASSESSMENT.—Not later than 15 days after the date on which each Department of Defense assessment required by subsection (b) is completed, the Secretary shall submit to the appropriate committees of Congress a report on such assessment.

(2) PRE-POSITIONING AND STOCKPILE IMPLEMENTATION REPORT.—Not later than 180 days after the date on which the report required by paragraph (1) is submitted, and every 180 days thereafter through December 31, 2027, the Secretary shall submit to the appropriate committees of Congress a report that—

(A) details the actions being taken by the United States, if any, to pre-position, increase, stockpile, address shortfalls, and otherwise ensure that the War Reserves Stock Allies-Israel has, and assist Israel in ensuring that Israel has, sufficient quantities and types of munitions, including precision-guided munitions, to conduct the operations described in subparagraphs (B) through (D) of subsection (b)(1); and

(B) includes a description of procedures implemented by the United States, if any, for rapidly replenishing, or assisting in the rapid replenishment of, stockpiles of such munitions for use by Israel as may be necessary.

(3) FORM.—The report required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(4) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term "appropriate committees of Congress" means—

(A) the Committee on Foreign Relations and the Committee on Armed Services of the Senate; and

(B) the Committee on Foreign Affairs and the Committee on Armed Services of the House of Representatives.

(d) CONSOLIDATION OF REPORTS.—

(1) Section 1273 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 2066) is amended by striking subsection (b).

(2) Section 1275 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3979; 22 U.S.C. 2321h note) is amended by striking subsection (d).

Deadlines.

**SEC. 1256. ASSISTANCE TO ISRAEL FOR AERIAL REFUELING.**

(a) TRAINING ISRAELI PILOTS TO OPERATE KC–46 AIRCRAFT.—

(1) IN GENERAL.—The Secretary of the Air Force shall—

(A) make available sufficient resources and accommodations within the United States to train members of the Israeli Air Force on the operation of KC–46 aircraft; and

(B) conduct training for members of the Israeli Air Force, including—

(i) training for pilots and crew on the operation of the KC–46 aircraft in accordance with standards considered sufficient to conduct coalition operations of the United States Air Force and the Israeli Air Force; and

(ii) training for ground personnel on the maintenance and sustainment requirements of the KC–46 aircraft considered sufficient for such operations.

(2) UNITED STATES AIR FORCE MILITARY PERSONNEL EXCHANGE PROGRAM.—The Secretary of Defense shall, with respect to members of the Israeli Air Force associated with the operation of KC–46 aircraft—

(A) before the completion of the training required by paragraph (1)(B), authorize the participation of such members of the Israeli Air Force in the United States Air Force Military Personnel Exchange Program;

(B) make available billets in the United States Air Force Military Personnel Exchange Program necessary for such members of the Israeli Air Force to participate in such program; and

(C) to the extent practicable, ensure that such members of the Israeli Air Force are able to participate in the United States Air Force Military Personnel Exchange Program immediately after such members complete such training.

(3) TERMINATION.—This subsection shall cease to have effect on the date that is ten years after the date of the enactment of this Act.

(b) BRIEFING.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing that includes the following:

(1) An assessment of—  *Assessment.*

(A) the current operational requirements of the Government of Israel for aerial refueling; and

(B) any gaps in current or near-term capabilities.

(2) The estimated date of delivery to Israel of KC–46 aircraft procured by the Government of Israel.  *Estimated date.*

(3) A detailed description of—

(A) any actions the United States Government is taking to expedite the delivery to Israel of KC–46 aircraft procured by the Government of Israel, while minimizing adverse impacts to United States defense readiness, including strategic forces readiness;

(B) any additional actions the United States Government could take to expedite such delivery; and

(C) additional authorities Congress could provide to help expedite such delivery.

(4) A description of the availability of any United States aerial refueling tanker aircraft that is retired or is expected to be retired during the two-year period beginning on the date of the enactment of this Act that could be provided to Israel.  *Time period.*

(c) COSTS AND BENEFITS OF FORWARD DEPLOYMENT OF UNITED STATES KC–46 AIRCRAFT TO ISRAEL.—

(1) BRIEFING.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the Committees on Armed Services of the Senate and the House of Representatives a briefing that describes the costs and benefits of forward deploying KC–46 aircraft to Israel.

(2) PRESENCE.—The Secretary of Defense, in consultation with the Secretary of State, shall consult with the Government of Israel to determine the advisability and practicality of the Government of Israel hosting rotational deployments of United States KC–46 aircraft to Israel.

President.
22 USC 2321h note.
Time period.

**SEC. 1257. RULES GOVERNING TRANSFER OF AERIAL REFUELING TANKERS TO ISRAEL.**

(a) IN GENERAL.—Notwithstanding section 514(b) of the Foreign Assistance Act of 1961 (22 U.S.C. 2321h(b)), and subject to subsections (b) and (c) of this section, the President, acting through the Secretary of Defense, may transfer to Israel one or more retired United States aerial refueling tankers, any United States aerial refueling tanker that the Secretary of Defense plans to retire during the two-year period beginning on the date of the enactment of this Act, or any other United States aerial refueling tanker the President considers appropriate, consistent with—

(1) all other requirements set forth in the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq.); and

(2) the requirements set forth in the Arms Export Control Act (22 U.S.C. 2751 et seq.).

Determination.

(b) CONDITIONS.—Except in the case of an emergency, as determined by the President, a transfer under subsection (a) may only occur if the transfer—

(1) does not affect the ability of the United States to maintain a sufficient aerial refueling capacity to satisfy United States warfighting requirements;

(2) does not harm the combat readiness of the United States;

(3) does not affect the ability of the United States to meet its commitments to allies with respect to the transfer of aerial refueling capacity; and

(4) is in the national security interest of the United States.

Determination.
Deadline.

(c) CERTIFICATION.—

(1) IN GENERAL.—Except in the case of an emergency, as determined by the President, not later than 15 days before making a transfer under subsection (a), the Secretary of Defense shall certify to the appropriate congressional committees that the transfer meets the conditions specified in subsection (b).

(2) EMERGENCIES.—In the case of an emergency, as determined by the President, not later than five days after making a transfer under subsection (a), the President shall—

(A) certify to the appropriate congressional committees that the transfer supports the national security interests of the United States; and

(B) provide to the appropriate congressional committees an assessment of the impacts, risks, and mitigation measures with respect to the matters referred to in paragraphs (1) through (4) of subsection (b).

(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives; and

(2) the Committee on Armed Services and the Committee on Foreign Relations of the Senate.

### SEC. 1258. REPORT.

(a) REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to Congress a report on whether any products sold at commissary or exchange stores in fiscal years 2021 or 2022 were produced by companies described in paragraph (2) that have participated in a boycott action against the State of Israel.

(2) COMPANIES DESCRIBED.—The companies described in this paragraph are companies that have entered into a contract with the Department of Defense to sell products described in paragraph (1) the total value of which exceeds $10,000,000.

(b) SENSE OF CONGRESS.—Congress is concerned about the antisemitic efforts of the Boycott, Divestment, and Sanctions (BDS) movement against the State of Israel, including its efforts to delegitimize, isolate, and ultimately destroy the Jewish state.

(c) DEFINITION.—In subsection (a), the term "boycott action against the State of Israel" means engaging in a boycott action targeting the State of Israel, companies or individuals doing business in or with the State of Israel, or companies authorized by, licensed by, or organized under the laws of the State of Israel to do business.

# Subtitle E—Matters Relating to Syria, Iraq, Iran, and Afghanistan

### SEC. 1261. MIDDLE EAST INTEGRATED MARITIME DOMAIN AWARENESS AND INTERDICTION CAPABILITY.

(a) IN GENERAL.—The Secretary of Defense, using existing authorities, shall seek to build upon the incorporation of Israel into the area of responsibility of the United States Central Command to develop a Middle East integrated maritime domain awareness and interdiction capability for the purpose of protecting the people, infrastructure, and territory of such countries from—

(1) manned and unmanned naval systems, undersea warfare capabilities, and anti-ship missiles of Iran and groups affiliated with Iran; and

(2) violent extremist organizations, criminal networks, and piracy activities that threaten lawful commerce in the waterways within the area of responsibility of the United States Naval Forces Central Command.

(b) STRATEGY.—

(1) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Secretary of State, shall submit to the appropriate committees of Congress a strategy for the cooperation described in subsection (a).

Deadline.

(2) MATTERS TO BE INCLUDED.—The strategy required by paragraph (1) shall include the following:

Assessment.

(A) An assessment of the threats posed to ally or partner countries in the Middle East by—

(i) manned and unmanned naval systems, undersea warfare capabilities, and anti-ship missiles of Iran and groups affiliated with Iran; and

(ii) violent extremist organizations, criminal networks, and piracy activities that threaten lawful commerce in the waterways within the area of responsibility of the United States Naval Forces Central Command.

(B) A description of existing multilateral maritime partnerships currently led by the United States Naval Forces Central Command, including the Combined Maritime Forces (including its associated Task Forces 150, 151, 152, and 153), the International Maritime Security Construct, and the Navy's Task Force 59, and a discussion of the role of such partnerships in building an integrated maritime security capability.

(C) A description of progress made in advancing the integration of Israel into the existing multilateral maritime partnerships described in subparagraph (B).

(D) A description of efforts among countries in the Middle East to coordinate intelligence, reconnaissance, and surveillance capabilities and indicators and warnings with respect to the threats described in subparagraph (A), and a description of any impediment to optimizing such efforts.

(E) A description of the current Department of Defense systems that, in coordination with ally and partner countries in the Middle East—

(i) provide awareness of and defend against such threats; and

(ii) address current capability gaps.

(F) An explanation of the manner in which an integrated maritime domain awareness and interdiction architecture would improve collective security in the Middle East.

(G) A description of existing and planned efforts to engage ally and partner countries in the Middle East in establishing such an architecture.

(H) An identification of the elements of such an architecture that may be acquired and operated by ally and partner countries in the Middle East, and a list of such elements for each such ally and partner.

(I) An identification of the elements of such an architecture that may only be provided and operated by members of the United States Armed Forces.

(J) An identification of any challenge to optimizing such an architecture in the Middle East.

Assessment.

(K) An assessment of progress and key challenges in the implementation of the strategy required by paragraph (1) using the metrics identified in accordance with paragraph (3).

Recommendation.

(L) Recommendations for improvements in the implementation of such strategy based on such metrics.

(M) An assessment of any capabilities or lessons from the Navy's Task Force 59 that may be leveraged to support an integrated maritime domain awareness and interdiction capability in the Middle East.

*Assessment.*

(N) A cost estimate of establishing an integrated maritime domain awareness and interdiction capability, and an assessment of the resources that could be contributed by ally and partner countries of the United States to establish and strengthen such capability.

*Cost estimate.*

(O) Any other matter the Secretary of Defense considers relevant.

(3) METRICS.—The Secretary of Defense shall identify metrics to assess progress in the implementation of the strategy required by paragraph (1).

(4) FORMAT.—The strategy required by paragraph (1) shall be submitted in unclassified form but may include a classified annex.

(c) PROTECTION OF SENSITIVE INFORMATION.—Any activity carried out under this section shall be conducted in a manner that appropriately protects sensitive information and the national security interests of the United States.

(d) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this section, the term "appropriate committees of Congress" means—

(1) the Committee on Armed Services, the Committee on Appropriations, and the Committee on Foreign Relations of the Senate; and

(2) the Committee on Armed Services, the Committee on Appropriations, and the Committee on Foreign Affairs of the House of Representatives.

## SEC. 1262. MODIFICATION OF ESTABLISHMENT OF COORDINATOR FOR DETAINED ISIS MEMBERS AND RELEVANT POPULATIONS IN SYRIA.

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the Committee on Armed Services, the Committee on Foreign Relations, the Committee on the Judiciary, the Committee on Banking, Housing, and Urban Affairs, the Select Committee on Intelligence, and the Committee on Appropriations of the Senate; and

(B) the Committee on Armed Services, the Committee on Foreign Affairs, the Committee on the Judiciary, the Committee on Financial Services, the Permanent Select Committee on Intelligence, and the Committee on Appropriations of the House of Representatives.

(2) ISIS MEMBER.—The term "ISIS member" means a person who was part of, or substantially supported, the Islamic State in Iraq and Syria.

(3) SENIOR COORDINATOR.—The term "Senior Coordinator" means the coordinator for detained ISIS members and relevant displaced populations in Syria designated under subsection (a) of section 1224 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1642), as amended by subsection (d).

(b) SENSE OF CONGRESS.—

It is the sense of Congress that—

137 STAT. 476                 PUBLIC LAW 118–31—DEC. 22, 2023

(A) ISIS detainees held by the Syrian Democratic Forces and ISIS-affiliated individuals located within displaced persons camps in Syria pose a significant and growing humanitarian challenge and security threat to the region;

(B) the vast majority of individuals held in displaced persons camps in Syria are women and children, approximately 50 percent of whom are under the age of 12 at the al-Hol camp, and they face significant threats of violence and radicalization, as well as lacking access to adequate sanitation and health care facilities;

(C) there is an urgent need to seek a sustainable solution to such camps through repatriation and reintegration of the inhabitants;

(D) the United States should work closely with international allies and partners to facilitate the repatriation and reintegration efforts required to provide a long-term solution for such camps and prevent the resurgence of ISIS; and

(E) if left unaddressed, such camps will continue to be drivers of instability that jeopardize the long-term prospects for peace and stability in the region.

(c) STATEMENT OF POLICY.—It is the policy of the United States that—

(1) ISIS-affiliated individuals located within displacement camps in Syria, and other inhabitants of displacement camps in Syria, be repatriated and, where appropriate, prosecuted, or where possible, reintegrated into their country of origin, consistent with all relevant domestic laws and applicable international laws prohibiting refoulement; and

(2) the camps will be closed as soon as is practicable.

(d) MODIFICATION OF ESTABLISHMENT OF COORDINATOR FOR DETAINED ISIS MEMBERS AND RELEVANT DISPLACED POPULATIONS IN SYRIA.—Section 1224 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1642) is amended—

(1) by striking subsection (a);

(2) by amending subsection (b) to read as follows:

"(a) DESIGNATION.—

President.

"(1) IN GENERAL.—The President, in consultation with the Secretary of Defense, the Secretary of State, the Director of National Intelligence, the Secretary of the Treasury, the Administrator of the United States Agency for International Development, and the Attorney General, shall designate an existing official to serve within the executive branch as senior-level coordinator to coordinate, in conjunction with other relevant agencies, matters related to ISIS members who are in the custody of the Syrian Democratic Forces and other relevant displaced populations in Syria, including—

"(A) by engaging foreign partners to support the repatriation and disposition of such individuals, including by encouraging foreign partners to repatriate, transfer, investigate, and prosecute such ISIS members, and share information;

"(B) coordination of all multilateral and international engagements led by the Department of State and other

agencies that are related to the current and future handling, detention, and prosecution of such ISIS members;

"(C) the funding and coordination of the provision of technical and other assistance to foreign countries to aid in the successful investigation and prosecution of such ISIS members, as appropriate, in accordance with relevant domestic laws, international humanitarian law, and other internationally recognized human rights and rule of law standards;

"(D) coordination of all multilateral and international engagements related to humanitarian access and provision of basic services to, and freedom of movement and security and safe return of, displaced persons at camps or facilities in Syria that hold family members of such ISIS members;

"(E) coordination with relevant agencies on matters described in this section; and

"(F) any other matter the President considers relevant.

"(2) RULE OF CONSTRUCTION.—If, on the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, an individual has already been designated, consistent with the requirements and responsibilities described in paragraph (1), the requirements under that paragraph shall be considered to be satisfied with respect to such individual until the date on which such individual no longer serves as the Senior Coordinator.";

(3) in subsection (c), by striking "subsection (b)" and inserting "subsection (a)";

(4) in subsection (d), by striking "subsection (b)" and inserting "subsection (a)";

(5) in subsection (e), by striking "January 31, 2021" and inserting "January 31, 2025";

(6) in subsection (f)—

(A) by redesignating paragraph (2) as paragraph (3);

(B) by inserting after paragraph (1) the following new paragraph (2):

"(2) SENIOR COORDINATOR.—The term 'Senior Coordinator' means the individual designated under subsection (a)."; and

Definition.

(C) by adding at the end the following new paragraph:

"(4) RELEVANT AGENCIES.—The term 'relevant agencies' means—

Definition.

"(A) the Department of State;

"(B) the Department of Defense;

"(C) the Department of the Treasury;

"(D) the Department of Justice;

"(E) the United States Agency for International Development;

"(F) the Office of the Director of National Intelligence; and

"(G) any other agency the President considers relevant."; and

(7) by redesignating subsections (c) through (f) as subsections (b) through (e), respectively.

(e) STRATEGY ON ISIS-RELATED DETAINEE AND DISPLACEMENT CAMPS IN SYRIA.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State, in coordination with the Secretary of Defense, the Director of National

Deadline.

137 STAT. 478          PUBLIC LAW 118–31—DEC. 22, 2023

Intelligence, the Secretary of the Treasury, the Administrator of the United States Agency for International Development, and the Attorney General, shall submit to the appropriate committees of Congress an interagency strategy with respect to ISIS-affiliated individuals and ISIS-related detainee and other displaced persons camps in Syria.

(2) ELEMENTS.—The strategy required by paragraph (1) shall include—

(A) methods to address—

(i) disengagement from and prevention of recruitment into violence, violent extremism, and other illicit activity in such camps;

(ii) efforts to encourage and facilitate repatriation and, as appropriate, investigation and prosecution of foreign nationals from such camps, consistent with all relevant domestic and applicable international laws;

(iii) the return and reintegration of displaced Syrian and Iraqi women and children into their communities of origin;

(iv) international engagement to develop processes for repatriation and reintegration of foreign nationals from such camps;

(v) contingency plans for the relocation of detained and displaced persons who are not able to be repatriated from such camps;

(vi) efforts to improve the humanitarian conditions in such camps, including through the delivery of medicine, psychosocial support, clothing, education, and improved housing; and

(vii) assessed humanitarian and security needs of all camps and detainment facilities based on prioritization of such camps and facilities most at risk of humanitarian crises, external attacks, or internal violence;

Assessment.

(B) an assessment of—

(i) rehabilitation centers in northeast Syria, including humanitarian conditions and processes for admittance and efforts to improve both humanitarian conditions and admittance processes for such centers and camps, as well as on the prevention of youth radicalization; and

(ii) processes for being sent to, and resources directed towards, rehabilitation centers and programs in countries that receive returned ISIS affiliated individuals, with a focus on the prevention of radicalization of minor children;

Plan.

(C) a plan to improve, in such camps—

(i) security conditions, including by training of personnel and through construction; and

(ii) humanitarian conditions;

Framework.

(D) a framework for measuring progress of humanitarian, security, and repatriation efforts with the goal of closing such camps; and

(E) any other matter the Secretary of State considers appropriate.

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 479

(3) FORM.—The strategy required by paragraph (1) shall be submitted in unclassified form but may include a classified annex that is transmitted separately.

(f) ANNUAL INTERAGENCY REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and not less frequently than annually thereafter through January 31, 2025, the Senior Coordinator, in coordination with the relevant agencies, shall submit to the appropriate committees of Congress a detailed report that includes the following:

(A) A detailed description of the facilities and camps where detained ISIS members, and families with perceived ISIS affiliation, are being held and housed, including—

Assessments.

(i) a description of the security and management of such facilities and camps;

(ii) an assessment of resources required for the security of such facilities and camps;

(iii) an assessment of the adherence by the operators of such facilities and camps to international humanitarian law standards; and

(iv) an assessment of children held within such facilities and camps that may be used as part of smuggling operations to evade security at the facilities and camps.

(B) A description of all efforts undertaken by, and the resources needed for, the United States Government to address deficits in the humanitarian environment and security of such facilities and camps.

(C) A description of all multilateral and international engagements related to humanitarian access and provision of basic services to, and freedom of movement and security and safe return of, displaced persons at camps or facilities in Iraq, Syria, and any other area affected by ISIS activity, including a description of—

(i) support for efforts by the Syrian Democratic Forces to facilitate the return and reintegration of displaced people from Iraq and Syria;

(ii) repatriation efforts with respect to displaced women and children and male children aging into adults while held in these facilities and camps;

(iii) any current or future potential threat to United States national security interests posed by detained ISIS members or displaced families, including an analysis of the al-Hol camp and annexes; and

(iv) United States Government plans and strategies to respond to any threat identified under clause (iii).

(D) The number of individuals repatriated from the custody of the Syrian Democratic Forces.

(E) An analysis of factors on the ground in Syria and Iraq that may result in the unintended release of detained or displaced ISIS members, and an assessment of any measures available to mitigate such releases.

Analysis.

(F) A detailed description of efforts to encourage the final disposition and security of detained or displaced ISIS members with other countries and international organizations.

Analysis.

(G) A description of foreign repatriation and rehabilitation programs deemed successful systems to model, and an analysis of the long-term results of such programs.

(H) A description of the manner in which the United States Government communicates regarding repatriation and disposition efforts with the families of United States citizens believed to have been victims of a criminal act by a detained or displaced ISIS member, in accordance with section 503(c) of the Victims' Rights and Restitution Act of 1990 (34 U.S.C. 20141(c)) and section 3771 of title 18, United States Code.

Analysis.

(I) An analysis of all efforts between the United States and partner countries within the Global Coalition to Defeat ISIS or other countries to share related information that may aid in resolving the final disposition of ISIS members, and any obstacles that may hinder such efforts.

(J) Any other matter the Coordinator considers appropriate.

(2) FORM.—The report required by paragraph (1) shall be submitted in unclassified form but may include a classified annex that is transmitted separately.

(g) RULE OF CONSTRUCTION.—Nothing in this section, or an amendment made by this section, may be construed—

(1) to limit the authority of any Federal agency to independently carry out the authorized functions of such agency; or

(2) to impair or otherwise affect the activities performed by that agency as granted by law.

### SEC. 1263. EXTENSION AND MODIFICATION OF AUTHORITY TO PROVIDE ASSISTANCE TO COUNTER THE ISLAMIC STATE OF IRAQ AND SYRIA.

(a) IN GENERAL.—Subsection (a) of section 1236 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291; 128 Stat. 3559) is amended, in the matter preceding paragraph (1)—

(1) by striking "$4,000,000" and inserting "$6,000,000"; and

(2) by striking "December 31, 2023" and inserting "December 31, 2024".

(b) FUNDING.—Subsection (g) of such section is amended by striking "Overseas Contingency Operations for fiscal year 2023, there are authorized to be appropriated $358,000,000" and inserting "fiscal year 2024, there is authorized to be appropriated $241,950,000".

(c) LIMITATION ON COST OF CONSTRUCTION, REPAIR, AND RENOVATION PROJECTS.—Subsection (o) of such section is amended—

(1) in paragraph (1)—

(A) by striking "(1) IN GENERAL.—The President" and inserting "(1) AUTHORITY OF PRESIDENT.—The President"; and

(B) by striking "paragraph (2)" and inserting "paragraph (3)";

(2) by redesignating paragraphs (2), (3), (4), and (5) as paragraphs (3), (4), (5), and (6), respectively;

(3) by inserting after paragraph (1) (as so amended) the following:

Waivers.
President.
Notifications.

"(2) AUTHORITY OF SECRETARY OF DEFENSE.—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 481

"(A) IN GENERAL.—The Secretary of Defense may further adjust the total cost of a project subsequent to a waiver by the President of the dollar amount limitation in subsection (a) if—

"(i) such total cost does not exceed the sum of—

"(I) the cost estimate for the project as required by paragraph (4)(B)(i) that is included in the notification submitted by the President pursuant to such waiver; and

"(II) the amount that is 50 percent of such cost estimate; and

"(ii) the Secretary submits to the appropriate congressional committees a notification of the exercise of the adjustment.

"(B) SCOPE.—The Secretary may modify the scope of a project subsequent to a waiver by the President of the dollar amount limitation in subsection (a) if the Secretary submits to the appropriate congressional committees a notification of the exercise of the modification.";

(4) in paragraph (4) (as so redesignated)—

(A) in subparagraph (A), by adding at the end the following: "A project with respect to which the exercise of a further adjustment to the total cost of the project under paragraph (2)(A) applies or with respect to which the exercise of a modification to the scope of the project under paragraph (2)(B) applies may only be carried out after the end of a 15-day period beginning on the date on which the appropriate congressional committees receive the notification required by paragraph (2)(A) or (2)(B), as the case may be."; and

(B) in subparagraph (B), in the matter preceding clause (i), by inserting ", (2)(A), or (2)(B)" after "(1)(B)"; and

(5) in paragraph (6) (as so redesignated)—

(A) by striking "waiver authority" and inserting "waiver and other authorities"; and

(B) by striking "December 31, 2023" and inserting "December 31, 2024".

Applicability.
Time period.
Effective date.

SEC. 1264. EXTENSION AND MODIFICATION OF AUTHORITY TO PROVIDE ASSISTANCE TO VETTED SYRIAN GROUPS AND INDIVIDUALS.

(a) EXTENSION.—Subsection (a) of section 1209 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law 113–291; 128 Stat. 3541) is amended, in the matter preceding paragraph (1), by striking "December 31, 2023" and inserting "December 31, 2024".

(b) LIMITATION ON COST OF CONSTRUCTION AND REPAIR PROJECTS.—Subsection (l) of such section is amended—

(1) in paragraph (1)(A), by striking "$4,000,000" and inserting "$6,000,000"; and

(2) in paragraph (3)—

(A) by striking "(A) IN GENERAL.—The President" and inserting "(A) AUTHORITY OF PRESIDENT.—The President";

(B) by redesignating subparagraphs (B), (C), and (D) as subparagraphs (C), (D), and (E), respectively;

(C) by inserting after subparagraph (A) (as so amended) the following:

137 STAT. 482          PUBLIC LAW 118–31—DEC. 22, 2023

Waiver.
President.
Notification.

"(B) AUTHORITY OF SECRETARY OF DEFENSE.—
     "(i) IN GENERAL.—The Secretary of Defense may further adjust the total cost of a project subsequent to a waiver by the President of the limitation under paragraph (1)(A) if—
          "(I) such total cost does not exceed the sum of—
               "(aa) the cost estimate for the project as required by subparagraph (C)(ii)(I) that is included in the notification submitted by the President pursuant to such waiver; and
               "(bb) the amount that is 50 percent of such cost estimate; and
          "(II) the Secretary submits to the appropriate congressional committees a notification of the exercise of the adjustment.
     "(ii) SCOPE.—The Secretary may modify the scope of a project subsequent to a waiver by the President of the limitation under paragraph (1)(A) if the Secretary submits to the appropriate congressional committees a notification of the exercise of the modification.";
     (D) in subparagraph (C) (as so redesignated)—

Applicability.
Time period.
Effective date.

          (i) in clause (i), by adding at the end the following: "A project with respect to which the exercise of a further adjustment to the total cost of the project under subparagraph (B)(i) applies or with respect to which the exercise of a modification to the scope of the project under subparagraph (B)(ii) applies may only be carried out after the end of a 15-day period beginning on the date on which the appropriate congressional committees receive the notification required by subparagraph (B)(i) or (B)(ii), as the case may be."; and
          (ii) in clause (ii), in the matter preceding subclause (I), by inserting ", (B)(i), or (B)(ii)" after "(A)(ii)"; and
     (E) in subparagraph (E) (as so redesignated)—
          (i) by striking "waiver authority" and inserting "waiver and other authorities"; and
          (ii) by striking "December 31, 2023" and inserting "December 31, 2024".

**SEC. 1265. EXTENSION OF AUTHORITY TO SUPPORT OPERATIONS AND ACTIVITIES OF THE OFFICE OF SECURITY COOPERATION IN IRAQ.**

     (a) LIMITATION ON AMOUNT.—Subsection (c) of section 1215 of the National Defense Authorization Act for Fiscal Year 2012 (10 U.S.C. 113 note) is amended—
          (1) by striking "fiscal year 2022" and inserting "fiscal year 2024"; and
          (2) by striking "$25,000,000" and inserting "$18,000,000".
     (b) SOURCE OF FUNDS.—Subsection (d) of such section is amended by striking "fiscal year 2023" and inserting "fiscal year 2024".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 483

**SEC. 1266. PLAN OF ACTION TO EQUIP AND TRAIN IRAQI SECURITY FORCES AND KURDISH PESHMERGA FORCES.**

10 USC 113 note.
Deadlines.

(a) IN GENERAL.—Not later than February 1, 2024, the Secretary of Defense, in consultation with the Secretary of State, shall develop a plan of action to equip and train Iraqi security forces and Kurdish Peshmerga forces to defend against attack by missiles, rockets, and unmanned systems. The plan of action shall be based on and informed by the results of the report submitted by the Secretary of Defense pursuant to section 1237 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2839).

(b) MATTERS TO BE INCLUDED.—The plan required by subsection (a) shall include the following:

(1) The provision of available equipment to Iraq and the Iraqi Kurdistan Region to counter the air and missile threats addressed in the report, to include air defense systems, to counter attack by missiles, rockets, and unmanned systems.

(2) The provision of appropriate training of Iraqi security forces and Kurdish Peshmerga forces to support fielding and operational employment of the available equipment described in paragraph (1).

(c) IMPLEMENTATION.—

(1) IN GENERAL.—The Secretary of Defense shall begin implementation of the plan required by subsection (a) not later than 90 days after development of the plan required by subsection (a).

(2) WAIVER.—The Secretary of Defense may delay implementation of the plan required by subsection (a) if such implementation would adversely impact United States stocks and readiness.

(3) CONGRESSIONAL NOTIFICATION.—If the Secretary of Defense exercises the waiver authority under paragraph (2), the Secretary shall—

(A) notify the congressional defense committees of the exercise of such authority and the reason therefor not later than 10 days prior to the exercise of such authority; and

(B) notify the congressional defense committees of the exercise of such authority every 30 days thereafter until implementation of the plan required by subsection (a) begins.

(d) CONGRESSIONAL BRIEFING.—Not later than July 1, 2024, the Secretary of Defense should provide to the congressional defense committees a briefing on progress of the air defense equipping and training effort against the air and missile threat to Iraq, including in the Iraqi Kurdistan Region.

**SEC. 1267. PROHIBITION ON TRANSFERS TO THE BADR ORGANIZATION.**

10 USC 2241 note.

None of the amounts authorized to be appropriated by this Act or otherwise made available to the Department of Defense may be made available, directly or indirectly, to the Badr Organization.

137 STAT. 484          PUBLIC LAW 118–31—DEC. 22, 2023

## SEC. 1268. EXTENSION AND MODIFICATION OF ANNUAL REPORT ON MILITARY POWER OF IRAN.

(a) MATTERS TO BE INCLUDED.—Subsection (b) of section 1245 of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84) is amended—

10 USC 113 note.

(1) in paragraph (2)(D), by inserting after "Iran's conventional forces" the following: "and Iran's unconventional or parallel military forces";

(2) in paragraph (4)—

(A) in subparagraph (B), by striking "missile launch sites" and inserting "missile launch and storage sites";

(B) in subparagraph (C), by striking "; and" at the end;

(C) in subparagraph (D), by striking the period at the end and inserting a semicolon; and

(D) by adding at the end the following:

Assessment.

"(E) an assessment of Iran's space launch vehicle program and the ability of Iran to use those technologies to develop and field an intercontinental ballistic missile;

"(F) a detailed analysis of the effectiveness of Iran's drone forces; and

Estimate.

"(G) a description or estimation of the threat posed by Iran's Islamic Revolutionary Guard Corps to European citizens or to member countries of the European Union.";

(3) in paragraph (7), by inserting "the People's Republic of China," before "Cuba"; and

Assessments.

(4) by adding at the end the following:

"(9) An assessment of the threat posed by Iran against United States and partner military bases, to include missile, unmanned aircraft systems, and loitering munition attacks.

"(10) An assessment of the sale, supply, or transfer of narcotics in the Middle East region by the Islamic Revolutionary Guard Corps and Iran backed groups.

"(11) An assessment of groups that are supported by Iran and designated by the United States as foreign terrorist organizations and regional military groups, including Hezbollah, Hamas, the Houthis, and the Special Groups in Iraq, in particular those forces as having been assessed as to be willing to carry out terrorist operations on behalf of Iran.

"(12) An assessment of how Iran would utilize additional resources to further activities described in paragraphs (1) through (9).".

(b) DEFINITIONS.—Subsection (c)(1)(B) of such section is amended to read as follows:

"(B) includes all branches and sub-branches of Iran's national army or Artesh, such as its ground forces, air force, navy, and air defense forces as well as most branches of its parallel military, and the Islamic Revolutionary Guard Corps excluding its Quds-Force.".

## SEC. 1269. MODIFICATION AND UPDATE TO REPORT ON MILITARY CAPABILITIES OF IRAN AND RELATED ACTIVITIES.

Section 1227 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 1972) is amended—

(1) in subsection (a)—

(A) in paragraph (1)(C), by inserting "ballistic and cruise" after "instances of"; and

(B) in paragraph (2)—

(i) in subparagraph (F), by striking "The United Nations" and inserting "The effect of the United Nations"; and

(ii) by adding at the end the following new subparagraph:

"(H) Iranian involvement in regional narcotics trade, to include the following:

"(i) Any element of the Government of Iran, including the Islamic Revolutionary Guard Corps (in this section referred to as the 'IRGC') and any Iran-backed group operating in Iraq, Syria, Lebanon, or Yemen, that supports the sale, supply, or transfer of narcotics in the Middle East region.

"(ii) The benefits accrued from the sale, supply, and transfer of narcotics in the region by any element of the Government of Iran, including the IRGC and any Iran-backed groups operating in Iraq, Syria, Lebanon, or Yemen.

"(iii) All foreign terrorist organizations to or for which the IRGC, or any person owned or controlled by the IRGC, provides material support in the sale, supply, transfer, or production of captagon or other related narcotics or precursors in the Middle East and North Africa.

"(iv) Activities conducted by the IRGC in Afghanistan related to the trade of methamphetamine or opiates, including synthetic opiates.

"(v) All intercepted transfers involving the United States Fifth Fleet of narcotics from Iran or involving Iranian nationals or persons acting, or purporting to act, for or on behalf of the Government of Iran, including the IRGC.

"(I) Islamic Revolutionary Guard Corps-affiliated operatives serving in diplomatic and consular posts, cultural centers, religious institutions, and religious functions outside of Iran and actions taken by the Secretary of Defense, the Secretary of State, and the heads of the elements of the intelligence community (as such term is defined in section 3 of the National Security Act of 1947 (50 U.S.C. 3003), consistent with the necessary protections for sources and methods, to reduce the influence of such operations.";

(2) by redesignating subsection (c) and (d) as subsections (d) and (e), respectively;

(3) by inserting after subsection (b) the following new subsection:

"(c) UPDATED REPORT.—Not later than 180 days after the date of the enactment of the National Defense Authorization Act of 2024, the Director of National Intelligence shall submit to the appropriate congressional committees an updated report that includes each of the matters listed in paragraphs (1) and (2) of subsection (a) and covers developments during the period beginning in June 2022 and ending on the day before the date on which the updated report is submitted."; and

**137 STAT. 486**          **PUBLIC LAW 118–31—DEC. 22, 2023**

(4) in subsection (d), as so redesignated, by inserting ", and the updated report required by subsection (b)," after "report required by subsection (a)".

### SEC. 1270. PROHIBITION ON FUNDS TO IRAN.

None of the amounts authorized to be appropriated by this Act to the Department of Defense may be made available, directly or indirectly, to—

(1) the Government of Iran;

(2) any person owned or controlled by the Government of Iran;

(3) any person identified on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury, the property and interests in property of which are blocked pursuant to the International Emergency Economic Powers Act;

(4) any person owned or controlled by a person described in paragraph (3); or

(5) the Badr organization, Saraya Khorasani, or Kata'ib al-Imam Ali.

<span style="font-size:smaller">Saraya Khorasani. Kata'ib al-Imam Ali. 10 USC 2241 note.</span>

### SEC. 1271. PROHIBITION ON TRANSPORTING CURRENCY TO THE TALIBAN AND THE ISLAMIC EMIRATE OF AFGHANISTAN.

None of the amounts authorized to be appropriated by this Act or otherwise made available to the Department of Defense may be made available for the operation of any aircraft of the Department of Defense to transport currency or other items of value to the Taliban, the Islamic Emirate of Afghanistan, or any subsidiary, agent, or instrumentality of either the Taliban or the Islamic Emirate of Afghanistan.

### SEC. 1272. PROHIBITION ON FUNDING FOR THE TALIBAN.

(a) PROHIBITION ON FUNDING.—None of the funds authorized to be appropriated by this Act or otherwise made available for the Department of Defense for fiscal year 2024 may be made available to provide any form of United States assistance to the Taliban or to any Taliban affiliate.

<span style="font-size:smaller">Waiver. Classified information.</span>

(b) NATIONAL SECURITY CERTIFICATION.—The Secretary of Defense may waive the prohibition under subsection (a) on a case-by-case basis if the Secretary submits to the congressional defense committees an unclassified, written certification, which may include a classified annex, that such prohibition would be detrimental to national security interests of the United States or threaten the health and safety of the Afghan people.

(c) AFFILIATE DEFINED.—In this section, the term "affiliate" means, with respect to the Taliban—

(1) a person that is closely associated with the Taliban; or

(2) a person that has a common purpose with the Taliban.

# TITLE XIII—OTHER MATTERS RELATING TO FOREIGN NATIONS

Subtitle A—Matters Relating to the Indo-Pacific Region

Sec. 1301. Sense of Congress on defense alliances and partnerships in the Indo-Pacific region.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 487

Sec. 1302. Extension of Pacific Deterrence Initiative and report, briefings, and plan under the Initiative.
Sec. 1303. Modification of pilot program to develop young civilian defense leaders in the Indo-Pacific region.
Sec. 1304. Indo-Pacific campaigning initiative.
Sec. 1305. Indo-Pacific Maritime Domain Awareness Initiative.
Sec. 1306. Limitation on availability of funds pending feasibility study regarding delivery of harpoon missiles to foreign security partners.
Sec. 1307. Sense of Congress on Taiwan defense relations.
Sec. 1308. Oversight of Taiwan Enhanced Resilience Act.
Sec. 1309. Training, advising, and institutional capacity-building program for military forces of Taiwan.
Sec. 1310. Prohibition on use of funds to support entertainment projects with ties to the Government of the People's Republic of China.
Sec. 1311. Determination on involvement of the People's Republic of China in the Mexican fentanyl trade.
Sec. 1312. Analysis of certain biotechnology entities.
Sec. 1313. Studies on defense budget transparency of the People's Republic of China and the United States.
Sec. 1314. Extension of authority to transfer funds for Bien Hoa dioxin cleanup.
Sec. 1315. Extension and modification of pilot program to improve cyber cooperation with foreign military partners in Southeast Asia.
Sec. 1316. Enhancing major defense partnership with India.
Sec. 1317. Report on enhanced security cooperation with Japan.
Sec. 1318. Report and notification relating to transfer of operational control on Korean Peninsula.
Sec. 1319. Study and report on command structure and force posture of United States Armed Forces in the Indo-Pacific region.

Subtitle B—Matters Relating to the AUKUS Partnership

Sec. 1321. Definitions.

PART 1—ADMINISTRATIVE PROVISIONS

Sec. 1331. AUKUS partnership oversight and accountability framework.
Sec. 1332. Designation of senior official for Department of Defense activities relating to, and implementation plan for, the AUKUS partnership.
Sec. 1333. Reporting related to the AUKUS partnership.

PART 2—STREAMLINING AND PROTECTING TRANSFERS OF UNITED STATES MILITARY TECHNOLOGY FROM COMPROMISE

Sec. 1341. Priority for Australia and the United Kingdom in Foreign Military Sales and Direct Commercial Sales.
Sec. 1342. Identification and pre-clearance of platforms, technologies, and equipment for sale to Australia and the United Kingdom through Foreign Military Sales and Direct Commercial Sales.
Sec. 1343. Export control exemptions and standards.
Sec. 1344. Expedited review of export licenses for exports of advanced technologies to Australia, the United Kingdom, and Canada.
Sec. 1345. United States Munitions List.

PART 3—AUKUS SUBMARINE TRANSFER AUTHORIZATION ACT

Sec. 1351. Short title.
Sec. 1352. Authorization of sales of Virginia Class submarines to Australia.
Sec. 1353. Acceptance of contributions in support of Australia, United Kingdom, and United States submarine security activities.
Sec. 1354. Appropriate congressional committees and leadership defined.

# Subtitle A—Matters Relating to the Indo-Pacific Region

### SEC. 1301. SENSE OF CONGRESS ON DEFENSE ALLIANCES AND PARTNERSHIPS IN THE INDO-PACIFIC REGION.

It is the sense of Congress that the Secretary of Defense should continue efforts that strengthen United States defense alliances and partnerships in the Indo-Pacific region so as to further the comparative advantage of the United States in strategic competition with the People's Republic of China, including by—

137 STAT. 488          PUBLIC LAW 118–31—DEC. 22, 2023

(1) enhancing cooperation with Japan, consistent with the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, signed at Washington, January 19, 1960, including by developing advanced military capabilities, fostering interoperability across all domains, and improving sharing of information and intelligence;

(2) reinforcing the United States alliance with the Republic of Korea, including by maintaining the presence of approximately 28,500 members of the United States Armed Forces deployed to the country and affirming the United States commitment to extended deterrence using the full range of United States defense capabilities, and with deeper coordination on nuclear deterrence as highlighted in the Washington Declaration adopted by President Biden and President Yoon Suk Yeol during President Yoon Suk Yeol's state visit on April 26, 2023, consistent with the Mutual Defense Treaty Between the United States and the Republic of Korea, signed at Washington, October 1, 1953, in support of the shared objective of a peaceful and stable Korean Peninsula;

(3) fostering bilateral and multilateral cooperation with Australia, consistent with the Security Treaty Between Australia, New Zealand, and the United States of America, signed at San Francisco, September 1, 1951, and through the partnership among Australia, the United Kingdom, and the United States (commonly known as "AUKUS")—

(A) to advance shared security objectives;

(B) to accelerate the fielding of advanced military capabilities; and

(C) to build the capacity of emerging partners;

(4) advancing United States alliances with the Philippines and Thailand and United States partnerships with other partners in the Association of Southeast Asian Nations to enhance maritime domain awareness, promote sovereignty and territorial integrity, leverage technology and promote innovation, and support an open, inclusive, and rules-based regional architecture;

(5) broadening United States engagement with India, including through the Quadrilateral Security Dialogue—

(A) to advance the shared objective of a free and open Indo-Pacific region through bilateral and multilateral engagements and participation in military exercises, expanded defense trade, and collaboration on humanitarian aid and disaster response; and

(B) to enable greater cooperation on maritime security;

(6) strengthening the United States partnership with Taiwan, consistent with the Three Communiques, the Taiwan Relations Act (Public Law 96–8; 22 U.S.C. 3301 et seq.), and the Six Assurances, with the goal of improving Taiwan's defensive capabilities and promoting peaceful cross-strait relations;

(7) reinforcing the status of the Republic of Singapore as a Major Security Cooperation Partner of the United States and continuing to strengthen defense and security cooperation between the military forces of the Republic of Singapore and the Armed Forces of the United States, including through participation in combined exercises and training;

(8) engaging with the Federated States of Micronesia, the Republic of the Marshall Islands, the Republic of Palau, and

other Pacific Island countries with the goal of strengthening regional security and addressing issues of mutual concern, including protecting fisheries from illegal, unreported, and unregulated fishing; and

(9) collaborating with Canada, the United Kingdom, France, and other members of the European Union and the North Atlantic Treaty Organization to build connectivity and advance a shared vision for the region that is principled, long-term, and anchored in democratic resilience.

## SEC. 1302. EXTENSION OF PACIFIC DETERRENCE INITIATIVE AND REPORT, BRIEFINGS, AND PLAN UNDER THE INITIATIVE.

(a) EXTENSION OF INITIATIVE.—Subsection (c) of section 1251 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note) is amended—

(1) by striking "the National Defense Authorization Act for Fiscal Year 2023" and inserting "the National Defense Authorization Act for Fiscal Year 2024"; and

(2) by striking "fiscal year 2023" and inserting "fiscal year 2024".

(b) EXTENSION OF REPORT AND BRIEFINGS.—Subsection (d) of such section is amended—

(1) in paragraph (1)(A), by striking "fiscal years 2024 and 2025" and inserting "fiscal years 2025 and 2026"; and

(2) in paragraph (2), by striking "fiscal years 2023 and 2024" each place it appears and inserting "fiscal years 2025 and 2026".

(c) EXTENSION OF PLAN.—Subsection (e) of such section is amended by striking "fiscal years 2023 and 2024" and inserting "fiscal years 2025 and 2026".

## SEC. 1303. MODIFICATION OF PILOT PROGRAM TO DEVELOP YOUNG CIVILIAN DEFENSE LEADERS IN THE INDO-PACIFIC REGION.

Section 1261 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (10 U.S.C. 311 note) is amended—

(1) in subsection (b)—

(A) in the matter preceding paragraph (1), by striking "a national defense mission" and inserting "a defense-related national security mission"; and

(B) by inserting "and other appropriate ministries with a defense-related national security mission" after "civilian leaders in foreign partner ministries of defense" each place it appears; and

(2) in subsection (c), by striking "civilian defense leaders from foreign partner ministries of defense" and inserting "civilian leaders in foreign partner ministries of defense and other appropriate ministries with a defense-related national security mission".

## SEC. 1304. INDO-PACIFIC CAMPAIGNING INITIATIVE.

10 USC 333 note.

(a) IN GENERAL.—The Secretary of Defense shall establish, and the Commander of the United States Indo-Pacific Command shall carry out, an Indo-Pacific Campaigning Initiative (in this section referred to as the "Initiative") for purposes of—

(1) strengthening United States alliances and partnerships with foreign military partners in the Indo-Pacific region;

(2) deterring military aggression by potential adversaries against the United States and allies and partners of the United States;

(3) dissuading strategic competitors from seeking to achieve their objectives through the conduct of military activities below the threshold of traditional armed conflict;

(4) improving the understanding of the United States Armed Forces with respect to the operating environment in the Indo-Pacific region;

(5) shaping the perception of potential adversaries with respect to United States military capabilities and the military capabilities of allies and partners of the United States in the Indo-Pacific region; and

(6) improving the ability of the United States Armed Forces to coordinate and operate with foreign military partners in the Indo-Pacific region.

(b) BRIEFING AND REPORT.—

(1) BRIEFING.—Not later than March 1, 2024, the Secretary shall provide the congressional defense committees with a briefing that describes ongoing and planned campaigning activities in the Indo-Pacific region for fiscal year 2024.

(2) REPORT.—Not later than December 1, 2024, the Secretary shall submit to the congressional defense committees a report that—

Summaries.

(A) summarizes the campaigning activities conducted in the Indo-Pacific region during fiscal year 2024; and

(B) includes—

Assessment.

(i) an assessment of the value each such activity contributes to meeting strategic or operational objectives relative to the commitment of resources of such activity;

(ii) lessons learned in carrying out such activities;

(iii) any identified resource or authority gap that has negatively impacted the implementation of the Initiative; and

Plans.

(iv) proposed plans for additional campaigning activities in the Indo-Pacific region to fulfill the purposes described in subsection (a).

(c) CAMPAIGNING DEFINED.—In this section, the term "campaigning"—

(1) means the conduct and sequencing of logically linked military activities to achieve strategy aligned objectives, including modifying the security environment over time to the benefit of the United States and the allies and partners of the United States while limiting, frustrating, and disrupting competitor activities; and

(2) includes deliberately planned military activities in the Indo-Pacific region involving bilateral and multilateral engagements with foreign partners, training, exercises, demonstrations, experiments, and other activities to achieve the objectives described in subsection (a).

10 USC 333 note.

**SEC. 1305. INDO-PACIFIC MARITIME DOMAIN AWARENESS INITIATIVE.**

(a) ESTABLISHMENT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Secretary of State, shall seek to establish an initiative with allies and partners of the United States, including Australia,

Japan, and India, to be known as the "Indo-Pacific Maritime Domain Awareness Initiative" (in this section referred to as the "Initiative"), to bolster maritime domain awareness in the Indo-Pacific region.

(b) USE OF AUTHORITIES.—In carrying out the Initiative, the Secretary of Defense may use the authorities provided in chapter 16 of title 10, United States Code, and other applicable statutory authorities available to the Secretary of Defense.

(c) PURPOSES.—The purposes of the Initiative are as follows:

(1) To enhance the ability of allies and partners of the United States in the Indo-Pacific region to monitor the maritime domain of such region.

(2) To utilize emerging technologies to support maritime domain awareness objectives.

(3) To provide a comprehensive understanding of the maritime domain in the Indo-Pacific region, including by facilitating information sharing among such allies and partners.

### SEC. 1306. LIMITATION ON AVAILABILITY OF FUNDS PENDING FEASIBILITY STUDY REGARDING DELIVERY OF HARPOON MISSILES TO FOREIGN SECURITY PARTNERS.

(a) LIMITATION.—Of the funds authorized to be appropriated by this Act for fiscal year 2024 and available for the Assistant Secretary of the Navy for Research, Development and Acquisition, not more than 85 percent may be obligated or expended until the date on which the Assistant Secretary of the Navy for Research, Development and Acquisition submits to the congressional defense committees the feasibility study required by subsection (b).

(b) FEASIBILITY STUDY REQUIRED.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, acting through the Assistant Secretary of the Navy for Research, Development and Acquisition, shall conduct a study to analyze the feasibility and advisability of accelerating the provision of Harpoon missiles to foreign security partners under existing Foreign Military Sales cases, additional appropriations, and pursuant to the authority provided under section 506 of the Foreign Assistance Act of 1961 (22 U.S.C. 2318) or section 333 of title 10, United States Code. *[Deadline. Analysis.]*

(2) ELEMENTS.—The study required by paragraph (1) shall, at a minimum, include the following: *[Analysis.]*

(A) A list of existing Foreign Military Sales cases for Harpoon missiles to foreign security partners. *[List.]*

(B) The current timeline for the delivery of Harpoon missiles under each of the Foreign Military Sales cases identified under subparagraph (A). *[Timeline.]*

(C) A detailed analysis of contracting timelines for Harpoon missiles procured by foreign security partners through the Foreign Military Sales process and recommendations, if any, for accelerating such contracting timelines. *[Timeline.]*

(D) An analysis of the feasibility and advisability of accelerating the provision of Harpoon missiles to foreign security partners under existing Foreign Military Sales cases, including through—

(i) additional appropriations;

137 STAT. 492          PUBLIC LAW 118–31—DEC. 22, 2023

(ii) the authority provided under section 506 of the Foreign Assistance Act of 1961 (22 U.S.C. 2318);

(iii) the authority provided in section 333 of title 10, United States Code;

(iv) any other authorities available to the Secretary of Defense under title 10 of the United States Code.

(E) An analysis of the potential for the United States Government to facilitize additional production capacity or purchase additional Harpoon missiles for future provision under section 506 of the Foreign Assistance Act of 1961 (22 U.S.C. 2318).

(c) CONGRESSIONAL BRIEFING.—

Deadline.
Taiwan.

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act and every 180 days thereafter through December 31, 2027, the Secretary of Defense and Secretary of State shall jointly provide the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate a briefing on the current status of United States-provided security assistance to Taiwan, including—

List.

(A) a list of existing cases for defense articles and services to be provided to Taiwan utilizing the authorities described in paragraph (2), including, with respect to a defense item or service planned or anticipated to be provided—

(i) a narrative description of the item or service;

(ii) the total value of the item or service;

(iii) the lead program office involved in the provision of the item or service; and

(iv) the vendor of the item or service;

Estimate.

(B) the estimated delivery schedule for each case identified under subparagraph (A);

(C) an identification of any case identified under subparagraph (A) that has been delayed by more than 3 months from the original estimated delivery schedule;

(D) any actions the Department of State and the Department of Defense have identified to prevent delays or accelerate the delivery of any case identified under subparagraph (A); and

(E) any other matters determined to be relevant by the Secretary of State and the Secretary of Defense.

(2) AUTHORITIES DESCRIBED.—The authorities described in this paragraph are the following:

(A) The Foreign Military Financing, Foreign Military Sales, and Direct Commercial Sales programs of the Department of State.

(B) The Department of Defense security assistance authorized by chapter 16 of title 10, United States Code.

(C) The Department of State training and education programs authorized by chapter 5 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2347 et seq.).

(D) Section 506 of the Foreign Assistance Act of 1961 (22 U.S.C. 2318).

(E) The provision of excess defense articles pursuant to the requirements of the Arms Export Control Act (22 U.S.C. 2751 et seq.).

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 493

(F) Any other authority available to the Secretary of Defense or the Secretary of State.

SEC. 1307. SENSE OF CONGRESS ON TAIWAN DEFENSE RELATIONS.     22 USC 3351 note.

It is the sense of Congress that—

(1) the United States' one China policy, as guided by the Taiwan Relations Act (Public Law 96–8; 22 U.S.C. et seq.), the Three Communiques between the United States and the People's Republic of China, and the Six Assurances provided by the United States to Taiwan in July 1982, is the foundation for United States-Taiwan relations;

(2) as set forth in the Taiwan Relations Act, the United States decision to establish diplomatic relations with the People's Republic of China rests upon the expectation that the future of Taiwan will be determined by peaceful means, and that any effort to determine the future of Taiwan by other than peaceful means, including boycotts and embargoes, is of grave concern to the United States;

(3) the increasingly coercive and aggressive behavior of the People's Republic of China toward Taiwan is contrary to the expectation of the peaceful resolution of the future of Taiwan;

(4) as set forth in the Taiwan Relations Act, the capacity to resist any resort to force or other forms of coercion that would jeopardize the security, or the social or economic system, of the people on Taiwan should be maintained;

(5) the United States should continue to support the development of capable, ready, and modern defense forces necessary for Taiwan to maintain sufficient defensive capabilities, including by—

(A) supporting acquisition by Taiwan of defense articles and services through foreign military sales, direct commercial sales, and industrial cooperation, with an emphasis on capabilities that support an asymmetric strategy;

(B) ensuring timely review of and response to requests of Taiwan for defense articles and services;

(C) conducting practical training and military exercises with Taiwan that enable Taiwan to maintain sufficient defensive capabilities, as described in the Taiwan Relations Act;

(D) exchanges between defense officials and officers of the United States and Taiwan at the strategic, policy, and functional levels, consistent with the Taiwan Travel Act (Public Law 115–135; 132 Stat. 341), especially for the purposes of—

(i) enhancing cooperation on defense planning;

(ii) improving the interoperability of the military forces of the United States and Taiwan; and

(iii) improving the reserve force of Taiwan;

(E) cooperating with Taiwan to improve its ability to employ military capabilities in asymmetric ways, as described in the Taiwan Relations Act; and

(F) expanding cooperation in humanitarian assistance and disaster relief; and

(6) the United States should increase its support to a free and open society in the face of aggressive efforts by the

Government of the People's Republic of China to curtail or influence the free exercise of rights and democratic franchise.

### SEC. 1308. OVERSIGHT OF TAIWAN ENHANCED RESILIENCE ACT.

(a) OVERSIGHT OF TAIWAN SECURITY PROGRAMS.—Section 5502 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2395; 22 U.S.C. 3351) is amended—

(1) in subsection (e)(2)(A), by inserting "not later than 1 year after the date of enactment of the National Defense Authorization Act for Fiscal Year 2024 and" before "not less than annually"; and

(2) in subsection (f)(2)—

(A) in subparagraph (L), by striking "and" at the end;

(B) in subparagraph (M), by striking the period at the end and inserting a semicolon; and

(C) by adding at the end the following:

"(N) a description of actions taken to establish or expand a comprehensive training program with Taiwan pursuant to section 5504;

"(O) a description of actions taken to establish a joint consultative mechanism with appropriate officials of Taiwan, and the multi-year plan to provide for the acquisition of appropriate defensive capabilities by Taiwan, pursuant to section 5506 ; and

"(P) the list compiled pursuant to section 5507(a), and a description of actions taken pursuant to sections 5507(b) and 5507(c).".

(b) OVERSIGHT OF REGIONAL CONTINGENCY STOCKPILE FOR TAIWAN.—Section 5503 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2395) is amended by adding at the end the following:

"(e) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In subsection (d), the term "appropriate committees of Congress" means—

"(1) the congressional defense committees; and

"(2) the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate.".

### SEC. 1309. TRAINING, ADVISING, AND INSTITUTIONAL CAPACITY-BUILDING PROGRAM FOR MILITARY FORCES OF TAIWAN.

22 USC 3357b.

(a) ESTABLISHMENT.—Consistent with the Taiwan Relations Act (22 U.S.C. 3301 et seq.) and pursuant to section 5504 of the Taiwan Enhanced Resilience Act (22 U.S.C. 3353), the Secretary of Defense, in consultation with appropriate officials of Taiwan, shall establish a comprehensive training, advising, and institutional capacity-building program for the military forces of Taiwan using the authorities provided in chapter 16 of title 10, United States Code, and other applicable statutory authorities available to the Secretary of Defense.

(b) REPORTING.—Section 1248(a) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117– 81; 135 Stat. 1988) is amended—

(1) by redesignating paragraph (15) as paragraph (16); and

(2) by inserting after paragraph (14) the following new paragraph:

"(15) An update on efforts made to establish the program authorized by subsection (a) of section 1309 of the National Defense Authorization Act for Fiscal Year 2024 and an identification of any authority or resource shortfall that inhibits such efforts.".

Update.

### SEC. 1310. PROHIBITION ON USE OF FUNDS TO SUPPORT ENTERTAINMENT PROJECTS WITH TIES TO THE GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA.

(a) IN GENERAL.—None of the funds authorized to be appropriated by this Act for the Department of Defense may be used to knowingly provide active and direct support to any film, television, or other entertainment project if the Secretary of Defense has demonstrable evidence that the project has complied, or is likely to comply, with a demand from the Government of the People's Republic of China or the Chinese Communist Party, or an entity under the direction of the People's Republic of China or the Chinese Communist Party, to censor the content of the project in a material manner to advance the national interest of the People's Republic of China.

(b) WAIVER.—The Secretary of Defense may waive the prohibition under subsection (a) if the Secretary submits to the Committees on Armed Services of the Senate and House of Representatives a written certification that such a waiver is in the national interest of the United States.

### SEC. 1311. DETERMINATION ON INVOLVEMENT OF THE PEOPLE'S REPUBLIC OF CHINA IN THE MEXICAN FENTANYL TRADE.

(a) DETERMINATION.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense, in consultation with the Director of National Intelligence, shall determine if information available to the Department of Defense indicates that the Government of the People's Republic of China assisted in or approved of the transportation of pill presses, fentanyl products, or fentanyl precursors to one or more Mexican drug cartels.

Deadline.

(b) REPORTING REQUIREMENT.—If the determination of the Secretary of Defense under subsection (a) is an affirmative determination, the Secretary shall submit the determination to the Committees on Armed Services of the Senate and the House of Representatives.

### SEC. 1312. ANALYSIS OF CERTAIN BIOTECHNOLOGY ENTITIES.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall conduct an analysis to determine if any biotechnology entity, or any subsidiary, parent, affiliate, or successor of such an entity, should be identified as a Chinese military company or a military-civil fusion contributor and included on the list maintained by the Department of Defense in accordance with section 1260H(b) of the National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note).

Deadline.
Determination.

(b) BIOTECHNOLOGY ENTITY DEFINED.—In this section, the term "biotechnology entity" means an entity that makes or offers a technology, good, or service that applies to or is enabled by life sciences innovation or product development for biological materials, including disease detection, genetic analysis, and related services.

### SEC. 1313. STUDIES ON DEFENSE BUDGET TRANSPARENCY OF THE PEOPLE'S REPUBLIC OF CHINA AND THE UNITED STATES.

Deadlines.

(a) STUDIES REQUIRED.—

(1) STUDY OF PRC BUDGET.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a study on the defense budget of the People's Republic of China.

(2) COMPARATIVE STUDY ON BUDGETS.—Not later than 90 days after the date on which the study required by paragraph (1) is submitted, the Secretary of Defense shall submit to the congressional defense committees a comparative study on the defense budgets of the People's Republic of China and the United States.

(3) OBJECTIVE.—The objective of the studies required by paragraphs (1) and (2) shall be to provide the people of the United States with an accurate comparison of the defense spending of the People's Republic of China and the United States.

(b) ELEMENTS.—The studies required by subsection (a) shall include, at a minimum, the following:

Determination.

(1) A determination of the amounts invested by the applicable subject country across functional categories for spending, including—

(A) defense-related research and development;

(B) weapons procurement from domestic and foreign sources;

(C) operations and maintenance;

(D) pay and benefits;

(E) military construction;

(F) military pensions; and

(G) any other category the Secretary considers relevant.

(2) A consideration of the effects of purchasing power parity and market exchange rates, particularly on non-traded goods.

Estimate.

(3) An estimate of the magnitude of omitted spending from official defense budget information and, in the study required by subsection (a)(2), an accounting for such spending.

(c) METHODOLOGY.—The studies required by subsection (a) shall each employ a robust methodology that—

(1) does not depend on the official budget pronouncements of the Government of the People's Republic of China or the Chinese Communist Party;

(2) takes into account the military-civil fusion present in the People's Republic of China;

(3) employs the building-block method of analysis or a similar method of analysis, as appropriate; and

(4) excludes spending related to veterans benefits, other than military pensions provided to veterans.

(d) CONSIDERATIONS.—The studies required by this section may take into consideration the following:

(1) The effects of state-owned enterprises on the defense expenditures of the People's Republic of China.

(2) The role of differing acquisition policies and structures with respect to the defense expenditures of each subject country.

(3) Any other matter relevant to evaluating the resources dedicated to the defense spending or the various military-related outlays of the People's Republic of China.

(e) FORM.—The studies required by this section shall be submitted in unclassified form, without any designation relating to dissemination control, but may include classified annexes.

### SEC. 1314. EXTENSION OF AUTHORITY TO TRANSFER FUNDS FOR BIEN HOA DIOXIN CLEANUP.

Section 1253(b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3955) is amended by striking "fiscal year 2023" and inserting "fiscal year 2024".

### SEC. 1315. EXTENSION AND MODIFICATION OF PILOT PROGRAM TO IMPROVE CYBER COOPERATION WITH FOREIGN MILITARY PARTNERS IN SOUTHEAST ASIA.

(a) IN GENERAL.—Subsection (a) of section 1256 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3956; 10 U.S.C. 333 note) is amended—

(1) in the matter preceding paragraph (1), by striking "in Vietnam, Thailand, and Indonesia" and inserting "with covered foreign military partners";

(2) in paragraph (1), by striking "Vietnam, Thailand, and Indonesia" and inserting "covered foreign military partners"; and

(3) in paragraph (2), by striking "Vietnam, Thailand, and Indonesia on" and inserting "covered foreign military partners on defensive".

(b) ELEMENTS.—Subsection (b) of such section is amended—

(1) in paragraph (1), by striking "Vietnam, Thailand, and Indonesia" and inserting "covered foreign military partners"; and

(2) in paragraph (2), by striking "Vietnam, Thailand, and Indonesia" and inserting "covered foreign military partners".

(c) REPORTS.—Subsection (c)(2)(B) of such section is amended by striking "Vietnam, Thailand, and Indonesia" and inserting "covered foreign military partners".

(d) CERTIFICATION.—Subsection (d) of such section is amended—

(1) by inserting "with any covered foreign military partner" after "scheduled to commence"; and

(2) by striking "Vietnam, Indonesia, or Thailand" and inserting "the covered foreign military partner".

(e) EXTENSION.—Subsection (e) of such section is amended by striking "December 31, 2024" and inserting "December 31, 2027".

(f) DEFINITIONS.—Subsection (f) of such section is amended to read as follows:

"(f) DEFINITIONS.—In this section:

"(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term 'appropriate committees of Congress' means—

"(A) the Committee on Armed Services and the Committee on Foreign Relations of the Senate; and

"(B) the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives.

"(2) COVERED FOREIGN MILITARY PARTNER.—The term 'covered foreign military partner' means the following:

"(A) Vietnam.

"(B) Thailand.

"(C) Indonesia.

"(D) The Philippines.

137 STAT. 498          PUBLIC LAW 118–31—DEC. 22, 2023

"(E) Malaysia.".

(g) CONFORMING AMENDMENTS.—

(1) Section 1256 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3956; 10 U.S.C. 333 note) is amended, in the section heading, by striking "VIETNAM, THAILAND, AND INDONESIA" and inserting "COVERED FOREIGN MILITARY PARTNERS IN SOUTHEAST ASIA".

(2) The table of contents for the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3388) is amended by striking the item relating to section 1256 and inserting the following:

"Sec. 1256. Pilot program to improve cyber cooperation with covered foreign military partners in Southeast Asia.".

(3) The table of contents for title XII of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3905) is amended by striking the item relating to section 1256 and inserting the following:

"Sec. 1256. Pilot program to improve cyber cooperation with covered foreign military partners in Southeast Asia.".

10 USC 333 note.    **SEC. 1316. ENHANCING MAJOR DEFENSE PARTNERSHIP WITH INDIA.**

The Secretary of Defense, in coordination with the Secretary of State and the head of any other relevant Federal department or agency, shall seek to ensure that India is appropriately considered for cooperative defense activities consistent with the status of India as a major defense partner of the United States, including with respect to the following lines of effort:

(1) Eligibility for funding to initiate or facilitate cooperative research, development, testing, or evaluation projects with the Department of Defense, with priority given to projects in the areas of—

(A) intelligence, surveillance, and reconnaissance;

(B) undersea domain awareness;

(C) air combat and support;

(D) munitions; and

(E) mobility.

(2) Eligibility to enter into agreements with the Department of Defense for cooperative bilateral or multilateral provision of training to build capacity in the areas of—

(A) counterterrorism operations;

(B) counter-weapons of mass destruction operations;

(C) counter-illicit drug trafficking operations;

(D) counter-transnational organized crime operations;

(E) maritime and border security operations;

(F) military intelligence operations;

(G) air domain awareness operations; and

(H) cyberspace security and defensive cyberspace operations.

(3) Eligibility to enter into a memorandum of understanding or other formal agreement with the Department of Defense for the purpose of conducting cooperative research and development projects on defense equipment and munitions.

(4) Eligibility for entities from India to bid on contracts for the maintenance, repair, or overhaul of Department of Defense equipment located outside the United States.

## SEC. 1317. REPORT ON ENHANCED SECURITY COOPERATION WITH JAPAN.

(a) IN GENERAL.—Not later than June 1, 2024, the Secretary of Defense, in coordination with the Secretary of State, shall submit to the appropriate committees of Congress a report on enhancing United States security cooperation with Japan.

(b) ELEMENTS.—At a minimum, the report required by subsection (a) shall include the following:

(1) A description of the activities and investments the Department of Defense will implement for—

(A) increased bilateral training, exercises, combined patrols, and other activities between the United States Armed Forces and the Self-Defense Forces of Japan;

(B) improving information-sharing mechanisms and processes, including the adoption of enhanced security protocols; and

(C) enhancing cooperation on advanced technology initiatives.

(2) An analysis of the feasibility and advisability of— *Analysis.*

(A) modifying United States command structures in Japan—

(i) to coordinate United States military activities and operations;

(ii) to complement similar changes by the Self-Defense Forces of Japan; and

(iii) to facilitate integrated planning and implementation of combined activities; and

(B) additional modifications to the force posture of the United States Armed Forces in Japan.

(3) An identification of challenges to the implementation of the activities and investments described in paragraph (1) and any recommended legislative changes, resourcing requirements, bilateral agreements, or other measures that would facilitate the implementation of such activities and investments.

(c) FORM.—The report required by subsection (a) shall be submitted in unclassified form but may include a classified annex.

(d) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this section, the term "appropriate committees of Congress" means—

(1) the Committee on Foreign Relations and the Committee on Armed Services of the Senate; and

(2) the Committee on Foreign Affairs and the Committee on Armed Services of the House of Representatives.

## SEC. 1318. REPORT AND NOTIFICATION RELATING TO TRANSFER OF OPERATIONAL CONTROL ON KOREAN PENINSULA.

(a) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Secretary of State, shall submit to the appropriate committees of Congress a report that—

(1) describes the conditions under which the military forces of the Republic of Korea would be prepared to assume wartime operational control of the United States and Republic of Korea Combined Forces Command; and

Assessment.

(2) includes an assessment of the extent to which the military forces of the Republic of Korea meet such conditions as of the date on which the report is submitted.

(b) NOTIFICATION.—

(1) IN GENERAL.—Not later than 45 days before the date on which wartime operational control of the United States and Republic of Korea Combined Forces Command is transferred to the Republic of Korea, the Secretary of Defense, in coordination with the Secretary of State, shall notify the appropriate committees of Congress of such transfer.

Assessments.

(2) ELEMENTS.—The notification required by paragraph (1) shall include the following:

(A) An assessment of the extent to which the military forces of the Republic of Korea—

(i) meet the conditions described in the report submitted under subsection (a), including with respect to the acquisition by the Republic of Korea of necessary military capabilities to counter the capabilities of the Democratic People's Republic of Korea; or

(ii) meet updated conditions for the assumption of the wartime operational control described in subsection (a)(1), including an explanation of the changes to such conditions relative to the conditions described in the report submitted under subsection (a).

(B) A description of the command relationship among the United Nations Command, the United States and Republic of Korea Combined Forces Command, the United States Forces Korea, and the military forces of the Republic of Korea.

(C) An assessment of the extent to which such transfer impacts the security of the United States, the Republic of Korea, and other regional allies and partners.

(D) Any other matters determined relevant by the Secretary.

(c) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this section, the term "appropriate committees of Congress" means—

(1) the Committee on Armed Services and the Committee on Foreign Relations of the Senate; and

(2) the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives.

**SEC. 1319. STUDY AND REPORT ON COMMAND STRUCTURE AND FORCE POSTURE OF UNITED STATES ARMED FORCES IN THE INDO-PACIFIC REGION.**

(a) STUDY.—

Contracts.

(1) IN GENERAL.—The Secretary of Defense shall seek to enter into an agreement with a federally funded research and development center to conduct an independent study of the organizational structure and force posture of the United States Armed Forces in the area of responsibility of the United States Indo-Pacific Command.

(2) REPORT TO SECRETARY.—

(A) IN GENERAL.—Not later than 360 days after the date of the enactment of this Act, the federally funded research and development center selected to conduct the study required by paragraph (1) shall submit to the Secretary a report on the findings of the study.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 501

(B) ELEMENTS.—The report required by subparagraph (A) shall include the following:

(i) An assessment of—

(I) the organizational structure of the United States Armed Forces in the area of responsibility of the United States Indo-Pacific Command;

(II) the force posture, basing, access, and over-flight agreements of the United States Armed Forces in such area of responsibility; and

(III) any operational or command and control challenges resulting from the geography, force posture of the United States Armed Forces, or organizational structure of the United States Armed Forces in the area of responsibility of the United States Indo-Pacific Command.

(ii) Any recommendation for—

(I) adjustments to the force posture of the United States Armed Forces in such area of responsibility, including an identification of changes to any basing, access, or overflight agreement that may be necessary in response to the changing security environment in such area of responsibility;

(II) modifying the current organizational structure of the United States Indo-Pacific Command, including modifications affecting United States Forces in Japan and South Korea, in response to such changing security environment; or

(III) improving the ability to coordinate with allies and partners.

(b) REPORT TO CONGRESS.—

(1) IN GENERAL.—Not later than April 1, 2025, the Secretary shall submit to the congressional defense committees an unaltered copy of the report submitted to the Secretary under subsection (a)(2), together with the views of the Secretary on the findings set forth in such report and any corresponding recommendations.

(2) FORM.—The report required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

(3) PUBLIC AVAILABILITY.—The Secretary shall make available to the public the unclassified form of the report required by paragraph (1).

*Margin notes: Assessments. Recommendations. Records.*

# Subtitle B—Matters Relating to the AUKUS Partnership

**SEC. 1321. DEFINITIONS.**          22 USC 10401.

In this subtitle:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—Except as otherwise provided, the term "appropriate congressional committees" means—

(A) the Committee on Foreign Relations and the Committee on Armed Services of the Senate; and

(B) the Committee on Foreign Affairs and the Committee on Armed Services of the House of Representatives.

(2) AUKUS PARTNERSHIP.—

(A) IN GENERAL.—The term "AUKUS partnership" means the enhanced trilateral security partnership between Australia, the United Kingdom, and the United States announced in September 2021.

(B) PILLARS.—The AUKUS partnership includes the following two pillars:

(i) Pillar One is focused on developing a pathway for Australia to acquire conventionally armed, nuclear-powered submarines.

(ii) Pillar Two is focused on enhancing trilateral collaboration on advanced defense capabilities, including hypersonic and counter hypersonic capabilities, quantum technologies, undersea technologies, and artificial intelligence.

(3) INTERNATIONAL TRAFFIC IN ARMS REGULATIONS.—The term "International Traffic in Arms Regulations" means subchapter M of chapter I of title 22, Code of Federal Regulations (or successor regulations).

## PART 1—ADMINISTRATIVE PROVISIONS

22 USC 10411.

**SEC. 1331. AUKUS PARTNERSHIP OVERSIGHT AND ACCOUNTABILITY FRAMEWORK.**

(a) SENIOR ADVISOR.—

(1) DESIGNATION.—

(A) IN GENERAL.—The Secretary of State shall designate a senior advisor at the Department of State (in this section referred to as the "Senior Advisor"), who shall oversee and coordinate the implementation of the AUKUS partnership.

(B) QUALIFICATION.—The Senior Advisor may be an individual serving within the existing leadership of the Department of State but that individual may not hold any other position concurrently while serving as the Senior Advisor.

(C) REPORTING.—The Senior Advisor shall report directly to the Secretary of State.

(D) GUIDANCE.—The Secretary of State shall issue guidance to all bureaus of the Department of State specifying the Senior Advisor's responsibility for coordinating the implementation of all AUKUS partnership-related activities.

(2) DUTIES.—The duties of the Senior Advisor shall be to—

(A) coordinate efforts to implement the AUKUS partnership across relevant bureaus, directorates, and offices of the Department of State involved in matters such as arms exports, non-proliferation, deterrence, security assistance, and Indo-Pacific and United Kingdom relations;

(B) serve as the lead within the Department of State on matters relating to the AUKUS partnership in the interagency process;

(C) lead diplomatic efforts related to the AUKUS partnership with other governments to explain how the partnership will enhance security and stability in the Indo-Pacific region; and

(D) consult regularly with the appropriate congressional committees and keep such committees fully and currently informed on all aspects of the AUKUS partnership, to include—

(i) Australia's acquisition of conventionally armed, nuclear-powered submarines;

(ii) jointly developing advanced military capabilities; and

(iii) any new programs under the AUKUS partnership.

(3) PERSONNEL TO SUPPORT THE SENIOR ADVISOR.—The Secretary of State shall ensure that the Senior Advisor is adequately staffed with respect to the Senior Advisor's duties described in paragraph (2) through details, or assignment of employees of the Department of State, with expertise consistent with such duties.

(b) TASK FORCE.—

(1) ESTABLISHMENT.—The Secretary of State shall establish a task force, to be known as the Task Force on AUKUS (in this section referred to as the "Task Force"), which—

(A) shall meet regularly to coordinate internally on issues relating to the implementation of the AUKUS partnership; and

(B) shall be led by the Senior Advisor.

(2) DUTIES.—The duties of the Task Force may include—

(A) ensuring that responsible offices maintain a unified list of all defense-related transactions that have taken place under the AUKUS partnership;

(B) ensuring the establishment of a framework for gathering, maintaining, and exchanging information relating to companies, individuals, or entities that are compromising security of military technology, defense articles, and defense services exchanged under the AUKUS partnership; and

(C) establishing an AUKUS industry forum for industry stakeholders, including non-traditional defense contractors (as such term is defined in section 3014 of title 10, United States Code), that will be open for the participation of foreign industry involved in the AUKUS partnership.

(3) PERSONNEL TO SUPPORT THE TASK FORCE.—The personnel assigned to support the Senior Advisor under subsection (a)(3) shall also support the Task Force. The Secretary of State may not assign any additional personnel to support the Task Force.

(c) NOTIFICATION.—Not later than 180 days after the date of the enactment of this Act, or not later than 90 days after the date on which a senior advisor at the Department of State is designated as the Senior Advisor, whichever occurs earlier, the Secretary of State shall notify the appropriate congressional committees of the number of personnel, relevant expertise of such personnel, and duties of such personnel directly supporting the work of the Senior Advisor and the offices supporting the Task Force.

(d) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Secretary of State shall submit to the

Deadlines.

137 STAT. 504          PUBLIC LAW 118–31—DEC. 22, 2023

appropriate congressional committees a report that includes the following:

(1) A detailed description of the planned work of the Senior Advisor and the Task Force on matters related to the implementation of the AUKUS partnership.

(2) For the preceding two calendar years and the current calendar year—

(A) the average and median times for the United States Government to review applications for licenses to export defense articles or defense services to persons, corporations, and the governments (including agencies and subdivisions of such governments, including official missions of such governments) of Australia or the United Kingdom;

(B) the average and median times for the United States Government to review applications from Australia and the United Kingdom for foreign military sales beginning from the date Australia or the United Kingdom submitted a letter of request that resulted in a letter of acceptance; and

(C) the number of applications from Australia and the United Kingdom for licenses to export defense articles and defense services that were denied or approved with provisos, listed by year.

Time periods.

(3) For each of the preceding two calendar years, the number of voluntary disclosures resulting in a violation of the International Traffic in Arms Regulations enumerated under section 40 of the Arms Export Control Act (22 U.S.C. 2780) or involving proscribed countries listed in section 126.1 of the International Traffic in Arms Regulations, by persons, corporations, and the governments (including agencies and subdivisions of such governments, including official missions of such governments) of Australia or the United Kingdom, including information with respect to—

(A) any instance of unauthorized access to technical data or defense articles;

(B) inadequate physical or cyber security;

(C) retransfers or re-exports without authorization; and

(D) employees of foreign companies that are United States persons that provide defense services without authorization.

(e) ANNUAL REPORT.—Not later than one year after the date of the enactment of this Act, and annually thereafter, the Senior Advisor shall submit to the appropriate congressional committees a report that includes—

(1) a detailed description of any issues that representatives of the United States, the United Kingdom, or Australia have identified that threaten or conflict with the stated goals of the AUKUS partnership and any efforts to resolve these issues;

(2) information on the National Disclosure Policy Committee with respect to adoption of a classification category relating to any anticipatory disclosure policy for Australia and the United Kingdom;

(3) a detailed description of Department of State investigations into violations under section 38 of the Arms Export Control Act (22 U.S.C. 2778) or related provisions that involve AUKUS partners or entities in the United States, the United Kingdom, and Australia;

(4) details on whether regulatory changes to exemptions authorized under subsection (l) of section 38 of the Arms Export Control Act (22 U.S.C. 2778), as added by section 1343 of this Act, are likely or necessary within the next year; and

(5) an assessment of the change in the average and median Department of State licensing review times for the current reporting year based on the average and median licensing review times from the prior calendar year, including review times across the interagency for export licenses issued to Australia or the United Kingdom.

*Assessment.*
*Time period.*

(f) SUNSET.—

(1) IN GENERAL.—Subject to paragraph (2), the position of the Senior Advisor and the Task Force shall terminate on the date that is 7 years after the date of the enactment of this Act.

(2) RENEWAL.—The Secretary of State may renew the position of the Senior Advisor and the Task Force for 1 additional period of 4 years beginning after the date on which the Secretary notifies the appropriate congressional committees of the renewal.

*Time period.*
*Effective date.*
*Notification.*

(g) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs and Committee on Appropriations of the House of Representatives; and

(2) the Committee on Foreign Relations and Committee on Appropriations of the Senate.

### SEC. 1332. DESIGNATION OF SENIOR OFFICIAL FOR DEPARTMENT OF DEFENSE ACTIVITIES RELATING TO, AND IMPLEMENTATION PLAN FOR, THE AUKUS PARTNERSHIP.

*22 USC 10412.*

(a) DESIGNATION OF SENIOR OFFICIAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall designate a senior civilian official of the Department of Defense who shall be responsible for overseeing Department of Defense activities relating to the AUKUS partnership.

*Deadline.*

(b) PLAN.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Administrator for Nuclear Security and the Secretary of State, shall submit to the appropriate committees of Congress a report containing an implementation plan outlining Department of Defense efforts relating to the AUKUS partnership.

*Reports.*

(2) ELEMENTS.—The plan required by paragraph (1) shall include the following:

(A) Timelines and major anticipated milestones for the implementation of the AUKUS partnership.

*Timelines.*

(B) An identification of dependencies of such milestones on defense requirements that are—

(i) unrelated to the AUKUS partnership; and

(ii) solely within the decisionmaking responsibility of Australia or the United Kingdom.

(C) A consideration of the implications of the plan on the industrial base with respect to—

137 STAT. 506          PUBLIC LAW 118–31—DEC. 22, 2023

(i) the expansion of existing United States submarine construction capacity to fulfill United States, United Kingdom, and Australia requirements;

(ii) acceleration of the restoration of United States capabilities for producing highly enriched uranium to fuel submarine reactors;

(iii) stabilization of commodity markets and expanding supplies of high-grade steel, construction materials, and other resources required for improving shipyard condition and expanding throughput capacity; and

Coordination.

(iv) coordination and synchronization of industrial sourcing opportunities among Australia, the United Kingdom, and the United States.

(D) A description of resourcing and personnel requirements, including—

(i) a detailed assessment of the feasibility of hiring and retaining additional foreign disclosure officers to facilitate more rapid technology transfer to Australia and the United Kingdom; and

Assessment.

(ii) an assessment of any additional requirements for Department of Defense personnel to support the transfer of defense articles to Australia and the United Kingdom.

(E) A plan for improving information sharing, including—

Recommendations.

(i) recommendations for modifications to foreign disclosure policies and processes;

Guidelines.

(ii) the promulgation of written information-sharing guidelines or policies to improve information sharing under the AUKUS partnership;

(iii) the establishment of an information handling caveat specific to the AUKUS partnership; and

(iv) the reduction in use of the Not Releasable to Foreign Nations (NOFORN) information handling caveat.

Intellectual property. Patents. Recommendations.

(F) Processes for the protection of privately held intellectual property, including patents.

(G) Recommended updates to other title 10, United States Code, authorities or regulatory, policy, or process frameworks.

Deadlines. Termination date. Briefing.

(c) SEMIANNUAL UPDATES.—Not later than 60 days after the date on which the plan required by subsection (b) is submitted, and semiannually thereafter not later than April 1 and October 1 each year through 2029, the senior civilian official designated under subsection (a) shall provide the congressional defense committees and the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate with a briefing on the status of all Department activities to implement the AUKUS partnership.

22 USC 10413.

**SEC. 1333. REPORTING RELATED TO THE AUKUS PARTNERSHIP.**

(a) REPORT ON INSTRUMENTS.—

Submission.

(1) IN GENERAL.—Not later than 30 days after the signature, conclusion, or other finalization of any non-binding instrument related to the AUKUS partnership, the President

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 507

shall submit to the appropriate congressional committees the text of such instrument.

(2) NON-DUPLICATION OF EFFORTS; RULE OF CONSTRUC-TION.—To the extent the text of a non-binding instrument is submitted to the appropriate congressional committees pursu-ant to paragraph (1), such text does not need to be submitted to Congress pursuant to section 112b(a)(1)(A)(ii) of title 1, United States Code, as amended by section 5947 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 3476). Paragraph (1) shall not be construed to relieve the executive branch of any other requirement of section 112b of title 1, United States Code, as so amended, or any other provision of law.

(3) DEFINITIONS.—In this subsection:

(A) IN GENERAL.—The term "text", with respect to a non-binding instrument, includes—

(i) any annex, appendix, codicil, side agreement, side letter, or any document of similar purpose or function to the aforementioned, regardless of the title of the document, that is entered into contempora-neously and in conjunction with the non-binding instrument; and

(ii) any implementing agreement or arrangement, or any document of similar purpose or function to the aforementioned, regardless of the title of the docu-ment, that is entered into contemporaneously and in conjunction with the non-binding instrument.

(B) CONTEMPORANEOUSLY AND IN CONJUNCTION WITH.—As used in subparagraph (A), the term "contemporaneously and in conjunction with"—

(i) shall be construed liberally; and

(ii) may not be interpreted to require any action to have occurred simultaneously or on the same day.

(b) REPORT ON AUKUS PARTNERSHIP.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, and biennially thereafter, the Secretary of State, in coordination with the Secretary of Defense and other appropriate heads of agencies, shall submit to the appropriate congressional committees a report on the AUKUS partnership.

(2) ELEMENTS.—Each report required under paragraph (1) shall include the following elements:

(A) STRATEGY.—

(i) An identification of the defensive military capa-bility gaps and capacity shortfalls that the AUKUS partnership seeks to offset.

(ii) An explanation of the total cost to the United States associated with Pillar One of the AUKUS part-nership.

(iii) A detailed explanation of how enhanced access to the industrial base of Australia is contributing to strengthening the United States strategic position in Asia.

(iv) A detailed explanation of the military and strategic benefit provided by the improved access pro-vided by naval bases of Australia.

137 STAT. 508

PUBLIC LAW 118–31—DEC. 22, 2023

Assessment.

(v) A detailed assessment of how Australia's sovereign conventionally armed nuclear attack submarines contribute to United States defense and deterrence objectives in the Indo-Pacific region.

(B) IMPLEMENT THE AUKUS PARTNERSHIP.—

(i) Progress made on achieving the Optimal Pathway established for Australia's development of conventionally armed, nuclear-powered submarines, including the following elements:

(I) A description of progress made by Australia, the United Kingdom, and the United States to conclude an Article 14 arrangement with the International Atomic Energy Agency.

(II) A description of the status of efforts of Australia, the United Kingdom, and the United States to build the supporting infrastructure to base conventionally armed, nuclear-powered attack submarines.

Updates.

(III) Updates on the efforts by Australia, the United Kingdom, and the United States to train a workforce that can build, sustain, and operate conventionally armed, nuclear-powered attack submarines.

(IV) A description of progress in establishing submarine support facilities capable of hosting rotational forces in western Australia by 2027.

(V) A description of progress made in improving United States submarine production capabilities that will enable the United States to meet—

(aa) its objectives of providing up to five Virginia Class submarines to Australia by the early to mid-2030's; and

(bb) United States submarine production requirements.

Assessments.

(ii) Progress made on Pillar Two of the AUKUS partnership, including the following elements:

(I) An assessment of the efforts of Australia, the United Kingdom, and the United States to enhance collaboration across the following eight trilateral lines of effort:

(aa) Underseas capabilities.

(bb) Quantum technologies.

(cc) Artificial intelligence and autonomy.

(dd) Advanced cyber capabilities.

(ee) Hypersonic and counter-hypersonic capabilities.

(ff) Electronic warfare.

(gg) Innovation.

(hh) Information sharing.

(II) An assessment of any new lines of effort established.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 509

# PART 2—STREAMLINING AND PROTECTING TRANSFERS OF UNITED STATES MILITARY TECHNOLOGY FROM COMPROMISE

**SEC. 1341. PRIORITY FOR AUSTRALIA AND THE UNITED KINGDOM IN FOREIGN MILITARY SALES AND DIRECT COMMERCIAL SALES.**

22 USC 10421.

(a) IN GENERAL.—The President shall institute policies and procedures for letters of request from Australia and the United Kingdom to transfer defense articles and services under section 21 of the Arms Export Control Act (22 U.S.C. 2761) related to AUKUS to receive expedited consideration and processing relative to all other letters of request other than from Taiwan and Ukraine.

President.
Procedures.

(b) TECHNOLOGY TRANSFER POLICY FOR AUSTRALIA, CANADA, AND THE UNITED KINGDOM.—

(1) IN GENERAL.—The Secretary of State, in consultation with the Secretary of Defense, shall create an anticipatory release policy for the transfer of technologies described in paragraph (2) to Australia, the United Kingdom, and Canada through Foreign Military Sales and Direct Commercial Sales that are not covered by an exemption under the International Traffic in Arms Regulations.

(2) CAPABILITIES DESCRIBED.—The capabilities described in this paragraph are—

(A) Pillar One-related technologies associated with submarine and associated combat systems; and

(B) Pillar Two-related technologies, including hypersonic missiles, cyber capabilities, artificial intelligence, quantum technologies, undersea capabilities, and other advanced technologies.

(3) EXPEDITED DECISION-MAKING.—Review of a transfer under the policy established under paragraph (1) shall be subject to an expedited decision-making process.

Review.

(c) INTERAGENCY POLICY AND GUIDANCE.—The Secretary of State and the Secretary of Defense shall jointly review and update interagency policies and implementation guidance related to requests for Foreign Military Sales and Direct Commercial Sales, including by incorporating the anticipatory release provisions of this section.

Review.
Update.

**SEC. 1342. IDENTIFICATION AND PRE-CLEARANCE OF PLATFORMS, TECHNOLOGIES, AND EQUIPMENT FOR SALE TO AUSTRALIA AND THE UNITED KINGDOM THROUGH FOREIGN MILITARY SALES AND DIRECT COMMERCIAL SALES.**

22 USC 10422.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and on a biennial basis thereafter for 8 years, the President shall submit to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives a report that includes a list of advanced military platforms, technologies, and equipment that are pre-cleared and prioritized for sale and release to Australia, the United Kingdom and Canada through the Foreign Military Sales and Direct Commercial Sales programs without regard to whether a letter of request or license to purchase such platforms, technologies, or equipment has been received from any of such country.

Time period.
President.
Reports.
List.

137 STAT. 510          PUBLIC LAW 118–31—DEC. 22, 2023

(b) ADDITIONAL ITEMS.—Each list may include items that are not related to the AUKUS partnership but may not include items that are not covered by an exemption under the International Traffic in Arms Regulations except unmanned aerial or hypersonic systems.

### SEC. 1343. EXPORT CONTROL EXEMPTIONS AND STANDARDS.

President.

(a) IN GENERAL.—Section 38 of the Arms Export Control Act (22 U.S.C. 2778) is amended by adding at the end the following:
"(l) AUKUS DEFENSE TRADE COOPERATION.—
"(1) DETERMINATION AND CERTIFICATION.—

Deadline.

"(A) IN GENERAL.—Not later than 120 days after the date of the enactment of this subsection, the President shall determine and certify in writing, and include a detailed justification, to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives whether Australia or the United Kingdom has—
"(i) implemented a system of export controls comparable to those of the United States that satisfies the elements of subsection (j)(2)(A)(i), (ii), (iii), and (iv) and subsection (j)(2)(B)(i), (ii) and (v) for United States-origin defense articles and defense services, and for controlling the provision of military training; and
"(ii) implemented a comparable exemption from its export controls for the United States.
"(B) MATTERS TO BE INCLUDED.—

Assessment.

"(i) REQUIREMENTS MET.—If the President makes the determination that Australia or the United Kingdom meets the comparability standards of clauses (i) and (ii) of subparagraph (A), the justification required by such subparagraph shall include an assessment of how the country satisfied the specific elements described in such clauses.

Applicability.

"(ii) REQUIREMENTS NOT MET.—If the President makes a determination that Australia or the United Kingdom does not meet the comparability standards of clauses (i) and (ii) of subparagraph (A), the justification required by such subparagraph shall include, as applicable—
"(I) the specific elements of either such clause (i) or (ii) that were determined not to meet the comparability standards;
"(II) the specific actions the country needs to take in order to meet the comparability standards; and
"(III) the actions the United States is taking, as appropriate, to facilitate that the country is granted an exemption in a timely manner upon meeting the comparability standards.
"(C) FORM.—The determination and certification described in subparagraph (A) shall be submitted in unclassified form, but may include a classified annex.
"(2) EXEMPTION.—Upon submittal of a determination and certification to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives that Australia or the United Kingdom has

met the comparability standards of clauses (i) and (ii) of paragraph (1)(A), and subject to the limitation in paragraph (4), the President shall immediately exempt from the licensing or other approval requirements of this section exports and transfers (including reexports, transfers, temporary imports, and brokering activities) of defense articles and defense services between the United States and that country or among the United States, the United Kingdom, and Australia.

"(3) REASSESSMENT.—

"(A) IN GENERAL.—If the President is unable to make a determination that Australia or the United Kingdom has met the comparability standards of clauses (i) and (ii) of paragraph (1)(A) or suspends the exemption pursuant to paragraph (5), the President shall—

Reports.

"(i) not less frequently than once every 120 days reassess whether the country has met those requirements;

"(ii) report the results of such reassessment in writing, and include a detailed justification, to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives; and

"(iii) report on steps the country must take to establish the exemption.

"(B) POSITIVE REASSESSMENT.—Upon any reassessment under subparagraph (A) in which the President determines that Australia or the United Kingdom has met the comparability standards of clauses (i) and (ii) of paragraph (1)(A), the President shall immediately provide to that country an exemption described in paragraph (2).

Determination.

"(C) NEGATIVE REASSESSMENT.—If the President finds in any reassessment under subparagraph (A) that Australia or the United Kingdom has not met the comparability standards of clauses (i) and (ii) of paragraph (1)(A), the written reassessment shall include, as applicable—

"(i) the specific elements of either such clauses that were determined not to be comparable;

"(ii) the specific actions the country needs to take in order to meet the comparability standards; and

"(iii) the actions the United States is taking, as appropriate, to facilitate that the country is granted an exemption in a timely manner upon meeting the comparability standards.

"(D) FORM.—The reassessment described in subparagraph (A)(ii) shall be submitted in an unclassified form, but may include a classified annex.

"(4) LIMITATION.—An exemption described in paragraph (2) shall not apply to any activity (including exports, transfers, reexports, retransfers, temporary imports, or brokering) of defense articles and defense services between or among the United States, the United Kingdom, and Australia that—

"(A) are excluded by those countries;

"(B) are referred to in subsection (j)(1)(C)(ii); or

"(C) involve individuals or entities that are not approved by—

"(i) the Secretary of State; and

Determination.
Certification.

"(ii) the Ministry of Defense, the Ministry of Foreign Affairs, or other similar authority within those countries.

"(5) TEMPORARY SUSPENSION OF EXEMPTION.—

"(A) IN GENERAL.—The President may suspend an exemption described in paragraph (2) with respect to Australia or the United Kingdom if the President determines and certifies in writing, and includes a detailed justification, to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives that—

"(i) the country has ceased to implement a system of export controls comparable to those of the United States that satisfies the elements of subsection (j)(2)(A)(i), (ii), (iii), and (iv) and subsection (j)(2)(B)(i), (ii) and (v) for United States-origin defense articles and defense services, and for controlling the provision of military training; and

"(ii) due to a substantial change in circumstance, the suspension is necessary to protect the vital national security or foreign policy interests of the United States in relation to the country concerned; or

"(iii) the country concerned has ceased to implement a comparable exemption from its export controls for the United States.

"(B) ADDITIONAL MATTER TO BE INCLUDED.—The justification required to be included in the determination and certification described in subparagraph (A) shall also include a description of the specific actions the United States and the country are taking to address the reasons for the suspension.

"(C) FORM.—The determination and certification described in subparagraph (A) shall be submitted in unclassified form, but may include a classified annex.

"(D) REPORT.—If the President reissues an exemption described in paragraph (2) with respect to Australia or the United Kingdom that the President suspended pursuant to subparagraph (A), the President shall submit to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives a report stating the steps the country took that allowed the exemption to be so reinstated.

"(6) CERTAIN REQUIREMENTS NOT APPLICABLE.—

"(A) IN GENERAL.—Paragraphs (1), (2), and (3) of section 3(d) shall not apply to any export or transfer that is the subject of an exemption described in paragraph (2).

"(B) QUARTERLY REPORTS.—The Secretary of State shall—

"(i) require all exports and transfers that would be subject to the requirements of paragraphs (1), (2), and (3) of section 3(d) but for the application of subparagraph (A) to be reported to the Secretary; and

"(ii) submit such reports to the Committee on Foreign Relations of the Senate and Committee on Foreign Affairs of the House of Representatives on a quarterly basis.

"(7) SUNSET.—

"(A) IN GENERAL.—Any exemption described in paragraph (2) shall terminate on the date that is 15 years after the date of the enactment of this subsection.

"(B) RENEWAL.—The Secretary of State may renew such exemption for 5 years upon a certification to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives that such exemption is in the vital national interest of the United States with a detailed justification for such certification.".".

(b) REPORTS.—

22 USC 2778 note.

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, and annually thereafter until no exemptions described in subsection (l)(2) of section 38 of the Arms Export Control Act (22 U.S.C. 2778), as added by subsection (a) of this section, remain in effect, the Secretary of State shall submit to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives a report on the operation of exemptions described in such subsection (l)(2), including whether any changes to such exemptions are likely to be made in the coming year.

(2) INITIAL REPORT.—The first report submitted under paragraph (1) shall also include an assessment of key recommendations the United States Government has provided to the Governments of Australia and the United Kingdom to revise laws, regulations, and policies of such countries that are required to implement the AUKUS partnership.

(3) REPORT ON EXPEDITED REVIEW OF EXPORT LICENSES FOR EXPORTS OF ADVANCED TECHNOLOGIES.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State, in coordination with the Secretary of Defense, shall report on the practical application of a possible "fast track" decision-making process for applications, classified or unclassified, to export defense articles and defense services to Australia, the United Kingdom, and Canada.

## SEC. 1344. EXPEDITED REVIEW OF EXPORT LICENSES FOR EXPORTS OF ADVANCED TECHNOLOGIES TO AUSTRALIA, THE UNITED KINGDOM, AND CANADA.

22 USC 10423.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State, in coordination with the Secretary of Defense, shall initiate a rulemaking to establish an expedited decision-making process, classified or unclassified, for applications to export to Australia, the United Kingdom, and Canada commercial, advanced-technology defense articles and defense services that are not covered by an exemption under the International Traffic in Arms Regulations.

Deadline.
Regulations.

(b) ELIGIBILITY.—To qualify for the expedited decision-making process described in subsection (a), an application shall be for an export of defense articles or defense services that will take place wholly within or between the physical territory of Australia, Canada, or the United Kingdom and the United States and with governments or corporate entities from such countries.

(c) AVAILABILITY OF EXPEDITED PROCESS.—The expedited decision-making process described in subsection (a) shall be available

Deadlines.

137 STAT. 514    PUBLIC LAW 118–31—DEC. 22, 2023

for both classified and unclassified items, and the process must satisfy the following criteria to the extent practicable:

(1) Any licensing application to export defense articles and services that is related to a government to government agreement must be approved, returned, or denied within 30 days of submission.

(2) For all other licensing requests, any review shall be completed not later than 45 calendar days after the date of application.

### SEC. 1345. UNITED STATES MUNITIONS LIST.

(a) EXEMPTION FOR THE GOVERNMENTS OF THE UNITED KINGDOM AND AUSTRALIA FROM CERTIFICATION AND CONGRESSIONAL NOTIFICATION REQUIREMENTS APPLICABLE TO CERTAIN TRANSFERS.—Section 38(f)(3) of the Arms Export Control Act (22 U.S.C. 2778(f)(3)) is amended by inserting ", the United Kingdom, or Australia" after "Canada".

22 USC 2778 note.

(b) UNITED STATES MUNITIONS LIST PERIODIC REVIEWS.—

(1) IN GENERAL.—The Secretary of State, acting through authority delegated by the President to carry out periodic reviews of items on the United States Munitions List under section 38(f) of the Arms Export Control Act (22 U.S.C. 2778(f)) and in coordination with the Secretary of Defense, the Secretary of Energy, the Secretary of Commerce, and the Director of the Office of Management and Budget, shall carry out such reviews not less frequently than every 3 years.

(2) SCOPE.—The periodic reviews described in paragraph (1) shall focus on matters including—

(A) interagency resources to address current threats faced by the United States;

(B) the evolving technological and economic landscape;

(C) the widespread availability of certain technologies and items on the United States Munitions List; and

(D) risks of misuse of United States-origin defense articles.

(3) CONSULTATION.—The Department of State may consult with the Defense Trade Advisory Group (DTAG) and other interested parties in conducting the periodic review described in paragraph (1).

## PART 3—AUKUS SUBMARINE TRANSFER AUTHORIZATION ACT

AUKUS Submarine Transfer Authorization Act.
22 USC 10401 note.

### SEC. 1351. SHORT TITLE.

This part may be cited as the "AUKUS Submarine Transfer Authorization Act".

22 USC 10431 note.
President.
Effective date.
Time period.

### SEC. 1352. AUTHORIZATION OF SALES OF VIRGINIA CLASS SUBMARINES TO AUSTRALIA.

(a) IN GENERAL.—Effective beginning on the date that is one year after the date of the enactment of this Act, the President is authorized to transfer up to two Virginia Class submarines from the inventory of the Department of the Navy to the Government of Australia on a sale basis, and transfer not more than one additional Virginia Class submarine to the Government of Australia on a sale basis pursuant to section 21 of the Arms Export Control Act (22 U.S.C. 2761) during the 20-year period

beginning on the date of the enactment of this Act, to implement the trilateral security partnership between Australia, the United Kingdom, and the United States (in this section referred to as the "AUKUS partnership").

(b) PROVISIONS OF LAW SUPERSEDED.—The transfer of a vessel authorized under subsection (a) shall not be subject to the requirements of—

(1) section 36 of the Arms Export Control Act (22 U.S.C. 2776); or

(2) section 8677 of title 10, United States Code.

(c) COSTS OF TRANSFERS.—Any expense incurred by the United States in connection with a transfer of a vessel authorized under subsection (a) shall be charged to the Government of Australia notwithstanding section 516(e) of the Foreign Assistance Act of 1961 (22 U.S.C. 2321j(e)).

(d) CERTIFICATIONS AND OTHER REQUIREMENTS.—

(1) IN GENERAL.—Not later than 270 days prior to the transfer of a vessel authorized under subsection (a), the President shall submit to the appropriate congressional committees and leadership a certification that—

(A) the transfer of such vessels—

(i) will not degrade the United States undersea capabilities;

(ii) is consistent with United States foreign policy and national security interests; and

(iii) is in furtherance of the AUKUS partnership;

(B) the United States is making sufficient submarine production and maintenance investments to meet the combination of United States military requirements and the requirements under subparagraph (A);

(C) the Government of Australia has provided the appropriate funds and support for the additional capacity required to meet the requirements identified in this section; and

(D) the Government Australia has the capability to host and fully operate the vessels authorized to be transferred.

(2) WAIVER OF CHIEF OF NAVAL OPERATIONS CERTIFICATION.—The requirement for the Chief of Naval Operations to make a certification under section 8678 of title 10, United States Code, shall not apply to the transfer of a vessel authorized under subsection (a).

(3) REQUIRED MUTUAL DEFENSE AGREEMENT.—

(A) IN GENERAL.—The President may not provide for the transfer of a vessel authorized under subsection (a) unless the United States and Australia have entered into a mutual defense agreement that meets the requirements of subparagraph (B) and such agreement is in effect.

(B) REQUIREMENTS.—A mutual defense agreement meets the requirements described in this subparagraph if the agreement—

(i) provides a clear legal framework for the sole purpose of Australia's acquisition of conventionally armed, nuclear-powered submarines; and

(ii) meets the highest nonproliferation standards for the exchange of nuclear materials, technology,

Deadline.

equipment, and information between the United States and Australia.

(4) SUBSEQUENT SALES.—A transfer of vessel that is a Virginia class submarine on a sale basis other than a transfer described in subsection (a) may occur only if such transfer is explicitly authorized pursuant to a law enacted after the date of the enactment of this Act.

(e) CREDITING OF RECEIPTS.—

(1) IN GENERAL.—Notwithstanding any provision of law pertaining to the crediting of amounts received from a sale under the terms of section 21 of the Arms Export Control Act (22 U.S.C. 2761), any receipt of the United States as a result of a transfer of a vessel authorized under subsection (a) shall—

(A) be credited, at the discretion of the President to—

(i) the appropriation, fund, or account used in incurring the original obligation;

(ii) an appropriate appropriation, fund, or account currently available for the purposes for which the expenditures for the original acquisition of submarines transferred under this section were made; or

(iii) any other appropriation, fund, or account available for the improvement of the United States submarine industrial base; and

(B) remain available for obligation until expended for the same purpose as the appropriation to which the receipt is credited.

(2) NOTIFICATIONS AND REPORT.—

(A) INITIAL NOTIFICATION.—Not later than 30 days before the date of the delivery of the first vessel authorized to be transferred under subsection (a), the President shall notify the appropriate congressional committees and leadership of the following:

(i) The Government of Australia has achieved Submarine Rotational Forces-West full operational capability to support 4 rotationally deployed Virginia class submarines and one Astute class submarine, including having demonstrated the domestic capacity to fully perform all the associated activities necessary for the safe hosting and operation of nuclear-powered submarines.

(ii) The Government of Australia has achieved sovereign-ready initial operational capability to support a Royal Australian Navy Virginia class submarine, including having demonstrated the domestic capacity to fully perform all the associated—

(I) activities necessary for the safe hosting and operation of nuclear-powered submarines;

(II) crewing;

(III) operations;

(IV) regulatory and emergency procedures, including those specific to nuclear power plants; and

(V) detailed planning for enduring Virginia class submarine ownership, including each significant event leading up to and including nuclear defueling.

PUBLIC LAW 118–31—DEC. 22, 2023         137 STAT. 517

(B) NOTIFICATION.—Not later than 30 days after the date of a transfer of any vessel authorized under subsection (a), and upon any transfer or depositing of funds received pursuant to such a transfer, the President shall notify the appropriate congressional committees and leadership of—

(i) the amount of funds received pursuant to the transfer; and

(ii) the specific account or fund into which the funds described in clause (i) are deposited.

(C) REPORT.—Not later than 30 days after the receipt of funds as described in subparagraph (B), the President shall submit to the appropriate congressional committees and leadership a report on the matters described in clauses (i) and (ii) of subparagraph (A).

(f) APPLICABILITY OF EXISTING LAW TO TRANSFER OF SPECIAL NUCLEAR MATERIAL AND UTILIZATION FACILITIES FOR MILITARY APPLICATIONS.—

(1) IN GENERAL.—With respect to any special nuclear material for use in utilization facilities or any portion of a vessel transferred under the authority of subsection (a) constituting utilization facilities for military applications under section 91 of the Atomic Energy Act of 1954 (42 U.S.C. 2121), the transfer of such material or such facilities shall only occur in accordance with such section 91.

(2) USE OF FUNDS.—The President may use proceeds from a transfer described in subparagraph (1) for the acquisition of submarine naval nuclear propulsion plants and the nuclear fuel to replace the propulsion plants and fuel transferred to the Government of Australia.

(g) REPAIR AND REFURBISHMENT OF AUKUS SUBMARINES.— Section 8680 of title 10, United States Code, is amended—

(1) by redesignating subsection (c) as subsection (d); and

(2) by inserting after subsection (b) the following new subsection:

"(c) REPAIR AND REFURBISHMENT OF CERTAIN SUBMARINES.— (1) Notwithstanding any other provision of this section, and subject to paragraph (2), the President shall determine the appropriate public or private shipyard in the United States, Australia, or the United Kingdom to perform any repair or refurbishment of a United States submarine involved in submarine security activities between the United States, Australia, and the United Kingdom.

Determination.

"(2)(A) The President may determine under paragraph (1) that repair or refurbishment described in such paragraph may be performed in Australia or the United Kingdom only if—

"(i) such repair or refurbishment will facilitate the development of repair or refurbishment capabilities in the United Kingdom or Australia;

"(ii) such repair or refurbishment will be for a United States submarine that is operating forward outside of the United States; or

"(iii) the Secretary of Defense certifies to Congress that performing such repair or refurbishment at a shipyard in Australia or the United Kingdom is required due to an exigent threat to the national security interests of the United States.

"(B) In making a determination under subparagraph (A), the President shall consider any effects of such determination on the capacity and capability of shipyards in the United States.

Deadline.
Certification.
Brief.

"(C) Not later than 15 days after the date on which the Secretary of Defense makes a certification under subparagraph (A)(iii), the Secretary shall brief the congressional defense committees on—

"(i) the threat that requires the use of a shipyard in Australia or the United Kingdom; and

"(ii) opportunities to mitigate the future potential need to leverage foreign shipyards.

"(3) Repair or refurbishment described in paragraph (1) may be carried out by personnel and contractors of the United States, the United Kingdom, or Australia in accordance with the international arrangements governing the submarine security activities described in such paragraph.".

(h) TRANSFER OR EXPORT OF DEFENSE SERVICES.—

(1) IN GENERAL.—The President may transfer or authorize the export of defense services (as such term is defined in section 47 of the Arms Export Control Act (22 U.S.C. 2794)) to the Government of Australia and the Government of the United Kingdom necessary or incidental to support the transfer and operation of vessels authorized under subsection (a).

(2) AUTHORITY TO EXPORT TO AUSTRALIAN AND UNITED KINGDOM PRIVATE AND PUBLIC-SECTOR PERSONNEL.—The transfer or export of defense services under this subsection may be directly exported to private and public-sector personnel of Australia or to private and public-sector personnel of the United Kingdom to support the development of the Australian submarine industrial base necessary for submarine security activities between members of the AUKUS partnership, including in the case in which such private and public-sector personnel are not officers, employees, or agents of the Government of Australia or the Government of the United Kingdom.

(3) APPLICATION OF REQUIREMENTS FOR RETRANSFER AND REEXPORT.—Any person who receives any defense service transferred or exported under paragraph (1) may retransfer or reexport such service to other persons only in accordance with the requirements of the Arms Export Control Act (22 U.S.C. 2751 et seq.).

(4) SECURITY CONTROLS.—

(A) IN GENERAL.—Any defense service transferred or exported under paragraph (1) shall be subject to appropriate security controls to ensure that any sensitive information conveyed by such transfer or export is protected from disclosure to persons unauthorized by the United States to receive such information.

Deadline.

(B) CERTIFICATION.—Not later than 30 days before the first transfer or export of a defense service under paragraph (1), and annually thereafter, the President shall certify to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives that the controls described in subparagraph (A) will protect the information described in such subparagraph for the defense services so transferred or exported.

(i) REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act and annually thereafter for 15

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 519

years, the President shall submit to the appropriate congressional committees and leadership a report describing—

    (A) the status of the transfer of vessels authorized under subsection (a);

    (B) the implementation of submarine security cooperation under the AUKUS partnership and challenges towards its implementation;

    (C) expansion of the public and private Virginia class submarine production and repair facilities, to include proposed work conducted in Australia and the United Kingdom to meet the additional work required by commitments under the AUKUS partnership;

    (D) an annual procurement schedule for the total quantity of submarines the Department of Defense plans to procure over the 15 years following the date of the enactment of this Act; and

    (E) a list of transfers or exports of defense services authorized under subsection (h) and the private-sector personnel of Australia or the private-sector personnel of the United Kingdom to whom the defense services were exported.

    (2) FORM.—The report required by this subsection shall be submitted in classified form.

**SEC. 1353. ACCEPTANCE OF CONTRIBUTIONS IN SUPPORT OF AUSTRALIA, UNITED KINGDOM, AND UNITED STATES SUBMARINE SECURITY ACTIVITIES.**

    (a) ACCEPTANCE AUTHORITY.—The President may accept from the Government of Australia contributions of money made by the Government of Australia for use by the Department of Defense in support of non-nuclear related aspects of submarine security activities between Australia, the United Kingdom, and the United States (in this section referred to as the 'AUKUS partnership').

    (b) ESTABLISHMENT OF SUBMARINE SECURITY ACTIVITIES ACCOUNT.—

    (1) IN GENERAL.—There is established in the Treasury of the United States a special account to be known as the "Submarine Security Activities Account".

    (2) CREDIT TO ACCOUNT.—Contributions of money accepted by the President under subsection (a) shall be credited to the Submarine Security Activities Account.

    (3) AVAILABILITY.—Amounts credited to the Submarine Security Activities Account shall remain available until expended.

    (c) USE OF FUNDS.—

    (1) IN GENERAL.—Subject to paragraphs (2) and (3) of subsection (b), the President may use funds in the Submarine Security Activities Account—

    (A) for any purpose authorized by law that the President determines would support the AUKUS submarine security activities;

    (B) to carry out a military construction project that is consistent with the purposes for which the contributions were made and is authorized by law;

    (C) to develop and increase the submarine industrial base workforce by investing in recruiting, training, and

*Margin notes:*
Contracts.
Time period.

List.

Classified information.

22 USC 10432 note.
President.

137 STAT. 520          PUBLIC LAW 118–31—DEC. 22, 2023

retaining key specialized labor at public and private shipyards; or

(D) to upgrade facilities, equipment, and infrastructure needed to repair and maintain submarines at public and private shipyards.

(2) NO FURTHER SPECIFIC AUTHORIZATION IN LAW REQUIRED.—Funds in the Submarine Security Activities Account may be used as described in this subsection without further specific authorization in law.

Deadline.

(d) PLAN FOR USE OF FUNDS.—Not later than 30 days prior to any use of any funds in the Submarine Security Activities Account, the President shall submit to the appropriate congressional committees and leadership a plan detailing—

(1) the amount of funds in the Submarine Security Activities Account; and

(2) how such funds will be used, including specific amounts and purposes.

(e) TRANSFERS OF FUNDS.—

(1) TO DEPARTMENT OF DEFENSE.—

(A) IN GENERAL.—In carrying out subsection (c), the President may transfer funds available in the Submarine Security Activities Account to appropriations available to the Department of Defense.

(B) AUTHORITY IN ADDITION TO OTHER TRANSFER AUTHORITY.—The authority provided in this paragraph is in addition to any other transfer authority otherwise provided by law and is subject to the same terms and conditions as the authority provided in section 8005 of the Department of Defense Appropriations Act, 2023 (Public Law 117-328), except for monetary limitations concerning the amount of authority available.

(C) AVAILABILITY.—Funds transferred under the authority provided in this paragraph shall be merged with and available for the same purposes, and for the same time period, as the appropriation to which transferred.

Notification.
Cost estimate.
Time periods.
Records.

(D) LIMITATION ON CERTAIN TRANSACTIONS.—Contributions referred to in subsection (a) may not be obligated for a transaction authorized in subsection (c)(1)(B) until the President submits to the appropriate congressional committees and leadership notice of the transaction, including a detailed cost estimate, and a period of 21 days has elapsed after the date on which the notification is received by the appropriate congressional committees and leadership or, if earlier, a period of 14 days has elapsed after the date on which a copy of the notification is provided in an electronic medium.

(2) TO DEPARTMENT OF ENERGY.—In carrying out subsection (c), and in accordance with the Atomic Energy Act of 1954, (42 U.S.C. 2011 et seq.), the President may transfer funds available in the Submarine Security Activities Account to appropriations or funds of the Department of Energy available to carry out activities related to AUKUS submarine security activities.

Determination.

(3) TRANSFERS BACK TO SUBMARINE SECURITY ACTIVITIES ACCOUNT.—Upon a determination by the President that all or part of the funds transferred from the Submarine Security Activities Account under this subsection are not necessary for

the purposes for which such funds were transferred, all or such part of such funds shall be transferred back to the Submarine Security Activities Account.

(f) INVESTMENT OF MONEY.—

(1) IN GENERAL.—The President may invest money in the Submarine Security Activities Account in securities of the United States or in securities guaranteed as to principal and interest by the United States.

(2) INTEREST.—Any interest or other income that accrues from investment in securities referred to in paragraph (1) shall be deposited to the credit of the Submarine Security Activities Account.

(g) RELATIONSHIP TO OTHER LAWS.—The authority to accept or transfer funds under this section is in addition to any other statutory authority to accept or transfer funds.

(h) NOTIFICATION AND REPORT.—

(1) NOTIFICATION.—Not later than 60 days prior to the transfer of any funds from the Submarine Security Activities Account, the President shall notify the appropriate congressional committees and leadership of—

(A) the intended use of such funds by appropriation, program, project, and activity, as defined in the Joint Explanatory Statement accompanying the Department of Defense Appropriations Act 2023 (Public Law 117-328); and

(B) the extent to which such funds complement, supplement, or supplant other on-going or planned efforts funded by an appropriations Act with an identification of the associated funding and explanation of the combined efforts including the intended outcomes.

(2) ANNUAL REPORT.—Not later than November 30 of each year until one year after the date on which all funds transferred under this section have been fully expended, the President shall submit to the appropriate congressional committees and leadership a report that includes a detailed accounting of—

(A) the amount of funds transferred under this subsection during the fiscal year preceding the fiscal year in which the report is submitted; and

(B) the purposes for which such funds were used.

(i) REPORT.—

(1) IN GENERAL.—Not later than 30 days after the date on which contributions of money accepted by the President under subsection (a) are credited to the Submarine Security Activities Account under subsection (b), the President shall submit to the appropriate congressional committees and leadership a report on—

(A) the amount of money so transferred;

(B) a description of the intended use of the funds; and

(C) any other matters related to the administration of the Submarine Security Activities Account as determined necessary by the Secretary.

(2) FORM.—The report required by this subsection shall be submitted in unclassified form but may include a classified annex.

137 STAT. 522          PUBLIC LAW 118–31—DEC. 22, 2023

22 USC 10433.

**SEC. 1354. APPROPRIATE CONGRESSIONAL COMMITTEES AND LEADERSHIP DEFINED.**

In this subtitle, the term "appropriate congressional committees and leadership" means—

(1) the Speaker of the House of Representatives and the Committee on Foreign Affairs, the Committee on Armed Services, and the Committee on Appropriations of the House of Representatives; and

(2) the majority leader of the Senate and the Committee on Foreign Relations, the Committee on Armed Services, and the Committee on Appropriations of the Senate.

# TITLE XIV—OTHER AUTHORIZATIONS

Subtitle A—Military Programs

Sec. 1401. Working capital funds.
Sec. 1402. Chemical agents and munitions destruction, defense.
Sec. 1403. Drug interdiction and counter-drug activities, defense-wide.
Sec. 1404. Defense Inspector General.
Sec. 1405. Defense Health Program.

Subtitle B—National Defense Stockpile

Sec. 1411.  Improvements to Strategic and Critical Materials Stock Piling Act.
Sec. 1412. Authority to dispose of materials from the National Defense Stockpile.
Sec. 1413. Beginning balances of the National Defense Stockpile Transaction Fund for audit purposes.
Sec. 1414. Critical mineral independence.

Subtitle C—Other Matters

Sec. 1421. Modification of leasing authority of Armed Forces Retirement Home.
Sec. 1422. Authority for transfer of funds to joint Department of Defense-Department of Veterans Affairs Medical Facility Demonstration Fund for Captain James A. Lovell Health Care Center, Illinois.
Sec. 1423. Authorization of appropriations for Armed Forces Retirement Home.

# Subtitle A—Military Programs

**SEC. 1401. WORKING CAPITAL FUNDS.**

Funds are hereby authorized to be appropriated for fiscal year 2024 for the use of the Armed Forces and other activities and agencies of the Department of Defense for providing capital for working capital and revolving funds, as specified in the funding table in section 4501.

**SEC. 1402. CHEMICAL AGENTS AND MUNITIONS DESTRUCTION, DEFENSE.**

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated for the Department of Defense for fiscal year 2024 for expenses, not otherwise provided for, for Chemical Agents and Munitions Destruction, Defense, as specified in the funding table in section 4501.

(b) USE.—Amounts authorized to be appropriated under subsection (a) are authorized for—

(1) the destruction of lethal chemical agents and munitions in accordance with section 1412 of the Department of Defense Authorization Act, 1986 (50 U.S.C. 1521); and

(2) the destruction of chemical warfare materiel of the United States that is not covered by section 1412 of such Act.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 523

### SEC. 1403. DRUG INTERDICTION AND COUNTER-DRUG ACTIVITIES, DEFENSE-WIDE.

Funds are hereby authorized to be appropriated for the Department of Defense for fiscal year 2024 for expenses, not otherwise provided for, for Drug Interdiction and Counter-Drug Activities, Defense-wide, as specified in the funding table in section 4501.

### SEC. 1404. DEFENSE INSPECTOR GENERAL.

Funds are hereby authorized to be appropriated for the Department of Defense for fiscal year 2024 for expenses, not otherwise provided for, for the Office of the Inspector General of the Department of Defense, as specified in the funding table in section 4501.

### SEC. 1405. DEFENSE HEALTH PROGRAM.

Funds are hereby authorized to be appropriated for fiscal year 2024 for the Defense Health Program for use of the Armed Forces and other activities and agencies of the Department of Defense for providing for the health of eligible beneficiaries, as specified in the funding table in section 4501.

# Subtitle B—National Defense Stockpile

### SEC. 1411. IMPROVEMENTS TO STRATEGIC AND CRITICAL MATERIALS STOCK PILING ACT.

(a) PURPOSES.—Section 2 of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98a) is amended by adding at the end the following new subsection:

"(d) To the maximum extent practicable and to reduce the reliance of the National Defense Stockpile program on appropriated funds, the National Defense Stockpile Manager shall seek to achieve positive cash flows from the recovery of strategic and critical materials pursuant to section 6(a)(5).".

(b) STOCKPILE MANAGEMENT.—Section 6 of such Act (50 U.S.C. 98e) is amended—

(1) in subsection (a)(5), by striking "from excess" and all that follows and inserting "from other Federal agencies, either directly as materials or embedded in excess-to-need, end-of-life items, or waste streams;";

(2) in subsection (c)(1), by striking "subsection (a)(5) or (a)(6)" and inserting "subsection (a)(6) or (a)(7)";

(3) in subsection (d)(2), by striking "subsection (a)(5)" and inserting "subsection (a)(6)"; and

(4) by adding at the end the following new subsections:

"(g)(1) The National Defense Stockpile Manager shall establish a pilot program to use, to the maximum extent practicable, commercial best practices in the acquisition and disposal of strategic and critical materials for the stockpile.

"(2)(A) The Stockpile Manager shall brief the congressional defense committees (as defined in section 101(a) of title 10, United States Code)— <span style="float:right">Brief.</span>

"(i) as soon as practicable after the establishment of the pilot program under paragraph (1); and

"(ii) annually thereafter until the termination of the pilot program under paragraph (3).

"(B) The briefing required by subparagraph (A)(i) shall address—

137 STAT. 524          PUBLIC LAW 118–31—DEC. 22, 2023

"(i) the commercial best practices selected for use under the pilot program;

"(ii) how the Stockpile Manager determined which commercial best practices to select; and

Plan.

"(iii) the plan of the Stockpile Manager for using such practices.

Summaries.

"(C) Each briefing required by subparagraph (A)(ii) shall provide a summary of—

"(i) how the Stockpile Manager has used commercial best practices under the pilot program during the year preceding the briefing;

"(ii) how many times the Stockpile Manager has used such practices;

"(iii) the outcome of each use of such practices; and

"(iv) any savings achieved or lessons learned as a result of the use of such practices.

Termination date.

"(3) The pilot program established under paragraph (1) shall terminate effective on the date that is 5 years after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024.

"(h) Except to the extent necessary for the national defense, the National Defense Stockpile Manager shall ensure that each program for the recovery of strategic and critical materials implemented under subsection (a)(5) operates in a manner designed to achieve positive cash flow.".

(c) STRATEGIC AND CRITICAL MATERIALS BOARD OF DIRECTORS.—Section 10 of such Act (50 U.S.C. 98h–1) is amended—

(1) in subsection (c)—

(A) in paragraph (4), by striking "of the National Defense Stockpile Manager" and inserting "of the management and operations of the National Defense Stockpile program";

(B) by striking paragraph (5) and redesignating paragraphs (6) through (10) as paragraphs (5) through (9), respectively; and

(C) in paragraph (7), as so redesignated—

(i) by striking "required by section 11(a)(2) of this Act, including a review of" and inserting "required by section 11(a) of this Act. The report required by section 11(b)(2) shall include the views and recommendations of the Board on"; and

Recommendations.

(ii) by striking "proposed actions to be taken under the Annual Materials and Operations Plan" and inserting "all acquisition of materials for and disposals of materials from the stockpile"; and

(2) by amending subsection (e) to read as follows:

"(e) APPLICATION OF PROVISIONS RELATING TO FEDERAL ADVISORY COMMITTEES.—Section 1013(a) of title 5, United States Code, shall not apply to the Board.".

(d) REPORTS.—Section 11 of such Act (50 U.S.C. 98h-2) is amended—

(1) in subsection (a), by striking "the following:" and all that follows and inserting "an Annual Materials and Operations Plan for the forthcoming year.";

(2) in subsection (b)—

(A) in paragraph (1)—

(i) in the heading—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 525

(I) by striking "REPORTS" and inserting "REPORT"; and

(II) by striking "MANAGE" and inserting "MANAGER";

(ii) in the matter preceding subparagraph (A)—

(I) by striking "90 days after the conclusion of the fourth quarter of each fiscal year" and inserting "February 15 of each fiscal year"; and

(II) by striking "a report" and inserting "an Annual Operations and Materials Plan";

(iii) by amending subparagraph (E) to read as follows:

"(E) a statement and explanation of the financial status of the National Defense Stockpile Transaction Fund and anticipated appropriations to be made to the Fund, and obligations to be made from the fund, during the current fiscal year;"; and

*Financial statement.*

(iv) by striking subparagraphs (G) and (H) and inserting the following:

"(G) an annual materials plan for the operation of the stockpile during the next fiscal year and the succeeding four fiscal years and planned expenditures from the National Defense Stockpile Transaction Fund and anticipated receipts from disposal of stockpile materials, which shall include—

*Time periods. Plan.*

"(i) details of all planned expenditures from the National Defense Stockpile Transaction Fund during such period and of anticipated receipts from the proposed disposals of stockpile materials during such period;

"(ii) details regarding materials development and research projects to be conducted during the fiscal years covered by the report using moneys in the National Defense Stockpile Transaction Fund pursuant to section 9(b)(2)(G); and

"(iii) with respect to each development and research project described in clause (ii), the report shall specify the amount planned to be expended from the National Defense Stockpile Transaction Fund, the material intended to be developed, the potential military or defense industrial applications for that material, and the development and research methodologies to be used;

"(H) any proposed expenditure or disposal detailed in the annual materials plan for any such fiscal year, and any expenditure or disposal proposed in connection with any transaction submitted for such fiscal year to the appropriate committees of Congress pursuant to section 5(a)(2) that is not obligated or executed in that fiscal year may not be obligated or executed until such proposed expenditure or disposal is resubmitted in a subsequent annual materials plan or is resubmitted to the appropriate committees of Congress in accordance with section 5(a)(2), as appropriate; and

*Proposed expenditures. Plan.*

"(I) a summary of the implementation and findings of the pilot program established under section 6(g)(1), including—

*Summary.*

137 STAT. 526          PUBLIC LAW 118–31—DEC. 22, 2023

"(i) the commercial best practices selected for use under the pilot program;

"(ii) how the National Defense Stockpile Manager determined which commercial best practices to select;

"(iii) how the National Defense Stockpile Manager has used commercial best practices under the pilot program during the year preceding the briefing;

"(iv) the outcome of each use of such practices; and

"(v) any savings achieved or lessons learned as a result of the use of such practices."; and

(B) in paragraph (2), by striking "paragraph (1)" and all that follows and inserting "paragraph (1) which shall include the activities of the Board to carry out the duties listed in section 10(c) of this Act".

(e) DEVELOPMENT AND CONSERVATION OF RELIABLE SOURCES.—

(1) IN GENERAL.—Section 15 of such Act (50 U.S.C. 98h–6) is amended to read as follows:

## "SEC. 15. DEVELOPMENT AND CONSERVATION OF RELIABLE SOURCES.

"(a) DUTIES.—Subject to subsection (d), the National Defense Stockpile Manager shall encourage the development and appropriate conservation of reliable sources of strategic and critical materials—

"(1) by purchasing, or making a commitment to purchase, strategic and critical materials from reliable sources when such materials are needed for the stockpile;

"(2) by contracting with facilities located in and owned and controlled by reliable sources, or making a commitment to contract with such facilities, for the processing or refining of strategic and critical materials in the stockpile when processing or refining is necessary to convert such materials into a form more suitable for storage or disposition or meeting stockpile requirements;

"(3) by qualifying facilities located in and owned and controlled by reliable sources, or qualifying strategic and critical materials produced by such facilities, to meet stockpile requirements;

"(4) by contracting with facilities located in and owned and controlled by reliable sources to recycle strategic and critical materials to meet stockpile requirements or increase the balance of the National Defense Stockpile Transaction Fund under section 9; and

"(5) by entering into an agreement to co-fund a bankable feasibility study for a project for the development of strategic and critical materials located in and owned and controlled by a reliable source, if the agreement—

"(A) limits the liability of the stockpile to not more than the total funding provided by the Federal Government;

"(B) limits the funding contribution of the Federal Government to not more than 50 percent of the cost of the bankable feasibility study; and

"(C) does not obligate the Federal Government to purchase strategic and critical materials from the reliable source.

"(b) ADDITIONAL AUTHORITIES.—

Time period.          "(1) EXTENDED CONTRACTING AUTHORITY.—

"(A) IN GENERAL.—The term of a contract or commitment made under subsection (a) may not exceed ten years.

"(B) PREEXISTING CONTRACTS.—A contract entered into before the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024 for a term of more than ten years may be extended, on or after such date of enactment, for a total of not more than an additional ten years pursuant to any option or options set forth in the contract.

"(2) MATTERS RELATING TO CO-FUNDING OF BANKABLE FEASIBILITY STUDIES.—To the extent authorized by Congress pursuant to the Defense Production Act of 1950 (50 U.S.C. 4501 et seq.) and determined to be required by the President pursuant to that Act, the National Defense Stockpile Manager may provide for loans or procure debt issued by other entities to carry out a project for the development of strategic and critical materials with respect to which a study was carried out under subsection (a)(5).

<div style="float:right">Determination.<br>President.</div>

"(c) PROPOSED TRANSACTIONS INCLUDED IN ANNUAL MATERIALS PLAN.—Descriptions of proposed transactions under subsection (a) shall be included in the Annual Materials and Operations Plan. Changes to any such transaction, or the addition of a transaction not included in such plan, shall be made in accordance with section 5(a)(2).

"(d) AVAILABILITY OF FUNDS.—The authority of the National Defense Stockpile Manager to enter into obligations under this section is effective for any fiscal year only to the extent that funds in the National Defense Stockpile Transaction Fund under section 9 are adequate to meet such obligations.

"(e) BANKABLE FEASIBILITY STUDY DEFINED.—In this section, the term 'bankable feasibility study' means a comprehensive technical and economic study—

"(1) of the selected option for a strategic and critical materials development project that includes appropriately detailed assessments of realistically assumed extraction, processing, metallurgical, economic, marketing, legal, environmental, social, and governmental considerations and any other relevant operational factors and detailed financial analysis, that are necessary to demonstrate at the time of reporting that production is reasonably justified; and

"(2) that may reasonably serve as the basis for a final decision by a proponent of a project or financial institution to proceed with, or finance, the development of the project.".

(2) CONFORMING AMENDMENTS.—

(A) SIGNIFICANT STOCKPILE TRANSACTION CHANGE REPORT.—Section 5(a)(2) of such Act (50 U.S.C. 98d(a)(2)) is amended by striking "the Board" and inserting "the National Defense Stockpile Manager".

(B) MATERIALS RESEARCH AND DEVELOPMENT.—Section 8(a) of such Act (50 U.S.C. 98g(a)) is amended—

(i) in paragraph (1), by striking "or in its territories or possessions," and inserting "its territories or possessions, or in a reliable source"; and

(ii) in paragraph (2), by striking "in order to—" and all that follows and inserting the following: "in order to develop new sources of strategic and critical materials, develop substitutes, or conserve domestic

137 STAT. 528          PUBLIC LAW 118–31—DEC. 22, 2023

sources and reliable sources of supply for such strategic and critical materials.".

(C) DEFINITIONS.—Section 12 of such Act (50 U.S.C. 98h–3) is amended by striking paragraph (3) and inserting the following new paragraph:

"(3) The term 'reliable source' mean a citizen or business entity organized under the laws of—

"(A) the United States or any territory or possession of the United States;

"(B) a country of the national technology and industrial base, as such term is defined in section 4801 of title 10, United States Code; or

"(C) a qualifying country, as defined in section 225.003 of the Defense Federal Acquisition Regulation Supplement or any successor document.".

50 USC 98d note.

**SEC. 1412. AUTHORITY TO DISPOSE OF MATERIALS FROM THE NATIONAL DEFENSE STOCKPILE.**

Pursuant to section 5(b) of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98d(b)), the National Defense Stockpile Manager may dispose of the following materials contained in the National Defense Stockpile in the following quantities:

(1) 8 short tons of beryllium.

(2) 154,043 short dry tons of metallurgical grade manganese ore.

(3) 5,000 kilograms of germanium.

(4) 91,413 pounds of pan-based carbon fibers.

(5) Not more than 1,000 short tons of materials transferred from another department or agency of the United States to the National Defense Stockpile under section 4(b) of such Act (50 U.S.C. 98c(b)) that the National Defense Stockpile Manager determines is no longer required for the Stockpile (in addition to any amount of such materials previously authorized for disposal).

**SEC. 1413. BEGINNING BALANCES OF THE NATIONAL DEFENSE STOCK-PILE TRANSACTION FUND FOR AUDIT PURPOSES.**

For purposes of an audit conducted under chapter 9A of title 10, United States Code, of the National Defense Stockpile Transaction Fund established by section 9 of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98h)—

(1) the ending balance of $313,633,491.15 reported in the Central Accounting Reporting System of the Department of the Treasury for September 30, 2021, is the Fund Balance with Treasury ending balance on that date;

(2) the Total Actual Resources–Collected opening balance for October 1, 2021, for United States Standard General Ledger Account 420100 is $314,548,154.42, as recorded in official accounting records; and

(3) the Unapportioned–Unexpired Authority ending balance for September 30, 2021, for United States Standard General Ledger Account 445000 is $216,976,300.69, as recorded in official accounting records.

10 USC 4811 note.

**SEC. 1414. CRITICAL MINERAL INDEPENDENCE.**

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 529

(A) the Committee on Armed Services of the Senate; and

(B) the Committee on Armed Services of the House of Representatives.

(2) COVERED COUNTRY.—The term "covered country" means—

(A) a covered nation (as defined in section 4872(d) of title 10, United States Code); and

(B) any other country determined by the Secretary of Defense to be a strategic competitor or adversary of the United States for purposes of this section.

(3) CRITICAL MINERAL.—The term "critical mineral" means a critical mineral (as defined in section 7002(a) of the Energy Act of 2020 (30 U.S.C. 1606(a))) that the Secretary of Defense determines to be important to the national security of the United States for purposes of this section.

(4) SHORTFALL MATERIAL.—The term "shortfall material" means materials determined to be in shortfall in the most recent report on stockpile requirements submitted to Congress under subsection (a) of section 14 of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98h–5) and included in the most recent briefing required by subsection (f) of such section.

(b) STATEMENT OF POLICY.—It is the policy of the United States—

(1) to expand secure sources of supply of critical minerals, including rare earth elements, in the United States and in countries that are allies or partners of the United States to meet the needs of the United States defense sector so that the Department of Defense will achieve critical mineral supply chain independence from covered countries, including the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, and the Democratic People's Republic of North Korea; and

(2) that the Department of Defense will procure critical minerals and products made using supply chains involving critical minerals that are not mined or processed in or by covered countries.

(c) STRATEGY TO ACHIEVE CRITICAL MINERAL SUPPLY CHAIN INDEPENDENCE FOR THE DEPARTMENT OF DEFENSE.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment shall submit to the appropriate committees of Congress a strategy to develop supply chains for the Department of Defense that are not dependent on mining or processing of critical minerals in or by covered countries, in order to achieve critical mineral supply chain independence from covered countries for the Department by 2035. [margin: Deadlines.]

(2) ELEMENTS.—The strategy required by paragraph (1) shall—

(A) identify and assess significant vulnerabilities in the supply chains of contractors and subcontractors of the Department of Defense involving critical minerals that are mined or processed in or by covered countries; [margin: Assessment.]

(B) identify and recommend changes to the acquisition laws, regulations, and policies of the Department of Defense to ensure contractors and subcontractors of the Department [margin: Recommendations.]

use supply chains involving critical minerals that are not mined or processed in or by covered countries to the greatest extent practicable;

Evaluation.

(C) evaluate the utility and desirability of leveraging the process for acquiring shortfall materials for the National Defense Stockpile under the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.) to strengthen mining and processing capacity for critical minerals in the United States and in countries that are allies or partners of the United States;

(D) identify areas of potential engagement and partnership with the governments of countries that are allies or partners of the United States to jointly reduce dependence on critical minerals mined or processed in or by covered countries;

(E) identify and recommend other policy changes that may be needed to achieve critical mineral supply chain independence from covered countries for the Department;

Recommendations.

(F) identify and recommend measures to streamline authorities and policies with respect to critical minerals and supply chains for critical minerals; and

(G) prioritize the recommendations made in the strategy to achieve critical mineral supply chain independence from covered countries for the Department, taking into consideration economic costs and varying degrees of vulnerability posed to the national security of the United States by reliance on different types of critical minerals.

(3) FORM OF STRATEGY.—The strategy required by paragraph (1) shall be submitted in classified form but shall include an unclassified summary.

# Subtitle C—Other Matters

24 USC 411 note.

## SEC. 1421. MODIFICATION OF LEASING AUTHORITY OF ARMED FORCES RETIREMENT HOME.

(a) AGREEMENTS.—Before entering a lease under section 1511(i) of the Armed Forces Retirement Home Act of 1991 (24 U.S.C. 411(i)), the Chief Operating Officer of the Armed Forces Retirement Home may enter into an agreement with a potential lessee for such lease providing for a period of exclusivity, access, study, or for similar purposes. The agreement shall provide for the payment (in cash or in kind) by the potential lessee of consideration for the agreement unless the Chief Operating Officer determines that payment of consideration will not promote the purpose and financial stability of the Armed Forces Retirement Home or be in the public interest.

Payment.
Determination.

Determination.

(b) APPROVAL AND NOTIFICATION.—A sublease pursuant to section 1511(i) of the Armed Forces Retirement Home Act of 1991 (24 U.S.C. 411(i)) shall not be subject to the approval of the Secretary of Defense or any requirement to notify or submit a report to Congress described in such section if the Chief Operating Officer of the Armed Forces Retirement Home determines that the terms of the sublease conform with the terms of such lease.

(c) ADMINISTRATION OF FUNDS.—

(1) AGREEMENT PROCEEDS.—The proceeds from an agreement entered into under subsection (a) shall be deposited in the Armed Forces Retirement Home Trust Fund.

(2) FUND USES.—The proceeds from the lease of property under section 1511(i) of the Armed Forces Retirement Home Act of 1991 (24 U.S.C. 411(i)) and the proceeds from agreements entered into under subsection (a) of this section that are deposited in the Armed Forces Retirement Home Trust Fund shall remain available for obligation and expenditure to finance expenses of the Retirement Home related to the formation and administration of agreements and leases entered into under the provisions of this section or such section 1511(i).

(d) SUNSET.—This section shall terminate on September 30, 2026.

## SEC. 1422. AUTHORITY FOR TRANSFER OF FUNDS TO JOINT DEPARTMENT OF DEFENSE-DEPARTMENT OF VETERANS AFFAIRS MEDICAL FACILITY DEMONSTRATION FUND FOR CAPTAIN JAMES A. LOVELL HEALTH CARE CENTER, ILLINOIS.

(a) AUTHORITY FOR TRANSFER OF FUNDS.—Of the funds authorized to be appropriated for section 1405 and available for the Defense Health Program for operation and maintenance, $172,000,000 may be transferred by the Secretary of Defense to the Joint Department of Defense–Department of Veterans Affairs Medical Facility Demonstration Fund established by subsection (a)(1) of section 1704 of the National Defense Authorization Act for Fiscal Year 2010 (Public Law 111–84; 123 Stat. 2571). For purposes of subsection (a)(2) of such section 1704, any funds so transferred shall be treated as amounts authorized and appropriated specifically for the purpose of such a transfer.

(b) USE OF TRANSFERRED FUNDS.—For the purposes of subsection (b) of such section 1704, facility operations for which funds transferred under subsection (a) may be used are operations of the Captain James A. Lovell Federal Health Care Center, consisting of the North Chicago Veterans Affairs Medical Center, the Navy Ambulatory Care Center, and supporting facilities designated as a combined Federal medical facility under an operational agreement covered by section 706 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Public Law 110–417; 122 Stat. 4500).

## SEC. 1423. AUTHORIZATION OF APPROPRIATIONS FOR ARMED FORCES RETIREMENT HOME.

There is hereby authorized to be appropriated for fiscal year 2024 from the Armed Forces Retirement Home Trust Fund the sum of $77,000,000 of which—

(1) $68,060,000 is for operating expenses; and

(2) $8,940,000 is for capital maintenance and construction.

# TITLE XV—CYBERSPACE-RELATED MATTERS

Subtitle A—Cyber Operations

Sec. 1501. Performance metrics for pilot program on sharing cyber capabilities and related information with foreign operational partners.
Sec. 1502. Harmonization and clarification of Strategic Cybersecurity Program and related matters.

137 STAT. 532          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1503. Modification of authority to use operation and maintenance funds for cyber operations-peculiar capability development projects.
Sec. 1504. Quarterly briefings on joint all domain command and control effort.
Sec. 1505. Authority for countering illegal trafficking by Mexican transnational criminal organizations in cyberspace.
Sec. 1506. Development of cyber support mechanisms for geographic combatant commands.
Sec. 1507. Review and plan relating to cyber red teams of Department of Defense.

Subtitle B—Cybersecurity

Sec. 1511. Responsibility for cybersecurity and critical infrastructure protection of defense industrial base.
Sec. 1512. Cybersecurity enhancements for nuclear command, control, and communications network.
Sec. 1513. Pilot program relating to semiconductor supply chain and Cybersecurity Collaboration Center.
Sec. 1514. Transfer of data and technology developed under MOSAICS program.
Sec. 1515. Modernization program for network boundary and cross-domain defense.
Sec. 1516. Establishment of certain identity, credential, and access management activities as program of record.
Sec. 1517. Pilot program on assuring critical infrastructure support for military contingencies.
Sec. 1518. Military cybersecurity cooperation with Taiwan.
Sec. 1519. Guidance regarding securing laboratories of the Armed Forces.

Subtitle C—Information Technology and Data Management

Sec. 1521. Control and management of Department of Defense data; establishment of Chief Digital and Artificial Intelligence Officer Governing Council.
Sec. 1522. Modification to Department of Defense enterprise-wide procurement of cyber data products and services.
Sec. 1523. Management of data assets by Chief Digital and Artificial Intelligence Officer.
Sec. 1524. Course of education and pilot program on authentication of digital content provenance for certain Department of Defense media content.
Sec. 1525. Prize competitions for business systems modernization.
Sec. 1526. Requirements for deployment of fifth generation information and communications capabilities to military installations and other Department facilities.
Sec. 1527. Required policies to establish datalink strategy of Department of Defense.

Subtitle D—Personnel

Sec. 1531. Office for academic engagement relating to cyber activities.
Sec. 1532. Selected Reserve order to active duty to respond to a significant cyber incident.
Sec. 1533. Post-graduate employment of Department of Defense Cyber Service Academy scholarship recipients in intelligence community.
Sec. 1534. Minimum number of scholarships to be awarded annually through Department of Defense Cyber Service Academy.
Sec. 1535. Pilot program and other measures to enhance readiness and effectiveness of Cyber Mission Force.
Sec. 1536. Authority to conduct pilot program on Civilian Cybersecurity Reserve.
Sec. 1537. Requirements for implementation of user activity monitoring for certain personnel.
Sec. 1538. Study on occupational resiliency of Cyber Mission Force.

Subtitle E—Artificial Intelligence

Sec. 1541. Modification to acquisition authority of senior official with principal responsibility for artificial intelligence and machine learning.
Sec. 1542. Artificial intelligence bug bounty programs.
Sec. 1543. Prize competition for technology that detects and watermarks use of generative artificial intelligence.
Sec. 1544. Plans, strategies, and other matters relating to artificial intelligence.
Sec. 1545. Study to analyze vulnerability for artificial intelligence-enabled military applications.

Subtitle F—Reports and Other Matters

Sec. 1551. Limitation on availability of funds for travel for Office of Under Secretary of Defense for Personnel and Readiness pending strategy relating to Defense Travel System.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 533

Sec. 1552. Management by Department of Defense of mobile applications.
Sec. 1553. Report on Department of Defense Enterprise capabilities for cybersecurity.
Sec. 1554. Report on technology modernization for Army Human Resources Command 2030 Transformation Plan.
Sec. 1555. Certification requirement regarding contracting for military recruiting.

# Subtitle A—Cyber Operations

### SEC. 1501. PERFORMANCE METRICS FOR PILOT PROGRAM ON SHARING CYBER CAPABILITIES AND RELATED INFORMATION WITH FOREIGN OPERATIONAL PARTNERS.

Chapter 19 of title 10, United States Code, is amended—

(1) by redesignating the second section 398 (relating to pilot program for sharing cyber capabilities and related information with foreign operational partners) as section 398a; and

10 USC prec. 391.

(2) in section 398a, as so redesignated—

(A) by redesignating subsections (f) and (g) as subsections (g) and (h), respectively; and

(B) by inserting after subsection (e) the following new subsection:

"(f) PERFORMANCE METRICS.—(1) The Secretary of Defense shall maintain performance metrics to track the results of sharing cyber capabilities and related information with foreign operational partners under a pilot program authorized by subsection (a).

"(2) The performance metrics under paragraph (1) shall include the following:

"(A) Whom the cyber capability was used against.

"(B) The effect of the cyber capability, including whether and how the transfer of the cyber capability improved the operational cyber posture of the United States and achieved operational objectives of the United States, or had no effect.

"(C) Such other outcome-based or appropriate performance metrics as the Secretary considers appropriate for evaluating the effectiveness of a pilot program carried out under subsection (a).".

### SEC. 1502. HARMONIZATION AND CLARIFICATION OF STRATEGIC CYBERSECURITY PROGRAM AND RELATED MATTERS.

(a) HARMONIZATION AND CLARIFICATION.—

(1) IN GENERAL.—Chapter 19 of title 10, United States Code, is amended by inserting after section 391a the following new section:

10 USC prec. 391.

### "§ 391b. Strategic cybersecurity program

10 USC 391b.

"(a) IN GENERAL.—(1) There is a program to be known as the 'Strategic Cybersecurity Program' (in this section referred to as the 'Program') to ensure the ability of the Department of Defense to conduct the most critical military missions of the Department.

"(2) The Secretary of Defense shall designate a principal staff assistant from within the Office of the Secretary of Defense whose office shall serve as the office of primary responsibility for the Program, and provide policy, direction, and oversight regarding the execution of the responsibilities of the program manager selected pursuant to subsection (c)(1).

Designation.

"(b) MEMBERSHIP.—In addition to the office of primary responsibility for the Program under subsection (a)(2) and the program

manager selected pursuant to subsection (c)(1), membership in the Program shall include the following:

"(1) The Vice Chairman of the Joint Chiefs of Staff.

"(2) The Commanders of the United States Cyber Command, United States European Command, United States Indo-Pacific Command, United States Northern Command, United States Strategic Command, United States Space Command, United States Transportation Command.

"(3) The Under Secretary of Defense for Acquisition and Sustainment.

"(4) The Under Secretary of Defense for Policy.

"(5) The Chief Information Officer of the Department of Defense.

"(6) The Chief Digital and Artificial Intelligence Officer of the Department of Defense.

"(7) The chief information officers of the military departments.

"(8) The Principal Cyber Advisor of the Department of Defense.

"(9) The Principal Cyber Advisors of the military departments.

"(10) Each senior official identified pursuant to subsection (i) of section 1647 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1118).

"(11) Such other officials as may be determined necessary by the Secretary of Defense.

"(c) PROGRAM OFFICE.—(1) There is in the Cybersecurity Directorate of the National Security Agency a program office to support the Program by identifying threats to, vulnerabilities in, and remediations for, the missions and mission elements specified in subsection (d)(1). Such program office shall be headed by a program manager selected by the Director of the National Security Agency.

"(2) The Chief Information Officer of the Department of Defense, in exercising authority, direction, and control over the Cybersecurity Directorate of the National Security Agency, shall ensure that the program office under paragraph (1) is responsive to the requirements and direction of the program manager selected pursuant to such paragraph.

"(3) The Secretary may augment the personnel assigned to the program office under paragraph (1) by assigning personnel as appropriate from among members of any covered armed force (including the reserve components thereof), civilian employees of the Department of Defense (including the Defense Intelligence Agency), and personnel of the research laboratories of the Department of Defense, who have particular expertise in the areas of responsibility referred to in subsection (d).

"(d) DESIGNATION OF MISSION ELEMENTS OF PROGRAM.—(1) The Under Secretary of Defense for Policy, the Under Secretary of Defense for Acquisition and Sustainment, and the Vice Chairman of the Joint Chiefs of Staff shall identify and designate for inclusion in the Program all of the systems, critical infrastructure, kill chains, and processes, including systems and components in development, that comprise the following military missions of the Department of Defense:

"(A) Nuclear deterrence and strike.

"(B) Select long-range conventional strike missions germane to the warfighting plans of the United States European Command and the United States Indo-Pacific Command.

"(C) Offensive cyber operations.

"(D) Homeland missile defense.

"(2) The Vice Chairman of the Joint Chiefs of Staff shall coordinate the identification and prioritization of the missions and mission components, and the development and approval of requirements relating to the cybersecurity of the missions and mission components, of the Program.

Coordination.

"(e) ADDITIONAL RESPONSIBILITIES OF HEAD OF OFFICE OF PRIMARY RESPONSIBILITY.—In addition to providing policy, direction, and oversight as specified in subsection (a)(2), the head of the office of primary responsibility for the Program designated under such subsection shall be responsible—

"(1) for overseeing and providing direction on any covered statutory requirement that is ongoing, recurrent (including on an annual basis), or unfulfilled, including by—

"(A) reviewing any materials required to be submitted to Congress under the covered statutory requirement prior to such submission; and

"(B) ensuring such submissions occur by the applicable deadline under the covered statutory requirement: and

"(2) recording and monitoring the remediation of identified vulnerabilities in constituent systems, infrastructure, kill chains, and processes of the missions specified in subsection (d)(1).

"(f) RESPONSIBILITIES OF PROGRAM MANAGER.—The program manager selected pursuant to subsection (c)(1) shall be responsible for the following:

"(1) Conducting end-to-end vulnerability assessments of the constituent systems, infrastructure, kill chains, and processes of the missions specified in subsection (d)(1).

"(2) Prioritizing and facilitating the remediation of identified vulnerabilities in such constituent systems, infrastructure, kill chains, and processes.

"(3) Conducting, prior to the Milestone B approval for any proposed such system or infrastructure germane to the missions of the Program, appropriate reviews of the acquisition and system engineering plans for that proposed system or infrastructure, in accordance with the policy and guidance of the Under Secretary of Defense for Acquisition and Sustainment regarding the components of such reviews and the range of systems and infrastructure to be reviewed.

"(4) Advising the Secretaries of the military departments, the commanders of the combatant commands, and the Joint Staff on the vulnerabilities and cyberattack vectors that pose substantial risk to the missions of the Program and their constituent systems, critical infrastructure, kill chains, or processes.

"(5) Ensuring that the Program builds upon (including through the provision of oversight and direction by the head of the office of primary responsibility for the Program pursuant to subsection (e), as applicable), and does not duplicate, other efforts of the Department of Defense relating to cybersecurity, including the following:

"(A) The evaluation of cyber vulnerabilities of major weapon systems of the Department of Defense required under section 1647 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1118).

"(B) The evaluation of cyber vulnerabilities of critical infrastructure of the Department of Defense required under section 1650 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 2224 note).

"(C) The activities of the cyber protection teams of the Department of Defense.

"(g) RESPONSIBILITIES OF SECRETARY OF DEFENSE.—The Secretary of Defense shall define and issue guidance on the roles and responsibilities for components of the Department of Defense other than those specified in this section with respect to the Program, including—

"(1) the roles and responsibilities of the acquisition and sustainment organizations of the military departments in supporting and implementing remedial actions;

"(2) the alignment of Cyber Protection Teams with the prioritized missions of the Program;

"(3) the role of the Director of Operational Test and Evaluation in conducting periodic assessments, including through cyber red teams, of the cybersecurity of missions in the Program; and

"(4) the role of the Principal Cyber Adviser in coordinating and monitoring the execution of the Program.

"(h) ANNUAL REPORTING.—Not later than December 31 of each year, the head of the office of primary responsibility for the Program, in coordination with the appropriate members of the Program under subsection (b), shall submit to the congressional defense committees an annual report on the efforts carried out pursuant to this section or any covered provision of law, including with respect to such efforts concerning—

Evaluation.

"(1) the evaluation of cyber vulnerabilities of each major weapon system of the Department of Defense and related mitigation activities under section 1647 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1118);

Evaluation.

"(2) the evaluation of cyber vulnerabilities of the critical infrastructure of the Department of Defense under section 1650 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 2224 note);

"(3) operational technology and the mapping of mission-relevant terrain in cyberspace under section 1505 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 394 note);

Assessments.

"(4) the assessments of the vulnerabilities to and mission risks presented by radio-frequency enabled cyber attacks with respect to the operational technology embedded in weapons systems, aircraft, ships, ground vehicles, space systems, sensors, and datalink networks of the Department of Defense under section 1559 of the National Defense Authorization Act for Fiscal Year 2023; and

"(5) the work of the Program in general, including information relating to staffing and accomplishments.

"(i) ANNUAL BUDGET DISPLAY.—(1) On an annual basis for each fiscal year, concurrently with the submission of the budget of the President for that fiscal year under section 1105(a) of title 31, United States Code, the head of the office of primary responsibility for the Program, in coordination with the appropriate members of the Program under subsection (b), shall submit to the congressional defense committees a consolidated budget justification display that covers all programs and activities associated with this section and any covered provision of law, including with respect to the matters listed in subsection (h).

"(2) Each display under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

"(3) For the purpose of facilitating the annual budget display requirement under paragraph (1), the Chief Information Officer of the Department of Defense shall provide to the head of the office of primary responsibility for the Program and the appropriate members of the Program under subsection (b) fiscal guidance on the programming of funds in support of the Program.

"(j) DEFINITIONS.—In this section:

"(1) The term 'covered armed force' means the Army, Navy, Air Force, Marine Corps, or Space Force.

"(2) The term 'covered statutory requirement' means a requirement under any covered provision of law.

"(3) The term 'covered provision of law' means the following:

"(A) Section 1647 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1118).

"(B) Section 1650 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 2224 note).

"(C) Section 1505 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 394 note).

"(D) Section 1559 of the National Defense Authorization Act for Fiscal Year 2023.".

(2) CONFORMING AMENDMENTS.—

(A) REPEAL OF DUPLICATE BRIEFING REQUIREMENT.— Section 1647 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 129 Stat. 1118) is amended—

 10 USC 2224 note.

(i) by striking subsection (c); and

(ii) by redesignating subsections (d) through (j) as subsections (c) through (i), respectively.

(B) REPEAL OF ADDITIONAL DUPLICATE BRIEFING REQUIREMENT.—Section 1650 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 2224 note) is amended—

(i) by striking subsection (d); and

(ii) by redesignating subsections (e) and (f) as subsections (d) and (e), respectively.

(C) REPEAL OF DUPLICATE PROVISION RELATING TO STRATEGIC CYBERSECURITY PROGRAM.—Section 1640 of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–9; 10 U.S.C. 2224 note) is repealed.

(D) REPEAL OF DUPLICATE BUDGET REQUIREMENT.—Section 1637 of the John S. McCain National Defense

Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 221 note) is repealed.

(E) REPEAL OF DUPLICATE REPORTING REQUIREMENT.—Section 1505 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 394 note) is amended—

(i) by striking subsection (h); and

(ii) by redesignating subsections (i) and (j) as subsections (h) and (i), respectively.

(F) REPEAL OF ADDITIONAL DUPLICATE BRIEFING REQUIREMENT; REMOVAL OF REFERENCE TO REPEALED PROVISION.—Section 1559 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 is amended—

10 USC 2224 note.

(i) by striking ", section 1637 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 221 note),"; and

(ii) by striking subsection (f).

Plan.

(b) REPORT REQUIRED.—Not later than 180 days after the date of the enactment of this Act, the head of the office of primary responsibility for the Strategic Cybersecurity Program under section 391b of title 10, United States Code, as added by subsection (a), shall submit to the congressional defense committees a report setting forth the plan of the head to harmonize and interlink the annual reporting and annual budget display requirements under subsections (h) and (i) of such section, respectively, to ensure unity and a lack of duplication in such efforts.

**SEC. 1503. MODIFICATION OF AUTHORITY TO USE OPERATION AND MAINTENANCE FUNDS FOR CYBER OPERATIONS-PECULIAR CAPABILITY DEVELOPMENT PROJECTS.**

133 Stat. 1750.

Section 1640 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92) is amended—

(1) in subsection (a)—

(A) by striking " and each Secretary of the military departments concerned";

(B) by striking "per use" and inserting "per project"; and

(C) by striking "through 2025" and inserting "through 2028";

(2) by amending subsection (b) to read as follows:

"(b) LIMITATION.—Each fiscal year, the Commander of the United States Cyber Command may obligate and expend under subsection (a) not more than $16,000,000.";

(3) in subsection (c)—

(A) by striking "$500,000" and inserting "$1,000,000"; and

(B) by striking "the Secretary of Defense, or his designee, and each Secretary of the military departments concerned, or their designees," and inserting "the Secretary of Defense (or a designee)"; and

(4) in subsection (d), by striking "2025" and inserting "2028".

**SEC. 1504. QUARTERLY BRIEFINGS ON JOINT ALL DOMAIN COMMAND AND CONTROL EFFORT.**

Section 1076 of the National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 134 Stat. 3866) is amended—

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 539

(1) by amending subsection (a) to read as follows:

"(a) QUARTERLY BRIEFINGS.—

"(1) IN GENERAL.—During the period beginning on October 1, 2021, and ending on October 1, 2028, the Deputy Secretary of Defense, the Vice Chairman of the Joint Chiefs of Staff, the Chief Digital and Artificial Intelligence Officer of the Department of Defense, the Chief Information Officer of the Department of Defense, and a senior military service representative for each of the Armed Forces shall provide to the congressional defense committees quarterly briefings on the progress of the Joint All Domain Command and Control (in this section referred to as 'JADC2') effort of the Department of Defense.

"(2) ANNUAL PARTICIPATION BY CERTAIN COMBATANT COMMANDS.—For each fiscal year during the period specified in paragraph (1), a senior representative from each of the United States Indo-Pacific Command, United States Central Command, and United States European Command shall participate in the provision of the first quarterly briefing under such paragraph following the submission of the budget of the President to Congress under section 1105 of title 31, United States Code, for that fiscal year."; and

(2) in subsection (b), by adding at the end the following new paragraphs:

"(7) A detailed programmatic table of the funding for the JADC2 efforts of the Office of the Secretary of Defense and the military departments, as set forth in the budget of the President most recently submitted to Congress under section 1105 of title 31, United States Code. The information in such table shall be organized primarily by key programs, projects, and activities (such as data integration layer, joint operating system, global experimentation, and mission command applications).

"(8) A detailed summary of the lessons learned from large-scale exercises and experiments relevant to the JADC2 effort conducted during the period covered by the briefing.".

**SEC. 1505. AUTHORITY FOR COUNTERING ILLEGAL TRAFFICKING BY MEXICAN TRANSNATIONAL CRIMINAL ORGANIZATIONS IN CYBERSPACE.**

(a) AUTHORITY.—In accordance with sections 124 and 394 of title 10, United States Code, the Secretary of Defense, in support of and in coordination with the heads of other relevant Federal departments and agencies and in consultation with the Government of Mexico as appropriate, may conduct detection, monitoring, and other operations in cyberspace to counter Mexican transnational criminal organizations that are engaged in any of the following activities that cross the southern border of the United States:

(1) Smuggling of illegal drugs, controlled substances, or precursors thereof.

(2) Human trafficking.

(3) Weapons trafficking.

(4) Other illegal activities.

(b) CERTAIN ENTITIES.—The authority under paragraph (1) may be used to counter Mexican transnational criminal organizations, including entities cited in the most recent National Drug Threat Assessment published by the United States Drug Enforcement

*[margin notes: Time period. / Summary. / Drugs and drug abuse. Firearms. 10 USC 394 note.]*

137 STAT. 540        PUBLIC LAW 118–31—DEC. 22, 2023

Administration, that are engaged in any of the activities described in such paragraph.

10 USC 167b note.

**SEC. 1506. DEVELOPMENT OF CYBER SUPPORT MECHANISMS FOR GEOGRAPHIC COMBATANT COMMANDS.**

Deadline.

(a) DEVELOPMENT OF MECHANISMS REQUIRED.—Not later than 270 days after the date of the enactment of this Act, each commander of a geographic combatant command, in coordination with the Commander of the United States Cyber Command, shall develop a cyber support mechanism to support the operations of that geographic combatant command.

(b) ELEMENTS.—Each cyber support mechanism developed with respect to a geographic combatant command under subsection (a) shall include the following:

Processes.

(1) Processes to enhance the cyber capabilities of such combatant command.

Plans.

(2) Plans to develop and maintain a sufficient cyber planning capacity in such combatant command.

Processes.

(3) Processes to integrate cyber capabilities into operational support for such combatant command.

(4) A prioritization of cyber risks and vulnerabilities within the geographic area of responsibility of such combatant command.

Plans.

(5) Specific plans to assist in the defense of friendly foreign countries.

Deadlines.
10 USC 2224 note.

**SEC. 1507. REVIEW AND PLAN RELATING TO CYBER RED TEAMS OF DEPARTMENT OF DEFENSE.**

(a) REVIEW RELATING TO PRIOR JOINT ASSESSMENT.—

(1) REVIEW REQUIRED.—Not later than 90 days after the date of the enactment of this Act, the officials described in subsection (c) shall review, and assess the status of the implementation of, the recommendations set forth by the Secretary of Defense in response to the joint assessment requirement under section 1660 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1771).

(2) ELEMENTS.—The review under paragraph (1) shall include, with respect to the recommendations specified in such paragraph—

Timelines.

(A) the timelines associated with each such recommendation, regardless of whether the recommendation is fully implemented or yet to be fully implemented; and

(B) a description of any impediments to the implementation of such recommendations encountered.

(b) PLAN REQUIRED.—

(1) PLAN.—Not later than 180 days after the date of the enactment of this Act, the officials described in subsection (c) shall submit to the congressional defense committees a plan, developed taking into account the findings of the review under subsection (a), to ensure cyber red teams of the Department of Defense achieve sufficient capacity and capability to provide services and meet current and projected future demands on a Defense-wide basis. Such plan shall include—

(A) a description of the funding necessary for such cyber red teams to achieve such capacity and capability;

(B) a description of any other resources, personnel, infrastructure, or authorities for access to information necessary for such cyber red teams to achieve such capacity

and capability (including with respect to the emulation of threats from foreign countries with advanced cyber capabilities, automation, artificial intelligence or machine learning, and data collection and correlation); and

(C) updated joint service standards and metrics to ensure the training, staffing, and equipping of such cyber red teams at levels necessary to achieve such capacity and capability.

Updates.
Standards.

(2) IMPLEMENTATION.—Not later than one year after the date of enactment of this Act, the Secretary of Defense shall prescribe such regulations and issue such guidance as the Secretary determines necessary to implement the plan developed under subsection (a).

Regulations.
Guidance.

(c) OFFICIALS DESCRIBED.—The officials described in this subsection are the Principal Cyber Advisor to the Secretary of Defense, the Chief Information Officer of the Department of Defense, the Director of Operational Test and Evaluation, and the Commander of the United States Cyber Command.

(d) ANNUAL REPORTS.—Not later than January 31, 2025, and not less frequently than annually thereafter until January 31, 2031, the Director of Operational Test and Evaluation shall include in each annual report required under section 139(h) of title 10, United States Code, an update on progress made with respect to the implementation of this section, including the following:

Termination date.
Updates.

(1) The results of test and evaluation events, including any resource or capability shortfalls limiting the capacity or capability of cyber red teams of the Department of Defense to meet operational requirements.

(2) The extent to which operations of such cyber red teams have expanded across the competition continuum, including during cooperation and competition phases, to match adversary positioning and cyber activities.

(3) A summary of identified categories of common gaps and shortfalls across cyber red teams of the military departments and Defense Agencies (as such terms are defined in section 101 of title 10, United States Code).

Summary.

(4) Any identified lessons learned that would affect training or operational employment decisions relating to the cyber red teams of the Department of Defense.

# Subtitle B—Cybersecurity

### SEC. 1511. RESPONSIBILITY FOR CYBERSECURITY AND CRITICAL INFRASTRUCTURE PROTECTION OF DEFENSE INDUSTRIAL BASE.

Section 1724 of the National Defense Authorization Act for Fiscal Year 2021 (116–283; 10 U.S.C. 2224 note) is amended—

(1) in subsection (b), by striking "The Secretary of Defense shall designate the Principal Cyber Advisor of the Department of Defense" and inserting "Not later than 30 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, the Secretary of Defense shall designate a principal staff assistant from within the Office of the Secretary of Defense who shall serve";

Deadline.
Designation.

(2) in subsection (c)—

137 STAT. 542          PUBLIC LAW 118–31—DEC. 22, 2023

(A) in the matter preceding paragraph (1), by striking "the Principal Cyber Advisor of the Department of Defense" and inserting "the principal staff assistant designated under subsection (b)"; and

(B) in paragraph (1), by striking "Sector Specific Agency" and inserting "Sector Risk Management Agency";

(3) in subsection (d), by striking "Principal Cyber Advisor of the Department of Defense" and inserting "principal staff assistant designated under subsection (b)"; and

(4) in subsection (e)—

(A) in the matter preceding paragraph (1), by striking "this Act" and inserting "the National Defense Authorization Act for Fiscal Year 2024";

(B) in paragraph (2), by striking "Sector Specific Agency functions under Presidential Policy Directive-21 from non-cybersecurity Sector Specific Agency functions" and inserting "functions of a Sector Risk Management Agency pursuant to section 9002 of the National Defense Authorization Act for Fiscal Year 2021 (6 U.S.C. 652a) from non-cybersecurity functions of a Sector Risk Management Agency"; and

(C) by striking paragraph (3).

10 USC 499 note.    **SEC. 1512. CYBERSECURITY ENHANCEMENTS FOR NUCLEAR COMMAND, CONTROL, AND COMMUNICATIONS NETWORK.**

(a) ESTABLISHMENT OF CROSS-FUNCTIONAL TEAM.—

Deadline.    (1) ESTABLISHMENT.—Not later than 180 days after the date of the enactment of this Act, and consistent with section 911(c) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 111 note), the Secretary of Defense shall establish a cross-functional team to develop and direct the implementation of a threat-driven cyber defense construct for the systems and networks that support the nuclear command, control, and communications (commonly referred to as "NC3") mission (in this section referred to as the "cross-functional team").

(2) COMPOSITION OF CROSS-FUNCTIONAL TEAM.—

(A) IN GENERAL.—The cross functional team shall be composed of senior officers selected from among each of the military departments, the Defense Information Systems Agency, the National Security Agency, the United States Cyber Command, the United States Strategic Command, and any other organization or element of the Department of Defense determined appropriate by the Secretary.

Designation.    (B) LEADERSHIP.—The Secretary shall designate a senior officer from those selected under subparagraph (A) to serve as the leader of the cross-functional team.

(C) STAFF.—The Secretary shall ensure the heads of the organizations and elements specified in subparagraph (A) detail staff to support the cross-functional team in carrying out the duties under paragraph (3).

(3) DUTIES.—The duties of the cross-functional team shall be to enhance the cyber defense of the systems and networks that support the nuclear command, control, and communications mission.

Deadline.    (b) REQUIRED CONSTRUCT, PLAN OF ACTION, AND MILESTONES.—

Not later than one year after the date of the enactment of this

PUBLIC LAW 118–31—DEC. 22, 2023     137 STAT. 543

Act, the leader of the cross-functional team designated pursuant to subsection (a)(2)(B) shall develop a threat-driven cyber defense construct, and associated plans and milestones, to enhance the security of the systems and networks that support the nuclear command, control, and communications mission. Such construct shall be based on—

(1) the application of the principles of the approach to cybersecurity commonly referred to as "zero trust architecture";

(2) an analysis of appropriately comprehensive endpoint and network telemetry data; and

(3) control capabilities enabling rapid investigation and remediation of indicators of compromise and threats to mission execution.

(c) ANNUAL BRIEFINGS.—During the 60-day period beginning on the date that is 30 days before the date on which the President submits to Congress the budget of the President pursuant to section 1105(a) of title 31, United States Code, for each of fiscal years 2025 through 2028, the Secretary shall provide to the appropriate congressional committees a briefing on the implementation of this section.

*Time periods.*

(d) TERMINATION.—

(1) IN GENERAL.—Except as provided in paragraph (2), the cross-functional team under this section shall terminate on October 31, 2028.

(2) EXTENSION AUTHORITY.—The Secretary of Defense may extend the date of termination under paragraph (1) as the Secretary determines appropriate.

(e) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the congressional defense committees; and

(2) the Permanent Select Committee on Intelligence of the House of Representatives.

**SEC. 1513. PILOT PROGRAM RELATING TO SEMICONDUCTOR SUPPLY CHAIN AND CYBERSECURITY COLLABORATION CENTER.**

*10 USC note prec. 3241.*

(a) ESTABLISHMENT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Director of the National Security Agency, shall commence the conduct of a pilot program under which the Cybersecurity Collaboration Center of the National Security Agency may collaborate with, including by entering into contracts or other agreements with, eligible persons under subsection (c), for the purpose of assessing the feasibility and advisability of improving the cybersecurity of the semiconductor supply chain (in this section referred to as the "pilot program").

*Deadline. Contracts.*

(b) PROGRAM OBJECTIVES.—Under the pilot program, the Secretary of Defense shall seek to improve the cybersecurity of the supply chain for the design, manufacturing, assembly, packaging, and testing of semiconductors, including through the following:

(1) Improving the cybersecurity of processes for such design, manufacturing, assembly, packaging, and testing.

(2) Protecting against cyber-driven intellectual property theft with respect to such design, manufacturing, assembly, packaging, and testing.

(3) Reducing the risk of disruptions caused by cyberattacks to the supply chain for such design, manufacturing, assembly, packaging, and testing.

(c) ELIGIBILITY.—A person is eligible to participate in the pilot program if such person—

(1) directly supports the design, manufacturing, assembly, packaging, or testing of semiconductors within the United States; and

(2) provides semiconductor components for the Department of Defense, any national security system (as such term is defined in section 3552(b) of title 44, United States Code), or the defense industrial base.

Deadlines.

(d) BRIEFINGS.—

(1) INITIAL BRIEFING.—

(A) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall provide to the appropriate congressional committees an initial briefing on the pilot program.

(B) ELEMENTS.—The briefing under subparagraph (A) shall include the following:

(i) A description of the status of the implementation of the pilot program.

(ii) An identification of key priorities for the pilot program.

(iii) An identification of any challenges to implementing the pilot program or impediments to participation in the pilot program by eligible persons under subsection (c).

(2) ANNUAL BRIEFINGS.—

(A) IN GENERAL.—Not later than one year after the date of the initial briefing under paragraph (1), and annually thereafter until the date of termination under subsection (f), the Secretary of Defense shall provide to the appropriate congressional committees a briefing on the progress of the pilot program.

(B) ELEMENTS.—Each briefing under subparagraph (A) shall include the following:

Recommendations.

(i) Recommendations for addressing relevant policy, budgetary, security, and legislative gaps to increase the effectiveness of the pilot program, including, with respect to the first briefing under such subparagraph, an assessment of the resources necessary for successful implementation of the pilot program.

Recommendations.

(ii) Recommendations for increasing participation in the pilot program by eligible persons under subsection (c).

(iii) A description of any challenges encountered in carrying out the pilot program, including any concerns expressed by manufacturers of semiconductors or suppliers of semiconductor components.

(iv) The findings of the Secretary, in consultation with the Director of the National Security Agency, with respect to the feasibility and advisability of extending or expanding the pilot program.

(v) Such other matters as the Secretary considers appropriate.

(e) TERMINATION.—The pilot program shall terminate on the date that is four years after the date of the enactment of this Act.

(f) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services and the Permanent Select Committee on Intelligence of the House of Representatives; and

(2) the Committee on Armed Services and the Select Committee on Intelligence of the Senate.

**SEC. 1514. TRANSFER OF DATA AND TECHNOLOGY DEVELOPED UNDER MOSAICS PROGRAM.**

10 USC 2224 note.

(a) TRANSFERS AUTHORIZED.—The Secretary of Defense may transfer to eligible private sector entities data and technology developed under the MOSAICS program to enhance cyber threat detection and protection of critical industrial control system assets used for electricity distribution.

(b) AGREEMENTS.—In carrying out subsection (a), the Secretary of Defense may—

(1) enter into cooperative research and development agreements under section 4026 of title 10, United States Code; and

(2) use such other mechanisms for the transfer of technology and data as are authorized by law.

(c) NOTIFICATION.—Not later than 15 days after any date on which the Secretary determines to transfer data or technology to an eligible private sector entity under subsection (a), the Secretary shall submit to the congressional defense committees a written notification of such determination. Such notification shall include the following:

Deadline.
Determination.

(1) An identification of the data or technology to be transferred.

(2) An identification of the eligible private sector entity, including an identification of the specific individual employed by or otherwise associated with such entity responsible for the security and integrity of the data or technology to be received.

(3) A detailed description of any special security handling instructions required pursuant to an agreement entered into between the Secretary and the eligible private sector entity for such transfer.

(4) Timelines associated with such transfer.

Timelines.

(c) DEFINITIONS.—In this section:

(1) The term "eligible private sector entity" means a private sector entity that—

(A) has functions relevant to the civil electricity sector; and

(B) is determined by the Secretary of Defense to be eligible to receive data and technology transferred under subsection (a).

(2) The term "MOSAICS program" means the program of the Department of Defense known as the "More Situational Awareness for Industrial Control Systems Joint Capabilities Technology Demonstration program", or successor program.

137 STAT. 546          PUBLIC LAW 118–31—DEC. 22, 2023

Deadlines.
10 USC 2224
note.

**SEC. 1515. MODERNIZATION PROGRAM FOR NETWORK BOUNDARY AND CROSS-DOMAIN DEFENSE.**

(a) MODERNIZATION PROGRAM REQUIRED.—The Secretary of Defense shall carry out a modernization program for network boundary and cross-domain defense against cyber attacks. In carrying out such modernization program, the Secretary shall expand upon the fiscal year 2023 pilot program on modernized network boundary defense capabilities and the initial deployment of such capabilities to the primary Internet access points of the Department of Defense managed by the Director of the Defense Information Systems Agency.

(b) PROGRAM PHASES.—

(1) IN GENERAL.—The Secretary of Defense shall implement the modernization program under subsection (a) in phases, with the objective of completing such program by October 1, 2028.

Surveys.

(2) OBJECTIVES.—The phases required by paragraph (1) shall include the following objectives:

(A) By September 30, 2026, completion of—

(i) the pilot program specified in subsection (a) and the deployment of modernized network boundary defense capabilities to the Internet access points managed by the Director of the Defense Information Systems Agency; and

(ii) the extension of modernized network boundary defense capabilities to all additional Internet access points of the information network of the Department of Defense.

(B) By September 30, 2027, the conduct of a survey, completion of a pilot program, and deployment of modernized network boundary defense capabilities to the access points and cross-domain capabilities of the Secret Internet Protocol Router Network.

(C) By September 30, 2028, the conduct of a survey, completion of a pilot program, and deployment of modernized network boundary defense capabilities to any remaining classified network or enclave of the information network of the Department.

(c) IMPLEMENTATION PLAN.—Not later than 90 days after the date of the enactment of this Act, the Secretary shall submit to the congressional defense committees a plan for the implementation of the modernization program under subsection (a). Such plan shall include—

Summary.

(1) a summary of findings from the pilot program specified in subsection (a); and

(2) an identification of the resources necessary for such implementation, including for implementing the phase of the modernization program specified in subsection (b)(2)(C).

Deadlines.
10 USC 2224
note.

**SEC. 1516. ESTABLISHMENT OF CERTAIN IDENTITY, CREDENTIAL, AND ACCESS MANAGEMENT ACTIVITIES AS PROGRAM OF RECORD.**

(a) ESTABLISHMENT OF PROGRAM OF RECORD.—

(1) PROGRAM OF RECORD.—Except as provided in subsection (b), not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall establish a program

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 547

of record, governed by standard Department of Defense requirements and practices, and transition all covered activities to such program of record.

(2) OBJECTIVES.—The program of record under subsection (a) shall include, at a minimum, covered activities undertaken to achieve the following objectives:

(A) Correcting weaknesses in authentication and credentialing security, including with respect to the program of the Department of Defense known as the "Public Key Infrastructure" program (or any successor program), identified by the Director of Operational Test and Evaluation in a report submitted to Congress in April, 2023, titled "FY14–21 Observations of the Compromise of Cyber Credentials".

(B) Implementing improved authentication technologies, such as biometric and behavioral authentication techniques and other non-password-based solutions.

(3) BRIEFING.—Not later than 150 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the congressional defense committees a briefing on the covered activities to be included under the program of record under subsection (a).

(b) WAIVER AUTHORITY.—

(1) AUTHORITY.—The Secretary of Defense may waive the requirement under subsection (a) if the Secretary of Defense determines that the objectives listed in paragraph (2) of such subsection would be better achieved, and the level of rigor of the operational testing and oversight requirements applicable to such objectives would be improved, through a management approach other than the establishment of a program of record and transition of covered activities to such program of record. *Determination.*

(2) JUSTIFICATION.—Not later than 14 days after issuing a waiver under paragraph (1), the Secretary of Defense shall submit to the congressional defense committees a detailed justification for the waiver, including—

(A) an explanation of why the establishment of a program of record is not the preferred approach to achieve the objectives listed in subsection (a)(2);

(B) details relating to the management approach proposed to be implemented in lieu of the establishment of a program of record;

(C) an implementation plan for such proposed alternative approach; and *Implementation plan.*

(D) such other information as the Secretary of Defense determines appropriate.

(c) DESIGNATION OF DATA ATTRIBUTES.—Not later than 120 days after the date of the enactment of this Act, the Chief Information Officer of the Department of Defense, in coordination with the Secretaries of the military departments, shall complete the designation of Tier 1 level data attributes to be used as a baseline set of standardized attributes for identity, credential, and access management, Defense-wide.

(d) BRIEFING.—Upon completing the requirement under subsection (c), the Chief Information Officer of the Department of

137 STAT. 548          PUBLIC LAW 118–31—DEC. 22, 2023

Defense and the Secretaries of the military departments shall provide to the Committees on Armed Services of the House of Representatives and the Senate a briefing on the activities carried out under this section.

(e) DEFINITIONS.—In this section:

(1) The term "covered activity" means any activity of the Office of the Secretary of Defense or a Defense Agency relating to the identity, credential, and access management initiative of the Department of Defense.

(2) The term "Defense Agency" has the meaning given that term in section 101 of title 10, United States Code.

10 USC 2224 note.

**SEC. 1517. PILOT PROGRAM ON ASSURING CRITICAL INFRASTRUCTURE SUPPORT FOR MILITARY CONTINGENCIES.**

Deadline.

(a) ESTABLISHMENT OF PILOT PROGRAM.—Not later than 60 days after the date of the enactment of this Act, the Secretary of Defense shall establish a pilot program to be known as the "Assuring Critical Infrastructure Support for Military Contingencies Pilot Program".

(b) SELECTION OF INSTALLATIONS.—

Deadline.

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, acting through the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, shall select not fewer than four geographically diverse military installations at which to carry out the pilot program under subsection (a).

Determinations.

(2) PRIORITIZATION.—

(A) IN GENERAL.—In selecting military installations under paragraph (1), the Secretary of Defense shall give priority to any military installation that the Secretary determines is a key component of not fewer than two contingency plans or operational plans, with further priority given to such plans in the area of responsibility of the United States Indo-Pacific Command or the United States European Command.

(B) SELECTION BETWEEN EQUAL PRIORITIES.—If two or more military installations qualify for equal priority under subparagraph (A), the Secretary of Defense shall give further priority for selection under such paragraph to any such military installation that the Secretary of Defense determines is—

(i) connected to national-level infrastructure;

(ii) located near a commercial port; or

(iii) located near a national financial hub.

(c) ACTIVITIES.—In carrying out the pilot program under subsection (a), the Secretary of Defense, acting through the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, shall—

(1) without duplicating or disrupting existing cyber exercise activities under the National Cyber Exercise Program under section 2220B of the Homeland Security Act of 2002 (6 U.S.C. 665h), conduct cyber resiliency and reconstitution stress test scenarios through tabletop exercises and, if possible, live exercises—

Assessment.

(A) to assess how to prioritize restoration of power, water, and telecommunications for a military installation in the event of a significant cyberattack on regional critical

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 549

infrastructure that has similar impacts on State and local infrastructure; and

(B) to determine the recovery process needed to ensure the military installation has the capability to function and support an overseas contingency operation or a homeland defense mission, as appropriate;

(2) map dependencies on power, water, and telecommunications at the military installation and the connections to distribution and generation outside the military installation;

(3) recommend priorities for the order of recovery for the military installation in the event of a significant cyberattack, considering both the requirements needed for operations of the military installation and the potential participation of personnel at the military installation in an overseas contingency operation or a homeland defense mission; and

(4) develop a lessons-learned database from the exercises conducted under paragraph (1) across all military installations participating in the pilot program, to be shared with the Committees on Armed Services of the House of Representatives and the Senate.

(d) COORDINATION WITH RELATED PROGRAMS.—The Secretary of Defense, acting through the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, shall ensure that activities under subsection (c) are coordinated with—

(1) private entities that operate power, water, and telecommunications for a military installation participating in the pilot program under subsection (a);

(2) relevant military and civilian personnel; and

(3) any other entity that the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs determines is relevant to the execution of activities under subsection (c).

(e) REPORT.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall submit to the Assistant to the President for Homeland Security, the National Cyber Director, the head of any other relevant Sector Risk Management Agency, the Committees on Armed Services of the House of Representatives and the Senate, and, if the Secretary of Defense determines it appropriate, relevant private sector owners and operators of critical infrastructure a report on the activities carried out under pilot program under subsection (a), including a description of any operational challenges identified.

(f) DEFINITIONS.—In this section:

(1) The term "critical infrastructure" has the meaning given that term in the Critical Infrastructures Protection Act of 2001 (42 U.S.C. 5195c).

(2) The term "Sector Risk Management Agency" has the meaning given that term in section 2200 of the Homeland Security Act of 2002 (6 U.S.C. 650).

**SEC. 1518. MILITARY CYBERSECURITY COOPERATION WITH TAIWAN.**

Deadlines.
22 USC 3351 note.

(a) REQUIREMENT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, acting through the Under Secretary of Defense for Policy, with the concurrence of the Secretary of State and in coordination with the Commander of the United States Cyber Command and the Commander of the United States Indo-Pacific Command, shall seek to engage with appropriate officials of Taiwan for the purpose of cooperating

137 STAT. 550          PUBLIC LAW 118–31—DEC. 22, 2023

with the military forces of Taiwan on defensive military cybersecurity activities.

(b) IDENTIFICATION OF ACTIVITIES.—In cooperating on defensive military cybersecurity activities with the military forces of Taiwan under subsection (a), the Secretary of Defense may carry out efforts to identify cooperative activities to—

(1) defend military networks, infrastructure, and systems;

(2) counter malicious cyber activity that has compromised such military networks, infrastructure, and systems;

(3) leverage United States commercial and military cybersecurity technology and services to harden and defend such military networks, infrastructure, and systems; and

(4) conduct combined cybersecurity training activities and exercises.

(c) BRIEFINGS.—

(1) REQUIREMENT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Secretary of State, shall provide to the appropriate congressional committees a briefing on the implementation of this section.

(2) CONTENTS.—The briefing under paragraph (1) shall include the following:

(A) A description of the feasibility and advisability of cooperating with the Ministry of Defense of Taiwan on the defensive military cybersecurity activities identified pursuant to subsection (b).

(B) An identification of any challenges and resources that would be needed to addressed to conduct such cooperative activities.

Overview.

(C) An overview of efforts undertaken pursuant to this section.

(D) Any other matters the Secretary determines relevant.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives; and

(2) the Committee on Armed Services and the Committee on Foreign Relations of the Senate.

10 USC note prec. 2661.

**SEC. 1519. GUIDANCE REGARDING SECURING LABORATORIES OF THE ARMED FORCES.**

Deadline.

(a) GUIDANCE.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense, in coordination with the Chief Information Officer of the Department of Defense, the Chief Digital and Artificial Intelligence Officer of the Department, the Under Secretary of Defense for Research and Engineering, and the Under Secretary of Defense for Intelligence and Security, shall issue Department-wide guidance regarding methods and processes to secure laboratories of the Armed Forces from—

(1) unauthorized access and intrusion;

(2) damage to, and destruction, manipulation, or theft of, physical and digital laboratory assets;

(3) accidental or intentional release or disclosure of sensitive information; and

(4) cyber sabotage.

(b) METHODS AND PROCESSES.—At a minimum, the guidance under subsection (a) shall include, with respect to laboratories of the Armed Forces, methods and processes to—

(1) secure laboratory operations through zero trust principles;

(2) control the access of devices to laboratory information networks;

(3) secure inventory management processes of such laboratories;

(4) control or limit access to such laboratories to authorized individuals;

(5) maintain the security and integrity of data libraries, repositories, and other digital assets of such laboratories;

(6) report and remediate cyber incidents or other unauthorized intrusions affecting such laboratories;

(7) train and educate personnel of the Department on laboratory security;

(8) develop an operations security plan to secure laboratory operations that may be used by applicable units of the Armed Forces to implement countermeasures appropriate with respect to the mission, assessed risk, and resources available to the unit (including guidelines for implementation of routine procedures and measures to be employed during daily operations or activities of the unit); and

(9) develop and train applicable units of the Armed Forces on individualized secure laboratory critical information and indicator lists to aid in protecting critical information regarding any activity, intention, capability, or limitation of the Department over which an adversary seeks to gain a military, political, diplomatic, economic, or technological advantage.

# Subtitle C—Information Technology and Data Management

**SEC. 1521. CONTROL AND MANAGEMENT OF DEPARTMENT OF DEFENSE DATA; ESTABLISHMENT OF CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER GOVERNING COUNCIL.**

(a) CONTROL AND MANAGEMENT OF DEPARTMENT OF DEFENSE DATA.—The Chief Digital and Artificial Intelligence Officer of the Department of Defense may access and control, on behalf of the Secretary of Defense, any data collected, acquired, accessed, or used by a component (as such term is defined in section 1513 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 4001 note)), consistent with such section.

10 USC 4001 note.

(b) CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER GOVERNING COUNCIL.—Section 238(d)(3) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. note prec. 4061) is amended to read as follows:

"(3) CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER GOVERNING COUNCIL.—

"(A) ESTABLISHMENT.—The Secretary shall establish a council to provide policy oversight to ensure the responsible, coordinated, and ethical employment of data and artificial intelligence capabilities across Department of

137 STAT. 552             PUBLIC LAW 118–31—DEC. 22, 2023

Defense missions and operations. Such council shall be known as the 'Chief Digital and Artificial Intelligence Officer Governing Council' (in this paragraph referred to as the 'Council').

"(B) MEMBERSHIP.—The Council shall be composed of the following:

"(i) Joint Staff J–6.

"(ii) The Under Secretary of Defense for Acquisition and Sustainment.

"(iii) The Under Secretary of Defense for Research and Evaluation.

"(iv) The Under Secretary of Defense for Intelligence and Security.

"(v) The Under Secretary of Defense for Policy.

"(vi) The Director of Cost Analysis and Program Evaluation.

"(vii) The Chief Information Officer of the Department.

"(viii) The Director of Administration and Management.

"(ix) The service acquisition executives of each of the military departments.

"(C) HEAD OF COUNCIL.—The Council shall be headed by the Chief Digital and Artificial Intelligence Officer of the Department.

Time period.

"(D) MEETINGS.—The Council shall meet not less frequently than twice each fiscal year.

"(E) DUTIES OF COUNCIL.—The duties of the Council are as follows:

"(i) To streamline the organizational structure of the Department as such structure relates to the development, implementation, and oversight of artificial intelligence.

"(ii) To improve coordination on artificial intelligence governance with the defense industry sector.

"(iii) To issue and oversee guidance on ethical requirements and protections for the use of artificial intelligence supported by Department funding and the reduction or mitigation of instances of unintended bias in artificial intelligence algorithms.

"(iv) To identify, monitor, and periodically update appropriate recommendations for the operational use of artificial intelligence.

"(v) To review, to the extent the head of the Council considers necessary, artificial intelligence program funding, to ensure that any investment by the Department in an artificial intelligence tool, system, or algorithm adheres to each applicable policy of the Department relating to artificial intelligence.

"(vi) To provide periodic status updates on the efforts of the Department to develop and implement artificial intelligence into existing Department programs and processes.

"(vii) To issue guidance on access and distribution restrictions relating to data, models, tool sets, or testing or validation infrastructure.

"(viii) To implement and oversee an educational program on data and artificial intelligence, for the purpose of familiarizing personnel Department-wide on the applications of artificial intelligence within the respective operations of such personnel.

"(ix) To implement and oversee a scorecard to assess data decrees of the Department.

"(x) Such other duties as the Council determines appropriate.

"(F) PERIODIC REPORTS.—Not later than 180 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, and not less frequently than once every 18 months thereafter, the Council shall submit to the Secretary and the congressional defense committees a report on the activities of the Council during the period covered by the report.".

## SEC. 1522. MODIFICATION TO DEPARTMENT OF DEFENSE ENTERPRISE-WIDE PROCUREMENT OF CYBER DATA PRODUCTS AND SERVICES.

Section 1521(a) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 2224 note) is amended—

(1) by redesignating paragraph (6) as paragraph (7);

(2) in paragraph (7), as so redesignated, by striking "(1) through (5)" and inserting "(1) through (6)"; and

(3) by inserting after paragraph (5) the following new paragraph:

"(6) Evaluating emerging cyber technologies, such as artificial intelligence-enabled security tools, for efficacy and applicability to the requirements of the Department of Defense.".

## SEC. 1523. MANAGEMENT OF DATA ASSETS BY CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER.

10 USC 394 note.

(a) IN GENERAL.—The Secretary of Defense, subject to existing authorities and limitations and acting through the Chief Digital and Artificial Intelligence Officer of the Department of Defense, shall provide the digital infrastructure and procurement vehicles necessary to manage data assets and data analytics capabilities at scale to enable an understanding of foreign key terrain and relational frameworks in cyberspace to support the planning of cyber operations, the generation of indications and warnings regarding military operations and capabilities, and the calibration of actions and reactions in strategic competition.

(b) RESPONSIBILITIES OF CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER.—The Chief Digital and Artificial Intelligence Officer shall—

(1) develop a baseline of data assets exclusive to foreign key terrain and relational frameworks in cyberspace maintained by the intelligence agencies of the Department of Defense, the military departments, the combatant commands, and any other components of the Department of Defense;

(2) develop and oversee the implementation of plans to enhance such data assets that the Chief Digital and Artificial Intelligence Officer determines are essential to support the purposes set forth in subsection (a); and

(3) ensure that such activities and plans are undertaken in cooperation and in coordination with the Assistant to the

Secretary of Defense for Privacy, Civil Liberties, and Transparency, to ensure that any data collection, procurement, acquisition, use, or retention measure conducted pursuant to this section is in compliance with applicable laws and regulations, including standards pertaining to data related to United States persons or any persons in the United States.

(c) OTHER MATTERS.—The Chief Digital and Artificial Intelligence Officer shall—

Designation.

(1) designate or establish one or more Department of Defense executive agents for enhancing data assets and the acquisition of data analytic tools for users;

(2) ensure that data assets referred to in subsection (b) that are in the possession of a component of the Department of Defense are accessible for the purposes described in subsection (a); and

(3) ensure that advanced analytics, including artificial intelligence technology, are developed and applied to the analysis of the data assets referred to in subsection (b) in support of the purposes described in subsection (a).

Deadline.

(d) SEMIANNUAL BRIEFINGS.—Not later than 120 days after the date of the enactment of this Act, and not less frequently than semiannually thereafter, the Chief Digital and Artificial Intelligence Officer shall provide to the appropriate congressional committees a briefing on the implementation of this section.

(e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to authorize the Department of Defense to collect, procure, or otherwise acquire data, including commercially available data, in any manner that is not authorized by law, or to make use of data assets in any manner, or for any purpose, that is not otherwise authorized by law.

(f) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the congressional defense committees;

(2) the Permanent Select Committee on Intelligence of the House of Representatives; and

(3) the Select Committee on Intelligence of the Senate.

Deadlines.
10 USC note
prec. 2001.

**SEC. 1524. COURSE OF EDUCATION AND PILOT PROGRAM ON AUTHENTICATION OF DIGITAL CONTENT PROVENANCE FOR CERTAIN DEPARTMENT OF DEFENSE MEDIA CONTENT.**

(a) COURSE OF EDUCATION.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense, acting through the Director of the Defense Media Activity, shall establish a course of education at the Defense Information School, the purpose of which shall be to provide instruction on the practical concepts and skills needed by public affairs, audiovisual, visual information, and records management specialists to understand the following:

(A) Digital content provenance for applicable Department media content.

(B) The challenges posed to missions and operations of the Department by a digital content forgery.

(C) How industry open technical standards may be used to authenticate the digital content provenance of applicable Department media content.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 555

(2) MATTERS.—The course of education under paragraph (1) shall cover the following matters:

(A) The challenges to missions and operations of the Department posed by a digital content forgery.

(B) The development of industry open technical standards for authenticating the digital content provenance of applicable Department media content.

(C) Hands-on training on techniques to record secure and authenticated digital content to document and communicate relevant themes and messages of the Department.

(D) Training on—

(i) the use of industry open technical standards for authenticating digital content provenance in the completion of post-production tasks; and

(ii) the transmission of applicable Department media content in both operational and nonoperational environments.

(E) Such other matters as the Director of the Defense Media Activity considers appropriate.

(3) REPORT.—Not later than one year after the date of the establishment of the course of education under paragraph (1), the Director of the Defense Media Activity shall submit to the Committees on Armed Services of the House of Representatives and the Senate a report on the following:

(A) The status of the development of a curriculum for such course of education.

(B) The implementation plan of the Director for such course of education, including the following:

<span style="float:right">Implementation plan.</span>

(i) The expertise and qualifications of the personnel of the Department responsible for teaching such course of education.

(ii) The list of sources consulted or otherwise used to develop the curriculum for such course of education.

<span style="float:right">List.</span>

(iii) A description of the industry open technical standards referred to in paragraph (1)(C).

(iv) The status of the implementation of such course of education.

(C) The resources available to the Director to carry out this subsection and whether the Director requires any additional resources to carry out this subsection.

(b) PILOT PROGRAM ON IMPLEMENTING DIGITAL CONTENT PROVENANCE STANDARDS.—

(1) PILOT PROGRAM.—Not later than one year after the date of the enactment of this Act, the Director of the Defense Media Activity shall carry out a pilot program to assess the feasibility and advisability of implementing industry open technical standards for digital content provenance for official photographs and videos of the Department of Defense publicly released by the Defense Visual Information Distribution Service, or any successor operation, and other distribution platforms, systems, and services used by the Department of Defense (in this subsection referred to as the "pilot program").

<span style="float:right">Assessment.</span>

(2) ELEMENTS.—In carrying out the pilot program, the Director of the Defense Media Activity shall—

(A) establish a process for using industry open technical standards to verify the digital content provenance of applicable Department media content;

<span style="float:right">Process.</span>

(B) apply technology solutions that comport with industry open technical standard for digital content provenance to photographs and videos of the Department publicly released as described in paragraph (1) after the date of the enactment of this Act;

Assessment.

(C) assess the feasibility and advisability of applying an industry open technical standard for digital content provenance to historical visual information records of the Department stored at the Defense Visual Information Records Center; and

(D) develop and apply measure of effectiveness for the implementation of the pilot program.

(3) CONSULTATION.—In carrying out the pilot program, the Director of the Defense Media Activity may consult with federally funded research and development centers, entities within private industry, institutions of higher education, and such other entities as the Director considers appropriate.

(4) TERMINATION.—The pilot program shall terminate on January 1, 2027.

(5) REPORT.—

(A) IN GENERAL.—Not later than January 1, 2026, the Director of the Defense Media Activity shall submit to the Committees on Armed Services of the House of Representatives and the Senate a report on the pilot program.

(B) ELEMENTS.—The report under subparagraph (A) shall include the following:

(i) The findings of the Director with respect to the pilot program.

(ii) The name of each entity the Director consulted with pursuant to paragraph (3) in carrying out the pilot program.

Assessment.

(iii) An assessment by the Director of the effectiveness of the pilot program.

(iv) A recommendation by the Director as to whether the pilot program should be made permanent.

(c) DEFINITIONS.—In this section:

(1) The term "applicable Department media content" means any media holding generated, stored, or controlled by the Defense Media Activity.

(2) The term "digital content forgery" means the use of emerging technologies, including artificial intelligence and machine learning techniques, to fabricate or manipulate audio, visual, or text content with the intent to mislead.

(3) The term "digital content provenance" means the verifiable chronology of the origin and history of an image, video, audio recording, electronic document, or other form of digital content.

Deadlines.
10 USC 2222
note.

## SEC. 1525. PRIZE COMPETITIONS FOR BUSINESS SYSTEMS MODERNIZATION.

(a) ESTABLISHMENT.—Not later than 270 days after the date of the enactment of this Act, under the authority of section 4025 of title 10, United States Code, the Secretary of Defense shall establish one or more prize competitions to support the business systems modernization goals of the Department of Defense.

(b) SCOPE.—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 557

(1) IN GENERAL.—The Secretary of Defense shall structure any prize competition established under subsection (a) to complement, and to the extent practicable, accelerate the delivery or expand the functionality of business systems capabilities sought by the Secretaries of the military departments that are in operation, in development, or belong to any broad class of systems covered by the defense business enterprise architecture specified in section 2222(e) of title 10, United States Code.

(2) AREAS FOR CONSIDERATION.—In carrying out subsection (a), the Secretary of Defense and the Secretaries of the military departments shall consider the following:

(A) Integration of artificial intelligence or machine learning capabilities.

(B) Data analytics, business intelligence, or related visualization capabilities.

(C) Automated updating of business architectures, business systems integration, or documentation relating to existing systems or manuals.

(D) Improvements to interfaces or processes for interacting with other non-Department of Defense business systems.

(E) Updates or replacements for legacy defense business systems to improve operational effectiveness and efficiency, such as the system of the Defense Logistics Agency known as the "Mechanization of Contract Administration Services" system, or any successor system.

(F) Contract writing systems, or expanded capabilities relating to such systems, that may be integrated into existing systems of the Department of Defense.

(G) Pay and personnel systems, or expanded capabilities relating to such systems, that may be integrated into existing systems of the Department of Defense.

(H) Other finance and accounting systems, or expanded capabilities relating to such systems, that may be integrated into existing systems of the Department of Defense.

(I) Systems supporting the defense industrial base and related supply chain visibility, analytics, and management.

(c) FRAMEWORK.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the congressional defense committees a briefing on the framework to be used in carrying out the prize competition under subsection (a).

(d) ANNUAL BRIEFINGS.—Not later than October 1 of each year until the date of termination under subsection (e), the Secretary of Defense shall provide to the congressional defense committees a briefing on the results of the prize competition under subsection (a).

(e) TERMINATION.—The authority to carry out the prize competition under subsection (a) shall terminate on September 30, 2028.

**SEC. 1526. REQUIREMENTS FOR DEPLOYMENT OF FIFTH GENERATION INFORMATION AND COMMUNICATIONS CAPABILITIES TO MILITARY INSTALLATIONS AND OTHER DEPARTMENT FACILITIES.**

10 USC 4571 note.

(a) REQUIREMENTS.—

Deadlines.

(1) STRATEGY FOR PRIVATE WIRELESS NETWORKS.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall develop and implement a strategy for deploying to military installations and other facilities of the Department of Defense private wireless networks that are—

(A) based on fifth generation information and communications capabilities and Open Radio Access Network architecture; and

(B) tailored to the mission, security, and performance requirements of the respective military installation or other facility.

(2) PROCESS FOR PUBLIC WIRELESS NETWORK SERVICE PROVIDERS.—

(A) ESTABLISHMENT.—The Secretary shall establish a Department-wide process under which a public wireless network service provider of fifth generation information and communications capabilities may gain access to a military installation or other facility of the Department to provide commercial subscriber services to military and civilian personnel of the Department (including contractor personnel) located at, and organizational elements of the Department maintained at, such installation or facility.

(B) DESIGN REQUIREMENTS.—In establishing the process under subparagraph (A), the Secretary shall ensure relevant system architectures and supporting infrastructure are designed to support modular upgrades to future generation technologies.

(3) DETERMINATION RELATING TO CONTRACT AUTHORITY.—The Secretary shall determine, on a contract-by-contract basis or as a determination with uniform applicability to contracts across military installations and other facilities of the Department, whether to enter into a contract for—

(A) neutral hosting, under which infrastructure and services would be provided to companies deploying private wireless networks and public wireless network services to such installation or other facility through multi-operator core network architectures; or

(B) separate private wireless network and public wireless network infrastructure at such installation or other facility (which shall include a determination by the Secretary on how to establish roaming agreements and policies between such networks).

(4) BRIEFING.—Not later than 150 days after the date of the enactment of this Act, the Secretary shall provide to the congressional defense committees a briefing on the strategy developed under paragraph (1) and any other activity carried out pursuant to this subsection.

(b) INTERNATIONAL COOPERATION ACTIVITIES.—The Secretary, using existing authorities available to the Secretary, may engage in cooperation activities with foreign allies and partners of the United States to—

(1) improve the implementation of the strategy under subsection (a)(1); and

(2) inform the deployment of private wireless networks to military installations and other facilities of the Department pursuant to such strategy.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 559

(c) OPEN RADIO ACCESS NETWORK ARCHITECTURE DEFINED.— In this section, the term "Open Radio Access Network architecture" means a network architecture that is modular, uses open interfaces, and virtualizes functionality on commodity hardware through software.

**SEC. 1527. REQUIRED POLICIES TO ESTABLISH DATALINK STRATEGY OF DEPARTMENT OF DEFENSE.**

10 USC 2223 note.

(a) POLICIES REQUIRED.—

(1) IN GENERAL.—The Secretary of Defense shall develop and implement policies to establish a unified datalink strategy of the Department of Defense (in this section referred to as the "strategy").

(2) ELEMENTS.—The policies under paragraph (1) shall provide for, at a minimum, the following:

(A) The designation of an organization to serve as the lead coordinator of datalink activities throughout the Department of Defense.

Designation.

(B) The prioritization and coordination across the military departments with respect to the strategy within the requirements generation process of the Department.

(C) The use throughout the Department of a common standardized datalink network or transport protocol that ensures interoperability between independently developed datalinks, regardless of physical medium used, and ensures mesh routing. In developing such policy, the Secretary of Defense shall consider the use of a subset of Internet Protocol.

(D) A programmatic decoupling of the physical method used to transmit data, the network or transport protocols used in the transmission and reception of data, and the applications used to process and use data.

(E) Coordination of the strategy with respect to weapon systems executing the same mission types across the military departments, including through the use of a common set of datalink waveforms. In developing such policy, the Secretary shall evaluate the use of redundant datalinks for line-of-sight and beyond-line-of-sight information exchange for each weapon systems platform.

Evaluation.

(F) Coordination between the Department and the intelligence community (as such term is defined in section 3 of the National Security Act of 1947 (50 U.S.C. 3003)) to leverage any efficiencies and overlap with existing datalink waveforms of the intelligence community.

(G) Methods to support the rapid integration of common datalinks across the military departments.

(H) Support for modularity of specific datalink waveforms to enable rapid integration of future datalinks, including the use of software defined radios compliant with modular open system architecture and sensor open system architecture.

(b) INFORMATION TO CONGRESS.—Not later than June 1, 2024, the Secretary of Defense shall—

Deadline.

(1) provide to the appropriate congressional committees a briefing on the proposed policies under subsection (a)(1), including timelines for the implementation of such policies; and

Briefing.

137 STAT. 560        PUBLIC LAW 118–31—DEC. 22, 2023

(2) submit to the appropriate congressional committees—

(A) an estimated timeline for the implementations of datalinks;

Timeline.

(B) a list of any additional resources and authorities necessary to implement the strategy; and

List.

(C) a determination of whether a common set of datalinks can and should be implemented across all major weapon systems (as such term is defined in section 3455 of title 10, United States Code) of the Department of Defense.

Determination.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means the congressional defense committees and the congressional intelligence committees, as such term is defined in section 3 of the National Security Act of 1947 (50 U.S.C. 3003).

# Subtitle D—Personnel

### SEC. 1531. OFFICE FOR ACADEMIC ENGAGEMENT RELATING TO CYBER ACTIVITIES.

(a) ESTABLISHMENT.—Chapter 111 of title 10, United States Code, is amended by inserting after section 2192b the following new section:

10 USC prec. 2191.

**"§ 2192c. Office for academic engagement relating to cyber activities**

10 USC 2192c.

"(a) ESTABLISHMENT.—The Secretary of Defense, acting through the Chief Information Officer of the Department of Defense, shall establish an office to establish, maintain, and oversee the activities of the Department of Defense that pertain to the relationship between the Department and academia, including with entities involved in primary, secondary, or postsecondary education, with respect to cyber-related matters (in this section referred to as the 'Office').

"(b) DIRECTOR.—The Office shall have a Director who shall report directly to the Chief Information Officer of the Department of Defense. An individual serving as Director, while so serving, shall be a member of the Senior Executive Service.

"(c) RESPONSIBILITIES.—(1) The Office shall be responsible for the following:

"(A) Serving as the consolidated focal point for engagements carried out between the Department of Defense and academia with respect to cyber-related matters.

"(B) Coordinating covered academic engagement programs for the Department of Defense.

"(C) Conducting ongoing analysis, as determined necessary by the Director, of the performance of cyber-related educational scholarships, camps, support efforts, and volunteer partnerships of the Department of Defense.

"(D) Identifying actions the Secretary of Defense may take to improve the cyber skills of personnel within the Department of Defense through participation by such personnel in covered academic engagement programs, for the purposes of assisting the Secretary in cyber-related matters and meeting the long-term national defense needs of the United States for personnel proficient in such skills.

"(E) Managing funds and resources for the National Centers for Academic Excellence in Cybersecurity program, the Department of Defense Cyber Scholarship Program, the National Defense University College of Information and Cyberspace, the University Consortium for Cybersecurity, the senior military colleges, and other educational partnerships between academic institutions and active components of the Armed Forces.

"(F) Establishing requirements, policies, and procedures to collect data on, and to monitor and evaluate, the performance of covered academic engagement programs with respect to the involvement in such programs by the Department of Defense.

"(G) Monitoring and evaluating through applicable performance measurements (including those established pursuant to subparagraph (F)) the performance of covered academic engagement programs with respect to the involvement in such programs by the Department of Defense, and advising the Secretary of Defense on whether to continue, modify, or terminate such involvement.

"(H) Conducting budgetary oversight and supervision, taking into consideration the findings of performance evaluations under subparagraph (G), with respect to—

"(i) the involvement in covered academic engagement programs by the Department of Defense; and

"(ii) other matters relating to the responsibilities under this subsection.

"(2) The Office shall be the office of primary responsibility for carrying out the following:

"(A) Section 2200c of title 10, United States Code.

"(B) Section 1640 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 2200 note).

"(C) Section 1649 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1758).

"(D) The duties of the Secretary of Defense under section 1659 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 391 note).

"(E) The duties of the Chief Information Officer of the Department of Defense under section 1726 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 1599f note).

"(F) Section 1532 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 2191 note prec.).

"(G) Section 1535 of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 2200 note).

"(H) Such other provisions of law as the Secretary of Defense may determine relevant.

"(d) AUTHORITY RELATING TO COMPLIANCE.—The Secretary of Defense shall take such steps as may be necessary to ensure that the Director of the Office has sufficient authority to compel and enforce compliance with any decisions or directives issued pursuant to the responsibilities under subsection (c).

"(e) ADDITIONAL AUTHORITIES.—In carrying out this section, the Director of the Office may, under any provision of this chapter or any other provision of this title providing for the support of

educational programs in cyber-related matters (and unless otherwise specified in such provision)—

Contracts.

"(1) enter into contracts and cooperative agreements, including for the purpose of supporting academic and hands-on programs for individuals transitioning into the cyber field of the Department;

Grants.

"(2) make grants of financial assistance, including to civilian and military students;

"(3) provide cash awards and other items;

"(4) accept voluntary services; and

"(5) support national competition judging, other educational event activities, and associated award ceremonies in connection with covered academic engagement programs.

"(f) RELATIONSHIP TO OTHER ENTITIES.—The Under Secretary of Defense for Research and Engineering and the Secretaries concerned shall coordinate and collaborate with the Director of the Office on covered academic engagement programs sponsored by the Under Secretary as Science, Technology, Engineering, and Mathematics (STEM) programs and activities.

"(g) COVERED ACADEMIC ENGAGEMENT PROGRAM DEFINED.— In this section, the term 'covered academic engagement program' means any of the following:

"(1) A primary, secondary, or post-secondary educational program with a cyber focus.

"(2) A program of the Department of Defense for the recruitment or retention of cyberspace civilian and military personnel (including scholarship programs) other than a Reserve Officers' Training Corps program.

"(3) An academic partnership focused on establishing cyber talent among the personnel referred to in paragraph (2).".

10 USC 2192c note.

(b) DEADLINE FOR ESTABLISHMENT.—The Secretary of Defense shall establish the office under section 2192c of title 10, United States Code, as added by subsection (a), by not later than 270 days after the date of the enactment of this Act.

(c) CONFORMING AMENDMENTS.—

(1) PROGRAM TO ESTABLISH CYBER INSTITUTES AT INSTITUTIONS OF HIGHER LEARNING.—Section 1640 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 2200 note) is amended by inserting at the end the following new subsection:

"(h) DISCHARGE THROUGH DIRECTOR.—In carrying out this section, the Secretary of Defense shall act through the Director of the office established under section 2192c of title 10, United States Code.".

(2) REPORT ON CYBERSECURITY TRAINING PROGRAMS.—Section 1649 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1758) is amended by inserting ", acting through the Director of the office established under section 2192c of title 10, United States Code," after "Secretary of Defense".

(3) CONSORTIA OF UNIVERSITIES TO ADVISE SECRETARY OF DEFENSE ON CYBERSECURITY MATTERS.—Section 1659 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 10 U.S.C. 391 note) is amended by adding at the following new subsection:

"(g) DISCHARGE THROUGH DIRECTOR.—In carrying out this section, the Secretary of Defense shall act through the Director of

the office established under section 2192c of title 10, United States Code.".

(4) DEPARTMENT OF DEFENSE CYBER WORKFORCE EFFORTS.—Section 1726 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 1599f note) is amended by adding at the end the following new subsection:

"(b) DISCHARGE THROUGH DIRECTOR.—In carrying out this section, the Chief Information Officer of the Department of Defense shall act through the Director of the office established under section 2192c of title 10, United States Code.".

(5) STUDY ON ESTABLISHMENT OF DESIGNATED CENTRAL PROGRAM OFFICE.—Section 1532 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 2191 note prec.) is amended—

(A) by redesignating subsection (e) as subsection (f); and

(B) by inserting after subsection (d) the following new subsection:

"(e) DISCHARGE THROUGH DIRECTOR.—In carrying out this section, the Secretary of Defense shall act through the Director of the office established under section 2192c of title 10, United States Code.".

(6) DEPARTMENT OF DEFENSE CYBER AND DIGITAL SERVICE ACADEMY.—Section 1535 of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 2200 note) is amended by adding at the end the following new subsection:

"(p) DISCHARGE THROUGH DIRECTOR.—In carrying out this section, the Secretary of Defense shall act through the Director of the office established under section 2192c of title 10, United States Code.".

### SEC. 1532. SELECTED RESERVE ORDER TO ACTIVE DUTY TO RESPOND TO A SIGNIFICANT CYBER INCIDENT.

Section 12304 of title 10, United States Code, is amended—

(1) in subsection (a), by striking "for any named operational mission";

(2) by redesignating subsections (c) through (j) as subsections (d) through (k), respectively;

(3) by inserting after subsection (b) the following new subsection:

"(c) AUTHORITY RELATING TO SIGNIFICANT CYBER INCIDENTS.—When the Secretary of Defense or the Secretary of the department in which the Coast Guard is operating determines that it is necessary to augment the active armed forces for the response of the Department of Defense or other department under which the Coast Guard is operating, respectively, to a covered incident, such Secretary may, without the consent of the member affected, order any unit, and any member not assigned to a unit organized to serve as a unit of the Selected Reserve (as defined in section 10143(a) of this title), under the respective jurisdiction of such Secretary, to active duty for not more than 365 consecutive days.";

(4) in paragraph (1) of subsection (d), as redesignated by paragraph (2), by inserting "or subsection (c)" after "subsection (b)";

Determination.
Time period.

137 STAT. 564          PUBLIC LAW 118–31—DEC. 22, 2023

(5) in subsection (g), as redesignated by paragraph (2), by inserting "or subsection (c)" after "subsection (a)";

(6) by amending subsection (h), as redesignated by paragraph (2), to read as follows:

"(h) TERMINATION OF DUTY.—(1) Whenever any unit of the Selected Reserve or any member of the Selected Reserve not assigned to a unit organized to serve as a unit, or any member of the Individual Ready Reserve, is ordered to active duty under authority of subsection (a), the service of all units or members so ordered to active duty may be terminated by—

"(A) order of the President; or

"(B) law.

"(2) Whenever any unit of the Selected Reserve or any member of the Selected Reserve not assigned to a unit organized to serve as a unit is ordered to active duty under authority of subsection (c), the service of all units or members so ordered to active duty may be terminated by—

"(A) order of the Secretary of Defense or, with respect to the Coast Guard, the Secretary of the Department in which the Coast Guard is operating; or

"(B) law."; and

(7) in subsection (k), as redesignated by paragraph (2)—

(A) by redesignating paragraphs (1) and (2) as paragraphs (2) and (3), respectively; and

(B) by inserting after the matter preceding paragraph (2), as so redesignated, the following new paragraph:

*Definition.*
*Determinations.*

"(1) The term 'covered incident' means—

"(A) a cyber incident involving a Department of Defense information system, or a breach of a Department of Defense system that involves personally identifiable information, that the Secretary of Defense determines is likely to result in demonstrable harm to the national security interests, foreign relations, or the economy of the United States, or to the public confidence, civil liberties, or public health and safety of the people of the United States;

"(B) a cyber incident involving a Department of Homeland Security information system, or a breach of a Department of Homeland Security system that involves personally identifiable information, that the Secretary of Homeland Security determines is likely to result in demonstrable harm to the national security interests, foreign relations, or the economy of the United States or to the public confidence, civil liberties, or public health and safety of the people of the United States;

*President.*

"(C) a cyber incident, or collection of related cyber incidents, that the President determines is likely to result in demonstrable harm to the national security interests, foreign relations, or economy of the United States or to the public confidence, civil liberties, or public health and safety of the people of the United States; or

"(D) a significant incident declared pursuant to section 2233 of the Homeland Security Act of 2002 (6 U.S.C. 677b).".

**SEC. 1533. POST-GRADUATE EMPLOYMENT OF DEPARTMENT OF DEFENSE CYBER SERVICE ACADEMY SCHOLARSHIP RECIPIENTS IN INTELLIGENCE COMMUNITY.**

Section 1535 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 2200 note) is amended—

(1) in the section heading, by striking **"DEPARTMENT OF DEFENSE CYBER AND DIGITAL SERVICE ACADEMY"** and inserting **"DEPARTMENT OF DEFENSE CYBER SERVICE ACADEMY"**;

(2) in subsection (a)—

(A) in paragraph (1), by inserting ", the heads of the elements of the intelligence community," after "the Secretary of Homeland Security"; and

(B) in paragraph (3), by striking "Department of Defense Cyber and Digital Service Academy" and inserting "Department of Defense Cyber Service Academy";

(3) in subsection (d)—

(A) by inserting "or an element of the intelligence community" after "missions of the Department"; and

(B) by striking "Secretary" each place it appears and inserting "head concerned";

(4) in subsection (e)—

(A) by striking "Secretary" each place it appears and inserting "head concerned"; and

(B) by inserting ", or within an element of the intelligence community, as the case may be" after "United States Code";

(5) in subsections (h), (j), and (k), by striking "Secretary" each place it appears and inserting "head concerned"; and

(6) by adding at the end of the following new subsections:

"(p) INTERAGENCY CONSIDERATIONS.—

"(1) IN GENERAL.—Subject to paragraph (2), a scholarship recipient may satisfy their post-award employment obligation under this section by working for an element of the intelligence community that is not part of the Department of Defense only if—

"(A) the Secretary of Defense has entered into an agreement with the head of that element authorizing the placement of scholarship recipients under the Program in positions within that element; [Contracts.]

"(B) under such agreement, the head of that element has agreed to reimburse the Department of Defense for the scholarship program costs associated with any scholarship recipient so placed; and [Reimbursement.]

"(C) the scholarship recipient has satisfied appropriate hiring criteria and security clearance requirements applicable to that element.

"(2) LIMITATION ON PERCENTAGE PER GRADUATING CLASS.—Not more than 10 percent of each graduating class of scholarship recipients under the Program may be placed in positions not within the Department of Defense unless the Secretary of Defense submits to the congressional defense committees a certification that the Department of Defense is unable to facilitate placements in positions within the Department of Defense for such excess percentage. [Certification.]

"(q) DEFINITIONS.—In this section:

"(1) The term 'head concerned' means—
"(A) The Secretary of Defense, with respect to matters concerning the Department of Defense; or
"(B) the head of an element of the intelligence community, with respect to matters concerning that element.
"(2) The term 'intelligence community' has the meaning given such term in section 3 of the National Security Act of 1947 (50 U.S.C. 3003).".

### SEC. 1534. MINIMUM NUMBER OF SCHOLARSHIPS TO BE AWARDED ANNUALLY THROUGH DEPARTMENT OF DEFENSE CYBER SERVICE ACADEMY.

Section 1535(c) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 2200 note) is amended by adding at the end the following new paragraph:

"(5) MINIMUM NUMBER OF SCHOLARSHIP AWARDS.—
"(A) IN GENERAL.—The Secretary of Defense shall award not fewer than 1,000 scholarships under the Program in fiscal year 2026 and in each fiscal year thereafter.

<div style="margin-left:2em"><em>Determination.<br>Notification.</em></div>

"(B) WAIVER.—The Secretary of Defense may award fewer than the number of scholarships required under subparagraph (A) in a fiscal year if the Secretary determines and notifies the congressional defense committees that fewer scholarships are necessary to address workforce needs.".

<em>Deadlines.<br>10 USC 167b<br>note.</em>

### SEC. 1535. PILOT PROGRAM AND OTHER MEASURES TO ENHANCE READINESS AND EFFECTIVENESS OF CYBER MISSION FORCE.

(a) PERSONNEL REQUIREMENTS AND TRAINING FOR CRITICAL WORK ROLES.—Not later than 270 days after the date of the enactment of this Act, the Secretary of Defense shall—

<em>Guidance.</em>

(1) direct and oversee the implementation of guidance, to be issued by each Secretary of a military department, that correlates critical work roles to military occupational specialties and periods of obligated service with respect to that military department;

<em>Compliance.</em>

(2) require that, prior to the attachment or assignment of a member of the Armed Forces to a unit of the United States Cyber Command, the Secretary concerned ensure such member is fully trained and in compliance with the required standards for the work role to be assumed by the member within such unit, including with respect to critical work roles within the Cyber Mission Force;

(3) ensure that the period of obligated service for members of the Armed Forces is—
(A) uniform across the military departments with respect to positions of the Cyber Mission Force involving critical work roles;
(B) commensurate with the financial and time investments made by Secretary concerned for the purpose of furnishing training pursuant to paragraph (2); and
(C) sufficient to meet the readiness requirements established by the Commander of the United States Cyber Command;

(4) facilitate consecutive assignments of members of the Armed Forces to the same unit of the United States Cyber

Command without inhibiting the advancement or promotion potential of any such member;

(5) provide to the Secretaries of the military departments direction for the integration of critical work roles into the personnel system of record of the respective military department, to provide for tracking cyber personnel data by work role; and

(6) establish within at least one military department the curriculum and capacity necessary to train sufficient numbers of members of the Armed Forces from across the military departments in the performance of critical work roles within the Cyber Mission Force to achieve the readiness requirements established by the Commander of United States Cyber Command.

(b) PILOT PROGRAM ON CONTRACTING FOR SERVICES RELEVANT TO CRITICAL WORK ROLES.—

(1) PILOT PROGRAM.—Not later than 180 days after the date of the enactment of this Act, the Commander of the United States Cyber Command shall carry out a pilot program under which the Commander shall seek to enter into one or more contracts under which skilled contractor personnel provide services relevant to critical work roles within the Cyber Mission Force, for the purpose of enhancing the readiness and effectiveness of the Cyber Mission Force.

(2) DURATION.—The Commander shall carry out the pilot program under paragraph (1) during the three-year period beginning on the date of the commencement of the pilot program and following such period, may—

(A) continue carrying out such pilot program for such duration as the Commander considers appropriate;

(B) transition such pilot program to a permanent program; or

(C) terminate such pilot program.

(c) PLAN ON HIRING, TRAINING, AND RETAINING CIVILIANS TO SERVE IN CRITICAL WORK ROLES.—Not later than 120 days after the date of the enactment of this Act, the Commander of the United States Cyber Command shall—

(1) develop a plan to hire, train, and retain civilians to serve in critical work roles and other work roles within the Cyber Mission Force, for the purpose of enhancing the readiness and effectiveness of the Cyber Mission Force; and

(2) provide to the congressional defense committees a briefing on such plan.

Briefing.

(d) DEFINITIONS.—In this section:

(1) The term "critical work role" means a work role designated as critical by the Commander of the United States Cyber Command for purposes of this section.

(2) The term "Secretary concerned" has the meaning given that term in section 101 of title 10, United States Code.

### SEC. 1536. AUTHORITY TO CONDUCT PILOT PROGRAM ON CIVILIAN CYBERSECURITY RESERVE.

10 USC note prec. 7371.

(a) AUTHORITY.—The Secretary of the Army may conduct a pilot program to establish a Civilian Cybersecurity Reserve to provide to the United States Cyber Command manpower to effectively—

(1) preempt, defeat, deter, or respond to malicious cyber activity;

(2) conduct cyberspace operations;

(3) secure information and systems of the Department of Defense against malicious cyber activity; and

(4) assist in solving cyber workforce-related challenges.

(b) CONDITIONS PRIOR TO CONDUCT OF PILOT PROGRAM.—

(1) IMPLEMENTATION PLAN.—The Secretary of the Army may not take any action to commence a pilot program pursuant to the authority under subsection (a) until the Secretary—

(A) submits to the congressional defense committees an implementation plan for the pilot program; and

Briefing.

(B) provides to the congressional defense committees a briefing on such implementation plan.

(2) PROGRAM GUIDANCE.—If the Secretary of the Army intends to conduct a pilot program pursuant to the authority under subsection (a), prior to commencing such pilot program, the Secretary, in consultation with the Director of the Office of Personnel Management and the Director of the Office of Government Ethics, shall issue guidance for the establishment and implementation of the pilot program.

(c) CONDITIONS ON CONDUCT OF PILOT PROGRAM.—Any pilot program conducted by the Secretary of the Army pursuant to the authority under subsection (a) shall be subject to the following:

(1) HIRING AUTHORITY; STATUS IN RESERVE.—

(A) HIRING AUTHORITY.—In conducting the pilot program, the Secretary of the Army may use any authority otherwise available to the Secretary for the recruitment, employment, and retention of civilian personnel within the Department, including the authority under section 1599f of title 10, United States Code.

Time periods.

(B) STATUS IN RESERVE.—During the period beginning on the date on which an individual is recruited to serve in the Civilian Cybersecurity Reserve and ending on the date on which the individual is appointed to the Civilian Cybersecurity Reserve, and during any period elapsing between any such appointments, the individual may not be considered a Federal employee.

(2) ELIGIBILITY; APPLICATION AND SELECTION.—

(A) CRITERIA REQUIRED.—The Secretary of the Army shall establish criteria for—

(i) individuals to be eligible to serve in the Civilian Cybersecurity Reserve; and

(ii) the application and selection processes for service in the Civilian Cybersecurity Reserve.

(B) REQUIREMENTS FOR INDIVIDUALS.—The criteria under subparagraph (A) shall include, with respect to an individual—

Time period.

(i) if the individual has previously served as a member of the Civilian Cybersecurity Reserve, that the previous appointment ended not fewer than 60 days before the individual may be appointed for a subsequent temporary position in the Civilian Cybersecurity Reserve; and

(ii) cybersecurity expertise.

(C) PRESCREENING.—The Secretary of the Army shall—

(i) prior to the appointment of an individual to the Civilian Cybersecurity Reserve, conduct a prescreening of the individual for any topic or product that would create a conflict of interest; and

(ii) require each individual so appointed to notify the Secretary if a potential conflict of interest arises during such appointment.

Notification.

(D) AGREEMENT REQUIRED.—The Secretary of the Army may only appoint an individual to the Civilian Cybersecurity Reserve if the individual enters into an agreement with the Secretary to serve in the Civilian Cybersecurity Reserve. Such agreement shall set forth the rights and obligations of the individual and the Army.

(E) EXCEPTION FOR CONTINUING MILITARY SERVICE COMMITMENTS.—A member of the Selected Reserve under section 10143 of title 10, United States Code, may not serve as a member of the Civilian Cybersecurity Reserve.

(F) PROHIBITION.—No individual who is an officer or employee of the United States Government, including any member of the uniformed services, may be recruited or appointed to serve in the Civilian Cybersecurity Reserve.

(3) SECURITY CLEARANCES.—

(A) IN GENERAL.—The Secretary of the Army shall ensure that each member of the Civilian Cybersecurity Reserve is subject to appropriate personnel vetting and adjudication commensurate with the duties of the position, including, with respect to positions for which a security clearance is necessary, a favorable determination of eligibility for access to classified information, consistent with applicable provisions of law and policy.

(B) COST OF SPONSORING CLEARANCES.—If a member of the Civilian Cybersecurity Reserve requires a security clearance in order to carry out the duties of the member, the Army shall be responsible for the cost of sponsoring the security clearance of the member.

(4) BRIEFINGS.—Not later than one year after the date on which the guidance under subsection (b)(2) is issued with respect to the pilot program, and annually thereafter until the date on which the pilot program terminates pursuant to paragraph (7), the Secretary of the Army shall provide to the congressional defense committees a briefing on activities carried out under the pilot program, including—

Deadline.
Evaluations.

(A) participation in the Civilian Cybersecurity Reserve, including the number of members of the Civilian Cybersecurity Reserve, the diversity of such members, and any barriers to recruitment or retention of such members;

(B) an evaluation of the ethical requirements of the pilot program;

(C) whether the Civilian Cybersecurity Reserve has been effective in providing additional capacity to the Army; and

(D) an evaluation of the eligibility requirements for the pilot program.

(5) FINAL REPORT AND BRIEFING REQUIRED.—Not earlier than 180 days and not later than 90 days prior to the date on which the pilot program terminates pursuant to paragraph (7), the Secretary of the Army shall submit to the congressional

Recommendations.

137 STAT. 570          PUBLIC LAW 118–31—DEC. 22, 2023

defense committees a report, and provide to the congressional defense committees a briefing, on recommendations relating to the pilot program, including recommendations for—

(A) whether the pilot program should be modified, extended in duration, or established as a permanent program, and if so, an appropriate scope for the program;

(B) how to attract prospective members of the Civilian Cybersecurity Reserve, ensure a diversity of such members, and address any barriers to recruitment or retention of such members;

(C) the ethical requirements of the pilot program and the effectiveness of mitigation efforts to address any conflict of interest concerns; and

Evaluation.

(D) an evaluation of the eligibility requirements for the pilot program.

Deadline.

(6) EVALUATION REQUIRED.—Not later than three years after the date on which the pilot program commences, the Comptroller General of the United States shall—

Study.

(A) conduct a study evaluating the pilot program; and

(B) submit to the congressional defense committees—

(i) a report on the results of the study; and

Recommenda-
tions.

(ii) a recommendation with respect to whether the pilot program should be modified.

(7) SUNSET.—The authority to conduct the pilot program shall terminate on the date that is four years after the date on which the pilot program commences.

10 USC 2224
note.

**SEC. 1537. REQUIREMENTS FOR IMPLEMENTATION OF USER ACTIVITY MONITORING FOR CERTAIN PERSONNEL.**

(a) IN GENERAL.—The Secretary of Defense shall require each head of a component of the Department of Defense to fully implement each directive, policy, and program requirement for user activity monitoring and least privilege access controls with respect to the personnel of that component, including Federal employees and contractors, granted access to classified information and classified networks, including the following directives (and any successor directives):

(1) The Committee on National Security Systems Directive 504, issued on February 4, 2014, relating to the protection of national security systems from insider threats (including any annex to such directive).

(2) Department of Defense Directive 5205.16, issued on September 30, 2014, relating to the insider threat program of the Department of Defense.

(b) ADDITIONAL REQUIREMENT.—The Secretary of Defense shall require each head of a component of the Department of Defense to implement, with respect to systems, devices, and personnel of the component, automated controls to detect and prohibit privileged user accounts from performing general user activities not requiring privileged access.

(c) PERIODIC TESTING.—The Secretary shall require that, not less frequently than once every two years, each head of a component of the Department of Defense—

(1) conducts insider threat testing using threat-realistic tactics, techniques, and procedures; and

Reports.

(2) submits to the Under Secretary of Defense for Intelligence and Security, the Chief Information Officer of the

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 571

Department of Defense, and the Director of Operational Test and Evaluation of the Department of Defense a report on the findings of the head with respect to the testing conducted pursuant to paragraph (1).

(d) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the appropriate congressional committees a report on the implementation of this section.

(e) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services and the Permanent Select Committee on Intelligence of the House of Representatives; and

(2) the Committee on Armed Services and the Select Committee on Intelligence of the Senate.

### SEC. 1538. STUDY ON OCCUPATIONAL RESILIENCY OF CYBER MISSION FORCE.

(a) STUDY.—Not later than 180 days after the date of the enactment of this Act, the Principal Cyber Advisor of the Department of Defense and the Under Secretary of Defense for Personnel and Readiness, in coordination with the principal cyber advisors of the military departments and the Commander of the United States Cyber Command, shall conduct a study on the personnel and resources required to enhance and support the occupational resiliency of the Cyber Mission Force.

Deadline.

(b) ELEMENTS.—The study under subsection (a) shall include the following:

(1) An inventory of the resources and programs available to personnel assigned to the Cyber Mission Force, disaggregated by Armed Force and location.

Inventory.

(2) An assessment of the risk to the occupational resiliency of such personnel relative to the respective operational work role within the Cyber Mission Force (as defined by the Commander of the United States Cyber Command) and the number of such personnel available to perform operations in each such category of operational work role.

Assessment.

(3) An evaluation of the extent to which personnel assigned to the Cyber Mission Force have been made aware of the resources and programs referred to in paragraph (1), and of measures required to improve such awareness.

Evaluation.

(4) A determination by the Commander of the United States Cyber Command regarding the adequacy and accessibility of such resources and programs for personnel assigned to the Cyber Mission Force.

Determination.

(5) Such other matters as may be determined necessary by the Principal Cyber Advisor of the Department of Defense and the Under Secretary of Defense for Personnel and Readiness.

(c) SUBMISSION TO CONGRESS.—Upon completing the study under subsection (a), the Principal Cyber Advisor of the Department of Defense and the Under Secretary of Defense for Personnel and Readiness shall submit to the congressional defense committees a report containing the results of such study.

Reports.

(d) OCCUPATIONAL RESILIENCY DEFINED.—In this section, the term "occupational resiliency" means, with respect to personnel

assigned to the Cyber Mission Force, the ability of such personnel to mitigate the unique psychological factors that contribute to the degradation of mental health and job performance under such assignment.

# Subtitle E—Artificial Intelligence

### SEC. 1541. MODIFICATION TO ACQUISITION AUTHORITY OF SENIOR OFFICIAL WITH PRINCIPAL RESPONSIBILITY FOR ARTIFICIAL INTELLIGENCE AND MACHINE LEARNING.

Section 808 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 10 U.S.C. 4001 note) is amended—

(1) in subsection (c)(1), by striking "The Secretary of Defense shall provide the Office with at least 10 full-time employees" and inserting "The Secretary of Defense shall ensure that, at any given time for the duration of the period specified in subsection (d), the Office has at least 10 full-time employees provided by the Secretary";

(2) in subsection (d), by striking "in each of fiscal years 2021, 2022, 2023, 2024, and 2025" and inserting "in each of fiscal years 2024 through 2029";

(3) by amending subsection (e)(1) to read as follows:

Deadlines.

"(1) IN GENERAL.—

"(A) PLAN REQUIRED.—Not later than 30 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, the Secretary of Defense, acting through the Under Secretary of Defense for Acquisition and Sustainment, shall submit to the congressional defense committees a plan for the delegation and exercise of the acquisition authority described in subsection (a).

"(B) DEMONSTRATION REQUIRED.—Not later than 90 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, the Secretary of Defense, acting through the Chief Digital and Artificial Intelligence Officer of the Department of Defense, shall provide a demonstration of operational capability delivered under such authority. In addition to the matters specified in paragraph (4), such demonstration shall include a description of—

"(i) how the Chief Digital and Artificial Intelligence Officer may use the acquisition authorities available to the Chief Digital and Artificial Intelligence Officer to further the data and artificial intelligence objectives of the Department of Defense, including an inventory of requirements and funding associated with the exercise of such acquisition authorities;

"(ii) how the Chief Digital and Artificial Intelligence Officer may use the acquisition authorities of other Federal entities to further such objectives, including an inventory of requirements and funding associated with the exercise of such acquisition authorities; and

"(iii) the challenges and benefits of using the acquisition authorities described in clauses (i) and (ii), respectively, to further such objectives."; and

(4) in subsection (f), by striking "October 1, 2025" and inserting "October 1, 2029".

**SEC. 1542. ARTIFICIAL INTELLIGENCE BUG BOUNTY PROGRAMS.**

(a) PROGRAM FOR FOUNDATIONAL ARTIFICIAL INTELLIGENCE PRODUCTS BEING INTEGRATED WITHIN DEPARTMENT OF DEFENSE.—

(1) DEVELOPMENT REQUIRED.—Not later than 180 days after the date of the enactment of this Act and subject to the availability of appropriations, the Chief Digital and Artificial Intelligence Officer of the Department of Defense shall develop a bug bounty program for foundational artificial intelligence models being integrated into the missions and operations of the Department of Defense.

(2) COLLABORATION.—In developing the program under paragraph (1), the Chief Digital and Artificial Intelligence Officer may collaborate with the heads of other Federal departments and agencies with expertise in cybersecurity and artificial intelligence.

(3) IMPLEMENTATION AUTHORIZED.—The Chief Digital and Artificial Intelligence Officer may carry out the program developed under subsection (a).

(4) CONTRACTS.—The Secretary of Defense shall ensure, as may be appropriate, that whenever the Secretary enters into any contract, such contract allows for participation in the bug bounty program developed under paragraph (1).

(5) RULE OF CONSTRUCTION.—Nothing in this subsection shall be construed to require—

(A) the use of any foundational artificial intelligence model; or

(B) the implementation of the program developed under paragraph (1) for the purpose of the integration of a foundational artificial intelligence model into the missions or operations of the Department of Defense.

(b) BRIEFING.—Not later than one year after the date of the enactment of this Act, the Chief Digital and Artificial Intelligence Officer shall provide to the congressional defense committees a briefing on—

(1) the development and implementation of bug bounty programs the Chief Digital and Artificial Intelligence Officer considers relevant to the matters covered by this section; and

(2) long-term plans of the Chief Digital and Artificial Intelligence Officer with respect to such bug bounty programs.

(c) FOUNDATIONAL ARTIFICIAL INTELLIGENCE MODEL DEFINED.— In this section, the term "foundational artificial intelligence model" means an adaptive generative model that is trained on a broad set of unlabeled data sets that may be used for different tasks with minimal fine-tuning.

**SEC. 1543. PRIZE COMPETITION FOR TECHNOLOGY THAT DETECTS AND WATERMARKS USE OF GENERATIVE ARTIFICIAL INTELLIGENCE.**

(a) ESTABLISHMENT.—Not later than 270 days after the date of the enactment of this Act, under the authority of section 4025 of title 10, United States Code, the Secretary of Defense shall establish a prize competition designed to evaluate technology

*Margin notes:*
Deadlines.
10 USC 4001 note.

Plans.

10 USC 4025 note.

Deadline.
Evaluation.

137 STAT. 574        PUBLIC LAW 118–31—DEC. 22, 2023

(including applications, tools, and models) for generative artificial intelligence detection and generative artificial intelligence watermarking, for the purposes of—

(1) facilitating the research, development, testing, evaluation, and competition of such technologies to support the Secretaries of the military departments and the commanders of combatant commands in warfighting requirements; and

(2) transitioning such technologies, including technologies developed pursuant to pilot programs, prototype projects, or other research and development programs, from the prototyping phase to production.

(b) PARTICIPATION.—The participants in the prize competition under subsection (a) may include federally funded research and development centers, entities within the private sector, entities within the defense industrial base, institutions of higher education, Federal departments and agencies, and such other categories of participants as the Secretary of Defense considers appropriate.

(c) DESIGNATION.—The prize competition under subsection (a) shall be known as the "Generative AI Detection and Watermark Competition".

(d) ADMINISTRATION.—The Under Secretary of Defense for Research and Engineering shall administer the prize competition under subsection (a).

Deadline.
Briefing.

(e) FRAMEWORK.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall provide to the congressional defense committees a briefing on the framework to be used in carrying out the prize competition under subsection (a).

(f) ANNUAL BRIEFINGS.—Not later than October 1 of each year until the date of termination under subsection (g), the Secretary of Defense shall provide to the congressional defense committees a briefing on the results of the prize competition under subsection (a).

(g) TERMINATION.—The authority to carry out the prize competition under subsection (a) shall terminate on December 31, 2025.

(h) DEFINITIONS.—In this section:

(1) The term "generative artificial intelligence detection" means, with respect to digital content, the positive identification of the use of generative artificial intelligence in the generation of such content.

(2) The term "generative artificial intelligence watermarking" means, with respect to digital content, embedding within such content data conveying attribution of the generation of such content to generative artificial intelligence.

10 USC 4001 note.

**SEC. 1544. PLANS, STRATEGIES, AND OTHER MATTERS RELATING TO ARTIFICIAL INTELLIGENCE.**

(a) IN GENERAL.—The Secretary of Defense, in consultation with the Deputy Secretary of Defense, shall—

Procedures.
Timelines.
Review.
Assessment.

(1) establish and document procedures, including timelines, for the periodic review of the 2018 Department of Defense Artificial Intelligence Strategy, or any successor strategy, and associated annexes of the military departments to assess the implementation of such strategy and whether any revision is necessary;

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 575

(2) issue Department of Defense-wide guidance that defines outcomes of near-term and long-term strategies and plans relating to—

    (A) the adoption of artificial intelligence;

    (B) the adoption and enforcement of policies on the ethical use of artificial intelligence systems; and

    (C) the identification and mitigation of bias in artificial intelligence algorithms;

(3) issue Department-wide guidance regarding methods to monitor accountability for artificial intelligence-related activity, including artificial intelligence performance indicators and metrics;

(4) develop a strategic plan for the development, use, and cybersecurity of generative artificial intelligence, including a policy governing the use of, and the defense against adversarial use of, generative artificial intelligence;

(5) assess technical workforce needs across the future years defense plan to support the continued development of artificial intelligence capabilities, including recruitment and retention policies and programs;

(6) assess the availability and adequacy of the basic artificial intelligence training and education curricula, including efforts developed or authorized pursuant to section 256 of the National Defense Authorization Act for Fiscal Year 2020 (133 Stat. 1290; Public Law 116–92), available to the broader civilian workforce of the Department and military personnel to promote artificial intelligence literacy to the nontechnical workforce and senior leadership with responsibilities adjacent to artificial intelligence technical development;

(7) develop and issue a timeline and guidance for the Chief Digital and Artificial Intelligence Officer of the Department and the Secretaries of the military departments to establish a common lexicon for artificial intelligence-related activities;

(8) develop and implement a plan to protect and secure the integrity, availability, and privacy of artificial intelligence systems and models, including large language models, data libraries, data repositories, and algorithms, in training, development, and production environments;

(9) ensure the fulfilment of the statutory requirement to establish data repositories under section 232 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 4001 note), as amended by section 212 of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2466);

(10) develop and implement a plan—

    (A) to identify commercially available and relevant large language models; and

    (B) to make such models available, as appropriate, on classified networks;

(11) develop a plan to defend the personnel, organizations, and systems of the Department against adversarial artificial intelligence, including an identification of organizations within the Department capable of providing to cyber red teams of the Department capabilities for operational and developmental needs;

*Guidance.*

*Guidance.*

*Policy.*

*Assessment.*

*Assessment.*

*Timeline.*
*Guidance.*

*Data.*

137 STAT. 576          PUBLIC LAW 118–31—DEC. 22, 2023

Policy.

(12) develop and implement a policy for use by contracting officials to protect the intellectual property of commercial entities that provide artificial intelligence algorithms to a data repository specified in paragraph (9), including a policy for how to address data rights in situations in which governmental and commercial intellectual property may be mixed when such artificial intelligence algorithms are deployed in an operational environment;

Guidance.
Directives.

(13) issue guidance and directives governing how the Chief Digital and Artificial Intelligence Officer of the Department shall exercise authority to access, control, and maintain, on behalf of the Secretary, data collected, acquired, accessed, or used by components of the Department consistent with section 1513 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 10 U.S.C. 4001 note); and

Guidance.

(14) clarify guidance on the instances for, and the role of human intervention and oversight in, the exercise of artificial intelligence algorithms for use in the generation of offensive or lethal courses of action for tactical operations.

(b) ETHICAL AND RESPONSIBLE ARTIFICIAL INTELLIGENCE.—

(1) PROCESS.—The Secretary of Defense, acting through the Chief Digital and Artificial Intelligence Officer, shall develop and implement a process—

Assessment.
Compliance.

(A) to assess whether a given artificial intelligence technology used by the Department of Defense is in compliance with a test, evaluation, verification, and validation framework that—

(i) operationalizes responsible artificial intelligence principles; and

(ii) is validated and selected by the Chief Digital and Artificial Intelligence Officer for purposes of this subsection;

Reports.
Determination.
Compliance.

(B) to report and remediate any artificial intelligence technology that is determined not to be in compliance with the framework selected pursuant to subparagraph (A); and

(C) in a case in which efforts to remediate such technology have been unsuccessful, to discontinue the use of the technology until effective remediation is achievable.

(2) ADDITIONAL REQUIREMENTS.—In developing and implementing the process under paragraph (1), the Secretary of Defense shall—

Criteria.

(A) develop clear criteria against which the compliance of an artificial intelligence technology with the framework selected pursuant to subparagraph (A) of such paragraph may be assessed under such subparagraph, taking into consideration—

(i) similar criteria previously developed by the Secretary; and

China.
Russia.

(ii) the identification of potential vulnerabilities in systems and infrastructure of the Armed Forces that could be exploited by adversarial artificial intelligence applications used by the People's Republic of China, the Russian Federation, or other foreign adversaries;

(B) take steps to integrate such process across the elements of the Department of Defense, including the combatant commands; and

(C) provide information on such process to members of the Armed Forces and civilian personnel of the Department that are—

(i) responsible for developing and deploying artificial intelligence technologies;

(ii) end users of such technologies, including members of the Army, Navy, Air Force, Marine Corps, or Space Force who use such technologies in military operations; or

(iii) otherwise determined relevant by the Secretary.

(c) DEADLINE; BRIEFING.—

(1) DEADLINE.—The Secretary shall complete the requirements under this section by not later than 120 days after the date of enactment of this Act.

(2) BRIEFING.—Not later than 150 days after the date of the enactment of this Act, the Secretary shall provide to the congressional defense committees a briefing on the implementation of this section.

## SEC. 1545. STUDY TO ANALYZE VULNERABILITY FOR ARTIFICIAL INTELLIGENCE-ENABLED MILITARY APPLICATIONS.

(a) STUDY.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall complete a study to assess the functionality of artificial intelligence-enabled military applications, research and development needs related to such applications, and vulnerabilities to the privacy, security, and accuracy of such applications.

<div style="text-align: right">Deadline.<br>Assessment.</div>

(b) ELEMENTS.—The study under subsection (a) shall include the following:

<div style="text-align: right">Assessments.</div>

(1) An assessment of research and development efforts, including transition pathways, needed to advance explainable and interpretable artificial intelligence-enabled military applications, including the capability to assess the architectures, data models, and algorithms underlying such applications.

(2) An assessment of any potential risks to the privacy, security, or accuracy of the architectures, data models, or algorithms underlying artificial intelligence-enabled military applications, including the following:

(A) Individual foundational artificial intelligence models, including the adequacy of existing testing, training, and auditing for such models to ensure such models may be properly assessed over time.

(B) The interactions of multiple artificial intelligence-enabled military applications and how such interactions may affect the ability to detect and assess new, complex, and emergent behavior among individual agents, as well as the collective effect of such interactions on risks to the privacy, security, and accuracy of such applications over time.

(C) The effect of increased agency in artificial intelligence-enabled military applications and how such increased agency may affect the ability to detect and assess

137 STAT. 578          PUBLIC LAW 118–31—DEC. 22, 2023

new, complex, and emergent behavior, as well risks to the privacy, security, and accuracy of such applications over time.

(3) An assessment of the survivability and traceability of decision support systems that are integrated with artificial intelligence-enabled military applications and used in a contested environment.

(4) An identification of existing artificial intelligence metrics, developmental, testing and audit capabilities, personnel, and infrastructure of the Department of Defense, including test and evaluation facilities of the Department, needed to enable ongoing assessment under paragraphs (1) through (3).

(5) An identification of any research gaps necessary to be filled to sufficiently carry out the assessments and identifications required under paragraphs (1) through (3) that are not currently, or not sufficiently, funded within the Department of Defense.

Deadline.

(c) INTERIM BRIEFING.—Not later than 180 days after the date of the enactment of this Act, the Chief Digital and Artificial Intelligence Officer shall provide to the congressional defense committees a briefing on the interim findings of the study under subsection (a).

(d) FINAL REPORT.—

(1) SUBMISSION.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a final report on the findings with respect to the study conducted pursuant to subsection (a).

(2) FORM.—The final report under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(e) FOUNDATIONAL ARTIFICIAL INTELLIGENCE MODEL DEFINED.—In this section, the term "foundational artificial intelligence model" means an adaptive generative model that is trained on a broad set of unlabeled data sets that may be used for different tasks with minimal fine-tuning.

# Subtitle F—Reports and Other Matters

### SEC. 1551. LIMITATION ON AVAILABILITY OF FUNDS FOR TRAVEL FOR OFFICE OF UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS PENDING STRATEGY RELATING TO DEFENSE TRAVEL SYSTEM.

(a) STRATEGY.—The Under Secretary of Defense for Personnel and Readiness shall develop a strategy to modernize or replace the end-to-end travel management system of the Department of Defense known as the "Defense Travel System" (in this section, referred to as the "Defense Travel System").

(b) ELEMENTS.—The strategy under subsection (a) shall include the following:

Analysis.
Evaluation.

(1) A business case analysis that evaluates options for modernizing or replacing the Defense Travel System, including—

(A) an assessment of the upgradability of the code base for the Defense Travel System before such code base reaches a point of unsustainability;

Assessment.

(B) an assessment of commercially available tools that may be used to upgrade the capabilities of the Defense Travel System;

Assessment.

(C) an identification of system dependencies of the Defense Travel System, with a particular focus on any such dependencies with respect to connections with financial management systems;

(D) an identification of system weaknesses of the Defense Travel System affecting audit readiness;

(E) projections of usage rates of the Defense Travel System necessary to maintain workload and reimbursement rate viability; and

(F) estimated costs for any activity associated with the strategy.

Cost estimate.

(2) A plan for the implementation of the strategy, including timelines for achieving such implementation.

Plan.
Timelines.

(3) An identification of risks to such implementation, including potential delays to such timelines.

(c) LIMITATION.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for travel for the Office of the Under Secretary of Defense for Personnel and Readiness, not more than 93 percent may be obligated or expended until the Chief Information Officer of the Department of Defense independently certifies to the Committees on Armed Services of the House of Representatives and the Senate that the strategy under subsection (a) meets the validated requirements of the Department of Defense.

Certification.

### SEC. 1552. MANAGEMENT BY DEPARTMENT OF DEFENSE OF MOBILE APPLICATIONS.

10 USC 2224 note.

(a) IMPLEMENTATION OF RECOMMENDATIONS.—

(1) IN GENERAL.—The Secretary of Defense shall evaluate and implement to the maximum extent practicable the recommendations of the Inspector General of the Department of Defense with respect to managing mobile applications contained in the report set forth by the Inspector General dated February 9, 2023, and titled "Management Advisory: The DoD's Use of Mobile Applications" (Report No. DODIG–2023–041).

Evaluation.

(2) DEADLINE.—The Secretary shall implement each of the recommendations specified in subsection (a) by not later than one year after the date of the enactment of this Act unless the Secretary submits to the congressional defense committees a written notification of any specific recommendation that the Secretary declines to implement or plans to implement after the date that is one year after the date of the enactment of this Act.

Notification.

(b) BRIEFING ON REQUIREMENTS RELATED TO COVERED APPLICATIONS.—

(1) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the Secretary shall provide to the congressional defense committees a briefing on actions taken by the Secretary to enforce compliance with existing policy of the Department of Defense that prohibits—

Deadline.

(A) the installation and use of covered applications on Federal Government devices; and

(B) the use of covered applications on the Department of Defense Information Network on personal devices.

(2) COVERED APPLICATIONS DEFINED.—In this subsection, the term "covered applications" means the social networking service TikTok, or any successor application or service developed or provided by ByteDance Limited or an entity owned by ByteDance Limited.

### SEC. 1553. REPORT ON DEPARTMENT OF DEFENSE ENTERPRISE CAPABILITIES FOR CYBERSECURITY.

(a) REPORT.—

(1) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Chief Information Officer of the Department of Defense shall submit to the congressional defense committees a report on any actions or determinations by the Department pertaining to the requirements under section 1511 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 2037) taken or made for the purpose of using cybersecurity capabilities to protect assets and networks across the Department.

Analyses.

(2) ELEMENTS.—The report under paragraph (1) shall include the following:

(A) A description of the risks and benefits associated with the actions and determinations specified in paragraph (1).

Plans.

(B) A description of future plans of the Department for the acquisition of integrated and interoperable cybersecurity tools and applications through a competitive process that would allow multiple vendors to compete separately and as teams.

(C) The results of the analysis conducted by the Director of Cost Assessment and Program Evaluation of the Department of the costs and effectiveness of the cybersecurity capabilities described in paragraph (1).

(D) The results of any analyses conducted by the Director of Operational Test and Evaluation, or the head of any other element of the Department, to test the effectiveness of the cybersecurity capabilities described in paragraph (1) compared to other commercially available products and vendors.

(b) BRIEFING.—Not later than 60 days after the date of the enactment of this Act, the Chief Information Officer of the Department shall provide to the congressional defense committees a briefing on the plans of the Department to ensure competition and interoperability in the security and identity and access management product market segments.

### SEC. 1554. REPORT ON TECHNOLOGY MODERNIZATION FOR ARMY HUMAN RESOURCES COMMAND 2030 TRANSFORMATION PLAN.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of the Army shall submit to the congressional defense committees a report on the plan of the Army known as the "Human Resources Command 2030 Transformation Plan" that includes—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 581

(1) an estimated timeline for the completion of the implementation milestones set forth in such plan; and

Timeline.

(2) an identification of future resource needs relating to the modernization of legacy information technology systems.

(b) LEGACY INFORMATION TECHNOLOGY SYSTEM DEFINED.—In this section, the term "legacy information technology system" has the meaning given such term in section 1076 of the National Defense Authorization Act for Fiscal Year 2018 (Public Law 115–91; 40 U.S.C. 11301 note).

### SEC. 1555. CERTIFICATION REQUIREMENT REGARDING CONTRACTING FOR MILITARY RECRUITING.

10 USC 503 note.

(a) CERTIFICATION REQUIREMENT.—Prior to the Secretary of Defense entering into any contract or other agreement (or extending, renewing, or otherwise modifying an existing contract or other agreement) with an entity for the purpose of that entity placing military recruitment advertisements on behalf of the Department of Defense, the Secretary shall require, as a condition of such contract or agreement, that the entity certify to the Secretary that the entity does not place advertisements in news sources based on personal or institutional political preferences or biases, or determinations of misinformation.

(b) NOTIFICATION REQUIREMENT.—

(1) IN GENERAL.—The Secretary of Defense, in coordination with the Secretaries of the military departments, shall submit a notification to the congressional defense committees and congressional leadership each time the Department of Defense enters into a contract related to the placement of recruitment advertising with an entity specified in paragraph (2) and if such entities are used how they are used.

(2) ENTITIES SPECIFIED.—The entities specified in this paragraph are—

(A) NewsGuard Technologies Inc.;

NewsGuard Technologies Inc.

(B) the Global Disinformation Index, incorporated in the United Kingdom as "Disinformation Index LTD"; and

Disinformation Index LTD.

(C) any similar entity.

(c) SUNSET.—The requirement under this section shall terminate on the date that is one year after the date of the enactment of this Act.

# TITLE XVI—SPACE ACTIVITIES, STRATEGIC PROGRAMS, AND INTELLIGENCE MATTERS

### Subtitle A—Space Activities

Sec. 1601. Delegation of certain authority of explosive safety board.
Sec. 1602. Classification review of space major defense acquisition programs.
Sec. 1603. Enhanced authority to increase space launch capacity through space launch support services.
Sec. 1604. Principal Military Deputy for Space Acquisition and Integration.
Sec. 1605. Modification to updates of space policy review.
Sec. 1606. Authorization for establishment of the National Space Intelligence Center as a field operating agency.
Sec. 1607. Initial operational capability for Advanced Tracking and Launch Analysis System and requirements for system-level review.
Sec. 1608. Use of middle tier acquisition program for proliferated warfighter space architecture of the Space Development Agency.
Sec. 1609. Process and plan for Space Force space situational awareness.

137 STAT. 582          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1610. Plan to improve threat-sharing arrangements with commercial space op-
erators.
Sec. 1611. Plan for an integrated and resilient satellite communications architec-
ture for the Space Force.

Subtitle B—Defense Intelligence and Intelligence-Related Activities

Sec. 1621. Military intelligence collection and analysis partnerships.

Subtitle C—Nuclear Forces

Sec. 1631. Establishment of major force program for nuclear command, control, and
communications programs.
Sec. 1632. Technical amendment to additional report matters on strategic delivery
systems.
Sec. 1633. Amendment to annual report on the plan for the nuclear weapons stock-
pile, nuclear weapons complex, nuclear weapons delivery systems, and
nuclear weapons command and control systems.
Sec. 1634. Matters relating to the acquisition and deployment of the Sentinel inter-
continental ballistic missile weapon system.
Sec. 1635. Tasking and oversight authority with respect to intercontinental ballistic
missile site activation task force for Sentinel Program.
Sec. 1636. Study of weapons programs that allow Armed Forces to address hard
and deeply buried targets.
Sec. 1637. Repeal of requirement for review of nuclear deterrence postures.
Sec. 1638.  Retention of capability to redeploy multiple independently targetable re-
entry vehicles.
Sec. 1639. Authorization to establish technology transition program for strategic
nuclear deterrence.
Sec. 1640. Matters relating to the nuclear-armed, sea-launched cruise missile.
Sec. 1641. Requirements relating to operational silos for the Sentinel interconti-
nental ballistic missile.
Sec. 1642. Long-term sustainment of Sentinel ICBM guidance system.
Sec. 1643. Integrated master schedule for the Sentinel missile program of the Air
Force.
Sec. 1644. Operational timeline for Strategic Automated Command and Control
System.
Sec. 1645. Pilot program on development of reentry vehicles and related systems.
Sec. 1646. Prohibition on reduction of the intercontinental ballistic missiles of the
United States.
Sec. 1647.  Limitation on availability of funds pending compliance with information
requests from the Government Accountability Office.
Sec. 1648. Congressional notification of decision to delay strategic delivery system
test event.
Sec. 1649. Congressional notification of nuclear cooperation between Russia and
China.
Sec. 1650. Plan for decreasing the time to upload additional warheads to the inter-
continental ballistic missile fleet.

Subtitle D—Missile Defense Programs

Sec. 1661. Deputy Director of Office of Missile Defense Agency.
Sec. 1662. Modification of program accountability matrices requirements for next
generation interceptors for missile defense.
Sec. 1663. National missile defense policy.
Sec. 1664. Modification of requirement for Comptroller General to review and as-
sess missile defense acquisition programs.
Sec. 1665. Iron Dome short-range rocket defense system and Israeli cooperative
missile defense program co-development and co-production.
Sec. 1666. Programs to achieve initial and full operational capabilities for the Glide
Phase Interceptor program.
Sec. 1667. Rescission of memorandum on missile defense governance.
Sec. 1668. Limitation on availability of funds for Office of Cost Assessment and
Program Evaluation until submission of report on missile defense roles
and responsibilities.
Sec. 1669. Strategy for integrated air and missile defense of Hawaii and the Indo-
Pacific region.
Sec. 1670. Report on potential enhancements to integrated air and missile defense
capabilities in Europe.
Sec. 1671. Independent analysis of space-based missile defense capability.

Subtitle E—Other Matters

Sec. 1681. Extension of authorization for protection of certain facilities and assets
from unmanned aircraft.

Sec. 1682. Electromagnetic warfare.
Sec. 1683. Cooperative threat reduction funds.
Sec. 1684. Matters relating to space-based ground and airborne moving target indi-
cation systems.
Sec. 1685. Positioning, navigation, and timing.
Sec. 1686. Actions to address serious deficiencies in electronic protection of systems
that operate in the radio frequency spectrum.
Sec. 1687. Limitation on use of funds for certain unreported programs.
Sec. 1688. Indo-Pacific missile strategy.
Sec. 1689. Study on the future of the Integrated Tactical Warning Attack Assess-
ment System.
Sec. 1690. Research and analysis on multipolar deterrence and escalation dynam-
ics.

# Subtitle A—Space Activities

### SEC. 1601. DELEGATION OF CERTAIN AUTHORITY OF EXPLOSIVE SAFETY BOARD.

(a) DELEGATION OF RESPONSIBILITIES.—Section 172 of title 10, United States Code, is amended—

(1) in subsection (c), by striking "The chair" and inserting "Except as provided in subsection (h), the chair"; and

(2) by adding at the end the following new subsection:

"(h) EXPLOSIVES USED BY SPACE LAUNCH VEHICLES.—(1) The Secretary of Defense shall delegate to the Secretary of the Air Force, who may further delegate to the Commanders of the Space Launch Deltas, the responsibilities under subsection (c) with respect to explosives used by space launch vehicles.

"(2) In this subsection, the term 'launch vehicle' has the meaning given such term in section 50902(11) of title 51.".

Definition.

(b) IMPROVED PROCESS FOR YIELD DETERMINATION.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense, the Secretary of Transportation, and the Administrator of the National Aeronautics and Space Administration shall jointly establish a process through which scientifically-valid yield determinations can be assessed for space launch vehicles while in flight.

Deadline.
Assessments.
51 USC 20301 note.

(c) REPORT.—Not later than 90 days after the completion of the LOX-Methane Assessment working group process, the Secretary of Defense, the Secretary of Transportation, and the Administrator of the National Aeronautics and Space Administration shall submit to the appropriate congressional committees a report that includes a description of the effects of the LOX-Methane Assessment on existing and future maximum credible event analyses and any resulting effects on commercial space launch, civil space activities, and national security.

(d) DEFINITIONS.—In this section:

(1) The term "appropriate congressional committees" means the following:

(A) The congressional defense committees.

(B) The Committee on Commerce, Science, and Transportation of the Senate.

(C) The Committee on Science, Space, and Technology of the House of Representatives.

(D) The Committee on Transportation and Infrastructure of the House of Representatives.

(2) The term "LOX-Methane Assessment working group" means the ongoing interagency working group studying the explosive characteristics of liquid oxygen and methane and

**137 STAT. 584**          **PUBLIC LAW 118–31—DEC. 22, 2023**

comprised of representatives from the Department of Defense, the Department of Transportation, and the National Aeronautics and Space Administration.

(3) The term "launch vehicle" has the meaning given such term in section 50902(11) of title 51, United States Code.

### SEC. 1602. CLASSIFICATION REVIEW OF SPACE MAJOR DEFENSE ACQUISITION PROGRAMS.

10 USC
prec. 2771.

Chapter 135 of title 10, United States Code, is amended by inserting after section 2275a the following new section:

10 USC 2275b.

**"§ 2275b. Requirements for appropriate classification guidance.**

Determinations.

"(a) IN GENERAL.—Before a space major defense acquisition program achieves Milestone B approval, or equivalent, the milestone decision authority shall determine whether the classification guidance for the program remains appropriate and—

Certification.

"(1) if such guidance is determined to be appropriate, submit to the congressional defense committees a certification of such determination; or

Updates.

"(2) if such guidance is determined to be inappropriate, initiate an update to such guidance.

"(b) DEFINITIONS.—In this section:

"(1) The term 'Milestone B approval' has the meaning given such term in section 4172(e)(7) of this title.

"(2) The term 'major defense acquisition program' has the meaning given such term in section 4201 of this title.

"(3) The term 'space major defense acquisition program' means a major defense acquisition program for the acquisition of a satellite, ground system, or command and control system.".

### SEC. 1603. ENHANCED AUTHORITY TO INCREASE SPACE LAUNCH CAPACITY THROUGH SPACE LAUNCH SUPPORT SERVICES.

10 USC
prec. 2271.

Chapter 135 of title 10, United States Code, is amended by inserting after section 2276 the following new section:

10 USC 2276a.

**"§ 2276a. Special authority for provision of space launch support services to increase space launch capacity**

"(a) IN GENERAL.—The Secretary of a military department may support Federal and commercial space launch capacity on any domestic real property under the control of the Secretary through the provision of space launch support services.

"(b) PROVISION OF LAUNCH EQUIPMENT AND SERVICES TO COMMERCIAL ENTITIES.—

"(1) CONTRACT OR OTHER TRANSACTION AUTHORITY.—The Secretary of a military department may enter into a contract or other transaction with one or more commercial entities that intend to conduct space launch activities on a military installation under the jurisdiction of the Secretary. Under such a contract or agreement, the Secretary may agree to provide to the commercial entity supplies, services, equipment, and construction needed for commercial space launch.

"(2) COSTS.—

Reimbursement.

"(A) DIRECT COSTS.—If the Secretary of a military department enters into a contract or other transaction with a commercial entity under paragraph (1), such contract or transaction shall include a provision that requires the commercial entity to reimburse the Department of Defense

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 585

for all direct costs to the United States that are associated with any good, service, or equipment provided to the commercial entity under the contract or other transaction.

"(B) INDIRECT COSTS.—If the Secretary of a military department enters into a contract or other transaction with a commercial entity under paragraph (1), such contract or transaction may include a provision that requires the commercial entity to reimburse the Department of Defense for such indirect costs as the Secretary considers to be appropriate. In such a case, such contract or other transaction may provide for the reimbursement of such indirect costs through the establishment of a rate, fixed price, or similar mechanism the Secretary concerned determines is reasonable.

*Determination.*

"(3) RETENTION OF FUNDS COLLECTED FROM COMMERCIAL USERS.—Any amount collected from a commercial entity as a reimbursement under paragraph (2) shall be credited to the appropriations account from which the cost for which such reimbursement is provided was derived.

"(4) REGULATIONS.—The Secretary of each of the military departments shall prescribe regulations to carry out this subsection.

"(c) DEFINITIONS.—In this section:

"(1) SPACE LAUNCH.—The term 'space launch' includes all activities, supplies, equipment, facilities, or services supporting launch preparation, launch, reentry, recovery, and other launch-related activities for both the payload and the space transportation vehicle.

"(2) COMMERCIAL ENTITY.—The term 'commercial entity' or 'commercial' means a non-Federal entity organized under the laws of the United States or of any jurisdiction within the United States.

"(d) TRANSITION LIMITATIONS AND REPORTING REQUIREMENTS.— For each of fiscal years 2024, 2025, and 2026, the Secretary of a military department shall—

*Time periods.*

"(1) with respect to any contract or other transaction authority entered into pursuant to subsection (b), limit the amount of the indirect costs that are reimbursable under paragraph (2)(B) of such subsection to not more than 30 percent, not to exceed $5,000,000 annually (based on fiscal year 2024 constant dollars), of the total amount of the direct costs reimbursable under paragraph (2)(A) of such subsection; and

"(2) not later than 90 days after the last day of each such fiscal year, provide for each of the congressional defense committees a briefing that includes—

*Deadline.*
*Briefing.*
*Costs.*
*Reimbursement.*

"(A) an identification of the total amounts of direct and indirect costs reimbursed to each spaceport for the fiscal year covered by the report;

"(B) a description of the support provided by reimbursed indirect costs for the fiscal year covered by the report; and

"(C) an identification of the rate, fixed price, or similar mechanism, if any, used to calculate the amount of the indirect costs that are reimbursable for the fiscal year following the fiscal year covered by the report.".

### SEC. 1604. PRINCIPAL MILITARY DEPUTY FOR SPACE ACQUISITION AND INTEGRATION.

Section 9016(b)(6) of title 10, United States Code, is amended by adding at the end the following new subparagraph:

"(C) The Assistant Secretary of the Air Force for Space Acquisition and Integration shall have a Principal Military Deputy for Space Acquisition and Integration, who shall be an officer of the Space Force on active duty. The Principal Military Deputy for Space Acquisition and Integration shall be appointed from among officers who have significant experience in the areas of acquisition and program management. The position of Principal Military Deputy for Space Acquisition and Integration shall be designated as a critical acquisition position under section 1731 of this title. In the event of a vacancy in the position of Assistant Secretary of the Air Force for Space Acquisition and Integration, the Principal Military Deputy for Space Acquisition and Integration may serve as Acting Assistant Secretary for Space Acquisition and Integration for a period of not more than one year.".

### SEC. 1605. MODIFICATION TO UPDATES OF SPACE POLICY REVIEW.

Paragraph (2) of section 1611(c) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 2082) is amended to read as follows:

"(2) UPDATES.—The Secretary shall provide for updates to the assessments, analyses, and evaluations carried out pursuant to such review. The Secretary shall submit to the appropriate congressional committees a report on any such updates concurrently with the National Defense Strategy required to be submitted to Congress under section 113(g) of title 10, United States Code.".

### SEC. 1606. AUTHORIZATION FOR ESTABLISHMENT OF THE NATIONAL SPACE INTELLIGENCE CENTER AS A FIELD OPERATING AGENCY.

(a) AUTHORIZATION.—The Secretary of the Air Force may establish the National Space Intelligence Center as a field operating agency of the Space Force to analyze and produce scientific and technical intelligence on space-based and counterspace threats from foreign adversaries.

(b) COLOCATION.—If the Secretary of the Air Force decides to establish the National Space Intelligence Center as a field operating agency, the Secretary shall consider the operational and geographical benefits provided by colocating with the National Air and Space Intelligence Center.

### SEC. 1607. INITIAL OPERATIONAL CAPABILITY FOR ADVANCED TRACKING AND LAUNCH ANALYSIS SYSTEM AND REQUIREMENTS FOR SYSTEM-LEVEL REVIEW.

(a) ADVANCED TRACKING AND LAUNCH ANALYSIS SYSTEM.—

(1) DATE FOR INITIAL OPERATIONAL CAPABILITY.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Air Force shall—

(A) designate a date on which the Advanced Tracking and Launch Analysis System (commonly referred to as "ATLAS") is expected to achieve initial operational capability; and

Appointment.

Time period.

10 USC 2271 note.

Reports.

10 USC 9081 note.

Deadlines.

Designation.

(B) notify the congressional defense committees of such date. — Notification.

(2) EFFECT OF FAILURE TO TIMELY DELIVER.—If the initial operational capability for the Advanced Tracking and Launch Analysis System is not achieved by the date designated under paragraph (1)(A), the Secretary shall—

(A) terminate the Advanced Tracking and Launch Analysis System program; — Termination.

(B) designate an alternative program option that provides a comparable capability to the capability intended to be provided by the Advanced Tracking and Launch Analysis System; and — Designation.

(C) not later than 30 days after such date, notify the congressional defense committees with respect to— — Notification.

(i) such termination;

(ii) the designated alternative program option;

(iii) the justification for selecting such option; and

(iv) the estimated time and total costs to completion of such option.

(b) SYSTEM-LEVEL REVIEW.—

(1) IN GENERAL.—The Secretary of the Air Force shall seek to enter into a contract with a federally funded research and development center under which the center shall, not less frequently than every 2 years during the period from 2024 through 2032, conduct a review of the space command and control software acquisition program to assess the ability of such program to build a software framework that integrates multiple aspects of space operations to enable the warfighter to command and control space assets in a time of conflict. — Contracts. Time periods. Assessment.

(2) ELEMENTS.—Each review under paragraph (1) shall—

(A) evaluate whether and to what extent the software framework described in such paragraph integrates— — Evaluation.

(i) sensor data applicable to the command and control of space assets;

(ii) information contained in the Unified Data Library relating to the number and location of space objects; and

(iii) the ability to control space assets based on such data and information; and

(B) address such other matters as the Secretary of the Air Force considers necessary.

(3) BRIEFING.—Not later than 30 days after the conclusion of each review under paragraph (1), the Secretary of the Air Force shall provide to the congressional defense committees a briefing on the findings of the review, including—

(A) an assessment of any deficiency identified in the review; and — Assessment.

(B) a plan to address such deficiency in a timely manner. — Plan.

**SEC. 1608. USE OF MIDDLE TIER ACQUISITION PROGRAM FOR PRO-LIFERATED WARFIGHTER SPACE ARCHITECTURE OF THE SPACE DEVELOPMENT AGENCY.** — Deadlines. 10 USC 2271 note.

(a) IN GENERAL.—The Director of the Space Development Agency shall use a middle tier acquisition program for the rapid fielding of satellites and associated systems for each of the following

137 STAT. 588          PUBLIC LAW 118–31—DEC. 22, 2023

tranches of the of the proliferated warfighter space architecture of the Agency:

(1) Tranch 1.

(2) Tranch 2.

(3) Tranch 3.

(b) RAPID PROTOTYPING AND FIELDING.—Any tranche of satellites or associated systems developed and fielded under subsection (a) shall have a level of maturity that allows such satellites or systems to be rapidly prototyped within an acquisition program or rapidly fielded within five years of the development of an approved requirement for such satellites or systems.

(c) DESIGNATION AS MAJOR CAPABILITY ACQUISITION.—

(1) IN GENERAL.—The Under Secretary of Defense for Acquisition and Sustainment may designate a tranche described in subsection (a) as a major capability acquisition program consistent with Department of Defense Instruction 5000.85, titled "Major Capability Acquisition" and issued on August 6, 2020 (or a successor instruction).

(2) NOTICE TO CONGRESS.—Not later than 90 days before the date on which a designation under paragraph (1) is made, the Under Secretary of Defense for Acquisition and Sustainment shall notify the congressional defense committees of the intent of the Under Secretary to make such designation and include with such notice a justification for such designation.

(d) SPACE ACQUISITION COUNCIL REVIEW AND WAIVER.—

(1) REVIEW.—In accordance with section 9021 of title 10, United States Code, the Space Acquisition Council shall review each tranch described subsection (a) to ensure integration across the national security space enterprise.

(2) WAIVER.—The Space Acquisition Council may waive the requirements of subsection (a) with respect to a tranch or portion of a tranch described in such subsection if the Council—

<p style="margin-left:2em">Determination.</p>

(A) on the basis of the review conducted under paragraph (1), determines that the use of a middle tier acquisition program is not warranted for such tranch or portion thereof; and

<p style="margin-left:2em">Notice.</p>

(B) not later than 14 days after making such determination, submits to the congressional defense committees notice of the intent of the Council to issue such a waiver.

(e) MIDDLE TIER ACQUISITION PROGRAM DEFINED.—In this section, the term "middle tier acquisition program" means an acquisition program or project that is carried out using the rapid fielding or rapid prototyping acquisition pathway under section 804 of the National Defense Authorization Act for Fiscal Year 2016 (Public Law 114–92; 10 U.S.C. 3201 note prec.) in a manner consistent with Department of Defense Instruction 5000.80, titled "Operation of the Middle Tier of Acquisition (MTA)" and issued on December 30, 2019 (or a successor instruction).

10 USC 2274 note.

**SEC. 1609. PROCESS AND PLAN FOR SPACE FORCE SPACE SITUATIONAL AWARENESS.**

(a) IN GENERAL.—The Assistant Secretary of the Air Force for Space Acquisition and Integration, in consultation with Chief of Space Operations, shall—

Evaluation.

(1) establish a process to regularly identify and evaluate commercial space situational awareness capabilities, including

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 589

the extent to which commercial space situational awareness data could meet needs of the Space Force with respect to maintaining situational awareness in space; and

(2) develop and implement a plan to integrate the unified data library into the operational systems of the Space Force, including operational systems for space situational awareness and space command and control missions.

(b) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Assistant Secretary of the Air Force for Space Acquisition and Integration shall submit to the congressional defense committees a report that includes a description of the process and plan developed under subsection (a).

**SEC. 1610. PLAN TO IMPROVE THREAT-SHARING ARRANGEMENTS WITH COMMERCIAL SPACE OPERATORS.**

10 USC 2276 note.

(a) PLAN FOR THREAT SHARING WITH COMMERCIAL SPACE OPERATORS.—The Assistant Secretary of the Air Force for Space Acquisition and Integration, in consultation with the Commander of the United States Space Command, shall develop and implement a plan to expand threat-sharing arrangements with commercial space operators that are under contract with the Department of Defense as of the date of the enactment of this Act.

(b) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Assistant Secretary of the Air Force for Space Acquisition and Integration, in coordination with the Commander of the United States Space Command, shall submit to the congressional defense committees a report on the plan required under subsection (a).

**SEC. 1611. PLAN FOR AN INTEGRATED AND RESILIENT SATELLITE COMMUNICATIONS ARCHITECTURE FOR THE SPACE FORCE.**

(a) IN GENERAL.—The Secretary of the Air Force, in coordination with the Assistant Secretary of the Air Force for Space Acquisition and Integration and the Chief of Space Operations, shall—

(1) as part of the force design process for the Space Force, consider options for the integration of resilient military tactical satellite communications capabilities;

(2) develop a plan for the integration of such capabilities into the Space Force, as required under subsection (b); and

(3) ensure that a geostationary small satellite communications constellation is evaluated for inclusion as a component of the space data transport force design of the Space Force through, at a minimum, the end of fiscal year 2027.

Evaluation.

(b) PLAN FOR INTEGRATION.—

(1) IN GENERAL.—The Secretary of the Air Force, in coordination with the Assistant Secretary of the Air Force for Space Acquisition and Integration and the Chief of Space Operations, shall develop a plan for an integrated and resilient satellite communications architecture for the Space Force.

(2) ELEMENTS.—The plan under paragraph (1) shall include, at a minimum, options for—

(A) leveraging commercially available geostationary small satellite communications technology developed and produced in the United States;

(B) ensuring sufficient funding for such an integration;

(C) including the unique requirements for small satellite communications constellations throughout the

acquisition and deployment period, including support for global X-band coverage and support for secure communications waveforms using on-board digital processing; and

(D) potential integration of such geostationary small satellite communications capability into the enterprise satellite communications management and control (commonly known as "ESC–MC") implementation plan of the Department of Defense.

Deadline.

(3) BRIEFING.—Not later than the date specified in paragraph (4), than the Secretary of the Air Force shall provide to the congressional defense committees a briefing on the plan developed under paragraph (1).

(4) DATE SPECIFIED.—The date specified in this subsection is the earlier of—

(A) July 1, 2024; or

(B) the date on which the Secretary of the Air Force completes the space data transport force design for the Space Force.

# Subtitle B—Defense Intelligence and Intelligence-Related Activities

10 USC note prec. 421.

## SEC. 1621. MILITARY INTELLIGENCE COLLECTION AND ANALYSIS PARTNERSHIPS.

(a) USE OF FUNDS OTHER THAN APPROPRIATED FUNDS.—

(1) IN GENERAL.—Subject to paragraph (2), the Director of the Defense Intelligence Agency, in coordination with the Director of National Intelligence, may accept and expend funds from one or more foreign partners for the foreign partner (or partners, as the case may be) to share with the Defense Intelligence Agency the expenses of joint and combined military intelligence collection and analysis activities.

(2) LIMITATIONS.—

(A) PREVIOUSLY DENIED FUNDS.—Funds accepted under this section may not be expended, in whole or in part, by or for the benefit of the Defense Intelligence Agency for any purpose for which Congress has previously denied funds.

(B) JOINT BENEFIT.—The authority under paragraph (1) may not be used to acquire items or services for the sole benefit of the United States.

Time period.

(b) ANNUAL REPORT.—Not later than March 1, 2025, and annually thereafter for four years, the Director of the Defense Intelligence Agency shall submit to the appropriate congressional committees a report on any funds accepted or expended under this section during the preceding calendar year, including an identification of the foreign partner or partners involved and a description of the purpose of such funds.

(c) TERMINATION.—The authority to accept and expend funds from a foreign partner pursuant to this section shall terminate on December 31, 2028.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Armed Services, the Committee on Appropriations, and the Select Committee on Intelligence of the Senate; and

(2) the Committee on Armed Services, the Committee on Appropriations, and the Permanent Select Committee on Intelligence of the House of Representatives.

# Subtitle C—Nuclear Forces

**SEC. 1631. ESTABLISHMENT OF MAJOR FORCE PROGRAM FOR NUCLEAR COMMAND, CONTROL, AND COMMUNICATIONS PROGRAMS.**

Chapter 9 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC prec. 221.

**"§ 239e. Nuclear command, control, and communications: major force program and budget assessment**

10 USC 239e.

"(a) ESTABLISHMENT OF MAJOR FORCE PROGRAM.—The Secretary of Defense shall establish a unified major force program for nuclear command, control, and communications programs pursuant to section 222(b) of this title to prioritize such programs in accordance with the requirements of the Department of Defense and national security.

"(b) BUDGET ASSESSMENT.—(1) The Secretary shall include with the defense budget materials for each of fiscal years 2025 through 2030 a report on the budget for nuclear command, control, and communications programs of the Department of Defense.

Time period. Reports.

"(2) Each report on the budget for nuclear command, control, and communications programs of the Department under paragraph (1) shall include the following:

"(A) An overview of the budget, including—

"(i) a comparison between that budget, the previous budget, the most recent and prior future-years defense program submitted to Congress under section 221 of this title (such comparison shall exclude the responsibility for research and development of the continuing improvement of such nuclear command, control, and communications program), and the amounts appropriated for such nuclear command, control, and communications programs during the previous fiscal year; and

"(ii) the specific identification, as a budgetary line item, for the funding under such programs.

"(B) An assessment of the budget, including significant changes, priorities, challenges, and risks.

Assessment.

"(C) Any additional matters the Secretary determines appropriate.

"(3) Each report under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

"(c) DEFINITIONS.—In this section:

"(1) The term 'budget', with respect to a fiscal year, means the budget for that fiscal year that is submitted to Congress by the President under section 1105(a) of title 31.

"(2) The term 'defense budget materials', with respect to a fiscal year, means the materials submitted to Congress by the Secretary of Defense in support of the budget for that fiscal year.

"(3) The term 'nuclear command, control, and communications programs' means programs through which presidential authority and operational command and control of nuclear weapons is conducted, including programs that facilitate senior-level decisions on nuclear weapons employment.".

### SEC. 1632. TECHNICAL AMENDMENT TO ADDITIONAL REPORT MATTERS ON STRATEGIC DELIVERY SYSTEMS.

Section 495(b) of title 10, United States Code, is amended in the matter preceding paragraph (1)—

(1) by striking "before fiscal year 2020" and inserting "prior to the expiration of the Treaty between the United States of America and the Russian Federation on Measures for the Further Reduction and Limitation of Strategic Offensive Arms, signed on April 8, 2010, and entered into force on February 5, 2011 (commonly referred to as the 'New START Treaty'),"; and

(2) by striking "1043 of the National Defense Authorization Act for Fiscal Year 2012" and inserting "492(a) of this title".

### SEC. 1633. AMENDMENT TO ANNUAL REPORT ON THE PLAN FOR THE NUCLEAR WEAPONS STOCKPILE, NUCLEAR WEAPONS COMPLEX, NUCLEAR WEAPONS DELIVERY SYSTEMS, AND NUCLEAR WEAPONS COMMAND AND CONTROL SYSTEMS.

Section 492a of title 10, United States Code, is amended by adding at the end the following new subsection:

Deadlines.

"(d) INDEPENDENT ASSESSMENT BY UNITED STATES STRATEGIC COMMAND.—

"(1) IN GENERAL.—Not later than 150 days after the submission to Congress of the budget of the President under section 1105(a) of title 31, for each fiscal year the Commander of United States Strategic Command shall complete an independent assessment of any operational effects of the sufficiency of the execution, as of the date of the assessment, of the acquisition, construction, and recapitalization programs of the Department of Defense and the National Nuclear Security Administration to modernize the nuclear forces of the United States and meet current and future deterrence requirements.

Evaluation.

"(2) CONTENTS.—Each assessment required under paragraph (1) shall include an evaluation of the ongoing execution of modernization programs associated with—

"(A) the nuclear weapons design, production, and sustainment infrastructure;

"(B) the nuclear weapons stockpile;

"(C) the delivery systems for nuclear weapons; and

"(D) the nuclear command, control, and communications system.

"(3) ROUTING AND SUBMISSION.—

"(A) SUBMISSION TO NUCLEAR WEAPONS COUNCIL.—Not later than 15 days after completion of an assessment required by paragraph (1), the Commander of United States Strategic Command shall—

"(i) submit the assessment to the Chairman of the Nuclear Weapons Council; and

Notification.

"(ii) notify the congressional defense committees that the assessment has been submitted to the Chairman of the Nuclear Weapons Council.

"(B) SUBMISSION TO CONGRESS.—Not later than 15 days after the Chairman of the Nuclear Weapons Council receives an assessment required by paragraph (1), the Chairman shall transmit the assessment, without change, to the congressional defense committees.".

### SEC. 1634. MATTERS RELATING TO THE ACQUISITION AND DEPLOYMENT OF THE SENTINEL INTERCONTINENTAL BALLISTIC MISSILE WEAPON SYSTEM.

(a) MODIFICATIONS TO THE INTERCONTINENTAL BALLISTIC MISSILE SITE ACTIVATION TASK FORCE.—Section 1638 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended—

(1) in subsection (b)(1), by inserting ", who shall report directly to the Commander of Air Force Global Strike Command" after "Modernization"; and

*136 Stat. 2941.*

(2) by striking subsection (d)(1) and inserting the following:

*136 Stat. 2942.*

"(1) WEAPON SYSTEM.—For purposes of nomenclature and acquisition life cycle activities ranging from development through sustainment and demilitarization, each wing level configuration of the LGM–35A Sentinel intercontinental ballistic missile shall be a weapon system.".

(b) ASSESSMENT FOR NEEDED OR MODIFIED ACQUISITION AUTHORITIES.—

(1) ASSESSMENT REQUIRED.—The Secretary of the Air Force shall conduct an assessment of the Sentinel weapon system program to determine if any existing, modified, or new acquisition authorities could be used in future years to—

*Determination.*

(A) ensure the program meets current timelines; or

(B) ensure the defense industrial base can adequately plan for and deliver components, subsystems, and systems in accordance with the integrated master schedule.

(2) MULTI-YEAR PROCUREMENT AUTHORITY.—In conducting the assessment required under paragraph (1), the Secretary shall evaluate the potential need for multi-year procurement authority.

(3) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Secretary of the Air Force shall submit to the congressional defense committees a report on the findings of the assessment required under paragraph (1). The report shall include—

(A) an identification of all authorities covered by the assessment;

(B) a determination of the effect of each such authority on the successful delivery of initial- and full-operational capability to the Sentinel weapon system program; and

*Determination.*

(C) in the case of any new authority, an identification of the year during which the authority should be granted.

### SEC. 1635. TASKING AND OVERSIGHT AUTHORITY WITH RESPECT TO INTERCONTINENTAL BALLISTIC MISSILE SITE ACTIVATION TASK FORCE FOR SENTINEL PROGRAM.

Section 1638 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2941), as amended by section 1634, is further amended by—

(1) redesignating subsection (e) as subsection (f); and

(2) inserting after subsection (d), the following new subsection (e):

137 STAT. 594          PUBLIC LAW 118–31—DEC. 22, 2023

Deadlines.

"(e) DELEGATION OF AUTHORITY.—The Secretary of Defense shall—

"(1) not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, delegate to the Commander of the Air Force Global Strike Command such tasking and oversight authorities as the Secretary considers necessary with respect to other components of the Department of Defense participating in the Task Force; and

Notification.

"(2) not later than 30 days after the date of such delegation of authority, notify the congressional defense committees of the delegation.".

### SEC. 1636. STUDY OF WEAPONS PROGRAMS THAT ALLOW ARMED FORCES TO ADDRESS HARD AND DEEPLY BURIED TARGETS.

136 Stat. 2964.

Section 1674 of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended—

(1) in subsection (e), by inserting "or fiscal year 2024" after "2023"; and

(2) by adding at the end the following new subsection:

"(g) AUTHORIZATION.—For fiscal year 2024, the Secretary of Energy may carry out activities related to the development and modification of a nuclear weapon to provide near-term capabilities that address portions of the strategy required by subsection (b)(3) using amounts authorized and appropriated for the sustainment of the B83-1 nuclear gravity bomb.".

### SEC. 1637. REPEAL OF REQUIREMENT FOR REVIEW OF NUCLEAR DETERRENCE POSTURES.

Section 1753 of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92; 133 Stat. 1852) is repealed.

### SEC. 1638. RETENTION OF CAPABILITY TO REDEPLOY MULTIPLE INDEPENDENTLY TARGETABLE REENTRY VEHICLES.

Section 1057 of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66; 10 U.S.C. 495 note) is amended by inserting "and Sentinel" after "Minuteman III" both places it appears.

10 USC note prec. 9531.

### SEC. 1639. AUTHORIZATION TO ESTABLISH TECHNOLOGY TRANSITION PROGRAM FOR STRATEGIC NUCLEAR DETERRENCE.

(a) IN GENERAL.—The Commander of Air Force Global Strike Command may, through the use of a partnership intermediary, establish a program—

(1) to carry out technology transition, digital engineering projects, and other innovation activities supporting the Air Force nuclear enterprise; and

(2) to identify capabilities for the Air Force nuclear enterprise that have the potential to generate life-cycle cost savings and provide data-driven approaches to resource allocation.

(b) TERMINATION.—The program established under subsection (a) shall terminate on September 30, 2029.

(c) PARTNERSHIP INTERMEDIARY DEFINED.—In this section, term "partnership intermediary" has the meaning given that term in section 23(c) of the Stevenson-Wydler Technology Innovation Act of 1980 (15 U.S.C. 3715(c)).

### SEC. 1640. MATTERS RELATING TO THE NUCLEAR-ARMED, SEA-LAUNCHED CRUISE MISSILE.

(a) PROGRAM TREATMENT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, acting through the Under Secretary of Defense for Acquisition and Sustainment, shall—

(1) establish a program for the development of a nuclear-armed, sea-launched cruise missile capability;

(2) designate such program as a major defense acquisition program (as defined in section 4201 of title 10, United States Code) for which the milestone decision authority (as defined in section 4251 of such title) is the Under Secretary of Defense for Acquisition and Sustainment;

(3) initiate a nuclear weapon project for the W80–4 ALT warhead, at phase 6.2 of the phase 6.X process (relating to feasibility study and down select), to adapt such warhead for use with the capability described in paragraph (1);

(4) submit to the National Nuclear Security Administration a formal request, through the Nuclear Weapons Council, requesting that the Administration participate in and support the W80–4 ALT warhead project described in paragraph (3); and

*Formal request.*

(5) designate the Department of the Navy as the military department to lead the W80–4 ALT nuclear weapon project for the Department of Defense.

*Designation.*

(b) INITIAL OPERATIONAL CAPABILITY.—The Secretary of Defense and the Administrator for Nuclear Security shall take such actions as are necessary to ensure the program and project described subsection (a) achieve initial operational capability, as defined jointly by the Secretary of the Navy and the Commander of the United States Strategic Command, by not later than September 30, 2034.

*Deadline.*

(c) LIMITATION ON AUTHORITY TO APPROVE PRODUCTION.—The Under Secretary of Defense for Acquisition and Sustainment may not approve a Full Rate Production Decision or authorize Full Scale Production (as those terms are defined in the memorandum of the Nuclear Weapons Council titled "Procedural Guidelines for the Phase 6.X Process" and dated April 19, 2000) for the W80–4 ALT project until authorized by Congress.

(d) BRIEFING.—

(1) IN GENERAL.—Not later than January 15, 2024, and not later than each March 1 and September 1 thereafter, the Under Secretary of Defense for Acquisition and Sustainment, the Secretary of the Navy, the Administrator for Nuclear Security, and the Commander of the United States Strategic Command shall jointly provide to the congressional defense committees a briefing on the progress of the program and project described in subsection (a).

*Deadlines.*

(2) CONTENTS.—Each briefing required under paragraph (1) shall include—

(A) a description of significant achievements of the program and project completed during the period specified in paragraph (3) and any planned objectives that were not achieved during such period;

(B) for the 180-day period following the briefing—

*Time period.*

(i) planned objectives for the program and project; and

137 STAT. 596          PUBLIC LAW 118–31—DEC. 22, 2023

(ii) anticipated spending plans for the program and project;

(C) a description of any notable technical hurdles that could impede timely completion of the program and project; and

(D) any other information the Under Secretary of Defense for Acquisition and Sustainment considers appropriate.

(3) PERIOD SPECIFIED.—The period specified in this paragraph is—

(A) in the case of the first briefing required by paragraph (1), the 180-day period preceding the briefing; and

(B) in the case of any subsequent such briefing, the period since the previous such briefing.

(4) TERMINATION.—The requirement to provide briefings under paragraph (1) shall terminate on the date that the program and project described subsection (a) achieve initial operational capability, as defined jointly by the Secretary of the Navy and the Commander of the United States Strategic Command.

(e) ASSESSMENT AND REPORT.—

Determination.

(1) IN GENERAL.—The Secretary of the Navy shall complete an assessment, in response to the courses of action developed by the Joint Staff in response to the report of the Secretary of Defense under subsection 1642(a) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2945), of the actions required to effectively deploy a nuclear sea-launched cruise missile from a Virginia class submarine and such other platforms as the Secretary determines appropriate.

(2) ELEMENTS.—The assessment under paragraph (1) shall address the following:

(A) Any hardware, software, manning, or certification modifications to platforms that are required to accommodate the nuclear sea-launched cruise missile on such platforms.

(B) Any required modifications to port facilities that would host platforms carrying the nuclear sea-launched cruise missile, including any modifications relating to physical security and monitoring.

(C) Effects on manning associated with the handling, storage, and operations of nuclear sea-launched cruise missiles at affected facilities of the Navy.

(D) Funding and schedule estimates to complete any actions identified under subparagraphs (A) through (C).

(3) REPORT REQUIRED.—Not later than 180 days after the date of the enactment of this Act, the Secretary of the Navy shall submit to the congressional defense committees a report on the results of the assessment conducted under paragraph (1), including the results of the assessment with respect to each element specified in paragraph (2).

(f) LIMITATION ON AVAILABILITY OF FUNDS PENDING SUBMITTAL OF REPORT.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of the Navy, and available for the Office of the Secretary of the Navy for the travel of persons, not more than 90 percent may be obligated or expended until the date on which the final

report required under section 1642(b)(2) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2945) has been submitted to the congressional defense committees.

(g) PHASE 6.X PROCESS DEFINED.—In this section, the term "phase 6.X process" means the phase 6.X process for major stockpile sustainment activities set forth in the memorandum of the Nuclear Weapons Council titled "Procedural Guidelines for the Phase 6.X Process" and dated April 19, 2000.

**SEC. 1641. REQUIREMENTS RELATING TO OPERATIONAL SILOS FOR THE SENTINEL INTERCONTINENTAL BALLISTIC MISSILE.**

State listing.

The Secretary of the Air Force shall refurbish and make operable not fewer than 150 silos for the LGM–35A Sentinel intercontinental ballistic missile at each of the following locations:

(1) Francis E. Warren Air Force Base, Laramie County, Wyoming.

(2) Malmstrom Air Force Base, Cascade County, Montana.

(3) Minot Air Force Base, Ward County, North Dakota.

**SEC. 1642. LONG-TERM SUSTAINMENT OF SENTINEL ICBM GUIDANCE SYSTEM.**

(a) IN GENERAL.—Prior to issuing a Milestone C decision for the program to develop the LGM–35A Sentinel intercontinental ballistic missile system (referred to in this section as the "Sentinel"), the Under Secretary of Defense for Acquisition and Sustainment shall certify to the congressional defense committees that there is a long-term capability in place to maintain and modernize the guidance system of the Sentinel over the full life cycle of the Sentinel.

Certification.

(b) CERTIFICATION ELEMENTS.—The certification described in subsection (a) shall include a list of capabilities to maintain and advance—

(1) accelerometers;

(2) gyroscopes;

(3) guidance computers;

(4) specialized mechanical and retaining assemblies;

(5) test equipment; and

(6) such other components to ensure the guidance system will be maintained and modernized over the life of the Sentinel.

**SEC. 1643. INTEGRATED MASTER SCHEDULE FOR THE SENTINEL MISSILE PROGRAM OF THE AIR FORCE.**

Deadlines.

(a) DOCUMENTATION REQUIRED.—Not later than 30 days after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment, acting through the Assistant Secretary of the Air Force for Acquisition, Technology, and Logistics, shall submit to the congressional defense committees an approved integrated master schedule for the Sentinel missile program of the Air Force.

(b) ADDITIONAL REQUIREMENTS.—The Under Secretary of Defense for Acquisition and Sustainment shall ensure that the integrated master schedule submitted under subsection (a)—

(1) is consistent with the scheduling best practices set forth in the publication of the Government Accountability Office titled "Schedule Assessment Guide: Best Practices for Project Schedules" (GAO–16–89G), dated December 2015 (or any successor to such guide);

(2) addresses the full scope of work required under the sentinel missile program; and

(3) fully integrates contractor and government activities.

Termination date.

(c) MONTHLY BRIEFINGS.—Not later than 180 days after the date of the enactment of this Act, and on a monthly basis thereafter until January 1, 2029, the Secretary of the Air Force shall provide to the congressional defense committees a briefing on the progress of the Sentinel missile program, which shall include an update on the progress of all subsystems and elements associated with achieving full operational capability of the weapons system.

(d) NOTIFICATION.—Not later than 30 days after the Secretary of the Air Force becomes aware of an event that is expected to delay, by more than one fiscal quarter, the date on which Sentinel missile achieves initial operational capability (as set forth in the integrated master schedule submitted under subsection (a)), the Secretary shall—

(1) submit notice of such delay to the congressional defense committees; and

(2) include with such notice—

(A) an explanation of the factors causing such delay; and

Plan.

(B) a plan to prevent or minimize the duration of such delay.

## SEC. 1644. OPERATIONAL TIMELINE FOR STRATEGIC AUTOMATED COMMAND AND CONTROL SYSTEM.

Deadline.

(a) IN GENERAL.—The Secretary of the Air Force shall develop a replacement of the Strategic Automated Command and Control System (SACCS) by not later than the date on which the LGM–35A Sentinel intercontinental ballistic missile program reaches initial operational capability.

(b) REPLACEMENT CAPABILITIES.—The replacement required by subsection (a) shall—

(1) replace the SACCS base processors;

(2) replace the SACCS processors at launch control centers;

(3) provide internet protocol connectivity for wing-wide command centers of the LGM–35A Sentinel intercontinental ballistic missile program; and

(4) include such other capabilities necessary to address the evolving requirements of the LGM–35A Sentinel intercontinental ballistic missile program as the Secretary considers appropriate.

10 USC note prec. 4421.

## SEC. 1645. PILOT PROGRAM ON DEVELOPMENT OF REENTRY VEHICLES AND RELATED SYSTEMS.

Assessment.

(a) IN GENERAL.—The Secretary of the Air Force may carry out a pilot program, to be known as the "Reentry Vehicle Flight Test Bed Program", to assess the feasibility of providing regular flight test opportunities that support the development of reentry vehicles to—

(1) facilitate technology upgrades tested in a realistic flight environment;

(2) provide an enduring, high-cadence test bed to mature technologies for planned reentry vehicles; and

(3) transition technologies developed under other programs and projects relating to long-range ballistic or hypersonic strike missiles from the research and development or prototyping phases into operational use.

(b) GRANTS, CONTRACTS, AND OTHER AGREEMENTS.—

(1) AUTHORITY.—In carrying out a pilot program under this section, the Secretary may, subject to paragraph (2), award grants and enter into contracts or other agreements with appropriate entities for the conduct of relevant flight tests of reentry vehicles and systems.

(2) GRANT AND CONTRACT REQUIREMENTS.—

(A) MERIT-BASED GRANTS.—Any grant under paragraph (1) shall be awarded through merit-based selection procedures.

(B) COMPETITIVE CONTRACT PROCEDURES.—Any contract or other agreement under paragraph (1) shall be awarded using competitive procedures (as defined in section 3012 of title 10, United States Code).

(3) USE OF FUNDS.—An entity that receives a grant, or enters into a contract or other agreement, as part of a pilot program carried out under this section shall use the grant, or any amount received under the contract or other agreement, to carry out one or more of the following activities:

(A) Conducting flight tests to develop or validate—

(i) aeroshell design;

(ii) thermal protective systems;

(iii) guidance and control systems;

(iv) sensors;

(v) communications;

(vi) environmental sensors; or

(vii) other relevant technologies.

(B) Expanding flight test opportunities through low-cost, high-cadence platforms.

(c) COORDINATION.—If the Secretary of the Air Force carries out a pilot program under this section, the Secretary shall ensure that the activities under the pilot program are carried out in coordination with the Secretary of Defense and the Secretary of the Navy.

(d) TERMINATION.—The authority to carry out a pilot program under this section shall terminate on December 31, 2029.

**SEC. 1646. PROHIBITION ON REDUCTION OF THE INTERCONTINENTAL BALLISTIC MISSILES OF THE UNITED STATES.**

(a) PROHIBITION.—Except as provided in subsection (b), none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of Defense may be obligated or expended for the following, and the Department may not otherwise take any action to do the following:

(1) Reduce, or prepare to reduce, the responsiveness or alert level of the intercontinental ballistic missiles of the United States.

(2) Reduce, or prepare to reduce, the quantity of deployed intercontinental ballistic missiles of the United States to a number less than 400.

(b) EXCEPTION.—The prohibition in subsection (a) shall not apply to any of the following activities:

(1) The maintenance or sustainment of intercontinental ballistic missiles.

(2) Ensuring the safety, security, or reliability of intercontinental ballistic missiles.

137 STAT. 600          PUBLIC LAW 118–31—DEC. 22, 2023

(3) Facilitating the transition from the Minuteman III intercontinental ballistic missile to the Sentinel intercontinental ballistic missile (previously referred to as the "ground-based strategic deterrent weapon").

Notification.

**SEC. 1647. LIMITATION ON AVAILABILITY OF FUNDS PENDING COMPLIANCE WITH INFORMATION REQUESTS FROM THE GOVERNMENT ACCOUNTABILITY OFFICE.**

Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for Operation and Maintenance, Defense-wide, and available for the Office of the Under Secretary of Defense for Policy, not more than 35 percent may be obligated or expended until the date on which the Comptroller General of the United States notifies the congressional defense committees that the Secretary of Defense has fully complied with information requests from the Government Accountability Office made in connection with the conduct of the study required by section 1652 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 2100).

10 USC 495 note.

**SEC. 1648. CONGRESSIONAL NOTIFICATION OF DECISION TO DELAY STRATEGIC DELIVERY SYSTEM TEST EVENT.**

Deadline.

(a) NOTIFICATION.—Not later than five days after the Secretary of Defense makes a decision to delay a scheduled test event for a strategic delivery system, the Secretary shall submit to the congressional defense committees written notice of such decision.

(b) REPORT.—

(1) IN GENERAL.—Except as provided in paragraph (3), not later than 60 days after the submission of a notification required under subsection (a) with respect to a decision to delay a scheduled test event, the Secretary shall submit to the congressional defense committees a report on the decision.

(2) ELEMENTS REQUIRED.—A report submitted under paragraph (1) shall include each of the following with respect to the scheduled test event covered by the report:

(A) A description of the objectives of the test.

(B) An explanation for the decision to cancel the test.

Expenditure estimate.

(C) An estimate of expenditures related to the cancelled test.

Assessment.

(D) An assessment of the effect of the test cancellation on—

(i) confidence in the reliability of the strategic nuclear weapons delivery system involved; and

(ii) any research, development, test, and evaluation activities related to the test.

Plan.

(E) A plan to reschedule the test event.

(3) EXCEPTION.—A report shall not be required under paragraph (1) in the case of a decision to delay a scheduled test event due to any of the following circumstances:

(A) Unfavorable weather conditions.

(B) Safety concerns.

(C) Technical issues related to the delivery system or test facility.

(D) Operational or security concerns at the test facility or on the test range.

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 601

### SEC. 1649. CONGRESSIONAL NOTIFICATION OF NUCLEAR COOPERATION BETWEEN RUSSIA AND CHINA.

10 USC 491 note.

If the Commander of the United States Strategic Command determines, after consultation with the Director of the Defense Intelligence Agency, that militarily significant cooperation between the Russian Federation and the People's Republic of China related to nuclear or strategic capabilities is likely to occur or has likely occurred, the Commander shall submit to the congressional defense committees a notification of such determination that includes—

Determination.

(1) a description of the military significant cooperation; and

(2) an assessment of the implication of such cooperation for the United States with respect to nuclear deterrence, extended deterrence, assurance, and defense.

Assessment.

### SEC. 1650. PLAN FOR DECREASING THE TIME TO UPLOAD ADDITIONAL WARHEADS TO THE INTERCONTINENTAL BALLISTIC MISSILE FLEET.

(a) IN GENERAL.—The Secretary of the Air Force, in coordination with the Commander of the United States Strategic Command and the Assistant Secretary of Defense for Space Policy, shall develop a plan to decrease the amount of time required to upload additional warheads to the intercontinental ballistic missile force in the event Presidential direction is given to exercise such a plan.

(b) ELEMENTS.—The plan required by subsection (a) shall include the following:

(1) An assessment of the storage capacity of weapons storage areas and any weapons generation facilities at covered bases, including the capacity of each covered base to store additional warheads.

Assessment.

(2) An assessment of the current nuclear warhead transportation capacity and workforce of the National Nuclear Security Administration and associated timelines for transporting additional nuclear warheads to covered bases.

Assessment.
Timelines.

(3) An evaluation of the capacity and limitations of the maintenance squadrons and security forces at covered bases and the associated timelines for adding warheads to the intercontinental ballistic missile force.

Evaluation.
Timelines.

(4) An identification of actions that would address any identified limitations to upload additional warheads.

(5) An evaluation of courses of actions to upload additional warheads to a portion of the intercontinental ballistic missile force.

Evaluation.

(6) An assessment of the feasibility and advisability of initiating immediate deployment of W78 warheads to a single wing of the intercontinental ballistic missile force as a hedge against delay of the LGM–35A Sentinel intercontinental ballistic missile.

Assessment.

(7) Any policy considerations that would need to be addressed, including any guidance and direction that would required, to execute the plan.

(8) An identification of all funding required to carry out actions identified in paragraphs (4) and (5).

(c) SUBMISSION TO CONGRESS.—Not later than 90 days after the date of the enactment of this Act, the Secretary of the Air Force and the Commander of the United States Strategic Command

Deadline.

137 STAT. 602          PUBLIC LAW 118–31—DEC. 22, 2023

shall submit to the congressional defense committees the plan required by subsection (a).

(d) FORM.—The plan required by subsection (a) shall be submitted in unclassified form, but may include a classified annex.

Deadline.

(e) BRIEFING.—Not later than 30 days after the submission of the plan required by subsection (a), the Secretary of the Air Force, the Commander of the United States Strategic Command, and the Assistant Secretary of Defense for Space Policy shall provide for the congressional defense committees a briefing on the actions being pursued to implement the plan.

State listing.

(f) COVERED BASE DEFINED.—The term "covered base" means the following:

(1) Francis E. Warren Air Force Base, Laramie County, Wyoming.

(2) Malmstrom Air Force Base, Cascade County, Montana.

(3) Minot Air Force Base, Ward County, North Dakota.

# Subtitle D—Missile Defense Programs

### SEC. 1661. DEPUTY DIRECTOR OF OFFICE OF MISSILE DEFENSE AGENCY.

Section 205 of title 10, United States Code, is amended—

(1) in subsection (a), by inserting "a general or flag officer" after "shall be"; and

(2) by redesignating subsection (b) as subsection (c); and

(3) by inserting after subsection (a) the following new subsection:

Appointment.

"(b) DEPUTY DIRECTOR.—(1) There is a Deputy Director of the Missile Defense Agency, who shall be appointed by the Secretary of Defense from among the general officers on active duty in the Army, Air Force, Marine Corps, or Space Force, or from among the flag officers on active duty in the Navy. In selecting an individual to serve as the Deputy Director, the Secretary of Defense shall select an individual who serves in a different armed force than the armed force in which the Director serves.

Time period.

"(2) The Deputy Director shall be appointed for a term of not fewer than two, and not more than four years.

"(3) The Deputy Director shall be under the authority, direction, and control of the Director of the Missile Defense Agency.

"(4) The Deputy Director shall—

"(A) carry out such responsibilities as may be assigned by the Director; and

"(B) serve as acting director during periods of absence by the Director, or at such times as the office of the Director is vacant.".

### SEC. 1662. MODIFICATION OF PROGRAM ACCOUNTABILITY MATRICES REQUIREMENTS FOR NEXT GENERATION INTERCEPTORS FOR MISSILE DEFENSE.

Section 1668(f) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 2107) is amended—

(1) by inserting "and the product development phase" after "technology development phase" each place it appears; and

(2) in paragraph (7), by striking "enter the product development phase" and inserting "enter the production phase".

### SEC. 1663. NATIONAL MISSILE DEFENSE POLICY.

Subsection (a) of section 1681 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 4205 note) is amended to read as follows:

"(a) POLICY.—It is the policy of the United States—

"(1) to research, develop, test, procure, deploy, and sustain, with funding subject to the annual authorization of appropriations for National Missile Defense, systems that provide effective, layered missile defense capabilities to defeat increasingly complex missile threats in all phases of flight; and

"(2) to rely on nuclear deterrence to address more sophisticated and larger quantity near-peer intercontinental missile threats to the homeland of the United States.".

### SEC. 1664. MODIFICATION OF REQUIREMENT FOR COMPTROLLER GENERAL TO REVIEW AND ASSESS MISSILE DEFENSE ACQUISITION PROGRAMS.

Section 232(a) of the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112–81; 125 Stat. 1339) is amended—

(1) in paragraph (1), by striking "through 2025" and inserting "through 2030";

(2) in paragraph (2), by striking "through 2026" and inserting "through 2031"; and

(3) in paragraph (3)—

(A) in the paragraph heading, by striking "EMERGING" and inserting "OTHER DEPARTMENT OF DEFENSE MISSILE DEFENSE ACQUISITION EFFORTS AND RELATED";

(B) by striking "emerging issues and" and inserting "emerging issues, any Department of Defense missile defense acquisition efforts, and any other related issue and"; and

(C) by inserting "on a mutually agreed upon date" before the period at the end.

### SEC. 1665. IRON DOME SHORT-RANGE ROCKET DEFENSE SYSTEM AND ISRAELI COOPERATIVE MISSILE DEFENSE PROGRAM CO-DEVELOPMENT AND CO-PRODUCTION.

(a) IRON DOME SHORT-RANGE ROCKET DEFENSE SYSTEM.—

(1) AVAILABILITY OF FUNDS.—Of the funds authorized to be appropriated by this Act for fiscal year 2024 for procurement, Defense-wide, and available for the Missile Defense Agency, not more than $80,000,000 may be provided to the Government of Israel to procure components for the Iron Dome short-range rocket defense system through co-production of such components in the United States by industry of the United States.

(2) CONDITIONS.—

(A) AGREEMENT.—Funds described in paragraph (1) for the Iron Dome short-range rocket defense program shall be available subject to the terms and conditions in the Agreement Between the Department of Defense of the United States of America and the Ministry of Defense of the State of Israel Concerning Iron Dome Defense System Procurement, signed on March 5, 2014, as amended to include co-production for Tamir interceptors.

(B) CERTIFICATION.—Not later than 30 days prior to the initial obligation of funds described in paragraph (1), the Under Secretary of Defense for Acquisition and

Deadline.

137 STAT. 604        PUBLIC LAW 118–31—DEC. 22, 2023

Risk assessment.

Sustainment shall submit to the appropriate congressional committees—

(i) a certification that the amended bilateral international agreement specified in subparagraph (A) is being implemented as provided in such agreement;

(ii) an assessment detailing any risks relating to the implementation of such agreement; and

(iii) for system improvements resulting in modified Iron Dome components and Tamir interceptor subcomponents, a certification that the Government of Israel has demonstrated successful completion of Production Readiness Reviews, including the validation of production lines, the verification of component conformance, and the verification of performance to specification as defined in the Iron Dome Defense System Procurement Agreement, as further amended.

(b) ISRAELI COOPERATIVE MISSILE DEFENSE PROGRAM, DAVID'S SLING WEAPON SYSTEM CO-PRODUCTION.—

(1) IN GENERAL.—Subject to paragraph (3), of the funds authorized to be appropriated for fiscal year 2024 for procurement, Defense-wide, and available for the Missile Defense Agency, not more than $40,000,000 may be provided to the Government of Israel to procure the David's Sling Weapon System, including for co-production of parts and components in the United States by United States industry.

(2) AGREEMENT.—Provision of funds specified in paragraph (1) shall be subject to the terms and conditions in the bilateral co-production agreement, including—

(A) a one-for-one cash match is made by Israel or in another matching amount that otherwise meets best efforts (as mutually agreed to by the United States and Israel); and

(B) co-production of parts, components, and all-up rounds (if appropriate) in the United States by United States industry for the David's Sling Weapon System is not less than 50 percent.

(3) CERTIFICATION AND ASSESSMENT.—The Under Secretary of Defense for Acquisition and Sustainment shall submit to the appropriate congressional committees—

(A) a certification that the Government of Israel has demonstrated the successful completion of the knowledge points, technical milestones, and Production Readiness Reviews required by the research, development, and technology agreement and the bilateral co-production agreement for the David's Sling Weapon System; and

(B) an assessment detailing any risks relating to the implementation of such agreement.

(c) ISRAELI COOPERATIVE MISSILE DEFENSE PROGRAM, ARROW 3 UPPER TIER INTERCEPTOR PROGRAM CO-PRODUCTION.—

(1) IN GENERAL.—Subject to paragraph (2), of the funds authorized to be appropriated for fiscal year 2024 for procurement, Defense-wide, and available for the Missile Defense Agency, not more than $80,000,000 may be provided to the Government of Israel for the Arrow 3 Upper Tier Interceptor Program, including for co-production of parts and components in the United States by United States industry.

(2) CERTIFICATION.—The Under Secretary of Defense for Acquisition and Sustainment shall submit to the appropriate congressional committees a certification that—

(A) the Government of Israel has demonstrated the successful completion of the knowledge points, technical milestones, and Production Readiness Reviews required by the research, development, and technology agreement for the Arrow 3 Upper Tier Interceptor Program;

(B) funds specified in paragraph (1) will be provided on the basis of a one-for-one cash match made by Israel or in another matching amount that otherwise meets best efforts (as mutually agreed to by the United States and Israel);

(C) the United States has entered into a bilateral international agreement with Israel that establishes, with respect to the use of such funds—

(i) in accordance with subparagraph (D), the terms of co-production of parts and components on the basis of the greatest practicable co-production of parts, components, and all-up rounds (if appropriate) by United States industry and minimizes nonrecurring engineering and facilitization expenses to the costs needed for co-production;

(ii) complete transparency on the requirement of Israel for the number of interceptors and batteries that will be procured, including with respect to the procurement plans, acquisition strategy, and funding profiles of Israel;

(iii) technical milestones for co-production of parts and components and procurement;

(iv) a joint affordability working group to consider cost reduction initiatives; and

(v) joint approval processes for third-party sales; and

(D) the level of co-production described in subparagraph (C)(i) for the Arrow 3 Upper Tier Interceptor Program is not less than 50 percent.

(d) NUMBER.—In carrying out paragraph (2) of subsection (b) and paragraph (2) of subsection (c), the Under Secretary may submit—

Certifications.

(1) one certification covering both the David's Sling Weapon System and the Arrow 3 Upper Tier Interceptor Program; or

(2) separate certifications for each respective system.

(e) TIMING.—The Under Secretary shall submit to the congressional defense committees the certification and assessment under subsection (b)(3) and the certification under subsection (c)(2) no later than 30 days before the funds specified in paragraph (1) of subsections (b) and (c) for the respective system covered by the certification are provided to the Government of Israel.

Deadline.

(f) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means the following:

(1) The congressional defense committees.

(2) The Committee on Foreign Relations of the Senate.

(3) The Committee on Foreign Affairs of the House of Representatives.

Deadlines.

**SEC. 1666. PROGRAMS TO ACHIEVE INITIAL AND FULL OPERATIONAL CAPABILITIES FOR THE GLIDE PHASE INTERCEPTOR PROGRAM.**

(a) PROGRAM TO ACHIEVE INITIAL OPERATIONAL CAPABILITY.—

(1) IN GENERAL.—The Secretary of Defense, acting through the Director of the Missile Defense Agency and in coordination with the officials specified in subsection (d), shall carry out a program to achieve, by not later than December 31, 2029, an initial operational capability for the Glide Phase Interceptor as described in paragraph (2).

(2) REQUIRED CAPABILITIES.—For purposes of paragraph (1), the Glide Phase Interceptor program shall be considered to have achieved initial operational capability if—

(A) the Glide Phase Interceptor is capable of defeating, in the glide phase, any endo-atmospheric hypersonic vehicles that are known to the Department of Defense and fielded as of the date of the enactment of this Act; and

(B) not fewer than 12 Glide Phase Interceptor missiles have been fielded.

(b) PROGRAM TO ACHIEVE FULL OPERATIONAL CAPABILITY.—

(1) PROGRAM REQUIRED.—The Secretary of Defense, acting through the Director of the Missile Defense Agency and in coordination with the officials specified in subsection (d), shall carry out a program to achieve, by not later than December 31, 2032, full operational capability for the Glide Phase Interceptor as described in paragraph (2).

(2) REQUIRED CAPABILITIES.—For purposes of paragraph (1), the Glide Phase Interceptor program shall be considered to have achieved full operational capability if—

(A) the Glide Phase Interceptor is capable of defeating, in the glide phase, any endo-atmospheric hypersonic vehicles—

(i) that are known to the Department of Defense and fielded as of the date of the enactment of this Act; and

(ii) that the Department of Defense expects to be fielded before the end of 2040;

(B) not fewer than 24 Glide Phase Interceptor missiles have been fielded; and

(C) the Glide Phase Interceptor has the ability to be operated collaboratively with space-based or terrestrial sensors that the Department of Defense expects to be deployed before the end of 2032.

(c) COOPERATIVE AGREEMENT AUTHORIZED.—The Director of the Missile Defense Agency is authorized to enter into a cooperative development agreement with one or more international partners of the United States for the development of the full operational capability described in subsection (b).

(d) OFFICIALS SPECIFIED.—The officials specified in this subsection are the following:

(1) The Under Secretary of Defense for Research and Engineering.

(2) The Secretary of the Navy.

(3) The Commander of the United States Indo-Pacific Command.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 607

(4) The Commander of the United States European Command.

**SEC. 1667. RESCISSION OF MEMORANDUM ON MISSILE DEFENSE GOVERNANCE.**

Deadline.
10 USC 205 note.

Not later than May 31, 2024, the Secretary of Defense shall—
(1) rescind Directive-type Memorandum 20-002 relating to "Missile Defense System Policies and Governance"; and
(2) in accordance with section 205(b) of title 10, United States Code, replace such memorandum with governance documents, policies, and procedures, that balance—
(A) providing the Missile Defense Agency with greater flexibility and agility, particularly with regards to milestone a (or equivalent) acquisition decisions to rapidly meet warfighter needs; and
(B) the need for continued oversight to ensure integration into joint-force air and missile defense capabilities.

**SEC. 1668. LIMITATION ON AVAILABILITY OF FUNDS FOR OFFICE OF COST ASSESSMENT AND PROGRAM EVALUATION UNTIL SUBMISSION OF REPORT ON MISSILE DEFENSE ROLES AND RESPONSIBILITIES.**

Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for operation and maintenance, Defense-wide, for the Office of Cost Assessment and program evaluation, not more than 50 percent may be obligated or expended until the date on which the Secretary of Defense submits to the congressional defense committees the report required by section 1675(b) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81).

**SEC. 1669. STRATEGY FOR INTEGRATED AIR AND MISSILE DEFENSE OF HAWAII AND THE INDO-PACIFIC REGION.**

(a) STRATEGY.—
(1) IN GENERAL.—The Commander of United States Indo-Pacific Command, in coordination with the Under Secretary of Defense for Acquisition and Sustainment, the Under Secretary of Defense for Policy, the Commander of United States Northern Command, the Director of the Missile Defense Agency, and the Director of the Joint Integrated Air and Missile Defense Organization, shall develop a comprehensive strategy for developing, acquiring, and operationally establishing an integrated air and missile defense architecture for area of responsibility of the United States Indo-Pacific Command.
(2) STRATEGY COMPONENTS.—At a minimum, the strategy required by paragraph (1) shall address each of the following:
(A) The sensing, tracking, and intercepting capabilities required to address the full range of credible missile threats to—
(i) the Hawaiian Islands;
(ii) the island of Guam and other islands in the greater Marianas region, as determined necessary by the Commander of United States Indo-Pacific Command;

Guam.
Determination.

(iii) other territories of the United States located within the area of responsibility of the United States Indo-Pacific Command; and

137 STAT. 608          PUBLIC LAW 118–31—DEC. 22, 2023

(iv) United States Armed Forces deployed within the territories of other countries located within such area of responsibility.

(B) The appropriate balance of missile detection, tracking, defense, and defeat capabilities in such area of responsibility.

(C) A command and control network for integrating missile detection, tracking, defense, and defeat capabilities across such area of responsibility.

(D) A time-phased scheduling construct for fielding the constituent systems that will comprise the integrated air and missile defense architecture for such area of responsibility.

(b) REPORTING REQUIREMENTS.—

(1) REPORT ON INITIAL FINDINGS.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report on the findings of the analysis conducted by Cost Assessment and Program Evaluation of the current integrated air and missile defense sensor architecture that informed the submission of the budget of the President (as submitted to Congress pursuant to section 1105(a) of title 31, United States Code) for fiscal year 2024, and specific programs of record that can support additional sensor coverage for the State of Hawaii. Such report shall include an identification of—

(A) the investments that should be made to increase the detection of nonballistic threats and improve the discrimination of ballistic missile threats, particularly with regards to Hawaii; and

(B) investments that should be made to integrate any sensors into the missile defense system to assist with protection of Hawaii.

(2) ANNUAL REPORT.—

(A) IN GENERAL.—Not later than April 15, 2024, and annually thereafter, the Commander of United States Indo-Pacific Command, in coordination with the Under Secretary of Defense for Acquisition and Sustainment, the Under Secretary of Defense for Policy, the Commander of United States Northern Command, the Director of the Missile Defense Agency, and the Director of the Joint Integrated Air and Missile Defense Organization, shall submit to the congressional defense committees an annual report on the status of the strategy required under subsection (a).

Time periods.

(B) REPORT CRITERIA.—At a minimum, each annual report under subparagraph (A) shall address—

(i) the activities conducted and progress made in developing and implementing the strategy over the calendar year preceding the calendar year during which the report is submitted;

(ii) the planned activities for developing and implementing the strategy in the calendar year following the calendar year during which the report is submitted; and

(iii) a description of likely risks and impediments to the successful implementation of the strategy.

(C) TERMINATION.—The requirement to submit a report under this paragraph shall terminate on the earlier of the following dates:

(i) March 15, 2029.

(ii) The date on which a comprehensive integrated air and missile defense architecture for the area of responsibility of United States Indo-Pacific Command has achieved initial operational capability, as determined jointly by the Commander of United States Indo-Pacific Command and the Director of the Missile Defense Agency.

<div style="float:right">Determination.</div>

(3) LIMITATION.—Of the funds authorized to be appropriated by this Act for fiscal year 2024 for Operation and Maintenance, Defense-wide, and available for the Office of the Under Secretary of Defense for Policy, not more than 90 percent may be obligated or expended until the date on which both of the following reports are submitted to the congressional defense committees:

(A) The report on initial findings required by paragraph (1).

(B) The first annual report required by paragraph (2)(A).

### SEC. 1670. REPORT ON POTENTIAL ENHANCEMENTS TO INTEGRATED AIR AND MISSILE DEFENSE CAPABILITIES IN EUROPE.

(a) IN GENERAL.—Not later than 240 days after the date of the enactment of this Act, the Secretary of Defense, in consultation with the officials specified in subsection (c), shall submit to the congressional defense committees a report on potential enhancements to U.S. and allied air and missile defense capabilities that could contribute to the integrated air and missile defense capability of the North Atlantic Treaty Organization (NATO).

(b) ELEMENTS.—The report required by subsection (a) shall include—

(1) identification of potential enhancements to U.S. and allied air and missile defense capabilities as described in such subsection taking into account a 360-degree approach tailored to address threats to NATO member nations emanating from all strategic directions;

(2) a description of—

(A) the efforts of NATO to increase its integrated air and missile defense capability, taking into account, as applicable—

(i) NATO's Deterrence and Defense of the Euro-Atlantic Area Family of Plans;

(ii) NATO's Defense Planning Process; and

(iii) other activities of NATO relating to such capability; and

(B) any challenges to such efforts;

(3) an assessment of the operational, political, and technical feasibility and advisability of developing, fielding, modifying, integrating, or otherwise employing current and future U.S. and allied air and missile defense capabilities to further improve the ability of the integrated air and missile defense capability of NATO to protect against any type of air or missile threat or attack (such as threats and attacks from cruise, ballistic, and hypersonic missiles), including—

137 STAT. 610          PUBLIC LAW 118–31—DEC. 22, 2023

(A) sensors to detect, track, discriminate, and support the engagement of multi-axial air and missile threats;

(B) defensive interceptor systems;

(C) passive defense options; and

(D) command and control elements;

Costs.

(4) a funding profile, by year, detailing the complete costs to the United States associated with the options assessed under paragraph (3); and

(5) such other information as the Secretary of Defense considers appropriate.

(c) CONSULTATION.—In preparing the report required by subsection (a), the Secretary of Defense shall seek advice and input from—

(1) the Secretary of State;

(2) Chairman of the Joint Chiefs of Staff;

(3) the Commander of the United States European Command; and

(4) the Director of the Missile Defense Agency.

(d) FORM OF REPORT.—The report required by section (a) shall be submitted in unclassified form, but may include a classified annex.

(e) DEFINITION.—In this section, the term "U.S. and allied air and missile defense capabilities" means air and missile defense capabilities of—

(1) the United States; and

(2) nations that are allies or partners of the United States.

## SEC. 1671. INDEPENDENT ANALYSIS OF SPACE-BASED MISSILE DEFENSE CAPABILITY.

Deadline.
Contracts.
Update.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense, acting through the Director of the Missile Defense Agency, shall seek to enter into an arrangement with an appropriate federally funded research and development center to update the study referred to in subsection (c).

(b) ELEMENTS.—The updated study under subsection (a) shall include analysis of the following:

(1) The extent to which space-based capabilities would address current and evolving missile threats to the United States and deployed Armed Forces.

(2) The maturity levels of technologies necessary for an operational space-based missile defense capability.

(3) Potential options for developing, fielding, operating, and sustaining a space-based missile defense capability, including—

Cost estimate.
Assessments.

(A) estimated costs; and

(B) assessments of the effectiveness of different architectures.

(4) The technical risks, knowledge gaps, or other challenges associated with the development and operation of space-based interceptor capabilities.

(5) The ability of the Department of Defense to protect and defend on-orbit space-based missile defense capabilities, including any recommendations for resiliency requirements that would be needed to ensure the effectiveness of such capabilities.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 611

(c) STUDY SPECIFIED.—The study referred to in this subsection is the study conducted by the federally funded research and development center known as the "Institute for Defense Analysis" examining the feasibility and advisability of developing a space-based missile defense capability.

(d) REPORT.—

(1) IN GENERAL.—Not later than 270 days after entering into an arrangement under subsection (a), the Secretary of Defense shall submit to the congressional defense committees a report that includes—

(A) an unaltered copy of the updated study completed pursuant to the arrangement; and

Records.

(B) any views of the Secretary of Defense with respect to such updated study.

(2) FORM.—The report required under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

# Subtitle E—Other Matters

### SEC. 1681. EXTENSION OF AUTHORIZATION FOR PROTECTION OF CERTAIN FACILITIES AND ASSETS FROM UNMANNED AIRCRAFT.

Section 130i(i) of title 10, United States Code, is amended by striking "2023" both places it appears and inserting "2026".

### SEC. 1682. ELECTROMAGNETIC WARFARE.

(a) IN GENERAL.—Part I of subtitle A of title 10, United States Code, is amended by adding at the end the following new chapter:

### "CHAPTER 25—ELECTROMAGNETIC WARFARE

10 USC prec. 500.

"500. Electromagnetic Spectrum Operations Executive Committee.
"500a. Guidance on electromagnetic spectrum operations mission area and joint electromagnetic spectrum operations.
"500b. Annual report on electromagnetic spectrum operations strategy of the Department of Defense.
"500c. Annual assessment of budget with respect to electromagnetic spectrum operations capabilities.
"500d. Electromagnetic spectrum superiority implementation plan.
"500e. Electromagnetic Spectrum Enterprise Operational Lead for Joint Electromagnetic Spectrum Operations.
"500f. Evaluations of abilities of armed forces and combatant commands to perform electromagnetic spectrum operations missions.

### "§ 500. Electromagnetic Spectrum Operations Executive Committee

10 USC 500.

"(a) IN GENERAL.—There is within the Department of Defense an Electromagnetic Spectrum Operations Executive Committee (in this section referred to as the 'Executive Committee').

"(b) PURPOSES.—The Executive Committee shall—

"(1) serve as the principal forum within the Department of Defense to inform, coordinate, and evaluate matters relating to electromagnetic warfare;

"(2) provide senior oversight, coordination, and budget and capability harmonization with respect to such matters; and

"(3) act as an advisory body to the Secretary of Defense, the Deputy Secretary of Defense, and the Management Action Group of the Deputy Secretary with respect to such matters.

137 STAT. 612          PUBLIC LAW 118–31—DEC. 22, 2023

"(c) RESPONSIBILITIES.—The Executive Committee shall—

"(1) advise key senior level decision-making bodies of the Department of Defense with respect to the development and implementation of acquisition investments relating to electromagnetic warfare and electromagnetic spectrum operations of the Department, including relevant acquisition policies, projects, programs, modeling, and test and evaluation infrastructure;

"(2) provide a forum to enable synchronization and integration support with respect to the development and acquisition of electromagnetic warfare capabilities by—

"(A) aligning the processes of the Department for requirements, research, development, acquisition, testing, and sustainment; and

"(B) carrying out other related duties; and

"(3) act as the senior level review forum for the portfolio of capability investments of the Department relating to electromagnetic warfare and electromagnetic spectrum operations and other related matters.

"(d) COORDINATION WITH INTELLIGENCE COMMUNITY.—The Executive Committee, acting through the Under Secretary of Defense for Intelligence and Security, shall coordinate with the intelligence community (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 3003)) to generate requirements, facilitate collaboration, establish interfaces, and align efforts of the Department of Defense with respect to capabilities and acquisition activities related to electromagnetic spectrum operations in areas of dependency or mutual interest.

"(e) MEETINGS.—(1) The Executive Committee shall hold meetings not less frequently than quarterly and as necessary to address particular issues.

"(2) The Executive Committee may hold meetings by video conference.

"(f) MEMBERSHIP.—The Executive Committee shall be composed of the following principal members:

"(1) The Under Secretary of Defense for Acquisition and Sustainment.

"(2) The Vice Chairman of the Joint Chiefs of Staff.

"(3) The Under Secretary of Defense for Intelligence and Security.

"(4) The Under Secretary of Defense for Policy.

"(5) The Commander of the United States Strategic Command.

"(6) The Chief Information Officer of the Department of Defense.

"(7) Such other Federal officers or employees as the Secretary of Defense considers appropriate, consistent with other authorities of the Department of Defense and publications of the Joint Staff, including the Charter for the Electronic Warfare Executive Committee, dated March 17, 2015.

"(g) CO-CHAIRS OF EXECUTIVE COMMITTEE.—(1) The Under Secretary of Defense for Acquisition and Sustainment and the Vice Chairman of the Joint Chiefs of Staff, or their designees, shall serve as co-chairs of the Executive Committee.

"(2) The co-chairs of the Executive Committee shall—

"(A) preside at all Executive Committee meetings or have their designees preside at such meetings;

"(B) provide administrative control of the Executive Committee;

"(C) jointly guide the activities and actions of the Executive Committee;

"(D) approve all agendas for and summaries of meetings of the Executive Committee;

"(E) charter tailored working groups to conduct mission area analysis, as required, under subsection (i); and

"(F) perform such other duties as may be necessary to ensure the good order and functioning of the Executive Committee.

"(h) ELECTROMAGNETIC SPECTRUM OPERATIONS CAPABILITY TEAM.—(1) There is within the Executive Committee an electromagnetic spectrum operations capability team, which shall—

"(A) serve as a flag officer level focus group and executive secretariat subordinate to the Executive Committee; and

"(B) in that capacity—

"(i) provide initial senior level coordination on key electromagnetic spectrum operations issues;

"(ii) prepare recommended courses of action to present to the Executive Committee; and

"(iii) perform other related duties.

"(2) The electromagnetic spectrum operations capability team shall be co-chaired by one representative from the Office of the Under Secretary of Defense for Acquisition and Sustainment and one representative from the Force Structure, Resources, and Assessment Directorate of the Joint Staff (J–8).

"(3) The principal members of the Executive Committee shall designate representatives from their respective staffs to the electromagnetic spectrum operations capability team.

"(i) MISSION AREA WORKING GROUPS.—(1) The Executive Committee shall establish mission area working groups on a temporary basis—

"(A) to address specific issues and mission areas relating to electromagnetic spectrum operations;

"(B) to involve subject matter experts and components of the Department of Defense with expertise in electromagnetic spectrum operations; and

"(C) to perform other related duties.

"(2) The Executive Committee shall dissolve a mission area working group established under paragraph (1) once the issue the working group was established to address is satisfactorily resolved.

"(j) ADMINISTRATION.—The Under Secretary of Defense for Acquisition and Sustainment shall administratively support the Executive Committee, including by designating not fewer than two officials of the Department of Defense to support the day-to-day operations of the Executive Committee.

"(k) REPORT TO CONGRESS.—Not later than February 28, 2024, and annually thereafter through 2030, the Executive Committee shall submit to the congressional defense committees a summary of activities of the Executive Committee during the preceding fiscal year.

### "§ 501. Guidance on electromagnetic spectrum operations mission area and joint electromagnetic spectrum operations

"The Secretary of Defense shall—

<div style="text-align: right">

Designations.

Establishment.

Summary.
Time period.

10 USC 501.

</div>

**137 STAT. 614**          **PUBLIC LAW 118–31—DEC. 22, 2023**

Processes.
Procedures.

"(1) establish processes and procedures to develop, integrate, and enhance the electromagnetic spectrum operations mission area and the conduct of joint electromagnetic spectrum operations in all domains across the Department of Defense; and

"(2) ensure that such processes and procedures provide for integrated defense-wide strategy, planning, and budgeting with respect to the conduct of such operations by the Department, including activities conducted to counter and deter such operations by malign actors.

10 USC 502.

**"§ 502. Annual report on electromagnetic spectrum operations strategy of the Department of Defense**

Time periods.

"(a) IN GENERAL.—At the same time as the President submits to Congress the budget of the President under section 1105(a) of title 31 for each of fiscal years 2025 through 2029, the Secretary of Defense, in coordination with the Chief Information Officer of the Department of Defense, the Chairman of the Joint Chiefs of Staff, and the Secretary of each of the military departments, shall submit to the congressional defense committees an annual report on the Electromagnetic Spectrum Superiority Strategy of the Department of Defense.

"(b) CONTENTS OF REPORT.—Each report required under subsection (a) shall include each of the following:

Overview.

"(1) A description and overview of—

"(A) the electromagnetic spectrum strategy of the Department of Defense;

"(B) how such strategy supports the national defense strategy under section 113(g) of this title; and

"(C) the organizational structure assigned to oversee the development of the Department's electromagnetic spectrum strategy, requirements, capabilities, programs, and projects.

List.

"(2) A list of all the electromagnetic spectrum operations acquisition programs and research and development projects of the Department of Defense and a description of how each program or project supports the Department's electromagnetic spectrum strategy.

"(3) For each unclassified program or project on the list required by paragraph (2)—

"(A) the senior acquisition executive and organization responsible for oversight of the program or project;

"(B) whether or not validated requirements exist for the program or project and, if such requirements do exist, the date on which the requirements were validated and the organizational authority that validated such requirements;

"(C) the total amount of funding appropriated, obligated, and forecasted by fiscal year for the program or project, including the program element or procurement line number from which the program or project receives funding;

Schedule.

"(D) the development or procurement schedule for the program or project;

Assessments.

"(E) an assessment of the cost, schedule, and performance of the program or project as it relates to the program baseline for the program or project, as of the date of the

submission of the report, and the original program baseline for such program or project, if such baselines are not the same;

"(F) the technology readiness level of each critical technology that is part of the program or project;

"(G) whether or not the program or project is redundant or overlaps with the efforts of another military department; and

"(H) the capability gap that the program or project is being developed or procured to fulfill.

"(4) A classified annex that contains the items described in subparagraphs (A) through (H) of paragraph (3) for each classified program or project on the list required by paragraph (2).

<div style="float:right">Classified<br>information.</div>

## "§ 503. Annual assessment of budget with respect to electromagnetic spectrum operations capabilities

<div style="float:right">10 USC 503.</div>

"At the same time as the President submits to Congress the budget of the President under section 1105(a) of title 31 for each of fiscal years 2025 through 2029, the Secretary of Defense shall submit to the congressional defense committees an assessment by the Electromagnetic Spectrum Operations Executive Committee as to whether sufficient funds are requested in such budget for anticipated activities in such fiscal year for each of the following:

<div style="float:right">Time periods.</div>

"(1) The development of an electromagnetic battle management capability for joint electromagnetic spectrum operations.

"(2) The establishment and operation of associated joint electromagnetic spectrum operations cells.

## "§ 504. Electromagnetic spectrum superiority implementation plan

<div style="float:right">10 USC 504.</div>

"(a) IN GENERAL.—The Chief Information Officer of the Department of Defense shall be responsible for oversight of the electromagnetic superiority implementation plan.

"(b) REPORT REQUIRED.—Concurrent with the submission of the budget of the President to Congress under section 1105(a) of title 31 for each of fiscal years 2025 through 2029, the Chief Information Officer shall submit to the congressional defense committees a report that includes the following with respect to the electromagnetic superiority implementation plan:

<div style="float:right">Time periods.<br>Assessments.</div>

"(1) The implementation plan in effect as of the date of the report, noting any revisions from the preceding plan.

"(2) A statement of the elements of the implementation plan that have been achieved.

<div style="float:right">Statement.</div>

"(3) For each element that has been achieved, an assessment of whether the element is having its intended effect.

"(4) For any element that has not been achieved, an assessment of progress made in achieving the element, including a description of any obstacles that may hinder further progress.

"(5) For any element that has been removed from the implementation plan, a description of the reason for the removal of the element and an assessment of the impact of not pursuing achievement of the element.

"(6) Such additional matters as the Chief Information Officer considers appropriate.

"(c) ELECTROMAGNETIC SUPERIORITY IMPLEMENTATION PLAN DEFINED.—In this section, the term 'electromagnetic superiority

137 STAT. 616          PUBLIC LAW 118–31—DEC. 22, 2023

implementation plan' means the Electromagnetic Superiority Implementation Plan signed by the Secretary of Defense on July 15, 2021, and any successor plan.

10 USC 505.

**"§ 505. Electromagnetic Spectrum Enterprise Operational Lead for Joint Electromagnetic Spectrum Operations**

Deadline.
Establishment.

"(a) IN GENERAL.—Not later than 30 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024, the Secretary of Defense shall establish an Electromagnetic Spectrum Enterprise Operational Lead for Joint Electromagnetic Spectrum Operations (in this section referred to as the 'operational lead') at the United States Strategic Command. The operational lead shall report to the Commander of the United States Strategic Command.

"(b) FUNCTION.—The operational lead shall be responsible for synchronizing, assessing, and making recommendations to the Chairman of the Joint Chiefs of Staff with respect to the readiness of the combatant commands to conduct joint electromagnetic spectrum operations.

Time periods.

"(c) BRIEFINGS REQUIRED.—Concurrent with the submission of the budget of the President to Congress under section 1105(a) of title 31 for each of fiscal years 2025 through 2029, the Chairman, acting through the operational lead, shall provide to the congressional defense committees a briefing on the following:

"(1) Progress made in achieving full operational capability to conduct joint electromagnetic spectrum operations and any impediments to achieving such capability.

"(2) The readiness of the combatant commands to conduct such operations.

Recommendations.

"(3) Recommendations for overcoming any deficiencies in the readiness of the combatant commands to conduct such operations and any material gaps contributing to such deficiencies.

"(4) Such other matters as the Chairman considers important to ensuring that the combatant commands are capable of conducting such operations.

Deadlines.
Time periods.
Assessments.
10 USC 506.

**"§ 506. Evaluations of abilities of armed forces and combatant commands to perform electromagnetic spectrum operations missions**

"(a) EVALUATIONS OF ARMED FORCES.—(1) Not later than October 1, 2024, and annually thereafter through 2029, the Chief of Staff of the Army, the Chief of Naval Operations, the Chief of Staff of the Air Force, the Commandant of the Marine Corps, and the Chief of Space Operations shall each carry out an evaluation of the ability of the armed force concerned to perform electromagnetic spectrum operations missions required by each of the following:

"(A) The Electromagnetic Spectrum Superiority Strategy.

"(B) The Joint Staff-developed concept of operations for electromagnetic spectrum operations.

"(C) The operations and contingency plans of the combatant commands.

Certification.

"(2) Not later than December 31 of each year in which evaluations are required under paragraph (1), each official specified in that paragraph shall certify to the congressional defense committees

PUBLIC LAW 118–31—DEC. 22, 2023         137 STAT. 617

that the evaluation required to be carried out by that official has occurred.

"(3) Each evaluation under paragraph (1) shall include an assessment of the following:

"(A) Current programs of record, including—

"(i) the ability of weapon systems to perform missions in contested electromagnetic spectrum environments; and

"(ii) the ability of electromagnetic attack with capabilities to disrupt adversary operations.

"(B) Future programs of record, including—

"(i) the need for distributed or network-centric electromagnetic warfare and signals intelligence capabilities; and

"(ii) the need for automated and machine learning- or artificial intelligence-assisted electromagnetic spectrum operations capabilities.

"(C) Order of battle.

"(D) Individual and unit training.

"(E) Tactics, techniques, and procedures, including—

"(i) maneuver, distribution of assets, and the use of decoys; and

"(ii) integration of non-kinetic and kinetic fires.

"(F) Other matters relevant to evaluating the ability of the armed force concerned to perform electromagnetic spectrum operations missions described in paragraph (1).

"(b) EVALUATIONS OF COMBATANT COMMANDS.—(1) Not later than October 1, 2024, and annually thereafter through 2029, the Chairman of the Joint Chiefs of Staff, acting through the Electromagnetic Spectrum Enterprise Operational Lead for Joint Electromagnetic Spectrum Operations established under section 500e (in this section referred to as the 'operational lead'), shall carry out an evaluation of the plans and posture of the combatant commands to execute the electromagnetic spectrum operations envisioned in each of the following:

"(A) The Electromagnetic Spectrum Superiority Strategy.

"(B) The Joint Staff-developed concept of operations for electromagnetic spectrum operations.

"(2) Each evaluation under paragraph (1) shall include an assessment, as relevant, of the following:

"(A) Operation and contingency plans.

"(B) The manning, organizational alignment, and capability of joint electromagnetic spectrum operations cells.

"(C) Mission rehearsal and exercises.

"(D) Force positioning, posture, and readiness.

"(3) Not later than December 31 of each year in which an evaluation is required under paragraph (A), the Chairman of the Joint Chiefs of Staff, acting through the operational lead, shall brief the congressional defense committees on the results of the evaluation.".

Briefing.

(b) CLERICAL AMENDMENT.—The tables of chapters at the beginning of subtitle A of title 10, United States Code, and at the beginning of part I of such subtitle, are each amended by inserting after the item relating to chapter 24 the following new item:

10 USC prec. 101.

"25. Electronic Warfare ........................................................................................ 500".

(c) CONFORMING REPEAL.—Section 1053 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 113 note) is repealed.

### SEC. 1683. COOPERATIVE THREAT REDUCTION FUNDS.

(a) FUNDING ALLOCATION.—Of the $350,999,000 authorized to be appropriated to the Department of Defense for fiscal year 2024 in section 301 and made available by the funding table in division D for the Department of Defense Cooperative Threat Reduction Program established under section 1321 of the Department of Defense Cooperative Threat Reduction Act (50 U.S.C. 3711), the following amounts may be obligated for the purposes specified:

(1) For strategic offensive arms elimination, $6,815,000.

(2) For chemical security and elimination, $16,400,000.

(3) For global nuclear security, $19,406,000.

(4) For biological threat reduction, $228,030,000.

(5) For proliferation prevention, $46,324,000.

(6) For activities designated as Other Assessments/Administration Costs, $34,024,000.

(b) SPECIFICATION OF COOPERATIVE THREAT REDUCTION FUNDS.—Funds appropriated pursuant to the authorization of appropriations in section 301 and made available by the funding table in division D for the Department of Defense Cooperative Threat Reduction Program shall be available for obligation for fiscal years 2024, 2025, and 2026.

*Time periods.*

*10 USC 2271 note.*

### SEC. 1684. MATTERS RELATING TO SPACE-BASED GROUND AND AIRBORNE MOVING TARGET INDICATION SYSTEMS.

(a) IN GENERAL.—The Secretary of the Air Force shall be responsible for presenting space-based ground and airborne moving target indication systems to the combatant commands to accomplish missions assigned to such commands under the Unified Command Plan that—

(1) are primarily or fully funded by the Department of Defense; and

(2) provide near real-time, direct support to satisfy the operational requirements of such commands.

(b) MILESTONE DECISION AUTHORITY.—The Secretary of the Air Force, in consultation with the Director of National Intelligence, shall be milestone decision authority (as defined in section 4204 of title 10, United States Code) for Milestone A approval (as defined in section 4211 of such title) for space-related acquisition programs for ground and airborne moving target indication systems described in subsection (a) that are primarily or fully funded within the military intelligence program.

*Deadlines.*

(c) WORKING GROUP.—

(1) ESTABLISHMENT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall establish a working group, to be known as the "Moving Target Indication Working Group" (referred to in this section as the "working group").

(2) RESPONSIBILITIES.—The working group shall be responsible for—

(A) addressing Department of Defense joint service requirements for moving target indication systems;

(B) monitoring the cost, schedule, and performance of all efforts to replace the tactical intelligence, surveillance, and reconnaissance capability that is provided, as of the date of enactment of this Act, by the Joint Surveillance Target Attack Radar System; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 619

(C) developing the processes and procedures for tasking, collection, processing, exploitation, and dissemination of the data collected by moving target indication systems.

(3) MEMBERSHIP.—

(A) IN GENERAL.—The working group shall be composed of members selected by the Secretary of Defense as follows:

(i) One member of the Space Force and one member of the Joint Staff each of whom shall serve as a co-chair of the working group.

(ii) One representative of each of the following:

(I) The Army.

(II) The Navy.

(III) The Marine Corps.

(IV) The Air Force.

(B) CONGRESSIONAL NOTIFICATION.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a list of the members selected to serve on the working group pursuant to subparagraph (A). `List.`

(4) BRIEFING REQUIREMENTS.—

(A) INITIAL BRIEFING.—Not later than 120 days after the date of the enactment of this Act, the co-chairs of the working group shall provide to the congressional defense committees a briefing on—

(i) any capabilities development documents developed by the working group that are either approved by, or in development for, the Joint Requirements Oversight Council; and

(ii) any progress of the working group towards developing processes and procedures for tasking, collection, processing, exploitation, and dissemination of data collected by future moving target indication systems.

(B) BIANNUAL BRIEFINGS.—Not less frequently than biannually following the initial briefing under subparagraph (A), the working group shall provide to the congressional defense committees a briefing on the status of any moving target indication programs under development by the Department of Defense as of the date of the briefing.

(C) SUNSET.—The requirement to provide briefings under this paragraph shall terminate on the date that is five years after the date of the enactment of this Act.

**SEC. 1685. POSITIONING, NAVIGATION, AND TIMING.**

(a) QUARTERLY BRIEFINGS ON IMPLEMENTATION OF MILITARY-CODE COMPLIANT GPS RECEIVERS.—

(1) IN GENERAL.—Not later than February 1, 2024, and quarterly thereafter until the date specified in paragraph (2), the Co-Chairs of the Council on Oversight of the Department of Defense Positioning, Navigation, and Timing Enterprise, shall provide to the congressional defense committees a briefing on the status of the implementation of M-Code compliant GPS receivers through the Military GPS User Equipment program, including the status of increments 1 and 2 of such program and details regarding expected dates of M-Code compliance for all sea-, air, and land-based terminals across the platforms of each of the Armed Forces. `Deadline.`

137 STAT. 620        PUBLIC LAW 118–31—DEC. 22, 2023

(2) TERMINATION DATE.—The date specified in this paragraph is the date on which the Secretary of Defense submits to the congressional defense committees certification that the increments 1 and 2 of the Military GPS User Equipment program have reached full operational capacity.

(b) TREATMENT OF POSITIONING, NAVIGATION, AND TIMING RESILIENCY, MODIFICATIONS, AND IMPROVEMENTS PROGRAM.—The Under Secretary of Defense for Acquisition and Sustainment shall treat the Positioning, Navigation, and Timing Resiliency, Modifications, and Improvements program of the Air Force (Program Element 0604201F) as an acquisition category 1D program, and the authority to manage such program may not be delegated.

*Requirements.*
*10 USC 2224*
*note.*

### SEC. 1686. ACTIONS TO ADDRESS SERIOUS DEFICIENCIES IN ELECTRONIC PROTECTION OF SYSTEMS THAT OPERATE IN THE RADIO FREQUENCY SPECTRUM.

(a) IN GENERAL.—The Secretary of Defense shall—

(1) establish requirements for and assign sufficient priority to ensuring electronic protection of military sensor, navigation, and communications systems and subsystems against jamming, spoofing, and unintended interference from military systems of the United States and foreign adversaries; and

(2) provide management oversight and supervision of the military departments to ensure military systems that emit and receive radio frequencies are protected against threats and interference from United States and foreign adversary military systems operating in the same or adjacent radio frequencies.

*Deadlines.*

(b) SPECIFIC REQUIRED ACTIONS.—The Secretary of Defense shall require the military departments and combat support agencies to carry out the following activities:

(1) Not later than 270 days after the date of the enactment of this Act, develop and approve requirements, through the Joint Requirements Oversight Council as appropriate, for every radar, signals intelligence, navigation, and communications system and subsystem subject to the Global Force Management process to ensure such systems and subsystems are able to withstand threat-realistic levels of jamming, spoofing, and unintended interference, including self-generated interference.

*Time period.*

(2) Not less frequently than once every 4 years, test each system and subsystem described in paragraph (1) at a test range that permits threat-realistic electronic warfare attacks against the system or subsystem by a red team or simulated opposition force, with the first set of highest priority systems to be initially tested by not later than the end of fiscal year 2025.

(3) With respect to each system and subsystem described in paragraph (1) that fails to meet electronic protection requirements during testing conducted under paragraph (2)—

(A) not later than 3 years after the initial failed test, retrofit the system or subsystem with electronic protection measures that can withstand threat-realistic jamming, spoofing, and unintended interference; and

(B) not later than 4 years after the initial failed test, retest such systems and subsystems.

*Survey.*

(4) Survey, identify, and test available technology that can be practically and affordably retrofitted on the systems and subsystems described in paragraph (1) and which provides

robust protection against threat-realistic jamming, spoofing, and unintended interference.

(5) Design and build electronic protection into ongoing and future development programs to withstand expected jamming and spoofing threats and unintended interference.

(c) WAIVER.—The Secretary of Defense may establish a process for issuing waivers, on a case-by-case basis, for the testing requirement under paragraph (2) of subsection (b) and for the retrofit requirement under paragraph (3) of such subsection. <span>Process.</span>

(d) ANNUAL REPORTS.—Concurrent with the submission of the budget of the President to Congress pursuant to section 1105(a) of title 31, United States Code, for each of fiscal years 2025 through 2030, the Director of Operational Test and Evaluation shall submit to the Electronic Warfare Executive Committee of the Department of Defense and the Committees on Armed Services of the Senate and the House of Representatives a comprehensive annual report that— <span>Time periods.</span>

(1) aggregates and summarizes information received from the military departments and combat support agencies for purposes of the preparation of the report; and <span>Summary.</span>

(2) includes a description of—

(A) the activities carried out to implement the requirements of this section;

(B) the systems and subsystems subject to testing in the previous year and the results of such tests, including a description of the requirements for electronic protection established for the tested systems and subsystems; and

(C) each waiver issued in the previous year with respect to such requirements, together with a detailed rationale for the waiver and a plan for addressing any issues that formed the basis of the waiver request.

### SEC. 1687. LIMITATION ON USE OF FUNDS FOR CERTAIN UNREPORTED PROGRAMS.

(a) LIMITATION ON AVAILABILITY OF FUNDS.—None of the funds authorized to be appropriated or otherwise made available by this Act may be obligated or expended in support of any activities involving unidentified anomalous phenomena protected under any form of special access or restricted access limitations unless the Secretary of Defense has provided the details of the activity to the appropriate congressional committees and congressional leadership, including for any activities described in a report released by the All-Domain Anomaly Resolution Office in fiscal year 2024.

(b) LIMITATION REGARDING INDEPENDENT RESEARCH AND DEVELOPMENT.—Consistent with Department of Defense Instruction Number 3204.01 (dated August 20, 2014, incorporating change 2, dated July 9, 2020; relating to Department policy for oversight of independent research and development), independent research and development funding relating to unidentified anomalous phenomena shall not be allowable as indirect expenses for purposes of contracts covered by such instruction, unless such material and information is made available the appropriate congressional committees and congressional leadership. <span>50 USC 3373 note.</span>

(c) DEFINITIONS.—In this section:

(1) The term "appropriate congressional committees" means—

(A) the congressional defense committees; and

137 STAT. 622          PUBLIC LAW 118–31—DEC. 22, 2023

(B) the Permanent Select Committee on Intelligence of the House of Representatives and the Select Committee on Intelligence of the Senate.

(2) The term "congressional leadership" means—

(A) the majority leader of the Senate;

(B) the minority leader of the Senate;

(C) the Speaker of the House of Representatives; and

(D) the minority leader of the House of Representatives.

(3) The term "unidentified anomalous phenomena" has the meaning given such term in section 1683(n)of the National Defense Authorization Act for Fiscal Year 2022 (50 U.S.C. 3373(n)), as amended by section 6802(a) of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117–263).

### SEC. 1688. INDO-PACIFIC MISSILE STRATEGY.

*Deadline.*

(a) STRATEGY.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a strategy for ground-based theater-range conventional missiles in the Indo-Pacific region.

(b) ELEMENTS.—The strategy required by subsection (a) shall include the following:

*Assessment.*

(1) An assessment of gaps in ground-based theater-range conventional missile capabilities in the area of responsibility of the United States Indo-Pacific Command.

*Requirements.*

(2) An identification of military requirements for ground-based theater-range conventional missile systems, including range, propulsion, payload, launch platform, weapon effects, and other operationally relevant factors.

*Assessment.*

(3) An identification of prospective basing locations for ground-based theater-range conventional missiles in the area of responsibility of the United States Indo-Pacific Command and an assessment of steps required to receive host-nation permission for forward-basing of such weapon systems.

(4) A description of operational concepts for employment of such ground-based theater-range conventional missiles, including integration with other capabilities in the Western Pacific region.

(5) An identification of prospective allies, partners, and institutional mechanisms for co-production of new ground-based theater-range conventional missiles.

*Assessment.*

(6) An assessment of the cost, schedule, and feasibility of ground-based theater-range conventional missile programs, including any potential cost-sharing structures through existing institutional mechanisms.

(7) Any other matter the Secretary considers relevant.

(c) FORM.—The strategy required by subsection (a) may be submitted in classified form, but shall include an unclassified summary.

(d) GROUND-BASED THEATER-RANGE CONVENTIONAL MISSILE.—

*Definition.*

The term "ground-based theater-range conventional missile" means a short-range, medium-range, or intermediate-range conventional mobile ground-launched cruise or hypersonic missile system with a range between 500 and 5,500 kilometers.

PUBLIC LAW 118–31—DEC. 22, 2023     137 STAT. 623

### SEC. 1689. STUDY ON THE FUTURE OF THE INTEGRATED TACTICAL WARNING ATTACK ASSESSMENT SYSTEM.

(a) IN GENERAL.—The Chairman of the Joint Chiefs of Staff shall enter into an agreement with a federally funded research and development center under which the center shall—

*Contracts.*

(1) conduct a study on the future of the Integrated Tactical Warning Attack Assessment System; and

(2) submit to the Chairman a report on the findings of the center with respect to the study conducted under paragraph (1).

*Reports.*

(b) ELEMENTS.—The study conducted pursuant to an agreement under subsection (a) shall cover the following:

(1) Future air and missile threats to the United States.

(2) The integration of multi-domain sensor data and their ground systems with the existing architecture of the Integrated Tactical Warning Attack Assessment System.

(3) The effect of the integration described in paragraph (2) on the data reliability standards of the Integrated Tactical Warning Attack Assessment System.

(4) Future data visualization, conferencing, and decision-making capabilities of such system.

(5) Such other matters as the Chairman considers relevant to the study.

(c) REPORT.—Not later than 270 days after the date of the enactment of this Act, the Chairman shall submit to the congressional defense committees—

(1) the report submitted to the Chairman under subsection (a)(2); and

(2) the assessment of the Chairman with respect to the findings in such report and the recommendations of the Chairman with respect to modernizing the Integrated Tactical Warning Attack Assessment System.

*Assessment. Recommendations.*

### SEC. 1690. RESEARCH AND ANALYSIS ON MULTIPOLAR DETERRENCE AND ESCALATION DYNAMICS.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall seek to enter into an agreement with a university affiliated research center with expertise in strategic deterrence to conduct research and analysis on multipolar deterrence and escalation dynamics.

*Deadline. Contracts.*

(b) ELEMENTS.—The research and analysis conducted under subsection (a) shall include assessment of the following:

(1) Implications for strategic deterrence and allied assurance given the emergence of a second near-peer nuclear power.

(2) Potential alternative conventional, strategic, and nuclear force structures to optimize deterrence of two near-peer nuclear powers.

(3) The contribution made by countervailing nonstrategic capabilities to strategic deterrence.

(4) Escalation patterns arising from Russia's Strategic Operations to Destroy Critically Important Targets operational concept and response options for the United States.

*Russia.*

(5) Multilateral efforts that could contribute to multipolar strategic deterrence and escalation dynamics.

(6) Capabilities and operations sufficient to assure European and Pacific allies.

(c) REPORT REQUIRED.—

137 STAT. 624          PUBLIC LAW 118–31—DEC. 22, 2023

(1) IN GENERAL.—Not later than March 1, 2025, the Secretary of Defense shall submit to the congressional defense committees a report that includes the results of the research and analysis conducted under subsection (a).

(2) FORM.—The report under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

Space Force
Personnel
Management Act.

# TITLE XVII—SPACE FORCE PERSONNEL MANAGEMENT

Sec. 1701. Short title.

Subtitle A—Space Force Military Personnel System Without Component

Sec. 1711. Establishment of military personnel management system for the Space Force.
Sec. 1712. Composition of the Space Force without component.
Sec. 1713. Definitions for single personnel management system for the Space Force.
Sec. 1714. Basic policies relating to service in the Space Force.
Sec. 1715. Status and participation.
Sec. 1716. Officers.
Sec. 1717. Enlisted members.
Sec. 1718. Retention and separation generally.
Sec. 1719. Separation of officers for substandard performance of duty or for certain other reasons.
Sec. 1719A. Retirement.

Subtitle B—Conforming Amendments Related to Space Force Military Personnel System

Sec. 1721. Amendments to Department of the Air Force provisions of title 10, United States Code.
Sec. 1722. Amendments to subtitle A of title 10, United States Code.
Sec. 1723. Title 38, United States Code (Veterans' Benefits).

Subtitle C—Transition Provisions

Sec. 1731. Transition period.
Sec. 1732. Change of duty status of members of the Space Force.
Sec. 1733. Transfer to the Space Force of members of the reserve components of the Air Force.
Sec. 1734. Placement of officers on the Space Force officer list.
Sec. 1735. Disestablishment of Regular Space Force.
Sec. 1736. End strength flexibility.
Sec. 1737. Promotion authority flexibility.

Subtitle D—Other Amendments Related to the Space Force

Sec. 1741. Title 10, United States Code.
Sec. 1742. Other provisions of law.

10 USC 101 note.    **SEC. 1701. SHORT TITLE.**

This title may be cited as the "Space Force Personnel Management Act".

# Subtitle A—Space Force Military Personnel System Without Component

**SEC. 1711. ESTABLISHMENT OF MILITARY PERSONNEL MANAGEMENT SYSTEM FOR THE SPACE FORCE.**

Title 10, United States Code, is amended by adding at the end the following new subtitle:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 625

# "Subtitle F—Alternative Military Personnel Systems

10 USC
prec. 101,
prec. 20001.

## "PART I—SPACE FORCE

10 USC
prec. 20001.

### "CHAPTER 2001— SPACE FORCE PERSONNEL SYSTEM

10 USC
prec. 20001.

"Sec.
"20001. Single military personnel management system.
"20002. Members: duty status.
"20003. Members: minimum service requirement as applied to Space Force.

### "§ 20001. Single military personnel management system

10 USC 20001.

"Members of the Space Force shall be managed through a single military personnel management system, without component.".

"Chap.   ..........................................................................................................
"2001.   Space Force Personnel System ...............................................................20001
"2003.   Status and Participation .........................................................................20101
"2005.   Officers .....................................................................................................20201
"2007.   Enlisted Members. ...................................................................................20301
"2009.   Retention and Separation Generally ......................................................20401
"2011.   Separation of Officers for Substandard Performance of Duty or for
          Certain Other Reasons ............................................................................20501
"2013.   Retirement ...............................................................................................20601".

10 USC 20001.

## SEC. 1712. COMPOSITION OF THE SPACE FORCE WITHOUT COMPONENT.

(a) COMPOSITION OF THE SPACE FORCE.—Section 9081(b) of title 10, United States Code, is amended—

(1) by striking paragraph (1);

(2) by redesignating paragraphs (2) and (3) as paragraphs (1) and (2), respectively; and

(3) in paragraph (1), as so redesignated, by striking ", including" and all that follows through "emergency".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect on the date of the certification by the Secretary of the Air Force under section 1745.

10 USC 9081
note.

## SEC. 1713. DEFINITIONS FOR SINGLE PERSONNEL MANAGEMENT SYSTEM FOR THE SPACE FORCE.

(a) SPACE FORCE DEFINITIONS.—Section 101 of title 10, United States Code, is amended—

(1) by redesignating subsections (e), (f), and (g) as subsections (f), (g), and (h), respectively; and

(2) by inserting after subsection (d) the following new subsection (e):

"(e) SPACE FORCE.—The following definitions relating to members of the Space Force apply in this title:

"(1) The term 'space force active status' means the status of a member of the Space Force who is not in a space force inactive status and is not retired.

"(2) The term 'space force inactive status' means the status of a member of the Space Force who is designated by the Secretary of the Air Force, under regulations prescribed by the Secretary, as being in a space force inactive status.

"(3) The term 'space force retired status' means the status of a member of the Space Force who—

"(A) is receiving retired pay ; or

"(B) but for being under the eligibility age applicable under section 12731 of this title, would be eligible for retired pay under chapter 1223 of this title.

"(4) The term 'sustained duty' means full-time duty by a member of the Space Force ordered to such duty by an authority designated by the Secretary of the Air Force—

"(A) in the case of an officer—

"(i) to fulfill the terms of an active-duty service commitment incurred by the officer under any provision of law; or

"(ii) with the consent of the officer; and

"(B) in the case of an enlisted member, with the consent of the enlisted member as specified in the terms of the member's enlistment or reenlistment agreement.".

(b) AMENDMENTS TO EXISTING DUTY STATUS DEFINITIONS.—Subsection (d) of such section is amended—

(1) in paragraph (1), by inserting ", including sustained duty in the Space Force" after "United States"; and

(2) in paragraph (7), by inserting ", or a member of the Space Force," after "Reserves" in subparagraphs (A) and (B).

### SEC. 1714. BASIC POLICIES RELATING TO SERVICE IN THE SPACE FORCE.

Chapter 2001 of title 10, United States Code, as added by section 1711, is amended by adding at the end the following new sections:

### "§ 20002. Members: duty status

"Under regulations prescribed by the Secretary of the Air Force, each member of the Space Force shall be placed in one of the following duty statuses:

"(1) Space Force active status.

"(2) Space Force inactive status.

"(3) Space Force retired status.

### "§ 20003. Members: minimum service requirement as applied to Space Force

"(a) INAPPLICABILITY OF ACTIVE/RESERVE SERVICE DISTINCTION.—In applying section 651 of this title to a person who becomes a member of the Space Force, the provisions of the second sentence of subsection (a) and of subsection (b) of that section (relating to service in a reserve component) are inapplicable.

"(b) TREATMENT UPON TRANSFER OUT OF SPACE FORCE.—A member of the Space Force who transfers to one of the other armed forces before completing the service required by subsection (a) of section 651 of this title shall upon such transfer be subject to section 651 of this title in the same manner as if such member had initially entered the armed force to which the member transfers.".

### SEC. 1715. STATUS AND PARTICIPATION.

Subtitle F of title 10, United States Code, as added by section 1711, is amended by adding at the end the following new chapter:

### "CHAPTER 2003—STATUS AND PARTICIPATION

"Sec.

"20101. Members in Space Force active status: amount of annual training or active duty service required.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 627

"20102. Individual ready guardians: designation; mobilization category.
"20103. Members not on sustained duty: agreements concerning conditions of service.
"20104. Orders to active duty: with consent of member.
"20105. Sustained duty.
"20106. Orders to active duty: without consent of member.
"20107. Transfer to inactive status: initial service obligation not complete.
"20108. Members of Space Force: credit for service for purposes of laws providing pay and benefits for members, dependents, and survivors.
"20109. Policy for order to active duty based upon determination by Congress.

## "§ 20101. Members in Space Force active status: amount of annual training or active duty service required

Time periods.
10 USC prec. 20101, 20101.

"Except as specifically provided in regulations prescribed by the Secretary of Defense, a member of the Space Force in a space force active status who is not serving on sustained duty shall be required to—

"(1) participate in at least 48 scheduled drills or training periods during each year and serve on active duty for not less than 14 days (exclusive of travel time) during each year; or

"(2) serve on active duty for training for not more than 30 days during each year.

## "§ 20102. Individual ready guardians: designation; mobilization category

10 USC prec. 20101, 20102.

"(a) IN GENERAL.—Under regulations prescribed by the Secretary of Defense, the Secretary of the Air Force may designate a member of the Space Force in a space force active status as an Individual Ready Guardian.

"(b) MOBILIZATION CATEGORY.—

"(1) IN GENERAL.—Among members of the Space Force designated as Individual Ready Guardians, there is a category of members (referred to as a 'mobilization category') who, as designated by the Secretary of the Air Force, are subject to being ordered to active duty without their consent in accordance with section 20106(a) of this title.

"(2) LIMITATIONS ON PLACEMENT IN MOBILIZATION CATEGORY.—A member designated as an Individual Ready Guardian may not be placed in the mobilization category referred to in paragraph (1) unless—

"(A) the member volunteers to be placed in that mobilization category; and

"(B) the member is selected by the Secretary of the Air Force, based upon the needs of the Space Force and the grade and military skills of that member.

"(3) LIMITATION ON TIME IN MOBILIZATION CATEGORY.—A member of the Space Force in a space force active status may not remain designated an Individual Ready Guardian in such mobilization category after the end of the 24-month period beginning on the date of the separation of the member from active service.

Time period.

"(4) DESIGNATION OF GRADES AND MILITARY SKILLS OR SPECIALTIES.—The Secretary of the Air Force shall designate the grades and military skills or specialties of members to be eligible for placement in such mobilization category.

"(5) BENEFITS.—A member in such mobilization category shall be eligible for benefits (other than pay and training) on the same basis as are available to members of the Individual

Ready Reserve who are in the special mobilization category under section 10144(b) of this title, as determined by the Secretary of Defense.

Contracts.
10 USC
prec. 20101,
20103.

**"§ 20103. Members not on sustained duty: agreements concerning conditions of service**

"(a) AGREEMENTS.—The Secretary of the Air Force may enter into a written agreement with a member of the Space Force not on sustained duty—

"(1) requiring the member to serve on active duty for a definite period of time;

"(2) specifying the conditions of the member's service on active duty; and

"(3) for a member serving in a space force inactive status, specifying the conditions for the member's continued service as well as order to active duty with and without the consent of the member.

"(b) CONDITIONS OF SERVICE.—An agreement under subsection (a) shall specify the conditions of service. The Secretary of the Air Force shall prescribe regulations establishing—

Regulations.

"(1) what conditions of service may be specified in the agreement;

"(2) the obligations of the parties; and

"(3) the consequences of failure to comply with the terms of the agreement.

"(c) AUTHORITY FOR RETENTION ON ACTIVE DUTY DURING WAR OR NATIONAL EMERGENCY.—If the period of service on active duty of a member under an agreement under subsection (a) expires during a war or during a national emergency declared by Congress or the President, the member concerned may be kept on active duty, without the consent of the member, as otherwise prescribed by law.

10 USC
prec. 20101,
20104.

**"§ 20104. Orders to active duty: with consent of member**

"(a) AUTHORITY.—A member of the Space Force who is serving in a space force active status and is not on sustained duty, or who is serving in a space force inactive status, may, with the consent of the member, be ordered to active duty, or retained on active duty, under the following sections of chapter 1209 of this title in the same manner as applies to a member of a reserve component ordered to active duty, or retained on active duty, under that section with the consent of the member:

"(1) Section 12301(d), relating to orders to active duty at any time with the consent of the member.

"(2) Section 12301(h), relating to orders to active duty in connection with medical or health care matters.

"(3) Section 12322, relating to active duty for health care.

"(4) Section 12323, relating to active duty pending line of duty determination required for response to sexual assault.

"(b) APPLICABLE PROVISIONS OF LAW.—The following sections of chapter 1209 of this title pertaining to a member of a reserve component ordered to active duty with the consent of the member apply to a member of the Space Force who is ordered to active duty under this section in the same manner as to such a reserve component member:

"(1) Section 12308, relating to retention after becoming qualified for retired pay.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 629

"(2) Section 12309, relating to use of Reserve officers in expansion of armed forces.

"(3) Section 12313, relating to release of reserve members from active duty.

"(4) Section 12314, relating to kinds of duty.

"(5) Section 12315, relating to duty with or without pay.

"(6) Section 12316, relating to payment of certain Reserves while on duty.

"(7) Section 12318, relating to duties and funding of reserve members on active duty.

"(8) Section 12320, relating to grade in which ordered to active duty.

"(9) Section 12321, relating to a limitation on number of reserve members assigned to Reserve Officer Training Corps units.

### "§ 20105. Sustained duty

10 USC prec. 20101, 20105.

"(a) ENLISTED MEMBERS.—An authority designated by the Secretary of the Air Force may order an enlisted member of the Space Force in a space force active status to sustained duty, or retain an enlisted member on sustained duty, with the consent of that member, as specified in the terms of the member's enlistment or reenlistment agreement.

"(b) OFFICERS.—

"(1) An authority designated by the Secretary of the Air Force may order a Space Force officer in a space force active status to sustained duty—

"(A) with the consent of the officer; or

"(B) to fulfill the terms of an active-duty service commitment incurred by the officer under any provision of law.

"(2) An officer ordered to sustained duty under paragraph (1) may not be released from sustained duty without the officer's consent except as provided in chapter 2009 or 2011 of this title.

### "§ 20106. Orders to active duty: without consent of member

Applicability. 10 USC prec. 20101, 20106.

"(a) MEMBERS IN A SPACE FORCE ACTIVE STATUS.—

"(1) A member of the Space Force in a space force active status who is not on sustained duty, may, without the consent of the member, be ordered to active duty or inactive duty in the same manner as a member of a reserve component ordered to active duty or inactive duty under the provisions of chapter 1209 of this title and any other provision of law authorizing the order to active duty of a member of a reserve component in an active status without the consent of the member.

"(2) The provisions of chapter 1209 of this title, or other applicable provisions of law, pertaining to a member of the Ready Reserve when ordered to active duty shall apply to a member of the Space Force who is in a space force active status when ordered to active duty under paragraph (1).

"(3) The provisions of section 12304 of this title pertaining to members in the Individual Ready Reserve mobilization category shall apply to a member of the Space Force who is designated an Individual Ready Guardian when ordered to

active duty who meets the provisions of section 20102(b) of this title.

"(b) MEMBERS IN A SPACE FORCE INACTIVE STATUS.—

"(1) A member of the Space Force in a space force inactive status may be ordered to active duty under—

"(A) the provisions of chapter 1209 of this title;

"(B) any other provision of law authorizing the order to active duty of a member of a reserve component in an inactive status; and

"(C) the terms of any agreement entered into by the member under section 20103 of this title.

"(2) The provisions of chapter 1209 of this title, or other applicable provisions of law, pertaining to the Standby Reserve shall apply to a member of the Space Force who is in a space force inactive service when ordered to active duty.

"(c) MEMBERS IN A SPACE FORCE RETIRED STATUS.—

"(1) Chapters 39 and 1209 of this title include provisions authorizing the order to active duty of a member of the Space Force in a space force retired status.

"(2) The provisions of sections 688, 688a, and 12407 of this title pertaining to a retired member or a member of the Retired Reserve shall apply to a member of the Space Force in a space force retired status when ordered to active duty.

"(3) The provisions of section 689 of this title pertaining to a retired member ordered to active duty shall apply to a member of the Space Force in a space force retired status who is ordered to active duty.

"(d) OTHER APPLICABLE PROVISIONS.—The following provisions of chapter 1209 of this title pertaining shall apply to a member of the Space Force ordered to active duty in the same manner as to a Reserve or member of the Retired Reserve ordered to active duty:

"(1) Section 12305, relating to the authority of the President to suspend certain laws relating to promotion, retirement, and separation.

"(2) Section 12308, relating to retention after becoming qualified for retired pay.

"(3) Section 12313, relating to release from active duty.

"(4) Section 12314, relating to kinds of duty.

"(5) Section 12315, relating to duty with or without pay.

"(6) Section 12316, relating to payment of certain Reserves while on duty.

"(7) Section 12317, relating to theological students; limitations.

"(8) Section 12320, relating to grade in which ordered to active duty.

10 USC prec. 20101, 20107.

**"§ 20107. Transfer to inactive status: initial service obligation not complete**

"(a) GENERAL RULE.—A member of the Space Force who has not completed the required minimum service obligation referred to in section 20003 of this title shall, if terminating space force active status, be transferred to a space force inactive status and, unless otherwise designated an Individual Ready Guardian under section 20102 of this title, shall remain subject to order to active duty without the member's consent under section 20106 of this title.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 631

"(b) EXCEPTION.—Subsection (a) does not apply to a member who is separated from the Space Force by the Secretary of the Air Force under section 20503 of this title.

### "§ 20108. Members of Space Force: credit for service for purposes of laws providing pay and benefits for members, dependents, and survivors

10 USC prec. 20101, 20108.

"For the purposes of laws providing pay and benefits for members of the armed forces and their dependents and beneficiaries:

"(1) Military training, duty, or other service performed by a member of the Space Force in a space force active status not on sustained duty shall be considered military training, duty, or other service, as the case may be, as a member of a reserve component.

"(2) Sustained duty performed by a member of the Space Force under section 20105 of this title shall be considered active duty as a member of a regular component.

"(3) Active duty performed by a member of the Space Force in a space force active status not on sustained duty shall be considered active duty as a member of a reserve component.

"(4) Inactive-duty training performed by a member of the Space Force shall be considered inactive-duty training as a member of a reserve component.

### "§ 20109. Policy for order to active duty based upon determination by Congress

10 USC prec. 20101, 20109.

"Whenever Congress determines that more units and organizations capable of conducting space operations are needed for the national security than are available among those units comprised of members of the Space Force serving on active duty, members of the Space Force not serving on active duty shall be ordered to active duty and retained as long as so needed.".

#### SEC. 1716. OFFICERS.

(a) ORIGINAL APPOINTMENTS.—Subtitle F of title 10, United States Code, as amended by section 1715, is further amended by adding at the end the following new chapter:

10 USC prec. 20201.

### "CHAPTER 2005—OFFICERS

10 USC prec. 20201.

"SUBCHAPTER I—ORIGINAL APPOINTMENTS

10 USC prec. 20201.

### "§ 20201. Original appointments: how made

Determinations. 10 USC prec. 20201, 20201.

"(a) IN GENERAL.—The provisions of section 531 of this title shall apply to original appointments of commissioned officers in the Space Force.

"(b) GRADE UPON APPOINTMENT.—(1) The grade of a person receiving an appointment under this section who at the time of appointment is credited with service under section 20203 of this title shall be determined under regulations prescribed by the Secretary of the Defense based upon the amount of service credited.

"(2) The grade of a person receiving an appointment under this section who at the time of the appointment is a commissioned officer of a reserve component shall be determined under section 20203(e) of this title.

137 STAT. 632          PUBLIC LAW 118–31—DEC. 22, 2023

Determinations.
10 USC
prec. 20201,
20202.

**"§ 20202. Original appointments: qualifications**

"(a) IN GENERAL.—An original appointment as a commissioned officer in the Space Force may be given only to a person who—

"(1) is a citizen of the United States;

"(2) is at least 18 years of age; and

"(3) has such other physical, mental, moral, professional, and age qualifications as the Secretary of the Air Force may prescribe by regulation.

"(b) EXCEPTION.—A person who is otherwise qualified, but who has a physical condition that the Secretary of the Air Force determines will not interfere with the performance of the duties to which that person may be assigned, may be appointed as an officer in the Space Force.

10 USC
prec. 20201,
20203.
Applicability.

**"§ 20203. Original appointments: service credit**

"(a) IN GENERAL.—The provisions of section 533 of this title shall apply to the crediting of prior active commissioned service for original appointments of commissioned officers.

"(b) CREDIT FOR PRIOR SERVICE.—(1) For the purpose of determining the grade and rank within grade of a person receiving an original appointment in a commissioned grade in the Space Force, such person shall be credited at the time of such appointment with any commissioned service (other than service as a commissioned warrant officer) that the person performed before such appointment—

"(A) as a Space Force officer on active duty or in a space force active status; or

"(B) as a regular officer, or as a reserve officer in an active status, in any uniformed service.

Applicability.

"(2) The regulations prescribed by the Secretary of Defense under section 533 of this title shall apply to the Space Force to authorize the Secretary of the Air Force to limit the amount of prior active commissioned service with which a person receiving an original appointment may be credited under paragraph (1).

"(b) CREDIT FOR EDUCATION, TRAINING, AND EXPERIENCE.—(1) Under regulations prescribed by the Secretary of the Air Force, the Secretary shall credit a person who is receiving an original appointment in a commissioned grade in the Space Force and who has advanced education, training, or special experience with constructive service for such education, training, or experience in a particular officer career field as designated by the Secretary of the Air Force, if such education, training, or experience is directly related to the operational needs of the Space Force.

"(2)(A) The Secretary may credit a person with constructive service under this subsection for each instance of relevant advanced education or training or special experience regardless of whether two or more such instances are concurrent.

"(B) The Secretary may not credit more than 20 persons with an amount of constructive credit under this paragraph in any year.

"(3) The amount of constructive service credited an officer under this subsection may not exceed the amount required in order for the officer to be eligible for an original appointment in the grade of colonel.

"(4) Constructive service credited an officer under this subsection is in addition to any service credited that officer under

subsection (a) and shall be credited at the time of the original appointment of the officer.

"(5) Not later than December 1 of each year, the Secretary of the Air Force shall submit a report to the Committees on Armed Services of the Senate and House of Representatives regarding the amount of constructive service credited under this subsection during the preceding calendar year.

"(c) AUTHORIZED USE OF CONSTRUCTIVE CREDIT.—Constructive service credited an officer under subsection (b) shall be used only for determining the officer's—

"(1) initial grade;

"(2) rank in grade; and

"(3) service in grade for promotion eligibility.

"(d) EXCLUSION FOR GRADUATES OF THE SERVICE ACADEMIES.— A graduate of a Service Academy (as such term is defined in section 347 of this title) is not entitled to service credit under this section for service performed, or education, training, or experience obtained, before graduation from such Service Academy.

"(e) RESERVE OFFICERS.—A reserve officer (other than a warrant officer) who receives an original appointment as an officer in the Space Force shall—

"(1) in the case of an officer on the active-duty list of an armed force immediately before that appointment, be appointed in the same grade and with the same date of rank as the grade and date of rank held by the officer on the active-duty list immediately before the appointment; and

"(2) in the case of an officer not on the active-duty list immediately before that appointment, be appointed in the same grade and with the same date of rank as the grade and date of rank which the officer would have held had the officer been serving on the active-duty list on the date of the appointment.

"(f) CONTINUITY OF EXISTING DELEGATION OF PRESIDENTIAL APPOINTMENT FUNCTIONS.—Except as otherwise provided by the President by Executive order, the provisions of Executive Order 13384 (10 U.S.C. 531 note) relating to the functions of the President under section 531(a) of this title shall apply in the same manner to functions of the President under section 20201 of this title.".

(b) CONFORMING AMENDMENTS RELATING TO ORIGINAL APPOINTMENTS.—

(1) DEFINITIONS.—Section 101 of title 10, United States Code, is amended in subsection (b)(10) by inserting before the period at the end the following: "and, with respect to the appointment of a member of the armed forces in the Space Force, refers to that member's most recent appointment in the Space Force that is neither a promotion nor a demotion".

(2) ORIGINAL APPOINTMENTS OF COMMISSIONED OFFICERS.— Section 531 of such title is amended by striking "Regular" before "Space Force" each place it appears.

(3) QUALIFICATIONS FOR ORIGINAL APPOINTMENT AS A COMMISSIONED OFFICER.—Section 532(a) of such title is amended by striking "Regular Marine Corps, or Regular Space Force" and inserting "or Regular Marine Corps".

(4) SERVICE CREDIT UPON ORIGINAL APPOINTMENT AS A COMMISSIONED OFFICER.—Section 533 of such title is amended by striking "Regular" before "Space Force" each place it appears.

Reports.

Determinations.

Applicability.

137 STAT. 634          PUBLIC LAW 118–31—DEC. 22, 2023

(c) SELECTION BOARDS AND PROMOTIONS.—Chapter 205 of title 10, United States Code, as added by subsection (a), is amended by adding at the end the following new subchapters:

## "SUBCHAPTER II—SELECTION BOARDS

### "§ 20211. Convening of selection boards

"(a) IN GENERAL.—Whenever the needs of the service require, the Secretary of the Air Force shall convene selection boards to recommend for promotion to the next higher permanent grade officers of the Space Force in each permanent grade from first lieutenant through brigadier general.

"(b) EXCEPTION FOR OFFICERS IN GRADE OF FIRST LIEUTENANT.—Subsection (a) does not require the convening of a selection board in the case of Space Force officers in the permanent grade of first lieutenant when the Secretary of the Air Force recommends for promotion to the grade of captain under section 20238(a)(4)(A) of this title all such officers whom the Secretary finds to be fully qualified for promotion.

"(c) SELECTION BOARDS FOR EARLY RETIREMENT OR DISCHARGE.—The Secretary of the Air Force may convene selection boards to recommend officers for early retirement under section 20404(a) of this title or for discharge under section 20404(b) of this title.

"(d) REGULATIONS.—The convening of selection boards under subsection (a) shall be under regulations prescribed by the Secretary of the Defense.

### "§ 20212. Composition of selection boards

"(a) APPOINTMENT AND COMPOSITION OF BOARDS.—

"(1) IN GENERAL.—Members of a selection board shall be appointed by the Secretary of Air Force in accordance with this section. A selection board shall consist of five or more officers of the Space Force. Each member of a selection board must be serving in a grade higher than the grade of the officers under consideration by the board, except that no member of a board may be serving in a grade below major. The members of a selection board shall include at least one member serving on sustained duty and at least one member in a space force active status who is not serving on sustained duty. The ratio of the members of a selection board serving on sustained duty to members serving in a space force active status not on sustained duty shall, to the extent practicable, reflect the ratio of officers serving in each of those statuses who are being considered for promotion by the board. The members of a selection board shall represent the diverse population of the Space Force to the extent practicable.

"(2) REPRESENTATION FROM COMPETITIVE CATEGORIES.—(A) Except as provided in subparagraph (B), a selection board shall include at least one officer from each competitive category of officers to be considered by the board.

"(B) A selection board need not include an officer from a competitive category when there are no officers of that competitive category on the Space Force officer list in a grade higher than the grade of the officers to be considered by the board and eligible to serve on the board.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 635

"(3) RETIRED OFFICERS.—If qualified officers on the Space Force officer list are not available in sufficient number to comprise a selection board, the Secretary of the Air Force shall complete the membership of the board by appointing as members of the board—

"(A) Space Force officers who hold a grade higher than the grade of the officers under consideration by the board and who are retired officers; and

"(B) if sufficient Space Force officers are not available pursuant to subparagraph (A), Air Force officers who hold a grade higher than the grade of the officers under consideration by the board and who are retired officers, but only if the Air Force officer to be appointed to the board has served in the Space Force or in a space-related career field of the Air Force for sufficient time such that the Secretary of the Air Force determines that the retired Air Force officer has adequate knowledge concerning the standards of performance and conduct required of an officer of the Space Force.

Determination.

"(4) EXCLUSION OF RETIRED GENERAL OFFICERS ON ACTIVE DUTY TO SERVE ON A BOARD FROM NUMERIC GENERAL OFFICER ACTIVE-DUTY LIMITATIONS.—A retired general officer who is on active duty for the purpose of serving on a selection board shall not, while so serving, be counted against any limitation on the number of general and flag officers who may be on active duty.

"(b) LIMITATION ON MEMBERSHIP ON CONSECUTIVE BOARDS.—

"(1) GENERAL RULE.—Except as provided in paragraph (2), no officer may be a member of two successive selection boards convened under section 20211 of this title for the consideration of officers of the same competitive category and grade.

"(2) EXCEPTION FOR GENERAL OFFICER BOARDS.—Paragraph (1) does not apply with respect to selection boards convened under section 20211 of this title for the consideration of officers in the grade of colonel or brigadier general.

"(c) JOINT QUALIFIED OFFICERS.—(1) Each selection board convened under section 20211 of this title that will consider an officer described in paragraph (2) shall include at least one officer designated by the Chairman of the Joint Chiefs of Staff who is a joint qualified officer.

Designation.

"(2) Paragraph (1) applies with respect to an officer who—

Applicability.

"(A) is serving on, or has served on, the Joint Staff; or

"(B) is a joint qualified officer.

"(3) The Secretary of Defense may waive the requirement in paragraph (1) for any selection board of the Space Force.

Waiver authority.

## "§ 20213. Notice of convening of selection boards

"(a) NOTICE TO ELIGIBLE OFFICERS.—At least 30 days before a selection board is convened under section 20211 of this title to recommend officers in a grade for promotion to the next higher grade, the Secretary of the Air Force shall—

10 USC prec. 20211, 20213. Time period.

"(1) notify in writing the officers eligible for consideration for promotion of the date on which the board is to convene and the name and date of rank of the junior officer, and of the senior officer, in the promotion zone as of the date of the notification; or

"(2) issue a general written notice to the Space Force regarding the convening of the board which shall include the convening date of the board and the name and date of rank of the junior officer, and of the senior officer, in the promotion zone as of the date of the notification.

Deadline.

"(b) COMMUNICATION FROM OFFICERS.—An officer eligible for consideration by a selection board convened under section 20211 of this title (other than an officer who has been excluded under section 20231(d) of this title from consideration by the board) may send a written communication to the board, to arrive not later than 10 calendar days before the date on which the board convenes, calling attention to any matter concerning the officer that the officer considers important to the officer's case. The selection board shall give consideration to any timely communication under this subsection.

"(c) NOTICE OF INTENT OF CERTAIN OFFICERS TO SERVE ON OR OFF ACTIVE DUTY.—An officer on the Space Force officer list in the grade of colonel or brigadier general who receives a notice under subsection (a) shall inform the Secretary of the officer's preference to serve either on or off sustained duty if promoted to the grade of brigadier general or major general, respectively.

Applicability.
10 USC
prec. 20211,
20214.

## "§ 20214. Information furnished to selection boards

"The provisions of section 615 of this title shall apply to information furnished to selection boards.

10 USC
prec. 20211,
20215.

## "§ 20215. Recommendations for promotion by selection boards

"(a) BOARD TO RECOMMEND OFFICERS BEST QUALIFIED FOR PROMOTION.—A selection board convened under section 20211 of this title shall recommend for promotion to the next higher grade those officers considered by the board whom the board, giving due consideration to the needs of the Space Force for officers with particular skills (as noted in the guidelines or information furnished the board under section 615(b) of this title), considers best qualified for promotion within each competitive category considered by the board.

"(b) NUMBER TO BE RECOMMENDED.—The Secretary of the Air Force shall establish the number of officers such a selection board may recommend for promotion from among officers being considered.

"(c) BOARD PROCEDURES FOR RECOMMENDATIONS; LIMITATIONS.—A selection board convened under section 20211 of this title may not recommend an officer for promotion unless—

"(1) the officer receives the recommendation of a majority of the members of the board;

"(2) a majority of the members of the board finds that the officer is fully qualified for promotion; and

"(3) a majority of the members of the board, after consideration by all members of the board of any adverse information about the officer that is provided to the board under section 615 of this title, finds that the officer is among the officers best qualified for promotion to meet the needs of the Space Force consistent with the requirement of exemplary conduct set forth in section 9233 of this title.

"(d) LIMITATION ON PROMOTIONS UNDER OTHER AUTHORITY.—Except as otherwise provided by law, a Space Force officer may

not be promoted to a higher grade under this chapter unless the officer is considered and recommended for promotion to that grade by a selection board convened under this chapter or, in the case of an officer transferring into the Space Force from another armed force, chapter 36 or chapter 1403 of this title.

"(e) DISCLOSURE OF BOARD RECOMMENDATIONS.—The recommendations of a selection board may be disclosed only in accordance with regulations prescribed by the Secretary of Defense. Those recommendations may not be disclosed to a person not a member of the board (or a member of the administrative staff designated by the Secretary of the Air Force to assist the board) until the written report of the recommendations of the board, required by section 617 of this title, is signed by each member of the board.

"(f) PROHIBITION ON ATTEMPTING TO INFLUENCE MEMBERS OF A BOARD.—The Secretary of the Air Force, and an officer or other official exercising authority over any member of a selection board, may not—

"(1) censure, reprimand, or admonish the selection board or any member of the board with respect to the recommendations of the board or the exercise of any lawful function within the authorized discretion of the board; or

"(2) attempt to coerce or, by any unauthorized means, influence any action of a selection board or any member of a selection board in the formulation of the board's recommendations.

"(g) HIGHER PLACEMENT ON PROMOTION LIST OF OFFICER OF PARTICULAR MERIT.—(1) In selecting the officers to be recommended for promotion, a selection board shall, when authorized by the Secretary of the Air Force, recommend officers of particular merit, pursuant to guidelines and procedures prescribed by the Secretary, from among those officers selected for promotion, to be placed higher on the promotion list established by the Secretary under section 624(a)(1) of this title.

"(2) An officer may be recommended to be placed higher on a promotion list under paragraph (1) only if the officer receives the recommendation of at least a majority of the members of the board, unless the Secretary of the Air Force establishes an alternative requirement. Any such alternative requirement shall be furnished to the board as part of the guidelines furnished to the board under section 615 of this title.

"(3) For the officers recommended to be placed higher on a promotion list under paragraph (1), the board shall recommend, pursuant to guidelines and procedures prescribed by the Secretary, the order in which those officers should be placed on the list.

## "§ 20216. Reports of selection boards

"(a) IN GENERAL.—Each selection board convened under section 20211 of this title shall submit to the Secretary of the Air Force a written report, signed by each member of the board, containing a list of the names of the officers it recommends for promotion and certifying—

"(1) that the board has carefully considered the record of each officer whose name was furnished to it under section 615 of this title; and

"(2) that, in the opinion of a majority of the members of the board, the officers recommended for promotion by the board are best qualified for promotion to meet the needs of

10 USC prec. 20211, 20216.
List.
Recommendations.
Certification.

the Space Force (as noted in the guidelines or information furnished the board under section 615(b) of this title) among those officers whose names were furnished to the selection board.

"(b) OFFICERS WHO SHOULD BE REQUIRED TO SHOW CAUSE FOR RETENTION.—A selection board convened under section 20211 of this title shall include in its report the name of any officer before it for consideration for promotion whose record, in the opinion of a majority of the members of the board, indicates that the officer should be required under section 20503 of this title to show cause for the officer's retention in a space force active status.

"(c) OFFICERS RECOMMENDED TO BE PLACED HIGHER ON THE PROMOTION LIST.—A selection board convened under section 20211 of this title shall, when authorized under section 20214(g) of this title, include in its report the names of those officers recommended by the board to be placed higher on the promotion list and the order in which the board recommends that those officers should be placed on the list.

"(d) RECOMMENDATION FOR OFFICERS TO BE EXCLUDED FROM FUTURE CONSIDERATION FOR PROMOTION.—A selection board convened under section 20211 of this title may include in its report a recommendation that an officer considered by the board be excluded from future consideration for promotion under this chapter.

10 USC prec. 20211, 20217.

### "§ 20217. Action on reports of selection boards for promotion to brigadier general or major general

"(a) IN GENERAL.—After reviewing a report received under section 20215 of this title recommending officers on the Space Force officer list for promotion to the grade of brigadier general or major general, but before submitting the report to the Secretary of Defense, the Secretary of the Air Force may, under regulations prescribed by the Secretary of the Air Force, adjust the placement of officers as recommended in the report in order to ensure that sufficient number of officers on both sustained and non-sustained duty are promoted to meet the requirements of the Space Force to fill general officer vacancies.

"(b) REPORT.—Whenever the Secretary of the Air Force uses the authority under subsection (a), the Secretary shall submit to the Committees on Armed Services of the Senate and House of Representatives a report informing the committees that the authority has been used and the reason for the use of the authority.

10 USC prec. 20231.

10 USC prec. 20231, 20231.

### "SUBCHAPTER III—PROMOTIONS

### "§ 20231. Eligibility for consideration for promotion: general rules

"(a) IN GENERAL.—

"(1) REQUIREMENT TO BE ON SPACE FORCE OFFICER LIST.—An officer is eligible under this chapter for consideration for promotion by a selection board convened under section 14101(a) of this title only if the officer is on the Space Force officer list.

Deadlines.

"(2) AUTHORITY TO PRECLUDE FROM CONSIDERATION CERTAIN OFFICERS BASED ON TIME OF ENTRY ON OR DEPARTURE FROM SUSTAINED DUTY.—The Secretary of the Air Force—

"(A) may, by regulation, prescribe a period of time, not to exceed one year, from the time an officer on the Space Force officer list transfers on or off of sustained duty during which the officer shall be ineligible for consideration for promotion; and

"(B) may, by regulation, provide for the exclusion from consideration for promotion by a selection board of an officer otherwise eligible to be considered by the board who has an established date for removal from the Space Force officer list that is not more than 90 days after the date on which the board is to be convened.

"(b) CERTAIN OFFICERS NOT TO BE CONSIDERED.—A selection board convened under section 20211 of this title may not consider for promotion to the next higher grade any of the following officers:

"(1) An officer whose name is on a promotion list for that grade as a result of recommendation for promotion to that grade by an earlier selection board convened under that section or section 20151 of this title, under section 14101 or 14502 of this title, or under chapter 36 of this title.

"(2) An officer who is recommended for promotion to that grade in the report of an earlier selection board convened under a provision referred to in paragraph (1), in the case of such a report that has not yet been approved by the President.

"(3) An officer who has been nominated by the President for promotion to that grade under any other provision of law, if that nomination is pending before the Senate.

"(4) An officer in the grade of first lieutenant who is on an approved all-fully-qualified-officers list under section 20238(a)(4) of this title.

"(5) An officer excluded under 20232 of this title.

"(6) An officer who has failed of promotion to a higher grade the maximum number of times specified for opportunities for promotion for such grade within the competitive category concerned pursuant to section 20234 of this title.

"(c) CERTAIN COLONELS.—

"(1) AUTHORITY TO PRECLUDE FROM CONSIDERATION.—The Secretary of Defense may authorize the Secretary of the Air Force to preclude from consideration by selection boards for promotion to the grade of brigadier general, officers in the grade of colonel who—

"(A) have been considered and not selected for promotion to the grade of brigadier general or by at least two selection boards; and

"(B) are determined, in accordance with standards and procedures prescribed pursuant to paragraph (2), as not being exceptionally well qualified for promotion.

Determination.

"(2) REGULATIONS.—If the Secretary of Defense authorizes the Secretary of the Air Force to have the authority described in subparagraph (A), the Secretary shall prescribe by regulation the standards and procedures for the exercise of such authority. Those regulations shall apply uniformly among the military departments and shall include the following provisions:

Standards.
Procedures.
Requirements.

Applicability.

"(A) A requirement that the Secretary of the Air Force may exercise such authority in the case of a particular selection board only if the Secretary of Defense approves the exercise of that authority for that board.

137 STAT. 640          PUBLIC LAW 118–31—DEC. 22, 2023

*Recommendation.*

"(B) A requirement that an officer may be precluded from consideration by a selection board under this paragraph only upon the recommendation of a preselection board of officers convened by the Secretary of the military department concerned and composed of at least three officers all of whom are serving in a grade higher than the grade of such officer.

*Notice.*

"(C) A requirement that such a preselection board may not recommend that an officer be precluded from such consideration unless the Secretary of the Air Force has given the officer advance written notice of the convening of such board and of the military records that will be considered by the board and has given the officer a reasonable period before the convening of the board in which to submit comments to the board.

*Guidance.*

"(D) A requirement that the Secretary of the Air Force shall provide general guidance to the board in accordance with standards and procedures prescribed by the Secretary of Defense in those regulations.

*Recommendation.*

"(E) A requirement that the preselection board may recommend that an officer be precluded from consideration by a selection board only on the basis of the general guidance provided by the Secretary Air Force, information in the officer's official military personnel records that has been described in the notice provided the officer as required pursuant to subparagraph (C), and any communication to the board received from that officer before the board convenes.

*Time periods.*

"(d) BRIGADIER GENERALS.—
"(1) OFFICERS NOT ON SPACE FORCE OFFICER LIST.—A brigadier general who is not eligible for consideration for promotion because the officer is not on the Space Force officer list (as required by paragraph (1) of subsection (a) for such eligibility) is nevertheless eligible for consideration for promotion to the grade of major general by a selection board convened under section 20211(a) of this title if—

*Effective date.*

"(A) as of the date of the convening of the promotion board, the officer has been in an inactive status for less than the minimum threshold established in paragraph (2) of subsection (a); and

*Time period.*

"(B) immediately before the date of the officer's most recent transfer to an inactive status, the officer had continuously served on the Space Force officer list for at least one year.
"(2) OFFICERS NOT MEETING MINIMUM PARTICIPATION THRESHOLD.—A brigadier general who is on the Space Force officer list but who is not eligible for consideration for promotion because the officer's service does not meet the minimum participation threshold established under subsection (a)(2) is nevertheless eligible for consideration for promotion to the grade of major general by a promotion board convened under section 20211(a) of this title if—
"(A) the officer was transferred from an inactive status to the reserve active-status list during the one-year period preceding the date of the convening of the promotion board;

"(B) immediately before the date of the officer's most recent transfer to an active status, the officer had been in an inactive status for less than one year; and

"(C) immediately before the date of the officer's most recent transfer to an inactive status, the officer had continuously served for at least one year on the reserve active-status list or the active-duty list (or a combination of the reserve active-status list and the active-duty list).

"(e) OFFICERS ON EDUCATIONAL DELAY.—An officer on the Space Force officer list is ineligible for consideration for promotion, but shall remain on the Space Force officer list, while the officer—

"(1) is pursuing a program of graduate level education in an educational delay status approved by the Secretary concerned; and

"(2) is receiving from the Secretary financial assistance in connection with the pursuit of that program of education while in that status.

"(f) CERTAIN OFFICERS NOT TO BE CONSIDERED FOR SELECTION FOR PROMOTION.—The Secretary of the Air Force may provide that an officer who is in a space force active status, but is in a duty status in which the only points the officer accrues under section 12732(a)(2) of this title are pursuant to subparagraph (C)(i) of that section, shall not be considered for selection for promotion until completion of two years of service in such duty status. Any such officer may remain on the Space Force officer list.

Time period.

## "§ 20232. Authority to allow officers to opt out of selection board consideration

Determinations.
10 USC
prec. 20231,
20232.

"(a) AUTHORITY.—The Secretary of the Air Force may provide that an officer on the Space Force officer list may, upon the officer's request and with the approval of the Secretary, be excluded from consideration by a selection board convened under section 20211 of this title to consider officers for promotion to the next higher grade.

"(b) CRITERIA.—The Secretary may only approve a request under subsection (a) as follows:

"(1) COMPLETION OF CERTAIN ASSIGNMENTS.—If—

"(A) the basis for the request is to allow an officer to complete a broadening assignment, an advanced education assignment, another assignment of significant value to the Department, or a career progression requirement delayed by such an assignment;

"(B) the Secretary determines the exclusion from consideration is in the best interest of the Space Force; and

"(C) the officer has not previously failed of selection for promotion to the grade for which the officer requests the exclusion from consideration.

"(2) COMPLETION OF CERTAIN EDUCATION.—If—

"(A) the basis for the request is to allow an officer to complete advanced education or professional military education;

"(B) the Secretary determines that it is in the best interests of the Space Force for the officer to continue to serve in current position and grade; and

"(C) the officer has not previously opted out of a promotion board under this section.

137 STAT. 642          PUBLIC LAW 118–31—DEC. 22, 2023

"(3) SERVICE IN CRITICAL SKILL POSITION.—If—
"(A) the officer is serving in a critical skill position that cannot be filled by another Space Force officer serving in the same grade;
"(B) the Secretary determines that it is in the best interests of the Space Force for the officer to continue to serve in their current position and grade; and
"(C) the officer has not previously opted out of a promotion board under this section.

10 USC prec. 20231, 20233.

**"§ 20233. Eligibility for consideration for promotion: designation as joint qualified officer required before promotion to brigadier general; exceptions**

"(a) GENERAL RULE.—An officer on the Space Force officer list may not be appointed to the grade of brigadier general unless the officer has been designated as a joint qualified officer in accordance with section 661 of this title.

Waiver authority.

"(b) EXCEPTIONS.—Subject to subsection (c), the Secretary of Defense may waive subsection (a) in the following circumstances:
"(1) When necessary for the good of the service.
"(2) In the case of an officer whose proposed selection for promotion is based primarily upon scientific and technical qualifications for which joint requirements do not exist.
"(3) In the case of an officer selected by a promotion board for appointment to the grade of brigadier general while serving in a joint duty assignment if—

Time period.

"(A) the officer's total consecutive service in joint duty assignments is not less than two years; and
"(B) the officer has successfully completed a program of education described in subsections (b) and (c) of section 2155 of this title.
"(4) In the case of an officer who—
"(A) is selected by a promotion board for appointment to the grade of brigadier general;
"(B) is not exempted under subsection (g); and
"(C) has successfully completed the education requirements prescribed in subparagraph (A) of section 661(c)(1) of this title but has not been afforded the opportunity to complete the experience requirements described in subparagraph (B) of that section.
"(c) WAIVER TO BE INDIVIDUAL.—A waiver may be granted under subsection (b) only on a case-by-case basis in the case of an individual officer.
"(d) SPECIAL RULE FOR GOOD-OF-THE-SERVICE WAIVER.—In the case of a waiver under subsection (b)(1), the Secretary of Defense shall provide that the first duty assignment as a general officer of the officer for whom the waiver is granted shall be in a joint duty assignment.
"(e) LIMITATION ON DELEGATION OF WAIVER AUTHORITY.—The authority of the Secretary of Defense to grant a waiver under subsection (b)(4) may only be delegated as provided in section 619a(e) of this title.
"(f) REGULATIONS.—The Secretary of Defense shall prescribe regulations to carry out this section. The regulations shall specifically identify for purposes of subsection (b)(2) those categories of officers for which selection for promotion to brigadier general is

based primarily upon scientific and technical qualifications for which joint requirements do not exist.

"(g) EXEMPTION.—Subsection (a) shall not apply to an officer who transfers to the Space Force from a reserve component before the first day of the sixth fiscal year beginning after the date of the enactment of this section, and who, as of the date of the transfer, is serving in the grade of major, lieutenant colonel, or colonel or, in the case of the Navy or Coast Guard, lieutenant commander, commander, or captain.

Effective date.

## "§ 20234. Opportunities for consideration for promotion

10 USC prec. 20231, 20234.

"(a) SPECIFICATION OF NUMBER OF OPPORTUNITIES FOR CONSIDERATION FOR PROMOTION.—The Secretary of the Air Force shall specify the number of opportunities for consideration for promotion to be afforded to Space Force officers for promotion to each grade above the grade of captain .

"(b) LIMITED AUTHORITY OF SECRETARY OF THE AIR FORCE TO MODIFY NUMBER OF OPPORTUNITIES.—The Secretary of the Air Force may modify the number of opportunities for consideration for promotion to be afforded officers within a competitive category for promotion to a particular grade, as previously specified by the Secretary pursuant subsection (a), not more frequently than once every five years.

Time period.

"(c) AUTHORITY OF SECRETARY OF DEFENSE TO MODIFY NUMBER OF OPPORTUNITIES.—The Secretary of Defense may modify the number of opportunities for consideration for promotion to be afforded officers of the Space Force within a competitive category for promotion to a particular grade, as previously specified or modified pursuant to any provision of this section, at the discretion of the Secretary.

"(d) LIMITATION ON NUMBER OF OPPORTUNITIES SPECIFIED.—The number of opportunities for consideration for promotion to be afforded officers of the Space Force within a competitive category for promotion to a particular grade, as specified or modified pursuant to any provision of this section, may not exceed five opportunities.

"(e) EFFECT OF CERTAIN REDUCTION IN NUMBER OF OPPORTUNITIES SPECIFIED.—If, by reason of a reduction in the number of opportunities for consideration for promotion under this section, an officer would no longer have one or more opportunities for consideration for promotion that were available to the officer before the reduction, the officer shall be afforded one additional opportunity for consideration for promotion after the reduction.

## "§ 20235. Space Force officer list

10 USC prec. 20231, 20235.

"(a) SINGLE LIST.—The Secretary of the Air Force shall maintain a single list of all Space Force officers serving in a space force active status. The list shall be known as the 'Space Force officer list'.

"(b) ORDER OF OFFICERS ON LIST.—Officers shall be carried on the Space Force officer list in the order of seniority of the grade in which they are serving. Officers serving in the same grade shall be carried in the order of their rank in that grade.

"(c) EFFECT OF SERVICE IN A TEMPORARY APPOINTMENT.—An officer whose position on the Space Force officer list results from service under a temporary appointment or in a grade held by reason of assignment to a position has, when that appointment

137 STAT. 644          PUBLIC LAW 118–31—DEC. 22, 2023

or assignment ends, the grade and position on the Space Force officer list that the officer would have held if the officer had not received that appointment or assignment.

10 USC prec. 20231, 20236.

## "§ 20236. Competitive categories

"(a) REQUIREMENT TO ESTABLISH COMPETITIVE CATEGORIES FOR PROMOTION.—Under regulations prescribed by the Secretary of Defense, the Secretary of the Air Force shall establish at least one competitive category for promotion for officers on the Space Force officer list. Each officer whose name appears on the Space Force officer list shall be carried in a competitive category of officers. Officers in the same competitive category shall compete among themselves for promotion.

"(b) SINGLE COMPETITIVE CATEGORY FOR PROMOTION TO GENERAL OFFICER GRADES.—The Secretary of the Air Force shall establish a single competitive category for all officers on the Space Force officer list who will be considered by a selection board convened under section 20211 of this title for promotion to the grade of brigadier general or major general.

Estimates. 10 USC prec. 20231, 20237.

## "§ 20237. Numbers to be recommended for promotion

"(a) PROMOTION TO GRADES BELOW BRIGADIER GENERAL.—

"(1) DETERMINATION OF MAXIMUM NUMBER.—Before convening a selection board under section 20211 of this title to consider officers for recommendation for promotion to a grade below brigadier general and in any competitive category, the Secretary of the Air Force shall determine the maximum number of officers in that competitive category that the board may recommend for promotion.

"(2) DETERMINATIONS.—In order to make the determination under paragraph (1), the Secretary shall determine—

"(A) the number of positions needed to accomplish mission objectives which require officers of that competitive category in the grade to which the board will recommend officers for promotion;

"(B) the estimated number of officers needed to fill vacancies in those positions during the period in which it is anticipated that officers selected for promotion will be promoted; and

"(C) the number of officers in a space force active status authorized by the Secretary of the Air Force to serve both on sustained duty and not on sustained duty in the grade and competitive category under consideration.

"(b) PROMOTION TO BRIGADIER GENERAL AND MAJOR GENERAL.—

"(1) DETERMINATION OF MAXIMUM NUMBERS.—Before convening a selection board under section 20211 of this title to consider officers for recommendation for promotion to the grade of brigadier general or major general, the Secretary of the Air Force shall determine the maximum number of officers serving in a space force active status on sustained duty, and the maximum number of officers serving in a space force active status not on sustained duty, that the board may recommend for promotion.

"(2) DETERMINATIONS.—In order to make the determinations under paragraph (1), the Secretary shall determine—

"(A) the number of positions needed to accomplish mission objectives which require officers serving in a space force active status on sustained duty, and in a space force active status not on sustained duty, in the grade to which the board will recommend officers for promotion; and

"(B) the estimated number of officers on sustained duty and not on sustained duty needed to fill vacancies in those positions over the 24-month period beginning on the date on which the selection board convenes.

Time period.

## "§ 20238. Establishment of promotion zones

10 USC prec. 20231, 20238.

"(a) IN GENERAL.—Before convening a selection board under section 20211 of this title to consider officers for promotion to any grade above first lieutenant or lieutenant (junior grade), the Secretary of the Air Force shall establish a promotion zone for officers serving in each grade and competitive category to be considered by the board.

"(b) DETERMINATION OF NUMBER.—The Secretary of the Air Force shall determine the number of officers in the promotion zone for officers serving in any grade and competitive category from among officers who are eligible for promotion in that grade and competitive category. Such determination shall be made on the basis of an estimate of—

Estimates. Time periods.

"(1) the number of officers needed in that competitive category in the next higher grade in each of the next five years;

"(2) the number of officers to be serving in that competitive category in the next higher grade in each of the next five years;

"(3) in the case of a promotion zone for officers to be promoted to a grade to which section 523 of this title is applicable, the number of officers authorized for such grade under such section to be on sustained duty on the last day of each of the next five fiscal years; and

"(4) the number of officers that should be placed in that promotion zone in each of the next five years to provide to officers in those years relatively similar opportunity for promotion.

## "§ 20239. Promotions: how made

10 USC prec. 20231, 20239. President.

"(a) PROMOTION LISTS.—

"(1) PLACEMENT OF NAMES ON PROMOTION LIST.—When the report of a selection board convened under section 20211 of this title is approved by the President, the Secretary of the Air Force shall place the names of all officers approved for promotion within a competitive category on a single list for that competitive category, to be known as a promotion list, in the order of the seniority of such officers on the Space Force officer list or based on particular merit, as determined by the promotion board, or as modified by the Secretary of the Air Force under section 20217 of this title.

"(2) TIME OF ESTABLISHMENT OF PROMOTION LIST.—A promotion list is considered to be established under this section as of the date of the approval of the report of the selection board under paragraph (1).

"(b) PROMOTIONS; HOW MADE; ORDER.—

"(1) APPOINTMENT AUTHORITY.—Officers on a promotion list shall be promoted by appointment in the manner specified in section 20201 of this title.

"(2) TIMING.—Officers on a promotion list for a competitive category shall be promoted to the next higher grade in accordance with regulations prescribed by the Secretary of the Air Force.

"(3) ORDER.—Except as provided in subsections (e) and (f), promotions shall be made in the order in which the names of officers appear on the promotion list and after officers previously selected for promotion in that competitive category have been promoted.

"(4) PROMOTIONS TO GRADE OF FIRST LIEUTENANT.—Officers to be promoted to the grade of first lieutenant shall be promoted in accordance with regulations prescribed by the Secretary of the Air Force.

Determinations.

"(c) PROMOTION OF FIRST LIEUTENANTS ON AN ALL-FULLY-QUALI-FIED OFFICERS LIST.—(1) Except as provided in subsection (f), officers on the Space Force officer list in the grade of first lieutenant who are on an approved all-fully-qualified-officers list shall be promoted to the grade of captain in accordance with regulations prescribed by the Secretary of the Air Force.

"(2) An all-fully-qualified-officers list shall be considered to be approved for purposes of subparagraph (A) when the list is approved by the President. When so approved, such a list shall be treated in the same manner as a promotion list under this chapter.

Recommendation.

"(3) The Secretary of the Air Force may make a recommendation to the President for approval of an all-fully-qualified-officers list only when the Secretary determines that all officers on the list are needed in the next higher grade to accomplish mission objectives.

"(4) For purposes of this paragraph, an all-fully-qualified-officers list is a list of all officers on the Space Force officer list in a grade who the Secretary of the Air Force determines—

"(A) are fully qualified for promotion to the next higher grade; and

"(B) would be eligible for consideration for promotion to the next higher grade by a selection board convened under section 20211 of this title upon the convening of such a board.

"(5) If the Secretary of the Air Force determines that one or more officers or former officers were not placed on an all-fully-qualified-list under this subsection because of administrative error, the Secretary may prepare a supplemental all-fully-qualified-officers list containing the names of any such officers for approval in accordance with this subsection.

"(d) DATE OF RANK.—

"(1) GENERAL RULE.—The date of rank of an officer appointed to a higher grade under this section is determined under section 741(d) of this title.

"(2) ADJUSTMENTS.—The date of rank of an officer appointed to a higher grade under this section may be adjusted in the same manner as an adjustment may be made under section 741(d)(4) of this title in the date of rank of an officer appointed to a higher grade under section 624(a) of this title.

Applicability.

In any use of the authority under the preceding sentence,

subparagraph (C)(ii) of such section shall be applied by substituting 'Space Force officer list' for 'active-duty list'.

"(3) ADDITIONAL PAY AND ALLOWANCES PRECLUDED.—Except as provided in paragraph (2) or as otherwise specifically authorized by law, an officer is not entitled to additional pay or allowances if the effective date of the officer's promotion is adjusted to reflect a date earlier than the actual date of the officer's promotion.

"(e) DELAY OF PROMOTIONS TO GENERAL OFFICER GRADES TO COMPLY WITH STRENGTH LIMITATIONS.—Under regulations prescribed by the Secretary of Defense, the promotion of an officer on the Space Force officer list to the grade of brigadier general or major general shall be delayed if that promotion would cause any strength limitation of section 526 of this title to be exceeded. The delay shall expire when the Secretary of the Air Force determines that the delay is no longer required to ensure compliance with the strength limitation.

Expiration.
Determination.

"(f) AUTHORITY TO DELAY APPOINTMENTS FOR SPECIFIED REASONS.—The provisions of section 14311 of this title shall apply to the appointment of an officer under this section in the same manner as they apply to an appointment of an officer under that section, and any reference in that section to an reserve active-status list shall be treated for purposes of applicability to an officer of the Space Force as referring to the Space Force officer list.

Applicability.

## "§ 20240. Acceptance of promotions; oath of office

10 USC
prec. 20231,
20240.

"(a) ACCEPTANCE.—An officer who is appointed to a higher grade under section 20239 of this title is considered to have accepted the appointment on the date on which the appointment is made unless the officer expressly declines the appointment.

"(b) OATH.—An officer who has served continuously since taking the oath of office prescribed in section 3331 of title 5 is not required to take a new oath upon appointment to a higher grade under section 20239 of this title.

## "§ 20241. Removal of officers from a list of officers recommended for promotion

10 USC
prec. 20231,
20241.

"(a) REMOVAL BY PRESIDENT.—The President may remove the name of any officer from a promotion list at any time before the date on which the officer is promoted.

"(b) REMOVAL FOR WITHHOLDING OF SENATE ADVICE AND CONSENT.—If the Senate does not give its advice and consent to the appointment to the next higher grade of an officer whose name is on a list of officers approved by the President for promotion (except in the case of promotions to a grade to which appointments may be made by the President alone), the name of that officer shall be removed from the list.

"(c) REMOVAL AFTER 18 MONTHS.—(1) If an officer whose name is on a list of officers approved for promotion under section 20238(a) of this title to a grade for which appointment is required by section 20201(a) of this title to be made by and with the advice and consent of the Senate is not appointed to that grade under such section during the officer's promotion eligibility period, the officer's name shall be removed from the list unless as of the end of such period the Senate has given its advice and consent to the appointment.

137 STAT. 648          PUBLIC LAW 118–31—DEC. 22, 2023

President.
Extension.

"(2) Before the end of the promotion eligibility period with respect to an officer under paragraph (1), the President may extend that period for purposes of paragraph (1) by an additional 12 months.

Definition.

"(3) In this subsection, the term 'promotion eligibility period' means, with respect to an officer whose name is on a list of officers approved for promotion under section 20238(a) of this title to a grade for which appointment is required by section 20201(a) of this title to be made by and with the advice and consent of the Senate, the period beginning on the date on which the list is so approved and ending on the first day of the eighteenth month following the month during which the list is so approved.

"(d) ADMINISTRATIVE REMOVAL.—Under regulations prescribed by the Secretary of the Air Force, if an officer on the Space Force officer list is discharged or dropped from the rolls or transferred to a retired status after having been recommended for promotion to a higher grade under this chapter, but before being promoted, the officer's name shall be administratively removed from the list of officers recommended for promotion by a selection board.

"(e) CONTINUED ELIGIBILITY FOR PROMOTION.—(1) An officer whose name is removed from a list under subsection (a), (b), or (c) continues to be eligible for consideration for promotion. If that officer is recommended for promotion by the next selection board convened for that officer's grade and competitive category and the officer is promoted, the Secretary of the Air Force may, upon the promotion, grant the officer the same date of rank, the same effective date for the pay and allowances of the grade to which promoted, and the same position on the Space Force officer list, as the officer would have had if the officer's name had not been removed from the list.

"(2) If such an officer who is in a grade below the grade of colonel is not recommended for promotion by the next selection board convened for the officer's grade and competitive category, or if the officer's name is again removed from the list of officers recommended for promotion, or if the Senate again does not give its advice and consent to his promotion, the officer shall be considered for all purposes to have failed of selection for promotion to the next higher grade.

"(f) APPLICABILITY OF PREVIOUS EXECUTIVE ORDER.—Except as otherwise provided by the President by Executive order, any Executive order issued before the date of the enactment of this section relating to functions of the President under section 14310 of this title shall apply in the same manner to functions of the President under this section.

10 USC
prec. 20231,
20242.
President.
Time period.

## "§ 20242. Authority to vacate promotions to grade of brigadier general

"(a) AUTHORITY.—The President may vacate the appointment of a Space Force officer to the grade of brigadier general if the period of time during which the officer has served in that grade after promotion to that grade is less than 18 months.

"(b) EFFECT OF PROMOTION BEING VACATED.—An officer whose promotion to the grade of brigadier general is vacated under this section holds the grade of colonel. Upon assuming the grade of colonel under this section, the officer shall have the same position on the Space Force officer list as the officer would have had if the officer had not served in the higher grade.

## "§ 20243. General officers ceasing to occupy positions commensurate with grade

10 USC prec. 20231, 20243. Deadline.

"(a) GENERAL OFFICERS.—Within 60 days after an officer of the Space Force on the Space Force officer list in a general officer grade ceases to occupy a position commensurate with that grade (or commensurate with a higher grade), the Secretary of the Air Force shall transfer or discharge the officer in accordance with whichever of the following the officer elects:

"(1) Transfer the officer in grade to the Space Force retired list, if the officer is qualified and applies for the transfer.

"(2) Transfer the officer in grade to a Space Force inactive status, if the officer is qualified.

"(3) Discharge the officer from the officer's appointment and, if the officer is qualified and applies therefor, appoint the officer in the grade held by the officer as a before the officer's appointment in a general officer grade.

"(4) Discharge the officer from the officer's appointment.

"(b) CREDIT FOR SERVICE IN GRADE.—An officer who is appointed under subsection (a)(3) shall be credited with an amount of service in the grade in which appointed that is equal to the amount of prior service in an active status in that grade and in any higher grade.

### "SUBCHAPTER IV—FAILURE OF SELECTION FOR PROMOTION AND INVOLUNTARY SEPARATION

10 USC prec. 20251.

## "§ 20251. Failure of selection for promotion

10 USC prec. 20251, 20251. Applicability.

"(a) IN GENERAL.—Except as provided in this section, sections 14501, 14503, and 14504 and section 631 and 632 of this title shall apply to promotions of officers on the Space Force officer list. For the purpose of such applicability—

"(1) any reference in those sections to the reserve active-status list or the active-duty list shall apply to the Space Force officer list; and

"(2) any reference in those sections to a board convened under section 14201 or 611 of this title shall apply to a board convened under section 20211 of this title.

"(b) INAPPLICABILITY OF FAILURE OF SELECTION FOR PROMOTION TO OFFICERS ABOVE PROMOTION ZONE.—The reference in section 14501 of this title to an officer above the promotion zone shall not apply in the promotion of officers on the Space Force officer list.

"(c) RETIREMENT AUTHORITIES.—In applying section 631 or 632 of this title to such an officer, the reference in subsection (a)(3) of that section to qualifying for retirement under certain sections of this title shall be deemed to refer to qualifying for retirement under any provision of law other than chapter 61 of this title.

"(d) EFFECT OF FAILURE OF SELECTION.—In the administration of this chapter pursuant to subsection (a)—

"(1) an officer on the Space Force officer list shall not be deemed to have failed twice of selection for promotion for purposes of section 629(e)(2) or 14502(b) of this title until the officer has failed selection of promotion to the next higher grade the maximum number of times specified for opportunities for promotion to such grade within the competitive category concerned under section 20234 of this title; and

"(2) any reference in section 631(a) or 632(a) of this title, or in sections 14504 through 14506 of this title, to an officer who has failed of selection for promotion to the next higher grade for the second time shall be deemed to refer instead to an officer on the Space Force officer list who has failed of selection for promotion to the next higher grade for the maximum number of times specified for opportunities for promotion to such grade within the competitive category concerned under section 20234 of this title.

**"§ 20251. Special selection boards; correction of errors**

10 USC
prec. 20251,
20251.

"(a) PERSONS NOT CONSIDERED BY PROMOTION BOARD BECAUSE OF ADMINISTRATIVE ERROR.—

Determination.

"(1) CONVENING OF BOARD.—In the case of an officer or former officer who the Secretary of the Air Force determines was not considered for selection for promotion by a selection board convened under section 20211 of this title because of administrative error, the Secretary shall convene a special selection board under this subsection to determine whether that officer or former officer should be recommended for promotion.

Appointment.

"(2) BOARD COMPOSITION; OATH.—Any such board shall be convened under regulations prescribed by the Secretary of Defense and shall be appointed and composed in accordance with section 20212 of this title and shall include the representation of competitive categories required by that section. The

Requirement.

members of a board convened under this subsection shall be required to take an oath in the same manner as prescribed in section 14103 of this title.

"(3) RECORD CONSIDERED BY BOARD.—A special selection board convened under paragraph (1) shall consider the record of the officer or former officer as that record would have appeared to the selection board that should have considered the officer or former officer. That record shall be compared with a sampling of the records of those officers of the same grade and competitive category who were recommended for promotion, and those officers of the same grade and competitive category who were not recommended for promotion, by that board.

"(4) EFFECT.—If a special selection board convened under paragraph (1) does not recommend for promotion an officer or former officer in a grade below the grade of colonel whose name was referred to it for consideration, the officer or former officer shall be considered to have failed of selection for promotion.

"(b) OFFICERS CONSIDERED BUT NOT SELECTED; MATERIAL ERROR.—

Determination.

"(1) CONVENING OF BOARD.—In the case of an officer or former officer who was eligible for promotion and was considered for selection for promotion by a selection board convened under section 20211 of this title but was not selected, the Secretary of the Air Force may, under regulations prescribed by the Secretary of Defense, convene a special selection board under this subsection to determine whether the officer or former officer should be recommended for promotion, if the Secretary must determine that—

"(A) the action of the selection board that considered the officer or former officer was contrary to law in a matter material to the decision of the board or involved material error of fact or material administrative error; or

"(B) the board did not have before it for its consideration material information.

"(2) BOARD COMPOSITION; OATH.—A special selection board convened under paragraph ((1) shall be appointed and composed in accordance with section 20212 of this title (including the representation of competitive categories required by that section), and the members of sch a board shall take an oath in the same manner as prescribed in section 14103 of this title.

"(3) RECORD CONSIDERED BY BOARD.—The special selection board shall consider the record of the officer or former officer as that record, if corrected, would have appeared to the board that considered the officer or former officer. That record shall be compared with the records of a sampling of those officers of the same grade and competitive category who were recommended for promotion, and those officers of the same grade and competitive category who were not recommended for promotion, by that board.

"(4) EFFECT.—If a special selection board convened under paragraph (1) does not recommend for promotion a officer or former officer whose name was referred to it for consideration, the officer or former officer incurs no additional failure of selection for promotion.

"(c) REPORT OF BOARD.—Each special selection board convened under this section shall submit to the Secretary of the Air Force a written report, signed by each member of the board, containing the name of each officer or former officer it recommends for promotion and certifying that the board has carefully considered the record of each officer or former officer whose name was referred to it.

"(d) APPLICABLE PROVISIONS.—The provisions of sections 20215 and 20216 of this title apply to the report and proceedings of a special selection board convened under this section in the same manner as they apply to the report and proceedings of a selection board convened under section 20211 of this title.

"(e) APPOINTMENT OF OFFICERS RECOMMENDED FOR PROMOTION.—

"(1) PROMOTION.—An officer or former officer whose name is placed on a promotion list as a result of a recommendation for promotion by a special selection board convened under this section shall, as soon as practicable, be appointed to the next higher grade in accordance with the law and policies which would have been applicable had the officer or former officer been recommended for promotion by the board which should have considered or which did consider the officer of former officer.

"(2) STATUS OF PROMOTED OFFICER.—An officer who is promoted to the next higher grade as the result of the recommendation of a special selection board convened under this section shall, upon such promotion, have the same date of rank, the same effective date for the pay and allowances of that grade, and the same position on the Space Force officer list as the officer would have had if the officer had been recommended

Appointment.

Recommendations.
Certification.

137 STAT. 652          PUBLIC LAW 118–31—DEC. 22, 2023

for promotion to that grade by the selection board which should have considered, or which did consider, the officer.

President.

"(3) CORRECTION OF MILITARY RECORD.—If the report of a special selection board convened under this section, as approved by the President, recommends for promotion to the next higher grade an officer not currently eligible for promotion or a former officer whose name was referred to it for consideration, the Secretary of the Air Force may act under section 1552 of this title to correct the military record of the officer or former officer to correct an error or remove an injustice resulting from not being selected for promotion by the board which should have considered, or which did consider, the officer.

"(f) PRESCRIBING OF CIRCUMSTANCES FOR CONSIDERATION BY BOARD.—The Secretary of Defense may prescribe by regulation—

Regulations.

"(1) the circumstances under which consideration by a special selection board is contingent upon application for consideration by an officer or former officer; and

"(2) time limits within which of officer or former officer must make such application in order to be considered by a special selection board under this section.

"(g) CONVENING OF BOARDS.—A board convened under this section—

"(1) shall be convened under regulations prescribed by the Secretary of Defense;

"(2) shall be composed in accordance with section 20212 of this title and regulations prescribed by the Secretary of the Air Force; and

"(3) shall be subject to the provisions of section 613 of this title.

"(h) LIMITATION OF OTHER JURISDICTION.—No official or court of the United States shall have power or jurisdiction—

"(1) over any claim based in any way on the failure of an officer or former officer of the armed forces to be selected for promotion by a selection board convened under this chapter until—

"(A) the claim has been referred to a special selection board by the Secretary of the Air Force and acted upon by that board; or

"(B) the claim has been rejected by the Secretary without consideration by a special selection board; or

"(2) to grant any relief on such a claim unless the officer or former officer has been selected for promotion by a special selection board convened under this section to consider the officer or former officer's claim.

"(i) JUDICIAL REVIEW.—(1) A court of the United States may review a determination by the Secretary of the Air Force under subsection (a)(1), (b)(1), or (e)(3) not to convene a special selection board. If a court finds the determination to be arbitrary or capricious, not based on substantial evidence, or otherwise contrary to law, it shall remand the case to the Secretary, who shall provide for consideration of the officer or former officer by a special selection board under this section.

"(2) If a court finds that the action of a special selection board which considers an officer or former officer was contrary to law or involved material error of fact or material administrative error, it shall remand the case to the Secretary, who shall provide the

officer or former officer reconsideration by a new special selection board.

"(j) DESIGNATION OF BOARDS.—The Secretary of the Air Force may designate a promotion board convened under section 20201(a) of this title as a special selection board convened under this section.

### "§ 20252a. Special selection review boards: reference

"Section 628a of this title, relating to the convening of a special selection review board when credible information of an adverse nature was not furnished to a promotion board, applies with respect to persons recommended by a selection board for promotion to a grade at or below the grade of major general in the Space Force.

Applicability.
10 USC prec. 20251, 20252a.

### "§ 20253. Retirement: retirement for years of service

"Sections 633 through 636 of this title shall apply to the retirement of officers on the Space Force officer list in the same manner as to officers of the Regular Air Force.

10 USC prec. 20251, 20253.
Applicability.

### "SUBCHAPTER V—CONTINUATION ON ACTIVE DUTY AND SELECTIVE EARLY RETIREMENT; OTHER PROVISIONS

10 USC prec. 20261.

### "§ 20261 Selection of officers for continuation on the Space Force officer list

"Section 14701 of this title shall apply in continuation or retention on the Space Force officer in the same manner as to continuation on the reserve active-status list.

10 USC prec. 20261, 20261.
Applicability.

### "§ 20262. Retirement: selective early retirement

"Sections 638 and 638a of this title shall apply to the retirement of officers on the Space Force officer list in the same manner as to officers of the Regular Air Force.

10 USC prec. 20261, 20262.
Applicability.

### "§ 20263. Entitlement of officers discharged or retired under this chapter to separation pay or retired pay

"(a) SEPARATION PAY.—An officer who is discharged under this chapter is entitled, if eligible therefor, to separation pay under section 1174 of this title.

"(b) RETIRED PAY.—An officer who is retired under this chapter is entitled to retired pay computed under chapter 71 or 1223 of this title, as applicable.

10 USC prec. 20261, 20263.

### "§ 20264. Other administrative authorities

"The following provisions of this title shall apply to officers on the Space Force officer list in the same manner as to officers subject to those provisions:

"(1) Section 14518, relating to continuation of officers to complete disciplinary action.

"(2) Section 14519, relating to deferment of retirement or separation for medical reasons.

"(3) Section 14704, relating to the selective early removal from the reserve active-status list.".

(d) TEMPORARY ("BREVET") PROMOTIONS FOR OFFICERS WITH CRITICAL SKILLS.—Section 605 of title 10, United States Code, is amended as follows:

(1) COVERAGE OF SPACE FORCE OFFICERS.—Subsections (a), (b)(2)(A), (f)(1), and (f)(2) are amended by striking "or Marine

10 USC prec. 20261, 20264.
Applicability.

137 STAT. 654          PUBLIC LAW 118–31—DEC. 22, 2023

Corps," each place it appears and inserting "Marine Corps, or Space Force,".

10 USC 605.

(2) DISAGGREGATION OF AIR FORCE MAXIMUM NUMBERS.— Subsection (g) is amended—

(A) by redesignating paragraphs (3) and (4) as paragraphs (4) and (5), respectively; and

(B) by striking paragraph (2) and inserting the following new paragraphs (2) and (3):

"(2) In the case of the Air Force—

"(A) as captain 95;

"(B) as major, 305;

"(C) as lieutenant colonel, 165; and

"(D) as colonel, 75.

"(3) In the case of the Space Force—

"(A) as captain, 5;

"(B) as major, 20;

"(C) as lieutenant colonel, 10; and

"(D) as colonel, 5.".

### SEC. 1717. ENLISTED MEMBERS.

(a) IN GENERAL.—Subtitle F of title 10, United States Code, as amended by section 1716, is further amended by adding at the end the following new chapter:

10 USC prec. 20301.

### "CHAPTER 2007—ENLISTED MEMBERS

"Sec.
"20301. Original enlistments: qualifications; grade.
"20302. Enlisted members: term of enlistment.
"20303. Reference to chapter 31.

10 USC 20301.

### "§ 20301. Original enlistments: qualifications; grade

"(a) ORIGINAL ENLISTMENTS.—

"(1) AUTHORITY TO ACCEPT.—The Secretary of the Air Force may accept original enlistments in the Space Force of qualified, effective, and able-bodied persons.

"(2) AGE.—A person accepted for original enlistment shall be not less than seventeen years of age. However, no person under eighteen years of age may be originally enlisted without the written consent of the person's parent or guardian, if the person has a parent or guardian entitled to the person's custody and control.

"(b) GRADE.—A person is enlisted in the Space Force in the grade prescribed by the Secretary of the Air Force.

10 USC 20302.

### "§ 20302. Enlisted members: term of enlistment

"(a) TERM OF ORIGINAL ENLISTMENTS.—The Secretary of the Air Force may accept original enlistments of persons for the duration of their minority or for a period of at least two but not more than eight years in the Space Force.

Determination.

"(b) TERM OF REENLISTMENTS.—The Secretary of the Air Force may accept a reenlistment in the Space Force for a period determined in accordance with paragraphs (2), (3), and (4) of section 505(d) of this title.

10 USC 20303.

### "§ 20303. Reference to chapter 31

"For other provisions of this title applicable to enlistments in the Space Force, see chapter 31 of this title.".

(b) AMENDMENTS TO TITLE 10 CHAPTER RELATING TO ENLISTMENTS.—Chapter 31 of such title is amended as follows:

(1) RECRUITING CAMPAIGNS.—Section 503(a) is amended by inserting "and the Space Force" after "Regular Coast Guard".

(2) QUALIFICATIONS, TERM, GRADE.—Section 505 is amended—

(A) by striking "Regular Space Force," each place it appears; and

(B) by adding at the end the following new subsection:

"(e) ENLISTMENTS IN THE SPACE FORCE.—For enlistments in the Space Force, see sections 20301 and 20302 of this title.".

(3) EXTENSION OF ENLISTMENTS DURING WAR.—Section 506 is amended by striking "Regular" before "Space Force".

(4) REENLISTMENT.—Section 508 is amended striking "Regular" before "Space Force" in subsections (b) and (c).

(5) ENLISTMENT INCENTIVES FOR PURSUIT OF SKILLS TO FACILITATE NATIONAL SERVICE.—Section 510(c) is amended—

(A) in paragraph (2), by inserting "or the Space Force" after "Selected Reserve"; and

(B) in paragraph (3)—

(i) by redesignating subparagraphs (D) and (E) as subparagraphs (E) and (F), respectively;

(ii) by inserting after subparagraph (C) the following new subparagraph (D):

"(D) in the Space Force;"; and

(iii) in subparagraph (F), as so redesignated, by striking "subparagraphs (A) through (D)" and inserting "subparagraphs (A) through (E)".

(6) COLLEGE FIRST PROGRAM.—Section 511(b)(1)(A), is amended by inserting "or as a member of the Space Force," after "reserve component,".

(7) DELAYED ENTRY PROGRAM.—Section 513(a) is amended—

(A) by inserting, ", or who is qualified under section 20301 of this title and applicable regulations for enlistment in the Space Force," after "armed force"; and

(B) by inserting ", or be enlisted as a member of the Space Force," after "Coast Guard Reserve".

(8) EFFECT UPON ENLISTED STATUS OF ACCEPTANCE OF APPOINTMENT AS CADET OR MIDSHIPMAN.—Section 516(b) is amended by inserting "or in the Space Force," after "armed force".

**SEC. 1718. RETENTION AND SEPARATION GENERALLY.**

(a) IN GENERAL.—Subtitle F of title 10, United States Code, as amended by section 1717, is further amended by adding at the end the following new chapter:

### "CHAPTER 2009—RETENTION AND SEPARATION GENERALLY

10 USC
prec. 20401.

"Sec.

"20401. Applicability of certain provisions of law related to separation.
"20402. Enlisted members: standards and qualifications for retention.
"20403. Officers: standards and qualifications for retention.
"20404. Selection of officers for early retirement or discharge.
"20404. Force shaping authority.

10 USC 20401.

## "§ 20401. Applicability of certain provisions of law related to separation

"(a) OFFICER SEPARATION.—Except as specified in this section or otherwise modified in this chapter, the provisions of chapter 59 of this title applicable to officers of a regular component shall apply to officers of the Space Force.

"(b) Except as specified in this section or otherwise modified in this chapter, the provisions of sections 1169, 1170, 1171, 1173, 1174(b) 1176(a) of chapter 59 of this title applicable to enlisted members of a regular component shall apply to enlisted members of the Space Force.

"(c) The provisions of section 1172 of this title pertaining to a person enlisted under section 518 of this title shall apply to an enlisted member of the Space Force.

"(d) The provisions of section 1174 of this title—

"(1) pertaining to a regular officer shall apply to a Space Force officer serving on sustained duty;

"(2) pertaining to a regular enlisted member shall apply to an enlisted member of the Space Force serving on sustained duty; and

"(3) pertaining to other members shall apply to members of the Space Force not serving on sustained duty.

"(e) The provisions of section 1175 of this title pertaining to a voluntary appointment, enlistment, or transfer to a reserve component shall apply to the voluntary release from active duty of a member of the Space Force on sustained duty.

"(f) The provisions of section 1176 of this title—

"(1) pertaining to a regular enlisted member shall apply to an enlisted member of the Space Force serving on sustained duty; and

"(2) pertaining to a reserve enlisted member serving in an active status shall apply to an enlisted member of the Space Force serving in a space force active status or on sustained duty.

10 USC 20402.

## "§ 20402. Enlisted members: standards and qualifications for retention

Regulations.

"(a) STANDARDS AND QUALIFICATIONS FOR RETENTION.—The Secretary of the Air Force shall, by regulation, prescribe—

"(1) standards and qualifications for the retention of enlisted members of the Space Force; and

Procedures.
Determinations.
Compliance.

"(2) equitable procedures for the periodic determination of the compliance of each such member with those standards and qualifications.

"(b) EFFECT OF FAILURE TO COMPLY WITH STANDARDS AND QUALIFICATIONS.—If an enlisted member serving in Space Force active status fails to comply with the standards and qualifications prescribed under subsection (a), the member shall—

"(1) if qualified, be transferred to Space Force inactive status;

"(2) if qualified, be retired in accordance with section 20603 of this title; or

Termination.

"(3) have the member's enlistment terminated.

10 USC 20403.

## "§ 20403. Officers: standards and qualifications for retention

"(a) STANDARDS AND QUALIFICATIONS.—To be retained in an active status, a Space Force officer must—

"(1) in any applicable yearly period, attain the number of points under section 12732(a)(2) of this title that are prescribed by the Secretary of the Air Force; and

"(2) conform to such other standards and qualifications as the Secretary may prescribe for officers of the Space Force.

"(b) LIMITATION ON MINIMUM NUMBER OF POINTS.—The Secretary may not prescribe a minimum of more than 50 points under subsection (a).

"(c) RESULT OF FAILURE TO COMPLY.—A Space Force officer who fails to attain the number of points prescribed under subsection (a)(1), or to conform to the standards and qualifications prescribed under subsection (a)(2), may be referred to a board convened under section 20501(a) of this title.

## "§ 20404. Selection of officers for early retirement or discharge

Time periods.
10 USC 20404.

"(a) CONSIDERATION FOR EARLY RETIREMENT.—The Secretary of the Air Force may convene selection boards under section 20211(b) of this title to consider for early retirement officers on the space force officer list as follows:

"(1) Officers in the grade of lieutenant colonel who have failed of selection for promotion at least one time and whose names are not on a list of officers recommended for promotion.

"(2) Officers in the grade of colonel who have served in that grade for at least two years and whose names are not on a list of officers recommended for promotion.

"(3) Officers, other than those described in paragraphs (1) and (2), holding a grade below the grade of colonel—

"(A) who are eligible for retirement under section 20601 of this title or who after two additional years or less of active service would be eligible for retirement under that section; and

"(B) whose names are not on a list of officers recommended for promotion.

"(b) CONSIDERATION FOR DISCHARGE.—

"(1) The Secretary of the Air Force may convene selection boards under section 20211 of this title to consider for discharge officers on the space force officer list—

"(A) who have served at least one year of active status in the grade currently held;

"(B) whose names are not on a list of officers recommended for promotion; and

"(C) who are not eligible to be retired under any provision of law (other than by reason of eligibility pursuant to section 4403 of the National Defense Authorization Act for Fiscal Year 1993) and are not within two years of becoming so eligible.

"(2) An officer who is recommended for discharge by a selection board convened pursuant to the authority of paragraph (1) and whose discharge is approved by the Secretary of the Air Force shall be discharged on a date specified by the Secretary.

"(3) Selection of officers for discharge under paragraph (1) shall be based on the needs of the service.

"(c) DISCHARGES AND RETIREMENTS CONSIDERED TO BE INVOLUNTARY.—The discharge or retirement of an officer pursuant to

137 STAT. 658          PUBLIC LAW 118–31—DEC. 22, 2023

this section shall be considered to be involuntary for purposes of any other provision of law.

10 USC 20405.

**"§ 20405. Force shaping authority**

"(a) AUTHORITY.—The Secretary of the Air Force may, solely for the purpose of restructuring the Space Force—

"(1) discharge an officer described in subsection (b); or

"(2) involuntarily release such an officer from sustained duty.

"(b) COVERED OFFICERS.—

Time periods.

"(1) The authority under this section may be exercised in the case of an officer of the Space Force serving on sustained duty who—

"(A) has completed not more than six years of service as a commissioned officer in the armed forces; or

"(B) has completed more than six years of service as a commissioned officer in the armed forces, but has not completed the minimum service obligation applicable to that officer.

Definition.

"(2) In this subsection, the term 'minimum service obligation', with respect to a member of the Space Force, means the initial period of required active duty service applicable to the member, together with any additional period of required active duty service incurred by that member during the member's initial period of required active duty service.

"(c) REGULATIONS.—The Secretary of the Air Force shall prescribe regulations for the exercise of the Secretary's authority under this section.".

(b) CONFORMING AMENDMENTS.—Section 647 of title 10, United States Code, is amended—

(1) in subsection (b), by inserting "(other than an officer of the Space Force)" after "in the case of an officer";

(2) in subsection (c), by striking "Regular Marine Corps, of Regular Space Force" and inserting "or Regular Marine Corps"; and

(3) by adding at the end the following new subsection:

"(e) SPACE FORCE.—For a similar provision with respect to officers of the Space Force, see section 20405 of this title.".

**SEC. 1719. SEPARATION OF OFFICERS FOR SUBSTANDARD PERFORM-ANCE OF DUTY OR FOR CERTAIN OTHER REASONS.**

Subtitle F of title 10, United States Code, as amended by section 1718, is further amended by adding at the end the following new chapter:

10 USC prec. 20501.

**"CHAPTER 2011—SEPARATION OF OFFICERS FOR SUB-STANDARD PERFORMANCE OF DUTY OR FOR CER-TAIN OTHER REASONS**

"Sec.

"20501. Authority to establish procedures to consider the separation of officers for substandard performance of duty and for certain other reasons.

"20502. Retention boards.

"20503. Removal of officer: action by Secretary upon recommendation of retention board.

"20504. Rights and procedures.

"20505. Officer considered for removal: voluntary retirement or discharge.

"20506. Officers eligible to serve on retention boards.

### "§ 20501. Authority to establish procedures to consider the separation of officers for substandard performance of duty and for certain other reasons

Regulations.
Determinations.
10 USC 20501.

"(a) PROCEDURES FOR REVIEW OF RECORD OF OFFICERS RELATING TO STANDARDS OF PERFORMANCE OF DUTY.—

"(1) The Secretary of the Air Force shall prescribe, by regulation, procedures for the review at any time of the record of any commissioned officer (other than a retired officer) of the Space Force in a space force active status to determine whether the officer shall be required, because of a reason stated in paragraph (2), to show cause for the officer's retention in a space force active status.

"(2) The reasons referred to in paragraph (1) are the following:

"(A) The officer's performance of duty has fallen below standards prescribed by the Secretary of Defense.

"(B) The officer has failed to satisfy the standards and qualifications established under section 20403 of this title by the Secretary of the Air Force.

"(b) PROCEDURES FOR REVIEW OF RECORD OF OFFICERS RELATING TO CERTAIN OTHER REASONS.—

"(1) The Secretary of the Air Force shall prescribe, by regulation, procedures for the review at any time of the record of any commissioned officer (other than a retired officer) of the Space Force in a space force active status to determine whether the officer should be required, because of a reason stated in paragraph (2), to show cause for the officer's retention in a space force active status.

"(2) The reasons referred to in paragraph (1) are the following:

"(A) Misconduct.

"(B) Moral or professional dereliction.

"(C) The officer's retention is not clearly consistent with the interests of national security.

"(c) SECRETARY OF DEFENSE LIMITATIONS.—Regulations prescribed by the Secretary of the Air Force under this section are subject to such limitations as the Secretary of Defense may prescribe.

### "§ 20502. Retention boards

10 USC 20502.

"(a) CONVENING OF BOARDS TO CONSIDER OFFICERS REQUIRED TO SHOW CAUSE.—The Secretary of the Air Force shall convene retention boards at such times and places as the Secretary may prescribe to receive evidence and make findings and recommendations as to whether an officer who is required under section 20501 of this title to show cause for retention in a space force active status should be retained in a space force active status. Each retention board shall be composed of not less than three officers having the qualifications prescribed by section 20506 of this title.

Recommendations.

"(b) FAIR AND IMPARTIAL HEARING.—A retention board shall give a fair and impartial hearing to each officer required under section 20501 of this title to show cause for retention in a space force active status.

"(c) EFFECT OF BOARD DETERMINATION THAN AN OFFICER HAS FAILED TO ESTABLISH THAT THE OFFICER SHOULD BE RETAINED.—

"(1) If a retention board determines that the officer has failed to establish that the officer should be retained in a

Recommendations.

space force active status, the board shall recommend to the Secretary of the Air Force one of the following:

"(A) That the officer be transferred to an inactive status.

"(B) That the officer, if qualified under any provision of law, be retired.

"(C) That the officer be discharged from the Space Force.

"(2) Under regulations prescribed by the Secretary of the Air Force, an officer as to whom a retention board makes a recommendation under paragraph (1) that the officer not be retained in a space force active status may be required to take leave pending the completion of the officer's case under this chapter. The officer may be required to begin such leave at any time following the officer's receipt of the report of the retention board, including the board's recommendation for removal from a space force active status, and the expiration of any period allowed for submission by the officer of a rebuttal to that report. The leave may be continued until the date on which action by the Secretary of the Air Force on the officer's case is completed or may be terminated at any earlier time.

"(d) EFFECT OF BOARD DETERMINATION THAN AN OFFICER HAS ESTABLISHED THAT THE OFFICER SHOULD BE RETAINED.—

"(1) If a retention board determines that the officer has established that the officer should be retained in a space force active status, the officer's case is closed.

Time period.

"(2) An officer who is required to show cause for retention in a space force active status under subsection (a) of section 20501 of this title and who is determined under paragraph (1) to have established that the officer should be retained in a space force active status may not again be required to show cause for retention in a space force active status under such subsection within the one-year period beginning on the date of that determination.

"(3)(A) Subject to subparagraph (B), an officer who is required to show cause for retention in a space force active status under subsection (b) of section 20501 of this title and who is determined under paragraph (1) to have established that the officer should be retained in a space force active status may again be required to show cause for retention at any time.

"(B) An officer who has been required to show cause for retention in a space force active status under subsection (b) of section 20501 of this title and who is thereafter retained in an active status may not again be required to show cause for retention in a space force active status under such subsection solely because of conduct which was the subject of the previous proceedings, unless the findings or recommendations of the retention board that considered the officer's previous case are determined to have been obtained by fraud or collusion.

Recommendations.

"(4) In the case of an officer described in paragraph (2) or paragraph (3)(A), the retention board may recommend that the officer be required to complete additional training, professional education, or such other developmental programs as

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 661

may be available to correct any identified deficiencies and improve the officer's performance within the Space Force.

### "§ 20503. Removal of officer: action by Secretary upon recommendation of retention board

10 USC 20503.

"The Secretary of the Air Force may remove an officer from space force active status if the removal of such officer from space force active status is recommended by a retention board convened under section 20502 of this title.

### "§ 20504. Rights and procedures

10 USC 20504.

"(a) IN GENERAL.—Under regulations prescribed by the Secretary of the Air Force, each officer required under section 20501 of this title to show cause for retention in a space force active status—

"(1) shall be notified in writing, at least 30 days before the hearing of the officer's case by a retention board, of the reasons for which the officer is being required to show cause for retention in a space force active status;

Notification.
Deadline.

"(2) shall be allowed a reasonable time, as determined by the board, to prepare the officer's showing of cause for retention in a space force active status;

"(3) shall be allowed to appear either in person or through electronic means and to be represented by counsel at proceedings before the board; and

"(4) shall be allowed full access to, and shall be furnished copies of, records relevant to the officer's case, except that the board shall withhold any record that the Secretary determines should be withheld in the interest of national security.

Records.
Determination.

"(b) SUMMARY OF RECORDS WITHHELD IN INTEREST OF NATIONAL SECURITY.—When a record is withheld under subsection (a)(4), the officer whose case is under consideration shall, to the extent that the interest of national security permits, be furnished a summary of the record so withheld.

### "§ 20505. Officer considered for removal: voluntary retirement or discharge

10 USC 20505.

"(a) IN GENERAL.—At any time during proceedings under this chapter with respect to the removal of an officer from a space force active status , the Secretary of the Air Force may grant a request by the officer—

"(1) for voluntary retirement, if the officer is qualified for retirement; or

"(2) for discharge in accordance with subsection (b)(2).

"(b) RETIREMENT OR DISCHARGE.—An officer removed from a space force active status under section 20503 of this title shall—

"(1) if eligible for voluntary retirement under any provision of law on the date of such removal, be retired in the grade and with the retired pay for which the officer would be eligible if retired under such provision; and

"(2) if ineligible for voluntary retirement under any provision of law on the date of such removal—

"(A) be honorably discharged in the grade then held, in the case of an officer whose case was brought under subsection (a) of section 20501 of this title; or

"(B) be discharged in the grade then held, in the case of an officer whose case was brought under subsection (b) of section 20501 of this title.

"(c) SEPARATION PAY FOR DISCHARGED OFFICER.—An officer who is discharged under subsection (b)(2) is entitled, if eligible therefor, to separation pay under section 1174(a)(2) of this title.

Applicability.
Appointments.
10 USC 20506.

**"§ 20506. Officers eligible to serve on retention boards**

"(a) IN GENERAL.—The provisions of section 1187 of this title apply to the membership of boards convened under this chapter in the same manner as to the membership of boards convened under chapter 60 of this title.

"(b) RETIRED AIR FORCE OFFICERS.—

"(1) AUTHORITY.—In applying subsection (b) of section 1187 of this title to a board convened under this chapter, the Secretary of the Air Force may appoint retired officers of the Air Force, in addition to retired officers of the Space Force, to complete the membership of the board.

Determination.

"(2) LIMITATION.—A retired officer of the Air Force may be appointed to a board under paragraph (1) only if the officer served in a space-related career field of the Air Force for sufficient time such that the Secretary of the Air Force determines that the retired Air Force officer has adequate knowledge concerning the standards of performance and conduct required of an officer of the Space Force.".

**SEC. 1719A. RETIREMENT.**

(a) IN GENERAL.—Subtitle F of title 10, United States Code, as amended by section 1719, is further amended by adding at the end the following new chapter:

10 USC
prec. 20601.

**"CHAPTER 2013—VOLUNTARY RETIREMENT FOR LENGTH OF SERVICE**

"Sec.
"20601. Officers: voluntary retirement for length of service.
"20602. Officers: computation of years of service for voluntary retirement.
"20603. Enlisted members: voluntary retirement for length of service.
"20604. Enlisted members: computation of years of service for voluntary retirement.
"20605. Applicability of other provisions of law relating to retirement.

10 USC 20601.

**"§ 20601. Officers: voluntary retirement for length of service**

"(a) TWENTY YEARS OR MORE.—The Secretary of the Air Force may, upon the officer's request, retire a commissioned officer of the Space Force who has at least 20 years of service computed under section 20602 of this title, at least 10 years of which have been active service as a commissioned officer.

"(b) THIRTY YEARS OR MORE.—A commissioned officer of the Space Force who has at least 30 years of service computed under section 20602 of this title may be retired upon the officer's request, in the discretion of the President.

"(c) FORTY YEARS OR MORE.—Except as provided in section 20503 of this title, a commissioned officer of the Space Force who has at least 40 years of service computed under section 20602 of this title shall be retired upon the officer's request.

### "§ 20602. Officers: computation of years of service for voluntary retirement

10 USC 20602.

"(a) YEARS OF ACTIVE SERVICE.—For the purpose of determining whether an officer of the Space Force may be retired under section 20601 of this title, the officer's years of service are computed by adding all active service in the armed forces.

"(b) REFERENCE TO SECTION EXCLUDING SERVICE DURING CERTAIN PERIODS.—Section 972(b) of this title excludes from computation of an officer's years of service for purposes of this section any time identified with respect to that officer under that section.

### "§ 20603. Enlisted members: voluntary retirement for length of service

10 USC 20603.

"(a) TWENTY TO THIRTY YEARS.—Under regulations to be prescribed by the Secretary of the Air Force, an enlisted member of the Space Force who has at least 20, but less than 30, years of service computed under section 20604 of this title may, upon the member's request, be retired.

"(b) THIRTY YEARS OR MORE.—An enlisted member of the Space Force who has at least 30 years of service computed under section 20604 of this title shall be retired upon the member's request.

### "§ 20604. Enlisted members: computation of years of service for voluntary retirement

10 USC 20604.

"(a) YEARS OF ACTIVE SERVICE.—For the purpose of determining whether an enlisted member of the Space Force may be retired under section 20603 of this title, the member's years of service are computed by adding all active service in the armed forces.

"(b) REFERENCE TO SECTION EXCLUDING COUNTING OF CERTAIN SERVICE REQUIRED TO BE MADE UP.—Time required to be made up under section 972(a) of this title may not be counted in computing years of service under subsection (a).

### "§ 20605. Applicability of other provisions of law relating to retirement

10 USC 20605.

"(a) APPLICABILITY TO MEMBERS OF THE SPACE FORCE.—Except as specifically provided for by this chapter, the provisions of this title specified in subsection (b) apply to members of the Space Force as follows:

"(1) Provisions pertaining to an officer of the Air Force shall apply to an officer of the Space Force.

"(2) Provisions pertaining to an enlisted member of the Air Force shall apply to an enlisted member of the Space Force.

"(3) Provisions pertaining to a regular officer shall apply to an officer who is on sustained duty in the Space Force.

"(4) Provisions pertaining to a regular enlisted member shall apply to an enlisted member who is on sustained duty in the Space Force.

"(5) Provisions pertaining to a reserve officer shall apply to an officer who is in a space force active status but not on sustained duty.

"(6) Provisions pertaining to a reserve enlisted member shall apply to an enlisted member who is in a space force active status but not on sustained duty.

"(7) Provisions pertaining to service in a regular component shall apply to service on sustained duty.

"(8) Provisions pertaining to service in a reserve component shall apply to service in a space force active status not on sustained duty.

"(9) Provisions pertaining to a member of the Ready Reserve shall apply to a member of the Space Force who is in a space force active status prior to being ordered to active duty.

"(10) Provisions pertaining to a member of the Retired Reserve shall apply to a member of the Space Force who has retired under chapter 1223 of this title.

"(b) PROVISIONS OF LAW.—The provisions of this title referred to in subsection (a) are the following:

"(1) Chapter 61, relating to retirement or separation for physical disability.

"(2) Chapter 63, relating to retirement for age.

"(3) Chapter 69, relating to retired grade.

"(4) Chapter 71, relating to computation of retired pay.

"(5) Chapter 941, relating to retirement from the Air Force for length of service.

"(6) Chapter 945, relating to computation of retired pay.

"(7) Chapter 1223, relating to retired pay for non-regular service.

"(8) Chapter 1225, relating to retired grade.".

(b) CONFORMING AMENDMENTS.—Title 10, United States Code, is amended as follows:

(1) RETIRED MEMBERS ORDERED TO ACTIVE DUTY.—Section 688(b) is amended—

(A) in paragraph (1), by striking "Regular Marine Corps, or Regular Space Force" and inserting "or Regular Marine Corps"; and

(B) by adding at the end the following new paragraph: "(4) A retired member of the Space Force.".

(2) RETIRED GRADE.—Section 9341 is amended—

(A) by striking "or the Space Force" both places it appears in subsection (a);

(B) by striking "or a Regular or Reserve of the Space Force" in subsection (b); and

(C) by adding at the end the following new subsection:

"(c) SPACE FORCE.—(1) The retired grade of a commissioned officer of the Space Force who retires other than for physical disability is determined under section 1370 or 1370a of this title, as applicable to the officer.

"(2) Unless entitled to a higher retired grade under some other provision of law, a member of the Space Force not covered by paragraph (1) who retires other than for physical disability retires in the grade that the member holds on the date of the member's retirement.".

(3) RETIRED GRADE OF ENLISTED MEMBERS AFTER 30 YEARS OF SERVICE.—Section 9344(b)(2) is amended by striking "Regular" before "Space Force".

(4) RETIRED LISTS.—Section 9346 is amended—

(A) in subsection (a), by striking "or the Regular Space Force" and inserting "and a separate retired list containing the name of each retired commissioned officer of the Space Force (other than an officer whose name is on the list maintained under subsection (b)(2))";

(B) in subsection (b)—

(i) by inserting "(1)" after "(b)";

(ii) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively;

(iii) in subparagraph (A), as so redesignated, by striking ", or for commissioned officers of the Space Force other than of the Regular Space Force";

(iv) in subparagraph (B), as so redesignated, by striking "or the Space Force"; and

(v) by adding at the end the following new paragraph:

"(2) The Secretary shall maintain a retired list containing the name of—

"(A) each person entitled to retired pay who as a member of the Space Force qualified for retirement under section 20601 of this title; and

"(B) each retired warrant officer or enlisted member of the Space Force who is advanced to a commissioned grade.";

(C) in subsection (c), by striking "or the Space Force" and inserting "and a separate retired list containing the name of each retired warrant officer of the Space Force"; and

(D) in subsection (d), by striking "or the Regular Space Force" and inserting "and a separate retired list containing the name of each retired enlisted member of the Space Force".

# Subtitle B—Conforming Amendments Related to Space Force Military Personnel System

### SEC. 1721. AMENDMENTS TO DEPARTMENT OF THE AIR FORCE PROVISIONS OF TITLE 10, UNITED STATES CODE.

(a) PROVISIONS RELATING TO PERSONNEL.—Part II of subtitle D of title 10, United States Code, is amended as follows:

(1) GENDER-FREE BASIS FOR ACCEPTANCE OF ORIGINAL ENLISTMENTS.—

(A) Section 9132 by striking "Regular" before "Space Force".

(B) The heading of such section is amended by striking the fifth word.    10 USC prec. 9131, 9132.

(2) REENLISTMENT AFTER SERVICE AS AN OFFICER.—

(A) Section 9138(a) is amended by striking "Regular" before "Space Force" both places it appears.

(B) The heading of section 9138 is amended by striking the fifth word.    10 USC prec. 9131.

(3) WARRANT OFFICERS: ORIGINAL APPOINTMENT; QUALIFICATIONS.—Section 9160 is amended by striking "Regular" before "Space Force".

(4) SERVICE AS AN OFFICER TO BE COUNTED AS ENLISTED SERVICE.—Section 9252 is amended by striking "Regular" before "Space Force".

(5) CHAPTER HEADING.—

(A) The heading of chapter 915 is amended to read as follows:    10 USC prec. 9151.

137 STAT. 666        PUBLIC LAW 118–31—DEC. 22, 2023

## "CHAPTER 915—APPOINTMENTS IN THE REGULAR AIR FORCE AND IN THE SPACE FORCE".

10 USC
prec. 9011,
prec. 9110.

(B) The tables of chapters at the beginning of subtitle D, and at the beginning of part II of subtitle D of such title, are each amended by striking the item relating to chapter 915 and inserting the following new item:

"915. Appointments in the Regular Air Force and in the Space Force ............. 9151".

(b) PROVISIONS RELATING TO TRAINING GENERALLY.—Section 9401 of such title is amended—

(1) in subsection (b)—

(A) by striking "or the Regular Space Force" after "Regular Air Force"; and

(B) by inserting "or one of the Space Force in a space force active status not on sustained duty," after "on the active-duty list,";

(2) in subsection (c)—

(A) by striking "or Reserve of the Space Force" and inserting "or member of the Space Force in a space force active status not on sustained duty"; and

(B) by striking "the Reserve's consent" and inserting "the member's consent"; and

(3) in subsection (f)—

(A) by striking "the Regular Space Force" and inserting "of Space Force members on sustained duty"; and

(B) by striking "the Space Force Reserve" and inserting "of Space Force members in an active status not on sustained duty".

(c) PROVISIONS RELATING TO THE AIR FORCE ACADEMY.— Chapter 953 of such title is amended as follows:

(1) PERMANENT PROFESSORS; DIRECTOR OF ADMISSIONS.— Section 9436 is amended—

(A) in subsection (a)—

(i) by striking "the equivalent grade in" both places it appears;

(ii) by inserting "or the Space Force" after "Regular Air Force" the first place it appears;

(iii) by striking "and a permanent" and all that follows through "in the Regular Air Force"; and

(B) in subsection (b)—

(i) by striking "the equivalent grade in" both places it appears and inserting "the grade of lieutenant colonel in"; and

(ii) by striking "Regular Space Force has the grade equivalent to the grade of colonel in the Regular Air Force" and inserting "Space Force has the grade of colonel in the Space Force".

(2) APPOINTMENT OF CADETS.—Section 9442(b) is amended—

(A) in paragraph (1)(C), by inserting ", or the Space Force," after "members of reserve components"; and

(B) in paragraph (2), by striking "Regular" before "Space Force".

(3) AGREEMENT OF CADETS TO SERVE AS OFFICERS.—Section 9448(a) is amended—

(A) in paragraph (2)(A), by striking "Regular" before "Space Force"; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 667

(B) in paragraph (3)—
(i) in the matter preceding subparagraph (A), by inserting ", or to terminate the officer's order to sustained duty in the Space Force" after "resign as a regular officer";
(ii) in subparagraph (A), by striking "or as a Reserve in the Space Force for service in the Space Force Reserve" and inserting "or will accept further assignment in a space force active status"; and
(iii) in subparagraph (B), by inserting ", or the Space Force," after "that reserve component".

(4) HAZING.—Section 9452(c) is amended by striking "Marine Corps, or Space Force," and inserting, "or Marine Corps, or in the Space Force,". <span style="float:right">10 USC 9452.</span>

(5) COMMISSION UPON GRADUATION.—Section 9453(b) is amended—
(A) by striking "or in the equivalent grade in the Regular Space Force"; and
(B) by inserting before the period the following: "or a second lieutenant in the Space Force under section 531 or 20201 of this title".

(d) PROVISIONS RELATING TO SCHOOLS AND CAMPS.—Chapter 957 of such title is amended as follows:
(1) PURPOSE.—Section 9481 is amended—
(A) by striking "to qualify them for appointment" and inserting "to qualify them for—
"(1) appointment";
(B) by striking "or the Space Force Reserve." and inserting "; or"; and
(C) by adding at the end the following new paragraph:
"(2) appointment as officers, or enlistment as noncommissioned officers, for service in the Space Force in a space force active status.".

(2) OPERATION.—Section 9482(4) is amended by striking "or the Regular Space Force" and inserting "or members of the Space Force in an active status".

**SEC. 1722. AMENDMENTS TO SUBTITLE A OF TITLE 10, UNITED STATES CODE.**

(a) PROVISIONS RELATING TO ORGANIZATION AND GENERAL MILITARY POWERS.—Part I of subtitle A of title 10, United States Code, is amended as follows:
(1) ANNUAL DEFENSE MANPOWER REPORT.—Section 115a(d)(3)(F) is amended by inserting before the period the following: "or, in the case of the Space Force, officers ordered to active duty other than under section 20105(b) of this title".

(2) SUSPENSION OF END-STRENGTH AND OTHER STRENGTH LIMITATIONS IN TIME OF WAR OR NATIONAL EMERGENCY.—Section 123a(a)(2) is amended by inserting "or the Space Force" after "a reserve component".

(3) DEPUTY COMMANDER OF USNORTHCOM.—Section 164(e)(4) is amended—
(A) by inserting "(A)" after "(4)";
(B) by striking "shall be a" and all that follows and inserting "shall be—

137 STAT. 668          PUBLIC LAW 118–31—DEC. 22, 2023

"(i) a qualified officer of a reserve component who is eligible for promotion to the grade of lieutenant general or, in the case of the Navy, vice admiral; or

"(ii) a qualified officer of the Space Force whose prior service includes service in a space force active status other than sustained duty and who is eligible for promotion to the grade of lieutenant general."; and

(C) by adding at the end the following new subparagraph:

"(B) The requirement in subparagraph (A) does not apply when the officer serving as commander of the combatant command described in that subparagraph is (i) a reserve component officer, or (ii) an officer of the Space Force whose prior service includes service in a space force active status other than sustained duty.".

10 USC 482.

(4) READINESS REPORTS.—Section 482(a) is amended by inserting "and the Space Force" after "active and reserve components" in paragraphs (1) and (2).

(b) DOPMA OFFICER PERSONNEL PROVISIONS.—Chapter 36 of such title is amended as follows:

(1) NONDISCLOSURE OF BOARD PROCEEDINGS.—Section 613a is amended by striking "573, 611, or 628" and inserting "573, 611, 628, or 20211" in subsections (a) and (c).

(2) INFORMATION FURNISHED TO SELECTION BOARDS.—Section 615(a) is amended—

(A) in paragraph (1), by inserting "or 20211" after "section 611(a)"; and

(B) in paragraph (3)—

(i) in subparagraph (B), by striking "regular officer" and all that follows and inserting "regular officer or an officer in the Space Force, a grade above captain or, in the case of the Navy, lieutenant."; and

(ii) in subparagraph (D)—

(I) by striking "major general," and inserting "major general or"; and

(II) by striking "or, in the case of the Space Force, the equivalent grade,".

(3) ELIGIBILITY FOR CONSIDERATION FOR PROMOTION: TIME-IN-GRADE AND OTHER REQUIREMENTS.—Section 619(a) is amended by striking "Marine Corps, or Space Force" each place it appears and inserting "or Marine Corps".

(4) AUTHORITY TO VACATE PROMOTIONS TO GRADES OF BRIGADIER GENERAL AND REAR ADMIRAL (LOWER HALF).—Section 625(b) is amended by striking "Marine Corps, or Space Force" and inserting "or Marine Corps".

(5) SPECIAL SELECTION REVIEW BOARD.—Section 628a is amended—

(A) in subsection (a)(1)(A)—

(i) by striking "major general," and inserting "major general or"; and

(ii) by striking ", or an equivalent grade in the Space Force";

Applicability.

(B) in subsection (e)(2), by adding at the end the following new sentence: "However, in the case of an officer on the Space Force officer list, the provisions of sections 618, 20215, and 20216 of this title apply to the report and proceedings of a special selection review board convened under this section in the same manner as they

apply to report and proceedings of a promotion board convened under section 20211 of this title.", and

(C) in subsection (f)(1), by adding at the end the following new sentence: "However, if the report of a special selection review board convened under this section recommends the sustainment of the recommendation for promotion to the next higher grade of an officer on the Space Force officer list who was referred to it for review under this section, and the President approves the report, the officer shall, as soon as practicable, be appointed to the grade in accordance with subsections (b) and (c) of section 20251 of this title.".

Reports.
Recommendations.
President.
Appointment.

(6) RETIREMENT FOR YEARS OF SERVICE.—

(A) LIEUTENANT COLONELS.—Section 633(a) is amended—

10 USC 633.

(i) by inserting "(1)" before "Except as";

(ii) by striking "Regular Marine Corps, or Regular Space Force" and inserting "or Regular Marine Corps"; and

(iii) by adding at the end the following new paragraph:

"(2) Except as provided under section 637(b) or 637a of this title, each officer of the Space Force who holds the grade of lieutenant colonel who is not on a list of officers recommended for promotion to the grade of colonel shall, if not earlier retired, be retired on the first day of the month after the month in which the officer completes 28 years of active commissioned service.".

(B) COLONELS.—Section 634(a) is amended—

(i) by inserting "(1)" before "Except as";

(ii) by striking "Regular Marine Corps, or Regular Space Force" and inserting "or Regular Marine Corps"; and

(iii) by adding at the end the following new paragraph:

"(2) Except as provided under section 637(b) or 637a of this title, each officer of the Space Force who holds the grade of colonel who is not on a list of officers recommended for promotion to the grade of brigadier general shall, if not earlier retired, be retired on the first day of the month after the month in which the officer completes 30 years of active commissioned service.".

(C) BRIGADIER GENERALS.—Section 635 is amended—

(i) by inserting "(a) ARMY, NAVY, AIR FORCE, AND MARINE CORPS.—" before "Except as";

(ii) by striking "Regular Marine Corps, or Regular Space Force" and inserting "or Regular Marine Corps"; and

(iii) by adding at the end the following new subsection:

"(b) SPACE FORCE.—Except as provided under section 637(b) or 637a of this title, each officer of the Space Force who holds the grade of brigadier general who is not on a list of officers recommended for promotion to the grade of major general shall, if not earlier retired, be retired as specified in subsection (a).".

(D) OFFICERS IN GRADES ABOVE BRIGADIER GENERAL.—Section 636(a) is amended—

(i) by inserting "(1)" before "Except as";

(ii) by striking "Regular Marine Corps, or Regular Space Force" and inserting "or Regular Marine Corps"; and

(iii) by adding at the end the following new paragraph:

"(2) Except as provided in subsection (b) or (c) and under section 637(b) or 637a of this title, each officer of the Space Force who holds the grade of major general shall, if not earlier retired, be retired as specified in paragraph (1).".

(E) SECTION HEADINGS.—

10 USC prec. 627.

(i) The heading of section 633 is amended by striking "**lieutenant colonels and**" and inserting "**and Space Force lieutenant colonels; regular Navy**".

10 USC prec. 627.

(ii) The heading of section 634 is amended by striking "**colonels and**" and inserting "**and Space Force colonels; regular**".

10 USC prec. 627.

(iii) The heading of section 635 is amended by striking "**brigadier generals and**" and inserting "**and Space Force brigadier generals; regular Navy**".

10 USC prec. 627.

(iv) The heading of section 636 is amended by striking "**officers in grades above brigadier general and**" and inserting "**and Space Force officers in grades above brigadier general; regular Navy officers in grades above**".

(c) MANAGEMENT POLICIES FOR JOINT QUALIFIED OFFICERS.— Section 661(a) of such title is amended—

(1) by striking "Marine Corps, and Space Force" and inserting "and Marine Corps"; and

(2) by inserting ", and officers of the Space Force on the Space Force officer list," after "active-duty list".

(d) LEAVE.—Chapter 40 of such title is amended as follows:

(1) ENTITLEMENT AND ACCUMULATION.—Section 701 is amended—

(A) in subsection (h)—

(i) by inserting at the end of paragraph (2) the following new subparagraph:

"(D) A member of the Space Force in a space force active status, not on sustained duty."; and

(ii) in paragraphs (5)(B) and (6), by inserting ", or of the Space Force," after "member of a reserve component"; and

(B) in subsection (i), by inserting ", or of the Space Force," after "member of a reserve component".

(2) PAYMENT UPON DISAPPROVAL OF CERTAIN BOARD OF INQUIRY RECOMMENDATIONS FOR EXCESS LEAVE REQUIRED TO BE TAKEN.—Section 707a(a)(1) is amended by inserting "or 20503" after "section 1182(c)(2)".

(3) CAREER FLEXIBILITY TO ENHANCE RETENTION OF MEMBERS.—Section 710 is amended—

(A) in subsection (a), by inserting "or of the Space Force" after "regular components";

(B) in subsection (b)(2), by inserting ", or a Space Force officer in a space force active status not on active duty under section 20105(b) of this title," after "officer";

(C) in subsection (c)(1), by inserting before the period at the end the following: "or, in the case of a member

of the Space Force on sustained duty, to accept release from sustained duty orders and to serve in a space force active status"; and

(D) in subsection (g)(1)(A), by striking "chapter 36 or 1405" and inserting "chapter 36, 1405, or 2005".

(e) LIMITATION ON NUMBER OF OFFICES WHO MAY BE FROCKED TO A HIGHER GRADE.—Section 777(d)(2) of such title is amended by inserting ", or for the Space Force, the Space Force officer list," after "active-duty list".

10 USC 777.

(f) UNIFORM CODE OF MILITARY JUSTICE.—Chapter 47 of such title (the Uniform Code of Military Justice), is amended as follows:

(1) PERSONS SUBJECT TO UCMJ.—Section 802 (article 2) is amended—

(A) in subsection (a)—

(i) in paragraph (1), by inserting "and members of the Space Force on active duty under section 20105 of this title," after "regular component of the armed forces,";

(ii) in paragraph (3)(A)(i), by inserting "or the Space Force" after "reserve component";

(iii) in paragraph (5), by inserting ", or retired members of the Space Force who qualified for a non-regular retirement and are receiving retired pay," after "a reserve component"; and

(iv) by adding at the end the following new paragraph:

"(14) Retired members of the Space Force who qualified for a regular retirement under section 20603 of this title and are receiving retired pay."; and

(B) in subsection (d)—

(i) in paragraph (1), by inserting "or the Space Force" after "reserve component";

(ii) in paragraph (2), by inserting "or the Space Force" after "a reserve component"; and

(iii) in paragraph (4), by inserting "or the Space Force" after "in a regular component of the armed forces".

(2) JURISDICTION TO TRY CERTAIN PERSONNEL.—Subsection (d) of section 803 (article 3) is amended by inserting, "or the Space Force" after "reserve component".

(3) ARTICLES TO BE EXPLAINED.—Section 937 (article 137) is amended—

(A) in subsection (a)(1)—

(i) by striking "or" at the end of subparagraph (A);

(ii) by striking the period at the end of subparagraph (B) and inserting "; or"; and

(iii) by adding at the end the following new subparagraph:

"(C) the member's initial entrance on active duty or into a space force active status.";

(B) in subsection (a)(2)—

(i) by striking "and" at the end of subparagraph (A);

(ii) by redesignating subparagraph (B) as subparagraph (C); and

Time period.

(iii) by inserting after subparagraph (A) the following new subparagraph:

"(B) after a member of Space Force has completed six months of sustained duty or in the case of a member not on sustained duty, after the member has completed basic or recruit training; and";

(C) in subsection (b)(1)(B), by inserting "or the Space Force" after "in a reserve component"; and

(D) in subsection (d), by striking "or to a member of a reserve component," and inserting ", to a member of a reserve component, or to a member of the Space Force,".

(f) RESTRICTION ON PERFORMANCE OF CIVIL FUNCTIONS BY OFFICERS ON ACTIVE DUTY.—Section 973(b)(1) of such title 10 is amended—

(1) by striking "and" at the end of subparagraph (B);

(2) by striking the period at the end of subparagraph (C) and inserting "; and"; and

(3) by adding at the end the following new subparagraph:

"(D) to an officer on the Space Force officer list serving on active duty under section 20105(b) of this title or under a call or order to active duty for a period in excess of 270 days.".

(h) USE OF COMMISSARY STORES AND MWR RETAIL FACILITIES.—Section 1063 of such title is amended—

(1) in subsection (c)—

(A) in the heading, by inserting "AND SPACE FORCE" after "RESERVE"; and

(B) by inserting "or the Space Force" after "reserve component";

(2) by redesignating subsections (d) and (e) as subsections (e) and (f), respectively;

(3) by inserting after subsection (c) the following new subsection (d):

"(d) MEMBERS OF THE SPACE FORCE.—A member of the Space Force in a space force active status who is not on sustained duty shall be permitted to use commissary stores and MWR retail facilities under the same conditions as specified in subsection (a) for a member of the Selected Reserve."; and

(4) in subsection (e), as redesignated by paragraph (2), by striking "subsection (a) or (b)" in paragraph (1) and inserting "subsection (a), (b), or (d)".

(i) MEMBERS INVOLUNTARY SEPARATED.—

(1) ELIGIBILITY FOR CERTAIN BENEFITS AND SERVICES.—Section 1141 of such title is amended—

(A) by striking "and" at the end of paragraph (3);

(B) by striking the period at the end of paragraph (4) and inserting a semicolon; and

(C) by adding at the end the following new paragraphs:

"(5) in the case of an officer of the Space Force (other than a retired officer), the officer is involuntarily discharged or released from active duty under other than adverse conditions, as characterized by the Secretary of the Air Force; and

"(6) in the case of an enlisted member of the Space Force, the member is—

"(A) denied reenlistment; or

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 673

"(B) involuntarily discharged or released from active duty under other than adverse conditions, as characterized by the Secretary of the Air Force.".

(2) SEPARATION PAY.—Section 1174(a)(2) of such title is amended by striking ", Marine Corps, or Space Force" both places it appears and inserting "or Marine Corps".

10 USC 1174.

(j) BOARDS FOR THE CORRECTION OF MILITARY RECORDS.—Chapter 79 of such title is amended as follows:

(1) REVIEW OF ACTIONS OF SELECTION BOARDS AND CORRECTION OF MILITARY RECORDS.—Section 1558 is amended—

(A) inserting ", or the Space Force," after "reserve component" each place it appears; and

(B) in subsection (b)—

(i) in paragraph (1)(C), by striking "section 628 or 14502" and inserting "section 628, 14502, or 20252";

(ii) in paragraph (2)(A), by striking "or 14705" and inserting "14507, or 20403"; and

(iii) in paragraph (2)(B)(i), by striking "or 14101(a)" and inserting "14101(a), or 20211".

(2) TITLE OF AIR FORCE SERVICE REVIEW AGENCY.—

(A) Sections 1555(c)(3) and 1557(f)(3) are amended by inserting "the Department of" after "Air Force,".

(B) Section 1556(a) is amended by inserting "the Department of" after "the Army Review Boards Agency,".

(C) Section 1559(c)(3) is amended by inserting "the Department of the" after "Air Force,".

(k) MILITARY FAMILY PROGRAMS.—Chapter 88 of such title is amended as follows:

(1) MEMBERS OF DEPARTMENT OF DEFENSE MILITARY READINESS COUNCIL.—Section 1781a(b)(1)(B)(iii) is amended—

(A) by striking "member and" and inserting "member,"; and

(B) by inserting ", and one of whom shall be the spouse or parent of a member of the Space Force" after "parent of a reserve component member".

(2) DEPARTMENT OF DEFENSE POLICY AND PLANS FOR MILITARY FAMILY READINESS.—Section 1781b is amended—

(A) in subsection (b)(3), by striking "military families of members of the regular components and military families of members of the reserve components" and inserting "military families of members of the regular components, the reserve components, and the Space Force"; and

(B) in subsection (c)(2)—

(i) by striking "both"; and

(ii) by striking "military families of members of the regular components and military families of members of the reserve components" and inserting "military families of members of the regular components, members of the reserve components, and members of the Space Force".

(l) TRAINING AND EDUCATION PROGRAMS.—

(1) PAYMENT OF TUITION FOR OFF-DUTY TRAINING OR EDUCATION.—Section 2007 of such title is amended by adding at the end the following new subsection:

"(g) The provisions of this section pertaining to members of the Ready Reserve, the Selected Reserve, or the Individual Ready

Applicability.

Reserve also apply to members of the Space Force in a space force active status who are not on active duty.".

10 USC 2107.

(2) ROTC FINANCIAL ASSISTANT PROGRAM FOR SPECIALLY SELECTED MEMBERS.—Section 2107 of such title is amended—

(A) in subsection (a)—

(i) by striking "Navy," and inserting "Navy or"; and

(ii) by striking "or as an officer in the equivalent grade in the Space Force"; and

(B) by adding at the end the following a new subsection:

"(k) APPLICABILITY TO SPACE FORCE.—(1) Provisions of this section referring to a regular commission, regular officer, or a commission in a regular component shall be treated as also referring to the commission of an officer, or an officer, who is a commissioned officer in the Space Force serving on active duty pursuant to section 20105(b) of this title.

"(2) Provisions of this section referring to a reserve commission, reserve officer, or a commission in a reserve component shall be treated as also referring to the commission of an officer, or an officer, who is a commissioned officer in the Space Force not serving on active duty pursuant to section 20105(b) of this title.".

(3) DUTY AS ROTC ADMINISTRATORS AND INSTRUCTORS.— Section 2111 of such title is amended by adding at the end the following new sentence: "The Secretary of the Air Force may detail members of the Space Force in the same manner as regular and reserve members of the Air Force.".

## SEC. 1723. TITLE 38, UNITED STATES CODE (VETERANS' BENEFITS).

(a) DEFINITIONS.—

(1) GENERAL DEFINITIONS.—Section 101 of title 38, United States Code, is amended—

(A) in paragraph (23), by inserting ", or for members of the Space Force in a space force active status (as defined in section 101(e)(1) of title 10)," in subparagraphs (A) and (B) after "(including commissioned officers of the Reserve Corps of the Public Health Service)"; and

(B) in paragraph (27)—

(i) by striking subparagraph (E); and

(ii) by redesignating subparagraphs (F), (G), and (H) as subparagraphs (E), (F), and (G), respectively.

(2) DEFINITIONS FOR PURPOSES OF SGLI.—Section 1965 of such title is amended—

(A) in paragraph (2)(A), by inserting ", or by members of the Space Force in a space force active status (as defined in section 101(e)(1) of title 10) but not on sustained duty under section 20105 of title 10," after "for Reserves"; and

(B) in paragraph (3)(A), by inserting ", or for members of the Space Force in a space force active status (as defined in section 101(e)(1) of title 10)," after "(including commissioned officers of the Reserve Corps of the Public Health Service)".

(b) PERSONS ELIGIBLE FOR INTERMENT IN NATIONAL CEMETERIES.—Section 2402(a) of such title is amended in paragraph (2), by inserting " any member of the Space Force," after "a Reserve component of the Armed Forces,".

(c) EDUCATIONAL ASSISTANCE.—

(1) MONTGOMERY GI BILL.—Section 3011(a)(3)(D) of such title is amended by inserting "or for further service in the Space Force in a space force active status not on sustained duty under section 20105 of title 10" after "of the Armed Forces,".

38 USC 3011.

(2) POST 9-11 GI BILL.—Section 3311(c)(3) of such title is amended by inserting ", or for further service in the Space Force in a space force active status not on sustained duty under section 20105 of title 10," after "of the Armed Forces" the second place it appears.

# Subtitle C—Transition Provisions

### SEC. 1731. TRANSITION PERIOD.

In this subtitle, the term "transition period" means the period beginning on the date of the enactment of this Act and ending on the last day of the fourth fiscal year beginning after the date of the enactment of this Act.

Definition.
10 USC 20001 note.

### SEC. 1732. CHANGE OF DUTY STATUS OF MEMBERS OF THE SPACE FORCE.

(a) CHANGE OF DUTY STATUS.—

(1) CONVERSION OF STATUS AND ORDER TO SUSTAINED DUTY.—During the transition period, the Secretary of the Air Force shall change the duty status of each member of the Regular Space Force to space force active status and shall, at the same time, order the member to sustained duty under section 20105 of title 10, United States Code, as added by section 1715. Any such order may be made without regard to any otherwise applicable requirement that such an order be made only with the consent of the member or as specified in an enlistment agreement or active-duty service commitment.

(2) DEFINITIONS.—For purposes of this section, the terms "space force active status" and "sustained duty" have the meanings given those terms by subsection (e) of section 101 of title 10, United States Code, as added by section 1713(a).

(b) EFFECTIVE DATE OF CHANGE OF DUTY STATUS.—The change of a member's duty status and order to sustained duty in accordance with subsection (a) shall be effective on the date specified by the Secretary of the Air Force, but not later than the last day of the transition period.

### SEC. 1733. TRANSFER TO THE SPACE FORCE OF MEMBERS OF THE RESERVE COMPONENTS OF THE AIR FORCE.

(a) TRANSFER OF MEMBERS.—

(1) OFFICERS.—During the transition period, the Secretary of Defense may, with the officer's consent, transfer a covered officer of a reserve component of the Air Force to, and appoint the officer in, the Space Force.

Appointments.

(2) ENLISTED MEMBERS.—During the transition period, the Secretary of the Air Force may transfer each covered enlisted member of a reserve component of the Air Force to the Space Force, other than those members who do not consent to the transfer.

(3) EFFECTIVE DATE OF TRANSFERS.—Each transfer under this subsection shall be effective on the date specified by the Secretary of Defense, in the case of an officer, or the Secretary

of the Air Force, in the case of an enlisted member, but not later than the last day of the transition period.

(b) REGULATIONS.—Transfers under subsection (a) shall be carried out under regulations prescribed by the Secretary of Defense. In the case of an officer, applicable regulations shall include those prescribed pursuant to section 716 of title 10, United States Code.

(c) TERM OF INITIAL ENLISTMENT IN SPACE FORCE.—In the case of a covered enlisted member who is transferred to the Space Force in accordance with subsection (a), the Secretary of the Air Force may accept the initial enlistment of the member in the Space Force for a period of less than 2 years, but only if the period of enlistment in the Space Force is not less than the period remaining, as of the date of the transfer, in the member's term of enlistment in a reserve component of the Air Force.

(d) END STRENGTH ADJUSTMENTS UPON TRANSFERS FROM RESERVE COMPONENTS OF THE AIR FORCE.—During the transition period, upon the transfer of a mission of the Air Force Reserve to the Space Force—

(1) the end strength authorized for the Space Force pursuant to section 115(a)(1)(A) of title 10, United States Code, for the fiscal year during which the transfer occurs shall be increased by the number of billets associated with that mission; and

(2) the end strength authorized for the reserve components of the Air Force pursuant to section 115(a)(2) of such title for such fiscal year shall be decreased by the same number.

(e) ADMINISTRATIVE PROVISIONS.—For purposes of the transfer of covered members of the Air Force Reserve in accordance with subsection (a)—

(1) the Air Force Reserve, the Air National Guard, and the Space Force shall be considered to be components of the same Armed Force; and

(2) the Space Force officer list shall be considered to be an active-duty list of an Armed Force.

Determination.

(f) RETRAINING AND REASSIGNMENT FOR MEMBERS NOT TRANSFERRING.—If a covered member of a reserve component of the Air Force does not consent to transfer to the Space Force in accordance with subsection (a), the Secretary of the Air Force may, as determined appropriate by the Secretary in the case of the individual member, provide the member retraining and reassignment within a reserve component of the Air Force.

(g) COVERED DEFINED.—For purposes of this section, the term "covered", with respect to a member of a reserve component of the Air Force, means—

(1) a member who, as of the date of the enactment of this Act, holds an Air Force specialty code for a specialty held by members of the Space Force; and

(2) any other member designated by the Secretary of the Air Force for the purposes of this section.

### SEC. 1734. PLACEMENT OF OFFICERS ON THE SPACE FORCE OFFICER LIST.

(a) PLACEMENT ON LIST.—Officers of the Space Force whose duty status is changed in accordance with section 1732, and officers of the reserve components of the Air Force who transfer to the Space Force in accordance with 1733, shall be placed on the Space

Force officer list in an order determined by their respective grades and dates of rank.

(b) OFFICERS OF SAME GRADE AND DATE OF RANK.—Among officers of the same grade and date of rank, placement on the Space Force officer list shall be in the order of their rank as determined in accordance with section 741(c) of title 10, United States Code.

### SEC. 1735. DISESTABLISHMENT OF REGULAR SPACE FORCE.

(a) DISESTABLISHMENT.—The Secretary of the Air Force shall disestablish the Regular Space Force not later than the end of the transition period, once there are no longer any members remaining in the Regular Space Force. The Regular Space Force shall be disestablished upon the completion of the change of duty status of all members of the Space Force pursuant to section 1742 and certification by the Secretary of the Air Force to the congressional defense committees that there are no longer any members of the Regular Space Force.

*Deadline.*

*Certification.*

(b) PUBLICATION OF NOTICE IN FEDERAL REGISTER.—The Secretary shall publish in the Federal Register notice of the disestablishment of the Regular Space Force, including the date thereof, together with any certification submitted pursuant to subsection (a).

(c) CONFORMING REPEAL.—

(1) REPEAL.—Section 9085 of title 10, United States Code, relating to the composition of the Regular Space Force, is repealed.

(2) EFFECTIVE DATE.—The amendment made by this subsection shall take effect on the date on which the certification is submitted under subsection (a).

### SEC. 1736. END STRENGTH FLEXIBILITY.

(a) ADDITIONAL AUTHORITY TO VARY END STRENGTHS.—

(1) AUTHORITY.—Notwithstanding section 115(g) of title 10, United States Code, upon determination by the Secretary of the Air Force that such action would enhance manning and readiness in essential units or in critical specialties, the Secretary may vary the end strength authorized by Congress for a fiscal year as follows:

*Determination.*

(A) Increase the end strength authorized pursuant to section 115(a)(1)(A) of such title for a fiscal year for the Space Force by a number equal to not more than 5 percent of such authorized end strength.

(B) Decrease the end strength authorized pursuant to section 115(a)(1)(A) of such title for a fiscal year for the Space Force by a number equal to not more than 10 percent of such authorized end strength.

(2) TERMINATION.—The authority provided under paragraph (1) shall terminate on the last day of the transition period.

(b) TEMPORARY EXEMPTION FOR THE SPACE FORCE FROM END STRENGTH GRADE RESTRICTIONS.—Sections 517 and 523 of title 10, United States Code, shall not apply to the Space Force during the transition period.

### SEC. 1737. PROMOTION AUTHORITY FLEXIBILITY.

(a) PROMOTION AUTHORITY FLEXIBILITY.—During the transition period, the Secretary of the Air Force may convene selection boards

to consider officers on the space force officer list for promotion, and may promote Space Force officers selected by such boards, in accordance with any of the following provisions of title 10, United States Code:

(1) Chapter 36.

(2) Part III of subtitle E.

(3) Chapter 2005, as added by section 1716.

Applicability.

(b) COORDINATION OF PROVISIONS.—

(1) For a selection board convened pursuant to subsection (a) to consider members of the Space Force for promotion in accordance with chapter 36 of such title—

(A) provisions that apply to an officer of a regular component of the Armed Forces shall apply to an officer of the Space Force; and

(B) the space force officer list shall be considered to be an active-duty list.

(2) For a selection board convened pursuant to pursuant to subsection (a) to consider members of the Space Force for promotion in accordance with part III of subtitle E of such title—

(A) provisions that apply to an officer of a reserve component of the Armed Forces shall apply to an officer of the Space Force; and

(B) the space force officer list shall be considered to be a reserve active-status list.

(3) For a selection board convened pursuant to subsection (a) to consider members of the Space Force for promotion in accordance with either chapter 36 or part III of subtitle E of such title—

(A) section 20213 of such title shall apply to the composition of the selection board;

(B) the provisions of chapter 2005 of such title regarding officers on the space force officer list eligible to be considered for promotion to the grade of brigadier general or major general shall apply;

(C) section 20216 of such title shall apply; and

(D) the provisions of chapter 36 or part III of subtitle E of such title, as the case may be, regarding failure of selection for promotion shall apply.

(c) EFFECT OF USING NEW CHAPTER 2005 AUTHORITIES.—If the Secretary of the Air Force convenes a selection board under chapter 2005 of title 10, United States Code, as added by section 1716, to consider officers on the space force officer list in a particular grade and competitive category for selection for promotion to the next higher grade, the Secretary may not convene a future selection board pursuant to subsection (a) to consider officers of the same grade and competitive category under chapter 36 or part III of subtitle E of such title.

# Subtitle D—Other Amendments Related to the Space Force

**SEC. 1741. TITLE 10, UNITED STATES CODE.**

(a) AMENDMENTS RELATING TO THE DESIGNATION OF GRADES FOR OFFICERS OF THE SPACE FORCE.—Title 10, United States Code, is amended as follows:

(1) COMMISSIONED OFFICER GRADES.—Section 9151 is amended by inserting "and in the Space Force" after "in the Regular Air Force".

10 USC 9151.

(2) RANK.—Section 741(a) is amended in the table by striking "and Marine Corps" and inserting "Marine Corps, and Space Force".

(3) DEFINITION OF GENERAL OFFICER.—Section 101(b)(4) is amended by striking "or Marine Corps" and inserting "Marine Corps, or Space Force".

(4) TEMPORARY APPOINTMENTS TO POSITIONS DESIGNATED TO CARRY THE GRADE OF GENERAL OR LIEUTENANT GENERAL.— Section 601(e) is amended—

(A) by striking "or Marine Corps," and inserting "Marine Corps, or Space Force or"; and

(B) by striking "or the commensurate grades in the Space Force,".

(5) RETIRED GRADE OF OFFICERS.—Section 1370 is amended as follows:

(A) Subsection (a)(2) is amended by striking "major general" and all that follows in subparagraphs (A) and (B) and inserting "major general or rear admiral.".

(B) Subsection (b) is amended—

(i) in paragraph (1)—

(I) by striking "or Marine Corps" and all that follows through "the Space Force," and inserting "Marine Corps, or, Space Force or lieutenant in the Navy,"; and

(II) in subparagraph (B), by striking "major general" and all that follow through "Space Force" and inserting "major general or rear admiral";

(ii) in paragraph (4), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or captain in the Navy,";

(iii) in paragraph (5)—

(I) in subparagraph (A), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or lieutenant commander in the Navy,";

(II) in subparagraph (B), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or commander or captain in the Navy,"; and

(III) in subparagraph (C), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or rear admiral (lower half) or rear admiral in the Navy,"; and

(iv) in paragraph (6), by striking ", or an equivalent grade in the Space Force,".

(C) Subsection (c)(1) is amended by "or Marine Corps" and all that follows through "Space Force" and inserting "Marine Corps, or Space Force or vice admiral or admiral in the Navy".

(D) Subsection (d) is amended—

(i) in paragraph (1), by striking "or Marine Corps" and all that follows through "Space Force" and

inserting "Marine Corps, or Space Force or rear admiral in the Navy"; and

(ii) in paragraph (3), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or captain in the Navy,".

10 USC 1370.

(E) Subsection (e)(2) is amended by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or vice admiral or admiral in the Navy,".

(F) Subsection (f) is amended—

(i) in paragraph (3)—

(I) in subparagraph (A), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or rear admiral in the Navy"; and

(II) in subparagraph (B), by striking "'or Marine Corps' and all that follows through 'Space Force' and inserting ″Marine Corps, or Space Force or vice admiral or admiral in the Navy"; and

(ii) in paragraph (6)—

(I) in subparagraph (A), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or rear admiral in the Navy"; and

(II) in subparagraph (B), by striking "or Marine Corps" and all that follows through "Space Force," and inserting "Marine Corps, or Space Force or vice admiral or admiral in the Navy".

(6) HONORARY PROMOTIONS.—Sections 1563(c)(1) and 1563a(a)(1) are each amended—

(A) by striking "general," and inserting "general or"; and

(B) by striking ", or an equivalent grade in the Space Force".

(7) AIR FORCE INSPECTOR GENERAL.—Section 9020(a) is amended by striking "the general, flag, or equivalent officers of".

(b) OTHER TITLE 10 AMENDMENTS.—Such title is further amended as follows:

(1) LIMITATION ON NUMBER OF RETIRED MEMBERS ORDERED TO ACTIVE DUTY.—Section 690(a) is amended by striking "or Marine Corps," and inserting "Marine Corps, or Space Force,".

(2) THE UNIFORM.—Section 772(i) is amended—

(A) by striking "an Air Force School" and inserting "an Air Force or Space Force school"; and

(B) by striking "aviation badges of the Air Force" and inserting "aviation or space badges of the Air Force or Space Force".

(3) MEMBERSHIP IN MILITARY UNIONS, ORGANIZING OF MILITARY UNIONS, AND RECOGNITION OF MILITARY UNIONS PROHIBITED.—Section 976(a) is amended by inserting "or the Space Force" in paragraph (1)(C) after "member of a Reserve component".

(4) LIMITATION ON ENLISTED AIDES.—Section 981 is amended—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 681

(A) in subsection (a), by striking "Marine Corps, Air Force," and inserting "Air Force, Marine Corps, Space Force,";

(B) in subsection (b), by striking "and Marine Corps" and inserting "Marine Corps, and Space Force"; and

(C) in subsection (c)(1), by inserting "Space Force," after "Marine Corps,".

(5) DEFINITION OF VETERAN FOR PURPOSES OF FUNERAL HONORS.—Section 1491(h)(1) is amended by striking "or air service" and inserting "air, or space service". 10 USC 1491.

(6) HOUSING FOR RECRUITS.—Section 9419(d) is amended by inserting "or the Space Force" after "training program of the Air Force".

(7) CHARTER OF CHIEF OF SPACE OPERATIONS.—Section 9082 is amended as follows:

(A) CROSS-REFERENCE CORRECTION.—Subsection (d)(5) is amended by striking "sections" and all that follows through "of law" and inserting "sections 171 and 3104 of this title and other provisions of law".

(B) ELAPSED-TIME PROVISION.—Subsection (e)(1) is amended by striking "Commencing" and all that follows through "the Chief" and inserting "The Chief".

## SEC. 1742. OTHER PROVISIONS OF LAW.

(a) TRADE ACT OF 1974.—Section 233(i)(1) of the Trade Act of 1974 (19 U.S.C. 2293(i)(1)) is amended by inserting ", or a member of the Space Force," after "a member of a reserve component of the Armed Forces".

(b) TITLE 28, UNITED STATES CODE (JUDICIARY AND JUDICIAL PROCEDURE).—Section 631(c) of title 28, United States Code is amended by inserting "members of the Space Force" after "Coast Guard" the second place it appears.

(c) SERVICEMEMBERS CIVIL RELIEF ACT.—The Servicemembers Civil Relief Act (50 U.S.C. 3901 et seq.) is amended as follows:

(1) MILITARY SERVICE DEFINED.—Section 101(2)(A) (50 U.S.C. 3911(2)(A)) is amended by inserting "Space Force," after "Marine Corps,".

(2) SAME RIGHTS AND PROTECTIONS AS RESERVES ORDERED TO REPORT FOR MILITARY SERVICE.—Section 106 (50 U.S.C. 3911) is amended by adding at the end the following new subsection: 50 USC 3917.

"(c) The provisions of subsection (a) apply to a member of the Space Force who is ordered to report for military service in the same manner as to a member of a reserve component who is ordered to report for military service.". Applicability.

(3) EXERCISE OF RIGHTS UNDER SCRA.—Section 108(5) (50 U.S.C. 3919(5)) is amended by inserting before the period at the end the following: "or as a member of the Space Force".

# TITLE XVIII—OTHER DEFENSE MATTERS

Subtitle A—Other Defense Matters

Sec. 1801. Technical and conforming amendments.
Sec. 1802. Extension of authority to engage in certain commercial activities.
Sec. 1803. Modification to requirements relating to combating military reliance on Russian energy.
Sec. 1804. U.S. Hostage and Wrongful Detainee Day Act of 2023.

137 STAT. 682 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 1805. Improvements to Department of Veterans Affairs-Department of Defense Joint Executive Committee.
Sec. 1806. Access to and use of military post offices by United States citizens employed overseas by the North Atlantic Treaty Organization who perform functions in support of military operations of the Armed Forces.
Sec. 1807. Extension of admission to Guam or the Commonwealth of the Northern Mariana Islands for certain nonimmigrant H–2B workers.
Sec. 1808. Support for execution of bilateral agreements concerning illicit transnational maritime activity in Africa.
Sec. 1809. National Cold War Center designation.
Sec. 1810. Revision of requirement for transfer of certain aircraft to State of California for wildfire suppression purposes.
Sec. 1811. Limitation on funds for Wuhan Institute of Virology and EcoHealth Alliance, Inc.

Subtitle B—Drone Security

Sec. 1821. Short title.
Sec. 1822. Definitions.
Sec. 1823. Prohibition on procurement of covered unmanned aircraft systems from covered foreign entities.
Sec. 1824. Prohibition on operation of covered unmanned aircraft systems from covered foreign entities.
Sec. 1825. Prohibition on use of Federal funds for procurement and operation of covered unmanned aircraft systems from covered foreign entities.
Sec. 1826. Prohibition on use of Government-issued purchase cards to purchase covered unmanned aircraft systems from covered foreign entities.
Sec. 1827. Management of existing inventories of covered unmanned aircraft systems from covered foreign entities.
Sec. 1828. Comptroller General report.
Sec. 1829. Government-wide policy for procurement of unmanned aircraft systems.
Sec. 1830. State, local, and territorial law enforcement and emergency service exemption.
Sec. 1831. Study.
Sec. 1832. Exceptions.
Sec. 1833. Sunset.

Subtitle C—Unidentified Anomalous Phenomena

Sec. 1841. Unidentified anomalous phenomena records collection at the National Archives and Records Administration.
Sec. 1842. Review, identification, transmission to the National Archives, and public disclosure of unidentified anomalous phenomena records by government offices.
Sec. 1843. Grounds for postponement of public disclosure of unidentified anomalous phenomena records.

Subtitle D—World Trade Center Health Program

Sec. 1851. Flexibility and funding for the World Trade Center Health Program.
Sec. 1852. Extension of certain direct spending reductions.
Sec. 1853. Medicare improvement fund.

# Subtitle A—Other Defense Matters

**SEC. 1801. TECHNICAL AND CONFORMING AMENDMENTS.**

(a) TITLE 10, UNITED STATES CODE.—Title 10, United States Code, is amended as follows:

10 USC prec. 101.

(1) In the subtitle analysis for subtitle A—

(A) by striking the item relating to chapter 113 and inserting the following new item:

"113. **Defense Civilian Training Corps** .......................................................**2200g**";

(B) by striking the item relating to chapter 207 and inserting the following new item:

"207. **Budgeting and Appropriations** .............................................................. **3131**";

(C) by striking the item relating to chapter 225 and inserting the following new item:

"225. **[Reserved]** ............................................................................................. **3271**";

(D) by striking the item relating to chapter 272 and inserting the following new item:

"272. **[Reserved]** ........................................................................................ 3721";

(E) by striking the item relating to chapter 287 and inserting the following new item:

"287. **Other Contracting Programs** ................................................................ 3901";

(F) by striking the item relating to chapter 305 and inserting the following new item:

"305. **Universities** ...................................................................................... 4141";

(G) by inserting after the item relating to chapter 307 the following new items:

**"SUBPART F—MAJOR SYSTEMS, MAJOR DEFENSE ACQUISITION PROGRAMS, AND WEAPON SYSTEMS DEVELOPMENT**

"321. **General Matters** ...............................................................................4201
"322. **Major Systems and Major Defense Acquisition Programs Generally** ........................................................................................................4211
"323. **Life-Cycle and Sustainment** .............................................................4321
"324. **Selected Acquisition Reports** ............................................................4350
"325. **Cost Growth-Unit Cost Reports (Nunn-McCurdy)** ..........................4371
"326. **Weapon Systems Development And Related Matters** .............4401"; and

(H) by striking the item relating to chapter 383 and inserting the following new item:

"383. **Development, Application, and Support of Dual-Use Technologies** ................................................................................................. 4831".

(2) Section 172(c) is amended—    10 USC 172.
(A) in paragraph (5), by striking "performs" and inserting "perform";
(B) in paragraph (11), by striking "establishes" and inserting "establish"; and
(C) in paragraph (13), by striking "conducts" and inserting "conduct".
(3) Section 231 is amended—
(A) in the section heading, by striking "**plan and certification**" and inserting "**plans and certifications**"; and    10 USC prec. 221.
(B) in subsection (f)(1), by striking "such plan and certification" and inserting "such plans and certifications".
(4) Section 386(b) is amended—
(A) in paragraph (2)(E), by striking "bi-lateral" and inserting "bilateral"; and
(B) in paragraph (4)—
(i) in subparagraph (E)(iii), by inserting "and" after the semicolon; and
(ii) in subparagraph (H), by striking "sections" and inserting "section".
(5) Section 392a is amended—
(A) in subsection (b)(2)(B) by striking "designed" and inserting "designated"; and
(B) in subsection (c)(4)(A), by striking "clause (ii)" and inserting "subparagraph (B)".
(6) The second section 398 (relating to pilot program for sharing cyber capabilities and related information with foreign operational partners) is redesignated as section 398a.    10 USC prec. 391.
(7) Section 398a, as so redesignated, is amended—
(A) in subsection (b)—
(i) in paragraph (1)(A) by striking "paragraph (a)" inserting "subsection (a)";

137 STAT. 684          PUBLIC LAW 118–31—DEC. 22, 2023

          (ii) in paragraph (2), by striking "paragraph (a)" and inserting "paragraph (1)"; and

          (iii) in paragraph (3), by striking "clause (1)" and inserting "paragraph (1)"; and

      (B) in subsection (e), by striking "paragraph (a)" and inserting "subsection (a)".

10 USC 491.

    (8) Section 491(c) is amended by striking "the a" and inserting "a".

    (9) Section 526a is amended by redesignating the second subsection (i) as subsection (j).

    (10) Section 701(l)(1)(B) is amended by redesignating clauses (A) through (C) as clauses (i) through (iii).

    (11) Section 1074h(c)(1) is amended by striking "section 491 of title 14" and inserting "section 2732 of title 14".

    (12) Section 1076a(d)(1)(E)(i) is amended by inserting ")" after "subsection (e)(3)".

10 USC prec. 1071.

    (13) The section heading for section 1090a is amended by striking the period after "**disorders**".

    (14) Section 1090b(e)(1)(B)(ii) is amended by striking "ensure" and inserting "ensuring".

    (15) Section 1134a(b) is amended by striking "section 491 of title 14" and inserting "section 2732 of title 14".

    (16) Section 1370a is amended—

      (A) in subsection (e), by inserting "to" before "'active duty'"; and

      (B) in subsection (f)—

          (i) by striking "1370e(e)" and inserting "1370(e)"; and

          (ii) by striking "reference to 'chapter 71' of this title" and inserting "reference to 'chapter 71 of this title'".

    (17) Section 1789(c)(3) is amended by striking "subparagraph (A) or (B)" and inserting "paragraph (1) or (2)".

    (18) Section 2200g(a) is amended by inserting "IN GENERAL.—" before "The Secretary".

    (19) Section 2228(c)(2) is amended by striking ";;" and inserting ";".

    (20) The table of sections at the beginning of chapter 134 is amended by striking the item relating to section 2249.

10 USC prec. 2241.

    (21) Section 2275(g)(3) is amended by striking "sections" and inserting "section".

    (22) Section 2700(2) is amended by striking "The term" and inserting "The terms".

    (23) Section 2864(f) is amended by redesignating paragraph (6) as paragraph (4).

    (24) Section 2878(f)(2)(D)(iii) is amended by striking "An report" and inserting "A report".

10 USC prec. 3101.

    (25) The item relating to section 3106 in the table of sections at the beginning of chapter 205 is amended by inserting a period at the end.

    (26) Section 3304(g) is amended by inserting "under" before "this section".

    (27) Section 3323(b)(2) is amended by striking the period after "notwithstanding".

    (28) Section 3601(b)(4) is amended by inserting "note" before "prec.".

    (29) Section 3702 is amended—

(A) in subsection (a)(4) is amended by striking "subparagraph (C)" and inserting "paragraph (3)"; and

10 USC 3702.

(B) in subsection (f), by striking "subparagraphs (B) and (C) of such paragraph" and inserting "paragraphs (1) and (2) of such subsection".

(30) Section 4014(b) is amended by striking "section 4142(b) of this title" and inserting "section 4125(b) of this title".

(31) Section 4024 is amended by striking "section 2303(a) of this title" each place it appears and inserting "section 3063 of this title".

(32) By striking the second section 4094.

Repeal.
10 USC prec. 4061.

(33) Section 4092(c)(2) is amended by striking "the the" and inserting "the".

(34) Section 4273(b)(5)(A) is amended by striking "4736" and inserting "4376".

(35) Section 4351(c)(1)(B)(iv) is amended by striking "section 4355(4) of this title" and inserting "subsection (e)(4)".

(36) Section 4820(b) is amended—

(A) by striking "subchapters" and inserting "chapters"; and

(B) by striking "subchapter" and inserting "chapter".

(37) Section 4902(k)(5) is amended by inserting "the" before "mentor".

(38) Section 8062 is amended by redesignating the second subsection (g) as subsection (h).

(39) Chapter 863 is amended by redesignating the second section 8696 (relating to battle force ship employment, maintenance, and manning baseline plans) as section 8697.

10 USC prec. 8661.

(b) COORDINATION WITH OTHER AMENDMENTS MADE BY THIS ACT.—For purposes of applying amendments made by provisions of this Act other than this section, the amendments made by this section shall be treated as having been enacted immediately before any such amendments by other provisions of this Act.

10 USC 101 note.

## SEC. 1802. EXTENSION OF AUTHORITY TO ENGAGE IN CERTAIN COMMERCIAL ACTIVITIES.

Section 431(a) of title 10, United States Code, is amended by striking "December 31, 2023" and inserting "December 31, 2024".

## SEC. 1803. MODIFICATION TO REQUIREMENTS RELATING TO COMBATING MILITARY RELIANCE ON RUSSIAN ENERGY.

Section 1086 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended—

10 USC 2911 note.

(1) in subsection (a)(2), by striking "main operating bases" and inserting "operating bases"; and

(2) in each of subsections (b) and (g), by striking "main operating base" each place it appears and inserting "operating base";

(3) in subsection (c)—

(A) in the subsection heading, by striking "MAIN";

(B) by striking paragraph (1) and inserting the following new paragraph (1):

"(1) IDENTIFICATION OF INSTALLATIONS.—The Secretary of Defense shall submit to the congressional defense committees a list of operating bases within the area of responsibility of the United States European Command ranked according to

List.
Deadlines.

137 STAT. 686                PUBLIC LAW 118–31—DEC. 22, 2023

mission criticality and vulnerability to energy disruption as follows:

"(A) In the case of a main operating base, by not later than June 1, 2023.

"(B) In the case of any operating base other than a main operating base, by not later than June 1, 2024."; and

(C) in paragraph (2)(A), by inserting "(A)" after "paragraph (1)".

### SEC. 1804. U.S. HOSTAGE AND WRONGFUL DETAINEE DAY ACT OF 2023.

(a) DESIGNATION.—

(1) HOSTAGE AND WRONGFUL DETAINEE DAY.—

(A) IN GENERAL.—Chapter 1 of title 36, United States Code, is amended—

(i) by redesignating the second section 146 (relating to Choose Respect Day) as section 147; and

(ii) by adding at the end the following:

36 USC 148.

### "§ 148. U.S. Hostage and Wrongful Detainee Day

"(a) DESIGNATION.—March 9 is U.S. Hostage and Wrongful Detainee Day.

President.

"(b) PROCLAMATION.—The President is requested to issue each year a proclamation calling on the people of the United States to observe U.S. Hostage and Wrongful Detainee Day with appropriate ceremonies and activities.".

(B) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 1 of title 36, United States Code, is amended by striking the item relating to the second section 146 and inserting the following new items:

36 USC prec. 101.

"147. Choose Respect Day.
"148. U.S. Hostage and Wrongful Detainee Day.".

(2) HOSTAGE AND WRONGFUL DETAINEE FLAG.—

(A) IN GENERAL.—Chapter 9 of title 36, United States Code, is amended by adding at the end the following new section:

36 USC 904.

### "§ 904. Hostage and Wrongful Detainee flag

"(a) DESIGNATION.—The Hostage and Wrongful Detainee flag championed by the Bring Our Families Home Campaign is designated as the symbol of the commitment of the United States to recognizing, and prioritizing the freedom of, citizens and lawful permanent residents of the United States held as hostages or wrongfully detained abroad.

"(b) REQUIRED DISPLAY.—

"(1) IN GENERAL.—The Hostage and Wrongful Detainee flag shall be displayed at the locations specified in paragraph (3) on the days specified in paragraph (2).

"(2) DAYS SPECIFIED.—The days specified in this paragraph are the following:

"(A) U.S. Hostage and Wrongful Detainee Day, March 9.

"(B) Flag Day, June 14.

"(C) Independence Day, July 4.

"(D) Any day on which a citizen or lawful permanent resident of the United States—

"(i) returns to the United States from being held hostage or wrongfully detained abroad; or

"(ii) dies while being held hostage or wrongfully detained abroad.

"(3) LOCATIONS SPECIFIED.—The locations specified in this paragraph are the following:

"(A) The Capitol.

"(B) The White House.

"(C) The buildings containing the official office of—

"(i) the Secretary of State; and

"(ii) the Secretary of Defense.

"(c) DISPLAY TO BE IN A MANNER VISIBLE TO THE PUBLIC.— Display of the Hostage and Wrongful Detainee flag pursuant to this section shall be in a manner designed to ensure visibility to the public.

"(d) LIMITATION.—This section may not be construed or applied so as to require any employee to report to work solely for the purpose of providing for the display of the Hostage and Wrongful Detainee flag.".

(B) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 9 of title 36, United States Code, is amended by adding at the end the following: 36 USC prec. 901.

"904. Hostage and Wrongful Detainee flag.".

## SEC. 1805. IMPROVEMENTS TO DEPARTMENT OF VETERANS AFFAIRS-DEPARTMENT OF DEFENSE JOINT EXECUTIVE COMMITTEE.

Section 320 of title 38, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (2)—

(i) in subparagraph (A), by striking "; and" and inserting a semicolon;

(ii) in subparagraph (B), by striking the period at the end and inserting a semicolon; and

(iii) by adding at the end the following new subparagraphs:

"(C) the Assistant Secretary of Labor for Veterans' Employment and Training and such other officers and employees of the Department of Labor as the Secretary of Labor may designate; and

"(D) such officers and employees of other Executive agencies as the Secretary of Veterans Affairs and the Secretary of Defense jointly determine, with the consent of the heads of the Executive agencies of such officers and employees, necessary to carry out the goals and objectives of the Committee."; Determination.

(B) by adding at the end the following new paragraph:

"(3) The co-chairs of the Committee are the Deputy Secretary of Veterans Affairs and the Under Secretary of Defense for Personnel and Readiness.";

(2) in subsection (b)(2), by striking "Job Training and Post-Service Placement Executive Committee" and inserting "Transition Executive Committee";

(3) in subsection (d), by adding at the end the following new paragraph:

Determination.

"(6) Develop, implement, and oversee such other joint actions, initiatives, programs, and policies as the two Secretaries determine appropriate and consistent with the purpose of the Committee."; and

(4) in subsection (e)—

(A) in the subsection heading, by striking "JOB TRAINING AND POST-SERVICE PLACEMENT" and inserting "TRANSITION";

(B) in the matter before paragraph (1)—

(i) by striking "Job Training and Post-Service Placement" and inserting "Transition";

(ii) by inserting ", in addition to such other activities as may assigned to the committee under subsection (d)(6)" after "shall"; and

(C) in paragraph (2), by inserting ", transition from life in the Armed Forces to civilian life," after "job training".

### SEC. 1806. ACCESS TO AND USE OF MILITARY POST OFFICES BY UNITED STATES CITIZENS EMPLOYED OVERSEAS BY THE NORTH ATLANTIC TREATY ORGANIZATION WHO PERFORM FUNCTIONS IN SUPPORT OF MILITARY OPERATIONS OF THE ARMED FORCES.

(a) REQUIREMENT TO AUTHORIZE USE OF POST OFFICE.—Section 406 of title 39, United States Code, is amended by striking "may authorize the use" and inserting "shall authorize the use".

Deadline.

(b) BRIEFING REQUIREMENT.—Not later than March 1, 2024, the Secretary of Defense shall brief the Committees on Armed Services of the Senate and House of Representatives on the revision of the Financial Management Regulation to authorize individuals under subparagraph (A) of section 406(c)(1) of title 39, United States Code, as amended by subsection (a), to utilize the authority

Determinations.

provided under such subparagraph. If there is a determination that this authority is not feasible for a legal or financial reason, the Secretary shall include the background for those determinations in the briefing.

### SEC. 1807. EXTENSION OF ADMISSION TO GUAM OR THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS FOR CERTAIN NONIMMIGRANT H–2B WORKERS.

Section 6(b)(1)(B) of the Joint Resolution entitled "A Joint Resolution to approve the 'Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America', and for other purposes", approved March 24, 1976 (48 U.S.C. 1806(b)(1)(B)), is amended, in the matter preceding clause (i), by striking "December 31, 2024" and inserting "December 31, 2029".

10 USC 331 note.

### SEC. 1808. SUPPORT FOR EXECUTION OF BILATERAL AGREEMENTS CONCERNING ILLICIT TRANSNATIONAL MARITIME ACTIVITY IN AFRICA.

(a) IN GENERAL.—The Secretary of Defense, in coordination with the Commandant of the Coast Guard, and in consultation with the Secretary of State, may provide assistance to the Coast Guard for the execution of existing maritime law enforcement agreements between the United States and friendly African countries that were established to combat transnational organized illegal maritime activity, including illegal, unreported, and unregulated fishing.

(b) EFFECT ON MILITARY TRAINING AND READINESS.—The Secretary of Defense shall ensure that the provision of assistance under this section does not negatively affect military training, operations, readiness, or other military requirements.

(c) FUNDS.—If the Secretary of Defense provides assistance under subsection (a) during any fiscal year, the Secretary shall provide such assistance using amounts available for that fiscal year for the Department of Defense for operation and maintenance.

(d) ASSISTANCE DEFINED.—In this section, the term "assistance" means any of the following:

(1) The use of surface and air assets as bases of operations and information collection platforms.

(2) Communication infrastructure.

(3) Information sharing.

(4) The provision of logistic support, supplies, and services (as such term is defined in section 2350 of title 10, United States Code).

## SEC. 1809. NATIONAL COLD WAR CENTER DESIGNATION.

Arkansas.

(a) PURPOSES.—The purposes of this section are—

(1) to designate the museum located at Blytheville/Eaker Air Force Base in Blytheville, Arkansas, including its future and expanded exhibits, collections, and educational programs, as a "National Cold War Center";

(2) to recognize the preservation, maintenance, and interpretation of the artifacts, documents, images, and history collected by the Center;

(3) to enhance the knowledge of the American people of the experience of the United States during the Cold War years; and

(4) to ensure that all future generations understand the sacrifices made to preserve freedom and democracy, and the benefits of peace for all future generations in the 21st century and beyond.

(b) DESIGNATION.—

(1) IN GENERAL.—The museum located at Blytheville/Eaker Air Force Base in Blytheville, Arkansas, is designated as a "National Cold War Center".

(2) RULE OF CONSTRUCTION.—Nothing in this section shall preclude the designation of other national centers or museums in the United States interpreting the Cold War.

(c) EFFECT OF DESIGNATION.—The National Cold War Center designated by this section is not a unit of the National Park System, and the designation of the center as a National Cold War Center shall not be construed to require or permit Federal funds to be expended for any purpose related to the designation made by this section.

## SEC. 1810. REVISION OF REQUIREMENT FOR TRANSFER OF CERTAIN AIRCRAFT TO STATE OF CALIFORNIA FOR WILDFIRE SUPPRESSION PURPOSES.

(a) TRANSFER OF EXCESS COAST GUARD HC-130H AIRCRAFT.—

(1) TRANSFER TO STATE OF CALIFORNIA.—The Secretary of Homeland Security shall transfer to the State of California without reimbursement—

(A) the 7 HC–130H aircraft specified in paragraph (2); and

(B) initial spares and necessary ground support equipment for such aircraft.

(2) AIRCRAFT SPECIFIED.—The aircraft specified in this paragraph are the HC–130H Coast Guard aircraft with serial numbers 1706, 1708, 1709, 1713, 1714, 1719, and 1721.

(3) TIMING; AIRCRAFT MODIFICATIONS.—Subject to paragraph (4), the transfers under paragraph (1)—

(A) shall be made as soon as practicable after the date of the enactment of this Act; and

(B) may be carried out without further modifications to the aircraft by the United States.

Determination.

(4) DEMILITARIZATION.—The Secretary of Homeland Security shall ensure that before an aircraft specified under paragraph (2) is transferred under paragraph (1), such aircraft is demilitarized, as determined necessary by the Secretary.

(b) CONDITIONS OF TRANSFER.—Aircraft transferred to the State of California under this section—

(1) may be used only for wildfire suppression purposes, including search and rescue or emergency operations pertaining to wildfires;

(2) may not be flown outside of, or otherwise removed from, the United States unless dispatched by the National Interagency Fire Center in support of an international agreement to assist in wildfire suppression efforts or for other disaster-related response purposes approved by the Governor of California in writing in advance; and

(3) may only be disposed of by the State of California pursuant to the statutes and regulations governing the disposal of aircraft provided to the State of California pursuant to the Department of Defense excess personal property program under section 2576a of title 10, United States Code.

(c) CALCULATION OF INITIAL SPARES.—For purposes of subsection (a)(1)(B), initial spares shall be calculated based on shelf stock support for 7 HC–130H aircraft each flying 400 hours each year.

(d) TRANSFER OF RESIDUAL KITS AND PARTS HELD BY AIR FORCE.—The Secretary of the Air Force may transfer to the State of California, without reimbursement, any residual kits and parts held by the Secretary of the Air Force that were procured in anticipation of the transfer of the aircraft specified in subsection (a)(2).

(e) COSTS AFTER TRANSFER.—Any cost associated with the operation, maintenance, sustainment, or disposal of any aircraft, initial spare, or ground support equipment transferred to the State of California under this section that are incurred after the date on which such aircraft, initial spare, or ground support equipment is transferred shall be borne by the State of California.

(f) REPEAL OF PRIOR PROVISIONS OF LAW RELATING TO TRANSFER.—The following provisions of law are repealed:

(1) Subsections (a), (c), (d), and (f) of section 1098 of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66; 127 Stat. 881), as amended by subsections (a), (b), (c), and (d) of section 1083 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1989).

(2) Subsections (e) and (f) of section 1083 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1989).

### SEC. 1811. LIMITATION ON FUNDS FOR WUHAN INSTITUTE OF VIROLOGY AND ECOHEALTH ALLIANCE, INC.

(a) WUHAN INSTITUTE OF VIROLOGY.—None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of Defense may be made available for the Wuhan Institute of Virology for any purpose.

(b) ECOHEALTH ALLIANCE, INC..—None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of Defense may be used to fund any work to be performed in China by EcoHealth Alliance, Inc., including—

(1) work to be performed by any subsidiary of EcoHealth Alliance Inc, any organization that is directly controlled by EcoHealth Alliance Inc, or any organization or individual that is a subgrantee or subcontractor of EcoHealth Alliance Inc.; or

(2) any grant for the performance of any such work.

# Subtitle B—Drone Security

American Security Drone Act of 2023. 41 USC note prec. 3901.

### SEC. 1821. SHORT TITLE.

This subtitle may be cited as the "American Security Drone Act of 2023".

### SEC. 1822. DEFINITIONS.

In this subtitle:

(1) COVERED FOREIGN ENTITY.—The term "covered foreign entity" means an entity included on a list developed and maintained by the Federal Acquisition Security Council and published in the System for Award Management (SAM). This list will include entities in the following categories:

(A) An entity included on the Consolidated Screening List.

(B) Any entity that is subject to extrajudicial direction from a foreign government, as determined by the Secretary of Homeland Security.

(C) Any entity the Secretary of Homeland Security, in coordination with the Attorney General, Director of National Intelligence, and the Secretary of Defense, determines poses a national security risk.

(D) Any entity domiciled in the People's Republic of China or subject to influence or control by the Government of the People's Republic of China or the Communist Party of the People's Republic of China, as determined by the Secretary of Homeland Security.

China.

(E) Any subsidiary or affiliate of an entity described in subparagraphs (A) through (D).

(2) COVERED UNMANNED AIRCRAFT SYSTEM.—The term "covered unmanned aircraft system" has the meaning given the term "unmanned aircraft system" in section 44801 of title 49, United States Code.

(3) INTELLIGENCE; INTELLIGENCE COMMUNITY.—The terms "intelligence" and "intelligence community" have the meanings

given those terms in section 3 of the National Security Act of 1947 (50 U.S.C. 3003).

### SEC. 1823. PROHIBITION ON PROCUREMENT OF COVERED UNMANNED AIRCRAFT SYSTEMS FROM COVERED FOREIGN ENTITIES.

(a) IN GENERAL.—Except as provided under subsections (b) through (f), the head of an executive agency may not procure any covered unmanned aircraft system that is manufactured or assembled by a covered foreign entity, which includes associated elements related to the collection and transmission of sensitive information (consisting of communication links and the components that control the unmanned aircraft) that enable the operator to operate the aircraft in the National Airspace System. The Federal Acquisition Security Council, in coordination with the Secretary of Transportation, shall develop and update a list of associated elements.

*Updates.*
*List.*

(b) EXEMPTION.—The Secretary of Homeland Security, the Secretary of Defense, the Secretary of State, and the Attorney General are exempt from the restriction under subsection (a) if the procurement is required in the national interest of the United States and—

(1) is for the sole purposes of research, evaluation, training, testing, or analysis for electronic warfare, information warfare operations, cybersecurity, or development of unmanned aircraft system or counter-unmanned aircraft system technology;

(2) is for the sole purposes of conducting counterterrorism or counterintelligence activities, protective missions, or Federal criminal or national security investigations, including forensic examinations, or for electronic warfare, information warfare operations, cybersecurity, or development of an unmanned aircraft system or counter-unmanned aircraft system technology; or

*Determination.*

(3) is an unmanned aircraft system that, as procured or as modified after procurement but before operational use, can no longer transfer to, or download data from, a covered foreign entity and otherwise poses no national security cybersecurity risks as determined by the exempting official.

(c) DEPARTMENT OF TRANSPORTATION AND FEDERAL AVIATION ADMINISTRATION EXEMPTION.—The Secretary of Transportation is exempt from the restriction under subsection (a) if the operation or procurement is deemed to support the safe, secure, or efficient operation of the National Airspace System or maintenance of public safety, including activities carried out under the Federal Aviation Administration's Alliance for System Safety of UAS through Research Excellence (ASSURE) Center of Excellence (COE) and any other activity deemed to support the safe, secure, or efficient operation of the National Airspace System or maintenance of public safety, as determined by the Secretary or the Secretary's designee.

(d) NATIONAL TRANSPORTATION SAFETY BOARD EXEMPTION.—The National Transportation Safety Board, in consultation with the Secretary of Homeland Security, is exempt from the restriction under subsection (a) if the operation or procurement is necessary for the sole purpose of conducting safety investigations.

(e) NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION EXEMPTION.—The Administrator of the National Oceanic and Atmospheric Administration (NOAA), in consultation with the Secretary of Homeland Security, is exempt from the restriction under

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 693

subsection (a) if the procurement is necessary for the purpose of meeting NOAA's science or management objectives or operational mission.

(f) WAIVER.—The head of an executive agency may waive the prohibition under subsection (a) on a case-by-case basis—

(1) with the approval of the Director of the Office of Management and Budget, after consultation with the Federal Acquisition Security Council; and

(2) upon notification to—

(A) the Committee on Homeland Security and Governmental Affairs of the Senate;

(B) the Committee on Oversight and Accountability in the House of Representatives; and

(C) other appropriate congressional committees of jurisdiction.

**SEC. 1824. PROHIBITION ON OPERATION OF COVERED UNMANNED AIRCRAFT SYSTEMS FROM COVERED FOREIGN ENTITIES.**

(a) PROHIBITION.—

(1) IN GENERAL.—Beginning on the date that is two years after the date of the enactment of this Act, no Federal department or agency may operate a covered unmanned aircraft system manufactured or assembled by a covered foreign entity.

(2) APPLICABILITY TO CONTRACTED SERVICES.—The prohibition under paragraph (1) applies to any covered unmanned aircraft systems that are being used by any executive agency through the method of contracting for the services of covered unmanned aircraft systems.

(b) EXEMPTION.—The Secretary of Homeland Security, the Secretary of Defense, the Secretary of State, and the Attorney General are exempt from the restriction under subsection (a) if the operation is required in the national interest of the United States and—

(1) is for the sole purposes of research, evaluation, training, testing, or analysis for electronic warfare, information warfare operations, cybersecurity, or development of unmanned aircraft system or counter-unmanned aircraft system technology;

(2) is for the sole purposes of conducting counterterrorism or counterintelligence activities, protective missions, or Federal criminal or national security investigations, including forensic examinations, or for electronic warfare, information warfare operations, cybersecurity, or development of an unmanned aircraft system or counter-unmanned aircraft system technology; or

(3) is an unmanned aircraft system that, as procured or as modified after procurement but before operational use, can no longer transfer to, or download data from, a covered foreign entity and otherwise poses no national security cybersecurity risks as determined by the exempting official.

(c) DEPARTMENT OF TRANSPORTATION AND FEDERAL AVIATION ADMINISTRATION EXEMPTION.—The Secretary of Transportation is exempt from the restriction under subsection (a) if the operation is deemed to support the safe, secure, or efficient operation of the National Airspace System or maintenance of public safety, including activities carried out under the Federal Aviation Administration's Alliance for System Safety of UAS through Research Excellence (ASSURE) Center of Excellence (COE) and any other activity deemed to support the safe, secure, or efficient operation of the

Notification.

Effective date.

Determination.

Determination.

137 STAT. 694          PUBLIC LAW 118–31—DEC. 22, 2023

National Airspace System or maintenance of public safety, as determined by the Secretary or the Secretary's designee.

(d) NATIONAL TRANSPORTATION SAFETY BOARD EXEMPTION.—The National Transportation Safety Board, in consultation with the Secretary of Homeland Security, is exempt from the restriction under subsection (a) if the operation is necessary for the sole purpose of conducting safety investigations.

(e) NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION EXEMPTION.—The Administrator of the National Oceanic and Atmospheric Administration (NOAA), in consultation with the Secretary of Homeland Security, is exempt from the restriction under subsection (a) if the procurement is necessary for the purpose of meeting NOAA's science or management objectives or operational mission.

(f) WAIVER.—The head of an executive agency may waive the prohibition under subsection (a) on a case-by-case basis—

(1) with the approval of the Director of the Office of Management and Budget, after consultation with the Federal Acquisition Security Council; and

Notification.

(2) upon notification to—

(A) the Committee on Homeland Security and Governmental Affairs of the Senate;

(B) the Committee on Oversight and Accountability in the House of Representatives; and

(C) other appropriate congressional committees of jurisdiction.

Deadline.

(g) REGULATIONS AND GUIDANCE.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Homeland Security, in consultation with the Attorney General and the Secretary of Transportation, shall prescribe regulations or guidance to implement this section.

### SEC. 1825. PROHIBITION ON USE OF FEDERAL FUNDS FOR PROCUREMENT AND OPERATION OF COVERED UNMANNED AIRCRAFT SYSTEMS FROM COVERED FOREIGN ENTITIES.

Effective date.

(a) IN GENERAL.—Beginning on the date that is two years after the date of the enactment of this Act, except as provided in subsection (b), no Federal funds awarded through a contract, grant, or cooperative agreement, or otherwise made available may be used—

(1) to procure a covered unmanned aircraft system that is manufactured or assembled by a covered foreign entity; or

(2) in connection with the operation of such a drone or unmanned aircraft system.

(b) EXEMPTION.—The Secretary of Homeland Security, the Secretary of Defense, the Secretary of State, and the Attorney General are exempt from the restriction under subsection (a) if the procurement or operation is required in the national interest of the United States and—

(1) is for the sole purposes of research, evaluation, training, testing, or analysis for electronic warfare, information warfare operations, cybersecurity, or development of unmanned aircraft system or counter-unmanned aircraft system technology;

(2) is for the sole purposes of conducting counterterrorism or counterintelligence activities, protective missions, or Federal criminal or national security investigations, including forensic examinations, or for electronic warfare, information warfare

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 695

operations, cybersecurity, or development of an unmanned aircraft system or counter-unmanned aircraft system technology; or

(3) is an unmanned aircraft system that, as procured or as modified after procurement but before operational use, can no longer transfer to, or download data from, a covered foreign entity and otherwise poses no national security cybersecurity risks as determined by the exempting official.

*Determination.*

(c) DEPARTMENT OF TRANSPORTATION AND FEDERAL AVIATION ADMINISTRATION EXEMPTION.—The Secretary of Transportation is exempt from the restriction under subsection (a) if the operation or procurement is deemed to support the safe, secure, or efficient operation of the National Airspace System or maintenance of public safety, including activities carried out under the Federal Aviation Administration's Alliance for System Safety of UAS through Research Excellence (ASSURE) Center of Excellence (COE) and any other activity deemed to support the safe, secure, or efficient operation of the National Airspace System or maintenance of public safety, as determined by the Secretary or the Secretary's designee.

*Determination.*

(d) NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION EXEMPTION.—The Administrator of the National Oceanic and Atmospheric Administration (NOAA), in consultation with the Secretary of Homeland Security, is exempt from the restriction under subsection (a) if the operation or procurement is necessary for the purpose of meeting NOAA's science or management objectives or operational mission.

(e) WAIVER.—The head of an executive agency may waive the prohibition under subsection (a) on a case-by-case basis—

(1) with the approval of the Director of the Office of Management and Budget, after consultation with the Federal Acquisition Security Council; and

(2) upon notification to—

*Notification.*

(A) the Committee on Homeland Security and Governmental Affairs of the Senate;

(B) the Committee on Oversight and Accountability in the House of Representatives; and

(C) other appropriate congressional committees of jurisdiction.

(f) REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Federal Acquisition Regulatory Council shall prescribe regulations or guidance, as necessary, to implement the requirements of this section pertaining to Federal contracts.

*Deadline.*
*Guidance.*

## SEC. 1826. PROHIBITION ON USE OF GOVERNMENT-ISSUED PURCHASE CARDS TO PURCHASE COVERED UNMANNED AIRCRAFT SYSTEMS FROM COVERED FOREIGN ENTITIES.

Effective immediately, Government-issued Purchase Cards may not be used to procure any covered unmanned aircraft system from a covered foreign entity.

## SEC. 1827. MANAGEMENT OF EXISTING INVENTORIES OF COVERED UNMANNED AIRCRAFT SYSTEMS FROM COVERED FOREIGN ENTITIES.

(a) IN GENERAL.—All executive agencies must account for existing inventories of covered unmanned aircraft systems manufactured or assembled by a covered foreign entity in their personal

*Deadline.*

property accounting systems, within one year of the date of enactment of this Act, regardless of the original procurement cost, or the purpose of procurement due to the special monitoring and accounting measures necessary to track the items' capabilities.

Inventory data.
Determination.

(b) CLASSIFIED TRACKING.—Due to the sensitive nature of missions and operations conducted by the United States Government, inventory data related to covered unmanned aircraft systems manufactured or assembled by a covered foreign entity may be tracked at a classified level, as determined by the Secretary of Homeland Security or the Secretary's designee.

(c) EXCEPTIONS.—The Department of Defense, the Department of Homeland Security, the Department of Justice, the Department of Transportation, and the National Oceanic and Atmospheric Administration may exclude from the full inventory process, covered unmanned aircraft systems that are deemed expendable due to mission risk such as recovery issues, or that are one-time-use covered unmanned aircraft due to requirements and low cost.

(d) INTELLIGENCE COMMUNITY EXCEPTION.—Nothing in this section shall apply to any element of the intelligence community.

### SEC. 1828. COMPTROLLER GENERAL REPORT.

Not later than 275 days after the date of the enactment of this Act, the Comptroller General of the United States shall submit to Congress a report on the amount of commercial off-the-shelf drones and covered unmanned aircraft systems procured by Federal departments and agencies from covered foreign entities, except that nothing in this section shall apply to any element of the intelligence community.

### SEC. 1829. GOVERNMENT-WIDE POLICY FOR PROCUREMENT OF UNMANNED AIRCRAFT SYSTEMS.

Deadline.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Director of the Office of Management and Budget, in coordination with the Department of Homeland Security, Department of Transportation, the Department of Justice, and other Departments as determined by the Director of the Office of Management and Budget, and in consultation with the National Institute of Standards and Technology, shall establish a government-wide policy for the procurement of an unmanned aircraft system—

(1) for non-Department of Defense and non-intelligence community operations; and

Grants.

(2) through grants and cooperative agreements entered into with non-Federal entities.

(b) INFORMATION SECURITY.—The policy developed under subsection (a) shall include the following specifications, which to the extent practicable, shall be based on industry standards and technical guidance from the National Institute of Standards and Technology, to address the risks associated with processing, storing, and transmitting Federal information in an unmanned aircraft system:

(1) Protections to ensure controlled access to an unmanned aircraft system.

(2) Protecting software, firmware, and hardware by ensuring changes to an unmanned aircraft system are properly managed, including by ensuring an unmanned aircraft system can be updated using a secure, controlled, and configurable mechanism.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 697

(3) Cryptographically securing sensitive collected, stored, and transmitted data, including proper handling of privacy data and other controlled unclassified information.

(4) Appropriate safeguards necessary to protect sensitive information, including during and after use of an unmanned aircraft system.

(5) Appropriate data security to ensure that data is not transmitted to or stored in non-approved locations.

(6) The ability to opt out of the uploading, downloading, or transmitting of data that is not required by law or regulation and an ability to choose with whom and where information is shared when it is required.

(c) REQUIREMENT.—The policy developed under subsection (a) shall reflect an appropriate risk-based approach to information security related to use of an unmanned aircraft system.

(d) REVISION OF ACQUISITION REGULATIONS.—Not later than 180 days after the date on which the policy required under subsection (a) is issued— <span style="float:right">Deadline.</span>

(1) the Federal Acquisition Regulatory Council shall revise the Federal Acquisition Regulation, as necessary, to implement the policy; and

(2) any Federal department or agency or other Federal entity not subject to, or not subject solely to, the Federal Acquisition Regulation shall revise applicable policy, guidance, or regulations, as necessary, to implement the policy.

(e) EXEMPTION.—In developing the policy required under subsection (a), the Director of the Office of Management and Budget shall—

(1) incorporate policies to implement the exemptions contained in this subtitle; and

(2) incorporate an exemption to the policy in the case of a head of the procuring department or agency determining, in writing, that no product that complies with the information security requirements described in subsection (b) is capable of fulfilling mission critical performance requirements, and such determination— <span style="float:right">Determination.</span>

(A) may not be delegated below the level of the Deputy Secretary, or Administrator, of the procuring department or agency;

(B) shall specify—

(i) the quantity of end items to which the waiver applies and the procurement value of those items; and

(ii) the time period over which the waiver applies, which shall not exceed three years; <span style="float:right">Time period.</span>

(C) shall be reported to the Office of Management and Budget following issuance of such a determination; and <span style="float:right">Reports.</span>

(D) not later than 30 days after the date on which the determination is made, shall be provided to the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Oversight and Accountability of the House of Representatives. <span style="float:right">Deadline.</span>

## SEC. 1830. STATE, LOCAL, AND TERRITORIAL LAW ENFORCEMENT AND EMERGENCY SERVICE EXEMPTION.

(a) RULE OF CONSTRUCTION.—Nothing in this subtitle shall prevent a State, local, or territorial law enforcement or emergency

service agency from procuring or operating a covered unmanned aircraft system purchased with non-Federal dollars.

Contracts.
Grants.

(b) CONTINUITY OF ARRANGEMENTS.—The Federal Government may continue entering into contracts, grants, and cooperative agreements or other Federal funding instruments with State, local, or territorial law enforcement or emergency service agencies under which a covered unmanned aircraft system will be purchased or operated if the agency has received approval or waiver to purchase or operate a covered unmanned aircraft system pursuant to section 1825.

**SEC. 1831. STUDY.**

(a) STUDY ON THE SUPPLY CHAIN FOR UNMANNED AIRCRAFT SYSTEMS AND COMPONENTS.—

(1) REPORT REQUIRED.—Not later than one year after the date of the enactment of this Act, the Under Secretary of Defense for Acquisition and Sustainment shall provide to the appropriate congressional committees a report on the supply chain for covered unmanned aircraft systems, including a discussion of current and projected future demand for covered unmanned aircraft systems.

(2) ELEMENTS.—The report under paragraph (1) shall include the following:

(A) A description of the current and future global and domestic market for covered unmanned aircraft systems that are not widely commercially available except from a covered foreign entity.

(B) A description of the sustainability, availability, cost, and quality of secure sources of covered unmanned aircraft systems domestically and from sources in allied and partner countries.

Plan.

(C) The plan of the Secretary of Defense to address any gaps or deficiencies identified in subparagraph (B), including through the use of funds available under the Defense Production Act of 1950 (50 U.S.C. 4501 et seq.) and partnerships with the National Aeronautics and Space Administration and other interested persons.

(D) Such other information as the Under Secretary of Defense for Acquisition and Sustainment determines to be appropriate.

(3) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.— In this section, the term "appropriate congressional committees" means the following:

(A) The Committees on Armed Services of the Senate and the House of Representatives.

(B) The Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Oversight and Accountability of the House of Representatives.

(C) The Committee on Commerce, Science, and Transportation of the Senate and the Committee on Science, Space, and Technology of the House of Representatives.

(D) The Select Committee on Intelligence of the Senate and the Permanent Select Committee on Intelligence of the House of Representatives.

(E) The Committee on Transportation and Infrastructure of the House of Representatives.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 699

(F) The Committee on Homeland Security of the House of Representatives.

(G) The Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives.

### SEC. 1832. EXCEPTIONS.

(a) EXCEPTION FOR WILDFIRE MANAGEMENT OPERATIONS AND SEARCH AND RESCUE OPERATIONS.—The appropriate Federal agencies, in consultation with the Secretary of Homeland Security, are exempt from the procurement and operation restrictions under sections 1823, 1824, and 1825 to the extent the procurement or operation is necessary for the purpose of supporting the full range of wildfire management operations or search and rescue operations.

(b) EXCEPTION FOR INTELLIGENCE ACTIVITIES.—Sections 1823, 1824, and 1825 shall not apply to any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.), any authorized intelligence activities of the United States, or any activity or procurement that supports an authorized intelligence activity.

(c) EXCEPTION FOR TRIBAL LAW ENFORCEMENT OR EMERGENCY SERVICE AGENCY.—Tribal law enforcement or Tribal emergency service agencies, in consultation with the Secretary of Homeland Security, are exempt from the procurement, operation, and purchase restrictions under sections 1823, 1824, and 1825 to the extent the procurement or operation is necessary for the purpose of supporting the full range of law enforcement operations or search and rescue operations on Indian lands.

### SEC. 1833. SUNSET.

Sections 1823, 1824, and 1825 shall cease to have effect on the date that is five years after the date of the enactment of this Act.

# Subtitle C—Unidentified Anomalous Phenomena

SEC. 1841. UNIDENTIFIED ANOMALOUS PHENOMENA RECORDS COLLECTION AT THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION.

*44 USC 2107 note.*

(a) RECORDS COLLECTION.—

(1) ESTABLISHMENT OF COLLECTION.—

(A) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, the Archivist shall commence establishment of a collection of unidentified anomalous phenomena, as such term is defined in section 1673(n)(8) of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 50 U.S.C. 3373), records in the National Archives, to be known as the "Unidentified Anomalous Phenomena Records Collection".

*Deadline.*

(B) PHYSICAL INTEGRITY.—In carrying out subparagraph (A), the Archivist shall ensure the physical integrity and original provenance (or if indeterminate, the earliest historical owner) of all records in the Collection.

(C) RECORD COPIES.—The Collection shall consist of record copies of all Government, Government-provided, or

Government-funded records relating to unidentified anomalous phenomena, technologies of unknown origin, and non-human intelligence (or equivalent subjects by any other name with the specific and sole exclusion of temporarily non-attributed objects), which shall be transmitted to the National Archives in accordance with section 2107 of title 44, United States Code.

(D) SUBJECT GUIDEBOOK.—The Archivist shall prepare and publish a subject guidebook and index to the Collection.

(2) CONTENTS.—The Collection shall include the following:

(A) Copies of all unidentified anomalous phenomena records, regardless of age or date of creation—

(i) that have been transmitted to the National Archives or disclosed to the public in an unredacted form prior to the date of the enactment of this Act;

(ii) that are otherwise required to have been transmitted to the National Archives after the date of the enactment of this Act; or

(iii) the disclosure of which is postponed under this subtitle.

(B) A central directory comprised of identification aids created for each record transmitted to the Archivist under section 1842(e).

(b) DISCLOSURE OF RECORDS.—Copies of all unidentified anomalous phenomena records transmitted to the National Archives for disclosure to the public shall—

(1) be included in the Collection; and

(2) be available to the public—

(A) for inspection and copying at the National Archives within 30 days after their transmission to the National Archives; and

(B) digitally via the National Archives online database within a reasonable amount of time not to exceed 180 days thereafter.

(c) FEES FOR COPYING.—

(1) IN GENERAL.—The Archivist shall—

(A) charge fees for copying unidentified anomalous phenomena records; and

(B) grant waivers of such fees pursuant to the standards established by section 552(a)(4) of title 5, United States Code.

(2) AMOUNT OF FEES.—The amount of a fee charged by the Archivist pursuant to paragraph (1)(A) for the copying of an unidentified anomalous phenomena record shall be such amount as the Archivist determines appropriate to cover the costs incurred by the National Archives in making and providing such copy, except that in no case may the amount of the fee charged exceed the actual expenses incurred by the National Archives in making and providing such copy.

(d) ADDITIONAL REQUIREMENTS.—

(1) USE OF FUNDS.—The Collection shall be preserved, protected, archived, digitized, and made available to the public at the National Archives and via the official National Archives online database using appropriations authorized, specified, and restricted for use under the terms of this subtitle.

(2) SECURITY OF RECORDS.—The National Security Program Office at the National Archives, in consultation with the

*[margin notes: Public information. Deadlines. / Waivers. / Determination. / Public information. Web posting.]*

National Archives Information Security Oversight Office, shall establish a program to ensure the security of the postponed unidentified anomalous phenomena records in the protected, and yet-to-be disclosed or classified portion of the Collection.

(e) OVERSIGHT.—

(1) SENATE.—The Committee on Homeland Security and Governmental Affairs, the Committee on Armed Services, and the Select Committee on Intelligence of the Senate shall have continuing legislative oversight jurisdiction in the Senate with respect to the Collection.

(2) HOUSE OF REPRESENTATIVES.—The Committee on Oversight and Accountability, the Committee on Armed Services, and the Permanent Select Committee on Intelligence of the House of Representatives shall have continuing legislative oversight jurisdiction in the House of Representatives with respect to the Collection.

### SEC. 1842. REVIEW, IDENTIFICATION, TRANSMISSION TO THE NATIONAL ARCHIVES, AND PUBLIC DISCLOSURE OF UNIDENTIFIED ANOMALOUS PHENOMENA RECORDS BY GOVERNMENT OFFICES.

(a) IDENTIFICATION, ORGANIZATION, AND PREPARATION FOR TRANSMISSION.—

(1) IN GENERAL.—As soon as practicable after the date of the enactment of this Act, each head of a Government office shall—

(A) identify and organize records in the possession of the Government office or under the control of the Government office relating to unidentified anomalous phenomena; and

(B) prepare such records for transmission to the Archivist for inclusion in the Collection.

(2) PROHIBITIONS.—

(A) DESTRUCTION; ALTERATION; MUTILATION.—No unidentified anomalous phenomena record shall be destroyed, altered, or mutilated in any way.

(B) WITHHOLDING; REDACTION; POSTPONEMENT OF DISCLOSURE; RECLASSIFICATION.—No unidentified anomalous phenomena record made available or disclosed to the public prior to the date of the enactment of this Act may be withheld, redacted, postponed for public disclosure, or reclassified.

(C) RECORDS CREATED BY NON-FEDERAL PERSONS OR ENTITIES.—No unidentified anomalous phenomena record created by a person or entity outside the Federal Government (excluding names or identities consistent with the requirements of section 1843) shall be withheld, redacted, postponed for public disclosure, or reclassified.

(b) CUSTODY OF UNIDENTIFIED ANOMALOUS PHENOMENA RECORDS PENDING REVIEW.—During the review by the heads of Government offices under subsection (c), each head of a Government office shall retain custody of the unidentified anomalous phenomena records of the office for purposes of preservation, security, and efficiency, unless it is a third agency record described in subsection (c)(2)(C).

(c) REVIEW BY HEADS OF GOVERNMENT OFFICES.—

137 STAT. 702          PUBLIC LAW 118–31—DEC. 22, 2023

Deadline.

(1) IN GENERAL.—Not later than 300 days after the date of the enactment of this Act, each head of a Government office shall review, identify, and organize each unidentified anomalous phenomena record in the custody or possession of the office for—

(A) disclosure to the public; and

(B) transmission to the Archivist.

Determinations.

(2) REQUIREMENTS.—In carrying out paragraph (1), the head of a Government office shall—

(A) determine which of the records of the office are unidentified anomalous phenomena records;

(B) determine which of the unidentified anomalous phenomena records of the office have been officially disclosed or made publicly available in a complete and unredacted form;

(C)(i) determine which of the unidentified anomalous phenomena records of the office, or particular information contained in such a record, was created by a third agency or by another Government office; and

(ii) transmit to a third agency or other Government office those records, or particular information contained in those records, or complete and accurate copies thereof;

(D)(i) determine whether the unidentified anomalous phenomena records of the office or particular information in unidentified anomalous phenomena records of the office are covered by the standards for postponement of public disclosure under this subtitle; and

(ii) specify on the identification aid required by subsection (d) the applicable postponement provision contained in section 1841;

(E) organize and make available, upon request, to heads of Government offices other than the Government office with custody, including the All-domain Anomaly Resolution Office, all relevant unidentified anomalous records identified under subparagraph (D);

(F) organize and make available to the heads of Government offices other than the Government office with custody, including the All-domain Anomalous Resolution Office, for assistance with any record concerning which the office has any uncertainty as to whether the record is an unidentified anomalous phenomena record governed by this subtitle; and

(G) give precedence of work to—

(i) the identification, review, and transmission of unidentified anomalous phenomena records not already publicly available or disclosed as of the date of the enactment of this Act;

(ii) the identification, review, and transmission of all records that most unambiguously and definitively pertain to unidentified anomalous phenomena, technologies of unknown origin, and non-human intelligence;

(iii) the identification, review, and transmission of unidentified anomalous phenomena records that on the date of the enactment of this Act are the subject of litigation under section 552 of title 5, United States Code; and

(iv) the identification, review, and transmission of unidentified anomalous phenomena records with earliest provenance when not inconsistent with clauses (i) through (iii) and otherwise feasible.

(3) PRIORITY OF EXPEDITED REVIEW FOR DIRECTORS OF CERTAIN ARCHIVAL DEPOSITORIES.—The Director of each archival depository established under section 2112 of title 44, United States Code, shall have as a priority the expedited review for public disclosure of unidentified anomalous phenomena records in the possession and custody of the depository, and shall make copies of such records available to the All-domain Anomaly Resolution Office.

(d) IDENTIFICATION AIDS.—

(1) IN GENERAL.—

(A) PREPARATION AND AVAILABILITY.—Not later than 45 days after the date of the enactment of this Act, the Archivist, in consultation with the heads of such Government offices as the Archivist considers appropriate, shall prepare and make available to all Government offices a standard form of identification, or finding aid, for use with each unidentified anomalous phenomena record subject to review under this subtitle whether in hardcopy (physical), softcopy (electronic), or digitized data format as may be appropriate.  *Deadline.*

(B) UNIFORM SYSTEM.—The Archivist shall ensure that the identification aid program is established in such a manner as to result in the creation of a uniform system for cataloging and finding every unidentified anomalous phenomena record subject to review under this subtitle where ever and how ever stored in hardcopy (physical), softcopy (electronic), or digitized data format.

(2) REQUIREMENTS FOR GOVERNMENT OFFICES.—Upon completion of an identification aid using the standard form of identification prepared and made available under subparagraph (A) of paragraph (1) for the program established pursuant to subparagraph (B) of such paragraph, the head of a Government office shall—

(A) attach a printed copy to each physical unidentified anomalous phenomena record, and an electronic copy to each softcopy or digitized data unidentified anomalous phenomena record, the identification aid describes; and

(B) attach a printed copy to each physical unidentified anomalous phenomena record, and an electronic copy to each softcopy or digitized data unidentified anomalous phenomena record the identification aid describes, when transmitted to the Archivist.

(3) RECORDS OF THE NATIONAL ARCHIVES THAT ARE PUBLICLY AVAILABLE.—Unidentified anomalous phenomena records which are in the possession of the National Archives on the date of the enactment of this Act, and which have been publicly available in their entirety without redaction, shall be made available in the Collection without any additional review by another authorized office under this subtitle, and shall not be required to have such an identification aid unless required by the Archivist.

(e) TRANSMISSION TO THE NATIONAL ARCHIVES.—Each head of a Government office shall—

137 STAT. 704          PUBLIC LAW 118–31—DEC. 22, 2023

(1) transmit to the Archivist, and, as soon as possible, make available to the public, all unidentified anomalous phenomena records of the Government office that can be publicly disclosed, including those that are publicly available on the date of the enactment of this Act, without any redaction, adjustment, or withholding under the standards of this subtitle; and

(2) transmit to the Archivist upon approval for postponement by the original classification authority upon completion of other action authorized by this subtitle, all unidentified anomalous phenomena records of the Government office the public disclosure of which has been postponed, in whole or in part, under the standards of this subtitle, to become part of the protected, yet-to-be disclosed, or classified portion of the Collection.

(f) CUSTODY OF POSTPONED UNIDENTIFIED ANOMALOUS PHENOMENA RECORDS.—An unidentified anomalous phenomena record the public disclosure of which has been postponed shall, pending transmission to the Archivist, be held for reasons of security and preservation by the originating body until such time as the information security program has been established at the National Archives as required in section 1841(d)(2).

(g) PERIODIC REVIEW OF POSTPONED UNIDENTIFIED ANOMALOUS PHENOMENA RECORDS.—

(1) IN GENERAL.—All postponed or redacted records shall be reviewed periodically by the originating agency and the Archivist.

.(2) REQUIREMENTS.—

(A) PUBLIC DISCLOSURE.—A periodic review under paragraph (1) shall address the public disclosure of additional unidentified anomalous phenomena records in the Collection under the standards of this subtitle.

(B) UNCLASSIFIED WRITTEN DESCRIPTION OF REASON.—All postponed unidentified anomalous phenomena records determined to require continued postponement shall require an unclassified written description of the reason for such continued postponement relevant to these specific records. Such description shall be provided to the Archivist and published in the Federal Register upon determination.

<span style="float:left">Federal Register, publication. Determination.</span>

(C) PERIODIC REVIEW; DOWNGRADING AND DESCLASSIFICATION OF INFORMATION.—The Archivist shall establish requirements for periodic review of postponed unidentified anomalous phenomena records that shall serve to downgrade and declassify information.

<span style="float:left">President. Certification.</span>

(D) DEADLINE FOR FULL DISCLOSURE.—Each unidentified anomalous phenomena record shall be publicly disclosed in full, and available in the Collection, not later than the date that is 25 years after the date of the first creation of the record by the originating body, unless the President certifies that—

(i) continued postponement is made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations; and

(ii) the identifiable harm is of such gravity that it outweighs the public interest in disclosure.

(h) REQUIREMENTS FOR EXECUTIVE AGENCIES.—

(1) IN GENERAL.—The heads of Executive agencies shall—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 705

(A) transmit digital records electronically in accordance with section 2107 of title 44, United States Code;

(B) charge fees for copying unidentified anomalous phe- <span style="float:right">Fees.</span> nomena records; and

(C) grant waivers of such fees pursuant to the stand- <span style="float:right">Waivers.</span> ards established by section 552(a)(4) of title 5, United States Code.

(2) AMOUNT OF FEES.—The amount of a fee charged by the head of an Executive agency pursuant to paragraph (1)(B) for the copying of an unidentified anomalous phenomena record shall be such amount as the head determines appropriate to cover the costs incurred by the Executive agency in making and providing such copy, except that in no case may the amount of the fee charged exceed the actual expenses incurred by the Executive agency in making and providing such copy.

## SEC. 1843. GROUNDS FOR POSTPONEMENT OF PUBLIC DISCLOSURE OF UNIDENTIFIED ANOMALOUS PHENOMENA RECORDS.

<span style="float:right">Deadlines.</span>

(a) POSTPONEMENT DETERMINATION.—In addition to the relevant authorities in Executive Order 13526, disclosure of unidentified anomalous phenomena records or particular information in unidentified anomalous phenomena records to the public may be postponed subject to the limitations of this subtitle if the original classification authority makes a determination that there is clear and convincing evidence that—

(1) the threat to the military defense, intelligence operations, or conduct of foreign relations of the United States posed by the public disclosure of the unidentified anomalous phenomena record is of such gravity that it outweighs the public interest in disclosure, and such public disclosure would reveal—

(A) an intelligence agent whose identity currently requires protection;

(B) an intelligence source or method which is currently utilized, or reasonably expected to be utilized, by the Federal Government and which has not been officially disclosed, the disclosure of which would interfere with the conduct of intelligence activities; or

(C) any other matter currently relating to the military defense, intelligence operations, or conduct of foreign relations of the United States, the disclosure of which would demonstrably and substantially impair the national security of the United States;

(2) the public disclosure of the unidentified anomalous phenomena record would violate section 552a of title 5, United States Code (referred to as the "Privacy Act of 1974");

(3) the public disclosure of the unidentified anomalous phenomena record could reasonably be expected to constitute an unwarranted invasion of personal privacy, and that invasion of privacy is so substantial that it outweighs the public interest; or

(4) the public disclosure of the unidentified anomalous phenomena record would compromise the existence of an understanding of confidentiality currently requiring protection between a Federal Government agent and a cooperating individual or a foreign government, and public disclosure would be so harmful that it outweighs the public interest.

137 STAT. 706          PUBLIC LAW 118–31—DEC. 22, 2023

Notification.

(b) WITHDRAWAL OF RECORDS.—Senior Agency Officials designated in accordance with Executive Order 13526 or any successor Orders may withdraw records in the Collection that are determined to be both not related to unidentified anomalous phenomena and properly classified. The Senior Agency Official must notify the congressional leadership and the oversight committees of Congress, as identified in section 1841(e), by not later than 60 days before each record is withdrawn.

(c) CONGRESSIONAL NOTIFICATION OF POSTPONEMENT OF DISCLOSURE.—In the event that the disclosure of unidentified anomalous phenomena records or particular information in unidentified anomalous phenomena records to the public is postponed by an Executive agency, the head of the Executive agency shall notify congressional leadership and the oversight committees of Congress, as identified in section 1841(e), within 15 days of such decision with a reason for the postponement of disclosure.

# Subtitle D—World Trade Center Health Program

### SEC. 1851. FLEXIBILITY AND FUNDING FOR THE WORLD TRADE CENTER HEALTH PROGRAM.

(a) DEPARTMENT OF DEFENSE, ARMED FORCES, OR OTHER FEDERAL WORKER RESPONDERS TO THE SEPTEMBER 11 ATTACKS AT THE PENTAGON AND SHANKSVILLE, PENNSYLVANIA.—Title XXXIII of the Public Health Service Act (42 U.S.C. 300mm et seq.) is amended—

Definitions.

(1) in section 3306 (42 U.S.C. 300mm–5)—

(A) by redesignating paragraphs (5) through (11) and paragraphs (12) through (17) as paragraphs (6) through (12) and paragraphs (14) through (19), respectively;

(B) by inserting after paragraph (4) the following:

"(5) The term 'Federal agency' means an agency, office, or other establishment in the executive, legislative, or judicial branch of the Federal Government."; and

(C) by inserting after paragraph (12), as so redesignated, the following:

"(13) The term 'uniformed services' has the meaning given the term in section 101(a) of title 10, United States Code."; and

Time periods.

(2) in section 3311(a) (42 U.S.C. 300mm–21(a))—

(A) in paragraph (2)(C)(i)—

(i) in subclause (I), by striking "; or" and inserting a semicolon;

(ii) in subclause (II), by striking "; and" and inserting a semicolon; and

(iii) by adding at the end the following:

"(III) was an employee of the Department of Defense or any other Federal agency, worked during the period beginning on September 11, 2001, and ending on September 18, 2001, for a contractor of the Department of Defense or any other Federal agency, or was a member of a regular or reserve component of the uniformed services; and performed rescue, recovery, demolition, debris cleanup, or other related services at the Pentagon site of the terrorist-related

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 707

aircraft crash of September 11, 2001, during the period beginning on September 11, 2001, and ending on the date on which the cleanup of the site was concluded, as determined by the WTC Program Administrator; or

"(IV) was an employee of the Department of Defense or any other Federal agency, worked during the period beginning on September 11, 2001, and ending on September 18, 2001, for a contractor of the Department of Defense or any other Federal agency, or was a member of a regular or reserve component of the uniformed services; and performed rescue, recovery, demolition, debris cleanup, or other related services at the Shanksville, Pennsylvania, site of the terrorist-related aircraft crash of September 11, 2001, during the period beginning on September 11, 2001, and ending on the date on which the cleanup of the site was concluded, as determined by the WTC Program Administrator; and"; and

(B) in paragraph (4)(A)—

(i) by striking "(A) IN GENERAL.—The" and inserting the following:

"(A) LIMIT.—

"(i) IN GENERAL.—The";

(ii) by inserting "or subclause (III) or (IV) of paragraph (2)(C)(i)" after "or (2)(A)(ii)"; and

(iii) by adding at the end the following:

"(ii) CERTAIN RESPONDERS TO THE SEPTEMBER 11 ATTACKS AT THE PENTAGON AND SHANKSVILLE, PENNSYLVANIA.—The total number of individuals who may be enrolled under paragraph (3)(A)(ii) based on eligibility criteria described in subclause (III) or (IV) of paragraph (2)(C)(i) shall not exceed 500 at any time.".

(b) ADDITIONAL FUNDING FOR THE WORLD TRADE CENTER HEALTH PROGRAM.—Title XXXIII of the Public Health Service Act (42 U.S.C. 300mm et seq.) is amended by adding at the end the following:

**"SEC. 3353. SPECIAL FUND.**

42 USC 300mm–63.

"(a) IN GENERAL.—There is established a fund to be known as the World Trade Center Health Program Special Fund (referred to in this section as the 'Special Fund'), consisting of amounts deposited into the Special Fund under subsection (b).

"(b) AMOUNT.—Out of any money in the Treasury not otherwise appropriated, there is appropriated for fiscal year 2024 $444,000,000 for deposit into the Special Fund, which amounts shall remain available in such Fund through fiscal year 2033.

"(c) USES OF FUNDS.—Amounts deposited into the Special Fund under subsection (b) shall be available, without further appropriation and without regard to any spending limitation under section 3351(c), to the WTC Program Administrator as needed at the discretion of such Administrator, for carrying out any provision in this title (including sections 3303 and 3341(c)).

"(d) REMAINING AMOUNTS.—Any amounts that remain in the Special Fund on September 30, 2033, shall be deposited into the Treasury as miscellaneous receipts.

137 STAT. 708        PUBLIC LAW 118–31—DEC. 22, 2023

Pennsylvania.
42 USC
300mm–64.

**"SEC. 3354. PENTAGON/SHANKSVILLE FUND.**

"(a) IN GENERAL.—There is established a fund to be known as the World Trade Center Health Program Fund for Certain WTC Responders at the Pentagon and Shanksville, Pennsylvania (referred to in this section as the 'Pentagon/Shanksville Fund'), consisting of amounts deposited into the Pentagon/Shanksville Fund under subsection (b).

"(b) AMOUNT.—Out of any money in the Treasury not otherwise appropriated, there is appropriated for fiscal year 2024 $232,000,000 for deposit into the Pentagon/Shanksville Fund, which amounts shall remain available in such Fund through fiscal year 2033.

"(c) USES OF FUNDS.—

"(1) IN GENERAL.—Amounts deposited into the Pentagon/Shanksville Fund under subsection (b) shall be available, without further appropriation and without regard to any spending limitation under section 3351(c), to the WTC Program Administrator for the purpose of carrying out section 3312 with regard to WTC responders enrolled in the WTC Program based on eligibility criteria described in subclause (III) or (IV) of section 3311(a)(2)(C)(i).

Time period.

"(2) LIMITATION ON OTHER FUNDING.—Notwithstanding sections 3331(a), 3351(b)(1), 3352(c), and 3353(c), and any other provision in this title, for the period of fiscal years 2024 through 2033, no amounts made available under this title other than those amounts appropriated under subsection (b) may be available for the purpose described in paragraph (1).

"(d) REMAINING AMOUNTS.—Any amounts that remain in the Pentagon/Shanksville Fund on September 30, 2033, shall be deposited into the Treasury as miscellaneous receipts.".

(c) CONFORMING AMENDMENTS.—Title XXXIII of the Public Health Service Act (42 U.S.C. 300mm et seq.) is amended—

(1) in section 3311(a)(4)(B)(i)(II) (42 U.S.C. 300mm–21(a)(4)(B)(i)(II)), by striking "sections 3351 and 3352" and inserting "this title";

(2) in section 3321(a)(3)(B)(i)(II) (42 U.S.C. 300mm–31(a)(3)(B)(i)(II)), by striking "sections 3351 and 3352" and inserting "this title";

(3) in section 3331 (42 U.S.C. 300mm–41)—

(A) in subsection (a), by striking "the World Trade Center Health Program Fund and the World Trade Center Health Program Supplemental Fund" and inserting "(as applicable) the Funds established under sections 3351, 3352, 3353, and 3354"; and

(B) in subsection (d)—

(i) in paragraph (1)(A), by inserting "or the World Trade Center Health Program Special Fund under section 3353" after "section 3351";

(ii) in paragraph (1)(B), by inserting "or the World Trade Center Health Program Fund for Certain WTC Responders at the Pentagon and Shanksville, Pennsylvania under section 3354" after "section 3352"; and

(iii) in paragraph (2), in the flush text following subparagraph (C), by inserting "or the World Trade Center Health Program Fund for Certain WTC Responders at the Pentagon and Shanksville, Pennsylvania under section 3354" after "section 3352"; and

(4) in section 3351(b) (42 U.S.C. 300mm–61(b))—

(A) in paragraph (2), by inserting ", the World Trade Center Health Program Special Fund under section 3353, or the World Trade Center Health Program Fund for Certain WTC Responders at the Pentagon and Shanksville, Pennsylvania under section 3354" before the period at the end; and

(B) in paragraph (3), by inserting ", the World Trade Center Health Program Special Fund under section 3353, or the World Trade Center Health Program Fund for Certain WTC Responders at the Pentagon and Shanksville, Pennsylvania under section 3354" before the period at the end.

### SEC. 1852. EXTENSION OF CERTAIN DIRECT SPENDING REDUCTIONS.

Section 251A(6)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 901a(6)(D)) is amended—

(1) in clause (i), by striking "6" and inserting "7"; and

(2) in clause (ii), by striking "second 6 months" and inserting "last 5 months".

### SEC. 1853. MEDICARE IMPROVEMENT FUND.

Section 1898(b)(1) of the Social Security Act (42 U.S.C. 1395iii(b)(1)) is amended by striking "$466,795,056" and inserting "$2,250,795,056".

# DIVISION B—MILITARY CONSTRUCTION AUTHORIZATIONS

Military Construction Authorization Act for Fiscal Year 2024.

### SEC. 2001. SHORT TITLE.

This division and title XLVI of division D may be cited as the "Military Construction Authorization Act for Fiscal Year 2024".

### SEC. 2002. EXPIRATION OF AUTHORIZATIONS AND AMOUNTS REQUIRED TO BE SPECIFIED BY LAW.

(a) EXPIRATION OF AUTHORIZATIONS AFTER THREE YEARS.— Except as provided in subsection (b), all authorizations contained in titles XXI through XXVII for military construction projects, land acquisition, family housing projects and facilities, and contributions to the North Atlantic Treaty Organization Security Investment Program (and authorizations of appropriations therefor) shall expire on the later of—

(1) October 1, 2026; or

(2) the date of the enactment of an Act authorizing funds for military construction for fiscal year 2027.

(b) EXCEPTION.—Subsection (a) shall not apply to authorizations for military construction projects, land acquisition, family housing projects and facilities, and contributions to the North Atlantic Treaty Organization Security Investment Program (and authorizations of appropriations therefor), for which appropriated funds have been obligated before the later of—

(1) October 1, 2026; or

(2) the date of the enactment of an Act authorizing funds for fiscal year 2027 for military construction projects, land acquisition, family housing projects and facilities, or contributions to the North Atlantic Treaty Organization Security Investment Program.

137 STAT. 710        PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 2003. EFFECTIVE DATE.**

Titles XXI through XXVII shall take effect on the later of—
   (1) October 1, 2023; or
   (2) the date of the enactment of this Act.

# TITLE XXI—ARMY MILITARY CONSTRUCTION

Sec. 2101. Authorized Army construction and land acquisition projects.
Sec. 2102. Family housing.
Sec. 2103. Authorization of appropriations, Army.
Sec. 2104. Extension of authority to use cash payments in special account from land conveyance, Natick Soldier Systems Center, Massachusetts.
Sec. 2105. Extension of authority to carry out fiscal year 2018 project at Kunsan Air Base, Korea.
Sec. 2106. Extension of authority to carry out certain fiscal year 2019 Army military construction projects.
Sec. 2107. Extension of authority to carry out certain fiscal year 2021 Army military construction projects.

**SEC. 2101. AUTHORIZED ARMY CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

(a) INSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2103(a) and available for military construction projects inside the United States as specified in the funding table in section 4601, the Secretary of the Army may acquire real property and carry out military construction projects for the installations or locations inside the United States, and in the amounts, set forth in the following table:

**Army: Inside the United States**

| State | Installation | Amount |
|---|---|---|
| Alabama | Redstone Arsenal | $53,000,000 |
| Georgia | Fort Eisenhower | $177,000,000 |
| Hawaii | Aliamanu Military Reservation | $20,000,000 |
| | Fort Shafter | $80,000,000 |
| | Helemano Military Reservation | $90,000,000 |
| | Schofield Barracks | $70,000,000 |
| Kansas | Fort Riley | $105,000,000 |
| Kentucky | Fort Campbell | $39,000,000 |
| Louisiana | Fort Johnson | $13,400,000 |
| Massachusetts | Soldier Systems Center Natick | $18,500,000 |
| Michigan | Detroit Arsenal | $72,000,000 |
| North Carolina | Fort Liberty | $253,000,000 |
| Pennsylvania | Letterkenny Army Depot | $89,000,000 |
| Texas | Fort Bliss | $118,000,000 |
| | Red River Army Depot | $113,000,000 |
| Washington | Joint Base Lewis-McChord | $100,000,000 |

(b) OUTSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2103(a) and available for military construction projects outside the United States as specified in the funding table in section 4601, the Secretary of the Army may acquire real property and carry out military construction projects for the installations or locations outside the United States, and in the amounts, set forth in the following table:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 711

**Army: Outside the United States**

| Country | Installation or Location | Amount |
|---------|--------------------------|--------|
| Germany .................... | Grafenwoehr ............................................. | $10,400,000 |
|  | Hohenfels ................................................ | $88,000,000 |

#### SEC. 2102. FAMILY HOUSING.

(a) CONSTRUCTION AND ACQUISITION.—Using amounts appropriated pursuant to the authorization of appropriations in section 2103(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Army may construct or acquire family housing units (including land acquisition and supporting facilities) at the installations or locations, in the number of units, and in the amounts set forth in the following table:

### Army: Family Housing

| Country | Installation or Location | Units | Amount |
|---------|--------------------------|-------|--------|
| Germany .......... | Baumholder .............. | Family Housing New Construction ........... | $90,135,000 |
| Kwajalein ........ | Kwajalein Atoll ......... | Family Housing Replacement Construction ................. | $98,600,000 |

(b) IMPROVEMENTS TO MILITARY FAMILY HOUSING UNITS.—Subject to section 2825 of title 10, United States Code, and using amounts appropriated pursuant to the authorization of appropriations in section 2103(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Army may improve existing military family housing units in an amount not to exceed $100,000,000.

(c) PLANNING AND DESIGN.—Using amounts appropriated pursuant to the authorization of appropriations in section 2103(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Army may carry out architectural and engineering services and construction design activities with respect to the construction or improvement of family housing units in an amount not to exceed $27,549,000.

#### SEC. 2103. AUTHORIZATION OF APPROPRIATIONS, ARMY.

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for military construction, land acquisition, and military family housing functions of the Department of the Army as specified in the funding table in section 4601.

(b) LIMITATION ON TOTAL COST OF CONSTRUCTION PROJECTS.— Notwithstanding the cost variations authorized by section 2853 of title 10, United States Code, and any other cost variation authorized by law, the total cost of all projects carried out under section 2101 of this Act may not exceed the total amount authorized to be appropriated under subsection (a), as specified in the funding table in section 4601.

137 STAT. 712    PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 2104. EXTENSION OF AUTHORITY TO USE CASH PAYMENTS IN SPECIAL ACCOUNT FROM LAND CONVEYANCE, NATICK SOLDIER SYSTEMS CENTER, MASSACHUSETTS.**

Section 2844(c)(2)(C) of the Military Construction Authorization Act for Fiscal Year 2018 (division B of Public Law 115–91; 131 Stat. 1865) is amended—

(1) in the heading, by striking "OCTOBER 1, 2025" and inserting "OCTOBER 1, 2027"; and

(2) by striking "October 1, 2025" and inserting "October 1, 2027".

**SEC. 2105. EXTENSION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2018 PROJECT AT KUNSAN AIR BASE, KOREA.**

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2018 (division B of Public Law 115–91; 131 Stat. 1817), the authorization set forth in the table in subsection (b), as provided in section 2101(b) of such Act (131 Stat. 1819) and extended by section 2106(a) of the Military Construction Act for Fiscal Year 2023 (division B of Public Law 117–263; 136 Stat. 2973), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

### Army: Extension of 2018 Project Authorization

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Korea .......... | Kunsan Air Base. | Unmanned Aerial Vehicle Hangar ........... | $53,000,000 |

**SEC. 2106. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2019 ARMY MILITARY CONSTRUCTION PROJECTS.**

(a) ARMY MILITARY CONSTRUCTION.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorizations set forth in the table in paragraph (2), as provided in section 2101 of that Act (132 Stat. 2241), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 713

(2) TABLE.—The table referred to in paragraph (1) is as follows:

### Army: Extension of 2019 Project Authorizations

| State/Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Korea ................. | Camp Tango ..... | Command and Control Facility. | $17,500,000 |
| Maryland ........... | Fort Meade ....... | Cantonment Area Roads. | $16,500,000 |

(b) ARMY OVERSEAS CONTINGENCY OPERATIONS MILITARY CONSTRUCTION.—

(1) EXTENSION.—Notwithstanding such section, the authorizations set forth in the table in paragraph (2), as provided in section 2901 of such Act, shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

### Army: Extension of 2019 Project Authorizations

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Bulgaria ..... | Nevo Selo FOS ..... | EDI: Ammunition Holding Area ............... | $5,200,000 |
| Romania ..... | Mihail Kogalniceanu FOS ................... | EDI: Explosives and Ammo Load/Unload Apron. ............ | $21,651,000 |

### SEC. 2107. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2021 ARMY MILITARY CONSTRUCTION PROJECTS.

(a) ARMY CONSTRUCTION AND LAND ACQUISITION.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorizations set forth in the table in paragraph (2), as provided in section 2101(a) of that Act (134 Stat. 4295), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

137 STAT. 714          PUBLIC LAW 118–31—DEC. 22, 2023

**Army: Extension of 2021 Project Authorizations**

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Arizona ...... | Yuma Proving Ground .............. | Ready Building | $14,000,000 |
| Georgia ...... | Fort Gillem ........... | Forensic Lab ..... | $71,000,000 |
| Louisiana ... | Fort Johnson ........ | Information Systems Facility .................. | $25,000,000 |

(b) CHILD DEVELOPMENT CENTER, FORT EISENHOWER, GEORGIA.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorization under section 2865 of that Act (10 U.S.C. 2802 note) for the project described in paragraph (2) in Fort Eisenhower, Georgia, shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) PROJECT DESCRIBED.—The project described in this paragraph is the following:

**Army: Extension of 2021 Project Authorization**

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Georgia ...... | Fort Eisenhower .. | Child Development Center .. | $21,000,000 |

# TITLE XXII—NAVY MILITARY CONSTRUCTION

Sec. 2201. Authorized Navy construction and land acquisition projects.
Sec. 2202. Family housing.
Sec. 2203. Authorization of appropriations, Navy.
Sec. 2204. Extension of authority to carry out certain fiscal year 2019 Navy military construction projects.
Sec. 2205. Extension of authority to carry out certain fiscal year 2021 Navy military construction projects.

**SEC. 2201. AUTHORIZED NAVY CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

(a) INSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2203(a) and available for military construction projects inside the United States as specified in the funding table in section 4601, the Secretary of the Navy may acquire real property and carry out military construction projects for the installations or locations inside the United States, and in the amounts, set forth in the following table:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 715

### Navy: Inside the United States

| State | Installation | Amount |
|---|---|---|
| California ...................... | Marine Corps Air Ground Combat Center Twentynine Palms ............................................... | $55,341,000 |
| | Port Hueneme .......................................................... | $120,800,000 |
| Connecticut ................... | Naval Submarine Base New London .................... | $333,344,000 |
| District Of Columbia ..... | Marine Barracks Washington (8th Street and I) | $131,800,000 |
| Florida .......................... | Naval Air Station Whiting Field ......................... | $148,505,000 |
| Georgia .......................... | Marine Corps Logistics Base Albany ................... | $64,000,000 |
| Guam .............................. | Andersen Air Force Base ....................................... | $497,620,000 |
| | Joint Region Marianas ........................................ | $174,540,000 |
| | Naval Base Guam ................................................. | $950,656,000 |
| Hawaii ............................ | Marine Corps Base Kaneohe Bay ......................... | $318,845,000 |
| Maryland ....................... | Fort Meade .............................................................. | $186,480,000 |
| | Naval Air Station Patuxent River ........................ | $141,700,000 |
| North Carolina .............. | Marine Corps Air Station Cherry Point ............... | $269,790,000 |
| | Marine Corps Base Camp Lejeune ...................... | $286,780,000 |
| Pennsylvania ................. | Naval Surface Warfare Center Philadelphia ........ | $100,000,000 |
| Virginia ......................... | Dam Neck Annex .................................................... | $109,680,000 |
| | Joint Expeditionary Base Little Creek - Fort Story ...................................................................... | $57,000,000 |
| | Marine Corps Base Quantico ................................ | $127,120,000 |
| | Naval Station Norfolk ........................................... | $175,878,000 |
| | Naval Weapons Station Yorktown ........................ | $283,500,000 |
| Washington .................... | Naval Base Kitsap ................................................. | $245,000,000 |

(b) OUTSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2203(a) and available for military construction projects outside the United States as specified in the funding table in section 4601, the Secretary of the Navy may acquire real property and carry out military construction projects for the installations or locations outside the United States, and in the amounts, set forth in the following table:

### Navy: Outside the United States

| Country | Installation | Amount |
|---|---|---|
| Djibouti ........................... | Camp Lemonnier ................................................... | $126,839,000 |
| Italy ................................ | Naval Air Station Sigonella ................................. | $90,348,000 |

**SEC. 2202. FAMILY HOUSING.**

(a) CONSTRUCTION AND ACQUISITION.—Using amounts appropriated pursuant to the authorization of appropriations in section 2203(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Navy may construct or acquire family housing units (including land acquisition and supporting facilities) at the installations or locations, in the number of units, and in the amounts set forth in the following table:

### Navy: Family Housing

| Location | Installation | Amount |
|---|---|---|
| Guam ...................... | Joint Region Marianas ............................... | $290,365,000 |

(b) IMPROVEMENTS TO MILITARY FAMILY HOUSING UNITS.—Subject to section 2825 of title 10, United States Code, and using amounts appropriated pursuant to the authorization of appropriations in section 2203(a) and available for military family housing functions as specified in the funding table in section 4601, the

Secretary of the Navy may improve existing military family housing units in an amount not to exceed $57,740,000.

(c) PLANNING AND DESIGN.—Using amounts appropriated pursuant to the authorization of appropriations in section 2203(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Navy may carry out architectural and engineering services and construction design activities with respect to the construction or improvement of family housing units in an amount not to exceed $14,370,000.

### SEC. 2203. AUTHORIZATION OF APPROPRIATIONS, NAVY.

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for military construction, land acquisition, and military family housing functions of the Department of the Navy, as specified in the funding table in section 4601.

(b) LIMITATION ON TOTAL COST OF CONSTRUCTION PROJECTS.— Notwithstanding the cost variations authorized by section 2853 of title 10, United States Code, and any other cost variation authorized by law, the total cost of all projects carried out under section 2201 may not exceed the total amount authorized to be appropriated under subsection (a), as specified in the funding table in section 4601.

### SEC. 2204. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2019 NAVY MILITARY CONSTRUCTION PROJECTS.

(a) NAVY MILITARY CONSTRUCTION.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorizations set forth in the table in paragraph (2), as provided in section 2201 of that Act (132 Stat. 2244), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

### Navy: Extension of 2019 Project Authorizations

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Bahrain ...... | SW Asia ................ | Fleet Maintenance Facility and TOC ........ | $26,340,000 |
| North Carolina ......... | Marine Corps Base Camp Lejeune .............. | 2nd Radio BN Complex, Phase 2 .......... | $51,300,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 717

**Navy: Extension of 2019 Project Authorizations**—Continued

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| South Carolina ......... | Marine Corps Air Station Beaufort | Recycling/Hazardous Waste Facility .......... | $9,517,000 |
| Washington | Bangor .................. | Pier and Maintenance Facility .................. | $88,960,000 |

(b) ENHANCING FORCE PROTECTION AND SAFETY ON MILITARY INSTALLATIONS.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorization set forth in the table in paragraph (2), as provided in section 2810 of that Act (132 Stat. 2266), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Navy: Extension of 2019 Project Authorization**

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| South Carolina .............. | Marine Corps Air Station Beaufort ........... | Laurel Bay Fire Station ................ | $10,750,000 |

(c) NAVY CONSTRUCTION AND LAND ACQUISITION PROJECT.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorization set forth in the table in paragraph (2), as provided in section 2902 of that Act (132 Stat. 2286), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

137 STAT. 718          PUBLIC LAW 118–31—DEC. 22, 2023

### Navy: Extension of 2019 Project Authorization

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Greece ............ | Naval Support Activity Souda Bay ......... | EDI: Joint Mobility Processing Center ....................... | $41,650,000 |

**SEC. 2205. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2021 NAVY MILITARY CONSTRUCTION PROJECTS.**

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorizations set forth in the table in subsection (b), as provided in section 2201 of that Act (134 Stat. 4297), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

### Navy: Extension of 2021 Project Authorizations

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| California ... | Twentynine Palms | Wastewater Treatment Plant .............. | $76,500,000 |
| Guam ......... | Joint Region Marianas ................... | Joint Communication Upgrade ............. | $166,000,000 |
| Maine ......... | NCTAMS LANT Detachment Cutler ................ | Perimeter Security ................. | $26,100,000 |
| Nevada ....... | Fallon .................... | Range Training Complex, Phase 1 .......... | $29,040,000 |

# TITLE XXIII—AIR FORCE MILITARY CONSTRUCTION

Sec. 2301. Authorized Air Force construction and land acquisition projects.
Sec. 2302. Family housing.
Sec. 2303. Authorization of appropriations, Air Force.
Sec. 2304. Extension of authority to carry out certain fiscal year 2017 Air Force military construction projects.
Sec. 2305. Extension of authority to carry out certain fiscal year 2018 Air Force military construction projects.
Sec. 2306. Extension of authority to carry out certain fiscal year 2019 Air Force military construction projects.
Sec. 2307. Extension of authority to carry out fiscal year 2021 Air Force military construction projects.

### SEC. 2301. AUTHORIZED AIR FORCE CONSTRUCTION AND LAND ACQUISITION PROJECTS.

(a) INSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2303(a) and available for military construction projects inside the United States as specified in the funding table in section 4601, the Secretary of the Air Force may acquire real property and carry out military construction projects for the installations or locations inside the United States, and in the amounts, set forth in the following table:

### Air Force: Inside the United States

| State | Installation | Amount |
|---|---|---|
| Florida | Eglin Air Force Base | $15,500,000 |
| | MacDill Air Force Base | $148,000,000 |
| | Patrick Space Force Base | $27,000,000 |
| | Tyndall Air Force Base | $252,000,000 |
| Georgia | Robins Air Force Base | $115,000,000 |
| Guam | Joint Region Marianas | $411,000,000 |
| Massachusetts | Hanscom Air Force Base | $37,000,000 |
| Mississippi | Columbus Air Force Base | $39,500,000 |
| Montana | Malmstrom Air Force Base | $10,300,000 |
| South Dakota | Ellsworth Air Force Base | $235,000,000 |
| Texas | Joint Base San Antonio-Lackland | $158,000,000 |
| Utah | Hill Air Force Base | $107,000,000 |
| Wyoming | F.E. Warren Air Force Base | $85,000,000 |

(b) OUTSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2303(a) and available for military construction projects outside the United States as specified in the funding table in section 4601, the Secretary of the Air Force may acquire real property and carry out military construction projects for the installations or locations outside the United States, and in the amounts, set forth in the following table:

### Air Force: Outside the United States

| Country | Installation | Amount |
|---|---|---|
| Australia | Royal Australian Air Force Base Darwin | $26,000,000 |
| | Royal Australian Air Force Base Tindal | $130,500,000 |
| Norway | Rygge Air Station | $136,000,000 |
| Philippines | Cesar Basa Air Base | $35,000,000 |
| Spain | Morón Air Base | $34,000,000 |
| United Kingdom | Royal Air Force Fairford | $67,000,000 |
| | Royal Air Force Lakenheath | $101,000,000 |

### SEC. 2302. FAMILY HOUSING.

(a) CONSTRUCTION AND ACQUISITION.—Using amounts appropriated pursuant to the authorization of appropriations in section 2303(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Air Force may construct or acquire family housing units (including land acquisition and supporting facilities) at the installations or locations, in the number of units, and in the amounts set forth in the following table:

**Navy: Family Housing**

| Country | Installation | Amount |
|---------|-------------|--------|
| Japan .................... | Yokota Air Base ............................... | $27,000,000 |

(b) IMPROVEMENTS TO MILITARY FAMILY HOUSING UNITS.—Subject to section 2825 of title 10, United States Code, and using amounts appropriated pursuant to the authorization of appropriations in section 2303(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Air Force may improve existing military family housing units in an amount not to exceed $229,282,000.

(c) PLANNING AND DESIGN.—Using amounts appropriated pursuant to the authorization of appropriations in section 2303(a) and available for military family housing functions as specified in the funding table in section 4601, the Secretary of the Air Force may carry out architectural and engineering services and construction design activities with respect to the construction or improvement of family housing units in an amount not to exceed $7,815,000.

### SEC. 2303. AUTHORIZATION OF APPROPRIATIONS, AIR FORCE.

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for military construction, land acquisition, and military family housing functions of the Department of the Air Force, as specified in the funding table in section 4601.

(b) LIMITATION ON TOTAL COST OF CONSTRUCTION PROJECTS.— Notwithstanding the cost variations authorized by section 2853 of title 10, United States Code, and any other cost variation authorized by law, the total cost of all projects carried out under section 2301 of this division may not exceed the total amount authorized to be appropriated under subsection (a), as specified in the funding table in section 4601

### SEC. 2304. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2017 AIR FORCE MILITARY CONSTRUCTION PROJECTS.

(a) AIR FORCE MILITARY CONSTRUCTION PROJECTS OUTSIDE THE UNITED STATES.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2017 (division B of Public Law 114–328; 130 Stat. 2688), the authorizations set forth in the table in paragraph (2), as provided in section 2301(b) of that Act (130 Stat. 2696) and extended by section 2304 of the Military Construction Act for Fiscal Year 2022 (division B of Public Law 117–81; 135 Stat. 2169), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 721

### Air Force: Extension of 2017 Project Authorizations

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Germany .... | Ramstein Air Base | 37 AS Squadron Operations/ Aircraft Maintenance Unit | $13,437,000 |
| Germany .... | Spangdahlem Air Base ................... | Upgrade Hardened Aircraft Shelters for F/A–22 .............. | $2,700,000 |
| Japan ......... | Yokota Air Base ... | C–130J Corrosion Control Hangar .......... | $23,777,000 |

(b) AIR FORCE OVERSEAS CONTINGENCY OPERATIONS PROJECTS.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2017 (division B of Public Law 114–328; 130 Stat. 2688), the authorization set forth in the table in paragraph (2), as provided in section 2902 of that Act (130 Stat. 2743) and extended by section 2304 of the Military Construction Act for Fiscal Year 2022 (division B of Public Law 117–81; 135 Stat. 2169), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

### Air Force: Extension of 2017 Project Authorization

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Germany .... | Spangdahlem Air Base ................... | F/A–22 Low Observable/Composite Repair Facility .......... | $12,000,000 |

### SEC. 2305. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2018 AIR FORCE MILITARY CONSTRUCTION PROJECTS.

(a) TYNDALL AIR FORCE BASE, FLORIDA.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2018 (division B of Public Law 115–91; 131 Stat. 1817), the authorization set forth in the table in paragraph (2), as provided in section 2301(a) of that Act (131 Stat. 1825) and extended by section

137 STAT. 722         PUBLIC LAW 118–31—DEC. 22, 2023

2304(a) of the Military Construction Act for Fiscal Year 2023 (division B of Public Law 117–263), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Air Force: Extension of 2018 Project Authorization**

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Florida ....... | Tyndall Air Force Base ................... | Fire Station ...... | $17,000,000 |

(b) AIR FORCE OVERSEAS CONTINGENCY OPERATIONS PROJECTS.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2018 (division B of Public Law 115–91; 131 Stat. 1817), the authorizations set forth in the table in paragraph (2), as provided in section 2903 of that Act (131 Stat. 1876) and extended by section 2304(b) of the Military Construction Act for Fiscal Year 2023 (division B of Public Law 117–263), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Air Force: Extension of 2018 Project Authorizations**

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Hungary ..... | Kecskemet Air Base ................... | ERI: Airfield Upgrades ....... | $12,900,000 |
| | Kecskemet Air Base ................... | ERI: Construct Parallel Taxiway ................ | $30,000,000 |
| | Kecskemet Air Base ................... | ERI: Increase POL Storage Capacity ........ | $12,500,000 |
| Luxembourg | Sanem ................... | ERI: ECAOS Deployable Airbase System Storage .. | $67,400,000 |
| Slovakia ..... | Malacky ................ | ERI: Airfield Upgrades ....... | $4,000,000 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 723

**Air Force: Extension of 2018 Project Authorizations—**
Continued

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| | Malacky ................ | ERI: Increase POL Storage Capacity ........ | $20,000,000 |

**SEC. 2306. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2019 AIR FORCE MILITARY CONSTRUCTION PROJECTS.**

(a) AIR FORCE MILITARY CONSTRUCTION PROJECTS.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorizations set forth in the table in paragraph (2), as provided in section 2301 of that Act (132 Stat. 2246), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Air Force: Extension of 2019 Project Authorizations**

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Mariana Islands ....... | Tinian ................... | APR-Cargo Pad with Taxiway Extension. ..... | $46,000,000 |
| | Tinian ................... | APR-Maintenance Support Facility .......... | $4,700,000 |
| Maryland ... | Joint Base Andrews ................ | Child Development Center .. | $13,000,000 |
| | Joint Base Andrews ................ | PAR Relocate Haz Cargo Pad and EOD Range. ........... | $37,000,000 |
| New Mexico | Holloman Air Force Base ........ | MQ–9 FTU Ops Facility .......... | $85,000,000 |

137 STAT. 724          PUBLIC LAW 118–31—DEC. 22, 2023

**Air Force: Extension of 2019 Project Authorizations—**
Continued

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| United Kingdom | Kirtland Air Force Base ................... | Wyoming Gate Upgrade for Anti-Ter-rorism Com-pliance ........... | $7,000,000 |
| | Royal Air Force Lakenheath ....... | F–35A ADAL Conventional Munitions MX. ................ | $9,204,000 |
| Utah ........... | Hill Air Force Base ................... | Composite Air-craft Antenna Calibration Fac. ................ | $26,000,000 |

(b) AIR FORCE OVERSEAS CONTINGENCY OPERATIONS PROJECTS.—
(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorizations set forth in the table in paragraph (2), as provided in section 2903 of that Act (132 Stat. 2287), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.
(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Air Force: Extension of 2019 Project Authorizations**

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Slovakia .... | Malacky ................ | EDI: Regional Munitions Storage Area | $59,000,000 |
| United Kingdom | RAF Fairford ....... | EDI: Construct DABS-FEV Storage .......... | $87,000,000 |
| | RAF Fairford ........ | EDI: Munitions Holding Area | $19,000,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 725

### SEC. 2307. EXTENSION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2021 AIR FORCE MILITARY CONSTRUCTION PROJECTS.

(a) JOINT BASE LANGLEY–EUSTIS, VIRGINIA.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorization set forth in the table in paragraph (2), as provided in section 2301 of that Act (134 Stat. 4299), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Air Force: Extension of 2021 Project Authorization**

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Virginia ...... | Joint Base Langley-Eustis .......... | Access Control Point Main Gate With Land Acq. ...... | $19,500,000 |

(b) AIR FORCE OVERSEAS CONTINGENCY OPERATIONS.—

(1) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorizations set forth in the table in paragraph (2), as provided in section 2902 of that Act (134 Stat. 4373), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Air Force: Extension of 2021 Project Authorizations**

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Germany .... | Ramstein Air Base | EDI: Rapid Airfield Damage Repair Storage ................ | $36,345,000 |
| | Spangdahlem ........ | EDI: Rapid Airfield Damage Repair Storage ................ | $25,824,000 |

137 STAT. 726          PUBLIC LAW 118–31—DEC. 22, 2023

# TITLE XXIV—DEFENSE AGENCIES MILITARY CONSTRUCTION

Sec. 2401. Authorized Defense Agencies construction and land acquisition projects.
Sec. 2402. Authorized Energy Resilience and Conservation Investment Program projects.
Sec. 2403. Authorization of appropriations, Defense Agencies.
Sec. 2404. Extension of authority to carry out certain fiscal year 2018 Defense Agencies military construction projects.
Sec. 2405. Extension and modification of authority to carry out certain fiscal year 2019 Defense Agencies military construction projects.
Sec. 2406. Extension of authority to carry out fiscal year 2021 project at Defense Fuel Support Point Tsurumi, Japan.
Sec. 2407. Extension of authority to carry out certain fiscal year 2021 Energy Resilience and Conservation Investment projects.
Sec. 2408. Authority to carry out military construction projects to improve certain fiscal year 2022 utility systems.
Sec. 2409. Additional authority to carry out certain military construction projects to improve certain fiscal year 2023 utility systems.

**SEC. 2401. AUTHORIZED DEFENSE AGENCIES CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

(a) INSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2403(a) and available for military construction projects inside the United States as specified in the funding table in section 4601, the Secretary of Defense may acquire real property and carry out military construction projects for the installations or locations inside the United States, and in the amounts, set forth in the following table:

**Defense Agencies: Inside the United States**

| State | Installation | Amount |
|---|---|---|
| Alabama | Redstone Arsenal | $147,975,000 |
| California | Marine Corps Air Station Miramar | $103,000,000 |
| | Naval Base Coronado | $51,000,000 |
| | Naval Base San Diego | $101,644,000 |
| Delaware | Dover Air Force Base | $30,500,000 |
| Maryland | Fort Meade | $885,000,000 |
| | Joint Base Andrews | $38,300,000 |
| Montana | Great Falls International Airport | $30,000,000 |
| North Carolina | Marine Corps Base Camp Lejeune | $70,000,000 |
| Utah | Hill Air Force Base | $14,200,000 |
| Virginia | Fort Belvoir | $185,000,000 |
| | Joint Expeditionary Base Little Creek - Fort Story. | $61,000,000 |
| | Pentagon | $30,600,000 |
| Washington | Joint Base Lewis-McChord | $62,000,000 |
| | Manchester | $71,000,000 |
| | Naval Undersea Warfare Center Keyport | $37,000,000 |

(b) OUTSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2403(a) and available for military construction projects outside the United States as specified in the funding table in section 4601, the Secretary of Defense may acquire real property and carry out military construction projects for the installations or locations outside the United States, and in the amounts, set forth in the following table:

**Defense Agencies: Outside the United States**

| Country | Installation | Amount |
|---|---|---|
| Cuba | Naval Station Guantanamo Bay | $257,000,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 727

**Defense Agencies: Outside the United States**—Continued

| Country | Installation | Amount |
|---------|--------------|--------|
| Germany ............ | Baumholder ................................................. | $57,700,000 |
|  | Ramstein Air Base ...................................... | $181,764,000 |
| Honduras ........... | Soto Cano Air Base ..................................... | $41,300,000 |
| Japan ................ | Kadena Air Base ......................................... | $100,300,000 |
| Spain ................. | Naval Station Rota ..................................... | $80,000,000 |

### SEC. 2402. AUTHORIZED ENERGY RESILIENCE AND CONSERVATION INVESTMENT PROGRAM PROJECTS.

(a) INSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2403(a) and available for energy conservation projects as specified in the funding table in section 4601, the Secretary of Defense may carry out energy conservation projects under chapter 173 of title 10, United States Code, for the installations or locations inside the United States, and in the amounts, set forth in the following table:

**ERCIP Projects: Inside the United States**

| State | Installation or Location | Amount |
|-------|--------------------------|--------|
| California ................ | Marine Corps Air Station Miramar ...................... | $30,550,000 |
|  | Naval Base San Diego .......................................... | $6,300,000 |
|  | Vandenberg Space Force Base .............................. | $57,000,000 |
| Colorado ................... | Buckley Space Force Base ..................................... | $14,700,000 |
| Georgia ..................... | Naval Submarine Base Kings Bay ........................ | $74,500,000 |
| Kansas ...................... | Forbes Field ................................................................ | $5,850,000 |
| Missouri ................... | Lake City Army Ammunition Plant ..................... | $80,100,000 |
| Nebraska .................. | Offutt Air Force Base ............................................. | $41,000,000 |
| North Carolina ........ | Fort Liberty (Camp Mackall) ................................ | $10,500,000 |
| Oklahoma ................. | Fort Sill ....................................................................... | $76,650,000 |
| Puerto Rico .............. | Fort Buchanan ........................................................... | $56,000,000 |
| Texas ........................ | Fort Cavazos ............................................................... | $18,250,000 |
| Virginia .................... | Pentagon ....................................................................... | $2,250,000 |
| Washington .............. | Joint Base Lewis-McChord ..................................... | $49,850,000 |
| Wyoming .................. | F.E. Warren Air Force Base ................................. | $25,000,000 |

(b) OUTSIDE THE UNITED STATES.—Using amounts appropriated pursuant to the authorization of appropriations in section 2403(a) and available for energy conservation projects as specified in the funding table in section 4601, the Secretary of Defense may carry out energy conservation projects under chapter 173 of title 10, United States Code, for the installations or locations outside the United States, and in the amounts, set forth in the following table:

**ERCIP Projects: Outside the United States**

| Country | Installation or Location | Amount |
|---------|--------------------------|--------|
| Korea ............. | K–16 Air Base ................................... | $5,650,000 |
| Kuwait ........... | Camp Buehring ................................. | $18,850,000 |

(c) IMPROVEMENTS TO CONVEYED UTILITY SYSTEMS.—In the case of a utility system that is conveyed under section 2688 of title 10, United States Code, and that only provides utility services to a military installation, notwithstanding subchapters I and III of chapter 169 and chapters 221 and 223 of title 10, United States

Contracts.

137 STAT. 728    PUBLIC LAW 118–31—DEC. 22, 2023

Code, the Secretary of Defense or the Secretary of a military department may authorize a contract with the conveyee of the utility system to carry out the military construction projects set forth in the following table:

### Improvements to Conveyed Utility Systems

| State | Installation or Location | Project |
|-------|--------------------------|---------|
| Nebraska | Offutt Air Force Base | Microgrid and Backup Power |
| North Carolina | Fort Liberty (Camp Mackall) | Microgrid and Backup Power |
| Texas | Fort Cavazos | Microgrid and Backup Power |
| Washington | Joint Base Lewis-McChord | Power Generation and Microgrid |

**SEC. 2403. AUTHORIZATION OF APPROPRIATIONS, DEFENSE AGENCIES.**

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for military construction, land acquisition, and military family housing functions of the Department of Defense (other than the military departments), as specified in the funding table in section 4601.

(b) LIMITATION ON TOTAL COST OF CONSTRUCTION PROJECTS.— Notwithstanding the cost variations authorized by section 2853 of title 10, United States Code, and any other cost variation authorized by law, the total cost of all projects carried out under section 2401 of this Act may not exceed the total amount authorized to be appropriated under subsection (a), as specified in the funding table in section 4601.

**SEC. 2404. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2018 DEFENSE AGENCIES MILITARY CONSTRUCTION PROJECTS.**

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2018 (division B of Public Law 115–91; 131 Stat. 1817), the authorizations set forth in the table in subsection (b), as provided in section 2401(b) of that Act (131 Stat. 1829) and extended by section 2404 of the Military Construction Authorization Act for Fiscal Year 2023 (division B of Public Law 117–263), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

### Defense Agencies: Extension of 2018 Project Authorizations

| Country | Installation or Location | Project | Original Authorized Amount |
|---------|--------------------------|---------|----------------------------|
| Japan | Iwakuni | PDI: Construct Bulk Storage Tanks PH 1 | $30,800,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 729

**Defense Agencies: Extension of 2018 Project Authorizations**—Continued

| Country | Installation or Location | Project | Original Authorized Amount |
|---------|--------------------------|---------|----------------------------|
| Puerto Rico | Punta Borinquen .. | Ramey Unit School Replacement ...... | $61,071,000 |

### SEC. 2405. EXTENSION AND MODIFICATION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2019 DEFENSE AGENCIES MILITARY CONSTRUCTION PROJECTS.

(a) EXTENSION.—

(1) IN GENERAL.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorizations set forth in the table in paragraph (2), as provided in section 2401(b) of that Act (132 Stat. 2249), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(2) TABLE.—The table referred to in paragraph (1) is as follows:

**Defense Agencies: Extension of 2019 Project Authorizations**

| Country | Installation or Location | Project | Original Authorized Amount |
|---------|--------------------------|---------|----------------------------|
| Germany .... | Baumholder ... | SOF Joint Parachute Rigging Facility ...... | $11,504,000 |
| Japan .......... | Camp McTureous .. | Betchel Elementary School ...................... | $94,851,000 |
|  | Iwakuni .......... | Fuel Pier ..................... | $33,200,000 |

(b) MODIFICATION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2019 PROJECT IN BAUMHOLDER, GERMANY.—

(1) MODIFICATION OF PROJECT AUTHORITY.—In the case of the authorization contained in the table in section 2401(b) of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2249) for Baumholder, Germany, for construction of a SOF Joint Parachute Rigging Facility, the Secretary of Defense may construct a 3,200 square meter facility.

(2) MODIFICATION OF PROJECT AMOUNTS.—

(A) DIVISION B TABLE.—The authorization table in section 2401(b) of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2249), as extended pursuant to subsection (a), is amended in the item relating to Baumholder, Germany, by striking "$11,504,000" and inserting

137 STAT. 730          PUBLIC LAW 118–31—DEC. 22, 2023

"$23,000,000" to reflect the project modification made by paragraph (1).

(B) DIVISION D TABLE.—The funding table in section 4601 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 2406) is amended in the item relating to Defense-wide, Baumholder, Germany, SOF Joint Parachute Rigging Facility, by striking "11,504" in the Conference Authorized column and inserting "23,000" to reflect the project modification made by paragraph (1).

### SEC. 2406. EXTENSION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2021 PROJECT AT DEFENSE FUEL SUPPORT POINT TSURUMI, JAPAN.

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorization set forth in the table in subsection (b), as provided in section 2401(b) of that Act (134 Stat. 4304), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

**Defense Agencies: Extension of 2021 Project Authorization**

| Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Japan ......... | Def Fuel Support Point Tsurumi .. | Fuel Wharf ....... | $49,500,000 |

### SEC. 2407. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2021 ENERGY RESILIENCE AND CONSERVATION INVESTMENT PROJECTS.

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorizations set forth in the table in subsection (b), as provided in section 2402 of that Act (134 Stat. 4306), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

**ERCIP Projects: Extension of 2021 Project Authorizations**

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Arkansas .... | Ebbing Air National Guard Base ................... | PV Arrays and Battery Storage ................. | $2,600,000 |

**ERCIP Projects: Extension of 2021 Project Authorizations—**
Continued

| State/ Country | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| California ... | Marine Corps Air Combat Center Twentynine Palms ................ | Install 10 Mw Battery Energy Storage for Various Buildings ....... | $11,646,000 |
| | Military Ocean Terminal Concord .................... | Military Ocean Terminal Concord Microgrid | $29,000,000 |
| | Naval Support Activity Monterey | Cogeneration Plant at B236 | $10,540,000 |
| Italy ............ | Naval Support Activity Naples ..... | Smart Grid ....... | $3,490,000 |
| Nevada ....... | Creech Air Force Base ................... | Central Standby Generators .... | $32,000,000 |
| Virginia ...... | Naval Medical Center Portsmouth ................ | Retro Air Handling Units From Constant Volume; Reheat to Variable Air Volume .......... | $611,000 |

**SEC. 2408. AUTHORITY TO CARRY OUT MILITARY CONSTRUCTION PROJECTS TO IMPROVE CERTAIN FISCAL YEAR 2022 UTILITY SYSTEMS.**

Contracts.

In the case of a utility system that is conveyed under section 2688 of title 10, United States Code, and that only provides utility services to a military installation, notwithstanding subchapters I and III of chapter 169 and chapters 221 and 223 of title 10, United States Code, the Secretary of Defense or the Secretary of a military department may authorize a contract with the conveyee of the utility system to carry out the military construction projects set forth in the following table:

137 STAT. 732          PUBLIC LAW 118–31—DEC. 22, 2023

### Improvement of Conveyed Utility Systems

| State | Installation or Location | Project |
|---|---|---|
| Alabama ......... | Fort Novosel ..................................... | Construct a 10 MW RICE Generator Plant and Micro-Grid Controls |
| Georgia ........... | Fort Moore ........................................ | Construct 4.8MW Generation and Microgrid |
| | Fort Stewart .................................... | Construct a 10 MW Generation Plant, with Microgrid Controls |
| New York ....... | Fort Drum ........................................ | Well Field Expansion Project |
| North Carolina ............. | Fort Liberty ..................................... | Construct 10 MW Microgrid Utilizing Existing and New Generators |
| | Fort Liberty ..................................... | Fort Liberty Emergency Water System |

Contracts.

**SEC. 2409. ADDITIONAL AUTHORITY TO CARRY OUT CERTAIN MILITARY CONSTRUCTION PROJECTS TO IMPROVE CERTAIN FISCAL YEAR 2023 UTILITY SYSTEMS.**

In the case of a utility system that is conveyed under section 2688 of title 10, United States Code, and that only provides utility services to a military installation, notwithstanding subchapters I and III of chapter 169 and chapters 221 and 223 of title 10, United States Code, the Secretary of Defense or the Secretary of a military department may authorize a contract with the conveyee of the utility system to carry out the military construction projects set forth in the following table:

### Improvement of Conveyed Utility Systems

| State | Installation or Location | Project |
|---|---|---|
| Georgia ........... | Fort Stewart – Hunter Army Airfield ............................................... | Power Generation and Microgrid |
| Kansas ........... | Fort Riley ........................................ | Power Generation and Microgrid |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 733

**Improvement of Conveyed Utility Systems**—Continued

| State | Installation or Location | Project |
|-------|--------------------------|---------|
| Texas .............. | Fort Cavazos .................................... | Power Generation and Microgrid |

# TITLE XXV—INTERNATIONAL PROGRAMS

Subtitle A—North Atlantic Treaty Organization Security Investment

Sec. 2501. Authorized NATO construction and land acquisition projects.
Sec. 2502. Authorization of appropriations, NATO.

Subtitle B—Host Country In-Kind Contributions

Sec. 2511. Republic of Korea funded construction projects.
Sec. 2512. Republic of Poland funded construction projects.

# Subtitle A—North Atlantic Treaty Organization Security Investment

### SEC. 2501. AUTHORIZED NATO CONSTRUCTION AND LAND ACQUISITION PROJECTS.

The Secretary of Defense may make contributions for the North Atlantic Treaty Organization Security Investment Program, as provided in section 2806 of title 10, United States Code, in an amount not to exceed the sum of the amount authorized to be appropriated for this purpose in section 2502 and the amount collected from the North Atlantic Treaty Organization as a result of construction previously financed by the United States.

### SEC. 2502. AUTHORIZATION OF APPROPRIATIONS, NATO.

Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for contributions by the Secretary of Defense under section 2806 of title 10, United States Code, for the share of the United States of the cost of projects for the North Atlantic Treaty Organization Security Investment Program authorized by section 2501 as specified in the funding table in section 4601.

# Subtitle B—Host Country In-Kind Contributions

### SEC. 2511. REPUBLIC OF KOREA FUNDED CONSTRUCTION PROJECTS.

Pursuant to agreement with the Republic of Korea for required in-kind contributions, the Secretary of Defense may accept military construction projects for the installations or locations in the Republic of Korea, and in the amounts, set forth in the following table:

137 STAT. 734          PUBLIC LAW 118–31—DEC. 22, 2023

**Republic of Korea Funded Construction Projects**

| Component | Installation or Location | Project | Amount |
|---|---|---|---|
| Army ........... | Camp Bonifas | Vehicle Maintenance Shop ......................... | $7,700,000 |
| Army ........... | Camp Carroll | Humidity Controlled Warehouse ............... | $189,000,000 |
| Army ........... | Camp Humphreys ......... | Airfield Services Storage Warehouse ........ | $7,100,000 |
| Army ........... | Camp Walker | Consolidated Fire and Military Police Station ........................... | $48,000,000 |
| Army ........... | Pusan .............. | Warehouse Facility .... | $40,000,000 |
| Navy ........... | Chinhae .......... | Electrical Switchgear Building ................... | $6,000,000 |
| Air Force .... | Osan Air Base | Consolidated Operations Group and Maintenance Group Headquarters .......... | $46,000,000 |
| Air Force .... | Osan Air Base | Flight Line Dining Facility ......................... | $6,800,000 |
| Air Force .... | Osan Air Base | Reconnaissance Squadron Operations and Avionics Facility ..................... | $30,000,000 |
| Air Force .... | Osan Air Base | Repair Aircraft Maintenance Hangar B1732 ...................... | $8,000,000 |
| Air Force .... | Osan Air Base | Upgrade Electrical Distribution East, Phase 2 .................... | $46,000,000 |
| Air Force .... | Osan Air Base | Water Supply Treatment Facility ........... | $22,000,000 |

**SEC. 2512. REPUBLIC OF POLAND FUNDED CONSTRUCTION PROJECTS.**

Pursuant to agreement with the Republic of Poland for required in-kind contributions, the Secretary of Defense may accept military construction projects for the installations or locations in the Republic of Poland, and in the amounts, set forth in the following table:

**Republic of Poland Funded Construction Projects**

| Component | Installation or Location | Project | Amount |
|---|---|---|---|
| Army ........... | Powidz ............ | Barracks and Dining Facility .................... | $93,000,000 |
| Army ........... | Powidz ............ | Rotary Wing Aircraft Apron ....................... | $35,000,000 |
| Army ........... | Swietoszow ..... | Bulk Fuel Storage ...... | $35,000,000 |
| Army ........... | Swietoszow ..... | Rail Extension and Railhead ................... | $7,300,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 735

### Republic of Poland Funded Construction Projects—
Continued

| Component | Installation or Location | Project | Amount |
|---|---|---|---|
| Air Force .... | Wroclaw .......... | Aerial Port of Debarkation Ramp ............ | $59,000,000 |
| Air Force .... | Wroclaw .......... | Taxiways to Aerial Port of Debarkation Ramp ........................ | $39,000,000 |
| Defense-Wide. | Lubliniec ........ | Special Operations Forces Company Operations Facility | $16,200,000 |

# TITLE XXVI—GUARD AND RESERVE FORCES FACILITIES

Sec. 2601. Authorized Army National Guard construction and land acquisition projects.
Sec. 2602. Authorized Army Reserve construction and land acquisition projects.
Sec. 2603. Authorized Navy Reserve and Marine Corps Reserve construction and land acquisition projects.
Sec. 2604. Authorized Air National Guard construction and land acquisition projects.
Sec. 2605. Authorized Air Force Reserve construction and land acquisition projects.
Sec. 2606. Authorization of appropriations, National Guard and Reserve.
Sec. 2607. Extension of authority to carry out fiscal year 2018 project at Hulman Regional Airport, Indiana.
Sec. 2608. Extension of authority to carry out fiscal year 2019 project at Francis S. Gabreski Airport, New York.
Sec. 2609. Extension of authority to carry out certain fiscal year 2021 National Guard and Reserve military construction projects.
Sec. 2610. Modification of authority to carry out fiscal year 2023 project at Camp Pendleton, California.
Sec. 2611. Authority to conduct restoration and modernization projects at the First City Troop Readiness Center in Philadelphia, Pennsylvania.

**SEC. 2601. AUTHORIZED ARMY NATIONAL GUARD CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

Using amounts appropriated pursuant to the authorization of appropriations in section 2606 and available for the National Guard and Reserve as specified in the funding table in section 4601, the Secretary of the Army may acquire real property and carry out military construction projects for the Army National Guard locations inside the United States, and in the amounts, set forth in the following table:

### Army National Guard: Inside the United States

| State | Installation | Amount |
|---|---|---|
| Arizona .......................... | Surprise Readiness Center ..................................... | $15,000,000 |
| Florida .......................... | Camp Blanding ........................................... | $11,000,000 |
| Idaho ............................ | Jerome County Regional Site ................................ | $17,000,000 |
| Illinois .......................... | North Riverside Armory ........................................ | $24,000,000 |
| Kentucky | Burlington .................................................... | $16,400,000 |
| Mississippi | Southaven Readiness Center ................................ | $33,000,000 |
| Missouri ........................ | Bellefontaine ............................................. | $28,000,000 |
| New Hampshire .......... | Littleton ................................................... | $23,000,000 |
| New Mexico .................. | Rio Rancho Training Site ....................................... | $11,000,000 |
| New York ...................... | Lexington Avenue Armory ..................................... | $90,000,000 |
| Ohio .............................. | Camp Perry Joint Training Center .......................... | $19,200,000 |

137 STAT. 736          PUBLIC LAW 118–31—DEC. 22, 2023

**Army National Guard: Inside the United States**—Continued

| State | Installation | Amount |
|---|---|---|
| Oregon | Washington County Readiness Center .................. | $26,000,000 |
| Pennsylvania ................ | Hermitage Readiness Center ................................. | $13,600,000 |
| Rhode Island ................ | Quonset Point ........................................... | $41,000,000 |
| South Carolina ............. | Aiken County Readiness Center ............................ | $20,000,000 |
|  | McCrady Training Center ...................................... | $7,900,000 |
| Virginia ........................ | Sandston RC & FMS 1 ........................................... | $20,000,000 |
| Wisconsin ...................... | Viroqua ..................................................... | $18,200,000 |

**SEC. 2602. AUTHORIZED ARMY RESERVE CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

Using amounts appropriated pursuant to the authorization of appropriations in section 2606 and available for the National Guard and Reserve as specified in the funding table in section 4601, the Secretary of the Army may acquire real property and carry out military construction projects for the Army Reserve locations inside the United States, and in the amounts, set forth in the following table:

**Army Reserve**

| State | Installation | Amount |
|---|---|---|
| Alabama ......................... | Birmingham ............................................... | $57,000,000 |
| Arizona .......................... | San Tan Valley ......................................... | $17,000,000 |
| California ....................... | Fort Hunter Liggett ................................... | $40,000,000 |
| Georgia .......................... | Marine Corps Logistics Base Albany ..................... | $40,000,000 |

**SEC. 2603. AUTHORIZED NAVY RESERVE AND MARINE CORPS RESERVE CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

Using amounts appropriated pursuant to the authorization of appropriations in section 2606 and available for the National Guard and Reserve as specified in the funding table in section 4601, the Secretary of the Navy may acquire real property and carry out military construction projects for the Navy Reserve and Marine Corps Reserve locations inside the United States, and in the amounts, set forth in the following table:

**Navy Reserve and Marine Corps Reserve**

| State | Installation or Location | Amount |
|---|---|---|
| Michigan ............. | Naval Reserve Center Battle Creek .......................... | $24,549,000 |
| Virginia ............... | Marine Forces Reserve Dam Neck Virginia Beach .............................. | $12,400,000 |

**SEC. 2604. AUTHORIZED AIR NATIONAL GUARD CONSTRUCTION AND LAND ACQUISITION PROJECTS.**

Using amounts appropriated pursuant to the authorization of appropriations in section 2606 and available for the National Guard and Reserve as specified in the funding table in section 4601, the Secretary of the Air Force may acquire real property and carry out military construction projects for the Air National Guard

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 737

locations inside the United States, and in the amounts, set forth in the following table:

## Air National Guard

| State | Location | Amount |
|---|---|---|
| Alabama | Montgomery Regional Airport | $7,000,000 |
| Alaska | Joint Base Elmendorf – Richardson | $7,000,000 |
| Arizona | Tucson International Airport | $11,600,000 |
| Arkansas | Ebbing Air National Guard Base | $75,989,000 |
| Colorado | Buckley Space Force Base | $12,000,000 |
| Indiana | Fort Wayne International Airport | $8,900,000 |
| Oregon | Portland International Airport | $79,000,000 |
| Pennsylvania | Harrisburg International Airport | $8,000,000 |
| Wisconsin | Truax Field | $5,200,000 |

### SEC. 2605. AUTHORIZED AIR FORCE RESERVE CONSTRUCTION AND LAND ACQUISITION PROJECTS.

Using amounts appropriated pursuant to the authorization of appropriations in section 2606 and available for the National Guard and Reserve as specified in the funding table in section 4601, the Secretary of the Air Force may acquire real property and carry out military construction projects for the Air Force Reserve locations inside the United States, and in the amounts, set forth in the following table:

## Air Force Reserve

| State | Location | Amount |
|---|---|---|
| Arizona | Davis-Monthan Air Force Base | $8,500,000 |
| California | March Air Reserve Base | $226,500,000 |
| Georgia | Dobbins Air Reserve Base | $22,000,000 |
| Guam | Joint Region Marianas | $27,000,000 |
| Louisiana | Barksdale Air Force Base | $7,000,000 |
| Texas | Naval Air Station Joint Reserve Base Fort Worth | $16,000,000 |

### SEC. 2606. AUTHORIZATION OF APPROPRIATIONS, NATIONAL GUARD AND RESERVE.

Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for the costs of acquisition, architectural and engineering services, and construction of facilities for the Guard and Reserve Forces, and for contributions therefor, under chapter 1803 of title 10, United States Code (including the cost of acquisition of land for those facilities), as specified in the funding table in section 4601.

### SEC. 2607. EXTENSION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2018 PROJECT AT HULMAN REGIONAL AIRPORT, INDIANA.

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2018 (division B of Public Law 115–91; 131 Stat. 1817), the authorization set forth in the table in subsection (b), as provided in section 2604 of that Act (131 Stat. 1836) and extended by section 2608 of the Military Construction Act for Fiscal Year 2023 (division B of Public Law 117–263), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

Termination date.

(b) TABLE.—The table referred to in subsection (a) is as follows:

137 STAT. 738          PUBLIC LAW 118–31—DEC. 22, 2023

### National Guard and Reserve: Extension of 2018 Project Authorization

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Indiana ...... | Hulman Regional Airport ............... | Construct Small Arms Range .. | $8,000,000 |

**SEC. 2608. EXTENSION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2019 PROJECT AT FRANCIS S. GABRESKI AIRPORT, NEW YORK.**

Termination date.

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2019 (division B of Public Law 115–232; 132 Stat. 2240), the authorization set forth in the table in subsection (b), as provided in sections 2604 of that Act (132 Stat. 2255), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

### National Guard and Reserve: Extension of 2019 Project Authorization

| State | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| New York ... | Francis S. Gabreski Airport | Security Forces/ Comm. Training Facility .... | $20,000,000 |

**SEC. 2609. EXTENSION OF AUTHORITY TO CARRY OUT CERTAIN FISCAL YEAR 2021 NATIONAL GUARD AND RESERVE MILITARY CONSTRUCTION PROJECTS.**

Termination date.

(a) EXTENSION.—Notwithstanding section 2002 of the Military Construction Authorization Act for Fiscal Year 2021 (division B of Public Law 116–283; 134 Stat. 4294), the authorizations set forth in the table in subsection (b), as provided in sections 2601, 2602, and 2604 of that Act (134 Stat. 4312, 4313, 4314), shall remain in effect until October 1, 2024, or the date of the enactment of an Act authorizing funds for military construction for fiscal year 2025, whichever is later.

(b) TABLE.—The table referred to in subsection (a) is as follows:

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 739

### National Guard and Reserve: Extension of 2021 Project Authorizations

| State or Territory | Installation or Location | Project | Original Authorized Amount |
|---|---|---|---|
| Arkansas .... | Fort Chaffee ......... | National Guard Readiness Center ........... | $15,000,000 |
| California ... | Bakersfield ........... | National Guard Vehicle Maintenance Shop | $9,300,000 |
| Colorado ..... | Peterson Space Force Base ........ | National Guard Readiness Center ........... | $15,000,000 |
| Guam ......... | Joint Region Marianas ................... | Space Control Facility #5 ..... | $20,000,000 |
| Ohio ............ | Columbus .............. | National Guard Readiness Center ........... | $15,000,000 |
| Massachusetts ........ | Devens Reserve Forces Training Area ................... | Automated Multipurpose Machine Gun Range ............ | $8,700,000 |
| North Carolina ......... | Asheville ............... | Army Reserve Center/Land .. | $24,000,000 |
| Puerto Rico | Fort Allen ............. | National Guard Readiness Center ........... | $37,000,000 |
| South Carolina ......... | Joint Base Charleston ........ | National Guard Readiness Center ........... | $15,000,000 |
| Texas .......... | Fort Worth ............ | Aircraft Maintenance Hangar Addition/Alt. | $6,000,000 |
| | Joint Base San Antonio .............. | F–16 Mission Training Center .................. | $10,800,000 |
| Virgin Islands ....... | St. Croix ................ | Army Aviation Support Facility (AASF) ..... | $28,000,000 |
| | St. Croix ................ | CST Ready Building ........ | $11,400,000 |

### SEC. 2610. MODIFICATION OF AUTHORITY TO CARRY OUT FISCAL YEAR 2023 PROJECT AT CAMP PENDLETON, CALIFORNIA.

In the case of the authorization contained in the table in section 2602 of the Military Construction Authorization Act for Fiscal Year 2023 (division B of Public Law 117–263; 136 Stat. 2987) for Camp Pendleton, California, for construction of an area maintenance support activity, the Secretary of the Army may construct a 15,000 square foot facility.

### SEC. 2611. AUTHORITY TO CONDUCT RESTORATION AND MODERNIZATION PROJECTS AT THE FIRST CITY TROOP READINESS CENTER IN PHILADELPHIA, PENNSYLVANIA.

Contracts.

(a) IN GENERAL.—Subject to the conditions described in subsection (b), the Chief of the National Guard Bureau may only obligate or expend amounts available to the Army National Guard for Facilities Sustainment, Restoration, and Modernization, or award a contract, to conduct restoration and modernization projects at the First City Troop Readiness Center in Philadelphia, Pennsylvania.

(b) CONDITIONS.—The conditions described in this subsection are the following:

(1) As of the date on which the Chief awards a contract under subsection (a), any lease held by the Commonwealth of Pennsylvania for the First City Troop Readiness Center has a term sufficient to allow a project described in subsection (a) to realize the applicable full lifecycle benefit.

(2) The Federal contribution for such a project does not exceed 50 percent of the total cost of the project.

Deadline.
Notification.

(3) Not later than 15 days before the date on which the Chief awards any such contract, the Chief submits to the Committees on Armed Services of the Senate and the House of Representatives a notification that includes an explanation of the sufficiency of the term of the lease described in paragraph (1).

# TITLE XXVII—BASE REALIGNMENT AND CLOSURE ACTIVITIES

Sec. 2701. Authorization of appropriations for base realignment and closure activities funded through Department of Defense Base Closure Account.

Sec. 2702. Prohibition on conducting additional base realignment and closure (BRAC) round.

### SEC. 2701. AUTHORIZATION OF APPROPRIATIONS FOR BASE REALIGNMENT AND CLOSURE ACTIVITIES FUNDED THROUGH DEPARTMENT OF DEFENSE BASE CLOSURE ACCOUNT.

Funds are hereby authorized to be appropriated for fiscal years beginning after September 30, 2023, for base realignment and closure activities, including real property acquisition and military construction projects, as authorized by the Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note) and funded through the Department of Defense Base Closure Account established by section 2906 of such Act as specified in the funding table in section 4601.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 741

### SEC. 2702. PROHIBITION ON CONDUCTING ADDITIONAL BASE REALIGNMENT AND CLOSURE (BRAC) ROUND.

Nothing in this Act shall be construed to authorize an additional Base Realignment and Closure (BRAC) round.

# TITLE XXVIII—MILITARY CONSTRUCTION GENERAL PROVISIONS

TITLE XXVIII—MILITARY CONSTRUCTION GENERAL PROVISIONS

Subtitle A—Military Construction Programs

Sec. 2801. Modifications to Defense Community Infrastructure Program.
Sec. 2802.  Modification to authority for unspecified minor construction.
Sec. 2803. Application of dollar limitations for unspecified minor military construction projects to locations outside the United States.
Sec. 2804. Increase to amount of certain funds for military installation resilience projects.
Sec. 2805. Authority for certain construction projects in friendly foreign countries.
Sec. 2806. Temporary expansion of authority for use of one-step turn-key procedures for repair projects.
Sec. 2807. Authorization of cost-plus incentive-fee contracting for military construction projects to mitigate risk to the Sentinel program schedule and cost.
Sec. 2808. Inclusion on Department of Defense Form 1391 of information on consideration of certain methods of construction for certain military construction projects.
Sec. 2809. Incorporation of cybersecurity supply chain risk management tools and methods.
Sec. 2810. Authority for Indo-Pacific posture unspecified minor military construction projects.
Sec. 2811. Authority to conduct energy resilience and conservation projects at installations at which certain energy projects have occurred.

Subtitle B—Military Housing Reforms

Sec. 2821. Establishment of the Military Family Readiness Working Group for Military Housing.
Sec. 2822. Improvements to privatized military housing.
Sec. 2823. Notification relating to legal counsel for nondisclosure agreements.
Sec. 2824. Inclusion of questions regarding military housing for members of the Armed Forces in status of forces survey.
Sec. 2825. Implementation of Comptroller General recommendations relating to strengthening oversight of privatized military housing.

Subtitle C—Covered Military Unaccompanied Housing Reforms

Sec. 2831. Design standards for covered military unaccompanied housing.
Sec. 2832. Establishment of standards for habitability of covered military unaccompanied housing.
Sec. 2833. Modification of procedures for issuance of waivers of covered privacy and configuration standards; temporary biannual briefing.
Sec. 2834. Certification of habitability of covered military unaccompanied housing.
Sec. 2835. Pilot program for military construction projects to replace certain covered military unaccompanied housing facilities.
Sec. 2836. Establishment of civilian employees for oversight of covered military unaccompanied housing.
Sec. 2837. Maintenance work order management process for covered military unaccompanied housing.
Sec. 2838. Uniform index for evaluating the condition of covered military unaccompanied housing facilities.
Sec. 2839. Annual reports on the condition of covered military unaccompanied housing.
Sec. 2840. Submission of temporary housing support certification to Members of Congress.
Sec. 2841. Elimination of flexibilities for construction standards for covered military unaccompanied housing.

Subtitle D—Real Property and Facilities Administration

Sec. 2851. Guidance on Department of Defense-wide standards for access to military installations.

137 STAT. 742 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 2852. Authority to make grants for security and fire protection for former Army and Navy General Hospital, Hot Springs National Park, Hot Springs, Arkansas; briefing.
Sec. 2853. Plan and report on critical infrastructure systems at military installations.
Sec. 2854. Closure and disposal of the Pueblo Chemical Depot, Pueblo County, Colorado.
Sec. 2855. Limitation on authority to modify or restrict public access to Greenbury Point Conservation Area at Naval Support Activity Annapolis, Maryland.
Sec. 2856. Authorization for the Secretary of the Navy to resolve the electrical utility operations at Former Naval Air Station Barbers Point, Hawaii.
Sec. 2857. Inclusion of military installation resilience in real property management and installation master planning of Department.
Sec. 2858. Modification of authority to relocate Joint Spectrum Center to Fort Meade, Maryland.

Subtitle E—Land Conveyances

Sec. 2861. Extension of sunset for land conveyance, Sharpe Army Depot, Lathrop, California.
Sec. 2862. Clarification of authority of Department of Defense to conduct certain military activities at Nevada test and training range.
Sec. 2863. Extensions, additions, and revisions to the Military Lands Withdrawal Act of 1999 relating to the Barry M. Goldwater Range, Arizona.
Sec. 2864. Land acquisition, Westmoreland State Park, Virginia.
Sec. 2865. Land conveyance, Naval Weapons Station Earle, New Jersey.
Sec. 2866. Land Conveyance, Paine Field Air National Guard Station, Everett, Snohomish County, Washington.
Sec. 2867. Land conveyance, Wetzel County Memorial Army Reserve Center, New Martinsville, West Virginia.
Sec. 2868. Land conveyance, BG J Sumner Jones Army Reserve Center, Wheeling, West Virginia.

Subtitle F—Pilot Programs and Reports

Sec. 2871. Modification of pilot program on increased use of sustainable building materials in military construction.
Sec. 2872. Modification of pilot program on establishment of account for reimbursement for use of testing facilities at installations of the Department of the Air Force.
Sec. 2873. Pilot program to provide air purification technology in covered military housing.
Sec. 2874. Joint Housing Requirements and Market Analysis for certain military installations in Hawaii.
Sec. 2875. Quarterly briefings on military construction related to the Sentinel intercontinental ballistic missile weapon system program.

Subtitle G—Other Matters

Sec. 2881. Increase of limitation on fee for architectural and engineering services procured by military departments.
Sec. 2882. Development and operation of Marine Corps Heritage Center and National Museum of the Marine Corps.
Sec. 2883. Technical corrections.
Sec. 2884. Modification of authority of Secretary of the Army to enter into cooperative agreements relating to access and management of Air Force Memorial.
Sec. 2885. Designation of National Museum of the Mighty Eighth Air Force.
Sec. 2886. Continuing education curriculum on use of innovative products for military construction projects.
Sec. 2887. Guidance on encroachment that affects covered sites.
Sec. 2888. Extension and modification of annual updates to master plans and investment strategies for Army ammunition plants.
Sec. 2889. Limitation on use of funds for United States Space Command Headquarters.
Sec. 2890. Plan for use of excess construction materials on southwest border.

# Subtitle A—Military Construction Programs

### SEC. 2801. MODIFICATIONS TO DEFENSE COMMUNITY INFRASTRUC-TURE PROGRAM.

Section 2391(d) of title 10, United States Code, is amended—
(1) in the subsection heading, by striking "PILOT"; and
(2) by striking paragraph (5).

### SEC. 2802. MODIFICATION TO AUTHORITY FOR UNSPECIFIED MINOR CONSTRUCTION.

(a) INCLUSION OF DEMOLITION IN DEFINITION OF UNSPECIFIED MINOR MILITARY CONSTRUCTION PROJECT.—Section 2805(a) of title 10, United States Code, is amended—
(1) in paragraph (2), by inserting "or a demolition project" after "is a military construction project"; and
(2) by adding at the end the following new paragraph:
"(3) Notwithstanding the requirements of this section, the Secretary concerned may use amounts authorized pursuant to another law or regulation to carry out a demolition project described in paragraph (2).".
(b) MODIFICATION TO DOLLAR THRESHOLDS FOR UNSPECIFIED MINOR CONSTRUCTION.—Section 2805 of title 10, United States Code, is amended—
(1) in subsection (a)(2), by striking the dollar figure and inserting "$9,000,000";
(2) in subsection (b)(2), by striking the dollar figure and inserting "$4,000,000";
(3) in subsection (c), by striking the dollar figure and inserting "$4,000,000"; and
(4) in subsection (d)—
(A) in paragraph (1)—
(i) in subparagraph (A), by striking the dollar figure and inserting "$9,000,000"; and
(ii) in subparagraph (B), by striking the dollar figure and inserting "$9,000,000"; and
(B) in paragraph (2), by striking the dollar figure and inserting "$9,000,000".
(c) MODIFICATION TO ADJUSTMENT OF DOLLAR LIMITATIONS FOR LOCATION.—Section 2805(f) of title 10, United States Code, is amended—
(1) in paragraph (1), by striking the dollar figure and inserting "$14,000,000"; and
(2) by striking paragraph (3).
(d) REPORT.—No later than 270 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees a report on the impacts of inflation over time on the utility of the authority to carry out unspecified minor military construction projects under section 2805 of title 10, United States Code.
(e) REPEAL.—Section 2801 of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2992; 10 U.S.C. 2805 note) is repealed.

137 STAT. 744          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 2803. APPLICATION OF DOLLAR LIMITATIONS FOR UNSPECIFIED MINOR MILITARY CONSTRUCTION PROJECTS TO LOCATIONS OUTSIDE THE UNITED STATES.

Section 2805(f) of title 10, United States Code (as amended by section 2802), is further amended—

(1) in paragraph (1), by striking "inside the United States"; and

(2) by striking paragraph (2).

### SEC. 2804. INCREASE TO AMOUNT OF CERTAIN FUNDS FOR MILITARY INSTALLATION RESILIENCE PROJECTS.

Section 2815(e)(3) of title 10, United States Code, is amended by striking "$100,000,000" and inserting "$125,000,000".

### SEC. 2805. AUTHORITY FOR CERTAIN CONSTRUCTION PROJECTS IN FRIENDLY FOREIGN COUNTRIES.

10 USC prec. 2801.

Subchapter I of chapter 169 of title 10, United States Code, is amended by adding at the end the following new section:

10 USC 2817.

### "§ 2817. Authority for certain construction projects in friendly foreign countries

Determination.

"(a) CONSTRUCTION AUTHORIZED.—Using funds available for operations and maintenance, the Secretary of Defense may carry out a construction project in a friendly foreign country, and perform planning and design to support such a project, that the Secretary determines meets each of the following conditions:

"(1) The commander of the geographic combatant command in which the construction project will be carried out identified the construction project as necessary to support vital United States military requirements at an air port of debarkation, sea port of debarkation, or rail or other logistics support location.

"(2) The construction project will not be carried out at a military installation.

"(3) The funds made available under the authority of this section for the construction project—

"(A) will be sufficient to—

"(i) construct a complete and usable facility or make an improvement to a facility; or

"(ii) complete the repair of an existing facility or improvement to a facility; and

"(B) will not require additional funds from other Department of Defense accounts.

"(4) The level of construction for the construction project may not exceed the minimum necessary to meet the military requirements identified under paragraph (1).

"(5) Deferral of the construction project pending inclusion of the construction project proposal in the national defense authorization Act for a subsequent fiscal year is inconsistent with the military requirements identified under paragraph (1) and other national security or national interests of the United States.

"(b) CONGRESSIONAL NOTIFICATION.—

Determination.

"(1) NOTIFICATION REQUIRED.—Upon determining to carry out a construction project under this section that has an estimated cost in excess of the amounts authorized for unspecified minor military construction projects under section 2805(c) of

this title, the Secretary of Defense shall submit to the specified congressional committees a notification of such determination.

"(2) ELEMENTS.—The notification required by paragraph (1) shall include the following:

"(A) A certification that the conditions specified in subsection (a) are satisfied with regard to the construction project.

"(B) A justification for such project.

"(C) An estimate of the cost of such project.

"(3) NOTICE AND WAIT.—The Secretary of Defense may carry out a construction project only after the end of the 30-day period beginning on the date the notice required by paragraph (1) is received by the specified congressional committees in an electronic medium pursuant to section 480 of this title.

"(c) ANNUAL LIMITATIONS ON USE OF AUTHORITY.—

"(1) TOTAL COST LIMITATION.—The Secretary of Defense may not obligate more than $200,000,000 in any fiscal year under the authority provided by this section.

"(2) ADDITIONAL OBLIGATION AUTHORITY.—Notwithstanding paragraph (1), the Secretary of Defense may authorize the obligation under this section of not more than an additional $10,000,000 from funds available for operations and maintenance for a fiscal year if the Secretary determines that the additional funds are needed for costs associated with contract closeouts for all construction projects during such fiscal year.

"(3) PROJECT LIMITATION.—The maximum amount that the Secretary may obligate for a single construction project is $15,000,000.

"(d) SPECIFIED CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term 'specified congressional committees' means—

"(1) the Committee on Armed Services and the Subcommittee on Defense and the Subcommittee on Military Construction, Veterans Affairs, and Related Agencies of the Committee on Appropriations of the Senate; and

"(2) the Committee on Armed Services and the Subcommittee on Defense and the Subcommittee on Military Construction, Veterans Affairs, and Related Agencies of the Committee on Appropriations of the House of Representatives.".

### SEC. 2806. TEMPORARY EXPANSION OF AUTHORITY FOR USE OF ONE-STEP TURN-KEY PROCEDURES FOR REPAIR PROJECTS.

During the five-year period beginning on the date of the enactment of this Act, section 2862(a)(2) of title 10, United States Code, shall be applied and administered by substituting "$8,000,000" for "$4,000,000".

### SEC. 2807. AUTHORIZATION OF COST-PLUS INCENTIVE-FEE CONTRACTING FOR MILITARY CONSTRUCTION PROJECTS TO MITIGATE RISK TO THE SENTINEL PROGRAM SCHEDULE AND COST.

Notwithstanding section 3323 of title 10, United States Code, the Secretary of Defense may authorize the use of contracts using cost-plus incentive-fee contracting for military construction projects associated with launch facilities, launch centers, and related infrastructure of the Sentinel intercontinental ballistic missile weapon system program of the Department of Defense for not more than one low-rate initial production lot at each of the following locations:

(1) F.E. Warren Air Force Base, Wyoming.

Certification.

Cost estimates.
Time period.

Time period.
10 USC 2862 note.

State listing.

137 STAT. 746          PUBLIC LAW 118–31—DEC. 22, 2023

(2) Malmstrom Air Force Base, Montana.
(3) Minot Air Force Base, North Dakota.

10 USC 2802
note.

**SEC. 2808. INCLUSION ON DEPARTMENT OF DEFENSE FORM 1391 OF INFORMATION ON CONSIDERATION OF CERTAIN METHODS OF CONSTRUCTION FOR CERTAIN MILITARY CONSTRUCTION PROJECTS.**

(a) IN GENERAL.—As part of the Department of Defense Form 1391 submitted to the appropriate committees of Congress for a covered military construction project, each covered official shall, to the extent practicable, include information on whether all relevant construction materials and methods of construction included in the Unified Facilities Criteria/DoD Building Code (UFC 1–200–01) were considered in the design of such covered military construction project.

(b) DEFINITIONS.—In this section:
(1) The terms "appropriate committees of Congress" and "military construction project" have the meanings given in section 2801 of title 10, United States Code.
(2) The term "covered military construction project" means a military construction project with an estimated total cost in excess of $9,000,000.
(3) The term "covered official" means—
(A) the Secretary of Defense; and
(B) each Secretary of a military department.

**SEC. 2809. INCORPORATION OF CYBERSECURITY SUPPLY CHAIN RISK MANAGEMENT TOOLS AND METHODS.**

Section 2914 of title 10, United States Code, is amended—
(1) by redesignating subsection (e) as subsection (f); and
(2) by inserting after subsection (d) the following new subsection:

Requirements.

"(e) INCORPORATION OF CYBERSECURITY SUPPLY CHAIN RISK MANAGEMENT TOOLS AND METHODS.—(1) The Secretary of Defense shall incorporate into covered projects cybersecurity supply chain risk management tools and solutions to provide continuous analysis, monitoring, and mitigation of cyber vulnerabilities.

"(2) In carrying out the requirements of paragraph (1), the Secretary of Defense shall consider, to the maximum extent practicable, the following:
"(A) The adoption of commercially available cybersecurity supply chain risk management tools and solutions.
"(B) The inclusion of existing databases on cyber vulnerabilities when selecting such tools and solutions.
"(C) The need for such tools and methods to provide continuous analysis, monitoring, and mitigation of cyber vulnerabilities in covered projects.

Effective date.

"(D) Beginning with fiscal year 2026, documentation for any new requirements for cybersecurity supply chain risk management in annual guidance for covered projects that is submitted along with the annual budget request of the President submitted pursuant to section 1105 of title 31.

Definition.

"(3) In this subsection, the term 'covered project' means a project connected to a Department of Defense Information Network for which funds are made available under this section.".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 747

### SEC. 2810. AUTHORITY FOR INDO-PACIFIC POSTURE UNSPECIFIED MINOR MILITARY CONSTRUCTION PROJECTS.

10 USC 2805 note.

(a) AUTHORITY.—To support the posture of the Armed Forces in the United States Indo-Pacific Command area of operations, the Commander of the United States Indo-Pacific Command (in this section referred to as the "Commander") may carry out unspecified minor military construction projects not otherwise authorized by law with an approved cost less than $15,000,000.

(b) SCOPE OF PROJECT AUTHORITY.—A project carried out under this section may include—

(1) the design, construction, development, conversion, extension, renovation, or repair of a facility, whether to satisfy temporary or permanent requirements; and

(2) to the extent necessary, any acquisition of land subject to the limitations on real property acquisition of chapter 159 of title 10, United States Code.

(c) PURPOSES.—A project carried out under this section shall be for the purpose of—

(1) supporting the rotational deployments of the Armed Forces;

(2) enhancing facility preparedness and military installation resilience (as defined in section 101(e)(8) of title 10, United States Code) in support of potential, planned, or anticipated defense activities; or

(3) providing for prepositioning and storage of equipment and supplies.

(d) LOCATION OF PROJECTS.—A project carried out under this section must be located within the area of responsibility of the United States Indo-Pacific Command and at a military installation that includes a main operating base, cooperative security location, forward operating site, or contingency location for use by the Armed Forces.

(e) AVAILABLE AMOUNTS.—In carrying out a project under this section, the Commander may use amounts appropriated for—

(1) the INDOPACOM Military Construction Pilot Program fund (as specified in the funding table in section 4601); and

(2) operation and maintenance, not to exceed 200 percent of the amount specified in section 2805(c) of title 10, United States Code.

(f) NOTICE TO CONGRESS.—

(1) IN GENERAL.—If the Commander decides to carry out a project under this section with a cost exceeding $2,000,000, the Commander shall submit a written notification to the congressional defense committees of that decision.

(2) RELEVANT DETAILS.—A notice under paragraph (1) with respect to a project shall include relevant details and justification of the project, including the estimated cost, and may include a classified annex.

Cost estimates.

(3) TIMING.—A project under this section covered by paragraph (1) may not be carried out until the end of the 14-day period beginning on the date of receipt of the notification under such paragraph by the congressional defense committees.

(g) PROJECT EXECUTION.—

(1) PROJECT SUPERVISION.—Subsections (a) and (b) of section 2851 of title 10, United States Code, shall not apply to projects carried out by the Commander under this section.

(2) APPLICATION OF CHAPTER 169 OF TITLE 10, UNITED STATES CODE.—When exercising the authority under subsection (a), the Commander shall, for purposes of chapter 169 of title 10, United States Code, be considered the Secretary concerned.

Lists.
Recommenda-
tions.

(h) ANNUAL REPORT.—Not later than December 31, 2024, and annually thereafter until the termination date in subsection (i), the Commander shall submit to the congressional defense committees a report containing a list of projects funded, lessons learned, and, subject to the concurrence of the Secretary of Defense, recommended adjustments to the authority under this section for the most recently ended fiscal year covered by the report.

(i) TERMINATION.—The authority to carry out a project under this section expires on March 31, 2029.

### SEC. 2811. AUTHORITY TO CONDUCT ENERGY RESILIENCE AND CONSERVATION PROJECTS AT INSTALLATIONS AT WHICH CERTAIN ENERGY PROJECTS HAVE OCCURRED.

(a) IN GENERAL.—Subsection (k) of section 2688 of title 10, United States Code, is amended to read as follows:

"(k) IMPROVEMENT OF CONVEYED UTILITY SYSTEM.—(1) In the case of a utility system that has been conveyed under this section and that only provides utility services to a military installation, the Secretary of Defense or the Secretary of a military department may authorize a contract on a sole source basis with the conveyee of the utility system to carry out a military construction project as authorized and appropriated for by law for an infrastructure improvement that enhances the reliability, resilience, efficiency, physical security, or cybersecurity of the utility system.

"(2) The Secretary of Defense or the Secretary of a military department may convey under subsection (j) any infrastructure constructed under paragraph (1) that is in addition to the utility system conveyed under such paragraph.".

10 USC 2920
note.

(b) DEPARTMENT OF DEFENSE INFRASTRUCTURE RESILIENCE AND READINESS.—

(1) AUTHORITY.—The Secretary of Defense and the Secretary of the military department concerned may utilize existing areawide contracts to procure utility services from a utility service supplier—

(A) to support installation energy resilience and mission readiness;

(B) for the protection of critical infrastructure of the Department of Defense located at a military installation; and

(C) to achieve energy resilience at military installations through implementation of utility system infrastructure projects, to include facilities sustainment, restoration, and modernization of such infrastructure.

(2) SUNSET.—The authority under this subsection shall terminate on September 30, 2032.

(3) DEFINITIONS.—In this section:

(A) AREAWIDE CONTRACT.—The term "areawide contract" means a contract entered into between the General Services Administration and a utility service supplier under section 501 of title 40, United States Code, to procure the utility service needs of Federal agencies within the franchise territory of the supplier.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 749

(B) ENERGY RESILIENCE.—The term "energy resilience" has the meaning given the term in section 101(e) of title 10, United States Code.

(C) FRANCHISE TERRITORY.—The term "franchise territory" means a geographical area that a utility service supplier has a right to serve based upon a franchise granted by an independent regulatory body, a certificate of public convenience and necessity, or other legal means.

(D) UTILITY SERVICE.—The term "utility service"—

(i) means a utility or service described in section 2872a(b) of title 10, United States Code;

(ii) includes the services supplied by a utility service supplier described in an areawide contract such as connection, change, disconnection, continue service, line extension, alteration or relocation, metering, and special facilities, including primary generation, backup generation, microgrid controls, charging capabilities, and any supporting infrastructure; and

(iii) includes ancillary services, including total maintenance and repair, major restoration and repair, studies, and any other services, as appropriate.

(E) UTILITY SERVICE SUPPLIER.—The term "utility service supplier" means an entity that supplies a utility service.

(F) UTILITY SYSTEM.—The term "utility system" has the meaning given the term in subsections (i)(1)(A) and (i)(2)(A) of section 2688 of title 10, United States Code.

# Subtitle B—Military Housing Reforms

### SEC. 2821. ESTABLISHMENT OF THE MILITARY FAMILY READINESS WORKING GROUP FOR MILITARY HOUSING.

(a) IN GENERAL.—Subsection (e) of section 1781a of title 10, United States Code, is amended to read as follows:

"(e) MILITARY FAMILY READINESS WORKING GROUP FOR MILITARY HOUSING.—

"(1) There is in the Council the Military Family Readiness Working Group for Military Housing (in this section referred to as the 'Housing Working Group').

"(2)(A) The Housing Working Group shall be composed of the following members:

"(i) The Assistant Secretary of Defense for Energy, Installations, and Environment, who shall serve as chair of the Housing Working Group on a nondelegable basis.

"(ii) One representative of each of the Army, Navy, Air Force, Marine Corps, and Space Force—

"(I) each of whom shall be a member of the armed force to be represented; and

"(II) not fewer than two of whom shall be enlisted members.

"(iii) One spouse of a member of each of the Army, Navy, Air Force, Marine Corps, and Space Force on active duty, not fewer than two of which shall be the spouse of an enlisted member.

137 STAT. 750          PUBLIC LAW 118–31—DEC. 22, 2023

"(iv) One commander or senior official of a military installation from each military department with responsibility for the public works or civil engineering systems of such installation.

"(v) One individual appointed by the Secretary of Defense among representatives of a voluntary consensus standards body that develops personnel certification standards for building maintenance, inspections, or restoration.

"(vi) The Director of the Office of Military Family Readiness Policy.

Term.

"(B) The term of Housing Working Group members specified under clauses (ii) through (v) of subparagraph (A) shall be two years and may be renewed by the Secretary of Defense.

"(C) The chair of the Housing Working Group shall extend an invitation to all landlords for one representative of each landlord to attend such meetings of the Housing Working Group as the chair considers appropriate but at a minimum of once per year.

"(3) The Housing Working Group shall meet at least two times each year.

"(4) The duties of the Housing Working Group shall include the following:

"(A) To review and make recommendations to the Secretary of Defense on policies for covered military housing, including inspections practices and resident surveys.

"(B) To make recommendations to the Secretary of Defense to improve—

"(i) awareness and promotion of accurate and timely information about covered military housing, accommodations available through the Exceptional Family Member Program of the Department, and other support services; and

"(ii) collaboration among policymakers, providers of such accommodations and other support services, and targeted beneficiaries of such accommodations and other support services.

Definitions.

"(5) In this subsection:

"(A) The term 'landlord' has the meaning given that term in section 2871 of this title.

"(B) The term 'covered military housing' means housing acquired or constructed pursuant to subchapter IV of chapter 169 of this title that is owned by an entity other than the Federal Government.".

(b) ANNUAL REPORTS.—

(1) IN GENERAL.—Not later than July 1, 2024, and annually thereafter until July 1, 2029, the Department of Defense Military Family Readiness Council (established under section 1781a of title 10, United States Code) shall submit to the Secretary of Defense and the congressional defense committees a report on military family readiness.

(2) CONTENTS.—Each report under this subsection shall include the following:

Assessment.

(A) An assessment of the adequacy and effectiveness of the military family readiness programs and activities of the Department of Defense during the fiscal year preceding the date of submission of the report in meeting the needs and requirements of military families.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 751

(B) Recommendations on actions to be taken to improve the capability of the military family readiness programs and activities of the Department of Defense to meet the needs and requirements of military families, including actions relating to the allocation of funding and other resources to and among such programs and activities.

Recommendations.

(C) A report on the activities of the Military Family Readiness Working Group for Military Housing (established under subsection (e) of such section 1781a, as amended by this section) during the year covered by the report.

(c) CONFORMING AMENDMENT.—Paragraph (31) of section 1061(c) of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 111 note) is repealed.

### SEC. 2822. IMPROVEMENTS TO PRIVATIZED MILITARY HOUSING.

(a) INCLUSION OF INFORMATION ON COMPLIANCE WITH TENANT BILL OF RIGHTS IN NOTICE OF LEASE EXTENSION.—Section 2878(f)(2) of title 10, United States Code, is amended by adding at the end the following new subparagraph:

"(E) An assessment of compliance by the lessor with the Military Housing Privatization Initiative Tenant Bill of Rights developed under section 2890 of this title.".

Assessment.

(b) MODIFICATION OF AUTHORITY TO INVESTIGATE REPRISALS.—Subsection (e) of section 2890 of such title is amended—
    (1) in paragraph (1)—
        (A) by striking "Assistant Secretary of Defense for Sustainment" and inserting "Inspector General of the Department of Defense"; and
        (B) by striking "member of the armed forces" and inserting "tenant";
    (2) in paragraph (2)—
        (A) in the matter preceding subparagraph (A)—
            (i) by striking "Assistant Secretary of Defense for Sustainment" and inserting "Inspector General";
            (ii) by striking "member of the armed forces" and inserting "tenant"; and
            (iii) by striking "Assistant Secretary" and inserting "Inspector General"; and
        (B) in subparagraph (B), by striking "Assistant Secretary" and inserting "Inspector General"; and
    (3) in paragraph (3)—
        (A) by striking "Assistant Secretary of Defense for Sustainment" and inserting "Inspector General of the Department of Defense"; and
        (B) by striking "Secretary of the military department concerned" and inserting "Inspector General of the military department concerned".

(c) LIMITATION ON HOUSING ENHANCEMENT PAYMENTS.—Section 606(a)(2) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 2871 note) is amended—
    (1) in subparagraph (A)—
        (A) by striking "Each month" and inserting "Except as provided in subparagraph (D), each month"; and
        (B) by striking "one of more" and inserting "one or more"; and
    (2) by adding at the end the following new subparagraph:

137 STAT. 752          PUBLIC LAW 118–31—DEC. 22, 2023

Determination.

"(D) LIMITATION ON PAYMENT.—
"(i) IN GENERAL.—Subject to clause (ii), the Secretary of a military department may not make a payment under subparagraph (A) to a lessor unless the Assistant Secretary of Defense for Energy, Installations, and Environment determines the lessor is in compliance with the Military Housing Privatization Initiative Tenant Bill of Rights developed under section 2890 of title 10, United States Code.
"(ii) APPLICATION.—The limitation under clause (i) shall apply to any payment under a housing agreement entered into on or after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2024 by the Secretary of a military department with a lessor.".

### SEC. 2823. NOTIFICATION RELATING TO LEGAL COUNSEL FOR NON-DISCLOSURE AGREEMENTS.

Section 2890(f) of title 10, United States Code, is amended by adding at the end the following new paragraph:

Deadline.

"(3) A party presenting a proposed nondisclosure agreement to a tenant shall notify such tenant that such tenant may, not later than 10 business days after such presentation, seek legal counsel with respect to the terms of and implications of entering into such agreement. A tenant may not be required to sign such agreement before the end of such 10-day period.".

10 USC 2821 note.

### SEC. 2824. INCLUSION OF QUESTIONS REGARDING MILITARY HOUSING FOR MEMBERS OF THE ARMED FORCES IN STATUS OF FORCES SURVEY.

The Secretary of Defense shall include, at a minimum, in each status of forces survey of the Department of Defense conducted on or after the date of the enactment of this Act questions specifically relating to the following:
(1) Overall satisfaction with current military housing of members of the Armed Forces.
(2) Satisfaction of such members with the physical condition of such military housing.
(3) Satisfaction of such members with the affordability of such military housing.
(4) Whether such military housing of such members has impacted any decision of such a member related to reenlistment in the Armed Forces.

10 USC 2890 note.

### SEC. 2825. IMPLEMENTATION OF COMPTROLLER GENERAL RECOMMENDATIONS RELATING TO STRENGTHENING OVERSIGHT OF PRIVATIZED MILITARY HOUSING.

(a) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall implement each recommendation of the Comptroller General of the United States contained in the report titled "DOD Can Further Strengthen Oversight of Its Privatized Housing Program" (GAO–23–105377), dated April 6, 2023, and reissued with revisions on April 20, 2023.
(b) NON-IMPLEMENTATION REPORTING REQUIREMENT.—If the Secretary elects not to implement any such recommendation, the Secretary shall, not later than one year after the date of the enactment of this Act, submit to the Committees on Armed Services

of the Senate and the House of Representatives a report that includes a justification for such election.

# Subtitle C—Covered Military Unaccompanied Housing Reforms

**SEC. 2831. DESIGN STANDARDS FOR COVERED MILITARY UNACCOM-PANIED HOUSING.**

Deadlines.

(a) UNIFORM STANDARDS FOR FLOOR SPACE AND NUMBER OF MEMBERS ALLOWED.—

(1) IN GENERAL.—Section 2856 of title 10, United States Code, is amended—

(A) in the section heading, by striking "**local comparability of floor areas**" and inserting "**standards**";

(B) by striking "In" and inserting "(a) LOCAL COMPARABILITY IN FLOOR AREAS.—In";

(C) in subsection (a), as designated by subparagraph (B)—

(i) by inserting ", except for purposes of meeting minimum area requirements under subsection (b)(1)(A)," after "in that locality"; and

(ii) by inserting "covered" before "military unaccompanied housing"; and

(D) by adding at the end the following new subsections:

"(b) FLOOR SPACE AND NUMBER OF MEMBERS ALLOWED.—In the design and configuration of covered military unaccompanied housing, the Secretary of Defense shall establish uniform design standards that—

"(1) provide a minimum area of floor space, not including bathrooms or closets, per individual occupying a unit of covered military unaccompanied housing;

"(2) ensure that not more than two individuals may occupy such a unit; and

"(3) provide definitions and measures that specify—

"(A) criteria of design;

"(B) quality of construction material to be used; and

"(C) levels of maintenance to be required.

"(c) COVERED MILITARY UNACCOMPANIED HOUSING.—For purposes of this section, section 2856a, and section 2856b, the term 'covered military unaccompanied housing' means Government-owned military housing intended to be occupied by members of the armed forces serving a tour of duty unaccompanied by dependents.".

Definition.

(2) CLERICAL AMENDMENT.—The table of sections at the beginning of subchapter III of chapter 169 of title 10, United States Code, is amended by amending the item relating to section 2856 to read as follows:

10 USC prec. 2851.

"2856. Covered military unaccompanied housing: design standards.".

(b) COMPLETION AND ISSUANCE OF UNIFORM DESIGN STANDARDS.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall—

10 USC 2856 note.

(1) ensure that the uniform design standards required under section 2856(b)(1) of title 10, United States Code, as added by subsection (a)(1)(D), are completed, issued, and submitted to the congressional defense committees; or

137 STAT. 754          PUBLIC LAW 118–31—DEC. 22, 2023

Reports.

(2) submit to the congressional defense committees a report—

(A) explaining in detail why such standards are not completed and issued;

(B) indicating when such standards are expected to be completed and issued; and

(C) specifying the names of the personnel responsible for the failure to complete and issue such standards.

(c) COMPLIANCE WITH UNIFORM DESIGN STANDARDS.—

(1) IN GENERAL.—Not later than two years after the date of the enactment of this Act, the Secretary of each military department shall ensure that all covered military unaccompanied housing located on a military installation under the jurisdiction of such Secretary complies with the uniform standards established under section 2856(b)(1) of title 10, United States Code, as added by subsection (a)(1)(D).

(2) NO WAIVER.—The requirement under paragraph (1) may not be waived.

(3) COVERED MILITARY UNACCOMPANIED HOUSING DEFINED.—In this subsection, the term "covered military unaccompanied housing" has the meaning given in section 2856 of title 10, United States Code (as amended by subsection (a)).

Time period.
Compliance.

(d) CERTIFICATION OF BUDGET REQUIREMENTS.—The Under Secretary of Defense (Comptroller) shall include with the submission of the budget of the President to Congress pursuant to section 1105 of title 31, United States Code, for fiscal years 2025 through 2029 a signed certification that the Secretary of Defense and each Secretary of a military department has requested sufficient funds to comply with this section and the amendments made by this section.

### SEC. 2832. ESTABLISHMENT OF STANDARDS FOR HABITABILITY OF COVERED MILITARY UNACCOMPANIED HOUSING.

10 USC
prec. 2851.

(a) ESTABLISHMENT.—Subchapter III of title 10, United States Code, (as amended by section 2833) is further amended by inserting after section 2856a (as added by such section) the following new section:

10 USC 2856b.

**"§ 2856b. Covered military unaccompanied housing: standards for habitability**

"(a) STANDARDS REQUIRED.—For the purposes of assigning a member of the armed forces to a unit of covered military unaccompanied housing, the Secretary of Defense shall establish uniform minimum standards for covered military unaccompanied housing, that shall include minimum requirements for—

"(1) condition;

"(2) habitability, health, and environmental comfort;

"(3) safety and security; and

Determination.

"(4) any other element the Secretary of Defense determines appropriate.

"(b) LIMITATION ON ISSUANCE OF WAIVERS.—Any waiver of a uniform standard described in subsection (a) may only be issued by a Secretary of a military department.".

10 USC 2856b
note.

(b) GUIDANCE.—Not later than 30 days after the date on which the Secretary of Defense develops the uniform standards under section 2856b of title 10, United States Code (as added by subsection

(a)), the Secretary of Defense shall issue to each Secretary of a military department guidance on such uniform standards.

### SEC. 2833. MODIFICATION OF PROCEDURES FOR ISSUANCE OF WAIVERS OF COVERED PRIVACY AND CONFIGURATION STANDARDS; TEMPORARY BIANNUAL BRIEFING.

(a) TERMINATION OF EXISTING WAIVERS OF COVERED PRIVACY AND CONFIGURATION STANDARDS.—Any waiver of covered privacy and configuration standards in effect on or before the date of the enactment of this Act shall terminate on March 1, 2024.          <span>10 USC 2856a note.</span>

(b) WAIVERS OF COVERED PRIVACY AND CONFIGURATION STANDARDS.—Subchapter III of title 10, United States Code, is amended by inserting after section 2856 the following new section:          <span>10 USC prec. 2851.</span>

### "§ 2856a. Covered military unaccompanied housing: waivers of covered privacy and configuration standards
<span>10 USC 2856a.</span>

"(a) PROCEDURES FOR ISSUANCE OF CERTAIN WAIVERS.—Effective March 2, 2024, any waiver of covered privacy and configuration standards shall be issued in accordance with the following:          <span>Effective date.</span>

"(1) A commander of a military installation desiring a waiver of covered habitability standards shall submit to the Secretary of the military department concerned a request for such waiver.

"(2) A Secretary of a military department may approve a request under subparagraph (A) only if such Secretary has exhausted all options available to such Secretary to provide housing that meets covered privacy and configuration standards, including the—          <span>Approval.</span>

"(A) use of available privately-owned military housing;

"(B) modification of unit integrity goals to allow the use of each available unit of covered military unaccompanied housing that meets covered privacy and configuration standards; and

"(C) issuance of a certificate of nonavailability of covered military unaccompanied housing to allow eligibility for basic allowance for housing under section 403 of title 37.          <span>Certification.</span>

"(3) An official described in paragraph (1) or (2) may not delegate the respective authorities under such paragraphs.

"(4) Any waiver of covered privacy and configuration standards issued pursuant to this paragraph shall terminate on the date that is 9 months after the date on which such waiver was issued. A Secretary of a military department may not renew any such waiver.          <span>Termination date.</span>

"(b) ANNUAL REPORT ON WAIVERS.—Not later than March 1, 2025, and annually thereafter not later than 15 days after the submission of the budget of the President to Congress pursuant to section 1105 of title 31, the Secretary of Defense shall submit to the Committees on Armed Services of the House of Representatives and the Senate and the Comptroller General of the United States a report on waivers issued under this section that includes—

"(1) the number of such waivers that were issued during the period covered by the report;

"(2) a plan to remedy the deficiencies, if any, of covered military unaccompanied housing that required the issuance of such a waiver;          <span>Plan.</span>

Strategy.

"(3) a strategy to remedy issues, if any, caused by covered military unaccompanied housing that did not comply with such uniform standards;

Strategy.

"(4) a strategy to remedy the factors, if any, that require a commander of a military installation to submit to the applicable Secretary of a military department a request for consecutive waivers of such uniform standards, including a timeline for the implementation of such strategy; and

Analysis.

"(5) an analysis of strategies to remedy the factors described in paragraph (4), including—

"(A) projects to modernize existing covered military unaccompanied housing to comply with such uniform standards;

"(B) projects to construct new covered military unaccompanied housing; and

"(C) modifications to relevant policies of the Department of Defense, excluding such policies relating to infrastructure.

"(c) COVERED PRIVACY AND CONFIGURATION STANDARD DEFINED.—In this section, the term 'covered privacy and configuration standard' means the minimum standards for privacy and configuration applicable to covered military unaccompanied housing described in Department of Defense Manual 4165.63 titled 'DoD Housing Management' and dated October 28, 2010 (or a successor document).".

(c) TEMPORARY BIANNUAL BRIEFING ON WAIVERS; LIMITATIONS ON AVAILABILITY OF FUNDS.—

Deadline.
Termination date.

(1) BRIEFINGS.—Not later than 30 days after the submission of the budget of the President to Congress pursuant to section 1105 of title 31, United States Code, and on a biannual basis thereafter until the date that is two years after the date of the enactment of this Act, each Secretary of a military department shall provide to the congressional defense committees a briefing on waivers of covered privacy and configuration standards pursuant to section 2856a of title 10, United States Code, for covered military unaccompanied housing under the jurisdiction of that Secretary that includes—

(A) the number, disaggregated by military installation, of waivers in effect as of the date of such briefing relating to occupancy;

Lists.

(B) a list of each waiver described in subparagraph (A) that includes—

(i) an identification of the official who approved each such waiver;

(ii) a description of the military necessity underlying each such waiver; and

(iii) a statement of the period each such waiver is effective; and

(C) an identification of the number of members of the Armed Forces that reside in covered military unaccompanied housing subject to a waiver described in such subparagraph.

(2) LIMITATIONS.—

(A) OPERATIONS AND MAINTENANCE, ARMY.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal 2024 for Administration and Service-wide Activities, operations and maintenance, Army,

not more than 75 percent may be obligated or expended until the Secretary of the Army provides the first respective briefing described in paragraph (1).

(B) OPERATIONS AND MAINTENANCE, NAVY.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal 2024 for Administration and Service-wide Activities, operations and maintenance, Navy, not more than 75 percent may be obligated or expended until the Secretary of the Navy provides the first respective briefing described in such paragraph.

(C) OPERATIONS AND MAINTENANCE, AIR FORCE.—Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal 2024 for Administration and Service-wide Activities, operations and maintenance, Air Force, not more than 75 percent may be obligated or expended until the Secretary of the Air Force provides the first respective briefing described in such paragraph.

(d) REVISIONS TO RULES, GUIDANCE, OR OTHER ISSUANCES.— Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense and Secretaries of the military departments shall revise any rule, guidance, or other issuance of the Department of Defense and the military departments under the respective jurisdictions of such Secretaries to include the procedures for the issuance of waivers of covered privacy and configuration standards pursuant to section 2856a of title 10, United States Code (as added by subsection (a)). [10 USC 2856a note. Deadline.]

(e) COMPTROLLER GENERAL BRIEFING.—Not later than 60 days after the date of the submission of the plan described in subsection (b)(2) of section 2856a of title 10, United States Code (as added by subsection (a)), contained in the first report required under such subsection, the Comptroller General of the United States shall provide to the Committees on Armed Services of the House of Representatives and the Senate a briefing that includes— [Deadline.]

(1) an analysis on the ability of each military department to execute such plan; and [Analysis.]

(2) recommendations, if any, of the Comptroller General with respect to modifications of such plan. [Recommendations.]

(f) COVERED PRIVACY AND CONFIGURATION STANDARD.—The term "covered privacy and configuration standard" has the meaning given in section 2856a of title 10, United States Code (as added by subsection (a)). [Definition. 10 USC 2856a note.]

## SEC. 2834. CERTIFICATION OF HABITABILITY OF COVERED MILITARY UNACCOMPANIED HOUSING.

Section 2856b of title 10, United States Code (as added by section 2832) is amended by adding at the end the following new subsection:

"(c) CERTIFICATION.—The Secretary of Defense shall include, in conjunction with the submission of the budget of the President to Congress pursuant to section 1105 of title 31, a certification from each Secretary of a military department to the congressional defense committees that the cost for all needed repairs and improvements for each occupied covered military unaccompanied housing facility under the jurisdiction of such Secretary does not exceed 20 percent of the replacement cost of such facility, as mandated by Department of Defense Manual 4165.63 titled 'DoD Housing

137 STAT. 758          PUBLIC LAW 118–31—DEC. 22, 2023

Management' and dated October 28, 2010 (or a successor document).".

10 USC 2821 note.

**SEC. 2835. PILOT PROGRAM FOR MILITARY CONSTRUCTION PROJECTS TO REPLACE CERTAIN COVERED MILITARY UNACCOMPANIED HOUSING FACILITIES.**

(a) IN GENERAL.—Each Secretary of a military department may carry out a pilot program under which each such Secretary administers a military construction project, not otherwise authorized by law, to replace a covered military unaccompanied housing facility—

Determination.

(1) that such Secretary determines is not in compliance with the uniform standards for covered military unaccompanied housing under section 2856b of title 10, United States Code (as added by section 2832); and

(2) for which the total cost of a repair project to bring such covered military unaccompanied facility into compliance with such uniform standards exceeds 75 percent of the total cost of such a military construction project.

(b) FACILITY REQUIREMENTS.—A facility constructed pursuant to a military construction project under a pilot program under subsection (a)—

(1) with respect to the covered military unaccompanied housing facility such facility replaces—

(A) may not have a capacity to house more members of the Armed Forces;

(B) shall be designed and utilized for the same purpose; and

(C) shall be located on the same military installation; and

(2) shall be designed to meet, at a minimum, standards for construction, utilization, and force protection.

(c) NONDELEGATION.—For the purposes of carrying out a military construction project under a pilot program under subsection (a), the authority of a Secretary of a military department to determine whether a covered military unaccompanied housing facility is in substandard condition may not be delegated.

(d) SOURCE OF FUNDS.—A Secretary of a military department may spend amounts available to such Secretary for operation and maintenance or unspecified military construction to carry out this section.

Reports.

(e) CONGRESSIONAL NOTIFICATION.—With respect to a military construction project proposed to be carried out under a pilot program under subsection (a) with an estimated cost in excess of $10,000,000, the Secretary of the military department concerned shall submit to the appropriate committees of Congress a report that includes—

(1) a justification for such military construction project;

Cost estimate.

(2) an estimate of the total cost of such military construction project; and

(3) a description of the elements of military construction, including the elements specified in section 2802(b) of title 10, United States Code, incorporated into such military construction project.

(f) SUNSET.—The authority to carry out a pilot program pursuant to subsection (a) shall terminate on the date that is five years after the date of the enactment of this Act.

(g) DEFINITIONS.—In this section:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 759

(1) The term "appropriate committees of Congress" has the meaning given such term in section 2801 of title 10, United States Code.

(2) The term "covered military unaccompanied housing" has the meaning given such term in section 2856 of such title (as amended by section 2831).

**SEC. 2836. ESTABLISHMENT OF CIVILIAN EMPLOYEES FOR OVERSIGHT OF COVERED MILITARY UNACCOMPANIED HOUSING.**

10 USC note prec. 2851.

(a) ESTABLISHMENT CIVILIAN EMPLOYEES.—

(1) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act and subject to paragraph (3), the Secretary of Defense shall issue regulations to require each Secretary of a military department to establish a civilian employee at the housing office of each military installation under the respective jurisdiction of each such Secretary to be responsible for oversight of covered military unaccompanied housing at that military installation. Such civilian employee shall be an employee of—

Deadline.
Regulations.
Requirements.

(A) the Department of Defense; or

(B) the military department concerned.

(2) SUPERVISORY CHAIN.—Each civilian employee described in paragraph (1) and member of the Armed Forces described in paragraph (3) shall report to an appropriate supervisory civilian employee at the housing office for the applicable military installation.

(3) EXCEPTION.—The requirement under the regulations issued pursuant to paragraph (1) shall not apply with respect to military installations at which oversight of covered military unaccompanied housing is performed by a member of the Armed Forces with an occupational specialty that defines the primary duty of such member as a barracks manager or an equivalent occupation.

(b) LIMITATION ON ROLE BY MEMBERS OF THE ARMED FORCES; POSITION DESIGNATION.—

(1) LIMITATION.—The Secretary of Defense and the Secretaries of the military departments concerned may not allow an enlisted member of the Armed Forces or commissioned officer to, as a collateral duty, be designated as a barracks manager or supervisor overseeing, managing, accepting, or compiling maintenance records for any covered military unaccompanied housing at the applicable military installation.

(2) DESIGNATION.—Except as provided in paragraph (3) of subsection (a), the functions of a barracks manager or supervisor described in paragraph (1) shall be completed by a civilian employee described in paragraph (1) of such subsection.

(c) DEFINITIONS.—In this section:

(1) The term "covered military unaccompanied housing" has the meaning given such term in section 2856 of title 10, United States Code (as amended by section 2831).

(2) The term "military installation" has the meaning given such term in section 2801 of such title.

**SEC. 2837. MAINTENANCE WORK ORDER MANAGEMENT PROCESS FOR COVERED MILITARY UNACCOMPANIED HOUSING.**

10 USC note prec. 2851.

(a) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, the Secretary of Defense shall issue rules to establish for each military department a process associated

Deadline.
Regulations.

137 STAT. 760          PUBLIC LAW 118–31—DEC. 22, 2023

with maintenance work order management for covered military unaccompanied housing under the jurisdiction of such military department that is—

(1) in existence on or before the date of the enactment of this Act; or

(2) constructed or used on or after such date of enactment.

*Requirements.*

(b) USE OF PROCESS.—The processes required under subsection (a) shall include clearly defined requirements for effective and timely maintenance work order management, including requirements with respect to—

(1) quality assurance for maintenance completed;

(2) communication of maintenance progress and resolution with individuals responsible for the management of the covered military unaccompanied housing and the residents of such housing; and

(3) standardized performance metrics, such as the timeliness of completion of maintenance work orders.

*Updates.*
*Guidelines.*

(c) ADMINISTRATION.—The Secretary of each military department shall administer the process for maintenance work order management required under subsection (a) for the military department under the jurisdiction of such Secretary and shall issue or update relevant guidance as necessary.

(d) COVERED MILITARY UNACCOMPANIED HOUSING DEFINED.— In this section, the term "covered military unaccompanied housing" has the meaning given in section 2856 of title 10, United States Code (as amended by section 2831).

*Deadlines.*
*10 USC note*
*prec. 2851.*

**SEC. 2838. UNIFORM INDEX FOR EVALUATING THE CONDITION OF COVERED MILITARY UNACCOMPANIED HOUSING FACILITIES.**

(a) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act, the Secretary of Defense, acting through the Assistant Secretary of Defense for Energy, Installations, and Environment, shall establish a uniform index for evaluating the condition of covered military unaccompanied housing facilities—

(1) that exist as of the date of the enactment of this Act; and

(2) that are constructed or used on or after such date.

*Applicability.*

(b) COMPLETION OF INDEX.—Not later than 6 months after the date of the enactment of this Act, each Secretary of a military department shall apply the uniform index established under subsection (a) to evaluate the condition of each military installation under the jurisdiction of each such Secretary.

(c) DEFINITIONS.—In this section:

(1) The term "covered military unaccompanied housing" has the meaning given in section 2856 of title 10, United States Code (as amended by section 2831).

(2) The term "military department" has the meaning given in section 101 of such title.

(3) The term "military installation" has the meaning given in section 2801 of such title.

**SEC. 2839. ANNUAL REPORTS ON THE CONDITION OF COVERED MILITARY UNACCOMPANIED HOUSING.**

*Time period.*

(a) REPORT REQUIRED.—Along with the submission of the budget of the President to Congress pursuant to section 1105 of title 31, United States Code, for fiscal year 2025, and annually thereafter for the subsequent four years, each Secretary of a military department shall submit to the Committees on Armed Services

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 761

of the Senate and the House of Representatives a report on the condition of covered military unaccompanied housing facilities using the uniform index described in section 2838 of this Act.

(b) ELEMENTS.—Each report required under subsection (a) shall include the following:

(1) A list of the condition of each such covered military unaccompanied housing facility located on each military installation under the jurisdiction of the Secretary of the military department concerned.

(2) For such facilities in poor or failing condition—

(A) the percentage of repair costs as compared to the total replacement cost for each such facility;

(B) the funding required to conduct all needed repairs and improvements at each such facility; and

(C) the five-year plan for addressing conditions at such facility.

(3) For such facilities in good and fair condition, the five-year plan for sustainment to ensure that each such facility does not fall to poor or failing condition.

(4) Any other information determined appropriate by the Secretary of the military department concerned.

(c) DEFINITIONS.—In this section:

(1) The term "covered military unaccompanied housing" has the meaning given in section 2856 of title 10, United States Code (as amended by section 2831).

(2) The term "military department" has the meaning given in section 101 of such title.

(3) The term "military installation" has the meaning given in section 2801 of such title.

(d) AMENDMENT TO BRIEFINGS ON MHPI HOUSING PROJECTS.— Section 606(a)(4) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1795; 10 U.S.C. 2871 note) is amended by striking "the Secretary of Defense" and inserting "each Secretary of a military department".

(e) AMENDMENT TO SUBMISSIONS ON HOUSING DOCUMENTS.— Section 2890(d) of title 10, United States Code, is amended—

(1) by striking "the Secretary of Defense" each place it appears and inserting "each Secretary of a military department"; and

(2) by striking "the Department of Defense" and inserting "the military department under the jurisdiction of such Secretary".

**SEC. 2840. SUBMISSION OF TEMPORARY HOUSING SUPPORT CERTIFICATION TO MEMBERS OF CONGRESS.**

Section 2815 of the National Defense Authorization Act for Fiscal Year 2017 (Public Law 114–328; 10 U.S.C. 2556 note) is amended by adding at the end the following new sentence: "Upon granting such certification, the Secretary of Defense shall notify each Member of Congress representing the area in which such facility is located of such grant of certification."

Plans.

Lists.

Notification.

137 STAT. 762          PUBLIC LAW 118–31—DEC. 22, 2023

10 USC note
prec. 2851.

### SEC. 2841. ELIMINATION OF FLEXIBILITIES FOR CONSTRUCTION STANDARDS FOR COVERED MILITARY UNACCOMPANIED HOUSING.

Deadline.
Modifications.
Requirements.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense and each Secretary of a military department shall modify all directives, instructions, manuals, regulations, policies, and other guidance and issuances of the Department of Defense or appropriate military department to eliminate the grant of any flexibilities to the standards for construction of new covered military unaccompanied housing.

(b) MATTERS INCLUDED.—The requirement under subsection (a) shall include modifications that remove the flexibility provided to the military departments with respect to new construction standards for covered military unaccompanied housing, including modification of the Department of Defense Manual 4165.63 titled "DoD Housing Management" and dated October 28, 2010 (or a successor document).

(c) COVERED MILITARY UNACCOMPANIED HOUSING DEFINED.— In this section, the term "covered military unaccompanied housing" has the meaning given in section 2856 of title 10, United States Code (as amended by section 2831).

# Subtitle D—Real Property and Facilities Administration

Deadlines.
10 USC note
prec. 2661.

### SEC. 2851. GUIDANCE ON DEPARTMENT OF DEFENSE-WIDE STANDARDS FOR ACCESS TO MILITARY INSTALLATIONS.

(a) INTERIM GUIDANCE.—Not later than 30 days after the date of the enactment of this Act, the Secretary of Defense shall issue interim guidance to the appropriate official or officials within the Department of Defense for purposes of establishing final standards of the Department of Defense for determining the fitness of individuals for access to military installations, which shall include modifying volume 3 of the Department of Defense Manual 5200.08 titled "Physical Security Program: Access to DoD Installations" (dated January 2, 2019) or any comparable or successor policy guidance document.

(b) FINAL GUIDANCE.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall issue final guidance relating to the standards described in subsection (a).

(c) BRIEFING.—Not later than 60 days after issuing the interim guidance required under subsection (a), the Secretary of Defense shall brief the Committees on Armed Services of the Senate and the House of Representatives on such guidance, which shall include a timeline for the issuance of such final guidance.

### SEC. 2852. AUTHORITY TO MAKE GRANTS FOR SECURITY AND FIRE PROTECTION FOR FORMER ARMY AND NAVY GENERAL HOSPITAL, HOT SPRINGS NATIONAL PARK, HOT SPRINGS, ARKANSAS; BRIEFING.

Contracts.

(a) GRANT AUTHORITY.—The Secretary of Defense, acting through the Director of the Office of Local Defense Community Cooperation, may make a grant (including a supplemental grant) or enter into a cooperative agreement under section 2391 of title

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 763

10, United States Code, to assist the State of Arkansas provide security services and fire protection services for the covered property.

(b) BRIEFING REQUIRED.—Not later than 120 days after the date of the enactment of this Act, the Secretary of the Army shall provide to the congressional defense committees a briefing that includes—

    (1) a summary of the coordination among affected stakeholders during the period covered by the briefing, including—

        (A) the Administrator of the General Services Administration;

        (B) the National Park Service;

        (C) the Governor of Arkansas;

        (D) the Mayor of Hot Springs, Arkansas; and

        (E) the State Historic Preservation Officer for the State of Arkansas;

    (2) a summary of—

        (A) any environmental investigations conducted at the covered property as of the date of the enactment of this Act;

        (B) the response actions required under any such environmental investigation;

        (C) an identification of potentially responsible parties, if any, for any hazardous substance identified under an environmental investigation described in subparagraph (A); and

        (D) an estimate of the cost to complete environmental restoration at the covered property;

    (3) an estimation of the total cost to—

        (A) stabilize each structure on the covered property; and

        (B) demolish each such structure; and

    (4) an assessment of necessary steps for the covered property to be eligible for a grant under the Arkansas Brownfields Program and recommendations with respect to such steps.

(c) AUTHORIZATION OF APPROPRIATIONS.—The Secretary of Defense may obligate or expend not more than $2,750,000 of the funds authorized to be appropriated in section 4301 for the Office of Local Defense Community Operation to carry out subsection (a).

(d) COVERED PROPERTY DEFINED.—In this section, the term "covered property" means the approximately twenty-one acres, more or less, of land located at Hot Springs National Park, Arkansas, which comprise facilities previously occupied by the Army and Navy General Hospital conveyed by quitclaim deed to the State of Arkansas pursuant to the Act of September 21, 1959.

## SEC. 2853. PLAN AND REPORT ON CRITICAL INFRASTRUCTURE SYSTEMS AT MILITARY INSTALLATIONS.

(a) PLAN.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense, in coordination with each Secretary of a military department, shall submit to the Committees on Armed Services of the Senate and the House of Representatives a plan to implement a standardized system to measure and report on the condition and performance of, the level of investment in, and any applicable risks to critical infrastructure systems owned by the Federal Government that—

*[margin notes: Deadline. Summaries. Cost estimates. / Assessment. Recommendations. / 10 USC 2801 note.]*

137 STAT. 764          PUBLIC LAW 118–31—DEC. 22, 2023

(1) have not been privatized or transferred pursuant to a conveyance under section 2688 of title 10, United States Code; and

(2) are located on a military installation (as defined in section 2801 of such title).

(b) REPORT.—

(1) IN GENERAL.—Beginning on February 1 of the year immediately following the date on which the plan under subsection (a) is submitted, and annually thereafter, the Secretary of Defense, in coordination with each Secretary of a military department, shall submit to the Committees on Armed Services of the Senate and the House of Representatives a consolidated report on the condition of critical infrastructure systems owned by the Federal Government located at military installations.

(2) ELEMENTS.—Each report required by paragraph (1) shall include the following:

Time periods.

(A) Installation-level data for each critical infrastructure system described in paragraph (1) that includes the following for each such system:

(i) For the five-year period preceding the date of submission of the report, all instances of noncompliance of such system with any applicable Federal or State law or regulation, including information on any prior or current consent order or equivalent compliance agreement with any Federal or State regulatory agency.

(ii) The year of original installation of critical infrastructure system components, including treatment facilities, pump stations, and storage tanks.

(iii) The average age of distribution system piping and wiring.

(iv) The rate of system recapitalization, represented as an annual percentage replacement rate of all critical infrastructure system assets.

(v) For the one-year period preceding the date of submission of the report, the percentage of key system operational components (including fire hydrants, valves, and backflow preventors) inspected and determined through testing to be fully operational.

(vi) For the one-year period preceding the date of submission of the report, the absolute number, and a normalized measure for comparative purposes, of all unplanned system outages.

(vii) For the one-year period preceding the date of submission of the report, the absolute duration, and a normalized measure for comparative purposes, of all unplanned system outages.

(viii) For the one-year period preceding the date of submission of the report, the absolute number, and a normalized measure for comparative purposes, of all critical infrastructure system main breaks and leaks.

Risk assessment.

(B) A standardized risk assessment for each military installation, identifying the current and projected level of risk related to the following:

(i) The ability to maintain compliance with applicable current and proposed State regulations and

standards and applicable regulations and policies of the Department of Defense and the military departments related to each critical infrastructure system described in paragraph (1), and the ability to operate critical infrastructure systems in accordance with accepted industry standards.

(ii) The ability to maintain a consistent and compliant supply of water for current and projected future installation needs based on current and projected source water availability and quality, including an assessment of source water contamination risks for each critical infrastructure system described in paragraph (1).

(iii) The ability of each critical infrastructure system described in paragraph (1) to withstand severe weather events, including drought, flooding, and temperature fluctuations.

(iv) The ability for utility industrial controls systems for each critical infrastructure system described in paragraph (1) to maintain compliance with applicable current and proposed cybersecurity standards and regulations.

(3) FORM.—A report under this subsection shall be submitted in an unclassified form but may contain a classified annex.

(c) CRITICAL INFRASTRUCTURE SYSTEM DEFINED.—In this section, the term "critical infrastructure system" includes a transportation infrastructure system and a utilities infrastructure system.

### SEC. 2854. CLOSURE AND DISPOSAL OF THE PUEBLO CHEMICAL DEPOT, PUEBLO COUNTY, COLORADO.

(a) IN GENERAL.—The Secretary of the Army shall close Pueblo Chemical Depot in Pueblo County, Colorado (in this section referred to as the "Depot"), not later than one year after the completion of the chemical demilitarization mission in such location in accordance with the Chemical Weapons Convention Treaty.

Deadline.

(b) PROCEDURES.—The Secretary of the Army shall carry out the closure and subsequent related property management and disposal of the Depot, including the land, buildings, structures, infrastructure, and associated equipment, installed equipment, material, and personal property that comprise the Chemical Agent-Destruction Pilot Plant, in accordance with the procedures and authorities for the closure, management, and disposal of property under the appropriate base closure laws (as defined in section 101 of title 10, United States Code).

(c) OFFICE OF LOCAL DEFENSE COMMUNITY COOPERATION ACTIVITIES.—The Office of Local Defense Community Cooperation of the Department of Defense may make grants and supplement other Federal funds pursuant to section 2391 of title 10, United States Code, to support closure and reuse activities of the Depot.

(d) TREATMENT OF EXISTING PERMITS.—Nothing in this section shall be construed to prevent the removal or demolition by the Program Executive Office, Assembled Chemical Weapons Alternatives of the Department of the Army of existing buildings, structures, infrastructure, and associated equipment, installed equipment, material, and personal property of the Chemical Agent-Destruction Pilot Plant at the Depot in accordance with the existing

Hazardous Waste Permit Number CO-20-09-02-01 under the Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) (commonly known as the Resource Conservation and Recovery Act of 1976) issued by the State of Colorado, or any associated or follow-on permits under such Act.

(e) RELATION TO PROCEDURES FOR USE TO ASSIST THE HOME-LESS.—Such land, buildings, structures, infrastructure, and associated equipment, installed equipment, material, and personal property comprising the Chemical Agent-Destruction Pilot Plant at the Depot is—

(1) hereby deemed unsuitable for use to assist the homeless; and

(2) not subject to the procedures relating to the use to assist the homeless of buildings and property at military installations under the Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note).

### SEC. 2855. LIMITATION ON AUTHORITY TO MODIFY OR RESTRICT PUBLIC ACCESS TO GREENBURY POINT CONSERVATION AREA AT NAVAL SUPPORT ACTIVITY ANNAPOLIS, MARYLAND.

(a) IN GENERAL.—Except as provided in subsection (b), the Secretary of the Navy may not modify or restrict public access to the Greenbury Point Conservation Area at Naval Support Activity Annapolis, Maryland.

(b) EXCEPTIONS.—The limitation in subsection (a) shall not apply to—

(1) temporary restrictions to protect public safety that are necessitated by emergent situations, hazardous conditions, maintenance of existing facilities, or live fire exercises; or

(2) the terms of a lease or transfer of the Greenbury Point Conservation Area to another public entity.

### SEC. 2856. AUTHORIZATION FOR THE SECRETARY OF THE NAVY TO RESOLVE THE ELECTRICAL UTILITY OPERATIONS AT FORMER NAVAL AIR STATION BARBERS POINT, HAWAII.

Contracts.

(a) IN GENERAL.—The Secretary of the Navy (in this section referred to as the "Secretary") may enter into an agreement with the State of Hawaii or a third party for the purpose of resolving the electrical utility operations at Former Naval Air Station Barbers Point, Hawaii, also known as "Kalaeloa".

Requirements.

(b) ELEMENTS OF AGREEMENT.—An agreement entered into under subsection (a) shall include a requirement that the Secretary—

(1) assist with—

(A) the transfer of customers of the Navy off of the electrical utility system of the Navy at the location specified in such subsection; and

(B) the enhancement of the surrounding electrical utility system to accept any additional load from such transfer, with a priority for such systems that serve downtown Kalaeloa, Hawaii, and the Hawaii Army National Guard;

Analysis.

(2) provide the instantaneous peak demand analysis and design necessary to conduct such transfer;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 767

(3) provide rights of way and easements necessary to support the construction of replacement electrical infrastructure; and

(4) be responsible for all environmental assessments and remediation, and costs related to the removal and disposal, of the electrical utility system of the Navy once it is no longer in use.

(c) LIMITATION ON EXPENDITURE OF AMOUNTS.—The Secretary may expend not more than $48,000,000 during any fiscal year to provide support for an agreement entered into under subsection (a).

(d) NOTIFICATION.—Not later than 180 days after the date of the enactment of this Act, and not less frequently than every 180 days thereafter until the date on which an agreement described in subsection (a) is entered into, the Secretary shall submit to the congressional defense committees a report on progress made in developing and entering into an agreement described in subsection (a).

(e) REPEAL.—Section 2205 of the Military Construction Authorization Act for Fiscal Year 2023 (division B of Public Law 117–263; 136 Stat. 2977) is repealed.

**SEC. 2857. INCLUSION OF MILITARY INSTALLATION RESILIENCE IN REAL PROPERTY MANAGEMENT AND INSTALLATION MASTER PLANNING OF DEPARTMENT.**

(a) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Secretary of Defense shall—

(1) update Department of Defense Instruction 4165.70 (relating to real property management) and Unified Facilities Criteria 2–100–01 (relating to installation master planning) to—

(A) include a requirement to incorporate the impact of military installation resilience in all installation master plans;

(B) include a list of all sources of information approved by the Department of Defense;

(C) define the 17 identified military installation resilience hazards to ensure that the impacts from such hazards are reported consistently across the Department;

(D) require each commander of a military installation to address the rationale for determining that any such hazard is not applicable to the military installation concerned;

(E) standardize reporting formats for military installation resilience plans;

(F) establish and define standardized risk rating categories for the use by each Secretary of a military department; and

(G) define criteria for determining the level of risk to a military installation to compare hazards between military departments; and

(2) require each Secretary of a military department to update the handbook for the military department concerned to incorporate the requirements under paragraph (1).

Assessment.
Costs.

Deadline.
Termination date.

10 USC 2802 note.

Deadline.
Requirements.
Updates.

Lists.

Criteria.

### SEC. 2858. MODIFICATION OF AUTHORITY TO RELOCATE JOINT SPECTRUM CENTER TO FORT MEADE, MARYLAND.

Section 2887(a)(1) of the Military Construction Authorization Act for Fiscal Year 2008 (division B of Public Law 110–181; 122 Stat. 569) is amended by striking "; and" and inserting "; or".

# Subtitle E—Land Conveyances

### SEC. 2861. EXTENSION OF SUNSET FOR LAND CONVEYANCE, SHARPE ARMY DEPOT, LATHROP, CALIFORNIA.

Section 2833(g) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283) is amended by striking "three years" and inserting "five years".

### SEC. 2862. CLARIFICATION OF AUTHORITY OF DEPARTMENT OF DEFENSE TO CONDUCT CERTAIN MILITARY ACTIVITIES AT NEVADA TEST AND TRAINING RANGE.

(a) SPECIFICATION OF AUTHORIZED MILITARY ACTIVITIES.—Paragraph (1) of section 3011(b) of the Military Lands Withdrawal Act of 1999 (title XXX of the National Defense Authorization Act for Fiscal Year 2000; Public Law 106–65; 113 Stat. 886) is amended—

(1) in the matter preceding subparagraph (A), by inserting ", subject to the conditions set forth in subsection (a) of section 3014" after "Secretary of the Air Force";

(2) by striking "and" at the end of subparagraph (C);

(3) by redesignating subparagraph (D) as subparagraph (G); and

(4) by inserting after subparagraph (C) the following new subparagraphs:

"(D) for emergency response;

"(E) for the establishment and use of existing or new electronic tracking and communications sites, including the construction of up to 15 equipment pads, no larger than 150-by-150 feet in size, along existing roads to allow placement and operation of threat emitters;

"(F) for the use and maintenance of roads in existence as of January 1, 2024, to allow access to threat emitters and repeaters for installation, maintenance, and periodic relocation; and".

(b) INTERAGENCY COMMITTEE.—Section 3011(b)(5)(G) of the Military Lands Withdrawal Act of 1999 (title XXX of the National Defense Authorization Act for Fiscal Year 2000; Public Law 106–65) is amended—

134 Stat. 4351.

(1) by amending clause (i) to read as follows:

"(i) IN GENERAL.—The Secretary of the Interior and the Secretary of the Air Force shall jointly establish an interagency committee (referred to in this subparagraph as the 'interagency committee') to—

"(I) facilitate coordination, manage public access needs and requirements, and minimize potential conflict between the Department of the Interior and the Department of the Air Force with respect to joint operating areas within the Desert National Wildlife Refuge; and

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 769

"(II) discuss the activities authorized in paragraph (1) and provide input to the United States Fish and Wildlife Service and the Department of the Air Force when assessing whether these activities may be conducted on the joint operating areas within the Desert National Wildlife Refuge that are under the primary jurisdiction of the Secretary of the Interior in a manner that is consistent with the National Wildlife Refuge System Administration Act (16 U.S.C. 668dd et seq.) and other applicable law."; and

(2) in clause (ii)—

(A) by inserting ", including a designee of the Director of the United States Fish and Wildlife Service" before the period at the end of subclause (I); and

(B) by inserting ", including a designee of the Assistant Secretary of the Air Force for Energy, Installations, and Environment" before the period at the end of subclause (II).

(c) ADDITIONAL PURPOSE OF INTERGOVERNMENTAL EXECUTIVE COMMITTEE.—Section 3011(b)(5)(H)(ii) of the Military Lands Withdrawal Act of 1999 (title XXX of the National Defense Authorization Act for Fiscal Year 2000; Public Law 106–65) is amended—

134 Stat. 4352.

(1) by striking "and" at the end of subclause (I);

(2) by striking the period at the end of subclause (II) and inserting "; and"; and

(3) by adding at the end the following new subclause:

"(III) discussing and making recommendations to the interagency committee established under subparagraph (G) with respect to any proposal by the Secretary of the Air Force to undertake any of the activities authorized in paragraph (1) on the joint operating areas within the Desert National Wildlife Refuge.".

Recommendations.

(d) COMPLETION OF INTERAGENCY MEMORANDUM OF UNDERSTANDING.—

(1) DEADLINE.—Not later than one year after the date of the enactment of this Act, the Secretary of the Air Force and the Secretary of the Interior shall—

(A) enter into a complete new operational memorandum of understanding under paragraph (5)(E) of section 3011(b) of the Military Lands Withdrawal Act of 1999 (title XXX of the National Defense Authorization Act for Fiscal Year 2000; Public Law 106–65); or

(B) amend the current memorandum of understanding in effect under that paragraph that will complete the memorandum of understanding.

(2) ACCESS TO JOINT USE AREA FOR FISH AND WILDLIFE SERVICE.—The memorandum of understanding entered into or amended under paragraph (1) shall include one or more provisions to ensure adequate access for the United States Fish and Wildlife Service to the joint use area.

(e) BUREAU OF LAND MANAGEMENT AND STATE OF NEVADA COOPERATIVE AGREEMENT.—Not later than 180 days after the date of enactment of this Act, the Secretary of the Interior shall submit to the Committee on Energy and Natural Resources of the Senate

Reports.

and the Committee on Natural Resources of the House of Representatives a report that describes the status of the cooperative agreement authorized under section 2905(j)(6) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 3043).

**SEC. 2863. EXTENSIONS, ADDITIONS, AND REVISIONS TO THE MILITARY LANDS WITHDRAWAL ACT OF 1999 RELATING TO THE BARRY M. GOLDWATER RANGE, ARIZONA.**

(a) EXTENSION OF WITHDRAWAL AND GILA BEND ADDITION TO BARRY M. GOLDWATER RANGE.—Section 3031(a)(3) of the Military Lands Withdrawal Act of 1999 (title XXX of Public Law 106–65; 113 Stat. 898) is amended—

(1) by striking "comprise approximately 1,650,200 acres" and inserting the following: "comprise—

"(A) approximately 1,656,491.94 acres";

(2) by striking "'Barry M. Goldwater Range Land Withdrawal', dated June 17, 1999" and inserting the following: "'Barry M. Goldwater Range Requested Withdrawal Extension Map', dated June 13, 2022"; and

(3) by striking "section 3033." and inserting the following: "section 3033; and

"(B) approximately 2,365.89 acres of land in Maricopa County, Arizona, as generally depicted on the map entitled 'Gila Bend Addition to Barry M. Goldwater Range', dated July 5, 2022, and filed in accordance with section 3033.".

(b) RELATION TO OTHER WITHDRAWALS AND RESERVATIONS.—Section 3031(a) of such Act is amended—

(1) by redesignating paragraphs (4), (5), (6), and (7) as paragraphs (5), (6), (7), and (8), respectively;

(2) in paragraph (5), as so redesignated, by inserting ", whichever is later" after "accepted by the Secretary of the Interior"; and

(3) by inserting after paragraph (3) the following:

"(4) RELATION TO OTHER WITHDRAWALS AND RESERVATIONS.—

Revocations.

"(A) The prior withdrawals and reservations identified as Public Land Order Nos. 56 and 97, and Executive Orders 8892, 9104, and 9215, are hereby revoked in their entirety.

Transfer authority.

"(B) Upon the date of the enactment of this paragraph, the patented mining claim known as the Legal Tender, Mineral Survey No. 3445, located in Section 26, Township 15 South, Range 10 West, Gila Salt River Meridian, Arizona, is hereby transferred from the Secretary of the Air Force to the Secretary of the Interior, at no cost and in 'as-is' condition, and shall be managed by the United States Fish and Wildlife Service as a land parcel included within the Cabeza Prieta National Wildlife Refuge and in wilderness status as part of the Cabeza Prieta Wilderness.".

(c) RENEWAL OF CURRENT WITHDRAWAL AND RESERVATION.—Section 3031(d) of such Act is amended by striking "25 years after the date of the enactment of this Act" and inserting "on October 5, 2049".

(d) EXTENSION.—Section 3031(e) of such Act is amended—

(1) in the heading, by striking "INITIAL"; and

(2) in paragraph (1), by striking "initial".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 771

### SEC. 2864. LAND ACQUISITION, WESTMORELAND STATE PARK, VIRGINIA.

(a) AUTHORITY.—The Secretary of the Navy may acquire, by purchase or lease from the Commonwealth of Virginia (in this section referred to as the "Commonwealth"), a real property interest in approximately 225 square feet of land, including ingress and egress, at Westmoreland State Park, Virginia, for the purpose of installing, operating, maintaining, and protecting equipment to support research and development activities by the Department of the Navy for national security purposes.

(b) TERMS AND CONDITIONS.—The acquisition of property under this section shall be subject to the following terms and conditions:

(1) The Secretary shall pay the Commonwealth fair market value for the interest to be acquired, as determined by the Secretary.

*Payment.*
*Determination.*

(2) Such other terms and conditions considered appropriate by the Secretary.

(c) DESCRIPTION OF PROPERTY.—The legal description of the property to be acquired under this section shall be determined by a survey that is satisfactory to the Secretary and the Commonwealth.

*Determination.*
*Land survey.*

(d) APPLICABILITY OF THE LAND AND WATER CONSERVATION FUND ACT.—The provisions of chapter 2003 of title 54, United States Code, shall not apply to the acquisition of property under this section.

(e) REIMBURSEMENT.—The Secretary shall reimburse the Commonwealth for reasonable and documented administrative costs incurred by the Commonwealth to execute the acquisition by the Secretary authorized by this section.

(f) TERMINATION OF REAL PROPERTY INTEREST.—The real property interest acquired by the Secretary shall terminate, and be released without cost to the Commonwealth, when the Secretary determines such real property interest is no longer required for national security purposes.

*Determination.*

### SEC. 2865. LAND CONVEYANCE, NAVAL WEAPONS STATION EARLE, NEW JERSEY.

(a) CONVEYANCE AUTHORIZED.—The Secretary of the Navy may convey to Colts Neck Township, New Jersey (in this section referred to as the "Township"), all right, title, and interest of the United States in and to a parcel of real property, including any improvements thereon, consisting of approximately 3.13 acres and currently used by the Township for school bus parking.

(b) CONSIDERATION.—

(1) CONSIDERATION REQUIRED.—As consideration for the conveyance under subsection (a), the Township shall pay to the Secretary of the Navy an amount equal to not less than the fair market value of the property to be conveyed, as determined by the Secretary, which may consist of cash payment, in-kind consideration as described in paragraph (2), or a combination thereof.

*Payment.*

(2) IN-KIND CONSIDERATION.—In-kind consideration provided by the Township under paragraph (1) may include—

(A) the acquisition, construction, provision, improvement, maintenance, repair, or restoration (including environmental restoration), or a combination thereof, of

any property, facilities, or infrastructure with proximity to Naval Weapons Station Earle, New Jersey; or

(B) the delivery of services relating to the needs of Naval Weapons Station Earle that the Secretary considers acceptable.

(3) CONVEYANCE.—Cash payments received under subsection (b) as consideration for the conveyance under subsection (a) shall be deposited in the special account in the Treasury established under section 572(b)(5) of title 40, United States Code.

(c) PAYMENT OF COSTS OF CONVEYANCE.—

Reimbursement.

(1) PAYMENT REQUIRED.—The Secretary of the Navy shall require the Township to cover costs to be incurred by the Secretary, or to reimburse the Secretary for such costs incurred by the Secretary, to carry out the conveyance under subsection (a), including survey costs, costs for environmental documentation related to the conveyance, and any other administrative costs related to the conveyance. If amounts are collected from

Refund.

the Township in advance of the Secretary incurring the actual costs, and the amount collected exceeds the costs actually incurred by the Secretary to carry out the conveyance, the Secretary shall refund the excess amount to the Township.

(2) TREATMENT OF AMOUNTS RECEIVED.—Amounts received as reimbursement under paragraph (1) shall be credited to the fund or account that was used to cover the costs incurred by the Secretary in carrying out the land conveyance under subsection (a) or, if the period of availability of obligations for that appropriation has expired, to the appropriations of a fund that is currently available to the Secretary for the same purpose. Amounts so credited shall be merged with amounts in such fund or account and shall be available for the same purposes, and subject to the same conditions and limitations, as amounts in such fund or account.

Determination.
Land survey.

(d) DESCRIPTION OF PROPERTY.—The exact acreage and legal description of the parcel of real property to be conveyed under subsection (a) shall be determined by surveys satisfactory to the Secretary of the Navy.

(e) ADDITIONAL TERMS AND CONDITIONS.—The Secretary of the Navy may require such additional terms and conditions in connection with the conveyance under subsection (a) as the Secretary considers appropriate to protect the interests of the United States.

**SEC. 2866. LAND CONVEYANCE, PAINE FIELD AIR NATIONAL GUARD STATION, EVERETT, SNOHOMISH COUNTY, WASHINGTON.**

(a) CONVEYANCE AUTHORIZED.—The Secretary of the Air Force (in this section referred to as the "Secretary") may convey to Snohomish County, a political subdivision of the State of Washington (in this section referred to as the "County") all right, title, and interest of the United States in and to three parcels of real property, including any improvements thereon and any related easements, consisting of approximately 14.23 acres, collectively, located on the Washington Air National Guard Base at Paine Field, Everett, Washington, for the purposes of—

(1) removing the property from the boundaries of the Washington Air National Guard Base and accommodating the operational needs of the Snohomish County Airport and Paine Field; and

(2) the development of the parcels and buildings for economic purposes.

(b) CONDITIONS OF CONVEYANCE.—The conveyance under subsection (a) shall be—

(1) subject to valid existing rights;

(2) subject to the condition that the County accept the real property, and any improvements thereon, in its condition at the time of the conveyance (commonly known as a conveyance "as is");

(3) subject to any other terms and conditions as agreed to by the Secretary and the County; and

(4) subject to any other terms and conditions as the Secretary considers appropriate to protect the interests of the United States.

(c) CONSIDERATION.—

(1) CONSIDERATION REQUIRED.—As consideration for the conveyance under subsection (a), the County shall pay to the Secretary in cash an amount that is not less than the fair market value of the right, title, and interest conveyed under subsection (a), as determined by the Secretary based on an appraisal of the property.

*Determination. Appraisal.*

(2) TREATMENT OF CONSIDERATION RECEIVED.—Consideration received by the Secretary under paragraph (1) shall be deposited in the account in the Treasury established under section 572(b) of title 40, United States Code, and shall be available in accordance with paragraph (5)(B)(ii) of such subsection.

(d) PAYMENT OF COSTS OF CONVEYANCE.—

(1) PAYMENT REQUIRED.—The Secretary may require the County to cover all costs (except costs for environmental remediation of the property) to be incurred by the Secretary, or to reimburse the Secretary for costs incurred by the Secretary, to carry out the conveyance under subsection (a), including costs related to real estate due diligence and any other administrative costs related to the conveyance. If amounts paid by the County to the Secretary in advance exceed the costs actually incurred by the Secretary to carry out the conveyance under subsection (a), the Secretary shall refund the excess amount to the County.

*Reimbursement.*

*Refund.*

(2) TREATMENT OF AMOUNTS RECEIVED.—Amounts received under paragraph (1) as reimbursement for costs incurred by the Secretary to carry out the conveyance under subsection (a) shall be credited to the fund or account that was used to cover the costs incurred by the Secretary in carrying out the conveyance or to an appropriate fund or account currently available to the Secretary for the purposes for which the costs were paid. Amounts so credited shall be merged with amounts in such fund or account and shall be available for the same purposes, and to the same conditions and limitations, as amounts in such fund or account.

(e) DESCRIPTION OF PROPERTY.—The exact acreage and legal description of the property to be conveyed under subsection (a) shall be determined by a survey satisfactory to the Secretary.

*Determination. Land survey.*

**SEC. 2867. LAND CONVEYANCE, WETZEL COUNTY MEMORIAL ARMY RESERVE CENTER, NEW MARTINSVILLE, WEST VIRGINIA.**

(a) CONVEYANCE AUTHORIZED.—

(1) IN GENERAL.—The Secretary of the Army (in this section referred to as the "Secretary") may convey to the City of New Martinsville, West Virginia (in this section referred to as the "City"), all right, title, and interest of the United States in and to a parcel of real property, including any improvements thereon, consisting of approximately 2.96 acres, known as the former Wetzel County Memorial Army Reserve Center, located within the City, for the purpose of providing emergency management response or law enforcement services.

(2) CONTINUATION OF EXISTING EASEMENTS, RESTRICTIONS, AND COVENANTS.—The conveyance of the property under paragraph (1) shall be subject to any easement, restriction, or covenant of record applicable to the property and in existence on the date of the enactment of this Act.

(b) REVISIONARY INTEREST.—

Determination.

(1) IN GENERAL.—If the Secretary determines at any time that the property conveyed under subsection (a) is not being used in accordance with the purpose of the conveyance specified in such subsection, all right, title, and interest in and to the property, including any improvements thereto, may, at the option of the Secretary, revert to and become the property of the United States, and the United States may have the right of immediate entry onto such property.

(2) DETERMINATION.—A determination by the Secretary under paragraph (1) may be made on the record after an opportunity for a hearing.

(c) PAYMENT OF COSTS OF CONVEYANCE.—

Reimbursement.

(1) PAYMENT REQUIRED.—The Secretary may require the City to cover all costs (except costs for environmental remediation of the property) to be incurred by the Secretary, or to reimburse the Secretary for costs incurred by the Secretary, to carry out the conveyance under subsection (a), including costs for environmental and real estate due diligence and any other administrative costs related to the conveyance.

(2) REFUND OF EXCESS AMOUNTS.—If amounts are collected from the City under paragraph (1) in advance of the Secretary incurring the actual costs, and the amount collected exceeds the costs actually incurred by the Secretary to carry out the conveyance under subsection (a), the Secretary shall refund the excess amount to the City.

(d) LIMITATION ON SOURCE OF FUNDS.—The City may not use Federal funds to cover any portion of the costs required to be paid by the City under this section.

(e) DESCRIPTION OF PROPERTY.—The exact acreage and legal description of the property to be conveyed under subsection (a) shall be determined by a survey satisfactory to the Secretary.

(f) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions in connection with the conveyance under subsection (a) as the Secretary considers appropriate to protect the interests of the United States.

### SEC. 2868. LAND CONVEYANCE, BG J SUMNER JONES ARMY RESERVE CENTER, WHEELING, WEST VIRGINIA.

(a) CONVEYANCE AUTHORIZED.—

(1) IN GENERAL.—The Secretary of the Army (in this section referred to as the "Secretary") may convey to the City of Wheeling, West Virginia (in this section referred to as the

"City"), all right, title, and interest of the United States in and to a parcel of real property, including any improvements thereon, consisting of approximately 3.33 acres, known as the former BG J Sumner Jones Army Reserve Center, located within the City, for the purpose of providing emergency management response or law enforcement services.

(2) CONTINUATION OF EXISTING EASEMENTS, RESTRICTIONS, AND COVENANTS.—The conveyance of the property under paragraph (1) shall be subject to any easement, restriction, or covenant of record applicable to the property and in existence on the date of the enactment of this Act.

(b) REVISIONARY INTEREST.—

(1) IN GENERAL.—If the Secretary determines at any time that the property conveyed under subsection (a) is not being used in accordance with the purpose of the conveyance specified in such subsection, all right, title, and interest in and to the property, including any improvements thereto, may, at the option of the Secretary, revert to and become the property of the United States, and the United States may have the right of immediate entry onto such property.    *Determination.*

(2) DETERMINATION.—A determination by the Secretary under paragraph (1) may be made on the record after an opportunity for a hearing.

(c) PAYMENT OF COSTS OF CONVEYANCE.—

(1) PAYMENT REQUIRED.—The Secretary may require the City to cover all costs (except costs for environmental remediation of the property) to be incurred by the Secretary, or to reimburse the Secretary for costs incurred by the Secretary, to carry out the conveyance under subsection (a), including costs for environmental and real estate due diligence and any other administrative costs related to the conveyance.    *Reimbursement.*

(2) REFUND OF EXCESS AMOUNTS.—If amounts are collected from the City under paragraph (1) in advance of the Secretary incurring the actual costs, and the amount collected exceeds the costs actually incurred by the Secretary to carry out the conveyance under subsection (a), the Secretary shall refund the excess amount to the City.

(d) LIMITATION ON SOURCE OF FUNDS.—The City may not use Federal funds to cover any portion of the costs required to be paid by the City under this section.

(e) DESCRIPTION OF PROPERTY.—The exact acreage and legal description of the property to be conveyed under subsection (a) shall be determined by a survey satisfactory to the Secretary.    *Determination. Land survey.*

(f) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions in connection with the conveyance under subsection (a) as the Secretary considers appropriate to protect the interests of the United States.    *Requirement.*

# Subtitle F—Pilot Programs and Reports

### SEC. 2871. MODIFICATION OF PILOT PROGRAM ON INCREASED USE OF SUSTAINABLE BUILDING MATERIALS IN MILITARY CONSTRUCTION.

Section 2861 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 2802 note) is amended—

(1) in subsection (b)(1), by striking "at least" and all that follows through the period at the end and inserting ", under the pilot program, at least—

"(A) one military construction project for mass timber; and

"(B) one military construction project for low carbon concrete.";

(2) in subsection (d), by striking "September 30, 2024" and inserting "September 30, 2025";

(3) by redesignating subsections (e) and (f) as subsections (f) and (g), respectively;

(4) by inserting after subsection (d) the following new subsection:

"(e) DEADLINE FOR COMMENCEMENT OF CONSTRUCTION.—Any construction pursuant to a military construction project carried out under the pilot program must commence by not later than January 1, 2025."; and

(5) in subsection (f)(1) (as so redesignated), by striking "December 31, 2024" and inserting "December 31, 2025".

### SEC. 2872. MODIFICATION OF PILOT PROGRAM ON ESTABLISHMENT OF ACCOUNT FOR REIMBURSEMENT FOR USE OF TESTING FACILITIES AT INSTALLATIONS OF THE DEPARTMENT OF THE AIR FORCE.

(a) IN GENERAL.—Section 2862 of the Military Construction Authorization Act for Fiscal Year 2022 (division B of Public Law 117–81; 10 U.S.C. 9771 note prec.) is amended—

(1) in subsection (a), by striking "testing" and inserting "Major Range and Test Facility Base";

(2) in subsection (b), by inserting ", have Major Range and Test Facility Base facilities," after "construct";

(3) by amending subsection (c) to read as follows:

"(c) OVERSIGHT OF FUNDS.—

"(1) USE OF AMOUNTS.—The commander of an installation selected to participate in the pilot program may obligate or expend amounts reimbursed under the pilot program for projects at the installation.

"(2) DESIGNATION OF MAINTENANCE COSTS.—

Reimbursement.

"(A) IN GENERAL.—The commander of an installation selected to participate in the pilot program may designate the appropriate amount of maintenance cost reimbursements to be charged to users of Major Range and Test Facility Base facilities under the pilot program.

"(B) USE OF MAINTENANCE COST REIMBURSEMENTS.— Maintenance cost reimbursements under subparagraph (A) for an installation may be used either solely or in combination with funds otherwise made available to satisfy the costs of maintenance projects at the installation.

"(3) OVERSIGHT.—The commander of an installation selected to participate in the pilot program shall have direct oversight over amounts reimbursed to the installation under the pilot program for Facility, Sustainment, Restoration, and Modernization.";

(4) by redesignating subsection (e) as subsection (f);

(5) by inserting after subsection (d) the following new subsection:

"(e) TREATMENT OF REIMBURSEMENTS.—Funds otherwise made available to participants in the pilot program may not be reduced by amounts reimbursed under the pilot program for Facility, Sustainment, Restoration, and Modernization."; and

(6) in subsection (f), as redesignated by paragraph (2), by striking "December 1, 2026" and inserting "December 1, 2027".

(b) CLERICAL AMENDMENT.—The heading for such section 2862 is amended to read as follows:

**"SEC. 2862. PILOT PROGRAM TO AUGMENT SUSTAINMENT WITH MAINTENANCE COST REIMBURSEMENTS FROM MAJOR RANGE AND TEST FACILITY BASE USERS AT INSTALLATIONS OF THE DEPARTMENT OF THE AIR FORCE.".**

**SEC. 2873. PILOT PROGRAM TO PROVIDE AIR PURIFICATION TECHNOLOGY IN COVERED MILITARY HOUSING.**

10 USC 2821 note.

(a) IN GENERAL.—The Secretary of Defense may carry out a pilot program to—

(1) provide commercially available off-the-shelf items (as defined in section 104 of title 41, United States Code) for air purification and covered sensors to landlords; and

(2) monitor and measure the effect of such items on the environmental health and public health of tenants of covered military housing.

(b) SELECTION OF INSTALLATIONS.—

(1) IN GENERAL.—The Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force shall each select one military installation under the jurisdiction of such Secretary to carry out any pilot program carried out under this section.

(2) CONSIDERATIONS.—Each Secretary shall ensure that the military installation selected under this section contains military unaccompanied housing in which the items described in subsection (a) may be used.

(c) DEVICES.—An air purification item or a covered sensor provided under this section shall use technology proven to reduce indoor air risks and yield measurable environmental health and public health outcomes.

(d) BRIEFING.—Not later than 365 days after the date on which a pilot program is commenced under this section, the Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force shall each provide to the Committees on Armed Services of the House of Representatives and the Senate a briefing on the pilot program established under this section, including a description of the items described in subsection (a) used under such program. The briefing shall include—

Deadline.

(1) a description of any cost savings identified from use of such items relating to—

(A) extending the durability and habitability of covered military housing; and

(B) reducing maintenance frequency; and

(2) with respect to cost savings identified in paragraph (1), a plan to expand the use of covered sensors and air purification items in newly constructed covered military housing.

(e) DEFINITIONS.—In this section:

(1) The term "covered sensor" means a commercially available off-the-shelf item (as defined in section 104 of title 41,

United States Code) manufactured in the United States that detects the conditions for potential mold growth before mold is present.

(2) The term "covered military housing" means—

(A) military unaccompanied housing; and

(B) Government-owned units of military housing.

(3) The term "military unaccompanied housing" has the meaning given in section 2871 of title 10, United States Code.

### SEC. 2874. JOINT HOUSING REQUIREMENTS AND MARKET ANALYSIS FOR CERTAIN MILITARY INSTALLATIONS IN HAWAII.

(a) IN GENERAL.—The Secretary of Defense, in consultation with appropriate Federal, State, and local stakeholders (to the maximum extent practicable) shall conduct a joint Housing Requirements and Market Analysis for each covered military installation.

(b) DEADLINE.—Not later than one year after the date of the enactment of this Act, the Secretary shall submit to the congressional defense committees a report on each joint Housing Requirements and Market Analysis conducted under subsection (a) that includes—

(1) an analysis of the extent to which military installations in Hawaii have affected the availability of housing in communities in proximity to such military installations;

(2) the number of members of the Armed Forces and their dependents residing in privately-owned housing located outside of such military installations;

(3) a cost-benefit analysis of implementing a requirement for each member of the Armed Forces assigned to a duty station in Hawaii to reside in housing located on the military installation to which such member is assigned;

(4) an assessment of strategies to reduce the effect of members of the Armed Forces and dependents of such members on the availability of rental housing in such communities, including strategies to provide such members and dependents with alternative housing options;

(5) the optimal stock and occupancy rate of military housing units in Hawaii, as determined by the Secretary;

(6) an estimate of the cost to the United States to maintain such optimal stock and occupancy rate;

(7) an assessment of the feasibility of expanding housing located on military installations in Hawaii to create housing intended to be occupied by civilian employees and contractors of the Department of Defense;

(8) an identification of limitations and challenges, if any, to data collection and analysis in carrying out such joint Housing Requirements and Market Analysis;

(9) strategies to—

(A) address such limitations and challenges; and

(B) standardize methods of data collection and analysis for conducting a Housing Requirements and Market Analysis under section 2837 of title 10, United States Code; and

(10) other relevant information, as determined by the Secretary.

(c) DEFINITIONS.—In this section:

(1) The term "covered military installation" means a military installation in Hawaii for which a Housing Requirements

and Market Analysis has not been conducted during the three-year period preceding the date of the enactment of this Act.

(2) The term "Housing Requirements and Market Analysis" has the meaning given such term in section 2837 of title 10, United States Code.

(3) The term "military installation" has the meaning given such term in section 2801 of such title.

### SEC. 2875. QUARTERLY BRIEFINGS ON MILITARY CONSTRUCTION RELATED TO THE SENTINEL INTERCONTINENTAL BALLISTIC MISSILE WEAPON SYSTEM PROGRAM.

(a) BRIEFING REQUIRED.—Not later than 180 days after the date of the enactment of this Act, and every 90 days thereafter until the date that is five years after the date of the enactment of this Act, the Secretary of the Air Force shall provide to the Committees on Armed Services of the House of Representatives and the Senate a briefing on contracts for covered construction projects relating to the Sentinel intercontinental ballistic missile weapon system program.

<div style="float:right">Deadline.<br>Termination date.<br>Time period.<br>Contracts.</div>

(b) ELEMENTS.—These briefings shall include at a minimum the following information:

(1) An update on the Sentinel intercontinental ballistic missile weapon system program, including delays that may affect the timelines for covered construction projects.

<div style="float:right">Update.</div>

(2) An update on timelines and costs for covered construction projects, including details on land acquisitions for such projects.

<div style="float:right">Update.<br>Timelines.<br>Costs.</div>

(3) An update on any site surveys conducted at the site for performance of the covered construction project, including new information about site conditions that may impact future contracts for covered construction projects.

<div style="float:right">Update.<br>Surveys.</div>

(4) With respect to any contract or subcontract (at any tier) for a covered construction project that is not a fixed-price contract, a description of the location of performance for such contract or subcontract.

(5) With respect to any contract or subcontract (at any tier) for a covered construction project that is a cost-plus-incentive-fee contract, a description of the following for performance of the contract or subcontract:

(A) The target cost.

(B) The target incentive fee.

(C) The minimum and maximum incentive fee amounts.

(D) A description of the incentive fee adjustment formula (including allowable costs).

(E) A description of the incentive fee structure.

(F) An analysis of any change to the elements in subparagraphs (A) through (E) since the previous quarter.

<div style="float:right">Analysis.</div>

(6) A summary of Government actions to mitigate cost growth of covered construction projects.

<div style="float:right">Summary.</div>

(7) A review of conditions observed at the site for performance of the covered construction project contract during the previous quarter and how those conditions may impact the cost of such contract and subsequent contracts for covered construction projects at such site.

<div style="float:right">Review.</div>

(8) The most recent construction schedule, including any anticipated delays and mitigation measures for each such delay,

<div style="float:right">Schedule.</div>

137 STAT. 780          PUBLIC LAW 118–31—DEC. 22, 2023

requests for equitable adjustment, and any changes to the schedule since the previous quarter.

Update.
Cost estimates.

(9) An update on the estimated cost to complete the covered construction project.

Summary.

(10) A summary of any factors that may cause delay to the completion of the covered construction project or cost growth for such project, including workforce shortages, regulatory review timelines, and supply chain shortages.

(11) Any required changes to statute or regulation, including any changes to the future-years defense program submitted under section 221 of title 10, United States Code, relating to the covered construction project.

(c) COVERED CONSTRUCTION PROJECT DEFINED.—In this section, the term "covered construction project" means a below-ground military construction project or other infrastructure project in connection with the development and fielding of the Sentinel intercontinental ballistic missile weapon system program.

# Subtitle G—Other Matters

### SEC. 2881. INCREASE OF LIMITATION ON FEE FOR ARCHITECTURAL AND ENGINEERING SERVICES PROCURED BY MILITARY DEPARTMENTS.

(a) ARMY.—Section 7540(b) of title 10, United States Code, is amended by striking "6 percent" and inserting "10 percent".

(b) NAVY.—Section 8612(b) of such title is amended by striking "6 percent" and inserting "10 percent".

(c) AIR FORCE.—Section 9540(b) of such title is amended by striking "6 percent" and inserting "10 percent".

### SEC. 2882. DEVELOPMENT AND OPERATION OF MARINE CORPS HERITAGE CENTER AND NATIONAL MUSEUM OF THE MARINE CORPS.

10 USC
prec. 8604.

(a) IN GENERAL.—Chapter 861 of title 10, United States Code, is amended by inserting after section 8617 the following new section:

10 USC 8618.

**"§ 8618. Marine Corps Heritage Center and National Museum of the Marine Corps at Marine Corps Base, Quantico, Virginia**

"(a) JOINT VENTURE FOR DEVELOPMENT AND CONTINUED MAINTENANCE AND OPERATION.—The Secretary of the Navy may enter into a joint venture with the Marine Corps Heritage Foundation (in this section referred to as the 'Foundation'), a not-for-profit entity, for the design, construction, and maintenance and operation of a multipurpose facility to be used for historical displays for public viewing, curation, and storage of artifacts, research facilities, classrooms, offices, and associated activities consistent with the mission of the Marine Corps University. The facility shall be known as the Marine Corps Heritage Center and the National Museum of the Marine Corps.

"(b) DESIGN AND CONSTRUCTION.—For each phase of development of the facility described in subsection (a), the Secretary may—

"(1) permit the Foundation to contract for the design, construction, or both of such phase of development; or

"(2) accept funds from the Foundation for the design, construction, or both of such phase of development.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 781

"(c) ACCEPTANCE AUTHORITY.—Upon completion of construction of any phase of development of the facility described in subsection (a) by the Foundation to the satisfaction of the Secretary, and the satisfaction of any financial obligations incident thereto by the Foundation, the facility shall become the real property of the Department of the Navy with all right, title, and interest in and to facility being in the United States.

Real property.

"(d) MAINTENANCE, OPERATION, AND SUPPORT.—(1) The Secretary may, for the purpose of maintenance and operation of the Marine Corps Heritage Center and the National Museum of the Marine Corps—

Contracts.

    "(A) enter into contracts or cooperative agreements, on a sole-source basis, with the Foundation for the procurement of property or services for the direct benefit or use of the Marine Corps Heritage Center and the National Museum of the Marine Corps; and

    "(B) notwithstanding the requirements of subsection (h) of section 2667 of this title and under such terms and conditions as the Secretary considers appropriate for the joint venture authorized by subsection (a), lease in accordance with such section 2667 portions of the facility developed under subsection (a) to the Foundation for use in generating revenue for activities of the facility and for such administrative purposes as may be necessary for support of the facility.

"(2) In making a determination of fair market value under section 2667(b)(4) of this title for payment of consideration pursuant to a lease described in paragraph (1)(B), the Secretary may consider the entirety of the educational efforts of the Foundation, support to the Marine Corps Heritage Center history division by the Foundation, or the funding of museum programs and exhibits by the Foundation, or other support related to the Marine Corps Heritage Center and the National Museum of the Marine Corps, in addition to the types of in-kind consideration provided under section 2667(c) of this title.

"(3) The Secretary may authorize the Foundation to use real or personal property within the Marine Corps Heritage Center and National Museum of the Marine Corps to conduct additional revenue-generating activities, as the Secretary considers appropriate considering the work of the Foundation and needs of the Marine Corps Heritage Center and National Museum of the Marine Corps. The Secretary shall only authorize the use of such property for a revenue-generating activity if the Secretary determines the activity will not interfere with military activities and personnel or the activities of the Marine Corps Heritage Center and National Museum of the Marine Corps.

Property.

Determination.

"(4) The Secretary shall retain lease payments received under this section, other than in-kind consideration authorized under paragraph (2) or under section 2667(c) of this title, solely for use in support of the Marine Corps Heritage Center and the National Museum of the Marine Corps, and funds received as lease payments shall remain available until expended.

"(e) AUTHORITY TO ACCEPT GIFTS.—(1) The Secretary of the Navy may accept, hold, administer, and spend any gift, devise, or bequest of real property, personal property, or money made on the condition that the gift, devise, or bequest be used for the benefit, or in connection with, the establishment, operation, or maintenance, of the Marine Corps Heritage Center or the National

Applicability.
Property.

137 STAT. 782          PUBLIC LAW 118–31—DEC. 22, 2023

Museum of the Marine Corps. Section 2601 (other than subsections (b), (c), and (e)) of this title shall apply to gifts accepted under this subsection.

"(2) The Secretary may display at the Marine Corps Heritage Center or the National Museum of the Marine Corps recognition for an individual or organization that contributes money to a partner organization, or an individual or organization that contributes a gift directly to the Navy, for the benefit of the Marine Corps Heritage Center or the National Museum of the Marine Corps, whether or not the contribution is subject to the condition that the recognition be provided. The Secretary shall prescribe regulations governing the circumstances under which contributor recognition may be provided, appropriate forms of recognition, and suitable display standards.

"(3) The Secretary may authorize the sale of donated property received under paragraph (1). A sale under this paragraph need not be conducted in accordance with disposal requirements that would otherwise apply, so long as the sale is conducted at arms-length and includes an auditable transaction record.

"(4) Any money received under paragraph (1) and any proceeds from the sale of property under paragraph (3) shall be deposited into a fund established in the Treasury to support the Marine Corps Heritage Center and the National Museum of the Marine Corps.

"(f) ADDITIONAL TERMS AND CONDITIONS.—The Secretary may require such additional terms and conditions in connection with the joint venture authorized by subsection (a) as the Secretary considers appropriate to protect the interests of the United States.".

(b) CONFORMING REPEAL.—Section 2884 of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001 (Public Law 106–398) is repealed.

### SEC. 2883. TECHNICAL CORRECTIONS.

(a) NUMU NEWE SPECIAL MANAGEMENT AREA.—Section 2902(c) of the Military Construction Authorization Act for Fiscal Year 2023 (16 U.S.C. 460gggg(c)) is amended by striking "217,845" and inserting "209,181".

(b) REDUCTION OF IMPACT OF FALLON RANGE TRAINING COMPLEX MODERNIZATION.—Section 2995(a)(3)(A) of the Military Land Withdrawals Act of 2013 (title XXIX of Public Law 113–66) (as added by section 2901 of the Military Construction Authorization Act for Fiscal Year 2023 (division B of Public Law 117–263; 136 Stat. 3016)) is amended by inserting "Gas" after "Basin".

### SEC. 2884. MODIFICATION OF AUTHORITY OF SECRETARY OF THE ARMY TO ENTER INTO COOPERATIVE AGREEMENTS RELATING TO ACCESS AND MANAGEMENT OF AIR FORCE MEMORIAL.

Section 2863(e) of the Military Construction Authorization Act for Fiscal Year 2002 (division B of Public Law 107–107; 115 Stat. 1332), is amended by striking "the Foundation" and inserting "non-Federal Government entities, the Secretary of the Air Force, or both,".

### SEC. 2885. DESIGNATION OF NATIONAL MUSEUM OF THE MIGHTY EIGHTH AIR FORCE.

(a) DESIGNATION.—The National Museum of the Mighty Eighth Air Force located at 175 Bourne Avenue, Pooler, Georgia (or any

*Regulations.*

*40 USC 8903 note.*

*Georgia.*

successor location), is designated as the official National Museum of the Mighty Eighth Air Force of the United States (referred to in this section as the "National Museum").

(b) RELATION TO NATIONAL PARK SYSTEM.—The National Museum shall not be included as a unit of the National Park System.

(c) RULE OF CONSTRUCTION.—This section shall not be construed to appropriate, or authorize the appropriation of, Federal funds for any purpose related to the National Museum.

**SEC. 2886. CONTINUING EDUCATION CURRICULUM ON USE OF INNOVATIVE PRODUCTS FOR MILITARY CONSTRUCTION PROJECTS.**

10 USC note prec. 2001.

(a) CURRICULUM REQUIRED.—Not later than one year after the date of the enactment of this Act, the Commander of the Naval Facilities Systems Engineering Command and the Deputy Commanding General for Military and International Operations for the Army Corps of Engineers, shall establish a joint continuing education curriculum for the following individuals responsible for managing military construction projects and planning and design projects within the Department of Defense:

Deadline.

(1) Project managers.
(2) Program managers.
(3) Design professionals.
(4) Contracting officers.
(5) Representatives of such contracting officers.

(b) ELEMENTS.—The curriculum under subsection (a) shall include training on—

(1) cost estimating and cost control mechanisms, including analyses of contract types;
(2) standards relating to antiterrorism force protection, lateral wind, seismic activity, and fire performance;
(3) life-cycle sustainability and renewability;
(4) use of innovative building materials (including sustainable materials) and innovative construction methods; and
(5) designs to improve the resilience of military installations.

(c) PROVISION OF TRAINING; CURRICULUM UPDATES.—The Secretary of Defense shall ensure that—

Deadlines.

(1) not later than 180 days after the date of the completion of the curriculum under subsection (a), such curriculum is made available to the contracting officers and program managers described in such subsection;
(2) by not later than January 1, 2025—
(A) not less than 75 percent of the individuals described in paragraphs (1) through (5) of such subsection have completed the continuing education curriculum required under such subsection in effect as of such date; and
(B) such individuals are provided updated information on innovative construction techniques on a continuous basis; and
(3) such curriculum is updated each time an innovative product or construction method is included in the Unified Facilities Criteria/DoD Building Code (UFC 1–200–01).

(d) REPORT.—Not later than June 1, 2025, the Secretary of Defense shall submit to Committees on Armed Services of the House of Representatives and the Senate a report that includes—

137 STAT. 784    PUBLIC LAW 118–31—DEC. 22, 2023

Update.

Plan.

(1) an update on the status of the curriculum under subsection (a); and

(2) a plan for administering such curriculum to the individuals described in paragraphs (1) through (5) of such subsection.

(e) DEFINITIONS.—In this section, the terms "military construction project" and "military installation" have the meanings given in section 2801 of title 10, United States Code.

10 USC 2684a note.

**SEC. 2887. GUIDANCE ON ENCROACHMENT THAT AFFECTS COVERED SITES.**

Deadline.

(a) GUIDANCE REQUIRED.—Not later than 180 days after the date of the enactment of this Act, each Secretary of a military department shall issue guidance to establish—

(1) a process to identify encroachment with respect to a covered site;

(2) a method to mitigate such encroachment; and

Procedures.
Certification.

(3) a procedure to certify that such encroachment does not directly result in a national security risk to the covered site.

(b) CONSIDERATIONS.—In developing the guidance required by this section, each Secretary of a military department shall consider the following:

(1) The process by which a commander or head of a covered site identifies and reports encroachment with respect to such covered site.

(2) Methods to track data relating to processes, methods, and procedures described in subsection (a).

(3) Coordination processes to track and mitigate encroachment—

(A) within each military department; and

(B) between the military departments and the Assistant Secretaries of Defense for Sustainment and Industrial Base Policy.

Requirements.
Determination.

(c) FOREIGN INVESTMENT ENCROACHMENT.—Such guidance shall include a requirement that if a Secretary of a military department determines that encroachment described in subsection (a) involves or may involve foreign investment, such Secretary shall—

Reports.

(1) report information about encroachment relating to foreign investment to the Assistant Secretary of Defense for Industrial Base Policy; and

Coordination.

(2) coordinate with the Assistant Secretary of Defense for Industrial Base Policy on efforts to mitigate such encroachment or potential encroachment.

(d) REPORT.—Not later than 180 days after the date on which the guidance required by subsection (a) is issued, the Assistant Secretary of Defense for Sustainment, in coordination with the Secretaries of the military departments, shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on the guidance required by this section, including—

(1) the extent to which such guidance has been implemented within the Department of Defense;

(2) a description of methods to update any lists of covered sites; and

Assessment.

(3) an assessment of the procedure described in subsection (a)(3).

(e) DEFINITIONS.—In this section:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 785

(1) The term "covered site" means a military installation or another facility or property of the United States Government.

(2) The term "encroachment" means an activity conducted within close proximity to a covered site that—

(A) may pose a national security risk to a covered site;

(B) may affect the operational mission of a covered site; or

(C) is incompatible with an installation master plan of a covered site.

(3) The term "military department" has the meaning given such term in section 101 of title 10, United States Code.

(4) The term "military installation" has the meaning given such term in section 2801 of title 10, United States Code.

## SEC. 2888. EXTENSION AND MODIFICATION OF ANNUAL UPDATES TO MASTER PLANS AND INVESTMENT STRATEGIES FOR ARMY AMMUNITION PLANTS.

Section 2834(d) of the Military Construction Authorization Act for Fiscal Year 2022 (division B of Public Law 117–81; 135 Stat. 2201) is amended—

(1) in the matter preceding paragraph (1), by striking "March 31, 2026" and inserting "March 31, 2030"; and

(2) by adding at the end the following new paragraph:

"(5) A description of any changes to a master plan for an ammunition production facility made in response to global events, including pandemics and armed conflicts.".

## SEC. 2889. LIMITATION ON USE OF FUNDS FOR UNITED STATES SPACE COMMAND HEADQUARTERS.

None of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Department of Defense may be obligated or expended to acquire, construct, plan, or design a new headquarters building for United States Space Command until June 30, 2024, when the Inspector General of the Department of Defense and the Comptroller General of the United States shall complete reviews of the selection announced in July of 2023.

Reviews.

## SEC. 2890. PLAN FOR USE OF EXCESS CONSTRUCTION MATERIALS ON SOUTHWEST BORDER.

10 USC 2576a note.

(a) PLAN.—Not later than 75 days after the date of the enactment of this Act, the Secretary of Defense shall submit to Congress a plan to use, transfer, or donate to States on the southern border of the United States all covered materials, with prioritization given to the refurbishment and or maintenance of ports of entry along the southwest border and construction projects aimed at stopping illicit human and vehicle traffic along the border of the United States with Mexico.

Deadline.

(b) ELEMENTS.—The plan required by subsection (a) shall include the following:

(1) A detailed proposal for the disposition of such covered materials, including a timeline for disposition and the authorities under which such disposition shall occur.

(2) An assessment of the condition of such materials being stored, including (if applicable) a description of materials that have depreciated in value, become damaged, or been lost.

Assessment.

137 STAT. 786        PUBLIC LAW 118–31—DEC. 22, 2023

Certification.

(c) REQUIREMENTS OF REQUESTING STATES.—Any State requesting the covered materials made available under this section must certify, in writing, that the materials it accepts will be exclusively used for the refurbishment or maintenance of ports of entry along the southwest border or construction projects aimed at stopping illicit human and vehicle traffic along the border of the United States with Mexico.

Deadline.

(d) EXECUTION OF PLAN.—Not later than 100 days after the date of submission of the plan required by subsection (a), the Secretary of Defense shall commence execution of such plan until the date on which the Department of Defense is no longer incurring any costs to maintain, store, or protect the covered materials.

(e) REPORT.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall submit to Congress a report containing the following:

(1) A detailed description of the decision process of the Secretary to forgo the excess property disposal process of the Department of Defense and instead pay to store the covered materials.

Lists.

(2) A list of entities the Department is paying for use of their privately owned land to store the covered materials, with appropriate action taken to protect personally identifiable information, such as by making the list of entities available in an annex that is labeled as controlled unclassified information.

(3) An explanation of the process through which the Department contracted with private landowners to store the covered materials, including whether there was a competitive contracting process and whether the landowners have instituted an inventory review system.

(4) A description of any investigations by the Inspector General of the Department that have been opened related to storing the covered materials.

(f) DEFINITIONS.—In this section, the term "covered material" means all remaining construction materials currently possessed by the United States Government that were purchased under section 2808 and 284 of title 10, United States Code, from fiscal years 2017 through 2021, including bollards and Nucor tubular square structural tubes.

# DIVISION C—DEPARTMENT OF ENERGY NATIONAL SECURITY AUTHORIZATIONS AND OTHER AUTHORIZATIONS

## TITLE XXXI—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS

Subtitle A—National Security Programs and Authorizations

Sec. 3101. National Nuclear Security Administration.
Sec. 3102. Defense environmental cleanup.
Sec. 3103. Other defense activities.
Sec. 3104. Nuclear energy.

Subtitle B—Program Authorizations, Restrictions, and Limitations

Sec. 3111. Transfer of cybersecurity responsibilities to Administrator for Nuclear Security.

Sec. 3112. Redesignating duties related to departmental radiological and nuclear incident responses.
Sec. 3113. Cybersecurity Risk Inventory, Assessment, and Mitigation Working Group.
Sec. 3114. Modification of authority to establish certain contracting, program management, scientific, engineering, and technical positions.
Sec. 3115. Criminal penalties for interference with the transport of special nuclear materials, nuclear weapons components, or restricted data.
Sec. 3116. Prohibition on expansion of Advanced Recovery and Integrated Extraction System pending achievement of 30 pit-per-year base capability.
Sec. 3117. Plutonium Modernization Program management.
Sec. 3118. Modification of certain requirements and authorities relating to the removal or security of fissile materials, radiological materials, and related equipment at vulnerable sites worldwide.
Sec. 3119. Extension of briefing and reporting requirements for certain National Nuclear Security Administration contracts.
Sec. 3120. Modification of minor construction threshold for plant projects.
Sec. 3121. Modifications relating to unfunded priorities of the National Nuclear Security Administration.
Sec. 3122. Limitation on establishing an enduring bioassurance program within the National Nuclear Security Administration.
Sec. 3123. Modification of reporting requirements for uranium capabilities replacement project.
Sec. 3124. Prohibition on availability of funds for naval nuclear fuel systems based on low-enriched uranium.
Sec. 3125. Prohibition on availability of funds to reconvert or retire W76–2 warheads.
Sec. 3126. Limitation on availability of funds pending submittal of spend plan for development of sea-launched cruise missile warhead.
Sec. 3127. Deadlines for commencement of operations of certain atomic energy replacement projects.
Sec. 3128. Integrated schedule for future-years nuclear security program.

Subtitle C—Other Matters

Sec. 3131. U.S. nuclear fuel security initiative.
Sec. 3132. Updated financial integration policy.
Sec. 3133. Plan for domestic enrichment capability to satisfy Department of Defense uranium requirements.
Sec. 3134. Briefings on implementation of enhanced mission delivery initiative.

# Subtitle A—National Security Programs and Authorizations

### SEC. 3101. NATIONAL NUCLEAR SECURITY ADMINISTRATION.

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated to the Department of Energy for fiscal year 2024 for the activities of the National Nuclear Security Administration in carrying out programs as specified in the funding table in section 4701.

(b) AUTHORIZATION OF NEW PLANT PROJECTS.—From funds referred to in subsection (a) that are available for carrying out plant projects, the Secretary of Energy may carry out new plant projects for the National Nuclear Security Administration as follows:

Project 24–D–513, Z-Pinch Experimental Underground System Test Bed Facilities Improvement, Nevada National Security Site, Nye County, Nevada, $80,000,000.

Project 24–D–512, TA–46 Protective Force Facility, Los Alamos National Laboratory, Los Alamos, New Mexico, $48,500,000.

Project 24–D–511, Plutonium Production Building, Los Alamos National Laboratory, Los Alamos, New Mexico, $48,500,000.

Project 24–D–510, Analytic Gas Laboratory, Pantex Plant, Panhandle, Texas, $35,000,000.

137 STAT. 788          PUBLIC LAW 118–31—DEC. 22, 2023

> Project 24–D–530, Naval Reactors Facility Medical Science Complex, Idaho Falls, Idaho, $36,584,000.

### SEC. 3102. DEFENSE ENVIRONMENTAL CLEANUP.

(a) AUTHORIZATION OF APPROPRIATIONS.—Funds are hereby authorized to be appropriated to the Department of Energy for fiscal year 2024 for defense environmental cleanup activities in carrying out programs as specified in the funding table in section 4701.

(b) AUTHORIZATION OF NEW PLANT PROJECT.—From funds referred to in subsection (a) that are available for carrying out plant projects, the Secretary of Energy may carry out, for defense environmental cleanup activities, the following new plant project:

> Project 24–D–401, Environmental Restoration Disposal Facility Super Cell 11 Expansion Project, Hanford Site, Richland, Washington, $1,000,000.

### SEC. 3103. OTHER DEFENSE ACTIVITIES.

Funds are hereby authorized to be appropriated to the Department of Energy for fiscal year 2024 for other defense activities in carrying out programs as specified in the funding table in section 4701.

### SEC. 3104. NUCLEAR ENERGY.

Funds are hereby authorized to be appropriated to the Department of Energy for fiscal year 2024 for nuclear energy as specified in the funding table in section 4701.

# Subtitle B—Program Authorizations, Restrictions, and Limitations

### SEC. 3111. TRANSFER OF CYBERSECURITY RESPONSIBILITIES TO ADMINISTRATOR FOR NUCLEAR SECURITY.

The National Nuclear Security Administration Act (50 U.S.C. 2401 et seq.) is amended—

> (1) in section 3212(b) (50 U.S.C. 2402(b)), by adding at the end the following new paragraph:
> "(20) Information resources management, including cybersecurity."; and
> (2) in section 3232(b)(3) (50 U.S.C. 2422(b)(3)), by striking "and cyber".

### SEC. 3112. REDESIGNATING DUTIES RELATED TO DEPARTMENTAL RADIOLOGICAL AND NUCLEAR INCIDENT RESPONSES.

(a) DEPUTY ADMINISTRATOR FOR DEFENSE PROGRAMS.—Section 3214(b) of the National Nuclear Security Administration Act (50 U.S.C. 2404 (b)) is amended by striking paragraph (3).

(b) ADMINISTRATOR FOR NUCLEAR SECURITY.—Section 3212(b)(7) of the National Nuclear Security Administration Act (50 U.S.C. 2402(b)(7)) is amended by inserting "and Nuclear Emergency Support Team capabilities, including all field-deployed and remote technical support to public health and safety missions, countering weapons of mass destruction operations, technical and operational nuclear forensics, and responses to United States nuclear weapon accidents" after "management".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 789

### SEC. 3113. CYBERSECURITY RISK INVENTORY, ASSESSMENT, AND MITIGATION WORKING GROUP.

Subtitle A of the National Nuclear Security Administration Act (50 U.S.C. 2401 et seq.) is amended by adding at the end the following new section:

### "SEC. 3222. CYBERSECURITY RISK INVENTORY, ASSESSMENT, AND MITIGATION WORKING GROUP.

50 USC 2412.

"(a) ESTABLISHMENT.—There is in the Administration a working group, to be known as the 'Cybersecurity Risk Inventory, Assessment, and Mitigation Working Group' (referred to in this section as the 'working group').

"(b) MEMBERSHIP.—Members of the working group shall include—

"(1) the Deputy Administrator for Defense Programs;

"(2) the Associate Administrator for Information Management and Chief Information Officer; and

"(3) such other personnel of the Administration as are determined appropriate for inclusion in the working group by the Chairperson.

"(c) CHAIRPERSON.—The Deputy Administrator for Defense Programs shall serve as the Chairperson of the working group, except that the Administrator may designate another member of the working group to serve as Chairperson in lieu of the Deputy Administrator if the Administrator determines it is appropriate to do so.

"(d) COMPREHENSIVE STRATEGY.—The working group shall prepare a comprehensive strategy for inventorying the range of systems of the Administration that are potentially at risk in the operational technology and nuclear weapons information technology environments, assessing the systems at risk based on mission impact, and implementing risk mitigation actions. Such strategy shall incorporate key elements of effective cybersecurity risk management strategies, as identified by the Government Accountability Office, including the specification of—

"(1) goals, objectives, activities, and performance measures;

"(2) organizational roles, responsibilities, and coordination;

"(3) resources needed to implement the strategy through 2034; and

"(4) detailed milestones and schedules for completion of tasks.

"(e) SUBMISSION TO CONGRESS.—

Deadlines.
Plan.

"(1) INTERIM BRIEFING.—Not later than 120 days after the date of the enactment of this section, the working group shall provide to the congressional defense committees a briefing on the plan of the working group to develop the strategy required under subsection (d).

"(2) COMPLETED STRATEGY.—Not later than April 1, 2025, the working group shall submit the congressional defense committees a copy of the completed strategy.

Records.

"(f) TERMINATION.—The working group shall terminate on a date determined by the Administrator that is not earlier than the date that is five years after the date of the enactment of this section.".

Determination.
Time period.

### SEC. 3114. MODIFICATION OF AUTHORITY TO ESTABLISH CERTAIN CONTRACTING, PROGRAM MANAGEMENT, SCIENTIFIC, ENGINEERING, AND TECHNICAL POSITIONS.

Section 3241 of the National Nuclear Security Administration Act (50 U.S.C. 2441) is amended by striking "800" and inserting "1,200".

### SEC. 3115. CRIMINAL PENALTIES FOR INTERFERENCE WITH THE TRANSPORT OF SPECIAL NUCLEAR MATERIALS, NUCLEAR WEAPONS COMPONENTS, OR RESTRICTED DATA.

Section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) is amended—

(1) by redesignating subsection b. as subsection c.;

(2) by inserting after subsection a. the following new subsection:

"b. Whoever knowingly and willfully impedes the passage of a vehicle of a nuclear materials courier (as defined in section 8331 of title 5, United States Code) engaged in the transport of any atomic weapon, special nuclear material, atomic weapon component, or Restricted Data shall be subject to arrest and imposition of a criminal fine of not more than $1,000.";

(3) in subsection c. (as so redesignated), by striking "prohibited by subsection a." and inserting "prohibited by subsections a. or b."; and

(4) by adding at the end the following new subsection:

"d. The Attorney General shall have primary investigative authority for any violation of this section.".

### SEC. 3116. PROHIBITION ON EXPANSION OF ADVANCED RECOVERY AND INTEGRATED EXTRACTION SYSTEM PENDING ACHIEVEMENT OF 30 PIT-PER-YEAR BASE CAPABILITY.

Section 4219 of the Atomic Energy Defense Act (50 U.S.C. 2538a) is amended by—

(1) redesignating subsection (f) as subsection (g); and

(2) inserting after subsection (e) the following new subsection:

"(f) PROHIBITION ON ARIES EXPANSION BEFORE ACHIEVEMENT OF 30 PIT-PER-YEAR BASE CAPABILITY.—

Certification.

"(1) IN GENERAL.—Until the date on which the Administrator certifies to the congressional defense committees that the base capability to produce not less than 30 war reserve plutonium pits per year has been established at Los Alamos National Laboratory, the Administrator may not—

"(A) carry out a project to expand the pit disassembly and processing capability of the spaces at PF–4 occupied by ARIES as of the date of the enactment of this Act; or

"(B) otherwise expand such spaces.

"(2) EXCEPTIONS.—Paragraph (1) shall not apply with respect to—

"(A) ongoing or planned small projects to sustain or improve the efficiency of plutonium oxide production, provided that such projects do not expand the spaces at PF–4 occupied by ARIES as of the date of the enactment of this Act;

"(B) the planning and design of an additional ARIES capability at a location other than PF–4; or

"(C) the transfer of the ARIES capability to a location other than PF–4.

"(3) DEFINITIONS.—In this subsection:

"(A) The term 'ARIES' means the Advanced Recovery and Integrated Extraction System method, developed and piloted at Los Alamos National Laboratory, Los Alamos, New Mexico, for disassembling surplus defense plutonium pits and converting the plutonium from such pits into plutonium oxide.

"(B) The term 'PF–4' means the Plutonium Facility at Technical Area 55 located at Los Alamos National Laboratory, Los Alamos, New Mexico.".

### SEC. 3117. PLUTONIUM MODERNIZATION PROGRAM MANAGEMENT.

Section 4219 of the Atomic Energy Defense Act (50 U.S.C. 2538a), as amended by section 3116, is further amended by adding at the end the following new subsection:

"(h) Not later than 570 days after the date of the enactment of this subsection, the Administrator for Nuclear Security shall ensure that the plutonium modernization program established by the Office of Defense Programs of the National Nuclear Security Administration, or any subsequently developed program designed to meet the requirements under subsection (a), is managed in accordance with the best practices for schedule development and cost estimating of the Government Accountability Office.". Deadline.

### SEC. 3118. MODIFICATION OF CERTAIN REQUIREMENTS AND AUTHORITIES RELATING TO THE REMOVAL OR SECURITY OF FISSILE MATERIALS, RADIOLOGICAL MATERIALS, AND RELATED EQUIPMENT AT VULNERABLE SITES WORLDWIDE.

(a) MODIFICATION OF REPORTING REQUIREMENTS.—Section 4306B of the Atomic Energy Defense Act (50 U.S.C. 2569) is amended—

(1) by striking subsection (d); and

(2) by redesignating subsections (e), (f), and (g) as subsections (d), (e), and (f), respectively.

(b) EXTENSION OF AUTHORITY TO ACCEPT CERTAIN CONTRIBUTIONS.—Subsection (e) of such section, as so redesignated by subsection (a)(2) of this section, is amended by striking paragraph (6).

(c) CONFORMING AMENDMENT.—Section 4309(c)(7) of the Atomic Energy Defense Act (50 U.S.C. 2575(c)(7)) is amended by striking "section 3132(f) of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (50 U.S.C. 2569(f))" and inserting "with section 4306B(e)".

### SEC. 3119. EXTENSION OF BRIEFING AND REPORTING REQUIREMENTS FOR CERTAIN NATIONAL NUCLEAR SECURITY ADMINISTRATION CONTRACTS.

Section 4807(f)(1) of the Atomic Energy Defense Act (50 U.S.C. 2787(f)(1)) is amended by striking "2022" and inserting "2032".

### SEC. 3120. MODIFICATION OF MINOR CONSTRUCTION THRESHOLD FOR PLANT PROJECTS.

Section 4701(2) of the Atomic Energy Defense Act (50 U.S.C. 2741(2)) is amended—

137 STAT. 792          PUBLIC LAW 118–31—DEC. 22, 2023

(1) in subparagraph (A), by striking "subparagraphs (B) and (C)" and inserting "subparagraph (B)";

(2) in subparagraph (B), by striking "During the period beginning on the date of the enactment of the National Defense Authorization Act for Fiscal Year 2023 and ending on November 30, 2025, the" and inserting "The"; and

(3) by striking subparagraph (C).

### SEC. 3121. MODIFICATIONS RELATING TO UNFUNDED PRIORITIES OF THE NATIONAL NUCLEAR SECURITY ADMINISTRATION.

Section 4716 of the Atomic Energy Defense Act (50 U.S.C. 2756) is amended—

(1) in subsection (b)(1)—

(A) in subparagraph (A), by inserting "or the risk to be mitigated" after "objectives to be achieved"; and

(B) in subparagraph (B), by inserting "or risk mitigation" after "objectives"; and

(2) in subsection (c)(2), by striking "fulfill" and inserting "address".

### SEC. 3122. LIMITATION ON ESTABLISHING AN ENDURING BIOASSURANCE PROGRAM WITHIN THE NATIONAL NUCLEAR SECURITY ADMINISTRATION.

(a) IN GENERAL.—Subtitle B of title XLVIII of the Atomic Energy Defense Act (50 U.S.C. 2791 et seq.) is amended by adding at the end the following new section:

50 USC 2796.

### "SEC. 4815. LIMITATION ON ESTABLISHING AN ENDURING BIOASSURANCE PROGRAM WITHIN THE ADMINISTRATION.

"(a) IN GENERAL.—The Administrator may not establish, administer, manage, or facilitate a program within the Administration for the purposes of executing an enduring national security research and development effort to broaden the role of the Department of Energy in national biodefense.

"(b) RULE OF CONSTRUCTION.—The limitation described in subsection (a) shall not be interpreted—

"(1) to prohibit the establishment of a bioassurance program for the purpose of executing enduring national security research and development in any component of the Department of Energy other than the Administration or in any other Federal agency; or

"(2) to impede the use of resources of the Administration, including resources provided by a national security laboratory or a nuclear weapons production facility site, to support the execution of a bioassurance program, if such support is provided—

"(A) on a cost-reimbursable basis to an entity that is not a component of the Department of Energy; and

"(B) in a manner that does not interfere with mission of such laboratory or facility.".

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 793

(b) CLERICAL AMENDMENT.—The table of contents for the Atomic Energy Defense Act is amended by inserting after the item relating to section 4814 the following new item:

"Sec. 4815. Limitation on establishing an enduring bioassurance program within the Administration.".

### SEC. 3123. MODIFICATION OF REPORTING REQUIREMENTS FOR URANIUM CAPABILITIES REPLACEMENT PROJECT.

Section 3123 of the National Defense Authorization Act for Fiscal Year 2013 (Public Law 112–239; 126 Stat. 2177) is amended by striking subsection (g) and inserting the following new subsection:

"(g) PROGRAM ACCOUNTABILITY MATRICES AND GAO ASSESSMENTS.—

"(1) REQUIREMENT.—Concurrent with the submission of the budget of the President (as submitted to Congress pursuant to section 1105(a) of title 31, United States Code) for fiscal year 2025 and each fiscal year thereafter until the termination date specified in paragraph (4), the Administrator for Nuclear Security shall submit to the congressional defense committees and the Comptroller General of the United States the matrices described in paragraph (2) relating to the project referred to in subsection (a).

"(2) MATRICES DESCRIBED.—The matrices described in this subsection are the following:

"(A) TECHNOLOGY MATURITY MATRIX.—A matrix that identifies key milestones, development events, and specific performance goals for the development of critical technologies relating to the project referred to in subsection (a).

"(B) SCOPE, COST, AND SCHEDULE MATRIX.—A matrix that identifies—

"(i) causes of cost growth and schedule slippage, if any, for the project referred to in subsection (a), including challenges relating to construction, procurement, and supply chain issues;

"(ii) the impact of such cost and schedule problems on current and planned weapons modernization efforts; and

"(iii) the scope, cost, and schedule of activities funded by the uranium modernization program for the period of fiscal years 2024 through 2028 as set forth in the corresponding future-years nuclear security program submitted to Congress pursuant to section 2453 of title 10, United States Code.

Time period.

"(3) GAO ASSESSMENT.—Not later than 180 days after receiving the matrices described in paragraph (2), the Comptroller General of the United States shall—

Deadline.

"(A) assess the progress made on the project referred to in subsection (a); and

"(B) provide to the congressional defense committees a briefing on the results of that assessment.

Briefing.

"(4) TERMINATION.—The requirements of this subsection shall terminate on the date that is one year after the date on which the project referred to in subsection (a) is completed.".

### SEC. 3124. PROHIBITION ON AVAILABILITY OF FUNDS FOR NAVAL NUCLEAR FUEL SYSTEMS BASED ON LOW-ENRICHED URANIUM.

None of the funds authorized to be appropriated by this Act or otherwise made available for the National Nuclear Security Administration may be obligated or expended to conduct research or development relating to an advanced naval nuclear fuel system based on low-enriched uranium.

### SEC. 3125. PROHIBITION ON AVAILABILITY OF FUNDS TO RECONVERT OR RETIRE W76–2 WARHEADS.

(a) PROHIBITION.—Except as provided in subsection (b), none of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the National Nuclear Security Administration may be obligated or expended to reconvert or retire a W76–2 warhead.

*Certification.*

(b) WAIVER.—The Administrator for Nuclear Security may waive the prohibition under subsection (a) if the Administrator, in consultation with the Secretary of Defense and the Chairman of the Joint Chiefs of Staff, certifies in writing to the congressional defense committees that—

(1) Russia and China do not possess naval capabilities similar to the W76–2 warhead in the active stockpiles of the respective countries; and

(2) the Department of Defense does not have a valid military requirement for the W76–2 warhead.

### SEC. 3126. LIMITATION ON AVAILABILITY OF FUNDS PENDING SUBMITTAL OF SPEND PLAN FOR DEVELOPMENT OF SEA-LAUNCHED CRUISE MISSILE WARHEAD.

Of the funds authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Office of the Administrator for Nuclear Security, not more than 50 percent may be obligated or expended until the date on which the Administrator submits to the congressional defense committees the spend plan for the warhead associated with the sea-launched cruise missile required by section 1642(d) of the National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 2946).

### SEC. 3127. DEADLINES FOR COMMENCEMENT OF OPERATIONS OF CERTAIN ATOMIC ENERGY REPLACEMENT PROJECTS.

(a) HIGH EXPLOSIVE SYNTHESIS, FORMULATION, AND PRODUCTION FACILITY.—

(1) DEADLINE FOR COMMENCEMENT OF OPERATIONS.—Project 21-D-510, the High Explosive Synthesis, Formulation, and Production facility, shall commence operations by not later than December 31, 2034.

(2) ANNUAL REPORT.—

(A) IN GENERAL.—The Administrator for Nuclear Security shall submit to the congressional defense committees, not later than February 1 of each year until the termination date specified in subparagraph (B), a report that includes a comprehensive estimate of the funds necessary, by year, to achieve the deadline specified in paragraph (1).

(B) TERMINATION DATE.—The termination date specified in this subparagraph is the date on which the Administrator determines that the facility referred to in paragraph (1) has commenced operations.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 795

(b) TRITIUM FINISHING FACILITY.—

(1) DEADLINE FOR COMMENCEMENT OF OPERATIONS.—Project 18-D-650, the Tritium Finishing Facility, shall commence operations by not later than December 31, 2036.

(2) ANNUAL REPORT.—

(A) IN GENERAL.—The Administrator for Nuclear Security shall submit to the congressional defense committees, not later than February 1 of each year until the termination date specified in subparagraph (B), a report that includes a comprehensive estimate of the funds necessary, by year, to achieve the deadline specified in paragraph (1).

(B) TERMINATION DATE.—The termination date specified in this subparagraph is the date on which the Administrator determines that the facility referred to in paragraph (1) has commenced operations.

### SEC. 3128. INTEGRATED SCHEDULE FOR FUTURE-YEARS NUCLEAR SECURITY PROGRAM.

50 USC 2453 note.

(a) IN GENERAL.—The Administrator for Nuclear Security shall—

(1) develop and maintain a high-level milestone schedule document for all covered construction projects that includes production infrastructure modernization schedules with weapons modernization programs; and

(2) for each covered construction project included in the high-level milestone schedule document under paragraph (1), include in such document an identification and explanation of the status of any associated integrated master schedule.

(b) INCLUSION IN FUTURE-YEARS NUCLEAR SECURITY PROGRAM.—The milestone schedule document required under subsection (a) shall be included in the future-years nuclear security program for fiscal year 2025 and each subsequent fiscal year.

(c) COVERED CONSTRUCTION PROJECT.—In this section, the term "covered construction project" means—

Definition.

(1) a construction project that is subject to Department of Energy Order 413.3B, or a successor order; or

(2) a program designated as Enhanced Management A or B under the Program Execution Instruction of the Office of Defense Programs of the National Nuclear Security Administration.

# Subtitle C—Other Matters

### SEC. 3131. U.S. NUCLEAR FUEL SECURITY INITIATIVE.

Nuclear Fuel Security Act of 2023.
42 USC 16282.

(a) SHORT TITLE.—This section may be cited as the "Nuclear Fuel Security Act of 2023".

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the Department should—

(A) support increased domestic production of low-enriched uranium; and

(B) accelerate efforts to establish a domestic high-assay, low-enriched uranium enrichment capability; and

(2) if domestic enrichment of high-assay, low-enriched uranium will not be commercially available at the scale needed in time to meet the needs of the advanced nuclear reactor

demonstration projects of the Department, the Secretary shall consider and implement, as necessary—

(A) all viable options to make high-assay, low-enriched uranium produced from inventories owned by the Department available in a manner that is sufficient to maximize the potential for the Department to meet the needs and schedules of advanced nuclear reactor developers, without impacting existing Department missions, until such time that commercial enrichment and deconversion capability for high-assay, low-enriched uranium exists at a scale sufficient to meet future needs; and

(B) all viable options for partnering with countries that are allies or partners of the United States to meet those needs and schedules until that time.

(c) OBJECTIVES.—The objectives of this section are—

(1) to support domestic production of low-enriched uranium;

(2) to expeditiously increase domestic production of high-assay, low-enriched uranium by an annual quantity, and in such form, determined by the Secretary to be sufficient to meet the needs of—

(A) advanced nuclear reactor developers; and

(B) the consortium;

(3) to ensure the availability of domestically produced, converted, enriched, deconverted, and reduced uranium in a quantity determined by the Secretary, in consultation with U.S. nuclear energy companies, to be sufficient to address a reasonably anticipated supply disruption;

(4) to address gaps and deficiencies in the domestic production, conversion, enrichment, deconversion, and reduction of uranium by partnering with countries that are allies or partners of the United States if domestic options are not practicable;

(5) to ensure that, in the event of a supply disruption in the nuclear fuel market, a reserve of nuclear fuels is available to serve as a backup supply to support the nuclear nonproliferation and civil nuclear energy objectives of the Department, including collaborative research and development activities with other Federal agencies;

(6) to support enrichment, deconversion, and reduction technology deployed in the United States; and

(7) to ensure that, until such time that domestic enrichment and deconversion of high-assay, low-enriched uranium is commercially available at the scale needed to meet the needs of advanced nuclear reactor developers, the Secretary considers and implements, as necessary—

(A) all viable options to make high-assay, low-enriched uranium produced from inventories owned by the Department available in a manner that is sufficient to maximize the potential for the Department to meet the needs and schedules of advanced nuclear reactor developers; and

(B) all viable options for partnering with countries that are allies or partners of the United States to meet those needs and schedules.

(d) DEFINITIONS.—In this section:

(1) ADVANCED NUCLEAR REACTOR.—The term "advanced nuclear reactor" has the meaning given the term in section 951(b) of the Energy Policy Act of 2005 (42 U.S.C. 16271(b)).

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 797

(2) ASSOCIATED ENTITY.—The term "associated entity" means an entity that—

(A) is owned, controlled, or dominated by—

(i) the government of a country that is an ally or partner of the United States; or

(ii) an associated individual; or

(B) is organized under the laws of, or otherwise subject to the jurisdiction of, a country that is an ally or partner of the United States, including a corporation that is incorporated in such a country.

(3) ASSOCIATED INDIVIDUAL.—The term "associated individual" means an alien who is a national of a country that is an ally or partner of the United States.

(4) CONSORTIUM.—The term "consortium" means the consortium established under section 2001(a)(2)(F) of the Energy Act of 2020 (42 U.S.C. 16281(a)(2)(F)).

(5) DEPARTMENT.—The term "Department" means the Department of Energy.

(6) HIGH-ASSAY, LOW-ENRICHED URANIUM; HALEU.—The term "high-assay, low-enriched uranium" or "HALEU" means high-assay low-enriched uranium (as defined in section 2001(d) of the Energy Act of 2020 (42 U.S.C. 16281(d))).

(7) LOW-ENRICHED URANIUM; LEU.—The term "low-enriched uranium" or "LEU" means each of—

(A) low-enriched uranium (as defined in section 3102 of the USEC Privatization Act (42 U.S.C. 2297h)); and

(B) low-enriched uranium (as defined in section 3112A(a) of that Act (42 U.S.C. 2297h–10a(a))).

(8) PROGRAMS.—The term "Programs" means—

(A) the Nuclear Fuel Security Program established under subsection (e)(1);

(B) the American Assured Fuel Supply Program of the Department; and

(C) the HALEU for Advanced Nuclear Reactor Demonstration Projects Program established under subsection (e)(3).

(9) SECRETARY.—The term "Secretary" means the Secretary of Energy.

(10) U.S. NUCLEAR ENERGY COMPANY.—The term "U.S. nuclear energy company" means a company that—

(A) is organized under the laws of, or otherwise subject to the jurisdiction of, the United States; and

(B) is involved in the nuclear energy industry.

(e) ESTABLISHMENT AND EXPANSION OF PROGRAMS.—The Secretary, consistent with the objectives described in subsection (c), shall—

(1) establish a program, to be known as the "Nuclear Fuel Security Program", to increase the quantity of HALEU and, if determined to be necessary after completion of a market evaluation, LEU produced by U.S. nuclear energy companies;

(2) expand the American Assured Fuel Supply Program of the Department to ensure the availability of domestically produced, converted, enriched, deconverted, and reduced uranium in the event of a supply disruption; and

(3) establish a program, to be known as the "HALEU for Advanced Nuclear Reactor Demonstration Projects Program"—

137 STAT. 798    PUBLIC LAW 118–31—DEC. 22, 2023

(A) to maximize the potential for the Department to meet the needs and schedules of advanced nuclear reactor developers until such time that commercial enrichment and deconversion capability for HALEU exists in the United States at a scale sufficient to meet future needs; and

(B) where practicable, to partner with countries that are allies or partners of the United States to meet those needs and schedules until that time.

(f) NUCLEAR FUEL SECURITY PROGRAM.—

(1) IN GENERAL.—In carrying out the Nuclear Fuel Security Program, the Secretary—

(A) shall—

Deadlines.

(i) if determined to be necessary or appropriate based on the completion of a market evaluation, not later than 90 days after the date of enactment of this Act, take actions, including cost-shared financial agreements, milestone-based payments, or other mechanisms, to support commercial availability of LEU and to promote diversity of supply in domestic uranium mining, conversion, enrichment, and deconversion capacity and technologies, including new capacity, among U.S. nuclear energy companies;

(ii) not later than 180 days after the date of enactment of this Act, enter into 2 or more contracts with members of the consortium to begin acquiring not less than 20 metric tons per year of HALEU by December 31, 2027 (or the earliest operationally feasible date thereafter), from U.S. nuclear energy companies;

(iii) utilize only uranium produced, converted, enriched, deconverted, and reduced in—

(I) the United States; or

(II) if domestic options are not practicable, a country that is an ally or partner of the United States; and

(iv) to the maximum extent practicable, ensure that the use of domestic uranium utilized as a result of that program does not negatively affect the economic operation of nuclear reactors in the United States; and

(B)(i) may not make commitments under this subsection (including cooperative agreements (used in accordance with section 6305 of title 31, United States Code), purchase agreements, guarantees, leases, service contracts, or any other type of commitment) for the purchase or other acquisition of HALEU or LEU unless—

(I) funds are specifically provided for those purposes in advance in appropriations Acts enacted after the date of enactment of this Act; or

(II) the commitment is funded entirely by funds made available to the Secretary from the account described in subsection (j)(2)(B); and

(ii) may make a commitment described in clause (i) only—

(I) if the full extent of the anticipated costs stemming from the commitment is recorded as an obligation at the time that the commitment is made; and

(II) to the extent of that up-front obligation recorded in full at that time.

(2) CONSIDERATIONS.—In carrying out paragraph (1)(A)(ii), the Secretary shall consider and, if appropriate, implement—

(A) options to ensure the quickest availability of commercially enriched HALEU, including—

(i) partnerships between 2 or more commercial enrichers; and

(ii) utilization of up to 10-percent enriched uranium as feedstock in demonstration-scale or commercial HALEU enrichment facilities;

(B) options to partner with countries that are allies or partners of the United States to provide LEU and HALEU for commercial purposes;

(C) options that provide for an array of HALEU—

(i) enrichment levels;

(ii) output levels to meet demand; and

(iii) fuel forms, including uranium metal and oxide; and

(D) options—

(i) to replenish, as necessary, Department stockpiles of uranium that were intended to be downblended for other purposes, but were instead used in carrying out activities under the HALEU for Advanced Nuclear Reactor Demonstration Projects Program;

(ii) to continue supplying HALEU to meet the needs of the recipients of an award made pursuant to the funding opportunity announcement of the Department numbered DE–FOA–0002271 for Pathway 1, Advanced Reactor Demonstrations; and

(iii) to make HALEU available to other advanced nuclear reactor developers and other end-users.

(3) AVOIDANCE OF MARKET DISRUPTIONS.—In carrying out the Nuclear Fuel Security Program, the Secretary, to the extent practicable and consistent with the purposes of that program, shall not disrupt or replace market mechanisms by competing with U.S. nuclear energy companies.

(g) EXPANSION OF THE AMERICAN ASSURED FUEL SUPPLY PROGRAM.—The Secretary, in consultation with U.S. nuclear energy companies, shall—

(1) expand the American Assured Fuel Supply Program of the Department by merging the operations of the Uranium Reserve Program of the Department with the American Assured Fuel Supply Program; and

(2) in carrying out the American Assured Fuel Supply Program of the Department, as expanded under paragraph (1)—

(A) maintain, replenish, diversify, or increase the quantity of uranium made available by that program in a manner determined by the Secretary to be consistent with the purposes of that program and the objectives described in subsection (c);

(B) utilize only uranium produced, converted, enriched, deconverted, and reduced in—

(i) the United States; or

(ii) if domestic options are not practicable, a country that is an ally or partner of the United States;

(C) make uranium available from the American Assured Fuel Supply, subject to terms and conditions determined by the Secretary to be reasonable and appropriate;

(D) refill and expand the supply of uranium in the American Assured Fuel Supply, including by maintaining a limited reserve of uranium to address a potential event in which a domestic or foreign recipient of uranium experiences a supply disruption for which uranium cannot be obtained through normal market mechanisms or under normal market conditions; and

(E) take other actions that the Secretary determines to be necessary or appropriate to address the purposes of that program and the objectives described in subsection (c).

(h) HALEU FOR ADVANCED NUCLEAR REACTOR DEMONSTRATION PROJECTS PROGRAM.—

(1) ACTIVITIES.—On enactment of this Act, the Secretary shall immediately accelerate and, as necessary, initiate activities to make available from inventories or stockpiles owned by the Department and made available to the consortium, HALEU for use in advanced nuclear reactors that cannot operate on uranium with lower enrichment levels or on alternate fuels, with priority given to the awards made pursuant to the funding opportunity announcement of the Department numbered DE–FOA–0002271 for Pathway 1, Advanced Reactor Demonstrations, with additional HALEU to be made available to other advanced nuclear reactor developers, as the Secretary determines to be appropriate.

Deadlines.

(2) QUANTITY.—In carrying out activities under this subsection, the Secretary shall consider and implement, as necessary, all viable options to make HALEU available in quantities and forms sufficient to maximize the potential for the Department to meet the needs and schedules of advanced nuclear reactor developers, including by seeking to make available—

(A) by September 30, 2024, not less than 3 metric tons of HALEU;

(B) by December 31, 2025, not less than an additional 8 metric tons of HALEU; and

(C) by June 30, 2026, not less than an additional 10 metric tons of HALEU.

(3) FACTORS FOR CONSIDERATION.—In carrying out activities under this subsection, the Secretary shall take into consideration—

(A) options for providing HALEU from a stockpile of uranium owned by the Department, including—

(i) uranium that has been declared excess to national security needs during or prior to fiscal year 2023;

(ii) uranium that—

(I) directly meets the needs of advanced nuclear reactor developers; but

(II) has been previously used or fabricated for another purpose;

(iii) uranium that can meet the needs of advanced nuclear reactor developers after removing radioactive or other contaminants that resulted from previous use

or fabrication of the fuel for research, development, demonstration, or deployment activities of the Department, including activities that reduce the environmental liability of the Department by accelerating the processing of uranium from stockpiles designated as waste;

(iv) uranium from a high-enriched uranium stockpile (excluding stockpiles intended for national security needs), which can be blended with lower assay uranium to become HALEU to meet the needs of advanced nuclear reactor developers; and

(v) uranium from stockpiles intended for other purposes (excluding stockpiles intended for national security needs), but for which uranium could be swapped or replaced in time in such a manner that would not negatively impact the missions of the Department;

(B) options for expanding, or establishing new, capabilities or infrastructure to support the processing of uranium from Department inventories;

(C) options for accelerating the availability of HALEU from HALEU enrichment demonstration projects of the Department;

(D) options for providing HALEU from domestically enriched HALEU procured by the Department through a competitive process pursuant to the Nuclear Fuel Security Program established under subsection (e)(1);

(E) options to replenish, as needed, Department stockpiles of uranium made available pursuant to subparagraph (A) with domestically enriched HALEU procured by the Department through a competitive process pursuant to the Nuclear Fuel Security Program established under subsection (e)(1); and

(F) options that combine 1 or more of the approaches described in subparagraphs (A) through (E) to meet the deadlines described in paragraph (2).

(4) LIMITATIONS.—

(A) CERTAIN SERVICES.—The Secretary shall not barter or otherwise sell or transfer uranium in any form in exchange for services relating to—

(i) the final disposition of radioactive waste from uranium that is the subject of a contract for sale, resale, transfer, or lease under this subsection; or

(ii) environmental cleanup activities.

(B) CERTAIN COMMITMENTS.—In carrying out activities under this subsection, the Secretary—

(i) may not make commitments under this subsection (including cooperative agreements (used in accordance with section 6305 of title 31, United States Code), purchase agreements, guarantees, leases, service contracts, or any other type of commitment) for the purchase or other acquisition of HALEU or LEU unless—

(I) funds are specifically provided for those purposes in advance in appropriations Acts enacted after the date of enactment of this Act; or

(II) the commitment is funded entirely by funds made available to the Secretary from the account described in subsection (j)(2)(B); and

(ii) may make a commitment described in clause (i) only—

(I) if the full extent of the anticipated costs stemming from the commitment is recorded as an obligation at the time that the commitment is made; and

(II) to the extent of that up-front obligation recorded in full at that time.

(5) SUNSET.—The authority of the Secretary to carry out activities under this subsection shall terminate on the earlier of—

Notification.

(A) the date on which the Secretary notifies Congress that the HALEU needs of advanced nuclear reactor developers can be fully met by commercial HALEU suppliers in the United States, as determined by the Secretary, in consultation with U.S. nuclear energy companies; and

(B) September 30, 2034.

(i) DOMESTIC SOURCING CONSIDERATIONS.—

(1) IN GENERAL.—Except as provided in paragraph (2), the Secretary may only carry out an activity in connection with 1 or more of the Programs if—

(A) the activity promotes manufacturing in the United States associated with uranium supply chains; or

(B) the activity relies on resources, materials, or equipment developed or produced—

(i) in the United States; or

(ii) in a country that is an ally or partner of the United States by—

(I) the government of that country;

(II) an associated entity; or

(III) a U.S. nuclear energy company.

(2) WAIVER.—The Secretary may waive the requirements of paragraph (1) with respect to an activity if the Secretary determines a waiver to be necessary to achieve 1 or more of the objectives described in subsection (c).

(j) REASONABLE COMPENSATION.—

(1) IN GENERAL.—In carrying out activities under this section, the Secretary shall ensure that any LEU and HALEU made available by the Secretary under 1 or more of the Programs is subject to reasonable compensation, taking into account the fair market value of the LEU or HALEU and the purposes of this section.

(2) AVAILABILITY OF CERTAIN FUNDS.—

(A) IN GENERAL.—Notwithstanding section 3302(b) of title 31, United States Code, revenues received by the Secretary from the sale or transfer of fuel feed material acquired by the Secretary pursuant to a contract entered into under clause (i) or (ii) of subsection (f)(1)(A) shall—

(i) be deposited in the account described in subparagraph (B);

(ii) be available to the Secretary for carrying out the purposes of this section, to reduce the need for further appropriations for those purposes; and

(iii) remain available until expended.

(B) REVOLVING FUND.—There is established in the Treasury an account into which the revenues described in subparagraph (A) shall be—

(i) deposited in accordance with clause (i) of that subparagraph; and

(ii) made available in accordance with clauses (ii) and (iii) of that subparagraph.

(k) NUCLEAR REGULATORY COMMISSION.—The Nuclear Regulatory Commission shall prioritize and expedite consideration of any action related to the Programs to the extent permitted under the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.) and related statutes.

(l) USEC PRIVATIZATION ACT.—The requirements of section 3112(d)(2) of the USEC Privatization Act (42 U.S.C. 2297h–10(d)(2)) shall not apply to activities related to the Programs.

(m) NATIONAL SECURITY NEEDS.—The Secretary shall only make available to a member of the consortium under this section for commercial use or use in a demonstration project material that the President has determined is not necessary for national security needs during or prior to fiscal year 2023, subject to the condition that the material made available shall not include any material that the Secretary determines to be necessary for the National Nuclear Security Administration or any critical mission of the Department.

(n) INTERNATIONAL AGREEMENTS.—This section shall be applied in a manner consistent with the obligations of the United States under international agreements.

(o) REPORT ON CIVIL NUCLEAR CREDIT PROGRAM.—Not later than 180 days after the date of enactment of this Act, the Secretary shall submit to the appropriate committees of Congress a report that identifies the anticipated funding requirements for the civil nuclear credit program described in section 40323 of the Infrastructure Investment and Jobs Act (42 U.S.C. 18753), taking into account—

(1) the zero-emission nuclear power production credit authorized by section 45U of the Internal Revenue Code of 1986; and

(2) any increased fuel costs associated with the use of domestic fuel that may arise from the implementation of that program.

(p) SUPPLY CHAIN INFRASTRUCTURE AND WORKFORCE CAPACITY BUILDING.—

(1) SUPPLY CHAIN INFRASTRUCTURE.—Section 10781(b)(1) of Public Law 117–167 (commonly known as the "CHIPS and Science Act of 2022") (42 U.S.C. 19351(b)(1)) is amended by striking "and demonstration of advanced nuclear reactors" and inserting "demonstration, and deployment of advanced nuclear reactors and associated supply chain infrastructure".

(2) WORKFORCE CAPACITY BUILDING.—Section 954(b) of the Energy Policy Act of 2005 (42 U.S.C. 16274(b)) is amended—

(A) in the subsection heading, by striking "Graduate";

(B) by striking "graduate" each place it appears;

(C) in paragraph (2)(A), by inserting "community colleges, trade schools, registered apprenticeship programs, pre-apprenticeship programs," after "universities,";

(D) in paragraph (3), by striking "2021 through 2025" and inserting "2023 through 2027";

137 STAT. 804          PUBLIC LAW 118–31—DEC. 22, 2023

(E) by redesignating paragraph (3) as paragraph (4); and

(F) by inserting after paragraph (2) the following:

"(A) FOCUS AREAS.—In carrying out the subprogram under this subsection, the Secretary may implement traineeships in focus areas that, in the determination of the Secretary, are necessary to support the nuclear energy sector in the United States, including—

"(i) research and development;

"(ii) construction and operation;

"(iii) associated supply chains; and

"(iv) workforce training and retraining to support transitioning workforces.".

Deadline.
50 USC 2452
note.

### SEC. 3132. UPDATED FINANCIAL INTEGRATION POLICY.

Not later than 180 days after the date of the enactment of this Act, the Administrator for Nuclear Security shall issue an updated financial integration policy, which shall include the following:

(1) Updated responsibilities for offices of the National Nuclear Security Administration and requirements for management and operating contractors, including contractors at sites that are not sites of the Administration.

(2) Guidance for how offices of the Administration should use common financial data, including guidance requiring that such data be used as the primary source of financial data by program offices, to the extent practicable.

Recommenda-
tions.
Applicability.

(3) Processes recommended by the Government Accountability Office to improve financial integration efforts of the Administration, including an internal process to verify how management and operating contractors crosswalk data from their systems to the appropriate work breakdown structure of the Administration and apply common cost element definitions.

(4) Any other matters the Administrator considers appropriate.

50 USC 2538c
note.

### SEC. 3133. PLAN FOR DOMESTIC ENRICHMENT CAPABILITY TO SATISFY DEPARTMENT OF DEFENSE URANIUM REQUIREMENTS.

(a) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Administrator of the National Nuclear Security Administration shall submit to the congressional defense committees a report that contains a plan to establish a domestic enrichment capability sufficient to meet defense requirements for enriched uranium. Such plan shall include—

(1) a description of defense requirements for enriched uranium expected to be necessary between the date of the enactment of this Act and 2060 to meet the requirements of the Department of Defense, including quantities, material assay, and the dates by which new enrichment is required;

(2) key milestones, steps, and policy decisions required to achieve the domestic uranium enrichment capability;

(3) the dates by which such key milestones are to be achieved;

(4) a funding profile, broken down by project and subproject, for obtaining such capability;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 805

(5) a description of any changes in the requirement of the Department of Defense for highly enriched uranium due to AUKUS; and

(6) any other elements or information the Administrator determines appropriate.

(b) ANNUAL CERTIFICATION REQUIREMENT.—

(1) IN GENERAL.—Not later than February 1 of each year after the year during which the report required by subsection (a) is submitted until the date specified in paragraph (2), the Administrator shall submit to the congressional defense committees a certification that— *(margin: Deadline.)*

(A) the Administration is in compliance with the plan and milestones contained in the report; or

(B) the Administration is not in compliance with such plan or milestones, together with—

(i) a description of the nature of the non-compliance;

(ii) the reasons for the non-compliance; and

(iii) a plan to achieve compliance.

(2) TERMINATION DATE.—No report shall be required under paragraph (1) after the date on which the Administrator certifies to the congressional defense committees that the final key milestone under the plan has been met.

(c) FORM OF REPORTS.—The report under subsection (a) and each annual certification under subsection (b) shall be submitted in unclassified form, but may include a classified annex.

### SEC. 3134. BRIEFINGS ON IMPLEMENTATION OF ENHANCED MISSION DELIVERY INITIATIVE.

*(margin: Recommendations.)*

(a) BRIEFINGS REQUIRED.—Concurrent with the submission of the budget of the President to Congress under section 1105(a) of title 31, United States Code, for each of fiscal years 2025 through 2029, the Administrator for Nuclear Security, acting through the Director for Cost Estimating and Program Evaluation, shall provide to the congressional defense committees a briefing on the status of the implementation of the 18 principal recommendations and associated subelements of such recommendations set forth in the report titled "Evolving the Nuclear Security Enterprise: A Report of the Enhanced Mission Delivery Initiative", published by the National Nuclear Security Administration in September 2022.

(b) ELEMENTS.—Each briefing required by subsection (a) shall address—

(1) the status of the implementation of each recommendation described in subsection (a);

(2) with respect to each recommendation that has been implemented, whether the outcome of such implementation is achieving the desired result;

(3) with respect to each recommendation that has not been implemented, the reason for not implementing such recommendation;

(4) whether additional legislation is required in order to implement a recommendation; and

(5) such other matters as the Administrator considers necessary.

137 STAT. 806          PUBLIC LAW 118–31—DEC. 22, 2023

# TITLE XXXII—DEFENSE NUCLEAR FACILITIES SAFETY BOARD

Sec. 3201. Authorization.

### SEC. 3201. AUTHORIZATION.

There are authorized to be appropriated for fiscal year 2024, $47,230,000 for the operation of the Defense Nuclear Facilities Safety Board under chapter 21 of the Atomic Energy Act of 1954 (42 U.S.C. 2286 et seq.).

# TITLE XXXIV—NAVAL PETROLEUM RESERVES

Sec. 3401. Authorization of appropriations.

### SEC. 3401. AUTHORIZATION OF APPROPRIATIONS.

(a) AMOUNT.—There are hereby authorized to be appropriated to the Secretary of Energy $13,010,000 for fiscal year 2024 for the purpose of carrying out activities under chapter 869 of title 10, United States Code, relating to the naval petroleum reserves.

(b) PERIOD OF AVAILABILITY.—Funds appropriated pursuant to the authorization of appropriations in subsection (a) shall remain available until expended.

# TITLE XXXV—MARITIME ADMINISTRATION

Subtitle A—Maritime Administration

Sec. 3501. Authorization of appropriations for Maritime Administration.

Subtitle B—Maritime Infrastructure

Sec. 3511. Port infrastructure development program eligible projects.
Sec. 3512. Assistance for small inland river and coastal ports and terminals.
Sec. 3513. Port infrastructure development program: eligibility of shore power projects; selection criteria.
Sec. 3514. Codification of existing language; technical amendments.

Subtitle C—Reports

Sec. 3521. Reports on maritime industry, policies, and programs.
Sec. 3522. Reports on availability of used sealift vessels and the scrapping and recycling of imported vessels.
Sec. 3523. Study on foreign ownership and control of marine terminals.
Sec. 3524. Reports to Congress.

Subtitle D—Other Matters

Sec. 3531. Cargoes procured, furnished, or financed by the United States Government.
Sec. 3532. Recapitalization of National Defense Reserve Fleet.
Sec. 3533. United States Merchant Marine Academy and Coast Guard Academy matters; Maritime Administration requirements.
Sec. 3534. Maritime workforce working group.
Sec. 3535. Consideration of life-cycle cost estimates for acquisition and procurement of vessels.
Sec. 3536. Loans for retrofitting to qualify as a vessel of the United States.
Sec. 3537. Accountability for National Maritime Strategy.

# Subtitle A—Maritime Administration

### SEC. 3501. AUTHORIZATION OF APPROPRIATIONS FOR MARITIME ADMINISTRATION.

(a) IN GENERAL.—There are authorized to be appropriated to the Department of Transportation for fiscal year 2024, for programs associated with maintaining the United States Merchant Marine, the following amounts:

(1) For expenses necessary to support the United States Merchant Marine Academy, $198,500,000, of which—

(A) $103,500,000 shall be for Academy operations;

(B) $70,000,000 shall be for United States Merchant Marine Academy capital improvement projects;

(C) $22,000,000 shall be for facilities maintenance and repair and equipment; and

(D) $3,000,000 shall be for training, staffing, retention, recruiting, and contract management for United States Merchant Marine Academy capital improvement projects.

(2) For expenses necessary to support the State maritime academies, $66,580,000, of which—

(A) $4,480,000 shall be for the Student Incentive Payment Program;

(B) $6,000,000 shall be for direct payments for State maritime academies;

(C) $17,600,000 shall be for training ship fuel assistance;

(D) $8,000,000 shall be for offsetting the costs of training ship sharing; and

(E) $30,500,000 shall be for maintenance and repair of State maritime academy training vessels.

(3) For expenses necessary to support the National Security Multi-Mission Vessel program, including funds for construction and necessary expenses to construct shoreside infrastructure to support such vessels, $75,000,000.

(4) For expenses necessary to support Maritime Administration operations and programs, $105,573,000, of which—

(A) $15,000,000 shall be for the maritime environmental and technical assistance under section 50307 of title 46, United States Code;

(B) $15,000,000 shall be for the United States marine highways program, including to make grants authorized under section 55601 of title 46, United States Code;

(C) $74,773,000 shall be for headquarters operations expenses; and

(D) $800,000 shall be for expenses necessary to provide for National Defense Reserve Fleet resiliency.

(5) For expenses necessary for the disposal of obsolete vessels in the National Defense Reserve Fleet of the Maritime Administration, $6,021,000.

(6) For expenses necessary to maintain and preserve a United States flag merchant marine to serve the national security needs of the United States under chapter 531 of title 46, United States Code, $318,000,000.

(7) For expenses necessary for the loan guarantee program authorized under chapter 537 of title 46, United States Code, $43,020,000, of which—

137 STAT. 808        PUBLIC LAW 118–31—DEC. 22, 2023

(A) $40,000,000 may be for the cost (as such term is defined in section 502(5) of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a(5)) of loan guarantees under the program; and

(B) $3,020,000 may be used for administrative expenses relating to loan guarantee commitments under the program.

(8) For expenses necessary to provide assistance to small shipyards and for maritime training programs authorized under section 54101 of title 46, United States Code, $30,000,000.

Determination.

(9) For expenses necessary to implement the port infrastructure development program, as authorized under section 54301 of title 46, United States Code, $500,000,000, to remain available until expended, except that no such funds authorized under this title for this program may be used to provide a grant to purchase fully automated cargo handling equipment that is remotely operated or remotely monitored with or without the exercise of human intervention or control, if the Secretary of Transportation determines such equipment would result in a net loss of jobs within a port or port terminal. If such a determination is made, the data and analysis for such determination shall be reported to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives not later than 3 days after the date of the determination.

Data.
Analysis.
Deadline.

(10) For expenses necessary to implement the development of a national maritime strategy, as required by section 3542 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 3094), $2,000,000, to remain available until expended.

(11) For expenses necessary for the design of a vessel for the National Defense Reserve Fleet, as required by section 3546 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 46 U.S.C. 57100 note), $6,000,000, to remain available until expended.

(b) STUDENT INCENTIVE PAYMENT AGREEMENTS.—Section 51509(b) of title 46, United States Code, is amended—

(1) in paragraph (1), by striking "$8,000" and inserting "$16,000"; and

(2) in paragraph (2), by striking "$32,000" and inserting "$64,000".

# Subtitle B—Maritime Infrastructure

### SEC. 3511. PORT INFRASTRUCTURE DEVELOPMENT PROGRAM ELIGIBLE PROJECTS.

Section 54301(a)(3)(A)(ii) of title 46, United States Code, is amended—

(1) in subclause (III), by striking "or" at the end;

(2) in subclause (IV)(ii), by striking the period and inserting "; or"; and

(3) by adding at the end the following new subclause:

"(V) port and port-related infrastructure that supports seafood and seafood-related businesses,

including the loading and unloading of commercially harvested fish and fish products, seafood processing, cold storage, and other related infrastructure.".

**SEC. 3512. ASSISTANCE FOR SMALL INLAND RIVER AND COASTAL PORTS AND TERMINALS.**

Data.

(a) IN GENERAL.—Section 54301(b) of title 46, United States Code, is amended—

(1) in paragraph (1), by striking "the findings of which are acceptable to the Secretary";

(2) by redesignating paragraphs (2) through (5) as paragraphs (4) through (7), respectively; and

(3) by inserting after paragraph (1) the following new paragraph (2):

"(2) INDEPENDENT AUDIT.—

"(A) IN GENERAL.—If an eligible applicant provides data by an independent audit for purposes of paragraph (1), the Secretary shall use such data to make a tonnage determination if the Secretary determines that it is acceptable to use such data instead of using Corps of Engineers data.

Determination.

"(B) ACCEPTABLE USE OF DATA.—For purposes of subparagraph (A), an acceptable use of data means that the Secretary has determined such data is a reasonable substitute for Army Corps data.

"(C) JUSTIFICATION.—If the Secretary makes a determination pursuant to subparagraph (A) that it is not acceptable to use independent audit data provided by an eligible applicant, the Secretary shall provide the eligible applicant with notification of, and justification for, such determination.

"(3) TONNAGE DETERMINATION.—In making a determination of the average annual tonnage of cargo using Corps of Engineers data for purposes of evaluating an application of an eligible applicant pursuant to paragraph (1), the Secretary shall use data that is specific to the eligible applicant.".

(b) CONFORMING AMENDMENT.—Section 54301(a)(7)(C)(ii) of title 46, United States Code, is amended by striking "subsection (b)(3)(A)(ii)(III)" and inserting "subsection (b)(5)(A)(ii)(III)".

**SEC. 3513. PORT INFRASTRUCTURE DEVELOPMENT PROGRAM: ELIGIBILITY OF SHORE POWER PROJECTS; SELECTION CRITERIA.**

(a) ELIGIBILITY OF SHORE POWER PROJECTS.—

(1) IN GENERAL.—In making port infrastructure development grants under section 54301 of title 46, United States Code, for fiscal year 2024, the Secretary of Transportation shall treat a project described in paragraph (2) as—

(A) having met the requirements of paragraphs (1) and (6)(A)(i) of section 54301(a) of such title; and

(B) being an eligible project under section 54301(a)(3) of such title.

(2) PROJECT DESCRIBED.—A project described in this paragraph is a project to provide shore power at a port that services both of the following:

(A) Passenger vessels described in section 3507(k) of title 46, United States Code.

(B) Vessels that move goods or freight.

(b) SELECTION CRITERIA.—Section 54301(a)(6) of title 46, United States Code, is amended—

(1) in subparagraph (A)(ii), by inserting "(except in the case of a project described under subparagraph (C))" after "effective";

(2) in subparagraph (B)(ii), by inserting "(except in the case of a project described under subparagraph (C))" after "as applicable"; and

(3) by adding at the end, the following:

"(C) NONCONTIGUOUS STATES AND TERRITORIES.—The requirements under subparagraphs (A)(ii) and (B)(ii) shall not apply in the case of a project described in paragraph (3) in a noncontiguous State or territory.".

### SEC. 3514. CODIFICATION OF EXISTING LANGUAGE; TECHNICAL AMENDMENTS.

(a) PORT INFRASTRUCTURE DEVELOPMENT PROGRAM.—

(1) STRATEGIC SEAPORTS.—

(A) IN GENERAL.—Section 3505(a)(1) of the National Defense Authorization Act for Fiscal Year 2014 (Public Law 113–66; 46 U.S.C. 50302 note) is—

(i) transferred to appear after section 54301(a)(6)(B) of title 46, United States Code;

(ii) redesignated as subparagraph (C); and

46 USC 54301.

(iii) amended by striking "Under the port infrastructure development grant program established under section 50302(c) of title 46, United States Code" and inserting "In selecting projects described in paragraph (3)".

46 USC 50302 note.

(B) STRATEGIC SEAPORT DEFINED.—Section 3505(a)(2) of such Act is transferred to appear after section 54301(a)(12)(D) of title 46, United States Code, and redesignated as subparagraph (E).

(C) REPEAL.—Section 3505(a) of such Act is repealed.

(2) DETERMINATION OF EFFECTIVENESS.—Section 54301(b)(5)(B) of title 46, United States Code, is amended by striking "subsection (c)(6)(A)" and inserting "subsection (a)(6)(A)".

(b) TRANSFER OF IMPROVEMENTS TO PROCESS FOR WAIVING NAVIGATION AND INSPECTION LAWS.—Section 3502(b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 is—

46 USC 56101 note.

(1) amended—

(A) by striking "For fiscal year 2020 and each subsequent fiscal year, the" and inserting "The"; and

(B) by striking "section 56101 of title 46, United States Code," and inserting "this section";

46 USC 56101 note.

(2) transferred to appear after section 56101(e) of title 46, United States Code; and

(3) redesignated as subsection (f).

46 USC prec. 50301.

(c) CHAPTER ANALYSIS.—The analysis for chapter 503 of title 46, United States Code, is amended in the item relating to section 50308 by striking "**Port development; maritime transportation system emergency relief program**" and inserting "**Maritime transportation system emergency relief program**".

(d) VESSEL OPERATIONS REVOLVING FUND.—Section 50301(b) of title 46, United States Code, is amended by striking "(50 App.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 811

U.S.C. 1291(a), (c), 1293(c), 1294)" and inserting "(50 U.S.C. 4701(a), (c), 4703(c), 4704)".

(e) MARITIME TRANSPORTATION SYSTEM EMERGENCY RELIEF PROGRAM.—Section 50308 of title 46, United States Code, is amended—

(1) in subsection (a)(2)(B), by striking "Federal Emergency Management Administration" and inserting "Federal Emergency Management Agency"; and

(2) in subsection (j)(4)(A), by striking "Federal Emergency Management Administration" and inserting "Federal Emergency Management Agency".

(f) MARINE HIGHWAYS.—The analysis for subtitle V of title 46, United States Code, is amended in the item relating to chapter 556 by striking "**SHORT SEA TRANSPORTATION**" and inserting "**MARINE HIGHWAYS**".

46 USC prec. 50101.

(g) CHAPTER 537.—The analysis for chapter 537 of title 46, United States Code, is amended by striking the item relating to section 53703 and inserting the following:

46 USC prec. 53701.

"53703. Application and administration.".

(h) CHAPTER 541.—The analysis for chapter 541 of title 46, United States Code, is amended to read as follows:

46 USC prec. 54101.

"CHAPTER 541—MISCELLANEOUS

"Sec.
"54101. Assistance for small shipyards.".

(i) TECHICAL AMENDMENT.—Section 11328(b) of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended by striking "Maritime" and inserting "Marine".

33 USC 1958.

(j) NATIONAL DEFENSE RESERVE FLEET OBSOLETE VESSEL.—

(1) DEFINITION OF OBSOLETE VESSELS.—Chapter 571 of title 46, United States Code, is amended—

(A) by redesignating section 57111 as section 57110; and

(B) by adding at the end the following:

**"§ 57111. Definition of obsolete vessel**

46 USC 57111.

"In this chapter, the term 'obsolete vessel' means a vessel that—

"(1) is or will be in the custody and control of the Maritime Administration for purposes of disposing of the vessel; and

"(2) has been determined by the Secretary of Transportation to be of insufficient value, with respect to the programs of the Maritime Administration, to warrant—

"(A) preserving for future use or spare parts harvesting; or

"(B) retaining in the National Defense Reserve Fleet.".

(2) NATIONAL DEFENSE RESERVE FLEET VESSEL STATUS.—Section 57100(g) of title 46, United States Code, is amended by striking "of insufficient value to remain in the National Defense Reserve Fleet" and inserting "an obsolete vessel".

(3) PLACEMENT OF VESSELS IN NATIONAL DEFENSE RESERVE FLEET.—Section 57101(b) of title 46, United States Code, is amended by inserting ", or section 308704 of title 54" before the period at the end.

(4) DISPOSITION OF VESSELS.—Section 57102 of title 46, United States Code, is amended—

137 STAT. 812          PUBLIC LAW 118–31—DEC. 22, 2023

(A) in the heading, by striking "**not worth preserving**";

(B) in subsection (a), by striking "owned by the Maritime Administration" and all that follows through the period at the end and inserting "is an obsolete vessel, the Secretary may dispose of such vessel (by sale or by purchase of disposal services).''; and

(C) in subsection (b), by striking "on the basis of competitive sealed bids, after an appraisal and due advertisement" and inserting "on a best value basis".

(5) DONATION OF VESSELS IN THE NATIONAL DEFENSE RESERVE FLEET.—Section 57103 of title 46, United States Code, is amended—

(A) in the heading, by striking "**nonretention**"; and

(B) in subsection (a), by striking "of insufficient value to warrant its further preservation".

(6) TECHNICAL AND CONFORMING AMENDMENTS.—The analysis for chapter 571 of title 46, United States Code, is amended—

46 USC prec. 57100.

(A) by striking the item relating to section 57102 and inserting the following:

"Disposition of vessels.";

(B) by striking the item relating to section 57103 and inserting the following:

"Donation of vessels in the National Defense Reserve Fleet.";

(C) by redesignating the item relating to section 57111 as the item relating to section 57110; and

(D) by adding at the end the following:

"57111. Definition of obsolete vessel.".

(k) DEEPWATER PORTS.—

(1) DECLARATION OF POLICY.—Section 2 of the Deepwater Port Act of 1974 (33 U.S.C. 1501) is amended—

(A) in subsection (a)—

(i) in the matter preceding paragraph (1), by striking "(a) It" and all that follows through "to—" and inserting the following:

"(a) PURPOSES.—The purposes of this Act are—";

(ii) in each of paragraphs (1) through (6)—

(I) by inserting "to" after the paragraph designation; and

(II) by indenting the paragraphs appropriately;

(iii) in paragraph (2), by striking "such ports" and inserting "deepwater ports";

(iv) in paragraph (5)—

(I) by striking "continental shelf" and inserting "Continental Shelf"; and

(II) by striking "attendant thereto" and inserting "associated with that traffic"; and

(v) in paragraph (6), by striking "continental shelf" each place it appears and inserting "Continental Shelf"; and

(B) in subsection (b), by striking the subsection designation and all that follows through "to affect" and inserting the following:

"(b) EFFECT OF ACT.—Nothing in this Act affects".

(2) DEFINITIONS.—Section 3 of the Deepwater Port Act of 1974 (33 U.S.C. 1502) is amended—

(A) by striking the section designation and heading and all that follows through "the term—" in the matter preceding paragraph (1) and inserting the following:

## "SEC. 3. DEFINITIONS.

"In this Act:";

(B) in each of paragraphs (1) through (17)—

(i) by inserting "The term" after the paragraph designation;

(ii) by inserting a paragraph heading, the text of which comprises the term defined in that paragraph; and

(iii) by striking the semicolon at the end of the paragraph and inserting a period;

(C) in paragraph (2), by striking "section 5(c)(2)(A) or (B)" and inserting "subparagraph (A) or (B) of section 5(c)(2)";

(D) in each of paragraphs (18) and (19)—

(i) by inserting "The term" after the paragraph designation; and

(ii) by inserting a paragraph heading, the text of which comprises the term defined in that paragraph; and

(E) in paragraph (18), by striking "; and" at the end and inserting a period.

(3) LICENSES FOR OWNERSHIP, CONSTRUCTION, AND OPERATION OF DEEPWATER PORTS.—Section 4 of the Deepwater Port Act of 1974 (33 U.S.C. 1503) is amended—

(A) in subsection (c)—

(i) in each of paragraphs (1) through (7), by striking "he" after the paragraph designation and inserting "the Secretary";

(ii) in paragraph (1), by adding a semicolon at the end; and

(iii) in paragraph (8)—

(I) by striking "the adjacent" and inserting "each adjacent";

(II) by striking "of States, pursuant to section 9 of this Act,";

(III) by inserting "the" before "issuance"; and

(IV) by inserting "pursuant to section 9(b)(1), if applicable" before "; and";

(B) in subsection (e)—

(i) in paragraph (1), in the second sentence—

(I) by striking "requirements of this title" and inserting "requirements of this Act";

(II) by striking "section 10(a) of this title" and inserting "section 10(a)"; and

(III) by striking the semicolon and inserting a comma;

(ii) in paragraph (2)(B), by striking "he will comply" and inserting "the licensee or transferee will comply"; and

(iii) in paragraph (3)—

(I) in the first sentence, by striking "he deems necessary to assure" and inserting "the Secretary determines to be necessary to ensure";

(II) in the second sentence, by striking "he finds" and inserting "the Secretary finds"; and

(III) in the third sentence—

(aa) by striking "he determines" and inserting "the Secretary determines";

(bb) by striking "(67 Stat. 462)" and inserting "(43 U.S.C. 1331 et seq.)"; and

(cc) by striking "terms" and all that follows through the period at the end and inserting "terms of that Act."; and

(C) in subsection (f), by striking "this title" and inserting "this Act".

(4) PROCEDURE.—Section 5 of the Deepwater Port Act of 1974 (33 U.S.C. 1504) is amended—

(A) in subsection (c)—

(i) by striking the subsection designation and all that follows through the end of paragraph (1) and inserting the following:

"(c) APPLICATIONS.—

"(1) REQUIREMENTS.—

Plan.

"(A) IN GENERAL.—Each person that submits to the Secretary an application shall include in the application a detailed plan that contains all information required under paragraph (2).

Deadlines.
Determinations.

"(B) ACTION BY SECRETARY.—Not later than 21 days after the date of receipt of an application, the Secretary shall—

"(i) determine whether the application contains all information required under paragraph (2); and

Federal Register, publication.

"(ii)(I) if the Secretary determines that such information is contained in the application, not later than 5 days after making the determination, publish in the Federal Register—

Notice.
Summary.

"(aa) a notice of the application; and
"(bb) a summary of the plans; or
"(II) if the Secretary determines that all required information is not contained in the application—

Notification.

"(aa) notify the applicant of the applicable deficiencies; and
"(bb) take no further action with respect to the application until those deficiencies have been remedied.

"(C) APPLICABILITY.—On publication of a notice relating to an application under subparagraph (B)(ii)(I), the Secretary shall be subject to subsection (f)."; and

(ii) in paragraph (2)—

(I) by striking "of this paragraph" each place it appears;

(II) by striking the paragraph designation and all that follows through "to—" in the matter preceding subparagraph (A) and inserting the following:

"(2) INCLUSIONS.—Each application shall include such financial, technical, and other information as the Secretary determines to be necessary or appropriate, including—"; and

(III) by indenting subparagraphs (A) through (M) appropriately;

(B) in subsection (g), in the last sentence, by striking "section 5(c) of this Act" and inserting "subsection (c)";

(C) in subsection (h)—

(i) by striking "(h)(1) Each" and inserting the following:

"(h) FEES.—

"(1) REQUIREMENT.—

"(A) IN GENERAL.—Each";

(ii) in subparagraph (A) of paragraph (1) (as so designated), in the second sentence, by striking "In addition" and inserting the following:

"(B) REIMBURSEMENT.—In addition to a fee under subparagraph (A)"; and

(iii) in paragraph (2)—

(I) by striking the last sentence;

(II) by striking "(2) Notwithstanding" and inserting the following:

"(2) USAGE FEES.—

"(A) DEFINITION OF DIRECTLY RELATED LAND-BASED FACILITY.—In this paragraph, the term 'directly related land-based facility', with respect to a deepwater port facility, means an onshore tank farm and any pipelines connecting the tank farm to the deepwater port facility.

"(B) AUTHORIZATION.—Notwithstanding"; and

(III) in subparagraph (B) (as so designated)—

(aa) in the fourth sentence, by striking "Such fees" and inserting the following:

"(E) APPROVAL.—A fee established under this paragraph";

(bb) in the third sentence—

(AA) by striking "such" each place it appears and inserting "the applicable"; and

(BB) by striking "Fees under" and inserting the following:

"(D) AMOUNT.—The amount of a fee established under"; and

(cc) in the second sentence—

(AA) by striking "such" each place it appears and inserting "the applicable"; and

(BB) by striking "Fees may be fixed under authority of this paragraph" and inserting the following:

"(C) TREATMENT.—A fee may be established pursuant to this paragraph"; and

(iv) in paragraph (3)—

(I) by striking "Outer" and inserting "outer"; and

(II) by striking "(3) A licensee" and inserting the following:

"(3) RENTAL PAYMENT.—A licensee";

137 STAT. 816          PUBLIC LAW 118–31—DEC. 22, 2023

(D) in subsection (i)—
    (i) in paragraph (2)—
        (I) in subparagraph (A)—
            (aa) by inserting "First," after the subparagraph designation; and
            (bb) by striking the semicolon at the end and inserting a period;
        (II) in subparagraph (B)—
            (aa) by inserting "Second," after the subparagraph designation; and
            (bb) by striking the semicolon at the end and inserting a period; and
        (III) in subparagraph (C), by inserting "Third," after the subparagraph designation;
    (ii) in paragraph (3)—
        (I) in subparagraph (C), by striking "(C) any" and inserting the following:
"(D) Any";
        (II) in subparagraph (B)—
            (aa) by striking "; and" at the end and inserting a period; and
            (bb) by striking "(B) any" and inserting the following:
"(C) Any";
        (III) in subparagraph (A)—
            (aa) by striking "section 6 of this Act;" and inserting "section 6."; and
            (bb) by striking "(A) the degree" and inserting the following:
"(A) The degree"; and
        (IV) by inserting after subparagraph (A) the following:

*Assessment.*

"(B) National security, including an assessment of the implications for the national security of the United States or an allied country (as that term is defined in section 2350f(d)(1) of title 10, United States Code) of the United States."; and
    (iii) in paragraph (4)—
        (I) by striking the second sentence and inserting the following:
"(B) EFFECT OF FAILURE TO DETERMINE.—If the Secretary fails to approve or deny an application for a deepwater port for natural gas by the applicable deadline under subparagraph (A), the reporting requirements under paragraphs (1), (2), and (3) shall not apply to the application."; and
        (II) in the matter preceding subparagraph (B) (as so added), by striking "(4) The Secretary" and inserting the following:
"(4) APPLICATIONS FOR DEEPWATER PORTS FOR NATURAL GAS.—
    "(A) DEADLINE FOR DETERMINATION.—The Secretary";
    (E) in subsection (j)(1), by striking "of Transportation"; and
    (F) by adding at the end the following:
"(k) TRANSPARENCY IN ISSUANCE OF LICENSES AND PERMITS.—

PUBLIC LAW 118–31—DEC. 22, 2023     137 STAT. 817

"(1) DEFINITION OF APPLICABLE DEADLINE.—In this subsection, the term 'applicable deadline', with respect to an applicant, means the deadline or date applicable to the applicant under any of the following:

"(A) Section 4(c)(6).

"(B) Section 4(d)(3).

"(C) Subsection (c)(1)(B) (including clause (ii)(I) of that subsection).

"(D) Subsection (d)(3).

"(E) Paragraph (1) or (2) of subsection (e).

"(F) Subsection (g).

"(G) Paragraph (1) or (4)(A) of subsection (i).

"(2) SUSPENSIONS AND DELAYS.—If the Secretary suspends or delays an applicable deadline, the Secretary shall submit to the applicant, and publish in the Federal Register, a written statement— <span style="float:right">*Federal Register, publication.*</span>

"(A) describing the reasons for the suspension or delay;

"(B) describing and requesting any information necessary to issue the applicable license or permit and the status of applicable license or permit application at the lead agency and any cooperating agencies; and

"(C) identifying the applicable deadline with respect to the statement.

"(3) APPLICANT RIGHTS TO TECHNICAL ASSISTANCE.—

"(A) IN GENERAL.—An applicant that receives a statement under paragraph (2) may submit to the Secretary a request for a meeting with appropriate personnel of the Department of Transportation and representatives of each cooperating Federal agency, as appropriate, determined by the Secretary to be relevant with respect to the application, including such officials as are appropriate, who shall provide technical assistance, status, process, and timeline updates and additional information as necessary. <span style="float:right">*Updates.*</span>

"(B) TIMING.—A meeting requested under clause (i) shall be held not later than 30 days after the date on which the Secretary receives the request under that clause.

"(4) REQUIREMENTS.—On receipt of a request under paragraph (3)(A), and not less frequently than once every 30 days thereafter until the date on which the application process is no longer suspended or delayed, the Secretary shall submit a notice of the delay, including a description of the time elapsed since the applicable deadline and the nature and circumstances of the applicable suspension or delay, to— <span style="float:right">*Time period.*</span>

"(A) the Committee on Commerce, Science, and Transportation of the Senate; and

"(B) the Committee on Transportation and Infrastructure of the House of Representatives.

"(5) BRIEFING.—If the Secretary suspends or delays an applicable deadline, not later than 120 days after that applicable deadline, and not less frequently than once every 120 days thereafter until the date on which the application process is no longer suspended or delayed, the Secretary (or a designee of the Secretary) shall provide a briefing regarding the time elapsed since the applicable deadline and the nature and circumstances of the applicable suspension or delay to— <span style="float:right">*Deadline. Time period.*</span>

"(A) the Committee on Commerce, Science, and Transportation of the Senate; and

"(B) the Committee on Transportation and Infrastructure of the House of Representatives.".

(5) REVIEW CRITERIA.—Section 6 of the Deepwater Port Act of 1974 (33 U.S.C. 1505) is amended—

(A) in subsection (a), by striking "(a) The Secretary" and inserting the following:

"(a) ESTABLISHMENT.—The Secretary";

(B) in subsection (b)—

(i) by striking "of this section"; and

(ii) by striking "(b) The Secretary" and inserting the following:

"(b) REVIEW AND REVISION.—The Secretary"; and

(C) in subsection (c)—

(i) by striking "concurrently with the regulations in section 5(a) of this Act and in accordance with the provisions of that subsection" and inserting "concurrently with the regulations promulgated pursuant to section 5(a) and in accordance with that section"; and

(ii) by striking "(c) Criteria" and inserting the following:

"(c) REQUIREMENT.—The criteria".

(6) ADJACENT COASTAL STATES.—Section 9 of the Deepwater Port Act of 1974 (33 U.S.C. 1508) is amended—

(A) by striking subsection (a) and inserting the following:

"(a) DESIGNATION.—In issuing a notice relating to an application for a deepwater port under section 5(c)(1)(B)(ii)(I), the Secretary shall designate as an adjacent coastal State, with respect to the deepwater port, any coastal State that would be—

"(1) directly connected by pipeline to that deepwater port; or

"(2) located within 15 miles of that deepwater port."; and

(B) in subsection (b)—

(i) by striking "(b)(1) Not later than 10 days after the designation of adjacent coastal States pursuant to this Act" and inserting the following:

"(b) INPUT FROM ADJACENT COASTAL STATES AND OTHER INTERESTED STATES.—

"(1) SUBMISSION OF APPLICATIONS TO GOVERNORS FOR APPROVAL.—

Deadline.

"(A) IN GENERAL.—Not later than 10 days after the date on which the Secretary designates adjacent coastal States under subsection (a) with respect to a deepwater port proposed in an application";

(ii) in paragraph (1)(A) (as so designated)—

(I) in the fourth sentence, by striking "If the Governor" and inserting the following:

"(D) INCONSISTENCY WITH CERTAIN STATE PROGRAMS.— If the Governor of an adjacent coastal State";

(II) in the third sentence, by striking "If the Governor fails to transmit his" and inserting the following:

"(C) PRESUMED APPROVAL.—If the Governor of an adjacent coastal State fails to transmit a required"; and

(III) in the second sentence, by striking "The Secretary" and inserting the following:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 819

"(B) PROHIBITION.—The Secretary"; and
          (iii) in paragraph (2)—
                    (I) by striking "(2) Any other interested State"
          and inserting the following:
"(2) OTHER INTERESTED STATES.—Any other State with an interest relating to a deepwater port proposed in an application"; and
                    (II) by striking "a deepwater port" and inserting "the deepwater port".

## Subtitle C—Reports

**SEC. 3521. REPORTS ON MARITIME INDUSTRY, POLICIES, AND PROGRAMS.**

(a) REPORT ON ADMINISTRATION OF PROGRAMS.—
          (1) IN GENERAL.—Chapter 553 of title 46, United States Code, is amended by inserting before section 55302 the following:

**"§ 55301. Report on administration of programs by other Federal departments and agencies**

46 USC 55301.

"(a) IN GENERAL.—The Administrator of the Maritime Administration shall annually submit to Congress a report on the administration by—
          "(1) the Department of Defense of section 2631 of title 10; and
          "(2) other Federal departments and agencies of programs the Administrator determines are subject to section 55305 of this title.
"(b) CONTENTS.—Each annual report required under subsection (a) shall include, for each Federal department or agency that administers a program covered by the report—
          "(1) the gross tonnage of cargo (equipment, materials, or agricultural products), expressed by type of cargo, transported on United States flag vessels as compared to on foreign vessels; and
          "(2) the total number of United States flag vessels and total number of foreign vessels contracted by each department or agency.
"(c) AGENCY REPORTING REQUIREMENTS.—Not later than January 31 of each year, the head of each Federal department or agency that administers a program covered by a report required under subsection (a) shall submit to the Administrator of the Maritime Administration the information described in subsection (b) for that department or agency.".
          (2) CLERICAL AMENDMENT.—The analysis for chapter 553 of title 46, United States Code, is amended by inserting before the item relating to section 55302 the following new item:

46 USC
prec. 55301.

"55301. Report on administration of programs by other Federal departments and agencies.".

(b) REPORT ON SURVEY OF UNITED STATES SHIPBUILDING AND REPAIR FACILITIES.—
          (1) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, and annually thereafter for each of the subsequent four fiscal years, the Secretary of Transportation, in consultation with the Secretary of Defense, the

Administrator of the Maritime Administration, and the Commandant of the Coast Guard, shall submit to the appropriate committees of Congress a report that includes a survey of United States shipbuilding and repair facilities.

(2) CONTENTS.—Each report required under paragraph (1) shall include an identification of all requirements for a survey of United States shipbuilding and repair facilities in accordance with sections 50102 and 50103 of title 46, United States Code, and section 502(f) of the Merchant Marine Act of 1936 (46 U.S.C. 53101 note).

(3) PUBLIC AVAILABILITY.—At the time the Secretary of Transportation submits to the appropriate congressional committees a report under paragraph (1), the Secretary shall make the report, and all report data, publicly available on an appropriate website.

(4) DEFINITION.—In this subsection, the term "appropriate congressional committees" means—

(A) the Committee on Commerce, Science, and Transportation of the Senate; and

(B) the Committee on Transportation and Infrastructure and the Committee on Armed Services of the House of Representatives.

(c) REPORT ON PORT PREFERENCES FOR US-FLAG VESSELS.— Not later than one year after the date of the enactment of this Act, the Administrator of the Maritime Administration shall submit to Congress a report on the preference, if any, afforded by each port authority or marine terminal operator, as applicable, to vessels documented under the laws of the United States, including such vessels—

(1) operated by an armed force (as such term is defined in section 101(4) of title 10, United States Code);

(2) participating in the Maritime Security Program or the Emergency Preparedness Program under chapter 531 of title 46, United States Code, the Cable Security Fleet under chapter 532 of such title, the Tanker Security Fleet under chapter 534 of such title, or the National Defense Reserve Fleet under section 57100 of such title; or

(3) with a coastwise endorsement under chapter 121 of title 46, United States Code.

(d) REPORT ON INCREASING EFFECTIVENESS OF MARINE HIGHWAYS.—

(1) IN GENERAL.—Not later than one year after the date of the enactment of this Act, the Administrator of the Maritime Administration shall complete and make publicly available on an appropriate website a study that identifies opportunities for, and barriers to, increasing the effectiveness of marine highways designated under section 55601 of title 46, United States Code, in addressing two or more of the components described in clauses (i), (ii), and (iv) of subparagraphs (A) and subparagraph (B) of section 50307(a)(2) of title 46, United States Code.

(2) PILOT PROGRAM.—Beginning on the date that is 120 days after the date of the completion of the study required under paragraph (1), the Administrator shall carry out a one-year pilot program under which the Administrator shall select one marine highway project and implement the findings of the study with respect to that project.

46 USC 55601 note.

Public information. Web posting. Study.

Effective date.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 821

(3) FINAL REPORT.—Not later than 90 days after the completion of the pilot program under paragraph (3), the Administrator shall provide to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives, a briefing on the lessons learned from the pilot program, any recommendations based on feedback from maritime stakeholders, States, Indian Tribes, nonprofit organizations, and other stakeholders, and recommendations for establishing future marine highways in the United States.

Briefing.
Recommendations.

(e) STUDY ON AVAILABILITY OF FEDERAL STUDENT AID FOR MARINER TRAINING.—

(1) IN GENERAL.—The Comptroller General of the United States shall conduct a study of the availability of Federal financial assistance for licensed and unlicensed mariners, as applicable, for mariner training and the effectiveness of coordination with respect to such assistance of—

(A) Federal agencies;
(B) Federal agencies and States; and
(C) Federal agencies and Indian Tribes.

(2) MATTERS EVALUATED.—The study conducted under paragraph (1) shall include an evaluation of the following:

(A) The availability of Federal financial assistance for mariner training provided by the Department of Education, the Department of Veterans Affairs, the Department of Labor, the Maritime Administration, or other agencies to the full range of prospective mariners, and an identification of any gaps in financial assistance.

(B) The extent to which the Maritime Administration has effectively coordinated with the Department of Education, the Department of Veterans Affairs, the Department of Labor, or other relevant Federal agencies to align Federal financial assistance with the education and training needs of mariners.

(C) The extent to which the Maritime Administration has effectively communicated with prospective and current mariners about the availability of Federal financial assistance to facilitate their training and education needs.

(3) SCOPE.—The study conducted under paragraph (1) shall include an examination of the availability of Federal financial assistance, and the service obligations related to such financial assistance, if applicable, at mariner training institutions within the United States, including for students attending, or participating in—

Examination.

(A) the United States Merchant Marine Academy;
(B) a State maritime academy;
(C) an institution described in subparagraphs (B) and (C) of section 51706(c)(1) of title 46, United States Code;
(D) an Indian Tribe apprenticeship or other training program; or
(E) an educational program carried out by a Federal agency.

(4) REPORT.—Not later than two years after the date of the enactment of this Act, the Comptroller General shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure and the Committee on Armed Services of the House

of Representatives a report containing the findings of the Comptroller General with respect to the study conducted under paragraph (1).

### SEC. 3522. REPORTS ON AVAILABILITY OF USED SEALIFT VESSELS AND THE SCRAPPING AND RECYCLING OF IMPORTED VESSELS.

Market analysis.

(a) REPORT ON AVAILABILITY OF USED SEALIFT VESSELS.—
(1) IN GENERAL.—The Commander of the United States Transportation Command, in consultation with the Administrator of the Maritime Administration, shall conduct a market analysis to determine the availability of used sealift vessels that—
(A) meet military requirements; and

Time period.

(B) may be purchased using the authority provided under section 2218 of title 10, United States Code, within the period of five years following the date of the enactment of this Act.
(2) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Commander of the United States Transportation Command shall submit to the congressional defense committees and the Committee on Commerce, Science, and Transportation of the Senate a report on the results of the market analysis conducted under paragraph (1).
(b) STUDY ON THE SCRAPPING AND RECYCLING OF IMPORTED VESSELS.—
(1) IN GENERAL.—The Administrator of the Maritime Administration and the Deputy Under Secretary for International Affairs of the Department of Labor shall jointly conduct a study to review domestic United States ship scrapping capacity and capability.
(2) ELEMENTS.—The study required under paragraph (1) shall include the following:

Assessments.

(A) An assessment of—
(i) the capabilities of United States shipyards to recycle and dispose of domestic and foreign vessels and their component parts;
(ii) the capacity of United States shipyards to complete ship recycling and disposal of domestic and foreign vessels and their component parts and related activities; and
(iii) the infrastructure, regulatory, economic, or other barriers to domestic ship recycling and disposal of vessels of the United States (as defined in section 116 of title 46, United States Code) and foreign vessels and their component parts.
(B) An identification of—
(i) the estimated number of vessels over 1,000 tons that were recycled or scrapped globally each year for the ten-year period preceding the date of the enactment of this Act;
(ii) the country in which such vessels were scrapped or recycled;
(iii) the component parts of a vessel that require additional processing after ship recycling;
(iv) best practices and methods used globally, including in the United States, at the time of the

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 823

study, to recycle or dispose of the components described in clause (iii); and

(v) for the 15 foreign countries with the highest global market share for ship recycling and disposal, and for any countries with documented labor exploitation or environmental concerns (as determined by the Administrator and the Deputy Under Secretary)—

(I) the practices used at the time of the study for ship recycling and disposal, including for the component parts described in clause (iii); and

(II) to the extent such information is available, environmental and labor practices used in such recycling and disposal.

(3) REPORT.—Not later than one year after the date of the enactment of this Act, the Administrator shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives a report containing the findings of the study required under paragraph (1).

(4) DEFINITIONS OF COMPONENT PARTS.—In this subsection, the term "component parts" means an item or items on a ship that require additional processing after removal from the ship, such as cable insulation, rubber and felt gaskets, electronic equipment, caulking, or paint.

## SEC. 3523. STUDY ON FOREIGN OWNERSHIP AND CONTROL OF MARINE TERMINALS.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of Transportation, in consultation with the Secretary of Commerce, shall seek to enter into an agreement with a federally funded research and development center under which the center shall evaluate how foreign state-owned enterprises with leases, long term concessions, partial ownership, or ownership of marine terminals (including marine terminal operators) at the 15 largest United States container ports affect, or could affect, United States national and economic security.

Contracts.
Evaluation.

(b) CONTENTS.—An agreement entered into pursuant to subsection (a) shall provide that the center shall—

(1) consider—

(A) foreign ownership or state-owned enterprises with leases, long-term concessions, partial ownership, or ownership of marine terminals (including marine terminal operators) at 15 largest United States container ports over the 30-year period preceding the date of enactment of this Act;

Time period.

(B) instances of ownership in individual marine terminals and cumulative ownership by Chinese or Russian entities, state-owned enterprises, or nationals;

(C) instances of ownership in individual marine terminals and partial or complete ownership by any foreign entity;

(D) the amount of Federal funds that have been distributed to ports and marine terminals that are wholly or partially foreign-owned, including Chinese and Russian state-owned enterprises;

(E) where any stake in foreign ownership, or other vectors of control, exists (including any level of equity

137 STAT. 824          PUBLIC LAW 118–31—DEC. 22, 2023

stake in joint ventures with United States or foreign marine terminal operators), including Chinese or Russian state-owned enterprises, a detailed description of foreign operational control, including both affirmative and negative control; and

Time period.

(F) the degree to which transactions for leases, long-term concessions, partial ownership, or ownership of marine terminals referred to in subparagraph (A) were considered covered transactions by the Committee on Foreign Investment in the United States and subsequently subject to review during the 30-year period preceding the date of the enactment of this Act; and

Recommenda-
tions.

(2) offer recommendations on—

(A) policies by ports and marine terminal operators with respect to foreign ownership or control to prevent any degree of threats to United States national security and economic security;

(B) whether foreign ownership, a positional relationship, or state-owned enterprises with leases, long term concessions, partial ownership, or ownership of marine terminals (including marine terminal operators) affords the foreign entity access to operational technology and information unique to the United States and otherwise unavailable;

(C) whether foreign ownership or state-owned enterprises with leases, long term concessions, partial ownership, or ownership of marine terminals (including marine terminal operators) has or could affect the supply chain and policies related to the prioritization of certain cargoes; and

(D) legislative or other policy changes needed to secure and advance United States national and economic security of the United States.

(c) REPORT.—Not later than one year after the initiation of an evaluation carried out pursuant to an agreement entered into under subsection (a), the Secretary of Transportation shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives a report containing the results of such evaluation.

(d) FORM.—The report required under subsection (c) shall be submitted in unclassified form, but may include a classified annex.

**SEC. 3524. REPORTS TO CONGRESS.**

Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to Congress a report on the implementation by the Department of Defense of the amendments to section 2631 of title 10, United States Code, made by section 1024 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283).

## Subtitle D—Other Matters

### SEC. 3531. CARGOES PROCURED, FURNISHED, OR FINANCED BY THE UNITED STATES GOVERNMENT.

(a) IN GENERAL.—Section 55305 of title 46, United States Code, is amended—

(1) by striking subsection (a);

(2) by redesignating—

(A) subsection (b) as subsection (a); and

(B) subsections (c), (d), and (e), as subsections (d), (e), and (f), respectively;

(3) in subsection (a), as so redesignated, by striking "privately-owned commercial vessels of the United States," and inserting "privately-owned commercial vessels of the United States, as provided under subsection (b),";

(4) by inserting after subsection (a), as so redesignated, the following:

"(b) ELIGIBLE VESSELS.—To be eligible to carry cargo as provided under subsection (a), a privately-owned commercial vessel shall be documented under the laws of the United States— *Time periods.*

"(1) for not less than three years; or

"(2) after January 1, 2030, for less than three years, if *Effective date.* the vessel owner signs an agreement with the Secretary providing that—

"(A) the vessel shall remain documented under the laws of the United States for not less than three years; and

"(B) the vessel owner shall, upon request of the Secretary, agree to enroll the vessel in an emergency preparedness agreement or voluntary agreement authorized under section 708 of the Defense Production Act of 1950 (50 U.S.C. 4558) and shall ensure the vessel remains so enrolled until the vessel ceases to be documented under the laws of the United States.

"(c) VIOLATION OF AGREEMENT.—A vessel under an agreement executed pursuant to subsection (b)(2) may be seized by, and forfeited to, the United States if, in violation of that agreement—

"(1) the vessel owner places the vessel under foreign registry; or

"(2) a person operates the vessel under the authority of a foreign country."; and

(5) by striking subsection (d), as so redesignated, and inserting the following:

"(d) WAIVERS.—(1) Notwithstanding any other provision of law, *President.* when the President, the Secretary of Defense, or the Secretary *Determination.* of Transportation declares the existence of an emergency justifying *Time periods.* a temporary waiver of this section or section 55314 of this title, the President, the Secretary of Defense, or the Secretary of Transportation, following a determination by the Maritime Administrator, acting in the Administrator's capacity as Director, National Shipping Authority, of the non-availability of qualified United States flag capacity at fair and reasonable rates for commercial vessels of the United States to meet the requirements of this section or section 55314 of this title, may waive compliance with such section to the extent, in the manner, and on the terms the Maritime Administrator, acting in such capacity, prescribes, and

no other waivers of the requirements of this section or section 55314 of this title shall be authorized.

"(2)(A) Subject to subparagraphs (B) and (C), a waiver issued under this subsection shall be for a period of not more than 60 days.

Extension.

"(B) Upon termination of the period of a waiver issued under this subsection, the Maritime Administrator may extend the waiver for an additional period of not more than 30 days, if the Maritime Administrator makes the determinations described in paragraph (1).

"(C) The aggregate duration of the period of all waivers and extensions of waivers under this subsection with respect to any one set of events shall not exceed three months in a fiscal year.

"(3) The Maritime Administrator shall—

"(A) for each determination referred to in paragraph (1), identify any actions that could be taken to enable qualified United States flag capacity to meet the requirements of this section or section 55314 at fair and reasonable rates for commercial vessels of the United States;

Notice.

"(B) provide notice of each determination referred to in paragraph (1) to the Secretary of Transportation and, as applicable, the President or the Secretary of Defense; and

"(C) publish each determination referred to in paragraph (1)—

Web posting.
Deadline.

"(i) on the website of the Maritime Administration not later than 24 hours after notice of the determination is provided to the Secretary of Transportation; and

Federal Register, publication.
Notification.
Deadline.

"(ii) in the Federal Register.

"(4) The Maritime Administrator shall notify—

"(A) the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives of—

"(i) any request for a waiver (or an extension thereof) made by the Secretary of Transportation of this section or section 55314(a) of this title by not later than 72 hours after receiving such a request; and

"(ii) the issuance of any such waiver (or an extension thereof), and why such waiver or extension was necessary, by not later than 72 hours after such issuance; and

"(B) the Committee on Commerce, Science, and Transportation and the Committee on Armed Services of the Senate and the Committee on Transportation and Infrastructure and the Committee on Armed Services of the House of Representatives of—

"(i) any request for a waiver (or an extension thereof) made by the Secretary of Defense of this section or section 55314(a) of this title by not later than 72 hours after receiving such a request; and

"(ii) the issuance of any such waiver (or an extension thereof), and why such waiver or extension was necessary, by not later than 72 hours after such issuance.".

46 USC 3306 note.

(b) SMALL PASSENGER VESSELS WITH OVERNIGHT ACCOMMODATIONS.—

(1) EXTENSION AUTHORITY.—

(A) IN GENERAL.—The Commandant of the Coast Guard shall not enforce the requirements of section 3306(n)(3)(A)(v) of title 46, United States Code, against

an operator of an overnight fishing charter before April 1, 2024.

(B) PLAN REQUIRED.—Not later than April 1, 2024, an operator of an overnight fishing charter not in compliance with such section 3306(n)(3)(A)(v) shall submit to the Commandant a plan for complying with such requirements.

(C) EXTENSION.—On and after April 1, 2024, with respect to an operator of an overnight fishing charter which has submitted a plan for compliance in accordance with subparagraph (B), a captain of the port may extend the period described under subparagraph (A) until a date not later than January 1, 2026.

(2) LIMITATION.—Without further Congressional action, a captain of the port may not extend the period of nonenforcement of the requirements of section 3306(n)(3)(A)(v) of title 46, United States Code, with respect to an overnight fishing charter, to a date later than January 1, 2026.

(3) NOTICE TO PASSENGERS.—Beginning on the date on which the requirements under section 3306(n)(3)(A)(v) of title 46, United States Code, take effect, the owner or operator of a vessel for which an extension is granted under paragraph (1)(C) shall provide on the website of such owner or operator of the vessel, the vessel, and each ticket for a passenger a prominently displayed notice that the vessel is exempt from meeting the Coast Guard safety compliance standards concerning egress as described in such section.

(4) OVERNIGHT FISHING CHARTER DEFINED.—In this section, the term "overnight fishing charter" means a vessel that—

(A) is engaged in "charter fishing" as such term is defined in section 3 of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1802); and

(B) has overnight accommodations for passengers.

## SEC. 3532. RECAPITALIZATION OF NATIONAL DEFENSE RESERVE FLEET.

Section 3546 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263; 46 U.S.C. 57100 note) is amended—

(1) in subsection (a)—

(A) in the matter preceding paragraph (1)—

(i) by striking "Subject to the availability of appropriations" and inserting "Subject to the availability of appropriations made specifically available for reimbursements to the Ready Reserve Force, Maritime Administration account of the Department of Transportation for programs, projects, activities, and expenses related to the National Defense Reserve Fleet"; and

(ii) by striking "of Transportation" and inserting "of the Navy"; and

(B) in paragraph (1)—

(i) by striking "roll-on, roll-off cargo" and inserting "sealift"; and

(ii) by striking "2024" and inserting "2025";

(2) in subsection (d), by striking "The Secretary of Transportation shall consult and coordinate with the Secretary of the

*Margin notes:*
Deadline.

Effective date. Termination date.

Effective date. Web posting.

Navy" and inserting "The Secretary of the Navy shall consult and coordinate with the Secretary of Transportation"; and

Reports.

(3) by adding at the end the following new subsection: "(f) LIMITATION.—Of the amounts authorized to be appropriated by this Act or otherwise made available for fiscal year 2024 for the Secretary of the Navy for travel expenses, not more than 50 percent may be obligated or expended until the Secretary of the Navy submits to the congressional defense committees a report that includes a detailed description of the acquisition strategy for the execution of the authority under subsection (a).".

### SEC. 3533. UNITED STATES MERCHANT MARINE ACADEMY AND COAST GUARD ACADEMY MATTERS; MARITIME ADMINISTRATION REQUIREMENTS.

Deadlines.
46 USC 51301 note.

(a) TRAINING COURSE ON WORKINGS OF CONGRESS.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this section, the Secretary of Transportation, in consultation with the Maritime Administrator, the Superintendent of the United States Merchant Marine Academy, and such other individuals and organizations as the Secretary of Transportation considers appropriate, shall develop a training course on the workings of Congress and offer that training course at least once each year. This course shall be similar in design to the training course required under section 315 of title 14, United States Code, as practicable.

(2) COURSE SUBJECT MATTER.—The training course required by paragraph (1) shall provide an overview and introduction to Congress and the Federal legislative process, including—

(A) the history and structure of Congress and the committee systems of the Senate and the House of Representatives, including the functions and responsibilities of the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure and the Committee on Armed Services of the House of Representatives;

(B) the documents produced by Congress, including bills, resolutions, committee reports, and conference reports, and the purposes and functions of those documents;

(C) the legislative processes and rules of the Senate and the House of Representatives, including similarities and differences between the processes and rules of each chamber, including—

(i) the congressional budget process;

(ii) the congressional authorization and appropriations processes;

(iii) the Senate advice and consent process for Presidential nominees; and

(iv) the Senate advice and consent process for treaty ratification;

(D) the roles of Members of Congress and congressional staff in the legislative process; and

(E) the concept and underlying purposes of congressional oversight within the governance framework of separation of powers of the United States.

(3) LECTURERS AND PANELISTS.—

(A) OUTSIDE EXPERTS.—The Secretary of Transportation shall ensure that not less than 60 percent of the

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 829

lecturers, panelists, and other individuals providing education and instruction as part of the training course required by this subsection are bipartisan subject matter experts on Congress and the Federal legislative process who are not employed by the executive branch of the Federal Government.

(B) AUTHORITY TO ACCEPT PRO BONO SERVICES.—In satisfying the requirement under subparagraph (A), the Secretary of Transportation shall seek, and may accept, educational and instructional services of lecturers, panelists, and other individuals and organizations provided to the Department of Transportation on a pro bono basis.

(4) COMPLETION OF REQUIRED TRAINING.—

(A) IN GENERAL.—Not later than 60 days after the date on which the Secretary of Transportation completes the development of the training course described in this section, and annually thereafter while serving in applicable positions, the covered individuals described in subparagraph (B) shall complete the training course described in this subsection.

(B) COVERED INDIVIDUALS.—The covered individuals in this subsection are the following:

(i) The Administrator of the Maritime Administration and the Deputy Administrator of the Maritime Administration.

(ii) Any official of the Maritime Administration whose appointment is subject to the advice and consent of the Senate and Maritime Administration employees that are serving in a Senior Executive Service position (as defined in section 3132(a) of title 5, United States Code).

(iii) Any Maritime Administration employees whose duties consist of engagement with congressional, governmental, or public affairs, who are appointed or assigned to a billet in the National Capital Region on the date on which the Secretary of Transportation completes the development of the training course described in this section.

(iv) The Superintendent, Deputy Superintendent, Provost, Commandant of Midshipmen, Counsel, and Director of Public Affairs of the United States Merchant Marine Academy.

(C) NEW OFFICIALS AND EMPLOYEES.—Any Maritime Administration official or employee or United States Merchant Marine Academy official or employee who is a covered individual described in subparagraph (B) who is newly appointed, newly employed in the National Capital Region, or newly employed by the United States Merchant Marine Academy after the date on which the Secretary of Transportation completes the development of the training course described in this subsection, shall complete a training course that meets the requirements of this subsection not later than 60 days after reporting for duty, and annually thereafter, while serving in applicable positions.

(b) GOVERNMENT ACCOUNTABILITY OFFICE REPORT ON MARITIME ADMINISTRATION STAFFING REQUIREMENTS.—

Analysis.

(1) IN GENERAL.—Not later than six months after the date of the enactment of this Act, the Comptroller General of the United States shall submit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives, a report that includes an analysis of the staffing requirements for effectively executing the mission of the Maritime Administration and an identification of any existing gaps that could impede its operations.

(2) CONTENTS.—The report under paragraph (1) shall include—

Evaluation.

(A) an evaluation of the personnel requirements for the successful execution of the mission of the Maritime Administration, including such requirements for—

(i) those offices that deal with infrastructure, shipbuilding, or student safety;

(ii) those offices that have significant delays in meeting constituent needs, including offices involved in the processing of permits and grants, or which preform a communication or outreach function to the public, constituents, or Congress (including the Office of Public Affairs of the Maritime Administration);

(iii) the United States Merchant Marine Academy; and

(iv) other activities carried out by the Maritime Administration;

Analysis.

(B) a thorough analysis of any deficiencies or inadequacies in staffing levels, at the time the report is submitted, that could hinder the efficient functioning of the Maritime Administration; and

Recommendations.

(C) recommendations for integrating the findings of the report into the policies and planning processes of the Maritime Administration, with the aim of addressing the identified gaps and enhancing the overall effectiveness of the Maritime Administration.

(c) COAST GUARD ACADEMY IMPROVEMENT BRIEFING.—Not later than 30 days after the date of the enactment of this Act, the Commandant of the Coast Guard shall provide to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a briefing on—

Plan.
Timelines.
Cost estimates.

(1) a plan, which shall include timelines and cost estimates, to—

(A) remediate asbestos, lead, and mold from the Chase Hall of the Coast Guard Academy;

(B) house not more than two students to a room in Chase Hall; and

(C) upgrade electric outlet availability and storage space in student rooms at Chase Hall; and

(2) the increased student housing capacity necessary to allow the Coast Guard to put through sufficient officers to eliminate the current portion of the officer shortfall due to space constraints at the Coast Guard Academy, including the Officer Candidate School and direct Commission Officer Program housed at the Academy.

**SEC. 3534. MARITIME WORKFORCE WORKING GROUP.**

(a) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the Maritime Administrator, in consultation with the National Merchant Marine Personnel Advisory Committee, the National Offshore Safety Advisory Committee, the National Towing Safety Advisory Committee, and the Committee on the Marine Transportation System, shall convene a working group to examine and assess the size of the pool of mariners with covered credentials necessary to support the United States flag fleet.

Deadline.
Examination.
Assessment.

(b) MEMBERSHIP.—The Maritime Administrator shall designate individuals to serve as members of the working group convened under subsection (a). The working group shall consist of—

Designation.

(1) the Maritime Administrator, who shall serve as chairperson of the working group;

(2) the Superintendent of the United States Merchant Marine Academy;

(3) the Commandant of the Coast Guard;

(4) the Commander of the United States Transportation Command;

(5) the Secretary of the Navy; and

(6) at least one representative from each of—

(A) the State maritime academies;

(B) the owners and operators of United States-flagged vessels engaged in offshore oil and gas exploration, development, and production;

(C) the owners and operators of United States-flagged vessels engaged in inland river transportation;

(D) the owners and operators of United States-flagged vessels engaged in inland river transportation;

(E) a nonprofit labor organization representing a class of licensed or unlicensed engine department mariners who are employed on vessels operating in the United States flag fleet;

(F) a nonprofit labor organization representing a class of licensed or unlicensed mariners who are employed on vessels operating in the United States flag fleet;

(G) the owners of vessels operating in the United States flag fleet, or their private contracting parties, that are primarily operating in international transportation;

(H) Centers of Excellence for Maritime Training designated under section 51706 of title 46, United States Code; and

(I) private maritime training providers.

(c) NO QUORUM REQUIREMENT.—The Maritime Administrator may convene the working group virtually and without all members present.

(d) RESPONSIBILITIES.—The working group shall carry out the following responsibilities:

(1) Reviewing the report required by section 3525(b), and the study required by section 3545(a), of the James Inhofe National Defense Authorization Act for Fiscal Year 2023 (Public Law 117–263), if available.

(2) Identifying the number of mariners with covered credentials in each of the following categories:

(A) All such mariners.

(B) Such mariners who have a valid Coast Guard merchant mariner credential with the necessary endorsements for service on unlimited tonnage vessels that are subject to the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended.

(C) Such mariners who are participating in a Federal program that supports the United States merchant marine and the United States flag fleet.

(D) Such mariners who are available to crew the United States flag fleet and the surge sealift fleet in times of a national emergency.

(E) Such mariners who are full-time.

(F) Such mariners who are merchant mariner credentialed officers in the United States Navy Reserve.

(G) Such licensed and unlicensed mariners—

(i) required to maintain, mobilize, and operate the entire Ready Reserve Force for periods of 30 days, 90 days, 180 days, and one year including separate totals for merchant mariners employed to maintain the Ready Reserve Force in a reduced operating status; and

(ii) required to submit documentation of sea service to the National Maritime Center, including such mariners that have acquired sea service during the prior year and such mariners that have not acquired sea service during the prior year.

(3) Evaluating potential gaps or surpluses of credentialed merchant mariners, by rating and qualification, required to maintain, mobilize, and operate the Ready Reserve Force for periods of 30 days, 90 days, 180 days, and one year and the potential impacts such mobilization and operation will have on the commercial maritime industry's capability to operate during such periods.

(4) Identifying a list of all actively operating documented vessels of at least 500 gross registered tons, as measured under section 14502 of title 46, United States Code, or an alternate tonnage measured under section 14302 of such title as prescribed by the Secretary under section 14104, of such title, with the tonnage of each such vessel.

(5) Assessing the effect on the United States merchant marine and United States Merchant Marine Academy if graduates from State maritime academies and the United States Merchant Marine Academy were assigned to, or required to fulfill, certain maritime positions based on the overall needs of the United States merchant marine.

(6) Assessing the effectiveness of marketing and outreach efforts, including recruitment and retention strategy and methods of publicizing opportunities, for new mariner accession into the maritime industry.

(7) Assessing the accessibility of Coast Guard Merchant Mariner Licensing and Documentation System data for mariners with covered credentials, the maritime industry, and the Maritime Administration for the purposes of evaluating the pool of mariners with covered credentials.

(8) Assessing the impediments to the credentialing of United States merchant mariners, including training capacity,

credentialing system delays, costs to merchant mariners, statutory or regulatory requirements, and other factors.

(9) Making recommendations to—

(A) enhance the availability and quality of interagency data, including data from the United States Transportation Command, the Coast Guard, the Navy, and the Bureau of Transportation Statistics, for use by the Maritime Administration in evaluating the pool of mariners with covered credentials;

(B) close any gaps identified in the evaluation described in paragraph (3), including specific policy, legislative change proposals, and funding requests; and

(C) improve United States merchant mariner recruitment and retention.

(e) PROVISION OF INFORMATION.—All members of the working group convened under subsection (a) shall provide to the Maritime Administrator, in a timely manner and in a suitable format agreed to by members, any information that is needed to carry out the responsibilities under subsection (d).

(f) REPORT.—Not later than one year after the date of the enactment of this Act, the Secretary of Transportation shall submit to the Committee on Commerce, Science, and Transportation of the Senate, the Committee on Armed Services of the House of Representatives, and the Committee on Transportation and Infrastructure of the House of Representatives a report that contains the findings and conclusions of the working group gathered in the course of performing the responsibilities under subsection (d). Such report shall include each of the following:

(1) The number of mariners with covered credentials identified for each category described in subparagraphs (A) through (G) of subsection (d)(2).

(2) The results of the evaluation under subsection (d)(3).

(3) The list identified under subsection (d)(4).

(4) The results of the assessments conducted under paragraphs (5) and (8) of subsection (d).

(5) The recommendations made under paragraphs (5) and (9) of subsection (d).

(6) Such other information as the working group determines appropriate.

(g) CLASSIFIED ANNEX.—The report required under this section shall be submitted in unclassified form, but shall include a classified annex including the results from subsection (d)(2)(G) and subsection (d)(3).

(h) DEFINITIONS.—In this section:

(1) The term "covered credential" means any credential issued under part E of subtitle II of title 46, United States Code.

(2) The term "documented vessel" has the meaning given the term in section 106 of title 46, United States Code.

(3) The term "Ready Reserve Force" has the meaning given the term in chapter 571 of title 46, United States Code.

(i) SUNSET.—The Maritime Administrator shall disband the working group upon the submission of the report required under subsection (f).

(j) TEMPORARY REDUCTION OF LENGTHS OF CERTAIN PERIODS OF SERVICE.—For the 3-year period beginning on the date of enactment of this Act—

46 USC 7307 note.
Time period.
Applicability.

(1) section 7307 of title 46, United States Code, shall be applied by substituting "18 months" for "3 years";

(2) section 7308 of such title shall be applied by substituting "12 months" for "18 months"; and

(3) section 7309 of such title shall be applied by substituting "6 months" for "12 months".

(k) CENTERS OF EXCELLENCE FOR DOMESTIC MARITIME WORKFORCE TRAINING AND EDUCATION.—Section 51706 of title 46, United States Code, is amended—

(1) in subsection (a)—

(A) by striking "The Secretary" and inserting the following:

"(1) IN GENERAL.—The Secretary";

(B) by inserting ", after consultation with the Coast Guard," after "Transportation";

(C) by inserting ", for a 5-year period," after "designate"; and

(D) by adding at the end the following:

"(2) WITHDRAWAL OF DESIGNATION.—The Secretary of Transportation may withdraw a designation as a center of excellence for domestic maritime workforce training and education of a covered training entity upon discovery of adverse information, including discovery of information that the covered training entity has engaged in fraudulent or unlawful activities, or has been subjected to disciplinary or adverse administrative action by Federal, State, or other regulatory bodies.";

(2) in subsection (b), by adding at the end the following:

"(5) ELIGIBLE USES OF GRANT FUNDS.—A center of excellence receiving a grant under this subsection shall—

"(A) carry out activities that are identified as priorities for the purpose of developing, offering, or improving educational or career training programs for the United States maritime industry workforce; and

"(B) provide training to upgrade the skills of the United States maritime industry workforce, including training to acquire covered requirements as well as technical skills training for jobs in the United States maritime industry."; and

(3) in subsection (c)(1)—

(A) in subparagraph (B)(v), by striking "and" after the semicolon;

(B) in subparagraph (C), by striking the period at the end and inserting "; and"; and

(C) by adding at the end the following:

"(D) has—

"(i) not been subject to a disciplinary or adverse administrative action by Federal, State, or other regulatory bodies;

"(ii) no unresolved nonconformities from administrative audits by regulatory bodies; and

"(iii) not been subject to any adverse criminal action by a Federal, State, or local law enforcement authority.".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 835

### SEC. 3535. CONSIDERATION OF LIFE-CYCLE COST ESTIMATES FOR ACQUISITION AND PROCUREMENT OF VESSELS.

46 USC 57100 note.

In carrying out the acquisition and procurement of vessels in the National Defense Reserve Fleet, the Secretary of Transportation, acting through the Administrator of the Maritime Administration, shall consider the life-cycle cost estimates of vessels during the design and evaluation processes to the maximum extent practicable.

### SEC. 3536. LOANS FOR RETROFITTING TO QUALIFY AS A VESSEL OF THE UNITED STATES.

(a) IN GENERAL.—Section 53706(a) of title 46, United States Code, is amended by adding at the end the following:

"(8) Financing (including reimbursement of an obligor for expenditures previously made for) the reconstruction, reconditioning, retrofitting, repair, reconfiguration, or similar work in a shipyard located in the United States.".

(b) PROHIBITION ON USE OF APPROPRIATED FUNDS.—Amounts appropriated to the Maritime Administration before the date of enactment of this Act shall not be available to be used for the cost of loan guarantees for projects receiving financing support or credit enhancements under section 53706(a)(8) of title 46, United States Code, as added by this section.

### SEC. 3537. ACCOUNTABILITY FOR NATIONAL MARITIME STRATEGY.

46 USC 50114 note.

(a) BIANNUAL BRIEFING.—

(1) REQUIREMENT.—Not less than twice annually, the Administrator of the Maritime Administration, in consultation with the National Security Council, the Secretary of State, the Secretary of Transportation, and the Secretary of Homeland Security, shall provide to the appropriate congressional committees briefings on the status of establishing the type of national maritime strategy required under section 50114 of title 46, United States Code. The Chief of Naval Operations, the Commandant of the Marine Corps, and the Commandant of the Coast Guard shall participate in each briefing required under this paragraph.

(2) USE.—The Administrator shall use the briefings required under paragraph (1) to augment and influence the national maritime strategy discussion with national security focused stakeholders across the administration, until an updated strategy is published and endorsed by the President of the United States.

(b) ELEMENTS.—As the national maritime strategy relates to national security, each briefing under subsection (a) shall include the following:

Analyses.

(1) Recommendations for a whole-of-Government approach to orchestrating national instruments of power to shape all elements of the maritime enterprise of the United States, domestic and international, on the high seas or domestic waterways.

Recommendations.

(2) An assessment of great power competition in the maritime domain, to include opportunities for increased cooperation with allied and partner global maritime industry leaders to improve national shipbuilding and shipping, while promoting the international rules-based maritime order.

Assessment.

(3) An analysis of existing shipyards to build and capitalize on the virtuous cycle between commercial and military shipbuilding and repair, including areas of improvement.

(4) An analysis of opportunities for private or public financing to increase the capacity, efficiency, and effectiveness of United States shipyards, including infrastructure, labor force, technology, and global competitiveness.

(5) An analysis of potential improvements to national or cooperative arrangements for sealift capacity and shipping, including for contested logistics.

Definition.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES.—In this section, the term "appropriate congressional committees" means—

(1) the congressional defense committees;

(2) and the Committee on Transportation and Infrastructure of the House of Representatives; and

(3) the Committee on Commerce, Science, and Transportation of the Senate.

# DIVISION D—FUNDING TABLES

### SEC. 4001. AUTHORIZATION OF AMOUNTS IN FUNDING TABLES.

(a) IN GENERAL.—Whenever a funding table in this division specifies a dollar amount authorized for a project, program, or activity, the obligation and expenditure of the specified dollar amount for the project, program, or activity is hereby authorized, subject to the availability of appropriations.

(b) MERIT-BASED DECISIONS.—A decision to commit, obligate, or expend funds with or to a specific entity on the basis of a dollar amount authorized pursuant to subsection (a) shall—

(1) be based on merit-based selection procedures in accordance with the requirements of sections 3201 and 4024 of title 10, United States Code, or on competitive procedures; and

Compliance.

(2) comply with other applicable provisions of law.

(c) RELATIONSHIP TO TRANSFER AND PROGRAMMING AUTHORITY.—An amount specified in the funding tables in this division may be transferred or reprogrammed under a transfer or reprogramming authority provided by another provision of this Act or by other law. The transfer or reprogramming of an amount specified in such funding tables shall not count against a ceiling on such transfers or reprogrammings under section 1001 of this Act or any other provision of law, unless such transfer or reprogramming would move funds between appropriation accounts.

(d) APPLICABILITY TO CLASSIFIED ANNEX.—This section applies to any classified annex that accompanies this Act.

(e) ORAL OR WRITTEN COMMUNICATIONS.—No oral or written communication concerning any amount specified in the funding tables in this division shall supersede the requirements of this section.

# TITLE XLI—PROCUREMENT

## SEC. 4101. PROCUREMENT.

| | SEC. 4101. PROCUREMENT (In Thousands of Dollars) | | |
|---|---|---|---|
| Line | Item | FY 2024 Request | Conference Authorized |
| | **AIRCRAFT PROCUREMENT, ARMY** | | |
| | **FIXED WING** | | |
| 003 | FUTURE UAS FAMILY | 53,453 | 53,453 |
| 005 | SMALL UNMANNED AIRCRAFT SYSTEMS | 20,769 | 20,769 |
| | **ROTARY** | | |
| 006 | AH–64 APACHE BLOCK IIIA REMAN | 718,578 | 718,578 |
| 007 | AH–64 APACHE BLOCK IIIA REMAN AP | 110,360 | 110,360 |
| 008 | UH–60 BLACKHAWK M MODEL (MYP) | 668,258 | 668,258 |
| 009 | UH–60 BLACKHAWK M MODEL (MYP) AP | 92,494 | 92,494 |
| 010 | UH–60 BLACK HAWK L AND V MODELS | 153,196 | 153,196 |
| 011 | CH–47 HELICOPTER | 202,487 | 379,987 |
| | Four Additional Aircraft | | [177,500] |
| 012 | CH–47 HELICOPTER AP | 18,936 | 41,436 |
| | CH–47F Block II—Adv Procurement | | [22,500] |
| 012A | UH–72B LAKOTA HELICOPTER | | 20,000 |
| | Two aircraft | | [20,000] |
| | **MODIFICATION OF AIRCRAFT** | | |
| 013 | MQ–1 PAYLOAD | 13,650 | 13,650 |
| 014 | GRAY EAGLE MODS2 | 14,959 | 82,959 |
| | Program increase | | [68,000] |
| 016 | AH–64 MODS | 113,127 | 113,127 |
| 017 | CH–47 CARGO HELICOPTER MODS (MYP) | 20,689 | 20,689 |
| 022 | UTILITY HELICOPTER MODS | 35,879 | 53,879 |
| | Black Hawk Mods—60kVA Generators | | [15,000] |
| | Litter Basket Stabilization Systems | | [3,000] |
| 023 | NETWORK AND MISSION PLAN | 32,418 | 32,418 |
| 024 | COMMS, NAV SURVEILLANCE | 74,912 | 74,912 |
| 025 | DEGRADED VISUAL ENVIRONMENT | 16,838 | 16,838 |
| 026 | AVIATION ASSURED PNT | 67,383 | 67,383 |
| 027 | GATM ROLLUP | 8,924 | 8,924 |
| 029 | UAS MODS | 2,258 | 2,258 |
| | **GROUND SUPPORT AVIONICS** | | |
| 030 | AIRCRAFT SURVIVABILITY EQUIPMENT | 161,731 | 156,501 |
| | B–Kit unit cost adjustment | | [–5,230] |
| 031 | SURVIVABILITY CM | 6,526 | 6,526 |
| 032 | CMWS | 72,041 | 72,041 |
| 033 | COMMON INFRARED COUNTERMEASURES (CIRCM) | 261,384 | 261,384 |
| | **OTHER SUPPORT** | | |
| 034 | COMMON GROUND EQUIPMENT | 25,752 | 25,752 |
| 035 | AIRCREW INTEGRATED SYSTEMS | 22,097 | 22,097 |
| 036 | AIR TRAFFIC CONTROL | 21,216 | 21,216 |
| 037 | LAUNCHER, 2.75 ROCKET | 2,125 | 2,125 |
| | **TOTAL AIRCRAFT PROCUREMENT, ARMY** | **3,012,440** | **3,313,210** |
| | | | |
| | **MISSILE PROCUREMENT, ARMY** | | |
| | **SURFACE-TO-AIR MISSILE SYSTEM** | | |
| 001 | LOWER TIER AIR AND MISSILE DEFENSE (AMD) SEN | 6,625 | 6,625 |
| 003 | M-SHORAD—PROCUREMENT | 400,697 | 390,197 |
| | Excess fielding growth | | [–10,500] |
| 004 | MSE MISSILE | 1,212,832 | 1,212,832 |
| 006 | PRECISION STRIKE MISSILE (PRSM) | 384,071 | 377,821 |
| | Unjustified growth: Software maintenance | | [–6,250] |
| 007 | INDIRECT FIRE PROTECTION CAPABILITY INC 2–I | 313,189 | 313,189 |
| 008 | MID-RANGE CAPABILITY (MRC) | 169,519 | 169,519 |
| | **AIR-TO-SURFACE MISSILE SYSTEM** | | |
| 009 | HELLFIRE SYS SUMMARY | 21,976 | 21,976 |
| 010 | JOINT AIR-TO-GROUND MSLS (JAGM) | 303,409 | 303,409 |
| 012 | LONG-RANGE HYPERSONIC WEAPON | 156,821 | 156,821 |
| | **ANTI-TANK/ASSAULT MISSILE SYS** | | |
| 013 | JAVELIN (AAWS-M) SYSTEM SUMMARY | 199,509 | 199,509 |
| 014 | TOW 2 SYSTEM SUMMARY | 120,475 | 120,475 |
| 015 | GUIDED MLRS ROCKET (GMLRS) | 886,367 | 886,367 |

137 STAT. 838          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| 016 | GUIDED MLRS ROCKET (GMLRS) ................................................ | 55,913 | 55,913 |
| 017 | MLRS REDUCED RANGE PRACTICE ROCKETS (RRPR) .......... | 10,334 | 10,334 |
| 018 | HIGH MOBILITY ARTILLERY ROCKET SYSTEM (HIMARS ..... | 179,230 | 179,230 |
| 019 | ARMY TACTICAL MSL SYS (ATACMS)—SYS SUM .................... | 7,307 | 7,307 |
| | **MODIFICATIONS** | | |
| 021 | PATRIOT MODS ........................................................................ | 212,247 | 212,247 |
| 022 | STINGER MODS ......................................................................... | 36,484 | 36,484 |
| 023 | AVENGER MODS ........................................................................ | 22,274 | 22,274 |
| 025 | MLRS MODS ............................................................................... | 168,198 | 168,198 |
| 026 | HIMARS MODIFICATIONS ........................................................ | 76,266 | 76,266 |
| | **SPARES AND REPAIR PARTS** | | |
| 027 | SPARES AND REPAIR PARTS ..................................................... | 6,573 | 6,573 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | |
| 028 | AIR DEFENSE TARGETS ............................................................ | 11,701 | 11,701 |
| | **TOTAL MISSILE PROCUREMENT, ARMY** .................. | **4,962,017** | **4,945,267** |
| | | | |
| | **PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY** | | |
| | **TRACKED COMBAT VEHICLES** | | |
| 001 | ARMORED MULTI PURPOSE VEHICLE (AMPV) ....................... | 554,777 | 552,277 |
| | Program decrease ........................................................................ | | [–2,500] |
| 003 | MOBILE PROTECTED FIREPOWER ............................................ | 394,635 | 386,635 |
| | Excessive growth—systems technical support ......................... | | [–8,000] |
| | **MODIFICATION OF TRACKED COMBAT VEHICLES** | | |
| 004 | STRYKER UPGRADE ................................................................... | 614,282 | 749,682 |
| | Excessive growth—fleet modifications ..................................... | | [–4,600] |
| | Program increase ........................................................................ | | [140,000] |
| 005 | BRADLEY FIRE SUPPORT TEAM (BFIST) VEHICLE ................. | 5,232 | 5,232 |
| 006 | BRADLEY PROGRAM (MOD) ....................................................... | 158,274 | 217,070 |
| | Program increase ........................................................................ | | [65,000] |
| | Unjustified growth: modification 7 installation ....................... | | [–6,204] |
| 007 | M109 FOV MODIFICATIONS ........................................................ | 90,986 | 90,986 |
| 008 | PALADIN INTEGRATED MANAGEMENT (PIM) ......................... | 469,152 | 674,152 |
| | Program increase ........................................................................ | | [205,000] |
| 009 | IMPROVED RECOVERY VEHICLE (M88 HERCULES) .............. | 41,058 | 41,058 |
| 012 | JOINT ASSAULT BRIDGE .............................................................. | 159,804 | 159,804 |
| 013 | ABRAMS UPGRADE PROGRAM .................................................... | 697,883 | 1,240,283 |
| | Abrams Upgrade Predictive Maintenance (PPMX) ................. | | [10,000] |
| | Program increase ........................................................................ | | [532,400] |
| 014 | ABRAMS UPGRADE PROGRAM AP .............................................. | 102,440 | 102,440 |
| | **WEAPONS & OTHER COMBAT VEHICLES** | | |
| 016 | PERSONAL DEFENSE WEAPON (ROLL) .................................... | 510 | 510 |
| 017 | M240 MEDIUM MACHINE GUN (7.62MM) ................................. | 425 | 425 |
| 019 | MACHINE GUN, CAL .50 M2 ROLL ............................................. | 3,420 | 3,420 |
| 020 | MORTAR SYSTEMS ...................................................................... | 8,013 | 8,013 |
| 021 | LOCATION & AZIMUTH DETERMINATION SYSTEM (LADS ... | 3,174 | 3,174 |
| 022 | XM320 GRENADE LAUNCHER MODULE (GLM) ....................... | 14,143 | 14,143 |
| 023 | PRECISION SNIPER RIFLE ........................................................... | 5,248 | 5,248 |
| 024 | CARBINE ....................................................................................... | 571 | 8,571 |
| | Program Increase—M4 carbine upper receivers ....................... | | [8,000] |
| 025 | NEXT GENERATION SQUAD WEAPON ...................................... | 292,850 | 292,850 |
| 026 | HANDGUN ..................................................................................... | 32 | 32 |
| | **MOD OF WEAPONS AND OTHER COMBAT VEH** | | |
| 028 | M777 MODS .................................................................................... | 18,920 | 18,920 |
| 031 | M119 MODIFICATIONS ................................................................. | 13,097 | 13,097 |
| 032 | MORTAR MODIFICATION ............................................................. | 423 | 423 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | |
| 033 | ITEMS LESS THAN $5.0M (WOCV-WTCV) .................................. | 1,148 | 1,148 |
| 034 | PRODUCTION BASE SUPPORT (WOCV-WTCV) .......................... | 115,024 | 115,024 |
| | **TOTAL PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY.** | **3,765,521** | **4,704,617** |
| | | | |
| | **PROCUREMENT OF AMMUNITION, ARMY** | | |
| | **SMALL/MEDIUM CAL AMMUNITION** | | |
| 001 | CTG, 5.56MM, ALL TYPES ............................................................ | 90,853 | 90,853 |
| 002 | CTG, 7.62MM, ALL TYPES ............................................................ | 65,370 | 80,370 |
| | Program increase ........................................................................ | | [15,000] |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 839

**SEC. 4101. PROCUREMENT**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| 003 | NEXT GENERATION SQUAD WEAPON AMMUNITION | 191,244 | 191,244 |
| 004 | CTG, HANDGUN, ALL TYPES | 6,597 | 6,597 |
| 005 | CTG, .50 CAL, ALL TYPES | 41,534 | 64,402 |
|  | Program increase | | [22,868] |
| 006 | CTG, 20MM, ALL TYPES | 7,925 | 7,925 |
| 007 | CTG, 25MM, ALL TYPES | 38,760 | 31,503 |
|  | Excess to need | | [–7,257] |
| 008 | CTG, 30MM, ALL TYPES | 107,805 | 107,805 |
| 009 | CTG, 40MM, ALL TYPES | 148,970 | 148,970 |
| 010 | CTG, 50MM, ALL TYPES | 28,000 | 28,000 |
|  | **MORTAR AMMUNITION** | | |
| 011 | 60MM MORTAR, ALL TYPES | 35,160 | 35,160 |
| 012 | 81MM MORTAR, ALL TYPES | 40,562 | 40,562 |
| 013 | 120MM MORTAR, ALL TYPES | 106,784 | 106,784 |
|  | **TANK AMMUNITION** | | |
| 014 | CARTRIDGES, TANK, 105MM AND 120MM, ALL TYPES | 300,368 | 300,368 |
|  | **ARTILLERY AMMUNITION** | | |
| 015 | ARTILLERY CARTRIDGES, 75MM & 105MM, ALL TYPES | 21,298 | 21,298 |
| 016 | ARTILLERY PROJECTILE, 155MM, ALL TYPES | 150,839 | 150,839 |
| 018 | PRECISION ARTILLERY MUNITIONS | 96,406 | 96,406 |
| 019 | ARTILLERY PROPELLANTS, FUZES AND PRIMERS, ALL | 172,947 | 172,947 |
|  | **MINES** | | |
| 020 | MINES & CLEARING CHARGES, ALL TYPES | 71,182 | 71,182 |
| 021 | CLOSE TERRAIN SHAPING OBSTACLE | 55,374 | 55,374 |
|  | **ROCKETS** | | |
| 022 | SHOULDER LAUNCHED MUNITIONS, ALL TYPES | 18,630 | 18,630 |
| 023 | ROCKET, HYDRA 70, ALL TYPES | 87,293 | 87,293 |
|  | **OTHER AMMUNITION** | | |
| 024 | CAD/PAD, ALL TYPES | 6,564 | 6,564 |
| 025 | DEMOLITION MUNITIONS, ALL TYPES | 24,238 | 24,238 |
| 026 | GRENADES, ALL TYPES | 48,374 | 48,374 |
| 027 | SIGNALS, ALL TYPES | 23,252 | 23,252 |
| 028 | SIMULATORS, ALL TYPES | 11,309 | 11,309 |
|  | **MISCELLANEOUS** | | |
| 030 | AMMO COMPONENTS, ALL TYPES | 3,976 | 3,976 |
| 031 | NON-LETHAL AMMUNITION, ALL TYPES | 3,281 | 3,281 |
| 032 | ITEMS LESS THAN $5 MILLION (AMMO) | 17,436 | 17,436 |
| 033 | AMMUNITION PECULIAR EQUIPMENT | 13,133 | 13,133 |
| 034 | FIRST DESTINATION TRANSPORTATION (AMMO) | 18,068 | 18,068 |
| 035 | CLOSEOUT LIABILITIES | 102 | 102 |
|  | **PRODUCTION BASE SUPPORT** | | |
| 036 | INDUSTRIAL FACILITIES | 726,135 | 726,135 |
| 037 | CONVENTIONAL MUNITIONS DEMILITARIZATION | 183,752 | 183,752 |
| 038 | ARMS INITIATIVE | 4,057 | 4,057 |
|  | **TOTAL PROCUREMENT OF AMMUNITION, ARMY** | **2,967,578** | **2,998,189** |
|  | | | |
|  | **OTHER PROCUREMENT, ARMY** | | |
|  | **TACTICAL VEHICLES** | | |
| 001 | SEMITRAILERS, FLATBED: | 22,751 | 22,751 |
| 002 | SEMITRAILERS, TANKERS | 40,359 | 40,359 |
| 003 | HI MOB MULTI-PURP WHLD VEH (HMMWV) | 25,904 | 25,904 |
| 004 | GROUND MOBILITY VEHICLES (GMV) | 36,223 | 36,223 |
| 006 | JOINT LIGHT TACTICAL VEHICLE FAMILY OF VEHICL | 839,413 | 837,318 |
|  | Unit cost increases | | [–2,095] |
| 007 | TRUCK, DUMP, 20T (CCE) | 20,075 | 35,075 |
|  | Program increase | | [15,000] |
| 008 | FAMILY OF MEDIUM TACTICAL VEH (FMTV) | 110,734 | 110,734 |
| 009 | FAMILY OF COLD WEATHER ALL-TERRAIN VEHICLE | 28,745 | 28,745 |
| 010 | FIRETRUCKS & ASSOCIATED FIREFIGHTING EQUIP | 55,340 | 55,340 |
| 011 | FAMILY OF HEAVY TACTICAL VEHICLES (FHTV) | 66,428 | 166,428 |
|  | Program increase | | [100,000] |
| 012 | PLS ESP | 51,868 | 51,868 |
| 014 | TACTICAL WHEELED VEHICLE PROTECTION KITS | 3,792 | 3,792 |
| 015 | MODIFICATION OF IN SVC EQUIP | 80,326 | 137,826 |
|  | HMMWV ABS/ESC | | [57,500] |
|  | **NON-TACTICAL VEHICLES** | | |
| 016 | PASSENGER CARRYING VEHICLES | 2,203 | 2,203 |

SEC. 4101. PROCUREMENT
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| 017 | NONTACTICAL VEHICLES, OTHER | 8,246 | 8,246 |
| | **COMM—JOINT COMMUNICATIONS** | | |
| 018 | SIGNAL MODERNIZATION PROGRAM | 161,585 | 151,185 |
| | Program decrease | | [–10,400] |
| 019 | TACTICAL NETWORK TECHNOLOGY MOD IN SVC | 358,646 | 356,143 |
| | On-the-Move Sattelite Communications Terminals | | [9,500] |
| | SATCOM obsolescence previously funded | | [–12,003] |
| 020 | DISASTER INCIDENT RESPONSE COMMS TERMINAL (DI | 254 | 254 |
| 021 | JCSE EQUIPMENT (USRDECOM) | 5,097 | 5,097 |
| | **COMM—SATELLITE COMMUNICATIONS** | | |
| 024 | DEFENSE ENTERPRISE WIDEBAND SATCOM SYSTEMS | 101,181 | 101,181 |
| 025 | TRANSPORTABLE TACTICAL COMMAND COMMUNICA-TIONS. | 54,849 | 54,849 |
| 026 | SHF TERM | 41,634 | 41,634 |
| 027 | ASSURED POSITIONING, NAVIGATION AND TIMING | 202,370 | 202,370 |
| 028 | EHF SATELLITE COMMUNICATION | 19,122 | 19,122 |
| 030 | GLOBAL BRDCST SVC—GBS | 531 | 531 |
| | **COMM—C3 SYSTEM** | | |
| 031 | COE TACTICAL SERVER INFRASTRUCTURE (TSI) | 77,999 | 77,999 |
| | **COMM—COMBAT COMMUNICATIONS** | | |
| 032 | HANDHELD MANPACK SMALL FORM FIT (HMS) | 765,109 | 760,066 |
| | Excess to need | | [–5,043] |
| 033 | ARMY LINK 16 SYSTEMS | 60,767 | 60,767 |
| 035 | UNIFIED COMMAND SUITE | 18,999 | 18,999 |
| 036 | COTS COMMUNICATIONS EQUIPMENT | 492,001 | 484,901 |
| | Program decrease | | [–7,100] |
| 037 | FAMILY OF MED COMM FOR COMBAT CASUALTY CARE | 1,374 | 1,374 |
| 038 | ARMY COMMUNICATIONS & ELECTRONICS | 52,485 | 52,485 |
| | **COMM—INTELLIGENCE COMM** | | |
| 039 | CI AUTOMATION ARCHITECTURE-INTEL | 16,767 | 16,767 |
| 041 | MULTI-DOMAIN INTELLIGENCE | 119,989 | 119,989 |
| | **INFORMATION SECURITY** | | |
| 042 | INFORMATION SYSTEM SECURITY PROGRAM-ISSP | 701 | 701 |
| 043 | COMMUNICATIONS SECURITY (COMSEC) | 159,712 | 159,712 |
| 044 | DEFENSIVE CYBER OPERATIONS | 13,848 | 13,848 |
| 045 | INSIDER THREAT PROGRAM—UNIT ACTIVITY MONITO | 1,502 | 1,502 |
| 047 | BIOMETRIC ENABLING CAPABILITY (BEC) | 453 | 453 |
| | **COMM—LONG HAUL COMMUNICATIONS** | | |
| 049 | BASE SUPPORT COMMUNICATIONS | 23,278 | 23,278 |
| | **COMM—BASE COMMUNICATIONS** | | |
| 050 | INFORMATION SYSTEMS | 32,608 | 32,608 |
| 051 | EMERGENCY MANAGEMENT MODERNIZATION PROGRAM | 4,949 | 4,949 |
| 052 | INSTALLATION INFO INFRASTRUCTURE MOD PROGRAM | 243,011 | 243,011 |
| | **ELECT EQUIP—TACT INT REL ACT (TIARA)** | | |
| 055 | JTT/CIBS-M | 8,543 | 8,543 |
| 056 | TERRESTRIAL LAYER SYSTEMS (TLS) | 85,486 | 85,486 |
| 058 | DCGS-A-INTEL | 2,980 | 2,980 |
| 060 | TROJAN | 30,649 | 30,649 |
| 061 | MOD OF IN-SVC EQUIP (INTEL SPT) | 4,169 | 4,169 |
| 062 | BIOMETRIC TACTICAL COLLECTION DEVICES | 932 | 932 |
| | **ELECT EQUIP—ELECTRONIC WARFARE (EW)** | | |
| 063 | EW PLANNING & MANAGEMENT TOOLS (EWPMT) | 21,278 | 21,278 |
| 064 | AIR VIGILANCE (AV) | 6,641 | 6,641 |
| 065 | MULTI-FUNCTION ELECTRONIC WARFARE (MFEW) SYST | 15,941 | 15,941 |
| 067 | COUNTERINTELLIGENCE/SECURITY COUNTERMEASURES | 22,833 | 22,833 |
| 068 | CI MODERNIZATION | 434 | 434 |
| | **ELECT EQUIP—TACTICAL SURV. (TAC SURV)** | | |
| 069 | SENTINEL MODS | 161,886 | 161,886 |
| 070 | NIGHT VISION DEVICES | 141,143 | 98,722 |
| | Rephase to RDT&E for IVAS 1.2 Development | | [–39,137] |
| | Restore acquisition accountability: Government program management costs. | | [–3,284] |
| 071 | SMALL TACTICAL OPTICAL RIFLE MOUNTED MLRF | 15,484 | 15,484 |
| 073 | FAMILY OF WEAPON SIGHTS (FWS) | 185,634 | 185,634 |
| 074 | ENHANCED PORTABLE INDUCTIVE ARTILLERY FUZE SE | 3,652 | 3,652 |
| 075 | FORWARD LOOKING INFRARED (IFLIR) | 20,438 | 20,438 |
| 076 | COUNTER SMALL UNMANNED AERIAL SYSTEM (C-SUAS) | 365,376 | 305,376 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 841

**SEC. 4101. PROCUREMENT**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | Execution delays | | [–60,000] |
| 077 | JOINT BATTLE COMMAND—PLATFORM (JBC-P) | 215,290 | 210,066 |
| | Unjustified Cost Growth—Fielding and Systems Engineering | | [–5,224] |
| 078 | JOINT EFFECTS TARGETING SYSTEM (JETS) | 8,932 | 8,932 |
| 079 | COMPUTER BALLISTICS: LHMBC XM32 | 2,965 | 2,965 |
| 080 | MORTAR FIRE CONTROL SYSTEM | 8,024 | 8,024 |
| 081 | MORTAR FIRE CONTROL SYSTEMS MODIFICATIONS | 7,399 | 7,399 |
| 082 | COUNTERFIRE RADARS | 99,782 | 99,782 |
| | **ELECT EQUIP—TACTICAL C2 SYSTEMS** | | |
| 083 | ARMY COMMAND POST INTEGRATED INFRASTRUCTURE | 78,512 | 78,512 |
| 084 | FIRE SUPPORT C2 FAMILY | 10,052 | 10,052 |
| 085 | AIR & MSL DEFENSE PLANNING & CONTROL SYS | 68,892 | 68,892 |
| 086 | IAMD BATTLE COMMAND SYSTEM | 412,556 | 395,456 |
| | Excess Interim Contractor Support | | [–17,100] |
| 087 | LIFE CYCLE SOFTWARE SUPPORT (LCSS) | 4,270 | 4,270 |
| 088 | NETWORK MANAGEMENT INITIALIZATION AND SERVICE | 37,194 | 37,194 |
| 089 | GLOBAL COMBAT SUPPORT SYSTEM-ARMY (GCSS-A) | 1,987 | 1,987 |
| 090 | INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPP | 5,318 | 5,318 |
| 091 | MOD OF IN-SVC EQUIPMENT (ENFIRE) | 4,997 | 4,997 |
| | **ELECT EQUIP—AUTOMATION** | | |
| 092 | ARMY TRAINING MODERNIZATION | 10,130 | 10,130 |
| 093 | AUTOMATED DATA PROCESSING EQUIP | 61,489 | 61,489 |
| 094 | ACCESSIONS INFORMATION ENVIRONMENT (AIE) | 4,198 | 4,198 |
| 096 | HIGH PERF COMPUTING MOD PGM (HPCMP) | 76,053 | 76,053 |
| 097 | CONTRACT WRITING SYSTEM | 6,061 | 6,061 |
| 098 | CSS COMMUNICATIONS | 56,804 | 56,804 |
| | **CLASSIFIED PROGRAMS** | | |
| 151A | CLASSIFIED PROGRAMS | 1,781 | 1,781 |
| | **CHEMICAL DEFENSIVE EQUIPMENT** | | |
| 102 | BASE DEFENSE SYSTEMS (BDS) | 70,781 | 70,781 |
| 103 | CBRN DEFENSE | 63,198 | 63,198 |
| | **BRIDGING EQUIPMENT** | | |
| 104 | TACTICAL BRIDGING | 1,157 | 1,157 |
| 105 | TACTICAL BRIDGE, FLOAT-RIBBON | 82,228 | 82,228 |
| 106 | BRIDGE SUPPLEMENTAL SET | 4,414 | 4,414 |
| | **ENGINEER (NON-CONSTRUCTION) EQUIPMENT** | | |
| 110 | ROBOTICS AND APPLIQUE SYSTEMS | 68,893 | 68,893 |
| 112 | FAMILY OF BOATS AND MOTORS | 4,785 | 4,785 |
| | **COMBAT SERVICE SUPPORT EQUIPMENT** | | |
| 113 | HEATERS AND ECU'S | 7,617 | 7,617 |
| 115 | PERSONNEL RECOVERY SUPPORT SYSTEM (PRSS) | 5,356 | 5,356 |
| 116 | GROUND SOLDIER SYSTEM | 167,129 | 154,262 |
| | Excess to need | | [–12,867] |
| 117 | MOBILE SOLDIER POWER | 15,967 | 15,967 |
| 118 | FORCE PROVIDER | 34,200 | 34,200 |
| 120 | CARGO AERIAL DEL & PERSONNEL PARACHUTE SYSTEM | 45,792 | 45,792 |
| 121 | FAMILY OF ENGR COMBAT AND CONSTRUCTION SETS | 12,118 | 12,118 |
| | **PETROLEUM EQUIPMENT** | | |
| 123 | QUALITY SURVEILLANCE EQUIPMENT | 2,507 | 2,507 |
| 124 | DISTRIBUTION SYSTEMS, PETROLEUM & WATER | 40,989 | 40,989 |
| | **MEDICAL EQUIPMENT** | | |
| 125 | COMBAT SUPPORT MEDICAL | 86,829 | 86,829 |
| | **MAINTENANCE EQUIPMENT** | | |
| 126 | MOBILE MAINTENANCE EQUIPMENT SYSTEMS | 17,287 | 17,287 |
| | **CONSTRUCTION EQUIPMENT** | | |
| 128 | TRACTOR, FULL TRACKED | 29,878 | 29,878 |
| 129 | ALL TERRAIN CRANES | 27,725 | 30,725 |
| | FOATC Type I Cranes | | [3,000] |
| 131 | FAMILY OF DIVER SUPPORT EQUIPMENT | 1,811 | 1,811 |
| 132 | CONST EQUIP ESP | 8,898 | 8,898 |
| | **RAIL FLOAT CONTAINERIZATION EQUIPMENT** | | |
| 133 | ARMY WATERCRAFT ESP | 30,592 | 30,592 |
| 134 | MANEUVER SUPPORT VESSEL (MSV) | 149,449 | 191,476 |
| | One additional vessel | | [42,027] |
| | **GENERATORS** | | |
| 136 | GENERATORS AND ASSOCIATED EQUIP | 78,364 | 78,364 |
| 137 | TACTICAL ELECTRIC POWER RECAPITALIZATION | 11,088 | 11,088 |

137 STAT. 842          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | **MATERIAL HANDLING EQUIPMENT** | | |
| 138 | FAMILY OF FORKLIFTS ................................................ | 12,982 | 12,982 |
| | **TRAINING EQUIPMENT** | | |
| 139 | COMBAT TRAINING CENTERS SUPPORT ................................... | 56,619 | 56,619 |
| 140 | TRAINING DEVICES, NONSYSTEM ...................................... | 226,379 | 226,379 |
| 141 | SYNTHETIC TRAINING ENVIRONMENT (STE) ........................ | 234,965 | 234,965 |
| 142 | GAMING TECHNOLOGY IN SUPPORT OF ARMY TRAINING .. | 9,698 | 9,698 |
| | **TEST MEASURE AND DIG EQUIPMENT (TMD)** | | |
| 143 | INTEGRATED FAMILY OF TEST EQUIPMENT (IFTE) ............. | 36,149 | 36,149 |
| 144 | TEST EQUIPMENT MODERNIZATION (TEMOD) ...................... | 32,623 | 32,623 |
| | **OTHER SUPPORT EQUIPMENT** | | |
| 145 | PHYSICAL SECURITY SYSTEMS (OPA3) .................................... | 132,739 | 132,739 |
| 146 | BASE LEVEL COMMON EQUIPMENT ..................................... | 34,460 | 34,460 |
| 147 | MODIFICATION OF IN-SVC EQUIPMENT (OPA–3) .................... | 35,239 | 35,239 |
| 148 | BUILDING, PRE-FAB, RELOCATABLE ....................................... | 31,011 | 31,011 |
| 149 | SPECIAL EQUIPMENT FOR TEST AND EVALUATION ............ | 52,481 | 52,481 |
| | **OPA2** | | |
| 151 | INITIAL SPARES—C&E ................................................... | 9,169 | 9,169 |
| | **TOTAL OTHER PROCUREMENT, ARMY** ...................... | **8,672,979** | **8,725,753** |
| | | | |
| | **AIRCRAFT PROCUREMENT, NAVY** | | |
| | **COMBAT AIRCRAFT** | | |
| 001 | F/A–18E/F (FIGHTER) HORNET ...................................................... | 41,329 | 41,329 |
| 002 | JOINT STRIKE FIGHTER CV ....................................................... | 2,410,569 | 2,382,069 |
| | Flyaway unit cost growth .............................................................. | | [–28,500] |
| 003 | JOINT STRIKE FIGHTER CV AP ................................................. | 189,425 | 189,425 |
| 004 | JSF STOVL ........................................................................... | 2,126,317 | 2,083,651 |
| | Flyaway unit cost growth .............................................................. | | [–42,666] |
| 005 | JSF STOVL AP ...................................................................... | 193,125 | 193,125 |
| 006 | CH–53K (HEAVY LIFT) ............................................................. | 1,698,050 | 1,698,050 |
| 007 | CH–53K (HEAVY LIFT) AP .......................................................... | 456,567 | 456,567 |
| 008 | V–22 (MEDIUM LIFT) ............................................................... | 27,216 | 162,216 |
| | Program increase—one additional CMV–22 aircraft ............... | | [135,000] |
| 009 | H–1 UPGRADES (UH–1Y/AH–1Z) ................................................. | 4,292 | 4,292 |
| 010 | P–8A POSEIDON .................................................................... | 31,257 | 391,257 |
| | Two additional aircraft ............................................................... | | [360,000] |
| 011 | E–2D ADV HAWKEYE ............................................................... | 182,817 | 620,817 |
| | Two additional aircraft ............................................................... | | [438,000] |
| | **TRAINER AIRCRAFT** | | |
| 013 | MULTI-ENGINE TRAINING SYSTEM (METS) ............................ | 289,141 | 289,141 |
| | **OTHER AIRCRAFT** | | |
| 015 | KC–130J ............................................................................... | 241,291 | 241,291 |
| 017 | MQ–4 TRITON ........................................................................ | 416,010 | 416,010 |
| 019 | MQ–8 UAV ............................................................................ | 1,546 | 1,546 |
| 021 | MQ–25 ................................................................................. | 545,697 | 346,697 |
| | Scheduling delays ...................................................................... | | [–199,000] |
| 022 | MQ–25 AP ............................................................................. | 50,576 | 37,976 |
| | Scheduling delays ...................................................................... | | [–12,600] |
| 023 | MARINE GROUP 5 UAS ............................................................ | 89,563 | 86,063 |
| | Ancillary Equipment carryover ................................................... | | [–3,500] |
| 023A | UC–12W ............................................................................... | | 45,000 |
| | USMC UPL—2 additional aircraft ............................................. | | [45,000] |
| | **MODIFICATION OF AIRCRAFT** | | |
| 024 | F–18 A-D UNIQUE .................................................................. | 116,551 | 116,551 |
| 025 | F–18E/F AND EA–18G MODERNIZATION AND SUSTAINM ..... | 605,416 | 605,416 |
| 026 | MARINE GROUP 5 UAS SERIES .................................................. | 98,063 | 98,063 |
| 027 | AEA SYSTEMS ....................................................................... | 24,110 | 24,110 |
| 028 | AV–8 SERIES ........................................................................ | 22,829 | 22,829 |
| 029 | INFRARED SEARCH AND TRACK (IRST) ................................... | 179,193 | 179,193 |
| 030 | ADVERSARY .......................................................................... | 69,336 | 69,336 |
| 031 | F–18 SERIES ......................................................................... | 640,236 | 634,424 |
| | F/A–18 C/D/E/F and EA–18G training equipment previously funded. | | [–5,812] |
| 032 | H–53 SERIES ......................................................................... | 41,414 | 41,414 |
| 033 | MH–60 SERIES ....................................................................... | 106,495 | 106,495 |
| 034 | H–1 SERIES ........................................................................... | 114,284 | 124,284 |
| | UH–1Y—SIEPU Upgrades .......................................................... | | [10,000] |

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---:|---:|
| 035 | EP–3 SERIES | 8,548 | 8,548 |
| 036 | E–2 SERIES | 183,246 | 183,246 |
| 037 | TRAINER A/C SERIES | 16,376 | 16,376 |
| 039 | C–130 SERIES | 198,220 | 194,193 |
|  | Technical insertion (OSIP 019–14) Block 7 GFE unjustified growth. |  | [–4,027] |
| 040 | FEWSG | 651 | 651 |
| 041 | CARGO/TRANSPORT A/C SERIES | 13,930 | 13,930 |
| 042 | E–6 SERIES | 164,571 | 164,571 |
| 043 | EXECUTIVE HELICOPTERS SERIES | 60,498 | 60,498 |
| 044 | T–45 SERIES | 170,357 | 170,357 |
| 045 | POWER PLANT CHANGES | 21,079 | 21,079 |
| 046 | JPATS SERIES | 28,005 | 28,005 |
| 048 | COMMON ECM EQUIPMENT | 53,614 | 53,614 |
| 049 | COMMON AVIONICS CHANGES | 136,199 | 136,199 |
| 050 | COMMON DEFENSIVE WEAPON SYSTEM | 6,585 | 6,585 |
| 051 | ID SYSTEMS | 13,085 | 13,085 |
| 052 | P–8 SERIES | 316,168 | 316,168 |
| 053 | MAGTF EW FOR AVIATION | 24,901 | 24,901 |
| 054 | MQ–8 SERIES | 14,700 | 14,700 |
| 055 | V–22 (TILT/ROTOR ACFT) OSPREY | 215,997 | 226,887 |
|  | V–22 Nacelle Improvement |  | [10,890] |
| 056 | NEXT GENERATION JAMMER (NGJ) | 426,396 | 423,876 |
|  | Contract savings |  | [–2,520] |
| 057 | F–35 STOVL SERIES | 311,921 | 311,921 |
| 058 | F–35 CV SERIES | 166,909 | 166,909 |
| 059 | QRC | 28,206 | 28,206 |
| 060 | MQ–4 SERIES | 93,951 | 90,163 |
|  | OSIP (003–23) previously funded |  | [–3,788] |
|  | **AIRCRAFT SPARES AND REPAIR PARTS** |  |  |
| 062 | SPARES AND REPAIR PARTS | 2,451,244 | 2,451,244 |
|  | **AIRCRAFT SUPPORT EQUIP & FACILITIES** |  |  |
| 063 | COMMON GROUND EQUIPMENT | 566,156 | 561,156 |
|  | Program decrease |  | [–5,000] |
| 064 | AIRCRAFT INDUSTRIAL FACILITIES | 133,815 | 133,815 |
| 065 | WAR CONSUMABLES | 44,632 | 44,632 |
| 066 | OTHER PRODUCTION CHARGES | 49,907 | 49,907 |
| 067 | SPECIAL SUPPORT EQUIPMENT | 404,178 | 384,850 |
|  | Flyaway unit cost growth |  | [–19,328] |
|  | **TOTAL AIRCRAFT PROCUREMENT, NAVY** | **17,336,760** | **18,008,909** |
|  |  |  |  |
|  | **WEAPONS PROCUREMENT, NAVY** |  |  |
|  | **BALLISTIC MISSILES** |  |  |
| 001 | CONVENTIONAL PROMPT STRIKE | 341,434 | 256,076 |
|  | Early to need |  | [–85,358] |
|  | **MODIFICATION OF MISSILES** |  |  |
| 002 | TRIDENT II MODS | 1,284,705 | 1,284,705 |
|  | **SUPPORT EQUIPMENT & FACILITIES** |  |  |
| 003 | MISSILE INDUSTRIAL FACILITIES | 7,954 | 7,954 |
|  | **STRATEGIC MISSILES** |  |  |
| 004 | TOMAHAWK | 72,908 | 72,908 |
|  | **TACTICAL MISSILES** |  |  |
| 005 | AMRAAM | 439,153 | 439,153 |
| 006 | SIDEWINDER | 78,165 | 75,306 |
|  | AUR Block II unit cost increase |  | [–2,859] |
| 007 | STANDARD MISSILE | 969,525 | 969,525 |
| 008 | STANDARD MISSILE AP | 227,320 | 227,320 |
| 009 | SMALL DIAMETER BOMB II | 65,863 | 64,497 |
|  | AUR unit cost growth |  | [–1,366] |
| 010 | RAM | 114,896 | 114,896 |
| 011 | JOINT AIR GROUND MISSILE (JAGM) | 79,292 | 79,292 |
| 012 | HELLFIRE | 6,923 | 6,923 |
| 013 | AERIAL TARGETS | 176,588 | 176,588 |
| 014 | OTHER MISSILE SUPPORT | 3,687 | 3,687 |
| 015 | LRASM | 639,636 | 639,636 |
| 016 | NAVAL STRIKE MISSILE (NSM) | 29,925 | 29,925 |
| 017 | NAVAL STRIKE MISSILE (NSM) AP | 5,755 | 5,755 |

137 STAT. 844          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| | **MODIFICATION OF MISSILES** | | |
| 018 | TOMAHAWK MODS | 540,944 | 508,455 |
| | Contract award delays | | [–32,489] |
| 019 | ESSM | 290,129 | 290,129 |
| 020 | AARGM-ER | 162,429 | 162,429 |
| 021 | AARGM-ER AP | 33,273 | 33,273 |
| 022 | STANDARD MISSILES MODS | 89,255 | 89,255 |
| | **SUPPORT EQUIPMENT & FACILITIES** | | |
| 023 | WEAPONS INDUSTRIAL FACILITIES | 2,037 | 2,037 |
| | **ORDNANCE SUPPORT EQUIPMENT** | | |
| 025 | ORDNANCE SUPPORT EQUIPMENT | 208,154 | 208,154 |
| | **TORPEDOES AND RELATED EQUIP** | | |
| 026 | SSTD | 4,830 | 4,830 |
| 027 | MK–48 TORPEDO | 308,497 | 308,497 |
| 028 | ASW TARGETS | 14,817 | 14,817 |
| | **MOD OF TORPEDOES AND RELATED EQUIP** | | |
| 029 | MK–54 TORPEDO MODS | 104,086 | 104,086 |
| 030 | MK–48 TORPEDO ADCAP MODS | 20,714 | 20,714 |
| 031 | MARITIME MINES | 58,800 | 58,800 |
| | **SUPPORT EQUIPMENT** | | |
| 032 | TORPEDO SUPPORT EQUIPMENT | 133,187 | 133,187 |
| 033 | ASW RANGE SUPPORT | 4,146 | 4,146 |
| | **DESTINATION TRANSPORTATION** | | |
| 034 | FIRST DESTINATION TRANSPORTATION | 5,811 | 5,811 |
| | **GUNS AND GUN MOUNTS** | | |
| 035 | SMALL ARMS AND WEAPONS | 14,165 | 14,165 |
| | **MODIFICATION OF GUNS AND GUN MOUNTS** | | |
| 036 | CIWS MODS | 4,088 | 4,088 |
| 037 | COAST GUARD WEAPONS | 55,172 | 55,172 |
| 038 | GUN MOUNT MODS | 82,682 | 82,682 |
| 039 | LCS MODULE WEAPONS | 3,264 | 3,264 |
| 040 | AIRBORNE MINE NEUTRALIZATION SYSTEMS | 14,357 | 14,357 |
| | **SPARES AND REPAIR PARTS** | | |
| 042 | SPARES AND REPAIR PARTS | 177,819 | 177,819 |
| | **TOTAL WEAPONS PROCUREMENT, NAVY** | **6,876,385** | **6,754,313** |
| | | | |
| | **PROCUREMENT OF AMMUNITION, NAVY AND MARINE CORPS** | | |
| | **NAVY AMMUNITION** | | |
| 001 | GENERAL PURPOSE BOMBS | 43,519 | 38,893 |
| | O2181 laser guided bombs contract award delay | | [–4,626] |
| 002 | JDAM | 73,689 | 73,689 |
| 003 | AIRBORNE ROCKETS, ALL TYPES | 67,423 | 62,228 |
| | MK 66 rocket motor unit cost growth | | [–5,195] |
| 004 | MACHINE GUN AMMUNITION | 11,862 | 11,862 |
| 005 | PRACTICE BOMBS | 52,481 | 46,325 |
| | 01050 BLU–109 contract award delay | | [–6,156] |
| 006 | CARTRIDGES & CART ACTUATED DEVICES | 72,426 | 72,426 |
| 007 | AIR EXPENDABLE COUNTERMEASURES | 104,529 | 104,529 |
| 008 | JATOS | 7,433 | 7,433 |
| 009 | 5 INCH/54 GUN AMMUNITION | 30,871 | 25,841 |
| | Insufficient justification | | [–5,030] |
| 010 | INTERMEDIATE CALIBER GUN AMMUNITION | 41,261 | 41,261 |
| 011 | OTHER SHIP GUN AMMUNITION | 44,044 | 44,044 |
| 012 | SMALL ARMS & LANDING PARTY AMMO | 48,478 | 48,478 |
| 013 | PYROTECHNIC AND DEMOLITION | 9,521 | 9,521 |
| 014 | AMMUNITION LESS THAN $5 MILLION | 1,679 | 1,679 |
| 015 | EXPEDITIONARY LOITERING MUNITIONS | 249,575 | 299,575 |
| | Goalkeeper | | [50,000] |
| | **MARINE CORPS AMMUNITION** | | |
| 016 | MORTARS | 61,274 | 61,274 |
| 017 | DIRECT SUPPORT MUNITIONS | 73,338 | 73,338 |
| 018 | INFANTRY WEAPONS AMMUNITION | 178,240 | 176,255 |
| | AB39, CTG. 7.62 millimeter MK 316 mod contract award delay. | | [–602] |
| | Excess to need: Cartridge, caliber 50 4 API M8/1 API–T M20 linked. | | [–157] |

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 845

**SEC. 4101. PROCUREMENT**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | Excess to need: Cartridge, Caliber 50 Linked MK322 Mod 1/ Ball (1000m cap). | | [–1,226] |
| 019 | COMBAT SUPPORT MUNITIONS | 15,897 | 15,897 |
| 020 | AMMO MODERNIZATION | 17,941 | 17,941 |
| 021 | ARTILLERY MUNITIONS | 82,452 | 82,452 |
| 022 | ITEMS LESS THAN $5 MILLION | 5,340 | 5,340 |
| | **TOTAL PROCUREMENT OF AMMUNITION, NAVY AND MARINE CORPS.** | **1,293,273** | **1,320,281** |
| | | | |
| | **SHIPBUILDING AND CONVERSION, NAVY** | | |
| | **FLEET BALLISTIC MISSILE SHIPS** | | |
| 001 | OHIO REPLACEMENT SUBMARINE | 2,443,598 | 2,443,598 |
| 002 | OHIO REPLACEMENT SUBMARINE AP | 3,390,734 | 3,390,734 |
| | **OTHER WARSHIPS** | | |
| 003 | CARRIER REPLACEMENT PROGRAM | 1,115,296 | 1,115,296 |
| 004 | CVN–81 | 800,492 | 800,492 |
| 005 | VIRGINIA CLASS SUBMARINE | 7,129,965 | 7,129,965 |
| 006 | VIRGINIA CLASS SUBMARINE AP | 3,215,539 | 3,215,539 |
| 008 | CVN REFUELING OVERHAULS AP | 817,646 | 802,988 |
| | Excess growth | | [–14,658] |
| 009 | DDG 1000 | 410,400 | 410,400 |
| 010 | DDG–51 | 4,199,179 | 4,199,179 |
| 011 | DDG–51 AP | 284,035 | 784,035 |
| | Program increase | | [500,000] |
| 013 | FFG-FRIGATE | 2,173,698 | 2,163,698 |
| | Insufficient justification | | [–10,000] |
| | **AMPHIBIOUS SHIPS** | | |
| 014 | LPD FLIGHT II | | 1,000,000 |
| | Program increase for LPD–33—USMC UFR | | [1,000,000] |
| 018 | LHA REPLACEMENT | 1,830,149 | 1,830,149 |
| | **AUXILIARIES, CRAFT AND PRIOR YR PROGRAM COST** | | |
| 021 | AS SUBMARINE TENDER | 1,733,234 | 248,000 |
| | Late contract award | | [–1,485,234] |
| 022 | TAO FLEET OILER | 815,420 | 815,420 |
| 025 | LCU 1700 | 62,532 | 62,532 |
| 026 | OUTFITTING | 557,365 | 539,681 |
| | Outfitting early to need | | [–17,684] |
| 028 | SERVICE CRAFT | 63,815 | 93,815 |
| | Yard, Repair, Berthing, and Messing Barge | | [30,000] |
| 029 | AUXILIARY PERSONNEL LIGHTER | | 72,000 |
| | Additional APL–67 class berthing barge | | [72,000] |
| 030 | LCAC SLEP | 15,286 | 15,286 |
| 031 | AUXILIARY VESSELS (USED SEALIFT) | 142,008 | 142,008 |
| 032 | COMPLETION OF PY SHIPBUILDING PROGRAMS | 1,648,559 | 1,648,559 |
| | **TOTAL SHIPBUILDING AND CONVERSION, NAVY** | **32,848,950** | **32,923,374** |
| | | | |
| | **OTHER PROCUREMENT, NAVY** | | |
| | **SHIP PROPULSION EQUIPMENT** | | |
| 001 | SURFACE POWER EQUIPMENT | 14,003 | 14,003 |
| | **GENERATORS** | | |
| 002 | SURFACE COMBATANT HM&E | 105,441 | 100,100 |
| | DDG 51 ship control system cost growth | | [–5,341] |
| | **NAVIGATION EQUIPMENT** | | |
| 003 | OTHER NAVIGATION EQUIPMENT | 110,286 | 110,286 |
| | **OTHER SHIPBOARD EQUIPMENT** | | |
| 004 | SUB PERISCOPE, IMAGING AND SUPT EQUIP PROG | 262,951 | 262,951 |
| 005 | DDG MOD | 628,532 | 637,532 |
| | Navy Common Actuator | | [9,000] |
| 006 | FIREFIGHTING EQUIPMENT | 34,782 | 34,782 |
| 007 | COMMAND AND CONTROL SWITCHBOARD | 2,458 | 2,458 |
| 008 | LHA/LHD MIDLIFE | 104,369 | 104,369 |
| 009 | LCC 19/20 EXTENDED SERVICE LIFE PROGRAM | 10,529 | 10,529 |
| 010 | POLLUTION CONTROL EQUIPMENT | 23,272 | 23,272 |
| 011 | SUBMARINE SUPPORT EQUIPMENT | 112,526 | 112,526 |
| 012 | VIRGINIA CLASS SUPPORT EQUIPMENT | 32,076 | 32,076 |
| 013 | LCS CLASS SUPPORT EQUIPMENT | 18,832 | 18,832 |
| 014 | SUBMARINE BATTERIES | 28,221 | 28,221 |

137 STAT. 846　　　　PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| 015 | LPD CLASS SUPPORT EQUIPMENT | 91,890 | 85,274 |
|  | HWISW obsolescence installation cost growth |  | [–6,616] |
| 016 | DDG 1000 CLASS SUPPORT EQUIPMENT | 232,124 | 294,024 |
|  | Navy UPL |  | [61,900] |
| 017 | STRATEGIC PLATFORM SUPPORT EQUIP | 25,058 | 25,058 |
| 018 | DSSP EQUIPMENT | 4,623 | 4,623 |
| 020 | LCAC | 10,794 | 10,794 |
| 021 | UNDERWATER EOD EQUIPMENT | 19,549 | 19,549 |
| 022 | ITEMS LESS THAN $5 MILLION | 86,001 | 86,001 |
| 023 | CHEMICAL WARFARE DETECTORS | 3,288 | 3,288 |
|  | **REACTOR PLANT EQUIPMENT** |  |  |
| 024 | SHIP MAINTENANCE, REPAIR AND MODERNIZATION | 2,746,313 | 2,746,313 |
| 025 | REACTOR POWER UNITS | 2,016 | 2,016 |
| 026 | REACTOR COMPONENTS | 390,148 | 390,148 |
|  | **OCEAN ENGINEERING** |  |  |
| 027 | DIVING AND SALVAGE EQUIPMENT | 18,086 | 18,086 |
|  | **SMALL BOATS** |  |  |
| 028 | STANDARD BOATS | 74,963 | 83,963 |
|  | 40-foot Patrol Boats |  | [9,000] |
|  | **PRODUCTION FACILITIES EQUIPMENT** |  |  |
| 029 | OPERATING FORCES IPE | 187,495 | 187,495 |
|  | **OTHER SHIP SUPPORT** |  |  |
| 030 | LCS COMMON MISSION MODULES EQUIPMENT | 49,060 | 49,060 |
| 031 | LCS MCM MISSION MODULES | 93,961 | 79,670 |
|  | Excess to need |  | [–14,291] |
| 033 | LCS SUW MISSION MODULES | 12,102 | 12,102 |
| 034 | LCS IN-SERVICE MODERNIZATION | 171,704 | 154,674 |
|  | Excessive cost growth |  | [–17,030] |
| 035 | SMALL & MEDIUM UUV | 61,951 | 61,951 |
|  | **LOGISTIC SUPPORT** |  |  |
| 036 | LSD MIDLIFE & MODERNIZATION | 7,594 | 7,594 |
|  | **SHIP SONARS** |  |  |
| 037 | SPQ–9B RADAR | 7,267 | 7,267 |
| 038 | AN/SQQ–89 SURF ASW COMBAT SYSTEM | 138,065 | 138,065 |
| 039 | SSN ACOUSTIC EQUIPMENT | 463,577 | 463,577 |
| 040 | UNDERSEA WARFARE SUPPORT EQUIPMENT | 23,452 | 23,452 |
|  | **ASW ELECTRONIC EQUIPMENT** |  |  |
| 041 | SUBMARINE ACOUSTIC WARFARE SYSTEM | 46,726 | 46,726 |
| 042 | SSTD | 14,560 | 14,560 |
| 043 | FIXED SURVEILLANCE SYSTEM | 420,069 | 420,069 |
| 044 | SURTASS | 33,910 | 33,910 |
|  | **ELECTRONIC WARFARE EQUIPMENT** |  |  |
| 045 | AN/SLQ–32 | 329,513 | 329,513 |
|  | **RECONNAISSANCE EQUIPMENT** |  |  |
| 046 | SHIPBOARD IW EXPLOIT | 379,230 | 362,305 |
|  | Excessive cost growth |  | [–16,925] |
| 047 | AUTOMATED IDENTIFICATION SYSTEM (AIS) | 4,082 | 4,082 |
|  | **OTHER SHIP ELECTRONIC EQUIPMENT** |  |  |
| 048 | COOPERATIVE ENGAGEMENT CAPABILITY | 37,677 | 37,677 |
| 049 | NAVAL TACTICAL COMMAND SUPPORT SYSTEM (NTCSS) | 15,374 | 15,374 |
| 050 | ATDLS | 50,148 | 50,148 |
| 051 | NAVY COMMAND AND CONTROL SYSTEM (NCCS) | 3,918 | 3,918 |
| 052 | MINESWEEPING SYSTEM REPLACEMENT | 16,814 | 16,814 |
| 054 | NAVSTAR GPS RECEIVERS (SPACE) | 37,319 | 37,319 |
| 055 | AMERICAN FORCES RADIO AND TV SERVICE | 2,750 | 2,750 |
| 056 | STRATEGIC PLATFORM SUPPORT EQUIP | 6,437 | 6,437 |
|  | **AVIATION ELECTRONIC EQUIPMENT** |  |  |
| 057 | ASHORE ATC EQUIPMENT | 89,237 | 89,237 |
| 058 | AFLOAT ATC EQUIPMENT | 90,487 | 88,369 |
|  | Excessive cost growth |  | [–2,118] |
| 059 | ID SYSTEMS | 59,234 | 59,234 |
| 060 | JOINT PRECISION APPROACH AND LANDING SYSTEM | 3,343 | 3,343 |
| 061 | NAVAL MISSION PLANNING SYSTEMS | 39,180 | 39,180 |
|  | **OTHER SHORE ELECTRONIC EQUIPMENT** |  |  |
| 062 | MARITIME INTEGRATED BROADCAST SYSTEM | 6,994 | 6,994 |
| 063 | TACTICAL/MOBILE C4I SYSTEMS | 52,026 | 52,026 |
| 064 | DCGS-N | 16,579 | 16,579 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 847

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| 065 | CANES | 467,587 | 467,587 |
| 066 | RADIAC | 16,475 | 16,475 |
| 067 | CANES-INTELL | 48,207 | 48,207 |
| 068 | GPETE | 25,761 | 25,761 |
| 069 | MASF | 16,475 | 16,475 |
| 070 | INTEG COMBAT SYSTEM TEST FACILITY | 6,345 | 6,345 |
| 071 | EMI CONTROL INSTRUMENTATION | 4,282 | 4,282 |
| 073 | IN-SERVICE RADARS AND SENSORS | 255,256 | 240,256 |
|  | Insufficient justification |  | [–15,000] |
|  | **SHIPBOARD COMMUNICATIONS** |  |  |
| 074 | BATTLE FORCE TACTICAL NETWORK | 74,180 | 74,180 |
| 075 | SHIPBOARD TACTICAL COMMUNICATIONS | 29,776 | 29,776 |
| 076 | SHIP COMMUNICATIONS AUTOMATION | 96,916 | 96,916 |
| 077 | COMMUNICATIONS ITEMS UNDER $5M | 14,107 | 14,107 |
|  | **SUBMARINE COMMUNICATIONS** |  |  |
| 078 | SUBMARINE BROADCAST SUPPORT | 73,791 | 73,791 |
| 079 | SUBMARINE COMMUNICATION EQUIPMENT | 83,178 | 83,178 |
|  | **SATELLITE COMMUNICATIONS** |  |  |
| 080 | SATELLITE COMMUNICATIONS SYSTEMS | 72,871 | 72,871 |
| 081 | NAVY MULTIBAND TERMINAL (NMT) | 37,921 | 37,921 |
|  | **SHORE COMMUNICATIONS** |  |  |
| 082 | JOINT COMMUNICATIONS SUPPORT ELEMENT (JCSE) | 5,065 | 5,065 |
|  | **CRYPTOGRAPHIC EQUIPMENT** |  |  |
| 083 | INFO SYSTEMS SECURITY PROGRAM (ISSP) | 154,890 | 154,890 |
| 084 | MIO INTEL EXPLOITATION TEAM | 1,079 | 1,079 |
|  | **CRYPTOLOGIC EQUIPMENT** |  |  |
| 085 | CRYPTOLOGIC COMMUNICATIONS EQUIP | 17,483 | 17,483 |
|  | **OTHER ELECTRONIC SUPPORT** |  |  |
| 086 | COAST GUARD EQUIPMENT | 77,458 | 77,458 |
|  | **SONOBUOYS** |  |  |
| 088 | SONOBUOYS—ALL TYPES | 311,177 | 311,177 |
|  | **AIRCRAFT SUPPORT EQUIPMENT** |  |  |
| 089 | MINOTAUR | 5,396 | 5,396 |
| 090 | WEAPONS RANGE SUPPORT EQUIPMENT | 147,556 | 147,556 |
| 091 | AIRCRAFT SUPPORT EQUIPMENT | 162,273 | 162,273 |
| 092 | ADVANCED ARRESTING GEAR (AAG) | 11,930 | 11,930 |
| 093 | ELECTROMAGNETIC AIRCRAFT LAUNCH SYSTEM (EMALS | 17,836 | 17,836 |
| 094 | METEOROLOGICAL EQUIPMENT | 19,703 | 19,703 |
| 095 | LEGACY AIRBORNE MCM | 12,202 | 12,202 |
| 097 | AVIATION SUPPORT EQUIPMENT | 82,115 | 82,115 |
| 098 | UMCS-UNMAN CARRIER AVIATION(UCA)MISSION CNTRL ... | 152,687 | 152,687 |
| 099 | ARCHITECT & CAP FOR AUTONOMY IN NAV ENTER | 1,612 | 1,612 |
|  | **SHIP GUN SYSTEM EQUIPMENT** |  |  |
| 100 | SHIP GUN SYSTEMS EQUIPMENT | 6,404 | 6,404 |
|  | **SHIP MISSILE SYSTEMS EQUIPMENT** |  |  |
| 101 | HARPOON SUPPORT EQUIPMENT | 227 | 227 |
| 102 | SHIP MISSILE SUPPORT EQUIPMENT | 294,511 | 294,511 |
| 103 | TOMAHAWK SUPPORT EQUIPMENT | 92,432 | 92,432 |
|  | **FBM SUPPORT EQUIPMENT** |  |  |
| 104 | STRATEGIC MISSILE SYSTEMS EQUIP | 325,318 | 325,318 |
|  | **ASW SUPPORT EQUIPMENT** |  |  |
| 105 | SSN COMBAT CONTROL SYSTEMS | 133,063 | 133,063 |
| 106 | ASW SUPPORT EQUIPMENT | 27,469 | 27,469 |
|  | **OTHER ORDNANCE SUPPORT EQUIPMENT** |  |  |
| 107 | EXPLOSIVE ORDNANCE DISPOSAL EQUIP | 27,864 | 27,864 |
| 108 | ITEMS LESS THAN $5 MILLION | 6,171 | 6,171 |
|  | **OTHER EXPENDABLE ORDNANCE** |  |  |
| 109 | ANTI-SHIP MISSILE DECOY SYSTEM | 56,630 | 56,630 |
| 110 | SUBMARINE TRAINING DEVICE MODS | 76,954 | 76,954 |
| 111 | SURFACE TRAINING EQUIPMENT | 209,487 | 209,487 |
|  | **CIVIL ENGINEERING SUPPORT EQUIPMENT** |  |  |
| 112 | PASSENGER CARRYING VEHICLES | 3,827 | 3,827 |
| 113 | GENERAL PURPOSE TRUCKS | 4,570 | 4,570 |
| 114 | CONSTRUCTION & MAINTENANCE EQUIP | 56,829 | 56,829 |
| 115 | FIRE FIGHTING EQUIPMENT | 16,583 | 16,583 |
| 116 | TACTICAL VEHICLES | 24,236 | 24,236 |
| 117 | AMPHIBIOUS EQUIPMENT | 4,504 | 4,504 |

137 STAT. 848          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---:|---:|
| 118 | POLLUTION CONTROL EQUIPMENT | 3,898 | 3,898 |
| 119 | ITEMS LESS THAN $5 MILLION | 67,286 | 67,286 |
| 120 | PHYSICAL SECURITY VEHICLES | 1,286 | 1,286 |
| | **SUPPLY SUPPORT EQUIPMENT** | | |
| 121 | SUPPLY EQUIPMENT | 33,258 | 33,258 |
| 122 | FIRST DESTINATION TRANSPORTATION | 6,977 | 6,977 |
| 123 | SPECIAL PURPOSE SUPPLY SYSTEMS | 659,529 | 659,529 |
| | **TRAINING DEVICES** | | |
| 124 | TRAINING SUPPORT EQUIPMENT | 2,083 | 2,083 |
| 125 | TRAINING AND EDUCATION EQUIPMENT | 106,542 | 106,542 |
| | **COMMAND SUPPORT EQUIPMENT** | | |
| 126 | COMMAND SUPPORT EQUIPMENT | 44,448 | 44,448 |
| 127 | MEDICAL SUPPORT EQUIPMENT | 12,529 | 12,529 |
| 129 | NAVAL MIP SUPPORT EQUIPMENT | 5,408 | 5,408 |
| 130 | OPERATING FORCES SUPPORT EQUIPMENT | 12,105 | 12,105 |
| 131 | C4ISR EQUIPMENT | 7,670 | 7,670 |
| 132 | ENVIRONMENTAL SUPPORT EQUIPMENT | 52,597 | 52,597 |
| 133 | PHYSICAL SECURITY EQUIPMENT | 108,901 | 108,901 |
| 134 | ENTERPRISE INFORMATION TECHNOLOGY | 42,154 | 42,154 |
| | **OTHER** | | |
| 139 | NEXT GENERATION ENTERPRISE SERVICE | 177,585 | 177,585 |
| 140 | CYBERSPACE ACTIVITIES | 23,176 | 23,176 |
| | **CLASSIFIED PROGRAMS** | | |
| 143A | CLASSIFIED PROGRAMS | 16,290 | 17,990 |
| | Program increase | | [1,700] |
| | **SPARES AND REPAIR PARTS** | | |
| 142 | SPARES AND REPAIR PARTS | 645,900 | 645,900 |
| 143 | VIRGINIA CLASS (VACL) SPARES AND REPAIR PARTS | 470,000 | 470,000 |
| | **TOTAL OTHER PROCUREMENT, NAVY** | **14,535,257** | **14,539,536** |
| | | | |
| | **PROCUREMENT, MARINE CORPS** | | |
| | **TRACKED COMBAT VEHICLES** | | |
| 001 | AAV7A1 PIP | 3,353 | 3,353 |
| 002 | AMPHIBIOUS COMBAT VEHICLE FAMILY OF VEHICLES | 557,564 | 554,064 |
| | Unjustified growth—Program Management | | [–3,500] |
| 003 | LAV PIP | 42,052 | 42,052 |
| | **ARTILLERY AND OTHER WEAPONS** | | |
| 004 | 155MM LIGHTWEIGHT TOWED HOWITZER | 489 | 489 |
| 005 | ARTILLERY WEAPONS SYSTEM | 165,268 | 165,268 |
| 006 | WEAPONS AND COMBAT VEHICLES UNDER $5 MILLION | 14,004 | 14,004 |
| | **GUIDED MISSILES** | | |
| 007 | TOMAHAWK | 105,192 | 105,192 |
| 008 | NAVAL STRIKE MISSILE (NSM) | 169,726 | 169,726 |
| 009 | NAVAL STRIKE MISSILE (NSM) AP | 39,244 | 39,244 |
| 010 | GROUND BASED AIR DEFENSE | 249,103 | 253,603 |
| | Program increase | | [4,500] |
| 011 | ANTI-ARMOR MISSILE-JAVELIN | 54,883 | 54,883 |
| 012 | FAMILY ANTI-ARMOR WEAPON SYSTEMS (FOAAWS) | 23,627 | 23,627 |
| 013 | ANTI-ARMOR MISSILE-TOW | 2,007 | 2,007 |
| 014 | GUIDED MLRS ROCKET (GMLRS) | 8,867 | 8,867 |
| | **COMMAND AND CONTROL SYSTEMS** | | |
| 015 | COMMON AVIATION COMMAND AND CONTROL SYSTEM | 75,382 | 72,908 |
| | Unjustified fielding growth | | [–2,474] |
| | **REPAIR AND TEST EQUIPMENT** | | |
| 016 | REPAIR AND TEST EQUIPMENT | 53,590 | 53,590 |
| | **OTHER SUPPORT (TEL)** | | |
| 017 | MODIFICATION KITS | 1,782 | 1,782 |
| | **COMMAND AND CONTROL SYSTEM (NON-TEL)** | | |
| 018 | ITEMS UNDER $5 MILLION (COMM & ELEC) | 122,917 | 118,038 |
| | SBNVG unit cost growth | | [–4,879] |
| 019 | AIR OPERATIONS C2 SYSTEMS | 23,744 | 23,744 |
| | **RADAR + EQUIPMENT (NON-TEL)** | | |
| 020 | GROUND/AIR TASK ORIENTED RADAR (G/ATOR) | 66,291 | 66,291 |
| | **INTELL/COMM EQUIPMENT (NON-TEL)** | | |
| 021 | ELECTRO MAGNETIC SPECTRUM OPERATIONS (EMSO) | 177,270 | 177,270 |
| 022 | GCSS-MC | 4,144 | 4,144 |
| 023 | FIRE SUPPORT SYSTEM | 58,483 | 58,483 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 849

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| 024 | INTELLIGENCE SUPPORT EQUIPMENT | 148,062 | 148,062 |
| 026 | UNMANNED AIR SYSTEMS (INTEL) | 52,273 | 48,909 |
|  | Unit cost growth |  | [–3,364] |
| 027 | DCGS-MC | 68,289 | 73,389 |
|  | USMC UPL #5 |  | [5,100] |
| 028 | UAS PAYLOADS | 19,088 | 19,088 |
|  | **OTHER SUPPORT (NON-TEL)** |  |  |
| 031 | EXPEDITIONARY SUPPORT EQUIPMENT | 2,010 | 2,010 |
| 032 | MARINE CORPS ENTERPRISE NETWORK (MCEN) | 259,044 | 244,479 |
|  | Network transport excess growth |  | [–14,565] |
| 033 | COMMON COMPUTER RESOURCES | 27,966 | 27,966 |
| 034 | COMMAND POST SYSTEMS | 71,109 | 69,151 |
|  | Unit cost growth |  | [–1,958] |
| 035 | RADIO SYSTEMS | 544,059 | 504,327 |
|  | Unexecutable growth |  | [–39,732] |
| 036 | COMM SWITCHING & CONTROL SYSTEMS | 46,276 | 46,276 |
| 037 | COMM & ELEC INFRASTRUCTURE SUPPORT | 27,111 | 27,111 |
| 038 | CYBERSPACE ACTIVITIES | 27,583 | 27,583 |
| 040 | UNMANNED EXPEDITIONARY SYSTEMS | 13,564 | 13,564 |
|  | **CLASSIFIED PROGRAMS** |  |  |
| 057A | CLASSIFIED PROGRAMS | 2,799 | 2,799 |
|  | **ADMINISTRATIVE VEHICLES** |  |  |
| 043 | COMMERCIAL CARGO VEHICLES | 34,169 | 34,169 |
|  | **TACTICAL VEHICLES** |  |  |
| 044 | MOTOR TRANSPORT MODIFICATIONS | 17,299 | 17,299 |
| 045 | JOINT LIGHT TACTICAL VEHICLE | 232,501 | 232,501 |
| 046 | TRAILERS | 2,034 | 2,034 |
|  | **ENGINEER AND OTHER EQUIPMENT** |  |  |
| 047 | TACTICAL FUEL SYSTEMS | 12,956 | 12,956 |
| 048 | POWER EQUIPMENT ASSORTED | 28,899 | 28,899 |
| 049 | AMPHIBIOUS SUPPORT EQUIPMENT | 15,691 | 15,691 |
| 050 | EOD SYSTEMS | 41,200 | 41,200 |
|  | **MATERIALS HANDLING EQUIPMENT** |  |  |
| 051 | PHYSICAL SECURITY EQUIPMENT | 53,949 | 53,949 |
|  | **GENERAL PROPERTY** |  |  |
| 052 | FIELD MEDICAL EQUIPMENT | 5,457 | 5,457 |
| 053 | TRAINING DEVICES | 96,577 | 96,577 |
| 054 | FAMILY OF CONSTRUCTION EQUIPMENT | 29,883 | 29,883 |
| 055 | ULTRA-LIGHT TACTICAL VEHICLE (ULTV) | 17,034 | 17,034 |
|  | **OTHER SUPPORT** |  |  |
| 056 | ITEMS LESS THAN $5 MILLION | 27,691 | 27,691 |
|  | **SPARES AND REPAIR PARTS** |  |  |
| 057 | SPARES AND REPAIR PARTS | 35,657 | 35,657 |
|  | **TOTAL PROCUREMENT, MARINE CORPS** | **3,979,212** | **3,918,340** |
|  |  |  |  |
|  | **AIRCRAFT PROCUREMENT, AIR FORCE** |  |  |
|  | **STRATEGIC OFFENSIVE** |  |  |
| 001 | B–21 RAIDER | 1,617,093 | 1,617,093 |
| 002 | B–21 RAIDER AP | 708,000 | 708,000 |
|  | **TACTICAL FORCES** |  |  |
| 003 | F–35 | 4,877,121 | 4,773,381 |
|  | Flyaway unit cost growth |  | [–103,740] |
| 004 | F–35 AP | 402,000 | 402,000 |
| 005 | F–15EX | 2,670,039 | 2,442,861 |
|  | Other support costs unjustified growth |  | [–26,730] |
|  | Technical realignment |  | [–200,448] |
| 006 | F–15EX AP | 228,000 | 228,000 |
|  | **TACTICAL AIRLIFT** |  |  |
| 007 | KC–46A MDAP | 2,882,590 | 2,835,019 |
|  | Commodities activation excess to need |  | [–41,000] |
|  | Cost overestimation: Other government costs |  | [–6,571] |
|  | **OTHER AIRLIFT** |  |  |
| 008 | C–130J | 34,921 | 34,921 |
|  | **HELICOPTERS** |  |  |
| 011 | MH–139A | 228,807 | 228,807 |
| 012 | COMBAT RESCUE HELICOPTER | 282,533 | 379,749 |
|  | Obsolesence ahead of need |  | [–22,784] |

137 STAT. 850          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---:|---:|
| | Program increase—two aircraft | | [120,000] |
| | **MISSION SUPPORT AIRCRAFT** | | |
| 013 | CIVIL AIR PATROL A/C | 3,013 | 11,900 |
| | Program increase | | [8,887] |
| | **OTHER AIRCRAFT** | | |
| 015 | TARGET DRONES | 42,226 | 42,226 |
| 017 | E–11 BACN/HAG | 67,367 | 67,367 |
| | **STRATEGIC AIRCRAFT** | | |
| 019 | B–2A | 107,980 | 104,380 |
| | Excess to need: IFF transponder | | [–3,600] |
| 020 | B–1B | 12,757 | 9,782 |
| | Technical realignment | | [–2,975] |
| 021 | B–52 | 65,815 | 48,599 |
| | Cost overestimation: Tactical data links program support | | [–3,199] |
| | Technical realignment | | [–14,017] |
| 022 | LARGE AIRCRAFT INFRARED COUNTERMEASURES | 21,723 | 21,723 |
| | **TACTICAL AIRCRAFT** | | |
| 024 | E–11 BACN/HAG | 58,923 | 58,923 |
| 025 | F–15 | 34,830 | 155,278 |
| | Technical realignment | | [120,448] |
| 026 | F–16 | 297,342 | 360,743 |
| | Comms suite upgrade installation delays | | [–5,454] |
| | Comms suite upgrade kits previously funded | | [–5,705] |
| | IVEWS restoration | | [100,000] |
| | SLEP costs previously funded | | [–25,440] |
| 027 | F–22A | 794,676 | 359,679 |
| | Sensor enhancement delays | | [–434,997] |
| 028 | F–35 MODIFICATIONS | 451,798 | 451,798 |
| 029 | F–15 EPAW | 280,658 | 264,977 |
| | SEPM unjustified growth | | [–15,681] |
| | **AIRLIFT AIRCRAFT** | | |
| 031 | C–5 | 24,377 | 24,377 |
| 032 | C–17A | 140,560 | 140,560 |
| 033 | C–32A | 19,060 | 19,060 |
| 034 | C–37A | 13,454 | 13,454 |
| | **TRAINER AIRCRAFT** | | |
| 035 | GLIDER MODS | 5,270 | 5,270 |
| 036 | T–6 | 2,942 | 2,942 |
| 037 | T–1 | 10,950 | 10,950 |
| 038 | T–38 | 125,340 | 125,340 |
| | **OTHER AIRCRAFT** | | |
| 040 | U–2 MODS | 54,727 | 54,727 |
| 042 | C–12 | 446 | 446 |
| 044 | VC–25A MOD | 29,707 | 29,707 |
| 045 | C–40 | 8,921 | 8,921 |
| 046 | C–130 | 71,177 | 91,177 |
| | iMAFFS | | [20,000] |
| 047 | C–130J MODS | 121,258 | 121,258 |
| 048 | C–135 | 153,595 | 153,595 |
| 049 | COMPASS CALL | 144,686 | 194,686 |
| | SABER integration on EC–37B aircraft | | [50,000] |
| 050 | COMBAT FLIGHT INSPECTION—CFIN | 446 | 446 |
| 051 | RC–135 | 220,138 | 220,138 |
| 052 | E–3 | 1,350 | 1,350 |
| 053 | E–4 | 13,055 | 13,055 |
| 056 | H–1 | 816 | 816 |
| 057 | H–60 | 4,207 | 4,207 |
| 060 | HC/MC–130 MODIFICATIONS | 101,055 | 101,055 |
| 061 | OTHER AIRCRAFT | 54,134 | 73,403 |
| | Technical realignment | | [11,619] |
| | Technical realignment—Sentinel Aircraft Procurement | | [7,650] |
| 062 | MQ–9 MODS | 98,063 | 98,063 |
| 064 | SENIOR LEADER C3 SYSTEM—AIRCRAFT | 24,847 | 24,847 |
| 065 | CV–22 MODS | 153,006 | 153,006 |
| | **AIRCRAFT SPARES AND REPAIR PARTS** | | |
| 066 | INITIAL SPARES/REPAIR PARTS | 781,521 | 772,877 |
| | Technical realignment | | [–8,644] |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 851

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | **COMMON SUPPORT EQUIPMENT** | | |
| 067 | AIRCRAFT REPLACEMENT SUPPORT EQUIP ............................ | 157,664 | 157,664 |
| | **POST PRODUCTION SUPPORT** | | |
| 068 | B–2A ............................................................................................ | 1,838 | 1,838 |
| 069 | B–2B ............................................................................................ | 15,207 | 15,207 |
| 072 | MC–130J ...................................................................................... | 10,117 | 10,117 |
| 074 | F–16 ............................................................................................. | 1,075 | 1,075 |
| 075 | F–22A .......................................................................................... | 38,418 | 38,418 |
| | **INDUSTRIAL PREPAREDNESS** | | |
| 079 | INDUSTRIAL RESPONSIVENESS ................................................. | 18,874 | 18,874 |
| | **WAR CONSUMABLES** | | |
| 080 | WAR CONSUMABLES .................................................................. | 27,482 | 27,482 |
| | **OTHER PRODUCTION CHARGES** | | |
| 081 | OTHER PRODUCTION CHARGES ............................................... | 1,478,044 | 1,295,035 |
| | DAF requested realignment of funds ......................................... | | [80,000] |
| | Excess to need ............................................................................. | | [–229,400] |
| | T–7A depot activation ahead of need ......................................... | | [–33,609] |
| | **CLASSIFIED PROGRAMS** | | |
| 083A | CLASSIFIED PROGRAMS .............................................................. | 17,165 | 17,165 |
| | TOTAL AIRCRAFT PROCUREMENT, AIR FORCE ..... | 20,315,204 | 19,649,814 |
| | | | |
| | **MISSILE PROCUREMENT, AIR FORCE** | | |
| | **MISSILE REPLACEMENT EQUIPMENT—BALLISTIC** | | |
| 001 | MISSILE REPLACEMENT EQ-BALLISTIC .................................. | 69,319 | 69,319 |
| | **BALLISTIC MISSILES** | | |
| 003 | GROUND BASED STRATEGIC DETERRENT AP ......................... | 539,300 | 539,300 |
| | **STRATEGIC** | | |
| 004 | LONG RANGE STAND-OFF WEAPON ......................................... | 66,816 | 66,816 |
| | **TACTICAL** | | |
| 005 | REPLAC EQUIP & WAR CONSUMABLES .................................. | 37,318 | 37,318 |
| 006 | JOINT AIR-SURFACE STANDOFF MISSILE ............................... | 915,996 | 915,996 |
| 007 | JOINT AIR-SURFACE STANDOFF MISSILE AP ......................... | 769,672 | 769,672 |
| 008 | JOINT STRIKE MISSILE .................................................................. | 161,011 | 161,011 |
| 009 | LRASM0 ......................................................................................... | 87,796 | 87,796 |
| 010 | LRASM0 AP .................................................................................... | 99,871 | 99,871 |
| 011 | SIDEWINDER (AIM–9X) ................................................................. | 95,643 | 95,643 |
| 012 | AMRAAM ....................................................................................... | 489,049 | 489,049 |
| 013 | AMRAAM AP .................................................................................. | 212,410 | 212,410 |
| 014 | PREDATOR HELLFIRE MISSILE .................................................. | 1,049 | 1,049 |
| 015 | SMALL DIAMETER BOMB .............................................................. | 48,734 | 48,734 |
| 016 | SMALL DIAMETER BOMB II .......................................................... | 291,553 | 291,553 |
| 017 | STAND-IN ATTACK WEAPON (SIAW) ......................................... | 41,947 | 41,947 |
| | **INDUSTRIAL FACILITIES** | | |
| 018 | INDUSTRIAL PREPAREDNESS/POL PREVENTION .................. | 793 | 793 |
| | **CLASS IV** | | |
| 019 | ICBM FUZE MOD ............................................................................ | 115,745 | 115,745 |
| 020 | ICBM FUZE MOD AP ...................................................................... | 43,044 | 43,044 |
| 021 | MM III MODIFICATIONS ................................................................ | 48,639 | 48,639 |
| 022 | AIR LAUNCH CRUISE MISSILE (ALCM) .................................... | 41,494 | 41,494 |
| | **MISSILE SPARES AND REPAIR PARTS** | | |
| 023 | MSL SPRS/REPAIR PARTS (INITIAL) ........................................... | 6,840 | 6,840 |
| 024 | MSL SPRS/REPAIR PARTS (REPLEN) ......................................... | 75,191 | 75,191 |
| | **SPECIAL PROGRAMS** | | |
| 029 | SPECIAL UPDATE PROGRAMS .................................................... | 419,498 | 419,498 |
| | **CLASSIFIED PROGRAMS** | | |
| 029A | CLASSIFIED PROGRAMS .............................................................. | 851,718 | 851,718 |
| | TOTAL MISSILE PROCUREMENT, AIR FORCE ........ | 5,530,446 | 5,530,446 |
| | | | |
| | **PROCUREMENT OF AMMUNITION, AIR FORCE** | | |
| | **ROCKETS** | | |
| 001 | ROCKETS ........................................................................................ | 18,483 | 18,483 |
| | **CARTRIDGES** | | |
| 002 | CARTRIDGES .................................................................................. | 101,104 | 100,604 |
| | Small cal/ground munitions—(A143) 7.62MM ball linked unit cost adjustment. | | [–500] |
| | **BOMBS** | | |
| 004 | GENERAL PURPOSE BOMBS ....................................................... | 142,118 | 127,263 |

137 STAT. 852    PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| | Previously funded items | | [−14,855] |
| 005 | MASSIVE ORDNANCE PENETRATOR (MOP) | 14,074 | 1,250 |
| | Unjustified request | | [−12,824] |
| 006 | JOINT DIRECT ATTACK MUNITION | 132,364 | 128,487 |
| | PSC other government costs unjustified growth | | [−3,877] |
| 007 | B–61 | 68 | 68 |
| 008 | B61–12 TRAINER | 10,100 | 10,100 |
| | **OTHER ITEMS** | | |
| 009 | CAD/PAD | 51,487 | 51,487 |
| 010 | EXPLOSIVE ORDNANCE DISPOSAL (EOD) | 6,707 | 6,707 |
| 011 | SPARES AND REPAIR PARTS | 585 | 585 |
| 013 | FIRST DESTINATION TRANSPORTATION | 2,299 | 2,299 |
| 014 | ITEMS LESS THAN $5,000,000 | 5,115 | 5,115 |
| | **FLARES** | | |
| 015 | EXPENDABLE COUNTERMEASURES | 79,786 | 79,786 |
| | **FUZES** | | |
| 016 | FUZES | 109,562 | 109,562 |
| | **SMALL ARMS** | | |
| 017 | SMALL ARMS | 29,306 | 29,306 |
| | **TOTAL PROCUREMENT OF AMMUNITION, AIR FORCE**. | **703,158** | **671,102** |
| | | | |
| | **PROCUREMENT, SPACE FORCE** | | |
| | **SPACE PROCUREMENT, SF** | | |
| 001 | AF SATELLITE COMM SYSTEM | 64,345 | 64,345 |
| 003 | COUNTERSPACE SYSTEMS | 52,665 | 52,665 |
| 004 | FAMILY OF BEYOND LINE-OF-SIGHT TERMINALS | 25,057 | 25,057 |
| 005 | FABT FORCE ELEMENT TERMINAL | 121,634 | 121,634 |
| 007 | GENERAL INFORMATION TECH—SPACE | 3,451 | 3,451 |
| 008 | GPSIII FOLLOW ON | 119,700 | 70,400 |
| | Request for Equitable Adjustment | | [−49,300] |
| 009 | GPS III SPACE SEGMENT | 121,770 | 103,670 |
| | Unjustified growth SV 03–10 production | | [−18,100] |
| 010 | GLOBAL POSITIONING (SPACE) | 893 | 893 |
| 011 | HERITAGE TRANSITION | 6,110 | 6,110 |
| 012 | JOINT TACTICAL GROUND STATIONS | 580 | 580 |
| 013 | SPACEBORNE EQUIP (COMSEC) | 83,168 | 83,168 |
| 014 | MILSATCOM | 44,672 | 44,672 |
| 015 | SBIR HIGH (SPACE) | 39,438 | 39,438 |
| 016 | SPECIAL SPACE ACTIVITIES | 840,913 | 380,213 |
| | Space Force realignment of funds | | [−497,000] |
| | Space Force Unfunded Priorities List Classified Program A | | [36,300] |
| 017 | MOBILE USER OBJECTIVE SYSTEM | 101,147 | 101,147 |
| 018 | NATIONAL SECURITY SPACE LAUNCH | 2,142,846 | 2,142,846 |
| 020 | PTES HUB | 56,482 | 56,482 |
| 021 | ROCKET SYSTEMS LAUNCH PROGRAM | 74,848 | 74,848 |
| 022 | SPACE DEVELOPMENT AGENCY LAUNCH | 529,468 | 529,468 |
| 023 | SPACE MODS | 166,596 | 166,596 |
| 024 | SPACELIFT RANGE SYSTEM SPACE | 114,505 | 114,505 |
| | **SPARES** | | |
| 025 | SPARES AND REPAIR PARTS | 906 | 906 |
| | **SUPPORT EQUIPMENT** | | |
| 026 | POWER CONDITIONING EQUIPMENT | 3,100 | 3,100 |
| | **TOTAL PROCUREMENT, SPACE FORCE** | **4,714,294** | **4,186,194** |
| | | | |
| | **OTHER PROCUREMENT, AIR FORCE** | | |
| | **PASSENGER CARRYING VEHICLES** | | |
| 001 | PASSENGER CARRYING VEHICLES | 6,123 | 6,123 |
| | **CARGO AND UTILITY VEHICLES** | | |
| 002 | MEDIUM TACTICAL VEHICLE | 3,961 | 3,961 |
| 003 | CAP VEHICLES | 1,027 | 1,027 |
| 004 | CARGO AND UTILITY VEHICLES | 45,036 | 47,338 |
| | Technical realignment | | [2,302] |
| | **SPECIAL PURPOSE VEHICLES** | | |
| 005 | JOINT LIGHT TACTICAL VEHICLE | 57,780 | 51,721 |
| | Utility unjustified unit cost growth | | [−6,059] |
| 006 | SECURITY AND TACTICAL VEHICLES | 390 | 390 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 853

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|-----------------|-----------------------|
| 007 | SPECIAL PURPOSE VEHICLES | 79,023 | 82,803 |
|  | Technical realignment | | [3,780] |
|  | **FIRE FIGHTING EQUIPMENT** | | |
| 008 | FIRE FIGHTING/CRASH RESCUE VEHICLES | 70,252 | 70,252 |
|  | **MATERIALS HANDLING EQUIPMENT** | | |
| 009 | MATERIALS HANDLING VEHICLES | 73,805 | 75,895 |
|  | Technical realignment | | [2,090] |
|  | **BASE MAINTENANCE SUPPORT** | | |
| 010 | RUNWAY SNOW REMOV AND CLEANING EQU | 22,030 | 22,030 |
| 011 | BASE MAINTENANCE SUPPORT VEHICLES | 223,354 | 240,634 |
|  | Technical realignment | | [17,280] |
|  | **COMM SECURITY EQUIPMENT(COMSEC)** | | |
| 013 | COMSEC EQUIPMENT | 98,600 | 98,600 |
|  | **INTELLIGENCE PROGRAMS** | | |
| 015 | INTERNATIONAL INTEL TECH & ARCHITECTURES | 5,393 | 5,393 |
| 016 | INTELLIGENCE TRAINING EQUIPMENT | 5,012 | 5,012 |
| 017 | INTELLIGENCE COMM EQUIPMENT | 40,042 | 40,042 |
|  | **ELECTRONICS PROGRAMS** | | |
| 018 | AIR TRAFFIC CONTROL & LANDING SYS | 67,581 | 67,581 |
| 019 | NATIONAL AIRSPACE SYSTEM | 3,841 | 3,841 |
| 020 | BATTLE CONTROL SYSTEM—FIXED | 1,867 | 1,867 |
| 022 | 3D EXPEDITIONARY LONG-RANGE RADAR | 83,735 | 83,735 |
| 023 | WEATHER OBSERVATION FORECAST | 28,530 | 28,530 |
| 024 | STRATEGIC COMMAND AND CONTROL | 73,593 | 73,593 |
| 025 | CHEYENNE MOUNTAIN COMPLEX | 8,221 | 8,221 |
| 026 | MISSION PLANNING SYSTEMS | 17,078 | 17,078 |
| 029 | STRATEGIC MISSION PLANNING & EXECUTION SYSTEM | 3,861 | 3,861 |
|  | **SPCL COMM-ELECTRONICS PROJECTS** | | |
| 030 | GENERAL INFORMATION TECHNOLOGY | 206,142 | 212,093 |
|  | Insufficient justification | | [−25,000] |
|  | Technical realignment | | [30,951] |
| 031 | AF GLOBAL COMMAND & CONTROL SYS | 2,582 | 2,582 |
| 032 | BATTLEFIELD AIRBORNE CONTROL NODE (BACN) | 30 | 30 |
| 033 | MOBILITY COMMAND AND CONTROL | 3,768 | 3,768 |
| 034 | AIR FORCE PHYSICAL SECURITY SYSTEM | 208,704 | 208,704 |
| 035 | COMBAT TRAINING RANGES | 346,340 | 343,290 |
|  | Unit cost growth: P6CTS | | [−3,050] |
| 036 | MINIMUM ESSENTIAL EMERGENCY COMM N | 84,102 | 84,102 |
| 037 | WIDE AREA SURVEILLANCE (WAS) | 11,594 | 11,594 |
| 038 | C3 COUNTERMEASURES | 148,818 | 148,818 |
| 044 | AIR & SPACE OPERATIONS CENTER (AOC) | 5,032 | 5,032 |
|  | **AIR FORCE COMMUNICATIONS** | | |
| 046 | BASE INFORMATION TRANSPT INFRAST (BITI) WIRED | 108,532 | 322,704 |
|  | Technical realignment | | [214,172] |
| 047 | AFNET | 154,911 | 152,618 |
|  | Insufficient justification | | [−2,293] |
| 048 | JOINT COMMUNICATIONS SUPPORT ELEMENT (JCSE) | 5,381 | 5,381 |
| 049 | USCENTCOM | 18,025 | 18,025 |
| 050 | USSTRATCOM | 4,436 | 4,436 |
| 051 | USSPACECOM | 27,073 | 27,073 |
|  | **ORGANIZATION AND BASE** | | |
| 052 | TACTICAL C-E EQUIPMENT | 226,819 | 226,819 |
| 053 | RADIO EQUIPMENT | 30,407 | 30,407 |
| 054 | BASE COMM INFRASTRUCTURE | 113,563 | 113,563 |
|  | **MODIFICATIONS** | | |
| 055 | COMM ELECT MODS | 98,224 | 115,224 |
|  | NORTHCOM UPL—Over the Horizon Radar Acceleration | | [17,000] |
|  | **PERSONAL SAFETY & RESCUE EQUIP** | | |
| 056 | PERSONAL SAFETY AND RESCUE EQUIPMENT | 60,473 | 60,473 |
|  | **DEPOT PLANT+MTRLS HANDLING EQ** | | |
| 057 | POWER CONDITIONING EQUIPMENT | 9,235 | 9,235 |
| 058 | MECHANIZED MATERIAL HANDLING EQUIP | 15,662 | 15,662 |
|  | **BASE SUPPORT EQUIPMENT** | | |
| 059 | BASE PROCURED EQUIPMENT | 77,875 | 77,875 |
| 060 | ENGINEERING AND EOD EQUIPMENT | 280,734 | 293,968 |
|  | DAF requested realignment of funds from OMAF SAG 11R | | [5,950] |
|  | Recovery of Air Bases Denied by Ordnance Program | | [5,000] |

137 STAT. 854          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|-----------------|------------------------|
| | Technical realignment ...................................................... | | [2,284] |
| 061 | MOBILITY EQUIPMENT ...................................................... | 207,071 | 232,271 |
| | Technical realignment ...................................................... | | [25,200] |
| 062 | FUELS SUPPORT EQUIPMENT (FSE) ......................................... | 218,790 | 208,336 |
| | All Terrain Berm Storage System schedule discrepancies ...... | | [–7,215] |
| | Fuel storage bladder unjustified unit cost growth ................... | | [–3,239] |
| 063 | BASE MAINTENANCE AND SUPPORT EQUIPMENT ............... | 51,914 | 51,914 |
| | **SPECIAL SUPPORT PROJECTS** | | |
| 065 | DARP RC135 ........................................................................ | 28,882 | 28,882 |
| 066 | DCGS-AF ............................................................................. | 129,655 | 129,655 |
| 070 | SPECIAL UPDATE PROGRAM ............................................... | 1,042,833 | 1,042,833 |
| | **CLASSIFIED PROGRAMS** | | |
| 072A | CLASSIFIED PROGRAMS ..................................................... | 25,456,490 | 25,456,490 |
| | **SPARES AND REPAIR PARTS** | | |
| 071 | SPARES AND REPAIR PARTS (CYBER) ................................... | 1,032 | 1,032 |
| 072 | SPARES AND REPAIR PARTS ............................................... | 12,628 | 12,628 |
| | **TOTAL OTHER PROCUREMENT, AIR FORCE** ........... | **30,417,892** | **30,697,045** |
| | | | |
| | **PROCUREMENT, DEFENSE-WIDE** | | |
| | **MAJOR EQUIPMENT, SDA** | | |
| 001 | MAJOR EQUIPMENT, DPAA ................................................. | 516 | 516 |
| 002 | MAJOR EQUIPMENT, OSD .................................................... | 186,006 | 186,006 |
| | **MAJOR EQUIPMENT, DISA** | | |
| 011 | INFORMATION SYSTEMS SECURITY ...................................... | 12,275 | 12,275 |
| 012 | TELEPORT PROGRAM ......................................................... | 42,399 | 42,399 |
| 014 | ITEMS LESS THAN $5 MILLION ........................................... | 47,538 | 47,538 |
| 015 | DEFENSE INFORMATION SYSTEM NETWORK ......................... | 39,472 | 39,472 |
| 016 | WHITE HOUSE COMMUNICATION AGENCY ............................ | 118,523 | 118,523 |
| 017 | SENIOR LEADERSHIP ENTERPRISE ...................................... | 94,591 | 94,591 |
| 018 | JOINT REGIONAL SECURITY STACKS (JRSS) .......................... | 22,714 | 22,714 |
| 019 | JOINT SERVICE PROVIDER ................................................. | 107,637 | 97,637 |
| | Insufficient justification ................................................... | | [–10,000] |
| 020 | FOURTH ESTATE NETWORK OPTIMIZATION (4ENO) ............ | 33,047 | 33,047 |
| | **MAJOR EQUIPMENT, DLA** | | |
| 028 | MAJOR EQUIPMENT ......................................................... | 30,355 | 30,355 |
| | **MAJOR EQUIPMENT, DCSA** | | |
| 029 | MAJOR EQUIPMENT ......................................................... | 2,135 | 2,135 |
| | **MAJOR EQUIPMENT, TJS** | | |
| 030 | MAJOR EQUIPMENT, TJS .................................................. | 3,747 | 3,747 |
| | **MAJOR EQUIPMENT, MISSILE DEFENSE AGENCY** | | |
| 031 | THAAD ............................................................................. | 216,782 | 316,782 |
| | 6 additional THAAD Interceptors ....................................... | | [100,000] |
| 033 | AEGIS BMD ...................................................................... | 374,756 | 374,756 |
| 035 | BMDS AN/TPY–2 RADARS ................................................. | 29,108 | 29,108 |
| 036 | SM–3 IIAS ........................................................................ | 432,824 | 432,824 |
| 037 | ARROW 3 UPPER TIER SYSTEMS ...................................... | 80,000 | 80,000 |
| 038 | SHORT RANGE BALLISTIC MISSILE DEFENSE (SRBMD) ....... | 40,000 | 40,000 |
| 039 | DEFENSE OF GUAM PROCUREMENT ................................... | 169,627 | 169,627 |
| 040 | AEGIS ASHORE PHASE III ................................................ | 2,390 | 2,390 |
| 041 | IRON DOME ...................................................................... | 80,000 | 80,000 |
| 042 | AEGIS BMD HARDWARE AND SOFTWARE ............................ | 27,825 | 27,825 |
| | **MAJOR EQUIPMENT, DHRA** | | |
| 043 | PERSONNEL ADMINISTRATION ......................................... | 3,704 | 3,704 |
| | **MAJOR EQUIPMENT, DEFENSE THREAT REDUCTION AGENCY** | | |
| 046 | VEHICLES ........................................................................ | 366 | 366 |
| 047 | OTHER MAJOR EQUIPMENT .............................................. | 12,787 | 12,787 |
| 048 | DTRA CYBER ACTIVITIES ................................................. | 21,413 | 21,413 |
| | **MAJOR EQUIPMENT, DODEA** | | |
| 049 | AUTOMATION/EDUCATIONAL SUPPORT & LOGISTICS ......... | 1,358 | 1,358 |
| | **MAJOR EQUIPMENT, DMACT** | | |
| 050 | MAJOR EQUIPMENT ......................................................... | 13,012 | 13,012 |
| | **MAJOR EQUIPMENT, USCYBERCOM** | | |
| 051 | CYBERSPACE OPERATIONS ................................................ | 129,082 | 129,082 |
| | **CLASSIFIED PROGRAMS** | | |
| | **UNDISTRIBUTED** | | |
| 073A | CLASSIFIED PROGRAMS ................................................... | 658,529 | 658,529 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 855

**SEC. 4101. PROCUREMENT**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------|----------------------|
| | **AVIATION PROGRAMS** | | |
| 053 | ARMED OVERWATCH/TARGETING ............................................... | 266,846 | 266,846 |
| 054 | MANNED ISR ............................................................................ | 7,000 | 7,000 |
| 055 | MC–12 ...................................................................................... | 600 | 600 |
| 057 | ROTARY WING UPGRADES AND SUSTAINMENT .................... | 261,012 | 256,012 |
| | Underexecution ............................................................................. | | [–5,000] |
| 058 | UNMANNED ISR ...................................................................... | 26,997 | 26,997 |
| 059 | NON-STANDARD AVIATION ...................................................... | 25,782 | 21,782 |
| | Theater Basing Initiatives excess to need ................................ | | [–4,000] |
| 060 | U–28 ........................................................................................ | 7,198 | 7,198 |
| 061 | MH–47 CHINOOK ...................................................................... | 149,883 | 149,883 |
| 062 | CV–22 MODIFICATION .............................................................. | 75,981 | 75,981 |
| 063 | MQ–9 UNMANNED AERIAL VEHICLE ...................................... | 17,684 | 17,684 |
| 064 | PRECISION STRIKE PACKAGE ............................................... | 108,497 | 108,497 |
| 065 | AC/MC–130J ............................................................................. | 319,754 | 319,754 |
| 066 | C–130 MODIFICATIONS ............................................................ | 18,796 | 18,796 |
| | **SHIPBUILDING** | | |
| 067 | UNDERWATER SYSTEMS ........................................................ | 66,111 | 73,111 |
| | Deep Submergence Collective Propulsion ................................ | | [7,000] |
| | **AMMUNITION PROGRAMS** | | |
| 068 | ORDNANCE ITEMS <$5M .......................................................... | 147,831 | 147,831 |
| | **OTHER PROCUREMENT PROGRAMS** | | |
| 069 | INTELLIGENCE SYSTEMS ...................................................... | 203,400 | 203,400 |
| 070 | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS ....... | 5,718 | 5,718 |
| 071 | OTHER ITEMS <$5M ................................................................ | 108,816 | 106,316 |
| | Program decrease ....................................................................... | | [–2,500] |
| 072 | COMBATANT CRAFT SYSTEMS ............................................... | 55,064 | 55,064 |
| 073 | SPECIAL PROGRAMS ............................................................... | 20,412 | 20,412 |
| 074 | TACTICAL VEHICLES ............................................................... | 56,561 | 56,561 |
| 075 | WARRIOR SYSTEMS <$5M ....................................................... | 329,837 | 370,437 |
| | USSOCOM UPL—Counter Uncrewed Aerial Systems (CUAS) Group 3 Defeat Acceleration. | | [40,600] |
| 076 | COMBAT MISSION REQUIREMENTS ......................................... | 4,987 | 4,987 |
| 077 | OPERATIONAL ENHANCEMENTS INTELLIGENCE ................ | 23,639 | 23,639 |
| 078 | OPERATIONAL ENHANCEMENTS .............................................. | 322,341 | 322,341 |
| | **CBDP** | | |
| 079 | CHEMICAL BIOLOGICAL SITUATIONAL AWARENESS .......... | 159,884 | 159,884 |
| 080 | CB PROTECTION & HAZARD MITIGATION ............................... | 231,826 | 231,826 |
| | **TOTAL PROCUREMENT, DEFENSE-WIDE** ................... | **6,056,975** | **6,183,075** |
| | **NATIONAL GUARD AND RESERVE EQUIPMENT** **UNDISTRIBUTED** | | |
| 006 | UNDISTRIBUTED ..................................................................... | | 100,000 |
| | Program increase ....................................................................... | | [100,000] |
| | **TOTAL NATIONAL GUARD AND RESERVE EQUIP-MENT**. | | **100,000** |
| | **TOTAL PROCUREMENT** .................................................. | **167,988,341** | **169,169,465** |

# TITLE XLII—RESEARCH, DEVELOP-MENT, TEST, AND EVALUATION

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION.**

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
**(In Thousands of Dollars)**

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|----------------------|
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY** **BASIC RESEARCH** | | |
| 001 | 0601102A | DEFENSE RESEARCH SCIENCES .......................... | 296,670 | 301,670 |

137 STAT. 856          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | | AI-Enhanced Quantum Computing ............................. | | [5,000] |
| 002 | 0601103A | UNIVERSITY RESEARCH INITIATIVES ................. | 75,672 | 75,672 |
| 003 | 0601104A | UNIVERSITY AND INDUSTRY RESEARCH CENTERS. | 108,946 | 110,946 |
| | | Hypervelocity research and testing ............................ | | [2,000] |
| 004 | 0601121A | CYBER COLLABORATIVE RESEARCH ALLIANCE | 5,459 | 5,459 |
| 005 | 0601601A | ARTIFICIAL INTELLIGENCE AND MACHINE LEARNING BASIC RESEARCH. | 10,708 | 10,708 |
| | | **SUBTOTAL BASIC RESEARCH** ............................. | **497,455** | **504,455** |
| | | **APPLIED RESEARCH** | | |
| 006 | 0602002A | ARMY AGILE INNOVATION AND DEVELOPMENT-APPLIED RESEARCH. | 5,613 | 5,613 |
| 008 | 0602134A | COUNTER IMPROVISED-THREAT ADVANCED STUDIES. | 6,242 | 6,242 |
| 009 | 0602141A | LETHALITY TECHNOLOGY ...................................... | 85,578 | 95,578 |
| | | Armaments technology for unmanned systems .......... | | [2,500] |
| | | Convergent Advanced Manufacturing for Extreme Environments. | | [2,500] |
| | | Crtitical energetic materials chemistries .................... | | [2,500] |
| | | Universal Nanocrystalline Alloys Lethality ................ | | [2,500] |
| 010 | 0602142A | ARMY APPLIED RESEARCH ..................................... | 34,572 | 34,572 |
| 011 | 0602143A | SOLDIER LETHALITY TECHNOLOGY .................... | 104,470 | 124,970 |
| | | Airborne Pathfinder ........................................................ | | [8,000] |
| | | Body armor research ...................................................... | | [2,500] |
| | | Digital night vision technology ..................................... | | [5,000] |
| | | Pathfinder program ........................................................ | | [2,500] |
| | | Wafer-Level Vacuum Packaging (WLVP) of Microbolometers. | | [2,500] |
| 012 | 0602144A | GROUND TECHNOLOGY ........................................... | 60,005 | 85,505 |
| | | Cold weather research .................................................... | | [2,500] |
| | | Critical hybrid advanced materials processing ........... | | [5,000] |
| | | Engineered repair materials for roadways ................. | | [3,000] |
| | | Polar proving ground and training program .............. | | [5,000] |
| | | Titanium metal powder production technology .......... | | [10,000] |
| 013 | 0602145A | NEXT GENERATION COMBAT VEHICLE TECHNOLOGY. | 166,500 | 180,500 |
| | | Fuel cells for next generation combat vehicles ........... | | [3,500] |
| | | High Mobility Multipurpose Wheeled Vehicle (HMMWD – Humvee) Gunner Restraint System (GRS). | | [500] |
| | | Hydrogen fuel source research and development ....... | | [10,000] |
| 014 | 0602146A | NETWORK C3I TECHNOLOGY ................................ | 81,618 | 86,618 |
| | | Intelligent Resilience of Communications Signals ..... | | [2,500] |
| | | Secure Microelectronic Interposer Technology ........... | | [2,500] |
| 015 | 0602147A | LONG RANGE PRECISION FIRES TECHNOLOGY | 34,683 | 37,183 |
| | | Additive manufacturing for low-cost missile applications. | | [2,500] |
| 016 | 0602148A | FUTURE VERTICLE LIFT TECHNOLOGY .............. | 73,844 | 76,344 |
| | | eVTOL power source development ............................... | | [2,500] |
| 017 | 0602150A | AIR AND MISSILE DEFENSE TECHNOLOGY ....... | 33,301 | 60,801 |
| | | Counter-Unmanned Aircraft Systems technology ...... | | [5,000] |
| | | High energy laser enabling and support technology .. | | [2,500] |
| | | High energy Laser in a Box ......................................... | | [20,000] |
| 018 | 0602180A | ARTIFICIAL INTELLIGENCE AND MACHINE LEARNING TECHNOLOGIES. | 24,142 | 24,142 |
| 019 | 0602181A | ALL DOMAIN CONVERGENCE APPLIED RESEARCH. | 14,297 | 14,297 |
| 020 | 0602182A | C3I APPLIED RESEARCH ......................................... | 30,659 | 30,659 |
| 021 | 0602183A | AIR PLATFORM APPLIED RESEARCH .................. | 48,163 | 49,663 |
| | | Unmanned aerial and ground sensor network .......... | | [1,500] |
| 022 | 0602184A | SOLDIER APPLIED RESEARCH ............................... | 18,986 | 18,986 |
| 023 | 0602213A | C3I APPLIED CYBER .................................................. | 22,714 | 22,714 |
| 024 | 0602386A | BIOTECHNOLOGY FOR MATERIALS—APPLIED RESEARCH. | 16,736 | 16,736 |
| 025 | 0602785A | MANPOWER/PERSONNEL/TRAINING TECHNOLOGY. | 19,969 | 19,969 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 857

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|------------------------|
| 026 | 0602787A | MEDICAL TECHNOLOGY .......................................... | 66,266 | 76,166 |
| | | Precision Medicine for Bone Injuries ............................ | | [4,900] |
| | | Preventing trauma-related stress disorder ................. | | [5,000] |
| | | **SUBTOTAL APPLIED RESEARCH** ....................... | **948,358** | **1,067,258** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | |
| 027 | 0603002A | MEDICAL ADVANCED TECHNOLOGY ................... | 4,147 | 12,147 |
| | | Hearing Protections Communications ......................... | | [8,000] |
| 028 | 0603007A | MANPOWER, PERSONNEL AND TRAINING AD-VANCED TECHNOLOGY. | 16,316 | 16,316 |
| 029 | 0603025A | ARMY AGILE INNOVATION AND DEMONSTRA-TION. | 23,156 | 23,156 |
| 030 | 0603040A | ARTIFICIAL INTELLIGENCE AND MACHINE LEARNING ADVANCED TECHNOLOGIES. | 13,187 | 18,187 |
| | | Tactical artificial intelligence and machine learning | | [5,000] |
| 031 | 0603041A | ALL DOMAIN CONVERGENCE ADVANCED TECHNOLOGY. | 33,332 | 33,332 |
| 032 | 0603042A | C3I ADVANCED TECHNOLOGY ............................... | 19,225 | 19,225 |
| 033 | 0603043A | AIR PLATFORM ADVANCED TECHNOLOGY ........ | 14,165 | 14,165 |
| 034 | 0603044A | SOLDIER ADVANCED TECHNOLOGY .................... | 1,214 | 1,214 |
| 036 | 0603116A | LETHALITY ADVANCED TECHNOLOGY .............. | 20,582 | 17,755 |
| | | Program decrease ............................................................. | | [–2,827] |
| 037 | 0603117A | ARMY ADVANCED TECHNOLOGY DEVELOP-MENT. | 136,280 | 136,280 |
| 038 | 0603118A | SOLDIER LETHALITY ADVANCED TECH-NOLOGY. | 102,778 | 105,278 |
| | | Autonomous Long Range Resupply ............................. | | [2,500] |
| 039 | 0603119A | GROUND ADVANCED TECHNOLOGY .................... | 40,597 | 48,097 |
| | | Advanced composites and multi-material protective systems. | | [5,000] |
| | | Research supporting rapid entry in Arctic conditions | | [2,500] |
| 040 | 0603134A | COUNTER IMPROVISED-THREAT SIMULATION | 21,672 | 21,672 |
| 041 | 0603386A | BIOTECHNOLOGY FOR MATERIALS—AD-VANCED RESEARCH. | 59,871 | 59,871 |
| 042 | 0603457A | C3I CYBER ADVANCED DEVELOPMENT .............. | 28,847 | 28,847 |
| 043 | 0603461A | HIGH PERFORMANCE COMPUTING MOD-ERNIZATION PROGRAM. | 255,772 | 255,772 |
| 044 | 0603462A | NEXT GENERATION COMBAT VEHICLE AD-VANCED TECHNOLOGY. | 217,394 | 234,894 |
| | | Advanced Manufacturing Center of Excellence .......... | | [12,500] |
| | | Next Generation Combat Vehicle Advanced Tech-nology (Silent Watch Hydrogen Fuel Cell). | | [5,000] |
| 045 | 0603463A | NETWORK C3I ADVANCED TECHNOLOGY .......... | 105,549 | 105,549 |
| 046 | 0603464A | LONG RANGE PRECISION FIRES ADVANCED TECHNOLOGY. | 153,024 | 188,024 |
| | | Aluminum-Lithium Alloy Solid Rocket Motor ............ | | [5,000] |
| | | Maneuvering Submunitions for Precision Strike Mis-sile. | | [5,000] |
| | | Missile Virtual Interactive Testbeds And Labs .......... | | [5,000] |
| | | XM1155 Glide Flight Projectile ..................................... | | [20,000] |
| 047 | 0603465A | FUTURE VERTICAL LIFT ADVANCED TECH-NOLOGY. | 158,795 | 173,795 |
| | | Additive manufacturing ................................................ | | [10,000] |
| | | Next Generation Vertical Takeoff and Landing Con-cepts for Unmanned Aircraft. | | [5,000] |
| 048 | 0603466A | AIR AND MISSILE DEFENSE ADVANCED TECH-NOLOGY. | 21,015 | 23,515 |
| | | SHORAD S&T Engineering and Integration (SSEI) Lab. | | [2,500] |
| 049 | 0603920A | HUMANITARIAN DEMINING .................................. | 9,068 | 23,000 |
| | | Program increase .......................................................... | | [13,932] |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DE-VELOPMENT.** | **1,455,986** | **1,560,091** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|------|------|------|------|
| 051 | 0603305A | ARMY MISSLE DEFENSE SYSTEMS INTEGRATION. | 12,904 | 32,904 |
| | | Artificial Intelligence Decision Aids for All Domain Operations. | | [5,000] |
| | | Capability for Advanced Protetive Technologies Assessment and Integration (CAPTAIN). | | [8,000] |
| | | Integrated Environmental Control and Power ........... | | [5,000] |
| | | Resilient Position, Navigation, and Timing Development (PNT). | | [2,000] |
| 052 | 0603308A | ARMY SPACE SYSTEMS INTEGRATION ................ | 19,120 | 24,120 |
| | | Essential Multi-Function Multi-Mission Payload Development. | | [5,000] |
| 054 | 0603619A | LANDMINE WARFARE AND BARRIER—ADV DEV. | 47,537 | 47,537 |
| 055 | 0603639A | TANK AND MEDIUM CALIBER AMMUNITION .... | 91,323 | 91,323 |
| 056 | 0603645A | ARMORED SYSTEM MODERNIZATION—ADV DEV. | 43,026 | 43,026 |
| 057 | 0603747A | SOLDIER SUPPORT AND SURVIVABILITY ........... | 3,550 | 3,550 |
| 058 | 0603766A | TACTICAL ELECTRONIC SURVEILLANCE SYSTEM—ADV DEV. | 65,567 | 65,567 |
| 059 | 0603774A | NIGHT VISION SYSTEMS ADVANCED DEVELOPMENT. | 73,675 | 73,675 |
| 060 | 0603779A | ENVIRONMENTAL QUALITY TECHNOLOGY—DEM/VAL. | 31,720 | 34,220 |
| | | Program decrease ............................................................ | | [–2,500] |
| | | Underwater Cut and Capture Demonstration ............ | | [5,000] |
| 061 | 0603790A | NATO RESEARCH AND DEVELOPMENT ............... | 4,143 | 4,143 |
| 062 | 0603801A | AVIATION—ADV DEV ................................................ | 1,502,160 | 1,500,804 |
| | | FARA—Excess to need .................................................. | | [–13,356] |
| | | Modular Communication, Command, and Control Suite (MC3–Suite). | | [12,000] |
| 063 | 0603804A | LOGISTICS AND ENGINEER EQUIPMENT—ADV DEV. | 7,604 | 7,604 |
| 064 | 0603807A | MEDICAL SYSTEMS—ADV DEV ............................. | 1,602 | 1,602 |
| 065 | 0603827A | SOLDIER SYSTEMS—ADVANCED DEVELOPMENT. | 27,681 | 25,825 |
| | | Excessive growth—Program management .................. | | [–1,333] |
| | | Slow expenditure rate—Advance Development ......... | | [–523] |
| 066 | 0604017A | ROBOTICS DEVELOPMENT ....................................... | 3,024 | 3,024 |
| 067 | 0604019A | EXPANDED MISSION AREA MISSILE (EMAM) ..... | 97,018 | 97,018 |
| 068 | 0604020A | CROSS FUNCTIONAL TEAM (CFT) ADVANCED DEVELOPMENT & PROTOTYPING. | 117,557 | 117,557 |
| 069 | 0604035A | LOW EARTH ORBIT (LEO) SATELLITE CAPABILITY. | 38,851 | 38,851 |
| 070 | 0604036A | MULTI-DOMAIN SENSING SYSTEM (MDSS) ADV DEV. | 191,394 | 191,394 |
| 071 | 0604037A | TACTICAL INTEL TARGETING ACCESS NODE (TITAN) ADV DEV. | 10,626 | 10,626 |
| 072 | 0604100A | ANALYSIS OF ALTERNATIVES ................................. | 11,095 | 11,095 |
| 073 | 0604101A | SMALL UNMANNED AERIAL VEHICLE (SUAV) (6.4). | 5,144 | 5,144 |
| 074 | 0604103A | ELECTRONIC WARFARE PLANNING AND MANAGEMENT TOOL (EWPMT). | 2,260 | 2,260 |
| 075 | 0604113A | FUTURE TACTICAL UNMANNED AIRCRAFT SYSTEM (FTUAS). | 53,143 | 53,143 |
| 076 | 0604114A | LOWER TIER AIR MISSILE DEFENSE (LTAMD) SENSOR. | 816,663 | 816,663 |
| 077 | 0604115A | TECHNOLOGY MATURATION INITIATIVES ........ | 281,314 | 281,314 |
| 078 | 0604117A | MANEUVER—SHORT RANGE AIR DEFENSE (M-SHORAD). | 281,239 | 273,994 |
| | | Delayed expenditure—contract award delay ............. | | [–7,245] |
| 079 | 0604119A | ARMY ADVANCED COMPONENT DEVELOPMENT & PROTOTYPING. | 204,914 | 204,914 |
| 080 | 0604120A | ASSURED POSITIONING, NAVIGATION AND TIMING (PNT). | 40,930 | 40,930 |
| 081 | 0604121A | SYNTHETIC TRAINING ENVIRONMENT REFINEMENT & PROTOTYPING. | 109,714 | 109,714 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 859

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| 082 | 0604134A | COUNTER IMPROVISED-THREAT DEMONSTRA-TION, PROTOTYPE DEVELOPMENT, AND TESTING. | 16,426 | 16,426 |
| 083 | 0604135A | STRATEGIC MID-RANGE FIRES | 31,559 | 31,559 |
| 084 | 0604182A | HYPERSONICS | 43,435 | 43,435 |
| 085 | 0604403A | FUTURE INTERCEPTOR | 8,040 | 8,040 |
| 086 | 0604531A | COUNTER—SMALL UNMANNED AIRCRAFT SYSTEMS ADVANCED DEVELOPMENT. | 64,242 | 64,242 |
| 087 | 0604541A | UNIFIED NETWORK TRANSPORT | 40,915 | 40,915 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS | 19,200 | 19,200 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVEL-OPMENT & PROTOTYPES**. | **4,420,315** | **4,437,358** |
| | | **SYSTEM DEVELOPMENT & DEMONSTRA-TION** | | |
| 091 | 0604201A | AIRCRAFT AVIONICS | 13,673 | 13,673 |
| 092 | 0604270A | ELECTRONIC WARFARE DEVELOPMENT | 12,789 | 12,789 |
| 093 | 0604601A | INFANTRY SUPPORT WEAPONS | 64,076 | 64,076 |
| 094 | 0604604A | MEDIUM TACTICAL VEHICLES | 28,226 | 3,226 |
| | | Program decrease | | [–25,000] |
| 095 | 0604611A | JAVELIN | 7,827 | 7,827 |
| 096 | 0604622A | FAMILY OF HEAVY TACTICAL VEHICLES | 44,197 | 44,197 |
| 097 | 0604633A | AIR TRAFFIC CONTROL | 1,134 | 11,134 |
| | | Integrated Mission Planning & Airspace Control Tools (IMPACT). | | [10,000] |
| 098 | 0604641A | TACTICAL UNMANNED GROUND VEHICLE (TUGV). | 142,125 | 142,125 |
| 099 | 0604642A | LIGHT TACTICAL WHEELED VEHICLES | 53,564 | 9,671 |
| | | Incomplete development goals | | [–43,893] |
| 100 | 0604645A | ARMORED SYSTEMS MODERNIZATION (ASM)—ENG DEV. | 102,201 | 102,201 |
| 101 | 0604710A | NIGHT VISION SYSTEMS—ENG DEV | 48,720 | 82,829 |
| | | Rephase from Procurement for IVAS 1.2 develop-ment. | | [39,137] |
| | | Slow expenditure—Joint Effects Targetting System (JETS). | | [–5,028] |
| 102 | 0604713A | COMBAT FEEDING, CLOTHING, AND EQUIP-MENT. | 2,223 | 2,223 |
| 103 | 0604715A | NON-SYSTEM TRAINING DEVICES—ENG DEV | 21,441 | 21,441 |
| 104 | 0604741A | AIR DEFENSE COMMAND, CONTROL AND IN-TELLIGENCE—ENG DEV. | 74,738 | 84,738 |
| | | Software Integration Digital Eco-system | | [10,000] |
| 105 | 0604742A | CONSTRUCTIVE SIMULATION SYSTEMS DE-VELOPMENT. | 30,985 | 30,985 |
| 106 | 0604746A | AUTOMATIC TEST EQUIPMENT DEVELOPMENT | 13,626 | 13,626 |
| 107 | 0604760A | DISTRIBUTIVE INTERACTIVE SIMULATIONS (DIS)—ENG DEV. | 8,802 | 8,802 |
| 108 | 0604798A | BRIGADE ANALYSIS, INTEGRATION AND EVAL-UATION. | 20,828 | 20,828 |
| 109 | 0604802A | WEAPONS AND MUNITIONS—ENG DEV | 243,851 | 253,851 |
| | | Long Range Precision Guidance Kit | | [10,000] |
| 110 | 0604804A | LOGISTICS AND ENGINEER EQUIPMENT—ENG DEV. | 37,420 | 42,420 |
| | | Ultra-Lightweight Camouflage Net System | | [5,000] |
| 111 | 0604805A | COMMAND, CONTROL, COMMUNICATIONS SYS-TEMS—ENG DEV. | 34,214 | 34,214 |
| 112 | 0604807A | MEDICAL MATERIEL/MEDICAL BIOLOGICAL DEFENSE EQUIPMENT—ENG DEV. | 6,496 | 6,496 |
| 113 | 0604808A | LANDMINE WARFARE/BARRIER—ENG DEV | 13,581 | 13,581 |
| 114 | 0604818A | ARMY TACTICAL COMMAND & CONTROL HARDWARE & SOFTWARE. | 168,574 | 168,574 |
| 115 | 0604820A | RADAR DEVELOPMENT | 94,944 | 94,944 |
| 116 | 0604822A | GENERAL FUND ENTERPRISE BUSINESS SYS-TEM (GFEBS). | 2,965 | 2,965 |
| 117 | 0604827A | SOLDIER SYSTEMS—WARRIOR DEM/VAL | 11,333 | 11,333 |
| 118 | 0604852A | SUITE OF SURVIVABILITY ENHANCEMENT SYSTEMS—EMD. | 79,250 | 78,050 |

137 STAT. 860          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|------------------------|
| | | Maintain program management level of effort .......... | | [–1,200] |
| 119 | 0604854A | ARTILLERY SYSTEMS—EMD ................................... | 42,490 | 42,490 |
| 120 | 0605013A | INFORMATION TECHNOLOGY DEVELOPMENT | 104,024 | 104,024 |
| 121 | 0605018A | INTEGRATED PERSONNEL AND PAY SYSTEM-ARMY (IPPS-A). | 102,084 | 102,084 |
| 123 | 0605030A | JOINT TACTICAL NETWORK CENTER (JTNC) ..... | 18,662 | 18,662 |
| 124 | 0605031A | JOINT TACTICAL NETWORK (JTN) ....................... | 30,328 | 30,328 |
| 125 | 0605035A | COMMON INFRARED COUNTERMEASURES (CIRCM). | 11,509 | 11,509 |
| 126 | 0605036A | COMBATING WEAPONS OF MASS DESTRUC-TION (CWMD). | 1,050 | 1,050 |
| 128 | 0605041A | DEFENSIVE CYBER TOOL DEVELOPMENT ........ | 27,714 | 27,714 |
| 129 | 0605042A | TACTICAL NETWORK RADIO SYSTEMS (LOW-TIER). | 4,318 | 4,318 |
| 130 | 0605047A | CONTRACT WRITING SYSTEM ............................... | 16,355 | 16,355 |
| 131 | 0605049A | MISSILE WARNING SYSTEM MODERNIZATION (MWSM). | 27,571 | 27,571 |
| 132 | 0605051A | AIRCRAFT SURVIVABILITY DEVELOPMENT ....... | 24,900 | 24,900 |
| 133 | 0605052A | INDIRECT FIRE PROTECTION CAPABILITY INC 2—BLOCK 1. | 196,248 | 196,248 |
| 134 | 0605053A | GROUND ROBOTICS ................................................... | 35,319 | 35,319 |
| 135 | 0605054A | EMERGING TECHNOLOGY INITIATIVES ............. | 201,274 | 149,834 |
| | | Program decrease ............................................................. | | [–51,440] |
| 137 | 0605144A | NEXT GENERATION LOAD DEVICE—MEDIUM ... | 36,970 | 36,970 |
| 139 | 0605148A | TACTICAL INTEL TARGETING ACCESS NODE (TITAN) EMD. | 132,136 | 132,136 |
| 140 | 0605203A | ARMY SYSTEM DEVELOPMENT & DEMONSTRA-TION. | 81,657 | 81,657 |
| 141 | 0605205A | SMALL UNMANNED AERIAL VEHICLE (SUAV) (6.5). | 31,284 | 27,361 |
| | | Unjustified growth ........................................................... | | [–3,923] |
| 142 | 0605206A | CI AND HUMINT EQUIPMENT PROGRAM-ARMY (CIHEP-A). | 2,170 | 2,170 |
| 143 | 0605216A | JOINT TARGETING INTEGRATED COMMAND AND COORDINATION SUITE (JTIC2S). | 9,290 | 9,290 |
| 144 | 0605224A | MULTI-DOMAIN INTELLIGENCE ............................ | 41,003 | 41,003 |
| 146 | 0605231A | PRECISION STRIKE MISSILE (PRSM) .................... | 272,786 | 272,786 |
| 147 | 0605232A | HYPERSONICS EMD .................................................. | 900,920 | 900,920 |
| 148 | 0605233A | ACCESSIONS INFORMATION ENVIRONMENT (AIE). | 27,361 | 27,361 |
| 149 | 0605235A | STRATEGIC MID-RANGE CAPABILITY .................. | 348,855 | 348,855 |
| 150 | 0605236A | INTEGRATED TACTICAL COMMUNICATIONS ..... | 22,901 | 22,901 |
| 151 | 0605450A | JOINT AIR-TO-GROUND MISSILE (JAGM) ............ | 3,014 | 3,014 |
| 152 | 0605457A | ARMY INTEGRATED AIR AND MISSILE DE-FENSE (AIAMD). | 284,095 | 284,095 |
| 153 | 0605531A | COUNTER—SMALL UNMANNED AIRCRAFT SYSTEMS SYS DEV & DEMONSTRATION. | 36,016 | 36,016 |
| 154 | 0605625A | MANNED GROUND VEHICLE ................................. | 996,653 | 875,753 |
| | | OMFV slow expenditure ................................................ | | [–120,900] |
| 155 | 0605766A | NATIONAL CAPABILITIES INTEGRATION (MIP) | 15,129 | 15,129 |
| 156 | 0605812A | JOINT LIGHT TACTICAL VEHICLE (JLTV) ENGI-NEERING AND MANUFACTURING DEVELOP-MENT PH. | 27,243 | 26,143 |
| | | Slow expenditure ............................................................. | | [–1,100] |
| 157 | 0605830A | AVIATION GROUND SUPPORT EQUIPMENT ....... | 1,167 | 1,167 |
| 158 | 0303032A | TROJAN—RH12 ......................................................... | 3,879 | 3,879 |
| 159 | 0304270A | ELECTRONIC WARFARE DEVELOPMENT ............ | 137,186 | 137,186 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEM-ONSTRATION.** | **5,639,364** | **5,461,017** |
| | | **MANAGEMENT SUPPORT** | | |
| 160 | 0604256A | THREAT SIMULATOR DEVELOPMENT .................. | 38,492 | 38,492 |
| 161 | 0604258A | TARGET SYSTEMS DEVELOPMENT ....................... | 11,873 | 21,873 |
| | | Program increase ............................................................. | | [5,000] |
| | | U.S. Replacement for Foreign Engines for Aerial Targets. | | [5,000] |
| 162 | 0604759A | MAJOR T&E INVESTMENT ...................................... | 76,167 | 76,167 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 861

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| 163 | 0605103A | RAND ARROYO CENTER ........................................... | 37,078 | 37,078 |
| 164 | 0605301A | ARMY KWAJALEIN ATOLL ....................................... | 314,872 | 314,872 |
| 165 | 0605326A | CONCEPTS EXPERIMENTATION PROGRAM ........ | 95,551 | 95,551 |
| 167 | 0605601A | ARMY TEST RANGES AND FACILITIES ................ | 439,118 | 439,118 |
| 168 | 0605602A | ARMY TECHNICAL TEST INSTRUMENTATION AND TARGETS. | 42,220 | 47,220 |
| | | Rapid Assurance Modernization Program .................. | | [5,000] |
| 169 | 0605604A | SURVIVABILITY/LETHALITY ANALYSIS .............. | 37,518 | 37,518 |
| 170 | 0605606A | AIRCRAFT CERTIFICATION ..................................... | 2,718 | 2,718 |
| 172 | 0605706A | MATERIEL SYSTEMS ANALYSIS ............................ | 26,902 | 26,902 |
| 173 | 0605709A | EXPLOITATION OF FOREIGN ITEMS ..................... | 7,805 | 7,805 |
| 174 | 0605712A | SUPPORT OF OPERATIONAL TESTING ................ | 75,133 | 75,133 |
| 175 | 0605716A | ARMY EVALUATION CENTER ............................... | 71,118 | 71,118 |
| 176 | 0605718A | ARMY MODELING & SIM X-CMD COLLABORA-TION & INTEG. | 11,204 | 11,204 |
| 177 | 0605801A | PROGRAMWIDE ACTIVITIES .................................. | 93,895 | 93,895 |
| 178 | 0605803A | TECHNICAL INFORMATION ACTIVITIES ............ | 31,327 | 31,327 |
| 179 | 0605805A | MUNITIONS STANDARDIZATION, EFFECTIVE-NESS AND SAFETY. | 50,409 | 50,409 |
| 180 | 0605857A | ENVIRONMENTAL QUALITY TECHNOLOGY MGMT SUPPORT. | 1,629 | 1,629 |
| 181 | 0605898A | ARMY DIRECT REPORT HEADQUARTERS—R&D - MHA. | 55,843 | 55,843 |
| 182 | 0606002A | RONALD REAGAN BALLISTIC MISSILE DE-FENSE TEST SITE. | 91,340 | 91,340 |
| 183 | 0606003A | COUNTERINTEL AND HUMAN INTEL MOD-ERNIZATION. | 6,348 | 6,348 |
| 185 | 0606942A | ASSESSMENTS AND EVALUATIONS CYBER VULNERABILITIES. | 6,025 | 6,025 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** ............... | **1,624,585** | **1,639,585** |
| | | | | |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | |
| 187 | 0603778A | MLRS PRODUCT IMPROVEMENT PROGRAM ....... | 14,465 | 14,465 |
| 188 | 0605024A | ANTI-TAMPER TECHNOLOGY SUPPORT ............. | 7,472 | 7,472 |
| 189 | 0607131A | WEAPONS AND MUNITIONS PRODUCT IM-PROVEMENT PROGRAMS. | 8,425 | 8,425 |
| 190 | 0607136A | BLACKHAWK PRODUCT IMPROVEMENT PRO-GRAM. | 1,507 | 23,007 |
| | | Program increase ........................................................... | | [21,500] |
| 191 | 0607137A | CHINOOK PRODUCT IMPROVEMENT PROGRAM | 9,265 | 21,765 |
| | | 714C Engine Enhancement ........................................... | | [7,500] |
| | | Program increase ........................................................... | | [5,000] |
| 192 | 0607139A | IMPROVED TURBINE ENGINE PROGRAM ........... | 201,247 | 191,062 |
| | | Excessive growth—Government Planning ................... | | [–1,721] |
| | | Slow expenditure rate .................................................. | | [–8,464] |
| 193 | 0607142A | AVIATION ROCKET SYSTEM PRODUCT IM-PROVEMENT AND DEVELOPMENT. | 3,014 | 3,014 |
| 194 | 0607143A | UNMANNED AIRCRAFT SYSTEM UNIVERSAL PRODUCTS. | 25,393 | 25,393 |
| 195 | 0607145A | APACHE FUTURE DEVELOPMENT ........................ | 10,547 | 18,047 |
| | | Apache future development program increase .......... | | [7,500] |
| 196 | 0607148A | AN/TPQ–53 COUNTERFIRE TARGET ACQUISI-TION RADAR SYSTEM. | 54,167 | 54,167 |
| 197 | 0607150A | INTEL CYBER DEVELOPMENT ............................... | 4,345 | 4,345 |
| 198 | 0607312A | ARMY OPERATIONAL SYSTEMS DEVELOPMENT | 19,000 | 19,000 |
| 199 | 0607313A | ELECTRONIC WARFARE DEVELOPMENT ........... | 6,389 | 6,389 |
| 200 | 0607315A | ENDURING TURBINE ENGINES AND POWER SYSTEMS. | 2,411 | 2,411 |
| 201 | 0607665A | FAMILY OF BIOMETRICS ........................................ | 797 | 797 |
| 202 | 0607865A | PATRIOT PRODUCT IMPROVEMENT .................... | 177,197 | 177,197 |
| 203 | 0203728A | JOINT AUTOMATED DEEP OPERATION CO-ORDINATION SYSTEM (JADOCS). | 42,177 | 42,177 |
| 204 | 0203735A | COMBAT VEHICLE IMPROVEMENT PROGRAMS | 146,635 | 224,490 |
| | | Abrams Modernization Program ................................. | | [88,300] |
| | | Slow expenditure—Stryker Combat Vehicle Improve-ment Program. | | [–10,445] |

137 STAT. 862        PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| 205 | 0203743A | 155MM SELF-PROPELLED HOWITZER IMPROVEMENTS. | 122,902 | 110,802 |
| | | Excess growth—ERCA range prototype build ............ | | [–5,900] |
| | | Slow expenditure—Extended Range Cannon Artillery. | | [–6,200] |
| 207 | 0203752A | AIRCRAFT ENGINE COMPONENT IMPROVEMENT PROGRAM. | 146 | 146 |
| 208 | 0203758A | DIGITIZATION .............................................................. | 1,515 | 1,515 |
| 209 | 0203801A | MISSILE/AIR DEFENSE PRODUCT IMPROVEMENT PROGRAM. | 4,520 | 4,520 |
| 210 | 0203802A | OTHER MISSILE PRODUCT IMPROVEMENT PROGRAMS. | 10,044 | 10,044 |
| 211 | 0205412A | ENVIRONMENTAL QUALITY TECHNOLOGY—OPERATIONAL SYSTEM DEV. | 281 | 281 |
| 212 | 0205778A | GUIDED MULTIPLE-LAUNCH ROCKET SYSTEM (GMLRS). | 75,952 | 75,952 |
| 213 | 0208053A | JOINT TACTICAL GROUND SYSTEM ...................... | 203 | 203 |
| 216 | 0303028A | SECURITY AND INTELLIGENCE ACTIVITIES ...... | 301 | 301 |
| 217 | 0303140A | INFORMATION SYSTEMS SECURITY PROGRAM | 15,323 | 15,323 |
| 218 | 0303141A | GLOBAL COMBAT SUPPORT SYSTEM ................... | 13,082 | 13,082 |
| 219 | 0303142A | SATCOM GROUND ENVIRONMENT (SPACE) ....... | 26,838 | 26,838 |
| 222 | 0305179A | INTEGRATED BROADCAST SERVICE (IBS) .......... | 9,456 | 9,456 |
| 225 | 0305219A | MQ–1C GRAY EAGLE UAS ...................................... | 6,629 | 6,629 |
| 227 | 0708045A | END ITEM INDUSTRIAL PREPAREDNESS ACTIVITIES. | 75,317 | 85,317 |
| | | Additive manufacturing expansion .............................. | | [10,000] |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS ......................................... | 8,786 | 8,786 |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT.** | **1,105,748** | **1,212,818** |
| | | **SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS** | | |
| 228 | 0608041A | DEFENSIVE CYBER—SOFTWARE PROTOTYPE DEVELOPMENT. | 83,570 | 83,570 |
| | | **SUBTOTAL SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS.** | **83,570** | **83,570** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, ARMY.** | **15,775,381** | **15,966,152** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY** | | |
| | | **BASIC RESEARCH** | | |
| 001 | 0601103N | UNIVERSITY RESEARCH INITIATIVES ................. | 96,355 | 106,355 |
| | | Defense University Research Instrumentation Program (DURIP). | | [10,000] |
| 002 | 0601153N | DEFENSE RESEARCH SCIENCES ........................... | 540,908 | 543,908 |
| | | Hypersonic research initiatives .................................... | | [3,000] |
| | | **SUBTOTAL BASIC RESEARCH** ............................ | **637,263** | **650,263** |
| | | **APPLIED RESEARCH** | | |
| 003 | 0602114N | POWER PROJECTION APPLIED RESEARCH ........ | 23,982 | 23,982 |
| 004 | 0602123N | FORCE PROTECTION APPLIED RESEARCH ......... | 142,148 | 144,648 |
| | | Cavitation erosion research ......................................... | | [2,500] |
| 005 | 0602131M | MARINE CORPS LANDING FORCE TECHNOLOGY. | 59,208 | 68,708 |
| | | Unmanned logistics solutions ...................................... | | [9,500] |
| 006 | 0602235N | COMMON PICTURE APPLIED RESEARCH ........... | 52,090 | 52,090 |
| 007 | 0602236N | WARFIGHTER SUSTAINMENT APPLIED RESEARCH. | 74,722 | 77,722 |
| | | Research on foreign malign influence operations ...... | | [3,000] |
| 008 | 0602271N | ELECTROMAGNETIC SYSTEMS APPLIED RESEARCH. | 92,473 | 92,473 |
| 009 | 0602435N | OCEAN WARFIGHTING ENVIRONMENT APPLIED RESEARCH. | 80,806 | 89,806 |
| | | Continous distributed sensing systems ....................... | | [4,000] |
| | | Intelligent Autonomous Systems for Seabed Warfare | | [5,000] |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|----------------:|----------------------:|
| 010 | 0602651M | JOINT NON-LETHAL WEAPONS APPLIED RE-SEARCH. | 7,419 | 7,419 |
| 011 | 0602747N | UNDERSEA WARFARE APPLIED RESEARCH ....... | 61,503 | 74,003 |
| | | Academic Partnerships for Submarine & Undersea Vehicle Research & Manufacturing. | | [10,000] |
| | | Undersea Sensing and Communications .................... | | [2,500] |
| 012 | 0602750N | FUTURE NAVAL CAPABILITIES APPLIED RE-SEARCH. | 182,662 | 182,662 |
| 013 | 0602782N | MINE AND EXPEDITIONARY WARFARE AP-PLIED RESEARCH. | 30,435 | 30,435 |
| 014 | 0602792N | INNOVATIVE NAVAL PROTOTYPES (INP) AP-PLIED RESEARCH. | 133,828 | 133,828 |
| 015 | 0602861N | SCIENCE AND TECHNOLOGY MANAGEMENT—ONR FIELD ACITIVITIES. | 85,063 | 85,063 |
| | | **SUBTOTAL APPLIED RESEARCH** ....................... | **1,026,339** | **1,062,839** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | |
| 016 | 0603123N | FORCE PROTECTION ADVANCED TECH-NOLOGY. | 29,512 | 29,512 |
| 017 | 0603271N | ELECTROMAGNETIC SYSTEMS ADVANCED TECHNOLOGY. | 8,418 | 8,418 |
| 018 | 0603273N | SCIENCE & TECHNOLOGY FOR NUCLEAR RE-ENTRY SYSTEMS. | 112,329 | 112,329 |
| 019 | 0603640M | USMC ADVANCED TECHNOLOGY DEMONSTRA-TION (ATD). | 308,217 | 331,217 |
| | | Adaptive Future Force ................................................... | | [5,000] |
| | | Hardware In the Loop capabilities ............................. | | [8,000] |
| | | Long Range Maneuvering Projectile ........................... | | [10,000] |
| 020 | 0603651M | JOINT NON-LETHAL WEAPONS TECHNOLOGY DEVELOPMENT. | 15,556 | 15,556 |
| 021 | 0603673N | FUTURE NAVAL CAPABILITIES ADVANCED TECHNOLOGY DEVELOPMENT. | 264,700 | 267,200 |
| | | Automated acoustic signal classifier ........................... | | [2,500] |
| 022 | 0603680N | MANUFACTURING TECHNOLOGY PROGRAM ..... | 61,843 | 61,843 |
| 023 | 0603729N | WARFIGHTER PROTECTION ADVANCED TECH-NOLOGY. | 5,100 | 6,600 |
| | | Balloon catheter hemorrhage control device .............. | | [1,500] |
| 024 | 0603758N | NAVY WARFIGHTING EXPERIMENTS AND DEM-ONSTRATIONS. | 75,898 | 75,898 |
| 025 | 0603782N | MINE AND EXPEDITIONARY WARFARE AD-VANCED TECHNOLOGY. | 2,048 | 2,048 |
| 026 | 0603801N | INNOVATIVE NAVAL PROTOTYPES (INP) AD-VANCED TECHNOLOGY DEVELOPMENT. | 132,931 | 134,431 |
| | | HEL weapon system ...................................................... | | [1,500] |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DE-VELOPMENT**. | **1,016,552** | **1,045,052** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | |
| 027 | 0603128N | UNMANNED AERIAL SYSTEM ................................. | 108,225 | 105,053 |
| | | ILS support previously funded ..................................... | | [–3,172] |
| 028 | 0603178N | LARGE UNMANNED SURFACE VEHICLES (LUSV). | 117,400 | 117,400 |
| 029 | 0603207N | AIR/OCEAN TACTICAL APPLICATIONS ................ | 40,653 | 43,653 |
| | | Autonomous surface and underwater dual-modality vehicles. | | [3,000] |
| 030 | 0603216N | AVIATION SURVIVABILITY ...................................... | 20,874 | 20,874 |
| 031 | 0603239N | NAVAL CONSTRUCTION FORCES ......................... | 7,821 | 7,821 |
| 032 | 0603254N | ASW SYSTEMS DEVELOPMENT ............................. | 17,090 | 17,090 |
| 033 | 0603261N | TACTICAL AIRBORNE RECONNAISSANCE .......... | 3,721 | 3,721 |
| 034 | 0603382N | ADVANCED COMBAT SYSTEMS TECHNOLOGY .. | 6,216 | 9,216 |
| | | Tier 2.5 LO Inspection Technology .............................. | | [3,000] |
| 035 | 0603502N | SURFACE AND SHALLOW WATER MINE COUN-TERMEASURES. | 34,690 | 34,690 |
| 036 | 0603506N | SURFACE SHIP TORPEDO DEFENSE .................... | 730 | 730 |
| 037 | 0603512N | CARRIER SYSTEMS DEVELOPMENT ..................... | 6,095 | 6,095 |
| 038 | 0603525N | PILOT FISH ................................................................. | 916,208 | 916,208 |

SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|----------------------|
| 039 | 0603527N | RETRACT LARCH ........................................................ | 7,545 | 7,545 |
| 040 | 0603536N | RETRACT JUNIPER .................................................... | 271,109 | 271,109 |
| 041 | 0603542N | RADIOLOGICAL CONTROL ........................................ | 811 | 811 |
| 042 | 0603553N | SURFACE ASW ........................................................... | 1,189 | 1,189 |
| 043 | 0603561N | ADVANCED SUBMARINE SYSTEM DEVELOPMENT. | 88,415 | 88,415 |
| 044 | 0603562N | SUBMARINE TACTICAL WARFARE SYSTEMS ..... | 15,119 | 15,119 |
| 045 | 0603563N | SHIP CONCEPT ADVANCED DESIGN .................... | 89,939 | 96,939 |
| | | Support for Additive Manufacturing ........................... | | [7,000] |
| 046 | 0603564N | SHIP PRELIMINARY DESIGN & FEASIBILITY STUDIES. | 121,402 | 126,402 |
| | | Ship Concept Advanced Design ................................... | | [5,000] |
| 047 | 0603570N | ADVANCED NUCLEAR POWER SYSTEMS ............ | 319,656 | 319,656 |
| 048 | 0603573N | ADVANCED SURFACE MACHINERY SYSTEMS ... | 133,911 | 138,911 |
| | | Support Shipboard Distribution of High-Power Energy. | | [5,000] |
| 049 | 0603576N | CHALK EAGLE ............................................................. | 116,078 | 116,078 |
| 050 | 0603581N | LITTORAL COMBAT SHIP (LCS) ............................. | 32,615 | 32,615 |
| 051 | 0603582N | COMBAT SYSTEM INTEGRATION ........................... | 18,610 | 18,610 |
| 052 | 0603595N | OHIO REPLACEMENT ................................................. | 257,076 | 267,076 |
| | | Rapid composites ......................................................... | | [10,000] |
| 053 | 0603596N | LCS MISSION MODULES ......................................... | 31,464 | 31,464 |
| 054 | 0603597N | AUTOMATED TEST AND RE-TEST (ATRT) ........... | 10,809 | 10,809 |
| 055 | 0603599N | FRIGATE DEVELOPMENT ........................................ | 112,972 | 110,172 |
| | | Live fire test and evaluation early to need ................ | | [–2,800] |
| 056 | 0603609N | CONVENTIONAL MUNITIONS ................................ | 9,030 | 9,030 |
| 057 | 0603635M | MARINE CORPS GROUND COMBAT/SUPPORT SYSTEM. | 128,782 | 119,189 |
| | | Slow expenditure .......................................................... | | [–9,593] |
| 058 | 0603654N | JOINT SERVICE EXPLOSIVE ORDNANCE DEVELOPMENT. | 44,766 | 44,766 |
| 059 | 0603713N | OCEAN ENGINEERING TECHNOLOGY DEVELOPMENT. | 10,751 | 10,751 |
| 060 | 0603721N | ENVIRONMENTAL PROTECTION ........................... | 24,457 | 24,457 |
| 061 | 0603724N | NAVY ENERGY PROGRAM ........................................ | 72,214 | 77,214 |
| | | Marine Energy Systems for Sensors and Microgrids | | [5,000] |
| 062 | 0603725N | FACILITIES IMPROVEMENT .................................... | 10,149 | 10,149 |
| 063 | 0603734N | CHALK CORAL ............................................................. | 687,841 | 522,841 |
| | | Program decrease .......................................................... | | [–165,000] |
| 064 | 0603739N | NAVY LOGISTIC PRODUCTIVITY ........................... | 4,712 | 4,712 |
| 065 | 0603746N | RETRACT MAPLE ...................................................... | 420,455 | 420,455 |
| 066 | 0603748N | LINK PLUMERIA ........................................................ | 2,100,474 | 2,050,474 |
| | | Project 2937: Unjustified requirements ...................... | | [–50,000] |
| 067 | 0603751N | RETRACT ELM ............................................................. | 88,036 | 88,036 |
| 068 | 0603764M | LINK EVERGREEN ...................................................... | 547,005 | 547,005 |
| 069 | 0603790N | NATO RESEARCH AND DEVELOPMENT .............. | 6,265 | 6,265 |
| 070 | 0603795N | LAND ATTACK TECHNOLOGY ................................ | 1,624 | 1,624 |
| 071 | 0603851M | JOINT NON-LETHAL WEAPONS TESTING .......... | 31,058 | 31,058 |
| 072 | 0603860N | JOINT PRECISION APPROACH AND LANDING SYSTEMS—DEM/VAL. | 22,590 | 22,590 |
| 073 | 0603925N | DIRECTED ENERGY AND ELECTRIC WEAPON SYSTEMS. | 52,129 | 52,129 |
| 074 | 0604014N | F/A –18 INFRARED SEARCH AND TRACK (IRST) | 32,127 | 32,127 |
| 075 | 0604027N | DIGITAL WARFARE OFFICE ..................................... | 181,001 | 181,001 |
| 076 | 0604028N | SMALL AND MEDIUM UNMANNED UNDERSEA VEHICLES. | 110,506 | 93,991 |
| | | Medusa unexecutable contract award date ................. | | [–16,515] |
| 077 | 0604029N | UNMANNED UNDERSEA VEHICLE CORE TECHNOLOGIES. | 71,156 | 71,156 |
| 078 | 0604030N | RAPID PROTOTYPING, EXPERIMENTATION AND DEMONSTRATION.. | 214,100 | 214,100 |
| 079 | 0604031N | LARGE UNMANNED UNDERSEA VEHICLES ....... | 6,900 | 6,900 |
| 080 | 0604112N | GERALD R. FORD CLASS NUCLEAR AIRCRAFT CARRIER (CVN 78—80). | 118,182 | 118,182 |
| 082 | 0604127N | SURFACE MINE COUNTERMEASURES ................ | 16,127 | 16,127 |
| 083 | 0604272N | TACTICAL AIR DIRECTIONAL INFRARED COUNTERMEASURES (TADIRCM). | 34,684 | 34,684 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 865

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
#### (In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|------|------|------|------|
| 084 | 0604289M | NEXT GENERATION LOGISTICS | 5,991 | 5,991 |
| 085 | 0604292N | FUTURE VERTICAL LIFT (MARITIME STRIKE) | 2,100 | 2,100 |
| 086 | 0604320M | RAPID TECHNOLOGY CAPABILITY PROTOTYPE | 131,763 | 131,763 |
| 087 | 0604454N | LX (R) | 21,319 | 21,319 |
| 088 | 0604536N | ADVANCED UNDERSEA PROTOTYPING | 104,328 | 82,603 |
| | | Program delays | | [–21,725] |
| 089 | 0604636N | COUNTER UNMANNED AIRCRAFT SYSTEMS (C-UAS). | 11,567 | 11,567 |
| 090 | 0604659N | PRECISION STRIKE WEAPONS DEVELOPMENT PROGRAM. | 5,976 | 195,976 |
| | | SLCM-N | | [190,000] |
| 091 | 0604707N | SPACE AND ELECTRONIC WARFARE (SEW) AR-CHITECTURE/ENGINEERING SUPPORT. | 9,993 | 9,993 |
| 092 | 0604786N | OFFENSIVE ANTI-SURFACE WARFARE WEAP-ON DEVELOPMENT. | 237,655 | 237,655 |
| 093 | 0605512N | MEDIUM UNMANNED SURFACE VEHICLES (MUSVS)). | 85,800 | 74,248 |
| | | Program delays | | [–11,552] |
| 094 | 0605513N | UNMANNED SURFACE VEHICLE ENABLING CAPABILITIES. | 176,261 | 171,980 |
| | | Prior year underexecution | | [–4,281] |
| 095 | 0605514M | GROUND BASED ANTI-SHIP MISSILE | 36,383 | 36,383 |
| 096 | 0605516M | LONG RANGE FIRES | 36,763 | 36,763 |
| 097 | 0605518N | CONVENTIONAL PROMPT STRIKE (CPS) | 901,064 | 901,064 |
| 098 | 0303354N | ASW SYSTEMS DEVELOPMENT—MIP | 10,167 | 10,167 |
| 099 | 0304240M | ADVANCED TACTICAL UNMANNED AIRCRAFT SYSTEM. | 539 | 9,439 |
| | | KAMAN KARGO | | [8,900] |
| 100 | 0304270N | ELECTRONIC WARFARE DEVELOPMENT—MIP | 1,250 | 1,250 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVEL-OPMENT & PROTOTYPES**. | **9,734,483** | **9,686,745** |
| | | **SYSTEM DEVELOPMENT & DEMONSTRA-TION** | | |
| 101 | 0603208N | TRAINING SYSTEM AIRCRAFT | 44,120 | 44,120 |
| 102 | 0604038N | MARITIME TARGETING CELL | 30,922 | 30,922 |
| 103 | 0604212M | OTHER HELO DEVELOPMENT | 101,209 | 83,614 |
| | | Project 3406 insufficient justification | | [–17,595] |
| 104 | 0604212N | OTHER HELO DEVELOPMENT | 2,604 | 2,604 |
| 105 | 0604214M | AV–8B AIRCRAFT—ENG DEV | 8,263 | 8,263 |
| 106 | 0604215N | STANDARDS DEVELOPMENT | 4,039 | 4,039 |
| 107 | 0604216N | MULTI-MISSION HELICOPTER UPGRADE DE-VELOPMENT. | 62,350 | 62,350 |
| 108 | 0604221N | P–3 MODERNIZATION PROGRAM | 771 | 771 |
| 109 | 0604230N | WARFARE SUPPORT SYSTEM | 109,485 | 109,485 |
| 110 | 0604231N | COMMAND AND CONTROL SYSTEMS | 87,457 | 87,457 |
| 111 | 0604234N | ADVANCED HAWKEYE | 399,919 | 419,919 |
| | | Navy UPL—E–2D Theater Combat ID and HECTR | | [20,000] |
| 112 | 0604245M | H–1 UPGRADES | 29,766 | 29,766 |
| 113 | 0604261N | ACOUSTIC SEARCH SENSORS | 51,531 | 51,531 |
| 114 | 0604262N | V–22A | 137,597 | 137,597 |
| 115 | 0604264N | AIR CREW SYSTEMS DEVELOPMENT | 42,155 | 42,155 |
| 116 | 0604269N | EA–18 | 172,507 | 172,507 |
| 117 | 0604270N | ELECTRONIC WARFARE DEVELOPMENT | 171,384 | 168,350 |
| | | Prior year underexecution | | [–3,034] |
| 118 | 0604273M | EXECUTIVE HELO DEVELOPMENT | 35,376 | 35,376 |
| 119 | 0604274N | NEXT GENERATION JAMMER (NGJ) | 40,477 | 40,477 |
| 120 | 0604280N | JOINT TACTICAL RADIO SYSTEM—NAVY (JTRS-NAVY). | 451,397 | 461,397 |
| | | Navy Multiband Terminal | | [5,000] |
| | | Satellite Terminal (transportable) Non-Geo-stationary. | | [5,000] |
| 121 | 0604282N | NEXT GENERATION JAMMER (NGJ) INCRE-MENT II. | 250,577 | 199,645 |
| | | Next Generation Jammer—Low Band | | [–50,932] |
| 122 | 0604307N | SURFACE COMBATANT COMBAT SYSTEM EN-GINEERING. | 453,311 | 438,061 |

137 STAT. 866          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|-----------------------|
| | | Aegis capability package 2024 delays ......................... | | [–5,500] |
| | | Software SW factory insufficient justification ........... | | [–9,750] |
| 124 | 0604329N | SMALL DIAMETER BOMB (SDB) ............................ | 52,211 | 52,211 |
| 125 | 0604366N | STANDARD MISSILE IMPROVEMENTS ................. | 418,187 | 388,811 |
| | | Prior year underexecution ........................................... | | [–29,376] |
| 126 | 0604373N | AIRBORNE MCM ...................................................... | 11,368 | 11,368 |
| 127 | 0604378N | NAVAL INTEGRATED FIRE CONTROL—COUNTER AIR SYSTEMS ENGINEERING. | 66,445 | 68,945 |
| | | Stratospheric Balloon Research .................................... | | [2,500] |
| 128 | 0604419N | ADVANCED SENSORS APPLICATION PROGRAM (ASAP). | | 10,000 |
| | | Program increase .......................................................... | | [10,000] |
| 129 | 0604501N | ADVANCED ABOVE WATER SENSORS .................. | 115,396 | 115,396 |
| 130 | 0604503N | SSN–688 AND TRIDENT MODERNIZATION ......... | 93,435 | 93,435 |
| 131 | 0604504N | AIR CONTROL .............................................................. | 42,656 | 42,656 |
| 132 | 0604512N | SHIPBOARD AVIATION SYSTEMS ......................... | 10,442 | 10,442 |
| 133 | 0604518N | COMBAT INFORMATION CENTER CONVERSION | 11,359 | 11,359 |
| 134 | 0604522N | AIR AND MISSILE DEFENSE RADAR (AMDR) SYSTEM. | 90,307 | 90,307 |
| 135 | 0604530N | ADVANCED ARRESTING GEAR (AAG) ................... | 10,658 | 10,658 |
| 136 | 0604558N | NEW DESIGN SSN ...................................................... | 234,356 | 241,356 |
| | | Precision Manuevering Unit ........................................ | | [7,000] |
| 137 | 0604562N | SUBMARINE TACTICAL WARFARE SYSTEM ........ | 71,516 | 71,516 |
| 138 | 0604567N | SHIP CONTRACT DESIGN/ LIVE FIRE T&E ......... | 22,462 | 22,462 |
| 139 | 0604574N | NAVY TACTICAL COMPUTER RESOURCES ......... | 4,279 | 4,279 |
| 140 | 0604601N | MINE DEVELOPMENT ............................................... | 104,731 | 104,731 |
| 141 | 0604610N | LIGHTWEIGHT TORPEDO DEVELOPMENT .......... | 229,668 | 221,168 |
| | | Project 3418 testing ahead of need .............................. | | [–8,500] |
| 142 | 0604654N | JOINT SERVICE EXPLOSIVE ORDNANCE DEVELOPMENT. | 9,064 | 9,064 |
| 143 | 0604657M | USMC GROUND COMBAT/SUPPORTING ARMS SYSTEMS—ENG DEV. | 62,329 | 42,148 |
| | | OPF-M termination ....................................................... | | [–20,181] |
| 144 | 0604703N | PERSONNEL, TRAINING, SIMULATION, AND HUMAN FACTORS. | 9,319 | 9,319 |
| 145 | 0604727N | JOINT STANDOFF WEAPON SYSTEMS ................. | 1,964 | 1,964 |
| 146 | 0604755N | SHIP SELF DEFENSE (DETECT & CONTROL) ...... | 158,426 | 158,426 |
| 147 | 0604756N | SHIP SELF DEFENSE (ENGAGE: HARD KILL) ..... | 47,492 | 47,492 |
| 148 | 0604757N | SHIP SELF DEFENSE (ENGAGE: SOFT KILL/EW) | 125,206 | 125,206 |
| 149 | 0604761N | INTELLIGENCE ENGINEERING ............................. | 19,969 | 19,969 |
| 150 | 0604771N | MEDICAL DEVELOPMENT ....................................... | 6,061 | 6,061 |
| 151 | 0604777N | NAVIGATION/ID SYSTEM ......................................... | 45,262 | 45,262 |
| 154 | 0604850N | SSN(X) ........................................................................... | 361,582 | 321,828 |
| | | Unjustified growth—management and support costs | | [–7,950] |
| | | Unjustified growth—NSWC studies ............................ | | [–13,804] |
| | | Unjustified growth—shipbuilder studies .................... | | [–18,000] |
| 155 | 0605013M | INFORMATION TECHNOLOGY DEVELOPMENT | 22,663 | 22,663 |
| 156 | 0605013N | INFORMATION TECHNOLOGY DEVELOPMENT | 282,138 | 283,138 |
| | | Cyber supply chain risk management ......................... | | [1,000] |
| 157 | 0605024N | ANTI-TAMPER TECHNOLOGY SUPPORT .............. | 8,340 | 8,340 |
| 158 | 0605180N | TACAMO MODERNIZATION ..................................... | 213,743 | 213,743 |
| 159 | 0605212M | CH–53K RDTE ............................................................. | 222,288 | 222,288 |
| 160 | 0605215N | MISSION PLANNING ................................................. | 86,448 | 86,448 |
| 161 | 0605217N | COMMON AVIONICS ................................................. | 81,076 | 81,076 |
| 162 | 0605220N | SHIP TO SHORE CONNECTOR (SSC) ..................... | 1,343 | 1,343 |
| 163 | 0605327N | T-AO 205 CLASS ......................................................... | 71 | 71 |
| 164 | 0605414N | UNMANNED CARRIER AVIATION (UCA) .............. | 220,404 | 200,001 |
| | | Test excess to need due to EDM delays ...................... | | [–20,403] |
| 165 | 0605450M | JOINT AIR-TO-GROUND MISSILE (JAGM) ............ | 384 | 384 |
| 166 | 0605500N | MULTI-MISSION MARITIME AIRCRAFT (MMA) ... | 36,027 | 36,027 |
| 167 | 0605504N | MULTI-MISSION MARITIME (MMA) INCREMENT III. | 132,449 | 132,449 |
| 168 | 0605611M | MARINE CORPS ASSAULT VEHICLES SYSTEM DEVELOPMENT & DEMONSTRATION. | 103,236 | 103,236 |
| 169 | 0605813M | JOINT LIGHT TACTICAL VEHICLE (JLTV) SYSTEM DEVELOPMENT & DEMONSTRATION. | 2,609 | 2,609 |
| 170 | 0204202N | DDG–1000 ..................................................................... | 231,778 | 223,444 |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | | Prior year underexecution ............................................. | | [−8,334] |
| 171 | 0301377N | COUNTERING ADVANCED CONVENTIONAL WEAPONS (CACW). | 17,531 | 17,531 |
| 172 | 0304785N | ISR & INFO OPERATIONS ........................................ | 174,271 | 174,271 |
| 173 | 0306250M | CYBER OPERATIONS TECHNOLOGY DEVELOPMENT. | 2,068 | 2,068 |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION**. | **6,962,234** | **6,799,375** |
| | | **MANAGEMENT SUPPORT** | | |
| 174 | 0604256N | THREAT SIMULATOR DEVELOPMENT ................. | 22,918 | 22,918 |
| 175 | 0604258N | TARGET SYSTEMS DEVELOPMENT ...................... | 18,623 | 18,623 |
| 176 | 0604759N | MAJOR T&E INVESTMENT ...................................... | 74,221 | 74,221 |
| 177 | 0605152N | STUDIES AND ANALYSIS SUPPORT—NAVY ....... | 3,229 | 3,229 |
| 178 | 0605154N | CENTER FOR NAVAL ANALYSES ......................... | 45,672 | 45,672 |
| 180 | 0605804N | TECHNICAL INFORMATION SERVICES ............... | 1,000 | 1,000 |
| 181 | 0605853N | MANAGEMENT, TECHNICAL & INTERNATIONAL SUPPORT. | 124,328 | 124,328 |
| 182 | 0605856N | STRATEGIC TECHNICAL SUPPORT ...................... | 4,053 | 4,053 |
| 183 | 0605863N | RDT&E SHIP AND AIRCRAFT SUPPORT .............. | 203,447 | 203,447 |
| 184 | 0605864N | TEST AND EVALUATION SUPPORT ...................... | 481,975 | 481,975 |
| 185 | 0605865N | OPERATIONAL TEST AND EVALUATION CAPABILITY. | 29,399 | 29,399 |
| 186 | 0605866N | NAVY SPACE AND ELECTRONIC WARFARE (SEW) SUPPORT. | 27,504 | 27,504 |
| 187 | 0605867N | SEW SURVEILLANCE/RECONNAISSANCE SUPPORT. | 9,183 | 9,183 |
| 188 | 0605873M | MARINE CORPS PROGRAM WIDE SUPPORT ....... | 34,976 | 34,976 |
| 189 | 0605898N | MANAGEMENT HQ—R&D ........................................ | 41,331 | 41,331 |
| 190 | 0606355N | WARFARE INNOVATION MANAGEMENT ............ | 37,340 | 37,340 |
| 191 | 0305327N | INSIDER THREAT ....................................................... | 2,246 | 2,246 |
| 192 | 0902498N | MANAGEMENT HEADQUARTERS (DEPARTMENTAL SUPPORT ACTIVITIES). | 2,168 | 2,168 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** ............... | **1,163,613** | **1,163,613** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | |
| 196 | 0604840M | F–35 C2D2 ................................................................... | 544,625 | 509,122 |
| | | TR–3/B4 Unplanned cost growth ................................. | | [−35,503] |
| 197 | 0604840N | F–35 C2D2 ................................................................... | 543,834 | 512,266 |
| | | TR–3/B4 Unplanned cost growth ................................. | | [−31,568] |
| 198 | 0605520M | MARINE CORPS AIR DEFENSE WEAPONS SYSTEMS. | 99,860 | 89,360 |
| | | Slow expenditure ............................................................. | | [−10,500] |
| 199 | 0607658N | COOPERATIVE ENGAGEMENT CAPABILITY (CEC). | 153,440 | 153,440 |
| 200 | 0101221N | STRATEGIC SUB & WEAPONS SYSTEM SUPPORT. | 321,648 | 321,648 |
| 201 | 0101224N | SSBN SECURITY TECHNOLOGY PROGRAM ......... | 62,694 | 62,694 |
| 202 | 0101226N | SUBMARINE ACOUSTIC WARFARE DEVELOPMENT. | 92,869 | 92,869 |
| 203 | 0101402N | NAVY STRATEGIC COMMUNICATIONS ................ | 51,919 | 51,919 |
| 204 | 0204136N | F/A–18 SQUADRONS ................................................... | 333,783 | 321,783 |
| | | Next generation naval mission planning system insufficient justification. | | [−12,000] |
| 205 | 0204228N | SURFACE SUPPORT ................................................... | 8,619 | 8,619 |
| 206 | 0204229N | TOMAHAWK AND TOMAHAWK MISSION PLANNING CENTER (TMPC). | 122,834 | 122,834 |
| 207 | 0204311N | INTEGRATED SURVEILLANCE SYSTEM ............... | 76,279 | 76,279 |
| 208 | 0204313N | SHIP-TOWED ARRAY SURVEILLANCE SYSTEMS | 1,103 | 1,103 |
| 209 | 0204413N | AMPHIBIOUS TACTICAL SUPPORT UNITS (DISPLACEMENT CRAFT). | 1,991 | 1,991 |
| 210 | 0204460M | GROUND/AIR TASK ORIENTED RADAR (G/ATOR) | 92,674 | 84,074 |
| | | Slow expenditure ............................................................. | | [−8,600] |
| 211 | 0204571N | CONSOLIDATED TRAINING SYSTEMS DEVELOPMENT. | 115,894 | 115,894 |
| 212 | 0204575N | ELECTRONIC WARFARE (EW) READINESS SUPPORT. | 61,677 | 61,677 |

137 STAT. 868          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| 213 | 0205601N | ANTI-RADIATION MISSILE IMPROVEMENT ........ | 59,555 | 59,555 |
| 214 | 0205620N | SURFACE ASW COMBAT SYSTEM INTEGRATION. | 29,973 | 29,973 |
| 215 | 0205632N | MK–48 ADCAP ............................................................. | 213,165 | 213,165 |
| 216 | 0205633N | AVIATION IMPROVEMENTS .................................. | 143,277 | 143,277 |
| 217 | 0205675N | OPERATIONAL NUCLEAR POWER SYSTEMS ...... | 152,546 | 152,546 |
| 218 | 0206313M | MARINE CORPS COMMUNICATIONS SYSTEMS .. | 192,625 | 183,725 |
| | | Marine Electromagnetic Warfare Ground Family of Systems. | | [–7,200] |
| | | Tactical Communication Modernization ..................... | | [–1,700] |
| 219 | 0206335M | COMMON AVIATION COMMAND AND CONTROL SYSTEM (CAC2S). | 12,565 | 12,565 |
| 220 | 0206623M | MARINE CORPS GROUND COMBAT/SUPPORTING ARMS SYSTEMS. | 83,900 | 83,900 |
| 221 | 0206624M | MARINE CORPS COMBAT SERVICES SUPPORT .. | 27,794 | 27,794 |
| 222 | 0206625M | USMC INTELLIGENCE/ELECTRONIC WARFARE SYSTEMS (MIP). | 47,762 | 47,762 |
| 223 | 0206629M | AMPHIBIOUS ASSAULT VEHICLE .......................... | 373 | 373 |
| 224 | 0207161N | TACTICAL AIM MISSILES ......................................... | 36,439 | 36,439 |
| 225 | 0207163N | ADVANCED MEDIUM RANGE AIR-TO-AIR MISSILE (AMRAAM). | 29,198 | 29,198 |
| 226 | 0208043N | PLANNING AND DECISION AID SYSTEM (PDAS) | 3,565 | 3,565 |
| 230 | 0303138N | AFLOAT NETWORKS .................................................. | 49,995 | 49,995 |
| 231 | 0303140N | INFORMATION SYSTEMS SECURITY PROGRAM | 33,390 | 33,390 |
| 232 | 0305192N | MILITARY INTELLIGENCE PROGRAM (MIP) ACTIVITIES. | 7,304 | 7,304 |
| 233 | 0305204N | TACTICAL UNMANNED AERIAL VEHICLES ....... | 11,235 | 11,235 |
| 234 | 0305205N | UAS INTEGRATION AND INTEROPERABILITY ... | 16,409 | 16,409 |
| 235 | 0305208M | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS. | 51,192 | 51,192 |
| 236 | 0305220N | MQ–4C TRITON ............................................................. | 12,094 | 12,094 |
| 237 | 0305231N | MQ–8 UAV .................................................................... | 29,700 | 29,700 |
| 238 | 0305232M | RQ–11 UAV .................................................................. | 2,107 | 2,107 |
| 239 | 0305234N | SMALL (LEVEL 0) TACTICAL UAS (STUASL0) ...... | 2,999 | 2,999 |
| 240 | 0305241N | MULTI-INTELLIGENCE SENSOR DEVELOPMENT. | 49,460 | 49,460 |
| 241 | 0305242M | UNMANNED AERIAL SYSTEMS (UAS) PAYLOADS (MIP). | 13,005 | 13,005 |
| 242 | 0305251N | CYBERSPACE OPERATIONS FORCES AND FORCE SUPPORT. | 2,000 | 2,000 |
| 243 | 0305421N | RQ–4 MODERNIZATION ............................................. | 300,378 | 300,378 |
| 244 | 0307577N | INTELLIGENCE MISSION DATA (IMD) .................. | 788 | 788 |
| 245 | 0308601N | MODELING AND SIMULATION SUPPORT ........... | 10,994 | 10,994 |
| 246 | 0702207N | DEPOT MAINTENANCE (NON-IF) ........................... | 23,248 | 23,248 |
| 247 | 0708730N | MARITIME TECHNOLOGY (MARITECH) ............... | 3,284 | 3,284 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS ......................................... | 2,021,376 | 2,061,376 |
| | | INDOPACOM UPL ...................................................... | | [40,000] |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT**. | **6,359,438** | **6,292,367** |
| | | **SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS** | | |
| 249 | 0608013N | RISK MANAGEMENT INFORMATION—SOFTWARE PILOT PROGRAM. | 11,748 | 11,748 |
| 250 | 0608231N | MARITIME TACTICAL COMMAND AND CONTROL (MTC2)—SOFTWARE PILOT PROGRAM. | 10,555 | 10,555 |
| | | **SUBTOTAL SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS**. | **22,303** | **22,303** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, NAVY**. | **26,922,225** | **26,722,557** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, AF** | | |
| | | **BASIC RESEARCH** | | |
| 001 | 0601102F | DEFENSE RESEARCH SCIENCES ........................... | 401,486 | 401,486 |
| 002 | 0601103F | UNIVERSITY RESEARCH INITIATIVES ................. | 182,372 | 182,372 |

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|----------------:|----------------------:|
|      |                 | **SUBTOTAL BASIC RESEARCH** ............................. | **583,858** | **583,858** |
|      |                 | **APPLIED RESEARCH** | | |
| 003  | 0602020F | FUTURE AF CAPABILITIES APPLIED RE-SEARCH. | 90,713 | 90,713 |
| 004  | 0602022F | UNIVERSITY AFFILIATED RESEARCH CENTER (UARC)—TACTICAL AUTONOMY. | 8,018 | 8,018 |
| 005  | 0602102F | MATERIALS ................................................................ | 142,325 | 162,825 |
|      |          | Advanced materials science for manufacturing re-search. | | [9,000] |
|      |          | High energy synchrotron x-ray research ..................... | | [9,000] |
|      |          | Materials development for high mach capabilities .... | | [2,500] |
| 006  | 0602201F | AEROSPACE VEHICLE TECHNOLOGIES .............. | 161,268 | 163,768 |
|      |          | Aerospace engineering systems security integration | | [2,500] |
| 007  | 0602202F | HUMAN EFFECTIVENESS APPLIED RESEARCH | 146,921 | 146,921 |
| 008  | 0602203F | AEROSPACE PROPULSION ...................................... | 184,867 | 189,867 |
|      |          | High mach turbine engine ........................................... | | [5,000] |
| 009  | 0602204F | AEROSPACE SENSORS ............................................ | 216,269 | 216,269 |
| 011  | 0602298F | SCIENCE AND TECHNOLOGY MANAGEMENT—MAJOR HEADQUARTERS ACTIVITIES. | 10,303 | 10,303 |
| 012  | 0602602F | CONVENTIONAL MUNITIONS ................................ | 160,599 | 160,599 |
| 013  | 0602605F | DIRECTED ENERGY TECHNOLOGY ....................... | 129,961 | 118,452 |
|      |          | DAF requested realignment of funds to 6601SF ........ | | [−11,509] |
| 014  | 0602788F | DOMINANT INFORMATION SCIENCES AND METHODS. | 182,076 | 230,076 |
|      |          | Distributed quantum information sciences net-working testbed. | | [5,000] |
|      |          | Future Flag experimentation testbed .......................... | | [25,000] |
|      |          | Ion trapped quantum information sciences computer | | [8,000] |
|      |          | Multi-domain radio frequency spectrum testing envi-ronment. | | [5,000] |
|      |          | Secure interference-avoiding connectivity of autono-mous artificially intelligent machines. | | [5,000] |
|      |          | **SUBTOTAL APPLIED RESEARCH** ....................... | **1,433,320** | **1,497,811** |
|      |          | **ADVANCED TECHNOLOGY DEVELOPMENT** | | |
| 015  | 0603032F | FUTURE AF INTEGRATED TECHNOLOGY DEMOS. | 255,855 | 213,655 |
|      |          | Program reduction ......................................................... | | [−42,200] |
| 016  | 0603112F | ADVANCED MATERIALS FOR WEAPON SYS-TEMS. | 30,372 | 30,372 |
| 017  | 0603199F | SUSTAINMENT SCIENCE AND TECHNOLOGY (S&T). | 10,478 | 10,478 |
| 018  | 0603203F | ADVANCED AEROSPACE SENSORS ....................... | 48,046 | 45,846 |
|      |          | Multi-spectrum sensing demonstration excess to need. | | [−2,200] |
| 019  | 0603211F | AEROSPACE TECHNOLOGY DEV/DEMO .............. | 51,896 | 71,896 |
|      |          | Hybrid Electric Propulsion ........................................... | | [7,500] |
|      |          | Semiautonomous adversary air platform .................... | | [12,500] |
| 020  | 0603216F | AEROSPACE PROPULSION AND POWER TECH-NOLOGY. | 56,789 | 56,789 |
| 021  | 0603270F | ELECTRONIC COMBAT TECHNOLOGY ................. | 32,510 | 32,510 |
| 022  | 0603273F | SCIENCE & TECHNOLOGY FOR NUCLEAR RE-ENTRY SYSTEMS. | 70,321 | 70,321 |
| 023  | 0603444F | MAUI SPACE SURVEILLANCE SYSTEM (MSSS) .. | 2 | 2 |
| 024  | 0603456F | HUMAN EFFECTIVENESS ADVANCED TECH-NOLOGY DEVELOPMENT. | 15,593 | 15,593 |
| 025  | 0603601F | CONVENTIONAL WEAPONS TECHNOLOGY ........ | 132,311 | 132,311 |
| 026  | 0603605F | ADVANCED WEAPONS TECHNOLOGY .................. | 102,997 | 92,997 |
|      |          | Excessive cost growth .................................................... | | [−10,000] |
| 027  | 0603680F | MANUFACTURING TECHNOLOGY PROGRAM ..... | 44,422 | 51,922 |
|      |          | Additive manufacturing for aerospace parts .............. | | [5,000] |
|      |          | High accuracy robotics ................................................. | | [2,500] |
| 028  | 0603788F | BATTLESPACE KNOWLEDGE DEVELOPMENT AND DEMONSTRATION. | 37,779 | 40,279 |
|      |          | Modeling and simulation conversion software ........... | | [2,500] |
| 029  | 0207412F | CONTROL AND REPORTING CENTER (CRC) ........ | 2,005 | 2,005 |

137 STAT. 870        PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|----------------:|----------------------:|
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT**. | **891,376** | **866,976** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | |
| 030 | 0603036F | MODULAR ADVANCED MISSILE ............................ | 105,238 | 0 |
| | | Program decrease ............................................................ | | [–105,238] |
| 031 | 0603260F | INTELLIGENCE ADVANCED DEVELOPMENT ..... | 6,237 | 6,237 |
| 032 | 0603742F | COMBAT IDENTIFICATION TECHNOLOGY ......... | 21,298 | 21,298 |
| 033 | 0603790F | NATO RESEARCH AND DEVELOPMENT ............... | 2,208 | 2,208 |
| 034 | 0603851F | INTERCONTINENTAL BALLISTIC MISSILE—DEM/VAL. | 45,319 | 45,319 |
| 035 | 0604001F | NC3 ADVANCED CONCEPTS .................................... | 10,011 | 10,011 |
| 037 | 0604003F | ADVANCED BATTLE MANAGEMENT SYSTEM (ABMS). | 500,575 | 500,575 |
| 038 | 0604004F | ADVANCED ENGINE DEVELOPMENT ................... | 595,352 | 595,352 |
| 039 | 0604005F | NC3 COMMERCIAL DEVELOPMENT & PROTOTYPING. | 78,799 | 78,799 |
| 040 | 0604006F | DEPT OF THE AIR FORCE TECH ARCHITECTURE. | 2,620 | 0 |
| | | DAF requested realignment of funds to 64858F ........ | | [–2,620] |
| 041 | 0604007F | E–7 ...................................................................................... | 681,039 | 681,039 |
| 042 | 0604009F | AFWERX PRIME ............................................................. | 83,336 | 88,336 |
| | | Agility Prime .................................................................... | | [5,000] |
| 043 | 0604015F | LONG RANGE STRIKE—BOMBER ........................... | 2,984,143 | 2,984,143 |
| 044 | 0604025F | RAPID DEFENSE EXPERIMENTATION RESERVE (RDER). | 154,300 | 154,300 |
| 045 | 0604032F | DIRECTED ENERGY PROTOTYPING ..................... | 1,246 | 1,246 |
| 046 | 0604033F | HYPERSONICS PROTOTYPING ................................ | 150,340 | 0 |
| | | Air-Launched Rapid Response Weapon (ARRW) ........ | | [–150,340] |
| 047 | 0604183F | HYPERSONICS PROTOTYPING—HYPERSONIC ATTACK CRUISE MISSILE (HACM). | 381,528 | 381,528 |
| 048 | 0604201F | PNT RESILIENCY, MODS, AND IMPROVEMENTS | 18,041 | 18,041 |
| 049 | 0604257F | ADVANCED TECHNOLOGY AND SENSORS ......... | 27,650 | 25,180 |
| | | Imaging and targeting support excess growth .......... | | [–2,470] |
| 050 | 0604288F | SURVIVABLE AIRBORNE OPERATIONS CENTER (SAOC). | 888,829 | 790,537 |
| | | EMO excess to need ....................................................... | | [–69,716] |
| | | Management services overestimation .......................... | | [–15,919] |
| | | Test and evaluation excess to need ............................. | | [–12,657] |
| 051 | 0604317F | TECHNOLOGY TRANSFER ...................................... | 26,638 | 26,638 |
| 052 | 0604327F | HARD AND DEEPLY BURIED TARGET DEFEAT SYSTEM (HDBTDS) PROGRAM. | 19,266 | 19,266 |
| 053 | 0604414F | CYBER RESILIENCY OF WEAPON SYSTEMS-ACS | 37,121 | 37,121 |
| 054 | 0604534F | ADAPTIVE ENGINE TRANSITION PROGRAM (AETP). | | 280,000 |
| | | Technology Maturation and Risk Reduction ............... | | [280,000] |
| 055 | 0604668F | JOINT TRANSPORTATION MANAGEMENT SYSTEM (JTMS). | 37,026 | 37,026 |
| 056 | 0604776F | DEPLOYMENT & DISTRIBUTION ENTERPRISE R&D. | 31,833 | 31,833 |
| 057 | 0604858F | TECH TRANSITION PROGRAM ................................ | 210,806 | 235,476 |
| | | DAF requested realignment of funds from OMAF SAG 11R. | | [17,550] |
| | | DAF requested realignment of funds from OMAF SAG 11Z. | | [4,500] |
| | | DAF requested realignment of funds from RDAF 64006F. | | [2,620] |
| 058 | 0604860F | OPERATIONAL ENERGY AND INSTALLATION RESILIENCE. | 46,305 | 35,903 |
| | | Excess growth ................................................................... | | [–10,402] |
| 059 | 0605164F | AIR REFUELING CAPABILITY MODERNIZATION | 19,400 | 19,400 |
| 061 | 0207110F | NEXT GENERATION AIR DOMINANCE ................. | 2,326,128 | 2,326,128 |
| 062 | 0207179F | AUTONOMOUS COLLABORATIVE PLATFORMS .. | 118,826 | 101,013 |
| | | DAF requested realignment of funds .......................... | | [–17,813] |
| 063 | 0207420F | COMBAT IDENTIFICATION ..................................... | 1,902 | 1,902 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 871

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|-----------------------|
| 064 | 0207455F | THREE DIMENSIONAL LONG-RANGE RADAR (3DELRR). | 19,763 | 19,763 |
| 065 | 0207522F | AIRBASE AIR DEFENSE SYSTEMS (ABADS) | 78,867 | 78,867 |
| 066 | 0208030F | WAR RESERVE MATERIEL—AMMUNITION | 8,175 | 8,175 |
| 068 | 0305236F | COMMON DATA LINK EXECUTIVE AGENT (CDL EA). | 25,157 | 25,157 |
| 069 | 0305601F | MISSION PARTNER ENVIRONMENTS | 17,727 | 17,727 |
| 072 | 0708051F | RAPID SUSTAINMENT MODERNIZATION (RSM) | 43,431 | 43,431 |
| 073 | 0808737F | INTEGRATED PRIMARY PREVENTION | 9,364 | 9,364 |
| 074 | 0901410F | CONTRACTING INFORMATION TECHNOLOGY SYSTEM. | 28,294 | 28,294 |
| 075 | 1206415F | U.S. SPACE COMMAND RESEARCH AND DEVELOPMENT SUPPORT. | 14,892 | 14,892 |
| 075A | 0605057F | NEXT GENERATION AIR-REFUELING SYSTEM | | 7,928 |
| | | Technical realignment | | [7,928] |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES**. | **9,859,030** | **9,789,453** |
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | |
| 076 | 0604200F | FUTURE ADVANCED WEAPON ANALYSIS & PROGRAMS. | 9,757 | 17,757 |
| | | RAACM | | [5,000] |
| | | Stand-Off Attack Weapon Technology | | [3,000] |
| 077 | 0604201F | PNT RESILIENCY, MODS, AND IMPROVEMENTS | 163,156 | 163,156 |
| 078 | 0604222F | NUCLEAR WEAPONS SUPPORT | 45,884 | 45,884 |
| 079 | 0604270F | ELECTRONIC WARFARE DEVELOPMENT | 13,804 | 13,804 |
| 080 | 0604281F | TACTICAL DATA NETWORKS ENTERPRISE | 74,023 | 79,023 |
| | | DAF requested realignment of funds | | [5,000] |
| 081 | 0604287F | PHYSICAL SECURITY EQUIPMENT | 10,605 | 10,605 |
| 082 | 0604602F | ARMAMENT/ORDNANCE DEVELOPMENT | 5,918 | 5,918 |
| 083 | 0604604F | SUBMUNITIONS | 3,345 | 3,345 |
| 084 | 0604617F | AGILE COMBAT SUPPORT | 21,967 | 21,967 |
| 085 | 0604706F | LIFE SUPPORT SYSTEMS | 39,301 | 39,301 |
| 086 | 0604735F | COMBAT TRAINING RANGES | 152,569 | 152,569 |
| 087 | 0604932F | LONG RANGE STANDOFF WEAPON | 911,406 | 891,406 |
| | | DAF realignment of funds | | [–20,000] |
| 088 | 0604933F | ICBM FUZE MODERNIZATION | 71,732 | 71,732 |
| 089 | 0605030F | JOINT TACTICAL NETWORK CENTER (JTNC) | 2,256 | 2,256 |
| 090 | 0605031F | JOINT TACTICAL NETWORK (JTN) | 452 | 452 |
| 091 | 0605056F | OPEN ARCHITECTURE MANAGEMENT | 36,582 | 36,582 |
| 092 | 0605057F | NEXT GENERATION AIR-REFUELING SYSTEM | 7,928 | 0 |
| | | Technical realignment | | [–7,928] |
| 093 | 0605223F | ADVANCED PILOT TRAINING | 77,252 | 74,980 |
| | | Program delay | | [–2,272] |
| 094 | 0605229F | HH–60W | 48,268 | 47,376 |
| | | Support costs excess to need | | [–892] |
| 095 | 0605238F | GROUND BASED STRATEGIC DETERRENT EMD | 3,746,935 | 3,739,285 |
| | | DAF requested realignment of funds | | [–7,650] |
| 096 | 0207171F | F–15 EPAWSS | 13,982 | 13,982 |
| 097 | 0207279F | ISOLATED PERSONNEL SURVIVABILITY AND RECOVERY. | 56,225 | 56,225 |
| 098 | 0207328F | STAND IN ATTACK WEAPON | 298,585 | 285,585 |
| | | Aircraft integration delays | | [–13,000] |
| 099 | 0207701F | FULL COMBAT MISSION TRAINING | 7,597 | 17,597 |
| | | Airborne Augmented Reality for Pilot Training | | [10,000] |
| 100 | 0208036F | MEDICAL C-CBRNE PROGRAMS | 2,006 | 2,006 |
| 102 | 0305205F | ENDURANCE UNMANNED AERIAL VEHICLES | 30,000 | 30,000 |
| 103 | 0401221F | KC–46A TANKER SQUADRONS | 124,662 | 87,455 |
| | | Aircrew training system previously funded | | [–9,864] |
| | | Direct mission support excess to need | | [–7,168] |
| | | Test and evaluation previously funded | | [–20,175] |
| 104 | 0401319F | VC–25B | 490,701 | 433,701 |
| | | Excess to need | | [–57,000] |
| 105 | 0701212F | AUTOMATED TEST SYSTEMS | 12,911 | 12,911 |
| 106 | 0804772F | TRAINING DEVELOPMENTS | 1,922 | 1,922 |
| 106A | 0102417F | OVER-THE-HORIZON BACKSCATTER RADAR | | 428,754 |

137 STAT. 872          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|------------------------|
| | | Technical realignment ................................................ | | [428,754] |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEM-ONSTRATION**. | **6,481,731** | **6,787,536** |
| | | **MANAGEMENT SUPPORT** | | |
| 107 | 0604256F | THREAT SIMULATOR DEVELOPMENT ................. | 16,626 | 16,626 |
| 108 | 0604759F | MAJOR T&E INVESTMENT ...................................... | 31,143 | 31,143 |
| 109 | 0605101F | RAND PROJECT AIR FORCE .................................... | 38,398 | 38,398 |
| 110 | 0605502F | SMALL BUSINESS INNOVATION RESEARCH ...... | 1,466 | 1,466 |
| 111 | 0605712F | INITIAL OPERATIONAL TEST & EVALUATION ... | 13,736 | 13,736 |
| 112 | 0605807F | TEST AND EVALUATION SUPPORT ....................... | 913,213 | 946,026 |
| | | DAF requested realignment of funds .......................... | | [32,813] |
| 113 | 0605827F | ACQ WORKFORCE- GLOBAL VIG & COMBAT SYS. | 317,901 | 317,901 |
| 114 | 0605828F | ACQ WORKFORCE- GLOBAL REACH ..................... | 541,677 | 541,677 |
| 115 | 0605829F | ACQ WORKFORCE- CYBER, NETWORK, & BUS SYS. | 551,213 | 536,513 |
| | | DAF requested realignment of funds .......................... | | [–14,700] |
| 117 | 0605831F | ACQ WORKFORCE- CAPABILITY INTEGRATION | 243,780 | 273,780 |
| | | DAF requested realignment of funds .......................... | | [30,000] |
| 118 | 0605832F | ACQ WORKFORCE- ADVANCED PRGM TECH-NOLOGY. | 109,030 | 77,030 |
| | | DAF requested realignment of funds .......................... | | [–32,000] |
| 119 | 0605833F | ACQ WORKFORCE- NUCLEAR SYSTEMS ............. | 336,788 | 336,788 |
| 120 | 0605898F | MANAGEMENT HQ—R&D ........................................ | 5,005 | 6,705 |
| | | DAF requested realignment of funds .......................... | | [1,700] |
| 121 | 0605976F | FACILITIES RESTORATION AND MODERNIZA-TION—TEST AND EVALUATION SUPPORT. | 87,889 | 87,889 |
| 122 | 0605978F | FACILITIES SUSTAINMENT—TEST AND EVAL-UATION SUPPORT. | 35,065 | 35,065 |
| 123 | 0606017F | REQUIREMENTS ANALYSIS AND MATURATION | 89,956 | 89,956 |
| 124 | 0606398F | MANAGEMENT HQ—T&E ........................................ | 7,453 | 7,453 |
| 126 | 0303255F | COMMAND, CONTROL, COMMUNICATION, AND COMPUTERS (C4)—STRATCOM. | 20,871 | 45,871 |
| | | NC3 network sensor demonstration ............................. | | [15,000] |
| | | NC3 Rapid Engineering Architecture Collaboration Hub (REACH). | | [10,000] |
| 127 | 0308602F | ENTEPRISE INFORMATION SERVICES (EIS) ....... | 100,357 | 100,357 |
| 128 | 0702806F | ACQUISITION AND MANAGEMENT SUPPORT .... | 20,478 | 20,478 |
| 129 | 0804731F | GENERAL SKILL TRAINING .................................... | 796 | 796 |
| 132 | 1001004F | INTERNATIONAL ACTIVITIES ................................ | 3,917 | 3,917 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** ............... | **3,486,758** | **3,529,571** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | |
| 134 | 0604233F | SPECIALIZED UNDERGRADUATE FLIGHT TRAINING. | 41,464 | 40,282 |
| | | T–6 avionics replacement program delay .................... | | [–1,182] |
| 135 | 0604283F | BATTLE MGMT COM & CTRL SENSOR DEVEL-OPMENT. | 40,000 | 40,000 |
| 136 | 0604445F | WIDE AREA SURVEILLANCE ................................... | 8,018 | 8,018 |
| 137 | 0604617F | AGILE COMBAT SUPPORT ...................................... | 5,645 | 5,645 |
| 139 | 0604840F | F–35 C2D2 .................................................................... | 1,275,268 | 1,268,275 |
| | | DAF requested realignment of funds .......................... | | [–5,000] |
| | | Program decrease ......................................................... | | [–1,993] |
| 140 | 0605018F | AF INTEGRATED PERSONNEL AND PAY SYS-TEM (AF-IPPS). | 40,203 | 40,203 |
| 141 | 0605024F | ANTI-TAMPER TECHNOLOGY EXECUTIVE AGENCY. | 49,613 | 49,613 |
| 142 | 0605117F | FOREIGN MATERIEL ACQUISITION AND EX-PLOITATION. | 93,881 | 93,881 |
| 143 | 0605278F | HC/MC–130 RECAP RDT&E ...................................... | 36,536 | 11,536 |
| | | Excess to need .............................................................. | | [–5,000] |
| | | Program decrease ......................................................... | | [–20,000] |
| 144 | 0606018F | NC3 INTEGRATION .................................................... | 22,910 | 22,910 |
| 145 | 0101113F | B–52 SQUADRONS ...................................................... | 950,815 | 944,193 |
| | | DAF requested realignment of funds .......................... | | [14,017] |
| | | Scheduling delays ........................................................ | | [–20,639] |

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 873

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|------|------|------|------|
| 146 | 0101122F | AIR-LAUNCHED CRUISE MISSILE (ALCM) .......... | 290 | 290 |
| 147 | 0101126F | B–1B SQUADRONS ....................................................... | 12,619 | 12,619 |
| 148 | 0101127F | B–2 SQUADRONS ........................................................ | 87,623 | 87,623 |
| 149 | 0101213F | MINUTEMAN SQUADRONS ...................................... | 33,237 | 43,237 |
| | | Legacy Weapons Software Translation/Modernization. | | [5,000] |
| | | Multi-Domain Command and Control Tool ................ | | [5,000] |
| 150 | 0101316F | WORLDWIDE JOINT STRATEGIC COMMUNICA-TIONS. | 24,653 | 24,653 |
| 151 | 0101318F | SERVICE SUPPORT TO STRATCOM—GLOBAL STRIKE. | 7,562 | 7,562 |
| 153 | 0101328F | ICBM REENTRY VEHICLES ..................................... | 475,415 | 475,415 |
| 155 | 0102110F | MH–139A ..................................................................... | 25,737 | 25,737 |
| 156 | 0102326F | REGION/SECTOR OPERATION CONTROL CEN-TER MODERNIZATION PROGRAM. | 831 | 831 |
| 157 | 0102412F | NORTH WARNING SYSTEM (NWS) ......................... | 102 | 102 |
| 158 | 0102417F | OVER-THE-HORIZON BACKSCATTER RADAR ...... | 428,754 | 35,000 |
| | | NORTHCOM UPL—Over the Horizon Radar Accel-eration. | | [35,000] |
| | | Technical realignment .................................................. | | [–428,754] |
| 159 | 0202834F | VEHICLES AND SUPPORT EQUIPMENT—GEN-ERAL. | 15,498 | 19,498 |
| | | DAF requested realignment of funds .......................... | | [4,000] |
| 160 | 0205219F | MQ–9 UAV ................................................................... | 81,123 | 81,123 |
| 161 | 0205671F | JOINT COUNTER RCIED ELECTRONIC WAR-FARE. | 2,303 | 2,303 |
| 162 | 0207040F | MULTI-PLATFORM ELECTRONIC WARFARE EQUIPMENT. | 7,312 | 7,312 |
| 164 | 0207133F | F–16 SQUADRONS ..................................................... | 98,633 | 139,233 |
| | | IVEWS restoration ...................................................... | | [40,600] |
| 165 | 0207134F | F–15E SQUADRONS .................................................... | 50,965 | 50,965 |
| 166 | 0207136F | MANNED DESTRUCTIVE SUPPRESSION ............. | 16,543 | 16,543 |
| 167 | 0207138F | F–22A SQUADRONS ................................................... | 725,889 | 740,889 |
| | | Cyber Resiliency .......................................................... | | [15,000] |
| 168 | 0207142F | F–35 SQUADRONS ..................................................... | 97,231 | 97,231 |
| 169 | 0207146F | F–15EX ......................................................................... | 100,006 | 100,006 |
| 170 | 0207161F | TACTICAL AIM MISSILES ........................................ | 41,958 | 41,958 |
| 171 | 0207163F | ADVANCED MEDIUM RANGE AIR-TO-AIR MIS-SILE (AMRAAM). | 53,679 | 53,679 |
| 172 | 0207227F | COMBAT RESCUE—PARARESCUE ......................... | 726 | 726 |
| 173 | 0207238F | E–11A ............................................................................ | 64,888 | 64,888 |
| 174 | 0207247F | AF TENCAP ................................................................. | 25,749 | 25,749 |
| 175 | 0207249F | PRECISION ATTACK SYSTEMS PROCUREMENT | 11,872 | 11,872 |
| 176 | 0207253F | COMPASS CALL .......................................................... | 66,932 | 66,932 |
| 177 | 0207268F | AIRCRAFT ENGINE COMPONENT IMPROVE-MENT PROGRAM. | 55,223 | 60,223 |
| | | Additive manufacturing expansion .............................. | | [5,000] |
| 178 | 0207325F | JOINT AIR-TO-SURFACE STANDOFF MISSILE (JASSM). | 132,937 | 132,937 |
| 179 | 0207327F | SMALL DIAMETER BOMB (SDB) ............................. | 37,518 | 40,518 |
| | | GLSDB Maritime Seeker .............................................. | | [3,000] |
| 180 | 0207410F | AIR & SPACE OPERATIONS CENTER (AOC) ........ | 72,059 | 72,059 |
| 181 | 0207412F | CONTROL AND REPORTING CENTER (CRC) ........ | 17,498 | 17,498 |
| 183 | 0207418F | AFSPECWAR—TACP .................................................. | 2,106 | 2,106 |
| 185 | 0207431F | COMBAT AIR INTELLIGENCE SYSTEM ACTIVI-TIES. | 72,010 | 72,010 |
| 186 | 0207438F | THEATER BATTLE MANAGEMENT (TBM) C4I ..... | 6,467 | 6,467 |
| 187 | 0207439F | ELECTRONIC WARFARE INTEGRATED RE-PROGRAMMING (EWIR). | 10,388 | 10,388 |
| 188 | 0207444F | TACTICAL AIR CONTROL PARTY-MOD ................ | 10,060 | 10,060 |
| 189 | 0207452F | DCAPES ....................................................................... | 8,233 | 8,233 |
| 190 | 0207521F | AIR FORCE CALIBRATION PROGRAMS ................ | 2,172 | 2,172 |
| 192 | 0207573F | NATIONAL TECHNICAL NUCLEAR FORENSICS | 2,049 | 2,049 |
| 193 | 0207590F | SEEK EAGLE ............................................................... | 33,478 | 33,478 |
| 195 | 0207605F | WARGAMING AND SIMULATION CENTERS ........ | 11,894 | 11,894 |
| 197 | 0207697F | DISTRIBUTED TRAINING AND EXERCISES ........ | 3,811 | 3,811 |
| 198 | 0208006F | MISSION PLANNING SYSTEMS .............................. | 96,272 | 96,272 |

SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|------|------|------|------|
| 199 | 0208007F | TACTICAL DECEPTION ............................................. | 26,533 | 26,533 |
| 201 | 0208087F | DISTRIBUTED CYBER WARFARE OPERATIONS | 50,122 | 50,122 |
| 202 | 0208088F | AF DEFENSIVE CYBERSPACE OPERATIONS ....... | 113,064 | 113,064 |
| 208 | 0208288F | INTEL DATA APPLICATIONS ................................... | 967 | 967 |
| 209 | 0301025F | GEOBASE ....................................................................... | 1,514 | 1,514 |
| 211 | 0301113F | CYBER SECURITY INTELLIGENCE SUPPORT ..... | 8,476 | 8,476 |
| 218 | 0301401F | AF MULTI-DOMAIN NON-TRADITIONAL ISR BATTLESPACE AWARENESS. | 2,890 | 2,890 |
| 219 | 0302015F | E–4B NATIONAL AIRBORNE OPERATIONS CEN- TER (NAOC). | 39,868 | 39,868 |
| 220 | 0303004F | EIT CONNECT ............................................................. | 32,900 | 32,900 |
| 221 | 0303089F | CYBERSPACE OPERATIONS SYSTEMS ................. | 4,881 | 4,881 |
| 222 | 0303131F | MINIMUM ESSENTIAL EMERGENCY COMMU- NICATIONS NETWORK (MEECN). | 33,567 | 33,567 |
| 223 | 0303133F | HIGH FREQUENCY RADIO SYSTEMS .................... | 40,000 | 35,000 |
|  |  | Program support costs unjustified request ................. |  | [–5,000] |
| 224 | 0303140F | INFORMATION SYSTEMS SECURITY PROGRAM | 95,523 | 95,523 |
| 226 | 0303248F | ALL DOMAIN COMMON PLATFORM ...................... | 71,296 | 71,296 |
| 227 | 0303260F | JOINT MILITARY DECEPTION INITIATIVE .......... | 4,682 | 4,682 |
| 228 | 0304100F | STRATEGIC MISSION PLANNING & EXECUTION SYSTEM (SMPES). | 64,944 | 64,944 |
| 230 | 0304260F | AIRBORNE SIGINT ENTERPRISE ............................ | 108,947 | 106,745 |
|  |  | Underexecution ................................................................ |  | [–2,202] |
| 231 | 0304310F | COMMERCIAL ECONOMIC ANALYSIS ................... | 4,635 | 4,635 |
| 234 | 0305015F | C2 AIR OPERATIONS SUITE—C2 INFO SERV- ICES. | 13,751 | 13,751 |
| 235 | 0305020F | CCMD INTELLIGENCE INFORMATION TECH- NOLOGY. | 1,660 | 1,660 |
| 236 | 0305022F | ISR MODERNIZATION & AUTOMATION DVMT (IMAD). | 18,680 | 13,570 |
|  |  | Unjustified growth ........................................................... |  | [–5,110] |
| 237 | 0305099F | GLOBAL AIR TRAFFIC MANAGEMENT (GATM) ... | 5,031 | 5,031 |
| 238 | 0305103F | CYBER SECURITY INITIATIVE ............................... | 301 | 301 |
| 239 | 0305111F | WEATHER SERVICE .................................................... | 26,329 | 35,329 |
|  |  | Weather service data migration .................................... |  | [9,000] |
| 240 | 0305114F | AIR TRAFFIC CONTROL, APPROACH, AND LANDING SYSTEM (ATCALS). | 8,751 | 8,751 |
| 241 | 0305116F | AERIAL TARGETS ...................................................... | 6,915 | 6,915 |
| 244 | 0305128F | SECURITY AND INVESTIGATIVE ACTIVITIES ..... | 352 | 352 |
| 245 | 0305146F | DEFENSE JOINT COUNTERINTELLIGENCE AC- TIVITIES. | 6,930 | 6,930 |
| 246 | 0305179F | INTEGRATED BROADCAST SERVICE (IBS) .......... | 21,588 | 21,588 |
| 247 | 0305202F | DRAGON U–2 ................................................................ | 16,842 | 16,842 |
| 248 | 0305206F | AIRBORNE RECONNAISSANCE SYSTEMS ............ | 43,158 | 43,158 |
| 249 | 0305207F | MANNED RECONNAISSANCE SYSTEMS ............... | 14,330 | 14,330 |
| 250 | 0305208F | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS. | 88,854 | 88,854 |
| 251 | 0305220F | RQ–4 UAV ..................................................................... | 1,242 | 1,242 |
| 252 | 0305221F | NETWORK-CENTRIC COLLABORATIVE TAR- GETING. | 12,496 | 12,496 |
| 253 | 0305238F | NATO AGS ..................................................................... | 2 | 2 |
| 254 | 0305240F | SUPPORT TO DCGS ENTERPRISE .......................... | 31,589 | 31,589 |
| 255 | 0305600F | INTERNATIONAL INTELLIGENCE TECH- NOLOGY AND ARCHITECTURES. | 15,322 | 15,322 |
| 256 | 0305881F | RAPID CYBER ACQUISITION ................................... | 8,830 | 8,830 |
| 257 | 0305984F | PERSONNEL RECOVERY COMMAND & CTRL (PRC2). | 2,764 | 2,764 |
| 258 | 0307577F | INTELLIGENCE MISSION DATA (IMD) ................. | 7,090 | 7,090 |
| 259 | 0401115F | C–130 AIRLIFT SQUADRON .................................... | 5,427 | 5,427 |
| 260 | 0401119F | C–5 AIRLIFT SQUADRONS (IF) ............................... | 29,502 | 28,286 |
|  |  | SIL early to need ............................................................ |  | [–1,216] |
| 261 | 0401130F | C–17 AIRCRAFT (IF) ................................................. | 2,753 | 2,753 |
| 262 | 0401132F | C–130J PROGRAM ...................................................... | 19,100 | 19,100 |
| 263 | 0401134F | LARGE AIRCRAFT IR COUNTERMEASURES (LAIRCM). | 5,982 | 5,982 |
| 264 | 0401218F | KC–135S ........................................................................ | 51,105 | 49,522 |
|  |  | Comm 2 early to need ................................................... |  | [–1,583] |

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| 265 | 0401318F | CV–22 | 18,127 | 18,127 |
| 266 | 0408011F | SPECIAL TACTICS / COMBAT CONTROL | 9,198 | 9,198 |
| 268 | 0708610F | LOGISTICS INFORMATION TECHNOLOGY (LOGIT). | 17,520 | 17,520 |
| 269 | 0801380F | AF LVC OPERATIONAL TRAINING (LVC-OT) | 25,144 | 25,144 |
| 270 | 0804743F | OTHER FLIGHT TRAINING | 2,265 | 2,265 |
| 272 | 0901202F | JOINT PERSONNEL RECOVERY AGENCY | 2,266 | 2,266 |
| 273 | 0901218F | CIVILIAN COMPENSATION PROGRAM | 4,006 | 4,006 |
| 274 | 0901220F | PERSONNEL ADMINISTRATION | 3,078 | 3,078 |
| 275 | 0901226F | AIR FORCE STUDIES AND ANALYSIS AGENCY | 5,309 | 2,309 |
| | | Modeling and simulation development excess growth | | [–3,000] |
| 276 | 0901538F | FINANCIAL MANAGEMENT INFORMATION SYSTEMS DEVELOPMENT. | 4,279 | 4,279 |
| 277 | 0901554F | DEFENSE ENTERPRISE ACNTNG AND MGT SYS (DEAMS). | 45,925 | 45,925 |
| 278 | 1202140F | SERVICE SUPPORT TO SPACECOM ACTIVITIES | 9,778 | 9,778 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS | 16,814,245 | 16,587,427 |
| | | Classified adjustment | | [–212,081] |
| | | Program justification review | | [–14,737] |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT**. | **23,829,283** | **23,237,403** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, AF**. | **46,565,356** | **46,292,608** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, SF** | | |
| | | **APPLIED RESEARCH** | | |
| 004 | 1206601SF | SPACE TECHNOLOGY | 206,196 | 292,584 |
| | | Advanced analog microelectronics | | [3,000] |
| | | Advanced isotope power systems | | [3,000] |
| | | DAF requested realignment of funds | | [72,888] |
| | | Space modeling, simulation, and analysis hub | | [7,500] |
| | | **SUBTOTAL APPLIED RESEARCH** | **206,196** | **292,584** |
| | | **ADVANCED TECHNOLOGY DEVELOPMENT** | | |
| 005 | 1206310SF | SPACE SCIENCE AND TECHNOLOGY RESEARCH AND DEVELOPMENT. | 472,493 | 465,022 |
| | | Defense In Depth as Mission Assurance Spacecraft—Multilevel Security. | | [3,000] |
| | | Prior year carryover | | [–21,980] |
| | | Technical realignment | | [11,509] |
| 006 | 1206616SF | SPACE ADVANCED TECHNOLOGY DEVELOPMENT/DEMO. | 110,033 | 158,033 |
| | | DAF requested realignment of funds | | [40,000] |
| | | Modular multi-mode propulsion system | | [8,000] |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT**. | **582,526** | **623,055** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | |
| 007 | 0604002SF | SPACE FORCE WEATHER SERVICES RESEARCH | 849 | 849 |
| 008 | 1203010SF | SPACE FORCE IT, DATA ANALYTICS, DIGITAL SOLUTIONS. | 61,723 | 51,723 |
| | | Program decrease | | [–10,000] |
| 009 | 1203164SF | NAVSTAR GLOBAL POSITIONING SYSTEM (USER EQUIPMENT) (SPACE). | 353,807 | 353,807 |
| 010 | 1203622SF | SPACE WARFIGHTING ANALYSIS | 95,541 | 95,541 |
| 011 | 1203710SF | EO/IR WEATHER SYSTEMS | 95,615 | 95,615 |
| 013 | 1206410SF | SPACE TECHNOLOGY DEVELOPMENT AND PROTOTYPING. | 2,081,307 | 2,056,307 |
| | | Inadequate justification—other activities | | [–25,000] |
| 016 | 1206427SF | SPACE SYSTEMS PROTOTYPE TRANSITIONS (SSPT). | 145,948 | 96,475 |
| | | DAF requested realignment of funds to 6616SF | | [–40,000] |
| | | Underexecution | | [–9,473] |
| 017 | 1206438SF | SPACE CONTROL TECHNOLOGY | 58,374 | 58,374 |

137 STAT. 876          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|-----------------------|
| 018 | 1206458SF | TECH TRANSITION (SPACE) ..................................... | 164,649 | 164,649 |
| 019 | 1206730SF | SPACE SECURITY AND DEFENSE PROGRAM ...... | 59,784 | 59,784 |
| 020 | 1206760SF | PROTECTED TACTICAL ENTERPRISE SERVICE (PTES). | 76,554 | 76,554 |
| 021 | 1206761SF | PROTECTED TACTICAL SERVICE (PTS) ............... | 360,126 | 355,826 |
| | | Unjustified request—management services ............... | | [–4,300] |
| 022 | 1206855SF | EVOLVED STRATEGIC SATCOM (ESS) ................... | 632,833 | 632,833 |
| 023 | 1206857SF | SPACE RAPID CAPABILITIES OFFICE ................... | 12,036 | 12,036 |
| 024 | 1206862SF | TACTICALLY RESPONSE SPACE ............................ | 30,000 | 50,000 |
| | | Program increase ............................................... | | [20,000] |
| | | **SUBTOTAL ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES**. | **4,229,146** | **4,160,373** |
| | | | | |
| | | **SYSTEM DEVELOPMENT & DEMONSTRATION** | | |
| 025 | 1203269SF | GPS III FOLLOW-ON (GPS IIIF) ............................... | 308,999 | 308,999 |
| 027 | 1206421SF | COUNTERSPACE SYSTEMS ..................................... | 36,537 | 36,537 |
| 028 | 1206422SF | WEATHER SYSTEM FOLLOW-ON .......................... | 79,727 | 78,127 |
| | | Unjustified increase—management services .............. | | [–1,600] |
| 029 | 1206425SF | SPACE SITUATION AWARENESS SYSTEMS ......... | 372,827 | 372,827 |
| 030 | 1206431SF | ADVANCED EHF MILSATCOM (SPACE) ................. | 4,068 | 4,068 |
| 031 | 1206432SF | POLAR MILSATCOM (SPACE) ................................... | 73,757 | 73,757 |
| 032 | 1206433SF | WIDEBAND GLOBAL SATCOM (SPACE) ................ | 49,445 | 47,245 |
| | | Underexecution ................................................ | | [–2,200] |
| 033 | 1206440SF | NEXT-GEN OPIR—GROUND ................................... | 661,367 | 638,267 |
| | | Underexecution ................................................ | | [–23,100] |
| 034 | 1206442SF | NEXT GENERATION OPIR ...................................... | 222,178 | 217,178 |
| | | Underexecution ................................................ | | [–5,000] |
| 035 | 1206443SF | NEXT-GEN OPIR—GEO ........................................... | 719,731 | 715,466 |
| | | Unjustified increase—management services ............. | | [–4,265] |
| 036 | 1206444SF | NEXT-GEN OPIR—POLAR ........................................ | 1,013,478 | 1,010,213 |
| | | Unjustified increase—management services ............. | | [–3,265] |
| 037 | 1206445SF | COMMERCIAL SATCOM (COMSATCOM) INTEGRATION. | 73,501 | 73,501 |
| 038 | 1206446SF | RESILIENT MISSILE WARNING MISSILE TRACKING—LOW EARTH ORBIT (LEO). | 1,266,437 | 1,519,222 |
| | | DAF requested realignment of funds ......................... | | [252,785] |
| 039 | 1206447SF | RESILIENT MISSILE WARNING MISSILE TRACKING—MEDIUM EARTH ORBIT (MEO). | 538,208 | 790,992 |
| | | DAF requested realignment of funds ......................... | | [252,784] |
| 040 | 1206448SF | RESILIENT MISSILE WARNING MISSILE TRACKING—INTEGRATED GROUND SEGMENT. | 505,569 | 0 |
| | | DAF requested realignment of funds to 6446SF ........ | | [–252,785] |
| | | DAF requested realignment of funds to 6447SF ........ | | [–252,784] |
| 041 | 1206853SF | NATIONAL SECURITY SPACE LAUNCH PROGRAM (SPACE)—EMD. | 82,188 | 92,188 |
| | | Launch capability development ..................................... | | [10,000] |
| | | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION**. | **6,008,017** | **5,978,587** |
| | | | | |
| | | **MANAGEMENT SUPPORT** | | |
| 043 | 1203622SF | SPACE WARFIGHTING ANALYSIS .......................... | 3,568 | 3,568 |
| 046 | 1206392SF | ACQ WORKFORCE—SPACE & MISSILE SYSTEMS. | 258,969 | 276,500 |
| | | DAF requested realignment of funds ......................... | | [17,531] |
| 047 | 1206398SF | SPACE & MISSILE SYSTEMS CENTER—MHA ...... | 13,694 | 15,053 |
| | | DAF requested realignment of funds ......................... | | [1,359] |
| 048 | 1206601SF | SPACE TECHNOLOGY ............................................. | 91,778 | 0 |
| | | DAF requested realignment of funds ......................... | | [–91,778] |
| 049 | 1206759SF | MAJOR T&E INVESTMENT—SPACE ....................... | 146,797 | 146,797 |
| 050 | 1206860SF | ROCKET SYSTEMS LAUNCH PROGRAM (SPACE) | 18,023 | 18,023 |
| 052 | 1206864SF | SPACE TEST PROGRAM (STP) ................................ | 30,192 | 30,192 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** .............. | **563,021** | **490,133** |

**OPERATIONAL SYSTEMS DEVELOPMENT**

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 877

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|-----------------------|
| 055 | 1203001SF | FAMILY OF ADVANCED BLOS TERMINALS (FAB-T). | 91,369 | 91,369 |
| 056 | 1203040SF | DCO-SPACE ................................................................ | 76,003 | 76,003 |
| 057 | 1203109SF | NARROWBAND SATELLITE COMMUNICATIONS | 230,785 | 221,335 |
| | | Inadequate justification—management services ........ | | [–9,450] |
| 058 | 1203110SF | SATELLITE CONTROL NETWORK (SPACE) ......... | 86,465 | 84,365 |
| | | Underexecution ................................................................ | | [–2,100] |
| 059 | 1203154SF | LONG RANGE KILL CHAINS .................................... | 243,036 | 243,036 |
| 061 | 1203173SF | SPACE AND MISSILE TEST AND EVALUATION CENTER. | 22,039 | 22,039 |
| 062 | 1203174SF | SPACE INNOVATION, INTEGRATION AND RAPID TECHNOLOGY DEVELOPMENT. | 41,483 | 43,483 |
| | | Accelerating Space Operators Education and Experiential Learning. | | [2,000] |
| 063 | 1203182SF | SPACELIFT RANGE SYSTEM (SPACE) ................... | 11,175 | 11,175 |
| 065 | 1203330SF | SPACE SUPERIORITY ISR ........................................ | 28,730 | 28,730 |
| 067 | 1203873SF | BALLISTIC MISSILE DEFENSE RADARS .............. | 20,752 | 28,752 |
| | | Perimeter Acquisition Radar Attack Characterization System (PARCS) radar. | | [8,000] |
| 068 | 1203906SF | NCMC—TW/AA SYSTEM ........................................... | 25,545 | 25,545 |
| 069 | 1203913SF | NUDET DETECTION SYSTEM (SPACE) ................... | 93,391 | 93,391 |
| 070 | 1203940SF | SPACE SITUATION AWARENESS OPERATIONS .. | 264,966 | 264,966 |
| 071 | 1206423SF | GLOBAL POSITIONING SYSTEM III—OPERATIONAL CONTROL SEGMENT. | 317,309 | 271,909 |
| | | Excess to need ................................................................ | | [–45,400] |
| 075 | 1206770SF | ENTERPRISE GROUND SERVICES ......................... | 155,825 | 155,825 |
| 076 | 1208053SF | JOINT TACTICAL GROUND SYSTEM ..................... | 14,568 | 14,568 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS ......................................... | 5,764,667 | 6,358,367 |
| | | DCO-S ............................................................................. | | [43,000] |
| | | Space Force realignment of funds for classified program. | | [270,000] |
| | | Space Force Unfunded Priorities List Classified Program B. | | [83,000] |
| | | Space Force Unfunded Priorities List Classified Program C. | | [53,000] |
| | | Space Force Unfunded Priorities List Classified Program D. | | [54,700] |
| | | USSF UPL—Classified program F .............................. | | [90,000] |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVELOPMENT.** | **7,488,108** | **8,034,858** |
| | | **SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS** | | |
| 078 | 1208248SF | SPACE COMMAND & CONTROL—SOFTWARE PILOT PROGRAM. | 122,326 | 122,326 |
| | | **SUBTOTAL SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS.** | **122,326** | **122,326** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, SF.** | **19,199,340** | **19,701,916** |
| | | **RESEARCH, DEVELOPMENT, TEST & EVAL, DW** | | |
| | | **BASIC RESEARCH** | | |
| 001 | 0601000BR | DTRA BASIC RESEARCH ........................................... | 14,761 | 14,761 |
| 002 | 0601101E | DEFENSE RESEARCH SCIENCES ........................... | 311,531 | 311,531 |
| 003 | 0601108D8Z | HIGH ENERGY LASER RESEARCH INITIATIVES | 16,329 | 16,329 |
| 004 | 0601110D8Z | BASIC RESEARCH INITIATIVES ............................. | 71,783 | 91,783 |
| | | Defense Established Program to Stimulate Competitive Research (DEPSCoR). | | [20,000] |
| 005 | 0601117E | BASIC OPERATIONAL MEDICAL RESEARCH SCIENCE. | 50,430 | 50,430 |
| 006 | 0601120D8Z | NATIONAL DEFENSE EDUCATION PROGRAM .... | 159,549 | 162,549 |
| | | Program increase ........................................................... | | [3,000] |
| 007 | 0601228D8Z | HISTORICALLY BLACK COLLEGES AND UNIVERSITIES/MINORITY INSTITUTIONS. | 100,467 | 150,000 |
| | | Program increase ........................................................... | | [49,533] |

137 STAT. 878          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|-----------------------|
| 008 | 0601384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM. | 36,235 | 36,235 |
|  |  | **SUBTOTAL BASIC RESEARCH** | **761,085** | **833,618** |
|  |  |  |  |  |
|  |  | **APPLIED RESEARCH** |  |  |
| 009 | 0602000D8Z | JOINT MUNITIONS TECHNOLOGY | 19,157 | 19,157 |
| 010 | 0602115E | BIOMEDICAL TECHNOLOGY | 141,081 | 131,081 |
|  |  | Program decrease |  | [−10,000] |
| 011 | 0602128D8Z | PROMOTION AND PROTECTION STRATEGIES | 3,219 | 3,219 |
| 012 | 0602230D8Z | DEFENSE TECHNOLOGY INNOVATION | 55,160 | 40,160 |
|  |  | Realignment |  | [−15,000] |
| 013 | 0602234D8Z | LINCOLN LABORATORY RESEARCH PROGRAM | 46,858 | 46,858 |
| 014 | 0602251D8Z | APPLIED RESEARCH FOR THE ADVANCEMENT OF S&T PRIORITIES. | 66,866 | 66,866 |
| 015 | 0602303E | INFORMATION & COMMUNICATIONS TECHNOLOGY. | 333,029 | 333,029 |
| 017 | 0602384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM. | 240,610 | 240,610 |
| 018 | 0602668D8Z | CYBER SECURITY RESEARCH | 17,437 | 25,437 |
|  |  | Pacific Intelligence and Innovation Initiative |  | [5,000] |
|  |  | Semiconductor industry cybersecurity research |  | [3,000] |
| 019 | 0602675D8Z | SOCIAL SCIENCES FOR ENVIRONMENTAL SECURITY. | 4,718 | 4,718 |
| 020 | 0602702E | TACTICAL TECHNOLOGY | 234,549 | 214,549 |
|  |  | Program decrease |  | [−20,000] |
| 021 | 0602715E | MATERIALS AND BIOLOGICAL TECHNOLOGY | 344,986 | 344,986 |
| 022 | 0602716E | ELECTRONICS TECHNOLOGY | 572,662 | 572,662 |
| 023 | 0602718BR | COUNTER WEAPONS OF MASS DESTRUCTION APPLIED RESEARCH. | 208,870 | 208,870 |
| 024 | 0602751D8Z | SOFTWARE ENGINEERING INSTITUTE (SEI) APPLIED RESEARCH. | 11,168 | 11,168 |
| 025 | 0602890D8Z | HIGH ENERGY LASER RESEARCH | 48,804 | 48,804 |
| 026 | 0602891D8Z | FSRM MODELLING | 2,000 | 2,000 |
| 027 | 1160401BB | SOF TECHNOLOGY DEVELOPMENT | 52,287 | 52,287 |
|  |  | **SUBTOTAL APPLIED RESEARCH** | **2,403,461** | **2,366,461** |
|  |  |  |  |  |
|  |  | **ADVANCED TECHNOLOGY DEVELOPMENT** |  |  |
| 028 | 0603000D8Z | JOINT MUNITIONS ADVANCED TECHNOLOGY | 37,706 | 42,706 |
|  |  | Advanced Process Technology for Energetics |  | [5,000] |
| 029 | 0603021D8Z | NATIONAL SECURITY INNOVATION CAPITAL | 15,085 | 15,085 |
| 030 | 0603121D8Z | SO/LIC ADVANCED DEVELOPMENT | 30,102 | 30,102 |
| 031 | 0603122D8Z | COMBATING TERRORISM TECHNOLOGY SUPPORT. | 75,593 | 123,093 |
|  |  | Joint R&D with Israel |  | [47,500] |
| 032 | 0603133D8Z | FOREIGN COMPARATIVE TESTING | 27,078 | 27,078 |
| 033 | 0603160BR | COUNTER WEAPONS OF MASS DESTRUCTION ADVANCED TECHNOLOGY DEVELOPMENT. | 400,947 | 409,447 |
|  |  | Advanced manufacturing of energetic materials |  | [8,500] |
| 034 | 0603176BR | ADVANCED CONCEPTS AND PERFORMANCE ASSESSMENT. | 7,990 | 7,990 |
| 035 | 0603176C | ADVANCED CONCEPTS AND PERFORMANCE ASSESSMENT. | 17,825 | 17,825 |
| 036 | 0603180C | ADVANCED RESEARCH | 21,461 | 28,461 |
|  |  | Radiation Hardened Microelectronics—Facility and Workforce Development. |  | [5,000] |
|  |  | Testbed for Advanced Digital Low Latency Networks |  | [2,000] |
| 037 | 0603183D8Z | JOINT HYPERSONIC TECHNOLOGY DEVELOPMENT &TRANSITION. | 52,292 | 54,292 |
|  |  | Common Hypersonic Glide Body Development |  | [2,000] |
| 038 | 0603225D8Z | JOINT DOD-DOE MUNITIONS TECHNOLOGY DEVELOPMENT. | 19,567 | 19,567 |
| 039 | 0603260BR | INTELLIGENCE ADVANCED DEVELOPMENT | 10,000 | 10,000 |
| 040 | 0603286E | ADVANCED AEROSPACE SYSTEMS | 331,753 | 321,753 |
|  |  | Program decrease |  | [−10,000] |
| 041 | 0603287E | SPACE PROGRAMS AND TECHNOLOGY | 134,809 | 122,309 |
|  |  | Excess growth |  | [−12,500] |
| 042 | 0603288D8Z | ANALYTIC ASSESSMENTS | 24,328 | 24,328 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 879

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| 043 | 0603289D8Z | ADVANCED INNOVATIVE ANALYSIS AND CONCEPTS. | 55,626 | 55,626 |
| 044 | 0603330D8Z | QUANTUM APPLICATION | 75,000 | 75,000 |
| 046 | 0603342D8Z | DEFENSE INNOVATION UNIT (DIU) | 104,729 | 109,729 |
| | | Nuclear Advanced Propulsion and power | | [2,500] |
| | | Program increase | | [2,500] |
| 047 | 0603375D8Z | TECHNOLOGY INNOVATION | 123,837 | 123,837 |
| 048 | 0603379D8Z | ADVANCED TECHNICAL INTEGRATION | 11,000 | 11,000 |
| 049 | 0603384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM—ADVANCED DEVELOPMENT. | 267,073 | 234,654 |
| | | Generative Unconstrained Intelligent Drug Engineering-Enhanced Biodefense. | | [3,000] |
| | | Program decrease | | [−35,419] |
| 050 | 0603527D8Z | RETRACT LARCH | 57,401 | 57,401 |
| 051 | 0603618D8Z | JOINT ELECTRONIC ADVANCED TECHNOLOGY | 19,793 | 19,793 |
| 053 | 0603662D8Z | NETWORKED COMMUNICATIONS CAPABILITIES. | 11,197 | 11,197 |
| 054 | 0603680D8Z | DEFENSE-WIDE MANUFACTURING SCIENCE AND TECHNOLOGY PROGRAM. | 252,965 | 365,465 |
| | | Additive manufacturing at scale | | [5,000] |
| | | Bioindustrial Manufacturing Infrastructure | | [100,000] |
| | | Digital manufacturing modernization | | [5,000] |
| | | Hypersonic Advanced Composites Manufacturing | | [2,500] |
| 055 | 0603680S | MANUFACTURING TECHNOLOGY PROGRAM | 46,404 | 51,404 |
| | | Program increase | | [5,000] |
| 056 | 0603712S | GENERIC LOGISTICS R&D TECHNOLOGY DEMONSTRATIONS. | 16,580 | 16,580 |
| 057 | 0603716D8Z | STRATEGIC ENVIRONMENTAL RESEARCH PROGRAM. | 60,387 | 60,387 |
| 058 | 0603720S | MICROELECTRONICS TECHNOLOGY DEVELOPMENT AND SUPPORT. | 144,707 | 144,707 |
| 059 | 0603727D8Z | JOINT WARFIGHTING PROGRAM | 2,749 | 2,749 |
| 060 | 0603739E | ADVANCED ELECTRONICS TECHNOLOGIES | 254,033 | 244,033 |
| | | Reduce carryover—next generation microelectronics manufacturing. | | [−10,000] |
| 061 | 0603760E | COMMAND, CONTROL AND COMMUNICATIONS SYSTEMS. | 321,591 | 321,591 |
| 062 | 0603766E | NETWORK-CENTRIC WARFARE TECHNOLOGY | 885,425 | 885,425 |
| 063 | 0603767E | SENSOR TECHNOLOGY | 358,580 | 353,330 |
| | | Program decrease | | [−5,250] |
| 065 | 0603781D8Z | SOFTWARE ENGINEERING INSTITUTE | 16,699 | 16,699 |
| 066 | 0603838D8Z | DEFENSE INNOVATION ACCELERATION (DIA) | 257,110 | 257,110 |
| 067 | 0603924D8Z | HIGH ENERGY LASER ADVANCED TECHNOLOGY PROGRAM. | 111,799 | 111,799 |
| 068 | 0603941D8Z | TEST & EVALUATION SCIENCE & TECHNOLOGY. | 345,384 | 345,384 |
| 069 | 0603945D8Z | AUKUS INNOVATION INITIATIVES | 25,000 | 25,000 |
| 070 | 0603950D8Z | NATIONAL SECURITY INNOVATION NETWORK | 21,575 | 28,575 |
| | | National Security Innovation Network | | [7,000] |
| 071 | 0604055D8Z | OPERATIONAL ENERGY CAPABILITY IMPROVEMENT. | 171,668 | 186,033 |
| | | Excess growth | | [−5,635] |
| | | HELCAP Thermal Energy Storage | | [10,000] |
| | | Increase for tristructural-isotrophic fuel | | [10,000] |
| 072 | 1160402BB | SOF ADVANCED TECHNOLOGY DEVELOPMENT | 156,097 | 156,097 |
| | | **SUBTOTAL ADVANCED TECHNOLOGY DEVELOPMENT**. | **5,380,945** | **5,524,641** |
| | | **ADVANCED COMPONENT DEVELOPMENT & PROTOTYPES** | | |
| 074 | 0603161D8Z | NUCLEAR AND CONVENTIONAL PHYSICAL SECURITY EQUIPMENT RDT&E ADC&P. | 76,764 | 76,764 |
| 075 | 0603600D8Z | WALKOFF | 143,486 | 143,486 |
| 076 | 0603851D8Z | ENVIRONMENTAL SECURITY TECHNICAL CERTIFICATION PROGRAM. | 117,196 | 89,596 |
| | | Program decrease | | [−30,600] |

137 STAT. 880          PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
| | | Sustainable Technology Evaluation and Demonstration program increase. | | [3,000] |
| 077 | 0603881C | BALLISTIC MISSILE DEFENSE TERMINAL DEFENSE SEGMENT. | 220,311 | 310,311 |
| | | INDOPACOM UPL—Enhanced THAAD Mission Support Element Integration (eTMI). | | [90,000] |
| 078 | 0603882C | BALLISTIC MISSILE DEFENSE MIDCOURSE DEFENSE SEGMENT. | 903,633 | 903,633 |
| 079 | 0603884BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM—DEM/VAL. | 316,853 | 292,006 |
| | | Excess growth .................................................... | | [−24,847] |
| 080 | 0603884C | BALLISTIC MISSILE DEFENSE SENSORS ........... | 239,159 | 239,159 |
| 081 | 0603890C | BMD ENABLING PROGRAMS ................................. | 597,720 | 596,913 |
| | | Poor justification .............................................. | | [−807] |
| 082 | 0603891C | SPECIAL PROGRAMS—MDA .................................... | 552,888 | 635,280 |
| | | MDA UPL—Classified increase .................................. | | [22,892] |
| | | MDA UPL—Electronic Warfare for Missile Defense | | [27,300] |
| | | MDA UPL—Left Through Right of Launch Integration. | | [32,200] |
| 083 | 0603892C | AEGIS BMD ................................................. | 693,727 | 689,727 |
| | | Program decrease .............................................. | | [−4,000] |
| 084 | 0603896C | BALLISTIC MISSILE DEFENSE COMMAND AND CONTROL, BATTLE MANAGEMENT AND COMMUNICATI. | 554,201 | 554,201 |
| 085 | 0603898C | BALLISTIC MISSILE DEFENSE JOINT WARFIGHTER SUPPORT. | 48,248 | 48,248 |
| 086 | 0603904C | MISSILE DEFENSE INTEGRATION & OPERATIONS CENTER (MDIOC). | 50,549 | 50,549 |
| 087 | 0603906C | REGARDING TRENCH ............................................. | 12,564 | 27,564 |
| | | MDA UPL—Classified increase .................................. | | [15,000] |
| 088 | 0603907C | SEA BASED X-BAND RADAR (SBX) ........................ | 177,868 | 177,868 |
| 089 | 0603913C | ISRAELI COOPERATIVE PROGRAMS .................... | 300,000 | 300,000 |
| 090 | 0603914C | BALLISTIC MISSILE DEFENSE TEST ................... | 360,455 | 360,455 |
| 091 | 0603915C | BALLISTIC MISSILE DEFENSE TARGETS ........... | 570,258 | 597,258 |
| | | Advanced Reactive Target Simulation ........................ | | [10,000] |
| | | Hypersonic Maneuvering Extended Range (HMER) Target System. | | [2,000] |
| | | Hypersonic Target for MDA Advanced Target Front End Configuration 3 (ATFE C3). | | [5,000] |
| | | Hypersonic Targets and Countermeasures Program | | [10,000] |
| 092 | 0603923D8Z | COALITION WARFARE ............................................... | 12,103 | 12,103 |
| 093 | 0604011D8Z | NEXT GENERATION INFORMATION COMMUNICATIONS TECHNOLOGY (5G). | 179,278 | 179,278 |
| 094 | 0604016D8Z | DEPARTMENT OF DEFENSE CORROSION PROGRAM. | 3,185 | 3,185 |
| 095 | 0604102C | GUAM DEFENSE DEVELOPMENT ........................... | 397,578 | 544,578 |
| | | INDOPACOM UPL—Guam Defense System, INDOPACOM. | | [147,000] |
| 096 | 0604115C | TECHNOLOGY MATURATION INITIATIVES ........ | | 6,000 |
| | | Diode-Pumped Alkali Laser (DPAL) for Missile Defense. | | [6,000] |
| 097 | 0604124D8Z | CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER (CDAO)—MIP. | 34,350 | 34,350 |
| 098 | 0604181C | HYPERSONIC DEFENSE ........................................... | 208,997 | 433,997 |
| | | MDA UPL—Glide Phase Interceptor ......................... | | [225,000] |
| 099 | 0604250D8Z | ADVANCED INNOVATIVE TECHNOLOGIES ........ | 1,085,826 | 1,062,226 |
| | | Classified adjustment .................................................. | | [−28,600] |
| | | Mobile micronuclear reactors ....................................... | | [5,000] |
| 100 | 0604294D8Z | TRUSTED & ASSURED MICROELECTRONICS ..... | 810,839 | 752,540 |
| | | Radiation-Hardened Fully-Depleted Silicon-on-Insulator Microelectronics. | | [2,500] |
| | | Strategic Rad Hard Chiplet Design Accelaration ....... | | [2,500] |
| | | Unjustified growth ....................................................... | | [−63,299] |
| 101 | 0604331D8Z | RAPID PROTOTYPING PROGRAM ........................... | 110,291 | 110,291 |
| 102 | 0604331J | RAPID PROTOTYPING PROGRAM ........................... | 9,880 | 9,880 |
| 104 | 0604400D8Z | DEPARTMENT OF DEFENSE (DOD) UNMANNED SYSTEM COMMON DEVELOPMENT. | 2,643 | 2,643 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 881

**SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION**
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|-----------------------|
| 105 | 0604551BR | CATAPULT INFORMATION SYSTEM ...................... | 8,328 | 8,328 |
| 106 | 0604555D8Z | OPERATIONAL ENERGY CAPABILITY IMPROVE-MENT—NON S&T. | 53,726 | 60,726 |
| | | High Energy Laser Power Beaming ............................ | | [7,000] |
| 108 | 0604682D8Z | WARGAMING AND SUPPORT FOR STRATEGIC ANALYSIS (SSA). | 3,206 | 3,206 |
| 109 | 0604790D8Z | RAPID DEFENSE EXPERIMENTATION RESERVE (RDER). | 79,773 | 79,773 |
| 110 | 0604826J | JOINT C5 CAPABILITY DEVELOPMENT, INTE-GRATION AND INTEROPERABILITY ASSESS-MENTS. | 28,517 | 28,517 |
| 111 | 0604873C | LONG RANGE DISCRIMINATION RADAR (LRDR) | 103,517 | 103,517 |
| 112 | 0604874C | IMPROVED HOMELAND DEFENSE INTERCEP-TORS. | 2,130,838 | 2,130,838 |
| 113 | 0604876C | BALLISTIC MISSILE DEFENSE TERMINAL DE-FENSE SEGMENT TEST. | 47,577 | 47,577 |
| 114 | 0604878C | AEGIS BMD TEST ....................................................... | 193,484 | 188,435 |
| | | Excess growth ....................................................... | | [–5,049] |
| 115 | 0604879C | BALLISTIC MISSILE DEFENSE SENSOR TEST .... | 111,049 | 111,049 |
| 116 | 0604880C | LAND-BASED SM–3 (LBSM3) .................................... | 22,163 | 22,163 |
| 117 | 0604887C | BALLISTIC MISSILE DEFENSE MIDCOURSE SEGMENT TEST. | 41,824 | 41,824 |
| 118 | 0202057C | SAFETY PROGRAM MANAGEMENT ....................... | 2,484 | 2,484 |
| 119 | 0208059JCY | CYBERCOM ACTIVITIES .......................................... | 65,484 | 65,484 |
| 120 | 0208085JCY | ROBUST INFRASTRUCTURE AND ACCESS .......... | 170,182 | 135,535 |
| | | Unjustified growth .......................................................... | | [–34,647] |
| 121 | 0208086JCY | CYBER TRAINING ENVIRONMENT (CTE) ............. | 114,980 | 114,980 |
| 122 | 0300206R | ENTERPRISE INFORMATION TECHNOLOGY SYSTEMS. | 2,156 | 2,156 |
| 123 | 0305103C | CYBER SECURITY INITIATIVE ............................... | 2,760 | 2,760 |
| 124 | 0305245D8Z | INTELLIGENCE CAPABILITIES AND INNOVA-TION INVESTMENTS. | 3,000 | 3,000 |
| 125 | 0305251JCY | CYBERSPACE OPERATIONS FORCES AND FORCE SUPPORT. | 2,669 | 2,669 |
| 126 | 0901579D8Z | OFFICE OF STRATEGIC CAPITAL (OSC) .............. | 99,000 | 99,000 |
| 129 | 1206895C | BALLISTIC MISSILE DEFENSE SYSTEM SPACE PROGRAMS. | 109,483 | 109,483 |
| | | **SUBTOTAL ADVANCED COMPONENT DEVEL-OPMENT & PROTOTYPES**. | **12,187,050** | **12,607,593** |
| | | **SYSTEM DEVELOPMENT & DEMONSTRA-TION** | | |
| 130 | 0604123D8Z | CHIEF DIGITAL AND ARTIFICIAL INTEL-LIGENCE OFFICER (CDAO)—DEM/VAL AC-TIVITIES. | 615,246 | 582,346 |
| | | Insufficient justification ................................................. | | [–32,900] |
| 130A | 999999 | JADC2 ........................................................................... | | 174,000 |
| | | Program increase—Joint Fires Network (JFN) .......... | | [174,000] |
| 131 | 0604161D8Z | NUCLEAR AND CONVENTIONAL PHYSICAL SE-CURITY EQUIPMENT RDT&E SDD. | 6,229 | 6,229 |
| 132 | 0604384BP | CHEMICAL AND BIOLOGICAL DEFENSE PRO-GRAM—EMD. | 382,977 | 362,380 |
| | | Execution risk ................................................................. | | [–20,597] |
| 133 | 0604771D8Z | JOINT TACTICAL INFORMATION DISTRIBU-TION SYSTEM (JTIDS). | 9,775 | 9,775 |
| 134 | 0605000BR | COUNTER WEAPONS OF MASS DESTRUCTION SYSTEMS DEVELOPMENT. | 14,414 | 14,414 |
| 135 | 0605013BL | INFORMATION TECHNOLOGY DEVELOPMENT | 6,953 | 6,953 |
| 136 | 0605021SE | HOMELAND PERSONNEL SECURITY INITIA-TIVE. | 9,292 | 9,292 |
| 137 | 0605022D8Z | DEFENSE EXPORTABILITY PROGRAM ................. | 18,981 | 18,981 |
| 138 | 0605027D8Z | OUSD(C) IT DEVELOPMENT INITIATIVES .......... | 5,456 | 5,456 |
| 140 | 0605080S | DEFENSE AGENCY INITIATIVES (DAI)—FINAN-CIAL SYSTEM. | 32,629 | 32,629 |
| 141 | 0605141BR | MISSION ASSURANCE RISK MANAGEMENT SYSTEM (MARMS). | 9,316 | 9,316 |

SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|----------------:|----------------------:|
| 142 | 0605210D8Z | DEFENSE-WIDE ELECTRONIC PROCUREMENT CAPABILITIES. | 6,899 | 6,899 |
| 143 | 0605294D8Z | TRUSTED & ASSURED MICROELECTRONICS ..... | 297,586 | 276,586 |
|      |            | Program decrease ............................................................ |  | [–21,000] |
| 145 | 0605772D8Z | NUCLEAR COMMAND, CONTROL, & COMMUNICATIONS. | 4,110 | 4,110 |
| 146 | 0305304D8Z | DOD ENTERPRISE ENERGY INFORMATION MANAGEMENT (EEIM). | 8,159 | 8,159 |
| 147 | 0305310D8Z | CWMD SYSTEMS: SYSTEM DEVELOPMENT AND DEMONSTRATION. | 14,471 | 14,471 |
| 148 | 0505167D8Z | DOMESTIC PREPAREDNESS AGAINST WEAPONS OF MASS DESTRUCTION. | 3,770 | 3,770 |
|      |            | **SUBTOTAL SYSTEM DEVELOPMENT & DEMONSTRATION**. | **1,446,263** | **1,545,766** |
|      |            | **MANAGEMENT SUPPORT** |  |  |
| 149 | 0603829J | JOINT CAPABILITY EXPERIMENTATION ............. | 12,402 | 12,402 |
| 150 | 0604774D8Z | DEFENSE READINESS REPORTING SYSTEM (DRRS). | 12,746 | 12,746 |
| 151 | 0604875D8Z | JOINT SYSTEMS ARCHITECTURE DEVELOPMENT. | 8,426 | 8,426 |
| 152 | 0604940D8Z | CENTRAL TEST AND EVALUATION INVESTMENT DEVELOPMENT (CTEIP). | 833,792 | 836,292 |
|      |            | Reusable Hypersonic Testbed ....................................... |  | [2,500] |
| 153 | 0604942D8Z | ASSESSMENTS AND EVALUATIONS ...................... | 5,810 | 5,810 |
| 154 | 0605001E | MISSION SUPPORT ....................................................... | 99,090 | 99,090 |
| 155 | 0605100D8Z | JOINT MISSION ENVIRONMENT TEST CAPABILITY (JMETC). | 187,421 | 187,421 |
| 156 | 0605126J | JOINT INTEGRATED AIR AND MISSILE DEFENSE ORGANIZATION (JIAMDO). | 61,477 | 61,477 |
| 158 | 0605142D8Z | SYSTEMS ENGINEERING ......................................... | 39,949 | 39,949 |
| 159 | 0605151D8Z | STUDIES AND ANALYSIS SUPPORT—OSD ........... | 6,292 | 6,292 |
| 160 | 0605161D8Z | NUCLEAR MATTERS-PHYSICAL SECURITY ......... | 21,043 | 21,043 |
| 161 | 0605170D8Z | SUPPORT TO NETWORKS AND INFORMATION INTEGRATION. | 10,504 | 10,504 |
| 162 | 0605200D8Z | GENERAL SUPPORT TO OUSD(INTELLIGENCE AND SECURITY). | 2,980 | 2,980 |
| 163 | 0605384BP | CHEMICAL AND BIOLOGICAL DEFENSE PROGRAM. | 74,382 | 74,382 |
| 170 | 0605790D8Z | SMALL BUSINESS INNOVATION RESEARCH (SBIR)/ SMALL BUSINESS TECHNOLOGY TRANSFER. | 3,831 | 3,831 |
| 171 | 0605797D8Z | MAINTAINING TECHNOLOGY ADVANTAGE ........ | 38,923 | 38,923 |
| 172 | 0605798D8Z | DEFENSE TECHNOLOGY ANALYSIS ...................... | 60,404 | 60,404 |
| 173 | 0605801KA | DEFENSE TECHNICAL INFORMATION CENTER (DTIC). | 65,715 | 65,715 |
| 174 | 0605803SE | R&D IN SUPPORT OF DOD ENLISTMENT, TESTING AND EVALUATION. | 26,037 | 26,037 |
| 175 | 0605804D8Z | DEVELOPMENT TEST AND EVALUATION ........... | 37,353 | 37,353 |
| 176 | 0605898E | MANAGEMENT HQ—R&D ........................................ | 14,833 | 14,833 |
| 177 | 0605998KA | MANAGEMENT HQ—DEFENSE TECHNICAL INFORMATION CENTER (DTIC). | 3,752 | 3,752 |
| 178 | 0606005D8Z | SPECIAL ACTIVITIES ................................................. | 18,088 | 18,088 |
| 179 | 0606100D8Z | BUDGET AND PROGRAM ASSESSMENTS ............. | 14,427 | 14,427 |
| 180 | 0606114D8Z | ANALYSIS WORKING GROUP (AWG) SUPPORT .. | 4,200 | 4,200 |
| 181 | 0606135D8Z | CHIEF DIGITAL AND ARTIFICIAL INTELLIGENCE OFFICER (CDAO) ACTIVITIES. | 17,247 | 17,247 |
| 182 | 0606225D8Z | ODNA TECHNOLOGY AND RESOURCE ANALYSIS. | 3,386 | 3,386 |
| 183 | 0606300D8Z | DEFENSE SCIENCE BOARD ...................................... | 2,352 | 2,352 |
| 184 | 0606301D8Z | AVIATION SAFETY TECHNOLOGIES ..................... | 213 | 213 |
| 186 | 0606771D8Z | CYBER RESILIENCY AND CYBERSECURITY POLICY. | 45,194 | 45,194 |
| 187 | 0606853BR | MANAGEMENT, TECHNICAL & INTERNATIONAL SUPPORT. | 11,919 | 11,919 |
| 188 | 0203345D8Z | DEFENSE OPERATIONS SECURITY INITIATIVE (DOSI). | 3,112 | 3,112 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 883

### SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION
(In Thousands of Dollars)

| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
|------|-----------------|------|-----------------|------------------------|
| 189 | 0204571J | JOINT STAFF ANALYTICAL SUPPORT ................. | 4,916 | 4,916 |
| 190 | 0208045K | C4I INTEROPERABILITY ........................................... | 66,152 | 66,152 |
| 195 | 0305172K | COMBINED ADVANCED APPLICATIONS ............. | 5,366 | 5,366 |
| 197 | 0305208K | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS. | 3,069 | 3,069 |
| 199 | 0804768J | COCOM EXERCISE ENGAGEMENT AND TRAINING TRANSFORMATION (CE2T2)—NON-MHA. | 101,319 | 95,019 |
| | | No JLVC acquisition strategy ..................................... | | [–6,300] |
| 200 | 0808709SE | DEFENSE EQUAL OPPORTUNITY MANAGEMENT INSTITUTE (DEOMI). | 740 | 740 |
| 201 | 0901598C | MANAGEMENT HQ—MDA ........................................ | 28,363 | 28,363 |
| 202 | 0903235K | JOINT SERVICE PROVIDER (JSP) ........................... | 5,177 | 5,177 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS .......................................... | 36,315 | 36,315 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** ............... | **1,998,717** | **1,994,917** |
| | | **OPERATIONAL SYSTEMS DEVELOPMENT** | | |
| 203 | 0604130V | ENTERPRISE SECURITY SYSTEM (ESS) .............. | 42,482 | 42,482 |
| 205 | 0607210D8Z | INDUSTRIAL BASE ANALYSIS AND SUSTAINMENT SUPPORT. | 1,017,141 | 1,025,141 |
| | | Domestic advanced microelectronics packaging ........ | | [5,000] |
| | | Shipbuilding and ship repair workforce development | | [3,000] |
| 206 | 0607310D8Z | COUNTERPROLIFERATION SPECIAL PROJECTS: OPERATIONAL SYSTEMS DEVELOPMENT. | 12,713 | 12,713 |
| 207 | 0607327T | GLOBAL THEATER SECURITY COOPERATION MANAGEMENT INFORMATION SYSTEMS (G-TSCMIS). | 8,503 | 8,503 |
| 208 | 0607384BP | CHEMICAL AND BIOLOGICAL DEFENSE (OPERATIONAL SYSTEMS DEVELOPMENT). | 80,495 | 80,495 |
| 209 | 0208097JCY | CYBER COMMAND AND CONTROL (CYBER C2) .. | 95,733 | 95,733 |
| 210 | 0208099JCY | DATA AND UNIFIED PLATFORM (D&UP) ............. | 138,558 | 138,558 |
| 214 | 0302019K | DEFENSE INFO INFRASTRUCTURE ENGINEERING AND INTEGRATION. | 19,299 | 19,299 |
| 215 | 0303126K | LONG-HAUL COMMUNICATIONS—DCS ................ | 37,726 | 37,726 |
| 216 | 0303131K | MINIMUM ESSENTIAL EMERGENCY COMMUNICATIONS NETWORK (MEECN). | 5,037 | 5,037 |
| 218 | 0303140D8Z | INFORMATION SYSTEMS SECURITY PROGRAM | 97,171 | 91,171 |
| | | Program decrease ....................................................... | | [–6,000] |
| 220 | 0303140K | INFORMATION SYSTEMS SECURITY PROGRAM | 8,351 | 8,351 |
| 222 | 0303153K | DEFENSE SPECTRUM ORGANIZATION ................. | 35,995 | 35,995 |
| 223 | 0303171K | JOINT PLANNING AND EXECUTION SERVICES | 5,677 | 5,677 |
| 224 | 0303228K | JOINT REGIONAL SECURITY STACKS (JRSS) ..... | 3,196 | 3,196 |
| 228 | 0305104D8Z | DEFENSE INDUSTRIAL BASE (DIB) CYBER SECURITY INITIATIVE. | 25,655 | 25,655 |
| 232 | 0305133V | INDUSTRIAL SECURITY ACTIVITIES .................... | 2,134 | 2,134 |
| 235 | 0305146V | DEFENSE JOINT COUNTERINTELLIGENCE ACTIVITIES. | 2,295 | 2,295 |
| 236 | 0305172D8Z | COMBINED ADVANCED APPLICATIONS .............. | 52,736 | 52,736 |
| 239 | 0305186D8Z | POLICY R&D PROGRAMS ......................................... | 6,263 | 6,263 |
| 240 | 0305199D8Z | NET CENTRICITY ....................................................... | 23,275 | 21,963 |
| | | Prior year underexecution ........................................... | | [–1,312] |
| 242 | 0305208BB | DISTRIBUTED COMMON GROUND/SURFACE SYSTEMS. | 6,214 | 6,214 |
| 249 | 0305327V | INSIDER THREAT ....................................................... | 2,971 | 2,971 |
| 250 | 0305387D8Z | HOMELAND DEFENSE TECHNOLOGY TRANSFER PROGRAM. | 1,879 | 1,879 |
| 257 | 0306250JCY | CYBER OPERATIONS TECHNOLOGY SUPPORT .. | 469,385 | 476,385 |
| | | Modernization of Department of Defense Internet Gateway Cyber Defense. | | [7,000] |
| 261 | 0505167D8Z | DOMESTIC PREPAREDNESS AGAINST WEAPONS OF MASS DESTRUCTION. | 1,760 | 1,760 |
| 262 | 0708012K | LOGISTICS SUPPORT ACTIVITIES ......................... | 1,420 | 1,420 |
| 263 | 0708012S | PACIFIC DISASTER CENTERS ............................... | 1,905 | 1,905 |
| 264 | 0708047S | DEFENSE PROPERTY ACCOUNTABILITY SYSTEM. | 3,249 | 3,249 |
| 265 | 1105219BB | MQ–9 UAV .................................................................... | 37,188 | 67,188 |
| | | Adaptive Airborne Enterprise (A2E) ........................... | | [30,000] |

137 STAT. 884          PUBLIC LAW 118–31—DEC. 22, 2023

| SEC. 4201. RESEARCH, DEVELOPMENT, TEST, AND EVALUATION (In Thousands of Dollars) | | | | |
|---|---|---|---|---|
| Line | Program Element | Item | FY 2024 Request | Conference Authorized |
| 267 | 1160403BB | AVIATION SYSTEMS ................................................. | 216,174 | 222,174 |
| | | Alternative Domestic Source AC–130J IRSS .............. | | [6,000] |
| 268 | 1160405BB | INTELLIGENCE SYSTEMS DEVELOPMENT ........ | 86,737 | 86,737 |
| 269 | 1160408BB | OPERATIONAL ENHANCEMENTS ......................... | 216,135 | 216,135 |
| 270 | 1160431BB | WARRIOR SYSTEMS ............................................... | 263,374 | 268,374 |
| | | Counter Uncrewed Aerial Systems (CUAS) Group 3 Defeat Acceleration. | | [5,000] |
| 271 | 1160432BB | SPECIAL PROGRAMS .............................................. | 529 | 529 |
| 272 | 1160434BB | UNMANNED ISR ...................................................... | 6,727 | 6,727 |
| 273 | 1160480BB | SOF TACTICAL VEHICLES ...................................... | 9,335 | 9,335 |
| 274 | 1160483BB | MARITIME SYSTEMS .............................................. | 158,231 | 158,231 |
| 275 | 1160490BB | OPERATIONAL ENHANCEMENTS INTEL-LIGENCE. | 15,749 | 15,749 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS ........................................ | 8,463,742 | 8,463,742 |
| | | **SUBTOTAL OPERATIONAL SYSTEMS DEVEL-OPMENT**. | **11,683,139** | **11,731,827** |
| | | **SOFTWARE AND DIGITAL TECHNOLOGY PILOT PROGRAMS** | | |
| 278 | 0608648D8Z | ACQUISITION VISIBILITY—SOFTWARE PILOT PROGRAM. | 21,355 | 21,355 |
| 279 | 0303150K | GLOBAL COMMAND AND CONTROL SYSTEM ..... | 33,166 | 33,166 |
| 9999 | 9999999999 | CLASSIFIED PROGRAMS ........................................ | 270,653 | 270,653 |
| | | **SUBTOTAL SOFTWARE AND DIGITAL TECH-NOLOGY PILOT PROGRAMS**. | **325,174** | **325,174** |
| | | **TOTAL RESEARCH, DEVELOPMENT, TEST & EVAL, DW**. | **36,185,834** | **36,929,997** |
| | | **OPERATIONAL TEST & EVAL, DEFENSE MANAGEMENT SUPPORT** | | |
| 001 | 0605118OTE | OPERATIONAL TEST AND EVALUATION ............. | 169,544 | 169,544 |
| 002 | 0605131OTE | LIVE FIRE TEST AND EVALUATION ...................... | 103,252 | 103,252 |
| 003 | 0605814OTE | OPERATIONAL TEST ACTIVITIES AND ANAL-YSES. | 58,693 | 58,693 |
| | | **SUBTOTAL MANAGEMENT SUPPORT** ............... | **331,489** | **331,489** |
| | | **TOTAL OPERATIONAL TEST & EVAL, DE-FENSE**. | **331,489** | **331,489** |
| | | **TOTAL RDT&E** .......................................................... | **144,979,625** | **145,944,719** |

# TITLE XLIII—OPERATION AND MAINTENANCE

**SEC. 4301. OPERATION AND MAINTENANCE.**

| SEC. 4301. OPERATION AND MAINTENANCE (In Thousands of Dollars) | | | |
|---|---|---|---|
| Line | Item | FY 2024 Request | Conference Authorized |
| | **OPERATION AND MAINTENANCE, ARMY** **OPERATING FORCES** | | |
| 010 | MANEUVER UNITS ......................................................... | 3,943,409 | 4,203,409 |
| | Program increase: Expanding INDOPACOM cam-paigning activities ................................................. | | [360,000] |
| | Unjustified growth ...................................................... | | [–100,000] |
| 020 | MODULAR SUPPORT BRIGADES ................................ | 225,238 | 225,238 |
| 030 | ECHELONS ABOVE BRIGADE ..................................... | 947,395 | 933,395 |
| | Underexecution ............................................................ | | [–14,000] |
| 040 | THEATER LEVEL ASSETS .......................................... | 2,449,141 | 2,439,141 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 885

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | Underexecution ....................................................... | | [−10,000] |
| 050 | LAND FORCES OPERATIONS SUPPORT ................. | 1,233,070 | 1,219,070 |
| | Underexecution ....................................................... | | [−14,000] |
| 060 | AVIATION ASSETS ..................................................... | 2,046,144 | 2,006,144 |
| | Unjustified growth .................................................. | | [−40,000] |
| 070 | FORCE READINESS OPERATIONS SUPPORT ......... | 7,149,427 | 7,095,427 |
| | Unjustified growth .................................................. | | [−54,000] |
| 080 | LAND FORCES SYSTEMS READINESS .................... | 475,435 | 475,435 |
| 090 | LAND FORCES DEPOT MAINTENANCE .................. | 1,423,560 | 1,423,560 |
| 100 | MEDICAL READINESS ............................................... | 951,499 | 951,499 |
| 110 | BASE OPERATIONS SUPPORT .................................. | 9,943,031 | 9,930,362 |
| | Fire and Emergency Services .................................. | | [15,000] |
| | Unjustified growth .................................................. | | [−27,669] |
| 120 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION .................................................... | 5,381,757 | 5,705,353 |
| | Program increase ..................................................... | | [323,596] |
| 130 | MANAGEMENT AND OPERATIONAL HEAD-QUARTERS ................................................................. | 313,612 | 313,612 |
| 140 | ADDITIONAL ACTIVITIES ......................................... | 454,565 | 454,565 |
| 150 | RESET .......................................................................... | 447,987 | 447,987 |
| 160 | US AFRICA COMMAND .............................................. | 414,680 | 564,680 |
| | AFRICOM UPL—High-risk ISR ............................. | | [150,000] |
| 170 | US EUROPEAN COMMAND ....................................... | 408,529 | 408,529 |
| 180 | US SOUTHERN COMMAND ....................................... | 285,692 | 285,692 |
| 190 | US FORCES KOREA .................................................... | 88,463 | 88,463 |
| 200 | CYBERSPACE ACTIVITIES—CYBERSPACE OPER-ATIONS ..................................................................... | 507,845 | 507,845 |
| 210 | CYBERSPACE ACTIVITIES—CYBERSECURITY ...... | 704,667 | 704,667 |
| | **SUBTOTAL OPERATING FORCES** .................. | **39,795,146** | **40,384,073** |
| | | | |
| | **MOBILIZATION** | | |
| 230 | STRATEGIC MOBILITY .............................................. | 470,143 | 470,143 |
| 240 | ARMY PREPOSITIONED STOCKS ............................. | 433,909 | 433,909 |
| 250 | INDUSTRIAL PREPAREDNESS ................................. | 4,244 | 4,244 |
| | **SUBTOTAL MOBILIZATION** ............................. | **908,296** | **908,296** |
| | | | |
| | **TRAINING AND RECRUITING** | | |
| 260 | OFFICER ACQUISITION ............................................ | 178,428 | 178,428 |
| 270 | RECRUIT TRAINING ................................................. | 78,235 | 78,235 |
| 280 | ONE STATION UNIT TRAINING .............................. | 114,777 | 114,777 |
| 290 | SENIOR RESERVE OFFICERS TRAINING CORPS .. | 551,462 | 551,462 |
| 300 | SPECIALIZED SKILL TRAINING .............................. | 1,147,431 | 1,132,431 |
| | Unjustified growth .................................................. | | [−15,000] |
| 310 | FLIGHT TRAINING ..................................................... | 1,398,415 | 1,398,415 |
| 320 | PROFESSIONAL DEVELOPMENT EDUCATION ..... | 200,779 | 200,779 |
| 330 | TRAINING SUPPORT ................................................. | 682,896 | 682,896 |
| 340 | RECRUITING AND ADVERTISING ........................... | 690,280 | 780,280 |
| | Recruiting and advertising increase ....................... | | [90,000] |
| 350 | EXAMINING ................................................................ | 195,009 | 195,009 |
| 360 | OFF-DUTY AND VOLUNTARY EDUCATION ............ | 260,235 | 260,235 |
| 370 | CIVILIAN EDUCATION AND TRAINING .................. | 250,252 | 250,252 |
| 380 | JUNIOR RESERVE OFFICER TRAINING CORPS .... | 204,895 | 204,895 |
| | **SUBTOTAL TRAINING AND RECRUITING** .. | **5,953,094** | **6,028,094** |
| | | | |
| | **ADMINISTRATION AND SERVICE-WIDE AC-TIVITIES** | | |
| 400 | SERVICEWIDE TRANSPORTATION .......................... | 718,323 | 718,323 |
| 410 | CENTRAL SUPPLY ACTIVITIES ................................ | 900,624 | 875,624 |
| | Unjustified growth .................................................. | | [−25,000] |

137 STAT. 886          PUBLIC LAW 118–31—DEC. 22, 2023

SEC. 4301. OPERATION AND MAINTENANCE
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| 420 | LOGISTIC SUPPORT ACTIVITIES | 828,059 | 828,059 |
| 430 | AMMUNITION MANAGEMENT | 464,029 | 464,029 |
| 440 | ADMINISTRATION | 537,837 | 537,837 |
| 450 | SERVICEWIDE COMMUNICATIONS | 1,962,059 | 1,937,059 |
| | Insufficient justification | | [–25,000] |
| 460 | MANPOWER MANAGEMENT | 361,553 | 358,553 |
| | Unjustified growth | | [–3,000] |
| 470 | OTHER PERSONNEL SUPPORT | 829,248 | 829,248 |
| 480 | OTHER SERVICE SUPPORT | 2,370,107 | 2,365,107 |
| | Unjustified growth | | [–5,000] |
| 490 | ARMY CLAIMS ACTIVITIES | 203,323 | 203,323 |
| 500 | REAL ESTATE MANAGEMENT | 286,682 | 286,682 |
| 510 | FINANCIAL MANAGEMENT AND AUDIT READINESS | 455,928 | 455,928 |
| 520 | DEF ACQUISITION WORKFORCE DEVELOPMENT ACCOUNT | 39,867 | 39,867 |
| 530 | INTERNATIONAL MILITARY HEADQUARTERS | 610,201 | 610,201 |
| 540 | MISC. SUPPORT OF OTHER NATIONS | 38,948 | 38,948 |
| 590A | CLASSIFIED PROGRAMS | 2,291,229 | 2,291,229 |
| | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** | **12,898,017** | **12,840,017** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 600 | UNDISTRIBUTED | | –337,600 |
| | Foreign currency fluctuations | | [–208,000] |
| | Unobligated balances | | [–129,600] |
| | **SUBTOTAL UNDISTRIBUTED** | | **–337,600** |
| | | | |
| | **TOTAL OPERATION AND MAINTENANCE, ARMY** | **59,554,553** | **59,822,880** |
| | | | |
| | **OPERATION AND MAINTENANCE, ARMY RESERVE** | | |
| | **OPERATING FORCES** | | |
| 010 | MODULAR SUPPORT BRIGADES | 15,208 | 15,208 |
| 020 | ECHELONS ABOVE BRIGADE | 720,802 | 720,802 |
| 030 | THEATER LEVEL ASSETS | 143,400 | 143,400 |
| 040 | LAND FORCES OPERATIONS SUPPORT | 707,654 | 707,654 |
| 050 | AVIATION ASSETS | 134,346 | 134,346 |
| 060 | FORCE READINESS OPERATIONS SUPPORT | 451,178 | 451,178 |
| 070 | LAND FORCES SYSTEMS READINESS | 97,564 | 97,564 |
| 080 | LAND FORCES DEPOT MAINTENANCE | 45,711 | 45,711 |
| 090 | BASE OPERATIONS SUPPORT | 608,079 | 606,079 |
| | Unjustified growth | | [–2,000] |
| 100 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION | 495,435 | 495,435 |
| 110 | MANAGEMENT AND OPERATIONAL HEADQUARTERS | 28,783 | 28,783 |
| 120 | CYBERSPACE ACTIVITIES—CYBERSPACE OPERATIONS | 3,153 | 3,153 |
| 130 | CYBERSPACE ACTIVITIES—CYBERSECURITY | 19,591 | 19,591 |
| | **SUBTOTAL OPERATING FORCES** | **3,470,904** | **3,468,904** |
| | | | |
| | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** | | |
| 140 | SERVICEWIDE TRANSPORTATION | 19,155 | 19,155 |
| 150 | ADMINISTRATION | 21,668 | 21,668 |
| 160 | SERVICEWIDE COMMUNICATIONS | 44,118 | 44,118 |
| 170 | MANPOWER MANAGEMENT | 7,127 | 7,127 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 887

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|-----------------|----------------------|
| 180 | RECRUITING AND ADVERTISING ............................ | 67,976 | 67,976 |
| | **SUBTOTAL ADMINISTRATION AND SERV-ICE-WIDE ACTIVITIES** .................................. | **160,044** | **160,044** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 210 | UNDISTRIBUTED .......................................................... | | –14,300 |
| | Foreign currency fluctuations ................................ | | [–10,900] |
| | Unobligated balances .............................................. | | [–3,400] |
| | **SUBTOTAL UNDISTRIBUTED** .......................... | | **–14,300** |
| | | | |
| | **TOTAL OPERATION AND MAINTE-NANCE, ARMY RESERVE** .......................... | **3,630,948** | **3,614,648** |
| | | | |
| | **OPERATION AND MAINTENANCE, ARMY NA-TIONAL GUARD** | | |
| | **OPERATING FORCES** | | |
| 010 | MANEUVER UNITS ...................................................... | 925,071 | 925,071 |
| 020 | MODULAR SUPPORT BRIGADES ............................... | 201,781 | 201,781 |
| 030 | ECHELONS ABOVE BRIGADE .................................... | 840,373 | 833,373 |
| | Unjustified growth ................................................... | | [–7,000] |
| 040 | THEATER LEVEL ASSETS ........................................ | 107,392 | 105,392 |
| | Unjustified growth ................................................... | | [–2,000] |
| 050 | LAND FORCES OPERATIONS SUPPORT ................. | 62,908 | 62,908 |
| 060 | AVIATION ASSETS ...................................................... | 1,113,908 | 1,102,908 |
| | Unjustified growth ................................................... | | [–11,000] |
| 070 | FORCE READINESS OPERATIONS SUPPORT ......... | 832,946 | 831,446 |
| | Training Exercise Support ..................................... | | [3,500] |
| | Unjustified growth ................................................... | | [–5,000] |
| 080 | LAND FORCES SYSTEMS READINESS ................... | 50,696 | 50,696 |
| 090 | LAND FORCES DEPOT MAINTENANCE .................. | 231,784 | 231,784 |
| 100 | BASE OPERATIONS SUPPORT .................................. | 1,249,066 | 1,249,066 |
| 110 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION .................................................... | 1,081,561 | 1,081,561 |
| 120 | MANAGEMENT AND OPERATIONAL HEAD-QUARTERS ................................................................ | 1,468,857 | 1,468,857 |
| 130 | CYBERSPACE ACTIVITIES—CYBERSPACE OPER-ATIONS ...................................................................... | 9,566 | 9,566 |
| 140 | CYBERSPACE ACTIVITIES—CYBERSECURITY ...... | 15,710 | 15,710 |
| | **SUBTOTAL OPERATING FORCES** .................. | **8,191,619** | **8,170,119** |
| | | | |
| | **ADMINISTRATION AND SERVICE-WIDE AC-TIVITIES** | | |
| 150 | SERVICEWIDE TRANSPORTATION .......................... | 7,251 | 7,251 |
| 160 | ADMINISTRATION ....................................................... | 66,025 | 66,025 |
| 170 | SERVICEWIDE COMMUNICATIONS ......................... | 113,366 | 113,366 |
| 180 | MANPOWER MANAGEMENT ...................................... | 8,663 | 8,663 |
| 190 | OTHER PERSONNEL SUPPORT ................................ | 292,426 | 292,426 |
| 200 | REAL ESTATE MANAGEMENT .................................. | 3,754 | 3,754 |
| | **SUBTOTAL ADMINISTRATION AND SERV-ICE-WIDE ACTIVITIES** .................................. | **491,485** | **491,485** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 230 | UNDISTRIBUTED .......................................................... | | –49,000 |
| | Foreign currency fluctuations ................................ | | [–29,000] |
| | Unobligated balances .............................................. | | [–20,000] |
| | **SUBTOTAL UNDISTRIBUTED** .......................... | | **–49,000** |
| | | | |
| | **TOTAL OPERATION AND MAINTE-NANCE, ARMY NATIONAL GUARD** ......... | **8,683,104** | **8,612,604** |

137 STAT. 888          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| | **COUNTER-ISLAMIC STATE OF IRAQ AND SYRIA TRAIN AND EQUIP** | | |
| | **COUNTER ISIS TRAIN AND EQUIP FUND (CTEF)** | | |
| 010 | IRAQ ................................................................. | 241,950 | 241,950 |
| 020 | SYRIA ............................................................... | 156,000 | 156,000 |
| | **SUBTOTAL COUNTER ISIS TRAIN AND EQUIP FUND (CTEF)** ..................................... | **397,950** | **397,950** |
| | **TOTAL COUNTER-ISLAMIC STATE OF IRAQ AND SYRIA TRAIN AND EQUIP** .... | **397,950** | **397,950** |
| | **OPERATION AND MAINTENANCE, NAVY** | | |
| | **OPERATING FORCES** | | |
| 010 | MISSION AND OTHER FLIGHT OPERATIONS ........ | 7,882,504 | 7,882,504 |
| 020 | FLEET AIR TRAINING ................................................ | 2,773,957 | 2,773,957 |
| 030 | AVIATION TECHNICAL DATA & ENGINEERING SERVICES ................................................... | 73,047 | 73,047 |
| 040 | AIR OPERATIONS AND SAFETY SUPPORT ............ | 213,862 | 213,862 |
| 050 | AIR SYSTEMS SUPPORT ........................................... | 1,155,463 | 1,155,463 |
| 060 | AIRCRAFT DEPOT MAINTENANCE ......................... | 1,857,021 | 1,857,021 |
| 070 | AIRCRAFT DEPOT OPERATIONS SUPPORT ............ | 66,822 | 66,822 |
| 080 | AVIATION LOGISTICS ............................................... | 1,871,670 | 1,871,670 |
| 090 | MISSION AND OTHER SHIP OPERATIONS ............ | 7,015,796 | 7,005,796 |
| | Underexecution ......................................................... | | [–10,000] |
| 100 | SHIP OPERATIONS SUPPORT & TRAINING ........... | 1,301,108 | 1,301,108 |
| 110 | SHIP DEPOT MAINTENANCE ................................... | 11,164,249 | 11,164,249 |
| 120 | SHIP DEPOT OPERATIONS SUPPORT ...................... | 2,728,712 | 2,728,712 |
| 130 | COMBAT COMMUNICATIONS AND ELECTRONIC WARFARE ................................................... | 1,776,881 | 1,803,381 |
| | AFRICOM UPL—Somalia Persistent Presence ..... | | [26,500] |
| 140 | SPACE SYSTEMS AND SURVEILLANCE ................. | 389,915 | 389,915 |
| 150 | WARFARE TACTICS ..................................................... | 1,005,998 | 1,005,998 |
| 160 | OPERATIONAL METEOROLOGY AND OCEANOG-RAPHY ........................................................ | 455,330 | 455,330 |
| 170 | COMBAT SUPPORT FORCES ..................................... | 2,350,089 | 2,336,089 |
| | Naval Small Craft Instruction and Technical Training School .................................................... | | [6,000] |
| | Unjustified growth .................................................... | | [–20,000] |
| 180 | EQUIPMENT MAINTENANCE AND DEPOT OPER-ATIONS SUPPORT .................................................. | 189,044 | 189,044 |
| 200 | COMBATANT COMMANDERS CORE OPERATIONS | 92,504 | 92,504 |
| 210 | COMBATANT COMMANDERS DIRECT MISSION SUPPORT ................................................... | 352,980 | 416,980 |
| | INDOPACOM campaigning ..................................... | | [36,000] |
| | Joint Training Team ................................................ | | [28,000] |
| 230 | CYBERSPACE ACTIVITIES ......................................... | 522,180 | 522,180 |
| 240 | FLEET BALLISTIC MISSILE ...................................... | 1,763,238 | 1,763,238 |
| 250 | WEAPONS MAINTENANCE ........................................ | 1,640,642 | 1,615,642 |
| | Underexecution ......................................................... | | [–25,000] |
| 260 | OTHER WEAPON SYSTEMS SUPPORT ..................... | 696,653 | 696,653 |
| 270 | ENTERPRISE INFORMATION ..................................... | 1,780,645 | 1,762,645 |
| | Insufficient justification ........................................... | | [–18,000] |
| 280 | SUSTAINMENT, RESTORATION AND MOD-ERNIZATION ............................................................. | 4,406,192 | 4,714,316 |
| | Dry Dock Repairs at PSNS Investment Restoration and Modernization ....................................... | | [200,000] |
| | Hangar resilience and repair .................................. | | [20,000] |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 889

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | Program increase .................................................... | | [88,124] |
| 290 | BASE OPERATING SUPPORT ..................................... | 6,223,827 | 6,221,627 |
| | Navy divestment of electrical utility operations at | | |
| | former Naval Air Station Barbers Point ............ | | [18,000] |
| | Unjustified growth ................................................... | | [–20,200] |
| | **SUBTOTAL OPERATING FORCES** .................. | **61,750,329** | **62,079,753** |
| | | | |
| | **MOBILIZATION** | | |
| 300 | SHIP PREPOSITIONING AND SURGE ...................... | 475,255 | 475,255 |
| 310 | READY RESERVE FORCE ........................................... | 701,060 | 701,060 |
| 320 | SHIP ACTIVATIONS/INACTIVATIONS ..................... | 302,930 | 302,930 |
| 330 | EXPEDITIONARY HEALTH SERVICES SYSTEMS .. | 151,966 | 151,966 |
| 340 | COAST GUARD SUPPORT ......................................... | 21,464 | 21,464 |
| | **SUBTOTAL MOBILIZATION** ........................... | **1,652,675** | **1,652,675** |
| | | | |
| | **TRAINING AND RECRUITING** | | |
| 350 | OFFICER ACQUISITION ............................................. | 201,555 | 201,555 |
| 360 | RECRUIT TRAINING ................................................. | 16,521 | 16,521 |
| 370 | RESERVE OFFICERS TRAINING CORPS ................. | 175,171 | 175,171 |
| 380 | SPECIALIZED SKILL TRAINING .............................. | 1,238,894 | 1,233,894 |
| | Unjustified growth .................................................... | | [–5,000] |
| 390 | PROFESSIONAL DEVELOPMENT EDUCATION ..... | 335,603 | 335,603 |
| 400 | TRAINING SUPPORT ................................................. | 390,931 | 390,931 |
| 410 | RECRUITING AND ADVERTISING ........................... | 269,483 | 269,483 |
| 420 | OFF-DUTY AND VOLUNTARY EDUCATION ........... | 90,452 | 90,452 |
| 430 | CIVILIAN EDUCATION AND TRAINING ................. | 73,406 | 73,406 |
| 440 | JUNIOR ROTC ............................................................. | 58,970 | 58,970 |
| | **SUBTOTAL TRAINING AND RECRUITING** .. | **2,850,986** | **2,845,986** |
| | | | |
| | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** | | |
| 450 | ADMINISTRATION ...................................................... | 1,350,449 | 1,338,449 |
| | Program decrease ...................................................... | | [–12,000] |
| 460 | CIVILIAN MANPOWER AND PERSONNEL MANAGEMENT .................................................................. | 242,760 | 242,760 |
| 470 | MILITARY MANPOWER AND PERSONNEL MANAGEMENT .................................................................. | 745,666 | 745,666 |
| 490 | MEDICAL ACTIVITIES ............................................... | 323,978 | 323,978 |
| 500 | DEF ACQUISITION WORKFORCE DEVELOPMENT ACCOUNT .................................................................. | 67,357 | 67,357 |
| 510 | SERVICEWIDE TRANSPORTATION ........................... | 248,822 | 248,822 |
| 530 | PLANNING, ENGINEERING, AND PROGRAM SUPPORT .......................................................................... | 616,816 | 616,816 |
| 540 | ACQUISITION, LOGISTICS, AND OVERSIGHT ....... | 850,906 | 850,906 |
| 550 | INVESTIGATIVE AND SECURITY SERVICES ......... | 888,508 | 888,508 |
| 730A | CLASSIFIED PROGRAMS ........................................... | 655,281 | 655,281 |
| | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** ................................... | **5,990,543** | **5,978,543** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 740 | UNDISTRIBUTED ........................................................ | | –462,300 |
| | Foreign currency fluctuations ................................. | | [–236,300] |
| | Unobligated balances ............................................... | | [–226,000] |
| | **SUBTOTAL UNDISTRIBUTED** ......................... | | **–462,300** |
| | | | |
| | **TOTAL OPERATION AND MAINTENANCE, NAVY** ................................................ | **72,244,533** | **72,094,657** |

**OPERATION AND MAINTENANCE, MARINE CORPS**

137 STAT. 890          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---|---|
| | **OPERATING FORCES** | | |
| 010 | OPERATIONAL FORCES .............................................. | 1,799,964 | 1,793,964 |
| | INDOPACOM campaigning ................................... | | [8,000] |
| | Unjustified growth ................................................. | | [−14,000] |
| 020 | FIELD LOGISTICS ....................................................... | 1,878,228 | 1,853,228 |
| | Unjustified growth ................................................. | | [−25,000] |
| 030 | DEPOT MAINTENANCE ............................................. | 211,460 | 211,460 |
| 040 | MARITIME PREPOSITIONING .................................. | 137,831 | 137,831 |
| 060 | CYBERSPACE ACTIVITIES ........................................ | 205,449 | 205,449 |
| 070 | SUSTAINMENT, RESTORATION & MODERNIZA-TION ............................................................................ | 1,211,183 | 1,235,407 |
| | Program increase ....................................................... | | [24,224] |
| 080 | BASE OPERATING SUPPORT .................................... | 3,124,551 | 3,084,801 |
| | Unjustified growth ................................................. | | [−42,750] |
| | USMC Nucleated Foam Engine Wash .................. | | [3,000] |
| | **SUBTOTAL OPERATING FORCES** ................. | **8,568,666** | **8,522,140** |
| | | | |
| | **TRAINING AND RECRUITING** | | |
| 090 | RECRUIT TRAINING .................................................. | 26,284 | 26,284 |
| 100 | OFFICER ACQUISITION ............................................ | 1,316 | 1,316 |
| 110 | SPECIALIZED SKILL TRAINING .............................. | 133,176 | 133,176 |
| 120 | PROFESSIONAL DEVELOPMENT EDUCATION ..... | 66,213 | 66,213 |
| 130 | TRAINING SUPPORT .................................................. | 570,152 | 570,152 |
| 140 | RECRUITING AND ADVERTISING ........................... | 246,586 | 300,903 |
| | Marine Corps Enlisted Training Corps ................. | | [5,000] |
| | Recruiting and advertising increase ...................... | | [49,317] |
| 150 | OFF-DUTY AND VOLUNTARY EDUCATION ........... | 55,230 | 55,230 |
| 160 | JUNIOR ROTC .............................................................. | 29,616 | 29,616 |
| | **SUBTOTAL TRAINING AND RECRUITING** .. | **1,128,573** | **1,182,890** |
| | | | |
| | **ADMINISTRATION AND SERVICE-WIDE AC-TIVITIES** | | |
| 180 | SERVICEWIDE TRANSPORTATION ........................... | 90,366 | 90,366 |
| 190 | ADMINISTRATION ...................................................... | 428,650 | 428,650 |
| 220A | CLASSIFIED PROGRAMS ........................................... | 65,658 | 65,658 |
| | **SUBTOTAL ADMINISTRATION AND SERV-ICE-WIDE ACTIVITIES** .................................... | **584,674** | **584,674** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 230 | UNDISTRIBUTED ........................................................ | | −65,800 |
| | Foreign currency fluctuations ................................ | | [−33,800] |
| | Unobligated balances .............................................. | | [−32,000] |
| | **SUBTOTAL UNDISTRIBUTED** ......................... | | **−65,800** |
| | | | |
| | **TOTAL OPERATION AND MAINTE-NANCE, MARINE CORPS** ........................... | **10,281,913** | **10,223,904** |
| | | | |
| | **OPERATION AND MAINTENANCE, NAVY RE-SERVE** | | |
| | **OPERATING FORCES** | | |
| 010 | MISSION AND OTHER FLIGHT OPERATIONS ........ | 731,113 | 731,113 |
| 020 | INTERMEDIATE MAINTENANCE ............................. | 10,122 | 10,122 |
| 030 | AIRCRAFT DEPOT MAINTENANCE .......................... | 167,811 | 167,811 |
| 040 | AIRCRAFT DEPOT OPERATIONS SUPPORT ........... | 103 | 103 |
| 050 | AVIATION LOGISTICS ................................................ | 29,185 | 29,185 |
| 060 | COMBAT COMMUNICATIONS ................................... | 20,806 | 20,806 |
| 070 | COMBAT SUPPORT FORCES ...................................... | 186,590 | 186,590 |
| 080 | CYBERSPACE ACTIVITIES ........................................ | 296 | 296 |
| 090 | ENTERPRISE INFORMATION ................................... | 32,467 | 32,467 |

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|---|---|---:|---:|
| 100 | SUSTAINMENT, RESTORATION AND MODERNIZATION ................................................ | 63,726 | 63,726 |
| 110 | BASE OPERATING SUPPORT .................................... | 121,064 | 121,064 |
|  | **SUBTOTAL OPERATING FORCES** ................. | **1,363,283** | **1,363,283** |
|  | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** |  |  |
| 120 | ADMINISTRATION ...................................................... | 2,025 | 2,025 |
| 130 | MILITARY MANPOWER AND PERSONNEL MANAGEMENT ................................................ | 13,401 | 13,401 |
| 140 | ACQUISITION AND PROGRAM MANAGEMENT ..... | 2,101 | 2,101 |
|  | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** ................................ | **17,527** | **17,527** |
|  | **UNDISTRIBUTED** |  |  |
| 170 | UNDISTRIBUTED ......................................................... |  | −8,100 |
|  | Foreign currency fluctuations ................................ |  | [−3,900] |
|  | Unobligated balances .............................................. |  | [−4,200] |
|  | **SUBTOTAL UNDISTRIBUTED** ......................... |  | **−8,100** |
|  | **TOTAL OPERATION AND MAINTENANCE, NAVY RESERVE** ........................... | **1,380,810** | **1,372,710** |
|  | **OPERATION AND MAINTENANCE, MARINE CORPS RESERVE** **OPERATING FORCES** |  |  |
| 010 | OPERATING FORCES ................................................... | 128,468 | 128,468 |
| 020 | DEPOT MAINTENANCE ................................................ | 20,967 | 20,967 |
| 030 | SUSTAINMENT, RESTORATION AND MODERNIZATION ................................................ | 46,589 | 46,589 |
| 040 | BASE OPERATING SUPPORT .................................... | 120,808 | 120,808 |
|  | **SUBTOTAL OPERATING FORCES** ................. | **316,832** | **316,832** |
|  | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** |  |  |
| 050 | ADMINISTRATION ...................................................... | 12,563 | 12,563 |
|  | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** ................................ | **12,563** | **12,563** |
|  | **UNDISTRIBUTED** |  |  |
| 060 | UNDISTRIBUTED ......................................................... |  | −4,900 |
|  | Foreign currency fluctuations ................................ |  | [−3,900] |
|  | Unobligated balances .............................................. |  | [−1,000] |
|  | **SUBTOTAL UNDISTRIBUTED** ......................... |  | **−4,900** |
|  | **TOTAL OPERATION AND MAINTENANCE, MARINE CORPS RESERVE** ....... | **329,395** | **324,495** |
|  | **OPERATION AND MAINTENANCE, AIR FORCE** **OPERATING FORCES** |  |  |
| 010 | PRIMARY COMBAT FORCES ...................................... | 980,768 | 936,068 |
|  | Technical realignment ............................................ |  | [−14,700] |
|  | Unjustified growth .................................................. |  | [−30,000] |
| 020 | COMBAT ENHANCEMENT FORCES ......................... | 2,665,924 | 2,733,924 |
|  | INDOPACOM Campaigning .................................... |  | [104,000] |
|  | Unjustified growth .................................................. |  | [−36,000] |
| 030 | AIR OPERATIONS TRAINING (OJT, MAINTAIN SKILLS) ........................................................ | 1,630,552 | 1,611,552 |
|  | Unjustified growth .................................................. |  | [−19,000] |

137 STAT. 892          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------|----------------------|
| 040 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 4,632,693 | 4,644,043 |
|  | F–22 Block 20 buy-back costs ................................. |  | [11,350] |
| 050 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION ...................................................... | 4,252,815 | 4,279,719 |
|  | DAF requested realignment of funds ..................... |  | [−58,152] |
|  | Program increase ...................................................... |  | [85,056] |
| 060 | CYBERSPACE SUSTAINMENT ................................. | 229,440 | 229,440 |
| 070 | CONTRACTOR LOGISTICS SUPPORT AND SYS-TEM SUPPORT .......................................................... | 9,537,192 | 9,679,142 |
|  | F–22 Block 20 buy-back costs ................................. |  | [181,950] |
|  | Underexecution ........................................................ |  | [−40,000] |
| 080 | FLYING HOUR PROGRAM ......................................... | 6,697,549 | 6,600,149 |
|  | F–22 Block 20 buy-back costs ................................. |  | [17,600] |
|  | Underexecution ........................................................ |  | [−115,000] |
| 090 | BASE SUPPORT .......................................................... | 11,633,510 | 11,310,018 |
|  | DAF requested realignment of funds ..................... |  | [−223,192] |
|  | DAF requested realignment of funds from SAG 11A ......................................................................... |  | [14,700] |
|  | Underexecution ........................................................ |  | [−115,000] |
| 100 | GLOBAL C3I AND EARLY WARNING ...................... | 1,350,827 | 1,301,476 |
|  | Technical realignment .............................................. |  | [−30,951] |
|  | Unjustified request .................................................. |  | [−18,400] |
| 110 | OTHER COMBAT OPS SPT PROGRAMS ................... | 1,817,941 | 1,804,941 |
|  | Unjustified growth ................................................... |  | [−13,000] |
| 120 | CYBERSPACE ACTIVITIES ......................................... | 807,966 | 807,966 |
| 130 | TACTICAL INTEL AND OTHER SPECIAL ACTIVI-TIES ............................................................................... | 267,615 | 267,615 |
| 160 | US NORTHCOM/NORAD ............................................. | 245,263 | 245,263 |
| 170 | US STRATCOM .............................................................. | 541,720 | 541,720 |
| 190 | US CENTCOM ................................................................ | 335,220 | 329,220 |
|  | Office of Security Cooperation-Iraq reduction ....... |  | [−6,000] |
| 200 | US SOCOM ...................................................................... | 27,511 | 27,511 |
| 210 | US TRANSCOM ............................................................. | 607 | 607 |
| 220 | CENTCOM CYBERSPACE SUSTAINMENT .............. | 1,415 | 1,415 |
| 230 | USSPACECOM ................................................................ | 373,989 | 373,989 |
| 240 | MEDICAL READINESS ................................................ | 564,880 | 562,596 |
|  | Technical realignment .............................................. |  | [−2,284] |
| 480A | CLASSIFIED PROGRAMS ............................................ | 1,465,926 | 1,465,926 |
|  | **SUBTOTAL OPERATING FORCES** .................. | **50,061,323** | **49,754,300** |
|  | **MOBILIZATION** |  |  |
| 260 | AIRLIFT OPERATIONS ................................................ | 3,012,287 | 3,012,287 |
| 270 | MOBILIZATION PREPAREDNESS .............................. | 241,918 | 241,918 |
|  | **SUBTOTAL MOBILIZATION** ............................ | **3,254,205** | **3,254,205** |
|  | **TRAINING AND RECRUITING** |  |  |
| 280 | OFFICER ACQUISITION ............................................. | 202,769 | 202,769 |
| 290 | RECRUIT TRAINING .................................................. | 28,892 | 28,892 |
| 300 | RESERVE OFFICERS TRAINING CORPS (ROTC) .... | 137,647 | 137,647 |
| 310 | SPECIALIZED SKILL TRAINING .............................. | 588,131 | 588,131 |
| 320 | FLIGHT TRAINING ..................................................... | 875,230 | 862,989 |
|  | Underexecution ........................................................ |  | [−12,241] |
| 330 | PROFESSIONAL DEVELOPMENT EDUCATION ..... | 301,262 | 303,262 |
|  | Program increase ...................................................... |  | [2,000] |
| 340 | TRAINING SUPPORT ................................................. | 194,609 | 194,609 |
| 350 | RECRUITING AND ADVERTISING ........................... | 204,318 | 204,318 |
| 360 | EXAMINING ................................................................. | 7,775 | 7,775 |
| 370 | OFF-DUTY AND VOLUNTARY EDUCATION ........... | 263,421 | 263,421 |
| 380 | CIVILIAN EDUCATION AND TRAINING ................. | 343,039 | 343,039 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 893

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| 390 | JUNIOR ROTC ................................................ | 75,666 | 75,666 |
| | **SUBTOTAL TRAINING AND RECRUITING** .. | **3,222,759** | **3,212,518** |
| | | | |
| | **ADMINISTRATION AND SERVICE-WIDE AC-TIVITIES** | | |
| 400 | LOGISTICS OPERATIONS ........................................... | 1,062,199 | 1,062,199 |
| 410 | TECHNICAL SUPPORT ACTIVITIES ........................ | 162,919 | 162,919 |
| 420 | ADMINISTRATION ................................................ | 1,409,015 | 1,408,515 |
| | Program decrease—contract support ..................... | | [–500] |
| 430 | SERVICEWIDE COMMUNICATIONS ........................ | 30,268 | 30,268 |
| 440 | OTHER SERVICEWIDE ACTIVITIES ........................ | 1,851,856 | 1,811,376 |
| | Technical realignment ............................................. | | [4,520] |
| | Underexecution ....................................................... | | [–45,000] |
| 450 | CIVIL AIR PATROL .................................................... | 30,901 | 30,901 |
| 460 | DEF ACQUISITION WORKFORCE DEVELOPMENT ACCOUNT ............................................................. | 42,759 | 42,759 |
| 480 | INTERNATIONAL SUPPORT .................................... | 115,267 | 115,267 |
| 490A | CLASSIFIED PROGRAMS ........................................... | 1,506,624 | 1,506,624 |
| | **SUBTOTAL ADMINISTRATION AND SERV-ICE-WIDE ACTIVITIES** ................................. | **6,211,808** | **6,170,828** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 500 | UNDISTRIBUTED ......................................................... | | –408,500 |
| | Foreign currency fluctuations ................................ | | [–208,500] |
| | Unobligated balances ............................................... | | [–200,000] |
| | **SUBTOTAL UNDISTRIBUTED** .......................... | | **–408,500** |
| | | | |
| | **TOTAL OPERATION AND MAINTE-NANCE, AIR FORCE** ..................................... | **62,750,095** | **61,983,351** |
| | | | |
| | **OPERATION AND MAINTENANCE, SPACE FORCE** **OPERATING FORCES** | | |
| 010 | GLOBAL C3I & EARLY WARNING ............................ | 642,201 | 617,201 |
| | Unjustified growth ................................................... | | [–25,000] |
| 020 | SPACE LAUNCH OPERATIONS ................................ | 356,162 | 356,162 |
| 030 | SPACE OPERATIONS ................................................. | 866,547 | 864,047 |
| | Unjustified growth ................................................... | | [–2,500] |
| 040 | EDUCATION & TRAINING ........................................ | 199,181 | 212,353 |
| | Technical realignment ............................................. | | [18,172] |
| | Unjustified growth ................................................... | | [–5,000] |
| 050 | SPECIAL PROGRAMS ................................................. | 383,233 | 383,233 |
| 060 | DEPOT MAINTENANCE ............................................. | 67,757 | 67,757 |
| 070 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION ................................................ | 678,648 | 692,221 |
| | Program increase ..................................................... | | [13,573] |
| 080 | CONTRACTOR LOGISTICS AND SYSTEM SUP-PORT ......................................................................... | 1,380,350 | 1,378,350 |
| | Unjustified growth ................................................... | | [–2,000] |
| 090 | SPACE OPERATIONS -BOS ........................................ | 188,760 | 188,760 |
| 110A | CLASSIFIED PROGRAMS ........................................... | 71,475 | 71,475 |
| | **SUBTOTAL OPERATING FORCES** ................. | **4,834,314** | **4,831,559** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 120 | UNDISTRIBUTED ......................................................... | | –33,100 |
| | Foreign currency fluctuations ................................ | | [–14,100] |
| | Unobligated balances ............................................... | | [–19,000] |
| | **SUBTOTAL UNDISTRIBUTED** .......................... | | **–33,100** |

137 STAT. 894          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4301. OPERATION AND MAINTENANCE**
**(In Thousands of Dollars)**

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------:|----------------------:|
| | **ADMINISTRATION AND SERVICE-WIDE AC-TIVITIES** | | |
| 100 | LOGISTICS OPERATIONS ............................................ | 34,046 | 34,046 |
| 110 | ADMINISTRATION ...................................................... | 149,108 | 130,936 |
| | Technical realignment .............................................. | | [–18,172] |
| | **SUBTOTAL ADMINISTRATION AND SERV-ICE-WIDE ACTIVITIES** ................................... | **183,154** | **164,982** |
| | **TOTAL OPERATION AND MAINTE-NANCE, SPACE FORCE** .............................. | **5,017,468** | **4,963,441** |
| | **OPERATION AND MAINTENANCE, AIR FORCE RESERVE** | | |
| | **OPERATING FORCES** | | |
| 010 | PRIMARY COMBAT FORCES ...................................... | 2,088,949 | 2,058,949 |
| | Unjustified growth ................................................... | | [–30,000] |
| 020 | MISSION SUPPORT OPERATIONS ............................ | 198,213 | 198,213 |
| 030 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 647,758 | 647,758 |
| 040 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION ..................................................... | 122,314 | 122,314 |
| 050 | CONTRACTOR LOGISTICS SUPPORT AND SYS-TEM SUPPORT ............................................................ | 374,442 | 374,442 |
| 060 | BASE SUPPORT .......................................................... | 543,962 | 543,962 |
| 070 | CYBERSPACE ACTIVITIES ......................................... | 1,742 | 1,742 |
| | **SUBTOTAL OPERATING FORCES** .................. | **3,977,380** | **3,947,380** |
| | **ADMINISTRATION AND SERVICE-WIDE AC-TIVITIES** | | |
| 080 | ADMINISTRATION ...................................................... | 107,281 | 107,281 |
| 090 | RECRUITING AND ADVERTISING ............................ | 9,373 | 9,373 |
| 100 | MILITARY MANPOWER AND PERS MGMT (ARPC) | 15,563 | 15,563 |
| 110 | OTHER PERS SUPPORT (DISABILITY COMP) ......... | 6,174 | 6,174 |
| 120 | AUDIOVISUAL ............................................................. | 485 | 485 |
| | **SUBTOTAL ADMINISTRATION AND SERV-ICE-WIDE ACTIVITIES** ................................... | **138,876** | **138,876** |
| | **UNDISTRIBUTED** | | |
| 130 | UNDISTRIBUTED ........................................................ | | –40,500 |
| | Foreign currency fluctuations ................................. | | [–12,500] |
| | Unobligated balances ............................................... | | [–28,000] |
| | **SUBTOTAL UNDISTRIBUTED** .......................... | | **–40,500** |
| | **TOTAL OPERATION AND MAINTE-NANCE, AIR FORCE RESERVE** ................ | **4,116,256** | **4,045,756** |
| | **OPERATION AND MAINTENANCE, AIR NA-TIONAL GUARD** | | |
| | **OPERATING FORCES** | | |
| 010 | AIRCRAFT OPERATIONS ............................................ | 2,498,675 | 2,478,675 |
| | Unjustified growth ................................................... | | [–20,000] |
| 020 | MISSION SUPPORT OPERATIONS ............................ | 656,714 | 656,714 |
| 030 | DEPOT PURCHASE EQUIPMENT MAINTENANCE | 1,171,901 | 1,171,901 |
| 040 | FACILITIES SUSTAINMENT, RESTORATION & MODERNIZATION ..................................................... | 370,188 | 370,188 |
| 050 | CONTRACTOR LOGISTICS SUPPORT AND SYS-TEM SUPPORT ............................................................ | 1,280,003 | 1,262,003 |
| | Unjustified growth ................................................... | | [–18,000] |
| 060 | BASE SUPPORT .......................................................... | 1,089,579 | 1,089,579 |
| 070 | CYBERSPACE SUSTAINMENT ................................... | 19,708 | 19,708 |

SEC. 4301. OPERATION AND MAINTENANCE
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|-----------------|----------------------|
| 080 | CYBERSPACE ACTIVITIES ......................................... | 49,476 | 49,476 |
|  | **SUBTOTAL OPERATING FORCES** ................. | **7,136,244** | **7,098,244** |
|  |  |  |  |
|  | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** |  |  |
| 090 | ADMINISTRATION ....................................................... | 68,417 | 68,417 |
| 100 | RECRUITING AND ADVERTISING ............................ | 49,033 | 49,033 |
|  | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** ................................... | **117,450** | **117,450** |
|  |  |  |  |
|  | **UNDISTRIBUTED** |  |  |
| 110 | UNDISTRIBUTED .......................................................... |  | –46,200 |
|  | Foreign currency fluctuations ................................. |  | [–24,300] |
|  | Unobligated balances ............................................... |  | [–21,900] |
|  | **SUBTOTAL UNDISTRIBUTED** .......................... |  | **–46,200** |
|  |  |  |  |
|  | **TOTAL OPERATION AND MAINTENANCE, AIR NATIONAL GUARD** .............. | **7,253,694** | **7,169,494** |
|  |  |  |  |
|  | **OPERATION AND MAINTENANCE, DEFENSE-WIDE** |  |  |
|  | **OPERATING FORCES** |  |  |
| 010 | JOINT CHIEFS OF STAFF .......................................... | 461,370 | 467,770 |
|  | Combatant Commander's Initiative Fund (CCIF)—AFRICOM and SOUTHCOM .............. |  | [10,000] |
|  | Unobligated balances ............................................... |  | [–3,600] |
| 020 | JOINT CHIEFS OF STAFF—JTEEP ........................... | 701,081 | 698,081 |
|  | Unjustified growth .................................................... |  | [–3,000] |
| 030 | JOINT CHIEFS OF STAFF—CYBER .......................... | 8,210 | 8,210 |
| 040 | OFFICE OF THE SECRETARY OF DEFENSE—MISO ........................................................................... | 252,480 | 252,480 |
| 060 | SPECIAL OPERATIONS COMMAND COMBAT DEVELOPMENT ACTIVITIES ...................................... | 2,012,953 | 2,012,953 |
| 070 | SPECIAL OPERATIONS COMMAND MAINTENANCE ...................................................................... | 1,210,930 | 1,182,630 |
|  | MQ–9 Unmanned Aerial Vehicle unjustified increase ................................................................... |  | [–4,000] |
|  | Program decrease ...................................................... |  | [–24,300] |
| 080 | SPECIAL OPERATIONS COMMAND MANAGEMENT/OPERATIONAL HEADQUARTERS .............. | 202,574 | 199,968 |
|  | Program decrease ...................................................... |  | [–2,606] |
| 090 | SPECIAL OPERATIONS COMMAND THEATER FORCES ...................................................................... | 3,346,004 | 3,337,278 |
|  | Program decrease ...................................................... |  | [–8,726] |
| 100 | SPECIAL OPERATIONS COMMAND CYBERSPACE ACTIVITIES ................................................................. | 49,757 | 49,757 |
| 110 | SPECIAL OPERATIONS COMMAND INTELLIGENCE ................................................................... | 1,391,402 | 1,405,402 |
|  | Program decrease ...................................................... |  | [–6,000] |
|  | Special Operations Command Intelligence increase in Non-Traditional ISR (SOF Digital Ecosystem POR) .................................................. |  | [20,000] |
| 120 | SPECIAL OPERATIONS COMMAND OPERATIONAL SUPPORT ................................................. | 1,438,967 | 1,419,975 |
|  | Program decrease ...................................................... |  | [–18,992] |
| 130 | CYBERSPACE OPERATIONS ....................................... | 1,318,614 | 1,323,614 |
|  | Internet Operations Management .......................... |  | [5,000] |
| 140 | USCYBERCOM HEADQUARTERS ............................. | 332,690 | 332,690 |
|  | **SUBTOTAL OPERATING FORCES** ................. | **12,727,032** | **12,690,808** |

137 STAT. 896          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|----------------|----------------------|
| | **TRAINING AND RECRUITING** | | |
| 150 | DEFENSE ACQUISITION UNIVERSITY .................... | 183,342 | 183,342 |
| 160 | JOINT CHIEFS OF STAFF ......................................... | 118,172 | 118,172 |
| 170 | SPECIAL OPERATIONS COMMAND/PROFESSIONAL DEVELOPMENT EDUCATION ................ | 33,855 | 33,855 |
| | **SUBTOTAL TRAINING AND RECRUITING** .. | **335,369** | **335,369** |
| | **ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** | | |
| 180 | CIVIL MILITARY PROGRAMS .................................... | 142,240 | 275,740 |
| | National Guard Youth Challenge ........................... | | [83,500] |
| | STARBASE ................................................................. | | [50,000] |
| 190 | DEFENSE CONTRACT AUDIT AGENCY—CYBER ... | 4,870 | 4,870 |
| 200 | DEFENSE CONTRACT AUDIT AGENCY ................... | 667,943 | 667,943 |
| 210 | DEFENSE CONTRACT MANAGEMENT AGENCY ... | 1,567,119 | 1,564,119 |
| | Unobligated balances ............................................... | | [–3,000] |
| 220 | DEFENSE CONTRACT MANAGEMENT AGENCY—CYBER ...................................................................... | 30,279 | 30,279 |
| 230 | DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY ............................................................ | 1,062,123 | 1,027,123 |
| | Unjustified growth ................................................... | | [–35,000] |
| 250 | DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY—CYBER ............................................ | 9,835 | 9,835 |
| 260 | DEFENSE HUMAN RESOURCES ACTIVITY—CYBER ...................................................................... | 27,517 | 27,517 |
| 270 | DEFENSE HUMAN RESOURCES ACTIVITY ........... | 1,033,789 | 988,789 |
| | Underexecution ........................................................ | | [–45,000] |
| 300 | DEFENSE INFORMATION SYSTEMS AGENCY ....... | 2,567,698 | 2,532,798 |
| | Program decrease ..................................................... | | [–25,000] |
| | Unobligated balances ............................................... | | [–9,900] |
| 310 | DEFENSE INFORMATION SYSTEMS AGENCY—CYBER ...................................................................... | 526,893 | 526,893 |
| 320 | DEFENSE LEGAL SERVICES AGENCY .................... | 241,779 | 239,779 |
| | Historical unobligated balances .............................. | | [–2,000] |
| 330 | DEFENSE LOGISTICS AGENCY ................................ | 446,731 | 446,731 |
| 340 | DEFENSE MEDIA ACTIVITY ...................................... | 246,840 | 246,840 |
| 360 | DEFENSE POW/MIA OFFICE ..................................... | 195,959 | 195,959 |
| 370 | DEFENSE SECURITY COOPERATION AGENCY ..... | 2,379,100 | 2,259,100 |
| | Program decrease—Border Security ........................ | | [–120,000] |
| 380 | DEFENSE TECHNOLOGY SECURITY ADMINISTRATION ................................................................... | 41,722 | 41,722 |
| 390 | DEFENSE THREAT REDUCTION AGENCY ............. | 984,272 | 974,272 |
| | Program decrease ..................................................... | | [–10,000] |
| 410 | DEFENSE THREAT REDUCTION AGENCY—CYBER ...................................................................... | 70,548 | 70,548 |
| 420 | DEPARTMENT OF DEFENSE EDUCATION ACTIVITY ......................................................................... | 3,451,625 | 3,514,625 |
| | Historical unobligated balances .............................. | | [–7,000] |
| | Impact Aid ................................................................. | | [50,000] |
| | Impact Aid Students with Disabilities ................... | | [20,000] |
| 430 | MISSILE DEFENSE AGENCY ..................................... | 564,078 | 564,078 |
| 440 | OFFICE OF THE LOCAL DEFENSE COMMUNITY COOPERATION ......................................................... | 118,216 | 118,216 |
| 480 | OFFICE OF THE SECRETARY OF DEFENSE—CYBER ...................................................................... | 92,176 | 92,176 |
| 490 | OFFICE OF THE SECRETARY OF DEFENSE .......... | 2,676,416 | 2,628,173 |
| | Bien Hoa dioxin cleanup ......................................... | | [15,000] |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 897

**SEC. 4301. OPERATION AND MAINTENANCE**
(In Thousands of Dollars)

| Line | Item | FY 2024 Request | Conference Authorized |
|------|------|-----------------|----------------------|
| | Centers for Disease Control and Prevention Nation-wide human health assessment .................. | | [5,000] |
| | Legacy Resource Management Program ............... | | [2,000] |
| | Program decrease .................................................... | | [–91,443] |
| | Readiness and Environmental Protection Integration program ....................................................... | | [20,200] |
| | United States Telecommunications Training Institute ...................................................................... | | [1,000] |
| 530 | WASHINGTON HEADQUARTERS SERVICES .......... | 440,947 | 430,947 |
| | Program decrease .................................................... | | [–10,000] |
| 530A | CLASSIFIED PROGRAMS ........................................... | 20,114,447 | 20,043,479 |
| | Classified adjustment ............................................. | | [–70,968] |
| | **SUBTOTAL ADMINISTRATION AND SERVICE-WIDE ACTIVITIES** ................................... | **39,705,162** | **39,522,551** |
| | | | |
| | **UNDISTRIBUTED** | | |
| 540 | UNDISTRIBUTED ........................................................ | | –15,000 |
| | Historical unobligated balances .............................. | | [–15,000] |
| | **SUBTOTAL UNDISTRIBUTED** .......................... | | **–15,000** |
| | | | |
| | **TOTAL   OPERATION   AND   MAINTENANCE, DEFENSE-WIDE** ............................ | **52,767,563** | **52,533,728** |
| | | | |
| | **UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES** | | |
| | **ADMINISTRATION AND ASSOCIATED ACTIVITIES** | | |
| 010 | US COURT OF APPEALS FOR THE ARMED FORCES, DEFENSE ..................................................... | 16,620 | 16,620 |
| | **SUBTOTAL ADMINISTRATION AND ASSOCIATED ACTIVITIES** ...................................... | **16,620** | **16,620** |
| | | | |
| | **TOTAL UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES** ......... | **16,620** | **16,620** |
| | | | |
| | **DEPARTMENT OF DEFENSE ACQUISITION WORKFORCE DEVELOPMENT FUND** | | |
| | **ACQUISITION WORKFORCE DEVELOPMENT** | | |
| 010 | ACQ WORKFORCE DEV FD .......................................... | 54,977 | 54,977 |
| | **SUBTOTAL   ACQUISITION   WORKFORCE DEVELOPMENT** ................................................ | **54,977** | **54,977** |
| | | | |
| | **TOTAL DEPARTMENT OF DEFENSE ACQUISITION   WORKFORCE   DEVELOPMENT FUND** ................................................. | **54,977** | **54,977** |
| | | | |
| | **OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID** | | |
| | **HUMANITARIAN ASSISTANCE** | | |
| 010 | OVERSEAS   HUMANITARIAN,   DISASTER   AND CIVIC AID ................................................................. | 114,900 | 114,900 |
| | **SUBTOTAL HUMANITARIAN ASSISTANCE** | **114,900** | **114,900** |
| | | | |
| | **TOTAL OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID** ............................. | **114,900** | **114,900** |
| | | | |
| | **COOPERATIVE   THREAT   REDUCTION   ACCOUNT** | | |
| 010 | COOPERATIVE THREAT REDUCTION ..................... | 350,999 | 350,999 |

137 STAT. 898            PUBLIC LAW 118–31—DEC. 22, 2023

| | SEC. 4301. OPERATION AND MAINTENANCE (In Thousands of Dollars) | | |
|---|---|---|---|
| Line | Item | FY 2024 Request | Conference Authorized |
| | **SUBTOTAL COOPERATIVE THREAT RE-DUCTION** ......................................................... | **350,999** | **350,999** |
| | **TOTAL COOPERATIVE THREAT REDUC-TION ACCOUNT** ........................................... | **350,999** | **350,999** |
| | **ENVIRONMENTAL RESTORATION, ARMY** **DEPARTMENT OF THE ARMY** | | |
| 050 | ENVIRONMENTAL RESTORATION, ARMY ............. | 198,760 | 198,760 |
| | **SUBTOTAL DEPARTMENT OF THE ARMY** .. | **198,760** | **198,760** |
| | **TOTAL ENVIRONMENTAL RESTORA-TION, ARMY** .................................................. | **198,760** | **198,760** |
| | **ENVIRONMENTAL RESTORATION, NAVY** **DEPARTMENT OF THE NAVY** | | |
| 060 | ENVIRONMENTAL RESTORATION, NAVY ............. | 335,240 | 335,240 |
| | **SUBTOTAL DEPARTMENT OF THE NAVY** ... | **335,240** | **335,240** |
| | **TOTAL ENVIRONMENTAL RESTORA-TION, NAVY** .................................................. | **335,240** | **335,240** |
| | **ENVIRONMENTAL RESTORATION, AIR FORCE** **DEPARTMENT OF THE AIR FORCE** | | |
| 070 | ENVIRONMENTAL RESTORATION, AIR FORCE .... | 349,744 | 349,744 |
| | **SUBTOTAL DEPARTMENT OF THE AIR FORCE** ............................................................... | **349,744** | **349,744** |
| | **TOTAL ENVIRONMENTAL RESTORA-TION, AIR FORCE** ......................................... | **349,744** | **349,744** |
| | **ENVIRONMENTAL RESTORATION, DEFENSE** **DEFENSE-WIDE** | | |
| 080 | ENVIRONMENTAL RESTORATION, DEFENSE ....... | 8,965 | 8,965 |
| | **SUBTOTAL DEFENSE-WIDE** ............................ | **8,965** | **8,965** |
| | **TOTAL ENVIRONMENTAL RESTORA-TION, DEFENSE** ............................................ | **8,965** | **8,965** |
| | **ENVIRONMENTAL RESTORATION, FOR-MERLY USED DEFENSE SITES** **DEFENSE-WIDE** | | |
| 090 | ENVIRONMENTAL RESTORATION FORMERLY USED SITES ................................................................ | 232,806 | 232,806 |
| | **SUBTOTAL DEFENSE-WIDE** ............................ | **232,806** | **232,806** |
| | **TOTAL ENVIRONMENTAL RESTORA-TION, FORMERLY USED DEFENSE SITES** ............................................................. | **232,806** | **232,806** |
| | **TOTAL OPERATION & MAINTENANCE** .... | **290,071,293** | **288,822,629** |

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 899

# TITLE XLIV—MILITARY PERSONNEL

### SEC. 4401. MILITARY PERSONNEL.

**SEC. 4401. MILITARY PERSONNEL**
**(In Thousands of Dollars)**

| Item | FY 2024 Request | Conference Authorized |
|---|---|---|
| Military Personnel Appropriations | 168,320,510 | 166,211,649 |
| Air Force end strength underexecution | | [–564,000] |
| Air National Guard AGR end strength underexecution | | [–33,000] |
| Army, Underexecution of strength | | [–787,901] |
| Marine Corps Reserve, Underexecution of strength | | [–24,315] |
| Navy end strength underexecution | | [–600,000] |
| Navy Reserve, Projected underexecution | | [–10,000] |
| Unobligated balances | | [–89,645] |
| Medicare-Eligible Retiree Health Care Fund Contributions | 10,553,456 | 10,553,456 |
| **TOTAL, Military Personnel** | **178,873,966** | **176,765,105** |

# TITLE XLV—OTHER AUTHORIZATIONS

### SEC. 4501. OTHER AUTHORIZATIONS.

**SEC. 4501. OTHER AUTHORIZATIONS**
**(In Thousands of Dollars)**

| Program Title | FY 2024 Request | Conference Authorized |
|---|---|---|
| NATIONAL DEFENSE STOCKPILE TRANSACTION FUND | | |
| DEFENSE STOCKPILE | 7,629 | 7,629 |
| TOTAL NATIONAL DEFENSE STOCKPILE TRANSACTION FUND | **7,629** | **7,629** |
| | | |
| WORKING CAPITAL FUND, ARMY | | |
| ARMY ARSENALS INITIATIVE | 27,551 | 27,551 |
| ARMY SUPPLY MANAGEMENT | 1,662 | 1,662 |
| TOTAL WORKING CAPITAL FUND, ARMY | **29,213** | **29,213** |
| | | |
| WORKING CAPITAL FUND, AIR FORCE TRANSPORTATION | | |
| SUPPLIES AND MATERIALS | 83,587 | 83,587 |
| TOTAL WORKING CAPITAL FUND, AIR FORCE | **83,587** | **83,587** |
| | | |
| WORKING CAPITAL FUND, DEFENSE-WIDE | | |
| DEFENSE AUTOMATION & PRODUCTION SERVICES | 4 | 4 |
| ENERGY MANAGEMENT—DEFENSE | 114,663 | 114,663 |
| TOTAL WORKING CAPITAL FUND, DEFENSE-WIDE | **114,667** | **114,667** |
| | | |
| WORKING CAPITAL FUND, DEFENSE COMMISSARY AGENCY | | |
| WORKING CAPITAL FUND—DECA | 1,447,612 | 1,447,612 |
| TOTAL WORKING CAPITAL FUND, DEFENSE COMMISSARY AGENCY | **1,447,612** | **1,447,612** |
| | | |
| CHEMICAL AGENTS AND MUNITIONS DESTRUCTION, DEFENSE | | |
| OPERATION AND MAINTENANCE | 89,284 | 89,284 |

137 STAT. 900          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4501. OTHER AUTHORIZATIONS**
(In Thousands of Dollars)

| Program Title | FY 2024 Request | Conference Authorized |
|---|---|---|
| RESEARCH, DEVELOPMENT, TEST, AND EVALUATION ... | 1,002,560 | 1,002,560 |
| **TOTAL CHEMICAL AGENTS AND MUNITIONS DE-STRUCTION, DEFENSE** ............................................... | **1,091,844** | **1,091,844** |
| | | |
| **DRUG INTERDICTION AND COUNTER-DRUG ACTIVI-TIES, DEFENSE** | | |
| COUNTER-NARCOTICS SUPPORT ........................................... | 643,848 | 648,848 |
| Global Trader in the Office of Naval Intelligence Maritime Intelligence Support ................................... | | [5,000] |
| DRUG DEMAND REDUCTION PROGRAM ............................. | 134,313 | 136,813 |
| Young Marines Program .............................................. | | [2,500] |
| NATIONAL GUARD COUNTER-DRUG PROGRAM ................. | 102,272 | 122,272 |
| Program increase ........................................................... | | [20,000] |
| NATIONAL GUARD COUNTER-DRUG SCHOOLS ................. | 5,993 | 10,993 |
| Program increase ........................................................... | | [5,000] |
| **TOTAL DRUG INTERDICTION AND COUNTER-DRUG ACTIVITIES, DEFENSE** .................................... | **886,426** | **918,926** |
| | | |
| **OFFICE OF THE INSPECTOR GENERAL** | | |
| OFFICE OF THE INSPECTOR GENERAL—O&M ................... | 518,919 | 518,919 |
| OFFICE OF THE INSPECTOR GENERAL—CYBER .............. | 1,948 | 1,948 |
| OFFICE OF THE INSPECTOR GENERAL—RDT&E .............. | 3,400 | 3,400 |
| OFFICE OF THE INSPECTOR GENERAL—PROCURE-MENT ..................................................................................... | 1,098 | 1,098 |
| **TOTAL OFFICE OF THE INSPECTOR GENERAL** .... | **525,365** | **525,365** |
| | | |
| **DEFENSE HEALTH PROGRAM** | | |
| IN-HOUSE CARE ....................................................................... | 10,044,342 | 9,950,353 |
| Baseline adjustment .................................................... | | [–93,989] |
| PRIVATE SECTOR CARE ........................................................ | 19,893,028 | 19,867,877 |
| Unjustified growth ........................................................ | | [–25,151] |
| CONSOLIDATED HEALTH SUPPORT ..................................... | 2,007,012 | 2,000,994 |
| Historical underexecution ........................................... | | [–6,018] |
| INFORMATION MANAGEMENT .............................................. | 2,327,816 | 2,327,816 |
| MANAGEMENT ACTIVITIES .................................................. | 347,446 | 347,446 |
| EDUCATION AND TRAINING ................................................ | 336,111 | 343,111 |
| TriService Nursing Research Program ........................ | | [7,000] |
| BASE OPERATIONS/COMMUNICATIONS .............................. | 2,144,551 | 2,142,051 |
| Historical underexecution ........................................... | | [–2,500] |
| R&D RESEARCH ...................................................................... | 40,311 | 50,311 |
| Clinical study on treatment with psychedelic sub-stances ......................................................................... | | [10,000] |
| R&D EXPLORATRY DEVELOPMENT ...................................... | 178,892 | 178,892 |
| R&D ADVANCED DEVELOPMENT .......................................... | 327,040 | 327,040 |
| R&D DEMONSTRATION/VALIDATION ................................... | 172,351 | 172,351 |
| R&D ENGINEERING DEVELOPMENT .................................... | 107,753 | 107,753 |
| R&D MANAGEMENT AND SUPPORT ..................................... | 87,096 | 87,096 |
| R&D CAPABILITIES ENHANCEMENT ................................... | 18,330 | 18,330 |
| PROC INITIAL OUTFITTING ................................................. | 22,344 | 22,344 |
| PROC REPLACEMENT & MODERNIZATION ......................... | 238,435 | 238,435 |
| PROC JOINT OPERATIONAL MEDICINE INFORMATION SYSTEM ................................................................................... | 29,537 | 29,537 |
| PROC MILITARY HEALTH SYSTEM—DESKTOP TO DATACENTER ......................................................................... | 74,055 | 74,055 |
| PROC DOD HEALTHCARE MANAGEMENT SYSTEM MOD-ERNIZATION .......................................................................... | 17,510 | 17,510 |
| **TOTAL DEFENSE HEALTH PROGRAM** ...................... | **38,413,960** | **38,303,302** |
| | | |
| **TOTAL OTHER AUTHORIZATIONS** ............................. | **42,600,303** | **42,522,145** |

# TITLE XLVI—MILITARY CONSTRUCTION

Military Construction Authorization Act for Fiscal Year 2024.

## SEC. 4601. MILITARY CONSTRUCTION.

**SEC. 4601. MILITARY CONSTRUCTION**
(In Thousands of Dollars)

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---------|-------------------------------|---------------|-----------------|----------------------|
| **MILITARY CONSTRUCTION** | | | | |
| **ARMY** | | | | |
| | Alabama | | | |
| Army | Anniston Army Depot | ACCESS CONTROL POINT (P&D) ........ | 0 | 5,500 |
| Army | Anniston Army Depot | COMPONENT REBUILD SHOP (P&D) | 0 | 8,100 |
| Army | Anniston Army Depot | OPEN STORAGE (P&D) .......................... | 0 | 270 |
| Army | Anniston Army Depot | VEHICLE PAINT SHOP (P&D) ............. | 0 | 2,900 |
| Army | Fort Novosel | COST TO COMPLETE: ADV INDIVIDUAL TRAINING BARRACKS COMPLEX. | 0 | 41,200 |
| Army | Redstone Arsenal | SUBSTATION ........................................... | 50,000 | 50,000 |
| | Alaska | | | |
| Army | Fort Wainwright | COST TO COMPLETE: ENLISTED UNACCOMPANIED PERS HSG. | 34,000 | 34,000 |
| Army | Fort Wainwright | SOLDIER PERFORMANCE READINESS CENTER (P&D). | 0 | 7,900 |
| | Florida | | | |
| Army | Camp Bull Simons | CHILD DEVELOPMENT CENTER ........ | 0 | 0 |
| | Georgia | | | |
| Army | Fort Eisenhower | CYBER INSTRUCTIONAL FACILITY (CLASSROOMS). | 163,000 | 73,000 |
| Army | Fort Moore | CAMP MERRILL AST BARRACKS (P&D). | 0 | 1,320 |
| Army | Fort Stewart/Hunter Army Airfield | COMBAT AVIATION BRIGADE GSAB HANGAR (P&D). | 0 | 6,400 |
| Army | Fort Stewart/Hunter Army Airfield | MILITARY INTELLIGENCE BATTALION HANGAR (P&D). | 0 | 2,220 |
| | Germany | | | |
| Army | Grafenwoehr | AUTOMATED MULTIPURPOSE MACHINE GUN RANGE. | 10,400 | 10,400 |
| Army | Hohenfels | SIMULATIONS CENTER ......................... | 56,000 | 56,000 |
| | Hawaii | | | |
| Army | Aliamanu Military Reservation | WATER STORAGE TANK ....................... | 20,000 | 20,000 |
| Army | Fort Shafter | CLEARWELL AND BOOSTER PUMP ... | 0 | 23,000 |
| Army | Helemano Military Reservation | WELLS AND STORAGE TANKS ........... | 0 | 33,000 |
| Army | Schofield Barracks | ELEVATED TANK AND DISTRIBUTION LINES. | 0 | 16,000 |
| Army | Schofield Barracks | WATER STORAGE TANK ....................... | 0 | 21,000 |
| Army | Wheeler Army Airfield | AIR TRAFFIC CONTROL TOWER (P&D). | 0 | 5,400 |
| | Indiana | | | |
| Army | Crane Army Ammunition Plant | EARTH COVERED MAGAZINES (P&D) | 0 | 1,195 |
| | Kansas | | | |
| Army | Fort Riley | AIR TRAFFIC CONTROL TOWER (P&D). | 0 | 1,600 |
| Army | Fort Riley | AIRCRAFT MAINTENANCE HANGER | 105,000 | 105,000 |
| Army | Fort Riley | BOB DOLE INTERMODAL RAILYARD IMPROVEMENTS (P&D). | 0 | 1,110 |
| | Kentucky | | | |

**SEC. 4601. MILITARY CONSTRUCTION**
(In Thousands of Dollars)

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Army | Blue Grass Army Depot | SMALL ARMS MODERNIZATION (P&D). | 0 | 3,300 |
| Army | Fort Campbell | AIR TRAFFIC CONTROL TOWER (P&D). | 0 | 2,500 |
| Army | Fort Campbell | MULTIPURPOSE TRAINING RANGE .. | 38,000 | 39,000 |
| | Kwajalein | | | |
| Army | Kwajalein Atoll | COST TO COMPLETE: PIER ................. | 0 | 0 |
| | Louisiana | | | |
| Army | Fort Johnson | MULTIPURPOSE ATHLETIC FIELD .... | 0 | 13,400 |
| | Massachusetts | | | |
| Army | Soldier Systems Center Natick | BARRACKS ADDITION ........................... | 18,500 | 18,500 |
| | Michigan | | | |
| Army | Detroit Arsenal | GROUND TRANSPORT EQUIPMENT BUILDING. | 72,000 | 72,000 |
| Army | Detroit Arsenal | MANNED/UNMANNED TACTICAL VE-HICLE LAB (P&D). | 0 | 2,400 |
| | New Mexico | | | |
| Army | White Sands Mis-sile Range | J-DETC DIRECTED ENERGY FACIL-ITY (P&D). | 0 | 5,500 |
| | New York | | | |
| Army | Watervliet Arse-nal | TANK FARM (P&D) ................................ | 0 | 160 |
| | North Carolina | | | |
| Army | Fort Liberty | AIRCRAFT MAINTENANCE HANGAR | 0 | 61,000 |
| Army | Fort Liberty | AUTOMATED RECORD FIRE RANGE | 19,500 | 21,000 |
| Army | Fort Liberty | BARRACKS ............................................. | 50,000 | 50,000 |
| Army | Fort Liberty | BARRACKS (FACILITY PROTO-TYPING). | 85,000 | 85,000 |
| Army | Fort Liberty | CHILD DEVELOPMENT CENTER ........ | 0 | 36,000 |
| | Oklahoma | | | |
| Army | McAlester Army Ammunition Plant | WATER TREATMENT PLANT (P&D) ... | 0 | 1,194 |
| | Pennsylvania | | | |
| Army | Letterkenny Army Depot | ANECHOIC CHAMBER (P&D) .............. | 0 | 275 |
| Army | Letterkenny Army Depot | GUIDED MISSILE MAINTENANCE BUILDING. | 89,000 | 89,000 |
| Army | Tobyhanna Army Depot | HELIPAD (P&D) ....................................... | 0 | 311 |
| Army | Tobyhanna Army Depot | RADAR MAINTENANCE SHOP (P&D) | 0 | 259 |
| | Poland | | | |
| Army | Various Locations | PLANNING & DESIGN ........................... | 0 | 25,710 |
| | South Carolina | | | |
| Army | Fort Jackson | COST TO COMPLETE: RECEPTION BARRACKS COMPLEX, PHASE 2. | 0 | 66,000 |
| | Texas | | | |
| Army | Fort Bliss | COLLECTIVE TRAINING BARRACKS (P&D). | 0 | 8,000 |
| Army | Fort Bliss | RAIL YARD ............................................... | 74,000 | 74,000 |
| Army | Fort Cavazos | BARRACKS (P&D) ................................... | 0 | 20,000 |
| Army | Fort Cavazos | TACTICAL EQUIPMENT MAINTE-NANCE FACILITIES (P&D). | 0 | 5,800 |
| Army | Red River Army Depot | COMPONENT REBUILD SHOP ............. | 113,000 | 46,400 |
| Army | Red River Army Depot | NON-DESTRUCTIVE TESTING FACIL-ITY (P&D). | 0 | 280 |
| Army | Red River Army Depot | STANDBY GENERATOR (P&D) ............. | 0 | 270 |
| | Virginia | | | |
| Army | Fort Belvoir | EQUINE TRAINING FACILITY (P&D) | 0 | 4,000 |
| | Washington | | | |
| Army | Joint Base Lewis-McChord | BARRACKS ............................................... | 100,000 | 100,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 903

**SEC. 4601. MILITARY CONSTRUCTION**
(In Thousands of Dollars)

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Army | Joint Base Lewis-McChord | BARRACKS (P&D) ................................... | 0 | 7,900 |
| Army | Joint Base Lewis-McChord | VEHICLE MAINTENANCE SHOP (P&D). | 0 | 7,500 |
| Army | Yakima Training Center | AUTOMATED INFANTRY PLATOON BATTLE COURSE (P&D). | 0 | 960 |
| | Worldwide Unspecified | | | |
| Army | Unspecified Worldwide Locations | BARRACKS REPLACEMENT FUND (P&D). | 0 | 65,000 |
| Army | Unspecified Worldwide Locations | CHILD DEVELOPMENT CENTER PLANNING & DESIGN. | 0 | 20,000 |
| Army | Unspecified Worldwide Locations | COST TO COMPLETE ARMY ................ | 0 | 0 |
| Army | Unspecified Worldwide Locations | HOST NATION SUPPORT ...................... | 26,000 | 26,000 |
| Army | Unspecified Worldwide Locations | LAB INFRASTRUCTURE PLANNING & DESIGN. | 0 | 30,000 |
| Army | Unspecified Worldwide Locations | ORGANIC INDUSTRIAL BASE PLANNING & DESIGN. | 0 | 5,000 |
| Army | Unspecified Worldwide Locations | PLANNING & DESIGN ........................... | 270,875 | 270,875 |
| Army | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 76,280 | 86,280 |
| Army | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 15,000 |
| | **Subtotal Military Construction, Army** ....................................................... | | **1,470,555** | **1,912,289** |
| **NAVY** | | | | |
| | Arizona | | | |
| Navy | Marine Corps Air Station Yuma | WATER TREATMENT PLANT (P&D) ... | 0 | 8,900 |
| | Australia | | | |
| Navy | Royal Australian Air Force Base Darwin | PDI: AIRCRAFT PARKING APRON (INC). | 134,624 | 134,624 |
| | California | | | |
| Navy | Marine Corps Air Ground Combat Center Twentynine Palms | COMMUNICATIONS TOWERS .............. | 42,100 | 42,100 |
| Navy | Marine Corps Base Camp Pendleton | FIRE/EMERGENCY RESPONSE STATION (53 AREA) REPLACEMENT (P&D). | 0 | 2,683 |
| Navy | Naval Base Coronado | CHILD DEVELOPMENT CENTER (P&D). | 0 | 6,200 |
| Navy | Naval Base San Diego | CHILD DEVELOPMENT CENTER (P&D). | 0 | 5,600 |
| Navy | Port Hueneme | LABORATORY COMPOUND FACILITIES IMPROVEMENTS. | 110,000 | 70,000 |
| | Connecticut | | | |
| Navy | Naval Submarine Base New London | SUBMARINE PIER 31 EXTENSION ..... | 112,518 | 36,718 |

137 STAT. 904          PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
| Navy | Naval Submarine Base New London | WEAPONS MAGAZINE & ORDNANCE OPERATIONS FAC.. | 219,200 | 19,200 |
| | District of Columbia | | | |
| Navy | Marine Barracks Washington (8th Street and I) | BACHELOR ENLISTED QUARTERS & SUPPORT FACILITY. | 131,800 | 16,800 |
| Navy | Naval Support Activity | ELECTROMAGNETIC & CYBER COUNTERMEASURES LAB (P&D). | 0 | 40,000 |
| | Djibouti | | | |
| Navy | Camp Lemonnier | ELECTRICAL POWER PLANT .............. | 0 | 25,000 |
| | Florida | | | |
| Navy | Naval Air Station Whiting Field | ADVANCED HELICOPTER TRAINING SYSTEM HANGAR. | 0 | 50,000 |
| | Georgia | | | |
| Navy | Marine Corps Logistics Base Albany | CONSOLIDATED COMMUNICATION FACILITY. | 0 | 64,000 |
| | Guam | | | |
| Navy | Andersen Air Force Base | PDI: CHILD DEVELOPMENT CENTER | 105,220 | 55,220 |
| Navy | Andersen Air Force Base | PDI: JOINT CONSOL. COMM. CENTER (INC). | 107,000 | 107,000 |
| Navy | Joint Region Marianas | PDI: JOINT COMMUNICATION UPGRADE (INC). | 292,830 | 31,330 |
| Navy | Joint Region Marianas | PDI: MISSILE INTEGRATION TEST FACILITY. | 174,540 | 56,140 |
| Navy | Naval Base Guam | PDI: 9TH ESB TRAINING COMPLEX .. | 23,380 | 27,536 |
| Navy | Naval Base Guam | PDI: ARTILLERY BATTERY FACILITIES. | 137,550 | 137,550 |
| Navy | Naval Base Guam | PDI: CONSOLIDATED MEB HQ/NCIS PHII. | 19,740 | 19,740 |
| Navy | Naval Base Guam | PDI: RECREATION CENTER ................. | 34,740 | 34,740 |
| Navy | Naval Base Guam | PDI: RELIGIOUS MINISTRY SERVICES FACILITY. | 46,350 | 46,350 |
| Navy | Naval Base Guam | PDI: SATELLITE COMMUNICATIONS FACILITY (INC). | 166,159 | 56,159 |
| Navy | Naval Base Guam | PDI: TRAINING CENTER ....................... | 89,640 | 89,640 |
| | Hawaii | | | |
| Navy | Joint Base Pearl Harbor-Hickam | DRY DOCK 3 REPLACEMENT (INC) ... | 1,318,711 | 1,318,711 |
| Navy | Joint Base Pearl Harbor-Hickam | WASTEWATER TREATMENT PLANT .. | 0 | 15,000 |
| Navy | Joint Base Pearl Harbor-Hickam | WATERFRONT PRODUCTION FACILITY (P&D). | 0 | 60,000 |
| Navy | Marine Corps Base Kaneohe Bay | WATER RECLAMATION FACILITY COMPLIANCE UPGRADE. | 0 | 134,505 |
| | Italy | | | |
| Navy | Naval Air Station Sigonella | EDI: ORDNANCE MAGAZINES ............. | 77,072 | 77,072 |
| | Maine | | | |
| Navy | Portsmouth Naval Shipyard | MULTI-MISSION DRYDOCK #1 EXTENSION (INC). | 544,808 | 544,808 |
| | Maryland | | | |
| Navy | Fort Meade | CYBERSECURITY OPERATIONS FACILITY. | 186,480 | 60,580 |
| Navy | Naval Air Station Patuxent River | AIRCRAFT DEVELOPMENT AND MAINTENANCE FACILITIES. | 141,700 | 58,000 |
| Navy | Naval Support Activity Bethesda | CONSTRUCT JOINT NAVY/DHA FIRE STATION (P&D). | 0 | 3,000 |
| | North Carolina | | | |
| Navy | Marine Corps Air Station Cherry Point | 2D LAAD MAINTENANCE AND OPERATIONS FACILITIES. | 0 | 45,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 905

**SEC. 4601. MILITARY CONSTRUCTION**
(In Thousands of Dollars)

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Navy | Marine Corps Air Station Cherry Point | AIRCRAFT MAINTENANCE HANGAR (INC). | 19,529 | 19,529 |
| Navy | Marine Corps Air Station Cherry Point | MAINTENANCE FACILITY & MARINE AIR GROUP HQS. | 125,150 | 35,150 |
| Navy | Marine Corps Base Camp Lejeune | 10TH MARINES MAINTENANCE & OPERATIONS COMPLEX. | 0 | 66,270 |
| Navy | Marine Corps Base Camp Lejeune | AMPHIBIOUS COMBAT VEHICLE SHELTERS. | 0 | 32,890 |
| Navy | Marine Corps Base Camp Lejeune | CORROSION REPAIR FACILITY REPLACEMENT. | 0 | 45,000 |
| | Pennsylvania | | | |
| Navy | Naval Surface Warfare Center Philadelphia | AI MACHINERY CONTROL DEVELOPMENT CENTER. | 0 | 65,200 |
| | Virginia | | | |
| Navy | Dam Neck Annex | MARITIME SURVEILLANCE SYSTEM FACILITY. | 109,680 | 23,680 |
| Navy | Joint Expeditionary Base Little Creek—Fort Story | CHILD DEVELOPMENT CENTER ........ | 35,000 | 57,000 |
| Navy | Marine Corps Base Quantico | WATER TREATMENT PLANT ............... | 127,120 | 37,120 |
| Navy | Naval Station Norfolk | CHILD DEVELOPMENT CENTER ........ | 43,600 | 47,200 |
| Navy | Naval Station Norfolk | MQ–25 AIRCRAFT LAYDOWN FACILITIES. | 114,495 | 11,495 |
| Navy | Naval Station Norfolk | SUBMARINE PIER 3 (INC) .................... | 99,077 | 99,077 |
| Navy | Naval Weapons Station Yorktown | WEAPONS MAGAZINES ........................ | 221,920 | 46,920 |
| Navy | Norfolk Naval Shipyard | DRY DOCK SALTWATER SYSTEM FOR CVN–78 (INC). | 81,082 | 81,082 |
| | Washington | | | |
| Navy | Naval Air Station Whidbey Island | E/A–18G AIRCRAFT REGIONAL SERVICE FACILITY (P&D). | 0 | 11,100 |
| Navy | Naval Base Kitsap | ALTERNATE POWER TRANSMISSION LINE. | 0 | 19,000 |
| Navy | Naval Base Kitsap | ARMORED FIGHTING VEHICLE SUPPORT FACILITY. | 0 | 31,000 |
| Navy | Naval Base Kitsap | SHIPYARD ELECTRICAL BACKBONE | 195,000 | 15,000 |
| | Worldwide Unspecified | | | |
| Navy | Unspecified Worldwide Locations | BARRACKS REPLACEMENT FUND (P&D). | 0 | 75,000 |
| Navy | Unspecified Worldwide Locations | INDOPACOM PLANNING & DESIGN .. | 0 | 69,000 |
| Navy | Unspecified Worldwide Locations | SIOP (P&D) .............................................. | 0 | 50,000 |
| Navy | Unspecified Worldwide Locations | CHILD DEVELOPMENT CENTER PLANNING & DESIGN. | 0 | 20,000 |
| Navy | Unspecified Worldwide Locations | LAB INFRASTRUCTURE PLANNING & DESIGN. | 0 | 30,000 |

137 STAT. 906          PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
| Navy | Unspecified Worldwide Locations | NAVY SHORE UTILITY INFRASTRUC-TURE (P&D). | 0 | 85,000 |
| Navy | Unspecified Worldwide Locations | PLANNING & DESIGN ........................... | 599,942 | 599,942 |
| Navy | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 34,430 | 44,430 |
| Navy | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 15,000 |
| Navy | Unspecified Worldwide Locations | USMC MILITARY CONSTRUCTION PLANNING & DESIGN. | 0 | 48,749 |
| Navy | Unspecified Worldwide Locations | USMC UNSPECIFIED MINOR MILI-TARY CONSTRUCTION. | 0 | 30,000 |
| | Subtotal Military Construction, Navy ....................................................... | | 6,022,187 | 5,310,740 |
| **AIR FORCE** | | | | |
| | Alaska | | | |
| Air Force | Eielson Air Force Base | COAL THAW SHED ADDITION (P&D) | 0 | 1,500 |
| Air Force | Eielson Air Force Base | CONSOLIDATED MUNITIONS COM-PLEX (P&D). | 0 | 1,200 |
| Air Force | Eielson Air Force Base | FIRE STATION (P&D) ............................ | 0 | 1,700 |
| Air Force | Eielson Air Force Base | JOINT MOBILITY CENTER EXPAN-SION (P&D). | 0 | 3,000 |
| Air Force | Eielson Air Force Base | JOINT PACIFIC ALASKA RANGE COMPLEX (JPARC) OPS FACILITY (P&D). | 0 | 1,400 |
| Air Force | Eielson Air Force Base | PERMANENT PARTY DORM (P&D) ..... | 0 | 9,500 |
| Air Force | Joint Base Elmen-dorf-Richardson | COMBAT ALERT CELL (P&D) .............. | 0 | 18,100 |
| Air Force | Joint Base Elmen-dorf-Richardson | EXTEND RUNWAY 16/34 (INC 3) ........ | 107,500 | 107,500 |
| Air Force | Joint Base Elmen-dorf-Richardson | PRECISION GUIDED MISSILE COM-PLEX (P&D). | 0 | 6,100 |
| | Arizona | | | |
| Air Force | Luke Air Force Base | CHILD DEVELOPMENT CENTER (P&D). | 0 | 2,700 |
| Air Force | Luke Air Force Base | GILA BEND (P&D) ................................... | 0 | 2,600 |
| | Australia | | | |
| Air Force | Royal Australian Air Force Base Darwin | PDI: SQUADRON OPERATIONS FA-CILITY. | 26,000 | 26,000 |
| Air Force | Royal Australian Air Force Base Tindal | PDI: AIRCRAFT MAINTENANCE SUP-PORT FACILITY. | 17,500 | 17,500 |
| Air Force | Royal Australian Air Force Base Tindal | PDI: SQUADRON OPERATIONS FA-CILITY. | 20,000 | 20,000 |
| Air Force | Royal Australian Air Force Base Tindal | PDI: BOMBER APRON ........................... | 93,000 | 93,000 |
| | Florida | | | |
| Air Force | Eglin Air Force Base | LRSO HARDWARE SOFTWARE DE-VELOPMENT & TEST FACILITY. | 0 | 15,500 |
| Air Force | MacDill Air Force Base | KC–46A ADAL AIRCRAFT CORRO-SION CONTROL. | 25,000 | 25,000 |
| Air Force | MacDill Air Force Base | KC–46A ADAL AIRCRAFT MAINTE-NANCE HANGAR. | 27,000 | 27,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 907

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---------|-------------------------------|---------------|-----------------|----------------------|
| Air Force | MacDill Air Force Base | KC–46A ADAL APRON & HYDRANT FUELING PITS. | 61,000 | 61,000 |
| Air Force | MacDill Air Force Base | KC–46A ADAL FUEL SYSTEM MAINTENANCE DOCK. | 18,000 | 18,000 |
| Air Force | Patrick Space Force Base | COMMERCIAL VEHICLE INSPECTION. | 15,000 | 15,000 |
| Air Force | Patrick Space Force Base | COST TO COMPLETE: CONSOLIDATED COMMUNICATIONS CENTER. | 15,000 | 15,000 |
| Air Force | Patrick Space Force Base | FINAL DENIAL BARRIERS, SOUTH GATE. | 12,000 | 12,000 |
| Air Force | Tyndall Air Force Base | NATURAL DISASTER RECOVERY ....... | 0 | 252,000 |
| | Georgia | | | |
| Air Force | Robins Air Force Base | BATTLE MANAGEMENT COMBINED OPERATIONS COMPLEX. | 115,000 | 35,000 |
| | Guam | | | |
| Air Force | Joint Region Marianas | PDI: NORTH AIRCRAFT PARKING RAMP (INC). | 109,000 | 109,000 |
| | Japan | | | |
| Air Force | Kadena Air Base | PDI: HELO RESCUE OPS MAINTENANCE HANGAR (INC 3). | 46,000 | 46,000 |
| Air Force | Kadena Air Base | PDI: THEATER A/C CORROSION CONTROL CTR (INC). | 42,000 | 42,000 |
| | Louisiana | | | |
| Air Force | Barksdale Air Force Base | CHILD DEVELOPMENT CENTER (P&D). | 0 | 2,000 |
| Air Force | Barksdale Air Force Base | DORMITORY (P&D) ................................. | 0 | 7,000 |
| Air Force | Barksdale Air Force Base | WEAPONS GENERATION FACILITY (INC 3). | 112,000 | 112,000 |
| | Mariana Islands | | | |
| Air Force | Tinian | PDI: AIRFIELD DEVELOPMENT, PHASE 1 (INC 3). | 26,000 | 26,000 |
| Air Force | Tinian | PDI: FUEL TANKS W/PIPELINE & HYDRANT (INC 3). | 20,000 | 21,000 |
| Air Force | Tinian | PDI: PARKING APRON (INC 3) ............. | 32,000 | 32,000 |
| | Massachusetts | | | |
| Air Force | Hanscom Air Force Base | CHILD DEVELOPMENT CENTER ........ | 37,000 | 37,000 |
| Air Force | Hanscom Air Force Base | MIT-LINCOLN LAB (WEST LAB CSL/MIF) (INC 4). | 70,000 | 70,000 |
| | Mississippi | | | |
| Air Force | Columbus Air Force Base | T–7A GROUND BASED TRAINING SYSTEM FACILITY. | 30,000 | 30,000 |
| Air Force | Columbus Air Force Base | T–7A UNIT MAINTENANCE TRAINING FACILITY. | 9,500 | 9,500 |
| Air Force | Keesler Air Force Base | AIR TRAFFIC CONTROL TOWER (P&D). | 0 | 2,000 |
| | Montana | | | |
| Air Force | Malmstrom Air Force Base | FIRE STATION BAY/STORAGE AREA | 0 | 10,300 |
| | Nebraska | | | |
| Air Force | Offutt Air Force Base | 55 CES MAINTENANCE/WAREHOUSE (P&D). | 0 | 4,500 |
| Air Force | Offutt Air Force Base | BASE OPERATIONS/MOBILITY CENTER (P&D). | 0 | 5,000 |
| Air Force | Offutt Air Force Base | LOGISTICS READINESS SQUADRON TRANSPORTATION FACILITY (P&D). | 0 | 3,500 |
| | Nevada | | | |
| Air Force | Nellis Air Force Base | DORMITORY (P&D) ................................. | 0 | 7,500 |
| Air Force | Nellis Air Force Base | F–35 COALITION HANGAR (P&D) ....... | 0 | 5,500 |
| Air Force | Nellis Air Force Base | F–35 DATA LAB SUPPORT FACILITY (P&D). | 0 | 700 |

137 STAT. 908          PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
| | New Mexico | | | |
| Air Force | Cannon Air Force Base | SATELLITE FIRE STATION (P&D) ...... | 0 | 5,000 |
| Air Force | Kirtland Air Force Base | COST TO COMPLETE: WYOMING GATE UPGRADE FOR ANTITERRORISM COMPLIANCE. | 0 | 0 |
| | Norway | | | |
| Air Force | Rygge Air Station | EDI: DABS-FEV STORAGE .................... | 88,000 | 96,000 |
| Air Force | Rygge Air Station | EDI: MUNITIONS STORAGE AREA ..... | 31,000 | 40,000 |
| | Ohio | | | |
| Air Force | Wright-Patterson Air Force Base | ACQUISITION MANAGEMENT COMPLEX PHASE V (P&D). | 0 | 19,500 |
| | Oklahoma | | | |
| Air Force | Tinker Air Force Base | F–35 AIRCRAFT OXYGEN SHOP (P&D). | 0 | 5,800 |
| Air Force | Tinker Air Force Base | KC–46 3–BAY DEPOT MAINTENANCE HANGAR (INC 3). | 78,000 | 58,000 |
| Air Force | Vance Air Force Base | CONSOLIDATED UNDERGRADUATE PILOT TRAINING CENTER (P&D). | 0 | 8,400 |
| | Philippines | | | |
| Air Force | Cesar Basa Air Base | PDI: TRANSIENT AIRCRAFT PARKING APRON. | 35,000 | 35,000 |
| | South Dakota | | | |
| Air Force | Ellsworth Air Force Base | B–21 FUEL SYSTEM MAINTENANCE DOCK. | 75,000 | 75,000 |
| Air Force | Ellsworth Air Force Base | B–21 PHASE HANGAR .......................... | 160,000 | 34,000 |
| Air Force | Ellsworth Air Force Base | B–21 WEAPONS GENERATION FACILITY (INC). | 160,000 | 160,000 |
| | Spain | | | |
| Air Force | Morón Air Base | EDI: MUNITIONS STORAGE ................. | 26,000 | 34,000 |
| | Texas | | | |
| Air Force | Joint Base San Antonio-Lackland | 91 CYBER OPERATIONS CENTER ....... | 0 | 48,000 |
| Air Force | Joint Base San Antonio-Lackland | BMT – CHAPEL FOR AMERICA'S AIRMEN. | 0 | 90,000 |
| Air Force | Joint Base San Antonio-Lackland | CHILD DEVELOPMENT CENTER ........ | 20,000 | 20,000 |
| | United Kingdom | | | |
| Air Force | Royal Air Force Fairford | COST TO COMPLETE: EDI DABS-FEV STORAGE. | 0 | 28,000 |
| Air Force | Royal Air Force Fairford | COST TO COMPLETE: EDI MUNITIONS HOLDING AREA. | 0 | 20,000 |
| Air Force | Royal Air Force Fairford | EDI: RADR STORAGE FACILITY .......... | 47,000 | 47,000 |
| Air Force | Royal Air Force Lakenheath | EDI: RADR STORAGE FACILITY .......... | 28,000 | 28,000 |
| Air Force | Royal Air Force Lakenheath | SURETY DORMITORY ............................ | 50,000 | 50,000 |
| | Utah | | | |
| Air Force | Hill Air Force Base | F–35 T–7A EAST CAMPUS INFRASTRUCTURE. | 82,000 | 82,000 |
| | Worldwide Unspecified | | | |
| Air Force | Unspecified Worldwide Locations | BARRACKS REPLACEMENT FUND (P&D). | 0 | 65,000 |
| Air Force | Unspecified Worldwide Locations | CHILD DEVELOPMENT CENTER PLANNING & DESIGN. | 0 | 20,000 |
| Air Force | Unspecified Worldwide Locations | COST TO COMPLETE ............................. | 0 | 0 |

PUBLIC LAW 118–31—DEC. 22, 2023         137 STAT. 909

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Air Force | Unspecified Worldwide Locations | EDI: PLANNING & DESIGN ................. | 5,648 | 5,648 |
| Air Force | Unspecified Worldwide Locations | LAB INFRASTRUCTURE PLANNING & DESIGN. | 0 | 30,000 |
| Air Force | Unspecified Worldwide Locations | PLANNING & DESIGN ........................... | 429,266 | 429,266 |
| Air Force | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 64,900 | 74,900 |
| Air Force | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 15,000 |
| | **Wyoming** | | | |
| Air Force | F.E. Warren Air Force Base | COST TO COMPLETE: CONSOLIDATED HELO/TRF OPS/AMU AND ALERT FACILITY. | 0 | 18,000 |
| Air Force | F.E. Warren Air Force Base | GBSD INTEGRATED COMMAND CENTER (INC 2). | 27,000 | 27,000 |
| Air Force | F.E. Warren Air Force Base | GBSD INTEGRATED TRAINING CENTER. | 85,000 | 85,000 |
| Air Force | F.E. Warren Air Force Base | GBSD MISSILE HANDLING COMPLEX (INC 2). | 28,000 | 28,000 |
| | **Subtotal Military Construction, Air Force** ................................................ | | **2,605,314** | **3,151,314** |
| **DEFENSE-WIDE** | | | | |
| | **Alabama** | | | |
| Defense-Wide | Redstone Arsenal | GROUND TEST FACILITY INFRASTRUCTURE. | 147,975 | 67,975 |
| | **California** | | | |
| Defense-Wide | Marine Corps Air Station Miramar | AMBULATORY CARE CENTER—DENTAL CLINIC ADD//ALT. | 103,000 | 20,600 |
| Defense-Wide | Marine Corps Air Station Miramar | ELECTRICAL INFRASTRUCTURE, ON-SITE GENERATION, AND MICROGRID IMPROVEMENTS. | 0 | 30,550 |
| Defense-Wide | Monterey | COST TO COMPLETE: COGEN PLANT AT B236. | 0 | 5,460 |
| Defense-Wide | Naval Base Coronado | COST TO COMPLETE: SOF ATC OPERATIONS SUPPORT FACILITY. | 0 | 11,400 |
| Defense-Wide | Naval Base Coronado | SOF NAVAL SPECIAL WARFARE COMMAND OPERATIONS SUPPORT FACILITY PHASE 2. | 0 | 51,000 |
| Defense-Wide | Naval Base San Diego | AMBULATORY CARE CENTER—DENTAL CLINIC REPLMT. | 101,644 | 22,184 |
| Defense-Wide | Naval Base San Diego | MICROGRID AND BACKUP POWER ... | 0 | 6,300 |
| Defense-Wide | Naval Base Ventura County | COST TO COMPLETE: GROUND MOUNTED SOLAR PV. | 0 | 16,840 |
| Defense-Wide | Vandenberg Space Force Base | MICROGRID WITH BACKUP POWER | 0 | 57,000 |
| | **Colorado** | | | |
| Defense-Wide | Buckley Space Force Base | REDUNDANT ELECTRICAL SUPPLY | 0 | 9,000 |
| Defense-Wide | Buckley Space Force Base | REPLACEMENT WATER WELL ........... | 0 | 5,700 |
| | **Cuba** | | | |
| Defense-Wide | Naval Station Guantanamo Bay | AMBULATORY CARE CENTER (INC 1) | 60,000 | 60,000 |
| | **Delaware** | | | |
| Defense-Wide | Dover Air Force Base | WHOLE BLOOD PROCESSING LABORATORY REPLACEMENT. | 0 | 30,500 |
| | **Djibouti** | | | |

137 STAT. 910            PUBLIC LAW 118–31—DEC. 22, 2023

| | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | | |
|---|---|---|---|---|
| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
| Defense-Wide | Camp Lemonnier | COST TO COMPLETE: ENHANCE ENERGY SECURITY AND CONTROL SYSTEMS. | 0 | 5,200 |
| | Georgia | | | |
| Defense-Wide | Fort Moore | DEXTER ELEMENTARY SCHOOL (P&D). | 0 | 500 |
| Defense-Wide | Naval Submarine Base Kings Bay | ELECTRICAL TRANSMISSION AND DISTRIBUTION IMPROVEMENTS, PHASE 2. | 0 | 49,500 |
| | Germany | | | |
| Defense-Wide | Baumholder | HUMAN PERFORMANCE TRAINING CENTER. | 0 | 16,700 |
| Defense-Wide | Baumholder | SOF COMPANY OPERATIONS FACILITY. | 41,000 | 41,000 |
| Defense-Wide | Baumholder | SOF JOINT PARACHUTE RIGGING FACILITY. | 23,000 | 23,000 |
| Defense-Wide | Kaiserslautern Air Base | KAISERSLAUTERN MIDDLE SCHOOL | 21,275 | 21,275 |
| Defense-Wide | Ramstein Air Base | RAMSTEIN MIDDLE SCHOOL .............. | 181,764 | 181,764 |
| Defense-Wide | Rhine Ordnance Barracks | MEDICAL CENTER REPLACEMENT (INC 11). | 77,210 | 77,210 |
| Defense-Wide | Stuttgart | ROBINSON BARRACKS ELEM SCHOOL REPLACEMENT. | 8,000 | 8,000 |
| | Hawaii | | | |
| Defense-Wide | Joint Base Pearl Harbor-Hickam | COST TO COMPLETE: FY20 500 KW PV COVERED PARKING EV CHARGING STATION. | 0 | 7,476 |
| Defense-Wide | Joint Base Pearl Harbor-Hickam | COST TO COMPLETE: PRIMARY ELECTRICAL DISTRIBUTION. | 0 | 13,040 |
| | Honduras | | | |
| Defense-Wide | Soto Cano Air Base | FUEL FACILITIES ................................. | 41,300 | 41,300 |
| | Italy | | | |
| Defense-Wide | Naples | COST TO COMPLETE: SMART GRID .. | 0 | 7,610 |
| | Japan | | | |
| Defense-Wide | Fleet Activities Yokosuka | KINNICK HIGH SCHOOL (INC) ............ | 70,000 | 70,000 |
| Defense-Wide | Kadena Air Base | PDI SOF MAINTENANCE HANGAR .... | 88,900 | 88,900 |
| Defense-Wide | Kadena Air Base | PDI: SOF COMPOSITE MAINTENANCE FACILITY. | 11,400 | 11,400 |
| | Kansas | | | |
| Defense-Wide | Forbes Field | MICROGRID AND BACKUP POWER ... | 0 | 5,850 |
| Defense-Wide | Fort Riley | COST TO COMPLETE: POWER GENERATION AND MICROGRID. | 0 | 15,468 |
| | Kentucky | | | |
| Defense-Wide | Fort Knox | MIDDLE SCHOOL ADDITION (P&D) ... | 0 | 6,600 |
| | Korea | | | |
| Defense-Wide | K–16 Air Base | K–16 EMERGENCY BACKUP POWER | 0 | 5,650 |
| | Kuwait | | | |
| Defense-Wide | Camp Arifjan | COST TO COMPLETE: POWER GENERATION AND MICROGRID. | 0 | 8,197 |
| Defense-Wide | Camp Buehring | MICROGRID AND BACKUP POWER ... | 0 | 18,850 |
| | Louisiana | | | |
| Defense-Wide | Naval Air Station Joint Reserve Base New Orleans | COST TO COMPLETE: DISTRIBUTION SWITCHGEAR. | 0 | 6,453 |
| | Maryland | | | |
| Defense-Wide | Bethesda Naval Hospital | MEDICAL CENTER ADDITION/ALTERATION (INC 7). | 101,816 | 101,816 |
| Defense-Wide | Fort Meade | NSAW MISSION OPS AND RECORDS CENTER (INC). | 105,000 | 105,000 |
| Defense-Wide | Fort Meade | NSAW RECAP BUILDING 4 (INC) ........ | 315,000 | 315,000 |
| Defense-Wide | Fort Meade | NSAW RECAP BUILDING 5 (ECB 5) (INC). | 65,000 | 65,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 911

**SEC. 4601. MILITARY CONSTRUCTION**
(In Thousands of Dollars)

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Defense-Wide | Joint Base Andrews | HYDRANT FUELING SYSTEM ............. | 38,300 | 38,300 |
| | Missouri | | | |
| Defense-Wide | Lake City Army Ammunition Plant | MICROGRID AND BACKUP POWER ... | 0 | 80,100 |
| | Montana | | | |
| Defense-Wide | Great Falls International Airport | FUEL FACILITIES .................................. | 30,000 | 30,000 |
| | Nebraska | | | |
| Defense-Wide | Offutt Air Force Base | DEFENSE POW/MIA ACCOUNTABILITY AGENCY LABORATORY (P&D). | 0 | 5,000 |
| Defense-Wide | Offutt Air Force Base | MICROGRID AND BACKUP POWER ... | 0 | 41,000 |
| | North Carolina | | | |
| Defense-Wide | Fort Liberty (Camp Mackall) | MICROGRID AND BACKUP POWER ... | 0 | 10,500 |
| Defense-Wide | Marine Corps Base Camp Lejeune | MARINE RAIDER BATTALION OPERATIONS FACILITY. | 0 | 70,000 |
| | Oklahoma | | | |
| Defense-Wide | Fort Sill | MICROGRID AND BACKUP POWER ... | 0 | 76,650 |
| | Pennsylvania | | | |
| Defense-Wide | Fort Indiantown Gap | COST TO COMPLETE: GEOTHERMAL AND SOLAR PV. | 0 | 9,250 |
| | Puerto Rico | | | |
| Defense-Wide | Fort Buchanan | MICROGRID AND BACKUP POWER ... | 0 | 56,000 |
| Defense-Wide | Juana Díaz | COST TO COMPLETE: MICROGRID CONTROLS, 690 KW PV, 275KW GEN, 570 KWH BESS. | 0 | 7,680 |
| Defense-Wide | Ramey | COST TO COMPLETE: MICROGRID CONTROL SYSTEM, 460 KW PV, 275KW GEN, 660 KWH BESS. | 0 | 6,360 |
| | Spain | | | |
| Defense-Wide | Naval Station Rota | BULK TANK FARM, PHASE 1 ............... | 80,000 | 80,000 |
| | Texas | | | |
| Defense-Wide | Fort Cavazos | COST TO COMPLETE: POWER GENERATION AND MICROGRID. | 0 | 18,900 |
| Defense-Wide | Fort Cavazos | MICROGRID AND BACKUP POWER ... | 0 | 18,250 |
| | Utah | | | |
| Defense-Wide | Hill Air Force Base | OPEN STORAGE ..................................... | 14,200 | 14,200 |
| | Virginia | | | |
| Defense-Wide | Fort Belvoir | DIA HEADQUARTERS ANNEX ............. | 185,000 | 25,000 |
| Defense-Wide | Fort Belvoir (NGA Campus East) | COST TO COMPLETE: CHILLED WATER REDUNDANCY. | 0 | 550 |
| Defense-Wide | Hampton Roads | COST TO COMPLETE: BACKUP POWER GENERATION. | 0 | 1,200 |
| Defense-Wide | Joint Expeditionary Base Little Creek—Fort Story | SOF SDVT2 OPERATIONS SUPPORT FACILITY. | 61,000 | 61,000 |
| Defense-Wide | Pentagon | HVAC EFFICIENCY UPGRADES .......... | 0 | 2,250 |
| Defense-Wide | Pentagon | SEC OPS AND PEDESTRIAN ACCESS FACS. | 30,600 | 30,600 |
| | Washington | | | |
| Defense-Wide | Joint Base Lewis-McChord | POWER GENERATION AND MICROGRID. | 0 | 49,850 |
| Defense-Wide | Joint Base Lewis-McChord | SOF CONSOLIDATED RIGGING FACILITY. | 62,000 | 62,000 |
| Defense-Wide | Manchester | BULK STORAGE TANKS, PHASE 2 ..... | 71,000 | 71,000 |
| Defense-Wide | Naval Undersea Warfare Center Keyport | SOF COLD WATER TRAINING AUSTERE ENVIRONMENT FACILITY. | 0 | 37,000 |

137 STAT. 912          PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
| | Worldwide Unspecified | | | |
| Defense-Wide | Unspecified Worldwide Locations | INDOPACOM MILITARY CONSTRUCTION PILOT PROGRAM. | 0 | 150,000 |
| Defense-Wide | Unspecified Worldwide Locations | INDOPACOM UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 0 | 62,000 |
| Defense-Wide | Unspecified Worldwide Locations | ENERGY RESILIENCE AND CONSERV. INVEST. PROG.. | 548,000 | 0 |
| Defense-Wide | Unspecified Worldwide Locations | ERCIP PLANNING & DESIGN ............. | 86,250 | 101,250 |
| Defense-Wide | Unspecified Worldwide Locations | EXERCISE RELATED MINOR CONSTRUCTION. | 11,107 | 21,472 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (CYBERCOM) .. | 30,215 | 30,215 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (DEFENSE-WIDE). | 32,579 | 32,579 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (DHA) .............. | 49,610 | 49,610 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (DLA) ............... | 24,000 | 24,000 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (DODEA) .......... | 8,568 | 8,568 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (MDA) .............. | 1,035 | 21,035 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (NSA) ............... | 3,068 | 3,068 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (SOCOM) ......... | 25,130 | 25,130 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (TJS) ................. | 2,000 | 2,000 |
| Defense-Wide | Unspecified Worldwide Locations | PLANNING & DESIGN (WHS) .............. | 590 | 590 |
| Defense-Wide | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION (DEFENSE-WIDE). | 3,000 | 3,000 |
| Defense-Wide | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION (SOCOM). | 19,271 | 19,271 |
| Defense-Wide | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION (DLA). | 4,875 | 4,875 |
| | Wyoming | | | |
| Defense-Wide | F.E. Warren Air Force Base | MICROGRID AND BATTERY STORAGE. | 0 | 25,000 |
| **Subtotal Military Construction, Defense-Wide** ........................................ | | | **2,984,682** | **3,198,571** |
| **ARMY NATIONAL GUARD** | | | | |
| | Alabama | | | |
| Army National Guard | Fort McClellan | COST TO COMPLETE: ENLISTED BARRACKS, TT. | 0 | 7,000 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 913

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Army National Guard | Huntsville | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 4,650 |
| | **Arizona** | | | |
| Army National Guard | Surprise Readiness Center | NATIONAL GUARD READINESS CENTER. | 15,000 | 15,000 |
| | **Arkansas** | | | |
| Army National Guard | Fort Chaffee | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 610 |
| | **California** | | | |
| Army National Guard | Bakersfield | COST TO COMPLETE: VEHICLE MAINTENANCE SHOP. | 0 | 1,000 |
| Army National Guard | Camp Roberts | COST TO COMPLETE: AUTOMATED MULTIPURPOSE MACHINE GUN (MPMG) RANGE. | 0 | 5,000 |
| | **Colorado** | | | |
| Army National Guard | Peterson Space Force Base | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 3,000 |
| | **Connecticut** | | | |
| Army National Guard | Putnam | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 6,125 |
| | **Florida** | | | |
| Army National Guard | Camp Blanding | MULTIPURPOSE MACHINE GUN RANGE. | 0 | 11,000 |
| Army National Guard | Camp Blanding | TRAINING AIDS CENTER (P&D) ........ | 0 | 1,200 |
| Army National Guard | Camp Blanding | WEDGE INFANTRY SQUAD BATTLE COURSE (P&D). | 0 | 840 |
| | **Guam** | | | |
| Army National Guard | Barrigada | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 6,900 |
| | **Idaho** | | | |
| Army National Guard | Jerome County Regional Site | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 1,250 |
| Army National Guard | Jerome County Regional Site | NATIONAL GUARD VEHICLE MAINTENANCE SHOP. | 17,000 | 17,000 |
| | **Illinois** | | | |
| Army National Guard | Bloomington | COST TO COMPLETE: NATIONAL GUARD VEHICLE MAINTENANCE SHOP. | 0 | 5,250 |
| Army National Guard | Chicago, Jones Armory | GENERAL JONES NATIONAL GUARD READINESS CENTER ALTERATION (P&D). | 0 | 5,000 |
| Army National Guard | North Riverside Armory | NATIONAL GUARD VEHICLE MAINTENANCE SHOP. | 24,000 | 24,000 |
| Army National Guard | Peoria | READINESS CENTER (P&D) ................. | 0 | 2,400 |
| | **Indiana** | | | |
| Army National Guard | Shelbyville | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER ADD/ALT. | 0 | 5,000 |
| | **Kansas** | | | |
| Army National Guard | Topeka | COST TO COMPLETE: NATIONAL GUARD/RESERVE CENTER BUILDING. | 0 | 5,856 |
| | **Kentucky** | | | |
| Army National Guard | Burlington | VEHICLE MAINTENANCE SHOP ........ | 0 | 16,400 |
| Army National Guard | Frankfort | COST TO COMPLETE: NATIONAL GUARD/RESERVE CENTER BUILDING. | 0 | 2,000 |
| | **Louisiana** | | | |
| Army National Guard | Camp Beauregard | COLLECTIVE TRAINING UNACCOMPANIED HOUSING OPEN-BAY (P&D). | 0 | 2,400 |
| Army National Guard | Camp Beauregard | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 2,000 |

137 STAT. 914                PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
| Army National Guard | Camp Minden | COST TO COMPLETE: COLLECTIVE TRAINING UNACCOMPANIED HOUSING, OPEN BAY. | 0 | 3,718 |
| | Maine | | | |
| Army National Guard | Northern Maine Range Complex | AUTOMATED MULTIPURPOSE MACHINE GUN RANGE (P&D). | 0 | 2,800 |
| Army National Guard | Saco | COST TO COMPLETE: NATIONAL GUARD VEHICLE MAINTENANCE SHOP. | 0 | 7,420 |
| | Massachusetts | | | |
| Army National Guard | Camp Edwards | COST TO COMPLETE: AUTOMATED MULTIPURPOSE MACHINE GUN (MPMG) RANGE. | 0 | 0 |
| | Minnesota | | | |
| Army National Guard | Camp Ripley | ACCESS CONTROL FACILITY (P&D) .. | 0 | 1,530 |
| | Mississippi | | | |
| Army National Guard | Camp Shelby | CAMP SHELBY JFTC RAILHEAD EXPANSION (P&D). | 0 | 2,200 |
| Army National Guard | Camp Shelby | COST TO COMPLETE: MANEUVER AREA TRAINING EQUIPMENT SITE ADDITION. | 0 | 5,425 |
| Army National Guard | Meridian | ARMY AVIATION SUPPORT FACILITY 3 (P&D). | 0 | 2,160 |
| Army National Guard | Southaven Readiness Center | NATIONAL GUARD READINESS CENTER. | 0 | 33,000 |
| | Missouri | | | |
| Army National Guard | Bellefontaine | NATIONAL GUARD READINESS CENTER. | 28,000 | 28,000 |
| | Nebraska | | | |
| Army National Guard | Bellevue | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 9,090 |
| Army National Guard | Greenlief Training Site | COLLECTIVE TRAINING UNACCOMPANIED HOUSING OPEN-BAY (P&D). | 0 | 1,200 |
| Army National Guard | Mead Training Site | COST TO COMPLETE: COLLECTIVE TRAINING UNACCOMPANIED HOUSING, OPEN BAY. | 0 | 1,913 |
| Army National Guard | North Platte | COST TO COMPLETE: NATIONAL GUARD VEHICLE MAINTENANCE SHOP. | 0 | 400 |
| | Nevada | | | |
| Army National Guard | Floyd Edsall Training Center | COMBINED SUPPORT MAINTENANCE SHOP (P&D). | 0 | 2,700 |
| Army National Guard | Floyd Edsall Training Center | GENERAL INSTRUCTION FACILITY (P&D). | 0 | 5,490 |
| Army National Guard | Harry Reid Training Center | READY BUILDING (P&D) ...................... | 0 | 590 |
| | New Hampshire | | | |
| Army National Guard | Concord | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 200 |
| Army National Guard | Littleton | NATIONAL GUARD VEHICLE MAINTENANCE SHOP ADDITION. | 23,000 | 23,000 |
| | New Jersey | | | |
| Army National Guard | Joint Base McGuire-Dix-Lakehurst | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 605 |
| Army National Guard | Newark | NATIONAL GUARD READINESS CENTER (P&D). | 0 | 1,900 |
| | New Mexico | | | |
| Army National Guard | Rio Rancho Training Site | NATIONAL GUARD VEHICLE MAINTENANCE SHOP ADDITION. | 11,000 | 11,000 |
| | New York | | | |
| Army National Guard | Lexington Avenue Armory | NATIONAL GUARD READINESS CENTER ADDITION/ALTERATION. | 0 | 70,000 |
| | North Carolina | | | |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 915

**SEC. 4601. MILITARY CONSTRUCTION**
(In Thousands of Dollars)

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Army National Guard | Salisbury | ARMY AVIATION SUPPORT FACILITIES (P&D). | 0 | 2,200 |
| | North Dakota | | | |
| Army National Guard | Camp Grafton | INSTITUTIONAL POST-INITIAL MILITARY TRAINING, UNACCOMPANIED HOUSING (P&D). | 0 | 1,950 |
| Army National Guard | Dickinson | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 5,425 |
| | Ohio | | | |
| Army National Guard | Camp Perry Joint Training Center | NATIONAL GUARD READINESS CENTER. | 19,200 | 19,200 |
| Army National Guard | Columbus | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 4,000 |
| | Oklahoma | | | |
| Army National Guard | Ardmore | COST TO COMPLETE: VEHICLE MAINTENANCE SHOP. | 0 | 400 |
| Army National Guard | Shawnee Readiness Center | NATIONAL GUARD READINESS CENTER (P&D). | 0 | 1,800 |
| | Oregon | | | |
| Army National Guard | Washington County Readiness Center | NATIONAL GUARD READINESS CENTER. | 26,000 | 26,000 |
| | Pennsylvania | | | |
| Army National Guard | Fort Indiantown Gap | AUTOMATED MULTIPURPOSE MACHINE GUN RANGE (P&D). | 0 | 1,550 |
| Army National Guard | Hermitage Readiness Center | NATIONAL GUARD READINESS CENTER. | 13,600 | 13,600 |
| Army National Guard | Moon Township | COST TO COMPLETE: COMBINED SUPPORT MAINTENANCE SHOP. | 0 | 3,100 |
| | Puerto Rico | | | |
| Army National Guard | Fort Allen | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 3,677 |
| | Rhode Island | | | |
| Army National Guard | Camp Fogarty Training Site | COLLECTIVE TRAINING UNACCOMPANIED HOUSING OPEN-BAY (P&D). | 0 | 1,990 |
| Army National Guard | Quonset Point | NATIONAL GUARD READINESS CENTER. | 0 | 41,000 |
| | South Carolina | | | |
| Army National Guard | Aiken County Readiness Center | NATIONAL GUARD READINESS CENTER. | 20,000 | 20,000 |
| Army National Guard | Joint Base Charleston | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 4,373 |
| Army National Guard | McCrady Training Center | AUTOMATED MULTIPURPOSE MACHINE GUN RANGE. | 7,900 | 7,900 |
| | South Dakota | | | |
| Army National Guard | Sioux Falls | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 5,250 |
| | Tennessee | | | |
| Army National Guard | Campbell Army Air Field | ARMY AIR TRAFFIC CONTROL TOWERS (P&D). | 0 | 2,500 |
| Army National Guard | McMinnville | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 500 |
| | Texas | | | |
| Army National Guard | Fort Cavazos | GENERAL PURPOSE INSTRUCTION BUILDING (P&D). | 0 | 2,685 |
| Army National Guard | Fort Worth | COST TO COMPLETE: AIRCRAFT MAINTENANCE HANGAR ADD/ALT. | 0 | 6,489 |
| Army National Guard | Fort Worth | COST TO COMPLETE: NATIONAL GUARD VEHICLE MAINTENANCE SHOP. | 0 | 381 |
| | Utah | | | |
| Army National Guard | Camp Williams | COLLECTIVE TRAINING UNACCOMPANIED HOUSING, SENIOR NCO AND OFFICER (P&D). | 0 | 2,875 |
| | Vermont | | | |

137 STAT. 916          PUBLIC LAW 118–31—DEC. 22, 2023

| | | SEC. 4601. MILITARY CONSTRUCTION (In Thousands of Dollars) | | |
|---|---|---|---|---|
| **Account** | **State/Country and Installation** | **Project Title** | **FY 2024 Request** | **Conference Authorized** |
| Army National Guard | Bennington | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER. | 0 | 3,415 |
| | Virgin Islands | | | |
| Army National Guard | St. Croix | COST TO COMPLETE: ARMY AVIATION SUPPORT FACILITY. | 0 | 4,200 |
| Army National Guard | St. Croix | COST TO COMPLETE: READY BUILDING. | 0 | 1,710 |
| | Virginia | | | |
| Army National Guard | Sandston Rc & FMS 1 | AIRCRAFT MAINTENANCE HANGAR | 20,000 | 20,000 |
| Army National Guard | Troutville | COST TO COMPLETE: COMBINED SUPPORT MAINTENANCE SHOP ADDITION. | 0 | 2,415 |
| Army National Guard | Troutville | COST TO COMPLETE: NATIONAL GUARD READINESS CENTER ADDITION. | 0 | 2,135 |
| | Washington | | | |
| Army National Guard | Camp Murray | NATIONAL GUARD/RESERVE CENTER (P&D). | 0 | 3,600 |
| | West Virginia | | | |
| Army National Guard | Bluefield | NATIONAL GUARD READINESS CENTER (P&D). | 0 | 1,950 |
| Army National Guard | Charleston | NATIONAL GUARD READINESS CENTER (P&D). | 0 | 4,800 |
| Army National Guard | Parkersburg | NATIONAL GUARD READINESS CENTER (P&D). | 0 | 3,300 |
| | Wisconsin | | | |
| Army National Guard | Viroqua | NATIONAL GUARD READINESS CENTER. | 18,200 | 18,200 |
| | Worldwide Unspecified | | | |
| Army National Guard | Unspecified Worldwide Locations | COST TO COMPLETE ARMY NATIONAL GUARD. | 0 | 0 |
| Army National Guard | Unspecified Worldwide Locations | PLANNING & DESIGN | 34,286 | 34,286 |
| Army National Guard | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 63,000 | 73,000 |
| Army National Guard | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 15,000 |
| **Subtotal Military Construction, Army National Guard** | | | **340,186** | **732,078** |
| **ARMY RESERVE** | | | | |
| | Alabama | | | |
| Army Reserve | Birmingham | ARMY RESERVE CENTER/AMSA/LAND. | 57,000 | 57,000 |
| | Arizona | | | |
| Army Reserve | San Tan Valley | AREA MAINTENANCE SUPPORT ACTIVITY. | 12,000 | 17,000 |
| | California | | | |
| Army Reserve | Marine Corps Base Camp Pendleton | COST TO COMPLETE: AREA MAINTENANCE SUPPORT ACTIVITY. | 0 | 3,000 |
| Army Reserve | Fort Hunter Liggett | NETWORK ENTERPRISE CENTER | 0 | 40,000 |
| | Florida | | | |
| Army Reserve | Perrine | COST TO COMPLETE: ARMY RESERVE CENTER. | 0 | 3,000 |
| | Georgia | | | |
| Army Reserve | Marine Corps Logistics Base Albany | ARMY RESERVE CENTER | 0 | 40,000 |
| | North Carolina | | | |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 917

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Army Reserve | Asheville | COST TO COMPLETE: ARMY RESERVE CENTER. | 0 | 12,000 |
| | Ohio | | | |
| Army Reserve | Wright Patterson Air Force Base | COST TO COMPLETE: ARMY RESERVE CENTER. | 0 | 5,000 |
| | Virginia | | | |
| Army Reserve | Richmond | ARMY RESERVE CENTER (P&D) ......... | 0 | 4,000 |
| | Worldwide Unspecified | | | |
| Army Reserve | Unspecified Worldwide Locations | COST TO COMPLETE ARMY RESERVE. | 0 | 0 |
| Army Reserve | Unspecified Worldwide Locations | PLANNING & DESIGN ........................... | 23,389 | 23,389 |
| Army Reserve | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 14,687 | 24,687 |
| Army Reserve | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 5,000 |
| | **Subtotal Military Construction, Army Reserve** ........................................ | | **107,076** | **234,076** |
| **NAVY RESERVE & MARINE CORPS RESERVE** | | | | |
| | Michigan | | | |
| Navy Reserve & Marine Corps Reserve | Naval Reserve Center Battle Creek | ORGANIC SUPPLY FACILITIES .......... | 24,549 | 24,549 |
| | Virginia | | | |
| Navy Reserve & Marine Corps Reserve | Marine Forces Reserve Dam Neck Virginia Beach | G/ATOR SUPPORT FACILITIES ............ | 12,400 | 12,400 |
| | Worldwide Unspecified | | | |
| Navy Reserve & Marine Corps Reserve | Unspecified Worldwide Locations | MCNR PLANNING & DESIGN .............. | 6,495 | 6,495 |
| Navy Reserve & Marine Corps Reserve | Unspecified Worldwide Locations | MCNR UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 7,847 | 17,847 |
| Navy Reserve & Marine Corps Reserve | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 5,000 |
| | **Subtotal Military Construction, Navy Reserve & Marine Corps Reserve**. | | **51,291** | **66,291** |
| **AIR NATIONAL GUARD** | | | | |
| | Alabama | | | |
| Air National Guard | Montgomery Regional Airport | F–35 ADAL SQ OPS BLDG 1303 ............ | 7,000 | 7,000 |
| | Alaska | | | |
| Air National Guard | Eielson Air Force Base | AMC STANDARD DUAL BAY HANGAR (P&D). | 0 | 5,000 |
| Air National Guard | Joint Base Elmendorf-Richardson | ADAL ALERT CREW FACILITY HGR 18. | 0 | 7,000 |
| Air National Guard | Joint Base Elmendorf-Richardson | HC–130J SIMULATOR FACILITY (P&D). | 0 | 2,000 |
| | Arizona | | | |
| Air National Guard | Tucson International Airport | MCCA: AIRCRAFT ARRESTING SYSTEM (NEW RWY). | 11,600 | 11,600 |

137 STAT. 918          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | Arkansas | | | |
| Air National Guard | Ebbing Air National Guard Base | 3–BAY HANGAR ..................................... | 0 | 54,000 |
| Air National Guard | Ebbing Air National Guard Base | AIRCREW FLIGHT EQUIPMENT/STEP | 0 | 0 |
| Air National Guard | Ebbing Air National Guard Base | SPECIAL ACCESS PROGRAM FACILITY. | 0 | 21,989 |
| | Colorado | | | |
| Air National Guard | Buckley Space Force Base | AIRCRAFT CORROSION CONTROL ..... | 12,000 | 12,000 |
| | Florida | | | |
| Air National Guard | Jacksonville International Airport | F–35 MUNITIONS STORAGE AREA ADMIN (P&D). | 0 | 600 |
| | Indiana | | | |
| Air National Guard | Fort Wayne International Airport | FIRE STATION ......................................... | 8,900 | 8,900 |
| | Maine | | | |
| Air National Guard | Bangor International Airport | REPAIR HANGAR ACCESS APRON (LIGHT DUTY RAMP) (P&D). | 0 | 1,450 |
| Air National Guard | Bangor International Airport | REPAIR WHISKEY APRON (P&D) ........ | 0 | 704 |
| | Mississippi | | | |
| Air National Guard | Jackson International Airport | COST TO COMPLETE: 172ND AIRLIFT WING FIRE/CRASH RESCUE STATION. | 0 | 8,000 |
| | Missouri | | | |
| Air National Guard | Rosecrans Air National Guard Base | 139TH AIRLIFT WING ENTRY CONTROL POINT (P&D). | 0 | 2,000 |
| Air National Guard | Rosecrans Air National Guard Base | ENTRY CONTROL POINT (P&D) .......... | 0 | 0 |
| | New Jersey | | | |
| Air National Guard | Atlantic City International Airport | CONSOLIDATED DINING, SERVICES, AND FITNESS CENTER (P&D). | 0 | 2,000 |
| Air National Guard | Atlantic City International Airport | F–16 MISSION TRAINING CENTER (P&D). | 0 | 1,100 |
| | Oregon | | | |
| Air National Guard | Portland International Airport | SPECIAL TACTICS COMPLEX, PHASE 1. | 22,000 | 23,000 |
| Air National Guard | Portland International Airport | SPECIAL TACTICS COMPLEX, PHASE 2. | 18,500 | 21,000 |
| Air National Guard | Portland International Airport | SPECIAL TACTICS COMPLEX, PHASE 3. | 0 | 24,000 |
| Air National Guard | Portland International Airport | SPECIAL TACTICS COMPLEX, PHASE 4. | 0 | 11,000 |
| | Pennsylvania | | | |
| Air National Guard | Harrisburg International Airport | ENTRY CONTROL FACILITY ................ | 0 | 8,000 |
| | Wisconsin | | | |
| Air National Guard | Truax Field | F–35: MM&I FAC, B701 ......................... | 0 | 5,200 |
| Air National Guard | Volk Air National Guard Base | FIRE/CRASH RESCUE STATION (P&D). | 0 | 0 |
| | Worldwide Unspecified | | | |
| Air National Guard | Unspecified Worldwide Locations | PLANNING & DESIGN ........................... | 35,600 | 35,600 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 919

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Air National Guard | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 63,122 | 73,122 |
| Air National Guard | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 15,000 |
| **Subtotal Military Construction, Air National Guard** ............................ | | | **178,722** | **361,265** |
| **AIR FORCE RESERVE** | | | | |
| | Arizona | | | |
| Air Force Reserve | Davis-Monthan Air Force Base | GUARDIAN ANGEL POTFF FACILITY | 0 | 8,500 |
| | California | | | |
| Air Force Reserve | March Air Reserve Base | KC–46 ADD/ALTER B1244 FUT/ CARGO PALLET STORAGE. | 17,000 | 17,000 |
| Air Force Reserve | March Air Reserve Base | KC–46 ADD/ALTER B6000 SIMU- LATOR FACILITY. | 8,500 | 8,500 |
| Air Force Reserve | March Air Reserve Base | KC–46 TWO BAY MAINTENANCE/ FUEL HANGAR. | 201,000 | 201,000 |
| | Georgia | | | |
| Air Force Reserve | Dobbins Air Reserve Base | SECURITY FORCES FACILITY ............ | 0 | 22,000 |
| | Guam | | | |
| Air Force Reserve | Joint Region Marianas | AERIAL PORT FACILITY ...................... | 27,000 | 27,000 |
| | Louisiana | | | |
| Air Force Reserve | Barksdale Air Force Base | 307 BW MEDICAL FACILITY ADDI- TION. | 0 | 7,000 |
| | Ohio | | | |
| Air Force Reserve | Youngstown Air Reserve Station | FIRE STATION (P&D) ............................ | 0 | 2,500 |
| | Texas | | | |
| Air Force Reserve | Naval Air Station Joint Reserve Base Fort Worth | LRS WAREHOUSE .................................. | 16,000 | 16,000 |
| | Worldwide Unspecified | | | |
| Air Force Reserve | Unspecified Worldwide Locations | PLANNING & DESIGN ........................... | 12,146 | 12,146 |
| Air Force Reserve | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION. | 9,926 | 19,926 |
| Air Force Reserve | Unspecified Worldwide Locations | UNSPECIFIED MINOR MILITARY CONSTRUCTION DEMOLITION. | 0 | 5,000 |
| **Subtotal Military Construction, Air Force Reserve** ................................ | | | **291,572** | **346,572** |
| **NATO SECURITY INVESTMENT PROGRAM** | | | | |
| | Worldwide Unspecified | | | |
| NATO | NATO Security Investment Program | NATO SECURITY INVESTMENT PRO- GRAM. | 293,434 | 343,434 |
| **Subtotal NATO Security Investment Program** ......................................... | | | **293,434** | **343,434** |
| **TOTAL MILITARY CONSTRUCTION** .......................................................... | | | **14,345,019** | **15,656,630** |
| **FAMILY HOUSING** | | | | |
| **FAMILY HOUSING CONSTRUCTION, ARMY** | | | | |
| | Georgia | | | |
| Fam Hsg Con, Army | Fort Eisenhower | FORT EISENHOWER MHPI EQUITY INVESTMENT. | 50,000 | 50,000 |

137 STAT. 920          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | Germany | | | |
| Fam Hsg Con, Army | Baumholder | FAMILY HOUSING NEW CONSTRUCTION. | 78,746 | 90,135 |
| | Kwajalein | | | |
| Fam Hsg Con, Army | Kwajalein Atoll | FAMILY HOUSING REPLACEMENT CONSTRUCTION. | 98,600 | 98,600 |
| | Missouri | | | |
| Fam Hsg Con, Army | Fort Leonard Wood | FORT LEONARD WOOD MHPI EQUITY INVESTMENT. | 50,000 | 50,000 |
| | Worldwide Unspecified | | | |
| Fam Hsg Con, Army | Unspecified Worldwide Locations | FAMILY HOUSING P&D ........................ | 27,549 | 27,549 |
| | | | | |
| **Subtotal Family Housing Construction, Army** ......................................... | | | **304,895** | **316,284** |

**FAMILY HOUSING O&M, ARMY**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | Worldwide Unspecified | | | |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | FURNISHINGS ......................................... | 12,121 | 12,121 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | HOUSING PRIVATIZATION SUPPORT | 86,019 | 86,019 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | LEASING .................................................. | 112,976 | 112,976 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | MAINTENANCE ....................................... | 86,706 | 86,706 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | MANAGEMENT ....................................... | 41,121 | 41,121 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | MISCELLANEOUS ................................. | 554 | 554 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | SERVICES ................................................ | 7,037 | 7,037 |
| Fam Hsg O&M, Army | Unspecified Worldwide Locations | UTILITIES ............................................... | 38,951 | 38,951 |
| | | | | |
| **Subtotal Family Housing Operation And Maintenance, Army** ............ | | | **385,485** | **385,485** |

**FAMILY HOUSING CONSTRUCTION, NAVY & MARINE CORPS**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | Guam | | | |
| Fam Hsg Con, Navy & Marine Corps | Joint Region Marianas | REPLACE ANDERSEN HOUSING (AF), PHASE 7. | 83,126 | 83,126 |
| Fam Hsg Con, Navy & Marine Corps | Joint Region Marianas | REPLACE ANDERSEN HOUSING, PHASE 8. | 121,906 | 121,906 |
| | Worldwide Unspecified | | | |
| Fam Hsg Con, Navy & Marine Corps | Unspecified Worldwide Locations | DESIGN, WASHINGTON DC ................. | 4,782 | 4,782 |
| Fam Hsg Con, Navy & Marine Corps | Unspecified Worldwide Locations | IMPROVEMENTS, WASHINGTON DC | 57,740 | 57,740 |
| Fam Hsg Con, Navy & Marine Corps | Unspecified Worldwide Locations | USMC DPRI/GUAM PLANNING & DESIGN. | 9,588 | 9,588 |

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 921

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| **Subtotal Family Housing Construction, Navy & Marine Corps** .......... | | | **277,142** | **277,142** |
| **FAMILY HOUSING O&M, NAVY & MARINE CORPS** | | | | |
| | Worldwide Unspecified | | | |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | FURNISHINGS ......................................... | 17,744 | 17,744 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | HOUSING PRIVATIZATION SUPPORT | 65,655 | 65,655 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | LEASING ................................................... | 60,214 | 60,214 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | MAINTENANCE ...................................... | 101,356 | 101,356 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | MANAGEMENT ...................................... | 61,896 | 61,896 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | MISCELLANEOUS ................................. | 419 | 419 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | SERVICES ................................................ | 13,250 | 13,250 |
| Fam Hsg O&M, Navy & Marine Corps | Unspecified Worldwide Locations | UTILITIES ............................................... | 43,320 | 43,320 |
| **Subtotal Family Housing Operation & Maintenance, Navy & Marine Corps**. | | | **363,854** | **363,854** |
| **FAMILY HOUSING CONSTRUCTION, AIR FORCE** | | | | |
| | Alabama | | | |
| Fam Hsg Con, Air Force | Maxwell Air Force Base | MHPI RESTRUCTURE-AETC GROUP II. | 65,000 | 65,000 |
| | Colorado | | | |
| Fam Hsg Con, Air Force | U.S. Air Force Academy | CONSTRUCTION IMPROVEMENT—CARLTON HOUSE. | 9,282 | 9,282 |
| | Hawaii | | | |
| Fam Hsg Con, Air Force | Joint Base Pearl Harbor-Hickam | MHPI RESTRUCTURE-JOINT BASE PEARL HARBOR-HICKAM. | 75,000 | 75,000 |
| | Japan | | | |
| Fam Hsg Con, Air Force | Yokota Air Base | IMPROVE FAMILY HOUSING PAIP 9, PHASE 1 (24 UNITS). | 0 | 27,000 |
| | Mississippi | | | |
| Fam Hsg Con, Air Force | Keesler Air Force Base | MHPI RESTRUCTURE-SOUTHERN GROUP. | 80,000 | 80,000 |
| | Worldwide Unspecified | | | |
| Fam Hsg Con, Air Force | Unspecified Worldwide Locations | PLANNING & DESIGN .......................... | 7,815 | 7,815 |
| **Subtotal Family Housing Construction, Air Force** ................................ | | | **237,097** | **264,097** |
| **FAMILY HOUSING O&M, AIR FORCE** | | | | |
| | Worldwide Unspecified | | | |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | FURNISHINGS ......................................... | 12,884 | 23,884 |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | HOUSING PRIVATIZATION SUPPORT | 31,803 | 31,803 |

137 STAT. 922    PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | LEASING .................................................. | 5,143 | 5,143 |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | MAINTENANCE ...................................... | 135,410 | 124,410 |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | MANAGEMENT ...................................... | 68,023 | 68,023 |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | MISCELLANEOUS ................................. | 2,377 | 2,377 |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | SERVICES ............................................... | 10,692 | 10,692 |
| Fam Hsg O&M, Air Force | Unspecified Worldwide Locations | UTILITIES .............................................. | 48,054 | 48,054 |
| **Subtotal Family Housing Operation And Maintenance, Air Force** ..... | | | **314,386** | **314,386** |

**FAMILY HOUSING O&M, DEFENSE-WIDE**

Worldwide Unspecified

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | FURNISHINGS ........................................ | 673 | 673 |
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | FURNISHINGS ........................................ | 89 | 89 |
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | LEASING .................................................. | 32,042 | 32,042 |
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | LEASING .................................................. | 13,658 | 13,658 |
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | MAINTENANCE ...................................... | 35 | 35 |
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | UTILITIES .............................................. | 4,273 | 4,273 |
| Fam Hsg O&M, Defense-Wide | Unspecified Worldwide Locations | UTILITIES .............................................. | 15 | 15 |
| **Subtotal Family Housing Operation And Maintenance, Defense-Wide**. | | | **50,785** | **50,785** |

**FAMILY HOUSING IMPROVEMENT FUND**

Worldwide Unspecified

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Family Housing Improvement Fund | Unspecified Worldwide Locations | ADMINISTRATIVE EXPENSES—FHIF | 6,611 | 6,611 |
| **Subtotal Family Housing Improvement Fund** ........................................... | | | **6,611** | **6,611** |

**UNACCOMPANIED HOUSING IMPROVEMENT FUND**

Worldwide Unspecified

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| Unaccompanied Housing Improvement Fund | Unspecified Worldwide Locations | ADMINISTRATIVE EXPENSES—UHIF | 496 | 496 |
| **Subtotal Unaccompanied Housing Improvement Fund** ........................ | | | **496** | **496** |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 923

**SEC. 4601. MILITARY CONSTRUCTION**
**(In Thousands of Dollars)**

| Account | State/Country and Installation | Project Title | FY 2024 Request | Conference Authorized |
|---|---|---|---|---|
| | | **TOTAL FAMILY HOUSING** ............................................................ | **1,940,751** | **1,979,140** |
| **DEFENSE BASE REALIGNMENT AND CLOSURE** | | | | |
| **BASE REALIGNMENT AND CLOSURE, ARMY** | | | | |
| | Worldwide Unspecified | | | |
| BRAC, Army | Unspecified Worldwide Locations | BASE REALIGNMENT & CLOSURE .... | 150,640 | 200,640 |
| | | **Subtotal Base Realignment and Closure—Army** ..................................... | **150,640** | **200,640** |
| **BASE REALIGNMENT AND CLOSURE, NAVY** | | | | |
| | Worldwide Unspecified | | | |
| BRAC, Navy | Unspecified Worldwide Locations | BASE REALIGNMENT & CLOSURE .... | 108,818 | 158,818 |
| | | **Subtotal Base Realignment and Closure—Navy** ..................................... | **108,818** | **158,818** |
| **BASE REALIGNMENT AND CLOSURE, AIR FORCE** | | | | |
| | Worldwide Unspecified | | | |
| BRAC, Air Force | Unspecified Worldwide Locations | BASE REALIGNMENT & CLOSURE .... | 123,990 | 173,990 |
| | | **Subtotal Base Realignment and Closure—Air Force** .............................. | **123,990** | **173,990** |
| **BASE REALIGNMENT AND CLOSURE, DEFENSE-WIDE** | | | | |
| | Worldwide Unspecified | | | |
| BRAC, Defense-Wide | Unspecified Worldwide Locations | INT–4: DLA ACTIVITIES ........................ | 5,726 | 5,726 |
| | | **Subtotal Base Realignment and Closure—Defense-Wide** ....................... | **5,726** | **5,726** |
| | | **TOTAL DEFENSE BASE REALIGNMENT AND CLOSURE** .................. | **389,174** | **539,174** |
| | | **TOTAL MILITARY CONSTRUCTION, FAMILY HOUSING, AND BRAC**. | **16,674,944** | **18,174,944** |

# TITLE XLVII—DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS.**

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| **Discretionary Summary by Appropriation** | | |
| **Energy and Water Development and Related Agencies** | | |
| **Appropriation Summary:** | | |
| **Energy Programs** | | |
| Nuclear Energy ............................................................. | 177,733 | 160,000 |
| **Atomic Energy Defense Activities** | | |
| **National Nuclear Security Administration:** | | |

137 STAT. 924          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| Weapons Activities | 18,832,947 | 19,121,676 |
| Defense Nuclear Nonproliferation | 2,508,959 | 2,444,252 |
| Naval Reactors | 1,964,100 | 1,964,100 |
| Federal Salaries and Expenses | 538,994 | 518,994 |
| **Total, National Nuclear Security Administration** | **23,845,000** | **24,049,022** |
| Defense Environmental Cleanup | 7,073,587 | 7,043,763 |
| Defense Uranium Enrichment D&D | 427,000 | 0 |
| Other Defense Activities | 1,075,197 | 1,075,197 |
| **Total, Atomic Energy Defense Activities** | **32,420,784** | **32,167,982** |
| **Total, Discretionary Funding** | **32,598,517** | **32,327,982** |

**Nuclear Energy**

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| Safeguards and security | 177,733 | 160,000 |
| Program decrease | | [−17,733] |
| **Total, Nuclear Energy** | **177,733** | **160,000** |

**National Nuclear Security Administration**

**Weapons Activities**
**Stockpile management**
**Stockpile major modernization**

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| B61 Life extension program | 449,850 | 449,850 |
| W88 Alteration program | 178,823 | 178,823 |
| W80–4 Life extension program | 1,009,929 | 1,009,929 |
| W80–4 ALT Nuclear-armed sea-launched cruise missile | 0 | 70,000 |
| Program increase | | [70,000] |
| W87–1 Modification Program | 1,068,909 | 1,068,909 |
| W93 | 389,656 | 389,656 |
| B61–13 | 52,000 | 52,000 |
| **Subtotal, Stockpile major modernization** | **3,097,167** | **3,219,167** |
| Stockpile sustainment | 1,276,578 | 1,276,578 |
| Weapons dismantlement and disposition | 53,718 | 53,718 |
| Production operations | 710,822 | 710,822 |
| Nuclear enterprise assurance | 66,614 | 66,614 |
| **Total, Stockpile management** | **5,256,899** | **5,326,899** |

**Production Modernization**
**Primary Capability Modernization**
**Plutonium Modernization**
**Los Alamos Plutonium Modernization**

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| Los Alamos Plutonium Operations | 833,100 | 833,100 |
| 21–D–512 Plutonium Pit Production Project, LANL | 670,000 | 670,000 |
| 15–D–302 TA–55 Reinvestments Project, Phase 3, LANL | 30,000 | 30,000 |
| 07–D–220-04 Transuranic Liquid Waste Facility, LANL | 0 | 0 |
| 04–D–125 Chemistry and Metallurgy Research Replacement Project, LANL | 227,122 | 227,122 |
| **Subtotal, Los Alamos Plutonium Modernization** | **1,760,222** | **1,760,222** |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 925

### SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS
(In Thousands of Dollars)

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| **Savannah River Plutonium Modernization** | | |
| Savannah River Plutonium Operations ......... | 62,764 | 62,764 |
| 21–D–511 Savannah River Plutonium Processing Facility, SRS ..................................... | 858,235 | 1,000,235 |
| Program increase ...................................... | | [142,000] |
| **Subtotal, Savannah River Plutonium Modernization** .......................................................... | **920,999** | **1,062,999** |
| Enterprise Plutonium Support ............................................ | 87,779 | 87,779 |
| **Total, Plutonium Modernization** ........................................... | **2,769,000** | **2,911,000** |
| **High Explosives & Energetics** | | |
| High Explosives & Energetics ........................ | 93,558 | 93,558 |
| 23–D–516 Energetic Materials Characterization Facility, LANL ..................................... | 0 | 0 |
| 21–D–510 HE Synthesis, Formulation, and Production, PX ............................................. | 0 | 80,000 |
| Program increase ...................................... | | [80,000] |
| 15–D–301 HE Science & Engineering Facility, PX ......................................................... | 101,356 | 101,356 |
| **Subtotal, High Explosives & Energetics** ........ | **194,914** | **274,914** |
| **Total, Primary Capability Modernization** ................................. | **2,963,914** | **3,185,914** |
| **Secondary Capability Modernization** | | |
| Secondary Capability Modernization ......................................... | 666,914 | 666,914 |
| 18–D–690 Lithium Processing Facility, Y–12 ............................ | 210,770 | 210,770 |
| 06–D–141 Uranium Processing Facility, Y–12 .......................... | 760,000 | 760,000 |
| **Total, Secondary Capability Modernization** ............................. | **1,637,684** | **1,637,684** |
| **Tritium and Domestic Uranium Enrichment** | | |
| Tritium and Domestic Uranium Enrichment ............................ | 592,992 | 592,992 |
| 18–D–650 Tritium Finishing Facility, SRS ................................ | 0 | 37,000 |
| Program increase ...................................................... | | [37,000] |
| **Total, Tritium and Domestic Uranium Enrichment** ............... | **0** | **629,992** |
| **Non-Nuclear Capability Modernization** | | |
| Non-Nuclear Capability Modernization ...................................... | 166,990 | 166,990 |
| 22–D–513 Power Sources Capability, SNL ................................ | 37,886 | 37,886 |
| **Total, Non-Nuclear Capability Modernization** ......................... | **204,876** | **204,876** |
| Capability Based Investments ............................................ | 156,462 | 156,462 |
| **Total, Production Modernization** ......................................... | **5,555,928** | **5,814,928** |
| | | |
| **Stockpile research, technology, and engineering** | | |
| **Assessment Science** | | |
| Assessment Science ........................................ | 917,751 | 917,751 |
| 17–D–640 U1a Complex Enhancements Project, NNSS ......................................................... | 126,570 | 126,570 |
| **Total, Assessment Science** ............................... | **1,044,321** | **1,044,321** |
| Engineering and integrated assessments ............................ | 440,456 | 440,456 |
| Inertial confinement fusion ................................................ | 601,650 | 641,650 |
| Program increase ............................................... | | [40,000] |
| Advanced simulation and computing ................................. | 782,472 | 782,472 |
| Weapon technology and manufacturing maturation .......... | 327,745 | 307,745 |
| Program decrease ............................................... | | [–20,000] |
| Academic programs ............................................................. | 152,271 | 112,000 |
| Community Capacity Building Program ...................... | | [–30,000] |
| Program decrease ............................................... | | [–10,271] |
| **Total, Stockpile research, technology, and engineering** | **3,348,915** | **3,328,644** |
| | | |
| **Infrastructure and operations** | | |
| **Operating** | | |
| Operations of facilities .................................. | 1,053,000 | 1,053,000 |
| Safety and Environmental Operations ........................ | 139,114 | 139,114 |
| Maintenance and Repair of Facilities ......................... | 718,000 | 700,000 |

137 STAT. 926          PUBLIC LAW 118–31—DEC. 22, 2023

### SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS
(In Thousands of Dollars)

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| Program decrease ............................................. | | [−18,000] |
| **Recapitalization** | | |
| Infrastructure and Safety ...................................... | 650,012 | 638,012 |
| Program decrease ............................................. | | [−12,000] |
| **Subtotal, Recapitalization** ......................................... | **650,012** | **638,012** |
| **Total, Operating** ................................................................. | **2,560,126** | **2,530,126** |
| **Mission enabling construction:** | | |
| 22–D–510 Analytic Gas Laboratory, PX ...................... | 35,000 | 35,000 |
| 22–D–511 Plutonium Production Building, LANL ...... | 48,500 | 48,500 |
| 22–D–512 TA–46 Protective Force Facility, LANL ..... | 48,500 | 48,500 |
| 22–D–517 Electrical Power Capacity Upgrade, LANL | 75,000 | 75,000 |
| 22–D–518 Plutonium Modernization Ops & Waste Mngmt Office Bldg, LANL ......................................... | 0 | 0 |
| 23–D–519 Special Material Facility, Y–12 ................. | 0 | 0 |
| **Total, Mission enabling construction** ........................... | **207,000** | **207,000** |
| **Total, Infrastructure and operations** .................................. | **2,767,126** | **2,737,126** |
| | | |
| **Secure transportation asset** | | |
| Operations and equipment ................................................. | 239,008 | 239,008 |
| Program direction .................................................... | 118,056 | 118,056 |
| **Total, Secure transportation asset** ........................................ | **357,064** | **357,064** |
| | | |
| **Defense nuclear security** | | |
| Operations and maintenance ............................................... | 988,756 | 988,756 |
| **Construction:** | | |
| 17–D–710 West End Protected Area Reduction Project, Y–12 ................................................................ | 28,000 | 38,000 |
| Program increase .................................................... | | [10,000] |
| **Subtotal, Construction** ...................................................... | **28,000** | **38,000** |
| **Total, Defense nuclear security** ........................................... | **1,016,756** | **1,026,756** |
| | | |
| **Information technology and cybersecurity** ............................... | **578,379** | **578,379** |
| **Legacy contractor pensions** ......................................................... | **65,452** | **65,452** |
| **Total, Weapons Activities** ................................................................ | **18,946,519** | **19,235,248** |
| | | |
| **Adjustments** | | |
| Use of prior year balances ................................................. | −113,572 | −113,572 |
| **Total, Adjustments** .......................................................... | **−113,572** | **−133,572** |
| **Total, Weapons Activities** ................................................................ | **18,832,947** | **19,121,676** |
| | | |
| | | |
| **Defense Nuclear Nonproliferation** | | |
| **Material Management and Minimization** | | |
| Conversion (formerly HEU Reactor Conversion) ................ | 116,675 | 116,675 |
| Nuclear material removal .................................................... | 47,100 | 47,100 |
| Material disposition ............................................................ | 282,250 | 282,250 |
| **Total, Material Management and Minimization** .............. | **446,025** | **446,025** |
| **Global Material Security** | | |
| International nuclear security ............................................ | 84,707 | 75,000 |
| Program decrease ............................................................. | | [−9,707] |
| Radiological security .......................................................... | 258,033 | 258,033 |
| Nuclear smuggling detection and deterrence ..................... | 181,308 | 181,308 |
| **Total, Global Material Security** ............................................ | **524,048** | **514,341** |
| Nonproliferation and Arms Control ......................................... | 212,358 | 192,358 |
| Program decrease ................................................................. | | [−20,000] |
| **Defense Nuclear Nonproliferation R&D** | | |
| Proliferation detection ........................................................ | 290,388 | 280,388 |
| Program decrease ............................................................. | | [−10,000] |
| Nonproliferation stewardship program .............................. | 107,437 | 107,437 |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 927

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
(In Thousands of Dollars)

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| Nuclear detonation detection | 285,603 | 285,603 |
| Forensics R&D | 44,759 | 44,759 |
| Nonproliferation fuels development | 0 | 0 |
| **Total, Defense Nuclear Nonproliferation R&D** | **728,187** | **718,187** |
| **Nonproliferation Construction:** | | |
| 18–D–150 Surplus Plutonium Disposition Project, SRS | 77,211 | 77,211 |
| **Total, Nonproliferation Construction** | **77,211** | **77,211** |
| NNSA Bioassurance Program | 25,000 | 0 |
| Program decrease | | [–25,000] |
| Legacy contractor pensions | 22,587 | 22,587 |
| **Nuclear Counterterrorism and Incident Response Program** | | |
| Emergency Operations | 19,123 | 19,123 |
| Counterterrorism and Counterproliferation | 474,420 | 474,420 |
| **Total, Nuclear Counterterrorism and Incident Response Program** | **493,543** | **493,543** |
| **Subtotal, Defense Nuclear Nonproliferation** | **2,528,959** | **2,464,252** |
| | | |
| **Adjustments** | | |
| Use of prior year balances | –20,000 | –20,000 |
| **Total, Adjustments** | **–20,000** | **–20,000** |
| | | |
| **Total, Defense Nuclear Nonproliferation** | **2,508,959** | **2,444,252** |
| | | |
| **Naval Reactors** | | |
| Naval reactors development | 838,340 | 838,340 |
| Columbia-Class reactor systems development | 52,900 | 52,900 |
| S8G Prototype refueling | 0 | 0 |
| Naval reactors operations and infrastructure | 712,036 | 712,036 |
| Program direction | 61,540 | 61,540 |
| **Construction:** | | |
| 22–D–533 BL Component Test Complex | 0 | 0 |
| 22–D–531 KL Chemistry & Radiological Health Building | 10,400 | 10,400 |
| 21–D–530 KL Steam and Condensate Upgrade | 53,000 | 53,000 |
| 14–D–901 Spent Fuel Handling Recapitalization Project, NRF | 199,300 | 199,300 |
| 24–D–530 NRF Medical Science Complex | 36,584 | 36,584 |
| **Total, Construction** | **299,284** | **299,284** |
| **Total, Naval Reactors** | **1,964,100** | **1,964,100** |
| | | |
| **Federal Salaries and Expenses** | | |
| Program direction | 538,994 | 518,994 |
| Use of prior year balances | 0 | 0 |
| **Total, Federal Salaries and Expenses** | **538,994** | **518,994** |
| | | |
| **TOTAL, National Nuclear Security Administration** | **23,845,000** | **24,049,022** |
| | | |
| **Defense Environmental Cleanup** | | |
| Closure sites administration | 3,023 | 3,023 |
| **Richland** | | |
| River corridor and other cleanup operations | 180,000 | 180,000 |
| Central plateau remediation | 684,289 | 684,289 |
| Richland community and regulatory support | 10,100 | 10,100 |
| 18–D–404 Modification of Waste Encapsulation and Storage Facility | 0 | 0 |
| 22–D–401 L–888 Eastern Plateau Fire Station | 7,000 | 7,000 |
| 22–D–402 L–897 200 Area Water Treatment Facility | 11,200 | 11,200 |

137 STAT. 928          PUBLIC LAW 118–31—DEC. 22, 2023

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
(In Thousands of Dollars)

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| 23–D–404 181D Export Water System Reconfiguration and Upgrade | 27,149 | 27,149 |
| 23–D–405 181B Export Water System Reconfiguration and Upgrade | 462 | 462 |
| 24–D–401 Environmental Restoration Disposal Facility Supercell 11 Expans Proj | 1,000 | 1,000 |
| **Total, Richland** | **921,200** | **921,200** |
| | | |
| **Office of River Protection:** | | |
| Waste Treatment Immobilization Plant Commissioning | 466,000 | 430,000 |
| Program decrease | | [–36,000] |
| Rad liquid tank waste stabilization and disposition | 813,625 | 813,625 |
| **Construction:** | | |
| 23–D–403 Hanford 200 West Area Tank Farms Risk Management Project | 15,309 | 15,309 |
| 15–D–409 Low Activity Waste Pretreatment System | 60,000 | 60,000 |
| 18–D–16 Waste Treatment and Immobilization Plant—LBL/Direct feed LAW | 0 | 0 |
| 01–D–16D High-Level Waste Facility | 600,000 | 600,000 |
| 01–D–16E Pretreatment Facility | 20,000 | 20,000 |
| **Subtotal, Construction** | **695,309** | **695,309** |
| ORP Low-level waste offsite disposal | 0 | 0 |
| **Total, Office of River Protection** | **1,974,934** | **1,938,934** |
| | | |
| **Idaho National Laboratory:** | | |
| Idaho cleanup and waste disposition | 377,623 | 377,623 |
| Idaho community and regulatory support | 2,759 | 2,759 |
| **Construction:** | | |
| 22–D–403 Idaho Spent Nuclear Fuel Staging Facility | 10,159 | 10,159 |
| 22–D–404 Addl ICDF Landfill Disposal Cell and Evaporation Ponds Project | 46,500 | 46,500 |
| 22–D–402 Calcine Construction | 10,000 | 10,000 |
| **Subtotal, Construction** | **66,659** | **66,659** |
| **Total, Idaho National Laboratory** | **447,041** | **447,041** |
| | | |
| **NNSA sites and Nevada off-sites** | | |
| Lawrence Livermore National Laboratory | 1,879 | 1,879 |
| LLNL Excess Facilities D&D | 20,195 | 20,195 |
| Separations Processing Research Unit | 15,300 | 15,300 |
| Nevada Test Site | 61,952 | 61,952 |
| Sandia National Laboratory | 2,264 | 2,264 |
| Los Alamos National Laboratory | 273,831 | 273,831 |
| Los Alamos Excess Facilities D&D | 13,648 | 13,648 |
| **Total, NNSA sites and Nevada off-sites** | **389,069** | **389,069** |
| | | |
| **Oak Ridge Reservation:** | | |
| OR Nuclear Facility D&D | 335,000 | 335,000 |
| U233 Disposition Program | 55,000 | 55,000 |
| OR cleanup and waste disposition | 72,000 | 72,000 |
| **Construction:** | | |
| 14–D–403 Outfall 200 Mercury Treatment Facility | 10,000 | 10,000 |
| 17–D–401 On-site Waste Disposal Facility | 24,500 | 24,500 |
| **Subtotal, Construction** | **34,500** | **34,500** |
| OR community & regulatory support | 5,500 | 5,500 |
| OR technology development and deployment | 3,000 | 3,000 |
| **Total, Oak Ridge Reservation** | **505,000** | **505,000** |

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 929

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
(In Thousands of Dollars)

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| **Savannah River Site:** | | |
| Savannah River risk management operations | 453,109 | 460,241 |
| Program increase | | [7,132] |
| Savannah River legacy pensions | 65,898 | 65,898 |
| Savannah River community and regulatory support | 12,389 | 12,389 |
| Savannah River National Laboratory O&M | 42,000 | 42,000 |
| **Construction:** | | |
| 20-D–401 Saltstone Disposal Unit #10, 11, 12 | 56,250 | 56,250 |
| 19–D–701 SR Security Systems Replacement | 0 | 0 |
| 18–D–401 Saltstone Disposal Unit #8, 9 | 31,250 | 31,250 |
| 18–D–402 Emergency Operations Center Replacement, SR | 34,733 | 34,733 |
| **Subtotal, Construction** | **122,233** | **122,233** |
| Radioactive liquid tank waste stabilization | 880,323 | 900,323 |
| Program increase | | [20,000] |
| **Total, Savannah River Site** | **1,575,952** | **1,603,084** |
| | | |
| **Waste Isolation Pilot Plant** | | |
| Waste Isolation Pilot Plant | 369,961 | 369,961 |
| **Construction:** | | |
| 15–D–411 Safety Significant Confinement Ventilation System, WIPP | 44,365 | 44,365 |
| 15–D–412 Utility Shaft, WIPP | 50,000 | 50,000 |
| **Total, Construction** | **94,365** | **94,365** |
| **Total, Waste Isolation Pilot Plant** | **464,326** | **464,326** |
| | | |
| Program direction—Defense Environmental Cleanup | 326,893 | 326,893 |
| Program support—Defense Environmental Cleanup | 103,504 | 82,548 |
| Program decrease | | [–20,956] |
| Safeguards and Security—Defense Environmental Cleanup | 332,645 | 332,645 |
| Technology development and deployment | 30,000 | 30,000 |
| **Subtotal, Defense Environmental Cleanup** | **7,073,587** | **7,043,763** |
| | | |
| **TOTAL, Defense Environmental Cleanup** | **7,073,587** | **7,043,763** |
| | | |
| **Defense Uranium Enrichment D&D** | 427,000 | 0 |
| Program decrease | | [–427,000] |
| | | |
| **Other Defense Activities** | | |
| **Environment, health, safety and security** | | |
| Environment, health, safety and security mission support | 144,705 | 144,705 |
| Program direction | 86,558 | 86,558 |
| **Total, Environment, health, safety and security** | **231,263** | **231,263** |
| | | |
| **Office of Enterprise Assessments** | | |
| Enterprise assessments | 30,022 | 30,022 |
| Program direction | 64,132 | 64,132 |
| **Total, Office of Enterprise Assessments** | **94,154** | **94,154** |
| | | |
| Specialized security activities | 345,330 | 345,330 |
| | | |
| **Legacy Management** | | |
| Legacy Management Activities—Defense | 173,681 | 173,681 |
| Program Direction | 22,621 | 22,621 |
| **Total, Legacy Management** | **196,302** | **196,302** |
| | | |
| Defense-Related Administrative Support | 203,649 | 203,649 |

**SEC. 4701. DEPARTMENT OF ENERGY NATIONAL SECURITY PROGRAMS**
**(In Thousands of Dollars)**

| Program | FY 2024 Request | Conference Authorized |
|---|---|---|
| Office of Hearings and Appeals | 4,499 | 4,499 |
| **Subtotal, Other Defense Activities** | **1,075,197** | **1,075,197** |
| Use of prior year balances | 0 | 0 |
| **Total, Other Defense Activities** | **1,075,197** | **1,075,197** |

# DIVISION E—OTHER MATTERS

# TITLE L—VETERANS AFFAIRS MATTERS

Sec. 5001. Adjustment of threshold amount for minor medical facility projects of Department of Veterans Affairs.
Sec. 5002. Grave markers at Santa Fe National Cemetery, New Mexico.
Sec. 5003. Improving processing by Department of Veterans Affairs of disability claims for post-traumatic stress disorder through improved training.

**SEC. 5001. ADJUSTMENT OF THRESHOLD AMOUNT FOR MINOR MED-ICAL FACILITY PROJECTS OF DEPARTMENT OF VET-ERANS AFFAIRS.**

Section 8104(a) of title 38, United States Code, is amended—
(1) in paragraph (3)(A), by striking "$20,000,000" each place it appears and inserting "the amount specified in paragraph (4)"; and
(2) by adding at the end the following new paragraph:
"(4)(A) The amount specified in this paragraph is $30,000,000, as adjusted pursuant to this paragraph.

<span class="margin">Time period.
Determination.</span>

"(B)(i) The Secretary may annually adjust the amount specified in this paragraph to reflect a percentage increase, if any, in construction costs during the prior calendar year, as determined by—
"(I) the relevant composite construction and lease cost indices pursuant to section 3307(h) of title 40, or any similar successor index developed by the Administrator of the General Services Administration; or
"(II) the Producer Price Index for New Health Care Building Construction published by the Bureau of Labor Statistics of the Department of Labor, or any similar successor index developed by the Secretary of Labor.
"(ii) If there is no percentage increase in construction costs determined as described in clause (i) for a calendar year, the Secretary may not adjust the amount specified in subparagraph (A) for that year.

<span class="margin">Notice.
Federal Register, publication.</span>

"(C) If the Secretary adjusts the amount specified in this paragraph, the Secretary shall publish a notice of such adjustment in the Federal Register.

<span class="margin">Deadline.
Notification.</span>

"(D) Not later than 30 days before adjusting the amount specified in this paragraph, the Secretary shall notify the Committee on Veterans' Affairs and the Committee on Appropriations of the Senate and the Committee on Veterans' Affairs and the Committee on Appropriations of the House of Representatives.

<span class="margin">Determination.
Schedule.</span>

"(E) The Secretary shall determine a logical schedule for adjustments under this paragraph to take effect so that the amounts for and types of construction projects requested by the Department in the budget of the President under section 1105(a) of title 31

are consistent with the threshold for construction projects as so adjusted.".

### SEC. 5002. GRAVE MARKERS AT SANTA FE NATIONAL CEMETERY, NEW MEXICO.

(a) REPEAL OF AUTHORITY TO PROVIDE FLAT GRAVE MARKERS.— Section 612 of the Veterans Millennium Health Care and Benefits Act (Public Law 106–117; 38 U.S.C. 2404 note) is hereby repealed.

(b) STUDY REQUIRED.—Not later than one year after the date of the enactment of this Act, the Secretary of Veterans Affairs shall submit to the Committees on Veterans' Affairs of the Senate and House of Representatives, and make publicly available, a report on the cost of replacing the flat grave markers that were provided under such section 612 at the Santa Fe National Cemetery, New Mexico, with upright grave markers.

*Public information. Reports.*

### SEC. 5003. IMPROVING PROCESSING BY DEPARTMENT OF VETERANS AFFAIRS OF DISABILITY CLAIMS FOR POST-TRAUMATIC STRESS DISORDER THROUGH IMPROVED TRAINING.

*Deadlines. 38 USC 1101 note.*

(a) FORMAL PROCESS FOR CONDUCT OF ANNUAL ANALYSIS OF TRAINING NEEDS BASED ON TRENDS.—Not later than 180 days after the date of the enactment of this Act, the Secretary of Veterans Affairs, acting through the Under Secretary for Benefits, shall establish a formal process to analyze, on an annual basis, training needs of employees of the Department who review claims for disability compensation for post-traumatic stress disorder, based on identified processing error trends.

(b) FORMAL PROCESS FOR CONDUCT OF ANNUAL STUDIES TO SUPPORT ANNUAL ANALYSIS.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary, acting through the Under Secretary, shall establish a formal process to conduct, on an annual basis, studies to help guide the process established under subsection (a).

(2) ELEMENTS.—Each study conducted under paragraph (1) shall cover the following:

(A) Military post-traumatic stress disorder stressors.

(B) Decision-making claims for claims processors.

# TITLE LI—JUDICIARY MATTERS

Sec. 5101. Prohibition of demand for bribe.
Sec. 5102. Preventing child sex abuse.
Sec. 5103. Recognition as corporation and grant of Federal charter for National American Indian Veterans, Incorporated.
Sec. 5104. Visa availability for government employee immigrant visa program.

### SEC. 5101. PROHIBITION OF DEMAND FOR BRIBE.

Section 201 of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (2), by striking "and" at the end;

(B) in paragraph (3), by striking the period at the end and inserting a semicolon; and

(C) by adding at the end the following:

"(4) the term 'foreign official' means—

"(A)(i) any official or employee of a foreign government or any department, agency, or instrumentality thereof; or

137 STAT. 932                    PUBLIC LAW 118–31—DEC. 22, 2023

"(ii) any senior foreign political figure, as defined in section 1010.605 of title 31, Code of Federal Regulations, or any successor regulation;

"(B) any official or employee of a public international organization;

"(C) any person acting in an official capacity for or on behalf of—

"(i) a government, department, agency, or instrumentality described in subparagraph (A)(i); or

"(ii) a public international organization; or

"(D) any person acting in an unofficial capacity for or on behalf of—

"(i) a government, department, agency, or instrumentality described in subparagraph (A)(i); or

"(ii) a public international organization; and

Definition.

"(5) the term 'public international organization' means—

"(A) an organization that is designated by Executive order pursuant to section 1 of the International Organizations Immunities Act (22 U.S.C. 288); or

Designation.
President.
Effective date.

"(B) any other international organization that is designated by the President by Executive order for the purposes of this section, effective as of the date of publication of such order in the Federal Register."; and

(2) by adding at the end the following:

"(f) PROHIBITION OF DEMAND FOR A BRIBE.—

Applicability.

"(1) OFFENSE.—It shall be unlawful for any foreign official or person selected to be a foreign official to corruptly demand, seek, receive, accept, or agree to receive or accept, directly or indirectly, anything of value personally or for any other person or nongovernmental entity, by making use of the mails or any means or instrumentality of interstate commerce, from any person (as defined in section 104A of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd–3), except that that definition shall be applied without regard to whether the person is an offender) while in the territory of the United States, from an issuer (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a))), or from a domestic concern (as defined in section 104 of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd–2)), in return for—

"(A) being influenced in the performance of any official act;

"(B) being induced to do or omit to do any act in violation of the official duty of such foreign official or person; or

"(C) conferring any improper advantage,

in connection with obtaining or retaining business for or with, or directing business to, any person.

"(2) PENALTIES.—Any person who violates paragraph (1) shall be fined not more than $250,000 or 3 times the monetary equivalent of the thing of value, imprisoned for not more than 15 years, or both.

"(3) JURISDICTION.—An offense under paragraph (1) shall be subject to extraterritorial Federal jurisdiction.

Public information.
Web posting.

"(4) REPORT.—Not later than 1 year after the date of enactment of the Foreign Extortion Prevention Act, and annually thereafter, the Attorney General, in consultation with the Secretary of State as relevant, shall submit to the Committee

on the Judiciary and the Committee on Foreign Relations of the Senate and the Committee on the Judiciary and the Committee on Foreign Affairs of the House of Representatives, and post on the publicly available website of the Department of Justice, a report—

"(A) focusing, in part, on demands by foreign officials for bribes from entities domiciled or incorporated in the United States, and the efforts of foreign governments to prosecute such cases;

"(B) addressing United States diplomatic efforts to protect entities domiciled or incorporated in the United States from foreign bribery, and the effectiveness of those efforts in protecting such entities;

"(C) summarizing major actions taken under this section in the previous year, including enforcement actions taken and penalties imposed;

"(D) evaluating the effectiveness of the Department of Justice in enforcing this section; and

"(E) detailing what resources or legislative action the Department of Justice needs to ensure adequate enforcement of this section.

"(5) RULE OF CONSTRUCTION.—This subsection shall not be construed as encompassing conduct that would violate section 30A of the Securities Exchange Act of 1934 (15 U.S.C. 78dd–1) or section 104 or 104A of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd–2; 15 U.S.C. 78dd–3) whether pursuant to a theory of direct liability, conspiracy, complicity, or otherwise.".

## SEC. 5102. PREVENTING CHILD SEX ABUSE.

(a) SHORT TITLE.—This section may be cited as the "Preventing Child Sex Abuse Act of 2023".

(b) SENSE OF CONGRESS.—The sense of Congress is the following:

(1) The safety of children should be a top priority for public officials and communities in the United States.

(2) According to the Rape, Abuse & Incest National Network, an individual in the United States is sexually assaulted every 68 seconds. And every 9 minutes, that victim is a child. Meanwhile, only 25 out of every 1,000 perpetrators will end up in prison.

(3) The effects of child sexual abuse can be long-lasting and affect the victim's mental health.

(4) Victims are more likely than non-victims to experience the following mental health challenges:

(A) Victims are about 4 times more likely to develop symptoms of drug abuse.

(B) Victims are about 4 times more likely to experience post-traumatic stress disorder as adults.

(C) Victims are about 3 times more likely to experience a major depressive episode as adults.

(5) The criminal justice system should and has acted as an important line of defense to protect children and hold perpetrators accountable.

(6) However, the horrific crimes perpetuated by Larry Nassar demonstrate firsthand the loopholes that still exist in the criminal justice system. While Larry Nassar was found

Summary.
Time period.

Evaluation.

Preventing Child Sex Abuse Act of 2023.
18 USC 1 note.
18 USC 2423 note.

Larry Nassar.

137 STAT. 934          PUBLIC LAW 118–31—DEC. 22, 2023

guilty of several State-level offenses, he was not charged federally for his illicit sexual contact with minors, despite crossing State and international borders to commit this conduct.

(7) The Department of Justice has also identified a growing trend of Americans who use charitable or missionary work in a foreign country as a cover for sexual abuse of children.

(8) It is the intent of Congress to prohibit Americans from engaging in sexual abuse or exploitation of minors under the guise of work, including volunteer work, with an organization that affects interstate or foreign commerce, such as an international charity.

(9) Federal law does not require that an abuser's intention to engage in sexual abuse be a primary, significant, dominant, or motivating purpose of the travel.

(10) Child sexual abuse does not require physical contact between the abuser and the child. This is especially true as perpetrators turn increasingly to internet platforms, online chat rooms, and webcams to commit child sexual abuse.

(11) However, a decision of the United States Court of Appeals for the Seventh Circuit found the use of a webcam to engage in sexually provocative activity with a minor did not qualify as "sexual activity".

(12) Congress can address this issue by amending the definition of the term "sexual activity" to clarify that it does not require interpersonal, physical contact.

(13) It is the duty of Congress to provide clearer guidance to ensure that those who commit crimes against children are prosecuted to the fullest extent of the law.

(c) INTERSTATE CHILD SEXUAL ABUSE.—Section 2423 of title 18, United States Code, is amended—

(1) in subsection (b), by striking "with a motivating purpose of engaging in any illicit sexual conduct with another person" and inserting "with intent to engage in any illicit sexual conduct with another person";

(2) by redesignating subsections (d), (e), (f), and (g) as subsections (e), (f), (g), and (i), respectively;

(3) in subsection (e), as so redesignated, by striking "with a motivating purpose of engaging in any illicit sexual conduct" and inserting "with intent to engage in any illicit sexual conduct"; and

(4) by inserting after subsection (g), as so redesignated, the following:

"(h) RULE OF CONSTRUCTION.—As used in this section, the term 'intent' shall be construed as any intention to engage in prostitution, sexual activity for which any person can be charged with a criminal offense, or illicit sexual conduct, as applicable, at the time of the transportation or travel.".

(d) ABUSE UNDER THE GUISE OF CHARITY.—Section 2423 of title 18, United States Code, as amended by subsection (c) of this section, is amended—

(1) by inserting after subsection (c) the following:

Penalties.

"(d) ILLICIT SEXUAL CONDUCT IN CONNECTION WITH CERTAIN ORGANIZATIONS.—Any citizen of the United States or alien admitted for permanent residence who—

"(1) is an officer, director, employee, or agent of an organization that affects interstate or foreign commerce;

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 935

"(2) makes use of the mails or any means or instrumentality of interstate or foreign commerce through the connection or affiliation of the person with such organization; and

"(3) commits an act in furtherance of illicit sexual conduct through the connection or affiliation of the person with such organization,

shall be fined under this title, imprisoned for not more than 30 years, or both.";

(2) in subsection (f), as so redesignated, by striking "or (d)" and inserting "(d), or (e)"; and

(3) in subsection (i), as so redesignated, by striking "(f)(2)" and inserting "(g)(2)".

(e) SEXUAL ACTIVITY WITH MINORS.—Section 2427 of title 18, United States Code, is amended by inserting "does not require interpersonal physical contact, and" before "includes".

### SEC. 5103. RECOGNITION AS CORPORATION AND GRANT OF FEDERAL CHARTER FOR NATIONAL AMERICAN INDIAN VETERANS, INCORPORATED.

(a) IN GENERAL.—Part B of subtitle II of title 36, United States Code, is amended by inserting after chapter 1503 the following:

36 USC prec. 150401.

## "CHAPTER 1504—NATIONAL AMERICAN INDIAN VETERANS, INCORPORATED

"Sec.
"150401. Organization.
"150402. Purposes.
"150403. Membership.
"150404. Board of directors.
"150405. Officers.
"150406. Nondiscrimination.
"150407. Powers.
"150408. Exclusive right to name, seals, emblems, and badges.
"150409. Restrictions.
"150410. Duty to maintain tax-exempt status.
"150411. Records and inspection.
"150412. Service of process.
"150413. Liability for acts of officers and agents.
"150414. Failure to comply with requirements.
"150415. Annual report.

### "§ 150401 Organization

36 USC 150401.

"The National American Indian Veterans, Incorporated, a non-profit corporation organized in the United States (referred to in this chapter as the 'corporation'), is a federally chartered corporation.

### "§ 150402. Purposes

36 USC 150402.

"The purposes of the corporation are those stated in the articles of incorporation, constitution, and bylaws of the corporation, and include a commitment—

"(1) to uphold and defend the Constitution of the United States while respecting the sovereignty of the American Indian Nations;

"(2) to unite under one body all American Indian veterans who served in the Armed Forces of United States;

"(3) to be an advocate on behalf of all American Indian veterans without regard to whether they served during times of peace, conflict, or war;

137 STAT. 936          PUBLIC LAW 118–31—DEC. 22, 2023

"(4) to promote social welfare (including educational, economic, social, physical, and cultural values and traditional healing) in the United States by encouraging the growth and development, readjustment, self-respect, self-confidence, contributions, and self-identity of American Indian veterans;

"(5) to serve as an advocate for the needs of American Indian veterans and their families and survivors in their dealings with all Federal and State government agencies;

"(6) to promote, support, and utilize research, on a nonpartisan basis, pertaining to the relationship between American Indian veterans and American society; and

"(7) to provide technical assistance to the Bureau of Indian Affairs regional areas that are not served by any veterans committee or organization or program by—

"(A) providing outreach service to Indian Tribes in need; and

"(B) training and educating Tribal Veterans Service Officers for Indian Tribes in need.

36 USC 150403.

## "§ 150403. Membership

"Subject to section 150406, eligibility for membership in the corporation, and the rights and privileges of members, shall be as provided in the constitution and bylaws of the corporation.

36 USC 150404.

## "§ 150404. Board of directors

"Subject to section 150406, the board of directors of the corporation, and the responsibilities of the board, shall be as provided in the constitution and bylaws of the corporation and in conformity with the laws under which the corporation is incorporated.

36 USC 150405.

## "§ 150405. Officers

"Subject to section 150406, the officers of the corporation, and the election of such officers, shall be as provided in the constitution and bylaws of the corporation and in conformity with the laws of the jurisdiction under which the corporation is incorporated.

36 USC 150406.

## "§ 150406. Nondiscrimination

"In establishing the conditions of membership in the corporation, and in determining the requirements for serving on the board of directors or as an officer of the corporation, the corporation may not discriminate on the basis of race, color, religion, sex, national origin, handicap, or age.

36 USC 150407.

## "§ 150407. Powers

"The corporation shall have only those powers granted the corporation through its articles of incorporation, constitution, and bylaws, which shall conform to the laws of the jurisdiction under which the corporation is incorporated.

36 USC 150408.

## "§ 150408. Exclusive right to name, seals, emblems, and badges

"(a) IN GENERAL.—The corporation shall have the sole and exclusive right to use the names 'National American Indian Veterans, Incorporated' and 'National American Indian Veterans', and such seals, emblems, and badges as the corporation may lawfully adopt.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 937

"(b) EFFECT.—Nothing in this section interferes or conflicts with any established or vested rights.

## "§ 150409. Restrictions

36 USC 150409.

"(a) STOCK AND DIVIDENDS.—The corporation may not—
    "(1) issue any shares of stock; or
    "(2) declare or pay any dividends.
"(b) DISTRIBUTION OF INCOME OR ASSETS.—
    "(1) IN GENERAL.—The income or assets of the corporation may not—
        "(A) inure to any person who is a member, officer, or director of the corporation; or
        "(B) be distributed to any such person during the life of the charter granted by this chapter.
    "(2) EFFECT.—Nothing in this subsection prevents the payment of reasonable compensation to the officers of the corporation, or reimbursement for actual and necessary expenses, in amounts approved by the board of directors.
"(c) LOANS.—The corporation may not make any loan to any officer, director, member, or employee of the corporation.
"(d) NO FEDERAL ENDORSEMENT.—The corporation may not claim congressional approval or Federal Government authority by virtue of the charter granted by this chapter for any of the activities of the corporation.

## "§ 150410. Duty to maintain tax-exempt status

36 USC 150410.

"The corporation shall maintain its status as an organization exempt from taxation under the Internal Revenue Code of 1986.

## "§ 150411. Records and inspection

36 USC 150411.

"(a) RECORDS.—The corporation shall keep—
    "(1) correct and complete books and records of accounts;
    "(2) minutes of any proceeding of the corporation involving any member of the corporation, the board of directors, or any committee having authority under the board of directors; and
    "(3) at the principal office of the corporation, a record of the names and addresses of all members of the corporation having the right to vote.
"(b) INSPECTION.—
    "(1) IN GENERAL.—All books and records of the corporation may be inspected by any member having the right to vote, or by any agent or attorney of such a member, for any proper purpose, at any reasonable time.
    "(2) EFFECT.—Nothing in this section contravenes—
        "(A) the laws of the jurisdiction under which the corporation is incorporated; or
        "(B) the laws of those jurisdictions within the United States and its territories within which the corporation carries out activities in furtherance of the purposes of the corporation.

## "§ 150412. Service of process

36 USC 150412.

Compliance.

"With respect to service of process, the corporation shall comply with the laws of—
    "(1) the jurisdiction under which the corporation is incorporated; and

"(2) those jurisdictions within the United States and its territories within which the corporation carries out activities in furtherance of the purposes of the corporation.

36 USC 150413.

**"§ 150413. Liability for acts of officers and agents**

"The corporation shall be liable for the acts of the officers and agents of the corporation acting within the scope of their authority.

36 USC 150414.

**"§ 150414. Failure to comply with requirements**

"If the corporation fails to comply with any of the requirements of this chapter, including the requirement under section 150410 to maintain its status as an organization exempt from taxation, the charter granted by this chapter shall expire.

36 USC 150415.

**"§ 150415. Annual report**

"(a) IN GENERAL.—The corporation shall submit to Congress an annual report describing the activities of the corporation during the preceding fiscal year.

"(b) SUBMITTAL DATE.—Each annual report under this section shall be submitted at the same time as the report of the audit of the corporation required by section 10101(b).

"(c) REPORT NOT PUBLIC DOCUMENT.—No annual report under this section shall be printed as a public document.".

36 USC prec. 101.

(b) CLERICAL AMENDMENT.—The table of chapters for subtitle II of title 36, United States Code, is amended by inserting after the item relating to chapter 1503 the following:

"1504.  National American Indian Veterans, Incorporated ...............................150401".

**SEC. 5104. VISA AVAILABILITY FOR GOVERNMENT EMPLOYEE IMMIGRANT VISA PROGRAM.**

Effective date.
8 USC 1153 note.

(a) IN GENERAL.—Beginning in fiscal year 2024, subject to subsection (b), visas shall be made available to a special immigrant described in section 101(a)(27)(D) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)(D)) if a visa is not immediately available for issuance to the special immigrant under section 203(b)(4) of that Act (8 U.S.C. 1153(b)(4)).

Time periods.

(b) NUMERICAL LIMITATIONS.—

(1) FISCAL YEAR 2024.—For fiscal year 2024, not more than 3,500 visas shall be made available under subsection (a).

(2) SUBSEQUENT FISCAL YEARS.—For fiscal year 2025 and each fiscal year thereafter, not more than 3,000 visas shall be made available under subsection (a).

(c) TEMPORARY REDUCTION IN DIVERSITY VISAS.—Section 203(d)(2) of the Nicaraguan Adjustment and Central America Relief Act (8 U.S.C. 1151 note; Public Law 105–100) is amended—

(1) by amending paragraph (2) to read as follows:

"(2) In no case shall the reduction under paragraph (1) for a fiscal year exceed the amount by which—

"(A) the sum of—

"(i) one-half of the total number of individuals described in subclauses (I), (II), (III), and (IV) of section 309(c)(5)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note; Public Law 104–208) who have adjusted their status to that of aliens lawfully admitted for permanent residence under section 202 of the Nicaraguan Adjustment and Central American Relief Act (Public Law

105–100; 8 U.S.C. 1255 note) as of the end of the previous fiscal year; and

"(ii) the total number of individuals described in section 101(a)(27)(D) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)(D)) for whom visas shall have been made available under section 5104 of the National Defense Authorization Act for Fiscal Year 2024 as of the end of the previous fiscal year; exceeds

"(B) the total of the reductions in available visas under this subsection for all previous fiscal years."; and

(2) by adding at the end the following:

"(3)(A) Paragraph (1) shall not apply in a fiscal year following a fiscal year for which the sum calculated under paragraph (2)(A), minus the number in paragraph (2)(B), is zero.

"(B) Nothing in this paragraph may be construed—

"(i) to repeal, modify, or render permanently inapplicable paragraph (1); or

"(ii) to prevent the offsetting of the number of visas described in that paragraph for the purpose of providing visa availability for aliens described in section 5104 of the National Defense Authorization Act for Fiscal Year 2024.

"(4) In the event that the number of visas available for a fiscal year under section 201(e) of the Immigration and Nationality Act (8 U.S.C. 1151(e)) is reduced to a number fewer than 50,000, not fewer than 3,000 of such visas shall be made available for individuals described in section 5104 of the National Defense Authorization Act for Fiscal Year 2024.".

(d) RULE OF CONSTRUCTION.—Nothing in this section or the amendments made by this section may be construed to modify the number of visas available under section 203(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(4)) to special immigrants described in section 101(a)(27)(D) of that Act (8 U.S.C. 1101(a)(27)(D)).

8 USC 1153 note.

# TITLE LII—OVERSIGHT AND ACCOUNTABILITY MATTERS

Sec. 5201. Establishment of higher rates of regularly scheduled overtime pay for United States Border Patrol agents classified at GS–12.

## SEC. 5201. ESTABLISHMENT OF HIGHER RATES OF REGULARLY SCHEDULED OVERTIME PAY FOR UNITED STATES BORDER PATROL AGENTS CLASSIFIED AT GS–12.

Section 5550 of title 5, United States Code, is amended by adding at the end the following:

"(h) SPECIAL OVERTIME PAY FOR GS–12 BORDER PATROL AGENTS.—

"(1) IN GENERAL.—Notwithstanding paragraphs (1)(F), (2)(C), and (3)(C) of subsection (b), a border patrol agent encumbering a position at grade GS–12 shall receive a special overtime payment under this subsection for hours of regularly scheduled work described in paragraph (2)(A)(ii) or (3)(A)(ii) of subsection (b), as applicable, that are credited to the agent through actual performance of work, crediting under rules for

canine agents under subsection (b)(1)(F), or substitution of over-time hours in the same work period under subsection (f)(2)(A), except that no such payment may be made for periods of absence resulting in an hours obligation under paragraph (3) or (4) of subsection (f).

"(2) COMPUTATION.—The special overtime payment author-ized under paragraph (1) shall be computed by multiplying the credited hours by 50 percent of the border patrol agent's hourly rate of basic pay, rounded to the nearest cent.

"(3) LIMITATIONS.—The special overtime payment author-ized under paragraph (1)—

"(A) is not considered basic pay for retirement under section 8331(3) or 8401(4) or for any other purpose;

"(B) is not payable during periods of paid leave or other paid time off; and

"(C) is not considered in computing an agent's lump-sum annual leave payment under sections 5551 and 5552.".

Federal Data Center Enhancement Act of 2023.

# TITLE LIII—FEDERAL DATA AND INFORMATION SECURITY

Sec. 5301. Short title.
Sec. 5302. Federal Data Center Consolidation Initiative amendments.

44 USC 101 note.

## SEC. 5301. SHORT TITLE.

This title may be cited as the "Federal Data Center Enhance-ment Act of 2023".

## SEC. 5302. FEDERAL DATA CENTER CONSOLIDATION INITIATIVE AMENDMENTS.

44 USC 3601 note.

(a) FINDINGS.—Congress finds the following:

(1) The statutory authorization for the Federal Data Center Optimization Initiative under section 834 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (44 U.S.C. 3601 note; Public Law 113–291) expired at the end of fiscal year 2022.

(2) The expiration of the authorization described in para-graph (1) presents Congress with an opportunity to review the objectives of the Federal Data Center Optimization Initia-tive to ensure that the initiative is meeting the current needs of the Federal Government.

(3) The initial focus of the Federal Data Center Optimiza-tion Initiative, which was to consolidate data centers and create new efficiencies, has resulted in, since 2010—

(A) the consolidation of more than 6,000 Federal data centers; and

(B) cost savings and avoidance of $5,800,000,000.

(4) The need of the Federal Government for access to data and data processing systems has evolved since the date of enactment in 2014 of subtitle D of title VIII of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015.

(5) Federal agencies and employees involved in mission critical functions increasingly need reliable access to secure, reliable, and protected facilities to house mission critical data and data operations to meet the immediate needs of the people of the United States.

PUBLIC LAW 118–31—DEC. 22, 2023    137 STAT. 941

(6) As of the date of enactment of this title, there is a growing need for Federal agencies to use data centers and cloud applications that meet high standards for cybersecurity, resiliency, and availability.

(b) MINIMUM REQUIREMENTS FOR NEW DATA CENTERS.—Section 834 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (44 U.S.C. 3601 note; Public Law 113–291) is amended—

(1) in subsection (a), by striking paragraphs (3) and (4) and inserting the following:

"(3) NEW DATA CENTER.—The term 'new data center' means—

"(A)(i) a data center or a portion thereof that is owned, operated, or maintained by a covered agency; or

"(ii) to the extent practicable, a data center or portion thereof—

"(I) that is owned, operated, or maintained by a contractor on behalf of a covered agency on the date on which the contract between the covered agency and the contractor expires; and

"(II) with respect to which the covered agency extends the contract, or enters into a new contract, with the contractor; and

"(B) on or after the date that is 180 days after the date of enactment of the Federal Data Center Enhancement Act of 2023, a data center or portion thereof that is—

"(i) established; or

"(ii) substantially upgraded or expanded.";

(2) by striking subsection (b) and inserting the following: "(b) MINIMUM REQUIREMENTS FOR NEW DATA CENTERS.—

"(1) IN GENERAL.—Not later than 180 days after the date of enactment of the Federal Data Center Enhancement Act of 2023, the Administrator shall establish minimum requirements for new data centers in consultation with the Administrator of General Services and the Federal Chief Information Officers Council.

"(2) CONTENTS.—

"(A) IN GENERAL.—The minimum requirements established under paragraph (1) shall include requirements relating to—

"(i) the availability of new data centers;

"(ii) the use of new data centers, including costs related to the facility, energy consumption, and related infrastructure;

"(iii) uptime percentage;

"(iv) protections against power failures, including on-site energy generation and access to multiple transmission paths;

"(v) protections against physical intrusions and natural disasters;

"(vi) information security protections required by subchapter II of chapter 35 of title 44, United States Code, and other applicable law and policy; and

"(vii) any other requirements the Administrator determines appropriate.

"(B) CONSULTATION.—In establishing the requirements described in subparagraph (A)(vi), the Administrator shall

*Definition.*

*Effective date.*

*Deadline.*

consult with the Director of the Cybersecurity and Infrastructure Security Agency and the National Cyber Director.

Deadline.
Guidance.

"(3) INCORPORATION OF MINIMUM REQUIREMENTS INTO CURRENT DATA CENTERS.—As soon as practicable, and in any case not later than 90 days after the Administrator establishes the minimum requirements pursuant to paragraph (1), the Administrator shall issue guidance to ensure, as appropriate, that covered agencies incorporate the minimum requirements established under that paragraph into the operations of any data center of a covered agency existing as of the date of enactment of the Federal Data Center Enhancement Act of 2023.

"(4) REVIEW OF REQUIREMENTS.—The Administrator, in consultation with the Administrator of General Services and the Federal Chief Information Officers Council, shall review, update, and modify the minimum requirements established under paragraph (1), as necessary.

Determination.

"(5) REPORT ON NEW DATA CENTERS.—During the development and planning lifecycle of a new data center, if the head of a covered agency determines that the covered agency is likely to make a management or financial decision relating to any data center, the head of the covered agency shall—

Notification.

"(A) notify—
"(i) the Administrator;
"(ii) Committee on Homeland Security and Governmental Affairs of the Senate; and
"(iii) Committee on Oversight and Accountability of the House of Representatives; and
"(B) describe in the notification with sufficient detail how the covered agency intends to comply with the minimum requirements established under paragraph (1).

Determination.

"(6) USE OF TECHNOLOGY.—In determining whether to establish or continue to operate an existing data center, the head of a covered agency shall—

Assessment.

"(A) regularly assess the application portfolio of the covered agency and ensure that each at-risk legacy application is updated, replaced, or modernized, as appropriate, to take advantage of modern technologies; and
"(B) prioritize and, to the greatest extent possible, leverage commercial data center solutions, including hybrid cloud, multi-cloud, co-location, interconnection, or cloud computing (as defined in section 3607 of this Chapter) rather than acquiring, overseeing, or managing custom data center infrastructure.

"(7) PUBLIC WEBSITE.—
"(A) IN GENERAL.—The Administrator shall maintain a public-facing website that includes information, data, and explanatory statements relating to the compliance of covered agencies with the requirements of this section.
"(B) PROCESSES AND PROCEDURES.—In maintaining the website described in subparagraph (A), the Administrator shall—

Time period.
Updates.

"(i) ensure covered agencies regularly, and not less frequently than biannually, update the information, data, and explanatory statements posed on the website, pursuant to guidance issued by the Administrator,

relating to any new data centers and, as appropriate, each existing data center of the covered agency; and

"(ii) ensure that all information, data, and explanatory statements on the website are maintained as open Government data assets."; and

(3) in subsection (c), by striking paragraph (1) and inserting the following:

"(1) IN GENERAL.—The head of a covered agency shall oversee and manage the data center portfolio and the information technology strategy of the covered agency in accordance with Federal cybersecurity guidelines and directives, including—

"(A) information security standards and guidelines promulgated by the Director of the National Institute of Standards and Technology;

"(B) applicable requirements and guidance issued by the Director of the Office of Management and Budget pursuant to section 3614 of title 44, United States Code; and

"(C) directives issued by the Secretary of Homeland Security under section 3553 of title 44, United States Code.".

(c) EXTENSION OF SUNSET.—Section 834(e) of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (44 U.S.C. 3601 note; Public Law 113–291) is amended by striking "2022" and inserting "2026".

(d) GAO REVIEW.—Not later than 1 year after the date of the enactment of this title, and annually thereafter, the Comptroller General of the United States shall review, verify, and audit the compliance of covered agencies with the minimum requirements established pursuant to section 834(b)(1) of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (44 U.S.C. 3601 note; Public Law 113–291) for new data centers and subsection (b)(3) of that section for existing data centers, as appropriate.

*Deadline. Verification. Audits. 44 USC 3601 note.*

# TITLE LIV—FOREIGN AFFAIRS MATTERS

### Subtitle A—Combating Global Corruption

Sec. 5401. Short title.
Sec. 5402. Definitions.
Sec. 5403. Publication and provision of lists regarding progress on anti-corruption efforts.
Sec. 5404. Minimum standards for the elimination of corruption and assessment of efforts to combat corruption.
Sec. 5405. Imposition of sanctions under Global Magnitsky Human Rights Accountability Act.
Sec. 5406. Designation of embassy anti-corruption points of contact.

### Subtitle B—Other Matters

Sec. 5411. Global cooperative framework to end human rights abuses in sourcing critical minerals.
Sec. 5412. Connecting Oceania's Nations with Vanguard Exercises and National Empowerment.
Sec. 5413. Ending China's developing nation status.
Sec. 5414. Permitting for international bridges.

137 STAT. 944          PUBLIC LAW 118–31—DEC. 22, 2023

Combating Global Corruption Act.
22 USC 10501 note.

# Subtitle A—Combating Global Corruption

**SEC. 5401. SHORT TITLE.**

This subtitle may be cited as the "Combating Global Corruption Act".

22 USC 10501.

**SEC. 5402. DEFINITIONS.**

In this subtitle:
   (1) The term "appropriate congressional committees" means—
      (A) the Committee on Foreign Relations, the Committee on Appropriations, the Committee on Banking, Housing, and Urban Affairs, and the Committee on the Judiciary of the Senate; and
      (B) the Committee on Foreign Affairs, the Committee on Appropriations, the Committee on Financial Services, and the Committee on the Judiciary of the House of Representatives.
   (2) The term "corrupt actor" means—
      (A) any foreign person or entity that is a government official or government entity responsible for, or complicit in, an act of corruption; and
      (B) any company, in which a person or entity described in subparagraph (A) has a significant stake, which is responsible for, or complicit in, an act of corruption.
   (3) The term "corruption" means the unlawful exercise of entrusted public power for private gain, including by bribery, nepotism, fraud, or embezzlement.
   (4) The term "significant corruption" means corruption committed at a high level of government that has some or all of the following characteristics:
      (A) Illegitimately distorts major decision-making, such as policy or resource determinations, or other fundamental functions of governance.
      (B) Involves economically or socially large-scale government activities.

22 USC 10502.

**SEC. 5403. PUBLICATION AND PROVISION OF LISTS REGARDING PROGRESS ON ANTI-CORRUPTION EFFORTS.**

Time period.
Web posting.

(a) PUBLIC LIST.—The Secretary of State shall publish annually, on a publicly accessible website, a list of foreign countries where the government is sustaining or making good progress on anti-corruption efforts in accordance with the minimum standards set forth in section 5404. Such list shall include a brief description of each such country's progress or justification for being on such list.

(b) CLASSIFIED LIST.—The Secretary of State shall provide to the appropriate congressional committees a classified list of countries where the government is making limited or no efforts to comply with minimum standards set forth in section 5404, and are not achieving meaningful progress on combating corruption. Such list shall include a brief description of each country's lack of progress or justification for being on such list.

(c) ANNUAL UPDATE.—The Secretary of State shall provide an annual update in a classified setting to the appropriate congressional committees on the United States Government's efforts to fight against corruption. This update should include an overview

Overview.

of the key obstacles to combating corruption and present near-term and long-term strategies.

(d) IMPLEMENTATION AND TIMING.—

(1) DEADLINE.—The publication and submission of the lists and the annual update required by subsections (a), (b), and (c) shall be completed not later than 2 years after the date of the enactment of this Act, and annually thereafter for seven years.

(2) REPORT ON METHODOLOGY.—Not later than one year after the date of the enactment of this Act, the Secretary shall submit to the appropriate congressional committees a report detailing the methodology developed to assign countries to either the public list or the classified list and a proposed budget for preparing the first set of lists during the subsequent year.

(e) EXCEPTION TO PUBLICATION.—The Secretary may, in specific instances where the Secretary determines the inclusion of specific countries on the public list required by subsection (a) would not be in the national interests of the United States, submit the information required by subsection (a) about such specific countries in a classified manner in writing to the appropriate congressional committees, together with a justification for why publication would not be in the national interest. The justification, if applicable, shall be submitted the same date as the public list required by subsection (a).

*Determination.*

### SEC. 5404. MINIMUM STANDARDS FOR THE ELIMINATION OF CORRUPTION AND ASSESSMENT OF EFFORTS TO COMBAT CORRUPTION.

*Determinations.*
*22 USC 10503.*

(a) IN GENERAL.—The government of a country is complying with the minimum standards for the elimination of corruption if the government—

*Compliance.*

(1) has enacted and implemented laws and established government structures, policies, and practices that prohibit corruption, including significant corruption;

(2) enforces the laws described in paragraph (1) by punishing any person who is found, through a fair judicial process, to have violated such laws;

(3) prescribes punishment for significant corruption that is commensurate with the punishment prescribed for serious crimes; and

(4) is making serious and sustained efforts to address corruption, including through prevention.

(b) FACTORS FOR ASSESSING GOVERNMENT EFFORTS TO COMBAT CORRUPTION.—In determining whether a government is making serious and sustained efforts to address corruption, the Secretary of State shall consider, to the extent relevant or appropriate, factors such as—

(1) whether the government of the country has criminalized corruption, investigates and prosecutes acts of corruption, and convicts and sentences persons responsible for such acts over which it has jurisdiction, including, as appropriate, incarcerating individuals convicted of such acts;

(2) whether the government of the country vigorously investigates, prosecutes, convicts, and sentences public officials who participate in or facilitate corruption, including nationals of the country who are deployed in foreign military assignments,

trade delegations abroad, or other similar missions, who engage in or facilitate significant corruption;

(3) whether the government of the country has adopted measures to prevent corruption, such as measures to inform and educate the public, including potential victims, about the causes and consequences of corruption;

(4) what steps the government of the country has taken to prohibit government officials from participating in, facilitating, or condoning corruption, including the investigation, prosecution, and conviction of such officials;

(5) the extent to which the country provides access, or, as appropriate, makes adequate resources available, to civil society organizations and other institutions to combat corruption, including reporting, investigating, and monitoring;

(6) whether an independent judiciary or judicial body in the country is responsible for, and effectively capable of, deciding corruption cases impartially, on the basis of facts and in accordance with the law, without any improper restrictions, influences, inducements, pressures, threats, or interferences (direct or indirect);

(7) whether the government of the country is assisting in international investigations of transnational corruption networks and in other cooperative efforts to combat significant corruption, including, as appropriate, cooperating with the governments of other countries to extradite corrupt actors;

(8) whether the government of the country recognizes the rights of victims of corruption, ensures their access to justice, and takes steps to prevent victims from being further victimized or persecuted by corrupt actors, government officials, or others;

(9) whether the government of the country protects victims of corruption or whistleblowers from reprisal due to such persons having assisted in exposing corruption, and refrains from other discriminatory treatment of such persons;

(10) whether the government of the country is willing and able to recover and, as appropriate, return the proceeds of corruption;

(11) whether the government of the country is taking steps to implement financial transparency measures in line with the Financial Action Task Force recommendations, including due diligence and beneficial ownership transparency requirements;

(12) whether the government of the country is facilitating corruption in other countries in connection with state-directed investment, loans or grants for major infrastructure, or other initiatives; and

(13) such other information relating to corruption as the Secretary of State considers appropriate.

(c) ASSESSING GOVERNMENT EFFORTS TO COMBAT CORRUPTION IN RELATION TO RELEVANT INTERNATIONAL COMMITMENTS.—In determining whether a government is making serious and sustained efforts to address corruption, the Secretary of State shall consider the government of a country's compliance with the following, as relevant:

(1) The Inter-American Convention against Corruption of the Organization of American States, done at Caracas March 29, 1996.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 947

(2) The Convention on Combating Bribery of Foreign Public Officials in International Business Transactions of the Organisation of Economic Co-operation and Development, done at Paris December 21, 1997 (commonly referred to as the "Anti-Bribery Convention").

(3) The United Nations Convention against Transnational Organized Crime, done at New York November 15, 2000.

(4) The United Nations Convention against Corruption, done at New York October 31, 2003.

(5) Such other treaties or conventions ratified by the United States as the Secretary of State considers appropriate.

**SEC. 5405. IMPOSITION OF SANCTIONS UNDER GLOBAL MAGNITSKY HUMAN RIGHTS ACCOUNTABILITY ACT.**

22 USC 10504.

(a) IN GENERAL.—The Secretary of State, in consultation with the Secretary of the Treasury, should evaluate whether there are foreign persons engaged in significant corruption for the purposes of potential imposition of sanctions under the Global Magnitsky Human Rights Accountability Act (subtitle F of title XII of Public Law 114–328; 22 U.S.C. 10101 et seq.)—

Evaluation.

(1) in all countries identified pursuant to section 5403(b); and

(2) in relation to the planning or construction or any operation of the Nord Stream 2 pipeline.

(b) REPORT REQUIRED.—Not later than 180 days after providing the list required by section 5403(b), and annually thereafter, the Secretary of State shall submit to the appropriate congressional committees a report that includes—

Time period. Lists.

(1) a list of foreign persons with respect to which the President imposed sanctions pursuant to the evaluation under subsection (a);

(2) the dates on which such sanctions were imposed;

(3) the reasons for imposing such sanctions; and

(4) a list of all foreign persons that have engaged in significant corruption in relation to the planning, construction, or operation of the Nord Stream 2 pipeline.

(c) FORM OF REPORT.—Each report required by subsection (b) shall be submitted in unclassified form but may include a classified annex.

(d) BRIEFING IN LIEU OF REPORT.—The Secretary of State, in consultation with the Secretary of the Treasury, may, instead of submitting a written report required under subsection (b) (except with respect to the list required by subsection (b)(4)), provide to the appropriate congressional committees a briefing, together with a written justification, if doing so would better serve the national interests of the United States.

(e) TERMINATION OF REQUIREMENTS RELATING TO NORD STREAM 2.—The requirements under subsections (a)(2) and (b)(4) shall terminate on the date that is 5 years after the date of the enactment of this Act.

**SEC. 5406. DESIGNATION OF EMBASSY ANTI-CORRUPTION POINTS OF CONTACT.**

22 USC 10505.

(a) IN GENERAL.—The Secretary of State shall annually designate an anti-corruption point of contact at the United States diplomatic post to each country identified pursuant to section 5403(b), or which the Secretary otherwise determines is in need

Time period. Determination.

of such a point of contact. The point of contact shall be the chief of mission or the chief of mission's designee.

(b) RESPONSIBILITIES.—Each anti-corruption point of contact designated under subsection (a) shall be responsible for enhancing coordination and promoting the implementation of a whole-of-government approach among the relevant Federal departments and agencies undertaking efforts to—

(1) promote good governance in foreign countries; and

(2) enhance the ability of such countries—

(A) to combat public corruption; and

(B) to develop and implement corruption risk assessment tools and mitigation strategies.

(c) TRAINING.—The Secretary of State shall implement appropriate training for anti-corruption points of contact designated under subsection (a).

## Subtitle B—Other Matters

<div style="margin-left:0;"></div>

22 USC 2656 note.

### SEC. 5411. GLOBAL COOPERATIVE FRAMEWORK TO END HUMAN RIGHTS ABUSES IN SOURCING CRITICAL MINERALS.

(a) IN GENERAL.—The Secretary of State shall seek to convene a meeting of foreign leaders to establish a multilateral framework to end human rights abuses, including the exploitation of forced labor and child labor, related to the mining and sourcing of critical minerals.

Recommendations.

(b) IMPLEMENTATION REPORT.—The Secretary shall lead the development of an annual global report on the implementation of the framework under subsection (a), including progress and recommendations to fully end human rights abuses, including the exploitation of forced labor and child labor, related to the extraction of critical minerals around the world.

(c) CONSULTATIONS.—The Secretary shall consult closely on a timely basis with the following with respect to developing and implementing the framework under subsection (a):

(1) The Forced Labor Enforcement Task Force established under section 741 of the United States-Mexico-Canada Agreement Implementation Act (19 U.S.C. 4681); and

(2) Congress.

(d) RELATIONSHIP TO UNITED STATES LAW.—Nothing in the framework under subsection (a) shall be construed—

(1) to amend or modify any law of the United States; or

(2) to limit any authority conferred under any law of the United States.

(e) EXTRACTIVE INDUSTRIES TRANSPARENCY INITIATIVE AND CERTAIN PROVISIONS OF THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT.—Nothing in this section shall—

(1) affect the authority of the President to take any action to join and subsequently comply with the terms and obligations of the Extractive Industries Transparency Initiative (EITI); or

(2) affect section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. 78m note), or subsection (q) of section 13 of the Securities Exchange Act of 1934 (15 U.S.C. 78m), as added by section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act

(Public Law 111–203; 124 Stat. 2220), or any rule prescribed under either such section.

(f) CRITICAL MINERAL DEFINED.—In this section, the term "critical mineral" has the meaning given the term in section 7002(a) of the Energy Act of 2020 (30 U.S.C. 1606(a)).

### SEC. 5412. CONNECTING OCEANIA'S NATIONS WITH VANGUARD EXERCISES AND NATIONAL EMPOWERMENT.

Connecting Oceania's Nations with Vanguard Exercises and National Empowerment Act of 2023.
48 USC 1974.

(a) SHORT TITLE.—This section may be cited as the "Connecting Oceania's Nations with Vanguard Exercises and National Empowerment Act of 2023" or the "CONVENE Act of 2023".

(b) DEFINITIONS.—In this section:

(1) The term "appropriate committees of Congress" means—

(A) the Committee on Foreign Relations and the Select Committee on Intelligence of the Senate;

(B) the Committee on Foreign Affairs and the Permanent Select Committee on Intelligence of the House of Representatives; and

(C) the congressional defense committees.

(2) NATIONAL SECURITY COUNCIL.—The term "national security council" means, with respect to a specified country, an intergovernmental body under the jurisdiction of the freely elected government of the specified country that acts as the primary coordinating entity for security cooperation, disaster response, and the activities described in subsection (c)(5).

(3) SPECIFIED COUNTRY.—The term "specified country" means—

(A) the Federated States of Micronesia;

(B) the Republic of the Marshall Islands; and

(C) the Republic of Palau.

(c) NATIONAL SECURITY COUNCILS OF SPECIFIED COUNTRIES.—

(1) IN GENERAL.—The Secretary of State, in consultation with other relevant Federal departments and agencies, as appropriate, may consult and engage with each specified country to advise and provide assistance to a national security council (including by developing a national security council, if appropriate), or to identify a similar coordinating body for national security matters, comprised of citizens of the specified country—

(A) that enables the specified country—

(i) to better coordinate with the United States Government, including the Armed Forces, as appropriate;

(ii) to increase cohesion on activities, including emergency humanitarian response, law enforcement, and maritime security activities; and

(iii) to provide trained professionals to serve as members of the committees of the specified country established under the applicable Compact of Free Association; and

(B) for the purpose of enhancing resilience capabilities and protecting the people, infrastructure, and territory of the specified country from malign actions.

(2) COMPOSITION.—The Secretary of State, respecting the unique needs of each specified country, may seek to ensure that the national security council, or other identified coordinating body, of the specified country is composed of sufficient

staff and members to enable the activities described in paragraph (5).

(3) STANDARDS FOR EQUIPMENT AND SERVICES.—The Secretary of State may work with the national security council, or other identified coordinating body, of each specified country to ensure that—

Compliance.

(A) the equipment and services used by the national security council or other identified coordinating body are compliant with security standards so as to minimize the risk of cyberattacks or espionage;

(B) the national security council or other identified coordinating body takes all reasonable efforts not to procure or use systems, equipment, or software that originates from any entity identified under section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year (10 U.S.C. 113 note); and

(C) to the extent practicable, the equipment and services used by the national security council or other identified coordinating body are interoperable with the equipment and services used by the national security councils, or other identified coordinating bodies, of the other specified countries.

(4) REPORT ON IMPLEMENTATION.—

Time periods.
Assessments.

(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and annually thereafter for 2 years, the Secretary of State shall submit to the appropriate committees of Congress a report that includes—

(i) an assessment as to whether a national security council or a similar formal coordinating body is helping or would help achieve the objectives described in paragraph (1) at acceptable financial and opportunity cost;

(ii) a description of all actions taken by the United States Government to assist in the identification or maintenance of a national security council, or other identified coordinating body, in each specified country;

(iii) with respect to each specified country, an assessment as to whether—

(I) the specified country has appropriately staffed its national security council or other identified coordinating body; and

(II) the extent to which the national security council, or other identified coordinating body, of the specified country is capable of carrying out the activities described in paragraph (5);

(iv) an assessment of—

(I) any challenge to cooperation and coordination with the national security council, or other identified coordinating body, of any specified country;

(II) current efforts by the Secretary of State to coordinate with the specified countries on the activities described in paragraph (5); and

(III) existing governmental entities within each specified country that are capable of supporting such activities;

    (v) a description of any challenge with respect to—

     (I) the implementation of the national security council, or other identified coordinating body, of any specified country; and

     (II) the implementation of paragraphs (1) through (3);

    (vi) an assessment of any attempt or campaign by a malign actor to influence the political, security, or economic policy of a specified country, a member of a national security council or other identified coordinating body, or an immediate family member of such a member; and

    (vii) any other matter the Secretary of State considers relevant.

   (B) FORM.—Each report required by subparagraph (A) may be submitted in unclassified form and may include a classified annex.

  (5) ACTIVITIES DESCRIBED.—The activities described in this subsection are the following homeland security activities:

   (A) Coordination of—

    (i) the prosecution and investigation of transnational criminal enterprises;

    (ii) responses to national emergencies, such as natural disasters;

    (iii) counterintelligence and counter- coercion responses to foreign threats; and

    (iv) efforts to combat illegal, unreported, or unregulated fishing.

   (B) Coordination with United States Government officials on humanitarian response, military exercises, law enforcement, and other issues of security concern.

   (C) Identification and development of an existing governmental entity to support homeland defense and civil support activities.

### SEC. 5413. ENDING CHINA'S DEVELOPING NATION STATUS.

<div align="right">22 USC 6901 note.</div>

 (a) FINDING; STATEMENT OF POLICY.—

  (1) FINDING.—Congress finds that the People's Republic of China is still classified as a developing nation under multiple treaties and international organization structures, even though China has grown to be the second largest economy in the world.

  (2) STATEMENT OF POLICY.—It is the policy of the United States—

   (A) to oppose the labeling or treatment of the People's Republic of China as a developing nation in current and future treaty negotiations and in each international organization of which the United States and the People's Republic of China are both current members;

   (B) to pursue the labeling or treatment of the People's Republic of China as a developed nation in each international organization of which the United States and the People's Republic of China are both current members; and

   (C) to work with allies and partners of the United States to implement the policies described in subparagraphs (A) and (B).

137 STAT. 952          PUBLIC LAW 118–31—DEC. 22, 2023

(b) DEFINITIONS.—In this section:
(1) The term "appropriate committees of Congress" means—
(A) the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives with respect to subsection (c); and
(B) the Committee on Finance of the Senate and the Committee on Ways and Means of the House of Representatives with respect to subsection (d).
(2) The term "OECD" means the Organisation for Economic Co-operation and Development.
(3) The term "Secretary" means the Secretary of State.
(4) The term "WTO" means the World Trade Organization.
(c) DUTIES OF THE SECRETARY.—
(1) REPORT ON DEVELOPMENT STATUS IN CURRENT TREATY NEGOTIATIONS.—Not later than 180 days after the date of the enactment of this Act, the Secretary shall submit a report to the appropriate committees of Congress that—
(A) identifies all current treaty negotiations in which—
(i) the proposed treaty would provide for different treatment or standards for enforcement of the treaty based on respective development status of the states that are party to the treaty; and
(ii) the People's Republic of China is actively participating in the negotiations, or it is reasonably foreseeable that the People's Republic of China would seek to become a party to the treaty; and
(B) for each treaty negotiation identified pursuant to subparagraph (A), describes how the treaty under negotiation would provide different treatment or standards for enforcement of the treaty based on development status of the states parties.
(2) REPORT ON DEVELOPMENT STATUS IN EXISTING ORGANIZATIONS AND TREATIES.—Not later than 180 days after the date of the enactment of this Act, the Secretary shall submit a report to the appropriate committees of Congress that—
(A) identifies all international organizations or treaties of which the United States is a member, that provide different treatment or standards for enforcement based on the respective development status of the member states or states parties;
(B) describes the mechanisms for changing the country designation for each relevant treaty or organization; and
(C) for each of the organizations or treaties identified pursuant to subparagraph (A)—
(i) includes a list of countries that—
(I) are labeled as developing nations or receive the benefits of a developing nation under the terms of the organization or treaty; and
(II) meet the World Bank classification for upper middle income or high-income countries; and
(ii) describes how the organization or treaty provides different treatment or standards for enforcement based on development status of the member states or states parties.
(3) MECHANISMS FOR CHANGING DEVELOPMENT STATUS.—
(A) IN GENERAL.—In any international organization of which the United States and the People's Republic of China

List.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 953

are both current members, the Secretary, in consultation with allies and partners of the United States, shall pursue—

(i) changing the status of the People's Republic of China from developing nation to developed nation if a mechanism exists in such organization to make such status change; or

(ii) the development of a mechanism described in clause (i) to change the status of the People's Republic of China in such organization from developing nation to developed nation.

(B) WAIVER.—The President may waive the application of clause (i) or (ii) of subparagraph (A) with respect to any international organization if the President notifies the appropriate committees of Congress that such a waiver is in the national interests of the United States.

<div style="float:right">President.
Notification.</div>

(4) EXCEPTION.—This subsection shall not apply to the WTO or any treaty identified in subsection (d).

(d) DUTIES OF THE UNITED STATES TRADE REPRESENTATIVE.—

(1) REPORT ON SPECIAL AND DIFFERENTIAL TREATMENT AT THE WORLD TRADE ORGANIZATION.—Not later than 180 days after the date of the enactment of this Act, the United States Trade Representative shall submit a report to the appropriate committees of Congress that—

(A) identifies each provision of a WTO agreement that provides for special and differential treatment based on the self-declared development status of WTO members, including the People's Republic of China;

(B) identifies—

(i) all current multilateral negotiations at the WTO in which proposed negotiating text would provide for special and differential treatment for WTO members; and

(ii) all current plurilateral negotiations at the WTO in which the People's Republic of China is actively participating, or it is reasonably foreseeable that the People's Republic of China would seek to become a party to the agreement, in which proposed negotiating text would provide for special and differential treatment for WTO members;

(C) for each negotiation identified pursuant to subparagraph (B), describes how the draft provisions as of the date of the report would provide different treatment or standards for enforcement based on the self-declared development status of WTO members;

(D) includes a list of WTO members that—

<div style="float:right">List.</div>

(i) self-declare as developing country WTO members;

(ii) meet the World Bank classification for upper middle-income or high-income countries; and

(iii)(I) are members of, or applicants to, the OECD; or

(II) account for not less than 0.5 percent of global merchandise trade annually for each of the most recently completed 5 calendar years; and

(E) describes how the WTO provides different treatment or standards for enforcement based on the self-declared development status of the WTO members.

(2) SENSE OF CONGRESS ON MECHANISMS FOR CHANGING SPECIAL AND DIFFERENTIAL TREATMENT AT THE WORLD TRADE ORGANIZATION.—It is the sense of Congress that the United States Trade Representative, in consultation with allies and partners of the United States, should—

(A) oppose the use of special and differential treatment by the People's Republic of China at the WTO;

(B) work to preclude the People's Republic of China from being eligible to use special and differential treatment in future WTO agreements; and

(C) work to set appropriate thresholds, based on objective criteria, for determining each country's eligibility for special and differential treatment in current and future WTO negotiations, consistent with subparagraphs (A) and (B).

**SEC. 5414. PERMITTING FOR INTERNATIONAL BRIDGES.**

The International Bridge Act of 1972 (33 U.S.C. 535 et seq.) is amended by inserting after section 5 the following:

33 USC 535d.

**"SEC. 6. PERMITTING FOR INTERNATIONAL BRIDGES.**

"(a) DEFINITIONS.—In this section:

Time period.
Texas.

"(1) ELIGIBLE APPLICANT.—The term 'eligible applicant' means an entity that has submitted an application for a Presidential permit during the period beginning on December 1, 2020, and ending on December 31, 2024, for any of the following:

"(A) 1 or more international bridges in Webb County, Texas.

"(B) An international bridge in Cameron County, Texas.

"(C) An international bridge in Maverick County, Texas.

"(2) PRESIDENTIAL PERMIT.—

"(A) IN GENERAL.—The term 'Presidential permit' means—

"(i) an approval by the President to construct, maintain, and operate an international bridge under section 4; or

"(ii) an approval by the President to construct, maintain, and operate an international bridge pursuant to a process described in Executive Order 13867 (84 Fed. Reg. 15491; relating to Issuance of Permits With Respect to Facilities and Land Transportation Crossings at the International Boundaries of the United States) (or any successor Executive Order).

"(B) INCLUSION.—The term 'Presidential permit' includes an amendment to an approval described in clause (i) or (ii) of subparagraph (A).

"(3) SECRETARY.—The term 'Secretary' means the Secretary of State.

"(b) APPLICATION.—An eligible applicant for a Presidential permit to construct, maintain, and operate an international bridge shall submit an application for the permit to the Secretary.

"(c) RECOMMENDATION.—

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 955

"(1) IN GENERAL.—Not later than 60 days after the date on which the Secretary receives an application under subsection (b), the Secretary shall make a recommendation to the President— <span style="float:right">Deadline.</span>

"(A) to grant the Presidential permit; or

"(B) to deny the Presidential permit.

"(2) CONSIDERATION.—The basis for a recommendation under paragraph (1) shall be whether the international bridge is in the foreign policy interests of the United States.

"(d) PRESIDENTIAL ACTION.—

"(1) IN GENERAL.—The President shall grant or deny the Presidential permit for an application under subsection (b) by not later than 60 days after the earlier of— <span style="float:right">Deadline.</span>

"(A) the date on which the Secretary makes a recommendation under subsection (c)(1); and

"(B) the date on which the Secretary is required to make a recommendation under subsection (c)(1).

"(2) NO ACTION.—

"(A) IN GENERAL.—Subject to subparagraph (B), if the President does not grant or deny the Presidential permit for an application under subsection (b) by the deadline described in paragraph (1), the Presidential permit shall be considered to have been granted as of that deadline.

"(B) REQUIREMENT.—As a condition on a Presidential permit considered to be granted under subparagraph (A), the eligible applicant shall complete all applicable environmental documents required pursuant to Public Law 91–190 (42 U.S.C. 4321 et seq.).

"(e) DOCUMENT REQUIREMENTS.—Notwithstanding any other provision of law, the Secretary shall not require an eligible applicant for a Presidential permit—

"(1) to include in the application under subsection (b) environmental documents prepared pursuant to Public Law 91–190 (42 U.S.C. 4321 et seq.); or

"(2) to have completed any environmental review under Public Law 91–190 (42 U.S.C. 4321 et seq.) prior to the President granting a Presidential permit under subsection (d).

"(f) RULES OF CONSTRUCTION.—Nothing in this section—

"(1) prohibits the President from granting a Presidential permit conditioned on the eligible applicant completing all environmental documents pursuant to Public Law 91–190 (42 U.S.C. 4321 et seq.) and complying with relevant laws;

"(2) prohibits the Secretary from requesting a list of all permits and approvals from Federal, State, and local agencies that the eligible applicant believes are required in connection with the international bridge, or a brief description of how those permits and approvals will be acquired prior to making a recommendation to the President;

"(3) exempts an eligible applicant from the requirement to complete all environmental documents pursuant to Public Law 91–190 (42 U.S.C. 4321 et seq.) prior to construction of an international bridge; or

"(4) exempts an eligible applicant from complying with Public Law 91–190 (42 U.S.C. 4321 et seq.) or any other law.".

137 STAT. 956          PUBLIC LAW 118–31—DEC. 22, 2023

# TITLE LV—EDUCATION AND WORKFORCE MATTERS

Sec. 5501. Amendments to the Energy Employees Occupational Illness Compensa-
      tion Program Act of 2000.

Beryllium
Testing Fairness
Act.
42 USC 7384
note.

**SEC. 5501. AMENDMENTS TO THE ENERGY EMPLOYEES OCCUPATIONAL
      ILLNESS COMPENSATION PROGRAM ACT OF 2000.**

(a) SHORT TITLE.—This section may be cited as the "Beryllium
Testing Fairness Act".

(b) MODIFICATION OF DEMONSTRATION OF BERYLLIUM SENSI-
TIVITY.—Section 3621(8)(A) of the Energy Employees Occupational
Illness Compensation Program Act of 2000 (42 U.S.C. 7384l(8)(A))
is amended—

(1) by striking "established by an abnormal" and inserting
the following: "established by—
      "(i) an abnormal";

(2) by striking the period at the end and inserting "; or";
and

(3) by adding at the end the following:
      "(ii) three borderline beryllium lymphocyte pro-
      liferation tests performed on blood cells over a period
      of 3 years.".

(c) EXTENSION OF ADVISORY BOARD ON TOXIC SUBSTANCES AND
WORKER HEALTH.—Section 3687(j) of the Energy Employees
Occupational Illness Compensation Program Act of 2000 (42 U.S.C.
7385s-16(j)) is amended by striking "10 years" and inserting "15
years".

# TITLE LVI—TRANSPORTATION AND INFRASTRUCTURE MATTERS

Sec. 5601. Extension of prohibition on provision of airport improvement grant funds
      to certain entities that have violated intellectual property rights of
      United States entities.
Sec. 5602. Nogales wastewater improvement.
Sec. 5603. International Port Security Enforcement Act.

**SEC. 5601. EXTENSION OF PROHIBITION ON PROVISION OF AIRPORT
      IMPROVEMENT GRANT FUNDS TO CERTAIN ENTITIES
      THAT HAVE VIOLATED INTELLECTUAL PROPERTY RIGHTS
      OF UNITED STATES ENTITIES.**

Subsections (a) and (c)(2)(B) of section 10003 of the William
M. (Mac) Thornberry National Defense Authorization Act for Fiscal
Year 2021 (Public Law 116–283; 134 Stat. 4864) are each amended
by striking "2023" and inserting "2024".

Arizona.
Mexico.

**SEC. 5602. NOGALES WASTEWATER IMPROVEMENT.**

(a) AMENDMENT TO THE ACT OF JULY 27, 1953.—The first
section of the Act of July 27, 1953 (67 Stat. 195, chapter 242;
22 U.S.C. 277d–10), is amended by striking the period at the
end and inserting ": *Provided further*, That such equitable propor-
tion shall consist only of the costs directly associated with the
treatment and conveyance of the wastewater of the city and, to
the extent practicable, shall not include any costs directly associated
with the quality or quantity of wastewater originating in Mexico.".

22 USC 277d–10
note.

(b) NOGALES SANITATION PROJECT.—

(1) DEFINITIONS.—In this subsection:

(A) CITY.—The term "City" means the City of Nogales, Arizona.

(B) COMMISSION.—The term "Commission" means the United States Section of the International Boundary and Water Commission.

(C) INTERNATIONAL OUTFALL INTERCEPTOR.—The term "International Outfall Interceptor" means the pipeline that conveys wastewater from the United States-Mexico border to the Nogales International Wastewater Treatment Plant.

(D) NOGALES INTERNATIONAL WASTEWATER TREATMENT PLANT.—The term "Nogales International Wastewater Treatment Plant" means the wastewater treatment plant that—

(i) is operated by the Commission;

(ii) is located in Rio Rico, Santa Cruz County, Arizona, after manhole 99; and

(iii) treats wastewater originating from—

(I) Nogales, Sonora, Mexico; and

(II) Nogales, Arizona.

(E) NOGALES SANITATION PROJECT.—The term "Nogales sanitation project" means—

(i) the International Outfall Interceptor; and

(ii) the Nogales International Wastewater Treatment Plant.

(2) OWNERSHIP AND CONTROL.—

(A) IN GENERAL.—The Commission shall assume full ownership and control of the International Outfall Interceptor on the date on which—

(i) the City has conveyed, without consideration, all right, title, and interest of the City in the International Outfall Interceptor to the Commission;

(ii) all memoranda and agreements necessary for the Commission to operate and maintain the International Outfall Interceptor, as described in subparagraph (B), have been entered into; and

(iii) a total of $12,500,000 has been appropriated pursuant to paragraph (3) or otherwise secured by the Commission for use in carrying out such paragraph.

(B) AGREEMENTS.—In accordance with the Act of July 27, 1953 (67 Stat. 195, chapter 242; 22 U.S.C. 277d–10 et seq.), as amended by this section, the Commission shall, with respect to each applicable governing body in the State of Arizona, including the City, seek to enter into—

(i) a memorandum of understanding granting to the Commission access to existing easements for a right of entry to the International Outfall Interceptor for the life of the International Outfall Interceptor;

Memorandum.

(ii) an agreement with respect to the flows entering the International Outfall Interceptor that are controlled by the City; and

(iii) an agreement to work in good faith to expeditiously enter into such other agreements as are necessary for the Commission to operate and maintain the International Outfall Interceptor.

(3) OPERATION AND MAINTENANCE.—

Effective date.

    (A) IN GENERAL.—Beginning on the date on which the Commission assumes full ownership and control of the International Outfall Interceptor under paragraph (2), the Commission shall carry out the operation and maintenance of the International Outfall Interceptor.

Time period.

    (B) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Commission to carry out this paragraph $12,500,000 for the period of fiscal years 2025 through 2029, to remain available until expended.

  (4) DEBRIS SCREEN.—

    (A) DEBRIS SCREEN REQUIRED.—

      (i) IN GENERAL.—The Commission shall construct, operate, and maintain a debris screen, in coordination with other relevant Federal agencies, at manhole 1 of the International Outfall Interceptor for intercepting debris and drug bundles coming to the United States from Nogales, Sonora, Mexico.

      (ii) REQUIREMENT.—The Commission and the Commissioner of U.S. Customs and Border Protection shall coordinate the construction, operation, and maintenance of the debris screen under clause (i), including for purposes of the removal of drug bundles and other illicit goods caught in the debris screen.

Time periods.

    (B) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Commission, to remain available until expended—

      (i) for fiscal year 2025—

        (I) $8,000,000 for construction of the debris screen described in subparagraph (A)(i); and

        (II) not less than $1,000,000 for the operation and maintenance of the debris screen described in subparagraph (A)(i); and

      (ii) not less than $1,000,000 for each of fiscal years 2026 through 2029 for the operation and maintenance of the debris screen described in subparagraph (A)(i).

  (5) LIMITATION OF CLAIMS.—Chapter 171 and section 1346(b) of title 28, United States Code (commonly known as the "Federal Tort Claims Act"), shall not apply to any claim arising from the activities of the Commission in carrying out this subsection, including any claim arising from damages that result from overflow of the International Outfall Interceptor due to excess inflow to the International Outfall Interceptor originating from Nogales, Sonora, Mexico.

Deadline.

  (c) INTERNATIONAL TREATY.—Not later than six months after the date of enactment of this section, the Commission shall seek to initiate negotiations with Mexico for a new Treaty Minute or a modification of Treaty Minute 227 to address, at a minimum, the following:

    (1) Joint operation and maintenance responsibilities of the International Outfall Interceptor.

    (2) Capacity usage of wastewater flows from the United States and Mexico through the International Outfall Interceptor.

    (3) Payment for excess wastewater flows through the International Outfall Interceptor emanating from the Nogales, Sonora, Mexico area.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 959

(4) Any terms and conditions considered necessary to support proportional use and maintenance of the International Outfall Interceptor.

(d) REPORT.—Not later than one year after the date of enactment of this section, and each year thereafter, the Commission shall submit to the Committee on Foreign Relations of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives a report that includes—

(1) an operation and maintenance plan, or a description of the status of such plan, developed by the Commission and other relevant agencies, for the debris screen required under subsection (b)(4)(A);

Plan.

(2) a description of any operation and maintenance issues of the Nogales sanitation project, including relating to transnational criminal activity;

(3) an update on efforts by the Commission to renegotiate an existing Treaty Minute or develop a new Treaty Minute pursuant to subsection (c); and

Update.

(4) an accounting of all outstanding or overdue payments from Mexico or the City for the processing and conveyance of wastewater through the Nogales sanitation project.

Payments.

(e) EFFECTIVE DATE.—Subsections (a) and (b) (including the amendments made by such subsections) shall take effect on October 1, 2024.

22 USC 277d–10 note.

### SEC. 5603. INTERNATIONAL PORT SECURITY ENFORCEMENT ACT.

Section 70108 of title 46, United States Code, is amended—
(1) in subsection (f)—
(A) in paragraph (1), by striking "provided that" and all that follows and inserting the following: "if—"
"(A) the Secretary certifies that the foreign government or international organization—

Certification.

"(i) has conducted the assessment in accordance with subsection (b); and

Assessment.

"(ii) has provided the Secretary with sufficient information pertaining to its assessment (including information regarding the outcome of the assessment); and
"(B) the foreign government that conducted the assessment is not a state sponsor of terrorism (as defined in section 3316(h))."; and
(B) by amending paragraph (3) to read as follows:
"(3) LIMITATIONS.—Nothing in this section may be construed—
"(A) to require the Secretary to treat an assessment conducted by a foreign government or an international organization as an assessment that satisfies the requirement under subsection (a);
"(B) to limit the discretion or ability of the Secretary to conduct an assessment under this section;
"(C) to limit the authority of the Secretary to repatriate aliens to their respective countries of origin; or
"(D) to prevent the Secretary from requesting security and safety measures that the Secretary considers necessary to safeguard Coast Guard personnel during the repatriation of aliens to their respective countries of origin."; and
(2) by adding at the end the following:

137 STAT. 960          PUBLIC LAW 118–31—DEC. 22, 2023

"(g) STATE SPONSORS OF TERRORISM AND INTERNATIONAL TERRORIST ORGANIZATIONS.—The Secretary—

"(1) may not enter into an agreement under subsection (f)(2) with—

"(A) a foreign government that is a state sponsor of terrorism (as defined in section 3316(h)); or

"(B) an entity designated by the Secretary of State as a foreign terrorist organization pursuant to section 219 of the Immigration and Nationality Act (8 U.S.C. 1189); and

"(2) shall—

"(A) deem any port that is under the jurisdiction of a foreign government that is a state sponsor of terrorism as not having effective antiterrorism measures for purposes of this section and section 70109; and

"(B) immediately apply the sanctions described in section 70110(a) to such port.".

Architect of the Capitol Appointment Act of 2023.

# TITLE LVII—ARCHITECT OF THE CAPITOL APPOINTMENT ACT OF 2023

Sec. 5701. Short title.
Sec. 5702. Appointment and term of service of Architect of the Capitol.
Sec. 5703. Appointment of Deputy Architect of the Capitol; vacancy in Architect or Deputy Architect.
Sec. 5704. Deputy Architect of the Capitol to serve as acting in case of absence, disability, or vacancy.

2 USC 1801 note.

**SEC. 5701. SHORT TITLE.**

This title may be cited as the "Architect of the Capitol Appointment Act of 2023".

2 USC 1801a.

**SEC. 5702. APPOINTMENT AND TERM OF SERVICE OF ARCHITECT OF THE CAPITOL.**

(a) APPOINTMENT.—The Architect of the Capitol shall be appointed, without regard to political affiliation and solely on the basis of fitness to perform the duties of the office, upon a majority vote of a congressional commission (referred to in this section as the "commission") consisting of the Speaker of the House of Representatives, the majority leader of the Senate, the minority leaders of the House of Representatives and Senate, the chair and ranking minority member of the Committee on Appropriations of the House of Representatives, the chairman and ranking minority member of the Committee on Appropriations of the Senate, the chair and ranking minority member of the Committee on House Administration of the House of Representatives, and the chairman and ranking minority member of the Committee on Rules and Administration of the Senate.

Time period.

(b) TERM OF SERVICE.—The Architect of the Capitol shall be appointed for a term of 10 years and, upon a majority vote of the members of the commission, may be reappointed for additional 10-year terms.

(c) REMOVAL.—The Architect of the Capitol may be removed from office at any time upon a majority vote of the members of the commission.

(d) CONFORMING AMENDMENTS.—

(1) Section 319 of the Legislative Branch Appropriations Act, 1990 (2 U.S.C. 1801) is repealed.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 961

(2) The matter under the heading "For the Capitol:" under the heading "DEPARTMENT OF THE INTERIOR." of the Act of February 14, 1902 (32 Stat. 19, chapter 17; incorporated in 2 U.S.C. 1811) is amended by striking ", and he shall be appointed by the President".

(e) EFFECTIVE DATE.—This section, and the amendments made by this section, shall apply with respect to appointments made on or after the date of enactment of this Act.

## SEC. 5703. APPOINTMENT OF DEPUTY ARCHITECT OF THE CAPITOL; VACANCY IN ARCHITECT OR DEPUTY ARCHITECT.

Section 1203 of title I of division H of the Consolidated Appropriations Resolution, 2003 (2 U.S.C. 1805) is amended—

(1) in subsection (a)—

(A) by inserting "(in this section referred to as the 'Architect')" after "The Architect of the Capitol"; and

(B) by inserting "(in this section referred to as the 'Deputy Architect')" after "Deputy Architect of the Capitol";

(2) by redesignating subsection (b) as subsection (c);

(3) by inserting after subsection (a) the following:

"(b) DEADLINE.—The Architect shall appoint a Deputy Architect under subsection (a) not later than 120 days after—

"(1) the date on which the Architect is appointed under section 5702 of the Architect of the Capitol Appointment Act of 2023, if there is no Deputy Architect on the date of the appointment; or

"(2) the date on which a vacancy arises in the office of the Deputy Architect.";

(4) in subsection (c), as so redesignated, by striking "of the Capitol" each place it appears; and

(5) by adding at the end the following:

"(d) FAILURE TO APPOINT.—If the Architect does not appoint a Deputy Architect on or before the applicable date specified in subsection (b), the congressional commission described in section 5702(a) of the Architect of the Capitol Appointment Act of 2023 shall appoint the Deputy Architect by a majority vote of the members of the commission.

"(e) NOTIFICATION.—If the position of Deputy Architect becomes vacant, the Architect shall immediately notify the members of the congressional commission described in section 5702(a) of the Architect of the Capitol Appointment Act of 2023.".

## SEC. 5704. DEPUTY ARCHITECT OF THE CAPITOL TO SERVE AS ACTING IN CASE OF ABSENCE, DISABILITY, OR VACANCY.

2 USC 1805a.

(a) IN GENERAL.—The Deputy Architect of the Capitol (in this section referred to as the "Deputy Architect") shall act as Architect of the Capitol (in this section referred to as the "Architect") if the Architect is absent or disabled or there is no Architect.

(b) ABSENCE, DISABILITY, OR VACANCY IN OFFICE OF DEPUTY ARCHITECT.—For purposes of subsection (a), if the Deputy Architect is also absent or disabled or there is no Deputy Architect, the congressional commission described in section 5702(a) shall designate, by a majority vote of the members of the commission, an individual to serve as acting Architect until—

(1) the end of the absence or disability of the Architect or the Deputy Architect; or

(2) in the case of vacancies in both positions, an Architect has been appointed under section 5702(a).

137 STAT. 962          PUBLIC LAW 118–31—DEC. 22, 2023

(c) AUTHORITY.—An officer serving as acting Architect under subsection (a) or (b) shall perform all the duties and exercise all the authorities of the Architect, including the authority to delegate the duties and authorities of the Architect in accordance with the matter under the heading "Office of the Architect of the Capitol" under the heading "ARCHITECT OF THE CAPITOL" of the Legislative Appropriation Act, 1956 (2 U.S.C. 1803).

(d) CONFORMING AMENDMENT.—The matter under the heading "salaries" under the heading "Office of the Architect of the Capitol" under the heading "ARCHITECT OF THE CAPITOL" of the Legislative Branch Appropriation Act, 1971 (2 U.S.C. 1804) is amended by striking ": Provided," and all that follows through "no Architect".

# TITLE LVIII—FINANCIAL SERVICES MATTERS

Sec. 5801. Assessment of gifts and grants to United States institutions of higher education from entities on the Non-SDN Chinese Military-Industrial Complex Companies List.

## SEC. 5801. ASSESSMENT OF GIFTS AND GRANTS TO UNITED STATES INSTITUTIONS OF HIGHER EDUCATION FROM ENTITIES ON THE NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.

Deadline.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of the Treasury shall submit to the appropriate congressional committees an assessment of gifts and grants to United States institutions of higher education from entities on the Non-SDN Chinese Military-Industrial Complex Companies List maintained by the Office of Foreign Assets Control.

Estimate.

(b) ELEMENTS.—The Secretary, in consultation with the Secretary of Education, shall include in the assessment required by subsection (a) an estimate of—

(1) a list and description of each of the gifts and grants provided to United States institutions of higher education by entities described in subsection (a); and

(2) the monetary value of each of those gifts and grants.

(c) DEFINITIONS.—In this section:

(1) The term "appropriate congressional committees" means—

(A) the Committee on Banking, Housing, and Urban Affairs and the Committee on Health, Education, Labor, and Pensions of the Senate; and

(B) the Committee on Financial Services and the Committee on Education and the Workforce of the House of Representatives.

(2) The term "gifts and grants" includes financial contributions, material donations, provision of services, scholarships, fellowships, research funding, infrastructure investment, contracts, or any other form of support that provides a benefit to the recipient institution.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 963

# DIVISION F—DEPARTMENT OF STATE AUTHORIZATION ACT OF 2023

Department of State Authorization Act of 2023.

### SEC. 6001. SHORT TITLE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This division may be cited as the "Department of State Authorization Act of 2023".

(b) TABLE OF CONTENTS.—The table of contents for this division is as follows:

Sec. 6001. Short title; table of contents.
Sec. 6002. Definitions.

#### TITLE LXI—DIPLOMATIC SECURITY AND CONSULAR AFFAIRS

Sec. 6101. Special hiring authority for passport services.
Sec. 6102. Quarterly report on passport wait times.
Sec. 6103. Passport travel advisories.
Sec. 6104. Strategy to ensure access to passport services for all Americans.
Sec. 6105. Strengthening the National Passport Information Center.
Sec. 6106. Strengthening passport customer visibility and transparency.
Sec. 6107. Annual Office of Authentications report.
Sec. 6108. Publication and updates of estimated time for processing of passport applications.
Sec. 6109. Authority to designate additional passport acceptance agents.
Sec. 6110. Notification of passport expiration.
Sec. 6111. Use of commercially available technology in online passport renewal program.
Sec. 6112. Electronic payment for passport application fees.
Sec. 6113. Agreements with foreign countries regarding passports nearing expiration.
Sec. 6114. Passport fee exception for search, rescue, and other related disaster relief operations.
Sec. 6115. Increased accountability in assignment restrictions and reviews.
Sec. 6116. Suitability reviews for Foreign Service Institute instructors.
Sec. 6117. Diplomatic security fellowship programs.

#### TITLE LXII—PERSONNEL MATTERS

##### Subtitle A—Hiring, Promotion, and Development

Sec. 6201. Adjustment to promotion precepts.
Sec. 6202. Hiring authorities.
Sec. 6203. Extending paths to service for paid student interns.
Sec. 6204. Lateral Entry Program.
Sec. 6205. Mid-Career Mentoring Program.
Sec. 6206. Report on the Foreign Service Institute's language program.
Sec. 6207. Consideration of career civil servants as chiefs of missions.
Sec. 6208. Civil service rotational program.
Sec. 6209. Reporting requirement on chiefs of mission.
Sec. 6210. Report on chiefs of mission and deputy chiefs of mission.
Sec. 6211. Efforts to improve retention and prevent retaliation.
Sec. 6212. National advertising campaign.
Sec. 6213. Expansion of diplomats in residence programs.

##### Subtitle B—Pay, Benefits, and Workforce Matters

Sec. 6221. Education allowance.
Sec. 6222. Improving mental health services for foreign and civil servants.
Sec. 6223. Emergency back-up care.
Sec. 6224. Exception for government-financed air transportation.
Sec. 6225. Internet at hardship posts.
Sec. 6226. Competitive local compensation plan.
Sec. 6227. Supporting tandem spouses in the Foreign Service.
Sec. 6228. Accessibility at diplomatic missions.
Sec. 6229. Report on breastfeeding accommodations overseas.
Sec. 6230. Determining the effectiveness of knowledge transfers between Foreign Service Officers.
Sec. 6231. Education allowance for dependents of Department of State employees located in United States territories.
Sec. 6232. Overtime pay exception for protective services.

#### TITLE LXIII—INFORMATION SECURITY AND CYBER DIPLOMACY

Sec. 6301. Data-informed diplomacy.

137 STAT. 964 PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 6302. Establishment and expansion of the Bureau Chief Data Officer Program.
Sec. 6303. Establishment of the Chief Artificial Intelligence Officer of the Department of State.
Sec. 6304. Strengthening the Chief Information Officer of the Department of State.
Sec. 6305. Sense of Congress on strengthening enterprise governance.
Sec. 6306. Digital connectivity and cybersecurity partnership.
Sec. 6307. Establishment of a cyberspace, digital connectivity, and related technologies (CDT) fund.
Sec. 6308. Cyber protection support for personnel of the Department of State in positions highly vulnerable to cyber attack.
Sec. 6309. Implementation of GAO High Risk List recommendations.

### TITLE LXIV—ORGANIZATION AND OPERATIONS

Sec. 6401. Personal services contractors.
Sec. 6402. Hard-to-fill posts.
Sec. 6403. Enhanced oversight of the Office of Civil Rights.
Sec. 6404. Crisis response operations.
Sec. 6405. Special Envoy to the Pacific Islands Forum.
Sec. 6406. Special Envoy for Belarus.
Sec. 6407. Presidential Envoy for the Abraham Accords, Negev Forum, and Related Integration and Normalization Fora and Agreements.
Sec. 6408. Overseas placement of special appointment positions.
Sec. 6409. Resources for United States nationals unlawfully or wrongfully detained abroad.
Sec. 6410. Establishment of fiscal responsibility award.

### TITLE LXV—ECONOMIC DIPLOMACY

Sec. 6501. Report on recruitment, retention, and promotion of Foreign Service economic officers.
Sec. 6502. Mandate to revise Department of State metrics for successful economic and commercial diplomacy.
Sec. 6503. Direction to embassy deal teams.
Sec. 6504. Establishment of a "Deal Team of the Year" award.

### TITLE LXVI—PUBLIC DIPLOMACY

Sec. 6601. Public diplomacy outreach.
Sec. 6602. Modification on use of funds for Radio Free Europe/Radio Liberty.
Sec. 6603. Report on Radio Free Africa and Radio Free Americas.
Sec. 6604. John Lewis Civil Rights Fellowship program.
Sec. 6605. Domestic engagement and public affairs.
Sec. 6606. Modernization and enhancement strategy.

### TITLE LXVII—OTHER MATTERS

Sec. 6701. Internships of United States nationals at international organizations.
Sec. 6702. Training for international organizations.
Sec. 6703. Infrastructure projects and investments by the United States and People's Republic of China.
Sec. 6704. Special envoys.
Sec. 6705. US-ASEAN Center.
Sec. 6706. Briefings on the United States-European Union Trade and Technology Council.
Sec. 6707. Modification and repeal of reports.
Sec. 6708. Art in embassies.
Sec. 6709. Institute for Transatlantic Engagement.
Sec. 6710. Notification of revocation of clearances.

22 USC 2651 note.

**SEC. 6002. DEFINITIONS.**

In this division:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives.

(2) DEPARTMENT.—The term "Department" means the Department of State.

(3) SECRETARY.—The term "Secretary" means the Secretary of State.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 965

# TITLE LXI—DIPLOMATIC SECURITY AND CONSULAR AFFAIRS

**SEC. 6101. SPECIAL HIRING AUTHORITY FOR PASSPORT SERVICES.**

During the 3-year period beginning on the date of the enactment of this division, the Secretary, without regard to the provisions under sections 3309 through 3318 of title 5, United States Code, may directly appoint up to 80 candidates to positions in the competitive service (as defined in section 2102 of such title) at the Department in the Passport and Visa Examining Series 0967.

*Time period. Appointments. 22 USC 211a note.*

**SEC. 6102. QUARTERLY REPORT ON PASSPORT WAIT TIMES.**

Not later than 30 days after the date of the enactment of this division, and quarterly thereafter for the following 3 years, the Secretary shall submit a report to the appropriate congressional committees that describes—

*Time period.*

(1) the current estimated wait times for passport processing;

(2) the steps that have been taken by the Department to reduce wait times to a reasonable time;

(3) efforts to improve the rollout of the online passport renewal processing program, including how much of passport revenues the Department is spending on consular systems modernization;

(4) the demand for urgent passport services by major metropolitan area;

(5) the steps that have been taken by the Department to reduce and meet the demand for urgent passport services, particularly in areas that are greater than 5 hours driving time from the nearest passport agency; and

(6) how the Department details its staff and resources to passport services programs.

**SEC. 6103. PASSPORT TRAVEL ADVISORIES.**

Not later than 180 days after the date of the enactment of this division, the Department should make prominent in United States regular passports, on the first three pages of the passport, the following information:

*Deadlines. 22 USC 211a note.*

(1) A prominent, clear advisory for all travelers to check travel.state.gov for updated travel warnings and advisories.

(2) A prominent, clear notice urging all travelers to register with the Department prior to overseas travel.

(3) A prominent, clear advisory—

(A) noting that many countries deny entry to travelers during the last 6 months of their passport validity period; and

*Time period.*

(B) urging all travelers to renew their passport not later than 1 year prior to its expiration.

**SEC. 6104. STRATEGY TO ENSURE ACCESS TO PASSPORT SERVICES FOR ALL AMERICANS.**

*Deadlines.*

Not later than 180 days after the date of the enactment of this division, the Secretary shall submit a strategy to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House

of Representatives for ensuring reasonable access to passport services for all Americans, which shall include—

    (1) a detailed strategy describing how the Department could—

        (A) by not later than 1 year after submission of the strategy, reduce passport processing times to an acceptable average for renewals and for expedited service; and

        (B) by not later than 2 years after the submission of the strategy, provide United States residents living in a significant population center more than a 5-hour drive from a passport agency with urgent, in-person passport services, including the possibility of building new passport agencies; and

    (2) a description of the specific resources required to implement the strategy.

### SEC. 6105. STRENGTHENING THE NATIONAL PASSPORT INFORMATION CENTER.

    (a) SENSE OF CONGRESS.—It is the sense of Congress that passport wait times since 2021 have been unacceptably long and have created frustration among those seeking to obtain or renew passports.

    (b) ONLINE CHAT FEATURE.—The Department should develop an online tool with the capability for customers to correspond with customer service representatives regarding questions and updates pertaining to their application for, or renewal of, a passport.

    (c) GAO REPORT.—Not later than 90 days after the date of the enactment of this division, the Comptroller General of the United States shall initiate a review of National Passport Information Center (NPIC) operations, which shall include an analysis of the extent to which NPIC—

    (1) responds to constituent inquiries by telephone, including how long constituents are kept on hold and their ability to be placed in a queue;

    (2) provides personalized customer service;

    (3) maintains its telecommunications infrastructure to ensure it effectively handles call volumes; and

    (4) other relevant issues the Comptroller General deems appropriate.

### SEC. 6106. STRENGTHENING PASSPORT CUSTOMER VISIBILITY AND TRANSPARENCY.

    (a) ONLINE STATUS TOOL.—Not later than 2 years after the date of the enactment of this division, the Department should modernize the online passport application status tool to include, to the greatest extent possible, step by step updates on the status of passport applications, including with respect to the following stages:

    (1) Submitted for processing.

    (2) In process at a lockbox facility.

    (3) Awaiting adjudication.

    (4) In process of adjudication.

    (5) Adjudicated with a result of approval or denial.

    (6) Materials shipped.

    (b) ADDITIONAL INFORMATION.—The tool pursuant to subsection (a) should include a display that informs each passport applicant of—

*Review.*
*Analysis.*

*22 USC 213 note.*

*Deadline.*
*Updates.*

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 967

(1) the date on which his or her passport application was received; and

(2) the estimated wait time remaining in the passport application process.     Estimate.

(c) REPORT.—Not later than 90 days after the date of the enactment of this division, the Secretary shall submit a report to the appropriate congressional committees that outlines a plan for coordinated comprehensive public outreach to increase public awareness and understanding of—     Plan.

(1) the online status tool required under subsection (a);

(2) passport travel advisories required under section 6103; and

(3) passport wait times.

### SEC. 6107. ANNUAL OFFICE OF AUTHENTICATIONS REPORT.

(a) REPORT.—Not later than one year after the date of the enactment of this division, the Secretary shall submit an annual report for 5 years to the appropriate congressional committees that describes—     Time period.

(1) the number of incoming authentication requests, broken down by month and type of request, to show seasonal fluctuations in demand;

(2) the average time taken by the Office of Authentications of the Department to authenticate documents, broken down by month to show seasonal fluctuations in wait times;

(3) how the Department details staff to the Office of Authentications; and

(4) the impact that hiring additional, permanent, dedicated staff for the Office of Authentications would have on the processing times referred to in paragraph (2).

(b) AUTHORIZATION.—The Secretary is authorized to hire additional, permanent, dedicated staff for the Office of Authentications.     22 USC 2651a note.

### SEC. 6108. PUBLICATION AND UPDATES OF ESTIMATED TIME FOR PROCESSING OF PASSPORT APPLICATIONS.

Time period.
Web postings.
22 USC 213 note.

The Secretary shall publish and update on a quarterly basis on relevant websites of the Department the estimated time for processing of passport applications.

### SEC. 6109. AUTHORITY TO DESIGNATE ADDITIONAL PASSPORT ACCEPTANCE AGENTS.

22 USC 213a.

(a) AUTHORITY TO DESIGNATE.—The Secretary may designate any person described in subsection (b) that meets such other requirements as the Secretary may prescribe pursuant to regulations to serve as a passport acceptance agent, unless the Secretary withdraws such authorization on a case-by-case basis with respect to a given person.

(b) AUTHORIZED PERSONS.—A person described in this subsection is any of the following:

(1) An employee of the clerk of any Federal court.

(2) An employee of the clerk of any State court of record.

(3) A postal employee at a United States post office that has been selected to accept passport applications.

(4) An employee of the Department of Defense at a military installation that has been authorized to accept passport applications.

(5) An employee of a Federal department or agency that has been selected to accept passport applications.

(6) Any other person specifically designated by the Secretary.

(c) REGULATIONS.—The Secretary shall prescribe or revise such regulations as may be necessary to carry out this division.

Deadline.
22 USC 217a
note.

### SEC. 6110. NOTIFICATION OF PASSPORT EXPIRATION.

The Secretary shall take such steps as may be necessary to ensure that each individual holding a valid United States passport is notified of the upcoming expiration of such passport not later than one year before the date of such expiration.

Determination.
22 USC 213 note.

### SEC. 6111. USE OF COMMERCIALLY AVAILABLE TECHNOLOGY IN ONLINE PASSPORT RENEWAL PROGRAM.

The Secretary shall take such steps as may be necessary to compare and use the best commercially available technology in the private sector, as determined by the Secretary, in the development of the Department's online passport renewal program or any successor program.

22 USC 214 note.

### SEC. 6112. ELECTRONIC PAYMENT FOR PASSPORT APPLICATION FEES.

The Secretary shall develop a process to accept electronic payment for all fees associated with the processing of passport applications, including for applications submitted by regular mail.

President.
Time period.
22 USC 213 note.

### SEC. 6113. AGREEMENTS WITH FOREIGN COUNTRIES REGARDING PASSPORTS NEARING EXPIRATION.

The President, acting through the Secretary, shall seek to reach agreements with the governments of foreign countries that do not accept United States passports that are at or within 6 months of expiration to allow for the use of such United States passports.

First Responders
Passport Act.

### SEC. 6114. PASSPORT FEE EXCEPTION FOR SEARCH, RESCUE, AND OTHER RELATED DISASTER RELIEF OPERATIONS.

22 USC 211a
note.

(a) SHORT TITLE.—This section may be cited as the "First Responders Passport Act".

(b) IN GENERAL.—Section 1(a) of the Passport Act of June 4, 1920 (22 U.S.C. 214(a) is amended—

(1) by inserting "(1)" before "There shall be collected";

(2) by striking "No passport fee shall be collected from an officer" and inserting the following:

"(2) Notwithstanding paragraph (1), no passport fee shall be collected from—

"(A) an officer";

(3) by striking "or from members of his immediate family; from an American seaman who requires a passport in connection with his duties aboard an American flag-vessel; from a widow" and inserting the following: "or from immediate family of such officer or employee;

"(B) an American sailor who requires a passport in connection with assigned duties aboard an American flag-vessel;

"(C) a widow";

(4) by striking "memorial service for such member; or from an individual" and inserting the following: "memorial service for such member;

"(D) an individual"; and

(5) by striking "law enforcement purposes. No execution fee" and inserting "law enforcement purposes;

"(E) at the discretion of the Secretary, an individual who—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 969

"(i) is operating under a contract, grant, or cooperative agreement with the United States Government to participate in search, rescue, and other related disaster relief operations within a foreign country following a natural disaster; or

"(ii) is required pursuant to such contract, grant, or cooperative agreement to be available to travel abroad to assist in search, rescue, or other related disaster relief efforts immediately upon notice from the United States Government.

"(3) No execution fee".

### SEC. 6115. INCREASED ACCOUNTABILITY IN ASSIGNMENT RESTRICTIONS AND REVIEWS.

Deadlines.
22 USC 2734h.

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the use of policies to restrict personnel from serving in certain assignments may undermine the Department's ability to deploy relevant cultural and linguistic skills at diplomatic posts abroad if not applied judiciously; and

(2) the Department should continuously evaluate all processes relating to assignment restrictions, assignment reviews, and preclusions at the Department.

(b) NOTIFICATION OF STATUS.—Beginning not later than 90 days after the date of the enactment of this division, the Secretary shall—

(1) provide a status update for all Department personnel who, prior to such date of enactment, were subject to a prior assignment restriction, assignment review, or preclusion for whom a review or decision related to assignment is pending; and

(2) on an ongoing basis, provide a status update for any Department personnel who has been the subject of a pending assignment restriction or pending assignment review for more than 30 days.

(c) NOTIFICATION CONTENT.—The notification required under subsection (b) shall inform relevant personnel, as of the date of the notification—

(1) whether any prior assignment restriction has been lifted;

(2) if their assignment status is subject to ongoing review, and an estimated date for completion; and

Estimate.

(3) if they are subject to any other restrictions on their ability to serve at posts abroad.

(d) ADJUDICATION OF ONGOING ASSIGNMENT REVIEWS.—

(1) TIME LIMIT.—The Department shall establish a reasonable time limit for the Department to complete an assignment review and establish a deadline by which it must inform personnel of a decision related to such a review.

(2) APPEALS.—For any personnel the Department determines are ineligible to serve in an assignment due to an assignment restriction or assignment review, a Security Appeal Panel shall convene not later than 120 days of an appeal being filed.

Determination.

(3) ENTRY-LEVEL BIDDING PROCESS.—The Department shall include a description of the assignment review process and critical human intelligence threat posts in a briefing to new officers as part of their entry-level bidding process.

137 STAT. 970        PUBLIC LAW 118–31—DEC. 22, 2023

Designation.

(4) POINTS OF CONTACT.—The Department shall designate points of contact in the Bureau of Diplomatic Security and Bureau of Global Talent Management to answer employee and Career Development Officer questions about assignment restrictions, assignment reviews, and preclusions.

(e) SECURITY APPEAL PANEL.—Not later than 90 days after the date of the enactment of this division, the Security Appeal Panel shall be comprised of—

(1) the head of an office responsible for human resources or discrimination who reports directly to the Secretary;

(2) the Principal Deputy Assistant Secretary for the Bureau of Global Talent Management;

(3) the Principal Deputy Assistant Secretary for the Bureau of Intelligence and Research;

(4) an Assistant Secretary or Deputy, or equivalent, from a third bureau as designated by the Under Secretary for Management;

(5) a representative from the geographic bureau to which the restriction applies; and

(6) a representative from the Office of the Legal Adviser and a representative from the Bureau of Diplomatic Security, who shall serve as non-voting advisors.

Process.

(f) APPEAL RIGHTS.—Section 414(a) of the Department of State Authorities Act, Fiscal Year 2017 (22 U.S.C. 2734c(a)) is amended by striking the first two sentences and inserting "The Secretary shall establish and maintain a right and process for employees to appeal a decision related to an assignment, based on a restriction, review, or preclusion. Such right and process shall ensure that any such employee shall have the same appeal rights as provided by the Department regarding denial or revocation of a security clearance.".

Compliance.

(g) FAM UPDATE.—Not later than 120 days after the date of the enactment of this division, the Secretary shall amend all relevant provisions of the Foreign Affairs Manual, and any associated or related policies of the Department, to comply with this section.

22 USC 4030.

### SEC. 6116. SUITABILITY REVIEWS FOR FOREIGN SERVICE INSTITUTE INSTRUCTORS.

The Secretary shall take reasonable steps to ensure that all instructors at the Foreign Service Institute, including direct hires and contractors, who provide language instruction are—

(1) subject to suitability reviews and background investigations; and

(2) subject to periodic background checks or reinvestigations to the extent consistent with Department and Executive policy for other Department personnel.

### SEC. 6117. DIPLOMATIC SECURITY FELLOWSHIP PROGRAMS.

(a) IN GENERAL.—Section 47 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2719) is amended—

(1) by striking "The Secretary" and inserting the following: "(a) IN GENERAL.—The Secretary"; and

(2) by adding at the end the following new subsection:

Grants.

"(b) DIPLOMATIC SECURITY FELLOWSHIP PROGRAMS.—

"(1) ESTABLISHMENT.—The Secretary of State, working through the Assistant Secretary for Diplomatic Security, is authorized to establish Diplomatic Security fellowship programs

to provide grants to United States nationals pursuing post-secondary studies who commit to pursuing a career as a special agent, security engineering officer, or in the civil service in the Bureau of Diplomatic Security.

"(2) RULEMAKING.—The Secretary is authorized to promulgate regulations for the administration of Diplomatic Security fellowship programs that set forth—

"(A) the eligibility requirements for receiving a grant under this subsection;

"(B) the process by which eligible applicants may request such a grant;

"(C) the maximum amount of such a grant; and

"(D) the educational progress to which all grant recipients are obligated.".

(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $2,000,000 for each of fiscal years 2024 through 2028 to carry out this section.

*Time periods.*

# TITLE LXII—PERSONNEL MATTERS

## Subtitle A—Hiring, Promotion, and Development

### SEC. 6201. ADJUSTMENT TO PROMOTION PRECEPTS.

Section 603(b) of the Foreign Service Act of 1980 (22 U.S.C. 4003(b)) is amended—

(1) by redesignating paragraph (2), (3), and (4) as paragraphs (7), (8), and (9), respectively; and

(2) by inserting after paragraph (1) the following new paragraphs:

"(2) experience serving at an international organization, multilateral institution, or engaging in multinational negotiations;

"(3) willingness to serve in hardship posts overseas where applicable and across geographically distinct regions;

"(4) experience advancing policies or developing expertise that enhance the United States' competitiveness with regard to critical and emerging technologies;

"(5) willingness to participate in appropriate and relevant professional development opportunities offered by the Foreign Service Institute or other educational institutions associated with the Department;

"(6) willingness to enable and encourage subordinates at various levels to avail themselves of appropriate and relevant professional development opportunities offered by the Foreign Service Institute or other educational institutions associated with the Department;".

### SEC. 6202. HIRING AUTHORITIES.

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the Department should possess hiring authorities to enable recruitment of individuals representative of the nation with special skills needed to address 21st century diplomacy challenges; and

(2) the Secretary shall conduct a survey of hiring authorities held by the Department to identify—

(A) hiring authorities already authorized by Congress;

(B) other authorities granted through Presidential decree or executive order; and

(C) any authorities needed to enable recruitment of individuals with the special skills described in paragraph (1).

Legislative proposals.

(b) REPORT.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committee on Oversight and Accountability of the House of Representatives a report that includes a description of all existing hiring authorities and legislative proposals on any new needed authorities.

Time period.
Appointments.
22 USC 2651a note.

(c) SPECIAL HIRING AUTHORITY.—For an initial period of not more than 3 years after the date of the enactment of this division, the Secretary may appoint, without regard to the provisions of sections 3309 through 3318 of title 5, United States Code, up to 80 candidates directly to positions in the competitive service at the Department, as defined in section 2102 of that title, in the following occupational series: 25 candidates under 1560 Data Science, 25 candidates under 2210 Information Technology Management, and 30 candidates under 0201 Human Resources Management.

Time periods.

### SEC. 6203. EXTENDING PATHS TO SERVICE FOR PAID STUDENT INTERNS.

Appointments.
22 USC 2651a note.

(a) IN GENERAL.—For up to 2 years following the end of a compensated internship at the Department, the Department may offer employment to up to 25 such interns and appoint them directly to positions in the competitive service, as defined in section 2102 of title 5, United States Code, without regard to the provisions of sections 3309 through 3318 of such title.

(b) REPORT.—Not later than one year after the date of the enactment of this division, and annually thereafter for 3 years, the Secretary shall submit to the appropriate congressional committees, the Homeland Security and Governmental Affairs Committee of the Senate, and the Committee on Oversight and Accountability of the House of Representatives a report listing which undergraduate and post-secondary institutions the interns offered employment under subsection (a) attended, where available.

### SEC. 6204. LATERAL ENTRY PROGRAM.

22 USC 3943 note.

(a) IN GENERAL.—Section 404 of the Department of State Authorities Act, Fiscal Year 2017 (Public Law 114–323; 130 Stat. 1928) is amended—

(1) in subsection (b)—

(A) in the matter preceding paragraph (1), by striking "3-year" and inserting "5-year";

(B) in paragraph (5), by striking "; and";

(C) in paragraph (6), by striking the period at the end and inserting a semicolon; and

(D) by adding at the end the following new paragraphs:

"(7) does not include the use of Foreign Service-Limited or other noncareer Foreign Service hiring authorities; and

"(8) includes not fewer than 30 participants for each year of the pilot program."; and

(2) by adding at the end the following new subsection:

"(e) CERTIFICATION.—If the Secretary does not commence the lateral entry program within 180 days after the date of the enactment of this subsection, the Secretary shall submit a report to the appropriate congressional committees—

    "(1) certifying that progress is being made on implementation of the pilot program and describing such progress, including the date on which applicants will be able to apply;

    "(2) estimating the date by which the pilot program will be fully implemented;

    "(3) outlining how the Department will use the Lateral Entry Program to fill needed skill sets in key areas such as cyberspace, emerging technologies, economic statecraft, multilateral diplomacy, and data and other sciences.".

**SEC. 6205. MID-CAREER MENTORING PROGRAM.**

22 USC 2738.

(a) AUTHORIZATION.—The Secretary, in collaboration with the Director of the Foreign Service Institute, is authorized to establish a Mid-Career Mentoring Program (referred to in this section as the "Program") to assist in the retention of, and to decrease mid-career attrition of, employees, including those who have demonstrated potential for advancement and may be at risk of leaving the Department.

(b) SELECTION.—

    (1) NOMINATIONS.—The head of each bureau shall semi-annually nominate participants for the Program from a pool of applicants in the positions described in paragraph (2)(B), including from posts both domestically and abroad.

    (2) SUBMISSION OF SLATE OF NOMINEES TO SECRETARY.—The Director of the Foreign Service Institute, in consultation with the Director General of the Foreign Service, shall semi-annually—

        (A) vet the nominees most recently nominated pursuant to paragraph (1); and

        (B) submit to the Secretary a slate of applicants to participate in the Program, who shall consist of at least—

            (i) 10 Foreign Service Officers and specialists classified at the FS-03 or FS-04 level of the Foreign Service Salary Schedule;

            (ii) 10 Civil Service employees classified at GS-12 or GS-13 of the General Schedule; and

            (iii) 5 Foreign Service Officers from the United States Agency for International Development.

    (3) FINAL SELECTION.—The Secretary shall select the applicants who will be invited to participate in the Program from the slate received pursuant to paragraph (2)(B) and extend such an invitation to each selected applicant.

    (4) MERIT PRINCIPLES.—Section 105 of the Foreign Service Act of 1980 (22 U.S.C. 3905) shall apply to nominations, submissions to the Secretary, and selections for the Program under this section.

(c) PROGRAM SESSIONS.—

    (1) FREQUENCY; DURATION.—All of the participants who accept invitations extended pursuant to subsection (b)(3) shall meet 3 to 4 times per year for training sessions with high-level leaders of the Department and USAID, including private

*Reports.*

*Estimate.*

*Applicability.*

group meetings with the Secretary and the Administrator of the United States Agency for International Development.

(2) THEMES.—Each session referred to in paragraph (1) shall focus on specific themes developed jointly by the Foreign Service Institute and the Executive Secretariat focused on substantive policy issues and leadership practices.

Time period.

(d) MENTORING PROGRAM.—The Secretary and the Administrator each is authorized to establish a mentoring and coaching program that pairs a senior leader of the Department or USAID with each of the program participants who complete the Program during the 1-year period immediately following their participation in the Program.

Time periods.
Demographic
data.

(e) ANNUAL REPORT.—Not later than one year after the date of the enactment of this division, and annually thereafter for three years, the Secretary shall submit a report to the appropriate congressional committees that describes the activities of the Program during the most recent year and includes disaggregated demographic data on participants in the Program.

### SEC. 6206. REPORT ON THE FOREIGN SERVICE INSTITUTE'S LANGUAGE PROGRAM.

Not later than 60 days after the date of the enactment of this division, the Secretary shall submit a report to the appropriate congressional committees that includes—

(1) the average pass and fail rates for language programs at the Foreign Service Institute in comparison with Language Designated Position (LDP) requirements, disaggregated by language during the 5-year period immediately preceding the date of the enactment of this division;

(2) the number of Department employees and contractors who are language instructors at the Foreign Service Institute, and a comparison of the instructor/student ratio in the language programs at the Foreign Service Institute disaggregated by language;

(3) salaries for language instructors disaggregated by language, employment/contractor status, and a comparison to salaries for instructors teaching languages in comparable employment;

Plans.

(4) recruitment and retention plans for language instructors, disaggregated by language where necessary and practicable;

Plans.

(5) any plans to increase pass rates for languages with high failure rates; and

List.

(6) a list of all outside entities with which the Foreign Service Institute partners or contracts in order to hire or obtain foreign language instructors, including the duration of any relevant agreements, and an indication of how agreements are evaluated by the Department for potential renewal, where available.

### SEC. 6207. CONSIDERATION OF CAREER CIVIL SERVANTS AS CHIEFS OF MISSIONS.

Section 304(b) of the Foreign Service Act of 1980 (22 U.S.C. 3944) is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by inserting after paragraph (1) the following new paragraph:

"(2) The Secretary shall also furnish to the President, on an annual basis and to assist the President in selecting qualified candidates for appointments or assignments as chief of mission, the names of between 5 and 10 career civil servants serving at the Department of State or the United States Agency for International Development who are qualified to serve as chiefs of mission, together with pertinent information about such individuals.". <span style="float:right">Time period.</span>

### SEC. 6208. CIVIL SERVICE ROTATIONAL PROGRAM.

Deadlines.
Criteria.
22 USC 2739.

(a) ESTABLISHMENT OF PILOT ROTATIONAL PROGRAM FOR CIVIL SERVICE.—Not later than 180 days after the date of the enactment of this division, the Secretary shall establish a program to provide qualified civil servants serving at the Department an opportunity to serve at a United States embassy, including identifying criteria and an application process for such program.

(b) PROGRAM.—The program established under this section shall— <span style="float:right">Time periods.</span>

(1) provide at least 20 career civil servants the opportunity to serve for 2 to 3 years at a United States embassy to gain additional skills and experience;

(2) offer such civil servants the opportunity to serve in a political or economic section at a United States embassy; and

(3) include clear and transparent criteria for eligibility and selection, which shall include a minimum of 5 years of service at the Department.

(c) SUBSEQUENT POSITION AND PROMOTION.—Following a rotation at a United States embassy pursuant to the program established by this section, participants in the program must be afforded, at minimum, a position equivalent in seniority, compensation, and responsibility to the position occupied prior serving in the program. Successful completion of a rotation at a United States embassy shall be considered favorably with regard to applications for promotion in civil service jobs at the Department.

(d) IMPLEMENTATION.—Not later than 2 years after the date of the enactment of this division, the Secretary shall identify not less than 20 positions in United States embassies for the program established under this section and offer at least 20 civil servants the opportunity to serve in a rotation at a United States embassy pursuant to this section.

### SEC. 6209. REPORTING REQUIREMENT ON CHIEFS OF MISSION.

Time periods.
22 USC 3927b.

Not later than 30 days following the end of each calendar quarter, the Secretary shall submit to the appropriate congressional committees—

(1) a list of every chief of mission or United States representative overseas with the rank of Ambassador who, during the prior quarter, was granted approval by the Under Secretary of State for Management to be outside a country of assignment for purposes other than official travel or temporary duty orders; and

(2) the number of days each such chief of mission or United States representative overseas with the rank of Ambassador was outside a country of assignment during the previous quarter for purposes other than official travel or temporary duty orders.

**137 STAT. 976**          **PUBLIC LAW 118–31—DEC. 22, 2023**

### SEC. 6210. REPORT ON CHIEFS OF MISSION AND DEPUTY CHIEFS OF MISSION.

Time period.

Not later than April 1, 2024, and annually thereafter for the next 4 years, the Secretary shall submit to the appropriate congressional committees a report that includes—

(1) the Foreign Service cone of each current chief of mission and deputy chief of mission (or whoever is acting in the capacity of chief or deputy chief if neither is present) for each United States embassy at which there is a Foreign Service Officer filling either of those positions; and

Data.

(2) aggregated data for all chiefs of mission and deputy chiefs of mission described in paragraph (1), disaggregated by cone.

Deadlines.
22 USC 2736f.

### SEC. 6211. EFFORTS TO IMPROVE RETENTION AND PREVENT RETALIATION.

(a) STREAMLINED REPORTING.—Not later than one year after the date of the enactment of this division, the Secretary shall establish a single point of initial reporting for allegations of discrimination, and harassment that provides an initial review of the allegations and, if necessary, the ability to file multiple claims based on a single complaint.

(b) REQUIRED ANNUAL SURVEYS.—

Assessment.

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, and annually thereafter, the Secretary shall conduct an annual employee satisfaction survey to assess the level of job satisfaction, work environment, and overall employee experience within the Department.

(2) OPEN-ENDED RESPONSES.—The survey required under paragraph (1) shall include options for open-ended responses.

(3) SURVEY QUESTIONS.—The survey shall include questions regarding—

(A) work-life balance;

(B) compensation and benefits;

(C) career development opportunities;

(D) the performance evaluation and promotion process, including fairness and transparency;

(E) communication channels and effectiveness;

(F) leadership and management;

(G) organizational culture;

(H) awareness and effectiveness of complaint measures;

(I) accessibility and accommodations;

(J) availability of transportation to and from a work station;

(K) information technology infrastructure functionality and accessibility;

(L) the employee's understanding of the Department's structure, mission, and goals;

(M) alignment and relevance of work to the Department's mission;

(N) sense of empowerment to affect positive change; and

(O) experiences with harassment, discrimination, retaliation, and other events that contribute to attrition and negatively impact work culture and productivity.

(c) REQUIRED EXIT SURVEYS.—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 977

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary shall develop and implement a standardized, confidential exit survey process that includes anonymous feedback and exit interviews with employees who voluntarily separate from the Department, whether through resignation, retirement, or other means.

*Process.*

(2) SCOPE.—The exit surveys conducted pursuant to paragraph (1) shall—

(A) be designed to gather insights and feedback from departing employees regarding—

(i) their reasons for leaving, including caretaking responsibilities, career limitations for partner or spouse, and discrimination, harassment, or retaliation;

(ii) their overall experience with the Department; and

(iii) any suggestions for improvement; and

(B) include questions related to—

(i) the employee's reasons for leaving;

(ii) job satisfaction;

(iii) work environment;

(iv) professional growth opportunities;

(v) leadership effectiveness;

(vi) suggestions for enhancing the Department's performance; and

(vii) if applicable, the name and industry of the employee's future employer.

(3) COMPILATION OF RESULTS.—The Secretary shall compile and analyze the anonymized exit survey data collected pursuant to this paragraph to identify trends, common themes, and areas needing improvement within the Department.

*Analysis.*

(d) PILOT SURVEYS.—Not later than 180 days after the date of the enactment of this division, the Secretary shall conduct a Department-wide survey for Locally Employed Staff regarding retention, training, promotion, and other matters, including harassment, discrimination, and retaliation, that includes workforce perspectives on the accessibility and effectiveness of complaint measures.

(e) REPORT.—Not later than 60 days after the conclusion of each survey conducted pursuant to this section, the Secretary shall make the key findings available to the Department workforce and shall submit them to the appropriate congressional committees.

(f) RETALIATION PREVENTION EFFORTS.—

(1) EMPLOYEE EVALUATION.—

(A) IN GENERAL.—If there is a pending investigation of discrimination or harassment against a superior who is responsible for rating or reviewing the complainant employee, the complainant shall be reviewed by the superior's supervisor or other Department employee as appropriate.

*Reviews.*

(B) EFFECTIVE DATE.—This paragraph shall take effect 90 days after the date of the enactment of this division.

(2) RETALIATION PREVENTION GUIDANCE.—Any Department employee against whom an allegation of discrimination or harassment has been made shall receive written guidance (a "retaliation hold") on the types of actions that can be considered retaliation against the complainant employee. The employee's

137 STAT. 978          PUBLIC LAW 118–31—DEC. 22, 2023

immediate supervisor shall also receive the retaliation hold guidance.

Deadline.
Strategy.
Assessment.

**SEC. 6212. NATIONAL ADVERTISING CAMPAIGN.**

Not later than 270 days after the date of the enactment of this division, the Secretary shall submit a strategy to the appropriate congressional committees that assesses the potential benefits and costs of a national advertising campaign to improve the recruitment to the Civil Service and the Foreign Service by raising public awareness of the important accomplishments of the Department.

22 USC 2736a
note.
Deadline.

**SEC. 6213. EXPANSION OF DIPLOMATS IN RESIDENCE PROGRAMS.**

(a) IN GENERAL.—Not later than two years after the date of the enactment of this division—

(1) the Secretary is authorized to increase the number of diplomats in the Diplomats in Residence Program from 17 to at least 20; and

(2) the Administrator of the United States Agency for International Development is authorized to increase the number of development diplomats in the Diplomats in Residence Program from 1 to at least 3.

Time period.

(b) REPORT.—Not later than one year after the date of the enactment of this division, and every year for three years thereafter, the Secretary shall report to the appropriate congressional committees whether additional Diplomats in Residence have been established, and, if so, what regions or colleges or universities such diplomats are assigned to, with an explanation as to why those regions or schools were chosen as most in need of additional Department recruiting personnel.

# Subtitle B—Pay, Benefits, and Workforce Matters

**SEC. 6221. EDUCATION ALLOWANCE.**

(a) IN GENERAL.—Chapter 9 of title I of the Foreign Service Act of 1980 (22 U.S.C. 4081 et seq.) is amended by adding at the end the following new section:

22 USC 4088.

**"SEC. 908. EDUCATION ALLOWANCE.**

"A Department employee who is on leave to perform service in the uniformed services (as defined in section 4303(13) of title 38, United States Code) may receive an education allowance if the employee would, if not for such service, be eligible to receive the education allowance.".

(b) CLERICAL AMENDMENT.—The table of contents in section 2 of the Foreign Service Act of 1980 (22 U.S.C. 3901 note) is amended by inserting after the item relating to section 907 the following:

"Sec. 908. Education allowance".

**SEC. 6222. IMPROVING MENTAL HEALTH SERVICES FOR FOREIGN AND CIVIL SERVANTS.**

22 USC 4084
note.

(a) ADDITIONAL PERSONNEL TO ADDRESS MENTAL HEALTH.—

(1) IN GENERAL.—The Secretary shall seek to increase the number of personnel within the Bureau of Medical Services

to address mental health needs for both foreign and civil servants.

(2) EMPLOYMENT TARGETS.—Not later than 180 days after the date of the enactment of this division, the Secretary shall seek to employ not fewer than 10 additional personnel in the Bureau of Medical Services, compared to the number of personnel employed as of the date of the enactment of this division.

*Deadline.*

(b) STUDY.—The Secretary shall conduct a study on the accessibility of mental health care providers and services available to Department personnel, including an assessment of—

*Assessment.*

(1) the accessibility of mental health care providers at diplomatic posts and in the United States;

(2) the accessibility of inpatient services for mental health care for Department personnel;

(3) steps that may be taken to improve such accessibility;

(4) the impact of the COVID–19 pandemic on the mental health of Department personnel, particularly those who served abroad between March 1, 2020, and December 31, 2022, and Locally Employed Staff, where information is available;

*Time period.*

(5) recommended steps to improve the manner in which the Department advertises mental health services to the workforce;

*Recommendations.*

(6) hesitancy to seek out mental health services, due to perceptions and realities regarding the degree to which employees' use of mental health services could impact their career trajectory, including security clearances; and

(7) additional authorities and resources needed to better meet the mental health needs of Department personnel.

(c) REPORT.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to appropriate congressional committees a report containing the findings of the study under subsection (b).

### SEC. 6223. EMERGENCY BACK-UP CARE.

*22 USC 2703a.*

(a) IN GENERAL.—The Secretary and the Administrator for the United States Agency for International Development are authorized to provide for unanticipated non-medical care, including dependent child and eldercare, and essential services directly related to caring for an acute injury or illness, for USAID and Department employees and their family members, including through the provision of such non-medical services, referrals to care providers, and reimbursement of reasonable expenses for such services.

(b) LIMITATION.—Services provided pursuant to this section shall not exceed $2,000,000 per fiscal year.

### SEC. 6224. EXCEPTION FOR GOVERNMENT-FINANCED AIR TRANSPORTATION.

(a) REDUCING HARDSHIP FOR TRANSPORTATION OF DOMESTIC ANIMALS.—

*22 USC 4081a.*

(1) IN GENERAL.—Notwithstanding subsections (a) and (c) of section 40118 of title 49, United States Code, the Department is authorized to pay for the transportation by a foreign air carrier of Department personnel and any in-cabin or accompanying checked baggage or cargo if—

(A) no air carrier holding a certificate under section 41102 of such title is willing and able to transport up

**137 STAT. 980**          **PUBLIC LAW 118–31—DEC. 22, 2023**

to 3 domestic animals accompanying such Federal personnel; and

(B) the transportation is from a place—

(i) outside the United States to a place in the United States;

(ii) in the United States to a place outside the United States; or

(iii) outside the United States to another place outside the United States.

(2) LIMITATION.—An amount paid pursuant to paragraph (1) for transportation by a foreign carrier may not be greater than the amount that would otherwise have been paid had the transportation been on an air carrier holding a certificate under section 41102 had that carrier been willing and able to provide such transportation. If the amount that would otherwise have been paid to such an air carrier is less than the cost of transportation on the applicable foreign carrier, the Department personnel may pay the difference of such amount.

(3) DOMESTIC ANIMAL DEFINED.—In this subsection, the term "domestic animal" means a dog or a cat.

### SEC. 6225. INTERNET AT HARDSHIP POSTS.

Section 3 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2670) is amended—

(1) in subsection (l), by striking "; and" and inserting a semicolon;

(2) in subsection (m) by striking the period at the end and by inserting "; and"; and

(3) by adding at the end the following new subsection:

"(n) pay expenses to provide internet services in residences owned or leased by the United States Government in foreign countries for the use of Department personnel where Department personnel receive a post hardship differential equivalent to 30 percent or more above basic compensation.".

### SEC. 6226. COMPETITIVE LOCAL COMPENSATION PLAN.

(a) ESTABLISHMENT AND IMPLEMENTATION OF PREVAILING WAGE RATES GOAL.—Section 401(a) of the Department of State Authorities Act, fiscal year 2017 (22 U.S.C. 3968a(a)) is amended in the matter preceding paragraph (1), by striking "periodically" and inserting "every 3 years".

(b) REPORT.—Not later than one year after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report that includes—

(1) compensation (including position classification) plans for locally employed staff based upon prevailing wage rates and compensation practices for corresponding types of positions in the locality of employment; and

Assessment.

(2) an assessment of the feasibility and impact of changing the prevailing wage rate goal for positions in the local compensation plan from the 50th percentile to the 75th percentile.

22 USC 3982 note.

### SEC. 6227. SUPPORTING TANDEM SPOUSES IN THE FOREIGN SERVICE.

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 981

(1) challenges finding and maintaining spousal employment and family dissatisfaction are one of the leading reasons employees cite for leaving the Department;

(2) tandem Foreign Service personnel represent important members of the Foreign Service community, who act as force multipliers for our diplomacy;

(3) the Department can and should do more to keep tandem spouses posted together and consider family member employment needs when assigning tandem officers; and

(4) common sense steps providing more flexibility in the assignments process would improve outcomes for tandem officers without disadvantaging other Foreign Service Officers.

(b) DEFINITIONS.—In this section:

(1) FAMILY TOGETHERNESS.—The term "family togetherness" means facilitating the placement of Foreign Service personnel at the same United States diplomatic post when both spouses are members of a tandem couple of Foreign Service personnel.

(2) TANDEM FOREIGN SERVICE PERSONNEL; TANDEM.—The terms "tandem Foreign Service personnel" and "tandem" mean a member of a couple of which one spouse is a career or career candidate employee of the Foreign Service and the other spouse is a career or career candidate employee of the Foreign Service or an employee of one of the agencies authorized to use the Foreign Service Personnel System under section 202 of the Foreign Service Act of 1980 (22 U.S.C. 3922).

(c) FAMILY TOGETHERNESS IN ASSIGNMENTS.—Not later than 90 days after the date of enactment of this division, the Department shall amend and update its policies to further promote the principle of family togetherness in the Foreign Service, which shall include the following:

(1) ENTRY-LEVEL FOREIGN SERVICE PERSONNEL.—The Secretary shall adopt policies and procedures to facilitate the assignment of entry-level tandem Foreign Service personnel on directed assignments to the same diplomatic post or country as their tandem spouse if they request to be assigned to the same post or country. The Secretary shall also provide a written justification to the requesting personnel explaining any denial of a request that would result in tandem spouses not serving together at the same post or country.

(2) TENURED FOREIGN SERVICE PERSONNEL.—The Secretary shall add family togetherness to the criteria when making a needs of the Service determination, as defined by the Foreign Affairs Manual, for the placement of tenured tandem Foreign Service personnel at United States diplomatic posts.

(3) UPDATES TO ANTINEPOTISM POLICY.—The Secretary shall update antinepotism policies so that nepotism rules only apply when an employee and a relative are placed into positions wherein they jointly and exclusively control government resources, property, or money or establish government policy.

(4) TEMPORARY SUPERVISION OF TANDEM SPOUSE.—The Secretary shall update policies to allow for a tandem spouse to temporarily supervise another tandem spouse for up to 90 days in a calendar year, including at a United States diplomatic mission.

(d) REPORT.—Not later than 90 days after the date of enactment of this division, and annually thereafter for two years, the Secretary

*Margin notes:* Deadline. Updates. Policies. Time periods. Procedures. Determination.

137 STAT. 982          PUBLIC LAW 118–31—DEC. 22, 2023

shall submit to the appropriate congressional committees a report that includes—

(1) the number of Foreign Service tandem spouses currently serving;

(2) the number of Foreign Service tandems currently serving in separate locations, or, to the extent possible, that are on leave without pay (LWOP); and

Cost estimate.

(3) an estimate of the cost savings that would result if all Foreign Service tandem spouses were placed at a single post.

**SEC. 6228. ACCESSIBILITY AT DIPLOMATIC MISSIONS.**

Reports.

Not later than 180 days after the date of the enactment of this division, the Department shall submit to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report that includes—

List.

(1) a list of the overseas United States diplomatic missions that, as of the date of the enactment of this division, are not readily accessible to and usable by individuals with disabilities;

(2) any efforts in progress to make such missions readily accessible to and usable by individuals with disabilities; and

Cost estimate.

(3) an estimate of the cost to make all such missions readily accessible to and usable by individuals with disabilities.

**SEC. 6229. REPORT ON BREASTFEEDING ACCOMMODATIONS OVERSEAS.**

Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees a report that includes—

(1) a detailed report on the Department's efforts to equip 100 percent of United States embassies and consulates with dedicated lactation spaces, other than bathrooms, that are shielded from view and free from intrusion from coworkers and the public for use by employees, including the expected demand for such spaces as well as the status of such rooms when there is no demand for such space; and

(2) a description of costs and other resources needed to provide such spaces.

**SEC. 6230. DETERMINING THE EFFECTIVENESS OF KNOWLEDGE TRANSFERS BETWEEN FOREIGN SERVICE OFFICERS.**

Assessment.
Recommendations.
Analysis.

The Secretary shall assess the effectiveness of knowledge transfers between Foreign Service Officers who are departing from overseas positions and Foreign Service Officers who are arriving at such positions, and make recommendations for approving such knowledge transfers, as appropriate, by—

Deadline.
Survey.

(1) not later than 90 days after the date of the enactment of this division, conducting a written survey of a representative sample of Foreign Service Officers working in overseas assignments that analyzes the effectiveness of existing mechanisms to facilitate transitions, including training, mentorship, information technology, knowledge management, relationship building, the role of locally employed staff, and organizational culture; and

Reports.
Summary.

(2) not later than 120 days after the date of the enactment of this division, submitting to the appropriate congressional

PUBLIC LAW 118–31—DEC. 22, 2023      137 STAT. 983

committees a report that includes a summary and analysis of results of the survey conducted pursuant to paragraph (1) that—

(A) identifies best practices and areas for improvement;

(B) describes the Department's methodology for determining which Foreign Service Officers should receive familiarization trips before arriving at a new post;

(C) includes recommendations regarding future actions the Department should take to maximize effective knowledge transfer between Foreign Service Officers;

(D) identifies any steps taken, or intended to be taken, to implement such recommendations, including any additional resources or authorities necessary to implement such recommendations; and

(E) provides recommendations to Congress for legislative action to advance the priority described in subparagraph (C).

**SEC. 6231. EDUCATION ALLOWANCE FOR DEPENDENTS OF DEPARTMENT OF STATE EMPLOYEES LOCATED IN UNITED STATES TERRITORIES.**

22 USC 2701a.

(a) IN GENERAL.—An individual employed by the Department at a location described in subsection (b) shall be eligible for a cost-of-living allowance for the education of the dependents of such employee in an amount that does not exceed the educational allowance authorized by the Secretary of Defense for such location.

(b) LOCATION DESCRIBED.—A location is described in this subsection if—

(1) such location is in a territory of the United States; and

(2) the Secretary of Defense has determined that schools available in such location are unable to adequately provide for the education of—

Determination.

(A) dependents of members of the Armed Forces; or

(B) dependents of employees of the Department of Defense.

**SEC. 6232. OVERTIME PAY EXCEPTION FOR PROTECTIVE SERVICES.**

5 USC 5547 note.

(a) COVERED EMPLOYEE DEFINED.—In this section, the term "covered employee" means any individual employed by, and conducting protective services on behalf of, the Diplomatic Security Service for an individual.

(b) EXCEPTION TO THE LIMITATION ON PREMIUM PAY FOR PROTECTIVE SERVICES.—Notwithstanding the restrictions contained in section 5547 of title 5, United States Code, any covered employee may receive premium pay for overtime officially ordered or approved and performed while conducting protective security functions in excess of the annual equivalent of the limitation on the rate of pay contained in section 5547(a) of such title, except that such premium pay shall not be payable to an employee to the extent that such aggregate amount would exceed the rate of basic pay payable for a position at level II of the Executive Schedule under section 5313 of such title.

(c) TREATMENT OF ADDITIONAL PAY.—If the application of subsection (b) results in the payment of additional premium pay to a covered employee of a type that is normally creditable as basic pay for retirement or any other purpose, that additional pay shall not—

137 STAT. 984              PUBLIC LAW 118–31—DEC. 22, 2023

(1) be considered to be basic pay of the covered employee for any purpose; or

(2) be used in computing a lump-sum payment to the covered employee for accumulated and accrued annual leave under section 5551 or section 5552 of title 5, United States Code.

(d) AGGREGATE LIMIT.—With respect to the application of section 5307 of title 5, United States Code, the payment of any additional premium pay to a covered employee as a result of subsection (b) shall not be counted as part of the aggregate compensation of the covered employee.

(e) REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to the appropriate committees of Congress a report describing the steps the Department is taking to address the increased protective service demands placed upon individuals by the Diplomatic Security Service.

(2) ELEMENTS.—The report required under paragraph (1) shall include the following elements:

Analysis.

(A) An analysis of the current operational demands and staffing levels.

Recommendations.
Strategies.

(B) Recommended strategies for reducing overtime requirements, including—

(i) hiring additional personnel;

(ii) solutions such that sufficient resources are available throughout each year without the need for waivers of premium pay limitations;

(iii) redistribution of workload; and

(iv) other improvements in operational efficiency.

(3) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term "appropriate committees of Congress" means—

(A) the appropriate congressional committees;

(B) the Committee on Homeland Security and Governmental Affairs and the Committee on Appropriations of the Senate; and

(C) the Committee on Oversight and Accountability and the Committee on Appropriations of the House of Representatives.

(f) EFFECTIVE DATE.—This section shall take effect as if enacted on Jan 1, 2023.

(g) SUNSET.—This section shall terminate on December 31, 2025.

# TITLE LXIII—INFORMATION SECURITY AND CYBER DIPLOMACY

### SEC. 6301. DATA-INFORMED DIPLOMACY.

(a) FINDINGS.—Congress makes the following findings:

(1) In a rapidly evolving and digitally interconnected global landscape, access to and maintenance of reliable, readily available data is key to informed decisionmaking and diplomacy and therefore should be considered a strategic asset.

(2) In order to achieve its mission in the 21st century, the Department must adapt to these trends by maintaining

and providing timely access to high-quality data at the time and place needed, while simultaneously cultivating a data-savvy workforce.

(3) Leveraging data science and data analytics has the potential to improve the performance of the Department's workforce by providing otherwise unknown insights into program deficiencies, shortcomings, or other gaps in analysis.

(4) While innovative technologies such as artificial intelligence and machine learning have the potential to empower the Department to analyze and act upon data at scale, systematized, sustainable data management and information synthesis remain a core competency necessary for data-driven decision-making.

(5) The goals set out by the Department's Enterprise Data Council (EDC) as the areas of most critical need for the Department, including Cultivating a Data Culture, Accelerating Decisions through Analytics, Establishing Mission-Driven Data Management, and Enhancing Enterprise Data Governance, are laudable and will remain critical as the Department develops into a data-driven agency.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the Department should prioritize the recruitment and retainment of top data science talent in support of its data-informed diplomacy efforts as well as its broader modernization agenda; and

(2) the Department should strengthen data fluency among its workforce, promote data collaboration across and within its bureaus, and enhance its enterprise data oversight.

**SEC. 6302. ESTABLISHMENT AND EXPANSION OF THE BUREAU CHIEF DATA OFFICER PROGRAM.**

22 USC 2651a note.

(a) BUREAU CHIEF DATA OFFICER PROGRAM.—

(1) ESTABLISHMENT.—The Secretary shall establish a program, which shall be known as the "Bureau Chief Data Officer Program" (referred to in this section as the "Program"), overseen by the Department's Chief Data Officer. The Bureau Chief Data Officers hired under this program shall report to their respective Bureau leadership.

(2) GOALS.—The goals of the Program shall include the following:

(A) Cultivating a data culture by promoting data fluency and data collaboration across the Department.

(B) Promoting increased data analytics use in critical decisionmaking areas.

(C) Promoting data integration and standardization.

(D) Increasing efficiencies across the Department by incentivizing acquisition of enterprise data solutions and subscription data services to be shared across bureaus and offices and within bureaus.

(b) IMPLEMENTATION PLAN.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to the appropriate committees of Congress an implementation plan that outlines strategies for—

Deadline.
Strategies.

(A) advancing the goals described in subsection (a)(2);

(B) hiring Bureau Chief Data Officers at the GS-14 or GS-15 grade or a similar rank;

PUBLIC LAW 118–31—DEC. 22, 2023

(C) assigning at least one Bureau Chief Data Officer to each bureau of the Department; and

(D) allocation of necessary resources to sustain the Program.

(2) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term "appropriate committees of Congress" means—

(A) the appropriate congressional committees;

(B) the Committee on Homeland Security and Governmental Affairs and the Committee on Appropriations of the Senate; and

(C) the Committee on Oversight and Accountability and the Committee on Appropriations of the House of Representatives.

(c) ASSIGNMENT.—In implementing the Bureau Chief Data Officer Program, bureaus may not dual-hat currently employed personnel as Bureau Chief Data Officers.

Time period.

(d) ANNUAL REPORTING REQUIREMENT.—Not later than 180 days after the date of the enactment of this division, and annually thereafter for the following 3 years, the Secretary shall submit a report to the appropriate congressional committees regarding the status of the implementation plan required under subsection (b).

### SEC. 6303. ESTABLISHMENT OF THE CHIEF ARTIFICIAL INTELLIGENCE OFFICER OF THE DEPARTMENT OF STATE.

Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a) is amended by adding at the end the following new subsection:

"(n) CHIEF ARTIFICIAL INTELLIGENCE OFFICER.—

"(1) IN GENERAL.—There shall be within the Department of State a Chief Artificial Intelligence Officer, which may be dual-hatted as the Department's Chief Data Officer, who shall be a member of the Senior Executive Service.

"(2) DUTIES DESCRIBED.—The principal duties and responsibilities of the Chief Artificial Intelligence Officer shall be—

"(A) to evaluate, oversee, and, if appropriate, facilitate the responsible adoption of artificial intelligence (AI) and machine learning applications to help inform decisions by policymakers and to support programs and management operations of the Department of State; and

"(B) to act as the principal advisor to the Secretary of State on the ethical use of AI and advanced analytics in conducting data-informed diplomacy.

"(3) QUALIFICATIONS.—The Chief Artificial Intelligence Officer should be an individual with demonstrated skill and competency in—

"(A) the use and application of data analytics, AI, and machine learning; and

"(B) transformational leadership and organizational change management, particularly within large, complex organizations.

Consultation.

"(4) PARTNER WITH THE CHIEF INFORMATION OFFICER ON SCALING ARTIFICIAL INTELLIGENCE USE CASES.—To ensure alignment between the Chief Artificial Intelligence Officer and the Chief Information Officer, the Chief Information Officer will consult with the Chief Artificial Intelligence Officer on best

practices for rolling out and scaling AI capabilities across the Bureau of Information and Resource Management's broader portfolio of software applications.

"(5) ARTIFICIAL INTELLIGENCE DEFINED.—In this subsection, the term 'artificial intelligence' has the meaning given the term in section 238(g) of the National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 10 U.S.C. 4001 note).".

**SEC. 6304. STRENGTHENING THE CHIEF INFORMATION OFFICER OF THE DEPARTMENT OF STATE.**

22 USC 2684b.

(a) IN GENERAL.—The Chief Information Officer of the Department shall be consulted on all decisions to approve or disapprove, significant new unclassified information technology expenditures, including software, of the Department, including expenditures related to information technology acquired, managed, and maintained by other bureaus and offices within the Department, in order to—

Consultation.

(1) encourage the use of enterprise software and information technology solutions where such solutions exist or can be developed in a timeframe and manner consistent with maintaining and enhancing the continuity and improvement of Department operations;

(2) increase the bargaining power of the Department in acquiring information technology solutions across the Department;

(3) reduce the number of redundant Authorities to Operate (ATO), which, instead of using one ATO-approved platform across bureaus, requires multiple ATOs for software use cases across different bureaus;

(4) enhance the efficiency, reduce redundancy, and increase interoperability of the use of information technology across the enterprise of the Department;

(5) enhance training and alignment of information technology personnel with the skills required to maintain systems across the Department;

(6) reduce costs related to the maintenance of, or effectuate the retirement of, legacy systems;

(7) ensure the development and maintenance of security protocols regarding the use of information technology solutions and software across the Department; and

(8) improve end-user training on the operation of information technology solutions and to enhance end-user cybersecurity practices.

(b) STRATEGY AND IMPLEMENTATION PLAN REQUIRED.—

Deadlines.
Time period.

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Chief Information Officer of the Department shall develop, in consultation with relevant bureaus and offices as appropriate, a strategy and a 5-year implementation plan to advance the objectives described in subsection (a).

(2) CONSULTATION.—No later than one year after the date of the enactment of this division, the Chief Information Officer shall submit the strategy required by this subsection to the appropriate congressional committees and shall consult with the appropriate congressional committees, not less than on

an annual basis for 5 years, regarding the progress related to the implementation plan required by this subsection.

Deadlines.

(c) IMPROVEMENT PLAN FOR THE BUREAU FOR INFORMATION RESOURCES MANAGEMENT.—

Policies.
Protocols.

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Chief Information Officer shall develop policies and protocols to improve the customer service orientation, quality and timely delivery of information technology solutions, and training and support for bureau and office-level information technology officers.

Time period.

(2) SURVEY.—Not later than one year after the date of the enactment of this division, and annually thereafter for five years, the Chief Information Officer shall undertake a client satisfaction survey of bureau information technology officers to obtain feedback on metrics related to—

(A) customer service orientation of the Bureau of Information Resources Management;

(B) quality and timelines of capabilities delivered;

(C) maintenance and upkeep of information technology solutions;

(D) training and support for senior bureau and office-level information technology officers; and

(E) other matters which the Chief Information Officer, in consultation with client bureaus and offices, determines appropriate.

Summary.

(3) SUBMISSION OF FINDINGS.—Not later than 60 days after completing each survey required under paragraph (2), the Chief Information Officer shall submit a summary of the findings to the appropriate congressional committees, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committee on Oversight and Accountability of the House of Representatives.

(d) SIGNIFICANT EXPENDITURE DEFINED.—For purposes of this section, the term "significant expenditure" means any cumulative expenditure in excess of $250,000 total in a single fiscal year for a new unclassified software or information technology capability.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed—

(1) to alter the authorities of the United States Office of Management and Budget, Office of the National Cyber Director, the Department of Homeland Security, or the Cybersecurity and Infrastructure Security Agency with respect to Federal information systems; or

(2) to alter the responsibilities and authorities of the Chief Information Officer of the Department as described in titles 40 or 44, United States Code, or any other law defining or assigning responsibilities or authorities to Federal Chief Information Officers.

**SEC. 6305. SENSE OF CONGRESS ON STRENGTHENING ENTERPRISE GOVERNANCE.**

It is the sense of Congress that in order to modernize the Department, enterprise-wide governance regarding budget and finance, information technology, and the creation, analysis, and use of data across the Department is necessary to better align resources to strategy, including evaluating trade-offs, and to enhance efficiency and security in using data and technology as

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 989

tools to inform and evaluate the conduct of United States foreign policy.

**SEC. 6306. DIGITAL CONNECTIVITY AND CYBERSECURITY PARTNER-SHIP.**

22 USC 10307.

(a) DIGITAL CONNECTIVITY AND CYBERSECURITY PARTNERSHIP.— The Secretary is authorized to establish a program, which may be known as the "Digital Connectivity and Cybersecurity Partnership", to help foreign countries—

(1) expand and increase secure internet access and digital infrastructure in emerging markets, including demand for and availability of high-quality information and communications technology (ICT) equipment, software, and services;

(2) protect technological assets, including data;

(3) adopt policies and regulatory positions that foster and encourage open, interoperable, reliable, and secure internet, the free flow of data, multi-stakeholder models of internet governance, and pro-competitive and secure ICT policies and regulations;

(4) access United States exports of ICT goods and services;

(5) expand interoperability and promote the diversification of ICT goods and supply chain services to be less reliant on imports from the People's Republic of China;

(6) promote best practices and common standards for a national approach to cybersecurity; and

(7) advance other priorities consistent with paragraphs (1) through (6), as determined by the Secretary.

Determination.

(b) USE OF FUNDS.—Funds made available to carry out this section may be used to strengthen civilian cybersecurity and information and communications technology capacity, including participation of foreign law enforcement and military personnel in non-military activities, notwithstanding any other provision of law, provided that such support is essential to enabling civilian and law enforcement of cybersecurity and information and communication technology related activities in their respective countries.

(c) IMPLEMENTATION PLAN.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committee on Oversight and Accountability of the House of Representatives an implementation plan for the coming year to advance the goals identified in subsection (a).

Deadline.
Time period.

(d) CONSULTATION.—In developing and operationalizing the implementation plan required under subsection (c), the Secretary shall consult with—

(1) the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives;

(2) United States industry leaders;

(3) other relevant technology experts, including the Open Technology Fund;

(4) representatives from relevant United States Government agencies; and

(5) representatives from like-minded allies and partners.

(e) AUTHORIZATION OF APPROPRIATIONS.—For the purposes of carrying out this section, funds authorized to be appropriated to carry out chapter 4 of part II of the Foreign Assistance Act of

1961 (22 U.S.C. 2346 et seq.) may be made available, notwithstanding any other provision of law to strengthen civilian cybersecurity and information and communications technology capacity, including for participation of foreign law enforcement and military personnel in non-military activities, and for contributions to international organizations and international financial institutions of which the United States is a member. Such funds shall remain available until expended.

**SEC. 6307. ESTABLISHMENT OF A CYBERSPACE, DIGITAL CONNECTIVITY, AND RELATED TECHNOLOGIES (CDT) FUND.**

Part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2301 et seq.) is amended by adding at the end the following new chapter:

## "CHAPTER 10—CYBERSPACE, DIGITAL CONNECTIVITY, AND RELATED TECHNOLOGIES (CDT) FUND

22 USC 2349cc.

**"SEC. 591. FINDINGS.**

"Congress makes the following findings:

"(1) Increasingly digitized and interconnected social, political, and economic systems have introduced new vulnerabilities for malicious actors to exploit, which threatens economic and national security.

"(2) The rapid development, deployment, and integration of information and communication technologies into all aspects of modern life bring mounting risks of accidents and malicious activity involving such technologies, and their potential consequences.

"(3) Because information and communication technologies are globally manufactured, traded, and networked, the economic and national security of the United State depends greatly on cybersecurity practices of other actors, including other countries.

"(4) United States assistance to countries and international organizations to bolster civilian capacity to address national cybersecurity and deterrence in cyberspace can help—

"(A) reduce vulnerability in the information and communication technologies ecosystem; and

"(B) advance national and economic security objectives.

22 USC 2349cc–1.

**"SEC. 592. AUTHORIZATION OF ASSISTANCE AND FUNDING FOR CYBERSPACE, DIGITAL CONNECTIVITY, AND RELATED TECHNOLOGIES (CDT) CAPACITY BUILDING ACTIVITIES.**

Determination.

"(a) AUTHORIZATION.—The Secretary of State is authorized to provide assistance to foreign governments and organizations, including national, regional, and international institutions, on such terms and conditions as the Secretary may determine, in order to—

"(1) advance a secure and stable cyberspace;

"(2) protect and expand trusted digital ecosystems and connectivity;

"(3) build the cybersecurity capacity of partner countries and organizations; and

"(4) ensure that the development of standards and the deployment and use of technology supports and reinforces human rights and democratic values, including through the Digital Connectivity and Cybersecurity Partnership.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 991

"(b) SCOPE OF USES.—Assistance under this section may include programs to—

"(1) advance the adoption and deployment of secure and trustworthy information and communications technology (ICT) infrastructure and services, including efforts to grow global markets for secure ICT goods and services and promote a more diverse and resilient ICT supply chain;

"(2) provide technical and capacity building assistance to—

"(A) promote policy and regulatory frameworks that create an enabling environment for digital connectivity and a vibrant digital economy;

"(B) ensure technologies, including related new and emerging technologies, are developed, deployed, and used in ways that support and reinforce democratic values and human rights;

"(C) promote innovation and competition; and

"(D) support digital governance with the development of rights-respecting international norms and standards;

"(3) help countries prepare for, defend against, and respond to malicious cyber activities, including through—

"(A) the adoption of cybersecurity best practices;

"(B) the development of national strategies to enhance cybersecurity;

"(C) the deployment of cybersecurity tools and services to increase the security, strength, and resilience of networks and infrastructure;

"(D) support for the development of cybersecurity watch, warning, response, and recovery capabilities, including through the development of cybersecurity incident response teams;

"(E) support for collaboration with the Cybersecurity and Infrastructure Security Agency (CISA) and other relevant Federal agencies to enhance cybersecurity;

"(F) programs to strengthen allied and partner governments' capacity to detect, investigate, deter, and prosecute cybercrimes;

"(G) programs to provide information and resources to diplomats engaging in discussions and negotiations around international law and capacity building measures related to cybersecurity;

"(H) capacity building for cybersecurity partners, including law enforcement and military entities as described in subsection (f);

"(I) programs that enhance the ability of relevant stakeholders to act collectively against shared cybersecurity threats;

"(J) the advancement of programs in support of the Framework of Responsible State Behavior in Cyberspace; and

"(K) the fortification of deterrence instruments in cyberspace; and

"(4) such other purpose and functions as the Secretary of State may designate.

"(c) RESPONSIBILITY FOR POLICY DECISIONS AND JUSTIFICATION.—The Secretary of State shall be responsible for policy decisions regarding programs under this chapter, with respect to—

137 STAT. 992        PUBLIC LAW 118–31—DEC. 22, 2023

"(1) whether there will be cybersecurity and digital capacity building programs for a foreign country or entity operating in that country;

"(2) the amount of funds for each foreign country or entity; and

"(3) the scope and nature of such uses of funding.

"(d) DETAILED JUSTIFICATION FOR USES AND PURPOSES OF FUNDS.—The Secretary of State shall provide, on an annual basis, a detailed justification for the uses and purposes of the amounts provided under this chapter, including information concerning—

"(1) the amounts and kinds of grants;

"(2) the amounts and kinds of budgetary support provided, if any; and

"(3) the amounts and kinds of project assistance provided for what purpose and with such amounts.

"(e) ASSISTANCE AND FUNDING UNDER OTHER AUTHORITIES.—The authority granted under this section to provide assistance or funding for countries and organizations does not preclude the use of funds provided to carry out other authorities also available for such purpose.

"(f) AVAILABILITY OF FUNDS.—Amounts appropriated to carry out this chapter may be used, notwithstanding any other provision of law, to strengthen civilian cybersecurity and information and communications technology capacity, including participation of foreign law enforcement and military personnel in non-military activities, and for contributions to international organizations and international financial institutions of which the United States is a member, provided that such support is essential to enabling civilian and law enforcement of cybersecurity and information and communication technology related activities in their respective countries.

"(g) NOTIFICATION REQUIREMENTS.—Funds made available under this section shall be obligated in accordance with the procedures applicable to reprogramming notifications pursuant to section 634A of this Act.

22 USC
2349cc–2.

**"SEC. 593. REVIEW OF EMERGENCY ASSISTANCE CAPACITY.**

"(a) IN GENERAL.—The Secretary of State, in consultation as appropriate with other relevant Federal departments and agencies is authorized to conduct a review that—

Analysis.

"(1) analyzes the United States Government's capacity to promptly and effectively deliver emergency support to countries experiencing major cybersecurity and ICT incidents;

"(2) identifies relevant factors constraining the support referred to in paragraph (1); and

Strategy.

"(3) develops a strategy to improve coordination among relevant Federal agencies and to resolve such constraints.

"(b) REPORT.—Not later than one year after the date of the enactment of this chapter, the Secretary of State shall submit to the Committee on Foreign Relations and the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Foreign Affairs and the Committee on Oversight and Accountability of the House of Representatives a report that contains the results of the review conducted pursuant to subsection (a).

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 993

**"SEC. 594. AUTHORIZATION OF APPROPRIATIONS.**

Time period.
22 USC
2349cc–3.

"There is authorized to be appropriated $150,000,000 during the 5-year period beginning on October 1, 2023, to carry out the purposes of this chapter.".

**SEC. 6308. CYBER PROTECTION SUPPORT FOR PERSONNEL OF THE DEPARTMENT OF STATE IN POSITIONS HIGHLY VULNERABLE TO CYBER ATTACK.**

22 USC 10308.

(a) DEFINITIONS.—In this section:

(1) AT-RISK PERSONNEL.—The term "at-risk personnel" means personnel of the Department—

(A) whom the Secretary determines to be highly vulnerable to cyber attacks and hostile information collection activities because of their positions in the Department; and

Determination.

(B) whose personal technology devices or personal accounts are highly vulnerable to cyber attacks and hostile information collection activities.

(2) PERSONAL ACCOUNTS.—The term "personal accounts" means accounts for online and telecommunications services, including telephone, residential internet access, email, text and multimedia messaging, cloud computing, social media, health care, and financial services, used by Department personnel outside of the scope of their employment with the Department.

(3) PERSONAL TECHNOLOGY DEVICES.—The term "personal technology devices" means technology devices used by personnel of the Department outside of the scope of their employment with the Department, including networks to which such devices connect.

(b) REQUIREMENT TO PROVIDE CYBER PROTECTION SUPPORT.— The Secretary, in consultation with the Secretary of Homeland Security and the Director of National Intelligence, as appropriate—

(1) shall offer cyber protection support for the personal technology devices and personal accounts of at-risk personnel; and

(2) may provide the support described in paragraph (1) to any Department personnel who request such support.

(c) NATURE OF CYBER PROTECTION SUPPORT.—Subject to the availability of resources, the cyber protection support provided to personnel pursuant to subsection (b) may include training, advice, assistance, and other services relating to protection against cyber attacks and hostile information collection activities.

(d) PRIVACY PROTECTIONS FOR PERSONAL DEVICES.—The Department is prohibited pursuant to this section from accessing or retrieving any information from any personal technology device or personal account of Department employees unless—

(1) access or information retrieval is necessary for carrying out the cyber protection support specified in this section; and

(2) the Department has received explicit consent from the employee to access a personal technology device or personal account prior to each time such device or account is accessed.

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed—

(1) to encourage Department personnel to use personal technology devices for official business; or

(2) to authorize cyber protection support for senior Department personnel using personal devices, networks, and personal accounts in an official capacity.

(f) REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit to the appropriate committees of Congress a report regarding the provision of cyber protection support pursuant to subsection (b), which shall include—

(A) a description of the methodology used to make the determination under subsection (a)(1); and

Guidance.

(B) guidance for the use of cyber protection support and tracking of support requests for personnel receiving cyber protection support pursuant to subsection (b).

(2) APPROPRIATE COMMITTEES OF CONGRESS DEFINED.—In this subsection, the term "appropriate committees of Congress" means—

(A) the appropriate congressional committees;

(B) the Select Committee on Intelligence and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(C) the Permanent Select Committee on Intelligence and the Committee on Oversight and Accountability of the House of Representatives.

22 USC 2651a note.

### SEC. 6309. IMPLEMENTATION OF GAO HIGH RISK LIST RECOMMENDATIONS.

(a) IN GENERAL.—The Secretary shall implement the Government Accountability Office's High Risk List recommendations as applicable to the Department for the following activities:

(1) Improving the management of IT acquisitions and operations.

(2) Improving strategic human capital management.

(3) Managing Federal real property.

(4) Ensuring the cybersecurity of the nation.

(5) Managing government-wide personnel security clearance process.

(b) REPORT.—Not later than 90 days after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees a report on the Department's progress in implementing all of the Government Accountability Office's High Risk List recommendations as applicable to the Department described in subsection (a).

(c) HIGH RISK LIST DEFINED.—In this section, the term "High Risk List" refers to GAO–23–106203, the April 20, 2023, report by the Government Accountability Office titled, "High-Risk Series: Efforts Made to Achieve Progress Need to Be Maintained and Expanded to Fully Address All Areas".

# TITLE LXIV—ORGANIZATION AND OPERATIONS

Time periods.
22 USC 2665 note.

### SEC. 6401. PERSONAL SERVICES CONTRACTORS.

(a) SENSE OF CONGRESS.—It is the sense of Congress that the Department should seek to ensure it has sufficient full-time equivalent positions allotted to carry out its current mission,

working with the Office of Personnel Management and appropriate congressional committees to that end, and that the use of personal services contractors should not be relied upon to perform core Department functions indefinitely.

(b) EXIGENT CIRCUMSTANCES AND CRISIS RESPONSE.—To assist the Department in addressing and responding to exigent circumstances and urgent crises abroad, the Department is authorized to employ, domestically and abroad, a limited number of personal services contractors in order to meet exigent needs, subject to the requirements of this section.

(c) AUTHORITY.—The authority to employ personal services contractors is in addition to any existing authorities to enter into personal services contracts and authority provided in the Afghanistan Supplemental Appropriations Act, 2022 (division C of Public Law 117–43).

(d) EMPLOYING AND ALLOCATION OF PERSONNEL.—To meet the needs described in subsection (b) and subject to the requirements in subsection (e), the Department may—

(1) enter into contracts to employ a total of up to 100 personal services contractors at any given time for each of fiscal years 2024, 2025, and 2026; and

(2) allocate up to 20 personal services contractors to a given bureau.

(e) LIMITATION.—Employment authorized by this section shall not exceed two calendar years.

(f) NOTIFICATION AND REPORTING TO CONGRESS.—

(1) NOTIFICATION.—Not later than 15 days after the use of authority under this section, the Secretary shall notify the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives of the number of personal services contractors being employed, the expected length of employment, the relevant bureau, the purpose for using personal services contractors, an indication of how many personal services contractors were previously employees of the Department, and the justification, including the exigent circumstances requiring such use.

(2) ANNUAL REPORTING.—Not later than December 1, 2024, and annually thereafter for two years, the Department shall submit to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report describing the number of personal services contractors employed pursuant to this section for the prior fiscal year, the length of employment, the relevant bureau by which they were employed pursuant to this section, the purpose for using personal services contractors, disaggregated demographic data of such contractors, an indication of how many personal services contractors were previously employees of the Department, and the justification for the employment, including the exigent circumstances. *Demographic data.*

### SEC. 6402. HARD-TO-FILL POSTS.

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the number of hard-to-fill vacancies at United States diplomatic missions is far too high, particularly in Sub-Saharan Africa;

137 STAT. 996          PUBLIC LAW 118–31—DEC. 22, 2023

(2) these vacancies—

(A) adversely impact the Department's execution of regional strategies;

(B) hinder the ability of the United States to effectively compete with strategic competitors, such as the People's Republic of China and the Russian Federation; and

(C) present a clear national security risk to the United States; and

(3) if the Department is unable to incentivize officers to accept hard-to-fill positions, the Department should consider directed assignments, particularly for posts in Africa, and other means to more effectively advance the national interests of the United States.

(b) REPORT ON DEVELOPMENT OF INCENTIVES FOR HARD-TO-FILL POSTS.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit a report to the appropriate congressional committees on efforts to develop new incentives for hard-to-fill positions at United States diplomatic missions. The report shall include a description of the incentives developed to date and proposals to try to more effectively fill hard-to-fill posts.

(c) STUDY ON FEASIBILITY OF ALLOWING NON-CONSULAR FOREIGN SERVICE OFFICERS GIVEN DIRECTED CONSULAR POSTS TO VOLUNTEER FOR HARD-TO-FILL POSTS IN UNDERSTAFFED REGIONS.—

(1) STUDY.—

Deadline.

(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary shall conduct a study on—

Time periods.

(i) the number of Foreign Service positions vacant for six months or longer at overseas posts, including for consular, political, and economic positions, over the last five years, broken down by region, and a comparison of the proportion of vacancies between regions; and

(ii) the feasibility of allowing first-tour Foreign Service generalists in non-Consular cones, directed for a consular tour, to volunteer for reassignment at hard-to-fill posts in understaffed regions.

(B) MATTERS TO BE CONSIDERED.—The study conducted under subparagraph (A) shall consider whether allowing first-tour Foreign Service generalists to volunteer as described in such subparagraph would address current vacancies and what impact the new mechanism would have on consular operations.

(2) REPORT.—Not later than 60 days after completing the study required under paragraph (1), the Secretary shall submit to the appropriate congressional committees a report containing the findings of the study.

### SEC. 6403. ENHANCED OVERSIGHT OF THE OFFICE OF CIVIL RIGHTS.

(a) REPORT WITH RECOMMENDATIONS AND MANAGEMENT STRUCTURE.—Not later than 270 days after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees a report with any recommendations for the long-term structure and management of the Office of Civil Rights (OCR), including—

(1) an assessment of the strengths and weaknesses of OCR's investigative processes and procedures;

(2) any changes made within OCR to its investigative processes to improve the integrity and thoroughness of its investigations; and

(3) any recommendations to improve the management structure, investigative process, and oversight of the Office.

*Assessment.*

### SEC. 6404. CRISIS RESPONSE OPERATIONS.

(a) IN GENERAL.—Not later than 120 days after the date of the enactment of this division, the Secretary shall institute the following changes and ensure that the following elements have been integrated into the ongoing crisis response management and response by the Crisis Management and Strategy Office:

*Deadlines.*
*Time periods.*
*22 USC 4865 note.*

(1) The Department's crisis response planning and operations shall conduct, maintain, and update on a regular basis contingency plans for posts and regions experiencing or vulnerable to conflict or emergency conditions, including armed conflict, natural disasters, significant political or military upheaval, and emergency evacuations.

*Updates.*
*Contingency plans.*

(2) The Department's crisis response efforts shall be led by an individual with significant experience responding to prior crises, who shall be so designated by the Secretary.

*Designation.*

(3) The Department's crisis response efforts shall provide at least quarterly updates to the Secretary and other relevant senior officials, including a plan and schedule to develop contingency planning for identified posts and regions consistent with paragraph (1).

*Updates.*
*Plan.*
*Schedule.*

(4) The decision to develop contingency planning for any particular post or region shall be made independent of any regional bureau.

(5) The crisis response team shall develop and maintain best practices for evacuations, closures, and emergency conditions.

(b) UPDATES.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, and every 180 days thereafter for the next five years, the Secretary shall submit to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives an update outlining the steps taken to implement this section, along with any other recommendations to improve the Department's crisis management and response operations.

*Recommendations.*

(2) CONTENTS.—Each update submitted pursuant to paragraph (1) should include—

(A) a list of the posts whose contingency plans, including any noncombatant evacuation contingencies, has been reviewed and updated as appropriate during the preceding 180 days; and

(B) an assessment of the Secretary's confidence that each post—

(i) has continuously reached out to United States persons in country to maintain and update contact information for as many such persons as practicable; and

(ii) is prepared to communicate with such persons in an emergency or crisis situation.

(3) FORM.—Each update submitted pursuant to paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

### SEC. 6405. SPECIAL ENVOY TO THE PACIFIC ISLANDS FORUM.

22 USC 2651a note.

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the United States must increase its diplomatic activity and presence in the Pacific, particularly among Pacific Island nations; and

(2) the Special Envoy to the Pacific Islands Forum—

(A) should advance the United States partnership with Pacific Island Forum nations and with the organization itself on key issues of importance to the Pacific region; and

(B) should coordinate policies across the Pacific region with like-minded democracies.

(b) APPOINTMENT OF SPECIAL ENVOY TO THE PACIFIC ISLANDS FORUM.—Section 1 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a), as amended by section 6303, is further amended by adding at the end the following new subsection:

"(o) SPECIAL ENVOY TO THE PACIFIC ISLANDS FORUM.—

President.

"(1) APPOINTMENT.—The President shall appoint, by and with the advice and consent of the Senate, a qualified individual to serve as Special Envoy to the Pacific Islands Forum (referred to in this section as the 'Special Envoy').

"(2) CONSIDERATIONS.—

"(A) SELECTION.—The Special Envoy shall be—

"(i) a United States Ambassador to a country that is a member of the Pacific Islands Forum; or

"(ii) a qualified individual who is not described in clause (i).

"(B) LIMITATIONS.—If the President appoints an Ambassador to a country that is a member of the Pacific Islands Forum to serve concurrently as the Special Envoy to the Pacific Islands Forum, such Ambassador—

"(i) may not begin service as the Special Envoy until he or she has been confirmed by the Senate for an ambassadorship to a country that is a member of the Pacific Islands Forum; and

"(ii) shall not receive additional compensation for his or her service as Special Envoy.

"(3) DUTIES.—The Special Envoy shall—

"(A) represent the United States in its role as dialogue partner to the Pacific Islands Forum; and

"(B) carry out such other duties as the President or the Secretary of State may prescribe.".

(c) REPORT.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit a report to the appropriate congressional committees that describes how the Department will increase its ability to recruit and retain highly-qualified ambassadors, special envoys, and other senior personnel in posts in Pacific island countries as the Department expands its diplomatic footprint throughout the region.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 999

**SEC. 6406. SPECIAL ENVOY FOR BELARUS.**

(a) SPECIAL ENVOY.—The President shall appoint a Special Envoy for Belarus within the Department (referred to in this section as the "Special Envoy"). The Special Envoy should be a person of recognized distinction in the field of European security, geopolitics, democracy and human rights, and may be a career Foreign Service Officer.

(b) CENTRAL OBJECTIVE.—The central objective of the Special Envoy is to coordinate and promote efforts—

(1) to improve respect for the fundamental human rights of the people of Belarus;

(2) to sustain focus on the national security implications of Belarus's political and military alignment for the United States; and

(3) to respond to the political, economic, and security impacts of events in Belarus upon neighboring countries and the wider region.

(c) DUTIES AND RESPONSIBILITIES.—The Special Envoy shall—

(1) engage in discussions with Belarusian officials regarding human rights, political, economic and security issues in Belarus;

(2) support international efforts to promote human rights and political freedoms in Belarus, including coordination and dialogue between the United States and the United Nations, the Organization for Security and Cooperation in Europe, the European Union, Belarus, and the other countries in Eastern Europe;

(3) consult with nongovernmental organizations that have attempted to address human rights and political and economic instability in Belarus;

(4) make recommendations regarding the funding of activities promoting human rights, democracy, the rule of law, and the development of a market economy in Belarus;

(5) review strategies for improving protection of human rights in Belarus, including technical training and exchange programs;

(6) develop an action plan for holding to account the perpetrators of the human rights violations documented in the United Nations High Commissioner for Human Rights report on the situation of human rights in Belarus in the run-up to the 2020 presidential election and its aftermath (Human Rights Council Resolution 49/36);

(7) engage with member countries of the North Atlantic Treaty Organization, the Organization for Security and Cooperation in Europe and the European Union with respect to the implications of Belarus's political and security alignment for transatlantic security; and

(8) work within the Department and among partnering countries to sustain focus on the political situation in Belarus.

(d) ROLE.—The position of Special Envoy—

(1) shall be a full-time position;

(2) may not be combined with any other position within the Department;

(3) shall only exist as long as United States diplomatic operations in Belarus at the United States Embassy in Minsk, Belarus have been suspended;

22 USC 5811 note.
President.
Appointment.

Human rights.

(4) shall oversee the operations and personnel of the Belarus Affairs Unit; and

(5) shall have a duty station that is co-located with the Belarus Affairs Unit.

*Time period.*

(e) REPORT ON ACTIVITIES.—Not later than 180 days after the date of the enactment of this division, and annually thereafter for the following 5 years, the Secretary, in consultation with the Special Envoy, shall submit a report to the appropriate congressional committees that describes the activities undertaken pursuant to subsection (c) during the reporting period.

(f) SUNSET.—The position of Special Envoy for Belarus and the authorities provided by this section shall terminate 5 years after the date of the enactment of this division.

### SEC. 6407. PRESIDENTIAL ENVOY FOR THE ABRAHAM ACCORDS, NEGEV FORUM, AND RELATED INTEGRATION AND NORMALIZATION FORA AND AGREEMENTS.

Title I of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a et seq.) is amended by adding at the end the following new section:

*22 USC 2735a.*

### "SEC. 64. PRESIDENTIAL ENVOY FOR THE ABRAHAM ACCORDS, NEGEV FORUM, AND RELATED INTEGRATION AND NORMALIZATION FORA AND AGREEMENTS.

*Establishment.*

"(a) OFFICE.—There is established within the Department of State the Office of the Special Presidential Envoy for the Abraham Accords, Negev Forum, and Related Integration and Normalization Fora and Agreements (referred to in this section as the 'Regional Integration Office').

"(b) LEADERSHIP.—

"(1) SPECIAL ENVOY.—The Regional Integration Office shall be headed by the Special Presidential Envoy for the Abraham Accords, Negev Forum, and Related Normalization Agreements, who shall—

*Appointment.*

"(A) be appointed by the President, by and with the advice and consent of the Senate; and

"(B) report directly to the Secretary of State.

"(c) RANK AND STATUS OF AMBASSADOR.—The Special Envoy shall have the rank and status of ambassador.

"(d) DUTIES.—The Special Envoy shall—

"(1) lead diplomatic engagement—

"(A) to strengthen and expand the Negev Forum, the Abraham Accords, and related normalization agreements with Israel, including promoting initiatives that benefit the people of key partners in regional integration or other regional actors in order to encourage such expansion; and

"(B) to support the work of regional integration;

"(2) implement the policy of the United States to expand normalization and support greater regional integration—

"(A) within the Middle East and North Africa; and

"(B) between the Middle East and North Africa and other key regions, including sub-Saharan Africa, the Indo-Pacific region, and beyond;

"(3) work to deliver tangible economic and security benefits for the citizens of Abraham Accords countries, Negev Forum countries, and countries that are members of other related normalization agreements;

"(4) serve as the ministerial liaison for the United States to the Negev Forum and other emerging normalization and integration fora, as necessary, and provide senior representation at events, steering committee meetings, and other relevant diplomatic engagements relating to the Negev Forum or other regional integration bodies;

"(5) coordinate all cross-agency engagements and strategies in support of normalization efforts with other relevant officials and agencies;

"(6) ensure that the appropriate congressional committees are regularly informed about the work of the Regional Integration Office;

"(7) initiate and advance negotiations on a framework for an economic and security partnership with the Negev Forum countries, other key partners in regional integration, and other regional actors;

"(8) oppose efforts to delegitimize Israel and legal barriers to normalization with Israel;

"(9) initiate negotiations with Abraham Accords countries and Negev Forum countries, observers, and key partners in regional integration on an economic framework that includes—

"(A) improving supply chain security and resiliency;

"(B) aligning common regulatory and financial standards;

"(C) attracting foreign investment;

"(D) diversification of energy resources, including renewable sources of energy, and the development and deployment of emerging and advanced technologies that promote energy security; and

"(E) digital economy, cybersecurity, and cross-border data flow;

"(10) lead interagency efforts to reach an international agreement on the comprehensive economic framework described in paragraph (9);

"(11) endeavor to embed already established standards on countering money laundering and terrorist financing into the regional economic framework described in paragraph (9); and

"(12) promote regional integration and broader interconnectivity among the Abraham Accords countries, Negev Forum countries, observers, key partners in regional integration, and other regional actors by promoting and supporting targeted investment in regional infrastructure and other critical sectors that broaden and deepen interconnectivity, increase economic growth and resilience, create benefits for citizens of Abraham Accords countries and Negev Forum countries, and advance the national security, economic, and development interests of the United States.

"(e) LIMITATION.—The Special Envoy shall not be a dual-hatted official with other responsibilities within the Department of State or the executive branch.

"(f) SENSE OF CONGRESS.—It is the sense of Congress that whole-of-government resources should be harnessed to ensure the successful performance by the Special Envoy of the duties described in subsection (d).

"(g) REPORT.—

"(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this section, and annually thereafter, the

Special Envoy shall submit to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives a report on actions taken by all relevant Federal agencies—

"(A) to strengthen and expand the Abraham Accords and the work of the Negev Forum and future structures and organizations; and

"(B) towards the objectives of regional integration.

"(2) FORM OF REPORT.—The report required by paragraph (1) shall be submitted in unclassified form but may contain a separate, classified annex.

Deadline.

"(h) STRATEGY.—Not later than 180 days after the date of the enactment of this section, the Secretary of State, in consultation with the heads of other relevant Federal agencies, shall submit to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives an interagency strategy to use the economic tools of the Federal Government to promote regional integration through targeted investment as described in subsection (d)(12).

"(i) TERMINATION.—This section shall terminate on the date that is 6 years after date of the enactment of the section.

"(j) RULE OF CONSTRUCTION.—If, on the date of the enactment of this section, an individual has already been designated, consistent with the requirements and responsibilities described in subsections (b), (c), and (d) and section 1 of this Act (22 U.S.C. 2651a), the requirements under subsection (b) shall be considered to be satisfied with respect to such individual until the date on which such individual no longer serves as the Special Envoy.

"(k) DEFINITIONS.—In this section:

"(1) ABRAHAM ACCORDS.—The term 'Abraham Accords' means—

"(A) the Abraham Accords Declaration, done at Washington September 15, 2020;

"(B) the Abraham Accords Peace Agreement: Treaty of Peace, Diplomatic Relations and Full Normalization Between the United Arab Emirates and Israel, done at Washington September 15, 2020;

"(C) the Abraham Accords: Declaration of Peace, Cooperation, and Constructive Diplomatic and Friendly Relations, done at Washington September 15, 2020, between Israel and the Kingdom of Bahrain; and

"(D) the Joint Declaration of the Kingdom of Morocco, the United States, and Israel, done at Rabat December 22, 2020.

"(2) EXPAND.—The term 'expand', with respect to the Abraham Accords, means to increase the number of regional, Arab, or Muslim-majority countries that seek to normalize relations with the State of Israel.

"(3) KEY PARTNERS IN REGIONAL INTEGRATION.—The term 'key partners in regional integration' means—

"(A) any Abraham Accords country;

"(B) Egypt;

"(C) Jordan;

"(D) the Kingdom of Saudi Arabia; and

"(E) any other active and constructive country that supports cooperation—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1003

"(i) to normalize relations between countries in the Middle East and North Africa and Israel; and

"(ii) to advance regional integration.

"(4) NEGEV FORUM.—The term 'Negev Forum' means the regional grouping known as the Negev Forum Regional Cooperation Framework that was adopted on November 10, 2022, or any successor group.

"(5) OBSERVER.—The term 'observer'—

"(A) means any country, particularly inside the Middle East and North Africa region, or political entity that—

"(i) directly supports the objectives and processes of the Negev Forum;

"(ii) expresses serious interest in participating in certain projects determined by the Negev Forum that benefit normalization with Israel and greater regional integration; and

"(iii) is not an official member of the Negev Forum Steering Committee or any working group of the Negev Forum; and

"(B) includes 3+1 format members Cyprus and Greece.

"(6) OTHER REGIONAL ACTORS.—The term 'other regional actors' means the Palestinian Authority or a credible future political entity that serves as the interlocutor for the Palestinian people.

"(7) STRENGTHEN.—The term 'strengthen', with respect to the Abraham Accords and the Negev Forum, means to engage in efforts that improve the diplomatic relations between Abraham Accords countries and broaden the breadth and scope of issues on which Abraham Accords countries cooperate.".

**SEC. 6408. OVERSEAS PLACEMENT OF SPECIAL APPOINTMENT POSITIONS.**

Reports.

Not later than 90 days after the date of the enactment of this division, the Secretary shall submit to the appropriate congressional committees a report on current special appointment positions at United States diplomatic missions that do not exercise significant authority, and all positions under schedule B or schedule C of subpart C of part 213 of title 5, Code of Federal Regulations, at United States diplomatic missions. The report shall include the title and responsibilities of each position, the expected duration of the position, the name of the individual currently appointed to the position, and the hiring authority utilized to fill the position.

**SEC. 6409. RESOURCES FOR UNITED STATES NATIONALS UNLAWFULLY OR WRONGFULLY DETAINED ABROAD.**

Section 302(d) of the Robert Levinson Hostage Recovery and Hostage-Taking Accountability Act (22 U.S.C. 1741(d)) is amended—

(1) in the subsection heading, by striking "RESOURCE GUIDANCE" and inserting "RESOURCES FOR UNITED STATES NATIONALS UNLAWFULLY OR WRONGFULLY DETAINED ABROAD";

(2) in paragraph (1), by striking the paragraph heading and all that follows through "Not later than" and inserting the following:

"(1) RESOURCE GUIDANCE.—

"(A) IN GENERAL.—Not later than";

(3) in paragraph (2), by redesignating subparagraphs (A), (B), (C), (D), and (E) and clauses (i), (ii), (iii), (iv), and (v),

137 STAT. 1004          PUBLIC LAW 118–31—DEC. 22, 2023

respectively, and moving such clauses (as so redesignated) 2 ems to the right;

(4) by redesignating paragraph (2) as subparagraph (B) and moving such subparagraph (as so redesignated) 2 ems to the right;

(5) in subparagraph (B), as redesignated by paragraph (4), by striking "paragraph (1)" and inserting "subparagraph (A)"; and

(6) by adding at the end the following:

"(2) TRAVEL ASSISTANCE.—

"(A) FAMILY ADVOCACY.—For the purpose of facilitating meetings between the United States Government and the family members of United States nationals unlawfully or wrongfully detained abroad, the Secretary shall provide financial assistance to cover the costs of travel to and from Washington, D.C., including travel by air, train, bus, or other transit as appropriate, to any individual who—

"(i) is—

"(I) a family member of a United States national unlawfully or wrongfully detained abroad as determined by the Secretary under subsection (a); or

"(II) an appropriate individual who—

"(aa) is approved by the Special Presidential Envoy for Hostage Affairs; and

"(bb) does not represent in any legal capacity a United States national unlawfully or wrongfully detained abroad or the family of such United States national;

"(ii) has a permanent address that is more than 50 miles from Washington, D.C.; and

"(iii) requests such assistance.

"(B) TRAVEL AND LODGING.—

Time periods.
Determinations.

"(i) IN GENERAL.—For each such United States national unlawfully or wrongfully detained abroad, the financial assistance described in subparagraph (A) shall be provided for not more than 2 trips per fiscal year, unless the Special Presidential Envoy for Hostage Affairs determines that a third trip is warranted.

"(ii) LIMITATIONS.—Any trip described in clause (i) shall—

"(I) consist of not more than 2 family members or other individuals approved in accordance with subparagraph (A)(i)(II), unless the Special Presidential Envoy for Hostage Affairs determines that circumstances warrant an additional family member or other individual approved in accordance with subparagraph (A)(i)(II) and approves assistance to such third family member or other individual; and

"(II) not exceed more than 2 nights lodging, which shall not exceed the applicable government rate.

"(C) RETURN TRAVEL.—If other United States Government assistance is unavailable, the Secretary may provide to a United States national unlawfully or wrongfully detained abroad as determined by the Secretary under

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 1005

subsection (a), United States assistance, as necessary, for return travel to the United States upon release of such United States national.

"(3) SUPPORT.—

"(A) IN GENERAL.—The Secretary shall seek to make available physical health services, mental health services, and other support as appropriate, including providing information on available legal or financial resources, to—

"(i) any United States national unlawfully or wrongfully detained abroad; and

"(ii) any family member of such United States national.

"(B) LIMITATIONS.—

"(i) IN GENERAL.—For any support described in subparagraph (A) for an individual described in clause (i) or (ii) of such subparagraph that commences following the return of a United States national who was unlawfully or wrongfully detained abroad, such support shall be made available for up to 5 years from the date on which any individual identified in subparagraph (A) chooses to avail themselves of the support described in that subparagraph, unless the Special Presidential Envoy for Hostage Affairs determines that circumstances warrant extending such support.

"(ii) EXCEPTION.—The time limitation under clause (i) does not apply to any support provided during the pendency of the detention of a United States national unlawfully or wrongfully detained abroad.

<div style="float:right">Time period.<br>Determination.</div>

"(4) NOTIFICATION REQUIREMENT.—The Secretary shall notify the Committee on Foreign Relations of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the Committees on Appropriations of the Senate and the House of Representatives of any amount spent above $250,000 for any fiscal year to carry out paragraphs (2) and (3).

"(5) FUNDING.—Funds authorized to be appropriated for the Department of State, which may include funds made available for unforeseen emergencies arising in the diplomatic and consular service, may be used to provide the support authorized by this section.

"(6) REPORT.—Not later than 90 days after the end of each fiscal year, the Secretary shall submit to the Committees on Foreign Relations and Appropriations of the Senate and the Committee on Foreign Affairs and Appropriations of the House of Representatives a report that includes—

<div style="float:right">Time periods.</div>

"(A) a detailed description of expenditures made pursuant to paragraphs (2) and (3);

"(B) a detailed description of types of support provided pursuant to paragraph (3), provided that such description does not identify any individuals receiving any physical or mental health support, in order to protect their privacy; and

"(C) the number and location of visits outside of Washington, D.C., during the prior fiscal year made by the Special Presidential Envoy for Hostage Affairs to family members of each United States national unlawfully or wrongfully detained abroad.

"(7) SUNSET.—The authority and requirements under paragraphs (2), (3), (4), and (5) shall terminate on December 31, 2027.

"(8) FAMILY MEMBER DEFINED.—In this subsection, the term 'family member' means a spouse, father, mother, child, brother, sister, grandparent, grandchild, aunt, uncle, nephew, niece, cousin, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, or half sister.".

**SEC. 6410. ESTABLISHMENT OF FISCAL RESPONSIBILITY AWARD.**

22 USC 2651a note.

The Under Secretary of State for Management shall establish, in consultation with the Director of the Budget and Planning Bureau and the Director of Global Talent, an annual departmental award for any exemplary employee who recommends, identifies, or adopts significant cost-saving measures for program implementation or through the reallocation of resources.

# TITLE LXV—ECONOMIC DIPLOMACY

### SEC. 6501. REPORT ON RECRUITMENT, RETENTION, AND PROMOTION OF FOREIGN SERVICE ECONOMIC OFFICERS.

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this division, the Secretary shall submit a report to the appropriate congressional committees regarding the recruitment, retention, and promotion of economic officers in the Foreign Service.

(b) ELEMENTS.—The report required under subsection (a) shall include—

Overview.

(1) an overview of the key challenges the Department faces in—

(A) recruiting individuals to serve as economic officers in the Foreign Service; and

(B) retaining individuals serving as economic officers in the Foreign Service, particularly at the level of GS–14 of the General Schedule and higher;

Overview.

(2) an overview of the key challenges in recruiting and retaining qualified individuals to serve in economic positions in the Civil Service;

(3) a comparison of promotion rates for economic officers in the Foreign Service relative to other officers in the Foreign Service;

Summary.

(4) a summary of the educational history and training of current economic officers in the Foreign Service and Civil Service officers serving in economic positions;

(5) the identification, disaggregated by region, of hard-to-fill posts and proposed incentives to improve staffing of economic officers in the Foreign Service at such posts;

Summary. Analysis.

(6) a summary and analysis of the factors that lead to the promotion of—

(A) economic officers in the Foreign Service; and

(B) individuals serving in economic positions in the Civil Service; and

Summary. Analysis.

(7) a summary and analysis of current Department-funded or run training opportunities and externally-funded programs,

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1007

including the Secretary's Leadership Seminar at Harvard Business School, for—

> (A) economic officers in the Foreign Service; and
> (B) individuals serving in economic positions in the Civil Service.

### SEC. 6502. MANDATE TO REVISE DEPARTMENT OF STATE METRICS FOR SUCCESSFUL ECONOMIC AND COMMERCIAL DIPLOMACY.

(a) MANDATE TO REVISE DEPARTMENT OF STATE PERFORMANCE MEASURES FOR ECONOMIC AND COMMERCIAL DIPLOMACY.—The Secretary shall, as part of the Department's next regularly scheduled review on metrics and performance measures, include revisions of Department performance measures for economic and commercial diplomacy by identifying outcome-oriented, and not process-oriented, performance metrics, including metrics that—

*Review.*

> (1) measure how Department efforts advanced specific economic and commercial objectives and led to successes for the United States or other private sector actors overseas; and
> (2) focus on customer satisfaction with Department services and assistance.

(b) PLAN FOR ENSURING COMPLETE DATA FOR PERFORMANCE MEASURES.—As part of the review required under subsection (a), the Secretary shall include a plan for ensuring that—

> (1) the Department, both at its main headquarters and at domestic and overseas posts, maintains and fully updates data on performance measures; and

*Updates.*

> (2) Department leadership and the appropriate congressional committees can evaluate the extent to which the Department is advancing United States economic and commercial interests abroad through meeting performance targets.

(c) REPORT ON PRIVATE SECTOR SURVEYS.—The Secretary shall prepare a report that lists and describes all the methods through which the Department conducts surveys of the private sector to measure private sector satisfaction with assistance and services provided by the Department to advance private sector economic and commercial goals in foreign markets.

*List.*

(d) REPORT.—Not later than 90 days after conducting the review pursuant to subsection (a), the Secretary shall submit to the appropriate congressional committees—

> (1) the revised performance metrics required under subsection (a);
> (2) the report required under subsection (c); and
> (3) a report on the status of and actions taken to implement section 708 of the Championing American Business through Diplomacy Act of 2019 (title VII of division J of Public Law 116–94; 22 U.S.C. 9904).

### SEC. 6503. DIRECTION TO EMBASSY DEAL TEAMS.

22 USC 9901 note.

(a) PURPOSES.—The purposes of deal teams at United States embassies and consulates are—

> (1) to promote a private sector-led approach—
>> (A) to advance economic growth and job creation that is tailored, as appropriate, to specific economic sectors; and
>> (B) to advance strategic partnerships;
> (2) to prioritize efforts—

(A) to identify commercial and investment opportunities;

(B) to advocate for improvements in the business and investment climate;

(C) to engage and consult with private sector partners; and

(D) to report on the activities described in subparagraphs (A) through (C), in accordance with the applicable requirements under sections 706 and 707 of the Championing American Business Through Diplomacy Act of 2019 (22 U.S.C. 9902 and 9903);

(3)(A)(i) to identify trade and investment opportunities for United States companies in foreign markets; or

(ii) to assist with existing trade and investment opportunities already identified by United States companies; and

(B) to deploy United States Government economic and other tools to help such United States companies to secure their objectives;

(4) to identify and facilitate opportunities for entities in a host country to increase exports to, or investment in, the United States in order to grow two-way trade and investment;

(5) to modernize, streamline, and improve access to resources and services designed to promote increased trade and investment opportunities;

(6) to identify and secure United States or allied government support of strategic projects, such as ports, railways, energy production and distribution, critical minerals development, telecommunications networks, and other critical infrastructure projects vulnerable to predatory investment by an authoritarian country or entity in such country where support or investment serves an important United States interest;

(7) to coordinate across the Unites States Government to ensure the appropriate and most effective use of United States Government tools to support United States economic, commercial, and investment objectives; and

(8) to coordinate with the multi-agency DC Central Deal Team, established in February 2020, on the matters described in paragraphs (1) through (7) and other relevant matters.

(b) CLARIFICATION.—A deal team may be composed of the personnel comprising the mission economic team formed pursuant to section 207 of the Foreign Service Act of 1980.

Determination.

(c) RESTRICTIONS.—A deal team may not provide support for, or assist a United States person with a transaction involving, a government, or an entity owned or controlled by a government, if the Secretary determines that such government—

(1) has repeatedly provided support for acts of international terrorism, as described in—

(A) section 1754(c)(1)(A)(i) of the Export Control Reform Act of 2018 (subtitle B of title XVII of Public Law 115–232);

(B) section 620A(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2371(a));

(C) section 40(d) of the Arms Export Control Act (22 U.S.C. 2780(d)); or

(D) any other relevant provision of law; or

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1009

(2) has engaged in an activity that would trigger a restriction under section 116(a) or 502B(a)(2) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151n(a) and 2304(a)(2)) or any other relevant provision of law.

(d) FURTHER RESTRICTIONS.—

(1) PROHIBITION ON SUPPORT OF SANCTIONED PERSONS.— Deal teams may not carry out activities prohibited under United States sanctions laws or regulations, including dealings with persons on the list of specially designated persons and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury, except to the extent otherwise authorized by the Secretary of the Treasury or the Secretary.

(2) PROHIBITION ON SUPPORT OF ACTIVITIES SUBJECT TO SANCTIONS.—Any person receiving support from a deal team must be in compliance with all United States sanctions laws and regulations as a condition for receiving such assistance.

Compliance.

(e) CHIEF OF MISSION AUTHORITY AND ACCOUNTABILITY.—The chief of mission to a foreign country—

(1) is the designated leader of a deal team in such country; and

(2) shall be held accountable for the performance and effectiveness of United States deal teams in such country.

(f) GUIDANCE CABLE.—The Department shall send out regular guidance on Deal Team efforts by an All Diplomatic and Consular Posts (referred to in this section as "ALDAC") that—

(1) describes the role of deal teams; and

(2) includes relevant and up-to-date information to enhance the effectiveness of deal teams in a country.

(g) CONFIDENTIALITY OF INFORMATION.—

(1) IN GENERAL.—In preparing the cable required under subsection (f), the Secretary shall protect from disclosure any proprietary information of a United States person marked as business confidential information unless the person submitting such information—

(A) had notice, at the time of submission, that such information would be released by; or

(B) subsequently consents to the release of such information.

(2) TREATMENT AS TRADE SECRETS.—Proprietary information obtained by the United States Government from a United States person pursuant to the activities of deal teams shall be—

(A) considered to be trade secrets and commercial or financial information (as such terms are used under section 552b(c)(4) of title 5, United States Code); and

(B) exempt from disclosure without the express approval of the person.

Exemption.

(h) SUNSET.—The requirements under subsections (f) through (h) shall terminate on the date that is 5 years after the date of the enactment of this division.

**SEC. 6504. ESTABLISHMENT OF A "DEAL TEAM OF THE YEAR" AWARD.**

22 USC 9901 note.

(a) ESTABLISHMENT.—The Secretary shall establish a new award, to be known as the "Deal Team of the Year Award", and annually present the award to a deal team at one United States mission in each region to recognize outstanding achievements in

137 STAT. 1010          PUBLIC LAW 118–31—DEC. 22, 2023

supporting a United States company or companies pursuing commercial deals abroad or in identifying new deal prospects for United States companies.

(b) AWARD CONTENT.—

Certificate.

(1) DEPARTMENT OF STATE.—Each member of a deal team receiving an award pursuant to subsection (a) shall receive a certificate that is signed by the Secretary and—

(A) in the case of a member of the Foreign Service, is included in the next employee evaluation report; or

(B) in the case of a Civil Service employee, is included in the next annual performance review.

Determination.

(2) OTHER FEDERAL AGENCIES.—If an award is presented pursuant to subsection (a) to a Federal Government employee who is not employed by the Department, the employing agency may determine whether to provide such employee any recognition or benefits in addition to the recognition or benefits provided by the Department.

(c) ELIGIBILITY.—Any interagency economics team at a United States overseas mission under chief of mission authority that assists United States companies with identifying, navigating, and securing trade and investment opportunities in a foreign country or that facilitates beneficial foreign investment into the United States is eligible for an award under this section.

(d) REPORT.—Not later than the last day of the fiscal year in which awards are presented pursuant to subsection (a), the Secretary shall submit to the appropriate congressional committees, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committee on Oversight and Accountability of the House of Representatives a report that includes—

(1) each mission receiving a Deal Team of the Year Award.

(2) the names and agencies of each awardee within the recipient deal teams; and

(3) a detailed description of the reason such deal teams received such award.

# TITLE LXVI—PUBLIC DIPLOMACY

22 USC 2732 note.

**SEC. 6601. PUBLIC DIPLOMACY OUTREACH.**

(a) COORDINATION OF RESOURCES.—The Administrator of the United States Agency for International Development and the Secretary shall direct public affairs sections at United States embassies and USAID Mission Program Officers at USAID missions to coordinate, enhance and prioritize resources for public diplomacy and awareness campaigns around United States diplomatic and development efforts, including through—

(1) the utilization of new media technology for maximum public engagement; and

(2) enact coordinated comprehensive community outreach to increase public awareness and understanding and appreciation of United States diplomatic and development efforts.

(b) DEVELOPMENT OUTREACH AND COORDINATION OFFICERS.—USAID should prioritize hiring of additional Development Outreach and Coordination officers in USAID missions to support the purposes of subsection (a).

Evaluation.

(c) BEST PRACTICES.—The Secretary and the Administrator of USAID shall identify 10 countries in which Embassies and USAID

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1011

missions have successfully executed efforts, including monitoring and evaluation of such efforts, described in (a) and develop best practices to be turned into Department and USAID guidance.

**SEC. 6602. MODIFICATION ON USE OF FUNDS FOR RADIO FREE EUROPE/RADIO LIBERTY.**

In section 308(h) of the United States International Broadcasting Act of 1994 (22 U.S.C. 6207(h)) is amended—

(1) by striking subparagraphs (1), (3), and (5); and

(2) by redesignating paragraphs (2) and (4) as paragraphs (1) and (2), respectively.

**SEC. 6603. REPORT ON RADIO FREE AFRICA AND RADIO FREE AMERICAS.**

Not later than 180 days after the date of the enactment of this division, the Chief Executive Officer of the United States Agency for Global Media shall submit a report to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives that details the financial and other resources that would be required to establish and operate 2 nonprofit organizations, modeled after Radio Free Europe/Radio Liberty and Radio Free Asia, for the purposes of providing accurate, uncensored, and reliable news and information to—

(1) the region of Africa, with respect to Radio Free Africa; and

(2) the region of Latin America and the Caribbean, with respect to Radio Free Americas.

**SEC. 6604. JOHN LEWIS CIVIL RIGHTS FELLOWSHIP PROGRAM.**

(a) IN GENERAL.—The Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2451 et seq.) is amended by adding at the end the following:

**"SEC. 115. JOHN LEWIS CIVIL RIGHTS FELLOWSHIP PROGRAM.**          22 USC 2465.

"(a) ESTABLISHMENT.—There is established the John Lewis Civil Rights Fellowship Program (referred to in this section as the 'Fellowship Program') within the J. William Fulbright Educational Exchange Program.

"(b) PURPOSES.—The purposes of the Fellowship Program are—

"(1) to honor the legacy of Representative John Lewis by promoting a greater understanding of the history and tenets of nonviolent civil rights movements; and

"(2) to advance foreign policy priorities of the United States by promoting studies, research, and international exchange in the subject of nonviolent movements that established and protected civil rights around the world.

"(c) ADMINISTRATION.—The Bureau of Educational and Cultural Affairs (referred to in this section as the 'Bureau') shall administer the Fellowship Program in accordance with policy guidelines established by the Board, in consultation with the binational Fulbright Commissions and United States Embassies.

"(d) SELECTION OF FELLOWS.—

"(1) IN GENERAL.—The Board shall annually select qualified individuals to participate in the Fellowship Program. The     Determination. Bureau may determine the number of fellows selected each year, which, whenever feasible, shall be not fewer than 25.

"(2) OUTREACH.—

"(A) IN GENERAL.—To the extent practicable, the Bureau shall conduct outreach at institutions, including—

"(i) minority serving institutions, including historically Black colleges and universities; and

"(ii) other appropriate institutions that are likely to produce a range of qualified applicants, as determined by the Bureau.

"(B) DEFINITIONS.—In this paragraph:

"(i) HISTORICALLY BLACK COLLEGE AND UNIVERSITY.—The term 'historically Black college and university' has the meaning given the term 'part B institution' in section 322 of the Higher Education Act of 1965 (20 U.S.C. 1061).

"(ii) MINORITY SERVING INSTITUTION.—The term 'minority-serving institution' means an eligible institution under section 371(a) of the Higher Education Act of 1965 (20 U.S.C. 1067q(a)).

"(e) FELLOWSHIP ORIENTATION.—Annually, the Bureau shall organize and administer a fellowship orientation, which shall—

District of Columbia.

"(1) be held in Washington, D.C., or at another location selected by the Bureau; and

"(2) include programming to honor the legacy of Representative John Lewis.

"(f) STRUCTURE.—

"(1) WORK PLAN.—To carry out the purposes described in subsection (b)—

"(A) each fellow selected pursuant to subsection (d) shall arrange an internship or research placement—

"(i) with a nongovernmental organization, academic institution, or other organization approved by the Bureau; and

"(ii) in a country with an operational Fulbright U.S. Student Program; and

"(B) the Bureau shall, for each fellow, approve a work plan that identifies the target objectives for the fellow, including specific duties and responsibilities relating to those objectives.

"(2) CONFERENCES; PRESENTATIONS.—Each fellow shall—

"(A) attend a fellowship orientation organized and administered by the Bureau under subsection (e);

Deadline.

"(B) not later than the date that is 1 year after the end of the fellowship period, attend a fellowship summit organized and administered by the Bureau, which—

"(i) whenever feasible, shall be held in a location of importance to the civil rights movement in the United States; and

"(ii) may coincide with other events facilitated by the Bureau; and

"(C) at such summit, give a presentation on lessons learned during the period of the fellowship.

Determination.

"(3) FELLOWSHIP PERIOD.—Each fellowship under this section shall continue for a period determined by the Bureau, which, whenever feasible, shall be not fewer than 10 months.

"(g) FELLOWSHIP AWARD.—The Bureau shall provide each fellow under this section with an allowance that is equal to the amount needed for—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1013

"(1) the reasonable costs of the fellow during the fellowship period; and

"(2) travel and lodging expenses related to attending the orientation and summit required under subsection (e)(2).

"(h) ANNUAL REPORT.—Not later than 1 year after the date of the completion of the Fellowship Program by the initial cohort of fellows selected under subsection (d), and annually thereafter, the Secretary of State shall submit to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives a report on the implementation of the Fellowship Program, including—

"(1) a description of the demographics of the cohort of fellows who completed a fellowship during the preceding 1-year period;

"(2) a description of internship and research placements, and research projects selected by such cohort, under the Fellowship Program, including feedback from—

"(A) such cohort on implementation of the Fellowship Program; and

"(B) the Secretary on lessons learned;

"(3) a plan for factoring such lessons learned into future programming, and

"(4) an analysis of trends relating to the diversity of each cohort of fellows and the topics of projects completed since the establishment of the Fellowship Program.".

(b) TECHNICAL AND CONFORMING AMENDMENTS TO THE MUTUAL EDUCATIONAL AND CULTURAL EXCHANGE ACT OF 1961.—Section 112(a) of the Mutual Educational and Cultural Exchange Act of 1961 ( 22 U.S.C. 2460(a)) is amended—

(1) in paragraph (8), by striking "; and" and inserting a semicolon;

(2) in paragraph (9), by striking the period and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(10) the John Lewis Civil Rights Fellowship Program established under section 115, which provides funding for international internships and research placements for early- to mid-career individuals from the United States to study nonviolent civil rights movements in self-arranged placements with universities or nongovernmental organizations in foreign countries.".

(c) SUNSET.—The authority to carry out the John Lewis Civil Rights Fellowship Program established under section 115 of the Mutual Educational and Cultural Exchange Act of 1961 (22 U.S.C. 2451 et seq.), as added by subsection (a), shall expire on the date that is 10 years after the date of the enactment of this division.

**SEC. 6605. DOMESTIC ENGAGEMENT AND PUBLIC AFFAIRS.**

(a) STRATEGY REQUIRED.—Not later than 180 days after the date of the enactment of this division, the Secretary shall develop a strategy to explain to the American people the value of the work of the Department and the importance that United States foreign policy plays in advancing the national security of the United States. The strategy shall include—

(1) tools to inform the American people about the nonpartisan importance of United States diplomacy and foreign relations and to utilize public diplomacy to meet the United States' national security priorities;

*Margin notes:* Time period. Plan. Analysis. 22 USC 2465 note. Deadline.

(2) efforts to reach the widest possible audience of Americans, including those who historically have not had exposure to United States foreign policy efforts and priorities;

(3) additional staffing and resource needs including—

(A) domestic positions within the Bureau of Global Public Affairs to focus on engagement with the American people as outlined in paragraph (1);

(B) positions within the Bureau of Educational and Cultural Affairs to enhance programs and reach the widest possible audience;

(C) increasing the number of fellowship and detail programs that place Foreign Service and civil service employees outside the Department for a limited time, including Pearson Fellows, Reta Jo Lewis Local Diplomats, Brookings Fellows, and Georgetown Fellows; and

Recommendations.

(D) recommendations for increasing participation in the Hometown Diplomats program and evaluating this program as well as other opportunities for Department officers to engage with American audiences while traveling within the United States.

Deadline.

**SEC. 6606. MODERNIZATION AND ENHANCEMENT STRATEGY.**

Not later than 180 days after the date of the enactment of this division, the Secretary shall submit a strategy to the appropriate congressional committees for—

(1) modernizing and increasing the operational and programming capacity of American Spaces and American Corners throughout the world, including by leveraging public-private partnerships;

(2) providing salaries to locally employed staff of American Spaces and American Corners; and

(3) providing opportunities for United States businesses and nongovernmental organizations to better utilize American Spaces.

# TITLE LXVII—OTHER MATTERS

22 USC 276c–7.

**SEC. 6701. INTERNSHIPS OF UNITED STATES NATIONALS AT INTERNATIONAL ORGANIZATIONS.**

Grants.

(a) IN GENERAL.—The Secretary is authorized to bolster efforts to increase the number of United States citizens representative of the American people occupying positions in the United Nations system, agencies, and commissions, and in other international organizations, including by awarding grants to educational institutions and students.

(b) REPORT.—Not later than 90 days after the date of the enactment of this division, the Secretary of State shall submit a report to the appropriate congressional committees that identifies—

(1) the number of United States citizens who are involved in internship programs at international organizations;

(2) the distribution of the individuals described in paragraph (1) among various international organizations; and

(3) grants, programs, and other activities that are being utilized to recruit and fund United States citizens to participate in internship programs at international organizations.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 1015

(c) ELIGIBILITY.—An individual referred to in subsection (a) is an individual who—

 (1) is enrolled at or received their degree within two years from—

  (A) an institution of higher education; or

  (B) an institution of higher education based outside the United States, as determined by the Secretary; and

 (2) is a citizen of the United States.

(d) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $1,500,000 for the Department for fiscal year 2024 to carry out the grant program authorized under subsection (a).

**SEC. 6702. TRAINING FOR INTERNATIONAL ORGANIZATIONS.**

(a) TRAINING PROGRAMS.—Section 708 of the Foreign Service Act of 1980 (22 U.S.C. 4028) is amended by adding at the end of the following new subsection:

"(e) TRAINING IN MULTILATERAL DIPLOMACY.—

 "(1) IN GENERAL.—The Secretary, in consultation with other senior officials as appropriate, shall establish training courses on—

  "(A) the conduct of diplomacy at international organizations and other multilateral institutions; and

  "(B) broad-based multilateral negotiations of international instruments.

 "(2) REQUIRED TRAINING.—Members of the Service, including appropriate chiefs of mission and other officers who are assigned to United States missions representing the United States to international organizations and other multilateral institutions or who are assigned in other positions that have as their primary responsibility formulation of policy related to such organizations and institutions, or participation in negotiations of international instruments, shall receive specialized training in the areas described in paragraph (1) prior to the beginning of service for such assignment or, if receiving such training at that time is not practical, within the first year of beginning such assignment.".

(b) TRAINING FOR DEPARTMENT EMPLOYEES.—The Secretary of State shall ensure that employees of the Department of State who are assigned to positions described in paragraph (2) of subsection (e) of section 708 of the Foreign Service Act of 1980 (as added by subsection (a) of this section), including members of the civil service or general service, or who are seconded to international organizations for a period of at least one year, receive training described in such subsection and participate in other such courses as the Secretary may recommend to build or augment identifiable skills that would be useful for such Department officials representing United States interests at these institutions and organizations.

**SEC. 6703. INFRASTRUCTURE PROJECTS AND INVESTMENTS BY THE UNITED STATES AND PEOPLE'S REPUBLIC OF CHINA.**

Not later than 1 year after the date of the enactment of this division, the Secretary, in coordination with the Administrator of the United States Agency for International Development and the Chief Executive Officer of the Development Finance Corporation, shall submit to the appropriate congressional committees, the Committee on Appropriations of the Senate, and the Committee on

*[margin notes: Time period. / Time period. / 22 USC 4028 note. / Reports.]*

137 STAT. 1016          PUBLIC LAW 118–31—DEC. 22, 2023

Appropriations of the House of Representatives a report regarding the opportunities and costs of infrastructure projects in Middle East, African, and Latin American and Caribbean countries, which shall—

(1) describe the nature and total funding of United States infrastructure investments and construction in Middle East, African, and Latin American and Caribbean countries, and that of United States allies and partners in the same regions;

(2) describe the nature and total funding of infrastructure investments and construction by the People's Republic of China in Middle East, African, and Latin American and Caribbean countries;

Assessment.

(3) assess the national security threats posed by the infrastructure investment gap between the People's Republic of China and the United States and United States allies and partners, including—

(A) infrastructure, such as ports;

(B) access to critical and strategic minerals;

(C) digital and telecommunication infrastructure;

(D) threats to supply chains; and

(E) general favorability towards the People's Republic of China and the United States and United States' allies and partners among Middle East, African, and Latin American and Caribbean countries;

Assessment.

(4) assess the opportunities and challenges for companies based in the United States to invest in infrastructure projects in Middle East, African, and Latin American and Caribbean countries;

(5) describe options for the United States Government to undertake to increase support for United States businesses engaged in large-scale infrastructure projects in Middle East, African, and Latin American and Caribbean countries; and

(6) identify regional infrastructure priorities, ranked according to United States national interests, in Middle East, African, and Latin American and Caribbean countries.

**SEC. 6704. SPECIAL ENVOYS.**

Deadline.
Determination.

(a) REVIEW.—Not later than 180 days after the date of the enactment of this division, the Secretary shall conduct a review of all special envoy positions to determine—

(1) which special envoy positions are needed to accomplish the mission of the Department;

(2) which special envoy positions could be absorbed into the Department's existing bureau structure;

(3) which special envoy positions were established by an Act of Congress; and

(4) which special envoy positions were created by the Executive Branch without explicit congressional approval.

Lists.

(b) REPORT.—Not later than 60 days after the completion of the review required under subsection (a), the Secretary shall submit a report to the appropriate congressional committees that includes—

(1) a list of every special envoy position in the Department;

(2) a detailed justification of the need for each special envoy, if warranted;

(3) a list of the special envoy positions that could be absorbed into the Department's existing bureau structure without compromising the mission of the Department;

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 1017

(4) a list of the special envoy positions that were created by an Act of Congress; and

(5) a list of the special envoy positions that are not expressly authorized by statute.

**SEC. 6705. US-ASEAN CENTER.**

22 USC 2656 note.

(a) DEFINED TERM.—In this section, the term "ASEAN" means the Association of Southeast Asian Nations.

(b) ESTABLISHMENT.—The Secretary is authorized to enter into a public-private partnership for the purposes of establishing a US-ASEAN Center in the United States to support United States economic and cultural engagement with Southeast Asia.

Contracts.

(c) FUNCTIONS.—Notwithstanding any other provision of law, the US-ASEAN Center established pursuant to subsection (b) may—

(1) provide grants for research to support and elevate the importance of the US-ASEAN partnership;

(2) facilitate activities to strengthen US-ASEAN trade and investment;

(3) expand economic and technological relationships between ASEAN countries and the United States into new areas of cooperation;

(4) provide training to United States citizens and citizens of ASEAN countries that improve people-to-people ties;

(5) develop educational programs to increase awareness for the United States and ASEAN countries on the importance of relations between the United States and ASEAN countries; and

(6) carry out other activities the Secretary considers necessary to strengthen ties between the United States and ASEAN countries and achieve the objectives of the US-ASEAN Center.

(d) PARAMETERS.—In carrying out this section, the Secretary shall ensure that the activities of the US-ASEAN Center do not duplicate current lines of effort being conducted by the United States Government or its grantees.

**SEC. 6706. BRIEFINGS ON THE UNITED STATES-EUROPEAN UNION TRADE AND TECHNOLOGY COUNCIL.**

It is the sense of Congress that the United States-European Union Trade and Technology Council is an important forum for the United States and the European Union to engage on transatlantic trade, investment, and engagement on matters related to critical and emerging technology and that the Department should provide regular updates to the appropriate congressional committees on the deliverables and policy initiatives announced at United States-European Union Trade and Technology Council ministerials.

**SEC. 6707. MODIFICATION AND REPEAL OF REPORTS.**

(a) COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES.—

(1) IN GENERAL.—The Secretary shall examine the production of the 2023 and subsequent annual Country Reports on Human Rights Practices by the Assistant Secretary for Democracy, Human Rights, and Labor as required under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151n(d), 2304(b)) to maximize—

Examination.
21 USC 2151n note.

(A) cost and personnel efficiencies;

(B) the potential use of data and analytic tools and visualization; and

**137 STAT. 1018**          **PUBLIC LAW 118–31—DEC. 22, 2023**

(C) advancement of the modernization agenda for the Department announced by the Secretary on October 27, 2021.

(2) TRANSNATIONAL REPRESSION AMENDMENTS TO ANNUAL COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES.—Section 116(d) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151n(d)) is amended by adding at the end the following new paragraph:

Time period.

"(13) Wherever applicable, a description of the nature and extent of acts of transnational repression that occurred during the preceding year, including identification of—

"(A) incidents in which a government harassed, intimidated, or killed individuals outside of their internationally recognized borders and the patterns of such repression among repeat offenders;

"(B) countries in which such transnational repression occurs and the role of the governments of such countries in enabling, preventing, mitigating, and responding to such acts;

"(C) the tactics used by the governments of countries identified pursuant to subparagraph (A), including the actions identified and any new techniques observed;

"(D) in the case of digital surveillance and harassment, the type of technology or platform, including social media, smart city technology, health tracking systems, general surveillance technology, and data access, transfer, and storage procedures, used by the governments of countries identified pursuant to subparagraph (A) for such actions; and

"(E) groups and types of individuals targeted by acts of transnational repression in each country in which such acts occur.".

(b) ELIMINATION OF OBSOLETE REPORTS.—

(1) ANNUAL REPORTS RELATING TO FUNDING MECHANISMS FOR TELECOMMUNICATIONS SECURITY AND SEMICONDUCTORS.—Division H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283) is amended—

(A) in section 9202(a)(2) (47 U.S.C. 906(a)(2))—

(i) by striking subparagraph (C); and

(ii) by redesignating subparagraph (D) as subparagraph (C); and

(B) in section 9905 (15 U.S.C. 4655)—

(i) by striking subsection (c); and

(ii) by redesignating subsection (d) as subsection (c).

(2) ANNUAL REPORT ON PROMOTING THE RULE OF LAW IN THE RUSSIAN FEDERATION.—Section 202 of the Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012 (Public Law 112–208) is amended by striking subsection (a).

19 USC 2434 note.

(3) ANNUAL REPORT ON ADVANCING FREEDOM AND DEMOCRACY.—Section 2121 of the Advance Democratic Values, Address Nondemocratic Countries, and Enhance Democracy Act of 2007 (title XXI of Public Law 110–53) is amended by striking subsection (c).

22 USC 8221.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1019

(4) ANNUAL REPORTS ON UNITED STATES-VIETNAM HUMAN RIGHTS DIALOGUE MEETINGS.—Section 702 of the Foreign Relations Authorization Act, Fiscal Year 2003 (22 U.S.C. 2151n note) is repealed.

### SEC. 6708. ART IN EMBASSIES.

Section 5112(c) of the Department of State Authorization Act of 2021 (division E of Public Law 117–81; 135 Stat, 2350) is amended by striking "2 years after" and inserting "4 years after".

### SEC. 6709. INSTITUTE FOR TRANSATLANTIC ENGAGEMENT.

(a) ESTABLISHMENT.—The Secretary of State is authorized to establish the Institute for Transatlantic Engagement (referred to in this section as the "Institute").

(b) PURPOSE.—The purpose of any Institute established pursuant to subsection (a) shall be to strengthen national security by highlighting, to a geographically diverse set of populations from the United States, Canada, and European nations, the importance of the transatlantic relationship and the threats posed by adversarial countries, such as the Russian Federation and the People's Republic of China, to democracy, free-market economic principles, and human rights.

(c) DIRECTOR.—Any Institute established pursuant to subsection (a) shall be headed by a Director, to be appointed by the Secretary, who shall have expertise in transatlantic relations and diverse populations in the United States and Europe.

(d) SCOPE AND ACTIVITIES.—Any Institute established pursuant to subsection (a) shall—

(1) strengthen knowledge among participants of the formation and implementation of transatlantic policies critical to national security, including the threats posed by the Russian Federation and the People's Republic of China;

(2) increase awareness among participants of the roles of government and nongovernmental actors, such as multilateral organizations, businesses, civil society actors, academia, think tanks, and philanthropic institutions, in transatlantic policy development and execution;

(3) increase understanding among participants of the manner in which diverse backgrounds and perspectives affect the development of transatlantic policies;

(4) enhance the skills, abilities, and effectiveness of participating government officials;

(5) increase awareness among participants of the importance of, and interest in, international public service careers;

(6) not less than 3 times annually, convene representatives of the United States Government, the Government of Canada, and of governments of European nations for a program offered by the Institute; and

(7) develop metrics to track the success and efficacy of the program which shall be reported to the appropriate congressional committees and prior to the convening of the first program described in paragraph (6).

(e) ELIGIBILITY TO PARTICIPATE.—Participants in the programs of the Institute shall include elected government officials—

(1) serving at national, regional, or local levels in the United States, Canada, and European nations; and

(2) who represent geographically diverse backgrounds or constituencies in the United States, Canada, and Europe.

**margin notes:** Foreign countries. 22 USC 8201 note. Appointment. Time period. Reports.

137 STAT. 1020        PUBLIC LAW 118–31—DEC. 22, 2023

(f) SELECTION OF PARTICIPANTS.—

(1) UNITED STATES PARTICIPANTS.—Participants from the United States shall be appointed in an equally divided manner by—

(A) the chairpersons and ranking members of the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives;

(B) the majority leader of the Senate and the minority leader of the Senate; and

(C) the Speaker of the House of Representatives and the minority leader of the House of Representatives.

(2) EUROPEAN AND CANADIAN PARTICIPANTS.—Participants from Europe and Canada shall be appointed by the Secretary of State, in consultation with—

(A) the chairpersons and ranking members of the appropriate congressional committees;

(B) the majority leader of the Senate and the minority leader of the Senate; and

(C) the Speaker of the House of Representatives and the minority leader of the House of Representatives.

(g) RESTRICTIONS.—

(1) UNPAID PARTICIPATION.—Participants in the Institute may not be paid a salary for such participation.

(2) REIMBURSEMENT.—The Institute may pay or reimburse participants for reasonable travel, lodging, and food in connection with participation in the program.

(3) TRAVEL.—No funds authorized to be appropriated under subsection (h) may be used for travel for members of Congress to participate in Institute activities.

(h) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated up to $750,000 for fiscal years 2024 and 2025 to carry out this section.

(i) SUNSET.—The authority provided by this section terminates on December 31, 2025.

22 USC 2651a note.
Deadlines.

**SEC. 6710. NOTIFICATION OF REVOCATION OF CLEARANCES.**

(a) IN GENERAL.—With respect to any covered official whose security clearance is suspended or revoked, the Secretary shall—

(1) submit to the Chair and Ranking Member of the appropriate congressional committees, the Majority Leader of the Senate, the Minority Leader of the Senate, the Speaker of the House of Representatives, and the Minority Leader of the House of Representatives a notification not later than 15 days after the suspension or revocation of such clearance; and

Briefing.

(2) brief the Chair and Ranking Member of the appropriate congressional committees, the Majority Leader of the Senate, the Minority Leader of the Senate, the Speaker of the House of Representatives, and the Minority Leader of the House of Representatives not later than 30 days after such suspension or revocation on the present employment status of such individual and whether the job duties of such individual have changed since such suspension or revocation.

(b) FORM.—The notification and briefing required by subsection (a) may be provided in classified form, if necessary.

(c) COVERED OFFICIAL DEFINED.—For purposes of this section, the term "covered official" means any of the following:

(1) Any individual holding a position at or higher than the level of Assistant Secretary or its equivalent in the Department of State.

(2) Any individual holding the position of chief of mission or principal officer at any diplomatic or consular post.

(3) Any individual holding the rank and status of an ambassador or otherwise holding a position that reports directly to the Secretary, such as a special envoy.

(d) SUNSET.—This section shall terminate not later than three years after the date of the enactment of this division.

# DIVISION G—INTELLIGENCE AUTHORIZATION ACT FOR FISCAL YEAR 2024

*Intelligence Authorization Act for Fiscal Year 2024.*

### SEC. 7001. SHORT TITLE.

This division may be cited as the "Intelligence Authorization Act for Fiscal Year 2024".

### SEC. 7002. DEFINITIONS.

*50 USC 3003 note.*

In this division:

(1) CONGRESSIONAL INTELLIGENCE COMMITTEES.—The term "congressional intelligence committees" has the meaning given such term in section 3 of the National Security Act of 1947 (50 U.S.C. 3003).

(2) INTELLIGENCE COMMUNITY.—The term "intelligence community" has the meaning given such term in such section 3.

### SEC. 7003. EXPLANATORY STATEMENT.

The explanatory statement regarding this division, printed in the House section of the Congressional Record by the Chairman of the Permanent Select Committee on Intelligence of the House of Representatives and in the Senate section of the Congressional Record by the Chairman of the Select Committee on Intelligence of the Senate, shall have the same effect with respect to the implementation of this division as if it were a joint explanatory statement of a committee of conference.

# TITLE I—INTELLIGENCE ACTIVITIES

Sec. 7101. Authorization of appropriations.
Sec. 7102. Classified Schedule of Authorizations.
Sec. 7103. Intelligence Community Management Account.
Sec. 7104. Increase in employee compensation and benefits authorized by law.
Sec. 7105. Restriction on conduct of intelligence activities.

### SEC. 7101. AUTHORIZATION OF APPROPRIATIONS.

Funds are hereby authorized to be appropriated for fiscal year 2024 for the conduct of the intelligence and intelligence-related activities of the Federal Government.

### SEC. 7102. CLASSIFIED SCHEDULE OF AUTHORIZATIONS.

(a) SPECIFICATIONS OF AMOUNTS.—The amounts authorized to be appropriated under section 101 for the conduct of the intelligence activities of the Federal Government are those specified in the classified Schedule of Authorizations prepared to accompany this division.

137 STAT. 1022          PUBLIC LAW 118–31—DEC. 22, 2023

(b) AVAILABILITY OF CLASSIFIED SCHEDULE OF AUTHORIZATIONS.—

(1) AVAILABILITY.—The classified Schedule of Authorizations referred to in subsection (a) shall be made available to the Committee on Appropriations of the Senate, the Committee on Appropriations of the House of Representatives, and to the President.

(2) DISTRIBUTION BY THE PRESIDENT.—Subject to paragraph (3), the President shall provide for suitable distribution of the classified Schedule of Authorizations referred to in subsection (a), or of appropriate portions of such Schedule, within the executive branch of the Federal Government.

(3) LIMITS ON DISCLOSURE.—The President shall not publicly disclose the classified Schedule of Authorizations or any portion of such Schedule except—

(A) as provided in section 601(a) of the Implementing Recommendations of the 9/11 Commission Act of 2007 (50 U.S.C. 3306(a));

(B) to the extent necessary to implement the budget; or

(C) as otherwise required by law.

### SEC. 7103. INTELLIGENCE COMMUNITY MANAGEMENT ACCOUNT.

(a) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated for the Intelligence Community Management Account of the Director of National Intelligence for fiscal year 2024 the sum of $645,900,000.

(b) CLASSIFIED AUTHORIZATION OF APPROPRIATIONS.—In addition to amounts authorized to be appropriated for the Intelligence Community Management Account by subsection (a), there are authorized to be appropriated for the Intelligence Community Management Account for fiscal year 2024 such additional amounts as are specified in the classified Schedule of Authorizations referred to in section 102(a).

### SEC. 7104. INCREASE IN EMPLOYEE COMPENSATION AND BENEFITS AUTHORIZED BY LAW.

Appropriations authorized by this division for salary, pay, retirement, and other benefits for Federal employees may be increased by such additional or supplemental amounts as may be necessary for increases in such compensation or benefits authorized by law.

### SEC. 7105. RESTRICTION ON CONDUCT OF INTELLIGENCE ACTIVITIES.

The authorization of appropriations by this division shall not be deemed to constitute authority for the conduct of any intelligence activity which is not otherwise authorized by the Constitution or the laws of the United States.

# TITLE II—CENTRAL INTELLIGENCE AGENCY RETIREMENT AND DISABILITY SYSTEM

Sec. 7201. Authorization of appropriations.

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 1023

**SEC. 7201. AUTHORIZATION OF APPROPRIATIONS.**

There is authorized to be appropriated for the Central Intelligence Agency Retirement and Disability Fund $514,000,000 for fiscal year 2024.

# TITLE III—INTELLIGENCE COMMUNITY MATTERS

Subtitle A—General Intelligence Community Matters

Sec. 7301. Plan to recruit, train, and retain personnel with experience in financial intelligence and emerging technologies.
Sec. 7302. Policy and performance framework for mobility of intelligence community workforce.
Sec. 7303. Standards, criteria, and guidance for counterintelligence vulnerability assessments and surveys.
Sec. 7304. Improving administration of certain post-employment restrictions for intelligence community.
Sec. 7305. Mission of the National Counterintelligence and Security Center.
Sec. 7306. Budget transparency on costs of implementation of Executive Order 13556.
Sec. 7307. Improvements relating to intelligence community staffing, details, and assignments.
Sec. 7308. Insider threats.
Sec. 7309. Modification of deadline for annual submission of National Intelligence Priorities Framework.
Sec. 7310. Matters relating to chief data officers of intelligence community.
Sec. 7311. Modification to special pay authority for science, technology, engineering, or mathematics positions.
Sec. 7312. Annual report on unfunded priorities of intelligence community.
Sec. 7313. Submission of legislative proposals.
Sec. 7314. Annual report on reporting requirements.
Sec. 7315. Notice and damage assessment with respect to significant unauthorized disclosure or compromise of classified national intelligence.
Sec. 7316. In-state tuition rates for certain members of intelligence community.
Sec. 7317. Repeal of study on personnel under Strategic Intelligence Partnership Program.
Sec. 7318. Intelligence Community Counterintelligence Office at the Department of Agriculture.
Sec. 7319. Sunset of Climate Security Advisory Council.
Sec. 7320. Inclusion of counternarcotics as special topic in certain budget justification materials.
Sec. 7321. Development of plan to make open-source intelligence products available to certain Federal employees.
Sec. 7322. Intelligence community-wide policy on prepublication review.
Sec. 7323. Review relating to confidential human source program of Federal Bureau of Investigation.
Sec. 7324. Prohibition on availability of funds for certain activities and assessment of the Overt Human Intelligence and Open Source Intelligence Collection Programs of the Office of Intelligence and Analysis of the Department of Homeland Security.
Sec. 7325. Sense of Congress on priority of fentanyl in National Intelligence Priorities Framework.
Sec. 7326. Reports on civilian casualties caused by certain operations of foreign governments.
Sec. 7327. Modification and repeal of reporting requirements.

Subtitle B—Central Intelligence Agency

Sec. 7331. Change to penalties and increased availability of mental health treatment for unlawful conduct on Central Intelligence Agency installations.
Sec. 7332. Modifications to procurement authorities of the Central Intelligence Agency.
Sec. 7333. Inspector General of the Central Intelligence Agency quarterly employee engagement summaries.
Sec. 7334. Benjamin Tallmadge Institute as primary Central Intelligence Agency entity for education and training in counterintelligence.
Sec. 7335. Central Intelligence Agency intelligence assessment of Sinaloa Cartel and Jalisco Cartel.

137 STAT. 1024          PUBLIC LAW 118–31—DEC. 22, 2023

Sec. 7336. Central Intelligence Agency intelligence assessment with respect to ef-
          forts by People's Republic of China to increase influence in Middle East.
Sec. 7337. Assessment of availability of mental health and chaplain services to
          Agency employees.
Sec. 7338. Assessment by Director of Central Intelligence Agency on certain effects
          of Abraham Accords.
Sec. 7339. Reporting and investigating allegations of sexual assault and sexual har-
          assment within the Central Intelligence Agency.

Subtitle C—Matters Relating to Defense Intelligence and Overhead Architecture

Sec. 7341. Modification of reporting requirement for All-Domain Anomaly Resolu-
          tion Office.
Sec. 7342. Defense Intelligence Agency assessment of strategic competition in Latin
          America and the Caribbean.
Sec. 7343. Funding limitations relating to unidentified anomalous phenomena.

Subtitle D—Matters Relating to National Security Agency, Cyber, and Commercial
Cloud Enterprise

Sec. 7351. Congressional notification by National Security Agency of intelligence
          collection adjustments.
Sec. 7352. Modifications to enforcement of cybersecurity requirements for national
          security systems.
Sec. 7353. Support by intelligence community for certain cross-functional team of
          Department of Defense.
Sec. 7354. Commercial Cloud Enterprise notification.
Sec. 7355. Commercial Cloud Enterprise sole source task order notification require-
          ment.
Sec. 7356. Analysis of commercial cloud initiatives of intelligence community.

# Subtitle A—General Intelligence Community Matters

Deadlines.

**SEC. 7301. PLAN TO RECRUIT, TRAIN, AND RETAIN PERSONNEL WITH EXPERIENCE IN FINANCIAL INTELLIGENCE AND EMERGING TECHNOLOGIES.**

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence, in coordination with the heads of human capital of the Central Intelligence Agency, the National Security Agency, and the Federal Bureau of Investigation, shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a plan for the intelligence community to recruit, train, and retain personnel who have skills and experience in financial intelligence and emerging technologies in order to improve analytic tradecraft.

(b) ELEMENTS.—The plan required by subsection (a) shall include the following elements:

Assessment.

(1) An assessment, including measurable benchmarks of progress, of current initiatives of the intelligence community to recruit, train, and retain personnel who have skills and experience in financial intelligence and emerging technologies.

Assessment.

(2) An assessment of whether personnel in the intelligence community who have such skills are currently well integrated into the analytical cadre of the relevant elements of the intelligence community that produce analyses with respect to financial intelligence and emerging technologies.

(3) An identification of challenges to hiring or compensation in the intelligence community that limit progress toward rapidly increasing the number of personnel with such skills, and an

identification of hiring or other reforms to resolve such challenges.

(4) A determination of whether the National Intelligence University has the resources and expertise necessary to train existing personnel in financial intelligence and emerging technologies.

(5) A strategy, including measurable benchmarks of progress, to, by January 1, 2025, increase the analytical cadre of personnel with expertise and previous employment in financial intelligence and emerging technologies.

**SEC. 7302. POLICY AND PERFORMANCE FRAMEWORK FOR MOBILITY OF INTELLIGENCE COMMUNITY WORKFORCE.**

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence shall, in coordination with the Secretary of Defense and the Director of the Office of Personnel Management as the Director of National Intelligence considers appropriate, develop and implement a policy and performance framework to ensure the timely and effective mobility of employees and contractors of the Federal Government who are transferring employment between elements of the intelligence community.

(b) ELEMENTS.—The policy and performance framework required by subsection (a) shall include processes with respect to the following:

(1) Human resources.

(2) Medical reviews.

(3) Determinations of suitability or eligibility for access to classified information in accordance with Executive Order 13467 (50 U.S.C. 3161 note; relating to reforming processes related to suitability for Government employment, fitness for contractor employees, and eligibility for access to classified national security information).

**SEC. 7303. STANDARDS, CRITERIA, AND GUIDANCE FOR COUNTERINTELLIGENCE VULNERABILITY ASSESSMENTS AND SURVEYS.**

Section 904(d)(7)(A) of the Counterintelligence Enhancement Act of 2002 (50 U.S.C. 3383(d)(7)(A)) is amended to read as follows:

"(A) COUNTERINTELLIGENCE VULNERABILITY ASSESSMENTS AND SURVEYS.—To develop standards and criteria for counterintelligence risk assessments and surveys of the vulnerability of the United States to intelligence threats, including with respect to critical infrastructure and critical technologies, in order to identify the areas, programs, and activities that require protection from such threats.".

**SEC. 7304. IMPROVING ADMINISTRATION OF CERTAIN POST-EMPLOYMENT RESTRICTIONS FOR INTELLIGENCE COMMUNITY.**

Section 304(d) of the National Security Act of 1947 (50 U.S.C. 3073a(d)) is amended—

(1) in paragraph (1), by inserting "the restrictions under subsection (a) and" before "the report requirements";

(2) in paragraph (2), by striking "ceases to occupy" and inserting "occupies"; and

(3) in paragraph (3)(B), by striking "before the person ceases to occupy a covered intelligence position" and inserting "when the person occupies a covered intelligence position".

**Margin notes:**

Determination.

Strategy.

50 USC 3024 note.

Deadline.

Processes.

Determinations.

### SEC. 7305. MISSION OF THE NATIONAL COUNTERINTELLIGENCE AND SECURITY CENTER.

(a) IN GENERAL.—Section 904 of the Counterintelligence Enhancement Act of 2002 (50 U.S.C. 3383) is amended—

(1) by redesignating subsections (d) through (i) as subsections (e) through (j), respectively; and

(2) by inserting after subsection (c) the following:

"(d) MISSION.—The mission of the National Counterintelligence and Security Center shall include organizing and leading strategic planning for counterintelligence activities of the United States Government by integrating instruments of national power as needed to counter foreign intelligence activities.".

(b) CONFORMING AMENDMENTS.—

(1) COUNTERINTELLIGENCE ENHANCEMENT ACT OF 2002.— Section 904 of the Counterintelligence Enhancement Act of 2002 (50 U.S.C. 3383) is amended—

(A) in subsection (e), as redesignated by subsection (a)(1), by striking "Subject to subsection (e)" both places it appears and inserting "Subject to subsection (f)"; and

(B) in subsection (f), as so redesignated—

(i) in paragraph (1), by striking "subsection (d)(1)" and inserting "subsection (e)(1)"; and

(ii) in paragraph (2), by striking "subsection (d)(2)" and inserting "subsection (e)(2)".

(2) COUNTERINTELLIGENCE AND SECURITY ENHANCEMENTS ACT OF 1994.—Section 811(d)(1)(B)(ii) of the Counterintelligence and Security Enhancements Act of 1994 (50 U.S.C. 3381(d)(1)(B)(ii)) is amended by striking "section 904(d)(2) of that Act (50 U.S.C. 3383(d)(2))" and inserting "section 904(e)(2) of that Act (50 U.S.C. 3383(e)(2))".

Deadline.

### SEC. 7306. BUDGET TRANSPARENCY ON COSTS OF IMPLEMENTATION OF EXECUTIVE ORDER 13556.

The head of each element of the intelligence community shall provide a cost estimate for implementation of Executive Order 13556 (75 Fed. Reg. 68675; relating to controlled unclassified information), or any successor order, over the future years intelligence plan to the congressional intelligence committees not later than 30 days after the date on which the President submits to Congress a budget of the United States Government for fiscal year 2025 pursuant to section 1105(a) of title 31, United States Code.

### SEC. 7307. IMPROVEMENTS RELATING TO INTELLIGENCE COMMUNITY STAFFING, DETAILS, AND ASSIGNMENTS.

(a) IMPROVEMENTS RELATING TO ASSIGNMENTS AND DETAILS.— Section 102A(f)(3)(A) of the National Security Act of 1947 (50 U.S.C. 3024(f)(3)(A)) is amended—

(1) in the matter preceding clause (i), by striking "personnel policies" and inserting "binding personnel policies";

(2) by amending clause (i) to read as follows:

"(i) require and facilitate assignments and details of personnel to national intelligence centers, and between elements of the intelligence community over the course of the careers of such personnel;"; and

(3) by amending clause (v) to read as follows:

"(v) require service in more than one element of the intelligence community as a condition of promotion to such positions within the intelligence community as the Director shall specify, and take requisite steps to ensure compliance among elements of the intelligence community; and".

(b) REQUIRED STAFFING DOCUMENT FOR OFFICE OF DIRECTOR OF NATIONAL INTELLIGENCE.— 

50 USC 3025 note.

(1) REQUIREMENT.—Not later than 120 days after the date of the enactment of this Act, the Director of National Intelligence shall establish, and thereafter shall update as necessary, a single document setting forth each position within the Office of the Director of National Intelligence, including any directorate, center, or office within such Office.

(2) ELEMENTS.—The document under paragraph (1) shall include, with respect to each position set forth in the document, the following:

(A) A description of the position.

(B) The directorate, center, office, or other component of the Office of the Director of National Intelligence within which the position is.

(C) The element of the intelligence community designated to fill the position, if applicable.

(D) The requisite type and level of skills for the position, including any special skills or certifications required.

(E) The requisite security clearance level for the position.

(F) The pay grade for the position.

(G) Any special pay or incentive pay payable for the position.

(3) INTEGRATED REPRESENTATION.—In establishing and filling the positions specified in paragraph (1), the Director of National Intelligence shall take such steps as may be necessary to ensure the integrated representation of officers and employees from the other elements of the intelligence community with respect to such positions.

### SEC. 7308. INSIDER THREATS.

Section 102A(f) of the National Security Act of 1947 (50 U.S.C. 3024(f)) is amended—

(1) by redesignating paragraphs (8) through (10) as paragraphs (9) through (11), respectively; and

(2) by inserting after paragraph (7) the following new paragraph (8):

"(8) The Director of National Intelligence shall—

"(A) conduct assessments and audits of the compliance of each element of the intelligence community with minimum insider threat policy; 

Assessment. Audits.

"(B) receive information from each element of the intelligence community regarding the collection, sharing, and use by such element of audit and monitoring data for insider threat detection across all classified and unclassified information technology systems within such element;

"(C) provide guidance and oversight to Federal departments and agencies to fully implement automated records checks, consistent with personnel vetting reforms and the Trusted Workforce 2.0 initiative, or successor initiative, and ensure that information collected pursuant to such records checks is 

Guidance. Oversight.

appropriately shared in support of intelligence community-wide insider threat initiatives;

Evaluations.

"(D) carry out evaluations of the effectiveness of counterintelligence, security, and insider threat program activities of each element of the intelligence community, including with respect to the lowest organizational unit of each such element, that include an identification of any gaps, shortfalls, or resource needs of each such element;

Recommendations.

"(E) identify gaps, shortfalls, resources needs, and recommendations for adjustments in allocations and additional resources and other remedies to strengthen counterintelligence, security, and insider threat detection programs;

Determinations. Notifications.

"(F) pursuant to final damage assessments facilitated by the National Counterintelligence and Security Center that have been undertaken as a result of an unauthorized disclosure, determine whether the heads of the elements of the intelligence community implement recommended mitigation, and notify the congressional intelligence committees of such determinations and notify the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives in cases involving elements of the intelligence community withing the Department of Defense; and

Study. Data.

"(G) study the data collected during the course of background investigations and adjudications for security clearances granted to individuals who subsequently commit unauthorized disclosures, and issue findings regarding the quality of such data as a predictor for insider threat activity, delineated by the severity of the unauthorized disclosure.".

### SEC. 7309. MODIFICATION OF DEADLINE FOR ANNUAL SUBMISSION OF NATIONAL INTELLIGENCE PRIORITIES FRAMEWORK.

Section 102A(p)(3) of the National Security Act of 1947 (50 U.S.C. 3024(p)(3)) is amended by striking "October 1" and inserting "March 1".

### SEC. 7310. MATTERS RELATING TO CHIEF DATA OFFICERS OF INTELLIGENCE COMMUNITY.

(a) PROHIBITION ON SIMULTANEOUS SERVICE AS CHIEF DATA OFFICER AND CHIEF INFORMATION OFFICER.—Section 103G of the National Security Act of 1947 (50 U.S.C. 3032) is amended by adding at the end the following new subsection:

"(d) PROHIBITION ON SIMULTANEOUS SERVICE AS CHIEF DATA OFFICER AND CHIEF INFORMATION OFFICER.—An individual serving in the position of Chief Information Officer of the Intelligence Community or chief information officer of any other element of the intelligence community shall not concurrently serve as the Intelligence Community Chief Data Officer under section 103K and as the chief data officer of any other element of the intelligence community.".

Deadlines.

(b) CLARIFICATION OF DUTIES OF INTELLIGENCE COMMUNITY CHIEF DATA OFFICER.—

(1) CLARIFICATION OF DATA-RELATED DUTIES.—Section 103K(c)(4) of the National Security Act of 1947 (50 U.S.C. 3034b(c)(4)) is amended by inserting "relating to data" after "duties".

Determination. 50 USC 3034b note.

(2) REMOVAL OF UNRELATED DUTIES AND FUNCTIONS.—Not later than 90 days after the date of the enactment of this Act, consistent with section 103K(c) of the National Security

Act of 1947 (50 U.S.C. 3034b(c)), as amended by paragraph (1), the Director of National Intelligence shall complete such internal reorganization of the Office of the Director of National Intelligence as the Director determines necessary to ensure that the duties of the Intelligence Community Chief Data Officer appointed under such section do not include any other duty that does not relate to an issue involving data.

(3) BRIEFING.—Prior to the date on which the Director completes the reorganization under paragraph (2), the Director shall provide to the appropriate committees of Congress a briefing regarding—

(A) the proposed reorganization; and

(B) any other efforts of the Director to ensure that any future duties prescribed by the Director to be performed by the Intelligence Community Chief Data Officer pursuant to section 103K(c) of the National Security Act of 1947 (50 U.S.C. 3034b(c)), as amended by paragraph (1), relate exclusively to issues involving data, consistent with such section.

(c) REPORTS.—Not later than 90 days after the date of the enactment of this Act, the head of each element of the intelligence community shall submit to the appropriate committees of Congress a written report regarding the organizational and reporting structure for the chief data officer of that element, including an identification of whether such chief data officer reports to, or is otherwise subordinate to, the chief information officer of that element and, if so, the rationale for such organizational and reporting structure.

(d) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.— In this section, the term "appropriate committees of Congress" means—

(1) the congressional intelligence committees;

(2) the Committee on Appropriations of the Senate; and

(3) the Committee on Appropriations of the House of Representatives.

### SEC. 7311. MODIFICATION TO SPECIAL PAY AUTHORITY FOR SCIENCE, TECHNOLOGY, ENGINEERING, OR MATHEMATICS POSITIONS.

(a) MODIFICATION.—Section 113B of the National Security Act of 1947 (50 U.S.C. 3049a) is amended—

(1) in the section heading, by inserting "AND POSITIONS REQUIRING BANKING OR FINANCIAL SERVICES EXPERTISE" after "MATHEMATICS POSITIONS";

(2) in subsection (a)—

(A) in the heading, by inserting "OR IN BANKING OR FINANCIAL SERVICES" after "MATHEMATICS";

(B) in paragraph (1), in the matter preceding subparagraph (A), by inserting "or in banking or financial services (including expertise relating to critical financial infrastructure operations, capital markets, banking compliance programs, or international investments)" after "or mathematics";

(C) by redesignating paragraph (2) as paragraph (3); and

(D) by inserting after paragraph (1) the following new paragraph:

137 STAT. 1030       PUBLIC LAW 118–31—DEC. 22, 2023

Time period.

"(2) LIMITATION ON NUMBER OF RECIPIENTS.—For each element of the intelligence community, the number of individuals serving in a position in such element who receive a higher rate of pay established or increased under paragraph (1) may not, at any time during a given fiscal year, exceed 50 individuals or 5 percent of the total number of full-time equivalent positions authorized for such element for the preceding fiscal year, whichever is greater."; and

(3) in subsection (e), by striking "the element" and inserting "an element".

(b) CLERICAL AMENDMENT.—The table of contents at the beginning of such Act is amended by striking the item relating to section 113B and inserting the following new item:

"Sec. 113B. Special pay authority for science, technology, engineering, or mathematics positions and positions requiring banking or financial services expertise.".

Termination date.

(c) REPORTS.—Not later than September 1 of each year until September 1, 2025, the head of each element of the intelligence community shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report on any rates of pay established for such element under section 113B of such Act (50 U.S.C. 3049a), as amended by subsection (a), including—

(1) a description of any rates of pay so established; and

(2) an identification of the number of positions in such element that will be subject to such rates of pay during the subsequent fiscal year.

## SEC. 7312. ANNUAL REPORT ON UNFUNDED PRIORITIES OF INTELLIGENCE COMMUNITY.

Section 514(a) of the National Security Act of 1947 (50 U.S.C. 3113(a)) is amended by inserting "prepare and" after "each element of the intelligence community shall".

## SEC. 7313. SUBMISSION OF LEGISLATIVE PROPOSALS.

Title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) is amended by adding at the end the following new section (and conforming the table of contents at the beginning of such Act accordingly):

Deadline.
50 USC 3115.

## "SEC. 516. SUBMISSION OF LEGISLATIVE PROPOSALS.

"Not later than 45 days after the date on which the President submits to Congress the budget for each fiscal year pursuant to section 1105(a) of title 31, United States Code, the Director of National Intelligence shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives any legislative provisions that are proposed by the Director to be enacted as part of the annual intelligence authorization bill for that fiscal year.".

## SEC. 7314. ANNUAL REPORT ON REPORTING REQUIREMENTS.

(a) IN GENERAL.—Title XI of the National Security Act of 1947 (50 U.S.C. 3231 et seq.) is amended by adding at the end the following:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1031

**"SEC. 1114. ANNUAL REPORT ON REPORTING REQUIREMENTS.**

"(a) ANNUAL REPORT REQUIRED.—Not later than March 1 of each fiscal year, the Director of National Intelligence shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report detailing all congressionally mandated reporting requirements applicable to Office of the Director of National Intelligence for the upcoming fiscal year.

"(b) CONTENTS.—Each report submitted pursuant to subsection (a) shall include, for the fiscal year covered by the report and for each congressionally mandated reporting requirement detailed in the report:

"(1) A description of the reporting requirement.

"(2) A citation to the provision of law (or other source of congressional directive) imposing the reporting requirement.

"(3) Whether the reporting requirement is recurring, conditional, or subject to a termination provision.

"(4) Whether the Director recommends repealing or modifying the requirement.

"(c) FORM.—Each report submitted pursuant to subsection (a) may be submitted in classified form.".

(b) CLERICAL AMENDMENT.—The table of contents for such Act is amended by adding at the end the following:

"Sec. 1114. Annual report on reporting requirements.".

**SEC. 7315. NOTICE AND DAMAGE ASSESSMENT WITH RESPECT TO SIGNIFICANT UNAUTHORIZED DISCLOSURE OR COMPROMISE OF CLASSIFIED NATIONAL INTELLIGENCE.**

Title XI of the National Security Act of 1947 (50 U.S.C. 3231 et seq.) is amended by inserting after section 1105 the following new section (and conforming the table of contents at the beginning of such Act accordingly):

**"SEC. 1105A. NOTICE AND DAMAGE ASSESSMENT WITH RESPECT TO SIGNIFICANT UNAUTHORIZED DISCLOSURE OR COMPROMISE OF CLASSIFIED NATIONAL INTELLIGENCE.**

"(a) NOTIFICATION AND DAMAGE ASSESSMENT REQUIREMENTS.—

"(1) REQUIREMENTS.—If the Director of National Intelligence becomes aware of an actual or potential significant unauthorized disclosure or compromise of classified national intelligence—

"(A) as soon as practicable, but not later than 7 days after the date on which the Director becomes so aware, the Director shall notify the congressional intelligence committees of such actual or potential disclosure or compromise; and

"(B) in the case of an actual disclosure or compromise, not later than 7 days after the date on which the Director becomes so aware, the Director or the head of any element of the intelligence community from which the significant unauthorized disclosure or compromise originated shall initiate a damage assessment consistent with the procedures set forth in Intelligence Community Directive 732 (relating to the conduct of damage assessments), or successor directive, with respect to such disclosure or compromise.

"(2) CONTENTS OF NOTIFICATION.—A notification submitted to the congressional intelligence committees under paragraph

*Margin notes:*
50 USC 3244.

Time period.

Recommendations.

50 USC 3235a.

Deadlines.

Summaries.

137 STAT. 1032          PUBLIC LAW 118–31—DEC. 22, 2023

(1)(A) with respect to an actual or potential significant unauthorized disclosure or compromise of classified national intelligence shall include—

Appraisal.

"(A) a summary of the facts and circumstances of such disclosure or compromise;

"(B) a summary of the contents of the national intelligence revealed or potentially revealed, as the case may be, by such disclosure or compromise;

"(C) an initial appraisal of the level of actual or potential damage, as the case may be, to the national security of the United States as a result of such disclosure or compromise; and

"(D) in the case of an actual disclosure or compromise, which elements of the intelligence community will be involved in the damage assessment conducted with respect to such disclosure or compromise pursuant to paragraph (1)(B).

"(b) DAMAGE ASSESSMENT REPORTING REQUIREMENTS.—

Time period.

"(1) RECURRING REPORTING REQUIREMENT.—Not later than 30 days after the date of the initiation of a damage assessment pursuant to subsection (a)(1)(B), and every 90 days thereafter until the completion of the damage assessment or upon the request of the congressional intelligence committees, the Director of National Intelligence shall—

Records.

"(A) submit to the congressional intelligence committees copies of any documents or materials disclosed as a result of the significant unauthorized disclosure or compromise of the classified national intelligence that is the subject of the damage assessment; and

Briefing.

"(B) provide to the congressional intelligence committees a briefing on such documents and materials and a status of the damage assessment.

"(2) FINAL DAMAGE ASSESSMENT.—As soon as practicable after completing a damage assessment pursuant to subsection (a)(1)(B), the Director of National Intelligence shall submit the final damage assessment to the congressional intelligence committees.

"(c) NOTIFICATION OF REFERRAL TO DEPARTMENT OF JUSTICE.— If a referral is made to the Department of Justice from any element of the intelligence community regarding a significant unauthorized disclosure or compromise of classified national intelligence under this section, the Director of National Intelligence shall notify the congressional intelligence committees of the referral on the date such referral is made.".

### SEC. 7316. IN-STATE TUITION RATES FOR CERTAIN MEMBERS OF INTELLIGENCE COMMUNITY.

(a) IN GENERAL.—Section 135(d) of the Higher Education Act of 1965 (20 U.S.C. 1015d(d)), as amended by section 6206(a)(4) of the Foreign Service Families Act of 2021 (Public Law 117–81), is further amended—

135 Stat. 2392.

(1) in paragraph (1), by striking "or" after the semicolon;

(2) in paragraph (2), by striking the period at the end and inserting "; or"; and

(3) by adding at the end the following new paragraph:

"(3) an officer or employee of an element of the intelligence community (as such term is defined in section 3 of the National

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1033

Security Act of 1947 (50 U.S.C. 3003)) who serves in a position of employment in such element for a period of more than 30 days.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect at each public institution of higher education in a State that receives assistance under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.) for the first period of enrollment at such institution that begins after July 1, 2024.

20 USC 1015d note.

### SEC. 7317. REPEAL OF STUDY ON PERSONNEL UNDER STRATEGIC INTELLIGENCE PARTNERSHIP PROGRAM.

Section 6435 of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117–263; 136 Stat. 3533) is repealed (and conforming the table of contents in section 6001(b) accordingly).

### SEC. 7318. INTELLIGENCE COMMUNITY COUNTERINTELLIGENCE OFFICE AT THE DEPARTMENT OF AGRICULTURE.

50 USC 3384.

(a) DEFINITIONS.—In this section:

(1) DEPARTMENT.—The term "Department" means the Department of Agriculture.

(2) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

(b) REPEAL.—Section 415 of the Intelligence Authorization Act for Fiscal Year 2022 (Public Law 117–103; 28 U.S.C. 532 note) is repealed.

(c) ESTABLISHMENT OF INTELLIGENCE COMMUNITY COUNTER-INTELLIGENCE OFFICE.—

(1) AGREEMENT WITH SECRETARY OF AGRICULTURE.—The Director of National Intelligence, acting through the Director of the National Counterintelligence and Security Center, shall seek to enter into an agreement with the Secretary under which the Director of National Intelligence and the Secretary shall establish within the Department an office, which shall be known as the "Intelligence Community Counterintelligence Office", in accordance with this section.

Contracts.

(2) LOCATION.—The Intelligence Community Counterintelligence Office established pursuant to this section shall be physically located within the headquarters of the Department and within reasonable proximity to the offices of the leadership of the Department.

(3) SECURITY.—The Director of the National Counterintelligence and Security Center shall be responsible for the protection of classified information and for the establishment and enforcement of all security-related controls within the Intelligence Community Counterintelligence Office.

Classified information.

(d) PERSONNEL.—

(1) DIRECTOR.—

(A) APPOINTMENT.—There shall be at the head of the Intelligence Community Counterintelligence Office a Director who is appointed by the Director of National Intelligence. The Director of the Intelligence Community Counterintelligence Office shall—

(i) be supervised and subject to performance evaluations by the Director of the National Counterintelligence and Security Center, in consultation with the Secretary;

(ii) be an employee of the intelligence community with significant counterintelligence experience; and

137 STAT. 1034          PUBLIC LAW 118–31—DEC. 22, 2023

Time period.

(iii) serve for a period of 3 years.

(B) RESPONSIBILITIES.—The Director of the Intelligence Community Counterintelligence Office shall carry out the following responsibilities:

(i) Serving as the head of the Intelligence Community Counterintelligence Office, with supervisory responsibility for the Intelligence Community Counterintelligence Office and any other personnel assigned to the Intelligence Community Counterintelligence Office.

(ii) Advising the Secretary on counterintelligence and intelligence information.

(iii) Ensuring that counterintelligence threat information and, as appropriate, finished intelligence on topics related to the functions of the Department, are provided to appropriate personnel of the department or agency without delay.

(iv) Ensuring critical intelligence relevant to the Secretary is requested and disseminated in a timely manner.

(v) Establishing, as appropriate, mechanisms for collaboration through which Department subject matter experts, including those without security clearances, can share information and expertise with the intelligence community.

(vi) Correlating and evaluating counterintelligence threats identified within intelligence community reporting, in coordination with the National Counterintelligence and Security Center, and providing appropriate dissemination of such intelligence to officials of the Department with a need-to-know.

(vii) Advising the Secretary on methods to improve the counterintelligence posture of the Department.

(viii) Where appropriate, supporting the Department's leadership in engaging with the National Security Council.

(ix) In coordination with the National Counterintelligence and Security Center, establishing counterintelligence partnerships to improve the counterintelligence defense of the Department.

Appointment.

(2) DEPUTY DIRECTOR.—There shall be within the Intelligence Community Counterintelligence Office a Deputy Director who is appointed by the Secretary, in coordination with the Director of National Intelligence. The Deputy Director shall—

(A) be supervised and subject to performance evaluations by the Secretary, in consultation with the Director of the National Counterintelligence and Security Center;

(B) be a current or former employee of the Department with significant experience within the Department; and

(C) serve at the pleasure of the Secretary.

(3) OTHER EMPLOYEES.—

(A) JOINT DUTY ASSIGNMENT.—There shall be within the Intelligence Community Counterintelligence Office such other employees as the Director of National Intelligence, in consultation with the Secretary, determines appropriate.

Employment at the Intelligence Community Counterintelligence Office is an intelligence community joint duty assignment. A permanent change of station to the Intelligence Community Counterintelligence Office shall be for a period of not less than 2 years.

*Time period.*

(B) SUPERVISION.—The Director of the Intelligence Community Counterintelligence Office shall be responsible for the supervision and management of employees assigned to the Intelligence Community Counterintelligence Office, including employees assigned by program elements of the intelligence community and other Federal departments and agencies, as appropriate.

(C) JOINT DUTY OR ASSIGNED PERSONNEL REIMBURSEMENT.—The Director of National Intelligence shall reimburse a program element of the intelligence community or a Federal department or agency for any permanent change of station employee assigned to the Intelligence Community Counterintelligence Office from amounts authorized to be appropriated for the Office of the Director of National Intelligence.

(D) OPERATION UNDER AUTHORITY OF DIRECTOR OF NATIONAL INTELLIGENCE.—Employees assigned to the Intelligence Community Counterintelligence Office under this paragraph shall operate under the authorities of the Director of National Intelligence for the duration of their assignment or period of employment within the Intelligence Community Counterintelligence Office, except for temporary duty assignment employees.

(E) INCENTIVE PAY.—

*Time periods.*

(i) IN GENERAL.—An employee who accepts employment at the Intelligence Community Counterintelligence Office during the 120-day period after the date of the establishment of the Intelligence Community Counterintelligence Office shall receive an incentive payment, which shall be payable by the Director of National Intelligence, in an amount equal to 10 percent of the base annual pay of the employee. Such an employee who completes 2 years of service in the Intelligence Community Counterintelligence Office may receive an incentive payment in an amount equal to 10 percent of the base annual pay of the employee if the Director of the Intelligence Community Counterintelligence Office determines the performance of the employee is exceptional.

*Determination.*

(ii) ELIGIBILITY.—An employee is only eligible for an incentive payment under clause (i) if the employee enters into an agreement with the Director of National Intelligence to serve in the Intelligence Community Counterintelligence Office for a period of at least 2 years.

*Contracts.*

(e) FUNDING.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in this subsection, the Director of National Intelligence may expend such sums as are authorized within the National Intelligence Program of the Office of the Director of National Intelligence for—

(1) the renovation, furnishing, and equipping of a Federal building, as necessary, to meet the security and operational

137 STAT. 1036          PUBLIC LAW 118–31—DEC. 22, 2023

requirements of the Intelligence Community Counterintelligence Office;

(2) the provision of connectivity to the Intelligence Community Counterintelligence Office to enable briefings, secure audio and video communications, and collaboration between employees of the Department and the intelligence community at the unclassified, secret, and top secret levels;

(3) the provision of other information technology systems and devices, such as computers, printers, and phones, for use by employees of the Intelligence Community Counterintelligence Office;

(4) the assignment of employees of the intelligence community to support the operation of the Intelligence Community Counterintelligence Office; and

(5) the provision of other personal services necessary for the operation of the Intelligence Community Counterintelligence Office.

(f) DEADLINE FOR ESTABLISHMENT OF THE INTELLIGENCE COMMUNITY COUNTERINTELLIGENCE OFFICE.—

(1) ESTABLISHMENT.—Not later than January 1, 2025, the Director of National Intelligence shall seek to establish, in accordance with this section, the Intelligence Community Counterintelligence Office within the Department.

(2) REPORT.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report on the plan to establish the Intelligence Community Counterintelligence Office required under paragraph (1). Such report shall include the costs and schedule associated with establishing the Intelligence Community Counterintelligence Office.

*Costs. schedule.*

### SEC. 7319. SUNSET OF CLIMATE SECURITY ADVISORY COUNCIL.

Section 120(e) of the National Security Act of 1947 (50 U.S.C. 3060(e)) is amended by striking "December 31, 2025" and inserting "December 31, 2024".

*50 USC 3096 note.*

### SEC. 7320. INCLUSION OF COUNTERNARCOTICS AS SPECIAL TOPIC IN CERTAIN BUDGET JUSTIFICATION MATERIALS.

*Time period. Determination.*

(a) INCLUSION OF COUNTERNARCOTICS AS SPECIAL TOPIC.—For the purposes of the congressional budget justification book for the National Intelligence Program (as such term is defined in section 3 of the National Security Act of 1947 (50 U.S.C. 3003)) for each of fiscal years 2025 through 2027, and for any subsequent fiscal year as the Director of National Intelligence determines appropriate, information with respect to the aggregate amount of funding requested for counternarcotics required to be included as part of the budget justification materials submitted to Congress under section 506(a)(3) of such Act shall be included as a provision relating to a special topic in such congressional budget justification book.

(b) CONTENTS.—With respect to a fiscal year, the special topic provision included in the congressional budget justification book pursuant to subsection (a) regarding the aggregate amount of funding requested for counternarcotics shall include—

*Summary.*

(1) a summary of the main activities and investments that such requested funding would support;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1037

(2) a breakdown of such requested funding by program, budget category, intelligence discipline, and any other appropriate classification;

(3) a comparison of aggregate requested funding and aggregate enacted funding for counternarcotics for the current fiscal year and the previous fiscal year;

(4) the number of full-time equivalent civilian and military personnel assigned to the counternarcotics mission of the intelligence community; and

(5) such other information as the Director of National Intelligence determines appropriate.

### SEC. 7321. DEVELOPMENT OF PLAN TO MAKE OPEN-SOURCE INTELLIGENCE PRODUCTS AVAILABLE TO CERTAIN FEDERAL EMPLOYEES.

(a) PLAN REQUIREMENT.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence, in consultation with such heads of the elements of the intelligence community as the Director considers appropriate, shall develop and submit to the appropriate committees of Congress a plan to make available to covered individuals any covered open-source intelligence product.

*Deadline.*

(b) ELEMENTS.—The plan required under subsection (a) shall include the following:

*Procedures.*

(1) Policies and procedures to make available to covered individuals any covered open-source intelligence product in a manner consistent with the protection of intelligence sources and methods.

(2) Policies and procedures to increase the availability and accessibility to covered individuals of publicly available foreign language material that is translated by or within the intelligence community.

(3) Policies and procedures to ensure that the head of each element of the intelligence community that produces any covered open-source intelligence product complies with all policies and procedures issued to implement the plan submitted under subsection (a).

(4) Policies and procedures to ensure that any covered open-source intelligence product that is made available to covered individuals satisfies the requirements under any policy, procedure, or standard issued by the head of an element of the intelligence community relating to the production and dissemination of intelligence products.

(5) Any obstacles to making available to covered individuals unclassified products derived from open-source intelligence produced by the intelligence community, including translated foreign language material described in paragraph (2).

(6) With respect to implementation of the plan, a discussion of the estimated timeline, any additional funding or other resources, and any new authorities that would be required for such implementation.

(7) A discussion of the feasibility and advisability of making unclassified products derived from open-source intelligence produced by the intelligence community available to State and local government officials who would derive value from such unclassified products.

137 STAT. 1038          PUBLIC LAW 118–31—DEC. 22, 2023

(8) Policies and procedures relating to the dissemination of United States person information contained in covered open-source intelligence products.

(c) FORM.—The plan required under subsection (a) shall be submitted in unclassified form, but may include a classified annex.

Deadline.
Update.
50 USC 3367
note.

(d) INTELLIGENCE COMMUNITY DIRECTIVE WITH RESPECT TO OPEN-SOURCE INTELLIGENCE.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence shall update Intelligence Community Directive 208, Maximizing the Utility of Analytic Products (or any successor directive) to specifically address—

(1) the production and dissemination of unclassified intelligence products derived entirely from open-source intelligence, including from unclassified publicly available information, unclassified commercially available information, or any other type of unclassified information; and

(2) the needs and requirements of covered individuals who do not hold a security clearance or have access to the classified systems on which such unclassified intelligence products reside.

(e) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Committee on Homeland Security and Governmental Affairs, the Committee on the Judiciary, and the Committee on Appropriations of the Senate; and

(C) the Committee on Oversight and Accountability, the Committee on the Judiciary, and the Committee on Appropriations of the House of Representatives.

(2) COVERED INDIVIDUAL.—The term "covered individual" means an employee of the Federal Government—

(A) who is not an employee or contractor of an element of the intelligence community; and

(B) who would derive value from a covered open-source intelligence product.

(3) COVERED OPEN-SOURCE INTELLIGENCE PRODUCT.—The term "covered open-source intelligence product" means an unclassified product derived from open-source intelligence that is produced by the intelligence community.

Deadline.
50 USC 3161
note.

## SEC. 7322. INTELLIGENCE COMMUNITY-WIDE POLICY ON PREPUBLICATION REVIEW.

Not later than 30 days after the date of the enactment of this Act, the Director of National Intelligence shall issue, and submit to the congressional intelligence committees, the Committee on the Judiciary, the Committee on Homeland Security and Governmental Affairs, and the Committee on Appropriations of the Senate, and the Committee on the Judiciary, the Committee on Oversight and Accountability, and the Committee on Appropriations of the House of Representatives, an intelligence community-wide policy regarding prepublication review.

## SEC. 7323. REVIEW RELATING TO CONFIDENTIAL HUMAN SOURCE PROGRAM OF FEDERAL BUREAU OF INVESTIGATION.

Procedures.

(a) REVIEW.—The Inspector General of the Intelligence Community, in coordination with the Inspector General of the Department of Justice, shall conduct a review of the policies and procedures governing the confidential human source program of the Federal

Bureau of Investigation (in this section referred to as the "program)" and the compliance by the Federal Bureau of Investigation with such policies and procedures, including—

(1) the policy of the Department of Justice titled "The Attorney General's Guidelines Regarding the Use of FBI Confidential Sources" (or successor policy); and

(2) Intelligence Community Directive 304 (or successor directive).

(b) ELEMENTS.—The review under subsection (a) shall include the following:

<div style="float:right">Assessments.</div>

(1) An assessment of the compliance by the Federal Bureau of Investigation with the policies and procedures governing the program, including with respect to the management and validation of confidential human sources under such program.

(2) An assessment of the means by which the Federal Bureau of Investigation conducts risk assessments relating to the continual validation of long-term confidential human sources under the program.

(3) An assessment of the timeliness and completion rates of the reviews of confidential human sources under the program.

(4) An identification of the data points assessed by the Federal Bureau of Investigation during such reviews and the State and local databases used in conducting such reviews.

(5) A list containing an identification of each incident of noncompliance with a policy or procedure specified in paragraph (1).

<div style="float:right">List.</div>

(c) SUBMISSION.—Not later than 90 days after the date on which the review under subsection (a) is completed, the Inspector General of the Intelligence Community shall submit to the congressional intelligence committees, the Committee on the Judiciary and the Committee on Appropriations of the Senate, and the Committee on the Judiciary and the Committee on Appropriations of the House of Representatives a report containing the results of such review.

<div style="float:right">Reports.</div>

### SEC. 7324. PROHIBITION ON AVAILABILITY OF FUNDS FOR CERTAIN ACTIVITIES AND ASSESSMENT OF THE OVERT HUMAN INTELLIGENCE AND OPEN SOURCE INTELLIGENCE COLLECTION PROGRAMS OF THE OFFICE OF INTELLIGENCE AND ANALYSIS OF THE DEPARTMENT OF HOMELAND SECURITY.

<div style="float:right">6 USC 121 note.</div>

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the following:

(A) The congressional intelligence committees.

(B) The Committee on Homeland Security and Governmental Affairs of the Senate.

(C) The Committee on Homeland Security of the House of Representatives.

(2) COVERED ACTIVITY.—The term "covered activity" means—

(A) with respect to the Overt Human Intelligence Collection Program, an interview for intelligence collection purposes with any individual, including a United States person, who has been criminally charged, arraigned, or taken into the custody of a Federal, State, or local law enforcement agency, but whose guilt with respect to such

criminal matters has not yet been adjudicated, unless the Office of Intelligence and Analysis has obtained the consent of the interviewee following consultation with counsel;

(B) with respect to either the Overt Human Intelligence Collection Program or the Open Source Intelligence Collection Program, any collection targeting journalists in the performance of their journalistic functions; and

(C) with respect to the Overt Human Intelligence Collection Program, an interview for intelligence collection purposes with a United States person where the Office of Intelligence and Analysis lacks a reasonable belief based on facts and circumstances that the United States person may possess significant foreign intelligence (as defined in section 3 of the National Security Act of 1947 (50 U.S.C. 3003)).

(3) OVERT HUMAN INTELLIGENCE COLLECTION PROGRAM.— The term "Overt Human Intelligence Collection Program" means the program established by the Under Secretary of Homeland Security for Intelligence and Analysis pursuant to Policy Instruction 907 of the Office of Intelligence and Analysis, issued on June 29, 2016, or any successor program.

(4) OPEN SOURCE INTELLIGENCE COLLECTION PROGRAM.— The term "Open Source Collection Intelligence Program" means the program established by the Under Secretary of Homeland Security for Intelligence and Analysis for the purpose of collecting intelligence and information for potential production and reporting in the form of Open Source Information Reports as reflected in Policy Instruction 900 of the Office of Intelligence and Analysis, issued on January 13, 2015, or any successor program.

(5) UNITED STATES PERSON.—The term "United States person" means—

(A) a United States citizen;

(B) an alien known by the Office of Intelligence and Analysis to be a permanent resident alien;

(C) an unincorporated association substantially composed of United States citizens or permanent resident aliens; or

(D) a corporation incorporated in the United States, except for a corporation directed and controlled by a foreign government or governments.

(6) UNITED STATES PERSON INFORMATION (USPI).—The term "United States person information"—

(A) means information that is reasonably likely to identify 1 or more specific United States persons; and

(B) may be either a single item of information or information that, when combined with other available information, is reasonably likely to identify one or more specific United States persons.

(b) PROHIBITION ON AVAILABILITY OF FUNDS FOR COVERED ACTIVITIES OF OVERT HUMAN INTELLIGENCE COLLECTION PROGRAM AND OPEN SOURCE INTELLIGENCE COLLECTION PROGRAM.—None of the funds authorized to be appropriated by this division may be made available to the Office of Intelligence and Analysis of the Department of Homeland Security to conduct a covered activity.

(c) LIMITATION ON PERSONNEL.—None of the funds authorized to be appropriated by this division may be used by the Office

of Intelligence and Analysis of the Department of Homeland Security to increase, above the staffing level in effect on the day before the date of the enactment of this Act, the number of personnel assigned to the Open Source Intelligence Division who work exclusively or predominantly on domestic terrorism issues.

(d) INSPECTOR GENERAL OF THE INTELLIGENCE COMMUNITY ASSESSMENT OF OVERT HUMAN INTELLIGENCE COLLECTION PROGRAM AND OPEN SOURCE INTELLIGENCE COLLECTION PROGRAM.—

(1) REQUIREMENT.—The Inspector General of the Intelligence Community shall conduct an assessment of the Overt Human Intelligence Collection Program and the Open Source Intelligence Collection Program.

(2) ELEMENTS.—The assessment under paragraph (1) shall include findings and, as the Inspector General considers appropriate, recommendations on the following:

Recommendations.

(A) Whether the Overt Human Intelligence Collection Program and the Open Source Intelligence Collection Program are legally authorized, and if so, an identification of the legal authorities.

(B) Whether, and to what extent, such programs have provided valuable insights on national intelligence priorities and intelligence priorities of the Department of Homeland Security, citing specific examples of such insights at the appropriate classification level.

(C) Whether there is sufficient training provided to, and sufficient oversight provided of, personnel of the Office of Intelligence and Analysis of the Department of Homeland Security who conduct intelligence collection under such programs.

(D) Whether the responsibilities and requirements for such programs set forth in the relevant policy instructions, intelligence oversight guidelines, and other governing documents or standard operating procedures of the Office of Intelligence and Analysis, particularly as they relate to the obligation to safeguard the privacy, civil liberties, and civil rights of United States persons, are adequate, appropriate, and consistently adhered to by such personnel.

(E) Whether such programs raise or have raised legal, ethical, or operational concerns, including concerns relating to the actual or potential violation of any applicable policies or procedures for protecting the constitutional or statutory rights of United States persons.

(F) Whether other Federal agencies, such as the Federal Bureau of Investigation, conduct similar programs and, if so, a comparison of any similarities and differences between the respective programs.

(G) With respect to non-analytic intelligence reports produced by the Office of Intelligence and Analysis derived in whole or in part from such programs, whether such reports appropriately minimize United States person information and use press reporting in an appropriate manner.

(H) With respect to the Open Source Intelligence Collection Program, whether such program is effective at identifying threats directed against the United States, including true threats, incitement to violence, and malign cyber activity.

137 STAT. 1042          PUBLIC LAW 118–31—DEC. 22, 2023

(I) Whether there have been any identified instances in which State, local, territorial, or Tribal government agencies have used, or sought to use, the Office of Intelligence and Analysis as an instrument to introduce political or politicized information into the national intelligence collection and reporting stream.

(J) Any other matter the Inspector General of the Intelligence Community determines appropriate.

Deadline.

(3) BRIEFING.—Not later than 120 days after the date of the enactment of this Act, the Inspector General of the Intelligence Community shall provide to the appropriate congressional committees a briefing on the preliminary findings and recommendations of the Inspector General with respect to the assessment under paragraph (1).

(4) REPORT.—

(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Inspector General of the Intelligence Community shall submit to the appropriate congressional committees a report containing the findings and recommendations of the Inspector General with respect to the assessment under paragraph (1).

(B) FORM.—The report submitted pursuant to subparagraph (A) shall be submitted under that subparagraph in unclassified form, but may include a classified annex.

(5) QUARTERLY BRIEFINGS.—The Under Secretary of Homeland Security for Intelligence and Analysis shall, not less than once per quarter, provide to the appropriate congressional committees a briefing on the intelligence collection activities of the Office of Intelligence and Analysis. These briefings shall include—

(A) a description of any new activities, initiatives, or efforts undertaken pursuant to the Overt Human Intelligence Collection Program or the Open Source Intelligence Collection Program;

(B) a description of any new policies, procedures, or guidance concerning the Overt Human Intelligence Collection Program or the Open Source Intelligence Collection Program;

Update.

(C) a description of any compliance-related inquiries, investigations, reviews, checks, or audits initiated concerning the Overt Human Intelligence Collection Program or the Open Source Intelligence Collection Program, as well as an update on the outcome or status of any preexisting inquiries, investigations, reviews, checks, or audits concerning these programs;

(D) a comparison of the volume of intelligence and information collected on United States persons by the Office and used in finished intelligence products produced by the Office with the volume of intelligence or information on United States persons that is—

(i) collected by State, local, and Tribal territory governments, the private sector, and other components of the Department of Homeland Security;

(ii) provided directly or indirectly to the Office; and

(iii) used in finished intelligence products produced by the Office; and

(E) information on the reports and products issued by the Overt Human Intelligence Collection Program and the Open Source Intelligence Collection Program for the quarter covered by the briefing, which shall reflect—

(i) the number of reports and products issued by each program;

(ii) the number of reports and products issued by type or format of the report or product;

(iii) the number of reports and products based on information provided by representatives of Federal, foreign or international, State, local, Tribal, territorial, or private sector entities, respectively, and, for each of these subcategories, the number of reports or products based on information provided by known or presumed United States persons;

(iv) the number of reports and products based on information provided by individuals in administrative custody and, within that number, the number of reports or products based on information provided by known or presumed United States persons;

(v) the number of reports and products based on information provided by confidential informants and, within that number, the number of reports or products based on information provided by known or presumed United States persons;

(vi) the number of reports and products supporting different national or departmental missions and, for each of these subcategories, the number of reports or products based on information provided by known or presumed United States persons; and

(vii) the number of reports and products identifying United States persons.

(e) RULES OF CONSTRUCTION.—

(1) EFFECT ON OTHER INTELLIGENCE OVERSIGHT.—Nothing in this section shall be construed as limiting or superseding the authority of any official within the Department of Homeland Security to conduct legal, privacy, civil rights, or civil liberties oversight of the intelligence activities of the Office of Intelligence and Analysis.

(2) SHARING AND RECEIVING INTELLIGENCE INFORMATION.— Nothing in this section shall be construed to prohibit, or to limit the authority of, personnel of the Office of Intelligence and Analysis from sharing intelligence information with, or receiving information from—

(A) foreign, State, local, Tribal, or territorial governments (or any agency or subdivision thereof);

(B) the private sector; or

(C) other elements of the Federal government, including the components of the Department of Homeland Security.

**SEC. 7325. SENSE OF CONGRESS ON PRIORITY OF FENTANYL IN NATIONAL INTELLIGENCE PRIORITIES FRAMEWORK.**

It is the sense of Congress that the trafficking of illicit fentanyl, including precursor chemicals and manufacturing equipment associated with illicit fentanyl production and organizations that traffic or finance the trafficking of illicit fentanyl, originating from the

137 STAT. 1044          PUBLIC LAW 118–31—DEC. 22, 2023

People's Republic of China and Mexico should be among the highest priorities in the National Intelligence Priorities Framework of the Office of the Director of National Intelligence.

### SEC. 7326. REPORTS ON CIVILIAN CASUALTIES CAUSED BY CERTAIN OPERATIONS OF FOREIGN GOVERNMENTS.

(a) ANNUAL REPORTS.—Not later than 1 year after the date of the enactment of this Act, and annually thereafter for 2 years, the Director of National Intelligence shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, the Committee on Appropriations of the House of Representatives, and, consistent with the protection of intelligence sources and methods, the Foreign Relations Committee of the Senate and the Foreign Affairs Committee of the House of Representatives, a report on civilian casualties caused by covered operations.

(b) ELEMENTS.—Each report under subsection (a) shall include, for the year covered by the report, each of the following:

(1) A list identifying each covered operation during that year that has resulted in civilian casualties that the Director of National Intelligence has confirmed.

(2) An identification of the total number of civilian casualties resulting from covered operations during that year that the Director of National Intelligence has confirmed.

(3) For each covered operation identified in the list under paragraph (1), an identification of the following:

(A) The date on which, and the location where, the covered operation occurred.

(B) The element of the foreign government that conducted the covered operation.

(C) The individual or entity against which the covered operation was directed.

(D) Any other circumstances or facts that the Director of National Intelligence determines relevant.

(c) FORM.—Each report required under subsection (a) may be submitted in classified form, but if so submitted shall include an unclassified executive summary.

(d) COVERED OPERATION DEFINED.—In this section, the term "covered operation" means an operation—

(1) conducted by a foreign government;

(2) involving the use of force; and

(3) in which intelligence shared by an element of the intelligence community plays a significant role.

### SEC. 7327. MODIFICATION AND REPEAL OF REPORTING REQUIREMENTS.

(a) MODIFICATION OF FREQUENCY OF WHISTLEBLOWER NOTIFICATIONS TO INSPECTOR GENERAL OF THE INTELLIGENCE COMMUNITY.—Section 5334(a) of the Damon Paul Nelson and Matthew Young Pollard Intelligence Authorization Act for Fiscal Years 2018, 2019, and 2020 (Public Law 116–92; 50 U.S.C. 3033 note) is amended by striking "in near real time" and inserting "monthly".

(b) REPEAL OF REQUIREMENT FOR INSPECTORS GENERAL REVIEWS OF ENHANCED PERSONNEL SECURITY PROGRAMS.—

(1) IN GENERAL.—Section 11001 of title 5, United States Code, is amended—

(A) by striking subsection (d); and

(B) by redesignating subsection (e) as subsection (d).

*List.*

*Classified information. Summary.*

(2) TECHNICAL CORRECTIONS.—Subsection (d) of section 11001 of such title, as redesignated by paragraph (1)(B), is amended—

(A) in paragraph (3), by adding "and" after the semicolon at the end; and

(B) in paragraph (4), by striking "; and" and inserting a period.

(c) REPEAL OF CONGRESSIONAL NOTIFICATION REQUIREMENT FOR DEGREE-GRANTING AUTHORITY OF THE NATIONAL INTELLIGENCE UNIVERSITY.—Section 1032(c) of the National Security Act of 1947 (50 U.S.C. 3225a(c)) is repealed.

50 USC 3227a.

(d) REPEAL OF REQUIREMENT FOR DIRECTOR OF NATIONAL INTELLIGENCE TO UPDATE LIST IDENTIFYING ONLINE VIOLENT EXTREMIST CONTENT.—Section 403(b) of the Intelligence Authorization Act for Fiscal Year 2017 (50 U.S.C. 3368(b)) is amended by striking "or more frequently as needed" and inserting "until the date of the enactment of the Intelligence Authorization Act for Fiscal Year 2024".

(e) REPEAL OF REQUIREMENT FOR ANNUAL REPORT ON ILLICIT FINANCING OF ESPIONAGE AND FOREIGN INFLUENCE OPERATIONS.— Section 5722(d) of the Damon Paul Nelson and Matthew Young Pollard Intelligence Authorization Act for Fiscal Years 2018, 2019, and 2020 (Public Law 116–92; 133 Stat. 2176) is amended—

(1) in the heading, by striking "REPORTS" and inserting "REPORT";

(2) in the heading of paragraph (1), by striking "INITIAL REPORT" and inserting "IN GENERAL";

(3) by striking paragraph (2) and redesignating paragraph (3) as paragraph (2); and

(4) in paragraph (2), as so redesignated, by striking "Each report" and inserting "The report".

# Subtitle B—Central Intelligence Agency

**SEC. 7331. CHANGE TO PENALTIES AND INCREASED AVAILABILITY OF MENTAL HEALTH TREATMENT FOR UNLAWFUL CONDUCT ON CENTRAL INTELLIGENCE AGENCY INSTALLATIONS.**

Section 15(b) of the Central Intelligence Agency Act of 1949 (50 U.S.C. 3515(b)) is amended, in the second sentence, by striking "those specified in section 1315(c)(2) of title 40, United States Code" and inserting "the maximum penalty authorized for a Class B misdemeanor under section 3559 of title 18, United States Code".

**SEC. 7332. MODIFICATIONS TO PROCUREMENT AUTHORITIES OF THE CENTRAL INTELLIGENCE AGENCY.**

Section 3 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 3503) is amended—

(1) in subsection (a), by striking "sections" and all that follows through "session)" and inserting "sections 3201, 3203, 3204, 3206, 3207, 3302 through 3306, 3321 through 3323, 3801 through 3808, 3069, 3134, 3841, and 4752 of title 10, United States Code" and

(2) in subsection (d), by striking "in paragraphs" and all that follows through "1947" and inserting "in sections 3201 through 3204 of title 10, United States Code, shall not be delegable. Each determination or decision required by sections

3201 through 3204, 3321 through 3323, and 3841 of title 10, United States Code".

### SEC. 7333. INSPECTOR GENERAL OF THE CENTRAL INTELLIGENCE AGENCY QUARTERLY EMPLOYEE ENGAGEMENT SUMMARIES.

(a) DEFINITION OF APPROPRIATE CONGRESSIONAL COMMITTEES.—In this section, the term "appropriate congressional committees" means—

(1) the Select Committee on Intelligence and the Subcommittee on Defense of the Committee on Appropriations of the Senate; and

(2) the Permanent Select Committee on Intelligence and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

Deadline.

(b) IN GENERAL.—Not later than 30 days after the last day of the first full fiscal quarter beginning after the date of the enactment of this Act and not later than 30 days after the last day of each fiscal quarter thereafter until the last fiscal quarter of fiscal year 2027, the Inspector General of the Central Intelligence Agency shall submit to the appropriate congressional committees a summary of the engagement of employees of the Central Intelligence Agency with the Inspector General during that quarter.

(c) CONTENTS.—Each summary submitted pursuant to subsection (b) shall include each of the following for the quarter covered by the summary:

(1) The total number of reports filed with the Inspector General by employees of the Agency.

(2) An identification of the nature of the allegation made in each such report, such as—

(A) fraud, waste, and abuse;

(B) harassment or other personnel issues;

(C) questionable intelligence activities; or

(D) threats to health and safety.

(3) For each such report—

(A) whether an investigation was initiated because of the report;

(B) for any such investigation, whether the status of the investigation is initiated, in progress, or complete; and

(C) for any completed investigation, whether the allegation made in the report was found to be substantiated or unsubstantiated, and whether any recommendations or criminal referrals were made as a result.

Records.

(4) A copy of any audit, assessment, inspection, or other final report completed by the Inspector General during the quarter covered by the summary.

50 USC 3385.

### SEC. 7334. BENJAMIN TALLMADGE INSTITUTE AS PRIMARY CENTRAL INTELLIGENCE AGENCY ENTITY FOR EDUCATION AND TRAINING IN COUNTERINTELLIGENCE.

(a) IN GENERAL.—The Director of the Central Intelligence Agency shall maintain the Benjamin Tallmadge Institute as the primary entity within the Central Intelligence Agency for education and training related to all aspects of counterintelligence.

(b) RESPONSIBILITIES OF DIRECTOR.—The Director of the Central Intelligence Agency shall—

(1) ensure the Institute is fully and properly organized and has the resources necessary to provide counterintelligence

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1047

education and training for all career fields within the Agency, including specialized certifications for Agency counterintelligence personnel;

(2) develop appropriate certification courses that are designed to educate, train, and certify Agency personnel in—

(A) counterintelligence threats, insider threats, and other counterintelligence processes and issues;

(B) the conduct and support of counterintelligence inquiries and investigations;

(C) relevant skills necessary for coordination with Federal law enforcement; and

(D) any other skills as the Director determines necessary;

(3) identify and designate specific positions for which an individual shall be required to have a certification described in paragraph (2) prior to filling such a position; and

(4) develop necessary infrastructure and capacity to support the availability of courses under subsection (c) to increase participation by personnel from other components of the intelligence community in the courses offered by the Institute.

(c) TRAINING AND FAMILIARIZATION COURSES.—

(1) IN GENERAL.—The head of the Institute shall—

(A) develop training and familiarization courses at different classification levels, including courses at an unclassified level; and

(B) offer instruction in the courses developed under subparagraph (A) or make training curricula available to other intelligence community components, as appropriate, to support outreach efforts.

(2) AVAILABILITY OF COURSES.—The training and familiarization courses developed under paragraph (1) shall be made available to any of the following that have a need and appropriate clearance, as determined by the Director of the National Counterintelligence and Security Center in consultation with the Director of the Central Intelligence Agency, for a general education on counterintelligence threats, briefings on specific topics, or other training related to counterintelligence:

(A) Federal departments and agencies that are not elements of the intelligence community.

(B) State, local, and Tribal governments.

(C) Private sector entities.

(D) Such other personnel and entities as appropriate.

(d) BASELINE CERTIFICATION COURSE.—

(1) IN GENERAL.—The Institute shall develop, in coordination with the National Counterintelligence and Security Center and the Defense Intelligence Agency, and implement a baseline certification course for all counterintelligence career professionals that aligns the minimum certification requirements of the course and the Defense Counterintelligence Agent Course of the Joint Counterintelligence Training Activity.

(2) AVAILABILITY OF COURSE.—The baseline certification course developed under paragraph (1) shall be made available, on a space-available basis, to all intelligence community professionals and appropriate personnel with appropriate security clearance from any other agency, committee, commission, office, or other establishment in the executive, legislative, or judicial branch of the Federal Government.

137 STAT. 1048        PUBLIC LAW 118–31—DEC. 22, 2023

Mexico.
Drugs and drug
abuse.
Law enforcement
and crime.
Deadline.

## SEC. 7335. CENTRAL INTELLIGENCE AGENCY INTELLIGENCE ASSESS-MENT OF SINALOA CARTEL AND JALISCO CARTEL.

(a) ASSESSMENT.—Not later than 90 days after the date of the enactment of this Act, the Director of the Central Intelligence Agency, in consultation with the heads of the other elements of the intelligence community that the Director determines appropriate, shall submit to the appropriate committees of Congress an intelligence assessment on the transnational criminal organizations known as the Sinaloa Cartel and the Jalisco Cartel.

(b) ELEMENTS.—The intelligence assessment under subsection (a) shall include, with respect to each transnational criminal organization specified in such subsection, a description of the following:

(1) The key leaders, organizational structure, subgroups, presence in the states within Mexico, and cross-border illicit drug smuggling routes of the transnational criminal organization.

(2) The practices used by the transnational criminal organization to import the chemicals used to make synthetic drugs, to produce such drugs, and to smuggle such drugs across the border into the United States.

(3) The main suppliers and the main brokers that supply the transnational criminal organization with precursor chemicals and equipment used in the production of synthetic drugs.

(4) The manner in which the transnational criminal organization is tailoring the fentanyl products of such organization to attract a wider variety of United States consumers, including unwitting users.

(5) The degree to which the transnational criminal organization is using human and technical operations to undermine counternarcotics efforts by United States and Mexican security services.

(6) An estimate of the annual revenue received by the transnational criminal organization from the sale of illicit drugs, disaggregated by drug type.

(7) Any other information the Director of the Central Intelligence Agency determines relevant.

(c) FORM.—The intelligence assessment under subsection (a) may be submitted in classified form.

(d) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.—In this section, the term "appropriate committees of Congress" means—

(1) the congressional intelligence committees;

(2) the Committee on Foreign Relations, the Committee on Homeland Security and Governmental Affairs, the Committee on Banking, Housing, and Urban Affairs, and the Committee on Appropriations of the Senate; and

(3) the Committee on Foreign Affairs, the Committee on Homeland Security, and the Committee on Appropriations of the House of Representatives.

## SEC. 7336. CENTRAL INTELLIGENCE AGENCY INTELLIGENCE ASSESS-MENT WITH RESPECT TO EFFORTS BY PEOPLE'S REPUBLIC OF CHINA TO INCREASE INFLUENCE IN MIDDLE EAST.

Deadline.

(a) ASSESSMENT.—Not later than 90 days after the date of the enactment of this Act, the Director of the Central Intelligence

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1049

Agency, in consultation with such heads of the other elements of the intelligence community that the Director of National Intelligence determines appropriate, shall submit to the appropriate congressional committees an intelligence assessment on efforts by the People's Republic of China to increase its influence, through overt or covert means, with respect to the political, military, economic, or other policies or activities of governments of countries and territories in the Middle East in ways that are detrimental to the national security interests of the United States.

(b) ELEMENTS.—The intelligence assessment required under subsection (a) shall include the following:

(1) A summary of the key relationships that the People's Republic of China has developed, or is seeking to develop, with countries and territories in the Middle East, and the national security objectives that the People's Republic of China intends to advance through such established or emerging relationships.

> Summary.

(2) A description of the relationship between the People's Republic of China and Iran, including in the areas of security cooperation and intelligence sharing.

(3) An identification of the countries and territories in the Middle East in which the People's Republic of China has established, or is seeking to establish, a military or intelligence presence or military or intelligence partnerships.

(4) An assessment of how the People's Republic of China seeks to weaken the role, influence, and relationships of the United States with respect to countries and territories in the Middle East, including through the Global Security Initiative of the People's Republic of China, including through commercial engagements and agreements with state-owned enterprises of the People's Republic of China.

(5) An analysis of whether, and to what degree, efforts by the People's Republic of China to increase its influence among countries and territories in the Middle East are designed to support the broader strategic interests of the People's Republic of China, including with respect to Taiwan.

> Analysis. Taiwan.

(c) FORM.—The intelligence assessment required under subsection (a) may be submitted in classified form.

> Classified information.

(d) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the following:

(A) The congressional intelligence committees.

(B) The Committee on Foreign Relations, the Committee on Armed Services, and the Committee on Appropriations of the Senate.

(C) The Committee on Foreign Affairs, the Committee on Armed Services, the Committee on Appropriations, and the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party of the House of Representatives.

(2) COUNTRIES AND TERRITORIES IN THE MIDDLE EAST.— The term "countries and territories in the Middle East" means—

(A) Algeria;

(B) Bahrain;

(C) Egypt;

(D) Iran;

(E) Iraq;

137 STAT. 1050          PUBLIC LAW 118–31—DEC. 22, 2023

  (F) Israel;
  (G) Jordan;
  (H) Kuwait;
  (I) Lebanon;
  (J) Libya;
  (K) Morocco;
  (L) Oman;
  (M) the Palestinian territories;
  (N) Qatar;
  (O) Saudi Arabia;
  (P) Syria;
  (Q) Tunisia;
  (R) the United Arab Emirates; and
  (S) Yemen.

### SEC. 7337. ASSESSMENT OF AVAILABILITY OF MENTAL HEALTH AND CHAPLAIN SERVICES TO AGENCY EMPLOYEES.

  (a) ASSESSMENT.—The Director of the Central Intelligence Agency shall conduct an assessment on the availability of the services of mental health professionals and chaplains with appropriate security clearances to employees of the Agency. Such assessment shall include—

Evaluation.

    (1) an evaluation of the current availability of and demand for such services globally;
    (2) an assessment of the feasibility of expanding the availability of such services;

Schedule.
Cost estimate.

    (3) information, including a detailed schedule and cost estimate, as to what would be required to increase the availability of such services for Agency employees located in the United States and abroad; and
    (4) information on the feasibility and advisability of requiring that each employee returning from a high risk or high threat tour, as designated by the Director, access the services of a mental health professional, chaplain, or both, at the option of the employee.

  (b) REPORT.—Not later than 210 days after the date of the enactment of this Act, the Director shall submit to the appropriate congressional committees a report on the assessment required by subsection (a).

  (c) DEFINITIONS.—In this section:
    (1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—
      (A) the Permanent Select Committee on Intelligence and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives; and
      (B) the Select Committee on Intelligence and the Subcommittee on Defense of the Committee on Appropriations of the Senate.
    (2) CHAPLAIN.—The term "chaplain" means a member of the Chaplain Corps, as established under section 26 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 3527), whom the Director has certified as meeting common standards for professional chaplaincy and board certification by a national chaplaincy and pastoral care organization or equivalent.
    (3) MENTAL HEALTH PROFESSIONAL.—The term "mental health professional" means an appropriately trained and certified professional counselor, medical professional, psychologist,

psychiatrist, or other appropriate employee, as determined by the Director.

**SEC. 7338. ASSESSMENT BY DIRECTOR OF CENTRAL INTELLIGENCE AGENCY ON CERTAIN EFFECTS OF ABRAHAM ACCORDS.**

Israel

(a) ASSESSMENT.—Not later than 90 days after the date of the enactment of this Act, the Director of the Central Intelligence Agency, in consultation with the heads of the other elements of the intelligence community that the Director determines appropriate, shall submit to the appropriate committees of Congress an assessment of the current effects on the intelligence community of the agreements between Israel and 4 other foreign countries, collectively known as the Abraham Accords, and of the potential effects on the intelligence community if the Abraham Accords were to be expanded to additional foreign countries.

Determination.

(b) ELEMENTS.—The assessment under subsection (a) shall include, with respect to the agreements referred to in such subsection, the following:

Foreign countries.

(1) A description of whether, and in what respects, the agreement between Israel and Bahrain has resulted in the intelligence community obtaining new and valuable insights regarding national intelligence priorities.

(2) A description of whether, and in what respects, the agreement between Israel and Morocco has resulted in the intelligence community obtaining new and valuable insights regarding national intelligence priorities.

(3) A description of whether, and in what respects, the agreement between Israel and the United Arab Emirates has resulted in the intelligence community obtaining new and valuable insights regarding national intelligence priorities.

(4) A description of whether, and in what respects, the agreement between Israel and Sudan has resulted in the intelligence community obtaining new and valuable insights regarding national intelligence priorities.

(5) An assessment of whether, and in what respects, additional agreements between Israel and other foreign countries to normalize or otherwise enhance relations would result in the intelligence community obtaining new and valuable insights regarding national intelligence priorities.

(c) FORM.—The assessment under subsection (a) may be submitted in classified form.

Classified information.

(d) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.—In this section, the term "appropriate committees of Congress" means—

(1) the congressional intelligence committees;

(2) the Committee on Appropriations of the Senate; and

(3) the Committee on Appropriations of the House of Representatives.

**SEC. 7339. REPORTING AND INVESTIGATING ALLEGATIONS OF SEXUAL ASSAULT AND SEXUAL HARASSMENT WITHIN THE CENTRAL INTELLIGENCE AGENCY.**

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

50 USC 3531 note.

(1) sexual assault and sexual harassment arise from, and are often indicative of, an environment where toxic, provocative, and sometimes significantly inappropriate behavior is tolerated;

(2) when supervisors and senior leaders at headquarters and in the field are among the offenders and facilitate a work

climate in which toxic and disrespectful behavior is tolerated, harassment and even assault will often go unaddressed and unpunished;

(3) while establishing clear policies and procedures and enhancing training are necessary first steps toward protecting victims and establishing stronger internal mechanisms for preventing and responding to future sexual assault and sexual harassment within the Central Intelligence Agency, comprehensive culture change driven by Agency leadership will be necessary to accomplish impactful and enduring improvement; and

(4) it is vital for the Central Intelligence Agency to maintain an independent and neutral person with whom all employees at all levels, supervisors and non-supervisors, may speak confidentially, informally, and off-the-record about work-related concerns or questions.

(b) SEXUAL ASSAULT AND SEXUAL HARASSMENT WITHIN THE AGENCY.—The Central Intelligence Agency Act of 1949 (50 U.S.C. 3501 et seq.) is amended by adding at the end the following new section:

50 USC 3531.

**"SEC. 30. SEXUAL ASSAULT AND SEXUAL HARASSMENT WITHIN THE AGENCY.**

"(a) RESPONSIBILITIES OF DIRECTOR.—The Director shall carry out the following responsibilities:

"(1) Establishing professional and uniform training for employees assigned to working with all aspects of the response of the Agency to allegations of sexual assault and sexual harassment.

"(2) Developing and implementing policies and procedures to protect the confidentiality of employees who report sexual assault or sexual harassment and to mitigate negative effects on the reputation or career of such an employee as a result of such a report.

"(3) Developing and implementing documented standards for—

"(A) appropriate mitigation and protection measures for individuals who make allegations of a sexual assault or sexual harassment to be put in place while an investigation proceeds;

"(B) appropriate employee consequences to be imposed based on the findings of an inquiry or investigation into a substantiated allegation of sexual assault or sexual harassment;

"(C) appropriate career path protection for all employees involved in an incident resulting in a reported allegation of sexual assault or sexual harassment while an administrative or criminal investigation or review of the allegation is pending; and

"(D) mitigation measures to protect employees and mission execution while such allegations are being addressed.

"(4) Articulating and enforcing norms, expectations, practices, and policies, including with respect to employee promotions and assignments, that are published for the workforce and designed to promote a healthy workplace culture that is inhospitable to sexual assault and sexual harassment.

"(5) Developing and issuing workforce messaging to inform Agency employees of policies, procedures, resources, and points

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1053

of contact to obtain information related to, or to report, sexual assault or sexual harassment globally.

"(6) Developing and implementing sexual assault and sexual harassment training for all Agency employees that—

"(A) is designed to strengthen individual knowledge, skills, and capacity to prevent and respond to sexual assault and sexual harassment;

"(B) includes onboarding programs, annual refresher training, and specialized leadership training; and

"(C) includes details of the definitions of sexual assault and sexual harassment, the distinction between such terms, and what does or does not constitute each.

"(7) Developing and implementing processes and procedures applicable to personnel involved in providing the training referred to in paragraph (6) that—

"(A) are designed to ensure seamless policy consistency and mechanisms for submitting reports of sexual assault and sexual harassment in all training environments; and

"(B) include requirements for in-person training that—

"(i) covers the reporting processes for sexual assault and sexual harassment that are specific to training environments for students and trainers; and

"(ii) shall be provided at an appropriate time during the first 5 days of any extended or residential training course.

"(8) Developing and implementing, in consultation with the Victim Advocacy Specialists of the Federal Bureau of Investigation, appropriate training requirements, policies, and procedures applicable to all employees whose professional responsibilities include interaction with people making reports alleging sexual assault or sexual harassment.

"(9) Developing and implementing procedures under which current and former employees of the Agency who have reported an allegation of sexual assault or sexual harassment may obtain documents and records related to such a report, as appropriate and upon request.

"(10) Developing and implementing procedures under which an employee who makes a restricted or unrestricted report containing an allegation of a sexual assault or sexual harassment may transfer out of the current assignment or location of the employee, upon the request of the employee making the report. Such procedures shall be consistent with the privilege established in section 31.

"(11) Developing policies and procedures for the Special Victim Investigator, as applicable, to facilitate outside engagement requests of employees reporting allegations of sexual assault or sexual harassment as described in sections 31 and 32.

"(12) Coordinating the response of the Agency to allegations of sexual assault and sexual harassment.

"(b) SEMIANNUAL REPORT.—Not less frequently than once every 180 days, the Director shall submit to the Select Committee on Intelligence of the Senate and the Permanent Select Committee on Intelligence of the House of Representatives a report on the activities of all Agency offices responsible for preventing, investigating, adjudicating, and addressing claims of sexual assault or sexual harassment. The Director shall personally review, approve,                    Review.

and submit each report under this subsection on a nondelegable basis. Each such report shall include—

"(1) for the period covered by the report—

"(A) the number of new allegations of sexual assault and sexual harassment reported to any Agency office, disaggregated by restricted and unrestricted reports;

"(B) the number of new or ongoing cases in which the Sexual Harassment/Assault Response and Prevention Office has provided victim advocacy services;

"(C) a description of all training activities related to sexual assault and sexual harassment carried out Agency-wide, and the number of such trainings conducted; and

Time period.

"(2) for the period beginning on the date of the enactment of the Intelligence Authorization Act for Fiscal Year 2024 and ending on the last day of the period covered by the report—

"(A) the total number of allegations of sexual assault and sexual harassment;

"(B) the disposition of each report of such an allegation;

"(C) any corrective action taken in response to each such report;

"(D) the number of such allegations that were not substantiated; and

"(E) the number of employee reassignment and relocation requests, including—

"(i) the number of such requests that were granted;

"(ii) the number of such requests that were denied; and

"(iii) for any such request that was denied, the position of the individual who denied the request and the reason for denial.

"(c) APPLICABILITY.—

"(1) IN GENERAL.—The policies developed pursuant to this section shall apply to each of the following:

"(A) Any employee of the Agency.

"(B) Any person other than an Agency employee who alleges they were sexually assaulted or harassed at a facility associated with the Agency or during the performance of a function associated with the Agency. If such person is an employee of an industrial contractor, the contracting officer for the relevant contract shall coordinate with the contractually identified representative for the prime contractor in a manner consistent with section 31.

Coordination.

"(2) RELATION TO EXISTING REGULATIONS.—The policies developed pursuant to this section for handling allegations of sexual harassment shall be in addition to the requirements of part 1614 of title 29, Code of Federal Regulations, or successor regulations.".

(c) REPORTING AND INVESTIGATION OF ALLEGATIONS OF SEXUAL ASSAULT AND SEXUAL HARASSMENT.—Such Act is further amended by adding at the end the following new section:

50 USC 3532.

**"SEC. 31. REPORTING AND INVESTIGATION OF ALLEGATIONS OF SEXUAL ASSAULT AND SEXUAL HARASSMENT.**

"(a) POLICIES RELATING TO RESTRICTED AND UNRESTRICTED REPORTING OF SEXUAL ASSAULT AND SEXUAL HARASSMENT.—

Regulations.

"(1) IN GENERAL.—The Director shall develop and implement policies, regulations, personnel training, and workforce

education to establish and provide information about restricted reports and unrestricted reports of allegations of sexual assault and sexual harassment within the Agency in accordance with this subsection.

"(2) WORKFORCE EDUCATION.—Workforce education developed under paragraph (1) shall be designed to clearly inform Agency employees of the differences between restricted and unrestricted reporting of allegations of sexual assault and sexual harassment, and which individual or office within the Agency is responsible for receiving each type of report.

"(3) RELATIONSHIP TO THE SEXUAL HARASSMENT/ASSAULT RESPONSE AND PREVENTION OFFICE.—To the extent consistent with preserving a victim's complete autonomy, the policies, regulations, training, and messaging described in this subsection shall—

"(A) encourage Agency employees to make restricted or unrestricted reports of sexual assault and sexual harassment to the Sexual Harassment/Assault Response and Prevention Office;

"(B) encourage Agency employees to use the Sexual Harassment/Assault Response and Prevention Office as the primary point of contact and entry point for Agency employees to make restricted or unrestricted reports of sexual assault and sexual harassment;

"(C) encourage Agency employees to seek the victim advocacy services of the Sexual Harassment/Assault Response and Prevention Office after reporting an allegation of sexual assault or sexual harassment, to the extent consistent with the victim's election; and

"(D) encourage Agency employees and individuals who receive disclosures of sexual assault and sexual harassment to provide the report to, and receive guidance from, the Sexual Harassment/Assault Response and Prevention Office.

"(b) ELECTION.—Any person making a report containing an allegation of a sexual assault or sexual harassment shall elect whether to make a restricted report or an unrestricted report. Once an election is made to make an unrestricted report, such election may not be changed.

"(c) UNRESTRICTED REPORTS.—

"(1) ASSISTANCE.—A person who elects to make an unrestricted report containing an allegation of sexual assault or sexual harassment may seek the assistance of another employee of the Agency with taking the action required under paragraph (2).

"(2) ACTION REQUIRED.—A person electing to make an unrestricted report containing an allegation of sexual assault or sexual harassment shall submit the report to the Sexual Harassment/Assault Response and Prevention Office. To the extent consistent with the person's election after consultation with the Sexual Harassment/Assault Response and Prevention Office, the Sexual Harassment/Assault Response and Prevention Office may facilitate the person's contact with any other appropriate Agency official or office, and make available to Agency employees the following:

"(A) A list of physicians and mental health care providers (including from the private sector, as applicable)

Lists.

who have experience with the physical and mental health care needs of the Agency workforce.

"(B) A list of chaplains and religious counselors who have experience with the needs of the Agency workforce, including information regarding access to the Chaplain Corps established under section 26.

"(C) Information regarding how to select and retain private attorneys who have experience with the legal needs of the Agency workforce, including detailed information on the process for the appropriate sharing of information with retained private attorneys.

"(3) RULE OF CONSTRUCTION.—The inclusion of any person on a list maintained or made available pursuant to subsection (c)(2) shall not be construed as an endorsement of such person (or any service furnished by such person), and neither the Sexual Harassment/Assault Response and Prevention Office nor the Agency shall be liable, as a result of such inclusion, for any portion of compensable injury, loss, or damage attributable to such person or service.

"(d) RESTRICTED REPORTS.—

"(1) PROCESS FOR MAKING REPORTS.—A person who elects to make a restricted report containing an allegation of sexual assault or sexual harassment shall submit the report to the Sexual Harassment/Assault Response and Prevention Office.

"(2) ACTION REQUIRED.—A restricted report containing an allegation of sexual assault or sexual harassment—

"(A) shall be treated by the person who receives the report in the same manner as a communication covered by the privilege set forth in this section;

"(B) shall not result in a referral to law enforcement or commencement of a formal administrative investigation, unless the victim elects to change the report from a restricted report to an unrestricted report;

"(C) in a case requiring an employee reassignment, relocation, or other mitigation or protective measures, shall result only in actions that are managed in a manner to limit, to the extent possible, the disclosure of any information contained in the report;

Exemption.

"(D) shall be exempt from any Federal or, to the maximum extent permitted by the Constitution, State reporting requirements, including the requirements under section 535(b) of title 28, United States Code, section 17(b)(5) of this Act, relevant provisions of Executive Order 12333 (50 U.S.C. 3001 note; relating to United States intelligence activities), or successor order, Executive Order 13462 (50 U.S.C. 3001 note; relating to President's intelligence advisory board and intelligence oversight board), or successor order, title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 et seq.), title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.), and sections 501 and 505 of the Rehabilitation Act of 1973 (29 U.S.C. 791 and 794a), except when reporting is necessary to prevent or mitigate an imminent threat of serious bodily harm.

"(3) RULE OF CONSTRUCTION.—The receipt of a restricted report submitted under subsection (d) shall not be construed

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1057

as imputing actual or constructive knowledge of an alleged incident of sexual assault or sexual harassment to the Agency for the purpose of the Agency's responsibility to exercise reasonable care to take immediate and appropriate corrective action to prevent and correct harassing behavior.

"(e) PRIVILEGED COMMUNICATIONS WITH AGENCY EMPLOYEES.—

"(1) IN GENERAL.—A victim shall be entitled to maintain and assert a privilege against disclosure of, and be able to prevent any other person from disclosing, any confidential communication made between the victim and any employee of the Sexual Harassment/Assault Response and Prevention Office, if such communication was made for the purpose of facilitating advice or assistance to the victim in accordance with this section. A victim may consent to additional disclosures.

"(2) WHEN A COMMUNICATION IS CONFIDENTIAL.—A communication is confidential for the purposes of this section if made in the course of the relationship between the victim and any employee of the Sexual Harassment/Assault Response and Prevention Office and not intended to be disclosed to third persons, other than those to whom disclosure is made in furtherance of the provision of advice or assistance to the victim or those reasonably necessary for such transmission of the communication.

"(3) MAINTENANCE OF PRIVILEGE.—The privilege is maintained by the victim. A victim may authorize the Sexual Harassment/Assault Response and Prevention Office employee who received the communication to assert the privilege on his or her behalf, with confidentiality. The Sexual Harassment/Assault Response and Prevention Office employee who received the communication may assert the privilege on behalf of the victim. The authority of such Sexual Harassment/Assault Response and Prevention Office employee to so assert the privilege is presumed in the absence of evidence to the contrary.

"(4) EXCEPTIONS.—The privilege shall not apply to prevent limited disclosures necessary under the following circumstances:

"(A) When the victim is deceased.

"(B) When the Sexual Harassment/Assault Response and Prevention Office employee who received the communication has a reasonable belief that a victim's mental or emotional condition makes the victim a danger to any person, including the victim.

"(C) When the otherwise privileged communication clearly contemplates the future commission of a crime or breach of national security, or aiding any individual to commit or plan to commit what the victim knew or reasonable should have known to be a crime or breach of national security.

"(D) When disclosure of a communication is constitutionally required.

"(5) HANDLING OF EXCEPTIONS.—When the Sexual Harassment/Assault Response and Prevention Office employee determines that information requires an exception to the privilege, the Sexual Harassment/Assault Response and Prevention Office employee who received the communication will protect information pertaining to the facts and circumstances surrounding

Determination.

137 STAT. 1058          PUBLIC LAW 118–31—DEC. 22, 2023

the underlying sexual assault or sexual harassment allegations to the greatest extent possible.

"(f) INCIDENT REPORTS WHEN VICTIM OR ALLEGED PERPETRATOR IS AN AGENCY EMPLOYEE.—

Requirement.

"(1) INCIDENT REPORTING POLICY.—The Director shall establish and maintain a policy under which—

"(A) the head of the Sexual Harassment/Assault Response and Prevention Office is required to submit a written incident report not later than 8 days after receiving an unrestricted report containing an allegation of sexual assault or sexual harassment; and

"(B) each such incident report required under subparagraph (A) shall be provided to—

"(i) the Director of the Agency;

"(ii) the Chief Operating Officer of the Agency;

"(iii) the Special Victim Investigator; and

"(iv) such other individuals as the Director determines appropriate.

"(2) PURPOSE.—The purpose of an incident report required under paragraph (1) is—

Records.

"(A) to record the details about actions taken or in progress to provide the necessary care and support to the victim of the alleged incident;

"(B) to document the referral of the allegations to the appropriate investigatory or law enforcement agency; and

Notice.

"(C) to provide initial formal notification of the alleged incident.

"(3) ELEMENTS.—Each incident report required under paragraph (1) shall include each of the following:

"(A) The time, date, and location of the alleged sexual assault or sexual harassment.

"(B) An identification of the type of offense or harassment alleged.

"(C) An identification of the assigned office and location of the victim.

"(D) An identification of the assigned office and location of the alleged perpetrator, including information regarding whether the alleged perpetrator has been temporarily transferred or removed from an assignment or otherwise restricted, if applicable.

"(E) A description of any post-incident actions taken in connection with the incident, including—

"(i) referral to any services available to victims, including the date of each referral;

Notification.

"(ii) notification of the incident to appropriate investigatory organizations, including the organizations notified and dates of notifications; and

"(iii) issuance of any personal protection orders or steps taken to separate the victim and the alleged perpetrator within their place of employment.

"(F) Such other elements as the Director determines appropriate.

"(g) COMMON PERPETRATOR NOTICE REQUIREMENT.—

"(1) UNRESTRICTED REPORTS.—Upon receipt of an incident report under subsection (f)(1) containing an allegation of sexual assault or sexual harassment against an individual known to be the subject of at least one allegation of sexual assault or

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 1059

sexual harassment by another reporter, the Special Victim Investigator shall notify each of the following of all existing allegations against the individual:

"(A) The Director of the Agency.

"(B) The Chief Operating Officer of the Agency.

"(C) The Sexual Harassment/Assault Response and Prevention Office.

"(D) If the individual is an Agency employee, the head of the directorate employing the individual and the first-level supervisor of the individual.

"(E) If the individual is an Agency contractor, the Acquisition Group Chief and the contracting officer for the relevant contract. For industrial contractor personnel, the contracting officer shall notify the contractually identified representative for the prime contractor.

"(F) The Inspector General of the Agency.

"(G) Such other individuals as the Director determines appropriate.

Determination.

"(2) RESTRICTED REPORTS.—In the case of restricted reports under subsection (d), the Sexual Harassment/Assault Response and Prevention Office shall notify any victims known to have filed a restricted report against an individual known to be the subject of at least one unrestricted allegation of sexual assault or sexual harassment by another reporter that another allegation has been made against the same individual who is the alleged subject of the victim's report at the time of the victim's initial report or any time thereafter upon receipt of any subsequent unrestricted report under subsection (c) or a common perpetrator notice under paragraph (1) of this subsection.

Notification.

"(h) APPLICABILITY.—The policies developed pursuant to this section shall apply to each of the following:

"(1) Any employee of the Agency.

"(2) Any person other than an Agency employee who alleges they were sexually assaulted or harassed at a facility associated with the Agency or during the performance of a function associated with the Agency.

"(i) RECORDS.—

"(1) IN GENERAL.—The Director shall establish a system for the tracking and, in accordance with chapter 31 of title 44, United States Code (commonly known as the 'Federal Records Act of 1950'), long-term temporary retention of all Agency records related to any investigation into an allegation of sexual assault or sexual harassment made in an unrestricted report, including any related medical documentation.

"(2) RELATION TO PRIVILEGE.—Any Agency records created under the authority of this section are subject to the privileges described in this section. Routine records management activities conducted by authorized Agency personnel with respect to such records, including maintaining, searching, or dispositioning of records, shall not result in a waiver of those privileges.

"(3) APPLICABILITY TO FOIA.—This section shall constitute a withholding statute pursuant to section 552(b)(3) of title 5, United States Code, with respect to any information that may reveal the identity of a victim of sexual assault or sexual harassment, or any information subject to the privileges described in this section.

"(j) RELATIONSHIP TO THE OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY.—In the case of a restricted report of sexual harassment, such report shall not result in a referral to the Office of Equal Employment Opportunity, unless the victim elects to change the report from a restricted report to an unrestricted report. In the case of an unrestricted report, the Special Victim Investigator, the Office of Equal Employment Opportunity, law enforcement, or any other appropriate investigative body, or any appropriate combination thereof, may investigate the unrestricted report, as appropriate. Policies and procedures developed pursuant to this section are intended to offer victims options in addition to the process described in part 1614 of title 29, Code of Federal Regulations, or successor regulations.

"(k) DEFINITIONS.—In this section:

"(1) REPORT.—The term 'report' means a communication—

"(A) by a victim;

"(B) that describes information relating to an allegation of sexual assault or sexual harassment;

"(C) to an individual eligible to document an unrestricted or restricted report; and

"(D) that the victim intends to result in formal documentation of an unrestricted or restricted report.

"(2) VICTIM.—The term 'victim' means a person who alleges they have suffered direct physical or emotional harm because they were subjected to sexual assault or sexual harassment.".

(d) SPECIAL VICTIM INVESTIGATOR.—Such Act is further amended by adding at the end the following new section:

50 USC 3533.

## "SEC. 32. SPECIAL VICTIM INVESTIGATOR.

"(a) ESTABLISHMENT.—The Director shall establish in the Office of Security a Special Victim Investigator, who shall be authorized to investigate or facilitate the investigation of unrestricted reports containing allegations of sexual assault and sexual harassment. The person appointed as the Special Victim Investigator shall be an appropriately credentialed Federal law enforcement officer and may be detailed or assigned from a Federal law enforcement entity.

"(b) RESPONSIBILITIES.—The Investigator shall—

"(1) at the election of a victim (as defined in section 31(k)), be authorized to conduct internal Agency inquiries, investigations, and other fact-finding activities related to allegations of sexual harassment, which may be separate and in addition to any inquiry or investigation conducted by the Office of Equal Employment Opportunity;

"(2) conduct and manage internal Agency inquiries, investigations, and other fact-finding activities related to specific allegations of sexual assault;

"(3) testify in a criminal prosecution in any venue, where appropriate;

"(4) serve as the case agent for a criminal investigation in any venue, where appropriate;

"(5) facilitate engagement with other law enforcement relating to such allegations, where appropriate, including coordinating on the matter and any related matters with other Federal, State, local, and Tribal law enforcement agencies, as

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1061

necessary and appropriate, pursuant to regulations, requirements, and procedures developed in consultation with the Federal Bureau of Investigation, the Department of State's Diplomatic Security Service, or other Federal, State, local, or Tribal law enforcement authorities, for any such inquiries, investigations, or other fact-finding activities;

"(6) develop and implement policies and procedures necessary for the Special Victim Investigator or any law enforcement partner to conduct effective investigations and also protect sensitive information;

"(7) serve as the primary internal investigative body in the Agency for allegations of sexual assault, except that, in the case of an allegation of a sexual assault involving an employee of the Office of Security, the Special Victim Investigator shall coordinate with the Inspector General or appropriate criminal investigators employed by a Federal, State, local, or Tribal law enforcement entity, as necessary, to maintain the integrity of the investigation and mitigate potential conflicts of interest;

"(8) establish and coordinate clear policies regarding which agency should take the lead on conducting, or be the lead in coordinating with local law enforcement when applicable, investigations of sexual assault and sexual harassment overseas; and

"(9) sharing information with the Sexual Harassment/Assault Response and Prevention Office, including providing a copy of materials related to investigations with such redactions as deemed necessary, to facilitate the support and advocacy of such Office for victims of alleged sexual assault or sexual harassment.

"(c) TIMEFRAME FOR INVESTIGATIONS.—The Special Victim Investigator shall—

"(1) ensure that any Special Victim Investigator investigation into an allegation of a sexual assault or sexual harassment contained in an unrestricted report submitted under section 31 is completed by not later than 60 days after the date on which the report is referred to the Special Victim Investigator; and

Deadline.

"(2) if the Special Victim Investigator determines that the completion of an investigation will take longer than 60 days—

Determination.

"(A) not later than 60 days after the date on which the report is referred to the Special Victim Investigator, submit to the Director a request for an extension that contains a summary of the progress of the investigation, the reasons why the completion of the investigation requires additional time, and a plan for the completion of the investigation; and

Extension.
Summary.
Plan.

"(B) provide to the person who made the report and the person against whom the allegation in the report was made notice of the extension of the investigation.".

Notification.
Notice.

(e) IMPLEMENTATION AND REPORTING REQUIREMENTS.—

(1) DEADLINE FOR IMPLEMENTATION.—Not later than 180 days after the date of the enactment of this Act, the Director of the Central Intelligence Agency shall—

(A) complete an Agency climate assessment—

50 USC 3531
note.
Assessment.

137 STAT. 1062          PUBLIC LAW 118–31—DEC. 22, 2023

(i) which does not request any information that would make an Agency employee or an Agency employee's position identifiable;

(ii) for the purposes of—

(I) preventing and responding to sexual assault and sexual harassment; and

(II) examining the prevalence of sexual assault and sexual harassment occurring among the Agency's workforce; and

(iii) that includes an opportunity for Agency employees to express their opinions regarding the manner and extent to which the Agency responds to allegations of sexual assault and complaints of sexual harassment, and the effectiveness of such response;

(B) submit to the appropriate congressional committees the findings of the Director with respect to the climate assessment completed pursuant to subparagraph (A);

(C) establish and implement the policies required under sections 30 and 31 of the Central Intelligence Agency Act of 1949, as added by subsections (b) and (c), respectively;

(D) consolidate the responsibilities of the Director under section 30 of the Central Intelligence Agency Act of 1949 in a single Office, as determined by the Director; and

(E) establish the Special Victim Investigator, as required by section 32 of the Central Intelligence Agency Act of 1949, as added by subsection (d).

(2) REPORT.—Not later than 90 days after the date of the enactment of this Act, and not less frequently than once every 90 days thereafter for 2 years, the Director of the Central Intelligence Agency shall submit to the appropriate congressional committees a report on the implementation of this section and the amendments made by this section. The Director shall personally review, approve, and submit each report under this paragraph on a nondelegable basis.

(3) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.— In this subsection, the term "appropriate congressional committees" means—

(A) the Select Committee on Intelligence and the Subcommittee on Defense of the Committee on Appropriations of the Senate; and

(B) the Permanent Select Committee on Intelligence and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

# Subtitle C—Matters Relating to Defense Intelligence and Overhead Architecture

### SEC. 7341. MODIFICATION OF REPORTING REQUIREMENT FOR ALL-DOMAIN ANOMALY RESOLUTION OFFICE.

Section 1683(k)(1) of the National Defense Authorization Act for Fiscal Year 2022 (50 U.S.C. 3373(k)(1)), as amended by section 6802(a) of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117–263), is further amended—

(1) in the heading, by striking "DIRECTOR OF NATIONAL INTELLIGENCE AND SECRETARY OF DEFENSE" and inserting "ALL-DOMAIN ANOMALY RESOLUTION OFFICE"; and

(2) in subparagraph (A), by striking "Director of National Intelligence and the Secretary of Defense shall jointly" and inserting "Director of the Office shall".

### SEC. 7342. DEFENSE INTELLIGENCE AGENCY ASSESSMENT OF STRATEGIC COMPETITION IN LATIN AMERICA AND THE CARIBBEAN.

(a) ASSESSMENT.—Not later than 120 days after the date of the enactment of this Act, the Director of the Defense Intelligence Agency, in consultation with the heads of the other elements of the intelligence community that the Director determines appropriate, shall submit to the appropriate congressional committees an intelligence assessment on the level of intelligence and defense cooperation between covered countries and—   *Deadline.*

(1) the People's Republic of China; and   *China.*
(2) the Russian Federation.   *Russia.*

(b) ELEMENTS.—The intelligence assessment under subsection (a) shall include a description of any security-related cooperation or engagement between covered countries and the People's Republic of China or the Russian Federation in the following areas:

(1) Strategic dialogue.
(2) Training or professional military education.
(3) Defense agreements.
(4) Intelligence sharing agreements.
(5) Arms transfers.
(6) Defense equipment transfers.
(7) Military exercises.
(8) Joint operations.
(9) Permanent military presence.
(10) Space cooperation.
(11) Any other area the Director of the Defense Intelligence Agency determines appropriate.

(c) FORM.—The assessment under subsection (a) may be provided in classified form.

(d) FORMAT.—To the extent practicable, the Director shall present the information contained in the assessment under subsection (a) in the format of a chart or other graphic.

(e) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the following:

(A) The congressional intelligence committees.
(B) The congressional defense committees, as such term is defined in section 101(a) of title 10, United States Code.
(C) The Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives.

(2) COVERED COUNTRY.—The term "covered country" means Mexico and each foreign country or territory in Central or South America or in the Caribbean.

### SEC. 7343. FUNDING LIMITATIONS RELATING TO UNIDENTIFIED ANOMALOUS PHENOMENA.

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

137 STAT. 1064          PUBLIC LAW 118–31—DEC. 22, 2023

(A) the Select Committee on Intelligence, the Committee on Armed Services, and the Committee on Appropriations of the Senate; and

(B) the Permanent Select Committee on Intelligence, the Committee on Armed Services, and the Committee on Appropriations of the House of Representatives.

(2) CONGRESSIONAL LEADERSHIP.—The term "congressional leadership" means—

(A) the majority leader of the Senate;

(B) the minority leader of the Senate;

(C) the Speaker of the House of Representatives; and

(D) the minority leader of the House of Representatives.

(3) UNIDENTIFIED ANOMALOUS PHENOMENA.—The term "unidentified anomalous phenomena" has the meaning given such term in section 1683(n) of the National Defense Authorization Act for Fiscal Year 2022 (50 U.S.C. 3373(n)).

(b) LIMITATIONS.—None of the funds authorized to be appropriated or otherwise made available by this division may be obligated or expended in support of any activity involving unidentified anomalous phenomena protected under any form of special access or restricted access limitation unless the Director of National Intelligence has provided the details of the activity to the appropriate committees of Congress and congressional leadership, including for any activities described in a report released by the All-domain Anomaly Resolution Office in fiscal year 2024.

(c) LIMITATION REGARDING INDEPENDENT RESEARCH AND DEVELOPMENT.—Independent research and development funding relating to unidentified anomalous phenomena shall not be allowable as indirect expenses for purposes of contracts covered by such instruction, unless such material and information is made available to the appropriate congressional committees and leadership.

# Subtitle D—Matters Relating to National Security Agency, Cyber, and Commercial Cloud Enterprise

## SEC. 7351. CONGRESSIONAL NOTIFICATION BY NATIONAL SECURITY AGENCY OF INTELLIGENCE COLLECTION ADJUSTMENTS.

The National Security Agency Act of 1959 (50 U.S.C. 3601 et seq.) is amended by adding at the end the following new section:

50 USC 3620.

**"SEC. 22. CONGRESSIONAL NOTIFICATION OF INTELLIGENCE COLLECTION ADJUSTMENTS.**

Deadline.
Determination.

"(a) NOTIFICATION.—Not later than 30 days after the date on which the Director of the National Security Agency determines the occurrence of an intelligence collection adjustment, the Director shall submit to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a notification of the intelligence collection adjustment.

"(b) DEFINITIONS.—In this section:

"(1) CONGRESSIONAL INTELLIGENCE COMMITTEES.—The term 'congressional intelligence committees' has the meaning given

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1065

that term in section 3 of the National Security Act of 1947 (50 U.S.C. 3003).

"(2) INTELLIGENCE COLLECTION ADJUSTMENT.—The term 'intelligence collection adjustment' includes a change by the United States Government to a policy on intelligence collection or the prioritization thereof that results in a significant loss of intelligence.".

### SEC. 7352. MODIFICATIONS TO ENFORCEMENT OF CYBERSECURITY REQUIREMENTS FOR NATIONAL SECURITY SYSTEMS.

Section 6309 of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117–263) is amended—

    (1) by redesignating subsection (e) as subsection (f); and

    (2) by inserting after subsection (d) the following new subsection:

44 USC 3557 note.

"(e) IMPLEMENTATION REPORT.—Each head of an element of the intelligence community that owns or operates a national security system shall submit to the congressional intelligence committees not later than 90 days after the date of the enactment of this subsection a plan detailing the cost and schedule requirements necessary to meet all of the cybersecurity requirements for national security systems by the end of fiscal year 2026.".

Plan.

### SEC. 7353. SUPPORT BY INTELLIGENCE COMMUNITY FOR CERTAIN CROSS-FUNCTIONAL TEAM OF DEPARTMENT OF DEFENSE.

(a) ACCESS TO INFORMATION.—Upon request by the cross-functional team of the Department of Defense established under section 910 of the National Defense Authorization Act of Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 111 note) (in this section referred to as the "cross-functional team"), and consistent with the protection of intelligence sources and methods, the head of any element of the intelligence community shall provide such team with access to any information (including any intelligence reporting, analysis, or finished intelligence product) of the element potentially relevant to the duties of such team required under subsection (b)(1) of such section.

(b) RULE OF CONSTRUCTION.—Nothing in subsection (a) shall be construed as waiving the Health Insurance Portability and Accountability Act of 1996 (Public Law 104–191) or any other applicable law regarding privacy or the protection of health information.

(c) STAFFING OF CROSS-FUNCTIONAL TEAM BY CERTAIN ELEMENTS.—

    (1) STAFFING.—

        (A) COVERED ELEMENTS.—The head of each covered element shall detail or assign to the cross-functional team, including through a joint duty assignment (as applicable), intelligence or counterintelligence personnel of that covered element in such numbers as the head, in consultation with such team, determines necessary to support such team in fulfilling the duties required under section 910(b)(1) of the National Defense Authorization Act of Fiscal Year 2022 (Public Law 117–81; 10 U.S.C. 111 note).

        (B) OTHER ELEMENTS.—The head any element that is not a covered element may only detail or assign to the cross-functional team, including through a joint duty

assignment (as applicable), intelligence or counterintelligence personnel of such element if the head of such element—

(i) receives written concurrence from the Director of National Intelligence and the Secretary of Defense regarding the specific personnel to be detailed or assigned; and

Submission.
Notification.

(ii) submits to the congressional intelligence committees, the Committee on Armed Services of the Senate, and the Committee on Armed Services of the House of Representatives a notification describing the personnel to be detailed or assigned and the rationale for participation in the cross functional team.

(2) NATIONAL SECURITY AGENCY.—In carrying out paragraph (1) with respect to the National Security Agency, the Director of the National Security Agency shall ensure there is detailed or assigned to the cross-functional team at least 1 individual determined appropriate by the Director, who, while so detailed or assigned, shall provide such team with technical expertise of the National Security Agency relevant to the fulfilment of the duties referred to in paragraph (1).

(d) ADDITIONAL DETAIL AUTHORITY.—Upon request by the cross-functional team, the head of any element of the intelligence community may detail to such team personnel of the element to provide intelligence, counterintelligence, or related support.

(e) COVERED ELEMENT DEFINED.—In this section, the term "covered element" means the following:

(1) The National Security Agency.

(2) The Defense Intelligence Agency.

(3) The intelligence elements of the Army, the Navy, the Air Force, and the Marine Corps.

## SEC. 7354. COMMERCIAL CLOUD ENTERPRISE NOTIFICATION.

(a) NOTIFICATION REQUIREMENT.—Not later than 90 days after the date of the enactment of this Act, and on a quarterly basis thereafter, the Director of the Central Intelligence Agency shall submit to the appropriate committees of Congress a notification relating to the Commercial Cloud Enterprise contract entered into by the Director of the Central Intelligence Agency in November 2020 for commercial cloud services for the intelligence community, which shall include—

(1) the number and value of all task orders issued under such contract, broken down by vendor, for each element of the intelligence community;

(2) the duration of each task order;

(3) the number of sole source task orders issued compared to the number of task orders issued on a competitive basis under such contract; and

Update.

(4) with respect to each vendor authorized to provide commercial cloud services under such contract, an update on the status of the security accreditation and authority to operate decision of each vendor.

(b) DATA SHARING.—The head of each element of the intelligence community shall share such data with the Director of the Central Intelligence Agency as necessary to prepare the notification required under subsection (a).

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1067

(c) SUNSET.—The requirement to submit the notification under subsection (a) shall terminate on the date that is 3 years after the date of the enactment of this Act.

(d) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.— In this section, the term "appropriate committees of Congress" means—

 (1) the congressional intelligence committees;

 (2) the Committee on Appropriations of the Senate; and

 (3) the Committee on Appropriations of the House of Representatives.

## SEC. 7355. COMMERCIAL CLOUD ENTERPRISE SOLE SOURCE TASK ORDER NOTIFICATION REQUIREMENT.

(a) NOTIFICATION REQUIREMENT.—Not later than 90 days after the date of the enactment of this Act, and on a semiannual basis thereafter, the head of each element of the intelligence community shall submit to the appropriate committees of Congress a notification with respect to any sole source task order awarded by such head under the contract relating to the Commercial Cloud Enterprise entered into by the Director of the Central Intelligence Agency in November 2020 for commercial cloud services for the intelligence community.

*Deadline.*

(b) CONTENTS.—Each notification required under subsection (a) shall include, with respect to the task order concerned—

 (1) a description of the order;

 (2) the duration of the order;

 (3) a summary of services provided under the order;   *Summary.*

 (4) the value of the order;

 (5) the justification for awarding the order on a sole source basis; and

 (6) an identification of the vendor awarded the order.

(c) SUNSET.—The requirement to submit the notification under subsection (a) shall terminate on the date that is 3 years after the date of the enactment of this Act.

(d) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.— In this section, the term "appropriate committees of Congress" means—

 (1) the congressional intelligence committees;

 (2) the Committee on Appropriations of the Senate; and

 (3) the Committee on Appropriations of the House of Representatives.

## SEC. 7356. ANALYSIS OF COMMERCIAL CLOUD INITIATIVES OF INTELLIGENCE COMMUNITY.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Director of National Intelligence shall, in coordination with such heads of elements of the intelligence community as the Director considers appropriate—

*Deadline.*

 (1) complete a comprehensive analysis of the commercial cloud initiatives of the intelligence community relating to the Commercial Cloud Enterprise contract entered into by the Director of the Central Intelligence Agency in November 2020; and

 (2) provide to the congressional intelligence committees, the Committee on the Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a briefing on the findings of the Director with respect to the analysis conducted pursuant to paragraph (1).

*Briefing.*

137 STAT. 1068          PUBLIC LAW 118–31—DEC. 22, 2023

(b) ELEMENTS.—The analysis conducted under subsection (a) shall include—

Time period.
Cost projections.

(1) the current year and 5-year projected costs for commercial cloud utilization for each element of the intelligence community, including costs related to data storage, data migration, egress fees, and any other commercial cloud services;

Data.
Cost savings.

(2) the termination or planned termination, as the case may be, of legacy data storage capacity of an element of the intelligence community and the projected cost savings resulting from such termination;

(3) efforts underway by the Office of the Director of National Intelligence and elements of the intelligence community to utilize multiple commercial cloud service providers;

(4) the operational value that elements of the intelligence community are achieving through utilization of commercial cloud analytic tools and services; and

(5) how effectively the commercial cloud enterprise is currently postured to support artificial intelligence workloads of intelligence community elements and a description of criteria for continuing to rely on legacy data centers for those artificial intelligence requirements by an intelligence community element.

# TITLE IV—MATTERS CONCERNING FOREIGN COUNTRIES

Subtitle A—People's Republic of China

Sec. 7401. Intelligence community coordinator for accountability of atrocities of the People's Republic of China.
Sec. 7402. Interagency working group and report on the malign efforts of the People's Republic of China in Africa.
Sec. 7403. Amendment to requirement for annual assessment by intelligence community working group for monitoring the economic and technological capabilities of the People's Republic of China.
Sec. 7404. Assessments of reciprocity in the relationship between the United States and the People's Republic of China.
Sec. 7405. Assessment of threat posed to United States ports by cranes manufactured by countries of concern.
Sec. 7406. Intelligence assessment of influence operations by People's Republic of China toward Pacific Islands countries.
Sec. 7407. Independent study on economic impact of military invasion of Taiwan by People's Republic of China.
Sec. 7408. Report by Director of National Intelligence on Uyghur genocide.

Subtitle B—Other Foreign Countries

Sec. 7411. Report on efforts to capture and detain United States citizens as hostages.
Sec. 7412. Intelligence assessments regarding Haiti.
Sec. 7413. Monitoring Iranian enrichment of uranium-235.

# Subtitle A—People's Republic of China

50 USC 3025
note.

**SEC. 7401. INTELLIGENCE COMMUNITY COORDINATOR FOR ACCOUNTABILITY OF ATROCITIES OF THE PEOPLE'S REPUBLIC OF CHINA.**

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1069

(B) the Committee on Foreign Relations, the Committee on the Judiciary, the Committee on Armed Services, and the Committee on Appropriations of the Senate; and

(C) the Committee on Foreign Affairs, the Committee on the Judiciary, the Committee on Armed Services, and the Committee on Appropriations of the House of Representatives.

(2) ATROCITY OF THE PEOPLE'S REPUBLIC OF CHINA.—The term "atrocity of the People's Republic of China" means a crime against humanity, genocide, or a war crime committed by a foreign person who is—

(A) a member, official, or employee of the government of the People's Republic of China;

(B) a member, official, or employee of the Chinese Communist Party;

(C) a member of the armed forces, security, or other defense services of the People's Republic of China; or

(D) an agent or contractor of a person specified in subparagraph (A), (B), or (C).

(3) COMMIT.—The term "commit", with respect to an atrocity of the People's Republic of China, includes the planning, committing, aiding, and abetting of such atrocity of the People's Republic of China.

(4) FOREIGN PERSON.—The term "foreign person" means—

(A) any person or entity that is not a United States person; or

(B) any entity not organized under the laws of the United States or of any jurisdiction within the United States.

(5) GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA.— The term "government of the People's Republic of China" includes the regional governments of Xinjiang, Tibet, and Hong Kong.

(6) UNITED STATES PERSON.—The term "United States person" has the meaning given that term in section 105A(c) of the National Security Act of 1947 (50 U.S.C. 3039(c)).

(b) INTELLIGENCE COMMUNITY COORDINATOR FOR ACCOUNTABILITY OF ATROCITIES OF THE PEOPLE'S REPUBLIC OF CHINA.—

Deadlines.

(1) DESIGNATION.—Not later than 30 days after the date of the enactment of this Act, the Director of National Intelligence shall designate a senior official of the Office of the Director of National Intelligence to serve as the intelligence community coordinator for accountability of atrocities of the People's Republic of China (in this section referred to as the "Coordinator").

(2) DUTIES.—The Coordinator shall oversee the efforts of the intelligence community relating to the following:

(A) Identifying and, as appropriate, disseminating within the United States Government, intelligence relating to atrocities of the People's Republic of China.

(B) Identifying analytic and other intelligence needs and priorities of the United States Government with respect to the commitment of atrocities of the People's Republic of China.

137 STAT. 1070          PUBLIC LAW 118–31—DEC. 22, 2023

(C) Collaborating with appropriate counterparts across the intelligence community to ensure appropriate coordination on, and integration of the analysis of, the commitment of atrocities of the People's Republic of China.

(D) Ensuring that relevant departments and agencies of the United States Government receive appropriate support from the intelligence community with respect to the collection, analysis, preservation, and, as appropriate, downgrade and dissemination of intelligence products relating to the commitment of atrocities of the People's Republic of China.

(3) PLAN REQUIRED.—Not later than 90 days after the date of the enactment of this Act, the Director of National Intelligence shall submit to the appropriate committees of Congress—

(A) the name of the official designated as the Coordinator pursuant to paragraph (1);

Strategy.

(B) the strategy of the intelligence community for the prioritization and integration of intelligence relating to atrocities of the People's Republic of China, including a detailed description of how the Coordinator shall support the implementation of such strategy; and

Review.

(C) the plan of the intelligence community to conduct a review of classified and unclassified intelligence reporting regarding atrocities of the People's Republic of China for downgrading, dissemination, and, as appropriate, public release.

(4) BRIEFINGS TO CONGRESS.—Not later than 120 days after the date of enactment of this Act, and not less frequently than quarterly thereafter, the Director of National Intelligence, acting through the Coordinator, shall brief the appropriate committees of Congress on—

(A) the analytical findings, changes in collection, and other activities of the intelligence community with respect to atrocities of the People's Republic of China; and

(B) the recipients of intelligence reporting shared pursuant to this section in the prior quarter, including for the purposes of ensuring that the public is informed about atrocities of the People's Republic of China and to support efforts by the United States Government to seek accountability for the atrocities of the People's Republic of China, and the date of any such sharing.

(c) SUNSET.—This section shall cease to have effect on September 30, 2027.

### SEC. 7402. INTERAGENCY WORKING GROUP AND REPORT ON THE MALIGN EFFORTS OF THE PEOPLE'S REPUBLIC OF CHINA IN AFRICA.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—The Director of National Intelligence, in consultation with such heads of elements of the intelligence community as the Director considers appropriate, shall establish an interagency working group within the intelligence community to analyze the tactics and capabilities of the People's Republic of China in Africa.

(2) ESTABLISHMENT FLEXIBILITY.—The working group established under paragraph (1) may be—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1071

(A) independently established; or

(B) to avoid redundancy, incorporated into existing working groups or cross-intelligence efforts within the intelligence community.

(b) REPORT.—

(1) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.—In this subsection, the term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Committee on Foreign Relations, the Committee on Energy and Natural Resources, and the Subcommittee on Defense of the Committee on Appropriations of the Senate; and

(C) the Committee on Foreign Affairs, the Committee on Energy and Commerce, and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

(2) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the working group established under subsection (a) shall submit to the appropriate committees of Congress a report on the specific tactics and capabilities of the People's Republic of China in Africa.

(3) ELEMENTS.—Each report required by paragraph (2) shall include the following elements:

<span style="float:right">Assessments.</span>

(A) An assessment and description of efforts by the Government of the People's Republic of China to exploit mining and reprocessing operations in Africa.

(B) An assessment and description of efforts by the Government of the People's Republic of China to provide or fund technologies in Africa, including—

(i) telecommunications and energy technologies, such as advanced reactors, transportation, and other commercial products; and

(ii) by requiring that the People's Republic of China be the sole provider of such technologies.

(C) An assessment of opportunities for mitigation.

(4) FORM.—The report required by paragraph (2) shall be submitted in unclassified form, but may include a classified annex if necessary.

(c) SUNSET.—The requirements of this section shall terminate on the date that is 5 years after the date of the enactment of this Act.

**SEC. 7403. AMENDMENT TO REQUIREMENT FOR ANNUAL ASSESSMENT BY INTELLIGENCE COMMUNITY WORKING GROUP FOR MONITORING THE ECONOMIC AND TECHNOLOGICAL CAPABILITIES OF THE PEOPLE'S REPUBLIC OF CHINA.**

Section 6503(c)(3)(D) of the Intelligence Authorization Act for Fiscal Year 2023 (division F of Public Law 117–263) is amended by striking "the top 200" and inserting "all the known".

<span style="float:right">136 Stat. 3538.</span>

**SEC. 7404. ASSESSMENTS OF RECIPROCITY IN THE RELATIONSHIP BETWEEN THE UNITED STATES AND THE PEOPLE'S REPUBLIC OF CHINA.**

(a) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Assistant Secretary of State for Intelligence and Research, in consultation with the Director of National Intelligence and such other heads of elements of the intelligence

<span style="float:right">Deadline.</span>

community as the Assistant Secretary considers relevant, shall submit to Congress the following:

(1) A comprehensive assessment that identifies critical areas in the security, diplomatic, economic, financial, technological, scientific, commercial, academic, and cultural spheres in which the United States does not enjoy a reciprocal relationship with the People's Republic of China.

(2) A comprehensive assessment that describes how the lack of reciprocity between the People's Republic of China and the United States in the areas identified in the assessment required by paragraph (1) provides advantages to the People's Republic of China.

(b) FORM OF ASSESSMENTS.—

(1) CRITICAL AREAS.—The assessment required by subsection (a)(1) shall be submitted in unclassified form.

(2) ADVANTAGES.—The assessment required by subsection (a)(2) shall be submitted in classified form.

### SEC. 7405. ASSESSMENT OF THREAT POSED TO UNITED STATES PORTS BY CRANES MANUFACTURED BY COUNTRIES OF CONCERN.

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Banking, Housing, and Urban Affairs, the Committee on Commerce, Science, and Transportation, and the Subcommittee on Defense of the Committee on Appropriations of the Senate; and

(C) the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Financial Services, the Committee on Energy and Commerce, and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

(2) COUNTRY OF CONCERN.—The term "country of concern" has the meaning given that term in section 1(m)(1) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a(m)(1)).

(b) ASSESSMENT.—The Director of National Intelligence, in coordination with such other heads of the elements of the intelligence community as the Director considers appropriate and the Secretary of Defense, shall conduct an assessment of the threat posed to United States ports by cranes manufactured by countries of concern and commercial entities of those countries, including the Shanghai Zhenhua Heavy Industries Co. (ZPMC).

(c) REPORT AND BRIEFING.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence shall submit a report and provide a briefing to the appropriate committees of Congress on the findings of the assessment required by subsection (b).

(2) ELEMENTS.—The report and briefing required by paragraph (1) shall outline the potential for the cranes described in subsection (b) to collect intelligence, disrupt operations at

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1073

United States ports, and impact the national security of the United States.

(3) FORM OF REPORT.—The report required by paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

### SEC. 7406. INTELLIGENCE ASSESSMENT OF INFLUENCE OPERATIONS BY PEOPLE'S REPUBLIC OF CHINA TOWARD PACIFIC ISLANDS COUNTRIES.

(a) ASSESSMENT.—Not later than 180 days after the date of the enactment of this Act, the Assistant Secretary of State for Intelligence and Research, in consultation with the heads of the other elements of the intelligence community that the Assistant Secretary determines appropriate, shall submit to the appropriate congressional committees an assessment of influence operations by the People's Republic of China toward Pacific Islands countries. <span style="float:right">Deadline.</span>

(b) ELEMENTS.—The intelligence assessment under subsection (a) shall include the following:

(1) A description of recent and potential future efforts by the People's Republic of China, using either overt or covert means, to enhance its security, political, diplomatic, or economic ties with Pacific Islands countries.

(2) An assessment of how the People's Republic of China views the success of its efforts to expand influence in Pacific Islands countries, and the importance of such efforts to its national security, foreign policy, and economic development objectives.

(3) An identification of Pacific Islands countries in which the People's Republic of China has established, or is seeking to establish, an intelligence presence or intelligence partnerships.

(4) An assessment of the degree to which the People's Republic of China is using economic or other forms of coercion to pressure the Pacific Islands countries that diplomatically recognize Taiwan (the Republic of the Marshall Islands, Palau, Nauru, and Tuvalu) into instead recognizing the People's Republic of China.

(5) An analysis of how specific Pacific Islands countries are responding to efforts by the People's Republic of China to increase bilateral engagement. <span style="float:right">Analysis.</span>

(6) An assessment of the influence of the People's Republic of China in the Pacific Islands Forum (the main multilateral organization of the region) and of the efforts of the People's Republic of China to establish parallel regional organizations and recruit Pacific Islands countries to participate.

(7) An analysis of opportunities for the United States to counter influence operations by the People's Republic of China in the Pacific Islands region that undermine the national security or economic interests of the United States. <span style="float:right">Analysis.</span>

(c) FORM.—The intelligence assessment under subsection (a) may be submitted in classified form. <span style="float:right">Classified information.</span>

(d) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the congressional intelligence committees;

137 STAT. 1074          PUBLIC LAW 118–31—DEC. 22, 2023

(B) the Committee on Foreign Relations, the Committee on Armed Services, and the Committee on Appropriations of the Senate; and

(C) the Committee on Foreign Affairs, the Committee on Armed Services, the Committee on Appropriations, and the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party of the House of Representatives.

(2) PACIFIC ISLANDS COUNTRIES.—The term "Pacific Islands countries" includes the Federated States of Micronesia, Fiji, French Polynesia, Kiribati, the Republic of the Marshall Islands, Nauru, Palau, Solomon Islands, Tonga, Samoa, Niue, Tuvalu, and Vanuatu.

**SEC. 7407. INDEPENDENT STUDY ON ECONOMIC IMPACT OF MILITARY INVASION OF TAIWAN BY PEOPLE'S REPUBLIC OF CHINA.**

Deadline.
Contracts.

(a) REQUIREMENT.—Not later than 60 days after the date of the enactment of this Act, the Director of National Intelligence shall seek to enter into a contract with an eligible entity to conduct a comprehensive study on the global economic impact of a military invasion of Taiwan by the People's Republic of China or certain other aggressive or coercive actions taken by the People's Republic of China with respect to Taiwan.

Assessments.

(b) MATTERS INCLUDED.—The study required under subsection (a) shall include the following:

(1) An assessment of the economic impact globally, in the United States, and in the People's Republic of China that would result from an invasion of Taiwan by the People's Republic of China under various potential invasion and response scenarios, including with respect to the impact on—

(A) supply chains;
(B) trade flows;
(C) financial markets;
(D) sovereign debt; and
(E) gross domestic product, unemployment, and other key economic indicators.

(2) An assessment of the economic impact globally, in the United States, and in the People's Republic of China that would result from of an aggressive or coercive military, economic, or other action taken by the People's Republic of China with respect to Taiwan that falls short of an invasion, including as a result of a blockade of Taiwan.

(3) The development of economic policy options, to include sanctions and supply chain restrictions, designed to cause escalating impacts on the economy of the People's Republic of China during a preconflict phase.

(c) REPORT.—

(1) IN GENERAL.—Not later than 270 days after the date of the enactment of this Act, the eligible entity that the Director of National Intelligence enters into an agreement with under subsection (a) shall submit to the Director a report containing the results of the study conducted under such subsection.

(2) SUBMISSION TO CONGRESS.—Not later than 30 days after the date the Director receives the report under paragraph (1), the Director shall submit the report to—

(A) the congressional intelligence committees;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1075

(B) the Committee on Armed Services, the Committee on Foreign Relations, the Committee on Banking, Housing, and Urban Affairs, and the Committee on Appropriations of the Senate; and

(C) the Committee on Armed Services, the Committee on Foreign Affairs, and the Committee on Appropriations of the House of Representatives.

(3) FORM OF REPORT.—The report required under this subsection shall be submitted in unclassified form, but may include a classified annex.

(d) ELIGIBLE ENTITY DEFINED.—In this section, the term "eligible entity" means a federally funded research and development center or nongovernmental entity which has—

(1) a primary focus on studies and analysis;

(2) experience and expertise relevant to the study required under subsection (a); and

(3) a sufficient number of personnel with the appropriate security clearance to conduct such study.

## SEC. 7408. REPORT BY DIRECTOR OF NATIONAL INTELLIGENCE ON UYGHUR GENOCIDE.

(a) REPORT ON UYGHUR GENOCIDE.—

(1) SUBMISSION.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence, in coordination with the relevant heads of the elements of the intelligence community, shall submit to the appropriate committees of Congress a report on the Uyghur genocide.

(2) MATTERS.—The report under paragraph (1) shall address the following matters:

(A) Forced sterilization, forced birth control, and forced abortion of Uyghurs.

(B) Forced transfer of Uyghur children from their families.

(C) Forced labor of Uyghurs, inside and outside of Xinjiang.

(D) The work conditions of Uyghur laborers (including laborers in the textile, automobile and electric vehicle, solar panel, polyvinyl chloride, and rare earth metals sectors), including an identification of any company that is—

(i) organized under the laws of the People's Republic of China or otherwise subject to the jurisdiction of (or over which control is exercised or exercisable by) the Government of the People's Republic of China; and

(ii) employing forced Uyghur laborers from Xinjiang.

(E) Any other forms of physical or psychological torture against Uyghurs.

(F) Any other actions that infringe on the rights of Uyghurs to live freely in accordance with their customs, culture, and religious practices.

(G) The methods of surveillance of Uyghurs, including surveillance via technology, law enforcement notifications, and forcing Uyghurs to live with other individuals for monitoring purposes.

(H) Such other matters as the Director of National Intelligence may determine appropriate.

137 STAT. 1076          PUBLIC LAW 118–31—DEC. 22, 2023

(3) FORM.—The report under paragraph (1) shall be submitted in unclassified form, but may include a classified annex.

(b) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Committee on Foreign Relations and the Committee on Appropriations of the Senate; and

(C) the Committee on Foreign Affairs and the Committee on Appropriations of the House of Representatives.

(2) INTELLIGENCE; NATIONAL INTELLIGENCE.—The terms "intelligence" and "national intelligence" have the meanings given those terms in section 3 of the National Security Act of 1947 (50 U.S.C. 3003).

# Subtitle B—Other Foreign Countries

Venezuela.

## SEC. 7411. REPORT ON EFFORTS TO CAPTURE AND DETAIN UNITED STATES CITIZENS AS HOSTAGES.

(a) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.—In this section, the term "appropriate committees of Congress" means—

(1) the congressional intelligence committees;

(2) the Committee on Foreign Relations, the Committee on the Judiciary, and the Committee on Appropriations of the Senate; and

(3) the Committee on Foreign Affairs, the Committee on the Judiciary, and the Committee on Appropriations of the House of Representatives.

(b) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the Director of National Intelligence shall submit to the appropriate committees of Congress a report on efforts by the Maduro regime in Venezuela to detain United States citizens and lawful permanent residents.

(c) ELEMENTS.—The report required by subsection (b) shall include, regarding the arrest, capture, detainment, or imprisonment of United States citizens and lawful permanent residents, the following:

(1) The names, positions, and institutional affiliation of Venezuelan individuals, or those acting on their behalf, who have engaged in such activities.

(2) A description of any role played by transnational criminal organizations, and an identification of such organizations.

Assessment.

(3) Where relevant, an assessment of whether and how United States citizens and lawful permanent residents have been lured to Venezuela.

Analysis.

(4) An analysis of the motive for the arrest, capture, detainment, or imprisonment of United States citizens and lawful permanent residents.

(5) The total number of United States citizens and lawful permanent residents detained or imprisoned in Venezuela as of the date on which the report is submitted.

(d) FORM.—The report required by subsection (b) shall be submitted in unclassified form, but may include a classified annex.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1077

**SEC. 7412. INTELLIGENCE ASSESSMENTS REGARDING HAITI.**

(a) INTELLIGENCE COMMUNITY ASSESSMENT.— The Director of National Intelligence, acting through the National Intelligence Council, shall produce an intelligence community assessment regarding Haiti. Such assessment shall include each of the following:

(1) An analysis of the security, political, and economic situation in Haiti, and its effect on—

(A) the people of Haiti;

(B) other countries in the Caribbean region; and

(C) the United States, including Puerto Rico and the United States Virgin Islands, as a result of increased out-migration from Haiti to the United States, the increased use of Haiti as a transshipment point for illicit drugs destined for the United States, or any other relevant factor or trend.

(2) A description of opportunities available to improve or stabilize the security, political, and economic situation in Haiti.

(3) An identification of specific events or actions in Haiti that, were they to occur individually or in combination, would serve as signposts indicating the further deterioration or collapse of the security, political, and economic situation in Haiti.

(b) INTELLIGENCE ASSESSMENT.—The Director of National Intelligence shall produce an intelligence assessment based on a review of the intelligence products pertaining to Haiti that were written by elements of the intelligence community and provided to policymakers during the period of time beginning on January 1, 2021, and ending on July 7, 2021. Such assessment shall include each of the following:

(1) An analysis of whether, during the time period covered by the assessment, the intelligence community provided policymakers with adequate indications and warning of the assassination of Haitian President Jovenal Moise on July 7, 2021.

(2) An analysis of whether, during such time period, the intelligence community provided policymakers with useful and unique insights, derived from both covertly collected and open-source intelligence, that policymakers would not otherwise have been able to obtain from sources outside of the intelligence community.

(3) Based on the analyses conducted under paragraphs (1) and (2), any recommendations to improve indications and warning or to otherwise enhance the utility for policymakers of intelligence products that the intelligence community prepares on Haiti, specifically, or on other countries characterized by chronic insecurity, instability, and poverty.

(c) SUBMISSION TO CONGRESS.—

(1) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Director shall concurrently submit to the appropriate committees of Congress the intelligence community assessment produced under subsection (a) and the intelligence assessment produced under subsection (b).

(2) FORM.— The assessments submitted under paragraph (1) shall be submitted in classified form.

(3) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.—In this subsection, the term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

*Analysis.*

*Review.
Analysis.*

*Recommendations.*

*Deadline.*

*Classified information.*

137 STAT. 1078          PUBLIC LAW 118–31—DEC. 22, 2023

    (B) the Committee on Foreign Relations and the Committee on Appropriations of the Senate; and
    (C) the Committee on Foreign Affairs and the Committee on Appropriations of the House of Representatives.

22 USC 8701 note.

**SEC. 7413. MONITORING IRANIAN ENRICHMENT OF URANIUM-235.**

  (a) SIGNIFICANT ENRICHMENT ACTIVITY DEFINED.—In this section, the term "significant enrichment activity" means—
    (1) any enrichment of any amount of uranium-235 to a purity percentage that is 5 percent higher than the purity percentage indicated in the prior submission to Congress under subsection (b)(1); or
    (2) any enrichment of uranium-235 in a quantity exceeding 10 kilograms.
  (b) SUBMISSION TO CONGRESS.—

Deadline.
Assessment.

    (1) IN GENERAL.—Not later than 48 hours after the Director of National Intelligence assesses that the Islamic Republic of Iran has produced or possesses any amount of uranium-235 enriched to greater than 60 percent purity or has engaged in significant enrichment activity, the Director shall submit to Congress such assessment, consistent with the protection of intelligence sources and methods.
    (2) DUPLICATION.—For any submission required by this subsection, the Director of National Intelligence may rely upon existing products that reflect the current analytic judgment of the intelligence community, including reports or products produced in response to congressional mandate or requests from executive branch officials.

# TITLE V—MATTERS PERTAINING TO UNITED STATES ECONOMIC AND EMERGING TECHNOLOGY COMPETITION WITH UNITED STATES ADVERSARIES

### Subtitle A—General Matters

Sec. 7501. Detail of individuals from intelligence community to Department of Commerce.
Sec. 7502. Intelligence Community Innovation Unit.
Sec. 7503. Establishment of Office of Engagement.
Sec. 7504. Designation of a chief technology officer within certain elements of the intelligence community.
Sec. 7505. Requirement to authorize additional security clearances for certain contractors.
Sec. 7506. Intelligence Innovation Board.
Sec. 7507. Programs for next-generation microelectronics in support of artificial intelligence.
Sec. 7508. Program for Beyond 5G.
Sec. 7509. Intelligence community commercial remote sensing requirements.
Sec. 7510. Requirement to ensure intelligence community directives appropriately account for artificial intelligence and machine learning tools in intelligence products.

### Subtitle B—Next-generation Energy, Biotechnology, and Artificial Intelligence

Sec. 7511. Expanded annual assessment of economic and technological capabilities of the People's Republic of China and related briefing.
Sec. 7512. Assessment of using civil nuclear energy for intelligence community capabilities.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1079

Sec. 7513. Policies established by Director of National Intelligence for artificial intelligence capabilities.

# Subtitle A—General Matters

**SEC. 7501. DETAIL OF INDIVIDUALS FROM INTELLIGENCE COMMUNITY TO DEPARTMENT OF COMMERCE.**

50 USC 3334q.

(a) AUTHORITY.—In order to better facilitate the sharing of actionable intelligence on foreign adversary intent, capabilities, threats, and operations that pose a threat to the interests or security of the United States, particularly as they relate to the procurement, development, and use of dual-use and emerging technologies, the Director of National Intelligence may, acting through the Intelligence Community Civilian Joint Duty Program and in consultation with the Secretary of Commerce, advertise joint duty positions and detail or facilitate the detail of civilian employees from across the intelligence community to the Bureau of Industry and Security of the Department of Commerce.

(b) DETAIL.—Detailees on a joint duty assignment (JDA) assigned pursuant to subsection (a) shall be drawn from such elements of the intelligence community as the Director considers appropriate, in consultation with the Secretary of Commerce.

(c) EXPERTISE.—The Director shall ensure that detailees referred to in subsection (a) have subject matter expertise on countries of concern, including China, Iran, North Korea, and Russia, as well as functional areas such as illicit procurement, counterproliferation, emerging and foundational technology, economic and financial intelligence, information and communications technology systems, supply chain vulnerability, and counterintelligence.

(d) DUTY CREDIT.—The detail of an employee of the intelligence community to the Department of Commerce under subsection (a) shall be without interruption or loss of civil service status or privilege.

**SEC. 7502. INTELLIGENCE COMMUNITY INNOVATION UNIT.**

(a) ESTABLISHMENT.—Title I of the National Security Act of 1947 ( 50 U.S.C. 3021 et seq.) is amended by inserting after section 103K the following new section (and conforming the table of contents at the beginning of such Act accordingly):

**"§ 103L. Intelligence Community Innovation Unit**

50 USC 3034c.

"(a) DEFINITIONS.—In this section:
    "(1) EMERGING TECHNOLOGY.—the term 'emerging technology' has the meaning given that term in section 6701 of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117–263; 50 U.S.C. 3024 note).
    "(2) UNIT.—The term 'Unit' means the Intelligence Community Innovation Unit.
"(b) PLAN FOR IMPLEMENTATION OF INTELLIGENCE COMMUNITY INNOVATION UNIT.—
    "(1) PLAN REQUIRED.—Not later than 180 days after the date of the enactment of the Intelligence Authorization Act for Fiscal Year 2024, the Director of National Intelligence shall develop a plan for how to implement the Intelligence Community Innovation Unit within the intelligence community.

Deadline.

    "(2) MATTERS COVERED.—The plan developed pursuant to paragraph (1) shall cover how the Unit will—

"(A) benefit heads of the elements of the intelligence community in identifying commercial emerging technologies and associated capabilities to address critical mission needs of elements of the intelligence community;

"(B) provide to the heads of the elements of the intelligence community seeking to field commercial emerging technologies technical expertise with respect to such technologies.

"(C) facilitate the transition of potential prototypes and solutions to critical mission needs of the intelligence community from research and prototype projects to production; and

"(D) serve as a liaison between the intelligence community and the private sector, in which capacity such liaison shall focus on small- and medium-sized companies and other organizations that do not have significant experience engaging with the intelligence community.

"(3) REQUIREMENTS.—The plan developed pursuant to paragraph (1) shall—

"(A) plan for not more than 50 full-time equivalent personnel; and

"(B) include an assessment as to how the establishment of the Unit would benefit the identification and evaluation of commercial emerging technologies for prototyping and potential adoption by the intelligence community to fulfill critical mission needs.

"(4) SUBMISSION TO CONGRESS.—Upon completing development of the plan pursuant to paragraph (1), the Director shall—

"(A) submit to the congressional intelligence committees, the Subcommittee on Defense of the Committee on Appropriations of the Senate, and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives a copy of the plan; and

"(B) provide such committees and subcommittees a briefing on the plan.

"(c) ESTABLISHMENT.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in this section, not later than 180 days after the date on which the Director of National Intelligence submits the plan pursuant to subsection (b)(4)(A), the Director of National Intelligence shall establish the Unit within the Office of the Director of National Intelligence.

"(d) LIMITATION.—The Unit shall not abrogate or otherwise constrain any element of the intelligence community from conducting authorized activities.

"(e) DIRECTOR OF THE INTELLIGENCE COMMUNITY INNOVATION UNIT.—

"(1) APPOINTMENT; REPORTING.—The head of the Unit is the Director of the Intelligence Community Innovation Unit, who shall be appointed by the Director of National Intelligence and shall report directly to the Director of National Intelligence.

"(2) QUALIFICATIONS.—In selecting an individual for appointment as the Director of the Intelligence Community Innovation Unit, the Director of National Intelligence shall give preference to individuals who the Director of National Intelligence determines have—

Assessment.
Evaluation.

Records.

Briefing.

Deadline.

Determination.

"(A) significant relevant experience involving commercial emerging technology within the private sector; and

"(B) a demonstrated history of fostering the adoption of commercial emerging technologies by the United States Government or the private sector.

"(f) STAFF.—

"(1) IN GENERAL.—In addition to the Director of the Intelligence Community Innovation Unit, the Unit shall be composed of not more than 50 full- time equivalent positions.

"(2) STAFF WITH CERTAIN EXPERTISE.—The Director of National Intelligence shall ensure that there is a sufficient number of staff of the Unit, as determined by the Director, with expertise in—

"(A) other transaction authorities and nontraditional and rapid acquisition pathways for emerging technology;

"(B) engaging and evaluating small- and medium-sized emerging technology companies;

"(C) the mission needs of the intelligence community; and

"(D) such other skills or experiences as the Director determines necessary.

"(g) AUTHORITY RELATING TO DETAILEES.—Upon request of the Unit, each head of an element of the intelligence community may detail to the Unit any of the personnel of that element to assist in carrying out the duties under subsection (b) on a reimbursable or a nonreimbursable basis.

"(h) ENSURING TRANSITION FROM PROTOTYPING TO PRODUCTION.—The Director of the Intelligence Community Innovation Unit shall transition research and prototype projects to products in a production stage upon identifying a demonstrated critical mission need of one or more elements of the intelligence community and a potential mission partner likely to field and further fund upon maturation, including by designating projects as Emerging Technology Transition Projects under the pilot program required by section 6713 of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117–263; 50 U.S.C. 3024 note).

"(i) ENCOURAGEMENT OF USE BY ELEMENTS.—The Director of National Intelligence shall take such steps as may be necessary to encourage the use of the Unit by the heads of the other elements of the intelligence community.

"(j) RULES OF CONSTRUCTION.—

"(1) NO PREFERENTIAL TREATMENT FOR PRIVATE SECTOR.— Nothing in this section shall be construed to require any element of the intelligence community to provide preferential treatment for any private sector entity with regard to procurement of technology construed as restricting or preempting any activities of the intelligence community.

"(2) NO ADDITIONAL AUTHORITY.—The Unit established pursuant to subsection (c) will be limited to the existing authorities possessed by the Director of National Intelligence.

"(k) SUNSET.—The authorities and requirements of this section shall terminate on the date that is 5 years after the date of the establishment of the Unit.".

(b) CLARIFICATION OF EMERGING TECHNOLOGY DEFINITION.— Section 6701(8)(A) of the Intelligence Authorization Act for Fiscal Year 2023 (Public Law 117– 263; 50 U.S.C. 3024 note) is amended

137 STAT. 1082          PUBLIC LAW 118–31—DEC. 22, 2023

by striking "during the 10-year period beginning on January 1, 2022" and inserting "during the subsequent 10-year period".

Deadline.

(c) BRIEFINGS.—Not later than 180 days after the date of the establishment of the Intelligence Community Innovation Unit pursuant to section 103L of the National Security Act of 1947, as added by subsection (a), and on a semiannual basis thereafter for 5 years, the Director of National Intelligence shall provide to the appropriate congressional committees a briefing on the status of the Intelligence Community Innovation Unit, the staffing levels of such Unit, and the progress of such Unit in identifying and facilitating the adoption of commercial emerging technologies capable of advancing the mission needs of the intelligence community.

(d) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means the congressional intelligence committees, the Subcommittee on Defense of the Committee on Appropriations of the Senate, and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

(2) EMERGING TECHNOLOGY.—The term "emerging technology" has the meaning given such term in section 103L of the National Security Act of 1947, as added by subsection (a).

**SEC. 7503. ESTABLISHMENT OF OFFICE OF ENGAGEMENT.**

(a) ESTABLISHMENT.—Title I of the National Security Act of 1947 (50 U.S.C. 3021 et seq.), as amended by section 901, is further amended by adding at the end the following new section (and conforming the table of contents at the beginning of such Act accordingly):

50 USC 3062.

**"SEC. 122. OFFICE OF ENGAGEMENT.**

"(a) ESTABLISHMENT.—There is within the Office of the Director of National Intelligence an Office of Engagement (in this section referred to as the 'Office').

"(b) HEAD; STAFF.—

Appointment.

"(1) HEAD.—The Director of National Intelligence shall appoint as head of the Office an individual with requisite experience in matters relating to the duties of the Office, as determined by the Director of National Intelligence. Such head of the Office shall report directly to the Director of National Intelligence.

"(2) STAFF.—To assist the head of the Office in fulfilling the duties of the Office, the head shall employ full-time equivalent staff in such number, and with such requisite expertise in matters relating to such duties, as may be determined by the head.

"(c) DUTIES.—The duties of the Office shall be as follows:

"(1) To ensure coordination across the elements of the intelligence community efforts regarding outreach, relationship development, and associated knowledge and relationship management, with covered entities, consistent with the protection of intelligence sources and methods.

"(2) To assist in sharing best practices regarding such efforts among the elements of the intelligence community.

"(3) To establish and implement metrics to assess the effectiveness of such efforts.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1083

"(d) COVERED ENTITY DEFINED.—In this section, the term 'covered entity' means an entity that is not an entity of the United States Government, including private sector companies, institutions of higher education, trade associations, think tanks, laboratories, international organizations, and foreign partners and allies.".

(b) DEADLINE.—To the extent and in such amounts as specifically provided in advance in appropriations Acts for the purposes detailed in section 122 of the National Security Act of 1947, as added by subsection (a), the Director of National Intelligence shall establish the Office of Engagement by not later than 1 year after the date of the enactment of this Act.

50 USC 3062 note.

(c) TRANSFER.—The Director shall transfer to the Office of Engagement all functions within the Office of the Director of National Intelligence that, on the day before the date of the enactment of this Act, performed duties set forth in section 122 of the National Security Act of 1947, as added by subsection (a).

50 USC 3062 note.

(d) PLAN AND BRIEFINGS.—

Deadlines.

(1) PLAN.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence shall submit to the congressional intelligence committees a plan for the establishment of the Office of Engagement.

(2) QUARTERLY BRIEFINGS.—Not later than 1 year after the date of the establishment of the Office of Engagement, and on a quarterly basis for 5 years thereafter, the Director of National Intelligence shall submit to the congressional intelligence committees, the Committee on Homeland Security and Governmental Affairs and the Committee on Appropriations of the Senate, and the Committee on Oversight and Accountability and the Committee on Appropriations of the House of Representatives a briefing on the status of the Office, including with respect to the staffing levels, activities, and fulfilment of duties of the Office.

(e) RULE OF CONSTRUCTION.—Nothing in this section, or an amendment made by this section, shall be construed as restricting or preempting engagement or outreach activities of elements of the intelligence community.

50 USC 3062 note.

(f) DEFINITIONS.—In this section, the term "Office of Engagement" means the Office of Engagement established under section 122 of the National Security Act of 1947, as added by subsection (a).

50 USC 3062 note.

**SEC. 7504. DESIGNATION OF A CHIEF TECHNOLOGY OFFICER WITHIN CERTAIN ELEMENTS OF THE INTELLIGENCE COMMUNITY.**

50 USC 3334r.

(a) DESIGNATION AUTHORITY.—The head of each covered element of the intelligence community shall designate a senior official to serve as the chief technology officer of such element.

(b) COVERED ELEMENTS.—For purposes of this section, the covered elements of the intelligence community are the following:

(1) The Central Intelligence Agency.
(2) The Defense Intelligence Agency.
(3) The Federal Bureau of Investigation.
(4) The National Geospatial-Intelligence Agency.
(5) The National Security Agency.
(6) The National Reconnaissance Office.

(c) RESPONSIBILITY.—The chief technology officer of each covered element of the intelligence community shall be responsible

for assisting the head of such element in the identification and adoption of technology to advance mission needs.

(d) PROHIBITION OF DUAL APPOINTMENT.—Any chief technology officer designated pursuant to subsection (a) may not concurrently serve as the chief information officer, the chief data officer, or the principal science officer of any element of the intelligence community.

50 USC 3352g.

### SEC. 7505. REQUIREMENT TO AUTHORIZE ADDITIONAL SECURITY CLEARANCES FOR CERTAIN CONTRACTORS.

(a) DEFINITIONS.—In this section:

(1) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Subcommittee on Defense of the Committee on Appropriations of the Senate; and

(C) the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

(2) COVERED CONTRACT OR AGREEMENT.—The term "covered contract or agreement", with respect to an entity, means a contract or other agreement between that entity and an element of the intelligence community the performance of which requires a specified number of covered persons to hold a security clearance.

(3) COVERED PERSON.—The term "covered person", with respect to an entity, means a contractor or employee of that entity.

(b) PLAN AND STUDY.—

Deadline.

(1) IN GENERAL.—No later than April 1, 2024, the Director of National Intelligence shall—

(A) complete a study on the feasibility and advisability of implementing a program to authorize additional security clearances for certain contractors as described in subsection (c);

(B) develop a plan to implement the program described in subparagraph (A); and

(C) submit to the appropriate committees of Congress—

Reports.

(i) a report on the findings of the Director with respect to the study completed pursuant to subparagraph (A); and

(ii) the plan developed pursuant to subparagraph (B).

(2) STUDY ELEMENTS.—The study completed pursuant to paragraph (1)(A) shall address the following:

(A) For contracts agreed to after the date of the enactment of this Act, how private entities that contract with the intelligence community would make payments for additional clearances for their employees and how the intelligence community would receive payments.

List.

(B) A list of and changes to provisions of law required in order to fully implement the program required by subsection (c) and achieve the intent indicated in subparagraph (A) of this paragraph.

(C) Such considerations as the Director may have for carrying out the program required by subsection (c) and achieving the intent indicated in subparagraph (A) of this paragraph.

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1085

(c) PROGRAM TO AUTHORIZE ADDITIONAL SECURITY CLEARANCES FOR CERTAIN CONTRACTORS.— Subject to the limitations described in subsection (d), the Director shall establish a program under which—

(1) any entity that enters into a covered contract or agreement with an element of the intelligence community may designate an additional number of covered persons who may submit an application for a security clearance;

(2) the appropriate authorized investigative agency and authorized adjudicative agency, as such terms are defined in section 3001(a) of the Intelligence Reform and Terrorism Prevention Act of 2004 (50 U.S.C. 3341(a)), shall—

(A) upon receiving such an application—

(i) conduct an appropriate investigation of the background of the additional covered person; and

(ii) make a determination as to whether the additional covered person is eligible for access to classified information; and

(B) if the determination under subparagraph (A)(ii) is favorable, upon any of the specified number of covered persons required to hold a security clearance for the performance of work under that covered contract or agreement becoming unable to perform such work, make a determination as to whether the additional covered person has a demonstrated need-to-know under Executive Order 12968 (60 Fed. Reg. 40245; relating to access to classified information), or any successor thereto, or Executive Order 10865 (25 Fed. Reg. 1583; relating to safeguarding classified information within industry), or any successor thereto (without requiring an additional investigation to be conducted under subparagraph (A)(i)); and

(3) if the additional covered person receives a favorable determination regarding the need-to-know under paragraph (2)(B) and signs an approved nondisclosure agreement, the additional covered person may perform such work in lieu of such covered person.

(d) LIMITATIONS.—The limitations described in this subsection are as follows:

(1) LIMITATION ON NUMBER DESIGNATED PER CONTRACT.— The additional number designated by an entity under the program established pursuant to subsection (c) for each covered contract or agreement may not exceed the greater of the following:

(A) 10 percent of the number of security clearances required to be held by covered persons to perform work under the covered contract or agreement.

(B) 1 person.

(2) LIMITATION ON NUMBER DESIGNATED PER ENTITY.—The total additional number designated by an entity under the program established pursuant to subsection (c) may not exceed the greater of the following:

(A) 10 percent of the sum total number of security clearances required to be held by covered persons to perform work under all covered contracts or agreements of the entity.

(B) 1 person.

(e) PROHIBITIONS.—

<div style="float:right">Determination.</div>

<div style="float:right">Determination.</div>

(1) IN GENERAL.—No application for a security clearance may be submitted by a covered person of an entity or granted pursuant to the program established under subsection (c) in excess of the limitations under subsection (d) applicable to such entity.

(2) PROHIBITION ON BEARING COSTS.—No head of an element of the intelligence community may bear any cost associated with granting or maintaining a security clearance the application for which is submitted pursuant to subsection (c)(1).

(f) RULE OF CONSTRUCTION.—Nothing in this section may be construed as requiring the head of an element of the intelligence community to grant any covered person access to classified information if a favorable determination of eligibility to access such classified information is not made with respect to such person.

### SEC. 7506. INTELLIGENCE INNOVATION BOARD.

(a) ESTABLISHMENT OF INTELLIGENCE INNOVATION BOARD.— There is established in the executive branch of the Federal Government a board to be known as the Intelligence Innovation Board (in this section referred to as the "Board").

Recommendations.

(b) PURPOSE.—The purpose of the Board is to provide to the Director of National Intelligence and the heads of the other elements of the intelligence community advice and recommendations on changes to the culture, organizational structures, processes, and functions of the intelligence community necessary to address the adoption of emerging technologies by the intelligence community and to accelerate such adoption.

(c) MEMBERSHIP.—

(1) APPOINTMENT OF MEMBERS.—The Board shall be composed of 9 members appointed by the Director of National Intelligence, after consultation with the Chair and Ranking Member of the Permanent Select Committee on Intelligence of the House of Representatives and the Chair and Vice Chair of the Select Committee on Intelligence of the Senate, from among citizens of the United States—

(A) who are not officers or employees of an element of the intelligence community;

(B) who are eligible to hold an appropriate security clearance;

(C) who have demonstrated academic, government, business, or other expertise relevant to the mission and functions of the intelligence community; and

Determination.

(D) who the Director of National Intelligence determines—

(i) meet at least 1 of the qualifications described in paragraph (2); and

(ii) do not present any active or potential conflict of interest.

(2) QUALIFICATIONS.—

(A) IN GENERAL.—The qualifications described in this paragraph are the following:

(i) A proven track record of sound judgment in leading or governing a large and complex private sector corporation or organization.

(ii) A proven track record as a distinguished academic or researcher at an accredited institution of

PUBLIC LAW 118–31—DEC. 22, 2023        137 STAT. 1087

higher education (as defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001)).

(iii) Demonstrated experience in identifying emerging technologies and facilitating the adoption of such technologies into the operations of large organizations in either the public or private sector.

(iv) Demonstrated experience in developing new technology.

(v) Demonstrated experience in technical evaluations of commercial products.

(vi) Demonstrated expertise in privacy and civil liberties implications associated with emerging technologies.

(B) MEMBERSHIP STRUCTURE.—The Director shall ensure that no more than 4 concurrently serving members of the Board qualify for membership on the Board based predominately on a single qualification set forth under subparagraph (A).

(3) CHAIR.—The Board shall have a Chair, who shall be appointed by the Director of National Intelligence from among the members of the Board, after consultation with the Chair and Ranking Member of the Permanent Select Committee on Intelligence of the House of Representatives and the Chair and Vice Chair of the Select Committee on Intelligence of the Senate.

(4) NOTIFICATIONS.—Not later than 30 days after the date on which the Director of National Intelligence appoints a member to the Board under paragraph (1), or appoints a member of the Board as Chair under paragraph (3), the Director shall notify the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives of such appointment in writing.

*Deadline.*

(5) TERMS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), each member of the Board shall be appointed for a term of 2 years.

(B) VACANCIES.—A member of the Board appointed to fill a vacancy occurring before the expiration of the term for which the predecessor of the member was appointed shall be appointed only for the remainder of that term. A vacancy in the Board shall not affect the powers of the Board and shall be filled in the manner in which the original appointment was made.

(C) REAPPOINTMENTS.—A member of the Board may not be reappointed for an additional term, unless the Director of National Intelligence certifies to the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives that reappointment for a single additional term is vital to the completion of an ongoing project or initiative of the Board.

*Certification.*

(6) PROHIBITION ON COMPENSATION.—Members of the Board shall serve without pay.

(7) TRAVEL EXPENSES.—Each member of the Board may reimbursement of reasonable travel expenses, subject to a process established by the Director and in accordance with

137 STAT. 1088          PUBLIC LAW 118–31—DEC. 22, 2023

applicable provisions under subchapter I of chapter 57 of title 5, United States Code.

(8) MEETINGS.—

(A) IN GENERAL.—The Board shall meet as necessary to carry out its purpose and duties under this section, but shall meet in person not less frequently than on a quarterly basis. A majority of the members of the Board shall constitute a quorum.

(B) CLOSED MEETINGS.—Meetings of the Board may be closed to the public only to protect national security.

(d) STAFF.—

Determination.

(1) COMPOSITION.—To the extent and in such amounts as specifically provided in advance in appropriations Act for the purposes detailed in this section, the Board shall be supported by full-time staff with requisite experience to assist the Board in carrying out its purpose and duties under this section in such number as the Director of National Intelligence determines appropriate. Such staff may be appointed by the Director of National Intelligence or detailed or otherwise assigned from another element of the intelligence community.

(2) SECURITY CLEARANCES.—Staff of the Board, shall, as a condition of appointment, detail, or assignment to the Board, as the case may be, hold appropriate security clearances for access to the classified records and materials to be reviewed by the staff, and shall follow the guidance and practices on security under applicable Executive orders and Presidential or agency directives.

(e) REPORTS.—

Effective date.
Time period.

(1) SUBMISSION.—Beginning on the date that is 2 years after the date on which the Board is established, and once every 2 years thereafter until the date on which the Board terminates under subsection (i), the Board shall submit to the Director of National Intelligence and the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives a report on the activities of the Board, which shall include, with respect to the period covered by the report, the following:

Assessment.

(A) An assessment of the efforts of the intelligence community taken during such period to accelerate the adoption of competitive emerging technologies by the intelligence community, including such efforts taken with respect to the culture, organizational structures, processes, or functions of the intelligence community.

Recommenda-
tions.

(B) Recommendations on how the intelligence community may make further progress to accelerate such adoption, including recommendations on changes to the culture, organizational structures, processes, and functions of the intelligence community necessary for such accelerated adoption.

(C) Any other matters the Board or the Director of National Intelligence determines appropriate.

Classified
information.

(2) FORM.—Each report under paragraph (1) may be submitted in classified form, but if so submitted shall include an unclassified executive summary.

(f) TERMINATION.—

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1089

(1) IN GENERAL.—Except as provided in paragraph (2), the Board shall terminate on September 30, 2026.

(2) RENEWAL.—The Director of National Intelligence may renew the Board for an additional 2-year period following the date of termination specified in paragraph (1) if the Director notifies the congressional intelligence committees, the Committee on Appropriations of the Senate, and the Committee on Appropriations of the House of Representatives of such renewal.

*Time period.*
*Notification.*

(g) CHARTER.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Director of National Intelligence shall establish a charter for the Board, consistent with this section.

*Deadline.*

(2) ELEMENTS.—The charter established pursuant to paragraph (1) shall include the following:

(A) Mandatory processes for identifying potential conflicts of interest, including the submission of initial and periodic financial disclosures by Board members.

(B) The vetting of potential conflicts of interest by the Inspector General of the Intelligence Community.

(C) The establishment of a process and associated protections for any whistleblower alleging a violation of applicable conflict of interest, Federal contracting, or other provision of law.

### SEC. 7507. PROGRAMS FOR NEXT-GENERATION MICROELECTRONICS IN SUPPORT OF ARTIFICIAL INTELLIGENCE.

*50 USC 3334s.*

(a) PROGRAM ESTABLISHMENT.—Subject to the availability of appropriations, the Director of National Intelligence, acting through the Director of the Intelligence Advanced Research Projects Activity, shall establish or otherwise oversee a program to advance microelectronics research.

(b) RESEARCH FOCUS.—The Director of National Intelligence shall ensure that the research carried out under the program established under subsection (a) is focused on the following:

(1) Advanced engineering and applied research into next-generation computing models, materials, devices, architectures, and algorithms to enable the advancement of artificial intelligence and machine learning.

(2) Efforts to—

(A) overcome challenges with engineering and applied research of microelectronics, including with respect to the physical limits on transistors, electrical interconnects, and memory elements;

(B) promote long-term advancements in computing technologies, including by fostering a unified and multi-disciplinary approach encompassing research and development into—

(i) next-generation algorithm design;

(ii) next-generation compute capability;

(iii) generative and adaptive artificial intelligence for design applications;

(iv) photonics-based microprocessors, including electrophotonics;

(v) the chemistry and physics of new materials;

137 STAT. 1090        PUBLIC LAW 118–31—DEC. 22, 2023

(vi) optical communication networks, including electrophotonics; and

(vii) safety and controls for generative artificial intelligence applications for the intelligence community.

Determination.

(3) Any other activity the Director determines would promote the development of microelectronics research for future technologies, including optical communications or quantum technologies.

(c) CONSIDERATION, CONSULTATION, AND COLLABORATION.—In carrying out the program established under subsection (a), the Director of National Intelligence shall—

(1) consider the national strategy developed pursuant to subsection (a)(3)(A)(i) of section 9906 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (15 U.S.C. 4656);

(2) consult with the Secretary of Commerce; and

(3) actively collaborate with relevant Government agencies and programs, including the programs established under subsection (c), (d), (e), and (f) of such section 9906 (15 U.S.C. 4656), academic institutions, and private industry to leverage expertise and resources in conducting research.

(d) AUTHORIZATION OF APPROPRIATIONS.—Amounts authorized to be appropriated for the National Intelligence Program of the Office of the Director of National Intelligence may be made available to carry out the program established under subsection (a).

(e) BRIEFING REQUIREMENTS.—The Director of the Intelligence Advanced Research Projects Activity shall provide to the congressional intelligence committees, the Committee on Appropriations of the Senate, the Committee on Appropriations of the House of Representatives, and, consistent with the protection of intelligence sources and methods, the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives, regular briefings on—

(1) the progress, achievements, and outcomes of the program established under subsection (a);

(2) the collaborations conducted pursuant to subsection (c); and

Recommendations.

(3) recommendations for future research priorities.

50 USC 3334t.

**SEC. 7508. PROGRAM FOR BEYOND 5G.**

(a) ESTABLISHMENT.—The Director of National Intelligence, acting through the Director of the Intelligence Advanced Research Projects Activity, may initiate or otherwise carry out a program dedicated to research and development efforts relevant to 6G technology and any successor technologies, but only if such efforts are specific to potential applications of 6G technology (or any successor technologies) for the intelligence community or for other national security purposes.

(b) CONSULTATION AND COORDINATION.—In carrying out any program under subsection (a), the Director shall consult and coordinate with—

(1) relevant—

(A) heads of Federal departments and agencies, including the Administrator of the National Telecommunications and Information Administration;

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1091

(B) interagency bodies, such as the Committee for the Assessment of Foreign Participation in the United States Telecommunications Sector;

(C) private sector entities;

(D) institutions of higher learning; and

(E) federally funded research and development centers; and

(2) such other individuals and entities as the Director determines appropriate.

(c) 6G TECHNOLOGY DEFINED.—In this section, the term "6G technology" means hardware, software, or other technologies relating to sixth-generation wireless networks.

**SEC. 7509. INTELLIGENCE COMMUNITY COMMERCIAL REMOTE SENSING REQUIREMENTS.**

50 USC 3024 note.

(a) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the United States benefits from a robust commercial remote sensing industry that supports a science, technology, engineering, and mathematics academic pipeline, enables skilled manufacturing jobs, and fosters technological innovation;

(2) commercial remote sensing capabilities complement and augment dedicated Government remote sensing capabilities, both when integrated into Government architectures and leveraged as stand-alone services;

(3) the Director of National Intelligence and Under Secretary of Defense for Intelligence and Security should serve as the United States Government leads for commercial remote sensing procurement and seek to accommodate commercial remote sensing needs of the intelligence community, the Department of Defense, and Federal civil organizations under the preview of the cognizant functional managers; and

(4) a transparent, sustained investment by the United States Government in commercial remote sensing capabilities—

(A) is required to strengthen the United States commercial remote sensing commercial industry; and

(B) should include electro-optical, synthetic aperture radar, hyperspectral, and radio frequency detection and other innovative phenemonology that may have national security applications.

(b) GUIDANCE REQUIRED.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence and the Under Secretary of Defense for Intelligence and Security shall jointly develop guidance requiring the Commercial Strategy Board or, if that is not feasible, such other entities within the intelligence community and the Department of Defense that the Director and the Under Secretary determine appropriate, to perform, on a recurring basis, the following functions related to commercial remote sensing:

Deadline.
Determination.

(1) Validation of the current and long-term commercial remote sensing capability needs, as determined by the relevant functional managers, of the Department of Defense, the intelligence community, and Federal civil users under the preview of the cognizant functional managers.

(2) Development of commercial remote sensing requirements documents that are unclassified and releasable to United States commercial industry.

137 STAT. 1092        PUBLIC LAW 118–31—DEC. 22, 2023

Cost estimate.
Time period.

(3) Development of a cost estimate that is unclassified and releasable to United States commercial industry, covering at least 5 years, associated with fulfilling the requirements contained in the commercial remote sensing requirements documents referred developed under paragraph (2).

(c) FUNDING LEVELS.—In the case of any fiscal year for which a cost estimate is developed under subsection (b)(3) and for which the budget of the President (as submitted to Congress pursuant to section 1105 of title 31, United States Code) requests a level of funding for the procurement of commercial remote sensing requirements that is less than the amount identified in the cost estimate, the President shall include with the budget an explanation for the difference.

(d) REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Director of National Intelligence and the Under Secretary of Defense for Intelligence and Security shall jointly submit to the appropriate congressional committees a report on the implementation of subsection (b).

(2) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this subsection, the term "appropriate congressional committees" means—

(A) the congressional intelligence committees;

(B) the congressional defense committees;

(C) the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives; and

(D) the Subcommittee on Defense of the Committee on Appropriations of the Senate.

## SEC. 7510. REQUIREMENT TO ENSURE INTELLIGENCE COMMUNITY DIRECTIVES APPROPRIATELY ACCOUNT FOR ARTIFICIAL INTELLIGENCE AND MACHINE LEARNING TOOLS IN INTELLIGENCE PRODUCTS.

Deadline.
Briefing.

(a) REQUIREMENT.—Not later than 120 days after the date of the enactment of this Act, the Director of National Intelligence shall provide to the appropriate committees of Congress a briefing on whether intelligence community directives in effect as of the date such briefing is provided furnish intelligence community analysts with sufficient guidance and direction with respect to the use of artificial intelligence and machine learning tools in intelligence products produced by the intelligence community.

(b) ELEMENTS.—The briefing required under subsection (a) shall include—

Determinations.

(1) a determination by the Director as to—

(A) whether Intelligence Community Directive 203, Analytic Standards, Intelligence Community Directive 206, Sourcing Requirements for Disseminated Analytic Products, and any other intelligence community directive related to the production and dissemination of intelligence products by the intelligence community in effect as of the date the briefing under subsection (a) is provided furnish intelligence community analysts with sufficient guidance and direction on how to properly use, provide sourcing information about, and otherwise provide transparency to customers regarding the use of artificial intelligence and

machine learning tools in intelligence products produced by the intelligence community; and

(B) whether any intelligence community directive described in subparagraph (A) requires an update to provide such guidance and direction; and

(2) with respect to the determination under paragraph (1)—

(A) in the case the Director makes a determination that no update to an intelligence community directive described in such paragraph is required, an explanation regarding why such intelligence community directives currently provide sufficient guidance and direction to intelligence community analysts; and

(B) in the case the Director makes a determination that an update to an intelligence community directive described in such paragraph is required, a plan and proposed timeline to update any such intelligence community directive.

<div style="float:right">Plan.<br>Timeline.</div>

(c) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.— In this section, the term "appropriate committees of Congress" means—

(1) the congressional intelligence committees;

(2) the Committee on Appropriations of the Senate; and

(3) the Committee on Appropriations of the House of Representatives.

# Subtitle B—Next-generation Energy, Biotechnology, and Artificial Intelligence

### SEC. 7511. EXPANDED ANNUAL ASSESSMENT OF ECONOMIC AND TECHNOLOGICAL CAPABILITIES OF THE PEOPLE'S REPUBLIC OF CHINA AND RELATED BRIEFING.

(a) BRIEFING REQUIRED.—Not later than 45 days after the date of the enactment of this Act, the Director of National Intelligence shall provide to the congressional intelligence committees a briefing on the status of the implementation by the Director of section 6503 of the Intelligence Authorization Act for Fiscal Year 2023 (division F of Public Law 117–263), including—

<div style="float:right">Deadline.<br>Timelines.</div>

(1) the expected timeline for establishing the working group required by subsection (a) of such section;

(2) the expected timeline for such working group to submit to Congress the first assessment required by subsection (c)(2) of such section; and

(3) whether any elements of the assessment described in subsection (c)(3) of such section, as amended by subsection (b), should be prepared in consultation with other working groups or entities within the Office of the Director of National Intelligence.

(b) MODIFICATIONS.—Section 6503(c) of the Intelligence Authorization Act for Fiscal Year 2023 (division F of Public Law 117–263) is amended—

<div style="float:right">136 Stat. 3537.</div>

(1) in paragraph (1)—

(A) in subparagraph (B), by inserting "the Committee on Energy and Natural Resources, the Committee on Homeland Security and Governmental Affairs," after "Transportation,"; and

(B) in subparagraph (C), by inserting "the Committee on Oversight and Accountability," after "and Means,"; and

(2) in paragraph (3), by adding at the end the following:

Assessment.

"(I) A detailed assessment, prepared in consultation with all elements of the working group—

"(i) of the investments made by the People's Republic of China in—

"(I) artificial intelligence;

"(II) next-generation energy technologies, especially small modular reactors and advanced batteries; and

"(III) biotechnology; and

"(ii) that identifies—

"(I) competitive practices of the People's Republic of China relating to the technologies described in clause (i);

"(II) opportunities to counter the practices described in subclause (I);

"(III) countries the People's Republic of China is targeting for exports of civil nuclear technology;

"(IV) countries best positioned to utilize civil nuclear technologies from the United States in order to facilitate the commercial export of those technologies;

"(V) United States vulnerabilities in the supply chain of these technologies; and

"(VI) opportunities to counter the export by the People's Republic of China of civil nuclear technologies globally.

Assessment.

"(J) An identification and assessment of any unmet resource or authority needs of the working group that affect the ability of the working group to carry out this section.".

### SEC. 7512. ASSESSMENT OF USING CIVIL NUCLEAR ENERGY FOR INTELLIGENCE COMMUNITY CAPABILITIES.

Determination.

(a) ASSESSMENT REQUIRED.—The Director of National Intelligence shall, in consultation with the heads of such other elements of the intelligence community as the Director considers appropriate, conduct an assessment of capabilities identified by the Intelligence Community Continuity Program established pursuant to section E(3) of Intelligence Community Directive 118, or any successor directive, or such other intelligence community facilities or intelligence community capabilities as may be determined by the Director to be critical to United States national security, that have unique energy needs—

(1) to ascertain the feasibility and advisability of using civil nuclear reactors to meet such needs; and

(2) to identify such additional technologies, infrastructure, or authorities needed, or other potential obstacles, to commence use of a nuclear reactor to meet such needs.

(b) REPORT.—

Classified information.

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Director shall submit to the appropriate committees of Congress a report, which may be in classified form, on the findings of the Director with

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1095

respect to the assessment conducted pursuant to subsection (a).

(2) APPROPRIATE COMMITTEES OF CONGRESS.—In this subsection, the term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Committee on Homeland Security and Governmental Affairs, the Committee on Energy and Natural Resources, and the Committee on Appropriations of the Senate; and

(C) the Committee on Oversight and Accountability, the Committee on Energy and Commerce, and the Committee on Appropriations of the House of Representatives.

**SEC. 7513. POLICIES ESTABLISHED BY DIRECTOR OF NATIONAL INTELLIGENCE FOR ARTIFICIAL INTELLIGENCE CAPABILITIES.**

(a) IN GENERAL.—Section 6702 of the Intelligence Authorization Act for Fiscal Year 2023 (50 U.S.C. 3334m) is amended—

(1) in subsection (a), in the matter preceding paragraph (1), by striking "subsection (b)" and inserting "subsection (c)";

(2) by redesignating subsection (b) as subsection (c); and

(3) by inserting after subsection (a) the following:

"(b) POLICIES.—

"(1) IN GENERAL.—In carrying out subsection (a)(1), not later than 1 year after the date of the enactment of the Intelligence Authorization Act for Fiscal Year 2024, the Director of National Intelligence, in consultation with the heads of the elements of the intelligence community, the Director of the Office of Management and Budget, and such other officials as the Director of National Intelligence determines appropriate, shall establish the policies described in paragraph (2).

"(2) POLICIES DESCRIBED.—The policies described in this paragraph are policies for the acquisition, adoption, development, use, coordination, and maintenance of artificial intelligence capabilities that—

"(A) establish a lexicon relating to the use of machine learning and artificial intelligence developed or acquired by elements of the intelligence community;

"(B) establish minimum guidelines for evaluating the performance of models developed or acquired by elements of the intelligence community, such as by—

"(i) specifying conditions for the continuous monitoring of artificial intelligence capabilities for performance, including the conditions for retraining or retiring models based on performance;

"(ii) documenting performance objectives, including specifying how performance objectives shall be developed and contractually enforced for capabilities procured from third parties;

"(iii) specifying the manner in which models should be audited, as necessary, including the types of documentation that should be provided to any auditor; and

"(iv) specifying conditions under which models used by elements of the intelligence community should be subject to testing and evaluation for vulnerabilities to techniques meant to undermine the availability, integrity, or privacy of an artificial intelligence capability;

*Definition.*

*Guidelines.*

*Evaluation.*

137 STAT. 1096        PUBLIC LAW 118–31—DEC. 22, 2023

"(C) establish minimum guidelines for tracking dependencies in adjacent systems, capabilities, or processes impacted by the retraining or sunsetting of any model described in subparagraph (B);

Requirements.

"(D) establish minimum documentation requirements for capabilities procured from third parties, aligning such requirements, as necessary, with existing documentation requirements applicable to capabilities developed by elements of the intelligence community;

Standards.

"(E) establish minimum standards for the documentation of imputed, augmented, or synthetic data used to train any model developed, procured, or used by an element of the intelligence community; and

"(F) provide guidance on the acquisition and usage of models that have previously been trained by a third party for subsequent modification and usage by such an element.

Deadline.

"(3) POLICY REVIEW AND REVISION.—The Director of National Intelligence shall annually review or revise each policy established under paragraph (1).".

(b) CONFORMING AMENDMENT.—Section 6712(b)(1) of such Act (50 U.S.C. 3024 note) is amended by striking "section 6702(b)" and inserting "section 6702(c)".

# TITLE VI—CLASSIFICATION REFORM

Sensible Classification Act of 2023. Records.

Sec. 7601. Short title.
Sec. 7602. Promoting efficient declassification review.
Sec. 7603. Training to promote sensible classification.
Sec. 7604. Improvements to Public Interest Declassification Board.
Sec. 7605. Implementation of technology for classification and declassification.
Sec. 7606. Studies and recommendations on necessity of security clearances.

50 USC 3301 note.

**SEC. 7601. SHORT TITLE.**

This title may be cited as the "Sensible Classification Act of 2023".

50 USC 3350a.

**SEC. 7602. PROMOTING EFFICIENT DECLASSIFICATION REVIEW.**

Time period.

(a) IN GENERAL.—Whenever an agency is processing a request pursuant to section 552 of title 5, United States Code (commonly known as the "Freedom of Information Act") or the mandatory declassification review provisions of Executive Order 13526 (50 U.S.C. 3161 note; relating to classified national security information), or successor order, and identifies responsive classified records that are more than 25 years of age as of December 31 of the year in which the request is received, the head of the agency shall, in accordance with existing processes to protect national security under the Freedom of Information Act and the mandatory review provisions of Executive Order 12526, review the record and process the record for declassification and release by the National Declassification Center of the National Archives and Records Administration, unless the head of agency—

Certification.

(1) makes a certification to Congress, including the congressional intelligence committees, the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1097

Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, that the declassification of certain components within the record would be harmful to the protection of sources and methods or national security, pursuant to existing processes; and

(2) provides an explanation to Congress, including the congressional intelligence committees, the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, for such certification.

(b) APPLICATION.—Subsection (a) shall apply regardless of whether or not the record described in such subsection is in the legal custody of the National Archives and Records Administration.

### SEC. 7603. TRAINING TO PROMOTE SENSIBLE CLASSIFICATION.

50 USC 3344a.

(a) DEFINITIONS.—In this section:

(1) OVER-CLASSIFICATION.—The term "over-classification" means classification at a level that exceeds the minimum level of classification that is sufficient to protect the national security of the United States.

(2) SENSIBLE CLASSIFICATION.—The term "sensible classification" means classification at a level that is the minimum level of classification that is sufficient to protect the national security of the United States.

(b) TRAINING REQUIRED.—Each head of an agency with classification authority shall conduct training for employees of the agency with classification authority to hold employees accountable for over-classification and to promote sensible classification.

### SEC. 7604. IMPROVEMENTS TO PUBLIC INTEREST DECLASSIFICATION BOARD.

Section 703 of the Public Interest Declassification Act of 2000 (50 U.S.C. 3355a) is amended—

(1) in subsection (c), by adding at the end the following:

"(5) A member of the Board whose term has expired may continue to serve until the earlier of—

Termination date.

"(A) the date that a successor is appointed and sworn in; and

"(B) the date that is 1 year after the date of the expiration of the term.

"(6) Not later than 30 days after the date on which the term of a member of the Board ends, the appointing authority of the member shall submit to Congress a plan to appoint a successor."; and

Deadline. Plan.

(2) in subsection (f)—

(A) by inserting "(1)" before "Any employee"; and

(B) by adding at the end the following:

"(2) In addition to any employees detailed to the Board under paragraph (1), the Board may, subject to the availability of funds, hire not more than 12 staff members.".

137 STAT. 1098          PUBLIC LAW 118–31—DEC. 22, 2023

44 USC 3501 note.

### SEC. 7605. IMPLEMENTATION OF TECHNOLOGY FOR CLASSIFICATION AND DECLASSIFICATION.

Deadline.

(a) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Administrator of the Office of Electronic Government (in this section referred to as the "Administrator") shall, in consultation with the Secretary of Defense, the Director of the Central Intelligence Agency, the Director of National Intelligence, the Public Interest Declassification Board, the Director of the Information Security Oversight Office, and the head of the National Declassification Center of the National Archives and Records Administration—

(1) research a technology-based solutions—

(A) to support efficient and effective systems for classification and declassification; and

(B) to be implemented on an interoperable and federated basis across the Federal Government; and

Recommendations.

(2) submit to the President and Congress, including the congressional intelligence committees, the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, recommendations regarding a technology-based solutions described in paragraph (1).

Classified information.

(b) REPORT.—Not later than 540 days after the date of the enactment of this Act, the President shall submit to Congress a classified report describing actions taken to implement the recommendations under subsection (a)(2).

Reports.

### SEC. 7606. STUDIES AND RECOMMENDATIONS ON NECESSITY OF SECURITY CLEARANCES.

(a) AGENCY STUDIES ON NECESSITY OF SECURITY CLEARANCES.—

(1) STUDIES REQUIRED.—The head of each agency that grants security clearances to personnel of such agency shall conduct a study on the necessity of such clearances.

(2) REPORTS REQUIRED.—

(A) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, each head of an agency that conducts a study under paragraph (1) shall submit to Congress, including the congressional intelligence committees, the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, a report on the findings of the agency head with respect to such study, which the agency head may classify as appropriate.

(B) REQUIRED ELEMENTS.—Each report submitted by the head of an agency under subparagraph (A) shall include, for such agency, the following:

(i) The number of personnel eligible for access to information up to the "Top Secret" level.

(ii) The number of personnel eligible for access to information up to the "Secret" level.

(iii) Information on any reduction in the number of personnel eligible for access to classified information based on the study conducted under paragraph (1).

(iv) A description of how the agency head will ensure that the number of security clearances granted by such agency will be kept to the minimum required for the conduct of agency functions, commensurate with the size, needs, and mission of the agency.

(3) INDUSTRY.—This subsection shall apply to the Secretary of Defense in the Secretary's capacity as the Executive Agent for the National Industrial Security Program, and the Secretary shall treat contractors, licensees, and grantees as personnel of the Department of Defense for purposes of the studies and reports required by this subsection.

<div style="float:right">Applicability.</div>

(b) DIRECTOR OF NATIONAL INTELLIGENCE REVIEW OF SENSITIVE COMPARTMENTED INFORMATION.—Not later than 1 year after the date of the enactment of this Act, the Director of National Intelligence shall—

(1) review the number of personnel eligible for access to sensitive compartmented information; and

(2) submit to Congress, including the congressional intelligence committees, the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, a report on how the Director will ensure that the number of such personnel is limited to the minimum required.

(c) AGENCY REVIEW OF SPECIAL ACCESS PROGRAMS.—Not later than 1 year after the date of the enactment of this Act, each head of an agency who is authorized to establish a special access program by Executive Order 13526 (50 U.S.C. 3161 note; relating to classified national security information), or successor order, shall—

(1) review the number of personnel of the agency eligible for access to such special access programs; and

(2) submit to Congress, including the congressional intelligence committees, the Committee on Armed Services, the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, a report on how the agency head will ensure that the number of such personnel is limited to the minimum required.

(d) SECRETARY OF ENERGY REVIEW OF Q AND L CLEARANCES.—Not later than 1 year after the date of enactment of this Act, the Secretary of Energy shall—

(1) review the number of personnel of the Department of Energy granted Q and L access; and

(2) submit to Congress, including the congressional intelligence committees, the Committee on Armed Services, the

137 STAT. 1100        PUBLIC LAW 118–31—DEC. 22, 2023

Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Committee on the Judiciary of the Senate, and the Committee on Armed Services, the Committee on Oversight and Accountability, the Committee on Foreign Affairs, and the Committee on the Judiciary of the House of Representatives, a report on how the Secretary will ensure that the number of such personnel is limited to the minimum required

(e) INDEPENDENT REVIEWS.—Not later than 180 days after the date on which a study is completed under subsection (a) or a review is completed under subsections (b) through (d), the Director of the Office of Management and Budget shall each review the study or review, as the case may be.

# TITLE VII—SECURITY CLEARANCE AND TRUSTED WORKFORCE

Sec. 7701. Review of shared information technology services for personnel vetting.
Sec. 7702. Timeliness standard for rendering determinations of trust for personnel vetting.
Sec. 7703. Annual report on personnel vetting trust determinations.
Sec. 7704. Survey to assess strengths and weaknesses of Trusted Workforce 2.0.

### SEC. 7701. REVIEW OF SHARED INFORMATION TECHNOLOGY SERVICES FOR PERSONNEL VETTING.

(a) DEFINITION OF APPROPRIATE COMMITTEES OF CONGRESS.— In this section, the term "appropriate committees of Congress" means—

(1) the congressional intelligence committees;

(2) the Committee on Armed Services and the Subcommittee on Defense of the Committee on Appropriations of the Senate; and

(3) the Committee on Armed Services and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives.

Deadline.

(b) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Director of National Intelligence shall submit to the appropriate committees of Congress a review of the extent to which the intelligence community can use information technology services shared among the intelligence community for purposes of personnel vetting, including with respect to human resources, suitability, and security.

50 USC 3352h.

### SEC. 7702. TIMELINESS STANDARD FOR RENDERING DETERMINATIONS OF TRUST FOR PERSONNEL VETTING.

President.
Publication.
Public
information.
Standards.

(a) TIMELINESS STANDARD.—

(1) IN GENERAL.—The President shall, acting through the Security Executive Agent and the Suitability and Credentialing Executive Agent, establish and publish in such public venue as the President considers appropriate, new timeliness performance standards for processing personnel vetting trust determinations in accordance with the Federal personnel vetting performance management standards.

(2) QUINQUENNIAL REVIEWS.—Not less frequently than once every 5 years, the President shall, acting through the Security Executive Agent and the Suitability and Credentialing Executive Agent—

(A) review the standards established pursuant to paragraph (1); and

(B) pursuant to such review—

(i) update such standards as the President considers appropriate; and  {Update.}

(ii) publish in the Federal Register such updates as may be made pursuant to clause (i).  {Federal Register, publication.}

(3) CONFORMING AMENDMENT.—Section 3001 of the Intelligence Reform and Terrorism Prevention Act of 2004 (50 U.S.C. 3341) is amended by striking subsection (g).

(b) QUARTERLY REPORTS ON IMPLEMENTATION.—

(1) IN GENERAL.—Not less frequently than quarterly, the Security Executive Agent and the Suitability and Credentialing Executive Agent shall jointly make available to the public a quarterly report on the compliance of Executive agencies (as defined in section 105 of title 5, United States Code) with the standards established pursuant to subsection (a).  {Public information.}

(2) DISAGGREGATION.—Each report made available pursuant to paragraph (1) shall disaggregate, to the greatest extent practicable, data by appropriate category of personnel risk and between Government and contractor personnel.  {Data.}

(c) COMPLEMENTARY STANDARDS FOR INTELLIGENCE COMMUNITY.—The Director of National Intelligence may, in consultation with the Security, Suitability, and Credentialing Performance Accountability Council established pursuant to Executive Order 13467 (50 U.S.C. 3161 note; relating to reforming processes related to suitability for Government employment, fitness for contractor employees, and eligibility for access to classified national security information) establish for the intelligence community standards complementary to those established pursuant to subsection (a).

### SEC. 7703. ANNUAL REPORT ON PERSONNEL VETTING TRUST DETERMINATIONS.

(a) DEFINITION OF PERSONNEL VETTING TRUST DETERMINATION.—In this section, the term "personnel vetting trust determination" means any determination made by an executive branch agency as to whether an individual can be trusted to perform job functions or to be granted access necessary for a position.

(b) ANNUAL REPORT.—Not later than March 30, 2024, and annually thereafter for 5 years, the Director of National Intelligence, acting as the Security Executive Agent, and the Director of the Office of Personnel Management, acting as the Suitability and Credentialing Executive Agent, in coordination with the Security, Suitability, and Credentialing Performance Accountability Council, shall jointly make available to the public a report on specific types of personnel vetting trust determinations made during the fiscal year preceding the fiscal year in which the report is made available, disaggregated, to the greatest extent possible, by the following:  {Public information.}

(1) Determinations of eligibility for national security-sensitive positions, separately noting—

(A) the number of individuals granted access to classified national security information; and

(B) the number of individuals determined to be eligible for but not granted access to classified national security information.

(2) Determinations of suitability or fitness for a public trust position.

(3) Status as a Government employee, a contractor employee, or other category.

(c) ELIMINATION OF REPORT REQUIREMENT.—Section 3001 of the Intelligence Reform and Terrorism Prevention Act of 2004 (50 U.S.C. 3341) is amended by striking subsection (h).

<div style="margin-left:2em; font-size:small;">Deadline.<br>Termination date.</div>

### SEC. 7704. SURVEY TO ASSESS STRENGTHS AND WEAKNESSES OF TRUSTED WORKFORCE 2.0.

Not later than 1 year after the date of the enactment of this Act, and once every 2 years thereafter until 2029, the Comptroller General of the United States shall administer a survey to such sample of Federal agencies, Federal contractors, and other persons that require security clearances to access classified information as the Comptroller General considers appropriate to assess—

(1) the strengths and weaknesses of the implementation of the Trusted Workforce 2.0 initiative; and

(2) the effectiveness of vetting Federal personnel while managing risk during the onboarding of such personnel.

# TITLE VIII—ANOMALOUS HEALTH INCIDENTS

Sec. 7801. Improved funding flexibility for payments made by the Central Intelligence Agency for qualifying injuries to the brain.
Sec. 7802. Clarification of requirements to seek certain benefits relating to injuries to the brain.
Sec. 7803. Intelligence community implementation of HAVANA Act of 2021 authorities.
Sec. 7804. Report and briefings on Central Intelligence Agency handling of anomalous health incidents.

### SEC. 7801. IMPROVED FUNDING FLEXIBILITY FOR PAYMENTS MADE BY THE CENTRAL INTELLIGENCE AGENCY FOR QUALIFYING INJURIES TO THE BRAIN.

Section 19A(d) of the Central Intelligence Agency Act of 1949 (50 U.S.C. 3519b(d)) is amended by striking paragraph (3) and inserting the following new paragraph:

"(3) FUNDING.—

"(A) IN GENERAL.—Payment under paragraph (2) in a fiscal year may be made using any funds—

"(i) appropriated specifically for payments under such paragraph; or

"(ii) reprogrammed in accordance with section 504 of the National Security Act of 1947 (50 U.S.C. 3094).

"(B) BUDGET.—For each fiscal year, the Director shall include with the budget justification materials submitted to Congress in support of the budget of the President for that fiscal year pursuant to section 1105(a) of title 31, United States Code, an estimate of the funds required in that fiscal year to make payments under paragraph (2).".

### SEC. 7802. CLARIFICATION OF REQUIREMENTS TO SEEK CERTAIN BENEFITS RELATING TO INJURIES TO THE BRAIN.

(a) IN GENERAL.—Section 19A(d)(5) of the Central Intelligence Agency Act of 1949 (50 U.S.C. 3519b(d)(5)) is amended—

(1) by striking "Payments made" and inserting the following:

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1103

"(A) IN GENERAL.—Payments made"; and
(2) by adding at the end the following:
"(B) RELATION TO CERTAIN FEDERAL WORKERS COM-
PENSATION LAWS.—Without regard to the requirements in
sections (b) and (c), covered employees need not first seek
benefits provided under chapter 81 of title 5, United States
Code, to be eligible solely for payment authorized under
paragraph (2) of this subsection.".
(b) REGULATIONS.—Not later than 90 days after the date of
the enactment of this Act, the Director of the Central Intelligence
Agency shall—

Deadline.
50 USC 3519b
note.

(1) revise applicable regulations to conform with the amend-
ment made by subsection (a); and

Revisions.

(2) submit to the congressional intelligence committees,
the Subcomittee on Defense of the Committee on Appropria-
tions of the Senate, and the Subcommittee on Defense of the
Committee on Appropriations of the House of Representatives
copies of such regulations, as revised pursuant to paragraph
(1).

Records.

**SEC. 7803. INTELLIGENCE COMMUNITY IMPLEMENTATION OF HAVANA
ACT OF 2021 AUTHORITIES.**

50 USC 3519b
note.

(a) REGULATIONS.—Except as provided in subsection (c), not
later than 180 days after the date of the enactment of this Act,
each head of an element of the intelligence community that has
not already done so shall—

Deadline.

(1) issue regulations and procedures to implement the
authorities provided by section 19A(d) of the Central Intel-
ligence Agency Act of 1949 (50 U.S.C. 3519b(d)) and section
901(i) of title IX of division J of the Further Consolidated
Appropriations Act, 2020 (22 U.S.C. 2680b(i)) to provide pay-
ments under such sections, to the degree that such authorities
are applicable to the head of the element; and

(2) submit to the congressional intelligence committees,
the Committee on Armed Services and the Subcommittee on
Defense of the Committee on Appropriations of the Senate,
and the Committee on Armed Services and the Subcommittee
on Defense of the Committee on Appropriations of the House
of Representatives copies of such regulations.

Records.

(b) REPORTING.—Not later than 210 days after the date of
the enactment of this Act, each head of an element of the intel-
ligence community shall submit to the congressional intelligence
committees, the Committee on Armed Services and the Sub-
committee on Defense of the Committee on Appropriations of the
Senate, and the Committee on Armed Services and the Sub-
committee on Defense of the Committee on Appropriations of the
House of Representatives a report on—

Estimates.

(1) the estimated number of individuals associated with
their element that may be eligible for payment under the
authorities described in subsection (a)(1);
(2) an estimate of the obligation that the head of the
intelligence community element expects to incur in fiscal year
2025 as a result of establishing the regulations pursuant to
subsection (a)(1); and
(3) any perceived barriers or concerns in implementing
such authorities.

(c) ALTERNATIVE REPORTING.—Not later than 180 days after the date of the enactment of this Act, each head of an element of the intelligence community (other than the Director of the Central Intelligence Agency) who believes that the authorities described in subsection (a)(1) are not currently relevant for individuals associated with their element, or who are not otherwise in position to issue the regulations and procedures required by subsection (a)(1) shall provide written and detailed justification to the congressional intelligence committees, the Committee on Armed Services and the Subcommittee on Defense of the Committee on Appropriations of the Senate, and the Committee on Armed Services and the Subcommittee on Defense of the Committee on Appropriations of the House of Representatives to explain this position.

### SEC. 7804. REPORT AND BRIEFINGS ON CENTRAL INTELLIGENCE AGENCY HANDLING OF ANOMALOUS HEALTH INCIDENTS.

(a) DEFINITIONS.—In this section:

(1) AGENCY.—The term "Agency" means the Central Intelligence Agency.

(2) APPROPRIATE COMMITTEES OF CONGRESS.—The term "appropriate committees of Congress" means—

(A) the congressional intelligence committees;

(B) the Committee on Appropriations of the Senate; and

(C) the Committee on Appropriations of the House of Representatives.

(3) QUALIFYING INJURY.—The term "qualifying injury" has the meaning given such term in section 19A(d)(1) of the Central Intelligence Agency Act of 1949 (50 U.S.C. 3519b(d)(1)).

(b) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, the Director of the Central Intelligence Agency shall submit to the appropriate committees of Congress a report on the handling of anomalous health incidents by the Agency.

(c) CONTENTS.—The report required by subsection (b) shall include the following:

(1) PRIORITY CASES.—

Lists.

(A) A detailed list of priority cases of anomalous health incidents, including any cases that the Agency has assessed as potentially resulting from an external stimulus or the actions of a foreign actor, including, for each case, locations, dates, times, and circumstances of the anomalous health incidents.

(B) For each priority case listed in accordance with subparagraph (A)—

(i) an explanation as to why such case was determined to be a priority case;

(ii) a description of each entity assigned to investigate the case;

(iii) a detailed explanation of each credible alternative explanation that the Agency assigned to the incident, including whether each individual affected by the incident was informed about and provided with an opportunity to appeal such credible alternative explanation; and

PUBLIC LAW 118–31—DEC. 22, 2023     137 STAT. 1105

(iv) a detailed account of the input, data, evidence, or opinions the Agency has received from other agencies or components of the Federal Government that the Agency may have used to reach a conclusion on such case.

(C) For each priority case of an anomalous health incident determined to largely display the core characteristics of an anomalous health incident established by the Intelligence Community Experts Panel, including each case for which the Agency does not have a credible alternative explanation, a detailed description of such case.

(2) ANOMALOUS HEALTH INCIDENT SENSORS.—     *Lists.*

(A) A list of all types of sensors that the Agency has developed or deployed with respect to reports of anomalous health incidents, including, for each type of sensor, the deployment location, the date and the duration of the employment of such type of sensor, and, if applicable, the reason for removal.

(B) A list of entities to which the Agency has provided unrestricted access to data from sensors associated with anomalous health incidents.

(C) A list of requests for support the Agency has received from elements of the Federal Government regarding sensor development, testing, or deployment, and a description of the support provided in each case.

(D) A description of each emitter signature that the Agency prioritizes as a threat obtained by sensors associated with anomalous health incidents in Agency holdings since 2016, and an explanation of such prioritization.

(d) ADDITIONAL SUBMISSIONS.—Concurrent with the submission     *Records.* of the report required by subsection (b), the Director of the Central Intelligence Agency shall submit to the appropriate committees of Congress—

(1) a report on the length of time, from the time of initial application, for an applicant for payment under the Expanded Care Program of the Central Intelligence Agency to receive a determination from the Agency, disaggregated by qualifying injuries and qualifying injuries to the brain;

(2) copies of all informational and instructional materials provided to employees of and other individuals affiliated with the Agency, with respect to applying for the Expanded Care Program; and

(3) copies of Agency guidance provided to employees of and other individuals affiliated with the Agency, with respect to reporting and responding to a suspected anomalous health incident, and the roles and responsibilities of each element of the Agency tasked with responding to a report of an anomalous health incident.

(e) BRIEFING REQUIREMENT.—

(1) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Director of the Central Intelligence Agency shall brief the appropriate committees of Congress on the report required by subsection (b).

(2) ADDITIONAL BRIEFINGS.—Upon request of the appropriate committees of Congress, the Director shall brief such committees on anomalous health incidents.

(3) AVAILABILITY.—The Director shall ensure that employees and other personnel of the Agency are made available for briefings under this subsection.

# TITLE IX—OTHER MATTERS

Sec. 7901. Technical corrections.
Sec. 7902. Extension of title VII of FISA.

**SEC. 7901. TECHNICAL CORRECTIONS.**

(a) NATIONAL SECURITY ACT OF 1947.—The National Security Act of 1947 (50 U.S.C. 3001 et seq.) is amended—

(1) in section 102A(n) (50 U.S.C. 3024(n)) by redesignating the second paragraph (5) as paragraph (6);

(2) in section 503(c)(3) (50 U.S.C. 3093(c)(3)), by striking "section" and inserting "subsection";

(3) in section 805(6) (50 U.S.C. 3164(6)), by striking "sections 101 (a) and (b)" and inserting "subsections (a) and (b) of section 101"; and

(4) in section 1102A (50 U.S.C. 3232a)—

(A) in subsection (b)(3), by striking "subsection (2)" and inserting "paragraph (1)"; and

(B) in subsection (c)(4)(C)(iv), by striking "wavier" and inserting "waiver".

(b) INTELLIGENCE AUTHORIZATION ACT FOR FISCAL YEAR 2023.—The Intelligence Authorization Act for Fiscal Year 2023 (division F of Public Law 117–263) is amended—

(1) in section 6422(b) (50 U.S.C. 3334l(b)), by striking "Congressional" and inserting "congressional"; and

(2) in section 6732(b) (50 U.S.C. 3024 note; 136 Stat. 3583), by striking "paragraph (5)" and inserting "paragraph (6)".

(c) DAVID L. BOREN NATIONAL SECURITY EDUCATION ACT OF 1991.—The David L. Boren National Security Education Act of 1991 (50 U.S.C. 1901 et seq.) is amended—

(1) in section 802(j)(6) (50 U.S.C. 1902(j)(6))—

(A) by redesignating subparagraphs (C) and (D) as subparagraphs (B) and (C), respectively; and

(B) in subparagraph (B), as so redesignated, by striking "subparagraph (D)" and inserting "subparagraph (C)";

(2) in section 803(d)(9)(D) (50 U.S.C. 1903(d)(9)(D)), by striking "Local" and inserting "local"; and

(3) in section 808(4)(A) (50 U.S.C. 1908(4)(A)), by striking "a agency" and inserting "an agency".

(d) CENTRAL INTELLIGENCE AGENCY RETIREMENT ACT.—The Central Intelligence Agency Retirement Act (50 U.S.C. 2001 et seq.) is amended—

(1) in section 211(c)(2)(B) (50 U.S.C. 2021(c)(2)(B)), by striking "subsection 241(c)" and inserting "section 241(c)";

(2) in section 263(g)(1) (50 U.S.C. 2093(g)(1)), by striking "Fund" and inserting "fund";

(3) in section 271(b) (50 U.S.C. 2111(b)), by striking "section 231(b)" and inserting "section 231(c)"; and

(4) in section 304(c) (50 U.S.C. 2154(c))—

(A) in paragraph (1)(B)(i), by striking "title 50" and inserting "title 5"; and

(B) in paragraph (5)(A)(ii), by striking "sections" and inserting "section".

PUBLIC LAW 118–31—DEC. 22, 2023          137 STAT. 1107

(e) INTELLIGENCE REFORM AND TERRORISM PREVENTION ACT OF 2004.—Section 3001 of the Intelligence Reform and Terrorism Prevention Act of 2004 (50 U.S.C. 3341) is amended—

    (1) in subsection (a)—

        (A) in paragraph (4)(B)(i), by striking the semicolon and inserting ");"; and

        (B) in paragraph (9)(A), by striking "with industry" and inserting "within industry"; and

    (2) in subsection (j)(1)(C)(i), by striking "(d)," and all that follows through "section 8H" and inserting "(d), and (h) of section 8H".

(f) INTELLIGENCE AUTHORIZATION ACT FOR FISCAL YEAR 2003.—The Intelligence Authorization Act for Fiscal Year 2003 (Public Law 107–306; 116 Stat. 2383) is amended—

    (1) in section 313(d)(3)(B) (50 U.S.C. 3361(d)(3)(B)), by adding a period at the end; and

    (2) in section 343(d)(1) (50 U.S.C. 3363(d)(1)), by striking "Not later then" and inserting "Not later than".

(g) CENTRAL INTELLIGENCE AGENCY ACT OF 1949.—The Central Intelligence Agency Act of 1949 (50 U.S.C. 3501 et seq.) is amended—

    (1) in section 4—

        (A) in subsection (a)(1)(E) (50 U.S.C. 3505(a)(1)(E)), by striking the period at the end and inserting "; and"; and

        (B) in subsection (b)(2) (50 U.S.C. 3505(b)(2)), by striking "authorized by section" and inserting "authorized by sections";

    (2) in section 6 (50 U.S.C. 3507), by striking "or of the, names" and inserting "or of the names";

    (3) in section 12(a)(2)(A) (50 U.S.C. 3512(a)(2)(A)), by striking "used only for—"" and inserting "used only for—";

    (4) in section 17—

        (A) in subsection (d)(5)(B)(ii) (50 U.S.C. 3517(d)(5)(B)(ii)), by adding a period at the end; and

        (B) in subsection (e)(4) (50 U.S.C. 3517(e)(4)), by striking "which oath affirmation, or affidavit" and inserting "which oath, affirmation, or affidavit"; and

    (5) in section 19(a)(2) (50 U.S.C. 3519(a)(2)), by striking ", as a participant" and inserting "as a participant".

(h) CENTRAL INTELLIGENCE AGENCY VOLUNTARY SEPARATION PAY ACT.—Section 2(a)(1) of the Central Intelligence Agency Voluntary Separation Pay Act (50 U.S.C. 3519a(a)(1)) is amended by adding "and" at the end.

(i) NATIONAL SECURITY AGENCY ACT OF 1959.—Section 16(d)(1) of the National Security Agency Act of 1959 (50 U.S.C. 3614(d)(1)) is amended by striking "program participant," and inserting "program participant".

(j) INTELLIGENCE AUTHORIZATION ACT FOR FISCAL YEAR 1995.—Section 811(e)(7) of the Intelligence Authorization Act for Fiscal Year 1995 (50 U.S.C. 3381(e)(7)) is amended by striking "sections 101 (a) and (b)" and inserting "subsections (a) and (b) of section 101".

(k) COORDINATION WITH OTHER AMENDMENTS MADE BY THIS ACT.—For purposes of applying amendments made by provisions of this Act other than this section, the amendments made by this

Applicability.
50 USC 1902 note.

137 STAT. 1108          PUBLIC LAW 118–31—DEC. 22, 2023

section shall be treated as having been enacted immediately before any such amendments by other provisions of this Act.

**SEC. 7902. EXTENSION OF TITLE VII OF FISA.**

(a) IN GENERAL.—Section 403(b) of the Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008 is amended—

(1) in paragraph (1) (Public Law 110–261; 50 U.S.C. 1881 note), by striking "December 31, 2023" and inserting "April 19, 2024"; and

(2) in paragraph (2) (Public Law 110–261; 18 U.S.C. 2511 note), in the matter preceding subparagraph (A), by striking "December 31, 2023" and inserting "April 19, 2024".

(b) CONFORMING AMENDMENT.—Section 404(b) of the Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008 is amended in paragraph (1) in the paragraph heading, by striking "DECEMBER 31, 2023" and inserting "APRIL 19, 2024".

50 USC 1801 note.

Approved December 22, 2023.

---

LEGISLATIVE HISTORY—H.R. 2670 (S. 2226):

HOUSE REPORTS: Nos. 118–125 (Comm. on Armed Services) and 118–301 (Comm. of Conference).
SENATE REPORTS: No. 118–58 (Comm. on Armed Services) accompanying S. 2226.
CONGRESSIONAL RECORD, Vol. 169 (2023):
    July 12–14, considered and passed House.
    July 27, considered and passed Senate, amended.
    Dec. 7, 12, 13, Senate considered and agreed to conference report.
    Dec. 14, House agreed to conference report.
DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2023):
    Dec. 22, Presidential statement.

○