UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

KING HO WONG, Individually and On Behalf of All
Others Similarly Situated,

     Plaintiff,

                    24-cv-876 (CM)

  -against-

HESAI GROUP, YIFAN LI, LOUIS T. HSIEH, KAI
SUN, SHAOQING XIANG, CAILIAN YANG,
COLLEEN A. DEVRIES, GOLDMAN SACHS
(ASIA) L.L.C., MORGAN STANLEY ASIA
LIMITED, CREDIT SUISSE SECURITIES (USA)
LLC, HUATAI SECURITIES (USA), INC.,
COGENCY GLOBAL, INC.,

     Defendants.

——————————————————————————— x

**OPINION AND ORDER**

McMahon, J.:

  Lead Plaintiff King Ho Wong ("Plaintiff"), individually and on behalf of all others similarly situated, brings this putative class action under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), 77o, against Hesai Group ("Hesai" or the "Company"); its Chief Executive Officer Yifan "David" Li; its Chief Financial Officer Louis T. Hsieh; directors Kai Sun, Shaoqing Xiang, and Cailian Yang; and Colleen A. DeVries, who signed the registration statement as Hesai's authorized U.S. representative (collectively, the "Individual Defendants"); as well as Goldman Sachs (Asia) L.L.C., Morgan Stanley Asia Limited, Credit Suisse Securities (USA) LLC, and Huatai Securities (USA), Inc., the underwriters of Hesai's February 2023 initial public offering ("IPO") (the "Underwriter Defendants").

According to the complaint, the registration statement and prospectus issued in connection with the IPO (the "Offering Documents") contained materially false and misleading statements and omissions concerning two principal topics: (1) the impact of Hesai's shift toward lower-margin advanced driver assistance systems ("ADAS") LiDAR products on its gross margins; and (2) the risk that Hesai could be designated by the United States Department of Defense ("DoD") as a "Chinese military company" under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("Section 1260H") and placed on the DoD's "1260H List." *See* Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965–66 (2021).

Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6). Dkt. No. 39. For the following reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

### A.  Hesai's Business and LiDAR Products

Hesai Group is a NASDAQ-traded holding company incorporated in the Cayman Islands and headquartered in Shanghai, People's Republic of China ("PRC"). Dkt. No. 33, Am. Compl., ¶ 25. Hesai is a producer of three-dimensional light detection and ranging ("LiDAR") technology for passenger and commercial vehicles. *Id.*, ¶¶ 44–45. Plaintiff alleges that Hesai's LiDAR products are used primarily in the automotive industry for advanced driver-assistance systems ("ADAS") and for Autonomous Mobility applications, such as those found in driverless cars and robotaxis. *Id.*, ¶ 4.

The Complaint describes LiDAR as a remote sensing technology "akin to sonar and radar" that "uses pulses of laser light to accurately measure distances and properties of objects by gauging the time taken for the light to reflect back to the LiDAR sensor." *Id.*, ¶ 45. In the automobile industry, Plaintiff alleges, the high-resolution data and accuracy offered by LiDAR "enables

vehicles to perceive their surroundings with clarity," facilitating safe navigation for ADAS and autonomous driving applications. *Id.*, ¶ 45.

The Offering Documents described three categories of Hesai products: (i) ADAS products; (ii) Autonomous Mobility products; and (iii) LiDAR technology for robotic devices. *Id.*, ¶ 54. Before the IPO, the Company had for several years manufactured and sold Autonomous Mobility products; in July 2022, it began "volume shipment" of a separate ADAS product line. *Id.*, ¶ 54. The gravamen of the complaint is that Hesai's IPO emphasized its historically high gross margins from Autonomous Mobility products but failed to disclose that the Company's shift toward ADAS products would drastically reduce its profit margins. *Id.*, ¶¶ 5–8, 52–53.

### B.  The IPO and the Offering Documents' Gross-Margin Narrative

The complaint characterizes Hesai's "outstanding historical gross margins" as a centerpiece of the IPO and a "major basis of Hesai's growth story." *Id.*, ¶¶ 5, 52.  The Offering Documents "boasted that Hesai had earned gross margins of over 50% in 2019, 2020, and 2021." *Id.*, ¶¶ 5, 52.  They also emphasized that Hesai's "industry-leading gross margin of approximately 50% from 2020 onwards enables it to organically and rapidly grow its business" and that its "margins validate its global leadership." *Id.*, ¶¶ 5, 53.

Plaintiff's theory is that this narrative was incomplete.  Plaintiff asserts that Hesai's "outstanding margins in prior years were based almost exclusively on sales of its Autonomous Mobility products," and that Hesai "only began shipping its ADAS products at commercial volumes in July 2022, as its ADAS manufacturing ramped up." *Id.*, ¶ 6.  According to the complaint, the Offering Documents "did not provide pricing, cost, or margin information about these new [ADAS] products despite the fact that it planned to continue significantly ramping up [their] production." *Id.*

Hesai did caution that gross margin was expected to decline in the fourth quarter of 2022 ("4Q22") as it shifted toward the sale of lower-priced ADAS products. *Id.*, ¶ 7. What was not disclosed, according to the pleading, was that the ADAS line allegedly carried dramatically lower profit margins, not merely lower prices. The disparity is alleged to have been substantial: ADAS margins were "less than 10%" of the historical 50% plus margins associated with Autonomous Mobility products. *Id.* Average 2022 selling prices later disclosed were approximately $742 for ADAS products compared to $13,000 for Autonomous Mobility products, yet the Offering Documents did not state that ADAS gross margins would be "less than 5%." *Id.*, ¶¶ 8, 137. In Plaintiff's view, this omission masked how sharply the Company's overall margins would decline as ADAS sales increased.

### C. Section 1260H and the DoD's "Chinese Military Company" Designation Framework

Plaintiff alleges that the Offering Documents also omitted material information about the risk that Hesai could be designated by the U.S. Department of Defense ("DoD") as a "Chinese military company" under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021. *Id.*, ¶ 12. Plaintiff alleges that this was not a generic "PRC regulatory risk," but a company-specific, knowable risk tied to Hesai's footprint in the PRC and affiliations that allegedly existed at the time of the IPO, which reflect integration into state-backed programs central to the PRC's industrial and national defense policy objectives. *Id.*, ¶¶ 12–13, 76–79, 90. Because Plaintiff's theory rests on the premise that Hesai's alleged PRC-linked ties exposed it to designation under this statute, the Court briefly outlines Section 1260H's designation framework.

Section 1260H directs the Secretary of Defense to identify and publicly list entities that the Secretary determines are "Chinese military compan[ies]" operating directly or indirectly in the

4

United States. § 1260H(a)–(b). The statute defines a "Chinese military company" to include an entity "identified as a military-civil fusion contributor to the Chinese defense industrial base," provided the entity is also engaged in providing commercial services, manufacturing, producing, or exporting. *Id.*, § 1260H(d)(1)(B)(i)(II), (d)(1)(B)(ii). The statute further provides that a "military-civil fusion contributor" "includes," among other categories, "Entities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone." *Id.*, § 1260H(d)(2)(E). When the DoD determines that an entity meets this definition, it places the entity on the publicly released "1260H List," which is sent to Congress and published in the Federal Register. *See* § 1260H(b).

Congress has imposed specific funding and contracting restrictions on entities included on that list. For example, under 42 U.S.C. § 18912, an entity identified under Section 1260H is deemed an "entity of concern," § 18912(a)(3)(B), and – absent a waiver – may not "receive, or perform work under, any covered support," § 18912(c)(1). The term "covered support" is defined broadly to include "any grant, contract, subcontract, award, loan, program, support, or other activity" authorized under the relevant federal research and development provisions. § 18912(a)(2).

In addition, 42 U.S.C. § 19235 provides that an entity identified under Section 1260H "may not receive or participate in any grant, award, program, support, or other activity" under (1) the Directorate established in 42 U.S.C. ch. 186, (2) the semiconductor research and workforce programs authorized in 15 U.S.C. § 3722a(b)(1), and (3) the Manufacturing USA Program. *See* 42 U.S.C. § 19235.

More recent National Defense Authorization Acts further prohibit the Department of Defense and the Department of Homeland Security ("DHS") from entering into specified contracts

with entities designated as "Chinese military companies." *See* Pub. L. No. 118-31, § 805(a)(1), 137 Stat. 136, 315 (2023) (DoD); Pub. L. No. 118-47, § 536, 138 Stat. 460, 622 (2023) (DHS).

Consistent with these statutory provisions, the complaint alleges that, effective June 30, 2026, Hesai will be prohibited from entering into DoD or DHS procurement contracts; and effective June 30, 2027, DoD will be prohibited from procuring goods or services produced or developed by Hesai through third parties. *Id.*, ¶ 74. It further alleges that Hesai's Section 1260H designation carries "a distinct stigma" in the U.S. market. *Id.*, ¶ 75.

### D.  Alleged PRC "Military-Civil Fusion" Ties

Plaintiff alleges that the Offering Documents "failed to disclose to investors that, at the time of the IPO, Hesai had built, was building, or planned to build, major facilities in [the PRC's] military-civil fusion enterprise zones, including the Jiading Industrial Zone." *Id.*, ¶ 13. The Complaint describes the Jiading Industrial Zone as "a key industrial and economic development area . . . focused on the development of high-tech manufacturing and services," that provides infrastructure, real estate development, and support services to resident businesses. *Id.*, ¶ 76.

Plaintiff further alleges that Jiading is explicitly tied to "military-civilian integration." *Id.*, ¶ 77. For example, the Complaint alleges that "the military-civilian integration industry alliance in Jiading Industrial Zone is . . . a specific measure to connect with the national strategy of military-civilian integration." *Id.* Plaintiff also alleges that Hesai's proposed "Maxwell Facility" was located in the Jiading Industrial Zone and that Chinese news articles described the "Maxwell Intelligent Manufacturing Center" as located in the Jiading Industrial Zone. *Id.*, ¶ 78. Plaintiff further alleges that a PRC government website described the government's "careful nurturing" of private enterprises in Jiading, including Hesai, noting that Hesai "has grown into a unicorn" in a

6

"new infrastructure" sector and that the Jiading Industrial Zone provided the company with "free factory space" to spur its growth. *Id.*, ¶ 79.

According to the complaint, Hesai's footprint extended beyond Jiading. Hesai maintains facilities in the Chongqing Economic Development Zone, which is likewise a part of the PRC's military-civil fusion zone within the PRC's defense industrial base. *Id.*, ¶ 82. According to Plaintiff, Hesai's presence in both Jiading and Chongqing placed it squarely within state-backed military-civil zones that further the PRC's national defense objectives.

### E. Post-IPO Gross-Margin Disclosures

On March 16, 2023 – "just five weeks after Hesai's IPO" – the Company reported its fourth-quarter and full-year 2022 financial results in a Form 6-K. *Id.*, ¶ 135. In the Form 6-K, Hesai reported that gross margin fell to 30.0% for 4Q22 (down from 52.4% for 4Q21), and that full-year 2022 gross margin was 39.2% (down from 53.0% in 2021). *Id.* Plaintiff alleges that Hesai attributed the decline to "increased shipments of lower-margin ADAS LiDAR products during the early ramp-up stage with lower in-house plant capacity utilization." *Id.*

Also on March 16, 2023, Plaintiff alleges that during the "4Q22 Earnings Call," Hesai's CFO disclosed that Autonomous Mobility products had a gross margin "over 50%" in 2022, while ADAS products had a gross margin "less than 5%" in 2022. *Id.*, ¶ 137. Following these disclosures, Plaintiff alleges that Hesai's ADS price fell $1.55 (approximately 10.2%) that same day. *Id.*, ¶ 136.

### F. The DoD's 1260H Listing

Plaintiff alleges that, on January 31, 2024, the DoD published the 1260H List and included Hesai on it. *Id.*, ¶ 142. Plaintiff alleges that Hesai issued a response on the same day denying that it had any connection to the PRC military "despite its inclusion on the 1260H List." *Id.* Plaintiff

7

alleges that the ADS price fell $1.81 (approximately 31%) on February 1, 2024. *Id.*, ¶ 143. Plaintiff relies on this price reaction and the alleged consequences of listing to support his contention that Section 1260H designation risk was material to investors. *Id.*, ¶¶ 74–75, 143.

### G.  The D.D.C. Litigation and Judge Friedman's Decision

The subsequent litigation in the United States District Court for the District of Columbia illustrates how Section 1260H's criteria were applied to Hesai and underscores Plaintiff's theory that the designation risk was not merely abstract or hypothetical.

On May 13, 2024, Hesai filed suit in the United States District Court for the District of Columbia, seeking removal from the 1260H List. *Hesai Tech. Co. v. U.S. Dep't of Def.*, 792 F. Supp. 3d 22, 27 (D.D.C. 2025); Dkt. 33, Am. Compl., ¶ 155.  In October 2024, the DoD delisted and then immediately relisted Hesai, issuing a new decision memorandum that articulated four statutory grounds for designation under Section 1260H(d)(2) – including enterprise-zone affiliation, affiliation with the PRC Ministry of Industry and Information Technology ("MIIT"), receiving assistance through PRC science-and-technology programs, and advertising on PRC military procurement platforms.  792 F. Supp. 3d at 31–32; Am. Compl. ¶ 156.

In *Hesai Technology Co. v. United States Department of Defense*, 792 F. Supp. 3d 22 (D.D.C. 2025), Judge Paul L. Friedman denied Hesai's motion for summary judgment and granted DoD's cross-motion, upholding the Section 1260H designation under the APA.  The court explained that Section 1260H defines a "Chinese military company" to include an entity "identified as a military-civil fusion contributor to the Chinese defense industrial base" that is also "engaged in providing commercial services, manufacturing, producing, or exporting."  792 F. Supp. 3d at 28–29 (quoting § 1260H(d)(1)(B)(i)(II), (d)(1)(B)(ii)).  The court further noted that the statute defines "military-civil fusion contributor" to include entities "residing in or affiliated

with a military-civil fusion enterprise zone or receiving assistance from the [PRC] through such enterprise zone." *Id.* at 28–29 (quoting § 1260H(d)(2)(E)).

On the statutory interpretation issues most pertinent to this case, the court (i) held that DoD had "presented substantial evidence" that Hesai satisfied the "enterprise zone" prong, § 1260H(d)(2)(E), based on Hesai's facilities in the Chongqing Economic Development Zone and the Jiading Industrial Zone, and (ii) rejected Hesai's contention that "mere residence" in such a zone could not suffice – explaining that the "plain statutory language" makes residence in a military-civil fusion enterprise zone" sufficient to constitute a "military-civil fusion contributor" under § 1260H(d)(2)(E). *Id.* at 34–37. And while the court rejected DoD's argument that the phrase "to the Chinese defense industrial base" in § 1260H(d)(1)(B)(i)(II) has no independent meaning – instead construing that phrase to require a showing that the entity's product or technology has "substantial military application or benefit," *id.* at 38–42, Judge Friedman ultimately concluded that DoD's determination that Hesai qualified as a "Chinese military company" was supported by substantial evidence and was neither arbitrary nor capricious. *Id.* at 48.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(6) Standard

To survive dismissal, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*,

556 U.S. at 679 (citation omitted).  At this stage, the Court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor.  *Twombly*, 550 U.S. at 555–56.  If the allegations do not nudge the claims "across the line from conceivable to plausible," dismissal is required.  *Id.* at 569.

In resolving a Rule 12(b)(6) motion, the Court considers not only the complaint but also "written instruments attached, statements incorporated by reference," and "public disclosure documents filed with the SEC."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).  "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control[s], and the court need not accept the allegations in the complaint as true."  *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (citation omitted).

### B.  Applicable Pleading Standard Under the Securities Act

Because Plaintiff asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act, the Court must determine the applicable pleading standard.  Sections 11 and 12(a)(2) may be pleaded on negligence and strict-liability theories; accordingly, they generally are governed by Rule 8's notice-pleading standard.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Rule 9(b)'s heightened particularity requirement applies only if the Securities Act claims "sound in fraud," a determination guided by the "conduct alleged," not merely by labels.  *Id.*

Here, the complaint expressly disclaims fraud, scienter, and intentional misconduct in connection with the Securities Act counts.  Plaintiff alleges, for example, that his Section 11 claim "does not sound in fraud," and that he "does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent

intent." Dkt. No. 33, Am. Compl., ¶ 168. The Section 12(a)(2) claim is pleaded in the same manner. *Id.*, ¶ 184.

Nor does the "conduct alleged" transform these claims into fraud claims in substance. The complaint charges Defendants with failing to disclose material information in offering documents and with negligently preparing those disclosures – not with knowingly or recklessly deceiving investors. Where a complaint separates its Securities Act claims, disclaims fraud, and pleads them on negligence and strict-liability theories, Rule 8 governs. *See Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *1–3 (2d Cir. Oct. 28, 2024). Accordingly, the Court evaluates Plaintiff's Securities Act claims under Rule 8.

### C. The Securities Act Framework

Sections 11 and 12(a)(2) impose primary liability for materially false or misleading statements in offering materials, while Section 15 imposes derivative control-person liability. *See* 15 U.S.C. §§ 77k, 77l(a)(2), 77o.

#### i. Sections 11 and 12(a)(2)

Section 11 provides that any person acquiring a security issued under a registration statement that either (1) "contained an untrue statement of a material fact" or (2) "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" may sue specified offering participants, including the issuer, signatories to the registration statement, directors, and underwriters. 15 U.S.C. § 77k(a). Issuers are subject to "virtually absolute" liability, while other statutorily enumerated defendants may be liable for mere negligence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Liability attaches if any part of the operative registration statement contained a material misstatement or omission. *See*

*In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013). To state a claim, a plaintiff must allege that:

> (1) he purchased a registered security;
> (2) the defendant participated in the offering in a manner sufficient to give rise to Section 11 liability; and
> (3) the registration statement contained a material misstatement or omission.

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010). A plaintiff bringing a Section 11 claim need not plead scienter, reliance, or loss causation as elements of the prima facie case. *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

Section 12(a)(2) similarly imposes liability on any person who offers or sells a security by means of a prospectus or oral communication that (1) "includes an untrue statement of a material fact" or (2) "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). A defendant may avoid liability by proving that he did not know, and in the exercise of reasonable care could not have known, of the alleged misstatement or omission. *Id.*

Unlike Section 11, which expressly identifies covered participants, potential defendants under Section 12(a)(2) are limited by the "statutory seller" requirement. *Morgan Stanley*, 592 F.3d at 359. An individual is a statutory seller if he either (1) passed title to the security for value, or (2) successfully solicited the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner. *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988). As with Section 11, scienter, reliance, and loss causation are not prima facie elements of a Section 12(a)(2) claim. *Morgan Stanley*, 592 F.3d at 359.

### ii.    Section 15 Control-Person Liability

Section 15 provides that any person who "controls" a primary violator of Section 11 or Section 12(a)(2) is jointly and severally liable to the same extent as the controlled person. 15

U.S.C. § 77o(a).  To state a claim under Section 15, a plaintiff must plausibly allege (1) a primary violation of Section 11 or Section 12(a)(2), and (2) control of the primary violator.  *See Morgan Stanley*, 592 F.3d at 358.  Section 15 liability is derivative; absent a primary violation, there can be no control-person liability.

### iii.    Material Misstatements or Omissions

Liability under Sections 11 and 12(a)(2) of the Securities Act arises when a registration statement or prospectus contains a material misstatement or omission.  15 U.S.C. §§ 77k(a), 77l(a)(2).  As the Second Circuit has explained, claims under these provisions require a complaint to identify an omission or misstatement that is both (1) unlawful and (2) material.  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013).

Sections 11 and 12(a)(2) create three potential bases for liability in offering documents: (1) an affirmative misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; or (3) an omission of information necessary to prevent existing disclosures from being misleading.  *See* 15 U.S.C. § 77k(a).  Where a plaintiff proceeds on an omissions theory – as is the case here – the "question is whether, assuming the truth of plaintiffs' allegations, the Offering Documents omitted information that defendants were required to disclose."  *Morgan Stanley*, 592 F.3d at 360.  Where offering documents "accurately conveyed the specific risk that the plaintiffs assert materialized," no Section 11 claim lies.  *ProShares*, 728 F.3d at 102.

Moreover, the federal securities laws do not impose a freestanding obligation to disclose all material information.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Nor is a corporation "required to disclose a fact merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (stating that disclosure is not required "simply because [information] may be relevant or of interest to a reasonable investor.").  An omission is actionable

only when disclosure is "necessary" to make the statements made, "in the light of the circumstances under which they were made, not misleading." 15 U.S.C. §§ 77k(a), 77l(a)(2).

As the Second Circuit has emphasized, the Securities Act does not convert disclosure into "a rite of confession or exercise in common law pleading." *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5–6 (2d Cir. 1983). Nor does it impose a "generalized duty" to disclose the "entire corpus" of a company's knowledge relating to a subject. *Morgan Stanley*, 592 F.3d at 366. That said, once an issuer speaks on a subject – even absent any independent legal duty to do so – it undertakes a duty to be both "complete and accurate." *Id.* (citation omitted); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

If a plaintiff plausibly pleads an unlawful omission or misstatement, the Court must then determine whether the alleged defect is material. Materiality under Sections 11 and 12(a)(2) is defined identically to materiality under Section 10(b). *Morgan Stanley*, 592 F.3d at 360. A fact is material if there is "a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Because materiality is "inherently fact-specific," *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988), and "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences," *TSC Indus., Inc.*, 426 U.S. at 450, dismissal on materiality grounds is appropriate only where the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Applying these principles, the Court considers whether Plaintiff plausibly alleges that the Offering Documents contained material misstatements or omissions. Specifically, the Court examines whether Plaintiff has adequately pleaded that Defendants failed to disclose (i) material information concerning Hesai's gross margins at the time of the IPO, and (ii) a material, company-specific risk of designation under Section 1260H.

For the reasons that follow, the Court concludes that (1) Plaintiff's Section 11 theory premised on Section 1260H designation risk is time-barred; (2) Plaintiff has plausibly alleged a material omission under Section 11 with respect to the gross-margin theory; (3) Plaintiff lacks statutory standing to pursue a claim under Section 12(a)(2); and (4) Plaintiff has plausibly alleged derivative control-person liability under Section 15 insofar as a primary Section 11 violation remains in the case.

## III.    DISCUSSION

At the outset, there is no dispute that Plaintiff has adequately pleaded the threshold elements of a Section 11 claim – that he purchased securities issued pursuant to the Registration Statement and that Defendants participated in the offering in a manner sufficient to give rise to Section 11 liability. Defendants instead contest the third element: whether the Offering Documents contained a material misstatement or omission.

This case presents two distinct omission theories under Section 11. The first is premised on the alleged failure to disclose the risk that Hesai could be designated as a "Chinese military company" under Section 1260H. The second is premised on the alleged failure to disclose the magnitude of the disparity between Autonomous Mobility margins and LiDAR margins at the time of the IPO. The first theory fails because it is untimely under Section 13. The second survives

15

because Plaintiff plausibly alleges that the Offering Documents understated the magnitude of an existing margin disparity.  The Court addresses each theory in turn.

### A.  Plaintiff's Section 11 Claims

### i.  Section 1260H Designation Risk – Accrual Under Section 13

Before turning to the substance of Plaintiff's Section 11 theory premised on the alleged omission of facts concerning Hesai's risk of designation as a "Chinese military company" under Section 1260H at the time of its February 2023 IPO, the Court must address Defendants' statute-of-limitations defense.  If the claim is time-barred under Section 13 of the Securities Act, the Court need not reach the merits.  This appears to be the first securities case to consider accrual under Section 13 in the context of a Section 1260H designation.

Defendants argue that Plaintiff's Section 11 theory premised on Section 1260H designation risk is untimely under Section 13 of the Securities Act, 15 U.S.C. § 77m, because the one-year limitations period began to run no later than January 31, 2024, when the Department of Defense ("DoD") publicly designated Hesai as a "Chinese military company" under Section 1260H. Plaintiff responds that the limitations clock did not start until February 2025, when the DoD's underlying memorandum and the asserted bases for designation became public in the related D.D.C. litigation – providing, for the first time, facts supporting the claim that Hesai already qualified for designation at the time of the February 2023 IPO.  For the reasons that follow, neither position is correct.

The timeline is straightforward.  The original complaint in this action was filed on April 7, 2023.  Hesai was designated as a "Chinese military company" on January 31, 2024.  Plaintiff first asserted a Section 11 theory predicated on alleged omissions concerning Section 1260H designation risk in the amended complaint filed on November 11, 2025.

Section 13 provides, in relevant part, that "No action shall be maintained to enforce any liability created under [Section 11] . . . unless brought within *one year after the discov*ery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m (emphasis added).  Section 13 also contains a statute of repose.  A Section 11 claim may not be brought "more than three years after the security was bona fide offered to the public."  *Id.*  The one-year limitations period and the three-year repose period operate independently, and a claim must be filed within the shorter of the two.  If discovery occurs (or should have occurred) within three years of the offering, the one-year period governs; if discovery does not occur within that time, the three-year repose period provides an absolute outer limit.

There is no need to resort to the statute of repose here.  Hesai's IPO occurred in February 2023, and Plaintiff amended his complaint to assert the Section 1260H theory in November 2025 – less than three years after the offering.  The only question, therefore, is whether Plaintiff discovered, or should have discovered, the alleged omission more than one year before November 11, 2025.

As in most cases, the "discovery" inquiry under Section 13 is "fact-intensive."  *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016).  At the pleading stage, dismissal on limitations grounds is appropriate only when untimeliness is clear from the face of the complaint and documents properly considered on a motion to dismiss.

Although *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), interpreted the Securities Exchange Act of 1934's "discovery of the facts constituting the violation" provision, its construction of when "discovery" occurs is instructive here.  In *Merck*, the Supreme Court rejected

17

a rule that starts the clock at mere "inquiry notice" or upon generalized "storm warnings." Instead, accrual begins when the plaintiff actually discovered – or when a reasonably diligent plaintiff would have discovered – the "facts constituting the violation." *Id.* at 648–53. In the Second Circuit, the same practical constraint appears in the Section 13 context. A fact is not deemed "discovered" until the plaintiff can plead the facts constituting the violation "with sufficient detail and particularity" to survive a Rule 12(b)(6) motion. *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).

Defendants' core premise is that the January 31, 2024 designation itself revealed the alleged Securities Act violation. In their view, once the Government publicly determined that Hesai qualified as a "Chinese military company," investors necessarily knew – or should have known – that the IPO had omitted a material fact that should have been disclosed.

That argument has intuitive force. The fact of designation unquestionably alerted the market that a serious regulatory event had occurred. It may well have put a reasonable investor on notice that something significant had not been disclosed in the Offering Documents. But the materialization of a regulatory risk – here, DoD's placement of Hesai on the Section 1260H list in January 2024 – is not the same thing as discovery that the regulatory risk existed at the time of Hesai's February 2023 IPO, thereby rendering the Offering Documents misleading when issued. In other words, an investor can be on notice that a risk has materialized – *i.e.*, that the Government has taken an adverse action affecting the issuer – without knowing, or being able to know, facts necessary to plead that the Offering Documents were misleading *when issued.*

After all, a Section 1260H designation could reflect (among other possibilities) information developed after the IPO, a change in governmental interpretation or enforcement posture, or an agency determination resting on nonpublic materials not otherwise knowable to investors. But

Section 11 liability turns on whether the Offering Documents were materially false or misleading at the time they became effective. *See* 15 U.S.C. § 77k(a). The mere fact of a later regulatory designation does not, by itself, establish that the registration statement omitted facts that rendered it misleading when issued.

This is especially so here, where the DoD's public communications at the time of listing, as alleged, were devoid of any entity-specific factual basis. On January 31, 2024, DoD issued a press release announcing that it had updated its list of "Chinese military companies" pursuant to Section 1260H, identifying Hesai among the listed entities.[1] The release describes Section 1260H's statutory mandate and the broader policy objective of countering the PRC's "Military-Civil Fusion" strategy, but it does not articulate any entity-specific factual findings as to Hesai.

DoD subsequently published a Federal Register notice stating, in summary fashion, that "The Secretary of Defense has determined" that the entities listed – including "Hesai Technology Co., Ltd." – "qualify as 'Chinese military companies'" under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act. 89 Fed. Reg. 22,698, 22,698 (Apr. 2, 2024). The notice recited the statutory authority and then reproduced a list of designated entities. It did not set forth the factual basis for the Secretary's determination as to Hesai or any other entity.

Taken together, the press release and Federal Register notice conveyed the Secretary of Defense's bottom-line determination, not the underlying facts supporting it. That announcement may have alerted investors that designation risk had materialized, but it did not, by itself, reveal why DoD concluded Hesai qualified for designation, the factual predicates on which DoD relied,

---

[1] *See* Press Release, U.S. Department of Defense*, DOD Releases List of People's Republic of China (PRC) Military Companies in Accordance With Section 1260H of the National Defense Authorization Act for Fiscal Year 2021* (Jan. 31, 2024), https://www.defense.gov/News/Releases/Release/Article/3661985/dod-releases-list-of-peoplesrepublic-of-china-prc-military-companies-in-accord.

or whether those unstated grounds existed at the time of the IPO in February 2023. Even assuming the January 31, 2024 designation triggered an obligation to investigate, the publicly available materials at that time did not supply the facts necessary to plead a Section 11 omission claim.

To be sure, it is entirely plausible that Hesai appreciated, at the time of the IPO, that it faced some risk of being designated under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act. Section 1260H sets out specific criteria for designation, and in the related D.D.C. litigation Judge Friedman described the statute's framework in a manner that underscores that its operative categories were not mysterious or unknowable to a company operating in the relevant regulatory environment. But whether the issuer knew or should have known of its own designation risk is not the statute-of-limitations question under Section 13.

For limitations purposes, the question is when a reasonably diligent plaintiff discovered, or through the exercise of reasonable diligence should have discovered, the facts constituting the alleged omission – *i.e.*, facts sufficient to plead that the predicate conditions for a Section 1260H designation existed as of the IPO and rendered the Offering Documents misleading when issued. *See* 15 U.S.C. § 77m. Nothing in either the press release or the Federal Register notice provided the investing public with those facts, or with a basis to plead them with sufficient particularity.

Although the limitations period "does not await [a plaintiff's] leisurely discovery of the full details" of a claim, *Gieringer v. Silverman*, 731 F.2d 1272, 1277 (7th Cir. 1984), *Merck* and *MBIA* make clear that the clock starts when the plaintiff has (or should have) enough of the operative facts to plead the facts constituting the alleged omission-based violation. The January 31, 2024 press release was insufficient to trigger Section 13 accrual because it did not explain why a reasonable investor, at the time of the IPO, should have known of facts tending to show that Hesai would qualify as a "Chinese military company." Accordingly, for purposes of Section 13,

accrual does not begin upon designation alone, but only when the underlying, entity-specific facts supporting that designation are sufficiently accessible to permit a reasonably diligent plaintiff to plead the omission-based violation.

Plaintiff contends that the limitations clock did not start until February 2025, when the DoD's underlying memorandum and asserted bases for designation became public in the related D.D.C. litigation. The procedural history of that case, facts available from the amended complaint, and the documents on which it relies reveal that the necessary information was in fact filed publicly many months earlier. Hesai obtained the substantive report supporting its designation months earlier through its own FOIA request, and that same memorandum was not filed publicly on the D.D.C. docket until July 17, 2024.

On May 13, 2024, following DoD's January 2024 designation, Hesai initiated litigation in the District of Columbia challenging its inclusion on the Section 1260H List. Before the administrative record was certified, Hesai had already sought to obtain the decision memorandum underlying the designation. On March 13, 2024, Hesai submitted a FOIA request seeking "The decision memorandum or other document finalizing the Department's decision to include Hesai on the list" under Section 1260H. *Hesai Tech. Co., Ltd. v. U.S. Dep't of Def.*, No. 1:24-cv-01381 (D.D.C.), Dkt. No. 19-2, at 1.

DoD responded to Hesai's FOIA request on May 29, 2024. *Id.*, Dkt. No. 19-3, at 1. The response states that the Office of the Under Secretary of Defense for Acquisition & Sustainment "conducted a search of their records systems and located 15 pages determined to be responsive to [Hesai's] request," and enclosed those pages. *Id.* The enclosed document was a report dated November 2, 2023 – the report on which the Deputy Secretary's January 18, 2024 Section 1260H designation determination was based. *See id.*

As Libbi Finelson, Associate General Counsel with DoD, explained in a sworn declaration:

The Deputy Secretary of Defense's January 18, 2024, determination to include Hesai Technology Co., Ltd. (Hesai) on the list mandated by section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act (NDAA) for Fiscal Year 2021, Pub. L. No. 116-283, was based on a report dated 2 November 2023.

*Hesai*, No. 24-cv-1381 (D.D.C.), Dkt. No. 19-4, ¶ 2.; *see also* Dkt. No. 41-6 (Nov. 2, 2023 Report).

The November 2, 2023 report was filed publicly on the D.D.C. docket on July 17, 2024 as Exhibit 3 to Defendants' opposition to Hesai's motion to supplement the administrative record. *See Hesai*, No. 1:24-cv-01381 (D.D.C.), Dkt. No. 19-3. From that date forward, the memorandum – including its statutory analysis and entity-specific factual findings – was publicly accessible. As of that date, a reasonably diligent investor – especially one who had already filed a Securities Act complaint against Hesai, and who was undoubtedly following the D.D.C. lawsuit with great interest – possessed the operative factual basis necessary to plead that the designation rested on pre-IPO affiliations and activities, and that those affiliations and their concomitant risks were omitted from the IPO materials.

The November 2, 2023 memorandum was not a conclusory notice. It tracks the statutory elements of Section 1260H(d)(1)(B) and applies them expressly to Hesai. As previously discussed, Section 1260H defines a "Chinese military company" as an entity that (i) is either affiliated with the PLA or "identified as a military-civil fusion contributor to the Chinese defense industrial base," and (ii) is "engaged in providing commercial services, manufacturing, producing, or exporting." § 1260H(d)(1)(B). The statute further defines "military-civil fusion contributor" to include, among other categories, "Entities affiliated with the Chinese Ministry of Industry and Information Technology, including research partnerships and projects." § 1260H(d)(2)(B).

The memorandum explicitly grounds its determination in § 1260H(d)(1)(B)(i)(II) – the military-civil fusion prong. It states that "Hesai is a military-civil fusion contributor to the Chinese

defense industrial base through its affiliation with the Chinese MIIT." AR 00014. It identifies concrete affiliations and activities that fall squarely within § 1260H(d)(2)(B)'s "affiliated with the Chinese Ministry of Industry and Information Technology" language.

Specifically, the report explains that Hesai identified four MIIT-administered programs in its IPO prospectus, including the "Internet of Vehicles (Intelligent Connected Automobiles) Industry Development Action Plan" and the "Medium- and Long-Term Development Plan for the Automobile Industry." AR 00013. It further states that Hesai "acts as part of the National Automotive Standardization Technical Committee," which "the Chinese MIIT established and oversees," and that Hesai was "one of the main drafting organizations" of a national standard entitled "Automotive LiDAR performance requirements and test methods" under the jurisdiction of that MIIT-supervised committee. AR 00013–00014. The report also notes that Hesai "applied for and received the Radio Transmitting Equipment Model Approval . . . administrative license from the Chinese MIIT." AR 00014. Finally, it explains that MIIT administers the "Little Giants" program and that Hesai "was included in Batch 4 of 'Little Giants' announced in August 2022." AR 00015. Each of these findings ties Hesai to PRC-directed industrial initiatives – precisely the type of affiliation described in § 1260H(d)(2)(B). Importantly, several of these facts – including the August 2022 "Little Giants" designation – predate the February 2023 IPO.

The report separately addresses § 1260H(d)(1)(B)(ii)'s commercial-activity requirement, stating that Hesai "is engaged in providing commercial services, manufacturing, producing, or exporting because it manufactures and exports automotive three-dimensional LiDAR devices." AR 00014. It identifies Hesai's manufacturing operations and exports to U.S.-based customers. AR 00014–00015.

23

The memorandum also addresses the statutory requirement that the entity operate "directly or indirectly in the United States."  It concludes that Hesai "operates both directly and indirectly in the United States through its ownership of a U.S.-based subsidiary, its establishment of a U.S. office, its listing on a U.S. stock exchange, and its exports to U.S. companies."  AR 00015.  In support, it identifies Hesai's March 2019 acquisition of Oxigraf in Sunnyvale, California, the establishment of a Palo Alto office, its NASDAQ listing, and sales to U.S.-based customers.  *Id.*

The memorandum concludes that "Based on the foregoing, the Secretary of Defense determines that Hesai is a Chinese military company pursuant to Pub. L. No. 116-283, § 1260H."  AR 00014.

In short, by no later than July 17, 2024, Plaintiff had access to a written memorandum that (1) identified the specific statutory prongs applied against Hesai, (2) articulated detailed, entity-specific factual findings supporting the military-civil fusion determination, (3) tied those findings to pre-IPO affiliations and activities, and (4) concluded that Hesai met the statutory definition under Section 1260H.  Those findings – set forth in the November 2, 2023 memorandum – constitute the very "facts constituting the violation" within the meaning of *Merck*. For purposes of a Section 11 omission claim, the relevant "violation" is the issuance of a registration statement that omitted material facts necessary to make the statements therein not misleading.  *See* 15 U.S.C. § 77k(a).  Accordingly, the existence of pre-IPO affiliations and activities that, according to DoD, satisfied the statutory elements of Section 1260H is assuredly a "fact," and one that goes directly to whether the IPO disclosures omitted material information concerning designation risk.  *See Merck*, 559 U.S. at 648.  Once those facts were available, a reasonably diligent plaintiff had sufficient information to plead that the designation rested on pre-IPO relationships and that those relationships allegedly rendered the IPO disclosures misleading.

Moreover, Section 13 does not require that these facts be widely publicized.  It requires only that the plaintiff discover, or through reasonable diligence should have discovered, the facts constituting the alleged omission.  *See* 15 U.S.C. § 77m.  Accordingly, where a Section 11 omission theory is premised on a subsequent regulatory designation, the designation itself does not trigger accrual under Section 13 unless the underlying, entity-specific factual predicates supporting that designation are publicly available such that a reasonably diligent plaintiff could plead the omission-based violation.

Even if January 31, 2024 – the date on which Hesai was designated as a Chinese military company – is too early to mark the beginning of the one-year limitations period, July 17, 2024 is not.  By that date, the operative memorandum that set forth the statutory analysis and factual bases for Hesai's Section 1260H designation was publicly filed and accessible.  The one-year limitations period therefore began to run no later than July 17, 2024, and expired on July 17, 2025.  Because the Section 11 omission theory premised on alleged failure to disclose the risk of Hesai's Section 1260H designation was not asserted until November 11, 2025, that claim is untimely and must be dismissed as time-barred under Section 13.

To avoid this result, Plaintiff argues that his untimely Section 11 theory relates back to the initial complaint, filed on April 7, 2023, because it concerns statements and omissions in the same Offering Documents.  But that argument fails under Rule 15(c)(1)(B), which turns on notice – not on whether the amendment points to the same set of Offering Documents.

As the Second Circuit has explained, the "central inquiry" is whether "adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006).  Put differently, relation back is mandatory only when "the

facts provable under the amended complaint arose out of the conduct alleged in the original complaint." *Id.* at 227. When the amendment is instead "based on an entirely distinct set" of operative facts, it does not relate back. *Id.* at 229.

Measured against that standard, the Section 1260H omission theory does not relate back. The original complaint alleged that the Offering Documents were misleading because they overstated Hesai's "industry-leading gross margin" and failed to disclose the true extent and cause of the Company's gross margin deterioration in the fourth quarter of 2022. Dkt. No. 1, ¶¶ 31–35. The original pleading focused exclusively on gross margins related to product mix and undisclosed fourth-quarter results. *See id.* It did not mention Section 1260H, the Department of Defense, any risk of designation as a "Chinese military company," "military-civil fusion enterprise zones," or any risk that Hesai could lose its largest customer as a consequence of such a designation.

By contrast, the amended complaint newly alleges that the Offering Documents failed to disclose "the material risk that Hesai could be named to a statutory list of Chinese military companies by the U.S. Department of Defense," Dkt. No. 33, ¶ 12, that Hesai had built or planned facilities in military-civil fusion enterprise zones, *id.*, ¶¶ 76–84, that it was later named to the DoD's "1260H List," *id.*, ¶ 14, and that such designation imperiled its relationship with "Customer B," its largest customer accounting for approximately 20% of revenues, *id.*, ¶¶ 60–64. The amended pleading further alleges that placement on the 1260H List created reputational harm. *Id.*, ¶¶ 14–16. These allegations do not "render prior allegations more definite and precise." *Slayton*, 460 F.3d at 228. They arise from a distinct nucleus of facts centered on a federal statutory designation regime, alleged military-civil fusion affiliations, and the asserted downstream loss of a key customer. What is more, because the original complaint in this action predated the January

26

31, 2024 designation itself, it could not have set out – or even attempted to set out – the factual basis for a Section 1260H omission theory.

Because the original complaint did not provide Defendants with notice that they would be required to defend against omissions concerning Section 1260H designation risk and its asserted downstream consequences, the amended theory does not arise out of the same "conduct, transaction, or occurrence" as did the original complaint. It thus does not relate back to the allegations of the original complaint. It remains time-barred. Plaintiff's Section 11 theory premised on alleged omissions concerning Section 1260H designation risk is dismissed as untimely under Section 13 of the Securities Act.

The only remaining theory of primary liability under Section 11 is Plaintiff's gross-margin omission theory. The Court therefore turns to whether the Offering Documents materially misstated or omitted information concerning the magnitude of the disparity between Autonomous Mobility margins and ADAS margins at the time of the IPO.

### ii.    Statements Regarding Gross Margins

The Court's analysis begins with the actual language of the Offering Documents themselves, namely Hesai's IPO Prospectus and Registration Statement. Under Sections 11 and 12(a)(2), liability turns on whether the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §§ 77k(a), 77l(a)(2). The Court must "review the documents holistically and in their entirety." *Morgan Stanley*, 592 F.3d at 365–66.

The Offering Documents squarely disclose both (i) declining historical gross margins and (ii) an expected further decline tied to product mix shifts toward ADAS. The Prospectus states:

> Our gross margin decreased from 70.3% in 2019 to 57.5% in 2020, and further decreased to 53.0% in 2021. Our gross margin decreased from 53.3% in the nine

27

months ended September 30, 2021 to 44.0% in the nine months ended September 30, 2022.

Dkt. No. 41-2, at 90.  The Prospectus further warned:

> We expect the average selling price for our LiDAR units and our gross margin to decrease as our shipment volume increases, especially with the increasing shipment of LiDAR units for the ADAS market and LiDAR units shipped to the United States that incur higher tariffs.

*Id.*  And it explained:

> The LiDAR products for the ADAS market generally have much lower selling prices than the LiDAR products for the Autonomous Mobility market, and our changes in product mix that now starts to focus more on the LiDAR products for the ADAS market will decrease our average selling price.

*Id.*  In addition, in its Management's Discussion and Analysis section, the Prospectus reiterated:

> As a result of [increased revenue from the sale of LiDAR units], our gross profit increased by 42.6% from RMB244.8 million for the nine months ended September 30, 2021 to RMB349.1 million (US$49.1 million) for the nine months ended September 30, 2022.  Our gross margin decreased from 53.3% for the nine months ended September 30, 2021 to 44.0% for the nine months ended September 30, 2022 primarily due to the increased sales of LiDAR units that have lower margins.

*Id.* at 96.  These are not boilerplate risk disclosures.  They explicitly disclose a causal connection between declining gross margins and increasing, lower-priced LiDAR shipments.  Viewed on their own, the statements strongly support Defendants' position that the Offering Documents disclosed both the downward trend in gross margins and its connection to a shift in product mix.  And a claim does not lie where offering materials "accurately conveyed the specific risk that the plaintiffs assert materialized."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).

The analysis, however, does not stop there.  The relevant question is whether, taken together and in context, the disclosures "would have misled a reasonable investor."  *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  And once a company "speaks on an issue or topic, there is a duty to tell the whole truth."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).  Thus, the question is not simply whether Hesai disclosed that margins were declining, but

whether – having chosen to speak about margins as a core indicator of corporate strength – it told "the whole truth" and avoided presenting a materially incomplete picture.

Read as a whole, the Prospectus presents a tension. It acknowledged falling margins, yet at the same time touted its gross margin as a hallmark of Hesai's competitive strength. The Prospectus stated that Hesai's "shipment volume, revenue scale and margins validate its global leadership," Dkt. No. 41-2 at 3, and that its "industry-leading gross margin enables it to organically and rapidly grow its business," *id.* at 72. Thus, even as margins were trending downward, they were invoked as proof of competitive strength. Put simply, the Prospectus emphasized that Hesai's margins would remain a driver of future growth; yet it did not disclose how dramatically lower the margins were in the newer LiDAR line compared to its previous Autonomous Mobility products – information a reasonable investor would need to appreciate the likely effect of that product shift on Hesai's overall profitability.

To be clear, Plaintiff does not allege that declining margins were concealed. They were not. Nor does Plaintiff dispute that the shift toward LiDAR products was disclosed. It was. Rather, Plaintiff's theory is narrower: that the Offering Documents failed to disclose the magnitude of the disparity between Autonomous Mobility margins and LIDAR margins, and that this disparity was so severe that increasing ADAS volume would fundamentally alter the company's profitability.

Although securities laws do not require disclosure of "any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), once an issuer emphasizes margins as evidence of continued growth, while also telling investors that it is shifting toward products that "have lower margins," it must disclose enough information to avoid leaving investors with a materially incomplete understanding what that product shift would mean in practice. Second

Circuit precedent confirms that omission liability arises when statements "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Vivendi*, 838 F.3d at 240 (quotation omitted).

Applying that standard here, if – as Plaintiff alleges – LiDAR margins were an order of magnitude lower than Autonomous Mobility margins, then a reasonable investor could conclude that the severity of that gap would significantly alter the "total mix" of information available. *TSC Indus., Inc.*, 426 U.S. at 449. In this circumstance, describing ADAS products as having "lower margins," without conveying the magnitude of that difference, could plausibly be viewed as materially incomplete. *See Credit Suisse First Bos. Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described."). At the pleading stage, the Court does not determine whether that omission ultimately proves material; it holds only that Plaintiff has plausibly alleged material incompleteness. At a minimum, whether investors were adequately warned about the seriousness – not merely the existence – of decreasing profit margins presents a mixed question of law and fact that cannot be resolved on a motion to dismiss. *See Litwin*, 634 F.3d at 718.

Although Defendants do not expressly invoke the PSLRA safe harbor for forward-looking statements, their argument that the Prospectus merely expressed expectations about future margin trends implicates it. That argument fails at the outset. The statutory safe harbor "does not apply to statements made in connection with an initial public offering." *See* 15 U.S.C. §§ 77z-2(b)(2)(D), 78u-5(b)(2)(D); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). Because the challenged statements appear in Hesai's IPO Prospectus, the statutory safe harbor provides no protection.

Therefore, the analysis must proceed under the judicially created bespeaks-caution doctrine, which Defendants themselves fail to invoke. The bespeaks caution doctrine is "a corollary of the well-established principle that a statement or omission must be considered in context." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (internal quotation marks omitted). Under the doctrine, "a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Id.*; *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). To apply it, however, the cautionary language must "pertain to the specific risk that was realized." *Gregory*, 297 F. Supp. 3d at 398. And "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173.

Measured against those standards, it is clear the Prospectus contains warnings that margins would decrease as LiDAR shipments increased. *See* Dkt. No. 41-2 at 90, 96. Those warnings go a long way toward informing investors of the direction of the risk and its general cause. But Plaintiff's theory is not that investors were unaware that margins might fall. It is that the Prospectus failed to disclose the magnitude of the existing disparity between Autonomous Mobility margins and ADAS margins – an alleged present fact bearing directly on how severe the shift's impact would be. To the extent the Prospectus simultaneously described Hesai's "industry-leading gross margin" as enabling future growth, Dkt. No. 41-2 at 72, while Hesai already possessed data reflecting an unusually large margin gap, the omission concerns the scale of an existing condition – not merely a speculative future downturn.

The bespeaks-caution doctrine does not bar claims where cautionary language warns of possible adverse outcomes but omits "hard facts critical to appreciating the magnitude of the risks

31

described." *Credit Suisse First Bos. Corp.*, 2001 WL 300733, at \*8. As Judge Pollack aptly put it, the bespeaks-caution doctrine provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). If, as alleged, ADAS margins were dramatically lower than prior product lines, describing them only as "lower margins" may not have conveyed the severity of the profitability shift. Whether the Prospectus's warnings adequately contextualized that magnitude is not a question that can be resolved as a matter of law on the pleadings.

Accordingly, viewing the Offering Documents as a whole, Plaintiffs adequately allege that the Prospectus failed to disclose facts necessary to appreciate the magnitude of the margin risk associated with Hesai's shift toward LiDAR products. Whether the disclosures ultimately prove sufficient to render the omission immaterial is a question better resolved on a fuller record. *See Litwin*, 634 F.3d at 718.

Relying exclusively on *In re EHang Holdings Ltd. Securities Litigation*, 646 F. Supp. 3d 443, 462 (S.D.N.Y. 2022), Defendants separately argue that Hesai's statements describing itself as a "global leader" and touting its "industry-leading gross margin" are non-actionable puffery. That argument mischaracterizes both the nature of the challenged statements and the governing standard.

It is well established that vague expressions of corporate optimism – statements that are "too general to cause a reasonable investor to rely upon them" – are not actionable. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). Courts routinely dismiss claims premised on generic assertions of being "best-in-class," "premier," or "industry leading" where those statements are untethered to measurable facts and amount to little more than

promotional rhetoric. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019). But puffery doctrine is limited to "[s]ubjective claims about products, which cannot be proven either true or false." *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995). Courts have found statements to be puffery as a matter of law only where they "do not provide any concrete representations." *Basquiat ex rel. Estate of Basquiat v. Sakura Int'l*, 2005 WL 1639413, at 5 (S.D.N.Y. July 5, 2005).

Whether a statement is inactionable "puffery" depends on "the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). And here, Hesai's references to "global leadership" and "industry-leading gross margin" were situated in a Prospectus that repeatedly supplied concrete comparative metrics. For example, the Prospectus states that Hesai is "the most commercially successful LiDAR company globally," and immediately supports that assertion with shipment and revenue data: it had shipped "over 103,000 LiDAR units from 2017 to December 31, 2022," "over 80,400 LiDAR units in aggregate in 2022," and generated "the highest revenue as compared with listed LiDAR companies around the world for the nine months ended September 30, 2022, outperforming the second place by over 3.6 times," all "according to the Frost & Sullivan Report." Dkt. No. 41-2, at 11. It also disclosed precise historical gross margins – 70.3%, 57.5%, 53.0%, and 44.0% – alongside the assertion that its "industry-leading gross margin enables it to organically and rapidly grow its business." *Id.* at 11, 72. These comparative claims are concrete, and their "truth or falsity" is capable of objective verification.

Similarly, the Prospectus represents that Hesai was "the global No. 1 LiDAR solution provider in terms of revenue in the Autonomous Mobility application market in 2021, representing approximately 60% of the global market share," again citing the Frost & Sullivan Report. *Id.* at

13.  In the ADAS segment, it states that Hesai's "manufacturing capacity dedicated to the ADAS market has reached approximately 20,000 units per month," that it shipped "approximately 62,000 AT128 LiDAR units in aggregate in 2022," and that it ranked "No.1 in terms of LiDAR design wins" according to a Yole Intelligence Report. *Id.* at 13.  These are not generalized boasts.  They are precise claims about rank, market share, shipment volume, capacity, and revenue comparisons capable of objective verification.

Therefore, the challenged statements were not mere aspirational slogans.  They were presented as conclusions derived from quantifiable metrics of performance.  For this reason, Defendants' reliance on *In re EHang Holdings Ltd. Securities Litigation*, 646 F. Supp. 3d 443, 462 (S.D.N.Y. 2022) is misplaced.  There, the court addressed generalized claims of being "industry leading" and "first in the world" divorced from the type of detailed, data-driven financial comparisons present here.  646 F. Supp. 3d at 462.  Because Hesai's leadership assertions were tied to specific shipment volumes, revenue rankings, and margin figures, a reasonable investor could interpret such statements as comparative factual representations – not as vague expressions of optimism immune from scrutiny.

Accordingly, viewed in context and as part of the Prospectus as a whole, the challenged "global leadership" and "industry-leading gross margin" statements cannot be dismissed at this stage as immaterial puffery as a matter of law.  At a minimum, Plaintiff has plausibly alleged that the Prospectus failed to disclose the magnitude of the disparity between Autonomous Mobility margins and LiDAR margins, and that this disparity was so severe that the shift in product mix would materially alter Hesai's overall profitability – an alleged material omission of fact sufficient to withstand dismissal.

### iii.    Affirmative Obligation to Disclose Omitted Facts

Defendants next argue that, even if margins on Hesai's ADAS LiDAR products were dramatically lower than margins on its autonomous mobility products, the Securities Act imposed no obligation to quantify product-level margins in the IPO materials.  The Court therefore must determine whether the Offering Documents omitted information that Hesai was required to disclose by an applicable line-item requirement, or omitted information necessary to make what was said not misleading.  *Morgan Stanley*, 592 F.3d at 360.  Because the Securities Act does not impose a freestanding duty to disclose all material information, omission liability attaches only when a statute or regulation requires disclosure, or when the issuer chooses to speak and thereby assumes a duty to speak completely and accurately.  *See Resnik*, 303 F.3d at 154; *Matrixx Initiatives, Inc.*, 563 U.S. at 44.  Plaintiff invokes two sources of duty: (1) Form 20-F Item 5(D), governing "Operating and Financial Review and Prospects", and (2) Form 20-F Item 3(D), governing risk factors.

a.    Form 20-F Item 5(D) (MD&A) – Known Trends and Uncertainties

Section 13(a) of the Exchange Act requires issuers to file periodic information statements.  *See* 15 U.S.C. §§ 78m(a)(1), 78l(b)(1).  These statements include the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), in which companies must provide the information required by Item 303 of Regulation S–K.  Although Item 303 of Regulation S-K does not technically apply to foreign private issuers, courts treat Item 5(D) as calling for the same MD&A-style disclosure, including the obligation to discuss known trends and uncertainties that are reasonably likely to have a material impact.  *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021).

35

Item 5(D) of Form 20-F requires that registrants "discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition." *Cf.* 17 C.F.R. § 229.303(b)(2)(ii) (2022).

The SEC's interpretive release clarifies how registrants are to evaluate whether disclosure of a known trend is required.  The SEC's interpretive guidance establishes a two-step analysis:

1. Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

2. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

MD&A, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).  To plead a Section 11 claim, plaintiffs need not prove that the trend in fact caused the later decline.  Instead, they need only plausibly allege that (1) the trend was known to management at the time of the offering and (2) it was reasonably likely to have a material effect.  *Litwin*, 634 F.3d at 716–18.

Plaintiff alleges a specific, concrete trend that had already begun to manifest before the Registration Statement became effective.  According to the complaint, by the time of the IPO, Hesai had already realized gross margins of less than five percent on its LiDAR products during 2022, while maintaining margins exceeding fifty percent on its legacy Autonomous Mobility products.  Dkt. No. 33, ¶ 96.  Plaintiff further alleges that this extreme disparity was already

exerting downward pressure on Hesai's consolidated gross margin and that the effect was reasonably likely to intensify as LiDAR shipments increased. *Id.*, ¶¶ 94, 96–100, 123–125.

These allegations describe more than an abstract risk of future margin decline. They describe an existing shift in product mix toward a line of business with order-of-magnitude lower profitability – a shift that had already begun to affect reported results. The Offering Documents prominently highlighted Hesai's historical gross margins above fifty percent and described its margins as "industry-leading." At the same time, they stated that gross margin was expected to decrease in the fourth quarter of 2022 as product mix shifted toward ADAS. Dkt. No. 33, ¶ 95.

Plaintiff alleges, however, that this disclosure conveyed only a modest, prospective, quarter-specific decline, while omitting that: (1) the fourth quarter of 2022 was already complete; (2) margins had already "drastically decreased" during that quarter; and (3) the principal driver of the decline was an extreme and ongoing disparity between ADAS and autonomous mobility margins. *Id.*, ¶¶ 94–95, 123–125.

At this stage, those allegations plausibly identify the type of "known trend" Item 5(D) is designed to capture. Although Defendants are correct that Item 5(D) does not require granular product-level margin disclosure, Plaintiff's theory is not that Hesai was required to publish a catalogue of internal metrics. The theory is narrower: once Hesai's management knew that (1) its LiDAR products carried margins below five percent, (2) its LiDAR products were being scaled aggressively, and (3) that scaling was already decreasing consolidated gross margins, Item 5(D) required disclosure sufficient to communicate the existence and magnitude of that dramatic downward trend.

At the motion-to-dismiss stage, the Court cannot conclude that the alleged omission was "so obviously unimportant to a reasonable investor that reasonable minds could not differ."

37

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  Whether the shift toward ultra-low-margin LiDAR products was reasonably likely to have a material effect on profitability – and whether the Offering Documents adequately conveyed that reality – are fact-intensive determinations not suitable for resolution as a matter of law on the present record.  Accordingly, Plaintiff has plausibly alleged an omission of a known trend under Item 5(D).

   b.   Form 20-F Item 3(D) (Risk Factors)

Plaintiff's claim that Hesai violated its disclosure duties under Item 5(D) rests on the same allegations addressed above.  Item 3(D) of Form 20-F requires that registrants "disclose risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."   Form 20-F, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/files/form20-f.pdf (last visited Feb. 18, 2026); *cf.* 17 C.F.R. § 229.105 ("Item 105").

The Complaint alleges that Hesai's risk disclosures were misleading because they warned that margins may decline due to pricing pressures and product-mix shifts, while omitting that LiDAR margins were allegedly below five percent and had already materially decreased consolidated margins prior to the IPO.  Dkt. No. 33, ¶¶ 127–133.  According to Plaintiff, these omitted facts rendered the risk disclosures incomplete and understated the immediacy and magnitude of the margin decline.

As explained above, these allegations are not analytically distinct from Plaintiff's Item 5(D) theory.  The same alleged facts – namely, that Hesai knew of an extreme margin disparity between LiDAR and Autonomous Mobility products, and that this disparity was already affecting consolidated profitability – form the basis of both claims.  Accordingly, the same rationale that supports Plaintiff's Item 5(D) claim supports his Item 3(D) claim.  *See Hutchison v. Deutsche Bank*

*Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011).  To the extent Plaintiff maintains a separate claim under Item 3(D), it survives for the same reasons as the Item 5(D) claim.

### B.  Plaintiff Lacks Standing to Sue Under Section 12(a)(2)

Defendants separately argue that Plaintiff lacks standing to pursue his Section 12(a)(2) claim because there is no allegation that he purchased his shares directly in the IPO.  Plaintiff does not respond to this argument in his opposition brief.  The Court concludes that Plaintiff's Section 12(a)(2) claim must be dismissed for lack of statutory standing.

The complaint alleges only that Plaintiff "purchased Hesai ADSs pursuant and/or traceable to the Offering Documents and was damaged thereby."  Dkt. No. 33, Am. Compl., ¶ 24.  The class definition likewise includes persons who purchased ADSs "pursuant and/or traceable to" the Offering Documents issued in connection with the IPO.  *Id.*, ¶ 1.  Nowhere does the pleading allege that Plaintiff purchased his ADSs directly from Hesai or from any defendant in the IPO itself.  That omission is dispositive.

Section 12(a)(2) imposes liability on a person who "offers or sells a security … by means of a prospectus or oral communication" containing a material misstatement or omission, and makes that person "liable to the person purchasing such security from him."  15 U.S.C. § 77l(a)(2).  The statute thus requires a direct purchase from the defendant or its statutory equivalent.

In *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995), the Supreme Court squarely rejected the notion that Section 12(a)(2) liability extends to secondary-market transactions.  The Court held that "the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder."  *Id.* at 584.  Section 12(a)(2), the Court explained, is therefore limited to "public offerings by issuers and their controlling shareholders," *id.* at 578, because the statute ties liability to misstatements made "by means of a prospectus," and

a prospectus, properly understood, is a document "soliciting the public to acquire securities from the issuer," *id.* at 576–77.

The Court emphasized that the 1933 Act "was primarily concerned with the regulation of new offerings," *id.* at 571–72, and that § 12(2) liability "be limited to public offerings," *id.* at 578. It rejected any interpretation that would extend rescission liability to "every casual communication between buyer and seller in the aftermarket," warning that such a reading would create "vast additional liabilities" untethered to the Act's structure. *Id.* at 573–74.

Consistent with *Gustafson*, the Second Circuit has held that a plaintiff must have purchased securities directly from the defendant in the public offering in order to sue under Section 12(a)(2). *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013). Purchasers in the secondary market lack standing. *See also Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009). Courts in this District are therefore "appropriately wary" of allegations that a plaintiff purchased securities "pursuant or traceable to" an offering, because that formulation does not establish that the plaintiff purchased from the defendant in the offering itself. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 745 (S.D.N.Y. 2015) (collecting cases).

The pleading here uses precisely that ambiguous language – "pursuant and/or traceable to" – and contains no allegation as to the date, price, or counterparty of Plaintiff's purchase. That language may suffice for Section 11, which permits standing for purchasers who allege their shares are "traceable" to a registration statement. *See In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003). But Section 12(a)(2) requires more. It requires that the defendant be the plaintiff's seller – or at least a statutory seller within the meaning of *Pinter v. Dahl*, 486 U.S. 622 (1988). Because Plaintiff has not alleged that he purchased directly in the IPO, he lacks statutory standing to pursue a claim under Section 12(a)(2).

Nor can Plaintiff salvage the claim by invoking the class device.  The Supreme Court has made clear that "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quotation omitted).  A class action "adds nothing to the question of standing." *Id.*  Thus, a named plaintiff who lacks standing to assert a claim in his own right cannot manufacture standing by pointing to putative class members who might have it – and Plaintiff has not attempted to do so here.  Therefore, Plaintiff's Section 12(a)(2) claim is dismissed for lack of standing.

### C.  Plaintiff's Section 15 Claims

Having concluded that Plaintiff has plausibly alleged a primary violation under Section 11, the Court considers whether the Individual Defendants may be held liable as control persons under Section 15.  Defendants do not separately move to dismiss the Section 15 claim on the ground that control is inadequately pleaded, but the Court addresses the issue in the interest of completeness.

Section 15 imposes joint and several liability on "Every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" Section 11.  15 U.S.C. § 77o(a).  To state a claim, a plaintiff must plead (1) a primary violation and (2) control of the primary violator.  *See Morgan Stanley*, 592 F.3d at 358.

Unlike Section 20(a) of the Exchange Act, Section 15 does not require a plaintiff to plead "culpable participation."  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007).  The inquiry focuses solely on whether the defendant "possessed the power to direct or cause the direction of the management and policies" of the primary violator.  *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

The first element is satisfied for the reasons discussed above.  *See supra* Section III(A)(i)&(ii).

As to control, Plaintiff alleges that the Individual Defendants were Hesai's senior executives and directors at the time of the IPO, reviewed and contributed to the drafting of the Registration Statement, and signed it.  Dkt. No. 33, ¶¶ 27–32, 34.  Plaintiff further alleges that Defendants Li, Sun, and Xiang each held at least 25% of the Company's aggregate voting power following the Offering.  *Id.*, ¶¶ 27, 29–30.  Defendant DeVries signed the Registration Statement on her own behalf and on behalf of Cogency, Hesai's U.S. representative.  *Id.*, ¶ 32.

These allegations are sufficient at the pleading stage.  Section 15 is a parallel provision to § 20(a) of the Exchange Act and their "terms are interpreted in the same manner."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. at 660.  Whether a defendant exercised control is a "fact-intensive inquiry" that "generally should not be resolved on a motion to dismiss."  *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. at 208.  And courts routinely infer control where corporate officers and directors signed the registration statement at issue.  *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. at 746–47.  Accordingly, the pleaded facts – senior executive roles, board membership, substantial voting power (for certain defendants), participation in drafting, and signatures on the Registration Statement – plausibly support an inference of control over Hesai and its offering disclosures.

Finally, the Section 15 claim is not barred simply because the Individual Defendants are also alleged to be primary violators under Section 11.  Although a defendant ultimately may not be held liable as both a primary violator and a control person, alternative theories of liability are permissible at the pleading stage.  *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005); Fed. R. Civ. P. 8(d)(2).

Plaintiff has adequately pleaded control-person liability under Section 15.  Accordingly, the Section 15 claim survives to the extent it is predicated on the surviving Section 11 gross-margin theory.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff's Section 11 theory premised on alleged omissions concerning Section 1260H designation risk is DISMISSED as time-barred under Section 13 of the Securities Act. Plaintiff's claim under Section 12(a)(2) is DISMISSED for lack of statutory standing.

Defendants' motion is DENIED with respect to Plaintiff's Section 11 claim insofar as it is premised on alleged omissions concerning the magnitude of the disparity between Autonomous Mobility and LiDAR gross margins, including the disclosure theories asserted under Item 5(D) and Item 3(D) to the extent they support that surviving Section 11 claim.

Defendants' motion is likewise DENIED as to Plaintiff's Section 15 claim against the Individual Defendants to the extent that claim is predicated on the surviving Section 11 theory, and GRANTED to the extent it is predicated on any dismissed primary violation.

The Clerk of Court is directed to terminate the motion to dismiss pending at Docket Number 39.  This constitutes the decision and order of the Court.  It is a written decision.

Dated: February 18, 2026

_____

U.S.D.J.

43